UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

IN RE:  LIGHT CIGARETTES MARKETING      )      MDL DOCKET NO. 1-09-MD-2068
SALES PRACTICES LITIGATION                  )                ALL CASES

**PLAINTIFFS' MOTION FOR APPLICATION OF THE COLLATERAL ESTOPPEL
DOCTRINE WITH INCORPORATED MEMORANDUM OF LAW**

NOW COME Plaintiffs, by and through the undersigned counsel, and move the Court to

grant preclusive effect to certain findings of fact and conclusions of law issued by the United

States District Court for the District of Columbia in an action brought by the United States

against, *inter alia,* Philip Morris and Altria, the defendants in this multi-district litigation. The

findings of fact and conclusions of law for which Plaintiffs seek application of the collateral

estoppel doctrine are among the 4,088 findings of fact and numerous conclusions of law set forth

by Judge Kessler in *United States v. Philip Morris USA, Inc.,* 449 F. Supp. 2d 1 (D.D.C. 2006),

*aff'd in relevant part*, 566 F.3d 1095 (D.C. Cir. 2009).[1]

## I.  INTRODUCTION

Plaintiffs in the growing number of individual actions collected together in this MDL are

all smokers (past or present) of the various "light" and "low tar" brands of cigarettes ("Light

cigarettes") manufactured and marketed by Philip Morris.[2]  Under state law theories of consumer

fraud and unjust enrichment,[3] Plaintiffs allege that for decades, Philip Morris, Inc. (now known

---

[1] To assist the Court in its consideration of the instant motion, Plaintiffs are today hand delivering to the Clerk's office a bound Volume 449 of *West's* Federal Supplement, Second Series, containing the opinion of Judge Kessler. (Doc. No. 58).

[2]  Defendants' "light" or low tar products include Marlboro Lights, Virginia Slims Lights, Parliament Lights, Merit Lights, Ultra Lights, and Cambridge Lights.

[3] Plaintiffs respectfully request that the Court adopt the findings of fact and conclusions of law in the DOJ case as to all pending cases. Plaintiffs have chosen to brief California law and the law of the District of Columbia first for class certification, and use the laws of these jurisdictions herein for illustrative

as Philip Morris USA, Inc.) ("Philip Morris") and Philip Morris Companies, Inc. (now known as Altria Group, Inc.) ("Altria") (collectively referred to as "Defendants") knew that smokers were likely to receive as much or more tar and nicotine from Light cigarettes as they would from regular cigarettes, have falsely represented that their Light cigarettes are "light" and have "lowered tar and nicotine," and manipulated the nicotine content in Light cigarettes to maintain addiction in consumers.

Defendants' fraudulent marketing of their Light cigarettes has been established conclusively. In 1999, the United States of America brought an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Philip Morris, Altria, and various other cigarette companies (the "DOJ action"), charging that Philip Morris and Altria violated and continued to violate RICO by joining in a decades-long conspiracy to deceive the American public about the health effects and addictiveness of smoking cigarettes, including Light cigarettes. Judge Kessler described the litigation as follows:

> [This case is] about an industry, and in particular these Defendants, that survives, and profits, from selling a highly addictive product which causes diseases that lead to a staggering number of deaths per year, an immeasurable amount of human suffering and economic loss, and a profound burden on our national health care system. . . . Defendants have marketed and sold their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted.

449 F. Supp. 2d at 28.

After a nine-month bench trial, the United States District Court for the District of Columbia (the "D.C. Court") entered its Final Opinion and Judgment citing "overwhelming evidence" that Philip Morris, Altria, and the other cigarette companies engaged in a conspiracy to deceive the public. *Id*. at 27. Concerns of judicial efficiency and fundamental fairness dictate

---

purposes, as the elements required to establish claims for unjust enrichment and consumer fraud are substantially similar in all relevant jurisdictions.

that in the instant litigation, the Court should conserve its valuable time and resources, and those of the judicial system, by refusing to allow Defendants to relitigate what another federal court has already conclusively decided after presiding over a historic trial, reviewing the testimony of 246 witnesses, and considering over 13,000 exhibits.  The Court should give preclusive effect to the findings of fact and conclusions of law relevant to this matter that were unanimously upheld by the Circuit Court of Appeals for the District of Columbia.

The factual issues central to the current litigation, *i.e.,* Defendants' representations that their Light cigarettes delivered "lowered tar and nicotine" and were "light," were thoroughly examined by the D.C. Court in the DOJ action. The D.C. Court found, *inter alia*, that the evidence "overwhelmingly" established the following facts:

> It is clear, based on their internal research documents, reports, memoranda, and letters, that Defendants have known for decades that there is no clear health benefit from smoking low tar/low nicotine cigarettes as opposed to conventional full-flavor cigarettes.   It is also clear that while Defendants knew that the FTC Method for measuring tar and nicotine accurately compared the nicotine/tar percentages of different cigarettes, they also knew that that Method was totally unreliable for measuring the actual nicotine and tar any real-life smoker would absorb because it did not take into account the phenomenon of smoker compensation.   Defendants also knew that many smokers were concerned and anxious about the health effects of smoking, that a significant percentage of those smokers were willing to trade flavor for reassurance that their brands carried lower health risks, and that many smokers who were concerned and anxious about the health risks from smoking would rely on the health claims made for low tar cigarettes as a reason, or excuse, for not quitting smoking.
>
> Despite this knowledge, Defendants extensively-and successfully-marketed and promoted their low tar/light cigarettes as less harmful alternatives to full-flavor cigarettes.  Moreover, Defendants opposed any changes in the FTC Method which would more accurately reflect the effects of compensation on the actual tar and nicotine received by smokers, denied that they were making any health claims for their low tar/light cigarettes, and claimed that their marketing for these cigarettes was based on smokers' preference for a "lighter," "cleaner" taste.
>
> By engaging in this deception, Defendants dramatically increased their sales of low tar/light cigarettes, assuaged the fears of smokers about the health risks of

smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking.

*Id*. at 560-61. In fact, the D.C. Court found that "the evidence of Defendants' fraud is so overwhelming that it easily meets the clear and convincing standard of proof."[4] *Id.* at 888.

The findings of fact quoted above represent only a minute fraction of the 4,088 individual findings of fact issued by Judge Kessler in her opinion. Plaintiffs have carefully considered each of the D.C. Court's findings of fact and conclusions of law and have prepared a detailed table in an Appendix, annexed hereto as Exhibit A, of each individual finding of fact and conclusion of law that meets the legal requirements for the application of collateral estoppel in the instant litigation.

The common-law doctrine of collateral estoppel – also known as issue preclusion – is designed to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *see also Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328-29 (1971).

Under First Circuit law, a party seeking to estop the litigation of an issue by reference to a previous adjudication must establish:

> (1) an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding), (2) actuality of litigation (that is, that the point was actually litigated in the earlier proceeding), (3) finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and (4) the centrality of the adjudication (that is, that the

---

[4] The D.C. Court tended to agree with the government that "preponderance of the evidence" was the applicable standard for fraud, and not "clear and convincing" as argued by the defendants, including Philip Morris and Altria. However, because the evidence could meet either standard, the D.C. Court did not make a determination of the proper standard of proof.

determination of the issue in the prior proceeding was essential to the final judgment or order).

*Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999). As demonstrated herein, each of these factors identified by the First Circuit is established and compels the application of collateral estoppel in the current litigation.

When, as here, a plaintiff is "seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff," there are additional requirements which must be met as a threshold matter.[5] *Parklane Hosiery Co. v. Shore*, 439 U.S. 329, 331 (1979). The plaintiffs must establish that: 1) they could not easily have joined in the earlier action; and 2) application of the collateral estoppel doctrine would not be unfair to the defendant. *Id*. at 331. Here, as in *Parklane Hosiery*, "none of the circumstances that might justify reluctance to allow the offensive use of collateral estoppel is present." *Id.*

In the absence of any unfairness to Defendants, the law is clear. The First Circuit has held that "one opportunity to litigate an issue fully and fairly is enough." *Pignons S.A. de Mecanique v. Polaroid Corp*., 701 F.2d 1, 2 (1st Cir. 1983). Philip Morris and Altria had such an opportunity and took full advantage of that opportunity.  Defendants should be precluded, under the doctrine of collateral estoppel, from relitigating those findings of fact and conclusions of law identified by Plaintiffs in this memorandum and in the Appendix submitted herewith as Exhibit A.

---

[5]  This form of collateral estoppel is referred to as non-mutual, offensive collateral estoppel.

## II. <u>STATEMENT OF FACTS</u>

**A.     THE RELEVANT BACKGROUND AND HISTORY FROM THE DOJ ACTION**

### 1.     Adverse Health Effects of Smoking

Tobacco use in North America dates back to the 1600's. *Philip Morris USA, Inc.,* 449 F. Supp. 2d at 35 (Findings of Fact ("FOF") 1). By 1900, the annual per capita consumption of cigarettes was approximately forty-nine (49) cigarettes. *Id.* (FOF 2). By 1950, the annual per capita consumption of cigarettes had grown astronomically to over 3,000 cigarettes. *Id.* at 149 (FOF 539).[6] Concurrent with this rise in cigarette consumption was the increase in disease, particularly lung cancer. *Id.* By the 1920's, scientific investigations were being conducted to determine whether or not there was a relationship between the rise in cigarette consumption and the rise in lung cancer. *Id.* (FOF 538, 540, 541). Prior to 1900, death due to lung cancer was practically unheard of. *Id.* at 35 (FOF 2). The findings of many of these studies supported the conclusion that cigarette consumption leads to adverse health effects and could lead to serious diseases, such as lung cancer and coronary heart disease. *Id.* at 149-153 (FOF 541-56).

By 1953, the public was aware of the growing scientific evidence revealing a relationship between cigarette smoking and disease. *Id.* at 153 (FOF 558). In response, the defendants in the DOJ action, including Philip Morris, mounted and coordinated a well-financed and sophisticated public relations campaign designed to attack and cast doubt on any scientific evidence determining that there was indeed a link between smoking and disease. *Id.* at 168-174 (FOF 610-41). Rather than just passively waiting and wishing that such scientific evidence would magically disappear (as did some tobacco companies), the defendants in the DOJ action,

---

[6] All of the relevant Findings of Fact and Conclusions of Law, including each of those cited herein, can be found in the Appendix, submitted herewith as Exhibit A.

including Philip Morris, affirmatively decided to and did falsely inform the public that it was still an "open question" as to whether a link did in fact exist between smoking and disease, even though information and research in their own possession demonstrated just the opposite. *Id.*

On January 5, 1954, in an effort to further the smoking conspiracy, the cigarette industry, including Philip Morris, published a full-page advertisement entitled "A Frank Statement to Cigarette Smokers" in 448 newspapers throughout the United States. *Id.* at 39-40 (FOF 16-20), 164 (FOF 595). Within this advertisement, the cigarette industry, including Philip Morris, informed the public of its "open question" position as to the link between cigarette consumption and disease. *Id.* Included within the advertisement were the following statements:

- That there is no proof that cigarette smoking is one of the causes [of lung cancer].

- That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

- We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

- We believe the products we make are not injurious to health.

*Id.*

Following the publication of the "Frank Statement," for more than forty (40) years, and despite the fact that their own internal documents and scientific research revealed otherwise, the cigarette industry, including Philip Morris (and later Altria, which was incorporated in 1985), continued to maintain their position denying a causal relationship between smoking and disease. *Id.* at 168-174 (FOF 610-41). Their common goal? To keep smokers smoking, and recruit new smokers all for the sake of corporate profit. *Id.* at 188 (FOF 706).

In 1964, the U.S. Surgeon General issued a report stating that smoking cigarettes is hazardous to a person's health. *Id.* at 178-79 (FOF 655-60). Following the issuance of the

Surgeon General's report, Philip Morris continued to conduct internal research regarding the health effects of smoking, which continued to reveal that smoking causes serious adverse health effects. *Id.* at 180-87 (FOF 664-705). Nevertheless, for the self-serving goal of increasing revenue, Philip Morris, and later Altria, continued to deny such an association between the two. *Id.* at 188 (FOF 706).

> ### 2.      The Development of the "Light" or Low Tar Cigarette

In the 1950's and 1960's, Philip Morris became concerned about the increase in public awareness regarding the relationship between smoking and health, which it reasoned could lead to decreased sales as smoking became less attractive for both current smokers and potential smokers. *Id.* at 338-39 (FOF 1514).  Philip Morris knew that many smokers were willing to trade cigarette flavor for reassurance that their brands carried lower health risk, and that many smokers who were concerned and anxious about the health risks from smoking would rely on the health claims made for low tar cigarettes as a reason, or excuse, for not quitting smoking. *Id.* at 475-81 (FOF 2230-61), 560 (FOF 2627). In an effort to save its cigarette market, Philip Morris introduced a "less harmful" cigarette product. *Id.*

Since the 1970's, Philip Morris used "light" and "ultra light" to communicate reassuring messages that these cigarettes were healthier than regular cigarettes. *Id.* at 430-31 (FOF 2023-26). Unbeknownst to the public, Defendants' alternative healthier cigarette was anything but. *Id.* at 444-56 (FOF 2104-45). Indeed, some "light" or low tar cigarettes were actually more harmful than regular cigarettes. *Id.*

As Defendants have long been aware, nicotine delivered by cigarettes is addictive. *Id.* at 431 (FOF 2026). At the time Philip Morris was contemplating the manufacture of Light cigarettes, it was aware that if it reduced the levels of tar in cigarettes, it might also have to

reduce the levels of nicotine proportionately, because "large amounts of nicotine can make cigarettes harsh and unpalatable to the smoker." *Id.* at 337 (FOF 1509). This presented a problem for Philip Morris because a reduction in the level of nicotine would result in insufficient levels of nicotine to sustain addiction. *Id.* at 338-39 (FOF 1514).

Defendants' internal documents illustrate their understanding that, in order to obtain an amount of nicotine sufficient to satisfy a smoker's addiction, smokers of Light cigarettes would modify their smoking behavior to compensate for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with their fingers or lips, and/or smoking more cigarettes. *Id.* at 461-67 (FOF 2173-2200). Defendants recognized that as a result of this nicotine-driven smoker behavior, smokers of Light cigarettes would actually boost their intake of tar, thus negating the reason smokers and potential smokers were choosing to smoke Light cigarettes as opposed to regular cigarettes—less harmful health effects. *Id.* Despite their knowledge, Defendants manufactured and marketed their Light cigarettes in order to further their overarching economic goal:  to keep smokers smoking; to stop smokers from quitting; to encourage people, especially young people, to start smoking; and to maintain or increase corporate profits. *Id.* at 431 (FOF 2028).

So that Philip Morris could market its Light cigarettes, Philip Morris set out to "trick" the Federal Trade Commission ("FTC") and, thus, the public at large, about the actual levels of nicotine and tar that smokers would receive from these Light cigarettes. *Id.* at 500 (FOF 2346).

> In the early 1970s, the Federal Trade Commission developed a machine to measure tar and nicotine levels. Even though it became the accepted mechanism for taking such measurements, it became widely known in both the public health community and by the cigarette company Defendants that the FTC method did not accurately measure the amounts of nicotine and tar which a smoker actually ingested.  Cigarette company Defendants, with the benefit of their much more

sophisticated understanding of smoker compensation, as well as their knowledge of nicotine control, then intentionally developed and marketed cigarettes, which, in actuality, delivered higher levels of nicotine than those measured by the FTC method. Those levels of nicotine were sufficient to create and sustain addiction in smokers.

*Id.* at 310 (FOF 1370).

Defendants knew that the FTC method was unreliable for measuring the actual amount of nicotine and tar a real-life smoker would absorb because it did not take into account the phenomenon of smoker compensation. *Id.* at 437 (FOF 2066), 560 (FOF 2627). Despite this knowledge, Defendants extensively, and successfully, marketed and promoted their Light cigarettes as less harmful alternatives to regular cigarettes. Moreover, Defendants opposed any changes in the FTC Method that would more accurately reflect the effects of compensation on the actual tar and nicotine received by smokers. *Id.* at 560-61 (FOF 2628). By engaging in this deception, Defendants dramatically increased their sales of Light cigarettes, assuaged the fears of smokers about the health risks of smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking. *Id.* at 561 (FOF 2629).

### 3. Nicotine Manipulation

In order to accomplish their goal of manufacturing a "light" or low tar cigarette with enough nicotine to sustain addiction, Defendants engaged in nicotine manipulation. Nicotine manipulation concerns "making specific changes in that design to make nicotine go where you want it to go as opposed to where it would go by itself without changing the design." *Id.* at 337 (FOF 1509). Thus, Defendants were able to and did manipulate the nicotine levels in cigarettes to keep smokers addicted, and at the same time "trick" the FTC into believing that their products were actually "light" and low in tar. *Id.* at 338-39 (FOF 1514-16).

There are many different parameters, both physical and chemical, that can be manipulated to control the quality and content of smoke delivery by a cigarette, such as cigarette length, filter composition and design, air ventilation, cigarette paper composition, tobacco blend selection, and choice of additives. *Id.* at 337-38 (FOF 1510). None of these parameters on its own can control the level of nicotine delivered by a cigarette. *Id.* Rather, these parameters must be combined in some form to ensure sufficient nicotine delivery to the consumer. *Id.*

### a.      Manipulation of Physical Design Parameters

Defendants controlled the nicotine-to-tar ratio in their "light" and low tar cigarettes through using filters, which allowed smokers to control the levels of nicotine as they inhaled, and to increase the nicotine-to-tar ratio in that inhaled smoke. *Id.* at 349-60 (FOF 1573-1629). Their goal was to design a filter resulting in lower FTC measurements of tar that would not reduce nicotine intake in the body, so that addiction would be sustained. *Id.* at 349 (FOF 1573).

Defendants took into account design factors of the filter, including its physical design, density of the filter packing, filter length, filter wrapper porosity, ventilation holes and channels, and a variety of potential ingredients. *Id.* at 350-51 (FOF 1581-84). By manipulating these factors, Defendants were able to control the nicotine yield of the cigarette, its absorption by the body, and the taste and palatability of the cigarette. *Id.* at 350 (FOF 1583).

Through these filters, Defendants were also able to control the size of particulate matter in the smoke that enters the body.  *Id.* at 350-51 (FOF 1584). It was Defendants' goal to have the nicotine absorbed in the lungs in order to achieve a stronger addictive effect. *Id.* As such, the particle size could not be too big or too small. *Id.*

Another way in which Defendants manipulated the physical design parameters was to use ventilation holes to maintain nicotine delivery while reducing tar levels. *Id.* at 351 (FOF 1585-

86). The goal of adding the ventilation holes was to dilute mainstream cigarette smoke with air during inhalation. *Id.* As a result, these holes would reduce the concentration of tar and nicotine in the smoker. *Id.*

Defendants, with full knowledge of the habits of smokers, placed the ventilation holes at a certain distance beyond the reach of the FTC smoking machine, but where they knew they would be blocked by smokers' lips or fingers while they were smoking. *Id.* at 351 (FOF 1585-86). Thus, the FTC readings revealed a cigarette with a lower than actual delivery of tar and nicotine to smokers. *Id.* at 437 (FOF 2066), 560-61 (FOF 2627). The ventilation holes also served to change the chemistry of smoke. *Id.* at 351 (FOF 1587).

Yet, another way in which Philip Morris manipulated the nicotine-to-tar ratio was to change the composition of the cigarette paper. *Id.* at 351 (FOF 1588.) The paper used in manufactured cigarettes is different than paper used for cigars or hand-rolled cigarettes. *Id.* The latter does not burn well or evenly and tends to self-extinguish, while the former is treated with chemicals that affect nicotine delivery and make the cigarettes burn hotter and faster. *Id.*

Philip Morris also altered and controlled the porosity – the amount of air that could pass through – of the paper to manipulate nicotine delivery. *Id.* By doing so, Philip Morris was able to lower the amount of nicotine in smoke so that the cigarette would pass the FTC measurement test. *Id.*

"[F]ilter overwrap is a layer of tough, glued paper that attaches the filter to the tobacco rod and is composed of materials that resist decomposition when held in the lips." *Id.* at 352 (FOF 1590). Defendants placed the filter overwrap a few millimeters to nearly one centimeter beyond the filter. *Id.* Defendants were aware that the FTC machine would stop "smoking" the cigarette at 3 millimeters before reaching the filter overwrap, but human smokers often smoke

cigarettes all the way to the filter overwrap so that they could get "a few extra puffs of nicotine and tar." *Id.* at 352 (FOF 1590-91). These "few extra puffs" would contain more nicotine and tar than tobacco found further away from the filter overwrap. *Id.* at 352 (FOF 1591). As such, Defendants were able to once again trick the FTC measurement test.

### b.   Alteration of the Chemical Form of Nicotine Delivered in Cigarette Smoke

Defendants altered the acidity ("pH") of tobacco in an effort to enhance the psychoactive effects of nicotine on the brain. *Id.* at 352 (FOF 1592), 357 (FOF 1616). The pH of cigarette smoke plays an important role because it will affect the chemical form of the nicotine which gets delivered in smoke.  *Id.* at 353 (FOF 1599).  This then affects the rate and the amount of nicotine which gets delivered to the smoker. *Id.*  In this manner, defendants manipulated the pH of tobacco so that nicotine would be absorbed by the body at enhanced speeds.  *Id.* at 356-57 (FOF 1613).

The alteration of pH involved the use of ammonia technology and Philip Morris was the first tobacco manufacturer to use this process.  *Id.* at 355 (FOF 1606), 357 (FOF 1617). Indeed, in 1986 Philip Morris applied for a patent on a process of using ammonia to increase the nicotine delivery of Bright tobacco.[7] *Id.* at 359 (FOF 1626).

### B.   THE DOJ ACTION

On October 22, 1999, the United States brought a lawsuit against nine cigarette manufacturers, including defendants Philip Morris and its parent company Altria, and two tobacco trade-related organizations, alleging that the defendants violated and continued to violate

---

[7] Bright tobacco is one of three main varieties of tobacco that are used in the production of commercial cigarettes and is generally grown in Southern Virginia and the Southeastern United States. *Id.* at 339-40 (FOF 1518–19).

RICO by "joining together in a decades-long conspiracy to deceive the American public about the health effects and addictiveness of smoking cigarettes." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1105-06. The case was brought and tried in the United States District Court for the District of Columbia, before The Honorable Judge Gladys Kessler.

The DOJ action took almost seven years to litigate. *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 33-34 (D.D.C. 2006). The action was extremely complex and involved the exchange of approximately twenty-six (26) million pages of documents, the entry of more than 1,000 orders, and a nine month trial. *Id.* At trial, testimony was provided by nearly 250 witnesses. *Id.*

At the conclusion of the trial, Judge Kessler entered a decision finding that Philip Morris, Altria, and others had violated the RICO statutes by: (1) conspiring together to violate RICO in violation of 18 U.S.C. § 1962(d), and (2) engaging in a scheme to defraud smokers and potential smokers in violation of 18 U.S.C. § 1962(c). *Id.* at 851. Among the many ways Philip Morris and Altria were found to have violated RICO were:

(1)      Falsely denying the adverse health effects of smoking, *id.* at 854-56;

(2)      Falsely denying that nicotine and smoking are addictive, *id.* at 856-58;

(3)      Falsely denying that Defendants manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction, *id.* at 858-59;

(4)      Falsely representing that light and low tar cigarettes deliver less nicotine and tar and therefore present fewer health risks than regular cigarettes, *id.* at 859-61;

(5)      Suppressing documents, information, and research to prevent the public from learning the truth about these subjects and to avoid or limit liability in litigation, *id.* at 866-67; and

> (6)     Establishing an enterprise which had the common purpose of defrauding smokers and potential smokers and participating in the conduct of the enterprise (i.e. the tobacco conspiracy), *id.* at 867-78.

Judge Kessler entered 4,088 individual Findings of Fact supporting numerous conclusions of law. One of Judge Kessler's stated purposes was to put before the appellate court "all the factual determinations they need to decide the numerous legal issues which will unquestionably be raised." *Id.* at 29.

Thereafter, the case was appealed to the United States Court of Appeals for the District of Columbia Circuit, and a three-judge panel unanimously affirmed all of the D.C. Court's conclusions relevant here. *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009).

## C.     SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW NECESSARY TO THE RULING IN THE DOJ ACTION THAT ARE NECESSARY FOR A FINDING OF DEFENDANTS' LIABILITY IN THIS LITIGATION

There are hundreds of findings of fact and numerous conclusions of law entered by Judge Kessler in the DOJ litigation that meet the requirements for the offensive use of collateral estoppel in this case. Plaintiffs respectfully request that the Court apply the doctrine of collateral estoppel to Judge Kessler's Findings of Fact and Conclusions of Law that are relevant to the following areas:

> (1)     Defendants' engaging in a scheme to defraud smokers and potential smokers by falsely representing, advertising and marketing that their Light cigarettes delivered less nicotine and tar than regular cigarettes; falsely denying the addictive nature of nicotine; engaging in nicotine manipulation; suppressing documents, information and research; and establishing and participating in a scheme with the common purpose of defrauding smokers and potential smokers.

> (2)     Defendants having acted with the specific intent to defraud and deceive smokers and potential smokers.

The individual Findings of Fact and Conclusions of Law to which Plaintiffs seek application of collateral estoppel and preclusive effect are individually detailed in the Appendix, submitted herewith as Exhibit A, along with a quick reference summary as to why each individual finding of fact and conclusion of law meets the legal requirements for the application of collateral estoppel.[8]

### 1. The Elements of Proving Liability Under RICO are Substantially the Same as the Elements of Proving Liability Under the Laws of California and/or the District of Columbia.

#### a. <u>Elements of Liability Under RICO</u>

In finding a violation of 18 U.S.C. § 1962(c), Judge Kessler found that the government had proven:  (1) the existence of an enterprise; (2) the enterprise was engaged in, or its activities affected, interstate or foreign commerce; (3) each defendant was employed by or associated with the enterprise; (4) each defendant conducted or participated, directly or indirectly, in the conduct

---

[8] The first column of the chart in the Appendix sets forth the page and paragraph numbers per Judge Kessler's opinion.

The second column of the chart sets forth *verbatim* each and every finding of fact and conclusion of law of the D.C. Court that should be given preclusive effect in this litigation.  Also included within this column are the section headings and titles utilized by Judge Kessler in her decision.  While these section headings and titles are not actual findings or conclusions, they are included to provide the Court with a guide to the logical organization of the topics presented.

The third and fourth columns in the chart are entitled "Necessary Elements in the DOJ Case" and "Identical Issues in MDL," respectively, and are meant to be side by side comparisons of the elements which were necessary to the court's decision in the DOJ litigation and the elements which are now necessary to the present MDL litigation. As set forth in more detail below, three of the four factors a court should consider in determining whether the offensive use of collateral estoppel should be allowed are (1) identity of issues, (2) actuality of litigation, and (3) centrality of litigation. *See Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999).  The second, third, and fourth columns of the appended chart reflect these factors.

The fifth and final column refers to that portion of the District of Columbia Circuit Court of Appeals opinion, in which the court reviewed and affirmed the same finding of fact or conclusion of law made by Judge Kessler in her original opinion that Plaintiffs seek to have granted preclusive effect in the present litigation.  This column represents the fourth factor that a court should consider in determining whether the offensive use of collateral estoppel should be allowed, which is "finality of the DOJ action," as well as the second factor, actuality of litigation.

of the affairs of the enterprise; (5) each defendant committed at least two acts of racketeering within 10 years of one another; and (6) the racketeering acts constitute a pattern of racketeering activity.  449 F. Supp. 2d at 851.

The predicate racketeering acts of the defendants in the DOJ action involved mail or wire fraud (18 U.S.C. §§ 1341 or 1343).  In this regard, the D.C. Court found that defendants *Philip Morris and Altria devised a scheme to defraud* and used mailings and wire transmissions for the furthering of their scheme, and that they *acted with specific intent to defraud. Id.* at 852, 892.

In finding a violation of 18 U.S.C. § 1962(d), which provides that conspiracies to violate 18 U.S.C. § 1962(c) are unlawful, Judge Kessler further found that the government had proven: (1) the existence of an enterprise; (2) that the enterprise was engaged in, or its activities affected, interstate or foreign commerce; and (3) that each defendant knowingly agreed to the commission of a violation of 18 U.S.C. § 1962(c) . *Id.* at 851.

### b.      Elements of Liability Under California State Law

Plaintiffs bring claims against Defendants under California law based upon theories of consumer fraud and unjust enrichment. Consumer fraud claims in California may be brought under three separate statutes: Cal. Bus. & Prof. Code § 17200 *et seq.*, Cal. Bus. & Prof. Code § 17500 *et seq.*, and Cal. Civ. Code § 1770 *et seq.*

Plaintiffs allege that Defendants' advertising and marketing of their cigarettes as "light," "low tar," "mild," "medium" and "ultra light," constitute unlawful, unfair, and fraudulent acts or practices that are likely to mislead the public in violation of Cal. Bus & Prof. Code § 17200 *et seq*. Complaint, *Tyrer v. Philip Morris USA, Inc. et al.*, No. 09-CV-0052, ¶¶ 7, 99-109 (S.D. Cal.) ("*Tyrer* Complaint").

Plaintiffs allege that Defendants violated Cal. Bus. & Prof. Code § 17500, in that:

1.  Defendants disseminated or caused to be disseminated, false, deceptive and misleading statements and representations in advertisements, promotion and/or marketing for their Light cigarettes;

2.  Defendants' acts and representations in advertisements, promotions and marketing relating to their Light cigarettes are false, deceptive and misleading; and

3.  Defendants caused, and continue to cause, the dissemination of such false, deceptive and misleading statements.

*Id.* ¶¶ 110-119.

Plaintiffs also allege that Defendants violated Cal. Civ. Code § 1770(a), which declares unlawful an enumerated list of "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  In this regard, it is unlawful for any person to "(5) represent[] that goods . . . have . . . characteristics, ingredients, uses, benefits . . . which they do not have; . . . (9) advertis[e] goods . . . with intent not to sell them as advertised; . . . [and] (16) represent that the subject of a transaction has been supplied in accordance with a previous misrepresentation when it has not."  *See Tyrer* Complaint ¶¶ 134-38.

Finally, Plaintiffs allege that, as a result of Defendants' false and misleading advertisements that smoking their Light cigarettes was less harmful and addictive than smoking regular cigarettes, Defendants were unjustly enriched at Plaintiffs' expense. *See Tyrer* Complaint ¶¶ 65-71; *see also Hirsch v. Bank of Am.*, 107 Cal. App. 4th 708, 721-22, 132 Cal. Rptr. 2d 220 (Cal. App. Ct. 2003).

### c.    Elements of Liability Under the Law of the District of Columbia

Plaintiffs have brought claims against Defendants under the law of the District of Columbia based upon theories of consumer fraud and unjust enrichment.

Pursuant to D.C. Code § 28-3904, it is unlawful for any person to "(a) represent that

18

goods . . . have . . . characteristics, ingredients, uses, benefits . . . that they do not have; . . . (e) misrepresent as to a material fact which has a tendency to mislead; (f) fail to state a material fact if such failure tends to mislead; . . . [or] advertise or offer goods . . . without . . . the intent to sell them as advertised or offered . . . . "  It is irrelevant whether a consumer was in fact misled, deceived or damaged thereby. *Id.*

Pursuant to the law of unjust enrichment in the District of Columbia, Plaintiffs must demonstrate that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).  A claim for unjust enrichment in the District of Columbia focuses on whether it is fair and just for the recipient, in this case Defendants, to retain the benefit. *4934, Inc. v. D.C. Dept. of Employment Servs.*, 605 A.2d 50, 56 (D.C. 1992).  Fault on the part of the recipient is irrelevant to a claim for unjust enrichment. *Id.*

### 2.     Scheme to Defraud Smokers and Potential Smokers

At issue in this litigation is whether Defendants engaged in a scheme to defraud smokers and potential smokers. Such a determination has already been made in the DOJ action.

Specifically, the D.C. Court found that Defendants had engaged in a scheme to defraud smokers and potential smokers:  by falsely denying the adverse health effects of smoking (*Philip Morris*, 449 F. Supp. 2d 1, 146 (FOF 509)); falsely denying the addictive nature of nicotine (*Id.* at 209 (FOF 830), 271 (FOF 1146)); by engaging in nicotine manipulation (*Id.* at 209 (FOF 829)); falsely representing, advertising, and marketing that Light cigarettes delivered less nicotine and tar than regular cigarettes (*Id.* at 430-31 (FOF 2023-28)); suppressing documents,

information and research (*Id.* at 867); and establishing and participating in an enterprise with a common purpose of defrauding smokers and potential smokers (*Id.* at 869-70).

### a. Defendants Falsely Represented that Light Cigarettes Deliver Less Nicotine and Tar and, Therefore, Present Fewer Health Risks than <u>Regular Cigarettes</u>.

Plaintiffs allege that Defendants falsely represented that Light cigarettes were less harmful than regular cigarettes, when in fact they were just as harmful, if not more so. The D.C. Court has already made such a finding:

> As part of a scheme to intercept potential quitters and dissuade them from giving up smoking, Defendants developed and introduced filtered and purportedly "low tar and nicotine" cigarettes. As their internal documents reveal, Defendants engaged in massive, sustained, and highly sophisticated marketing and promotional campaigns to portray their light brands as less harmful than regular cigarettes, and thus an acceptable alternative to quitting, while at the same time carefully avoiding any admission that their full-flavor cigarettes were harmful to smokers' health. Defendants knew that by providing worried smokers with health reassurance, they could keep them buying and smoking cigarettes

> Defendants were aware, however, that because of nicotine addiction, smokers would not smoke "health reassurance" cigarettes if they failed to supply enough nicotine to sustain their addiction. Defendants therefore designed their low nicotine and low tar cigarettes with what they referred to as "elasticity" of delivery. This created the illusion that there would be less nicotine and less tar, but at the same time it would facilitate a smoker's ability to compensate for the reduced nicotine yield. As a result of smoker compensation, discussed in detail in the Findings of Facts, smokers inhale essentially the same amount of nicotine (and with it, tar) from low tar cigarettes as from regular cigarettes.

> In short, Defendants have known for decades that filtered and low tar cigarettes do not offer a meaningful reduction of risk, and that their marketing which emphasized reductions in tar and nicotine was false and misleading. Defendants have known for decades that each smoker has a particular nicotine requirement that he or she must satisfy in order to sustain the addiction and, as a result, smokers will inhale the same amount of nicotine, and with it tar, from low tar cigarettes as they do from regular cigarettes.

> As part of the Enterprise's scheme to defraud smokers, Defendants withheld and suppressed their extensive knowledge and understanding of nicotine-driven smoker compensation.

*Id.* at 860-61.

### b. **Defendants Falsely Denied the Addictive Nature of Nicotine**

Plaintiffs contend that Defendants manipulated the nicotine level in their Light cigarettes in such a way so as to keep nicotine at a sufficient level to maintain addiction. However, to this day, Defendants have never acknowledged that nicotine is addictive—they have only acknowledged that "cigarette smoking" is addictive—and it is anticipated that Defendants will contest the addictiveness of nicotine in this matter, especially in light of the testimony made by Altria's CEO, Geoffrey Bible, in 1998, where he stated that "for the sake of a consistent public health message, Philip Morris Companies [now Altria] would no longer debate the addictiveness of nicotine except insofar as it was 'necessary to defend ourselves and our opinions in the court.'" *Id.* at 273-74 (FOF 1163). Again, such a finding has already been made by the D.C. Court:

> Defendants have made and continue to make false and fraudulent statements about the addictiveness of nicotine and smoking. Fact and expert testimony, as well as Defendants' internal documents spanning five decades, firmly establish that Defendants have intended their statements about addiction to further the Enterprise's scheme to defraud by concealing what Defendants openly recognized internally - that smoking is an addiction driven primarily by the pharmacological effects of nicotine.
>
> Defendants' internal research reflects their understanding that nicotine is the most important chemical delivered by cigarettes because it is what compels smokers to smoke. Their product research and development efforts had the overriding objective of harnessing and manipulating the power of nicotine and ensuring that their marketed products delivered enough nicotine to create and sustain addiction.
>
> In response to the emergence of a scientific consensus on this issue in the early 1980s, Defendants began making four types of public statements: (1) Smoking cigarettes is not addictive because some smokers can, and do, quit smoking on their own (e.g., "smoking is a truly personal choice which can be stopped if and when a person decides to do so"; (2) Smoking cigarettes is not addictive because it does not lead to physical "dependence" (e.g., "the claim that there is a physical

dependence to smoking is simply a desperate attempt to find some way to differentiate smoking from other habits"; (3) Smoking cigarettes is not addictive because it does not induce "intoxication" (e.g., "Tobacco is not intoxicating, in direct contrast to any other substance that has been claimed to be addictive, from heroin and cocaine through to alcohol"; (4) Smoking cigarettes is not addictive because cigarettes are not like other addictive drugs-rather, smoking is merely a pleasurable behavior (e.g., the "attachment" to smoking is in the same category as "tennis, jogging, candy, rock music, Coca-Cola, members of the opposite sex and hamburgers."

Defendants have intentionally maintained and coordinated their fraudulent position on addiction and nicotine as an important part of their overall efforts to influence public opinion and persuade people that smoking is not dangerous. By the use of this fraud, Defendants have kept more smokers smoking, recruited more new smokers, and maintained or increased revenues.

*Id.* at 856-57.

### c. Defendants Falsely Represented that They Manipulated Cigarette Design and Composition so as to Assure Nicotine Delivery Levels That Create and Sustain Addiction

At issue in this litigation is also that Defendants had the knowledge and were capable of manipulating the nicotine levels in "light" and low tar cigarettes to keep people addicted to cigarettes. Once again, the D.C. Court already reached this conclusion:

Defendants recognized the relationship between nicotine delivery and continued cigarette sales. [citation]. By delivering the optimum amount of nicotine, Defendants could keep people smoking, keep those already addicted satisfied, and therefore maintain or increase cigarette sales revenue. Based on this understanding, Defendants actively tried to ensure that smokers would continue to receive sufficient nicotine from cigarettes that would deliver reduced tar and nicotine measurements under the FTC Method.

Defendants dedicated substantial resources to devising techniques to modify and manipulate the amount of nicotine that their products deliver. Defendants have studied extensively how every characteristic of every component of cigarettes-including the tobacco blend, the paper, the filter, additives, and the manufacturing process-affects nicotine delivery. They have utilized that understanding in designing their cigarettes. Defendants have designed their cigarettes with a central overriding objective-to ensure that smokers obtain enough nicotine to create and sustain addiction.

Nevertheless, Defendants have publicly and fraudulently denied that they manipulate nicotine delivery. The evidence establishes that Defendants' statements denying manipulation of nicotine have been intentionally deceptive, misleading, or otherwise fraudulent when made. Through these and other false statements, Defendants have furthered their common efforts to deceive the public and carry out their fraudulent scheme.

Defendants spent many millions of dollars and thousands of scientist hours over decades to ensure that smokers of all brands consumed sufficient nicotine to establish and maintain addiction. Defendants' own internal evidence shows that (a) they intended to manipulate the nicotine delivery of their cigarettes; (b) they employed numerous design techniques because they intended and believed that those techniques allowed them to successfully control nicotine delivery; and (c) these efforts were driven by Defendants' widespread understanding that nicotine is an addictive drug and that cigarette smoking is a drug-driven addiction.

Nevertheless, at the same time they were pursuing these techniques, Defendants fraudulently denied both their efforts to manipulate nicotine and their knowledge of nicotine's addictiveness. Defendants have publicly and fraudulently denied that they manipulate nicotine and falsely asserted that the level of nicotine in a cigarette is inextricably linked to the cigarette's tar level, that nicotine delivery levels automatically follow tar delivery levels in cigarette smoke, that nicotine is an essential flavorant, and that because they do not add "extra" nicotine to cigarettes they are not engaged in manipulating the delivery of nicotine through the smoke.

*Id.* at 858-59.

### d.  Defendants Suppressed Documents, Information, and Research.

In addition to the above, whether Defendants intentionally concealed the aforementioned information from the public is at issue in this litigation.  Again, the D.C. Court has already made such a finding:

Throughout the past fifty years, Defendants have engaged in parallel efforts to suppress, conceal, and destroy documents and information in furtherance of the Enterprise's goals of (1) preventing the public from learning the truth about smoking's adverse impact on health; (2) preventing the public from learning the truth about the addictiveness of nicotine; and (3) avoiding or, at a minimum, limiting liability for smoking and health related claims in litigation. These activities occurred despite declarations by Defendants that (a) they did not conceal, suppress or destroy evidence, and that (b) they shared with the American people all pertinent information regarding the true health effects of smoking, including research findings related to smoking and health.

Defendants' suppression of information was aimed, in large part, at protecting them from exposure in smoking and health litigation. Indeed, much of the documentary and testimonial evidence directly references their fear of litigation exposure from scientific data and reports in their possession.

In some instances, Defendants destroyed documents to prevent their release . . . Defendants also employed lawyers to review and edit scientific documents to ensure that no damaging information was retained in company files. [Citation]. In addition, certain Defendants, including Philip Morris . . . , made arrangements to ship secret scientific information outside of the United States or to use foreign scientific laboratories to shield documents from disclosure in litigation . . . Defendants attempted to create attorney-client privilege where none properly existed.

Over the next several decades, the common goal of preserving and enhancing the cigarette market, maximizing profits, avoiding costly liability judgments, and deterring or minimizing attempts to make smoking socially unacceptable remained central to the actions of Defendants. During that time, Defendants uniformly denied, both individually and collectively: that smoking had been proven as a cause of cancer and other serious diseases (while falsely promising that the industry was funding independent research to determine the health effects of smoking); . . . that smoking was addictive; that the industry manipulated the levels of nicotine in its products; that light and low tar cigarettes were no less hazardous than full flavor cigarettes.

*Id.* at 866-67.

### 3.  Specific Intent to Defraud or Deceive

A necessary element of proving liability under RICO, and an issue relevant to Plaintiffs' causes of action in this litigation, is a showing that Defendants acted with the specific intent to defraud smokers and potential smokers. Such a determination has already been made by the D.C. Court:

The United States has proven that Defendants have acted willfully and intentionally to further the Enterprise's scheme to defraud by making statements which were directly contrary to the internal, collective knowledge of each individual Defendant and the Enterprise as a whole. Accordingly, the Government has met its burden to show that Defendants acted with the specific intent to defraud or deceive.

*        *        *

In light of the extensive Findings of Fact describing what each Defendant company knew as well as the totality of the circumstances, the Court concludes that Defendants' fraudulent statements designated as Racketeering Acts evidence a specific intent to defraud. The Findings of Fact are replete with examples of representatives of each cigarette company Defendant, of CTR, and of the Tobacco Institute, either willfully stating something which they knew to be untrue or recklessly disregarding the falsity of their statements. A particularly egregious example is the use of hundreds of documents demonstrating Defendants' intent to offer smokers health reassurances with Light/Low Tar cigarettes even though Defendants knew that such cigarettes offer no meaningful reduction in disease risk.

*      *      *

All Defendants coordinated significant aspects of their public relations, scientific, legal, and marketing activity in furtherance of the shared objective-to use mail and wire transmissions to maximize industry profits by preserving and expanding the market for cigarettes through a scheme to deceive the public. Defendants executed the scheme by using several different strategies including: (1) denying that there were adverse health effects from smoking; (2) making false, misleading, and deceptive public statements designed to maintain doubt about whether smoking and exposure to secondhand smoke cause disease; (3) denying the addictiveness of smoking cigarettes and the role of nicotine therein; (4) disseminating advertising for light and low tar cigarettes suggesting they were less harmful than full flavor ones; and (5) undertaking a publicly announced duty to conduct and publicize disinterested and independent research into the health effects of smoking upon which the public could rely.

In addition, each Defendant also agreed to facilitate the substantive RICO violation by concealing or suppressing information and documents which may have been detrimental to the interests of the members of the Enterprise. Such information might well have been discoverable in smoking and health liability cases against Defendants and therefore could have constituted, or led to, evidence of the link between smoking cigarettes, addiction, and adverse health effects.

*Id.* at 892-905.

### 4.     Altria's Liability

The D.C. Court determined that Altria was individually liable for its involvement and participation in the common scheme to defraud smokers and potential smokers by, *inter alia*,

falsely marketing and representing that their Light cigarettes were less harmful than regular cigarettes.

> Since its creation in 1985, Altria, formerly Philip Morris Companies Inc., has participated directly in the conduct of the Enterprise and conspired to violate 1962(c). Even though there is overwhelming evidence that Altria effectively controlled Philip Morris USA and therefore "caused" some of its predicate Racketeering Acts, Altria's liability in this case stands on its own.

> Defendant Altria effectively and actively controls the activities of all of its subsidiaries, including Defendant Philip Morris USA Inc. and Philip Morris International, Inc. Altria management sets overall policy on all major components of the companies' operations, and senior Altria executives, employees, and agents participate in and/or control decisions about how the operating companies should implement those policies, through both formal and informal reporting relationships . . . Altria's relationship with its subsidiaries was structured to maintain consistency among its companies on sensitive issues such as smoking and health, addiction, and passive smoking . . . Moreover, the Court has already found that the document retention procedures and policies that led to the destruction of email by and to senior executives at Philip Morris while this lawsuit was pending were created with and approved by Altria.

> Accordingly, because Altria has participated in the Enterprise and conspiracy, both directly and indirectly, it cannot escape liability simply by virtue of being a holding company.

*Id.* at 907-08.

Accordingly, Altria should not be given yet another opportunity to escape liability when a court of competent jurisdiction has already found that Altria's actions in and of themselves were fraudulent.

## III. ARGUMENT

"Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue . . . and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co.*, 439 U.S. at 326; *see also Allen v. McCurry*, 449 U.S. 90, 94 (1980) (the purpose of collateral estoppel is to "relieve parties of the costs and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions,

encourage reliance on adjudication"). Collateral estoppel applies to both issues of law and issues of fact. *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984); *see also* Restatement (Second) of Judgments § 27. In *Parklane Hosiery*, 439 U.S. at 326-27, the Supreme Court recognized that collateral estoppel is appropriate in cases such as this, where Plaintiffs were not party to an original action— in this case, the DOJ action.

When, as here, a plaintiff is "seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff," they must first establish that: 1) they could not easily have joined in the earlier action; and 2) the application of the collateral estoppel doctrine would not be unfair to the defendant. *Parklane Hosiery Co.*, 439 U.S at 331. Additionally, they must establish:

> (1) an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding), (2) actuality of litigation (that is, that the point was actually litigated in the earlier proceeding), (3) finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and (4) the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order).

*Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999).

Plaintiffs likely could not have joined the DOJ action and Defendants had every incentive to vigorously defend themselves in that action. Further, the issues Plaintiffs seeks to preclude are the same as those addressed in the DOJ action, were actually litigated in the DOJ action, and were determined by a valid, binding, and final judgment in the DOJ action. Finally, a determination of the issues Plaintiffs seek precluded was necessary to the final judgment entered in the DOJ action. Thus, the Court should apply collateral estoppel in this matter.

**A.    THE PRESENT LITIGATION IS PRECISELY THE TYPE OF LITIGATION TO WHICH THE U.S. SUPREME COURT HAS STATED THE OFFENSIVE USE OF COLLATERAL ESTOPPEL SHOULD APPLY**

Plaintiffs seek to preclude Defendants from re-litigating the same issues that they previously litigated, and lost, in the DOJ action. The Supreme Court has expressly approved the offensive use of collateral estoppel, in actions such as this, where a prior government action has been successfully litigated against a defendant. *Parklane Hosiery Co.*, 439 U.S. at 331-32.

In *Parklane Hosiery*, stockholders brought a class action alleging that the defendants had issued a materially false and misleading proxy statement in connection with a merger in violation of the Securities Exchange Act. *Id.* at 324. Prior to trial in that action, the government, via the Securities and Exchange Commission ("SEC"), sued the same defendants alleging that the proxy statements were materially false and misleading, and following a four day trial, the district court held in favor of the SEC. *Id.* The district court's decision was subsequently affirmed by the Court of Appeals. *Id.* at 324-25. The stockholders in the class action then moved for partial summary judgment, asserting collateral estoppel as to the issues which had been resolved in the SEC action. *Id.* at 325.

The U.S. Supreme Court found the offensive use of non-mutual collateral estoppel was appropriate in the stockholders' class action suit because: (1) the plaintiffs likely could not have joined in the SEC action even if they had wanted to; and (2) given the seriousness of the allegations at issue and the foreseeability that subsequent private suits would follow any judgment in favor of the government, the defendants had every incentive to fully and fairly litigate the action brought against them by the SEC. *Id.* at 331-32. The facts of the present litigation are substantially similar to the facts of *Parklane Hosiery*.

### 1.    Plaintiffs Likely Could Not Have Joined in the DOJ Action.

Plaintiffs likely could not have joined in the earlier government action against Defendants. Pursuant to RICO, the federal government has special rules in place regarding civil actions; litigants filing for damages under RICO do not. By way of example, 18 U.S.C. § 1966 permits the Attorney General to file a certificate stating that in his opinion the case is of general public importance and the court will immediately designate a judge to hear and determine the action. *See* 18 U.S.C. § 1969. Should private plaintiffs attempt to join in the government's action, this could present a problem for the courts.

Similarly, 18 U.S.C. § 1967 provides that in any civil RICO action instituted by the United States, the proceedings may be open or closed to the public at the discretion of the court after consideration of the rights of the affected persons. If Congress had contemplated joint actions with both private and governmental plaintiffs, it would not have enacted these special laws that are applicable to governmental actions alone.

Accordingly, the structure of RICO implies that private actions should not be joined with the government actions brought for violations of RICO or any other state law.  Thus, Plaintiffs likely could not have properly joined in the DOJ action.

### 2.    Defendants Had Every Incentive to Vigorously Litigate the Aforementioned Findings of Fact and Conclusions of Law in the DOJ Action

Defendants had every incentive to defend the issues of liability in the DOJ action. The DOJ action took over seven years to litigate and "some pundits have opined that [it] is the largest piece of civil litigation ever brought." *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 34. The court issued over 1,000 orders and the trial itself took nine months. *Id.* at 33. The D.C. Court's findings of fact and conclusions of law totaled almost 1,000 pages. Further, the action involved serious allegations against Defendants, including, *inter alia*, that, over decades, Defendants had

engaged in "a lengthy, unlawful conspiracy to deceive the American public about the health effects of smoking and environmental tobacco smoke, the addictiveness of nicotine, the health benefits from low tar, 'light' cigarettes, and their manipulation of the design and composition of cigarettes in order to sustain nicotine addiction." *Id.* at 26-27. Accordingly, Defendants had every incentive to vigorously litigate the findings of fact and conclusions of law at issue in the DOJ action.

### 3. Future Suits Against Defendants for the Conduct Alleged and Tried in the DOJ Action Were Foreseeable

Moreover, while litigating the DOJ action, it was foreseeable to Defendants that private actions relating to their false advertising and marketing of Light cigarettes would be brought against them should the government prevail on their claims, as such actions typically follow a successful government judgment. *See Parklane Hosiery Co.*, 439 U.S. at 332.

Indeed, at the time the DOJ action was filed, at least one state court case had already been filed against Defendants alleging that they had falsely marketed and advertised their Light cigarettes as less harmful alternatives to regular cigarettes when in fact they were aware that just the opposite was true—their Light cigarettes were just as harmful, if not more so, than regular cigarettes. *See Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476 (Mass. 2004).

Defendants cannot reasonably make the argument that they did not have every possible incentive to fully defend the DOJ action, especially concerning their marketing and advertising of Light cigarettes as healthier cigarettes. The potential for future litigation was undeniably foreseeable.

4.      **The Present Litigation Does Not Afford Defendants Procedural Opportunities Unavailable in the Prior DOJ Action that Could Cause or Result in a Different Outcome**

Lastly, there are no procedural opportunities available to Defendants in this case that were not available to them in the DOJ action of a kind that might be likely to cause a different result.

Defendants indicated that collateral estoppel is inappropriate in this case because they intend to introduce new expert testimony that will change the outcome of any future trial. *See* Defendants' Motion for Entry of Proposed Case Management Order at p. 9. In *Pignons S.A. de Mecanique v. Polaroid Corporation*, 701 F.2d 1, 2 (1st Cir. 1983), the First Circuit rejected a similar effort by the plaintiff to avoid issue preclusion, finding that the plaintiff's offers of "new theories, evidence, and arguments . . .  is just [the] type of argument . . . that collateral estoppel bars . . . ."  The court held that the plaintiff had "had a fair opportunity to make these arguments and to introduce this evidence the first time," that the law provides the plaintiff nothing more than one opportunity to litigate an issue fully and fairly, and after that, an issue cannot be reopened just because the other party wishes to introduce more or better evidence.  *Id.*

Here, Defendants had more than seven years to introduce all theories, evidence, and arguments in the DOJ action. They cannot now come forward and ask for a "second chance" to introduce evidence that could have been introduced in the DOJ action.

Defendants have already raised the concern that "applying the findings of a single judge to foreclose the juries in these cases from considering issues would implicate Seventh Amendment concerns." *See* Defendant's Motion for Entry of Proposed Case Management Order with Incorporated Memorandum of Law dated October 16, 2009 at 4, n.3. This argument has already been heard by and rejected by the U.S. Supreme Court.  *See Parklane Hosiery Co.*, 439

U.S. at 337 (holding that "if the law of collateral estoppel forecloses the petitioners from relitigating the factual issues determined against them in the SEC action, nothing in the Seventh Amendment dictates a different result . . . . ").[9]

Accordingly, there are no threshold concerns regarding the application of offensive use of collateral estoppel in the present litigation.[10]

## B.   DEFENDANTS RECEIVED A FULL AND FAIR OPPORTUNITY TO LITIGATE THEIR CLAIMS IN THE DOJ ACTION

Once the threshold concerns regarding the offensive use of collateral estoppel have been addressed and found inapplicable, a court must next decide whether a defendant received a full and fair opportunity to litigate its claims in the prior trial.  *Acevedo-Garcia*, 351 F.3d at 575. Pursuant to the law of the First Circuit, a court should consider the following four factors:

1.   an identify of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding);

2.   actuality of litigation (that is, that the point was actually litigated in the earlier proceeding);

---

[9] In 1990, the Supreme Court, in *Lytle v. Household Mfg., Inc.*, 494 U.S. 545 (1990), reaffirmed its decision in *Parklane Hosiery*, and distinguished the situation addressed in *Parklane Hosiery*, from a situation in which an equitable claim and legal claim are brought in the same action.  "[W]hen legal and equitable claims are joined in the *same action*, the right to jury trial on the legal claim, including all issues common to both claims, remains intact." *Id.* at 550 (emphasis added) (citing *Curtis v. Loether*, 415 U.S. 189 (1974)).  The result in *Parklane Hosiery* was different because "an equitable determination can have collateral estoppel effect in a *subsequent* legal action and . . . not violate the Seventh Amendment." *Id.* (emphasis in original) (quoting *Parklane Hosiery Co.*, 439 U.S. at 335).

[10] In *In Re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322 (4th Cir. 2004), the Fourth Circuit also approved the offensive use of collateral estoppel in a similar situation where a government action had already been brought against a defendant, holding that the defendant had a full and fair opportunity to defend itself in the government action.

3.      finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order); and

4.      the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order).

*Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999).

### 1.      An Identity of Issues

The "identity of issues" factor does not necessarily mean that the issues of law and fact sought to be precluded have to be identical; rather, the focus of the inquiry is whether the issues of fact and law to be litigated in the second action are substantially or in substance the same as those that were litigated in the prior action. *In re Sonus Networks, Inc, Shareholder Derivative Litig.*, 499 F.3d 47, 62-63 (1st Cir. 2007); *see also Montana v. United States*, 440 U.S. 147, 155 (1979) (the application of collateral estoppel necessitates an inquiry into whether the "issues presented . . . are in substance the same as those resolved" in the prior action).

A court should look to the following factors to help identify whether the issues in both cases are substantially the same:

(1)      whether there is a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first;

(2)      whether new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding;

(3)      whether pretrial preparation and discovery related to the matter presented in the first action could reasonably be expected to have embraced the matter sought to be presented in the second; and

(4)      How closely related the claims involved in the two proceedings are.

Restatement (Second) of Judgments § 27, cmt. c.

Plaintiffs claim that Defendants falsely marketed and advertised their Light cigarettes as a less harmful alternative to regular cigarettes. In the DOJ action, the Court held that Defendants

did exactly this. The fact that Plaintiffs have brought different causes of action against Defendants is immaterial. *See Schwab v. Philip Morris, et al.*, 449 F. Supp. 2d 992, 1078 (E.D.N.Y. 2006) (finding that an identity of issues existed between two actions both brought under RICO against tobacco defendants for their fraudulent marketing of "light" cigarettes, even though one of the actions sought legal damages and the other sought equitable damages). The identity of issues factor is easily satisfied by the overwhelming overlap between the elements that Plaintiffs must establish in the present litigation and the elements that the government needed to establish in support of their RICO claim

Moreover, the discovery and pretrial preparation that Plaintiffs must undertake in this litigation relate to Defendants' unlawful marketing of their Light cigarettes, and are topics that were already embraced in the prior DOJ action.

Plaintiffs respectfully request that the Court grant preclusive effect to the findings and conclusions already made in the DOJ action relating to the common questions of law and fact which will undoubtedly arise in this litigation, such as the conclusion (and underlying findings of fact in support of said conclusion) that Defendants falsely represented to smokers and potential smokers that their Light cigarettes were less harmful than regular cigarettes.

### 2.      Actuality of Litigation

To satisfy the actuality of litigation factor, "the party seeking to impose issue preclusion must demonstrate that the issue to be given preclusive effect was actually litigated in the prior proceeding." An issue need not be "explicitly decided," in order to be actually decided. *Dennis v. R.I. Hosp. Trust Nat'l Bank*, 744 F.2d 893, 899 (1st Cir. 1984), *abrogated on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991)); *see also Hoult v. Hoult*, 157 F.3d 29, 32 (1st

Cir. 1998). An issue may have been actually decided if it "constituted, logically or practically, a necessary component of the decision reached." *Dennis*, 744 F.2d at 898.

The issues sought to be precluded were actually litigated in the DOJ case. This is not a case where Defendants may have ignored an issue or fact because they found it to be irrelevant or unimportant. Each element of the government's action against Defendants was essential to its proving that Defendants had engaged in a "lengthy, unlawful conspiracy to deceive the American public about the health effects of smoking and environmental tobacco smoke, the addictiveness of nicotine, the health benefits from low tar, 'light' cigarettes, and their manipulation of the design and composition of cigarettes in order to sustain nicotine addiction." *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 26-27. With full knowledge of the government's claims against them, Defendants did their best to litigate each and every factual allegation. Indeed, it took them seven years to do so.

### 3.      Finality of the Earlier Resolution

In order to satisfy the finality of earlier resolution category, it must be shown that the issues sought to be precluded were determined by a valid and binding final judgment or order. "[F]or purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13. Whether a judgment should be considered final for purposes of issue preclusion, turns upon factors such as "the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *O'Reilley v. Malon*, 747 F.2d 820, 823 (1st Cir. 1984) (quoting *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961), *cert. denied*, 368 U.S. 986 (1962)). "'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has

reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Id.*; *see also Pure Distrib., Inc. v. Baker*, 285 F.3d 150, 157 n.5 (1st Cir. 2002) (citing Restatement for the proposition that "finality may . . . be understood more broadly when analyzed in the context of issue preclusion, as opposed to claim preclusion"); *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003); *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 333 F.3d 763, 767 (7th Cir. 2003); *In re Nangle*, 274 F.3d 481, 485 (8th Cir. 2001); *Christo v. Padgett*, 223 F.3d 1324, 1339 n.47 (11th Cir. 2000); *In re Docteroff*, 133 F.3d 210, 215-16 (3d Cir. 1997).

The D.C. Court's opinion in the DOJ action is final for collateral estoppel purposes. Judge Kessler did not just tentatively decide that the DOJ had violated RICO. Rather, the court "decided that, as fact finder, its obligation [was] to present to the appellate courts, the parties, and the public *all* the relevant facts which have been proven by a preponderance of this massive body of evidence consisting of testimony (including written direct examination, in-court cross examination, and re-direct examination of witnesses in this trial, as well as deposition and trial testimony of witnesses in related cases), and thousands of exhibits. . . [so that] the appellate courts [would] have before them all the factual determinations they need to decide the numerous legal issues which will unquestionably be raised." *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 29.

Finally, the D.C. Court's opinion has already been subjected to review and was affirmed in relevant part by the Circuit Court of Appeals. *See United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009). It is irrelevant that the defendants in the DOJ action are in the process of seeking further review from the U.S. Supreme Court. The First Circuit has held that a party's taking of an appeal does not alter the preclusive effect of the judgments entered by a

district court or court of appeals.[11]  *Cadorette v. United States*, 988 F.2d 215, 222 (1st Cir. 1993)

(quoting the restatement that "a judgment otherwise final remains so despite the taking of an

appeal . . . "); see also *Kane v. Town of Harpswell*, 254 F.3d 325, 328 (1st Cir. 2001);  *Tauton

Gardens Co. v. Hills*, 557 F.2d 877, 878 n.2 (1st Cir. 1977) ("[I]t is well settled that in the federal

courts the pendency of an appeal does not destroy the res judicata effect of a judgment even if it

has been stayed pending appeal.") (citing 1B Moore's Federal Practice ¶0.416(3) at 2252-53); *In

re Belmont Realty Corp.*, 11 F.3d 1092, 1095-96 (1st Cir. 1993) (same). Likewise, the Seventh

Circuit has noted that collateral estoppel "requires only a judgment that is final in the court

rendering it, and not a judgment that is final after exhaustion of appellate remedies . . ."  *Old

Republic Ins. Co. v. Chuhak & Tecson, P.C.*, 84 F.3d 998, 1000–01 (7th Cir. 1996); *see also

Hawkins v. Risley*, 984 F.2d 321, 324 (9th Cir. 1993) ("in federal courts . . . the preclusive effects

of a lower court judgment cannot be suspended merely by taking an appeal that remains

undecided"); *U.S. v. Int'l Bd. of Teamsters*, 905 F.2d 610, 621 (2d. Cir. 1990) ("judgment may

be final for purposes of collateral estoppel, despite the fact that an appeal from it has not been

decided"); *Nat'l Post Office Mail Handlers v. Am. Postal Workers Union*, 907 F.2d 190, 192

(D.C. Cir. 1990).

Thus, the DOJ action was final, valid, and binding.

### 4.      The Centrality of the Adjudication

The fourth and final factor is centrality of the adjudication, meaning that the

determination of the issue in the prior proceeding was essential or necessary to the final

---

[11] "Federal law determines the preclusive effect of a judgment previously entered by a federal court."
*Coors Brewing Co. v. Mendez-Torres*, 562 F.3d 3, 8 (1st Cir. 2009) (quoting *Perez v. Volvo Car. Corp.*,
247 F.3d 303, 311 (1st Cir. 2001)); *see also Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978
(1st Cir. 1995) ("Since the judgment [] was rendered by a federal tribunal-the bankruptcy court- . . . ,
federal preclusion principles apply.").

judgment or order. In *Hoult v. Hoult*, 157 F.3d 29 (1st Cir. 1998), the First Circuit had the opportunity to address this requirement, specifically to define the term "necessary."  Rather than applying a strict and "demanding" definition of the term, the court held that a finding is "'necessary' if it was central to the route that led the factfinder to the judgment reached, even if the result 'could have been achieved by a different, shorter and more efficient route.'"  *Id.* at 32 (quoting *Commercial Assocs. v. Tilcon Gammino, Inc.*, 998 F.2d 1092, 1097 (1st Cir. 1993)); *see also Microsoft*, 355 F.3d at 329 (Gregory, CJ, concurring in part and dissenting in part) (a rigid construction of the term "necessary" for purposes of collateral estoppel runs contrary to the purposes behind which collateral estoppel serves – "to relieve parties of the cost and vexation of multiple lawsuit, conserve judicial recourse, and, by preventing inconsistent decisions, encourage reliance on adjudication."). Additionally, collateral estoppel is not limited to ultimate issues of fact or law; rather, necessary *intermediate findings* can be used to preclude relitigation. *Biggins v. The Hazen Paper Co.*, 111 F.3d 205, 210 (1st Cir. 1997) (citing *Grella v. Salem Five Cent Savings Bank*, 42 F.3d 26, 30-31 (1st Cir. 1994)).

Each and every finding of fact and conclusion of law relevant to Defendants' marketing of their Light cigarettes was essential to Judge Kessler's finding that Defendants had engaged in a decades-long conspiracy to defraud consumers in violation of RICO. *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 31 ("[D]espite the length and detail of the Findings of Fact, the evidentiary picture must be viewed in its totality in order to fully appreciate how massive the case is against the Defendants, how irresponsible their actions have been, and how heedless they have been of the public welfare and the suffering caused by the cigarettes they sell."). The findings of fact of the D.C. Court regarding Defendants' manufacture and marketing of their Light cigarettes led the court to its conclusion that Defendants had fraudulently represented that Light cigarettes

delivered less nicotine and tar, and therefore presented fewer health risks than regular cigarettes and, thus, the Court's ultimate conclusion that Defendants had engaged in a common scheme to defraud smokers and potential smokers.

There were no prior inconsistent judgments that would prevent Plaintiffs from invoking collateral estoppel in this matter, as Defendants appear to be suggesting, by their reference to *Grisham v. Philip Morris, Inc.*, No. 02 CV 7930 (C.D. Cal. Oct. 10, 2009) (slip op.).   In *Grisham*, the court denied Philip Morris' attempt to raise this same argument in recognizing that "the various tobacco cases have generally avoided litigating the question at issue in the DOJ case [whether Defendants engaged in fraud]", "many of the prior cases were litigated before plaintiffs had access to the full panoply of tobacco companies' bad acts," and "most importantly, no previous case appears to include an ultimate finding of fact absolving tobacco companies of liability on the basis that they <u>did not engage</u> in fraudulent activities." *Id.* at 36.[12]

In support of her ultimate conclusion that Defendants had indeed engaged in a common scheme to defraud smokers and potential smokers in violation of RICO, Judge Kessler reached the following conclusions:

> (1)    Defendants had falsely denied the adverse health effects of smoking when they had evidence before them to the contrary, *id.* at 854;

---

[12] Although the *Grisham* court denied the plaintiff's request to invoke collateral estoppel, that is inapplicable here, as it was based upon the court's conclusions that:  1) the plaintiff failed to show that the facts she sought preclusion with regard to were necessary to the court's judgment in the DOJ action; and 2) the availability of a jury trial in the *Grisham* action afforded Philip Morris procedural opportunities likely to produce a different result, which made it unfair to apply the findings from the DOJ action, determined by a judge. *Grisham*, No. 02 CV 7930, at 36, 41. The first issue—the plaintiff's failure to show to the court that the facts she sought to be precluded were necessary to judgment in the DOJ action—is clearly not applicable in this matter, as it was based upon the strength and detail of the plaintiff's analysis in that matter.  *See Id.* at 31. The second issue, regarding the availability of a jury trial, directly contradicts the Supreme Court's holding in *Parklane Hosiery* that "the presence or absence of a jury as factfinder is basically neutral," and, if adopted, would greatly undermine the strength of the American judicial system via recognizing that, as fact-finders, judges and juries afford parties procedural opportunities that are likely to produce a different result. 439 U.S. at 331 n.19.

(2)    Defendants had falsely denied that nicotine and smoking are addictive when they had evidence before them to the contrary, *id.* at 856;

(3)    Defendants had falsely denied that defendants manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction, *id.* at 858;

(4)    Defendants had falsely represented that light and low tar cigarettes deliver less nicotine and tar and therefore present fewer health risks than regular cigarettes, *id.* at 859;

(5)    Defendants had suppressed documents, information, and research to prevent the public from learning the truth about these subjects and to avoid or limit liability in litigation, *id.* at 866; and

(6)    Defendants had established an enterprise which had the common purpose of defrauding smokers and potential smokers and defendants had participated in the conduct of the enterprise, *id.* at 869.

On appeal of the District Court's judgment, the D.C. Circuit upheld the D.C. Court's findings of fact and conclusions of law relevant to this action, including the D.C. Court's ultimate conclusion that Defendants had engaged in a common scheme, with the requisite specific intent, to defraud smokers and potential smokers in violation of RICO.

The D.C. Circuit stated the following with respect to the D.C. Court's findings of fact regarding Defendants' conduct regarding their marketing and promotion of Light cigarettes:

> The government also presented evidence tending to show that Defendants marketed and promoted their low tar brands to smokers – who were concerned about the health hazards of smoking or considering quitting – as less harmful than full flavor cigarettes despite either lacking evidence to substantiate their claims or knowing them to be false. [cite] Internal industry documents introduced at trial revealed that by the late 1960s and early 1970s, Defendants were aware that lower tar cigarettes are unlikely to provide health benefits because they do not actually deliver the low levels of tar and nicotine advertised. [cite] Defendants researched and understood the phenomenon whereby smokers of low tar cigarettes, to satisfy their addiction, modify their smoking behavior to compensate for the reduced nicotine yields by 'taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with fingers or lips, and/or smoking more cigarettes.' [cite] As a result of this nicotine-driven behavior, smokers of low tar cigarettes boost their intake of tar, so that

lower tar cigarettes do not result in lower tar intake and therefore do not yield the touted health benefits or serve as a step toward quitting smoking. [cite]  Evidence at trial suggested that Defendants understood this connect for some time, better than the public health community or government regulators – while they promoted lower tar cigarettes as 'health reassurance' brands.

556 F.3d at 1107.

The conclusions of law and findings of fact made by the D.C. Court, of which Plaintiffs seek preclusive effect, should all be given preclusive effect because these facts were central to Judge Kessler's ultimate finding that Defendants violated RICO by engaging in a common scheme to defraud smokers and potential smokers.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court apply collateral estoppel to the findings of fact and conclusions of law identified by Plaintiffs herein and in the Appendix submitted herewith as Exhibit A, and grant such other relief the Court deems just and appropriate.

Dated:  November 20, 2009                          Respectfully submitted,


                                                      _/s/ Samuel W. Lanham, Jr._____
                                                   Samuel W. Lanham, Jr.
                                                   **LANHAM BLACKWELL, P.A.**
                                                   470 Evergreen Woods
                                                   Bangor, ME 04401

                                                   Ben Barnow
                                                   **BARNOW AND ASSOCIATES, P.C.**
                                                   One North LaSalle Street, Suite 4600
                                                   Chicago, IL 60602

                                                   Don Barrett
                                                   **BARRETT LAW OFFICE, P.A.**
                                                   404 Court Square
                                                   Lexington, MS 39095-0987

Kent Caperton
**BEN BARNES GROUP**
1215 19th Street, NW
Washington, DC 20036

Marian S. Rosen
**MARIAN S. ROSEN**
  **& ASSOCIATES**
5065 Westheimer, Suite 840
Houston, TX 77056

Howard Rubinstein
**LAW OFFICE OF**
**HOWARD WEIL RUBINSTEIN**
P.O. Box 4869
Aspen, CO 81611

Walter Umphrey
**PROVOST UMPHREY**
  **LAW FIRM, LLP**
P.O. Box 4905
Beaumont, TX 77704-4905

Joe R. Whatley, Jr.
**WHATLEY, DRAKE & KALLAS**
1540 Broadway, 37th Floor
New York, NY 1036

John Eddie Williams
**WILLIAMS, KHERKER, HART,**
  **BOUNDAS, LLP**
8441 Gulf Freeway, Suite 600
Houston, TX 77017

*Plaintiffs' Executive Committee*

## <u>CERTIFICATE OF SERVICE</u>

Service of the above Plaintiffs' Motion for Application of The Collateral Estoppel Doctrine with Incorporated Memorandum of Law and Appendix has been made through the Court's ECF system on all those registered to receive ECF service, and on all others, not registered but listed on the Court's Manual Notice List, by regular mail.


Date:   November 20, 2009              */s/ Samuel W. Lanham, Jr.*
                                       Samuel W. Lanham, Jr., Esq.
                                       Lanham Blackwell, P.A.
                                       470 Evergreen Woods
                                       Bangor, ME  04401
                                       Attorney for Plaintiffs

43