## EXHIBIT A

**APPENDIX TO PLAINTIFFS' MOTION FOR APPLICATION OF**

**THE COLLATERAL ESTOPPEL DOCTRINE**

**Explanation of the Appendix**

This Appendix contains all of the relevant Findings of Fact and Conclusions of Law, including those cited in the brief, for which Plaintiffs are requesting application of the collateral estoppel doctrine in this case.

The applicable conclusions of law are set forth on the next page of the Appendix.  The findings of fact follow within a chart with columns relating the actual finding to its related elements in the DOJ case and the MDL cases.

The first column of the chart sets forth the page and paragraph numbers per Judge Kessler's opinion.

The second column of the chart sets forth *verbatim* each and every finding of fact from that opinion which should be given preclusive effect in this litigation.  Also included within this column are the section headings and titles utilized by Judge Kessler in her decision.  While these are not actual findings, they are provided to guide the Court with the logical organization of the topics presented.

The third and fourth columns in the chart are entitled "Necessary Elements in  DOJ Case" and "Identical Issues in MDL," respectively, and are meant to be side by side comparisons of the elements which were necessary to the Court's decision in the prior DOJ litigation and the elements which are now necessary to the present MDL.  As set forth in more detail in Plaintiffs' Memorandum, three of the four factors a court should consider to determine whether the offensive use of collateral estoppel should be allowed are (1) identity of issues, (2) actuality of litigation, and (3) centrality of litigation.  The second, third and fourth columns of the chart reflect these three factors.

The fifth and final column refers to that portion of the District of Columbia Court of Appeals opinion in which the court reviewed and affirmed the same finding of fact or conclusion of law made by Judge Kessler in her original opinion, and which Plaintiffs seek to have granted preclusive effect in this MDL.  This column represents the fourth factor -- "finality of the DOJ action"-- which a court should consider in determining whether the offensive use of collateral estoppel should be allowed.

**APPLICABLE CONCLUSIONS OF LAW:**

**Defendants Philip Morris and Altria Engaged in a Scheme to Defraud Smokers and Potential Smokers:[1]**

**Defendants Falsely Denied the Adverse Health Effects of Smoking.** *United States v. Philip Morris*, 449 F. Supp.2d 1,  854 (D.D.C. 2006).

**Defendants Falsely Represented that Light and Low Tar Cigarettes Deliver Less Nicotine and Tar and, Therefore, Present Fewer Health Risks than Full-Flavor Cigarettes**. *Id.* **at 859.**

**Defendants Suppressed Documents, Information, and Research.** *Id* **at. 866.**

**Philip Morris and Altria acted with the specific intent to defraud or deceive** *Id.* **at 891.**

**Each Defendant Entered into a Conspiratorial Agreement.[2]**

**Altria Is Liable For Its Violations Of** *18 U.S.C. § 1962(c)* **and** *(d).*[3]

---

[1] "The Government has proven that the Enterprise knowingly and intentionally engaged in a scheme to defraud smokers and potential smokers, for purposes of financial gain, by making false and fraudulent statements, representations, and promises. Defendants participated in the Enterprise's overarching scheme to defraud smokers and potential smokers in order to maximize their profits by preserving and enhancing the market for cigarettes, to avoid costly liability judgments, to derail attempts to make smoking socially unacceptable, and to sustain the cigarette industry."  449 F. Supp. 2d at 852.  "The individual components must be viewed not independently but in context of the entire scheme to defraud." *Id.* at 853.

"The totality of the evidence proves Defendants' wide reaching and pervasive scheme to defraud consumers and potential consumers of cigarettes. As established at trial and explained below, Defendants coordinated their public relations, research, cigarette design and marketing efforts in order to advance their overarching scheme to defraud by: (1) denying the adverse health effects of active smoking; (2) denying the addictiveness of nicotine and cigarette smoking; (3) denying their manipulation of the nicotine content of cigarettes; (4) misrepresenting the health risks attached to light and low tar cigarettes; (5) denying their marketing to youth; (6) denying the adverse health effects of secondhand smoke; and (7) suppressing, concealing, and destroying information and documents related to the adverse health effects of smoking."  *Id.* at 854.

[2] " 'In order to be guilty of a RICO conspiracy, a defendant must either agree to [individually] commit two predicate acts or agree to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise.' " (citations omitted)  Defendants are liable for a RICO conspiracy under either test."  449 F. Supp.2d at 903.  This standard is higher than any requirement in the instant MDL.

[3] "Since its creation in 1985, Altria, formerly Philip Morris Companies Inc., has participated directly in the conduct of the Enterprise and conspired to violate *1962(c)*. Even though there is overwhelming evidence that Altria effectively controlled Philip Morris USA and therefore 'caused' some of its predicate Racketeering Acts, Altria's liability in this case stands on its own." *Id.* at *907.*

**Necessary Findings of Fact**

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | **III. CREATION, NATURE, AND OPERATION OF THE ENTERPRISE[4]** | | | |
| | **A. Pre-1953 Overview-The Rise in American Smoking and the Status of Scientific Research on Smoking and Health** | | | |
| 35 ¶ 1 | Tobacco usage in North America dates as far back to at least the 1600s when Christopher Columbus came to America and observed Native Americans smoking tobacco leaves. By the end of the 1800s, scientists observed a noticeable rise in the incidence of cigarette smoking, as well as a noticeable rise in the number of cases of lung cancer. | Conspiratorial agreement, and Intent to defraud or deceive [5] | Intent to defraud or deceive[6] | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009).[7] |
| 35 ¶ 2 | Prior to 1900, lung cancer was virtually unknown as a cause of death in the United States. By 1935, there were an estimated 4000 lung cancer deaths annually, and by 1945 that figure had almost tripled. VXA1601844-2232 at 1986 (U.S. 64057); Brandt WD, 31:16-32:1. Annual per capita consumption of cigarettes in 1900 was approximately forty-nine; by 1930 that figure had | Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009 ). |

---

[4] The headings as used by Judge Kessler in her Final Opinion are included to aid the reader.  These are not actual findings of fact but do provide guidance to the logical  organization of the Findings of Fact.

[5] "All Defendants coordinated significant aspects of their public relations, scientific, legal, and marketing activity in furtherance of the shared objective--to use mail and wire transmissions to maximize industry profits by preserving and expanding the market for cigarettes through a scheme to deceive the public. Defendants executed the scheme by using several different strategies including: (1) denying that there were adverse health effects from smoking; (2) making false, misleading, and deceptive public statements designed to maintain doubt about whether smoking and exposure to secondhand smoke cause disease; (3) denying the addictiveness of smoking cigarettes and the role of nicotine therein; (4) disseminating advertising for light and low tar cigarettes suggesting they were less harmful than full flavor ones; and (5) undertaking a publicly announced duty to conduct and publicize disinterested and independent research into the health effects of smoking upon which the public could rely. See Findings of Fact Sections III and V."  *Id.* at 904.

[6]*See Tyrer v. Philip Morris USA, Inc, and Altria Group, Inc*., United States District Court, Southern District of California, Complaint for Injunctive Relief, Restitution and Damages  ¶¶101,115, 123-124 (Case No.  CV-0052-W-CAB); and *Slater v. Philip Morris USA, Inc., and Altria Group, Inc.,* United States District Court for the District of Columbia, Class Action Complaint ¶¶37-39, 49, 70. (Case No. CV-02145-RMU)(awaiting transfer as a tag along case).  These cases are representative of the causes of action and consumer protection claims that have been brought in each of the state court cases in this MDL.

[7]"The district court found--permissibly in our view--that the enterprise had the common purpose of obtaining cigarette proceeds by defrauding existing and potential smokers, *Philip Morris, 449 F.Supp.2d at 869;* possessed the requisite structure both through informal association and through the formation of several formal organizations, *id. at 870-71;* functioned as a continuous unit despite personnel changes, *id. at 871-72;* and constituted a separate entity distinct from each Defendant, *id. at 875.* Defendants give us neither any basis for concluding that the district court's factual findings were clearly erroneous nor any reason to think them legally insufficient. The district court also found--again permissibly--that despite competing in some aspects of their business, Defendants jointly committed fraud and so participated in the conduct of not just their own affairs but the enterprise's as well, *id. at 875-78,* and also that they conspired to do so, *id. at 903-05.* Accordingly, we affirm the district court's findings that an enterprise existed and that Defendants participated in the conduct of its affairs and conspired to do so."

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | grown to 1300; by 1950, annual per capita consumption had skyrocketed to over 3000 cigarettes. | | | |
| 35 ¶ 3 | By the 1920s, scientists were beginning to investigate the relationship between the concomitant rise in cigarette consumption and lung cancer, and to focus on the health consequences of smoking.. For example, as early as 1928, researchers conducting a large field study associated heavy smoking with cancer. In 1931, Frederick L. Hoffman, a well-known statistician for the Prudential Insurance Company, linked smoking with cancer. In 1938, a population biologist and biometrician from Johns Hopkins Medical School, Raymond Pearl, published one of the first significant statistical analyses of the health impact of smoking and concluded that individuals who smoked could expect shorter lives. In the 1930s, chest surgeons Alton Oschner and Richard Overholt published observations that the patients they saw with advanced lung malignancies were typically smokers. By the end of the 1940s and early 1950s, far more evidence linking smoking to disease began to appear, ranging from the ground-breaking statistical studies of two eminent British statisticians, Bradford Hill and Sir Richard Doll, to the Graham and Wynder studies at Washington University, to animal research studies pointing to the carcinogenicity of cigarettes. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 35 ¶ 4 | The mainstream media began to pay attention to the growing scientific literature and report on the scientists' findings. For example, in 1953 Readers Digest, which was at the time one of the most popular publications in the country, published a series of articles titled "Cancer by the Carton" which relayed the scientific findings of Drs. Wynder and Graham. The magazine quoted one of the conclusions they reached in their American Cancer Society study which had been published in the American Medical Association's Journal of May 27, 1950 ("JAMA"), namely that "Excessive and prolonged use of tobacco, especially cigarettes, seems to be an important factor in the induction of bronchiogenic carcinoma." Such mainstream media publicity in popular magazines such as Time, Life, and Reader's Digest triggered understandable public concern. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 36 ¶ 5 | In short, by 1953, there had been a very substantial rise in the annual per capita consumption of cigarettes and the number of deaths attributable to lung cancer; scientists were more and more convinced that a relationship existed between cigarette smoking and lung cancer; and the public was growing increasingly aware of and anxious about both developments. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **B. Creation of the Enterprise** | | | |
| 36 ¶ 6 | In December 1953, Paul M. Hahn, President of Defendant American, sent telegrams to the presidents of the seven other major tobacco companies and one tobacco growers organization, inviting them to meet and develop an industry response to counter the negative publicity generated by the studies linking cigarette smoking and lung cancer. The telegrams were sent to: Edward A. Darr, President of Defendant Reynolds; Benjamin F. Few, President of Defendant Liggett; William J. Halley, President of Defendant Lorillard; Timothy V. Hartnett, President of Defendant B & W; O. Parker McComas, President of Defendant Philip Morris; Joseph F. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Cullman, Jr., President of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; and J. Whitney Peterson, President of United States Tobacco Co. | | | |
| 36 ¶ 7 | Executives from every tobacco company listed above, with the exception of Liggett, met in New York City at the Plaza Hotel on December 14, 1953. The executives discussed (i) the negative publicity from the recent articles in the media, (ii) responding to the problem by jointly engaging a public relations counsel, and (iii) removing health themes from advertising. They also discussed Liggett's decision not to attend the meeting because "in the course of time the whole thing would blow over." The executives also authorized the five members of the group who had their offices in New York to engage the services of Hill & Knowlton on behalf of the whole committee; to meet with John Hill at the Plaza Hotel the next day, December 15th, to discuss the negative publicity problem; and to request that Hill & Knowlton, if it accepted the assignment, submit recommendations to the full committee at a subsequent meeting as to how to proceed. It is clear from all the surrounding circumstances that representatives of Hill & Knowlton had been contacted about taking on this assignment prior to December 14, 1953. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 36 ¶ 8 | The tobacco company executives did not meet, as they have suggested, in an altruistic response to requests from the scientific community that the industry fund research on smoking and health. Rather, they convened a strategy meeting of the highest company officials to formulate an industry-wide response (a) to the public's growing anxiety generated by the negative publicity about the direction of scientific research on cigarettes and cancer, and (b) to what they accurately understood to be a major threat to their corporations' economic future. While it is true that there was a recommendation "to do good science, independent science," the minutes of the meeting reveal that:<br><br>It was recommended that this [research] group undertake to enlist the cooperation of the National Institutes of Health of the U.S. Public Health Service in working out a program of scientific investigation through which the facts in the present controversy would be developed. This was considered highly advisable in that it would give to the program an aspect of independence to the program to a degree not obtainable in any other way. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 37 ¶ 9 | At the December 14, 1953 meeting, Paul Hahn of American and Timothy Hartnett of B & W told the other company presidents that they had taken definite steps to remove the health themes from the advertising programs on Pall Mall and Viceroy. Darr [of Reynolds] made the point that he could not concur in sponsoring an industry paid advertising campaign (if this is the course recommended by the Public Relations Counsel) as long as the health theme continued to be featured by any one of the companies represented on the committee.<br><br>J. Whitney Peterson of United States Tobacco and Hartnett "expressed their agreement with Mr. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Darr's views in this matter." Hill & Knowlton wanted to develop some understanding with the Defendants that none is going to seek a competitive advantage by inferring to its public that *its* product is less risky than others. (No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a given brand less likely to cause you-know-what. No "Play-Safe-with-Luckies.)" | | | |
| 37 ¶ 10 | At the December 15, 1953 meeting, the participants were Paul Hahn of American, O. Parker McComas of Philip Morris, Joseph Cullman, Jr. of Benson & Hedges, J. Whitney Peterson of United States Tobacco, and representatives from Hill & Knowlton, including John Hill and Bert Goss. Hill & Knowlton was told that the industry viewed the "problem [posed by the scientific studies] as being extremely serious and worthy of drastic action… According to a Hill & Knowlton memo dated December 22, 1953, the public relations firm was asked to develop suggestions for dealing with the public relations problem confronting the industry as a result of widely publicized assertions by a few medical research men regarding the link between cigarette smoking and lung cancer. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009) |
| 37 ¶ 11 | In an internal planning memoranda, Hill & Knowlton assessed their tobacco clients' problems in the following manner:<br><br>There is only one problem-confidence, and how to establish it; public assurance, and how to create it-in a perhaps long interim when scientific doubts must remain. And, most important, how to free millions of Americans from the guilty fear that is going to arise deep in their biological depths-regardless of any pooh-poohing logic-every time they light a cigarette. No resort to mere logic ever cured panic yet, whether on Madison Avenue, Main Street, or in a psychologist's office. And no mere recitation of arguments pro, or ignoring of arguments con, or careful balancing of the two together, is going to deal with such fear now. That, gentlemen, is the nature of the unexampled challenge to this office. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009) |
| 38 ¶ 12 | Ten days later, on December 24, 1953, Hill & Knowlton submitted a proposal regarding the tobacco industry's public relations campaign, recommending that the companies form a joint industry research committee that would sponsor independent scientific research on the health effects of smoking and announce the formation of the research committee nationwide as news and in advertisements. Hill & Knowlton also recommended that the companies fund objective research by scientists who were independent of the tobacco industry, and that an advisory board be established composed of a group of distinguished scientists from the fields of medicine, research and education "whose integrity is beyond question." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009) |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 38 ¶ 13 | In its proposal, Hill & Knowlton expressed its concern about the "health" claims being made in the Defendants' advertising:<br><br>[I]t is impossible to overlook the fact that some of the industry's advertising has come in for serious public criticism because of emphasis on health aspects of smoking ... it must be recognized that some of the advertising may have created a degree of skepticism in the public mind which at the start at least could affect the believability of any public relations effort.<br><br>In fact, one of the questions posed by Hill & Knowlton to the Defendants was whether the companies considere[d] that their own advertising and competitive practices have been a principal factor in creating a health problem? The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 38 ¶ 14 | Four days later, on December 28, 1953, another meeting was held at the Plaza Hotel and was attended by Paul Hahn of American; Edward Darr of Reynolds; Herbert A. Kent, Chairman of Lorillard; Timothy Hartnett of B & W; O. Parker McComas of Philip Morris; Joseph Cullman of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; J. Whitney Peterson of United States Tobacco; and three people from the public relations firm of Hill & Knowlton, John Hill, Bert Goss, and Richard Darrow. The attendees agreed on Tobacco Industry Research Committee ("TIRC") as the official name of the research committee; chose Paul Hahn as temporary chairman of the committee; agreed that the search should begin immediately for a qualified director who, together with the companies' research directors, would recommend members for the research advisory board; and reviewed and accepted the Hill & Knowlton proposal regarding the tobacco industry's public relations campaign. The attendees also agreed on a mission statement for the new organization which stated that its "purposes and objectives" were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject.  Hill & Knowlton played a major role in creating, refining, and implementing the strategies adopted by the participants at the December meetings. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 39 ¶ 15 | Although Defendant Liggett did subsequently participate in Enterprise activities, Liggett did not participate in the December meetings because, at the time, the company believed that "the proper procedure is to ignore the whole controversy." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 39 ¶ 16 | Following Hill & Knowlton's advice, the formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers" published in 448 newspapers throughout the United States. All sponsoring cigarette manufacturers | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | and other tobacco industry entities were clearly identified. | | | |
| 39 ¶ 17 | The Frank Statement was subscribed to by the following domestic cigarette and tobacco product manufacturers, organizations of leaf tobacco growers, and tobacco warehouse associations that made up TIRC: Defendant American by Paul Hahn, President; Defendant B & W by Timothy Hartnett, President; Defendant Lorillard by Herbert Kent, Chairman; Defendant Philip Morris by O. Parker McComas, President; Defendant Reynolds by Edward A. Darr, President; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc. by W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager; Stephano Brothers, Inc. by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson, President. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 39 ¶ 18 | The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years-that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 39 ¶ 19 | The "Frank Statement" in its entirety stated as follows:<br><br>RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings.<br><br>Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed.<br><br>At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C .Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Distinguished authorities point out: <br><br> 1. That medical research of recent years indicates many possible causes of lung cancer. <br><br> 2. That there is no agreement among the authorities regarding what the cause is. <br><br> 3. That there is no proof that cigarette smoking is one of the causes. <br><br> 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists. <br><br> We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business. <br> We believe the products we make are not injurious to health. <br> We always have and always will cooperate closely with those whose task it is to safeguard the public health. <br><br> For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence. <br><br> Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of disease is a matter of deep concern to us. <br><br> Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer: <br><br> 1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. <br><br> 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. | | | |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | 3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.<br><br>This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it. | | | |
| 40 ¶ 20 | The issuance of the "Frank Statement to Cigarette Smokers," was an effective public relations step. By promising the public that the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with an effective rationale for continuing to smoke. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **C. TIRC/CTR Tobacco Industry Research Committee/Council for Tobacco Research** | | | |
| 41 ¶ 21 | With the creation of TIRC in January 1954, the Defendants established a sophisticated public relations vehicle-based on the premise of conducting independent scientific research-to deny the harms of smoking and reassure the public. That essential strand of their long-range strategy was developed and implemented in 1953-54, and guided their activities for more than forty years. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 41 ¶ 22 | In response to an inquiry by Stanley Barnes, Assistant Attorney General, from the Justice Department of Justice on January 21, 1954, TIRC Chairman Paul Hahn sent a letter to Barnes dated January 26, 1954, enclosing a statement of the origin, purpose, and proposed functions of TIRC. The purposes and objectives of TIRC as recorded in the Statement Concerning the Origin and Purpose of TIRC were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 41 ¶ 23 | The statement of origin and purpose was signed in the name of TIRC by Chairman Paul Hahn, was ratified and adopted by TIRC, and attached as Exhibit A to the Bylaws of the Tobacco Industry Research Committee. All of the bylaws could be altered and repealed by a majority vote of TIRC's corporate members, except "Article I. Purposes and Objectives" which could only be altered with the unanimous consent of all the corporate members. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 41 ¶ 24 | The statement of origin and purpose stated that TIRC had engaged the public relations firm of Hill & Knowlton to assist TIRC in effectuating its purpose. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 41 ¶ 25 | The TIRC bylaws stated that each corporate member of the TIRC "shall from time to time appoint an individual to serve as the personal member of the Committee representing such corporate member" and that a majority of the personal members of TIRC would select such officers, agents, and employees as they deemed necessary, including a Chairman to serve for a term of one year | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | and until his successor is elected and qualified. | | | |
| 41 ¶ 26 | The first officers selected by TIRC members were: Paul Hahn of American as temporary Chairman; J. Whitney Peterson of United States Tobacco as Vice Chairman; Joseph Cullman of Benson & Hedges as Treasurer; and Wilson Thomas ("W.T.") Hoyt of Hill & Knowlton as Secretary. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 42 ¶ 27 | TIRC bylaws described the method of funding TIRC as follows:<br><br>Each of the cigarette manufacturing corporate members has pledged to the Committee for payment before or during 1954 an amount equal to 1/4 of a cent for each one thousand of tax-paid cigarettes produced by such company in 1953 as estimated by Harry M. Wootten and published under the date of January 15, 1954, and has pledged to the Committee for payment during 1954 an additional amount equal to one-half of the amount originally pledged. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 42 ¶ 28 | At its January 29, 1964 meeting, the TIRC Executive Committee agreed to change the name of the organization to the Council for Tobacco Research-U.S.A. ("CTR"). 93218985-8986 (U.S. 21116). The organization bylaws were amended February 1, 1964, to reflect the name change. Although the name changed, the purposes, objectives, and functions of the organization did not. According to the amended bylaws, the purposes and objectives of CTR remained the same, i.e. to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer and to make available to the public factual information on this subject.<br><br>Timothy Hartnett announced the organization name change in a March 1964 press release. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 42 ¶ 29 | Robert Heimann, Chairman and Chief Executive Officer of American, commented upon the TIRC's name change in a December 6, 1977 letter to Addison Yeaman, CTR's Chairman and President and formerly the General Counsel of B & W:<br><br>[W]e decided some years ago to rename T.I.R.C. "The Council for Tobacco Research" because "Tobacco Industry Research Committee" sounded too much like industry-directed, as distinct from independent, research. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 42 ¶ 30 | In 1971, CTR changed from an unincorporated association to a corporation pursuant to the laws of the State of New York. CTR's Certificate of Incorporation was filed with the Department of State of the State of New York on January 8, 1971. The bylaws of the newly-formed corporation were adopted at the first meeting of CTR's Board of Directors on January 13, 1971. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 42 ¶ 31 | Following incorporation, CTR was divided into two classes of members, Class A and Class B. Class A members were: (1) designated by the Board of Directors; (2) domestic persons who sold | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | cigarettes in the United States; and (3) manufacturers of their own brand of cigarettes. Class A members included American Tobacco, B & W, Lorillard, Philip Morris, Reynolds, and United States Tobacco. Class B members were: (1) designated by the Board of Directors; and (2) a person, corporation, association,  partnership not eligible for Class A membership but involved in the production, manufacturing, and distribution of cigarettes. Class B members included Bright Belt Warehouse Association, Burley Auction Warehouse Association, Burley Tobacco Growers, Imperial Tobacco, Tobacco Associates, and United States Tobacco. | | | |
| 43 ¶ 32 | In 1963, Clarence Cook Little and W.T. Hoyt invited Liggett to join TIRC in order to secure complete industry cooperation in dealing with the 1963 Surgeon General's Advisory Committee. Liggett declined the invitation but, in its response, assured its cooperation: "[T]he aims of all of us are the same and the path that we [Liggett] have followed has been similar to that of the Committee in may respects." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 43 ¶ 33 | Liggett became a member of CTR in 1964 and resigned in 1968, but continued to participate in CTR activities for decades. In its January 1968 resignation letter, Liggett's President stated "we will continue to participate in defraying the cost of [CTR] Special Projects sponsored by the Council after evaluation of each Project on an individual basis." Liggett made contributions to CTR's Special Projects fund from 1966 through 1975 and to CTR's Literature Retrieval Division from 1971 through 1983. Liggett was also asked to attend scientific meetings at CTR. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 43 ¶ 34 | Representatives of Liggett attended CTR meetings at which CTR Class A members, CTR Class B members, CTR officers, CTR public relations counsel, tobacco industry attorneys, and other representatives of cigarette manufacturers and  the Tobacco Institute were present. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 43 ¶ 35 | Although Defendant BATCo was not a member of TIRC or CTR, communication and contact between high level smoking and health research scientists at BATCo and scientists at TIRC/CTR was frequent and direct. BATCo scientists, including David G. Felton, Lionel C.F. Blackman, and R.E. Thornton, visited TIRC/CTR several times over the years. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 43 ¶ 36 | For example, in 1958, three British scientists, D.G.I. (David) Felton of BATCo, W.W. Reid of BATCo-Australia, and H.R. (Herbert) Bentley of Imperial Tobacco, visited the United States for four weeks and met with members of TIRC's Scientific Advisory Board, as well as with representatives of Defendants | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 43 ¶ 37 | In October 1979, David Felton of BATCo went on a month-long "fact-finding mission to a number of laboratories engaged in research relating to smoking and health" in the United States. Felton was accompanied by two lawyers for most of his visits, either Patrick Sirridge of Shook, Hardy & Bacon or Timothy Finnegan of Jacob & Medinger. Near the end of the trip, Felton met with CTR executives and employees, including Addison Yeaman, CTR President; William Gardner, CTR Scientific Director; W.T. Hoyt, CTR Executive Vice President; Robert Hockett, | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | CTR Research Director; Vincent Lisanti, CTR Associate Research Director; and David Stone and Donald Ford, members of CTR's scientific staff. Discussions included CTR contract research, nitrosamines, smoking and stress, and nicotine research. During his visit, Felton also met with Tobacco Institute representatives Horace Kornegay, President, and Marvin Kastenbaum, Director of Statistics. | | | |
| 44 ¶ 38 | Defendants met frequently to discuss issues facing the Enterprise. Beginning in 1954 and until 1970, representatives of member companies met regularly with TIRC/CTR staff. After CTR's incorporation, in 1971 and until 1999, the Enterprise met annually at CTR's meetings of members. At these meetings, representatives of the Enterprise discussed activities of CTR which furthered their goals such as Special Projects, the Literature Retrieval Division, contract research, public relations, the TIRC/CTR Scientific Advisory Board, and scientific conferences. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 44 ¶ 39 | Members of the Enterprise also convened regularly between 1971 and 1998 at CTR's Board of Directors meetings. CTR's Board of Directors was made up of representatives from the member companies. At these meetings the CTR Board of Directors discussed and passed resolutions regarding issues such as CTR's budget, the status of grants and contract research, the election of officers, payment of dues, and amendments to the bylaws. In addition to Board members, attendees at the meetings included other corporate offices and executives from the tobacco companies, Defendants' legal counsel and public relations counsel, and representatives from the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 45 ¶ 40 | While Philip Morris Companies was not a Class A member of CTR, Philip Morris Companies executives attended and participated in meetings of the CTR Board of Directors from 1985 to 1992. These executives included Thomas Ahrensfeld, Senior Vice President and General Counsel; Murray Bring, Senior Vice President and General Counsel; Hugh Cullman, Vice Chairman of the Board; Alexander Holtzman, Vice President and Associate General Counsel; John Murphy, President and CEO; and R. William Murray, President, CEO, and Vice Chairman of the Board. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 45 ¶ 41 | Lorraine Pollice, CTR Corporate Secretary and Treasurer for over twenty years, attended CTR Board of Directors Meetings and CTR Annual Member Meetings, and personally prepared minutes of those meetings. Although the minutes of meeting after meeting show participation by Altria representatives, Pollice expressed confusion and uncertainty about the precise corporate affiliation of particular participants. Her testimony is simply not credible since it was directly contrary to the documents themselves, which were never corrected by Pollice herself or by former CTR presidents or by outside counsel for CTR who reviewed and finalized the minutes. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 46 ¶ 42 | From 1954 through October 31, 1999, payments to CTR's General Fund from Defendants totaled $473,369,512.22; $31,928,239.26 from American; $67,666,080.25 from B & W; $40,747,457.89 from Lorillard; $189,506,678.86 from Philip Morris; $141,890,169.04 from Reynolds; and | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | $721,868.85 from Liggett. | | | |
| 46 ¶ 43 | From 1966 through October 31, 1990, payments to CTR's Special Projects fund (discussed at Section III(E)(2), *infra* ) totaled $18,270,623.65, which included: $29,665.00 from American; $2,571,345.40 from B & W; $144,254.75 from Liggett; $1,638,490.68 from Lorillard; $5,837,923.49 from Philip Morris; and $6,029,255.33 from Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 46 ¶ 44 | From 1971 through April 15, 1983, payments to CTR's Literature Retrieval Division (discussed at Section III(G), *infra* ) totaled $16,870,480.00, which included: $2,214,135.00 from American; $2,681,358.00 from B & W; $606,043.50 from Liggett; $811,840.50 from Lorillard; $4,813,415.50 from Philip Morris; and $5,743,687.50 from Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **1. Selection and Approval of TIRC's Scientific Advisory Board Members and Scientific Director** | | | |
| 46 ¶ 45 | The first formal meeting of TIRC was held on January 18, 1954. At this first formal meeting, a budget of $1,200,000 was approved; an agreement between TIRC and Hill & Knowlton was approved; the research program, calling for a Scientific Director and a Scientific Advisory Board ("SAB") was approved; a Law Committee was appointed; and the research directors of TIRC member companies were designated as the Industry Technical Committee ("ITC") (discussed further at Section III(F)(2), *infra* | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 46 ¶ 46 | The Law Committee was composed of Chairman George Whiteside of Chadbourne, Parke, Whiteside, Wolf & Brophy; John Vance Hewitt of Conboy, Hewitt, O'Brien & Boardman; Leighton Coleman of Davis, Polk, Wardwell, Sunderland & Kiendl; F.R. Wadlinger of Foulk, Porter & Wadlinger; and Freeman Daniels of Perkins, Daniels & Perkins. This committee drafted the TIRC bylaws. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 46 ¶ 47 | On January 7, 1954, the ITC held an informal meeting at which its members discussed qualifications for a Scientific Research Director for TIRC and efforts to find and retain a suitable scientist. The research directors were H.R. Hanmer of American; Irwin W. Tucker of B & W; H.B. Parmele of Lorillard; Robert N. DuPuis of Philip Morris; Grant Clarke of Reynolds; Hugh Cullman of Benson & Hedges; Clinton Baber of Larus & Brother; C.S. Stephano of Stephano Brothers; and Ward B. Bennett of United States Tobacco. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 46 ¶ 48 | At the January 7, 1954 meeting, the ITC members agreed that the TIRC Research Director should be a medical doctor, recognized in cancer research, and with experience in chemistry. The ITC nominated persons for the position of TIRC Research Director, and a subcommittee f the ITC, headed by Grant Clarke, Research Director for Reynolds, was appointed to process and screen the list of nominees. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 47 ¶ 49 | At the March 15, 1954 meeting of TIRC, Chairman Paul Hahn of American, outlined the difficulties encountered in obtaining a Scientific Research Director, and suggested that SAB | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | members be appointed before the Research Director so that they could then assist in selecting a Research Director.). The ITC was directed to draw up a suggested list of names for the SAB with the assistance of Hill & Knowlton. TIRC appointed a subcommittee to select scientists to be invited to become members of SAB. | | | |
| 47 ¶ 50 | The ITC, public relations counsel Hill & Knowlton, and the Law Committee were actively involved in searching for, interviewing, and selecting the scientists appointed to the first SAB. The ITC screened the candidates being considered for membership on the SAB. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 47 ¶ 51 | Letters were sent to nine scientists inviting them to become members of the SAB, and acceptances were eventually obtained from seven. Their specialities included pathology, pharmacology, surgery, and statistics. The two scientists who did not accept were connected with the National Cancer Institute and believed that, as government employees, they should not, as a matter of policy, accept the invitation. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 47 ¶ 52 | The first meeting of the SAB was held on April 26, 1954. The SAB members chose as their Chairman, Clarence Cook Little, a well-known cancer researcher and geneticist of high integrity and national repute. At the second meeting of the SAB, Little was selected as Scientific Director on a part-time basis with an assistant who would serve on a full-time basis. In November 1954, Robert Hockett was chosen as Associate Scientific Director. Little served as SAB Chairman from 1954 to 1957 and as TIRC/CTR Scientific Director from 1954 to 1971. Little PD, Following Little, the Scientific Directors were William Gardner (1973-1981), Sheldon Sommers (1981-1987), James Glenn (1988-1990), and Harmon McAllister (1991-1999). | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 47 ¶ 53 | In a November 27, 1963 memorandum, Clarence Cook Little described the Enterprise's criteria for selecting the SAB members. Little wrote:<br><br>In the selection of a Scientific Advisory Board and in the acceptance of the nomination by that Board of a Scientific Director, it was clearly shown that the attitude of the TIRC was to pick scientists interested broadly in the origin and nature of the *diseases* implicated and in the evaluation of smoking as a *possible* factor, not as a *proven* one. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 48 ¶ 54 | Clarence Cook Little's personal commitments and assumptions about cancer causality made him an ideal proponent of the industry's goal of maintaining a "controversy" rather than scientifically resolving the questions regarding smoking and health. Little explained at the press conference announcing his appointment that: "I am ultraconservative about cause and effect relationships." However, at that same press conference, Little made many claims about the health benefits of cigarette use:<br><br>It is very well-known, for example, that tobacco has relaxed a great many people. It is a very good | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | therapy for a great many nervous people. | | | |
| 48 ¶ 55 | Little repeatedly centered attention on the so-called "constitutional hypothesis"; other environmental risks; and the need for more research into the basic etiology of the diseases associated with smoking. He believed that "the causation of lung cancer was not known," that it was a complicated and unsolved problem with many factors involved, such as nutrition, heredity, the mental type of the individual, present or former or existing infection, air pollution, and radiation. This statement of his beliefs became known as the "constitutional hypothesis." He argued that "no positive evidence has been advanced by anybody who believes in the tobacco guilt theory that has made me change my mind." Under Little's leadership, the SAB funded studies on vitamins, influenza, twins, and viruses, but not on carcinogenic agents in tobacco smoke because: "we believe that no such agents have been found which are carcinogenic to men,"… "[w]e don't believe they are there and a will-of-the-wisp hunt for something that hasn't yet been shown is a waste of money,"… [t]here are no carcinogenic agents in tobacco tar that have been proven to cause cancer in man.... And I say again that to transfer from the skin of a mouse to the lung of a man is not science." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 48 ¶ 56 | The SAB met regularly from 1954 until at least 1997 to review, approve, and renew grant applications and contracts. Those who attended the SAB meetings, in addition to SAB members, were the ITC Chairman, TIRC/CTR staff members, public relations counsel for TIRC/CTR, and (at times) Defendants' attorneys and scientific guests. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 49 ¶ 57 | Many meetings of the SAB had no written record. According to a confidential report on the December 9, 1981 meeting of the SAB, the following policy regarding meetings was reaffirmed: "to conduct informal 'in house' conferences on specific subjects 'off the record' held without minutes or publication, but not to sponsor open meetings with a resultant publication." This policy was in effect at least ten years prior to the 1981 meeting and continued into the late 1990s. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 49 ¶ 58 | Contrary to Defendants' assertions that the members of the SAB were disinterested parties who received no monetary compensation from the tobacco companies or from TIRC/CTR, sixteen members of the SAB (out of forty-three) were awarded over $5 million in grants-in-aid funding between 1954 and 1991. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 49 ¶ 59 | Defendants, through the CTR's Board of Directors, exercised control over the CTR research grant program throughout its existence by approving the total amount of funding for the grant program and, after the first few years, by selecting the CTR Scientific Directors and their staff. Zahn PD, In fact, Helmut Wakeham of Philip Morris complained to David Felton, a BATCo scientist, that finding a Scientific Director to succeed Little after he resigned "was in the hands of the lawyers committee" and the Tobacco Institute without consultation with CTR or company scientists. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **2. Research Activities of TIRC/CTR** | | | |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 49 ¶ 60 | TIRC focused its energies and resources in two areas-public relations and scientific research. First, it served as a sophisticated public relations unit for Defendants, especially in relation to growing public concern about the risks of smoking, by repeatedly attacking scientific studies that demonstrated the harms of cigarette smoke and insisting on the notion of an "open question" regarding cigarette smoking and health. Second, it developed a scientific research program that focused on basic processes of disease rather than evaluating the risks and harms associated with smoking-the very subject that the industry had pledged to pursue through TIRC. From the outset, the dual functions of TIRC were intertwined, with the scientific program of TIRC always subservient to the goals of public relations. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 49 ¶ 61 | Defendants' denials of the link between smoking and disease kept away many excellent researchers. In an October 1969 memorandum to Ross R. Millhiser of Philip Morris, Helmut Wakeham, Vice President and Director of Research for Philip Morris, expressed concern that the fforts of the tobacco industry through CTR and the American Medical Association have failed to involve the best investigators. At the beginning of our support of smoking and health research, this failure may have been connected with our consistent denial of the statistics and our continued assertion that there is nothing to the cigarette causation hypothesis. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 50 ¶ 62 | A year later, Wakeham again discussed CTR's strategy of frequent and public denials, in a December 1970 memorandum to Joseph Cullman, Chairman of Philip Morris and Chairman of the Executive Committee of the Tobacco Institute:

It has been stated that CTR is a program to find out the "truth about smoking and health." What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as "truth." Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes cancer. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 50 ¶ 63 | Defendants, through TIRC/CTR and its public relations strategy, were especially effective in identifying and supporting skeptics of the link between smoking and disease. Skeptics were invited to join the Scientific Advisory Board of the TIRC; they and their home institutions were provided with research grants from the TIRC. Their views were effectively solicited and broadcast widely by TIRC and the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 50 ¶ 64 | TIRC/CTR funded research through a variety of mechanisms: grants, contracts, CTR Special Staff Services, and CTR Special Projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 50 ¶ 65 | Virtually none of the research funded by TIRC/CTR centered on immediate questions relating to carcinogenesis and tobacco that could resolve the question of the harms brought about by cigarette smoking. Although some TIRC/CTR-funded researchers explored alternative hypotheses, TIRC/CTR did not typically pursue direct research on cigarettes and disease. Rather | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | than addressing the constituents in tobacco smoke and their demonstrated effect on the human body, TIRC/CTR directed the majority of its resources to alternative theories of the origins of cancer centering on genetic factors and environmental risks. The major thrust of TIRC/CTR was to emphasize that human cancers were complex processes, difficult to study and difficult to understand, and to focus on the "need for more research." Although research funded by the SAB was irrelevant to the immediate questions associated with tobacco smoking and health, it did "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.' | | | |
| 50 ¶ 66 | Two of CTR's Scientific Directors, Harmon McAllister and Sheldon Sommers, confirmed that the basic research funded by CTR was not immediately relevant to smoking and health. McAllister stated that they funded "basic medical research on the etiology of diseases that have been epidemiologically linked to smoking. That's our global [sic]-that's the way we operate. Those are the sorts of applications we entertain." Sommers stated that a CTR grant application's relevance to cigarette smoking and health  was not the primary factor the SAB used in rating grant applications, but that "[s]cientific merit was of equal or of greater importance than relevance." Sommers was an SAB member from 1967 to 1989, SAB Chairman from 1970 to 1980, CTR Research Director from 1969 to 1972, and CTR Scientific Director from 1981 to 1987. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 51 ¶ 67 | During a four-week visit to the United States in 1958, the three British scientists who met with representatives of TIRC and TIRC's SAB, as well as representatives of American, Liggett, and Philip Morris, reported that Liggett & Meyers stayed out of TIRC originally because they doubted the sincerity of TIRC's motives and believed that the organization was too unwieldy to work efficiently. They remain convinced that their misgivings were justified. In their opinion TIRC has done little if anything constructive, the constantly reiterated 'not proven' statements in the face of mounting contrary evidence has thoroughly discredited TIRC, and the SAB of TIRC is supporting almost without exception projects which are not related directly to smoking and lung cancer. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 51 ¶ 68 | After another visit to the United States in the fall of 1964, two different British scientists wrote in their report: "As we know, CTR supports only fundamental research of little relevance to present day problems." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 51 ¶ 69 | The Defendants knew that TIRC/CTR was funding research concerning cancer as a general issue, rather than the relationship of smoking to cancer. In January 1968, Addison Yeaman, B & W Vice President and General Counsel, wrote:<br><br>Review of SAB's current grants indicates that a very sizable number of them are for projects in what might be called 'basic research' without specific orientation to the problem of the relationship of the use of tobacco to human health. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 51 ¶ 70 | In addition, Defendants appreciated the delays associated with the basic research approach. Janet Brown, outside counsel for American, explained CTR's strategy of undertaking only basic research funding, as opposed to funding questions directly related to tobacco and health to Cy Hetsko, Vice President and General Counsel for American, and Addison Yeaman, Vice President and General Counsel for B & W, at a January 1968 meeting. The rationale was that basic research kept alive the Enterprise's open question argument on causation. Yeaman summarized Brown's position as:<br><br>First, we maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco, and<br><br>Secondly, that the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 51 ¶ 71 | 7Geoffrey F. Todd, Executive Director of the Tobacco Research Council, a British organization equivalent to CTR (discussed further at Section III(I)(3), *infra* ) made several visits to the United States, during which time he met with Defendants' representatives, attorneys, and scientists. After his 1973 trip, Todd wrote: "It was difficult to avoid the sad conclusion that C.T.R. has become a backwater of little significance in the world of smoking and health." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 52 ¶ 72 | 72. Throughout the existence of TIRC/CTR, representatives of the member companies and their attorneys were influential in its activities and research. Beginning in November 1971, CTR staff met semiannually with representatives of the member companies, usually the research directors and general counsel. The all-day meetings were designed to keep members of the Enterprise aware of the status of research funded by Defendants through TIRC/CTR. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 52 ¶ 73 | The Enterprise, through TIRC/CTR, sought out certain researchers and/or areas of research and solicited grant applications. Clarence Cook Little admitted that, seeing a line of work that showed promise, TIRC/CTR approached researchers and asked them, "Are any of you willing to try this if we provide your institution with money and you with help?" | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 52 ¶ 74 | Sheldon Sommers, CTR Scientific Director, stated that CTR frequently initiated research and suggested particular research for which it would make grants available. He said, "Yes. I go out all the time looking for opportunities and new ideas and investigators in various fields of biomedicine." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 52 ¶ 75 | One of the reasons that Paul Kotin decided to resign from the SAB was that he was disturbed by "the going out and requesting the submission of grants, of applications for grants. And I felt this circumvented the original foundation for the SAB, at least for my membership in the SAB."Kotin | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | PD, Kotin had served on the TIRC SAB from 1954 to 1965. Another reason for Kotin's resignation was reported by visitors from the United Kingdom's Tobacco Research Council in October 1964:<br><br>The recent [CTR] Annual Report by Dr. Little was severely criticised by the U.S. Surgeon General at a Washington press conference. Dr. Kotin was also highly critical of it and talks privately of resigning from the S.A.B. if another report of the same nature is going to be published next year. | | | |
| 52 ¶ 76 | Similarly, John Craighead, who was an SAB member for approximately one year, was also disturbed by the nature of the CTR research program. Craighead resigned from the SAB in part because he felt that the research did not address the fundamental issues related to tobacco and because of the involvement of CTR Chairman Addison Yeaman into the direction of the CTR research program. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 53 ¶ 77 | Sheldon Sommers acknowledged the influence and control wielded by CTR Chairmen and Presidents over the TIRC/CTR research program. All TIRC/CTR Presidents were from tobacco companies, and, until 1991, each and every TIRC/CTR Chairman was a retired tobacco company executive. McAllister WD, 18:15-16. In September 1981, Sommers wrote that "new Chairman Hobbs [from RJR] is more interested in basic research so relevance to smoking and health is no longer a crucial matter in funding." Sommers also testified that, after Addison Yeaman (from B & W) became CTR President and CEO, CTR began initiating more contracts because Yeaman believed that "the program was too diffuse and should be 'targeted.' | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 53 ¶ 78 | Following CTR's January 1975 annual meeting, the CTR staff was given more control over the grant and contract application process. According to the meeting minutes:<br><br>The Chairman stated that in the continued effort to bring maximum information to the Scientific Advisory Board preliminary investigation is being made by the Council's staff.... Following this, the proposals are then submitted for study by a subcommittee of the Board [SAB].... | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **3. Public Relations Activities of TIRC/CTR** | | | |
| 53 ¶ 79 | In December 1953, Timothy Hartnett, President of B & W, summarized the crisis of the industry in the following terms:<br><br>But cancer research, while certainly getting our support, can be only half an answer.... The other side of the coin is public relations ... [which] is basically a selling tool and the most astute selling may well be needed to get the industry out of this hole.... It isn't exaggeration that no public relations expert has ever been handed so real and yet so delicate a multi-million dollar problem.... | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Finally, one of the roughest hurdles which must be anticipated is how to handle significantly negative research results, if, as, and when they develop. | | | |
| 53 ¶ 80 | From the outset, the dual functions of TIRC-public relations and scientific research -were intertwined. Ernest Pepples, in an internal B & W letter dated April 4, 1978, acknowledged:<br><br>Originally, CTR was organized as a public relations effort. The industry told the world CTR would look at the diseases which were being associated with smoking. There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 53 ¶ 81 | One name initially proposed for TIRC/CTR, the "Tobacco Industry Committee for Public Information," reflected its public relations purpose. However, John Hill of the public relations firm Hill & Knowlton expressed skepticism that a public relations strategy that simply argued that the harms of cigarette smoking were "unproven" would succeed. Such a campaign might appear self-interested in the face of the serious health concerns being raised. As a result, Hill suggested that the industry should sponsor new research and use<br><br>[t]he word "research" ... in the name of the Committee to establish the fact that the group will carry on or sponsor fundamental scientific research and will not be solely an information agency. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 54 ¶ 82 | A white paper titled "A Scientific Perspective on the Cigarette Controversy" was one of the first public relations projects undertaken by Hill & Knowlton on behalf of its new client. Hill & Knowlton/TIRC undertook the project because Defendants felt it necessary and urgent to present to leaders of public opinion the fact that there was no unanimity among scientists regarding the charges against cigarettes. The twenty-page booklet consisted of published quotations from some three dozen scientists and researchers who denied that there was any proof that linked smoking and lung cancer or who questioned the validity of statistical methods and the conclusions drawn from recent laboratory experiments with mice. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 54 ¶ 83 | 205,000 copies of "A Scientific Perspective on the Cigarette Controversy" were released on April 14, 1954. The booklet was sent to 176,800 doctors, as well as to deans of medical and dental colleges. The booklet with a press release went to a press distribution of 15,000, including: editors of daily and weekly newspapers, consumer magazines, veterans magazines, and medical and dental journals; news syndicate managers; business editors; editorial and science writers; radio and television commentators; news columnists; and Members of Congress. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 54 ¶ 84 | In the June 1954 "Public Relations Report and Recommendations for Tobacco Industry Research Committee," Hill & Knowlton described the success of its public relations efforts for TIRC: | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Committee headquarters is steadily gaining recognition as a source of authoritative information on the subject of tobacco and health. The result is that news and magazine writers, columnists and commentators are turning to the Committee and its public relations counsel for more and more information. | | | |
| 54 ¶ 85 | Timothy Hartnett became the full-time chairman of TIRC on July 1, 1954, the day after his retirement as President of B & W, and continued to advance the Defendants' "open question" position in that role. In the press release generated by Hill & Knowlton announcing his appointment, Hartnett repeated the two commitments that TIRC had made in its Statement of Purpose and in its bylaws, i.e., (1) to carry on "comprehensive and objective scientific and statistical research to establish the facts," and (2) "report them to the public." After stating that the "tobacco industry is determined to find the answers to the public's questions about smoking and health," Hartnett continued:<br><br>It is an obligation of the Tobacco Industry Research Committee at this time to remind the public of [some] essential points: (1) There is no conclusive scientific proof of a link between smoking and cancer; (2) Medical research points to many possible causes of cancer; ... (5) The millions of people who derive pleasure and satisfaction from smoking can be reassured that every scientific means will be used to get all the facts as soon as possible. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 55 ¶ 86 | Wilson Hoyt, who was initially a Hill & Knowlton employee with no scientific background whatsoever, held positions as TIRC/CTR Executive Secretary, Executive Director, Executive Vice President, and President in his three decades with TIRC/CTR. In his 1955 administrative reports as TIRC Executive Secretary and Hill & Knowlton executive, Hoyt affirmed the intertwined functions of public relations and research in TIRC's program. In his April 1955 report, he wrote:<br><br>Essentially, the major purposes of the TIRC are Research and Public Relations. Our job is to maintain a balance between the two, and to continue to build soundly so that at all times Research and Public Relations complement each other. In that way we intend to assume the mantle of leadership and, ultimately, to create a condition where the public will look to the TIRC for answers rather than to others.<br><br>In his January 1955 report, he wrote, "Within this framework we have furthered and coordinated the two major purposes for which the Committee was organized namely, the public relations phase and the research program." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 55 ¶ 87 | Despite Defendants' assertion that TIRC/CTR was solely an organization that funded independent | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | research for the purpose of finding answers to smoking and health question, it served to a great extent as an effective public relations tool and information conduit. In a July 1963 memorandum, Addison Yeaman, General Counsel for B & W, wrote:<br><br>The TIRC cannot, in my opinion, provide the vehicle for such research. It was conceived as a public relations gesture and (however undefiled the Scientific Advisory Board and its grants may be) it has functioned as a public relations operation. | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 55 ¶ 88 | Alexander Spears, Lorillard's Director of Research, in 1974 echoed the sentiments of Addison Yeaman when he explained:<br><br>Historically, the joint industry funded smoking and health research programs have not been selected against specific scientific goals, but rather for various purposes such as public relations, political relations, position for litigation, etc. Thus, it seems obvious that reviews of such programs for scientific relevance and merit in the smoking and health field are not likely to produce high ratings. In general, these programs have provided some buffer to the public and political attack of the industry, as well as background for litigious strategy. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 55 ¶ 89 | In a 1975 speech to CTR members, Addison Yeaman gave his observations on the Council, noting, "It is my sober judgement that CTR, as it now operates is the greatest public relations *asset* you have in the problem of tobacco and health." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **4. Publications and Public Statements of TIRC/CTR**<br>**a. TIRC/CTR Annual Reports** | | | |
| 56 ¶ 90 | TIRC/CTR published and issued Annual Reports from 1956 through 1997. Copies of the TIRC/CTR Annual Reports were sent to libraries, colleges and universities, deans of medical schools, science and medical editors and writers for the popular press, CTR grant recipients, and members of professional medical societies. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 56 ¶ 91 | The TIRC/CTR Annual Reports routinely included, in varying formats: abstracts of articles published by researchers funded by TIRC/CTR grants; brief statements regarding organization and policy; lists of SAB members and their affiliations; lists of current and former grantees; lists of ongoing and completed projects; and research summaries, commentaries, rationales, and observations. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 56 ¶ 92 | From 1956 until 1993, TIRC/CTR public relations counsel Leonard Zahn was in charge of preparing and compiling the Annual Reports, making distribution recommendations, and drafting the Introduction section for some of them. In a December 1972 memo attached to his proposed outline for the next report, Zahn acknowledged that | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | [t]he research section of the CTR [Annual] Report is based on published articles by grantees and, unfortunately, not much directly related to tobacco appeared in the last 18 months. | | | |
| 57 ¶ 93 | The commentary in the Annual Reports uniformly challenged the hypothesis that smoking was linked to lung cancer and emphasized that data regarding smoking and health were controversial, contradictory, and inconclusive. For example: <br><br> • 1957 Report of the Scientific Director ("[S]ound medical and experimental knowledge of tobacco use is relatively limited, at times contradictory, and often conjectural rather than factual.... There is not known today any simple or quick way to answer the question of whether any one factor has a role in causing human lung cancer... no one has established that cigarette smoke, or any one of its known constituents, is cancer causing to man.... Members of the [TIRC SAB] Board take the general position that definitive conclusions or predictions of individual risks are unwarranted by the present imperfect state of knowledge in the complex field of lung cancer causation," and describing cancer as "this so-called constitutional disease."); <br><br> • 1958 Report of the Scientific Director ("[A] problem may well be obscured, and its solution delayed, by the soothing acceptance of an oversimplified and immature [tobacco theory] hypothesis.... The proponents of the tobacco theory have generated increasingly intensive and extensive propaganda.... As a result, a non-scientific atmosphere, conducive to prematurity, unbalance, and inadequacy of public judgement, has pervaded the whole field.... The prohibition concept discounts or ignores all considerations of smoking benefits in terms of pleasure, relaxation, relief of tension or other functions."); <br><br> • 1961 Report of the Scientific Director ("[T]hose who most actively promote this [smoking-lung cancer] hypothesis have consistently ignored or, at best, have minimized the fact that numerous directly relevant experiments either have failed to support the hypothesis or have provided only weak or uncertain data."); <br><br> • 1963-64 Report of the Scientific Director ("After 10 years the fact remains that knowledge is insufficient either to provide adequate proof of any hypothesis or to define the basic mechanisms of health and disease with which we are concerned."); <br><br> • 1964-65 Report of the Scientific Director ("[E]vidence to support the thesis that cigarettes exercise a direct carcinogenic effect on man has not been forthcoming."); <br><br> • 1978 Report of the Council for Tobacco Research-U.S.A., Inc. ("[T]he complex etiology of | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | these constitutional diseases [cancer, heart disease, chronic pulmonary ailments] remains unraveled. These diseases have been associated statistically with smoking, but such associations are not proof of cause and effect."). | | | |
| 58 ¶ 94 | For more than two decades, the commentaries in the Annual Reports also discounted the conclusions reached by the public health community and the Surgeon General linking smoking and disease and simply repeated the "open question" position of the tobacco industry. 5157092979340 (U.S. 20866); *see* Section (V)(A), *infra*. Robert Hockett, Associate Scientific Director at the Council for Tobacco Research-USA, which evaluated the content of the Annual Reports for the industry wrote: "The aim of [Little's] summations, much too apparently, seems to be to protect smoking." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 58 ¶ 95 | A June 20, 1984 memorandum from Wendell Stone, attorney at Shook, Hardy & Bacon, during the *Cipollone* litigation, acknowledged the bias of CTR/TIRC's annual reports. Stone commented that the reports, especially the early ones, "contained lengthy commentary ... which read much like industry position papers." Stone also concluded:<br><br>The TIRC/CTR commentary on research did not always seem to conform fully to the positions taken or implied in the abstract. For example, with respect to the Leuchtenberger inhalation research, the abstracts in the annual reports tend to give the impression that these researchers did in fact have a good animal model of lung cancer production by smoke inhalation. However, commentary on this research in the front material to the reports tended to argue away the relevance of the results. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **b. TIRC/CTR Newsletters** | | | |
| 58 ¶ 96 | From October 1957 to at least 1968, first TIRC and then the Tobacco Institute published a newsletter variously named Tobacco and Health, Research Reports on Tobacco and Health, and Reports on Tobacco and Health Research. The newsletter was published two or three times a year; contained articles that disputed the relationship between smoking and disease; criticized research supporting such a relationship; and emphasized that differing opinions existed regarding tobacco use and health. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 59 ¶ 97 | Initially, TIRC was to publish the Tobacco and Health newsletter. This provoked a strong reaction from members of the Scientific Advisory Board who received advance copies of the first issue. In a letter to SAB Chairman Clarence Little, SAB member McKeen Cattell classified the new publication as "obviously propaganda material" and expressed serious concern about the effect it would have on the SAB's program. Julius Comroe, another SAB member, advised that the SAB and TIRC should not be identified with the Tobacco and Health publication. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 59 ¶ 98 | In response to these concerns, the Tobacco Information Committee, a subcommittee of TIRC, was | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | formed in late 1957, from what was previously known as the TIRC Public Relations Committee. The committee was comprised of public relations employees from the companies and public relations counsel representing the companies, and one of its principal functions was to publish the Tobacco and Health newsletter. The first two issues of the Tobacco and Health newsletter were issued under the name of the Tobacco Information Committee and financed from the TIRC budget. | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 59 ¶ 99 | In 1958, after the first two issues were published, the Tobacco Institute assumed responsibility for publishing the Tobacco and Health newsletter on behalf of Defendants. Even when published by the Tobacco Institute, there was close coordination with TIRC, and most editorial material derived from TIRC annual reports, the TIRC library, and other materials available through TIRC. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 59 ¶ 100 | A 1968 Tobacco and Health Research procedural memorandum from Hill & Knowlton to William Kloepfer, Tobacco Institute Vice President, admitted that "[m]ost papers used in TH & R come from the Council for Tobacco Research Library through advance distribution of Ken Austin of CTR. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 59 ¶ 101 | The Tobacco and Health newsletter was a public relations vehicle used to influence health professionals. Its primary purpose was to present directly to the medical and scientific communities research material related to tobacco and health-material that frequently did not deal with tobacco but suggested other causes of cancer, such as viruses, air pollution, and previous chest ailments. Its secondary purpose was to attract the attention of the lay press to studies that challenged the validity of research linking cancer to cigarette use. A news release with each issue attracted press attention; one or both of the major wire services usually carried stories. In order to combat the effects of the Tobacco and Health newsletter, four non-governmental health agencies began issuing a Medical Bulletin on Tobacco in 1962. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 60 ¶ 102 | In 1962, circulation of the newsletter reached 520,000, with about 315,000 copies going to doctors, dentists, and medical schools, and the rest going to writers and editors, public opinion leaders, all members of Congress, brokerage houses, tobacco groups, farm and supplier groups, industry groups, and member companies. Publication of research results helped make news and was coordinated with other publicity efforts. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 60 ¶ 103 | In a procedural memorandum, Hill & Knowlton delineated specific criteria for selecting reports to be included in Tobacco and Health. The memorandum stated that research did not have to always deal specifically with tobacco; for example, research which suggested that other factors may cause diseases associated with smoking should be included; "[t]he most important type of story is that which casts doubt on the cause and effect theory of disease and smoking." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **b. TIRC/CTR Press Releases and Other Public Statements** | | | |
| 60 ¶ 104 | TIRC/CTR, with the assistance of its public relations counsel Hill & Knowlton, and later Leonard | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Zahn, was remarkably effective in making certain that the Defendants' position of "no proof" and the need for "more research" reached the national media, and thus the public. Typically, news accounts of new medical findings would be accompanied by a press release or statement from TIRC/CTR insisting that "nothing new" had been found and the studies were "merely" statistical. Moreover, TIRC/CTR was effective in mobilizing a relatively small group of skeptics and amplifying their views as if they were equal in number and significance to an emerging scientific consensus about the harms of smoking (1958 year-end Hill & Knowlton/TIRC press release in which TIRC Chairman Timothy Hartnett asserts that "scientists of high professional standing have produced additional evidence and opinions that challenge the validity of broad charges against tobacco use"); (TIRC's Clarence Cook Little's November 1959 response to Surgeon General Burney's statement that begins, "Today, more than ever before, scientific evidence is accumulating that conflicts with or fails to support the tobacco-smoking theories of lung cancer."); (1960 Hill & Knowlton/TIRC press release quoting Little and titled "New Evidence Shows Complexities of Lung Cancer, Scientist [Little] Says"); (1970 Leonard Zahn/CTR press release quoting Little that begins, "A considerable number of studies by independent scientists raise questions as to whether smoking has actually been shown to be a health hazard"); (1969 CTR press release quoting Little that begins, "The scientist [Little] who has been associated with more research in tobacco and health than any other person declared today that 'there is no demonstrated causal relationship between smoking and any disease. The gaps in knowledge are so great[.]' "); (1970 Leonard Zahn/CTR press release quoting Little on genetic and environmental factor theories). | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 61 ¶ 105 | The relationship between TIRC/CTR and Hill & Knowlton remained close for many years. Because TIRC had no headquarters and no staff when it was formed, Hill & Knowlton provided a working staff and temporary office space and assigned one of its experienced executives, Wilson Hoyt, to serve as Executive Secretary for the TIRC. In early 1956, the TIRC Executive Committee approved the relocation of TIRC's offices to the building where Hill & Knowlton's offices were located. At their January 29, 1964 meeting, the TIRC Executive Committee agreed to immediately transfer seven Hill & Knowlton employees, including Hoyt, to TIRC. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 61 ¶ 106 | Even after the Tobacco Institute (discussed further *infra* at Section III(D)) was created in 1958, TIRC/CTR continued its public relations activities with the assistance of public relations counsel Hill & Knowlton, and later Leonard Zahn. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 61 ¶ 107 | As noted earlier, Hill & Knowlton gave advice and direction to the leaders of the Enterprise even before its actual formation in December of 1953. Thereafter, it provided public relations services for TIRC/CTR from 1954 until 1964. It provided the same services for the Tobacco Institute from 1958 until 1968, in 1979, and again from 1987 through 1991. Leonard Zahn was an integral part of TIRC/CTR's public relations program -first as an employee of Hill & Knowlton assigned to the | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | TIRC account, and later, on his own, as primary public relations counsel for CTR. Leonard Zahn was hired by Hill & Knowlton in 1955 to work on the TIRC account. In 1969, Zahn resigned from Hill & Knowlton; formed his own company, Leonard Zahn & Associates; and was appointed CTR's public relations counsel. Zahn & Associates served as CTR public relations counsel through 1993 and was paid $127,053 by CTR that last year. During his decades with TIRC/CTR, Zahn attended and reported on scientific conferences, attended SAB meetings, organized press conferences, served as liaison between CTR and the Tobacco Institute, prepared articles, and drafted press releases and public statements as well as the annual reports for CTR. | | | |
| | **D. Tobacco Institute**<br>**1. Formation of the Tobacco Institute** | | | |
| 62 ¶ 108 | As time passed, TIRC faced increasing difficulty reconciling its dual functions of public relations and research. On the one hand some SAB members had always wanted a more distinct separation between the SAB and TIRC. As early as October 1954, the SAB recognized the need for a more affirmative informational approach by the TIRC, and expressed the feeling that it would be in order for the Committee [TIRC] to take more positive action on its own through Mr. Hartnett as chairman without, at the same time, drawing the Advisory Board or the research program into such utterances. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 62 ¶ 109 | In addition, there was growing concern about TIRC making partisan arguments on behalf of the industry while it was sponsoring research that the industry wanted to be perceived as objective. In 1958, a SAB member wrote a letter to those attending the February SAB meeting objecting to public statements which had been made by Clarence Cook Little, contending that when Little spoke as Scientific Director of the TIRC, the inference was that Little was also speaking for the SAB. The dissenting SAB member indicated that, unless a more distinct separation could be established between the SAB and TIRC, he felt he could not continue to serve on the SAB. Two other SAB members joined in this statement. According to SAB member Paul Kotin, members of the TIRC SAB made quite clear "the inadvisability and downright unacceptability" of the SAB or its members being quoted in TIRC press releases and public statements concerning the smoking and health controversy. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 62 ¶ 110 | On the other hand, some members of the Enterprise wanted an organization that would take a much more aggressive public relations stance to counter arguments linking smoking and disease and to oppose proposed labeling legislation facing the industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 62 ¶ 111 | Defendants finally decided to create a separate non-profit corporation, the Tobacco Institute ("TI"), which would be responsible for more aggressive public relations and political lobbying and would not have the limitations associated with TIRC. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 62 ¶ 112 | The creation of a separate organization was felt to be a way of keeping Little inviolate and | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | untainted in his ivory tower while giving a new group a little more freedom of action in the public relations field.... [T]he legal people were especially interested in this argument because they thought of Dr. Little as a potential witness and were not anxious to have him making public statements which could compromise his usefulness to them in court. | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 63 ¶ 113 | In January 1958, twelve manufacturers of cigarettes, smoking and chewing tobacco, and snuff jointly announced the formation of the Tobacco Institute. The companies forming the Tobacco Institute included Defendants American, B & W, Liggett, Lorillard, Philip Morris, and Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 63 ¶ 114 | The Tobacco Institute was incorporated in New York State, and the Tobacco Institute bylaws were adopted at the meeting of the incorporators and members held on January 29, 1958. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 63 ¶ 115 | The Tobacco Institute was a trade association. According to its 1958 Certificate of Incorporation, the Tobacco Institute was formed to promote a better understanding by the public of the tobacco industry and its place in the national economy; to cooperate with governmental agencies and public officials with reference to the tobacco industry; to collect and disseminate information relating to the use of tobacco; to collect and disseminate scientific and medical material relating to tobacco; to collect and disseminate information relating to the tobacco industry published or released by any governmental agency, federal or state, or derived from other sources independent of the industry; to collect and disseminate information relating to legislative and administrative developments, federal or state, affecting the tobacco industry; to promote public good will. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 63 ¶ 116 | The Tobacco Institute had a Board of Directors "composed in a fashion similar to that of the Council for Tobacco Research" and an Executive Committee consisting of the chief executive officers of the major tobacco companies. That Committee, "[a]s a practical matter ... for many years" was run by "a committee of four lawyers, one from each of the major member tobacco companies." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 63 ¶ 117 | The Tobacco Institute Board of Directors held its first meeting on January 30, 1958. Former Congressman James Richards of South Carolina was elected President and Executive Director; Joseph F. Cullman, III, President of Philip Morris, was elected Treasurer; and Chandler Kibbe, Vice President of Philip Morris, was elected Assistant Treasurer. Among those elected to membership at this meeting were American, Liggett, Lorillard, Philip Morris, and Reynolds. An Executive Committee was established, and its members were Cullman; Benjamin Few, President of Liggett; Bowman Gray, Chairman of Reynolds; Lewis Gruber, President and Chairman of Lorillard; and J. Whitney Peterson, President of United States Tobacco. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 63 ¶ 118 | At the first meeting of its Board of Directors, Hill & Knowlton was appointed Tobacco Institute public relations counsel, and Covington & Burling was appointed Tobacco Institute legal counsel. Both were to play a major role in setting the priorities for and guiding the future operation of the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 63 ¶ 119 | I n addition to Covington & Burling, the Tobacco Institute also had a relationship with Shook, Hardy & Bacon. A May 1982 letter from William Shinn of Shook, Hardy & Bacon, to Robert Sachs, Counsel for B & W, and Arthur Stevens, General Counsel for Lorillard, described this relationship. Shinn divided the law firm's activities into four categories: Tobacco Institute Clearance Procedures, Tobacco Institute Committees, Science and Research, and General. Clearance procedures were defined as a number of standard operating procedures in examining Tobacco Institute materials with potential smoking and health overtones. Tobacco Institute Committee work involved attending meetings of the Committee of Counsel, Communications Committee, and Executive Committee. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 64 ¶ 120 | Members of the Enterprise convened regularly between 1958 and 1998 at the meetings of the Tobacco Institute's Board of Directors. At these meetings, representatives from the Enterprise discussed and passed resolutions regarding the Tobacco Institute's budget, programs and projects of the various divisions, election of officers, payment of dues, and amendments to the bylaws. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 64 ¶ 121 | Although the membership fluctuated during the existence of the Tobacco Institute, all Defendants (except BATCo, CTR, and the Tobacco Institute itself) created, agreed to fund, and/or did jointly fund the Tobacco Institute over the years. TIFL0020285-0311 at 0297-0305 (JD 080429). From 1958 through 1999, payments to the Tobacco Institute from Defendants amounted to more than $618,432,000, including: $161,505,876 from Philip Morris; $1,848,530 from Liggett; $110,298,387 from Reynolds; $29,195,668 from Lorillard; $15,933,769 from B & W; and $19,146,216 from American. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 64 ¶ 122 | Lorillard was not a member of the Tobacco Institute from 1968 to 1971. However, even during its non-membership, Lorillard it continued to "receive the releases and other information issued by the Institute," attended meetings of the lawyers of all the major companies at the Institute's offices, and was "kept apprised of the Institute's activities." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 64 ¶ 123 | Executives of Defendant Philip Morris Companies attended and participated in meetings of the Tobacco Institute Board of Directors and the Executive Committee of the Board of Directors. These executives included Thomas Ahrensfeld, Senior Vice President and General Counsel; David Greenberg, Vice President; Kathleen Linehan, Vice President Government Affairs; Howard Liebengood, Vice President; and Steve Parrish, Senior Vice President. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 65 ¶ 124 | The Tobacco Institute's amended bylaws created two classes of membership. Class A members were the cigarette manufacturers (those members who as of the date of any election of directors would be subject to additional dues assessment per Article III, Section 1 of the bylaws). Class A members would be entitled to elect twice the number of directors as there were Class A members. Members not subject to such assessment would be entitled to elect the same number of directors as there were Class B members. In addition, the members determined that the chief executive of | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | each member company would be designated to serve on the Tobacco Institute Executive Committee. | | | |
| 65 ¶ 125 | The primary functions of the Tobacco Institute included: advancing-through press releases, advertisements, publications, and other public statements-the Enterprise's primary position that there were scientific and medical doubts concerning the relationship between smoking and disease; disputing statements from health organizations about smoking and disease, and later about second hand smoke and disease; using the results of TIRC/CTR research projects and other industry-sponsored research projects to question the charges against smoking, to emphasize the complexities of those diseases with which smoking has been statistically associated, and to reassure the public that the industry was actively investigating the issues; denying that cigarette smoking was addictive; minimizing the difficulties of quitting smoking; and denying that the industry marketed to youth. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 65 ¶ 126 | In 1958, when the Tobacco Institute was created, Hill & Knowlton secured the account to handle its public relations. Brandt WD, 52:8-9. Two of the Hill & Knowlton employees assigned to handle the new Tobacco Institute account were Leonard Zahn and Carl Thompson, who were also handling the TIRC account. Zahn PD. One of four public relations objectives in Hill & Knowlton's March 1958 Recommendations to the Tobacco Institute was: "To create a better public understanding of facts regarding tobacco use and health, and of the contribution the industry is making to efforts of science to find the answers to health questions." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 66 ¶ 127 | A 1966 document titled "The 'Mission' of the President of the Tobacco Institute" explained that, to meet its objectives, "the full resources of the Institute must be directed toward a consistent and positive program to gain public exposure to research results and scientific opinions that question the charges against smoking and that point up the complexities of those diseases with which smoking has been statistically associated." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 66 ¶ 128 | In a January 1968 memorandum to Earle Clements, Vice President William Kloepfer, who was responsible for public affairs, set forth what was to be the guiding public relations policy for the Tobacco Institute: "to attempt to increase substantially public awareness of the cigarette controversy; putting it another way, to make a greater portion of the public aware that widespread indictment of cigarettes as a cause of poor health does not amount to conviction." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 66 ¶ 129 | However, in an April 1968 memorandum to Earle Clements, President of the Tobacco Institute, William Kloepfer, expressed concern that the industry's strategy of constant and consistent denial of smoking's harm was untenable. He wrote: "Our basic position in the cigarette controversy is subject to the charge, and maybe subject to a finding, that we are making false and misleading statements to promote the sale of cigarettes." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **2. Relationship Between the Tobacco Institute and TIRC/CTR** | | | |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 66 ¶ 130 | Creation of the Tobacco Institute did not end TIRC/CTR's public relations activities. Rather, it marked the beginning of a joint public relations effort, between CTR, the Tobacco Institute, and their overlapping Defendant-members in which the scientific and information functions of TIRC/CTR were used by the Tobacco Institute in its public relations activities, although there was never a totally precise division of labor between TIRC/CTR and the Tobacco Industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 66 ¶ 131 | During the SAB's February 14-15, 1958 meeting, SAB Chairman Little asked TIRC Chairman Timothy Hartnett about the newly-formed Tobacco Institute, its purposes, and its relationship, if any, to TIRC. Hartnett explained that the Tobacco Institute was a separate entity and that its formation did not change or alter in any respect TIRC, its objectives, or its functions. He told the SAB members that it had become apparent, during the 1957 congressional hearings before the Blatnik Committee which had addressed the disclosure of tar and nicotine yields in advertising, that the tobacco industry needed to have one spokesman, rather than someone from each tobacco company, represent it at various times and places. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 66 ¶ 132 | TIRC Chairman Hartnett also informed the SAB members at that same meeting that Hill & Knowlton was acting as public relations counsel for both TIRC and the Tobacco Institute and "pointed out the desirability of this from both organizations' standpoint." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 66 ¶ 132 | At the July 1958 meeting of the Tobacco Institute Executive Committee, Chairman Bowman Gray of Reynolds reported that the respective functions of the Tobacco Institute and TIRC had been discussed at length, and announced "a tentative decision to let the matter of the respective functions of the two organizations (the Tobacco Institute and the TIRC) be decided on a case by case basis under the guidance of public relations counsel," Hill & Knowlton. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 67 ¶ 134 | Defendants expected the Tobacco Institute and TIRC/CTR to act in coordination when taking a position on specific news stories involving tobacco and health. In a February 1958 letter to John Hill of Hill & Knowlton, Paul Hahn, President of American, wrote, "In the present state of evidence, the position of the Institute should be compatible with that of TIRC and SAB." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 67 ¶ 135 | Hill & Knowlton understood that<br><br>[c]omment from TIRC for the press remains an effective way to meet anti-tobacco publicity efforts and emphasizes the multiple factors that should be considered. This, of course, is complemented with a continuing program of supplying information to give editors and writers a balanced perspective on questions of tobacco and health. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 67 ¶ 136 | Hill & Knowlton worked aggressively on behalf of both its clients, TIRC and the Tobacco Institute, to influence the media and ensure that the position and interests of the industry regarding smoking and health were well represented to journalists, broadcast reporters and magazine writers. Hill & Knowlton staff carefully documented their interventions, and their many | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | successes. | | | |
| 67 ¶ 137 | .For example, Hill & Knowlton, having anticipated the appearance of an article by United States Surgeon General Leroy E. Burney in the November 1959 Journal of the American Medical Association, VXA2150046-0054 (U.S. 63608), learned of its contents and provided the press, in advance of publication, with statements from both TIRC and Tobacco Institute representatives attacking the Surgeon General's assessment of the scientific evidence linking cigarettes to lung cancer. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 67 ¶ 138 | TIRC Chairman Timothy Hartnett reported to TIRC members in 1960 that:<br><br>The staff of TIRC is constantly in touch with Hill & Knowlton, and consults on every phase of activity relating to health matters. For example, it provides speakers for platforms, helps analyze both scientific papers and charges against smoking which appear in the public press, and consults on statements which are issued to inform the public. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 67 ¶ 139 | In the 1970s, Defendants discussed the need for even closer cooperation between CTR and the Tobacco Institute. William Kloepfer and Fred Panzer, Tobacco Institute Vice Presidents, proposed specific guidelines to assist CTR Chairman Henry Ramm select a new Scientific Director for CTR. TIMN0004138-4141 (U.S. 87588). The Tobacco Institute Executive Committee directed Tobacco Institute President Horace Kornegay to meet with Henry Ramm to discuss "closer cooperation between the Institute and the Council for Tobacco Research." Kornegay reported, at the April 2, 1973 meeting of the Tobacco Institute membership and Board of Directors, that "CTR did desire closer cooperation with the Institute and that the scientific personnel of the Institute would be invited to attend the May 15, 1973 CTR meeting in New York." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 68 ¶ 140 | After four months as CTR President, Addison Yeaman, chaired his first meeting of the CTR membership on December 10, 1975. He told the members that, "all the resources [of CTR], all the knowledge [of CTR], all the help that CTR can give, should be available to the lawyers, to the Tobacco Institute, and to any other of the troops in the field," and that CTR should be independent but "independent within the policies set down by the membership." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 68 ¶ 141 | In its press releases, advertisements, brochures, and other materials, the Tobacco Institute publicized the substance of TIRC/CTR research and the aggregate amount of the funds spent, as well as the amounts contributed by the industry in order to influence the public's perception of the industry's concern about cigarette smoking and health. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 68 ¶ 142 | A 1970 Tobacco Institute ad in the Washington Post discussed CTR grants totaling over $17 million under the heading "After millions of dollars and over 20 years of research: The question about smoking and health is still a question." A 1975 Tobacco Institute press release promoting its | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | booklet "The Cigarette Controversy," an outline of doubts about the health risks of smoking, noted the industry's commitment of "$50 million to help support researchers who are seeking the truth." In 1981, 1982, and 1984, Tobacco Institute brochures providing publicity for CTR funding of research were titled respectively "Tobacco Industry Research on Smoking and Health: A $104 Million Commitment;" "Tobacco Industry Research on Smoking and Health: A $111 Million Commitment:" and "Tobacco Industry Research on Smoking and Health: A $120 Million Commitment." | | | |
| 68 ¶ 143 | One Tobacco Institute advertisement that ran in major newspapers and magazines throughout the country consisted of a photocopy of a February 1969 CTR press release, quoting CTR's Scientific Director, Clarence Cook Little, with a headline declaring "How Much is Known about Smoking and Health." The General Counsel of Philip Morris, Reynolds, B & W, Lorillard, and Liggett were asked to, and did, approve the running of the advertisement. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 68 ¶ 144 | In a November 1962 interview on a Mutual Broadcasting System radio show discussing "Cigarette Smoking and Lung Cancer," Tobacco Institute President George Allen explained that the Tobacco Institute supported smoking and health research through a sister organization, the Tobacco [Industry] Research Committee, which has done more investigation in the eight years since it was established than any other private scientific organization or medical organization in the specific subject of lung cancer... over 100 individual grants over five million dollars. <br><br> When asked about statistical studies which seemed to implicate smoking and disease, Allen replied with the Defendants' position that [t]hese statistical studies add up to the need for further intensive scientific work on the subject ... nobody knows what causes cancer... this is a matter that remains to be found by thorough and energetic scientific investigation. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 69 ¶ 145 | Leonard Zahn, TIRC/CTR's public relations counsel, maintained close ties with the Tobacco Institute and served as a liaison between the two organizations. He kept in close touch with William Kloepfer at the Tobacco Institute, "advising [Kloepfer] in advance about meetings and other situations that might create a problem," such as an article or meeting "dealing with an adverse report on smokers." Zahn sent carbon copies of his CTR reports to the Tobacco Institute; spoke at sessions of the Tobacco Institute College of Tobacco Knowledge; and was a member of the Tobacco Institute Communications Committee. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 69 ¶ 146 | According to a 1969 letter, Robert Hockett, CTR's Associate Scientific Director, was asked to review Tobacco Institute publications, such as "The Cigarette Controversy" and "Eight Questions and Answers," and give suggestions for improvement. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 69 ¶ 147 | Members of CTR's supposedly independent SAB, like Arthur Furst and Sheldon Sommers, | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | appeared at Tobacco Institute press conferences to discredit mainstream scientific research. In an April 1970 briefing and update "on industry public relations in the field of smoking and health," Jim Bowling of Philip Morris reported to Robert Heimann, President of American, about Tobacco Institute plans to hold a press conference on April 30, 1970, to discredit the Auerbach-Hammond beagle study. The spokesmen for the industry were to be CTR's Arthur Furst and Sheldon Sommers who would "take a stand against the ACS [American Cancer Society] propaganda approach to 'science.' " | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 69 ¶ 148 | The Tobacco Institute invited Sheldon Sommers to testify before Congress on behalf of the industry. Leonard Zahn at TIRC/CTR edited the testimony that Sommers gave before Congress into a magazine article for American Druggist. The article titled "Smoking and Health: Many Unanswered Questions" was published in the September 1970 issue of American Druggist. The editor's note identified author Sheldon Sommers as Chairman of the SAB. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 70 ¶ 149 | In 1974, William Kloepfer, Tobacco Institute Vice President for Public Affairs, conducted filmed interviews with several CTR-affiliated persons on issues related to smoking and health. The opinions of the CTR-affiliated persons were unanimously supportive of the Enterprise's positions on smoking and health issues, although both individuals claimed to be expressing their own individual personal opinions. Sheldon Sommers, CTR's Association Scientific Director and SAB Chairman, stated that "there is no sound evidence that smoking is harmful to the health of the nonsmoker." Domingo Aviado, CTR Special Project funding recipient, stated that "on the basis of existing scientific evidence, tobacco smoke, I think, constitutes no health hazard to normal nonsmokers in public places." Robert Hockett, CTR's Scientific Director at that time, stated that "it just seems to me there is no justification for any general laws with respect to the protecting of nonsmokers from smoke." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 70 ¶ 150 | The Tobacco Institute failed to identify scientists as recipients of CTR Special Project funding and/or Lawyers Special Accounts funding, when incorporating their statements and conclusions in press releases and other publications as those of supposedly independent researchers or research results. (1982 press release challenging cigarette package warning, quoting Sterling);(1984 review of medical/scientific testimony presented to Congress titled "The Cigarette Controversy: Why More Research Is Needed," quoting Aviado, Bick, Bing, Blau, Eysenck, Fisher, Furst, Hickey, Rao, Salvaggio, Seltzer, Sterling); (1978 brochure titled "The Smoking Controversy: A Perspective," quoting Seltzer, Feinstein, Aviado, Sterling, Huber); (1983 press release opposing cigarette package warnings, quoting Blau, Fisher, Eysenck, and CTR's Scientific Director Sommers), (1988 press release disputing Surgeon General Koop's statement that cigarette smoking was addictive and quoting Blau). | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **3. Tobacco Institute Press Releases, Public Statements, Advertisements, Brochures, and Other Publications** | | | |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 70 ¶ 151 | During its existence, the Tobacco Institute was the leading public voice of the Defendants. To further the Enterprise's goals, the Tobacco Institute created, issued, and disseminated press releases, public statements, advertisements, brochures, pamphlets, and other written materials on behalf of Defendants (1) denying that there was any link between smoking and disease; that nicotine was addictive; that cigarette companies marketed to youth; and that environmental tobacco smoke ("ETS") posed a health risk; and (2) discrediting scientists and public health officials who took a different position on these issues. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 71 ¶ 152 | There is no question that the Tobacco Institute intended the public to rely on the public statements the organization made on behalf of its cigarette manufacturer members. As already noted, the Tobacco Institute's public spokespersons appeared on various television shows broadcast on all major networks in all fifty U.S. states. Brennan Dawson, Vice President of Public Relations for the Tobacco Institute and one of its major spokespersons, stated that she, on behalf of the Tobacco Institute, intended the public to rely on the public statements she made on television, regardless of whether the statements she made were in response to questions posed by the media or were spontaneous statements she volunteered to the media. Walker Merryman, another long-time Tobacco Institute spokesperson, similarly stated that the Tobacco Institute intended the public to believe its public statements. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 72 ¶ 153 | However, when asked about public scientific support for the public statements she was making on behalf of the Tobacco Institute, Brennan Dawson could not name a single public health organization that asserted, as did the Tobacco Institute, that it had not been proven that smoking caused disease during the time she was a spokesperson on behalf of the Tobacco Institute. Nor could Ms. Dawson name a single medical doctor, not associated with the tobacco industry, who took the position that it was not proven that smoking caused disease. Similarly, Walker Merryman, also a Tobacco Institute spokesperson for over twenty years, could not name a single medical doctor not affiliated with the tobacco industry who publicly took the position that there was some medical doubt as to whether smoking caused disease. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 72 ¶ 154 | The function of the Public Relations Division of the Tobacco Institute was to represent our member companies with the press, general public, anyone who had a question about tobacco, specifically the smoking and health issue, but also economics, history. We represented all the companies, so that no one of them had to answer questions from a press person or stock analyst. In other words, according to Tobacco Institute Vice President Brennan Dawson, the objectives of the Public Relations Division were "to make public statements and to provide the tobacco industry's point of view, not just one company's, but an industry-wide point of view on matters relating to tobacco." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 72 ¶ 155 | A May 1, 1972 memorandum from Fred Panzer, a public relations specialist with the Tobacco Institute, to Tobacco Institute President Horace Kornegay began by describing past industry | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | action:<br><br>For nearly twenty years, this industry has employed a single strategy to defend itself ... it has always been a holding strategy, consisting of creating doubt about the health charge without actually denying it, advocating the public's right to smoke without actually urging them to take up the practice ... encouraging objective scientific research as the only way to resolve the question of health hazard.<br><br>Panzer went on to discuss a proposed public relations campaign-The Roper Proposal-designed to persuade the public that "[c]igarette smoking may not be the health hazard that the anti-smoking people say it is because other alternatives are at least as probable" (emphasis omitted). The proposed campaign would suggest two such possible alternatives: (1) the constitutional hypothesis, i.e., smokers differ importantly from nonsmokers in terms of heredity, constitutional makeup, lifestyle, and stress; and (2) the multi-factorial hypothesis, i.e., other factors such as air pollution, viruses, food additives, and occupational hazards contribute to diseases for which smoking is considered a cause. | | | |
| 73 ¶ 156 | In order to issue public statements regarding smoking and health, the Tobacco Institute contracted with numerous scientists to conduct research on related issues. Such consultants included Salvatore DiNardi, Gio Gori, Larry Holcomb, Alan Katzenstein, Peter Lee, Maurice LeVois, Mark Reasor, Sorell Schwartz, Murray Senkus, David Weeks, Lawrence Wexler, Philip Witorsch, and Ray Witorsch. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 73 ¶ 157 | During the twenty-one years that Anne Duffin, and the twenty-two years that Walker Merryman, worked for the Tobacco Institute's Public Affairs Division, they prepared many of the Tobacco Institute publications that disputed the existence of any link between smoking and disease; that nicotine was addictive; that cigarette companies marketed to youth; and that Environmental Tobacco Smoke ("ETS") posed a health risk. Titles of such publications include, but are not limited to: Cigarette Smoking and Heart Disease; Cigarette Smoking and Cancer: A Scientific Perspective: Smoking and Health, The Continuing Controversy 1964-1979; On Tobacco: 21 Questions and Answers; The Cigarette Controversy, Eight Questions and Answers; About Tobacco Smoking: Smoking and Women; and Vital Statistics-How Accurate Are They? | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 73 ¶ 158 | Over the years, the Tobacco Institute attempted to discredit many of the  Surgeon General's Reports through its public statements, press conferences and other publications. For example, a "personal and confidential" Lorillard memorandum dated January 8, 1979 from Curtis H. Judge to J. Robert Ave and Arthur J. Stevens, all high corporate officials of Defendants, related a January 5, 1979 conversation that Judge had with Alexander Spears of Lorillard and another conversation with Bill Kloepfer of the Tobacco Institute: | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Dr. Spears surmises that this carbon monoxide information may be the new "bombshell" part of the Surgeon General's report and the part of the report which is new and likely to attract the media. At 4:30 on Friday afternoon I talked with Bill Kloepfer at the Tobacco Institute and he had just learned of this information a few hours ago (about the same time we did) on what he described as an "intercept." He agrees with our conclusions as to how it will be used in the Surgeon General's report and the Institute will work on counteracting it. I promised that we would get the information to him should we receive it before he does. | | | |
| 74 ¶ 159 | The Enterprise's concern about the substance of the 1983 Surgeon General's Report was a constant theme throughout the Tobacco Institute's documents for months before the report was ever published. As early as July 1, 1982, "the Scientific Affairs Division was in the process of devising strategies to counter the 1983 Surgeon General's Report." Before the Surgeon General's Report was even made public,<br>Sam Chilcote ... asked that [the Tobacco Institute] take certain steps to blunt the impact of the 1983 Surgeon General's report on the ground that, as in the past, it will lack objectivity. We expect the subject to be smoking and heart diseases.<br><br>Specifically, the plans directed the Scientific Division to prepare a relatively brief logical paper covering selected areas of inadequate knowledge and contradictions in the case for smoking as a cause of or risk factor in heart diseases.<br><br>The central role of legal counsel in the clearance process was also detailed in the memorandum: Shook, Hardy will provide clearance of the paper and of its final format which will be developed by the Public Relations Division. At the same time the PR staff and PR counsel will prepare a list of media people who may be expected to cover the Surgeon General's Report.<br><br>The following directive was issued by Kloepfer: "When the Surgeon General's Report is issued, the PR staff will stick to the TI position rather than commenting directly on the report." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 74 ¶ 160 | A document dated October 18, 1982, titled "Memorandum for the Record-Subject: Planning TI's Response or Planning to Meet the 1983 Surgeon General's Report" detailed the entire chronology of this Tobacco Institute effort. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 74 ¶ 161 | At the December 9, 1982 Tobacco Institute Board of Directors meeting, Tobacco Institute President Samuel D. Chilcote, Jr., discussed the Institute's approach to the upcoming 1983 Surgeon General's Report. The Tobacco Institute's plans included personally passing out summaries of its document on "Smoking and Cardiovascular Disease" to several dozen reporters; having George Schafer, Tobacco Institute Medical Director, on hand to answer the reporters' | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | questions and lend credibility; holding its "own press conference a day or so before the Surgeon General's press conference challenging the contention that smoking causes cardiovascular disease," with Shook, Hardy & Bacon providing assistance; and attempting to "encourage a non-tobacco state congressman to launch an investigation into MRFIT [Multiple Risk Factor Intervention Trials] shortly before the Surgeon General's conference," alleging that it was a waste of 115 million tax payers' dollars, "thereby putting the Surgeon General on the defensive." | | | |
| 75 ¶ 162 | A January 11, 1983 memorandum detailing the monthly overview of the Tobacco Institute's Scientific Affairs Division listed as its first "key" item the "[p]reparation and refinement of Institute's response to the 1983 Surgeon General's forthcoming report on heart disease." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 75 ¶ 163 | Similarly, the Tobacco Institute was very active in planning a response regarding the release of the 1987 Surgeon General's Report which discussed the addictive nature of smoking. Suggested strategies for the Tobacco Institute response and the public's potential reaction were carefully considered. Samuel Chilcote wrote informational memoranda about the Surgeon General's Reports for distribution to the Tobacco Institute Executive Committee. Brennan Dawson, Vice President of Public Relations for the Tobacco Institute, also made a presentation at a 1988 Tobacco Institute Communications Committee meeting, about her plans to distribute editorials favorable to the industry about the 1987 Surgeon General's Reports to editorial writers. Dawson also invited additional distribution suggestions from Communications Committee members. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 75 ¶ 164 | In anticipation of the 1989 Surgeon General's Report, the Tobacco Institute launched its "Enough is Enough" campaign which included national advertising efforts in 19 newspapers, a new public opinion poll, a comprehensive tobacco issues brief, and a video with smokers and nonsmokers expressing their opinions on the anti-smoking movement.<br><br>The Tobacco Institute launched a major media campaign, distributing materials and information to some 2,500 reporters, conducting a private briefing for the Washington, D.C. press corps, and distributing both television and radio satellite press releases, all with the aim of publicly discrediting the forthcoming Surgeon General's Report. Tobacco Institute documents indicate that the Tobacco Institute believed its efforts were worthwhile since the first question the Surgeon General received at his press conference releasing his 1989 Report was generated by the "Enough is Enough" campaign. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 75 ¶ 165 | Attorneys representing Defendants again played a major role in these efforts to discredit the Surgeon General's Reports and attack other scientific research linking smoking and disease. They meticulously edited and rewrote drafts of Tobacco Institute advertisements, articles, and public statements. Lawyers regularly recommended ideas for articles and provided materials to the Tobacco Institute for consideration. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 76 ¶ 166 | In a July 6, 1977 memorandum to William Kloepfer of the Tobacco Institute, attorney Donald Hoel of Shook, Hardy & Bacon significantly changed the draft of an article titled "Why the Case Against Smoking is Not Closed" and recommended a "major rewriting effort." Hoel also expressed dissatisfaction that attorneys had not previously had the chance to review the article. He wrote that it would be beneficial and time-saving if the content of such material as the proposed article could be first "cleared" with the appropriate persons at the Tobacco Institute before an "approved" draft is sent here for legal clearance.<br><br>Hoel went on to recommend that the lawyers be given advance notice of such articles so they could "make suggestions and provide materials for consideration." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 76 ¶ 167 | The Tobacco Institute also worked with its public relations counsel and its member companies to anonymously disseminate deceptive and misleading public statements, such as the True magazine article, to promote the sale of cigarettes. Joseph Fields, a public relations agent for B & W, arranged for a reporter named Stanley Frank to write a smoking and health article, titled "To Smoke or Not to Smoke-That Is Still The Question," which appeared in the January 1968 issue of True magazine. In the article, Frank stated that he had reviewed the evidence and found it contradictory and inconclusive; he concluded that the hazards of cigarette smoking were not so real as the public had been led to believe. Frank did not disclose that he had been paid $500 by the Defendants for his time and expenses in writing the article and had been guaranteed another $1250 in the event that it was not published; that tobacco industry representatives including Ed Jacob of Jacob & Medinger, attorneys for TIRC, had reviewed the article prior to publication; or that he worked for Hill & Knowlton. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 76 ¶ 168 | Furthermore, one of the Tobacco Institute's public relations agencies, The Tiderock Corp., had arranged to run a one-half-page advertisement promoting the True article titled "Are Cigarettes Really Harmful to Your Health?" The advertisement ran in the top seventy-two markets in the United States at an estimated cost of $69,000 paid for by Defendants Philip Morris, Reynolds, B & W, American, and Lorillard. The public did not become aware of these facts until the information was revealed in a series of investigations by the Wall Street Journal, Consumer Reports, and Senator Warren Magnuson. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 76 ¶ 69 | In addition to its press releases and publications, the Tobacco Institute regularly published various newsletters to further publicize its viewpoint on behalf of the Enterprise. In May 1976, the Tobacco Institute published its first issue of its most widely distributed newsletter, The Tobacco Observer. The public purpose of the newsletter, as stated in the first issue, was to "enable 'thousands' whose livelihoods are associated with tobacco 'to be well informed about the problems facing tobacco.' " The Tobacco Observer was published bi-monthly from 1976 until December 1988, under the supervision of the Tobacco Institute's Special Projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 77 ¶ 170 | The Tobacco Institute circulated The Tobacco Observer free of charge to company employees, broadcasters, newspapers, and individuals. At the early stages of publication, the Tobacco Institute requested and received lists of names and addresses of potential subscribers from the tobacco companies. In 1978, the Tobacco Institute calculated circulation to have reached 80,000 and by 1988 circulation had almost doubled to 145,000. Most subscriptions, however, were unsolicited. According to a June 1, 1987 memorandum from Anne Duffin to Peter Sparber, "TTO [The Tobacco Observer] subscribers, some dating back 11 years, have never been asked if they want copies. Most were added to the subscription list by Institute staff through personal contact or tobacco group rosters[.]" | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 77 ¶ 171 | Articles in The Tobacco Observer perpetuated the Enterprise's denials of causation and harm from smoking. One headline announced, "Smoke not harmful to average non-smoker" (October 1978). In the May 1976 issue, one headline read "No Simple Answers; Research Disputes UPI;" this article followed another that stated, "no cause and effect relationship between cigarette smoking and pulmonary emphysema has been established." In a June 1, 1987 memorandum, Anne Duffin wrote candidly about The Tobacco Observer:<br><br>Historically TTO [The Tobacco Observer] has related good news only, presenting the bad only in its most optimistic context ... TTO's purpose was to inform, to cast favorable light upon tobacco's many controversies. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **4. Tobacco Institute Committees** | | | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 77 ¶ 172 | The Tobacco Institute was run by a variety of committees, comprised of representatives and agents from Defendants Philip Morris, Lorillard, Liggett, Reynolds, and B & W, and employees from Defendant Tobacco Institute. The most influential and powerful of these were the Tobacco Institute Committee of Counsel, the Tobacco Institute Executive Committee, and the Tobacco Institute Communications Committee. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | |
| | **a. Committee of Counsel and Outside Counsel** | | | |
| 77 ¶ 173 | The Tobacco Institute Committee of Counsel was comprised of the general counsels of the sponsoring companies of the Tobacco Institute-Philip Morris, Reynolds, Lorillard, Liggett, and B & W-as well as counsel for American. Representatives from Philip Morris Companies also were members of the Committee of Counsel, and some Committee of Counsel meetings were held at Philip Morris Companies headquarters in New York. Northrip Members of the Committee of Counsel also included attorneys from the outside law firms of Covington & Burling, Jacob Medinger & Finnegan, and Shook, Hardy & Bacon. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 78 ¶ 174 | The purpose of the Committee of Counsel meetings was to discuss legal issues related to the tobacco industry and to provide legal advice on any matter that member companies would bring before it. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 78 ¶ 175 | The importance of the Committee of Counsel was described in an October 1964 trip report written by visitors from Britain's Tobacco Research Council:<br><br>The leadership in the U.S. smoking and health situation therefore lies with the powerful Policy Committee of senior lawyers advising the industry, and their policy, very understandably, in effect, is "don't take any chances." It is a situation that does not encourage constructive or bold approaches to smoking and health problems, and it also means that the Policy Committee of lawyers exercises close control over all aspects of the problems. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 78 ¶ 176 | The primary function of the Committee of Counsel within the Enterprise was described in a document prepared by Ernest Pepples, General Counsel for B & W:<br><br>[T]he primary function of this Committee of Counsel has been to circle the wagons, to coordinate not only the defense of active cases, but also to coordinate the advice which the General Counsels give to ongoing operations of their companies pertaining to products liability risks. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 78 ¶ 177 | The Committee of Counsel met frequently over the years and the agenda of its meetings covered a wide range of topics that were of concern to the Defendants. Typical items discussed included various smoking and health related issues including addiction, industry witness development (especially in the area of ETS), Special Projects, Special Accounts, CTR's Literature Retrieval Division, review of the Tobacco Institute's ads, institutional research, and smoking and health litigation generally. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 79 ¶ 178 | Even when Liggett decided to cease participation in the Tobacco Institute as a Class A member, it continued to participate in the Committee of Counsel. In a September 21, 1993 letter from Liggett's in-house counsel Josiah Murray to the Tobacco Institute's President and Counsel, Liggett sought to reduce its payments to the Tobacco Institute, but at the same time sought Tobacco Institute approval to continue participating in the Tobacco Institute's Committee of Counsel, and to have continued access to Tobacco Institute information and data, including reports and memoranda from Covington & Burling to the Committee of Counsel. In seeking these materials, Murray assured the letter's recipients that Liggett would continue to conform its conduct in accordance with the Enterprise's strategies, writing:<br><br>It is not the intent of Liggett to conduct its business in a manner adverse to the interest of the industry as a whole with respect to those legal and political issues as to which, by applicable law, the several competitor companies have a right to act in concert and in collaboration one | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | with another, and attaining this objective is enhanced, of course by [Liggett] being adequately informed. | | | |
| 79 ¶ 179 | The role of outside counsel, as opposed to the in-house general counsels, including Shook, Hardy & Bacon, Jacob, Medinger & Finnegan and Covington & Burling, was to assist the Committee of Counsel.. As has already been mentioned, and will be further elaborated on *infra*, two of those law firms, in particular Covington & Burling, became the guiding strategists for the Enterprise and were deeply involved in implementation of those strategies once adopted. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 79 ¶ 180 | Covington & Burling was counsel for the Tobacco Institute and was also described as counsel for the "industry." An attorney from Covington & Burling attended every meeting of the Committee of Counsel. Covington & Burling attorneys first reviewed agenda proposals for the Committee of Counsel meetings before they were sent to member companies. Covington & Burling also cleared press releases issued by the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 79 ¶ 181 | Shook, Hardy & Bacon was counsel for Defendants Philip Morris, Philip Morris Companies, Lorillard, Reynolds, and B & W, and benefitted from a close association with Defendant Tobacco Institute. In fact, Robert Northrip, following his attendance at a Committee of Counsel Meeting, would normally bill either three or four tobacco companies (including Philip Morris, Lorillard, B & W and possibly Reynolds) for his time. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 79 ¶ 182 | In addition to John Rupp of Covington & Burling serving as counsel for the Tobacco Institute and the "industry," Shook, Hardy & Bacon was also given a wide range of responsibilities for the Enterprise. In a May 18, 1982 memorandum, William Shinn of the firm described its activities relating to the Tobacco Institute and noted that it examined "most material emanating from the Tobacco Institute which has potential smoking and health overtones." This memorandum was addressed to Robert Sachs, Assistant General Counsel for B & W, and Arthur Stevens, Senior Vice President and General Counsel for Lorillard, and copied to Thomas Ahrensfeld, Senior Vice President and General Counsel for Philip Morris; Alexander Holtzman, Assistant General Counsel for Philip Morris; Ernest Pepples, General Counsel for B & W; and Samuel Witt, General Counsel for Reynolds. Since the firm's review involved a great deal of give and take, it sometimes "prepar[ed] the final version" of the product. Shook, Hardy & Bacon also assisted the Tobacco Institute in setting strategy, preparing witnesses on smoking and health issues, briefings, reviewing press releases, advertisements, and other public statements, and orchestrating follow-up activities. Shinn remarked: "While we are asked occasionally to do something that we believe T.I. should do itself, we have always reserved the right to decline unless directed by the Committee of Counsel." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 80 ¶ 183 | Shook, Hardy & Bacon's role was further explained in a June 28, 1988 memorandum from Donald Hoel of Shook, Hardy & Bacon to Todd Sollis, Associate General Counsel for Philip | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Morris Management Corporation. Hoel explained that [b]ecause SHB represents several of those [cigarette] manufacturers and enjoys a close association with the TI, the firm is able to move freely among industry members, facilitating cooperation and open communication. In this way, SHB helps eliminate potential difficulties within the tobacco industry that could reduce PM's ability to address effectively smoking and health issues and impair its defense of lawsuits. | | | |
| 80 ¶ 184 | Jacob, Medinger & Finnegan was yet another law firm which played a major advisory role as counsel for Reynolds, B & W, and CTR. Edwin Jacob attended and gave presentations at Committee of Counsel meetings; he was also involved in the administration of CTR Special Projects | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **b. Tobacco Institute Executive Committee** | | | |
| 80 ¶ 185 | The Tobacco Institute Executive Committee had the "final voice on TI matters" and Tobacco Institute statements. It included two representatives from each of the cigarette manufacturer member companies of the Tobacco Institute and had a rotating chairmanship. The Executive Committee also set Tobacco Institute policy and determined resource allocation within the organization. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 80 ¶ 186 | The Tobacco Institute Executive Committee met frequently to keep abreast of issues of common concern within the Enterprise. In addition to having final approval authority on all Tobacco Institute matters, the Executive Committee often discussed issues of joint industry research on smoking and health, research funded through CTR, and funding of Tobacco Institute advertising. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 81 ¶ 187 | For example, the Tobacco Institute Executive Committee met on January 12, 1964, to discuss the implications of the 1964 Surgeon General's Report on Smoking and Health. The Executive Committee agreed that it was "considered to be of prime importance that the industry maintain a united front and that if one or more companies were to conduct themselves as a matter of self interest, particularly in advertising, obvious vulnerability would be the result." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 81 ¶ 188 | A 1974 Tobacco Institute report titled "Defending Tobacco" stated that the Tobacco Institute Board of Governors' adoption, in January 1971, of the Guidelines for Authority and Responsibility of the Tobacco Institute, had greatly improved the Tobacco Institute's overall efficiency. The report established authority and responsibility of the Tobacco Institute's staff and committees, placed more authority in its President, and required more frequent meetings of the Executive Committee to create and review Tobacco Institute policies, programs and objectives. The Guidelines eliminated much undue delay occasioned in the past in obtaining approval and authority from the Tobacco Institute Executive Committee or its Board members for Tobacco Institute action and improved the overall efficiency of the Enterprise. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **c. Tobacco Institute Communications Committee** | | | |
| 81 ¶ 189 | The Tobacco Institute Communications Committee reviewed and approved Tobacco Institute | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
|  | advertisements, media plans, and public relations campaigns carried out by the Tobacco Institute on behalf of the Enterprise. | Intent to defraud or deceive |  | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 81 ¶ 190 | Each Tobacco Institute member company designated its public relations people to attend meetings of the Communication Committee and to inform their respective companies about the activities of the Committee. Membership of the Communications Committee consisted of representatives of Reynolds, B & W, Philip Morris, Lorillard, Liggett, and American, as well as outside lawyers from Shook, Hardy & Bacon and Covington & Burling, Tobacco Institute public relations staff and CTR public relations counsel Leonard Zahn. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 81 ¶ 191 | Members of the Communications Committee considered CTR a public relations benefit for the Enterprise. According to minutes from the September 17, 1971 Communications Committee meeting, William Kloepfer, Vice President of the Tobacco Institute, briefed the committee on the status of industry-financed research, including research funded by CTR. Kloepfer called this research, "the best basis for affirmative public relations." Leonard Zahn, public relations counsel to CTR from 1955 until 1993, was even a member of the Tobacco Institute Communications Committee and attended committee meetings at the behest of Kloepfer of the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 82 ¶ 192 | A 1974 Tobacco Institute report titled "Defending Tobacco" stated that, prior to 1967, much of the communication between member companies was through the Tobacco Institute Committee of Counsel, or by informational memoranda. According to this report, one change that greatly facilitated the internal information flow within the Enterprise was the creation in 1969 of the Communications Committee, which was made up of representatives of each major company and of the Tobacco Institute's legal counsel and who met frequently to advise on the Tobacco Institute's public relations strategy. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 82 ¶ 193 | Through these Tobacco Institute committees, the Defendants, through their executives, employees, agents, and attorneys, controlled the Tobacco Institute and set its policy, including approving and authorizing the multitude of statements made by the Tobacco Institute about smoking and health. While this structure changed somewhat over time, Defendants always maintained control over the Tobacco Institute's activities and committees. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
|  | **5. Tobacco Institute College of Tobacco Knowledge** |  |  |  |
| 82 ¶ 194 | Coordination of information and careful instruction on how information should be presented and disseminated to the public was a major aim of the Enterprise. It was considered vital to leave no member vulnerable to attack in litigation or to subject the industry to further regulation. One extremely successful method used to ensure that industry representatives understood and were able to publicly transmit consistent statements regarding smoking and health and other issues of common concern to the Defendants was the operation of training seminars by the Tobacco Institute's College of Tobacco Knowledge. The College began in the 1970s and operated for over | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | a decade. | | | |
| 83 ¶ 195 | Representatives of all the Defendants, including BATCo and Philip Morris Companies, Inc., as well as representatives of several international organizations (including TAC, INFOTAB, and ICOSI) attended the College. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 83 ¶ 196 | Students who attended the College sessions were "people from the tobacco industry;" people whose responsibilities included public affairs, public relations, government relations; "[p]eople from all facets of the industry from seed bed to sales counter;" and industry lobbyists. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 83 ¶ 197 | In accordance with the goal of achieving a unified public message for the industry, Walker Merryman, self-proclaimed "Dean of the College of Tobacco Knowledge" and also Vice President of Public Relations for the Tobacco Institute, gave presentations at the College during which he would "roam the room with a microphone and ask people questions [about what they had heard and learned over the two days] and see how they answered them." For example, he might ask a student if he believed that there was a relationship between smoking and disease, and suggest that the better response was that "there is a statistical relationship between smoking and disease" rather than that "smoking causes disease." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 83 ¶ 198 | The purpose of the Tobacco Institute College of Tobacco Knowledge was to "improve working relations with all major segments of the tobacco industry." Dawson WD, 28:6-8. For example, Brennan Dawson participated in a mock segment of "The Phil Donahue Show" titled "Should Smoking Be Restricted in the Workplace?" during the 1988 College of Tobacco Knowledge conference, playing the role of Tobacco Institute spokesperson while James Savarese played Donahue and they acted out a reaction on behalf of the tobacco industry to a Surgeon General's Report on the subject of ETS. Again, the College's intended purpose with the rehearsal was always to ensure presentation of a unified and consistent public stance on smoking and health issues. | Conspiratorial agreement, and Intent to defraud or deceive | Conspiratorial agreement, and Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 83 ¶ 199 | The College of Tobacco Knowledge "gave attendees an overview of a number of issues that the tobacco industry faces or faced at the time." The Tobacco Institute not only funded and operated the College of Tobacco Knowledge, it also developed the College's curriculum and its staff taught the sessions. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 84 ¶ 200 | After Tobacco Institute executives Merryman, Kloepfer, and Chilcote approved the curriculum, the Tobacco Institute mailed announcements to its Communications Committee, the International Tobacco Information Center ("INFOTAB"), its senior staff, and other interested parties. In preparing for a College session, the Tobacco Institute would make its senior vice presidents aware of the fact that one of these seminars was scheduled. And if they had new employees that they wanted to have invited or if they thought there was a contract lobbyist who might benefit, they could invite that individual. We also would let our member companies know that another seminar | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | was scheduled, and if they had people in mind whom they thought would benefit from such a seminar, they could be invited. | | | |
| 84 ¶ 201 | A number of speakers generally spoke on a "half dozen or more different issues." Merryman PD, Speakers at the College sessions included Tobacco Institute employees with specialities in communications, public relations, and federal and state regulation; lawyers for the industry; medical consultants; state senators or representatives; economists; and statisticians. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 84 ¶ 202 | The Enterprise wanted to achieve consistent public statements concerning various smoking and health related subject areas through its control of the College's curriculum. For example, there were frequent discussions at the College about the health hazards of smoking and of causation generally and how, according to the industry, causation had not yet been proven. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 84 ¶ 203 | The College's curriculum also included the topic of industry sponsored research and the function of CTR generally. For example, presentations by Leonard Zahn, CTR public relations counsel, would describe the activities of CTR and its research program "so that all the mid and perhaps slightly above mid-level employees from the various companies would have an idea, more exact knowledge, of what the Council was and how it worked." In addition, Zahn distributed or made available to the participants CTR materials including the Annual Report. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 84 ¶ 204 | Similarly, Addison Yeaman, CTR Chairman and President, spoke on the topic of sponsoring science, described in the syllabus as follows:<br><br>For 25 years, tobacco manufacturers, growers and warehouse operators have funded independent scientific research into tobacco use and health. How it is done and what is being learned. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 84 ¶ 205 | In addition to discussing the function of CTR, the College provided another opportunity for the Tobacco Institute and CTR to coordinate Enterprise activities. In a letter dated October 27, 1981, William Hobbs, CTR Chairman, wrote that CTR representatives "Tom Hoyt and Bob Gertenbach will attend T.I.'s College of Tobacco Knowledge November 16 and 17" providing an opportunity for the Tobacco Institute's Horace Kornegay to brief the CTR President and Executive Vice President on "T.I.'s advertising and research plans" because "it might be beneficial to CTR management." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 85 ¶ 206 | Another topic frequently discussed at the College was Environmental Tobacco Smoke ("ETS") and the failure to determine its true health effects on nonsmokers. Industry ETS consultants like Nancy Balter, John Graham and "Gray" Robertson also explained their opposition to public smoking restrictions. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 85 ¶ 207 | The College curriculum also included an "international perspective" on smoking and health related issues. For example, Mary Covington, Secretary General of INFOTAB, spoke at the November 1981 College about international perspectives related to ETS, explaining that the | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | College seminars offer an opportunity to learn a lot about smoking issues and industry programs in a very short time.... Without a concerted effort by the tobacco industry [initiatives to eliminate smoking in public places] will make gradual headway in changing attitudes towards smoking as a socially acceptable custom. | | | |
| 85 ¶ 208 | The topic of public relations was woven into each of the subject areas discussed above in order to achieve a consistent public message. For example, at both 1983 sessions of the College, William Kloepfer of the Tobacco Institute spoke to the students on public relations issues. In addressing the issue of the "effectiveness and unity" of the tobacco industry, Kloepfer contended that because "what affects one affects all," the Tobacco Institute used many strategies "to keep us together, to keep us all aware." According to Kloepfer, the Tobacco Institute Public Relations Division was primarily responsible for four strategies: the Tobacco Institute Tobacco Observer newspaper reaching 150,000 readers six times a year; advertising in tobacco trade publications; appearing as speakers before trade and industry groups; and the Tobacco Institute College of Tobacco Knowledge that has helped "educate" and "orient hundreds of key family members ... a united industry is our most potent public relations and legislative tool." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 85 ¶ 209 | In addressing the issue of public smoking restrictions, Kloepfer noted that through our spokesmen, our literature, and our advertising, we broadcast two messages: (1) ambient smoke has not been proven dangerous to non-smokers, and (2) smoking restrictions cause unnecessary expense, inconvenience, and discrimination.<br><br>In addressing "our oldest, most frustrating issue," Kloepfer maintained, as late as 1983, that<br>We call it the primary issue. It is the smoking and health controversy. We think of it as controversy ... a subject far from decided ... and through our spokesmen and literature we make that point. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 86 ¶ 210 | Finally, indications from those who attended the College were that the Enterprise, via the Tobacco College of Knowledge, was achieving its goal of uniting the industry and promoting a common public response to issues related to smoking and health. For example, Arthur Stevens, General Counsel for Lorillard, sent comments from the Lorillard attendees at one session to the Tobacco Institute. One employee wrote, "The information presented gave me a better view of the defensive position in which our industry finds itself." Similarly, in feedback after the September 1980 session regarding whether or not the College of Tobacco Knowledge was worthwhile, one Lorillard attendee wrote:<br><br>Definitely-The opportunity to meet with the pros, who fight in the trenches, was an experience which expanded my knowledge and commitment to our mutual goals. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Further commentary by Lorillard attendees on the Seventh College included:<br>[A]fter the program was completed, I definitely have a better understanding of the industries [sic] position in certain areas ... past attendees should be updated whenever the industries [sic] stand on a position changes or new information is available, especially in the overall smoking and health controversy. | | | |
| 86 ¶ 211 | In addition to the formal training received by Defendants' employees on the industry position in smoking and health matters at the Tobacco Institute's College of Tobacco Knowledge, industry lawyers also informally instructed tobacco company employees on the industry's smoking and health positions. For example, Jeffrey Wigand, former Vice President of Research and Development of B & W, shortly after starting to work for B & W, was sent to the law offices of Shook, Hardy & Bacon in Kansas City, Missouri, for an orientation. Shook, Hardy & Bacon attorneys William Shinn, Robert Northrip and Charles Wall instructed Wigand on the tobacco industry position on causation and addiction. Scott Appleton, a B & W toxicologist, also attended a training session at Shook, Hardy & Bacon. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **6. Tobacco Institute Testing Laboratory** | | | |
| 86 ¶ 212 | In June 1966, the Federal Trade Commission ("FTC") announced that it was establishing a laboratory to measure by machine the tar and nicotine content of cigarette smoke. That same year, the tobacco industry decided to establish its own laboratory, the Tobacco Institute Testing Laboratory ("TITL"), which would be a separate division of the Tobacco Institute. The TITL was established so that Defendants could conduct tests to determine the accuracy and reliability of the FTC laboratory's tests. The TITL was also used by Defendants for other testing purposes, such as the testing of the chemical Chemosol in the late 1960s and early 1970s. Murray Senkus, Director of Research at RJR, acknowledged that TITL was a "Mechanism for Mutual Cooperation" within the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **E. Joint Research Activity Directed by Defendants' Executives and Lawyers**<br>    **Witness Development** | | | |
| 87 ¶ 213 | Defendants Philip Morris, Reynolds, Lorillard, Liggett, B & W, American, CTR, and the Tobacco Institute developed a variety of joint research projects that were dubbed Special Projects. These projects assumed numerous forms and names, including CTR Special Projects, Lawyers Special Projects (projects paid through Lawyers Special Accounts), and Tobacco Institute Special Projects. These projects were exclusively funded by these particular Defendants. The main purpose of these projects, which were primarily lawyer-developed, directed, and supervised, was to obtain and develop witnesses favorable to Defendants for testimony before Congress and other regulatory bodies, for use in litigation, and for support of industry public statements. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 87 ¶ 214 | TIRC/CTR through its "Special Projects" allocated funding on a non-peer reviewed basis for research projects associated with litigation and witness preparation, and were not designed to address smoking and health issues in a way that would be helpful to increasing public knowledge about smoking and disease. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 87 ¶ 215 | Special Projects were overseen by the main members of the Committee of Counsel, i.e., the General Counsels of Defendants Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 87 ¶ 216 | The Committee of Counsel received frequent updates on Special Projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 87 ¶ 217 | Special Projects were often managed by yet another committee called the Ad Hoc Committee. The Ad Hoc Committee consisted of in-house counsel, litigating lawyers, and other agents such as public relations and research representatives of Defendants directed to conduct long range policy planning with respect to research and witness development. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 87 ¶ 218 | The focus on witness development, as opposed to scientific research, is illustrated in a letter dated October 28, 1966, where attorney Francis Decker advised David Hardy of Shook, Hardy & Bacon on the status of certain Ad Hoc matters. He stated,<br><br>Dr. Pratt is presently only available on a limited basis. However, we intend to try to develop him as a possible witness.... Dr. Soloff made the remark about the finding that the non-smoker and ex-smoker have the same incidence of heart disease. Nonetheless, I think he could be an excellent witness. To begin with, I think he might be persuaded that the validity of the above statement is questionable. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 87 ¶ 219 | In January 1967, the Ad Hoc Committee was comprised of: (1) Janet C. Brown, Chadbourne & Parke, counsel to American and CTR; (2) Kevin L. Carroll, White & Case, counsel to B & W; (3) Donald J. Cohen, Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, counsel to Liggett; (4) Edward J. Cooke, Jr., Davis, Polk & Wardell, counsel to Reynolds; (5) Francis Decker, Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, counsel to Liggett; (6) Alexander Holtzman, Conboy, Hewitt, O'Brien & Boardman, counsel to Philip Morris; (7) Edwin J. Jacob, Jacob, Medinger & Finnegan, counsel to CTR, B & W, and Reynolds; and (8) William W. Shinn, Shook, Hardy, Ottman, Mitchell & Bacon (later "Shook, Hardy & Bacon"), counsel to Philip Morris, Lorillard, B & W, and Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 88 ¶ 220 | At times, members of the Ad Hoc Committee and the Committee of Counsel held joint meetings to keep Defendants informed as to the status of joint research matters related to the enterprise, particularly "industry legislative" and litigation positions. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

51

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 88 ¶ 221 | On December 17, 1965, at a meeting of the "Committee of Six [i.e., the Committee of Counsel]," representatives of at least CTR, B & W, and Reynolds, and outside counsel met to discuss CTR and Ad Hoc special projects in relation to the need for industry witness development. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 88 ¶ 222 | In a follow-up letter dated January 4, 1966, attorney John Russell of Perkins, Daniels & McCormack informed J.E. Bennett, President of Lorillard:<br><br>As you are aware, the lawyers have, together with the staff of Council for Tobacco Research, been reviewing our industry's research program with a view toward developing some sort of a master plan.<br><br>Russell advised that there were three categories of research: "A. Adversary needs (Congress, litigation, etc.); B. Defensive needs; and C. Basic research." He further advised that some projects would be paid through Lawyers' Special Accounts and some out of CTR. 01125445-4445 (U.S. 26400). | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 88 ¶ 223 | An April 12, 1966 Reynolds document describing the mission of the Tobacco Institute discussed Defendants' goals including witness development in upcoming health litigation. The document stated that the authorization and purpose of CTR Special Projects and Ad Hoc Committee lawyer projects was to assure efficient handling of medical evidence and to provide the industry with witnesses for health litigation. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 88 ¶ 224 | David Hardy, partner at Shook, Hardy & Bacon, played a major role in Defendants' witness development plans to perpetuate the Enterprise's "open question" position. Hardy worked to secure possible witnesses for future litigation throughout the 1960s. For example, in a January 12, 1967 letter to the Ad Hoc Committee, he requested evaluations of potential industry witnesses. In the same letter, Hardy asked Ad Hoc Committee members to analyze the value of various CTR and Ad Hoc projects in an effort to get practical use out of them in time for expected Congressional hearings. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 88 ¶ 225 | A February 8, 1967 letter to Hardy from Donald Cohen and Francis Decker, attorneys with Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, responded to Hardy's request for comments and evaluations of potential industry witnesses. It addressed many areas of possible testimony in great detail and provided names of doctors and scientists, many of whom were CTR Special Projects recipients and funded by various Defendants in later years. Cohen and Decker stated that Defendants' witnesses should describe the unexplained paradoxes in the cigarette smoke theory of disease causation. [They] should present the idea that the statistics are as consistent, if not more so, with the constitutional theory as with the cigarette smoking theory.<br><br>Cohen and Decker also recommended that doctors and scientists who had received CTR grants- | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | inaid and CTR Special Project funding be used as potential witnesses. | | | |
| 89 ¶ 226 | William Shinn of Shook, Hardy & Bacon also responded to Hardy's request, with copies to members of the Ad Hoc Committee, regarding potential witnesses for Defendants in upcoming congressional hearings. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 89 ¶ 227 | Similarly, on March 31, 1967, Robert Hockett, on behalf of CTR, sent a memorandum to Hardy describing Adolphe D. Jonas, a psychiatrist who had worked on the psychology of smoking. In this memorandum, Hockett mentioned Jonas as a potential industry witness. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 89 ¶ 228 | When a scientist was willing to act as a witness in litigation or before congressional hearings on behalf of the Enterprise, her work was often funded by CTR Special Projects. For example, on October 3, 1968, in an attempt to funnel names to Hardy as potential witnesses before awarding industry funding to scientists, Alexander Holtzman, General Counsel of Philip Morris, wrote a letter proposing CTR Special Project funding for Richard Hickey. Hickey's application to CTR for $30,000 had previously been turned down, but Holtzman stated that

Dr. Hickey is willing to prepare a statement for Congress provided that he is put in a position to complete the analysis of data which he has in-hand and he would, in my opinion, make an excellent witness.

Holtzman also wrote that

I think we might be able to persuade him to make additional observations in these papers concerning the implications of his data in relation to the Public Health Service view on the smoking question. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 89 ¶ 229 | Similarly, a November 17, 1978 Philip Morris memorandum noted that "CTR has supplied spokesmen for the industry at Congressional hearings. The monies spent at CTR provides a base for introduction of witnesses." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 89 ¶ 230 | An industry document written by "A.H." (very likely Alexander Hotzman), describing what transpired at a General Counsels' meeting at the offices of Philip Morris on January 4, 1978, at which representatives from B & W, Liggett, Reynolds, the Tobacco Institute, and Philip Morris were present, demonstrated the development of Special Account No. 4 (a specific type of Lawyers Special Accounts) to address Defendants' need for witnesses. The Enterprise used Special Account No. 4 to fund researchers and scientists and to pay fees to consultants who could offer expert knowledge to Defendants and act as witnesses on their behalf. Recipients of such funding were sought out by Defendants' attorneys based on how helpful they would be in future litigation | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | and congressional hearings. Funds were allocated accordingly. Discussions and details of the lawyers' special projects were to be kept confidential. In this same document describing what occurred at the January 4, 1978 meeting, attendees were advised not to discuss the details of Special Account No. 4 in writing, and instead discuss any questions on the matter in a phone call. No response to a letter within a given date was assumed to mean that "the matter [was] agreeable." | | | |
| 90 ¶ 231 | In a February 9, 1978 letter to Thomas F. Ahrensfeld, General Counsel for Philip Morris; Max H. Crohn, Jr., General Counsel for Reynolds; Joseph Greer, General Counsel for Liggett; Arnold Henson, an attorney with Chadbourne & Parke; Ernest Pepples, General Counsel for B & W; and Arthur J. Stevens, General Counsel for Lorillard, William Shinn of Shook, Hardy & Bacon wrote of the need for special areas of research with due regard for the politics of science, the importance of developing witnesses and the need for a responsive mechanism to meet unfounded claims made about tobacco.<br><br>In this document, Shinn recommended approval for funding of projects through Special Account No. 4 and CTR Special Projects. Once again, recipients of this letter were reminded not to retain notes on matters of witness development. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 90 ¶ 232 | By at least the late 1970s, the Tobacco Institute and its agents became coordinators in Defendants' efforts to develop a group of witnesses for future litigation and hearings. An August 30, 1978 letter from Ernest Pepples of B & W to Richard Maddox of BATCo discussed the request of Horace Kornegay, President of the Tobacco Institute, that the Committee of Counsel be involved in selecting and providing scientific witnesses and documentary testimony for use in hearings before Congress and elsewhere. During its years as an active trade association, the Tobacco Institute prepared or provided over 100 witnesses for testimony before Congress, courts or state legislatures. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 90 ¶ 233[8] | A March 11, 1980 document drafted by Max Crohn of Reynolds acknowledged that longtime CTR Special Project and Special Account No. 4 recipient Theodor Sterling was "one of our industry's most valuable outside assets." In addition to numerous publications and studies, Crohn noted that "[Sterling] has continued to be one of the primary scientists available for consultation with Shook Hardy & Bacon in Kansas City." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 90 ¶ 234 | A 1983 letter from Ernest Pepples of B & W to Jim Bowling of Philip Morris and Alexander Spears of Lorillard attached "a paper proposing recommendations which we might make to the [Tobacco Institute] Executive Committee." 80419202-9202 (U.S. 21061). The attached paper | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

---

[8] Mis-numbered as 222; 449 F. Supp.2d at 88.

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | titled "Industry Research Support - Recommendations" listed the following among its considerations for upcoming scientific funding:<br><br>Be prepared to increase scientific funding of special projects toresolve scientific problems and develop witnesses....Maintain company cooperation-philosophies about research may differ at times, but goals should be the same....Improve cooperation between industry mechanisms such as CTR and TI. | | | |
| 90 ¶ 235 | In a February 2, 1984 memorandum written by Arthur Stevens, General Counsel for Lorillard, to Alexander Holtzman, General Counsel for Philip Morris; Ernest Pepples, General Counsel for B & W; Josiah Murray, General Counsel for Liggett; and Samuel Witt, General Counsel for Reynolds, Stevens discussed the intent of the Ad Hoc Committee to "propose a witness development plan" to assist the litigation and regulatory efforts of the member companies. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 91 ¶ 236 | An April 7, 1986 letter from Patrick Sirridge, Shook, Hardy & Bacon, to Alexander Holtzman, General Counsel for Philip Morris; Wayne W. Juchatz, General Counsel for Reynolds; Josiah J. Murray, III, General Counsel for Liggett; Ernest Pepples, General Counsel for B & W; Paul A. Randour, General Counsel for American; and Arthur J. Stevens, General Counsel for Lorillard, informed CTR Board members that Shook, Hardy & Bacon would take over both the administration of Special Account No. 4 from Jacob, Medinger & Finnegan and the submission of research proposals for CTR Special Projects. According to this letter, Shook, Hardy & Bacon anticipated higher funding requests for "certain witness development expenses incurred by national litigation counsel." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 91 ¶ 237 | Another long-time industry law firm involved in witness development was Wachtell, Lipton, Rosen & Katz. An April 28 memorandum from attorney David Murphy to attorneys Herbert Wachtell, Paul Vizcarrondo, Jr., and John Savarese described an issue that had arisen at Lorillard. Arthur Stevens and William Allinder of Lorillard wanted to know if Lorillard could "participate in funding through a Shook, Hardy special account the work of a Georgetown pathologist, Bennett Jensen." Murphy reported that he had been advised that Jensen had received CTR Special Project funding in 1988, and now faced problems at Georgetown because of his ties to the tobacco industry. Shook, Hardy & Bacon proposed to "give him" $40,000-not for specific research ... or with an eye to publication but solely in order to maintain a good relationship with him and secure his continued help in making contact with other scientists.<br><br>Murphy also reported that "Allinder admits that Shook, Hardy wants to give Jensen money to keep him happy and that there is no immediate value to his research." Jensen, however, was a potential witness in the *Haines* litigation and his contacts "could lead to legislative witnesses." Indeed, Robert Northrip, an attorney with Shook, Hardy & Bacon, acknowledged that one of the | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | benefits of Special Projects was preserving the good will of former witnesses. | | | |
| | **2. CTR Special Projects**<br>**a. Nature of CTR Special Projects** | | | |
| 91 ¶ 238 | CTR Special Projects were a separate category of research projects funded by CTR. Unlike the grant-in-aid category of research, CTR Special Projects were not screened by the CTR Scientific Advisory Board ("SAB"); instead the process was directed by the General Counsels of Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American, as well as attorneys at outside law firms including Jacob, Medinger & Finnegan, and Shook, Hardy & Bacon. The work was specifically commissioned for possible use in litigation. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 91 ¶ 239 | Because of the lawyer involvement and the lack of review by the SAB, there was recognition that CTR Special Projects did not constitute the independent research promised in the Frank Statement. Janet Brown, retained counsel for CTR, acknowledged the problem in a letter to David Hardy dated June 13, 1974:<br><br>Where the industry is itself the arbiter of the amount and nature of research to be done, however, arguments that the research is self-serving-that is, is too little, too late, does not bear reasonable relation to the nature and scope of the problems nor to the industry's market position, sales, profits, advertising expenditures-gain in force and acceptance. Moreover, the industry may have little, if any leeway to disassociate itself from any results of such research with which it does not agree. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 92 ¶ 240 | From 1966 to 1990, Defendants contributed the following amounts to CTR Special Projects: American-$2,049,354; B & W-$2,571,354; Lorillard - $1,638,490; Philip Morris $5,837,923; and Reynolds-$6,029,255. From 1966 to 1975, Liggett contributed approximately $144,000. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 92 ¶ 241 | Although Liggett withdrew from CTR in 1968, it continued to participate in CTR Special Projects. Indeed, in its January 8, 1968 resignation letter, Liggett's President stated "we will continue to participate in defraying the cost of [CTR] Special Projects sponsored by the Council after evaluation of each Project on an individual basis." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 92 ¶ 242 | Like CTR grants-in-aid, CTR Special Projects involved research into epidemiology, laboratory work, and animal experimentation. However, they were regarded by at least one prior Scientific Director of CTR as "soft science," which would not appeal to the CTR SAB. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 92 ¶ 243 | CTR Special Projects allowed participating tobacco manufacturers access to papers and statements by scientists before they were submitted for publication to journals or to regulatory bodies.  Special Project funding also allowed Defendants to have some say in publications resulting from such funding. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 92 ¶ 244 | The lawyers who coordinated, requested and monitored CTR Special Projects were not scientists and did not have scientific backgrounds. The lawyers wished to avoid the CTR SAB method of funding because the SAB evaluated its project-funding requests in part for scientific legitimacy, while the lawyers were focused on litigation and liability objectives. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 92 ¶ 245 | In the mid-1960s, Shook, Hardy & Bacon developed a smoking and health literature retrieval system within the firm to help the lawyers identify scientists friendly to the tobacco industry's liability positions so that these scientists could receive funding through the CTR Special Projects program. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 92 ¶ 246 | An April 14, 1967 memorandum from Addison Yeaman, Vice President and General Counsel of B & W, addressed to Frederick Haas, General Counsel for Liggett; Cyril Hetsko, General Counsel for American; Henry Ramm, General Counsel for Reynolds; Paul Smith, Associate General Counsel for Philip Morris; and Earle Clements, President of the Tobacco Institute, explained how SAB projects had been "deliberately isolated" from lawyer-directed projects:<br> We have deliberately isolated the SAB from those areas of research which they might consider were of a controversial or adversary nature and I see no reason why that isolation cannot and should not be maintained to the fullest preservation of the scientific integrity and dignity of the SAB, but with the release of funds from the SAB portion of CTR's budget to both research directly related to tobacco and the so-called Special Projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 93 ¶ 247 | A February 24, 1969 Lorillard memorandum also described the origin of CTR Special Projects:<br><br>For a number of years, certain representatives of the industry have felt that the work of the Council [for Tobacco Research] has not been as pertinent to our problems as it might be.... In an effort to meet this objection, in 1965 the Council embarked on a program of guided research.... In order to finance this phase of their activity, a special projects budget was developed. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 93 ¶ 248 | An April 18, 1980 memorandum to file by Arthur Stevens stated: "I concluded that this work [of CTR Special Project recipients Kuper and Janis] is potentially useful from a litigation point of view." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 93 ¶ 249 | A September 18, 1981 letter from Francis Decker, an attorney with Webster & Sheffield, to Joseph Greer, Vice President and General Counsel for Liggett, enclosed his notes from a September 10, 1981 meeting of the Committee of Counsel. Decker's notes described a discussion between Arthur Stevens, General Counsel for Lorillard, and Edwin Jacob, CTR attorney with Jacob, Medinger & Finnegan, noting the differences between CTR Special Projects and Lawyers Special Projects:<br><br>Stevens: "I need to know what the historical reasons were for the difference between the criteria | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | for lawyers' special projects and CTR special projects." <br><br> * * * <br><br> Jacob: "When we started the CTR Special Projects, the idea was that the scientific director of CTR would review a project. If he liked it, it was a CTR Special Project. If he did not like it, then it became a lawyers' special project." <br><br> Stevens: "He took offense re scientific embarrassment to us, but not to CTR." <br><br> Jacob: "With Spielberger, we were afraid of discovery for FTC and with Aviado, we wanted to protect it under the lawyers. We did not want it out in the open." | | | |
| 93 ¶ 250 | A 1984 document prepared by Lee Stanford of Shook, Hardy & Bacon to David Hardy of Shook, Hardy & Bacon, concerning the briefing of Alex Spears of Lorillard for a deposition, discussed CTR Special Projects. The document acknowledged that "[t]hese are initiated and developed through outside counsel (SHB and J & M)." 92456261-6268, (U.S. 75420). | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 93 ¶ 251 | A document prepared in or about 1992 titled "Funding Sources of Tobacco Industry Research" noted that CTR Special Projects were "-Research directed at industry problem-Witness development objective-Approved by general counsel-Funded through CTR." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 93 ¶ 252[9] | An April 28, 1992 Wachtell Lipton memorandum from attorney David Murphy to attorneys Herbert Wachtell, Paul Vizcarrondo, Jr., and John Savarese discussed the nature of CTR Special Projects and raised the spectre of "perpetrating a fraud on the public": <br><br> In my over cautious view, the Jensen issue raises a larger question -whether "CTR Special Projects" funds (and after such activities were moved out of CTR, joint industry funds administered through Shook, Hardy) were used to purchase favorable judicial or legislative testimony, thereby perpetrating a fraud on the public. Admittedly, this notion of fraud was unknown to the common law, but if we assume the other side of the looking glass ... perhaps it is cause for concern. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **b. Lawyers' Involvement with CTR Special Projects** | | | |
| 94 ¶ 253 | Attorneys at Jacob, Medinger & Finnegan and Shook, Hardy & Bacon kept the Committee of Counsel apprised of the status of CTR Special Projects and also made recommendations to | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

[9] Mis-numbered as 253; F. Supp.2d at 93-94.

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
|  | Defendants' General Counsels and to each other as to whether projects should be conducted through CTR Special Projects. |  |  |  |
| 94 ¶ 254 | For example, on May 19, 1967, William Shinn of Shook, Hardy & Bacon, sent a letter to Alexander Holtzman, Philip Morris General Counsel, regarding CTR Special Projects. He discussed a proposal to support and publicize research advancing the theory of smoking as beneficial to health as a stress reducer, even for "coronary prone" persons; represented that stress (rather than nicotine addiction) explains why smoking clinics fail; and proposed to publicize the "image of smoking as 'right' for many people ... as a scientifically approved 'diversion' to avoid disease causing stress." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 94 ¶ 255 | On February 5, 1974, Shinn sent a letter to the following General Counsels: Thomas Ahrensfeld of Philip Morris; DeBaun Bryant of B & W; Frederick Haas of Liggett; Cyril Hetsko of American; Henry Roemer of Reynolds; and Arthur Stevens of Lorillard, stating that "Dave Hardy and I strongly recommend approval of the $50,000 grant for Dr. Carl D. Seltzer's work as a CTR special project" at Harvard University, citing the valuable research he was conducting and the works he had already published relating to smoking and health, which were helpful to the industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 94 ¶ 256 | On June 3, 1986, Patrick Sirridge of Shook, Hardy & Bacon sent a letter to the following General Counsels: Alexander Holtzman of Philip Morris; Wayne Juchatz of Reynolds; Josiah Murray of Liggett; Ernest Pepples of B & W; Paul Randour of American; and Arthur Stevens of Lorillard, recommending approval for additional funding of Henry Rothschild through CTR Special Projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 94 ¶ 257 | Such industry attorney recommendations continued into the 1970s and 1980s. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 95 ¶ 258 | In-house counsel also made recommendations for CTR Special Projects. On October 3, 1968, Alexander Holtzman of Philip Morris sent a letter to David Hardy of Shook, Hardy & Bacon proposing that Richard Hickey, who had previously applied for funding through CTR but been rejected, receive Special Project funding. On October 21, 1968, Hardy endorsed that recommendation by sending a letter to Frederick Haas of Liggett; Cyril Hetsko of American; Henry Ramm, General Counsel for Reynolds; Paul Smith, General Counsel for Philip Morris; and Addison Yeaman, General Counsel for B & W, by also recommending approval for Hickey as a CTR Special Project. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 95 ¶ 259 | By letter dated May 28, 1970, William Shinn of Shook, Hardy & Bacon advised Holtzman that he now had approval from Philip Morris, Reynolds, and Liggett "with respect to the Hickey Special Project," a reference to studies relating air pollution to lung cancer incidence by Dr. Richard J. Hickey of the Institute of Environmental Studies at the University of Pennsylvania, and that he | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | intended to "call the other General Counsel, if I have not heard from them by then, early next week." | | | |
| 96 ¶ 260 | In 1981, Arthur Stevens, Senior Vice President and General Counsel of Lorillard, engaged in extensive correspondence with Patrick Sirridge of Shook, Hardy & Bacon regarding the possibility of establishing an industry relationship with Henry Shotwell, a Sun Chemical employee who specialized in air-sampling analysis systems. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 96 ¶ 261 | Similarly, on November 28, 1983, Arthur Stevens sent a letter to Patrick Sirridge of Shook, Hardy & Bacon, inquiring: "Is Binstock someone who might be appropriate for a special project?" | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 96 ¶ 262 | CTR personnel also recommended that certain projects be funded as CTR Special Projects. For example, on December 24, 1969, Arthur Furst, CTR consultant, sent a letter to David Hardy recommending Special Project funding for Hans J. Eysenck, of the Institute of Psychiatry of Maudsleu and Bethlehem Royal Hospitals in London, to test the hypothesis of a relationship between the emotional make-up of people and cancer by conducting a pilot study of carcinogenesis in rats bred for different characteristics. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 96 ¶ 263 | According to CTR's Harmon McAllister, after lawyers had initiated a Special Project proposal, "a description of the proposed project and its cost [were] presented to CTR ... for appraisal by the Scientific Director." Individuals who presented the proposed project description and cost estimate to the CTR Scientific Director included company attorneys, attorneys from Shook, Hardy & Bacon, and attorneys from Jacob & Medinger. McAllister. The CTR Scientific Director would then review the Special Project proposal and either approve or reject it. Sheldon Sommers reviewed and approved dozens of Special Project proposals during his tenure as CTR Scientific Director. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 96 ¶ 264 | If approved by the CTR Scientific Director, the proposal was presented to the General Counsels of Defendants Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American who would make the final decision whether to fund it. Sometimes, general counsel would advise CTR directly if a project was approved for CTR Special Project funding. For example, on July 22, 1970, Henry Ramm, Senior Vice President and General Counsel of Reynolds, advised Robert Hockett, Associate Scientific Director of CTR, regarding the proposed Conference to be held in the West Indies in January 1972, counsel representing Philip Morris, B & W, American Brands, Liggett & Myers and Lorillard which companies together with Reynolds participate in Special Projects have advised that if the Scientific Advisory Board does not approve this project the same can be treated as an approved Special Project. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 97 ¶ 265 | The proposed conference was approved as a CTR Special Project in October 1970; was held on St. Martin Island on January 12-15, 1972; and was called the Conference on the Motivational | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Mechanisms of Cigarette Smoking. Among the attendees were A.K. Armitage from Britain's Tobacco Research Council; Robert Hockett, CTR Associate Scientific Director; Henry Ramm, CTR Chairman and President; Gilbert Huebner, Tobacco Institute Medical Director; Marvin Kastenbaum, Tobacco Institute Director of Statistics; and several of the Defendants' research directors, including William Bates of Liggett, I.W. Hughes of B & W, Murray Senkus of Reynolds, Alexander Spears of Lorillard, and Helmut Wakeham of Philip Morris; and several CTR Special Project funding recipients, including Hans Eysenck, Richard Hickey, Hans Selye, and Carl Seltzer. | | | |
| 97 ¶ 266 | In general, however, Defendants' General Counsels would advise attorneys at Jacob, Medinger & Finnegan or Shook, Hardy & Bacon whether or not their companies would agree to fund the recommended CTR Special Projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 98 ¶ 267 | Once the General Counsels had approved a CTR Special Project, attorneys from Jacob, Medinger & Finnegan or Shook, Hardy & Bacon would advise CTR that the CTR Special Project had been approved. CTR would then assign each CTR Special Project a number and the CTR staff would administer and distribute the funds for that CTR Special Project to the recipient or his or her affiliated research institution from a separate bank account maintained by CTR for only the funding of CTR Special Projects. For example, on June 27, 1968, Ed Jacob of Jacob, Medinger & Finnegan sent a letter to W.T. Hoyt, Executive Director of CTR, with respect to approval of CTR Special Project funding for A. Clifford Barger, and requested: "[W]ould you please assign a CTR SP Number to the project and let me know what that number is." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 98 ¶ 268 | CTR Special Projects were not part of CTR's general fund budget; CTR's members provided the funding for CTR Special Projects in separate transactions. Each company-Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American-could decide whether or not to contribute to a particular project. The division of costs, however, was usually based upon the companies' respective market shares and the companies sent their share of a project's cost directly to CTR and its separate account for Special Projects. CTR personnel often sent letters to the General Counsels of the six companies requesting payments for the CTR "Special Projects Fund." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 98 ¶ 269 | Letters advising of the funding of a CTR Special Project were sent directly from CTR to the CTR Special Project recipient. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 98 ¶ 270 | CTR Special Project recipients were instructed to use an acknowledgment line in publications resulting from CTR Special Project funding which was different from the acknowledgment line recipients of CTR regular grants were instructed to use in their publications. The acknowledgment line, used by CTR Special Project recipients did not disclose that their research program was undertaken at the specific request of Defendants for predominantly litigation purposes and was | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | not screened and approved by the CTR SAB. | | | |
| 98 ¶ 271 | CTR did not include information about CTR Special Project research in its Annual Reports, which were widely distributed to medical editors at newspapers, medical editors for television programs, deans of colleges and universities in the United States, libraries at colleges and universities, college and university grant offices, the CTR board of directors, members of the CTR Scientific Advisory Board, CTR grantees, CTR Class A and B members, and the Tobacco Institute, and contained information about current and terminated grants-in-aid, grantees, and their institutions. CTR also did not include information about CTR Special Projects in press releases. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 99 ¶ 272 | CTR Special Project funding ended sometime around 1990. Thereafter, Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American continued to jointly fund research projects on behalf of the Enterprise through Lawyers Special Accounts, discussed further below. For example, on March 2, 1990, Stevens sent a letter to Patrick Sirridge of Shook, Hardy & Bacon, enclosing a check for $46,461, which represented Lorillard's share of joint funding for Theodor Sterling, a long-time CTR Special Projects grantee. Stevens noted "that this is no longer a CTR project, but is now being funded directly by the Companies and administered as a Special Research Project through your firm." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 99 ¶ 273 | On March 7, 1990, Wayne Juchatz of Reynolds sent a letter to Sirridge enclosing Reynolds' portion for the continued funding of Sterling. On March 19, 1990, Paul Randour of American also sent a letter to Sirridge indicating approval of the joint funding of Sterling. On July 23, 1990, Ernest Pepples of B & W sent a letter to Sirridge enclosing a check for $65,579, which represented B & W's share of funding for Sterling. Pepples sent another contribution for Sterling's work in 1991. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 99 ¶ 274 | On September 26, 1990, Patrick Sirridge of Shook, Hardy & Bacon sent a letter to Wayne Juchatz of Reynolds, Josiah Murray of Liggett, Ernest Pepples of B & W, Paul Randour of American, Arthur Stevens of Lorillard, and Charles Wall of Philip Morris concerning funding for Rodger Bick, a practicing oncologist-hematologist who had been collecting data on lung cancer incidence in Kern County, California. Sirridge noted that [f]or over 10 years, Dr. Rodger Bick's research on lung cancer has been supported under a CTR Special Project. Dr. Bick has requested that his support be renewed so that he can continue the work. We recommend that this project be approved in the amount of $40,404.32 and be funded directly by the companies. Philip Morris, Reynolds, B & W, Lorillard, and American all agreed to jointly fund the continued research. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 99 ¶ 275 | In 1990, the companies continued to jointly fund the work of Alvan Feinstein that had previously been funded as a CTR Special Project on behalf of the Enterprise. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 99 ¶ 276 | By letter dated February 26, 1991, Sirridge requested continued funding from Randour of American and Juchatz of Reynolds for Carl Seltzer, a long-time CTR Special Project recipient. Sirridge advised that B & W, Lorillard, and Philip Morris had already agreed to the continued funding. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 100 ¶ 277 | In March 1992, Bernard O'Neill of Shook, Hardy & Bacon sent a letter to Wayne Juchatz of Reynolds, Ernest Pepples of B & W, Paul Randour of American, Arthur Stevens of Lorillard, and Charles Wall of Philip Morris, and copied Steven Parrish of Philip Morris, recommending another extension of joint industry funding of Theodor Sterling. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 100 ¶ 278 | On May 18, 1992, Charles Wall, Vice President and Associate General Counsel of Philip Morris Companies, sent a letter to O'Neill of Shook, Hardy & Bacon enclosing a check representing Philip Morris Companies' contribution to Sterling's research efforts. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **c. Scientists Funded Through CTR Special Projects** | | | |
| 100 ¶ 279 | Documents reflect that the following scientists were funded through the CTR Special Project program: William H. Alban; Austin; Domingo M. Aviado; Roberto Bachi; Claus B. Bahnson; William J. Bair; Clifford A. Barger; Bevilacqua; Cesare Biancifiori; Rodger L. Bick; Herman V. Boenig; Brian Bozelka; Lyman A. Brewer, III; Geoffrey L. Brinkman; Barbara B. Brown; Brunner; Victor B. Buhler; John Robert Carter; Jeffrey N. Clark; Richard C. Clelland; Irven DeVore; Salvatore R. DiNardi; William L. Dunn (Philip Morris); Kurt Enslein; Hans J. Eysenck; Alvan R. Feinstein; T.N. Finley; G.H. Friedell; H. Hugh Fudenberg; Arthur Furst (CTR); Arvin S. Glicksman; Victor Gould; John G. Gruhn; Michael R. Guerin; William H. Gutstein; Frederick Hecht; Norman W. Heimstra; Doris L. Herman; Katherine M. Herrold; Richard J. Hickey; Robert C. Hockett (CTR); Ebbe Curtis Hoff; Freddy Homburger; E. Lee Husting; Duncan Hutcheon; Joseph M. Janis; Alfred Bennett Jenson; William V. Judy; Marvin A. Kastenbaum (Tobacco Institute); Leo Katz; David M. Kissen; Jerome Kleinerman; Suzanne Knoebel; Lawrence L. Kuper; Hiram T. Langston; Mariano LaVia; Leonard A. Lee; Samuel B. Lehrer; Eleanor J. MacDonald; Thomas F. Mancuso; J.H. Manhold; Marcus M. Mason; Neal L. McNiven; Aldo Misefari; Kenneth M. Moser; Harry Ness; S. O'Shea; Joseph M. Ogura; Ingram Olkin; Oser; Harold Perry; Charles D. Puglia; L.G.S. Rao; Herbert L. Ratcliffe; Vernon Riley; J.B. Roberts; Jay Roberts; Gray Robertson; Lisa Rosenblatt; Henry Rothschild; Linda Russek; Henry I. Russek; John Salvaggio; G.N. Schrauzer; Segi; Carl C. Seltzer; Hans Selye; Lucio Severi; James F. Smith; Louis A. Soloff; Darrel H. Spackman; Douglas H. Sprunt; R. Stankus; Frederick J. Stare; Russell Stedman; Theodor D. Sterling; David A. Sterling; Harold L. Stewart; Guiseppe Teti; Thomas; J.R. Trinidad; James A. Wakefield; John S. Waugh; John Vivian Wells; Carolyn K.Wells; Travis | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Winsor; George Wolf; and J. Yerushalmy. | | | |
| | **3. Lawyers' Special Accounts** | | | |
| 100 ¶ 280 | In addition to CTR Special Projects, Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American funded still another category of special research projects on behalf of the Enterprise, often referred to as Lawyers' Special Accounts. These accounts were directed by industry lawyers, including the Ad Hoc Committee. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 100 ¶ 281 | Defendants would often fund the same scientist through both CTR Special Projects and Lawyers' Special Accounts. For example, on September 26, 1977, Edwin Jacob sent a letter to Shinn, which enclosed a proposal from L.G.S. Rao. Jacob noted that<br><br>it now appears that this research is not appropriate for consideration as a CTR Special Project. Nevertheless, the work is of obvious value.... Dr. Rao should be a most effective proponent of some of his views and, under appropriate circumstances, might well be able to provide useful information to a Congressional Committee or other body inquiring into certain aspects of smoking and health.... For these, reasons, I would recommend that we fund Dr. Rao as a special project through Special Account No. 4. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 101 ¶ 282 | On September 4, 1986, Patrick Sirridge of Shook, Hardy & Bacon sent a letter to General Counsel Alexander Holtzman of Philip Morris, Wayne Juchatz of Reynolds, Josiah Murray of Liggett, Ernest Pepples of B & W, Paul Randour of Reynolds, and Arthur Stevens of Lorillard, recommending that Richard Hickey receive continued funding:<br><br>Because Dr. Hickey no longer has an official university position, we believe it is an appropriate time for his CTR Special Project support to end. However ... Dr. Hickey [should be paid] for one year, $12,000. The consultancy would be paid from Shook Hardy & Bacon Special Account. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 101 ¶ 283 | Another example is the multiple source funding for Dr. Hans Eysenck's work on the relationship between lung cancer and the patient's "emotional makeup." Eysenck received CTR Special Project funding after initially applying-and being turned down-for a CTR SAB grant in 1969. Eysenck continued to receive CTR Special Project funding for a number of projects through 1986. Eysenck also received CTR SAB grant funding from 1973 through 1976. And Jacob also recommended to Thomas Ahrensfeld of Philip Morris, Max Crohn of Reynolds, Joseph Greer of Liggett, Arnold Henson of American, Ernest Pepples of B & W, and Arthur Stevens of Lorillard that Eysenck receive funding through Special Account No. 4 in 1978 and 1979. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 101 ¶ 284 | Lawyers' Special Accounts were primarily handled through Special Account No. 3, Special Account No. 4, Special Account No. 5, and separate institutional grants, discussed below. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **a. Special Account No. 3** | | | |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 101 ¶ 285 | Special Account No. 3 was not used to fund research, but to coordinate smoking and health databases for use by the members of the Enterprise, especially litigating counsel. Contributors to Special Account No. 3 included: American, B & W, Liggett, Lorillard, Philip Morris, and Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **b. Special Account No. 4** | | | |
| 101 ¶ 286 | From 1969 through at least 1989, American, Philip Morris, Reynolds, B & W, Liggett, and Lorillard contributed to Special Account No. 4, which was used on behalf of the Enterprise for lawyers' special project funding, consultancy fees, and witness expenses. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 102 ¶ 287 | A May 18, 1971 document prepared by Arthur Stevens of Lorillard noted the nature of "Special Account No. 4, which is used for Congressional and regulatory matters." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 102 ¶ 288 | A September 19, 1973 document prepared by DeBaun Bryant of B & W stated that Special Account No. 4<br><br>is used to maintain expenses incurred for certain research work such as that done by Arthur D. Little on multivariate analysis; work performed by witnesses in preparation for Congressional or federal agencies hearings. The following companies contribute equal amounts to this account: American Brands, B & W, Liggett & Myers, P. Lorillard, Philip Morris, Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 102 ¶ 289 | A December 9, 1977 document prepared by Max Crohn, Assistant General Counsel for Reynolds, further described Special Account No. 4: "Special Account No. 4 has been used to pay expenses and fees connected with expert consultancies and statement preparation." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 102 ¶ 290 | A document titled "Special Account No. 4-funding of Crohn Subcommittee Expenses and General Review" indicated that during a "General Counsel meeting" on January 4, 1978, it was agreed that "Special Account No. 4 could be used for paying fees and expenses of expert witnesses willing to prepare statements or consult." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 102 ¶ 291 | A January 27, 1978 memorandum to the file prepared by Arthur Stevens of Lorillard noted that:<br><br>At a Committee of Counsel meeting on January 4, 1978 the future handling of Special Account No. 4 was discussed. Each project to be funded out of Special Account No. 4 will be the subject of specific prior approval by the Committee of Counsel. However, blanket approval was given by the Committee of Counsel for expenditures out of the account not to exceed $10,000 per year, without the need for prior approval. L & M noted that it will participate in the funding of Special Account No. 4 during 1978 only to the extent that it did in 1977 (approximately $40-$45,000?). | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 102 ¶ 292 | A February 9, 1978 memorandum from William Shinn of Shook, Hardy & Bacon to Thomas Ahrensfeld, General Counsel for Philip Morris; Max Crohn, Assistant General Counsel for | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Reynolds; Joseph Greer, Vice President and General Counsel for Liggett; Arnold Henson, General Counsel for American; Ernest Pepples, Vice President and General Counsel for B & W; and Arthur Stevens, General Counsel for Lorillard, stated in part: Some of you have asked for additional information concerning funding through Special Account No. 4. This account is administered by Jacob & Medinger and Ed Jacob and I have reviewed the enclosed report. I also enclose a memorandum with regard to funding of projects and would appreciate your advice if you find this to be incorrect in any way. There is probably no need for you to retain those notes once you have satisfied yourself of the current situation. | | | |
| 103 ¶ 293 | Another 1978 document described the present and future commitments of Special Account No. 4 funds and the procedure for the approval of emergency matters. The list of industry witnesses included: Aviado, Brown, Eysenck, Spielberger, Hine, Ridgon, Seltzer, Rao, Booker, E. Fisher, Valentin, Heimstra, Dunlap, Farris, F. Fisher, Hickey, Moser, Okun, Sterling, Weil, Jones, Bick, Soloff, Kuper, Harvard Medical School (Huber), Stanford Research Institute, Franklin Institute, and the Industry Research Liaison Committee. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 103 ¶ 294 | In the 1980s, Defendants Philip Morris, Reynolds, B & W, American, Lorillard, and Liggett, through the law firm of Shook, Hardy & Bacon, contracted with Battelle Laboratories of Columbus, Ohio to conduct studies on tobacco smoke and nicotine in the environment. Special Account No. 4 was used to fund the project. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 103 ¶ 295 | A February 22, 1980 letter from Arthur Stevens, Senior Vice President-General Counsel of Lorillard, to Timothy Finnegan of Jacob & Medinger and copied to Thomas F. Ahrensfeld, Alexander Holtzman, Max H. Crohn, Joseph H. Greer, Arnold Henson, Ernest Pepples, William W. Shinn, Ed Jacob, and Janet C. Brown acknowledged exactly why Special Account No. 4 was used to fund scientists. Stevens stated: I am mindful of the continuing mandate with which your office, Shook, Hardy and others have been charged by your respective clients on behalf of the Industry: that is, to find witnesses and researchers -and, if necessary in order to determine the feasibility of developing a relationship with them, engage them as consultants, or as researchers on initially modest projects.... [T]his [is an] important aspect of the Industry's work, that is, to attempt to posture ourselves to defend product liability litigation and related attacks on our products. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 103 ¶ 296 | As with CTR Special Projects, progress and status reports of Lawyers' Special Accounts projects were sent to Committee of Counsel members. For example, on March 27, 1980, Edwin Jacob sent a letter to Thomas Ahrensfeld, Max Crohn, Joseph Greer, Arnold Henson, Ernest Pepples, and Art Stevens, enclosing research papers "in part supported by the consultation research funds you have provided to Professor Eysenck through Special Account # 4." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 103 ¶ 297 | On March 28, 1980, Jacob sent a letter to Thomas Ahrensfeld, Max Crohn, Joseph Greer, Arnold Henson, Ernest Pepples, and Art Stevens enclosing a progress report from Professor Spielberger, a recipient of Special Account No. 4 funding. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 104 ¶ 298 | On September 10, 1981, a report was prepared on "Meeting of Company Counsel and Ad Hoc Committee Members" which discussed special projects and the Literature Retrieval Division. In it, the following comments were attributed to Edwin Jacob: "These 'special projects' are litigation and hearing oriented," and: <br><br> Difference between C.T.R. and Special Four (lawyers' projects). Director of C.T.R. reviews special projects-if project was problem for C.T.R., use Special Four. Also, if there are work product claims, need the lawyers' protection ... done through Special Four because of possibility that C.T.R. would be subpoenaed. <br><br> The comment, "Concerned that science has become diluted and secondary to lawyers' advocacy interests," was attributed to Stevens of Lorillard. Thomas Bezanson of Chadbourne & Parke also prepared a memorandum regarding the September 10, 1981 meeting. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 104 ¶ 299 | A January 10, 1983 chart demonstrates that Defendants jointly funded through Special Account No. 4 both consultancies (listed were Domingo Aviado, Theodore Blau, Walter Booker, Marc Micossi, Ragner Rylander, Carl Seltzer, and Murray Senkus of Reynolds) and research projects (listed were Battelle Columbus Laboratories, Melvin First, Arthur Furst, Nancy Mello and Jack Mendelson, L.G.S. Rao, and Charles Spielberger). This chart was sent on January 11, 1983, by Patrick Sirridge of Shook, Hardy & Bacon to Joseph Greer, General Counsel for Liggett; Arnold Henson, General Counsel for American; Alexander Holtzman, General Counsel for Philip Morris; Ernest Pepples, General Counsel for B & W; Arthur Stevens, General Counsel for Lorillard; and Samuel Witt, General Counsel for Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 104 ¶ 300 | Special Account No. 4 was first administered by Jacob & Medinger and then by Shook, Hardy & Bacon starting in 1986. Attorneys from both firms would periodically request contributions from Philip Morris, Reynolds, American, B & W, Lorillard, and Liggett. The companies were also sent accountant's reports regarding the activity in the account. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 104 ¶ 301 | In 1986, Shook, Hardy & Bacon reminded Committee of Counsel members that "[y]ou will recall that Special Fund 4 also is used to cover certain witness development expenses incurred by national litigation counsel." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 104 ¶ 302 | General Counsel from Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American and lawyers from Jacob, Medinger & Finnegan and Shook, Hardy & Bacon made recommendations with respect to the funding of Special Account No. 4 projects. For example, on February 9, 1978, | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | William Shinn of Shook, Hardy & Bacon sent a letter to Thomas Ahrensfeld, General Counsel of Philip Morris; Max Crohn, General Counsel of Reynolds; Joseph Greer, General Counsel of Liggett; Arnold Henson, General Counsel of American; Ernest Pepples, General Counsel of B & W; and Arthur Stevens, General Counsel of Lorillard, recommending the approval of funding for Hans Eysenck through Special Account No. 4. | | | |
| 105 ¶ 303 | On February 12, 1982, Pepples sent a letter to Patrick Sirridge of Shook, Hardy & Bacon, recommending the renewal of an annual grant to Arthur Furst be paid from Special Account No. 4. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 105 ¶ 304 | Such industry attorney recommendations lasted from at least the 1980s through the early 1990s. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 105 ¶ 305 | Documents reflect that, at a minimum, the following individuals and organizations received funding through Special Account No. 4 beginning in the 1960s and ending in the 1990s: Able-Lands, Inc.; Lauren Ackerman; ACVA Atlantic Inc.; George Albee; Aleph Foundation; Arthur D. Little, Inc.; Aspen Conference; Atmospheric Health Sciences; Domingo Aviado; James Ballenger; Alvan L. Barach; Walter Barker; Broda O. Barnes; Battelle Columbus Laboratories; Battelle Memorial Institute; Walter Becker; Peter Berger; Rodger L. Bick; Billings & Gussman, Inc.; Richard Bing; BioResearch Laboratories; Theodore Blau; Irvin Blose; Walter Booker; Evelyn J. Bowers; Thomas H. Brem; Lyman A. Brewer, III; Brigham Young University; Oliver Brooke; Richard Brotman; Barbara B. Brown; K. Alexander Brownlee; Katherine Bryant; Victor B. Buhler; Thomas Burford; J. Harold Burn; Marie Burnett; Maurice Campbell; Carney Enterprises, Inc.; Duane Carr; Rune Cederlof; Domenic V. Cicchetti; Martin Cline; Code Consultants Inc.; Cohen, Coleghety Foundation, Inc.; Colucci, & Associates, Inc.; Computerland; W. Clark Cooper; A. Cosentino; Daniel Cox; Gertrude Cox; CTR; Geza De Takato; Bertram D. Dimmens; Charles Dunlap; Henry W. Elliott; Engineered Energy Mgt. Inc.; Environmental Policy Institute; J. Earle Estes; Frederick J. Evans; William Evans; Expenses related to Congressional Hearings in Washington D.C.; Hans J. Eysenck; Eysenck Institute of Psychiatry; Jack M. Farris; Sherwin J. Feinhandler; Alvan R. Feinstein; Herman Feldman; Edward Fickes; T. Finley; Melvin First; Edwin Fisher; R. Fisher; Merritt W. Foster; Richard Freedman; Herbert Freudenberger; Fudenberg; Arthur Furst; Nicholas Gerber; Menard M. Gertler; Jean Gibbons; Carl Glasser; Donald Goodwin; B. Greenberg; Alan Griffen; F. Gyntelberg; Harvard Medical School; Hearings-Kennedy-Hart Bill; William Heavlin; Norman Heimstra; Joseph Herkson; Richard J. Hickey; Carlos Hilado; Charles H. Hine; Hine, Inc.; Harold C. Hodge; Gary Huber; Wilhelm C. Hueper; Darrell Huff; Duncan Hutcheon; Industry Research Liaison Committee; Information Intersciences, Inc.; International Consultancy; International Technology Corporation; International Information Institute, Inc.; J.B. Spalding Statistical Service; J.F. Smith Research Account; Jacob, Medinger & Finnegan; Joseph Janis; Roger Jenkins; Marvin Kastenbaum; Leo | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Katz; Marti Kirschbaum; Kravetz Levine & Spotnitz; Lawrence L. Kuper; Mariano La Via; H. Langston; William G. Leaman; Michael Lebowitz; Samuel B. Lehrer; William Lerner; Edward Raynar Levine; G.J. Lieberman; S.C. Littlechild; Eleanor Macdonald; Thomas Mancuso; Nathan Mantel; R. McFarland; Meckler Engineering Group; Milton Meckler; Nancy Mello; Jack Mendelson; Michigan State University; Marc Micozzi; Irvin Miller; K. Moser; Albert Niden; Judith O'Fallon; John O'Lane; William Ober; J.H. Ogura; Ronald Okun; Ingram Olkin; Thomas Osdene (Philip Morris); Peat, Marwick Main & Co.; Thomas L. Petty; Pitney, Hardin & Kipp; Leslie Preger; Walter J. Priest; R. Proctor; Terrence P. Pshler; Public Smoking Research Group; R.W. Andersohn & Assoc.; L.G.S. Rao; Herbert L. Ratcliffe; Attilio Renzetti; Response Analysis Project; Response Analysis Consultation; R.H. Rigdon; Jay Roberts; Milton B. Rosenblatt; John Rosencrans; Walter Rosenkrantz; Ray H. Rosenman; Linda Russek; Henry Russek; Ragnar Rylander; George L. Saiger; D.E. Sailagyi; I. Richard Savage; Richard S. Schilling; Schirmer Engineering Corp.; S. Schor; G.N. Schrauzer; Charles Schultz; John Schwab; Carl L. Seltzer; Murray Senkus (Reynolds); Paul Shalmy; R. Shilling; Shook, Hardy & Bacon; Henry Shotwell; Allen Silberberg; N. Skolnik; JF Smith; Louis A. Soloff; Sheldon C. Sommers (CTR); JB Spalding; Charles Spielberg; Charles Spielberger; Lawrence Spielvogel; St. George Hospital & Medical School; Stanford Research Institution Project; Russell Stedman; Arthur Stein; Elia Sterling; Theodor Sterling; Thomas Szasz; The Foundation for Research in Bronchial Asthma and Related Diseases; The Futures Group; Paul Toannidis; Trenton, New Jersey Hearings; Chris P. Tsokos; University of South Florida; Helmut Valentin; Richard Wagner; Norman Wall; Wayne State University; Weinberg Consulting Group; Roger Wilson; Wisconsin Alumni Research Foundation; Jack Wiseman; George Wright; John P. Wyatt; J. Yerushalmy; and Irving Zeidman. | | | |
| | **c. Special Account No. 5** | | | |
| 106 ¶ 306 | Another avenue used by Defendants for joint funding of scientists was the research supported through Lawyers' Special Account No. 5. In a memorandum dated November 8, 1978 to Thomas Ahrensfeld of Philip Morris; Joseph Greer, Liggett; Arnold Henson, American; Ernest Pepples, B & W; Henry Roemer, Reynolds; and Arthur Stevens, Lorillard, and copied to Janet Brown of Chadbourne & Parke; DeBaun Bryant, B & W; Max Crohn, Reynolds; Alexander Holtzman, Philip Morris; Lester Pollack, Lorillard; and William Shinn of Shook, Hardy & Bacon, Edwin Jacob of Jacob & Medinger enclosed a two-year, $400,000 research proposal from Alfred M. Freedman and Richard Brotman. Jacob advised: "Janet Brown, Bill Shinn and I have discussed this proposal with [Brotman and Freedman]. We recommend its approval." The Brotman/Freedman research, related to defining risks and "unhealthy" behavior, was designated by counsel to be a Special Account No. 5 project.[FN10] FN10. Lorillard did not participate in the second phase of funding for the Brotman/Freedman research. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 107 ¶ 307 | In July 1982, Arthur Stevens of Lorillard sent an updated Brotman/Freedman proposal to Lorillard scientist Alexander W. Spears for review. In his assessment, Spears concluded that the Brotman/Freedman proposals were of "little potential value to this Industry," but acknowledged "the area of Brotman's and Freedman's value as witnesses in legislative proceedings." Lorillard participated in the joint funding of the first phase of the project, but did not participate in the second phase. Stevens | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 107 ¶ 308 | The Brotman/Freedman project was approved in 1982 by four of the Defendants: American, Reynolds, Philip Morris and B & W and ran through the mid-1980s. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **d. Institutional Grants** | | | |
| 107 ¶ 309 | Lawyers' Special Accounts were also used to pay for the institutional grants funded by Philip Morris, Reynolds, Lorillard, Liggett, B & W, and American. Defendants funded projects at Harvard University, University of California Los Angeles ("UCLA"), and Washington University. Stevens. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 107 ¶ 310 | In a November 17, 1978 memorandum, Robert Seligman, Vice President of R & D of Philip Morris, described how Defendants used institutional grants to refurbish their scientific image. Seligman reported that at the meeting Shook, Hardy & Bacon attorney William Shinn had stated:<br><br>CTR began to lose their luster in the mid-60's and the tobacco industry looked around for more beneficial ways to spend their research dollars on smoking and health. It was at this time that special projects were instituted at Washington University, Harvard University, and UCLA.... [T]he industry received a major public relation 'plus' when monies were given to Harvard Medical School. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 107 ¶ 311 | Defendants' institutional grant to Washington University in St. Louis was to research the immunologic aspects of cancer. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 107 ¶ 312 | Defendants' institutional grant to Harvard University was under the direction of Dr. Gary Huber, who was conducting in vivo and in vitro animal studies on the biologic responses to tobacco smoke. Funding began in 1972, and the participating companies were Defendants American, B & W, Liggett, Lorillard, Philip Morris, Reynolds, along with Larus & Brother, Tobacco Associates, and United States Tobacco. The project was to be funded for a total of $2,792,750 over a five-year period. Arnold Henson of American acknowledged that one of the main reasons for the Harvard project was "the PR value of the Harvard name." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 108 ¶ 313 | Joint funding at UCLA began in 1974, and the participating companies were Defendants Philip Morris, Reynolds, and B & W, along with United States Tobacco and Tobacco Associates. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **F. Committees**<br>**1. Research Review Committee, Research Liaison Committee, and Industry Research** | | | |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | **Committee** | | | |
| 108 ¶ 314 | In February 1974, a consensus had developed among Defendants that an industry committee should be established to review their support of medical research and to make recommendations as to the future course Defendants' support should take. At a CTR meeting, Lorillard, through its President Curtis Judge, agreed to participate in an increased budget for CTR only on condition that such a review of industry research be undertaken. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 108 ¶ 315 | One set of suggested guidelines from the mid-1970s for an Industry Committee for the Review of Industry's Overall Independent Scientific Research Effort was: (1) to reconsider the CTR research program, both SAB grants and Special Projects; (2) to reconsider non-CTR research projects undertaken by one or more individual tobacco companies; and (3) to consider the establishment of a means of coordinating the research undertaken in (1) and (2). | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 108 ¶ 316 | William Smith, Chairman of the Tobacco Institute's Executive Committee, wrote in April 1974, that agreement had been reached with each of the major manufacturers as to their representative on the "committee to study the research programs funded by our industry, both through CTR and independent projects." Smith reported that David Hardy of Shook, Hardy & Bacon would chair the committee; Horace Kornegay and William Kloepfer would represent the Tobacco Institute; and William Gardner and Leonard Zahn would represent CTR. Smith stated that the members of the committee were charged with the responsibility for studying industry research programs and research projects funded outside of CTR, such as those at Harvard, Washington University, and UCLA, and reporting their recommendations to the chief executives of the six major cigarette companies-American, B & W, Liggett, Lorillard, Philip Morris, and Reynolds. Meetings of the Industry Research Committee began on May 7, 1974. After meeting several times in 1974, the committee recommended that a Research Liaison Committee be appointed to serve indefinitely to achieve "a coordinated and informed overview of all industry research." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 109 ¶ 317 | Creation of the Research Liaison Committee was approved at a meeting of the Tobacco Institute on October 3, 1974, as a successor to the Research Review Committee which had been established in April 1974. The newly formed Research Liaison Committee existed through early 1978. The aims and functions of the Research Liaison Committee were to devise and implement fiscal and peer review for institutional grants, and to consider and make recommendations with respect to proposals for institutional and other research projects in light of all research efforts in and outside of the industry. Members of the Research Liaison Committee were encouraged to attend meetings with CTR in order to keep informed about its plans and projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 109 ¶ 318 | At its January 1975 meeting, the Research Liaison Committee decided that the expenses of considering the feasibility of research projects and proposals would be funded through the CTR Special Projects fund and funded by those companies agreeing to the research study. The | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Committee also decided that participating companies would pay for the auditing expenses for the institutional projects at Harvard, UCLA, and Washington University, and discussed problems regarding funding of the Harvard/Huber research project at Harvard Medical School. | | | |
| 109 ¶ 319 | A report dated November 19, 1977, written by Janet Brown, attorney for American from Chadbourne & Parke, summarized the activity of the Research Liaison Committee from its inception as the Research Review Committee in April 1974 through 1977. Brown advised that American might wish to maintain a representative on the Research Liaison Committee after the departure of its representative, Cyril Hetsko. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 109 ¶ 320 | In 1978, the budget and direction of the CTR was again an area of concern for Defendants. Accordingly, Defendants proposed that yet another committee be convened again "to take up the general question of what kind of research the industry should be into through CTR or elsewhere." A Lorillard document dated April 21, 1978, also articulated the need for a new committee:<br><br>We have again "abdicated" the scientific research directional management of the Industry to the "Lawyers" with virtually *no* involvement on the part of scientific or business management side of the business.<br><br>Industry representatives held meetings and reported to the companies' General Counsels. The name of this new committee was the Industry Research Committee, which essentially performed the same functions as the prior Research Liaison Committee. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 110 ¶ 321 | An internal letter from Ernest Pepples, B & W Vice President and General Counsel, to Joseph E. Edens, Charles I. McCarty, I.W. Hughes and DeBaun Bryant dated April 4, 1978, discussed the new committee. Pepples reported:<br><br>That Committee, as you know, has a number of disciplines and attitudes represented including research and development, public relations, legal and one CEO (Curt Judge). It is the proper place to take up the general question of what kind of research the industry should be into through CTR or elsewhere. It can also deal with the issue of contract research versus grant research. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 110 ¶ 322 | The new Industry Research Committee met on November 6, 1978. In attendance were: Ernest Pepples, B & W; Charles Tucker, Reynolds; Arnold Henson, American; Janet Brown, attorney with Chadbourne & Park; James Bowling, Philip Morris; Edwin Jacob, attorney for CTR; and Donald Hoel, attorney with Shook, Hardy & Bacon. An even larger meeting was held on December 13, 1978, and meetings continued throughout 1979, 1980 and 1981 which were attended by Defendants' representatives and industry attorneys. With respect to the direction and role of CTR, "[i]t was agreed that the CTR role would be one of basic research into the disease | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | areas that have been statistically associated with smoking. CTR would not, however, engage in research designed to test the effects of tobacco smoke or tobacco products in animal or human systems," contrary to the promises made in the original Frank Statement. | | | |
| | **2. Industry Technical Committee** | | | |
| 110 ¶ 323 | TIRC designated the research directors of its tobacco company members as the Industry Technical Committee ("ITC") in January 1954. The research directors on the first ITC included representatives from American, B & W, Lorillard, Philip Morris, and Reynolds. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 110 ¶ 324 | The ITC provided technical information to the TIRC SAB concerning tobacco, its constituents, and other matters. The chairman of the ITC was invited to sit in on all SAB meetings in order to ensure coordination between the SAB and ITC.  Members of the ITC attended SAB meetings and answered questions from the SAB. Zahn PD. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 111 ¶ 325 | At a 1967 ITC meeting held at CTR, with representatives present from CTR, Chadbourne & Parke, Liggett, American, B & W, Reynolds, Lorillard and Philip Morris, Osdene of Philip Morris reported that<br>Dr. Hockett stated that CTR is moving into an era of active collaboration with the industry and they wish to make the technical committee more effective by including biologists.... Programs will be developed in which Hockett wishes to use the industry technical committee people to give advice which will go into the development of plans for submission to the SAB. C.C. Little would like to meet with this committee either before or after the SAB meeting. He feels that this would be an opportunity to build a creative future and that CTR would move with more speed. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 111 ¶ 326 | A subsequent 1967 meeting was called to "organize the Industry Technical Committee." Present again at the meeting were representatives from CTR, American, B & W, Reynolds, Lorillard, Philip Morris, and Chadbourne & Parke.<br><br>It was stated that the Scientific Advisory Board and the C.T.R. staff [were] desirous of obtaining the regular and organized assistance of the industry technical group. Functions of the ITC [were]: 1. To bring its technical know-how to bear on problems in which it is desired. 2. To assist the staff. 3. Make suggestions.... While the makeup of the I.T.C. has usually consisted of the Research Directors of the various participating companies, it was recognized that any company could designate whomever it wished as I.T.C. member. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 111 ¶ 327 | A meeting of the ITC was held on April 26, 1968, at the CTR office in New York and was called specifically by W.T. Hoyt of CTR on behalf of the CTR staff. Representatives from CTR, B & W, Lorillard, Philip Morris, Reynolds, and American attended the meeting. The meeting was called "to hear presentations by the CTR-staff of the contract research program being proposed by | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Mason Research Institute," which was to involve large-scale, long-term mouse inhalation experiments. 955033996-4012 (U.S. 32363). It was noted that:<br><br>a) the contract status as proposed represents a significant change of "tact" [sic]. b) the proposed program represents very considerable increase in costs and outlay. c) and therefore, this entire program may represent a significant "departure from CTR plans and policy." | | | |
| 111 ¶ 328 | In describing the background for the Mason contract, Arthur W. Burke of American reported that the CTR staff had taken an interest in inhalation toxicology ten years prior:<br><br>About this time the CTR-staff began to visit the various grantees to learn what was forthcoming from their studies, and on a visit to the Leuchtenbergers' laboratory learned that evidence was accumulating that adenocarcinomas of mouse lung were occurring with smoke inhalations.... "Since foes of Industry might snatch-up such preliminary findings and misuse the information, the CTR staff entertained a limited project at Mason Research Institute, the purpose of which would be to set-up and compare the operation of several animal exposure-smoking machines in one place and at one time, using the same mouse strain, etc.-*in short to study the smoking machines per se.* This work was initiated at Mason about one year ago." In the course of these machine evaluations, Mason noted some deficiencies in some of these machines, and the "CTR recognized that they were piddling in some dangerous areas." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 112 ¶ 329 | At an October 25, 1968 ITC meeting, there was also a discussion of the relationship between the ITC and the CTR Scientific Advisory Board. Hoyt voiced the opinion that the SAB is considering "more targeted research with closer CTR staff monitoring which would be in a) academia by grants, and b) other places by contract-where necessary." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 112 ¶ 330 | In a 1970 report, the Defendants' research directors-Helmut Wakeham of Philip Morris; Preston Leake of American; Alexander Spears of Lorillard; Murray Senkus of Reynolds; William W. Bates of Liggett; and I.W. Hughes of B & W-expressed their displeasure with CTR's research program, its focus on studies of diseases that were associated with smoking, its defensive posture, and its lack of guidance for future strategy of the tobacco industry in the area of smoking and health. The report offered opinions as to how CTR might become more effective as an instrument for the good of the tobacco industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 112 ¶ 331 | In the 1960s, the ITC assisted the Tobacco Institute, and ITC members were encouraged to attend meetings at the Tobacco Institute. An ITC meeting at the Tobacco Institute was called "to discuss the possible implications of a $50,000 grant from National Institutes of Health to the F.T.C. laboratory to develop a smoking machine capable of carbon monoxide analysis." Present at the meeting were representatives of Liggett, American, Reynolds, Lorillard, Philip Morris, B & W, Covington & Burling, and the Tobacco Institute. There was much concern over the possibility that | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | the FTC intended to publish brand carbon monoxide levels. The attendees suggested that Defendants be ready to demand public hearings on methodology and be prepared to "counteract the increasingly irrational public image being drawn by anti-smoking forces" on carbon monoxide hazard. | | | |
| | **3. Tobacco Working Group** | | | |
| 112 ¶ 332 | In March 1968, the National Cancer Institute created the Tobacco Working Group ("TWG") to serve as an advisory group to its Smoking and Health Program which was directed by Dr. Gio B. Gori. The Group was composed of a broad cross-section of scientists, researchers, and treating physicians specializing in smoking and health. Four of its members were from the tobacco industry: Murray Senkus, Director of Research for RJR; Alexander Spears, Director of Research and Development for Lorillard; Helmut Wakeham, Vice President of Corporate Research and Development for Philip Morris; and Charles Kensler of Arthur D. Little, Inc. By 1969, William Bates, Director of Research at Liggett, was attending TWG meetings, and by 1971, I.W. Hughes of Brown & Williamson had accepted membership. The TWG existed in various forms from 1968 through 1977, when it was dissolved as a cost cutting measure. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 113 ¶ 333 | Industry representatives repeatedly informed the TWG that they were participating in their individual capacities, and not as representatives of their individual tobacco company employers. Moreover, they emphasized that their participation did not represent acceptance of the view that cigarettes were hazardous to health or caused lung cancer. U.S. 88, 489. In his 1968 letter accepting membership in the TWG, Murray Senkus stated "I am in no manner accepting the view (1) that present cigarettes are hazardous or (2) that the smoke of such cigarettes causes or contributes to the development of human lung cancer." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 113 ¶ 334 | Participation by industry representatives proved valuable by allowing Defendants to keep abreast of what the United States Government was doing with respect to smoking and health issues. Their participation also provided a mechanism by which Defendants could try to influence the United States Government's activities in the smoking and health arena. An undated B & W document, discussing United States Department of Health, Education and Welfare activity in the 1960s, clearly articulated the reasons for Defendants' participation on the TWG:<br><br>Of these four actions [taken by the United States Department of Health, Education and Welfare with respect to smoking and health issues], the first three [developing epidemiological evidence linking smoking and certain diseases; launching a program to alert the public about the dangers of smoking; and pushing for legislation which would reduce cigarette consumption] have been of such immediate concern that they have received most of the attention of the tobacco industry. However, the later [initiating a research program designed to produce a "less hazardous cigarette"] is probably as important, or perhaps more important for the long-term future of the | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | industry. Although work in this area is in its initial stages, the direction of this work seems clearly indicated and should be evaluated.<br><br>* * *<br><br>One can logically expect that any reluctance on the part of industry to voluntarily produce commercial cigarettes on the basis of positive results from this program would result in legislation to force adoption. In all probability, little attention is likely to be given to the commercial acceptability of the [unreadable] from this program.<br><br>* * *<br><br>Since industry has representatives on this committee, it should be possible to remain completely aware of all actions taken and to have at least some influence on these actions. If one assumes complete and frank interchange of information arising from within this committee among all companies, the companies should then operate from a common base. | | | |
| 113 ¶ 335 | Similarly, a March 9, 1972 document drafted by Alexander W. Spears of Lorillard recognized:<br><br>If I were to withdraw [from the TWG], Lorillard would lose considerable insight into the workings of the National Cancer Institute program with respect to cigarettes. There is a very real possibility that this program is going to have a profound effect on the cigarette industry, and I believe that we should be aware of these effects as soon as they become clear. We also have some significant influence on the course of the detailed activities and, therefore, some effect on ultimate results. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 114 ¶ 336 | Defendants' approach to the TWG and all Defendants' related activities were jointly formulated and closely monitored by committees of industry lawyers and executives to ensure that such "participation" in the TWG did not threaten-and indeed served-Defendants' common purposes. Defendants' representatives to the TWG regularly reported to their counsel, who kept company executives, CTR, the Tobacco Institute, and one another abreast of TWG activities. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 114 ¶ 337 | The Enterprise engaged in a concerted effort to prevent, curtail, and ultimately to neutralize the TWG's efforts to evaluate cigarettes' effects using an animal inhalation bioassay developed by researcher Oscar Auerbach. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 114 ¶ 338 | In Auerbach's study, beagle dogs smoked cigarettes for up to 2.3 years through a throat opening in their windpipes. Two of the eighty-six dogs which started the test developed early squamous cell bronchial carcinoma, the most common lung cancer occurring in humans. An April 3, 1970 report from a United Kingdom tobacco manufacturer, Gallahers, circulated among Defendants, | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | concluded that "we believe the Auerbach work proves beyond a reasonable doubt that fresh whole cigarette smoke is carcinogenic to dog lungs and therefore it is highly likely that it is carcinogenic to human lungs." Dr. Auerbach and his co-researcher E. Cuyler Hammond applied to NCI to conduct follow-up studies on the effects of nicotine on cardiovascular disease in dogs, and made a presentation to the TWG at a meeting in November of 1970. | | | |
| 114 ¶ 339 | The Tobacco Institute carefully researched Auerbach and his past research projects and shared information with its member companies on behalf of the Enterprise. Helmut Wakeman indicated in a December 22, 1971 letter to other industry TWG members that "[t]he very great probability that this proposal will be accepted and funded by the N.C.I. is a matter of considerable concern to the tobacco industry." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 115 ¶ 340 | Despite the findings of Defendants' scientists, which affirmed the significance of the Auerbach study, the Tobacco Institute publically questioned the results. A 1970 Tobacco Institute press release stated, "We have good reason to question whether lung cancer experts in this review group were able to confirm any finding of lung cancer[.]" | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 115 ¶ 341 | Representatives of the Defendants also decided to try to block the TWG from replicating Auerbach's research. Edwin Jacob, counsel to CTR and Reynolds, instructed Reynolds's scientists Murray Senkus and Alan Rodgman, as well as other Defendants' scientists, to prevent the TWG from performing dog inhalation studies such as those deemed necessary to develop new products. Jacob argued against such studies on the grounds that they would be an admission by Defendants that existing cigarette products were harmful. Moreover, Jacob-an attorney, not a scientist-feared that these experiments might show proof of nicotine habituation. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 115 ¶ 342 | In his report to the Tobacco Institute Annual Meeting on January 28, 1971, William Kloepfer boasted that<br><br>[o]ur constant pressure on Hammond's and Auerbach's shaggy-or shabby-dog story has put that work as reported so far into a permanent file marked controversy-especially among scientists. It did more than that. It demonstrated our counterattack capability as a team. During the rest of the year we missed no event worth talking about in which our comment wasn't issued-and printed and broadcast-the same day. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 115 ¶ 343 | In addition to trying to shape the path of research undertaken by the TWG, Defendants' lawyers and executives determined that their scientist representatives on the TWG would offer no suggestions about experiments to conduct or projects to pursue in the search for a less hazardous cigarette. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 115 ¶ 344 | Defendants also utilized the relationships they developed with certain government scientists through the TWG. After the TWG was disbanded, they retained two of its members, Dr. Gio Gori, | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | former Chairman of the TWG from NCI and Dr. T.C. Tso from USDA, as consultants. Gori has been a spokesperson and consultant for the industry since leaving the NCI in the 1980s and Philip Morris secured the services of Tso upon his retirement from USDA in 1983. | | | |
| | **G. Coordinated Smoking and Health Literature Collection and Retrieval** | | | |
| 115 ¶ 345 | One of Defendants' paramount objectives has consistently been to avoid the issuance of any liability findings that could result in large damage awards as well as increased public recognition of the harmful effects of smoking. In pursuit of that objective, Defendants collectively gathered, organized, stored, and eventually automated medical and scientific literature related to smoking and health research. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 116 ¶ 346 | According to a February 1969 Lorillard memorandum, Defendants' "Central File" was started in the late 1950s, was supported financially by all members of the industry, and was supervised by the Ad Hoc Committee. It was eventually consolidated and put under the direct supervision of Defendants' attorney Edwin Jacob. The "Central File" was a collection of every document which could be found relating to the smoking and health controversy. Beginning in or about 1967, the major tobacco companies, with the exception of Lorillard, also joined together and established an "Information Center" for the collection, summarization, and computerization of all information and documents concerning smoking and health. The purpose of the Information Center was to have information readily available to the industry for litigation and congressional hearings. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 116 ¶ 347 | By 1964, indices of scientific literature were also being compiled separately by the individual Defendants and their agents for litigation purposes. Edwin Jacob, attorney for CTR, Reynolds, and B & W, employed a supervisor and three other employees to abstract and catalogue current medical and scientific literature by subject and author for litigation purposes. Henry Ramm, attorney for Reynolds, kept a similar but larger index, containing over 20,000 documents in eight volumes. In addition, Kenneth Austin and three other CTR staff members compiled indices of scientific literature for litigation purposes. Litigation indices were also kept by Janet Brown, attorney for American, and Alexander Holtzman, attorney for Philip Morris. Liggett hired a person to gather literature and advocated using space at an outside law firm of one of the companies to do the task, so that future literature could be collected "under the wing" of counsel. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 116 ¶ 348 | In a mid-1960s report, Lorillard stated<br><br>Because of the continued attacks on the industry ... it is in the best interests of Lorillard to join forces with all other members of the industry concerning the health controversy.<br><br>Although each cigarette company handled its own litigation through various trial attorneys, there | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | is a high degree of cooperation between the companies through ... the "Ad Hoc Committee" which finds medical witnesses and prepares testimony. Lorillard's representative on this Committee is Mr. David Hardy. The Committee supervises the Central File which is a collection of every document which can be found relating to the smoking and health controversy. This cooperation must be continued. An adverse decision against any member of the industry would be disastrous to all. | | | |
| 116 ¶ 349 | Defendants shared the expense of bibliographic services and analysis performed for the Central File. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 116 ¶ 350 | In 1971, the services supported under the Central File and the services performed by the Information Center were transferred to CTR. At the first meeting of CTR's Board of Directors after its incorporation in 1971, the Board gave approval to CTR to take over and operate, as a CTR Special Project, an information and retrieval system and to computerize medical literature, articles, and other published documents relating to tobacco and health, with the expenses to be borne by the participating companies. At the first annual meeting of CTR members after incorporation, the members approved the name Information Systems for this special project. Information Systems became a division of CTR which analyzed, summarized, indexed, and retrieved scientific and medical literature at the direction of Defendants' attorneys. Defendants relied on this division of CTR to review the medical literature relating to smoking and health even though they continued to monitor literature in-house. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 117 ¶ 351 | The Report of the Chairman to the second annual meeting of CTR members held on January 28, 1972, revealed that Information Systems had been changed to Information Retrieval Division. The Division was staffed by a group of twenty-six people and financed separately from the general budget; its name was eventually changed to the Literature Retrieval Division. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 117 ¶ 352 | CTR maintained a separate checking account called CTR Special Account No. 1 for the Literature Retrieval Division. CTR requested, received, and deposited monies from its sponsor companies for the Literature Retrieval Division. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 117 ¶ 353 | In addition to the CTR Literature Retrieval Division, Defendants American, B & W, Liggett, Lorillard, Philip Morris, and Reynolds also continued to fund Special Account No. 3 through Edwin Jacob's firm. The account was designated as a "File for Litigation" and was "used to maintain an office where several doctors work on an analysis of medical literature." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 117 ¶ 354 | Yearly expenditures for the Literature Retrieval Division continued to be shared by Defendants from 1970 until the Literature Retrieval Division ceased to exist in 1983. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 117 ¶ 355 | During her tenure in the Public Affairs Division of the Tobacco Institute, Anne Duffin obtained source material from the Literature Retrieval Division to assist her in writing articles, pamphlets, handouts, and other publications. Examples include "Smoking and Health 19641979, The | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Continuing Controversy," "Cigarette Smoking and Cancer: A Scientific Perspective, 1982," and "Cigarette Smoking and Heart Disease, 1983." | | | |
| 117 ¶ 356 | Alexander Spears's informal review report described the Literature Retrieval Division operation as "nearly complete coverage of the world medical literature on tobacco and health available at each user location with essentially state of art information search and retrieval capability."Because the Literature Retrieval Division system was useful to Lorillard "in the area of tobacco and health related to litigation and governmental regulatory proceedings," Spears supported the decision by Lorillard to fund the Literature Retrieval Division "since it seems an integral part of defending the industry and this company in the defined area." Lorillard funded the Literature Retrieval Division from 1980 through 1983. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 118 ¶ 357 | In September 1981, the Ad Hoc Committee, including William Shinn and Robert Northrip from Shook, Hardy & Bacon, met and discussed a proposal to sever the Literature Retrieval Division from CTR and reorganize it, along with the Central File (sometimes referred to as the Tobacco Litigation File), into a separate corporation. By providing litigation support services to counsel defending smoking and health actions, the separate corporation would be able to provide more extensive and reliable work product protection for the Literature Retrieval Division's microfilmed, computerized database and abstracts on smoking and health information when discovery was sought in litigation. *See* (no bates) (U.S. 36321 at 275). The proposal, which was ultimately adopted and implemented, recommended that: (1) the Literature Retrieval Division be removed to the custody of defense counsel into a new business corporation to be formed called LS, Inc., the stock of which would be owned by the four law firms; (2) payments to LS, Inc. by the law firms would be on a per client market share basis for all functions; (3) the only users of the system would be the four law firms plus Covington & Burling, representing the Tobacco Institute; (4) the only use of the system would be for litigation, which would be defined to include administrative proceedings and legislative hearings, at which proceedings and hearings the law firms were representing their clients; and (5) Fred Giller, then-Director of CTR's Literature Retrieval Division, would be appointed President and CEO of LS, Inc. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 118 ¶ 358 | In March 1983, the Committee of Counsel approved the implementation and incorporation of LS, Inc. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **H. Defendants' Organizations Focused on ETS Issues** | | | |
| 118 ¶ 359 | From the 1970s forward, members of the Enterprise, specifically Philip Morris, Reynolds, Lorillard, B & W, BATCo, and the Tobacco Institute on behalf of its member companies, pooled their resources and coordinated their activities with respect to passive smoking, or environmental tobacco smoke ("ETS"), issues through a variety of committees and organizations. The aims of the many different industry ETS organizations were to coordinate an industry position on passive | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | smoking and to fund projects that would generate data supporting the industry's position that tobacco smoke was not a proven health risk to nonsmokers. | | | |
| 119 ¶ 360 | The first industry committee dedicated specifically to addressing ETS concerns was formed as early as 1975. The committee, chaired by Shook, Hardy & Bacon counsel Don Hoel, met under the direction of the Research Liaison Committee to address ETS-specific projects which, at the time, were funded via Special Account. Regular members of this committee, sometimes referred to as the Public Smoking Committee or Advisory Group, included company scientists from Reynolds, Philip Morris, B & W, and Lorillard. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 119 ¶ 361 | Defendants reestablished this committee in 1984 under the name of the Tobacco Institute ETS Advisory Committee, or TI-ETSAG. ETSAG met almost monthly to propose, review, and manage scientific projects that the Committee of Counsel approved for funding. Regular members of ETSAG also included company scientists from Reynolds, Philip Morris, B & W, and Lorillard, in addition to Tobacco Institute representatives, Don Hoel, and Covington & Burling attorney John Rupp. 2021004058-4064 (U.S. 20339). While neither Liggett nor American directly participated in ETSAG, both participated with the funding of approved projects. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 119 ¶ 362 | The Center for Indoor Air Research ("CIAR") was formally established in 1988 to carry out industry-funded research related to passive smoking; the original charter members were Defendants Philip Morris, Reynolds, and Lorillard. Although CIAR had a Scientific Advisory Board to review the merit of project proposals, only the CIAR Board of Directors had authority to approve a project for funding. Moreover, a large number of industry favorable CIAR projects were approved directly by the CIAR Board of Directors without any review by its SAB. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 119 ¶ 363 | These committees and organizations furthered Defendants' collective goals by: (1) coordinating and funding Defendants' efforts to generate evidence to support its position that there remained an "open controversy" as to the health implications of exposure to ETS; (2) leading the attack on the Government's efforts to act on evidence linking ETS to disease; and, (3) in the case of CIAR, appearing to be an independent research funding organization when it was really a facade for concealing industry participation in certain studies. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 119 ¶ 364 | There is overwhelming evidence demonstrating Defendants' recognition that their economic interests would best be served by pursuing a united front on smoking and health issues and by a global coordination of their activities to protect and enhance their market positions in their respective countries. To further their shared objectives, the Defendants, over an extended period of time, created, controlled, used, or participated in an astonishing array of international entities, including, among many others, the Tobacco Manufacturers' Standing Committee ("TMSC"), which became the Tobacco Research Council ("TRC") and then the Tobacco Advisory Council ("TAC"); the International Committee on Smoking Issues ("ICOSI"), which became the | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | International Tobacco Information Center, Inc. ("INFOTAB") and then the International Tobacco Documentation Center ("TDC"); and the Center for Cooperation in Scientific Research Relative to Tobacco/Centre de Coopération pour les Recherches Scientifiques Relatives au Tabac ("CORESTA"). | | | |
| 120 ¶ 365 | Defendants coordinated their efforts to further their economic interests through multiple meetings around the globe. These numerous meetings, held between the 1950s and at least 2000, were scheduled by correspondence and memoranda that were sent via facsimile and by mail. While the cited exhibits are to meetings in the 1990s, many other exhibits cited throughout these Findings pertain to meetings between the 1950s and 2000. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 120 ¶ 366 | Agendas were usually transmitted in advance of the meetings and Defendants agreed, through correspondence, which of their industry representatives would and should attend. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 120 ¶ 367 | In many instances, meeting participants summarized the substance of the meetings, recorded the nature of the discussions, and identified the company representatives in attendance. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 121 ¶ 368 | Defendants used international meetings to identify and coordinate the respective responsibilities of the many international organizations affiliated with the tobacco industry such as the International ETS Management Committee ("IEMC"), Confederation of European Community Cigarette Manufacturers Limited ("CECCM"), TAC, INFOTAB, and others. Scores of documents demonstrate the sophisticated planning and coordination, as well as the division of labor, between the industry's international organizations. To cite just one example of allocation of responsibilities, W. David Rowland of Rothman's International summarized the "end product" of a July 25, 1995 IEMC meeting by stating: "However, it was eventually resolved: IEMC will develop the messages (globally), CECCM will deliver these messages (in Europe)." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 121 ¶ 369 | United States Summary Exhibit 17361(A) summarizes a vast number of Defendants' memoranda, agendas, and meeting minutes, all used to coordinate Defendants' meetings throughout the world. As this Summary Exhibit demonstrates, high-level decision-makers, including corporate officers, legal counsel, and experienced public relations and scientific personnel, attended Defendants' international meetings. It is clear from the frequency with which the names of the following individuals appear in the Summary Exhibit that they each played a central role in coordinating Defendants' efforts and ensuring that a united front was developed and followed on smoking and health issues: Sharon Blackie, a BAT scientist; John Rupp, Covington & Burling attorney; Charles Green, RJR Principal Scientist; Helmut Reif, Principal Scientist at a Philip Morris subsidiary and member of CIAR Board of Directors; Richard Carchman, Philip Morris Director of Scientific Affairs; J. Kendrick Wells III, B & W General Counsel; and Christopher Proctor, BATCo Head of Scientific & Regulatory Affairs at Chadbourne & Parke in United States between 1989 and 1993. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 121 ¶ 370 | Defendants used their many international meetings as opportunities to meet, coordinate and cooperate in identifying "threats" to the industry and to develop responses to these perceived "threats" as they evolved over time. For example, Sharon Blackie, John Rupp, Matt Winokur, J. Kendrick Wells, Chadbourne & Parke attorney Thomas Bezanson, and Christopher Proctor met on several occasions to discuss the activity of EPA and IARC, including the status and timing of the impending EPA risk assessment and IARC study and Defendants' potential responses thereto. Similarly, Defendants used INFOTAB to prepare a response to the perceived threats to the tobacco industry posed by the forthcoming IARC report. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 122 ¶ 371 | Defendants closely tracked regulatory "threats" to the industry in the United States. For example, the minutes of an August 26, 1996 CECCM meeting in Amsterdam read:

[N]ational Developments. USA. President Clinton has taken the decision to put tobacco under FDA jurisdiction. This decision will be challenged by the cigarette manufacturers. Since this decision has reactivated the debate on children and smoking, the Chairman will raise the issues again at the next Board meeting. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 122 ¶ 372 | ICOSI, one of the organizations that afforded Defendants an opportunity to meet regularly, explicitly recognized the international nature of the "threat" to Defendants' business. An April 1979 ICOSI document noted:

The problems and attacks proposing restrictions of smoking and normal commercial activities like advertising and publicity have become *highly international.* ... No *one* industry in one country nor any *one* company can wage and win the battle against this sort of organized world-wide attack.... The *whole Industry,* companies and Trade Associations alike *must unite* with *common targets* and *common approaches.* | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 122 ¶ 373 | The extent to which Defendants' far-reaching cooperative international conduct affected United States' interests is demonstrated by the following: meetings were held on United States soil; representatives of United States companies and organizations, including Defendants, attended meetings of the cooperating organizations both in the United States and abroad; at these meetings extensive consideration was given to the impact of United States litigation on overseas tobacco companies, as well as the impact of overseas development upon litigation in the United States; and express coordination with the United States tobacco industry, including Defendants, was planned and organized. For instance, in 1973, the Tobacco Institute's Committee of Counsel discussed expanding the Tobacco Institute's central role in the Enterprise to offshore activities, including combating foreign anti-cigarette activity. The purpose of expanding the Tobacco Institute's role was to preserve Defendants' position on smoking and health abroad and prevent erosion of public industry positions that had been adopted and publicized in the United States by | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | the actions of non-domestic companies.<br><br>It is preferable for the domestic industry to act together to combat foreign activity than for individual companies to act. On the subject of smoking and health the domestic industry has acted in concert through the Institute in the past, as it is legally permitted to do and presumably intends to continue to do. Thus, the policy with respect to combating anti-cigarette activity abroad would be but an extension of the domestic policy. | | | |
| 122 ¶ 374 | Additional examples of the nexus between Defendants' international organizations and the United States include a December 1978 memorandum asserting that the effectiveness of ICOSI required coordination with and input from the Tobacco Institute and Shook, Hardy & Bacon, 2501018326-8327 (U.S. 21505); a September 1983 INFOTAB meeting, held in Washington, D.C., concerning "[h]ow to use a tobacco network-U.S. hearings," 2501021486-1489 (U.S. 25366); INFOTAB's 1991 retention of Lovell, White & Durrant to provide legal clearance for all documents related to smoking and health, and of Chadbourne & Parke to review the documents with an eye toward making sure that "due consideration is given to the legal position in the United States;" a January 1993 CECCM meeting in Bonn, Germany, considering the "E.P.A. report on risk assessment of ETS" and "[r]eview of the published literature on smoking and work performance prepared by Covington & Burling," 300543360-3366; a February 1997 meeting concerning IARC Action, scheduled to "[r]eview status of study release ... expectations re: timing, risk, number, U.S. vs. European release" and "U.S.-based Scientific Assessment Team (on all in event of publication in U.S.-based journal);" and a May 1997 International Counsel Meeting, held in New York, regarding the "[i]mpact of U.S. litigation resolution discussions on other countries," as well as British and Australian matters. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 123 ¶ 375 | BATCo participated in many industry meetings related to ETS issues, as shown in U.S. 18325, a demonstrative exhibit showing a sampling of the many meetings that included direct contact with one or more representatives of BATCo. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **2. TMSC - Tobacco Manufacturers' Standing Committee** | | | |
| 123 ¶ 376 | On February 12, 1954, the British Minister of Health made a statement before the House of Parliament regarding the report of a special committee appointed by the British Health Ministry suggesting that the statistical evidence pointed to a possible causal relationship between smoking and lung cancer. The British tobacco manufacturers in the United Kingdom approached the Minister of Health and, on his advice, agreed to donate £250,000, to be spread over seven years, to the Medical Research Council for research into smoking and lung cancer. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 123 ¶ 377 | In March 1954, John Hill of Hill & Knowlton, TIRC's public relations counsel, and Alan Campbell-Johnson, the London associate of Hill & Knowlton, met with D.M. Oppenheim, | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | BATCo Chairman; Robert Sinclair, Imperial Tobacco Chairman; and E.P. Partridge, Imperial Tobacco Director and Secretary, to discuss the newly-formed TIRC and a possible relationship between TIRC and the tobacco manufacturers in the United Kingdom. Hill outlined proposed plans, policies, functions, and responsibilities for TIRC, the TIRC SAB, and the TIRC Research Director, and showed the group proofs of the about-to-be published white paper (detailed discussion of Hill & Knowlton/TIRC white paper at Section III(B), *supra* ). The British executives offered suggestions for changes to the white paper because "[q]uite naturally the British Tobacco group is vitally interested in what we do because the repercussions of what happens in the United States will affect Great Britain and vice versa." Timothy Hartnett, President of B & W, and other members of the TIRC Board "had asked [Hill] to discuss with [the BATCo and Imperial Tobacco executives] the possibility of some form of liaison between the two groups" and to suggest<br><br>that this could be worked through Hill & Knowlton, Inc. and our London Associate Campbell-Johnson, or in any other way they might suggest. The reaction to the idea of liaison was most favorable.<br><br>The arrangement by which Campbell-Johnson would "act as liaison through which the British industry could clear information regarding developments which it desired to communicate to TIRC" was confirmed by Timothy Hartnett when he was in London later in the spring of 1954. | | | |
| 124 ¶ 378 | In June 1956, the Tobacco Manufacturers' Standing Committee ("TMSC") was formed by BATCo and other United Kingdom tobacco manufacturers, giving formal status to the co-operation in research of the group of manufacturers who in 1954 made a donation of £250,000 to the Medical Research Council for investigation into the causes of lung cancer.<br><br>Its stated purpose was to assist research into questions concerned with the relationship between smoking and health, to keep in touch with scientists and others working on this subject in the United Kingdom and abroad, and to make information available to scientific workers and the public.<br><br>Geoffrey F. Todd was appointed Director of TMSC. Alan Campbell-Johnson, Hill & Knowlton's London associate, was appointed public relations consultant to TMSC. TSMC occupied a position in the United Kingdom analogous to the position of TIRC in the United States. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 124 ¶ 379 | As of August 31, 1959, the members of TMSC were Anthony McCormick and D.M. Oppenheim of BATCo; Alexander H. Maxwell; E.R. Adler of Carreras; R.S.W. Clark and E.J. Partridge of Imperial Tobacco; E.J. Foord of Gallahers; P.A.G. Philips of Godfrey Philips, Ltd.; J. Wallington | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | of Ardath Tobacco Co., Ltd.; and F.H. Wright of J. Wix & Sons, Ltd. TMSC also had a Technical Subcommittee which was comprised of members of the various UK tobacco manufacturers. | | | |
| 124 ¶ 380 | In June 1957, the Medical Research Council in England issued a statement, supplemented by a statement from the Minister of Health, condemning tobacco as a major cause of lung cancer and calling for a program by local health authorities and their education departments that would inform the general public of the risks of smoking. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 124 ¶ 381 | TMSC member companies in the United Kingdom and TIRC member companies in the United States coordinated their efforts to promote the open question on the relationship between smoking and disease and to deny causation. After Timothy Hartnett, TIRC Chairman, traveled to England to meet with TMSC members in June 1956, Campbell-Johnson wrote to John Hill that Hartnett's "presence at that particular moment should do much materially to help to get relations between TIRC and the new committee [TMSC] off to a good start." Campbell-Johnson ended the letter by counseling that:<br><br>[C]lose thought is needed on the relationship between TIRC and TMSC and the public relations implications of this are clearly left to our discretion to consider. While it is fully appreciated that the operations are, in fact, and should appear to be entirely separate, there clearly will be occasions when pronouncements emanating from one or other side of the Atlantic, from our respective authorities, can be usefully promoted at both ends. There now exists a potential interest in TIRC dicta on this side of the Atlantic and perhaps in TMSC statements on your side. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 125 ¶ 382 | Minutes of a November 15, 1960 TIRC meeting state, in part:<br><br>A close working relationship is maintained with the Tobacco Manufacturers' Standing Committee in England, which organization parallels the TIRC. Although methods of operation are considerably different, our cooperation, both in research and public relations, has proven very valuable. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 125 ¶ 383 | Representatives from TMSC, which included BATCo representatives, came to the United States in 1958 and met with representatives from TIRC, American, Liggett, and Philip Morris, among others. Clarence Cook Little, the first scientific director of TIRC, was among the individuals interviewed. A memorandum, drafted by BAT representatives and titled "Report on Visit to U.S.A. and Canada, 17th April-12th May 1958," demonstrated that although "Defendant manufacturers continued to assert publicly that there was no proof that cigarette smoking caused any disease," these public positions clearly "did not accord with the private views of their own scientists." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 125 ¶ 384 | G.F. Todd, Director of TMSC, attended a number of TIRC SAB meetings in the 1960s. | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 125 ¶ 385 | In 1963, TMSC decided to conduct its own smoking and health research program. To reflect that fact, TMSC was renamed the Tobacco Research Council in January, but retained the same purpose and mission as its predecessor. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **3. TRC - Tobacco Research Council** | | | |
| 125 ¶ 386 | When TMSC changed its name to the Tobacco Research Council ("TRC") in 1963, TRC continued to be funded by BATCo and other United Kingdom tobacco manufacturers. TRC built the Harrogate Labs in England. BATCo sat on the board at the Harrogate Laboratories and was one of the entities that directed the research at Harrogate. Research was conducted at the TRC laboratories in Harrogate from 1962 through 1974, when Harrogate was sold. Its projects included mouse skin painting, inhalation studies, other biological assays, and nicotine pharmacology. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 125 ¶ 387 | An October 1964 TRC trip report confirmed that Sir Philip J. Rogers, TRC Chairman, and Geoffrey F. Todd, TRC Director, had visited the United States and met with representatives of Defendants RJR, American, B & W, Philip Morris, Liggett, Lorillard, CTR, and the Tobacco Institute, as well as Hill & Knowlton executives and attorney Edwin Jacob, in a series of meetings. The United States manufacturers' main criticism of TRC's bio-assay research at Harrogate was that the research was an "implied admission that cigarettes are harmful." B & W considered TRC's research policy "particularly prejudicial to them through their association with B.A.T." The TRC representatives agreed that Harrogate bio-assay research might be seen as an implied admission, but pointed out that<br><br>TRC constantly bore in mind the possible repercussions of its actions in U.S.A. and that T.R.C. research was based on the needs of the situation in the U.K., including a need from the legal point of view to give no grounds for an accusation of negligence against the manufacturers.<br><br>At one of the meetings with Philip Morris, "[t]he informal agreement between TRC members not to make health claims was explained." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 126 ¶ 388 | Correspondence from Addison Yeaman, B & W General Counsel, to Anthony D. McCormick, BATCo's company secretary, in February 1966 sought to arrange for "a closer liaison between Harrogate, Hamburg and our C.T.R." It noted that "the cigarette companies in the U.S. have given the prime responsibility in the health area to their lawyers" and suggested that the lawyers, who direct "day-by-day decision and policy directions ... in the first instance" could facilitate this communication, in lieu of the "executive heads" of the respective tobacco companies. The letter noted that Ed Finch, as Chairman of the Executive Committee of the Tobacco Institute and President of B & W, could head the group and that Ed Jacob of Jacob & | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Medinger, counsel to CTR, should be included as he "is on retainer from RJR as well as B & W." Yeaman indicated in his letter that he was "troubled" that a prospective Harrogate research report might concede a significant causal relation between the use of tobacco and cancer of the lung.... [W]e would hope to be afforded the opportunity of consulting with the people on your side concerning the way Harrogate's work is presented, admittedly with the hope of "slanting" the report. | | | |
| 126 ¶ 389 | On February 14, 1967, A.W.H. Stewart-Moore, a member of the TRC Executive Committee, sent a letter to Virgil D. Heger, Executive Vice President of American Tobacco, notifying him that TRC would be sending a delegation of scientists to the United States in March to discuss nicotine with scientists designated by CTR. Despite the scientific nature of the meetings, Stewart-Moore indicated that the meetings would include "the lawyers from the major American tobacco manufacturers." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **4. TAC-Tobacco Advisory Council** | | | |
| 126 ¶ 390 | The TRC was re-named the Tobacco Advisory Council ("TAC") on August 31, 1978. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 126 ¶ 391 | Various members of the Enterprise participated in the TAC, including BATCo, RJR, and Philip Morris, John Rupp of Covington & Burling and Don Hoel of Shook, Hardy & Bacon. The last TAC meetings occurred in May of 1999. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 126 ¶ 392 | Alex Marine, BATCO counsel, in notes prepared on October 3, 1983 of a recent TAC Meeting on Smoking and Health, stated that:<br><br>[I]n BAT's view, the biggest single threat facing the industry, in both this country and elsewhere, is the issue of smoking and health. Because of this, we believe that the industry must be united in its universal stand on this issue and that no member company should seek to exploit the smoking and health issue for its own commercial advantage.... The industry is acutely aware of the possible impact on our business of the Product Liability laws around the world, and in particular those in the U.S.A.... I need not remind you that over the past 20 years, no less than 100 civil suits in the U.S.A. have been successfully defended by our Industry. Continuous success has not been coincidental. On the contrary, it has very largely been achieved by a co-ordinated and consistently applied self-discipline on the subject of smoking and health within the Industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 127 ¶ 393 | At a November 16-17, 1983 meeting, the TAC member company tobacco research directors agreed to modify a TAC publication, "Review of Research Activities," in response to the eleventh hour intervention by BAT lawyers on many aspects of the galley proof of the publication [because of] the extreme sensitivity of many of the issues, and of the vital need to be safe rather than sorry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | The participants agreed to replace summaries of the results of grantees' research-which the researchers had written-with "much shorter statements of results prepared by TAC and agreed to by the grantees." 109840381-0383 at 0383 (U.S. 20261). | | | |
| 127 ¶ 394 | TAC continued the British tobacco industry's relationship with public relations and research entities in the United States with respect to ETS issues. A February 24, 1986 RJR interoffice memorandum from Charles Green, RJR scientist, to his superior, Alan Rodgman, concerning the International ETS Working Committee stated:<br><br>A proposal has been made to Mr. Don Hoel, an attorney for Shook, Hardy & Bacon and chairman of the TI-ETS Working Committee, that more formal cooperation be established between the scientific committees concerned with ETS.<br>The memorandum further pointed out that members of the TAC were<br>prepared to meet with representatives of the U.S. Tobacco Institute ETS Working Committee in London on April 8th. Mr. Hoel has requested that Dr. Tom Osdene of Philip Morris and I accompany him to this meeting. It is expected that this will be the first of two or three meetings per year where the various committees will exchange scientific information and coordinate proposed studies.<br><br>Green requested permission from RJR to attend the meetings as "the value of our participation in these meetings should be obvious." Handwritten comments on the typed memorandum read:<br>Bob: Neither legal nor I have a problem with this. In fact, Mary Ward thinks it's a great idea. May we have your approval for Dr. Green to participate? -Alan 2/24/86; Approved! Bob 2/26/86. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 127 ¶ 395 | On April 8, 1986, a "joint meeting of the ETS advisory groups from West Germany, the United Kingdom, and the United States as well as the INFOTAB Board of Directors" was held at TAC's London office to discuss "scientific and public relations problems related to environmental tobacco smoke." The meeting included representatives from Defendants Philip Morris, BATCo, RJR, and the Tobacco Institute, as well as "the entire Tobacco Advisory Research Committee," and the law firm of Shook, Hardy & Bacon. The attendees discussed various research projects which could be used to address proposed regulations with respect to ETS, including projects and programs sponsored by the Tobacco Institute and the "cooperative [United States] industry study to measure carbon monoxide, nicotine, and particulate matter in restaurants." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 128 ¶ 396 | Representatives of TAC also met with the Tobacco Institute, Germany's Verband der Cigarettenindustrie ("Verband"), and Japan Tobacco International in Washington, D.C. on March 18-19, 1987, to address the need for increased cooperation among the participating countries and on an international level. The meeting was designed to inform participants about the current status | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | of ETS scientific research, public affairs, and political nuances in each of the countries. The Verband is the German equivalent of the Tobacco Institute. Philip Morris International, BATCo, and other cigarette manufacturers are affiliated with the Verband. | | | |
| 128 ¶ 397 | An April 6, 1987 RJR Interoffice Memorandum from Charles Green to Alan Rodgman, and copied to several individuals, including Mary Ward, discussed the joint meeting held in Washington, D.C. in March 1987. This April 1987 memorandum described the meeting discussions on "Industry-Sponsored Research on ETS," "Non-Industry Sponsored Research," "Current Public Affairs/Political Concerns," and "Future Research Needs" and stated:<br><br>The first session of the second day included presentations by Trevor King, Gerhardt Scherer, Y. Shimitzu, Bill Kloepfer, and John Rupp. There were many similarities among all the presentations and the need for close cooperation between scientists and public relations professionals was expressed repeatedly. R.J. Reynolds was praised by several speakers as an example of an effective research and public relations relationship.<br>This memorandum further stated that:<br>Dr. Spears stated that the Industry has only a short time (5 years) to solve the ETS problem. Vigorous denial is not a satisfactory defensive strategy. All agreed that the most significant ETS problem facing the Industry is the result of epidemiological studies which indicate a low risk related to ETS exposure. More industry sponsored research is needed to address this issue.... All of the attendees left this meeting with a better appreciation of the international ETS problem. Concerted action is needed to improve the Industry's position.<br><br>A proposed follow-up meeting "with the purpose of generating a world-wide ETS action plan" is further described. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 128 ¶ 398 | Sharon Blackie, formerly of BATCo and B & W, and one of the major organizers of the Defendants' international initiatives, acknowledged that she collaborated with representatives of other tobacco companies in fashioning consistent ETS public statements. Defendants who cooperated in this way included BAT, Philip Morris and RJR. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 128 ¶ 399 | Defendants circulated revised versions of TAC publications. According to a March 10, 1987 internal memorandum, Philip Morris planned to distribute the TAC publication "Tobacco Smoke and the Non-Smoker" to industrial organizations on behalf of the Enterprise once the document had met with the approval of industry attorneys. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 129 ¶ 400 | According to a March 17, 1987 letter to Hans Verkerk of INFOTAB, William Kloepfer of the Tobacco Institute planned to "compare notes on the ETS issue" with his colleagues at TAC before attending a steering committee meeting in connection with the Sixth World Conference on Smoking and Health. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 129 ¶ 401 | In a May 27, 1987 memorandum, Tobacco Institute Vice President William Kloepfer reported to Samuel Chilcote, Tobacco Institute President, about his meetings with TAC in London. According to Kloepfer's memorandum, he gave the TAC public relations committee an overview of Tobacco Institute issues and management. According to Kloepfer, TAC recognized ETS as its primary issue and wanted to adapt Tobacco Institute consultant Gray Robertson's video for TAC's use. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 129 ¶ 402 | TAC and the Tobacco Institute continued to share information on how to confront the ETS issue publically. On August 23, 1989, Clive Turner, TAC Deputy Chief Executive, wrote to Sam Chilcote, Tobacco Institute President, requesting an ETS publication kit prepared by the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 129 ¶ 403 | In January 1994, TAC changed its name to the Tobacco Manufacturers Association ("TMA") because "the name TAC did not clearly reflect the change of focus in its role to that of a trade association for the UK companies." TMA members included Defendants BATCo and RJR. TMA held meetings as recently as 2000, the date of the discovery deadline established in this case. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **5. ICOSI - International Committee on Smoking Issues** | | | |
| 129 ¶ 404 | August 2, 2006On December 3, 1976, Hugh Cullman, Executive Vice President of Philip Morris, talked by telephone with R.A. (Tony) Garrett, Chairman of Imperial Tobacco. Cullman's notes from that call indicate that Garrett explained he had been exploring, with a number of major tobacco companies, including Defendants BATCo and RJR, as well as Rothmans International and Reemtsma (Germany), whether company heads might be prepared "to meet discreetly to develop a defensive smoking and health strategy, to avoid our countries and/or companies being picked off one by one, with a resultant domino effect." The initial objective of this group would be to develop a smoking and health strategy which would include a voluntary agreement that no concessions beyond a certain point would be voluntarily made by the members [to their governments] and, if further concessions were required by respective governments, that these not be agreed to and that governments be forced to legislate. The proposed agenda for the meeting included Consideration of the international dimension to smoking and health. This might include such matters as ... how do developments in one country affect others. Defendants' effort was ultimately termed "Operation Berkshire" | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 130 ¶ 405 | On March 24, 1977, R.A. Garrett of Imperial Tobacco wrote to Alexander Holtzman, Associate General Counsel for Philip Morris, about "Operation Berkshire," an upcoming meeting between the executives of certain tobacco companies. Participants included representatives from | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Defendants BATCo, Philip Morris, and RJR, as well as Reemstma, Rothmans International, and Imperial Tobacco. The purpose of the meeting was to form a group to develop a common international position on smoking and health issues. The group formed was called the International Committee on Smoking Issues ("ICOSI"). The resulting position paper was reviewed and edited by the law firm of Jacob & Medinger, which represented RJR, B & W, and CTR. | | | |
| 130 ¶ 406 | The charter of ICOSI, states that its purposes and objectives are:<br><br>the establishment of a forum for exchange of views and information on international smoking issues (to include tobacco and health) by the coordination of data and information in economic, scientific, and technical areas. The general objectives are to broaden the knowledge of its members, of consumers, and of appropriate authorities. In large part accomplishment of these objectives will be sought by providing information to various national and other tobacco trade associations and by serving as a resource of expertise, data analysis and opinion on these subjects of interest to the industry and its public. The dissemination of the generality of this information will be made in the form of bulletins, reports, articles, surveys, pamphlets, and other analogous means. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 130 ¶ 407 | ICOSI's inaugural meeting, held in June 1977, at Shockerwick House in Britain served as the beginning of Operation Berkshire. This meeting, which was called by BAT CEO Tony Garrett, was attended by representatives of the major United States tobacco manufacturing companies. The meeting participants jointly agreed to "hold the line on admissions concerning what they would admit to their individual governments concerning smoking and health, among other things." According to notes in BATCo's files from a March 1978 meeting in Australia, the objective of ICOSI was "defensive research aimed at throwing up a smoke screen and to throw doubts on smoking research findings which show smoke causes deceases [sic]." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 130 ¶ 408 | Mary Covington, Secretary General of INFOTAB, told attendees at the November 1981 Tobacco Institute College of Tobacco Knowledge in Washington, D.C. that the organization (first named ICOSI and later renamed INFOTAB) was founded to perform internationally the functions that the Tobacco Institute performed for the domestic industry in the United States: "From the outset, the members recognized that the social acceptability of smoking, including the public smoking issue was a subject on which attention should be focused [sic]." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 131 ¶ 409 | ICOSI's key officers included the chairmen and other principals of the member companies who attended the Operation Berkshire meeting: Patrick Sheehy, BATCo Chairman; Kit Stuart Lockhart, BATCo Deputy Chairman; William Hobbs, RJR Chairman; William Murray, President of Philip Morris Europe; Alexander Holtzman, Associate General Counsel for Philip Morris; and Andrew Whist, Director Corporate Affairs of Philip Morris (Australia) Ltd. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 131 ¶ 410 | There were two governing groups of ICOSI. The Board of Governors was responsible for establishing policy, included one principal from each member company, and met at least annually. The Executive Committee was responsible for implementing the policies of ICOSI in those areas where decision-making powers had been delegated to the Committee by the Board of Governors. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 131 ¶ 411 | Representatives of the participating Defendants attended numerous meetings of several different ICOSI working groups and task forces, including the Social Acceptability Working Group, which dealt with ETS issues, the Medical and Behavioral Research Group, the EEC Task Force, the Product Liability Task Force, and the Swiss Referendum Task Force. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 131 ¶ 412 | ICOSI was registered as a non-profit association in Geneva, Switzerland, on December 1, 1978. The seven founding members of ICOSI were Defendants BATCo, Philip Morris, and RJR, as well as Gallahers, Imperial Tobacco, Reemstma, and Rothmans International. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 131 ¶ 413 | ICOSI representatives met six times between June 1977 and February 1979, to agree upon "the fundamentals of ICOSI's policy, form, organization, financing and work-programmes." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 131 ¶ 414 | ICOSI member companies agreed to act together to respond to smoking and health risk challenges worldwide by promoting the "open question" controversy and the myth of independent research. On October 14, 1977, Dennis Durden, Vice President of RJR and then-Chairman of ICOSI's Working Party on the Social Acceptability of Smoking, forwarded a report to the members of ICOSI regarding the research and analysis activities that would be conducted by the working party. Members of the working party listed in the summary included representatives of Defendants RJR (Durden and James Hind, RJR Vice President of Planning), BATCo (Richard Haddon, Public Relations Manager), and Philip Morris (John T. Landry, Senior Vice President). | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 131 ¶ 415 | On April 21, 1978, P. Isenring distributed a letter to Alexander Holtzman, Philip Morris Vice President and General Counsel, and others about the ICOSI EEC Task Force on Consumerism. Isenring urged cooperation and coordination between Philip Morris and RJR concerning the involvement of the law firms of Jacob & Medinger and Shook, Hardy & Bacon, both of which represented several Defendants. Specifically, Isenring discussed the fact that the ICOSI EEC Task Force on Consumerism had to prepare an industry response to the EEC Consumer Consultative Committee's anti-smoking paper "Tobacco and the Health of the Consumer" and suggested that ICOSI members and their respective law firms work together on a common approach to the response, given their exposure to the situation in Europe over the years. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 132 ¶ 416 | In advance of the June 1979 Fourth World Conference on Smoking and Health, ICOSI formed a Task Force to "monitor and combat on the spot the strong propaganda expected to be generated at this Conference" which is "sponsored by the World Health Organisation and the Swedish Health Authorities." In furtherance of this effort, the ICOSI Task Force met in Kansas City, Missouri on November 20-21, 1978, scheduled two task force meetings for early 1979, and another meeting | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | just prior to the conference. Attendees of the Kansas City meeting included: Gwynn Hargrove of BATCo; MurraySenkus of RJR; William Kloepfer of Tobacco Institute; Leonard Zahn, public relations counsel for CTR; Tim Finnegan of CTR's lawyers Jacob & Medinger; Hugh Grice of TAC; and Donald Hoel of Shook, Hardy & Bacon. ICOSI engaged a Stockholm-based public relations agency to "monitor the Conference organizers' activities and to assist with press room activities at the Conference." Additionally, the Task Force was charged with preparing a post-conference report covering several matters, including "contradictions," "Conference recommendations to governments," an evaluation of the possible impact of the Conference, and "industry positions as they relate to the Conference." | | | |
| 132 ¶ 417 | In March 1980, the Executive Committee of ICOSI was disbanded. Instead, the Board of Governors consisting of two named representatives of each member company were to meet at least twice a year. Each member company was to have one vote at the meetings of the Board of Governors. Chairmanship was held in rotation by each member company. William D. Hobbs, Chairman of RJR, was Chairman of the Board of Governors between 1979 and March 31, 1980. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **6. INFOTAB-International Tobacco Information Center** | | | |
| 132 ¶ 418 | ICOSI was renamed the International Tobacco Information Center/Centre International d'Information Du Tabac ("INFOTAB") and registered in Geneva, Switzerland, on December 8, 1980. INFOTAB's charter, filed with the Swiss Government on November 2, 1982, was substantially the same as ICOSI's charter. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 132 ¶ 419 | The six founding members of INFOTAB were Defendants BATCo, Philip Morris, and RJR, as well as Imperial Tobacco, Reemtsma, and Rothmans International. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 132 ¶ 420 | Defendant BATCo belonged to INFOTAB from 1981 or 1982 to approximately May 1990. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 132 ¶ 421 | INFOTAB had three categories of membership: Founding Members, Associate Members, and Allied Members. Defendants Liggett and Lorillard were Associate Members, while Defendant Tobacco Institute was an Allied Member, as was Britain's TAC. 504934906-4953 (U.S. 20737). Lorillard later withdrew from participation in INFOTAB because it felt that its contribution and participation in the Tobacco Institute provided adequate support for INFOTAB. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 133 ¶ 422 | In the mid-1980s, Hugh Cullman of Philip Morris, R.L.O. Ely of BATCo, Andrew Whist of Philip Morris, and Richard J. Marcotullio of RJR were on the INFOTAB Board of Governors, which was later re-named simply "the Board of Directors." Cullman was the Chairman of the Board of Directors. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 133 ¶ 423 | Tobacco Institute representatives, Peter Sparber and Bill Kloepfer (Senior Vice President, Public Relations), participated in an October 7-10, 1985 INFOTAB workshop in Copenhagen. Thereafter, INFOTAB's Secretary General wrote to Tobacco Institute President Samuel Chilcote | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | to thank him for the Tobacco Institute's participation. According to the conference program, the workshop included discussions about "the Social Acceptance of Smoking," "The Health Controversy-Some Aspects Old and New," and "Ambient Tobacco Smoke, Defense Medical, Defense-Political, and Relation with Indoor Pollution." According to the conference program, Hugh Cullman (then Vice Chairman, Philip Morris Companies and 1985/86 INFOTAB Chairman), John Tollison (then Institute Director of the Tobacco Institute of Australia Ltd.), and Hugh Grice (then Executive Director of the TAC) were also among the speakers, discussion group leaders and moderators scheduled to attend the workshop. | | | |
| 133 ¶ 424 | A November 30, 1989 INFOTAB document listed INFOTAB's "most important" roles, including: " 'Think tank' for industry cooperation worldwide, in association with member companies,""Preparation of positions agreed by the industry,""Preparation of published materials and kit sets for use by NMA's and lead companies," and "Promulgation of strategies agreed by the industry." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 133 ¶ 425 | INFOTAB prepared various materials on smoking and health issues including research-related materials, public relations campaign materials, and advocacy papers. For example, in 1986, INFOTAB produced an Issues Binder which provided members with reference materials and quotations in response to the major allegations in the smoking and health area. The binder [was] organized around nine issues-"addiction," advertising and sponsorship, developing countries, the public smoking issue, legislation, smoking and health, social costs, taxation and warning labels. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 133 ¶ 426 | J. Kendrick Wells of B & W sent a memorandum to Ernest Pepples of B & W dated October 27, 1981, concerning his recent discussion with L.C.F. Blackman, Director of the Group Research and Development Center of BATCo in Southampton, England, about Blackman's slide presentation titled "Basic Approach to Government and Medical Authorities." Wells voiced his concern with Blackman that the initial document "admit[ted], despite a disclaimer, that cigarettes are harmful to health in proportion to delivery." Wells further noted that the document "runs against important argument the U.S. industry is making in response to the FTC Staff Report and may need to make in response to charges that cigarettes are addictive." Blackman agreed to change the document and send it to the other INFOTAB members. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 134 ¶ 427 | BATCo relied on position papers developed for the industry by INFOTAB. An internal BATCo memorandum, distributed "[t]o all No. 1's and Public Relations Managers of Operating Companies, transmitted an updated INFOTAB paper on Advertising Argumentation," which provided arguments against advertising restrictions. The transmittal memo urged its recipients to "ensure that no mention is made of its source." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 134 ¶ 428 | BATCo and other Defendants used INFOTAB to monitor research that suggested smoking caused cancer. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 134 ¶ 429 | A June 28, 1988 memorandum addressed to Todd Sollis, Assistant General Counsel of Philip Morris, from Donald Hoel, attorney with Shook, Hardy & Bacon, described the central role played by Shook, Hardy & Bacon with respect to INFOTAB. Hoel stated:

SHB, as counsel to PM and other international manufacturers, was instrumental in the founding of INFOTAB to help strengthen and coordinate the activities of the various national manufacturers associations. The firm remains active in the operation of INFOTAB. It monitors the meetings and clears the draft minutes of the INFOTAB Board of Directors and the Global Issues Working Party, as well as INFOTAB workshops. All materials prepared by INFOTAB on smoking and health issues, including briefing documents sent to national manufacturers associations and presentations by the INFOTAB staff, are cleared by SHB in order to protect the member association and member companies. SHB also approves all public relations campaigns, tactics and strategies which address smoking and health issues. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 134 ¶ 430 | A 1989 INFOTAB document outlined how to attack the WHO [World Health Organization]. The tactics it suggested included the following:

Criticize budget management, Address health priorities, Expose resource blackmail, Highlight regional failures, Attack "behaviourism," Counter on public issues, Discredit activists' credentials, Engage in statistical warfare, Invest in press relations, Show impact of "cuckoo" organizations.

The document also suggested the industry should attack IOCU [the International Organization of Consumer Unions] with the following program goals: "Relieve NGO pressure on WHO, Expose activists' 'credentials,' Counter 'behaviorists' regulation, correct anti-business slant." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 134 ¶ 431 | In 1990, INFOTAB also issued an INFOTAB publication titled "Children & Smoking-The Balanced View" that addressed various World Health Organization claims. It stated that tobacco is not addictive, and that there were inconsistent findings as to whether smoking causes low birth weight, birth defects, and delayed mental and physical development in infancy. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 134 ¶ 432 | On January 19, 1990, Ron Loader, INFOTAB Director of Information Services, confirmed the first meeting of a worldwide industry working group at the offices of the Tobacco Institute in Washington, D.C. for the purpose of planning a Global Argumentation Project. The Global Argumentation Project was an effort to develop a standardized and comprehensive collection of argumentation papers on smoking and health issues, including ETS and youth marketing, which could be used by local management and National Manufacturing Associations ("NMAs") for lobbying, public information campaigns, or as basic documents for responding to public health advocates. Representatives from INFOTAB, the Tobacco Institute, Shook, Hardy & Bacon, and | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | several European and United States cigarette manufacturers attended the meeting, including Kay Comer of BATCo, Cynthia von Maerestetten of Philip Morris, Jim Goold of RJR; Donald Hoel and Jim Newsome of Shook, Hardy & Bacon, and Charles Powers and Fred Panzer of the Tobacco Institute. It had been decided that for several reasons "it would be sensible to hold this first meeting in Washington" because "we need to involve the U.S. TI at an early stage in order to take advantage of their detailed information/argumentation/lobbying materials developed over years in practical situations and needing personal discussion"; "most members of the Working Group are already in, or need to be in, the States (*i.e.* 8 out of 11)"; and "it provides the opportunity for INFOTAB coordinators to review other information sources (*e.g.*, RJR) at first hand." | | | |
| 135 ¶ 433 | INFOTAB also collaborated with the IEMC. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **7. TDC - Tobacco Documentation Centre** | | | |
| 135 ¶ 434 | On December 4, 1991, the Tobacco Documentation Centre ("TDC"), was established as a successor entity to INFOTAB. BATCo joined the TDC at its inception. Its charter stated: <br><br> The Association has as its purpose the establishment of a forum for exchange of views and information on international tobacco issues by the coordination of data and information in economic, social, scientific and technical areas. The general objectives are to broaden the knowledge of its members. In large part accomplishment of these objectives will be sought by providing information to various national and other tobacco trade associations and by serving as a resource of expertise and data analysis on these subjects of interest to the industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 135 ¶ 435 | The Founding Members of the TDC and subscription levels for each were as follows: Philip Morris International, Inc., 20%; RJR Tobacco International, Inc., 20%; BATCo, 20%; Gallahers, 10%; Reemtsma, 10%; and Rothmans International, 20%. Subscription levels of membership categories were based on annual production. On the unanimous proposal from Charter members, the following persons were unanimously elected to the Board of Directors for 1992: D.J. Bacon of BATCo, L.E. Birks of Gallahers, Richard J. Marcotullio of RJR International, F.J. Moreno of Philip Morris, C.J. Walther of Reemtsma, and A.A. Woods of Rothmans International. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 135 ¶ 436 | The TDC was formed to act as a central information resource for the tobacco industry worldwide. [Predecessor] INFOTAB had an extensive information collection and database, which was considered valuable and worth maintaining. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 135 ¶ 437 | The IEMC and CECCM scheduled meetings from time to time at TDC's offices. | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | | Intent to defraud or deceive | | *F.3d 1095 at 1116 (D.C. Cir. 2009).* |
| 136 ¶ 438 | On April 28, 1992, the International ETS Management Committee ("IEMC"), which was comprised of representatives from Defendants BATCo, Philip Morris, and RJR, prepared comments for distribution by the TDC regarding the draft EPA Risk Assessment on the health hazards of ETS. All national manufacturer associations ("NMA") were to use these comments in responding to inquiries regarding the draft Risk Assessment. The document was also provided to TDC member companies. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 136 ¶ 439 | TDC distributed the IEMC ETS position papers, dated May 6, 1992, to the NMAs and lead companies, stating that the documents had been cleared for use by Defendants BATCo, Philip Morris, and RJR. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 136 ¶ 440 | On June 19, 1992, Matt Winokur, Director of Corporate Affairs at Philip Morris International, informed Geoffrey Bible, President of Philip Morris, and other Philip Morris employees, that the EPA talking points prepared by Covington & Burling were<br><br>also being used by our international competitors and by National Manufacturers Association via the TDC. This coordinated approach to communications is highly desirable. It enables the entire global industry to espouse a common position immediately, an essential element in quickly responding to local government and media. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **8. CORESTA - Center for Cooperation in Scientific Research Relative to Tobacco/Centre de Coopération pour les Recherches Scientifiques Relatives au Tabac** | | | |
| 136 ¶ 441 | The Center for Cooperation in Scientific Research Relative to Tobacco/Centre de Coopération pour les Recherches Scientifiques Relatives au Tabac ("CORESTA") was created following the resolutions approved by the First International Scientific Tobacco Congress held in Paris, France, on September 10, 1955. It was created "[i]n order to operate a permanent Secretariat for international co-operation in scientific studies relative to tobacco." Its registered offices are located in Paris, and every world-wide major tobacco company and tobacco industry organization is a member. Meetings have been held every two years and, as of 1992, CORESTA had approximately 190 members, including Defendants BATCo, Philip Morris, Lorillard, B & W, Liggett, and RJR. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 136 ¶ 442 | A March 31, 1992 BATCo document described CORESTA's value to the tobacco industry:<br><br>It is perceived as being objective, technical and independent. It is this perception which makes CORESTA unique and very valuable. Unlike other organizations, e.g., CECCM[,] it is not regarded as a lobbying organization of the tobacco industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 136 ¶ 443 | In June 2001, representatives from Defendants Lorillard, Philip Morris, and RJR, along with other | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris*, 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | delegates from the industry, convened at CORESTA's ETS Sub Group meeting, where they discussed trends in ETS research. In November 2001, the CORESTA Sidestream Task Force, which included representatives from Defendants BATCo, RJR, and Philip Morris, among others, met to review research conducted on sidestream tar and nicotine. 525302822-2823 (U.S. 86526); 525302728-2729 (U.S. 86527); 525776902-6936 (U.S. 86528); 325260347-0362 at 0348 (U.S. 29146); 524596882-6890 at 6883 (U.S. 66571). | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **9. Tobacco Institute Interaction with Overseas and International Groups** | | | |
| 137 ¶ 444 | As described above, the Tobacco Institute worked closely and consistently over a lengthy period of time with overseas and international tobacco organizations to present a unified front on issues of common concern; to influence public opinion; to convince government officials to adopt the public positions of the United States tobacco industry; to maintain the Defendants' open question position on the relationship between smoking and adverse health effects; to avoid adverse liability verdicts in lawsuits brought around the world; and as an overarching goal to preserve and enhance Defendants' profits. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 137 ¶ 445 | In a document dated October 1, 1973, and titled "International Activities of the Tobacco Institute, Inc.," J.C.B. Ehringhaus, Jr., Tobacco Institute General Counsel, advocated that the Tobacco Institute have an increased role internationally. Ehringhaus noted that<br><br>any success of the anti-smoking group in another country "diminishes" us. I think we have to do something about it, to be aware and to participate in order to protect the interests of the American companies.<br><br>He further suggested:<br>We would keep aware of what's going on around the world and be able to advise our industry people in one country of these happenings so that they may be guided in dealing with their own local situations. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 137 ¶ 446 | The Tobacco Institute's role in international matters was then discussed at the October 4, 1973 meeting of the Tobacco Institute Executive Committee, and it was agreed that "the Committee of Counsel should continue consideration of this area." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 137 ¶ 447 | One way in which the Tobacco Institute coordinated worldwide industry positions was by publishing brochures, pamphlets, "backgrounders," industry position papers, and other materials on the Enterprise's stance on controversial smoking and health issues and making them available for overseas distribution, often through INFOTAB. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 137 ¶ 448 | The Tobacco Institute developed a Tobacco Institute "backgrounder" titled "Tobacco in the Developing Nations" and announced its availability in a Tobacco Institute newsletter on January | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | 14, 1980. Copies were to be forwarded to international public relations personnel of member companies, overseas NMAs and other trade associations, and international organizations such as INFOTAB and ICOSI. | | | |
| 137 ¶ 449 | On October 15, 1981, Donald Hoel of Shook, Hardy & Bacon, sent a letter to Horace Kornegay, President of the Tobacco Institute, transmitting a draft of a "Public Smoking Paper" for use by INFOTAB. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 137 ¶ 450 | In anticipation of the 1983 Surgeon General's Report on heart disease, the Tobacco Institute issued a report "Cigarette smoking and heart disease." The report was distributed to Tobacco Institute member companies who were requested not to distribute it widely, but to use it only for internal purposes until the Surgeon General's report on heart disease was released when additional copies would be made available. INFOTAB distributed the report as well, advising its members that the Tobacco Institute would acquaint news reporters with its views about smoking and heart disease before the release of the 1983 Surgeon General's report. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 138 ¶ 451 | In anticipation of the 1985 Surgeon General's Report on smoking and the workplace, the Tobacco Institute staff gathered prior publications on similar subjects by the prospective authors of the report chapters in order to forecast the conclusions of the report with some degree of accuracy and develop "shadow" papers by scientists who would question or reject such conclusions. TIMN0061572-1572 (U.S. 88450). Thereafter, INFOTAB informed NMAs throughout the world, including Britain's TMA, of which BATCo was a member, that the Tobacco Institute had assembled material for use in framing answers to possible specific questions from the media regarding the 1985 Surgeon General's Report. INFOTAB forwarded a copy of this material for use as a basic reference by Defendants and spokespersons from the NMAs. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 138 ¶ 452 | The Tobacco Institute's William Kloepfer was given six draft briefing papers in June 1987 that were to be presented at the Sixth World Conference on Smoking and Health. The papers discussed ETS and Indoor Air Quality; the Science of ETS; ETS Legislation; Tobacco and Developing Countries; Smoking and Young People; and Smoking and Women. Kloepfer was asked to, and did, rewrite all papers except the one on Smoking and Women. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 138 ¶ 453 | In a 1990 memorandum listing "Allies to Be Notified of Industry Youth Initiatives," the Tobacco Institute directed that, prior to public announcement of any new industry initiatives in the area of youth smoking, the Tobacco Institute staff would provide organizations within the tobacco family, groups, and allies of the new program with advance copies of press and program materials and a cover letter to be signed by the Tobacco Institute President or other appropriate staff. Among the international organizations to be kept abreast of the Tobacco Institute's activities on behalf of the industry were INFOTAB and TMA. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris,* 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 138 ¶ 454 | A letter dated March 6, 1992, from William Kloepfer, Tobacco Institute Senior Vice President, to | Conspiratorial agreement, and | Intent to defraud or deceive | *United States v. Philip Morris,* 566 |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Ron Tully of INFOTAB, and others, provided information about the Surgeon General's Report titled "Smoking and Health in the Americas" which was to be released on March 12, 1992. The letter explained that the Tobacco Institute would comment on the Surgeon General's Report, if asked, to United States media and Latin America media; that the Pan American Health Organization would be issuing a country-by-country status report on tobacco prevention and control measures; and that Kloepfer would bring materials prepared by Don Hoel of Shook, Hardy & Bacon and others to the briefing sessions. | Intent to defraud or deceive | | F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 138 ¶ 455 | The Tobacco Institute furnished advice, assistance, and financial support to international industry-related groups and organizations as these groups worked on projects, publications, videos, conferences, briefing papers, and lobbying materials. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 456 | In a January 17, 1983 form letter to its members, TAC informed each of its member companies, one of which was Defendant BATCo, that the Tobacco Institute had provided TAC with a copy of a Tobacco Institute videotape compilation showing their spokespersons' team in action:<br><br>It shows extracts of the four members of the team being interviewed on television and speaking to live audiences. Two points are of particular interest. The first, the way in which they publicly face and handle health issues. The second that all the team are first and foremost media trained and therefore utterly familiar with, and relaxed in, dealing with hostile interviews and audiences: their knowledge of tobacco matters, while vitally important, is a secondary consideration in the selection and training process. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 457 | The Tobacco Institute provided facilities at its offices for an INFOTAB Workshop for NMAs held on September 19-22, 1983. William Kloepfer, Tobacco Institute, Vice President, and Tony St. Aubyn, TAC Assistant Director, were among the presenters. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 458 | During 1984, the Tobacco Institute paid $70,000 for one half the cost of a monograph commissioned by INFOTAB, edited by Robert Tollison, Professor of Economics at Virginia's George Mason University, titled "Smoking in Society." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 459 | In November 1990, Samuel Chilcote, Tobacco Institute President, sent Martin Oldman of INFOTAB a list of "messages and sub-messages [that] could be helpful as a starting point for any global and/or NMA ETS campaign." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 460 | The Tobacco Institute provided guidance, advice, strategies, and tactics to overseas organizations and groups for setting up tobacco alliances outside the United States, as the following examples demonstrate. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 461 | On November 16, 1981, Mary Covington, Secretary General of INFOTAB, speaking on an "International Perspective on Smoking Issues and Related Activities of the Tobacco Industry," noted that INFOTAB had received outstanding help from the Tobacco Institute, "a valuable | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | source of information and ideas." | | | |
| 139 ¶ 462 | In a March 5, 1986 letter to Bryan Simpson, INFOTAB Secretary General, Arthur Stevens, Lorillard Senior Vice President and General Counsel, stated that:<br><br>Lorillard will not be renewing its INFOTAB membership subscription for 1986. Please understand that our action in no way reflects any disagreement or dissatisfaction with either the mission or the achievements of INFOTAB, all of which are credible and significant.... However, as active and significant contributors to the program of the U.S. Tobacco Institute, whose assistance is generously and frequently afforded to INFOTAB, we believe we are already supporting INFOTAB's efforts to a very significant degree. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 463 | Simpson wrote back to Stevens on March 21, 1986, confirming Lorillard's withdrawal as a member of INFOTAB and acknowledging that "we are aware of your major contribution to TI, and the benefits that we receive indirectly." | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 139 ¶ 464 | According to an October 2, 1981 BATCo document, the Tobacco Institute commented on the importance of INFOTAB: "INFOTAB has without any doubt at all made an immense change in the general atmosphere in the industry and this has led to an enormous increase in cooperation." This document further stated that the Institute had been looking for 15 years for an international umbrella to enable them to deal with other NMAs and to improve the strength of the industry as a whole;-the back-wash from events and attacks affecting the industry in smaller countries comes back powerfully to the USA; ... INFOTAB helps the industry to unite in trying to combat the attacks;-for years it had been hoped that there would be some sort of organization of international trade associations, which never happened. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 140 ¶ 465 | In remarks on September 20, 1983, at an INFOTAB workshop in Washington, D.C. on "How to Set Up a Tobacco Alliance," the Assistant Director of Britain's TAC, stated that the tobacco industry in the United Kingdom initially turned to the Tobacco Institute for guidance on setting up a tobacco alliance in early summer 1982.<br><br>[T]hanks to the unstinting help they gave us, we were able to draw much of our conceptual thinking from their experience with the Tobacco Action Network ... T.I.'s experience, and especially their warnings of some of the problems and pitfalls we had to avoid, was invaluable. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 140 ¶ 466 | Tobacco Institute representatives served on international teams, committees, and boards, along with industry representatives from outside the United States, in which strategies were developed for a coordinated approach to scientific research studies and public relations campaigns. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 140 ¶ 467 | The Tobacco Institute made countless presentations for INFOTAB and other international group workshops, seminars, symposia, and conferences outlining Defendants' strategies for attacking | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | what Defendants deemed "anti-smoking" research and programs linking smoking and health and ETS and health. | | | |
| 140 ¶ 468 | For example, on March 29, 1984, William Kloepfer, Tobacco Institute Vice President, participated in a meeting of the Passive Smoking Project Group, an INFOTAB committee, in Lausanne, Switzerland. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 140 ¶ 469 | On June 4, 1984, William Kloepfer attended the meeting of the INFOTAB ETS Committee in Brussels, Belgium. Scientists from Defendants Philip Morris and RJR also attended. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 140 ¶ 470 | On October 10, 1985, Tobacco Institute President Samuel Chilcote spoke at an INFOTAB International Workshop on the credibility gap between the tobacco industry and the public. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 140 ¶ 471 | On October 14-16, 1986, William Kloepfer spoke on Smoking in the Workplace at an INFOTAB International Workshop in Brussels, calling ambient smoke a political issue rather than a health issue. R.L.O. Ely, head of BATCo Public Affairs, addressed World Health Organization ("WHO") Initiatives. Tom Osdene, Philip Morris Director of Research, Charles Green, RJR scientist, and Donald Hoel, lawyer at Shook, Hardy & Bacon, took part in a panel discussion on ETS. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 141 ¶ 472 | On October 18, 1988, Walker Merryman, Tobacco Institute Vice President, spoke at an INFOTAB Workshop in Malaga, Spain, on anti-smoking activists. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 141 ¶ 473 | The Tobacco Institute arranged visits and briefing sessions for domestic and foreign industry representatives to discuss current and emerging issues that the Tobacco Institute believed threatened the industry. For example, after attending a luncheon in Washington, D.C., hosted by the Tobacco Institute's Horace Kornegay, members of Japan Tobacco, Inc. ("JTI") were invited to attend a Tobacco Institute ETS Advisory Group meeting in Washington, D.C. In his July 15, 1986 letter to JTI's S. Takeda, Donald Hoel, Chairman of the ETS Advisory Group, wrote:<br><br>One of the purposes and benefits from the proposed joint meeting would be to exchange detailed information as to current research projects.... The second day would include identification of research needs and perceived problems. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 141 ¶ 474 | In 1990, Charles H. Powers, Tobacco Institute Senior Vice President, arranged a visit and briefing session between the Tobacco Institute and the Canadian Tobacco Manufacturers' Council on current emerging issues in the two countries, particularly those issues which might produce spill-over effects from the United States to Canada and/or vice versa. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 141 ¶ 475 | Tobacco industry representatives from around the world attended the Tobacco Institute's College of Tobacco Knowledge, the seminars held to provide industry managers and other employees the most up to date information and industry positions on smoking and health related issues… At the October 1982 session, for example, seventeen of the forty-nine students were from foreign | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | countries, *e.g.*, Paraguay, Canada, United Kingdom, Australia, Brazil, Switzerland, Holland, Venezuela, and Guatemala. | | | |
| 141 ¶ 476 | Employees from INFOTAB were also invited to, and did attend, sessions of the Tobacco Institute College of Tobacco Knowledge. For example, five members of INFOTAB attended the November 1981 session of the College. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **J. Dissolution of CTR and the Tobacco Institute** | | | |
| 141 ¶ 477 | In November 1998, most of the State Attorneys General entered into a settlement agreement, referred to as the Master Settlement Agreement ("MSA"), with Philip Morris, R.J. Reynolds, B & W, Lorillard, Liggett, and Commonwealth Brands, Inc., to resolve all pending Medicaid recoupment litigation. The State Attorneys General for Florida, Mississippi, Minnesota, and Texas had already entered into settlements with tobacco defendants prior to November 1998. The MSA required that CTR and the Tobacco Institute cease all operations and dissolve. In addition, the tobacco products manufacturers signing the MSA were prohibited from reconstituting CTR or its function in any form. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **1. CTR** | | | |
| 142 ¶ 478 | On May 8, 1998, in connection with *State of Minnesota v. Philip Morris*, B & W, Lorillard, Philip Morris, and R.J. Reynolds (the four Class A members of CTR) entered into a Settlement Agreement and Stipulation for Entry of a Consent Judgment with the State of Minnesota ("Minnesota Settlement Agreement"), in which, among other things, the companies agreed to dissolve CTR and enter into a consent judgment ("Minnesota Consent Judgment"). Section VI of the Minnesota Consent Judgment, entered on May 19, 1998, provided that, within ninety days of May 8, 1998, CTR would cease all operations except as necessary to comply with existing grants or contracts and to continue its defense of other lawsuits and that CTR would be disbanded and dissolved within a reasonable time period thereafter. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 142 ¶ 479 | The members of CTR held a special meeting on October 19, 1998, at CTR's offices in New York City at which the Plan of Corporate Dissolution and Distribution of Assets of The Council for Tobacco Research-U.S.A., Inc. was approved by a unanimous vote of the members present. The Class A members present were B & W, represented by Senior Vice President Ernest Pepples; Philip Morris, represented by Senior Vice President of Operations John Nelson; Lorillard, represented by Chairman and CEO Alexander Spears; and R.J. Reynolds, represented by President and CEO Andrew Schindler. The Class B members present were Bright Belt Warehouse Association, Tobacco Association, Inc., Burley Auction Warehouse Association, Burley Tobacco Growers Cooperative Association, Inc., and United States Tobacco... The Plan of Corporate Dissolution allowed CTR to continue to defend itself and to protect its interest in litigation, and to assist in the defense of Defendants and CTR's other members in litigation, pursuant to joint | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | defense agreements or arrangements. | | | |
| 142 ¶ 480 | CTR and the Attorney General of New York agreed to the terms of the dissolution, and the New York Supreme Court entered an Order Approving CTR's Plan of Corporate Dissolution and Certificate of Dissolution on or about October 21, 1998. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 142 ¶ 481 | In March 1998, James Glenn, CTR President, sent a memorandum to the members of the Scientific Advisory Board requesting that they indicate their willingness to serve as a consultant or as a participant in any future activities of CTR or any successor organization. Glenn received mixed responses to his request. Some members, such as Carlo Croce, replied affirmatively expressing their willingness to continue with CTR's activities. Others such as Judith Swain, declined any further relationship with CTR, stating,<br><br>because of the information that has come out of the tobacco litigation process, I do not feel that I can continue as a member of the Council of Tobacco Research ... the information from previous years indicates that the Council may not have been totally independent of the tobacco industry. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| | **2. Tobacco Institute** | | | |
| 143 ¶ 482 | Pursuant to a plan of dissolution that was to be negotiated by the Attorney General of the State of New York and the Original Participating Manufacturers, B & W, Lorillard, Philip Morris, and R.J. Reynolds, in accordance with Exhibit G of the MSA, the Tobacco Institute was to cease all operations and be dissolved in accordance with the laws of the State of New York and under the authority of the Attorney General of the State of New York, with the preservation of all applicable privileges held by any member company of the Tobacco Institute. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 143 ¶ 483 | The Tobacco Institute's Plan of Corporate Dissolution and Distribution of Assets was approved on August 7, 2000, by its Class A members: Ernest Pepples, Senior Vice President of B & W; Michael Szymanczyk, CEO of Philip Morris, Inc.; Alexander Spears, Chairman of Lorillard; and Charles Blixt, Executive Vice President and General Counsel of R.J. Reynolds…The Plan of Corporate Dissolution allowed the Tobacco Institute to continue to defend itself and to protect its interest in litigation, and to assist in the defense of its members in litigation, pursuant to joint defense agreements or arrangements. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 143 ¶ 484 | The Tobacco Institute's Dissolution Plan was adopted by the Tobacco Institute Board of Directors. The members of the Board of Directors at the time were Nicholas Brookes and Ernest Pepples for B & W, Ronald Milstein and Alexander Spears for Lorillard, Tommy Payne and Andrew Schindler for R.J. Reynolds, Michael Szymanczyk for Philip Morris, Inc., and Howard Liebengood for Philip Morris Companies. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |
| 143 ¶ 485 | The Supreme Court of New York County entered an Order Approving the Tobacco Institute's Plan of Corporate Dissolution and Certificate of Dissolution on or about September 1, 2000. | Conspiratorial agreement, and Intent to defraud or deceive | Intent to defraud or deceive | *United States v. Philip Morris*, 566 F.3d 1095 at 1116 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | **B. *The Addictive Properties of Nicotine*** **1. Introduction** | | | |
| 208 ¶ 828 | Cigarette smoking is an addictive behavior, characterized by drug craving, compulsive use, tolerance, withdrawal symptoms, and relapse after withdrawal. Underlying the smoking behavior and its remarkable intractability to cessation is the drug nicotine. Nicotine is the primary component of cigarettes that creates and sustains addiction to cigarettes. While the terminology of addiction has evolved over time, the underlying facts about the addictive nature of smoking and the centrality of nicotine to the addiction have been known and have not changed in over 40 years. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; [10] Consumer Protection Act Violations;[11] Unjust Enrichment. | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119[12], 1120[13], 1125[14] (D.C. Cir. 2009). |

[10] *See Tyrer v. Philip Morris USA, Inc, and Altria Group, Inc.*, United States District Court, Southern District of California, Complaint for Injunctive Relief, Restitution and Damages ¶¶11-90; (Case No.CV-0052-W-CAB) *Slater v. Philip Morris USA, Inc., and Altria Group, Inc.*, United States District Court for the District of Columbia, Class Action Complaint ¶¶ 14-35. (Case No. CV-02145-RMU)). These cases are representative of the causes of action and consumer protection claims that have been brought in each of the state court cases in this MDL.

[11] *See Tyrer v. Philip Morris USA, Inc, and Altria Group, Inc.*, United States District Court, Southern District of California, Complaint for Injunctive Relief, Restitution and Damages ¶¶100-109, 111-115, 134-138 (Case No. CV-0052-W-CAB); and *Slater v. Philip Morris USA, Inc., and Altria Group, Inc.*, United States District Court for the District of Columbia, Class Action Complaint ¶¶ 44-53. (Case No. CV-02145-RMU) These cases are representative of the causes of action and consumer protection claims that have been brought in each of the state court cases in this MDL.

[12] "The evidence at trial demonstrated that the results of this research-essential to the core of Defendants' operations, including strategic planning, product development, and advertising-were well known, acknowledged, and accepted throughout the corporations. These results established that cigarette smoking causes disease, that nicotine is addictive, *that light cigarettes do not present lower health risks than regular cigarettes due to smoker compensation*, and that secondhand smoke is hazardous to health." 566 F. 3d at 1119 (emphasis added).

[13] "The government presented similar evidence regarding the other aspects of Defendants' scheme, such as addiction and nicotine. A few examples cannot adequately present the volumes of evidence underlying the district court's findings of fact, but the following provide a fair sample:… Regarding light cigarettes, internal research reports and memoranda at the Defendant companies revealed that they understood the phenomenon of smoker compensation and studied how to manipulate it in order to make their light brands appealing to addicted smokers while continuing to be able to advertise the brands as low tar. For example, a 1978 BATCo memorandum about that company's internal research acknowledged that 'a majority of habitual smokers compensate for changed delivery' and explained that if smokers 'choose [a] lower delivery brand ... than their usual brand' they 'will in fact increase the amounts of tar and gas phase that they take in, in order to take in the same amount of nicotine.' *Id. at 861.* Dr. Farone testified that Defendants' superior knowledge of compensation (compared to that of scientists outside the industry, including the government) was closely held within Philip Morris and the tobacco industry and there was an 'effort on the part of [his] coworkers at Philip Morris, including [his] supervisors, to restrict any public acknowledgment on the part of Philip Morris of the phenomena of compensation.' " *Id.*

[14] "It is also worth noting that the district court in this case did not find liability solely based on the use of descriptors such as 'light' and 'low tar.' The court found Defendants orchestrated 'highly sophisticated marketing and promotional campaigns to portray their light brands as less harmful than regular cigarettes." *Philip Morris, 449 F.Supp.2d at 860.* In addition to the misleading use of descriptors, the district court found '[Defendants'] public statements are blatantly false' in relation to the marketing of 'light' cigarettes. *Id. at 861.* The district court went on to find that '[a]s part of the Enterprise's scheme to defraud smokers, Defendants withheld and suppressed their extensive knowledge and understanding of nicotine-driven smoker compensation.' *Id.* These findings reveal that fraudulent activity surrounding 'light' cigarettes was not merely limited to the use of misleading descriptors. In addition to the fact that the descriptors were not authorized by the FTC, the district court relied on other fraudulent activity by Defendants."

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 209 ¶ 829 | Since the 1950s, Defendants have researched and recognized, decades before the scientific community did, that nicotine is an addictive drug, that cigarette manufacturers are in the drug business, and that cigarettes are drug delivery devices. The physiological impact of nicotine explains in large part why people use tobacco products and find it so difficult to stop using them. Moreover, Defendants have sought to exploit the addictive quality of smoking and nicotine for decades in order to develop new products and increase sales | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 209 ¶ 830 | Notwithstanding the understanding and acceptance of each Defendant that smoking and nicotine are addictive, Defendants have publicly denied and distorted the truth as to the addictive nature of their products for several decades. Defendants have publicly denied that nicotine is addictive, have suppressed research showing its addictiveness, and have repeatedly used misleading statistics as to the number of smokers who have quit voluntarily and without professional help. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 209 ¶ 831 | Defendants have intentionally maintained and coordinated their position on addiction and nicotine as an important part of their overall efforts to influence public opinion and persuade people that smoking was not dangerous; in this way, the cigarette company Defendants could keep more smokers smoking, recruit more new smokers, and maintain or increase their earnings. Additionally, Defendants have sought to discredit evidence of addiction in order to preserve their "smoking is a free choice" argument in smoking and health litigation. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| **3. Defendants Were Well Aware that Smoking and Nicotine Are Addictive** | | | | |
| 218 ¶ 882 | The wealth of documentary evidence examined in this Section, as well as Sections V(C) and (D), reveals that for decades Defendants knew and internally acknowledged that nicotine is an addictive drug, that cigarettes are a nicotine delivery device, and that addiction can be enhanced and perpetuated through manipulating both the amount of nicotine and the method of nicotine delivery. Much of Defendants' knowledge of nicotine was obtained from in-house and industry-funded research into the pharmacological effects of the drug. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 218 ¶ 883 | For example, internal documents reveal that Philip Morris researchers knew in 1969 that nicotine was "a powerful pharmacological agent" and that the company operated on the "premise that the primary motivation for smoking is to obtain the pharmacological effect of nicotine." RJR's lead nicotine researcher stated in 1972 that nicotine is the "sine qua non of smoking" and that the industry was based on the consensus in the 1970s that "the most probable reason for the addictive properties of the smoke is the nicotine." Liggett, like its larger cigarette manufacturer counterparts, was actively seeking ways to manipulate the nicotine delivery to smokers. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 219 ¶ 884 | Defendants have studied nicotine and its effects since the 1950s. The documents describing their research into and resulting knowledge of nicotine's pharmacological effects on smokers-whether they characterized that effect as "addictive," "dependence" producing or "habituating,"-demonstrate unequivocally that Defendants understood the central role nicotine plays in keeping | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | smokers smoking, and thus its critical importance to the success of their industry. | | | |
| 219 ¶ 885 | Defendants' internal records also demonstrate that they knew that cigarette smoking, and tobacco in particular, were the vehicles for delivering nicotine-the critical component in maintaining the addiction necessary to sustain and enhance their profits. Indeed, Defendants purposefully designed and sold products that delivered a pharmacologically effective dose of nicotine in order to create and sustain nicotine addiction in smokers. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 219 ¶ 886 | Other documents demonstrate Defendants' understanding and acceptance of nicotine's role in maintaining cigarette smoking by showing their recognition that smokers adjust their smoking behavior in order to obtain their necessary nicotine intake. This behavioral adaptation of smokers is known as "compensation," or "titration," a concept Defendants have been well aware of for many years. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 219 ¶ 887 | These industry documents also support the conclusion that Defendants knew early on in their research that if a cigarette did not deliver a certain amount of nicotine, new smokers would not become addicted, and "confirmed" smokers would be able to quit. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 219 ¶ 888 | The evidence set forth in this Section demonstrates the extensive knowledge Defendants have had since the 1950s about nicotine's addictive effects on smokers, their use of that knowledge to maintain and increase the sale of cigarettes, and their decades-long efforts both to deny the truth about the addictive nature of nicotine and to conceal their own internal research which generated that information. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 220 ¶ 893 | A handwritten summary by Philip Morris researcher Ronald Tamol of a February 1, 1965 brand development meeting/presentation recorded the conclusion that the cigarette manufacturer who could come up with a "flavorful" low tar cigarette with "enough nicotine to keep smokers hooked ... will reap huge benefits." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 220 ¶ 896 | Philip Morris was well aware that nicotine shared many attributes of an addictive drug. In a February 19, 1969 memorandum from Dunn to Wakeham, Dunn cautioned that nicotine was a drug with FDA implications. He also discussed the "dual action" of nicotine as a drug with pharmacological "stimulant-tranquilizer" effects that caused a "pleasant state of dizziness so clearly experienced by the beginning smoker and by the habituated smoker following abstention." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 221 ¶ 901 | Notwithstanding its longtime public denials that smoking cessation induces withdrawal-one of the classic hallmarks of addiction-Philip Morris knew the extreme difficulty of quitting and the physical and mental effects of cessation attempts on the smoker. Scientists Dunn and Frank Ryan | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | described some of the withdrawal effects of nicotine in a 1971 study on cessation in the following graphic terms:   Even after eight months quitters were apt to report having neurotic symptoms, such as feeling depressed, being restless and tense, being ill-tempered, having a loss of energy, being apt to doze off. They were further troubled by constipation and weight gains which averaged about five pounds per quitter.... This is not the happy picture painted by the Cancer Society's anti-smoking commercial which shows an exuberant couple leaping into the air and kicking their heels with joy because they have kicked the habit. A more appropriate commercial would show a restless, nervous, constipated husband bickering viciously with his bitchy wife who is nagging him about his slothful behavior and growing waistline. | | Enrichment | |
| 222 ¶ 902 | With respect to the phenomenon of nicotine "compensation," Schori and Dunn wrote in a January 1972 Report titled "Tar, Nicotine, and Cigarette Consumption" that their research supports the notion that smokers develop a daily nicotine intake quota and that when smoking cigarettes differing in nicotine delivery from that to which they are accustomed they tend to modify their consumption rate in order to maintain their normal quota. No support was found for the analogous notion of a daily tar intake quota, however. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 222 ¶ 903 | In a 1972 "Confidential" research report titled "Motives and Incentives in Cigarette Smoking," Dunn asserted that people smoke in order "to obtain nicotine," and that nicotine "is the industry's product," adding that "without nicotine, the argument goes, there would be no smoking." In the report, Dunn summarized a 1972 CTR-sponsored conference held on the Caribbean island of St. Martin. More commonly known as St. Martin Conference, the meeting was not a secret. Some scientists unconnected to the tobacco industry attended and the proceedings of the conference were published shortly thereafter.  Dunn wrote:

The majority of the conferees would go even further and accept the proposition that nicotine is the active constituent of cigarette smoke.

Without nicotine, the argument goes, there would be no smoking. Some strong evidence marshaled to support this argument:

1) No one has ever become a cigarette smoker by smoking cigarettes without nicotine.

2) Most of the physiological responses to inhaled smoke have been shown to be nicotine-related. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 222 ¶ 904 | Most graphically, Dunn urged the industry to adopt the following approach:

Think of the cigarette pack as a storage container for a day's supply of nicotine.... | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Think of the cigarette as a dispenser for a dose unit of nicotine: it is readily prepped for dispensing nicotine....<br><br>Think of a puff of smoke as the vehicle of nicotine....<br><br>Smoke is beyond question the most optimized vehicle of nicotine and the cigarette the most optimized dispenser of smoke. | | Enrichment | |
| 223 ¶ 906 | Philip Morris also documented compensation as further evidence of addiction. A March 1973 Philip Morris Research Report titled "Smoking Behavior: Real World Observations," written by Philip Morris scientists Dunn, Thomas Schori and Janet Duggins, reported that a Philip Morris in-house study had shown that, "the smokers in this study are now smoking cigarettes delivering less tar and nicotine than those they smoked in 1968 and that they are smoking both more rod per cigarette and more cigarettes." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 223 ¶ 907 | In a May 8, 1974 presentation to Philip Morris USA President Clifford Goldsmith, Dunn explained how in-house research suggested that smokers titrate or regulate their smoke intake to get what they want out of the smoke:<br><br>I'm sure you are aware of our belief that people smoke for rewards they get from smoke at the pharmacological level.... It's simply not an adequate explanation to say that smoking is a habit, or that it is social behavior. A smoker is introducing something into his system that he wants. Certain components of smoke, most likely nicotine, act upon his system in some undetermined way to give him some undetermined pleasure. If this is true, then we expect the smoker to seek to take in that amount of smoke that does the job best for him. He is going to regulate his intake to suit his need ... We are hypothesizing that the smoker titrates (regulates) his smoke intake to suit his dosage needs. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 223 ¶ 908 | Research conducted at the Philip Morris Research Laboratory in June 1974 using high nicotine and low nicotine cigarettes "showed the existence of a definite compensation mechanism" among smokers. According to the report, titled "Human Smoking Habits," these findings were consistent with:<br><br>evidence in literature that the nicotine of cigarette smoke exerts a distinct pharmacological effect on the smoker which reinforces the smoking behavior. The smoker doses himself with nicotine according to his personal needs which depend on the level of arousal, external stress, his | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | personality and, possibly, a number of other factors. | | | |
| 226 ¶ 926 | Ian Uydess, a Philip Morris scientist from 1977 until 1989, stated that Philip Morris knew that a cause and effect relationship existed between market performance and nicotine delivery levels. The declaration also makes clear that nicotine was distinct from taste:<br><br>This belief ... was reflected in many of the comments made at a number of internal meetings at which zero and "ultra low" delivery products were being discussed. Some scientists even predicted that products made with "no" or "too low" a level of nicotine would probably fail in test markets, "no matter what they tasted like." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 227 ¶ 935 | Philip Morris's nicotine research program included studies which began before 1980 and continued until 1984 to develop nicotine analogs as part of a purposeful effort to find a nicotine-equivalent drug that would retain nicotine's effects on the brain without nicotine's known adverse cardiovascular and carcinogenic effects. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 227 ¶ 936 | The premise of the research was that "people smoke primarily because of nicotine's rewarding effects on the brain." This research could then, in theory, assist Philip Morris in removing nicotine from tobacco, substituting the analog that lacked nicotine's adverse cardiovascular effects, and thus produce a "safer" cigarette that still possessed nicotine's reinforcing effects on the smoker. As Dr. William Farone, who worked for Philip Morris from 1976 to 1984 and was Director of Applied Research, explained, this was the second part of a "two-step process" of internal research, neither of which was pursued by Philip Morris to commercialization. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **4. Defendants Publicly Denied that Nicotine Is Addictive and Continue to Do So** | | | |
| 271 ¶ 1146 | Despite the extensive and detailed knowledge possessed by Defendants for decades about the addictive qualities of nicotine and smoking, Defendants have publicly made false and misleading denials of the addictiveness of smoking, as well as nicotine's role in causing that addiction, and have suppressed the research results and data they produced and possessed contradicting such denials. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 271 ¶ 1147 | As acknowledged by industry counsel Covington & Burling, in a once-confidential May 1988 summary, "Tobacco industry statements deal only sparsely with the issue of addiction. To the extent such statements exist they generally deny outright any addictive effect." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 271 ¶ 1148 | Defendants' statements denying addiction, as described in the May 1988 Covington & Burling memorandum, as well as the many other similar denials of smoking and nicotine addiction set forth, *infra.*, were used to convey four important themes to the public: | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | | | Enrichment | |
| | 1. Smoking cigarettes is not addictive because some smokers can, and have, quit smoking on their own; <br> 2. Smoking cigarettes is not addictive because it does not produce physical "dependence"; <br> 3. Smoking cigarettes is not addictive because it does not produce "intoxication"; and <br> 4. Smoking cigarettes is not addictive because cigarettes are not like other addictive drugs, i.e., they are not illegal and are not necessarily linked to an anti-social lifestyle; smoking cigarettes is merely a pleasurable "habit" like playing tennis, jogging, eating chocolate, listening to rock music, etc. | | | |
| | **5. Defendants Concealed and Suppressed Research Data and Other Evidence that Nicotine Is Addictive** | | | |
| 289 ¶ 1266 | As demonstrated, Defendants' internal documents reflect a sophisticated understanding of nicotine and its role in creating smoking addiction-an understanding that is totally inconsistent with their long-standing public denials that nicotine is addictive. In addition, it is clear that Defendants intentionally withheld from public dissemination, from the public health community, and from government authorities, accurate and important information regarding the addictiveness of nicotine in cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 289 ¶ 1267 | Defendants suppressed their own extensive research findings discussed in Section V(B)(3), *supra*, supporting the conclusion that nicotine is addictive, and fostered controversy about the extent of scientific knowledge concerning nicotine and its addictive effects that was publicly available. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 289 ¶ 1268 | As that evidence shows, Defendants themselves possessed, from their own in-house and external research, information that led them to conclude, long before public health bodies did, that the primary reason people keep smoking cigarettes is to obtain the drug nicotine, which is addictive. Defendants intentionally withheld this data (including many of studies on the physiological effects of nicotine in animals and humans, and much of their research on the determinants of nicotine dosing in cigarettes) when there were major public efforts to review and synthesize all available information. This occurred with the preparation of both the 1964 and 1985 Surgeon General's Reports and numerous congressional investigations. Defendants also engaged in a decades-long, elaborate, sophisticated, well-funded public relations offensive, denying and attacking the consensus conclusion they had long ago reached internally, but that the less well-funded public health community was belatedly reaching, that smoking is addictive primarily because cigarettes effectively deliver nicotine. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 290 ¶ 1269 | A September 9, 1980 Tobacco Institute internal memorandum revealed the recognition by the | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | member companies that a public admission that nicotine was addictive would undermine their litigation defense that a person's decision to smoke is a "free choice":<br><br>[T]he entire matter of addiction is the most potent weapon a prosecuting attorney could have in a lung cancer/cigarette case. We can't defend continued smoking as "free choice" if the person was "addicted." | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 290 ¶ 1270 | A second reason Defendants denied addiction was to avoid regulation by the FDA. None of the companies' internal research and evidence about addiction was submitted in 1996 when the FDA sought to assert jurisdiction over cigarettes as drug (nicotine) delivery devices. Instead, Defendants vigorously denied every aspect of addiction. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **a. Philip Morris** | | | |
| 290 ¶ 1272 | As already discussed, Philip Morris intensively studied nicotine and both its pharmacological and physiological effects on smokers (sometimes called addictive, dependence-producing, or reinforcing effects) in an effort to increase its market share within the industry. However, Philip Morris withheld from the public its internal knowledge and acceptance that smoking, because of nicotine, was addictive. Similarly, Philip Morris's research demonstrating the addictive impact of nicotine on the bodies of animals and humans was suppressed, and in some cases terminated. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **6. Conclusions** | | | |
| 307 ¶ 1359 | For approximately forty years, Defendants publicly, vehemently, and repeatedly denied the addictiveness of smoking and nicotine's central role in smoking. They made these denials out of fear that public acknowledgment of what was so well documented and widely accepted internally within their corporate offices and scientific laboratories could result in governmental (i.e., FDA) regulation, adverse liability judgments from addicted smokers suffering the adverse health effects of smoking, loss of social acceptability of smoking, and the ultimate loss of corporate profits. The evidence spelled out above is simply overwhelming that Defendants knew that smoking is addictive and knew that nicotine is the agent creating and sustaining that addiction. There is also overwhelming evidence that even though Defendants have known internally about addiction for decades, they have endeavored to keep the extensive research and data they had accumulated out of the public domain and out of the hands of the public health community by denying that such data existed, by refusing to disclose it, and by shutting down or censoring laboratories and research projects which were investigating the mechanisms of nicotine. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 307 ¶ 1360 | Defendants assert that the public health community and the public itself has known for decades that nicotine produced dependence. For example, Defendants cite to the 1962 publication of the well respected Larson, Haag and Silvette compendium, Tobacco Experimental and Clinical | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Studies, which described nicotine's effects on the human nervous system and summarized existing research suggesting that people smoke to obtain nicotine, that nicotine has pharmacological effects, and that nicotine is addictive or habituating.  Defendants also cite to the United States Supreme Court comment that, when Congress enacted the Federal Cigarette Labeling Act in 1965, "the adverse health consequences of tobacco were well known, as were nicotine's pharmacological effects." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 138, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Even if there is truth to Defendants' speculation that "everyone knew" of nicotine's addictiveness, there is no question that the public health community lacked the substantial and sophisticated understanding of nicotine's effects and role that Defendants possessed. Put quite simply, if the Surgeon General of the United States possessed the information and data Defendants possessed prior to publication of his 1964 Report, it is simply not possible that he would have ignored it. | | Enrichment | |
| 308 ¶ 1361 | Moreover, there is a basic inconsistency in Defendants' position. If, in fact, "everybody knew" that smoking and nicotine were addictive, then why were Defendants publicly, vehemently, and repeatedly denying it? | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 308 ¶ 1362 | Defendants' denials misled the public about why quitting smoking is so difficult, exactly how difficult it is, and about why failure to quit is not simply a function of personal weakness or lack of willpower. In short, after reassuring the smoker that smoking was not bad for her health, and was not addictive, Defendants then blamed her for being unable to stop using the product they had so successfully marketed with false information. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 308 ¶ 1363 | Defendants did not simply deny that smoking warranted the label "addiction"; they denied the entire concept of physiological dependence. The semantic battle Defendants have waged in the public realm and at trial is a distraction from the fact that, whether using the word "dependence" or "addiction," the core concept is the compulsive and uncontrollable use of nicotine reflected in drug-seeking and drug-taking behavior, all of which Defendants deny exist. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 308 ¶ 1364 | Based on the extensive individual Findings of Fact set forth in this Section, the Court finds that Defendants have known for decades that cigarette smoking was addictive, and that nicotine is the addicting element in smoking behavior. Defendants' false and misleading statements relating to addiction continue even today. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 308 ¶ 1365 | Moreover, Defendants deliberately and intentionally hid this information from the public and closed down research laboratories and on-going projects in order to ensure secrecy. Time and time again, Defendants falsely denied these facts to smokers and potential smokers, to government regulatory authorities, to the public health community and to the American public. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | **C. Nicotine "Manipulation": Defendants Have Falsely Denied That They Can and Do Control the Level of Nicotine Delivered In Order to Create and Sustain Addiction** | | | |
| 308 ¶ 1366 | As demonstrated in the previous Section, Defendants have long known that nicotine creates and sustains an addiction to smoking and that cigarette sales, and ultimately tobacco company profits, depend on creating and sustaining that addiction. Section V(B)(3), *supra*. Given the importance of nicotine to the ultimate financial health of Defendants, they have undertaken extensive research into how nicotine operates within the human body and how the physical and chemical design parameters of cigarettes influence the delivery of nicotine to smokers. Using the knowledge produced by that research, Defendants have designed their cigarettes to precisely control nicotine delivery levels and provide doses of nicotine sufficient to create and sustain addiction. At the same time, Defendants have concealed much of their nicotine-related research, and have continuously and vigorously denied their efforts to control nicotine levels and delivery. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 309 ¶ 1367 | Defendants, individually, jointly, and through third parties, have extensively studied smoking intake and inhalation, compensation, addiction physiology, smoker psychology, the pharmacological aspects of nicotine, the effects of nicotine on brain waves, and related subjects. As a result of this research, cigarette company Defendants have been aware for decades that cigarettes are addictive and that smoking addiction is caused primarily by the delivery of dependence-producing levels of nicotine. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 309 ¶ 1368 | The typical cigarette contains far more nicotine than an individual will inhale as he or she smokes… Every aspect of a cigarette is precisely tailored to ensure that a cigarette smoker can pick up virtually any cigarette on the market and obtain an addictive dose of nicotine… Most cigarettes are manufactured using reconstituted tobacco material, additives, burn accelerants, ash conditioners, and buffering substances, all of which affect nicotine levels and delivery. Other cigarette design features used by Defendants to control nicotine delivery include filter design, paper selection and perforation, ventilation holes, leaf blending, and use of additives (such as ammonia) to control the PH of cigarette smoke. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 309 ¶ 1369 | During the 1960s and 1970s, the public health community urged development of low-tar cigarettes as a healthier alternative to the "full-flavored" cigarettes which then dominated the market. In response, cigarette company Defendants developed low-tar cigarettes. They then falsely maintained that nicotine levels were inextricably linked to tar levels, and that nicotine levels would, of necessity, proportionately fall, as fast and as far as the tar levels in the newer low-tar cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 309 ¶ 1370 | In the early 1970s, the Federal Trade Commission developed a machine to measure tar and nicotine levels. Even though it became the accepted mechanism for taking such measurements, it became widely known in both the public health community and by the cigarette company Defendants that the FTC method did not accurately measure the amounts of nicotine and tar which a smoker actually ingested. Cigarette company Defendants, with the benefit of their much more sophisticated understanding of smoker compensation, as well as their knowledge of nicotine control, then intentionally developed and marketed cigarettes which, in actuality, delivered higher levels of nicotine than those measured by the FTC method. Those levels of nicotine were sufficient to create and sustain addiction in smokers. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **1. For Decades, Defendants Have Recognized that Controlling Nicotine Delivery, in Order to Create and Sustain Smokers' Addiction, Was Necessary to Ensure Commercial Success**<br><br>**a. Defendants Recognized the Need to Determine "Minimum" and "Optimum" Nicotine Delivery Levels in Order to Provide Sufficient "Impact" and "Satisfaction" to Cigarette Smokers** | | | |
| 309 ¶ 1371 | During years of research, cigarette company Defendants sought to identify what they often referred to as an "optimum" amount of nicotine: one that would meet smokers' demand for lower nicotine and tar products, while still providing enough nicotine to create and sustain addiction. Defendants' efforts often centered on attempting to identify a particular dose of nicotine that would "satisfy" smokers' need for nicotine and thereby assure continued smoking. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 310 ¶ 1372 | As Defendants' knowledge and understanding of nicotine delivery evolved, they identified and developed more sophisticated product design techniques that would assure the delivery of the minimum dose of nicotine to provide smokers with sufficient "impact" and "satisfaction," regardless of the type of cigarette. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 310 ¶ 1373 | Defendants' internal documents demonstrate that, based on their knowledge of nicotine's pharmacological properties and addictive nature, they incorporated physical and chemical design techniques into their commercial products that would assure delivery of the precise levels of nicotine necessary to assure taste, impact, and satisfaction, i.e., to maintain addiction. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 310 ¶ 1374 | In their research reports, studies, and memoranda, Defendants used different terms to describe or identify the attributes of nicotine which were so desirable to smokers. Those terms include the words "impact," "satisfaction," "hit," "optimum," "optimal," and "minimum." These terms were not used in a uniform or consistent manner, and were often used interchangeably. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 310 ¶ 1375 | Based on thorough examination of the many documents discussed in this Section, and the context in which the terms in issue were used, the Court finds that, in most instances, the word "impact" has been used by Defendants to refer to the immediate sensory effect that the delivery of nicotine has on a smoker. This sensory response occurs through nicotine's stimulation of the afferent nerves in the back of the throat when cigarette smoke is first inhaled, causing a peripheral nerve effect that is recognized by the brain. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 310 ¶ 1376 | Defendants' internal documents indicate that they were well aware that impact was significant to smokers, and that a particular cigarette's impact was a function of its nicotine delivery. For example, B & W defined impact to mean "[t]he sensory attribute most associated with nicotine," noting that "[t]he higher the nicotine delivery per puff of a product the higher the Impact felt by the inhaling smoker." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 310 ¶ 1377 | The Court also finds that, in most instances, the word "satisfaction" has been used by Defendants to refer to the pharmacological attributes associated with a cigarette's level of nicotine delivery. As found in industry documents, the word describes the "hit" of nicotine an individual receives when smoking a cigarette and the effect produced by that nicotine on the central nervouse system when it reaches the brain. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 310 ¶ 1378 | For example, Lorillard has stated that smokers "want some acceptable level of smoking satisfaction; which among other attributes means some acceptable level of nicotine delivery." Reynolds also discussed "the minimum level of nicotine required for smoker satisfaction." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 311 ¶ 1379 | Defendants have claimed that the terms "impact," "satisfaction," "hit," etc., as used in their internal documents, refer only to the taste characteristics of cigarettes. This claim is rejected because the documents themselves prove otherwise. Even though, as noted earlier, the scores of writers of these hundreds of documents do not always use the terms in a consistent manner, the numerous internal documents quoted and discussed *infra,* usually differentiate taste and impact from satisfaction or "hit," and the context makes clear when reference is being made to the taste and sensory attributes of nicotine as opposed to its physiological or addictive effects. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **(1) Philip Morris** | | | |
| 311 ¶ 1380 | Philip Morris has been aware of the need to effectively measure and control the amount of nicotine in cigarettes since as early as the 1940s, when it first conducted studies on controlling nicotine in its Parliament cigarettes. In a 1954 document titled, "An Outline of Current and Proposed Quality Control, for example, Development and Research for Benson and Hedges," Philip Morris discussed its program to "ensur[e] the over-all quality and uniformity of the finished Parliament cigarette and thus maintain[ ] its appeal for discriminating smokers." The program was focused on "nicotine content, tar content, acid-base balance, and content of taste and aroma | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | factors." The memorandum described Philip Morris's efforts to use "informally constituted smoking panels and the results of nicotine analyses performed on the blends ... to establish a desirable level of nicotine concentration in the blend and hence also in the smoke." | | | |
| 311 ¶ 1381 | Philip Morris was concerned that complaints relating to smoking and health might pressure the tobacco industry to reduce levels of nicotine to such a low level that the smoking market might be eliminated. In 1961, Helmut Wakeham, Philip Morris's Director of Research, wrote: "Even though nicotine is believed essential to cigarette acceptability, a reduction in level may be desirable for medical reasons.... How much nicotine reduction will be acceptable to the smoker?" | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 311 ¶ 1382 | That same year, Wakeham conducted a seminar titled, "The Big Picture for 1961," in which "Aim 2" was described as: "Define the potential of nicotine control as a cigarette improvement.... Determine optimum levels of nicotine in smoke.... Perfect processes for controlling nicotine content of filler." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 311 ¶ 1383 | From the 1950s and 1960s through the 1980s and 1990s, the most senior levels of executive leadership at Philip Morris considered various mechanisms for controlling the amount of nicotine delivered to smokers, from determining the optimal level of nicotine delivery to the control of nicotine levels through leaf blending and increasing nicotine delivery to cigarette smoke. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 311 ¶ 1384 | An October 19, 1977 report titled, "Smoker Psychology Program Review," postulated the following questions: (1) what is the optimum nicotine/tar ratio? (2) given a fixed quantity of nicotine in tobacco, what factors in the cigarette design determine its availability for delivery to the smoker? and (3) how important is the form of the delivered nicotine? | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 312 ¶ 1385 | In 1990, Philip Morris researchers explained in an inter-office memorandum that the question of whether there was an optimal amount of nicotine to be delivered to the smoker had been answered by Philip Morris's Electrophysiological Studies Research Group, which explored and measured the brain effects of nicotine. Listed among the various achievements of the group was that it had "shown that there are optimal cigarette nicotine deliveries for producing the most favorable physiological and behavioral responses." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **b. Defendants Have Long Recognized that Controlling the Nicotine to Tar Ratio Would Enable Them to Meet Minimum and Optimum Nicotine Delivery Levels**<br><br>**(1) Philip Morris** | | | |
| 315 ¶ 1403 | Philip Morris understood more than forty years ago that a high nicotine to tar ratio was important in formulating a successful cigarette strategy. A February 9, 1960 memorandum from L.L. Long, Research and Development Engineer, to A.B. Clarke, Research and Development Scientist, and | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | copied to Robert Seligman, who became Vice President of Research and Development, discussed Philip Morris's ongoing efforts to control the amount of nicotine received by a smoker through concentration of nicotine in tobacco smoke while maintaining lower levels of tar. Long wrote:<br><br>One of the objectives of the 1960 cigarette project is the control of TPM ["totalparticulate matter," or tar] at a low level while maintaining the nicotine level in the smoke at its current level of about 1 mg/cigt. Several years ago some work was conducted along these lines. Nicotine Maleate was added to a low nicotine filler with a resulting increase in nicotine in the smoke. It would be most helpful if you could conduct some investigation in this area along with your work on nicotine control through extraction.<br><br>This issue received further attention throughout 1960. | | Enrichment | |
| 316 ¶ 1406 | A March 24, 1969 Philip Morris memorandum' demonstrates that the company had considered several different filters, air dilution, and improved internal filtration, and had determined the effects that these methods would have on the nicotine to tar ratio measurements using the FTC method. The memorandum states that "[t]here does appear to be a definite increase in nicotine concentration as the percentage dilution increases." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 316 ¶ 1407 | Philip Morris's Cathy Ellis, a research scientist, stated that, during the 1970s, Philip Morris looked into increasing the nicotine delivery in its cigarettes while at the same time decreasing tar levels. Ellis explained that one method of achieving the higher nicotine delivery level was through selective tobacco blending. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 316 ¶ 1409 | Philip Morris conducted multiple consumer research studies to determine the acceptability of various nicotine to tar ratios. Studies conducted in the early- and mid-1970s tested smokers' reactions to "low tar, high nicotine" cigarettes. These studies showed that consumers preferred nicotine to tar ratios that were higher than those that occur naturally in tobacco. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 317 ¶ 1411 | In 1971, Philip Morris asked some of its own employees to participate in a smoking study in order to "find out how the nicotine and tar levels of cigarettes affected their acceptability and consumption." One of the conclusions of the study was that the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels, but not to the tar levels. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 317 ¶ 1415 | In a July 8, 1974 letter from Philip Morris's Helmut Wakeham to Max Hausermann of Philip Morris Europe, Wakeham acknowledged receipt of a Research Progress Report from Hausermann. Wakeham responded to studies highlighted in the report that had found | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | discrepancies between the way that humans smoke cigarettes as compared with the operation of the FTC smoking machine. Wakeham agreed that Philip Morris had found evidence of the same phenomenon. He advised Hausermann not to publicly share this information: | | Enrichment | |
| | **c. Defendants Understood the Correlation Between Nicotine Delivery and Cigarette Sales** | | | |
| 334 ¶ 1493 | For several decades, the cigarette company Defendants have recognized that the commercial success of any cigarette depends on its ability to deliver adequate levels of nicotine to smokers. As the internal documents discussed below reveal, each Defendant also understood that its market position, as well as the financial viability of the tobacco industry as a whole, required the development of cigarettes that provide nicotine in amounts sufficient to ensure that smokers become and remain addicted. Accordingly, each Defendant took steps, over a sustained period of time, to develop such cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **(1) Philip Morris** | | | |
| 334 ¶ 1494 | A May 5, 1975 memorandum from John T. Landry, Philip Morris's Executive Vice President of Marketing, to Clifford H. Goldsmith, President, expressed that Landry was "alarm[ed]" that Marlboro's nicotine delivery had "dropped ... sharply below that of Winston." Landry acknowledged, "it puts us at a competitive disadvantage," and recommended "that this problem be thoroughly explored with Manufacturing and R & D and that every attempt be made to return the nicotine delivery to more suitable levels." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 334 ¶ 1495 | Even though Philip Morris publicly stated for decades that nicotine is used in cigarettes for "taste," an internal Philip Morris document, dated March 18, 1980, discusses the utility of nicotine to Defendants, and to Philip Morris in particular. In that document, a memorandum from Jim Charles, Manager of Research and Development to Robert Seligman, then-Vice President of Research and Development, Charles wrote that "[n]icotine is a powerful pharmacological agent ... and may be the most important component of cigarette smoke." Charles argued that further research on nicotine was vital and that it would have a "direct bearing on our market position in a 10-15 year time frame." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **2. Defendants Researched, Developed, and Utilized Various Designs and Methods of Nicotine Control to Ensure that All Cigarettes Delivered Doses of Nicotine Adequate to Create and Sustain Addiction** | | | |
| 337 ¶ 1508 | Nicotine delivery levels are not a matter of random variation. Rather, cigarettes are specifically designed to deliver a range of nicotine doses so that a smoker can obtain her optimal dose from virtually any cigarette on the market, regardless of that cigarette's nicotine delivery level as measured by the FTC method. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 337 ¶ 1509 | Defendants' control of nicotine has not focused simply on delivering as much nicotine as possible, because delivery of large amounts of nicotine can make cigarettes harsh and unpalatable to the smoker. In addition, an unsmoked cigarette already contains much more nicotine than a smoker will inhale because, as mentioned, not all of the nicotine present in tobacco is transferred to cigarette smoke. Typically, a cigarette that delivers approximately one milligram of nicotine in smoke, as measured by FTC testing, retains "about 14-20 milligrams of nicotine in the unsmoked rod." Therefore, it is simplistic to consider only "spiking" of cigarettes by adding extraneous nicotine when determining Defendants' control of nicotine delivery. Rather, their control of nicotine must include consideration of the myriad design parameters Defendants have used to control the dose and form of nicotine delivered to mainstream cigarette smoke. As explained by Dr. Farone, who had extensive personal experience with Philip Morris's cigarette design efforts and objectives as Director of Applied Research from 1977 to 1984, nicotine control-or manipulation-means doing something to change the amount of nicotine that comes off a burning cigarette to make it different than what it would be if you just took tobacco, wrapped it up, put it in a rod, lit that up, and let the nicotine go where it may.... [N]icotine manipulation deals with making specific changes in that design to make nicotine go where you want it to go as opposed to where it would go by itself without changing the design. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 337 ¶ 1510 | As the following Findings of Fact demonstrate, Defendants have used a variety of physical and chemical design parameters to manipulate the nicotine delivery of their commercial products. For example, while Dr. Farone was at Philip Morris, researchers identified fifty-seven different parameters that influence the quality and content of smoke delivery by a burning cigarette... Physical design parameters include cigarette length, circumference, and density; filter composition and design; air dilution or ventilation; and cigarette paper composition and porosity. Chemical design parameters include tobacco blend selection, the chemical composition of tobacco filler, and the choice of additives, including additives such as ammonia and ammonia compounds to influence smoke pH and the amount of free nicotine… Defendants' goal to ensure that their products deliver sufficient nicotine to create and sustain addiction influences their selection and combination of design parameters. No single design parameter is responsible, on its own, for the level of nicotine delivered by a particular cigarette. Rather, Defendants combine design parameters to ensure that any particular cigarette delivers a sufficient level of nicotine | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 338 ¶ 1511 | Defendants' claims that their control of nicotine in their products is strictly for quality control measure are without factual support.<br>Cigarettes are designed to give a desired tar and nicotine level for each member of any brand family. They are designed into the product and they are not a matter of random variation.... [Defendants' control of nicotine] starts at the design stage and then it is maintained. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 338 ¶ 1512 | Defendants have long claimed that pressure from public health authorities motivated their efforts | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | to manipulate the design of their cigarettes in order to control nicotine delivery. The record does not support those claims. What is true is that in the 1970s, public health groups, such as the Tobacco Working Group in 1976, suggested that Defendants create less hazardous cigarettes by lowering the amount of tar while maintaining the amount of nicotine. However, many of Defendants' internal documents on the issue of nicotine delivery control predate the 1976 recommendations of the Working Group. In addition, even during the limited window of time in which the public health community was encouraging high nicotine/low tar cigarettes, Defendants did not disclose how sophisticated their understanding of nicotine manipulation was or how much they understood about the process of compensation. Finally, even today, long after the Tobacco Working Group and other members of the public health community have acknowledged that such efforts were counterproductive and would not benefit the public, Defendants continue to research and employ techniques to control nicotine delivery in their commercial cigarettes. | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 338 ¶ 1513 | Defendants also claim unpersuasively that their research into methods to control nicotine delivery never translated into any commercially successful products. They also challenge the scientific basis for some of the design parameters discussed, i.e., whether such a change in design actually had an effect on nicotine delivery and, correspondingly, addiction. While most of the physical and chemical design parameters discussed below were used in the manufacture of Defendants' commercial cigarettes and did have an effect on nicotine delivery to the smoker, that issue is not, in an of itself, relevant. In the context of these fraud claims, what is relevant is that Defendants firmly believed, as demonstrated by their internal documents, that they could-and did-control nicotine delivery to the smoker by manipulating the design of their cigarettes, and then lied about their knowledge and conduct to the American consumer. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **a. Defendants Recognized the Need to Design Cigarettes that Would Produce Low Nicotine and Tar Measurements under the FTC Method While Also Delivering the Minimum Nicotine Levels to Create and Sustain Addiction** | | | |
| 338 ¶ 1514 | Defendants began to anticipate in the 1950s and 1960s, as the relationship between smoking and health was becoming a more prominent subject of public concern, that public interest in less harmful cigarette products could ultimately require reduced levels of nicotine and tar in conventional commercial cigarettes. Defendants also recognized that if they addressed smokers' concerns about the health effects of smoking by reducing the levels of tar in their cigarettes, they might also effect a proportional drop in nicotine. They also recognized that a reduction in nicotine delivery levels which was no longer sufficient to sustain smokers' addiction could devastate their industry. Defendants therefore set out to design commercial cigarettes that were capable of delivering nicotine across a range of doses that would keep smokers addicted. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 339 ¶ 1515 | As discussed earlier, *see generally* Section V(E)(2)(b), *infra*, Defendants have known since the 1960s that individuals smoke to obtain the desired effects of nicotine, and that smokers of lower | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | nicotine yield cigarettes tend to adjust their smoking behavior to titrate (i.e., control) their intake of nicotine to achieve desired levels. This behavioral adaptation is referred to as smoker "compensation." By puffing lower yield cigarettes more frequently and/or more intensively, by blocking ventilation holes in the cigarette filter, and/or by smoking more cigarettes in a day, smokers are able to "compensate" for the lower nicotine deliveries of low nicotine/low tar cigarettes. Id. Defendants used this knowledge in their research on nicotine manipulation and the manufacture of cigarettes. | | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 339 ¶ 1516 | The primary means by which Defendants have ensured that their low delivery products will sustain smoking addiction is by incorporation of physical design characteristics and ingredients that enable the human smoker to easily obtain his or her reinforcing level of nicotine, regardless of the cigarette's nominal FTC machine-measured yield. Internal documents reveal that Defendants designed their cigarettes to increase the flexibility of their nicotine and tar dosing capacity to smokers even as they reduced nicotine and tar yields as determined by the FTC machine method. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **3. Defendants Have Made False and Misleading Public Statements Regarding Their Control of the Nicotine Content and Delivery of Their Products** | | | |
| 374 ¶ 1705 | Despite the overwhelming evidence of their research into and utilization of methods to control the amount and delivery of nicotine in cigarettes, Defendants have denied, repeatedly and publicly, that they manipulate nicotine content and delivery in cigarettes in order to create and sustain addiction. Defendants have also repeatedly and publicly claimed that the levels of nicotine delivered by cigarettes are determined by their levels of tar delivery | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **4. Conclusions** | | | |
| 374 ¶ 1758 | The Defendants have repeatedly made vigorous and impassioned public denials-before Congressional committees, in advertisements in the national print media, and on television-that neither smoking nor nicotine is addictive, and that they do not manipulate, alter, or control the amount of nicotine contained in the cigarettes they manufacture. The Findings of Fact contained in this Section and Section V(B), *supra*, provide overwhelming evidence that those statements are false. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 383 ¶ 1759 | As established by the Findings of Fact set forth in this Section, cigarette company Defendants researched, developed, and implemented many different methods and processes to control the delivery and absorption of the optimum amount of nicotine which would create and sustain smokers' addiction. These methods and processes included, but were not limited to: altering the physical and chemical make-up of tobacco leaf blends and filler; maintaining or increasing the nicotine to tar ratio by changing filter design, ventilation and air dilution processes, and the porosity and composition of filter paper; altering smoke pH by adding ammonia to speed nicotine | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | absorption by the central nervous system; and using other additives to increase the potency of nicotine. | | | |
| 384 ¶ 1760 | The fact that some of these methods and processes may also have been used, as Defendants argued, to improve flavor and taste, especially of low tar cigarettes as they were developed in response to the fears of the public about the adverse health effects of smoking, is in no way inconsistent with these Findings of Fact that Defendants also used them to manipulate, and increase the amount and form of nicotine delivered in cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 384 ¶ 1761 | Nor is the fact that during the 1970s, the public health community may have encouraged the development of low tar cigarettes because it believed-erroneously-that nicotine levels would fall as tar levels fell, in any way inconsistent with these Findings of Fact. What the public health community did or did not know is irrelevant to the issue of what Defendants knew about the relationship between nicotine and tar and whether they knowingly made false public statements about that relationship. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 384 ¶ 1762 | The words of Defendants themselves establish that the goal of their extensive efforts, through research and experimentation, to control the levels of nicotine delivery was to ensure that smokers obtained sufficient nicotine to create and sustain addiction:<br><br>Philip Morris listed as one of the achievements of its Electrophysiological Studies Research Group a discovery "that there are optimal cigarette nicotine deliveries for producing the most favorable physiological and behavioral responses." ¶ 947, *supra.*<br><br>RJR's "top priority [was] to develop and market low 'tar' brands ... that: [m]aximize the physiological satisfaction per puff-the single most important need of smokers." ¶ 1431, *supra.*<br><br>BATCo named as a "high priority" development of "alternative designs (that do not invite obvious criticism) which will allow the smoker to obtain significant enhanced deliveries should he so wish." ¶ 1460, *supra.*<br><br>The "major objective" of Lorillard's study of filter design was to "increase the physiological impact and/or nicotine to tar ratio in ultra low tar cigarettes." ¶ 1488, *supra.* | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 384 ¶ 1763 | In sum, the evidence as presented in these Findings of Fact is overwhelming that Defendants have, over the course of many years, time and again-and with great self-righteousness-denied that they manipulated the nicotine in cigarettes so as to increase the addiction and dependence of smokers. Those denials were false. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | **E. Defendants Falsely Marketed and Promoted Low Tar/Light Cigarettes as Less Harmful than Full-Flavor Cigarettes in Order to Keep People Smoking and Sustain Corporate Revenues** | | | |
| 430 ¶ 2023 | For several decades, Defendants have marketed and promoted their low tar brands as being less harmful than conventional cigarettes. That claim is false, as these Findings of Fact demonstrate. By making these false claims, Defendants have given smokers an acceptable alternative to quitting smoking, as well as an excuse for not quitting. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 430 ¶ 2024 | Defendants used a combination of techniques to market and promote their low tar brands. Defendants' marketing has emphasized claims of low tar and nicotine delivery accompanied by statements that smoking these brands would reduce exposure to the "controversial" elements of cigarette smoke (*i.e.,* tar). Since the 1970s, Defendants also have used so-called brand descriptors such as "light" and "ultra light" to communicate reassuring messages that these are healthier cigarettes and to suggest that smoking low tar cigarettes is an acceptable alternative to quitting. In addition to appealing advertising and easily-remembered brand descriptors, Defendants have used sophisticated marketing imagery such as lighter color cigarette packaging and white tipping paper to reinforce the same message that these brands were low in tar and therefore less harmful. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 430 ¶ 2025 | Even as they engaged in a campaign to market and promote their low tar cigarettes as less harmful than conventional ones, Defendants either lacked evidence to substantiate their claims or knew them to be false. Indeed, internal industry documents reveal Defendants' awareness by the late 1960s/early 1970s that, because low tar cigarettes do not actually deliver the low levels of tar and nicotine which are advertised, they are unlikely to provide any clear health benefit to human smokers, as opposed to the FTC smoking machine, when compared to regular, full flavor cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 431 ¶ 2026 | As Defendants have long been aware, nicotine delivered by cigarettes is addictive. Defendants' internal documents demonstrate their understanding that, in order to obtain an amount of nicotine sufficient to satisfy their addiction, smokers of low tar cigarettes modify their smoking behavior, or "compensate," for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with fingers or lips, and/or smoking more cigarettes. As a result of this nicotine-driven smoker behavior, smokers of light cigarettes boost their intake of tar, thus negating what Defendants have long promoted as the primary health-related benefit of light cigarettes: lower tar intake. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 431 ¶ 2027 | Defendants did not disclose the full extent and depth of their knowledge and understanding of smoker compensation to the public health community or to government regulators. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | | | Enrichment | |
| 431 ¶ 2028 | Defendants' conduct relating to low tar cigarettes was intended to further their overarching economic goal: to keep smokers smoking; to stop smokers from quitting; to encourage people, especially young people, to start smoking; and to maintain or increase corporate profits. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **1. Low Tar/Light Cigarettes Offer No Clear Health Benefit over Regular Cigarettes**<br>**a. History of Health Claims** | | | |
| 431 ¶ 2029 | In the early 1950s, on the heels of a series of studies linking smoking and disease, the Defendant cigarette manufacturers began making health claims, often using models in doctors' white coats, in their advertising:<br><br>American Tobacco Co. made representations "that its cigarettes were less irritating to the throat than competing brands, offered one's throat protection, were easy on one's throat, and provided protection against throat irritation and coughing...."<br><br>R.J. Reynolds Tobacco Co. "represented to the public ... that the smoking of such cigarettes ... aided digestion"; "represented that the wind and physical condition of athletes would not be impaired by the smoking of as many Camel cigarettes as desired"; and "represented that the smoking of Camel cigarettes was soothing, restful, and comforting to the nerves, and protected one against becoming 'jittery' or 'unsure' when subjected to intense nerve strain<br><br>Liggett & Myers Tobacco Co. represented " 'directly or by implication, that Chesterfield cigarettes can be smoked by an [sic] smoker without inducing any adverse affect upon the nose, throat and accessory organs of the smoker.'<br><br>Lorillard made comparisons between the tar and nicotine yields of its cigarettes and those of its competitors. For example, Old Gold advertisements included statements that Old Gold was "lowest in nicotine and throat irritating tars and resins when compared with 6 other leading brands. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 432 ¶ 2030 | As discussed in great detail in section V(E)(1)(a), *infra*, the FTC successfully prosecuted the Defendant cigarette manufacturers' for some of these health claims. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 432 ¶ 2031 | Those prosecutions led to public calls for a ban on advertisements containing such health claims… ("Cigarette advertisers were urged today by the National Better Business Bureau to | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | adopt an eight point code to eliminate unfounded health claims in cigarette advertising."). | | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 432 ¶ 2032 | Given the public's concern over tar and lung cancer, the "White Coat" ads of the 1940s and early 1950s gradually disappeared, and a wave of ads featuring claims about filtration and tar reduction became the new basis for competition… ("In the 1950s, cigarette manufacturers introduced cigarette filters as 'health protection' and advertised them widely."). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 432 ¶ 2033 | Defendants competed through comparative filtration ads in the period following 1953…(NCI Monograph 13) ("Companies initially responded to this health scare by introducing filtered products that were accompanied by advertisements with explicit health-related statements."). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 432 ¶ 2034 | In 1954, the FTC issued a letter to all tobacco companies announcing its intention to adopt uniform standards for cigarette advertising "to prevent the use of false or misleading claims."(no bates) During the ensuing negotiations with cigarette manufacturers, the FTC advised the industry to conform its advertising with FTC decisions, "including decisions finding that comparisons of tar and nicotine between brands were false and misleading." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 432 ¶ 2035 | In 1955, the FTC adopted the "Cigarette Advertising Guides," proscribing any implicit or explicit health claims in cigarette advertising. The Guides did, however, provide a limited exception to this general rule, for what the FTC believed were implicit health claims. This exception allowed comparative ads claiming that a cigarette was "low in nicotine or tars," provided it has "been established by competent scientific proof applicable at the time of dissemination that the claim is true, and if true, that such difference or differences are significant." At the same time, some members of the public health community urged the development and adoption of cigarettes with reduced tar yields. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2036 | By the mid to late 1950s, the American cigarette manufacturers responded with a heated "tar derby" of competing claims about the effectiveness of various filters: "[C]igarette companies advertised that certain brands were lower in 'tar' and nicotine and, by implication, less dangerous." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2037 | Smokers responded too, switching in droves to filtered cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2038 | However, Congress and the FTC perceived that the resulting competition was confusing since different cigarette manufacturers sought to substantiate their "low tar" claims based on different "scientific" testing methods. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 433 ¶ 2039 | Faced with the "tar derby" and perceived consumer confusion, the FTC concluded that, "[i]n the absence of uniform testing procedures, it was impossible to make claims about 'tar' and nicotine levels that could be substantiated  Accordingly, in 1959, the FTC called a halt to the "tar derby" and "reiterated its view that tar and nicotine claims would be regarded as conveying the additional claim that lower levels of tar and nicotine reduced health risks." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2040 | "[T]he position taken by the FTC at this time was that the simple fact of listing tar and nicotine deliveries ... constituted an implied health claim," because the "implication was that these cigarettes would be less hazardous or less harmful." On December 17, 1959, the FTC informed tobacco manufacturers that it henceforth would bar all health claims in advertising, including "all representations of low or reduced tar or nicotine, whether by filtration or otherwise.". The FTC further "inform[ed] the industry that in its opinion the evidence then available would support a complaint against any marketer who made any reference to tar or nicotine content, charging that such a reference was false and misleading." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2041 | A month later, the FTC requested that the cigarette manufacturers agree to make no references to tar and nicotine in their advertising, and the manufacturers agreed. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
|  | **b. The FTC Method** |  |  |  |
| 433 ¶ 2042 | The FTC thought the 1964 Surgeon General's Report provided "an evidentiary foundation to support a Rule requiring a positive statement [of average 'tar' and nicotine yields] in [cigarette] labeling and advertising." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2043 | Within a week of the issuance of the 1964 Surgeon General's Report, the FTC proposed a Trade Regulation Rule that, among other things, would permit the advertising of tar and nicotine yields, provided that such advertising was "verified in accordance with a uniform and reliable testing procedure approved by the Federal Trade Commission." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 434 ¶ 2044 | According to the FTC, "[c]onfusion can be obviated, and the ability of consumers to make an intelligent choice among competing brands protected, only if the measurement of cigarette-smoke ingredients accords with a uniform, fully reliable and approved testing procedure. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 434 ¶ 2045 | "[T]here was substantial support for the proposition that an accurate statement of tar and nicotine content would be in the public interest...." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 434 ¶ 2046 | The National Interagency Council on Smoking and Health "hope[d] that [the FTC would] take the | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

128

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | steps necessary to make it permissible for cigarette manufacturers to list tar and nicotine content on the labels of cigarette packages." | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 434 ¶ 2047 | The American Cancer Society, the American College Health Association, the Roswell Park Memorial Institute, and others expressed support for the proposed rule. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2048 | On March 24, 1966, the FTC notified cigarette manufacturers that they would be permitted to advertise tar and nicotine yields provided they used the Cambridge Filter Method, as published by Dr. C.L. Ogg of the U.S. Department of Agriculture, to substantiate any yield claims, and so long as "no collateral representations" were made as to the "reduction or elimination of health hazards" from lower yield cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 434 ¶ 2049 | The FTC Cambridge Filter Method uses a machine to "smoke" the cigarette for a designated puff volume at a designated interval for a designated period of time. As the smoke is drawn into the machine, it passes over a filter known as a Cambridge pad, on which the particulate tar matter is collected. That accumulated matter is measured to calculate the tar and nicotine yields for the cigarette. The FTC Method was developed to provide consumers with a relative ranking of nicotine, tar, and carbon monoxide yields from any cigarettes that were tested. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 434 ¶ 2050 | When the FTC gave manufacturers permission to make disclosures of tar and nicotine yields, it "recognized that the result would be that consumers would, in fact, believe that lowered delivery cigarettes were less hazardous and less harmful." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 434 ¶ 2051 | The FTC's change in policy to permit these claims was designed to achieve two goals: provide consumers with an incentive to smoke the lower tar/nicotine cigarettes rather than the higher tar/conventional cigarettes and give manufacturers a competitive incentive to produce cigarettes with low levels of tar and nicotine. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 433 ¶ 2052 | The federal government wanted to provide consumers with information that they could use to compare brands. ("The 'tar' and nicotine testing program was intended to provide smokers seeking to switch to lower 'tar' cigarettes with a single, standardized measurement with which to choose among the then-existing brands."). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 435 ¶ 2053 | In addition, given the premise of a dose-response relationship-*i.e.,* more tar equals more disease risk-the FTC wanted to encourage competition among the cigarette manufacturers, thereby increasing the research, development, and production of cigarettes with lower FTC-measured tar yields. ("Based upon the proposition that lower yield cigarettes present a lessened hazard to the | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | American public," the FTC has acted to "prompt cigarette manufacturers to develop less hazardous cigarettes. (Sen. Warren G. Magnuson, News Release, Nov. 27, 1967) ("The results of the first government tests ranking cigarette brands by tar and nicotine levels were released today.... Hopefully, the wide dissemination of this information and the growing awareness of its significance among the smoking public will channel competition in the cigarette industry toward the marketing of cigarettes of progressively lower tar and nicotine content."). | | | |
| 435 ¶ 2054 | The theory was that the public would shift its consumption away from higher tar products, and toward lower tar products, just as it had done with the advent of filter-tipped cigarettes. In this way, it was anticipated that the national sales-weighted-average tar yields of cigarettes sold in the United States would decline, and the public health would benefit. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | United States v. Philip Morris USA Inc., 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 435¶ 2055 | On July 31, 1967, the FTC directed its staff to commence "formal test [ing]" of cigarettes using the Cambridge Filter Test. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | United States v. Philip Morris USA Inc., 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 435 ¶ 2056 | On August 8, 1970, the FTC proposed a rule to mandate disclosure of tar and nicotine ratings in all cigarette advertising. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | United States v. Philip Morris USA Inc., 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 435 ¶ 2057 | The FTC also invited the cigarette manufacturers to submit a voluntary proposal, in lieu of the proposed rule, for such disclosures in cigarette advertising.  ("If the industry can devise a voluntary plan that is feasible and appropriate, the Commission is willing to consider it."). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | United States v. Philip Morris USA Inc., 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 435 ¶ 2058 | The tobacco companies complied,  and the FTC solicited public comment on the industry plan. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | United States v. Philip Morris USA Inc., 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 435 ¶ 2059 | Ultimately, the FTC agreed to allow tobacco companies make certain disclosures about tar and nicotine content in cigarette advertising instead of issuing a formal rule. On December 22, 1970, the FTC formally adopted a revised version of the cigarette manufacturers' proposal for displaying FTC tar and nicotine ratings in all advertising. The agreement was implemented by the FTC on January 13, 1971, as a substitute for its proposed trade regulation rule requiring such disclosure. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | United States v. Philip Morris USA Inc., 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 435 ¶ 2060 | The FTC concluded that the voluntary agreement to provide "tar and nicotine disclosure and the voluntary agreement ... to put the Surgeon General's health warning on the side of the pack in advertisements ... [were] highly responsible activit[ies] by" the cigarette manufacturers. Public | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | United States v. Philip Morris USA Inc., 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Health Cigarette Amendments of 1971, Hearings on S. 1454 before the Consumer Subcomm. of the Senate Comm. on Commerce, 92nd Cong. (1972) (statement of Robert Pitofsky, Dir., Bureau of Consumer Protection). | | Enrichment | |
| | **c. The FTC Method Does Not Measure Actual Tar and Nicotine Delivery** | | | |
| 435 ¶ 2061 | Within months after it notified cigarette manufacturers on March 24, 1996 of its decision to allow advertising of tar and nicotine yields so long as the Cambridge Filter Method was used, the FTC invited cigarette manufacturers to comment in detail on the precise method to be used to measure tar and nicotine yields.[FN24]<br><br>FN24. The FTC held a public hearing on November 30, 1966. Official Transcript of Proceedings, In The Matter Of Methods to Be Employed in Determining Tar and Nicotine Content of Cigarettes (Nov. 30, 1966). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 436 ¶ 2062. | Defendants "initially resisted imposition of the Cambridge testing method and claimed it would be inaccurate" because different smokers "smoke differently-and even smoke differently at different times." This is known as smoker variation. Early in the FTC process of developing a standard testing method, Defendants advised the Agency that, because of smoker variation, the Cambridge Filter Method would not measure the tar or nicotine that a human being would ingest from smoking any particular cigarette:<br><br>No two human smokers smoke in the same way. No individual smoker always smokes in the same fashion. The speed at which one smokes varies both among smokers, and usually also varies with the same individual under different circumstances even within the same day. Some take long puffs (or draws); some take short puffs. That variation affects the [tar and nicotine] quantity in the smoke generated.<br><br>(The Government admits that in 1966, during the comment period for discussion of the Cambridge method, certain tobacco companies stated that the FTC method would only be an effective measurement for certain conditions of smoking behavior). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 436 ¶ 2063 | The FTC also heard from, among others, Clyde L. Ogg, Ph.D., of USDA, who developed the method initially adopted by the FTC. He admitted that: "Since smokers vary so greatly in their smoking habits, the proposed ... method will not tell a smoker how much tar and nicotine he will get from any given cigarette. It will indicate, however, whether he will get more from one than from another cigarette if there is a significant difference between the two and if he smokes the two in the same manner." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 436 ¶ 2064 | The FTC's press release announcing its decision clearly described the limitations of the | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | standardized test method it was adopting… The FTC stated:<br><br>No test can precisely duplicate conditions of actual human smoking and, within fairly wide limits, no one method can be said to be either "right" or "wrong." The Commission considers it most important that the test results be based on a reasonable standardized method and that they be capable of being presented to the public in a manner that is readily understandable.... [T]he public interest requires that all test results presented to the public be based on a uniform method used by all laboratories. Use of more than one testing method would produce different results which would only serve to confuse or mislead the public.<br><br>The Cambridge Filter Method does not and cannot measure these many variations in human smoking habits.... It does not measure all of the tar and nicotine in any cigarette, but only that in the smoke drawn in the standardized machine smoking according to the prescribed method. Thus, the purpose of testing is not to determine the amount of tar and nicotine inhaled by any human smoker, but rather to determine the amount of tar and nicotine generated when a cigarette is smoked by machine in accordance with the prescribed method. | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 437 ¶ 2065 | On that same day, the Tobacco Institute issued a press release stating that the FTC method was "unsound" and declaring that the " 'tar' and nicotine results" produced by the FTC method "may be inaccurate [and] misleading" to consumers. Tobacco Institute Press Release, Tobacco Institute Says FTC Chose Unsound Test Methods: "Tar" and Nicotine Results May Be Inaccurate, Misleading, Aug. 1, 1967. Among other things, the press release pointed out that humans smoke cigarettes differently and that "per cigarette" tar and nicotine yields therefore would be "useless and misleading" to smokers who do not smoke within the FTC parameters. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 437 ¶ 2066 | Defendants did not, however, disclose their knowledge that smokers would ultimately ingest as much if not more nicotine and tar from low-delivery cigarettes as they would from full-flavor products. Defendants knew that the phenomenon of smoker compensation, discussed in greater detail *infra,* would cause smokers to smoke low-delivery products more intensely and more frequently in order to obtain their desired level of nicotine. To feed their addiction, therefore, these smokers would defeat the stated purpose of the lower-delivery products. Nor did Defendants disclose to the FTC that "a major reason that the method could yield misleading data was that nicotine addiction would drive smokers to achieve relatively stable nicotine intakes" and that smokers' "physiological need to obtain nicotine substantially lessens the accuracy of the FTC ratings." According to Dr. Farone, Defendants did not inform the FTC in 1966 "that smokers alter their smoking behavior to get nicotine." Nor did Defendants tell the FTC that people's "smoking behavior was driven by the need to satisfy their nicotine addiction." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 437 ¶ 2067 | There is a dose-response relationship between smoking and lung cancer. That is, the less smoke to which smokers are exposed, the lower their lung cancer risk.. The predicate for the development and marketing of lower FTC-yield cigarettes was the expectation that, as a group, smokers of lower FTC-yield cigarettes would be exposed to less smoke. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 437 ¶ 2068 | Because of compensation and the need of smokers to obtain a desired dose of nicotine, they may offset the decrease in their cigarettes' FTC tar and nicotine yields, in whole or in part, by one of two means. First, smokers may engage in so-called "puff" or "within cigarette compensation." This is done by smoking individual, lower FTC-yield cigarettes more intensively by taking bigger puffs, taking more frequent puffs, smoking the cigarette closer to the butt, blocking ventilation holes placed in the filter that dilute the smoke, or other means. Second, they may simply smoke more cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 437 ¶ 2069 | The issue of compensation has been discussed in the scientific literature since at least the 1940s… The early literature on nicotine, including compensation, was summarized in a well respected compendium of articles collected by Larson, P.S. et al., in Tobacco: Experimental and Clinical Studies: A Comprehensive Account of the World Literature (Baltimore, Williams & Wilkins Co.1961). This useful research tool was cited repeatedly in the 1964 Surgeon General's Report. The Larson volume was funded by TIRC. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 438 ¶ 2070 | It was a "common concern" in the early 1960s that smokers who switched to filtered cigarettes might "compensate" by smoking more cigarettes each day. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 438 ¶ 2071 | "Compensatory smoking behavior is a manifestation of nicotine addiction," and "occurs primarily due to nicotine." Dr. Benowitz described "the consensus in the medical and scientific fields" regarding compensation: "The concept of smoking to obtain desired levels of nicotine and the concept of nicotine titration with associated compensation is widely accepted by the scientific and public health communities." Methods of smoker compensation include taking "bigger puffs," taking "more frequent puffs," "block[ing] the ventilation holes in the filter," and smoking more cigarettes. Even as to ultra low tar cigarettes, where a smoker switching down may not be able to compensate fully "on a per cigarette basis[,] ... that smoker could always smoke more cigarettes." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 438 ¶ 2072 | Because each smoker smokes to obtain his or her own particular nicotine quota, smokers end up inhaling essentially the same amount of nicotine-and-tar-from so-called "low tar and nicotine" cigarettes as they would inhale from regular, "full flavor" cigarettes. This is referred to as "complete" compensation. Virtually all smokers, over 95%, compensate for nicotine. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 438 ¶ 2073 | The amount of nicotine that smokers need to sustain their nicotine addiction does not change over time. Therefore, compensation for reduced deliveries is permanent, and occurs for as long as the | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | smoker smokes the low tar product. | | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 438 ¶ 2074 | Because compensation is essentially complete, low tar cigarette smokers inhale essentially the same amount of tar and nicotine as they would from full flavor cigarettes, thereby eliminating any purported health benefit from low tar cigarettes. In short, "light and ultra-light cigarettes" do not, in actuality, "reduce the risks of smoking":<br><br>Considering the overall exposure data for individuals selecting their own brand, there is little reason to expect that smokers of cigarettes with low machine measured yields will have a lower risk of disease than those who smoke higher yield cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 439 ¶ 2075 | As Dr. Benowitz pointed out,<br><br>Compensation explains why smoking of light cigarettes has not been associated with a reduction of smoking-induced disease risks. One would think, looking at the FTC yield data, that toxic exposures would be substantially reduced if one switches to light cigarettes; however, because of compensation, resulting toxic exposures are similar for light and regular cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 439 ¶ 2076 | Despite the fact that tar deliveries, as measured by the FTC Method, decreased by more than two-thirds between 1954 and 1994, lung cancer in smokers actually increased. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 439 ¶ 2077 | Compensation behavior is distinct from "individual smoker variation":<br><br>Individual smoker variation refers to the fact that one smoker may smoke cigarettes-either regular or low tar-differently than another smoker, and that the same person may smoke the same cigarette differently on different occasions.... Individual smoker variability relates to the fact that cigarettes are smoked differently by different individuals. This type of variability is separate and distinct from the issue of compensation, which relates to the phenomenon of smokers smoking purportedly low-delivery cigarettes more intensely in order to achieve their particular desired level of nicotine intake. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 9 ¶ 2078 | In its August 1, 1967 press release, the FTC set forth the Commission's understanding of smoker variation:<br><br>No two human smokers smoke in the same way. No individual smoker always smokes in the same fashion. The speed at which one smokes varies both among smokers, and usually also varies with the same individual under different circumstances even within the same day. Some take | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | long puffs (or draws); some take short puffs. That variation affects the tar and nicotine quantity in the smoke generated.<br><br>Even with the same type of cigarette, individual smokers take a different number of puffs per cigarette depending upon the circumstances. When concentrating, or talking, the number of puffs is usually less. When listening, or required to listen to another person talking, the number of puffs per cigarette, as well as duration of each puff, usually increases. Smoking rates while reading a book may differ from smoking rates while viewing a television program. The number of puffs and puff duration (as well as butt length) will vary according to emotional state. Some smokers customarily put their cigarettes down in an ashtray where they burn between puffs; other smokers constantly hold cigarettes in their mouths; others hold them between their fingers. | | | |
| 439 ¶ 2079 | Significantly, the August 1, 1967 press release does not demonstrate a similar understanding of nicotine or addiction. It does not even mention nicotine and does not discuss the fact that nicotine addiction would lead smokers to obtain essentially the same amount of nicotine from so-called low tar cigarettes as they would from regular cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 439 ¶ 2080 | . Public service announcements of the Office on Smoking and Health from the early 1980s relating to the potential for compensation reflected a similarly incomplete and ultimately incorrect view of compensation. Rather, they "implie[d] that the individual has within [his/her] ability automatically not to compensate; that is, that the compensation is not driven by the addictive process. That was the understanding we had in the early 1980s.... It was only after that [ ] that we understood with precision and specificity how the nicotine drives that smoking change." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 440 ¶ 2081 | Defendants suggested an analogy between the FTC tar and nicotine yields and automobile gas mileage estimates, intimating that they are both useful, albeit imperfect. As Dr. Henningfield explained, this comparison is not valid:<br><br>[W]e know through that [gas mileage] rating system that if you buy a car with a better gas mileage rating, virtually no matter how you drive it, you're going to get better mileage than a car with a worse rating. But in cigarettes, by just subtle changes in the way you smoke and things that most people don't even know about, the ventilation and the channels and the burn accelerants and all these different tricks, makes those two cigarettes look the same. Thus, for example, when humans smoke Marlboro cigarettes ... Marlboro Lights can yield approximately twice as much nicotine as the Regulars are claimed to deliver by the standard FTC method. Marlboro Ultra Lights can deliver three times their advertised rating and most of the Carlton brands can deliver seven or more times their advertised rating. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 440 ¶ 2082 | Light cigarette descriptors also "are totally different" from the information on food labels and | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | drug labels, because "if you eat the listed serving size of [foods], you will receive the amount of [the constituents] listed on the label.... By contrast, ... the advertised FTC tar and nicotine ratings for cigarettes bear very little relation to the actual dose a smoker can and, in most instances, does receive from smoking that cigarette. The inaccuracy in the FTC ratings is especially pronounced for cigarettes sold as 'light' or 'low tar' by the tobacco companies. This discrepancy is especially serious because it is in the direction of more toxins than advertised." | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 440 ¶ 2083 | Dr. Whidby, a scientist, former employee, and consultant for Philip Morris USA, agreed that: "[m]easurements of tar and nicotine yields using the FTC method do not offer smokers meaningful information on the amount of tar and nicotine they will receive from a cigarette ... [or about] the relative amounts of tar and nicotine exposure likely to be received from smoking different brands of cigarettes." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 440 ¶ 2084 | Compensation has been documented by various scientific methods. Three different kinds of studies are generally used to conduct research on compensation: (1) spontaneous brand switching studies, (2) forced brand switching studies, and (3) cross-sectional studies. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 440 ¶ 2085 | First, spontaneous brand switching studies are longitudinal studies that follow the same group of smokers over a specific period of time. At the start, the study measures the smokers' daily smoke exposure and records the FTC-yield of the smokers' usual brand. Later, at follow-up, the same smokers are re-contacted, at which time the study observes any change in the FTC-yield of the smokers' usual cigarette and again measures the smokers' daily smoke exposure. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 441 ¶ 2086 | Such a study permits estimation of the changes in the daily smoke exposure of those smokers who, over the course of the study, spontaneously and voluntarily switched to cigarette brands with higher or lower FTC yields, as well as any changes in the daily smoke exposure of those smokers who did not change the FTC yield of their cigarette. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 441 ¶ 2087 | Spontaneous brand switching studies, like randomized experiments, may be long term or short term. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 441 ¶ 2088 | Spontaneous brand switching studies "are more informative of smokers' exposure in the real world when switching from higher to lower yield cigarettes," because "the brand of cigarette has been selected by the smoker and not by the researchers." … "[S]pontaneous brand switching studies generally show that there is no reduction in smoke intake [including nicotine and tar intake] per cigarette.... The per cigarette figure [is important because it] shows what an individual can take in from a particular cigarette. Thus, it provides information on the delivery characteristics of the product." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 441 ¶ 2089 | There is only one complete, peer-reviewed long-term spontaneous brand switching study. The study found:<br><br>a. per cigarette nicotine intake was about the same, comparing smokers who switched to lower FTC-yield cigarettes during the course of the study to their own baseline per cigarette nicotine intake…<br><br>b. per cigarette nicotine intake was lower, comparing smokers who switched to lower FTC-yield cigarettes during the course of the study to a similar "control group" of full-flavor smokers who did not switch. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 441 ¶ 2090 | Only daily nicotine intake was actually measured in the study. The per cigarette nicotine values were calculated by dividing daily nicotine intake by the number of cigarettes the smokers reported they smoked per day. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 441 ¶ 2091 | Dr. Benowitz drew this conclusion from his study:<br><br>For smokers who switched to lower yield cigarettes, the analysis of cotinine concentration or carbon monoxide per cigarette showed no change despite the reduction in nominal machine measured yield. Therefore, these smokers obtained the same dose of nicotine and carbon monoxide from each cigarette even though the machine measured yield was lower.<br><br>…The Benowitz study demonstrated that: "For spontaneous brand switchers, there is complete compensation for each cigarette smoked. As a result, for these smokers, switching from higher to lower yield cigarettes is not likely to reduce the risk of smoking." … The evidence that there is no reduction per cigarette by switching to lower tar cigarettes is particularly compelling in light of Dr. Benowitz's testimony that "we do know that on average people who are smoking lower-yield cigarettes smoke the same or even slightly more than higher-yield cigarettes." (explaining that "[c]otinine is a major breakdown product of nicotine" that "is metabolized ... by the liver" in humans, and therefore "has become the accepted marker for looking at nicotine exposure measurement from tobacco products"). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 442 ¶ 2092 | Based on this study, Monograph 13 concluded:<br><br>For spontaneous brand switchers, there appears to be complete compensation for nicotine delivery, reflecting more intensive smoking of lower-yield cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | * * * <br><br> Spontaneous brand-switching studies suggest that there is no reduction in smoke intake per cigarette.... | | | |
| 442 ¶ 2093 | There are also short-term spontaneous brand switching studies on compensation. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 442 ¶ 2094 | The peer-reviewed literature contains a 1999 meta-analysis of the brand switching studies that employed nicotine biomarker data. The mean estimate of the extent of compensation in that article was about 50-60%. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 442 ¶ 2095 | Second, in experimental studies for forced brand switching, smokers are randomly assigned to smoke cigarettes with higher or lower FTC yields. The smokers' daily smoke exposure, as measured by various biologic markers, is compared to see if the smokers assigned to smoke lower FTC-yield cigarettes have a lower daily smoke exposure than smokers assigned to smoke higher FTC-yield cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 442 ¶ 2096 | Daily smoke exposure takes into account both forms of potential compensation-the tendency of smokers of lower FTC-yield cigarettes to smoke individual cigarettes more intensively, as well as the tendency of smokers of lower FTC-yield cigarettes to smoke more cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 442 ¶ 2097 | In these long-term randomized experiments on forced brand switching, smokers randomly assigned to smoke lower tar cigarettes were exposed to less smoke each day than the smokers randomly assigned to smoke higher tar cigarettes. The estimated compensation is about 75-80%, suggesting substantial but incomplete compensation. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 442 ¶ 2098 | Dr. Benowitz explained that the substantial but incomplete compensation shown in the forced switching compensation studies is likely due to the act of forcing participants to switch brands: <br><br> [S]mokers are switched only for the purpose of the research. Motivation and cigarette acceptability differ from the natural situation of brand switching.... The forced brand switching studies show on average about eighty percent compensation.... Presumably compensation is not complete because the smokers have been switched to cigarettes that were not of their own choosing. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 442 ¶ 2099 | Third, in cross-sectional studies, the daily nicotine intake of smokers smoking their usual, | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | voluntarily-selected brand is measured, typically using biologic markers for exposure to cigarette smoke, such as cotinine in the blood or saliva, and compared with the FTC-yield of the smokers' cigarettes. | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 443 ¶ 2100 | Cross-sectional studies also lead to the conclusion that compensation is essentially complete:

Cross-sectional studies involve sampling smokers in the general population who are smoking their own chosen brand of cigarettes ... show that there is very little difference in tobacco smoke exposure in people smoking cigarettes with different machine-determined yields.... There have been many cross-sectional studies performed, and overall they demonstrate that while there are some differences in nicotine exposure when high- and low-yield cigarette brands are compared, these differences are quite small.... Cross-sectional studies show nearly 100 percent compensation. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 443 ¶ 2101 | In cross-sectional studies where the participants themselves choose the tar level of their cigarettes, there is a "very shallow slope" or "very tiny slope across the range of tar and nicotine" comparing the nicotine intake of smokers of various tar levels, demonstrating that smokers who smoke cigarettes of widely varied FTC tar levels are ingesting similar amounts of nicotine. This data indicates that compensation is essentially complete. As Dr. Burns explained, the fact that lower tar smokers may show, on the whole, slightly lower levels of nicotine than higher tar smokers does not mean that the lower levels are the result of the type of cigarette, but rather that the nicotine quota of smokers able to smoke lower tar cigarettes is customarily lower:

The effect is one that one would expect to be present as a small slope, since one would expect that high yield smokers would be likely to have higher nicotine levels and that the very lowest yield cigarette smokers would be there because they don't need much nicotine. That's independent of the brand of cigarettes they smoke. That's why they chose those brands. It's not an effect of the brand that they smoke. And so you would expect to see a small slope. The fact that the slope is as small as it is suggests that ... there is full compensation on a population level when people in the natural setting move from one brand to another.

Dr. Benowitz's 1983 study, which showed this "very shallow slope," has been "replicated [in]numerable times by other scientists," and "those studies show basically the same picture, that there's a very shallow slope between the machine yield and cotinine levels." (indicating that the Gori and Lynch compensation study "was presented and examined in [Monograph 13] by Dr. Benowitz and was part of the data that was examined in that chapter that reached the conclusion that compensation was essentially complete").[FN25] | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | FN25. To rebut the testimony of Drs. Benowitz, Burns, Henningfield, and Farone regarding smoker compensation, Defendants relied upon tobacco industry scientist Michael Dixon, Ph.D., an employee of Defendant BATCo, to testify as an expert in "human smoking behavior." Dr. Dixon testified that compensation is not complete because smokers compensate for tar not nicotine. Dr. Dixon is neither a medical doctor nor an epidemiologist; he holds a Ph.D. in respiratory physiology. Dr. Dixon further admitted that nowhere in his written direct examination did he even mention the subject of nicotine addiction. He has not published any articles on the subject of nicotine addiction, and there is nothing in the record to suggest that he has published a single peer-reviewed publication on any subject. Without any expertise in nicotine addiction, Dr. Dixon's testimony as to whether nicotine addiction drives smokers to compensate is not credible, especially when compared to the totally contrary evidence of government experts Benowitz, Burns, and Henningfield, each of whom has enormous expertise in the fields of nicotine addiction and smoking and health, have written numerous peer reviewed articles on these subjects, and have participated in the rigorous process of writing different Surgeon General's Reports on smoking and health. | | | |
| 444 ¶ 2102 | The cross-sectional studies as a whole suggested that compensation is not complete but substantial. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 444 ¶ 2103 | Evaluating all the types of studies as a whole, the evidence demonstrates, at a minimum, that compensation for daily nicotine is substantial if not complete. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **d. The Public Health Community Has Concluded that Low Tar Cigarettes Offer No Clear Health Benefit** | | | |
| 444 ¶ 2104 | Low tar cigarettes have not reduced the risks of smoking relative to full-flavor cigarettes. ("I have concluded that the changes in cigarettes that resulted in a lowering of the FTC tar and nicotine yields over the past 50 years have not resulted in a reduction in the disease risks of smoking cigarettes for the smokers who use these cigarettes."). Dr. Jonathan Samet, a Government expert with extraordinary qualifications, is a physician and epidemiologist with extensive experience treating patients with lung cancer and COPD. He is the Chair of the Department of Epidemiology at the Johns Hopkins University Bloomberg School of Public Health and has served as author and/or editor of several Surgeon Generals' Reports over more than 25 years, contributed to several National Cancer Institute Tobacco Control Monographs, and served as an author of Chapter 4 of | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Monograph 13. As an expert in the science of tobacco smoking and health, including epidemiology, pulmonary medicine, and internal medicine, he concluded that the use of lower tar and lower nicotine cigarettes "has had no clear benefit on the health risks of active smoking." Similarly, Dr. William Farone, fact and expert witness and former Director of Applied Research at Philip Morris, concluded that, based on his training and experience, " 'light' cigarettes-because they generally permit easy compensation and employ levels of dilution that increase the mutagenicity of the tar - are not any less hazardous than their full flavor versions." The Court credits the testimony of these three experts. | | | |
| 444 ¶ 2105 | The 1981 Surgeon General's Report concluded, referring to the FTC Method of measuring tar and nicotine:<br><br>[T]he smoking-machine model is limited in accurately reproducing human smoking behavior.... Smokers, however, are able to take larger, more frequent, and higher velocity puffs than the machines do. It appears that such compensatory adjustments often turn nominally lower 'tar' and nicotine cigarettes into higher 'tar' and nicotine cigarettes.... Even if the compensations made in smoking a single cigarette are small or nonexistent, smokers can increase their intake of 'tar' and nicotine by smoking more cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 445 ¶ 2106 | The 1981 Report recognized that there are still "smokers who are unwilling or as yet unable to quit." As to them, the Report concluded that they "are well advised to switch to cigarettes yielding less 'tar' and nicotine, provided they do not increase their smoking or change their smoking in other ways." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 445 ¶ 2107 | Dr. Burns, an editor of the 1981 Surgeon General's Report as well as "an author, editor or reviewer for each of the annual Reports of the U.S. Surgeon General on the Health Consequences of Smoking since 1975," concluded that, in his expert opinion,<br><br>had the information available to the tobacco industry been available to the scientists preparing the 1981 Surgeon General's Report, that Report would not have drawn the erroneous conclusion that lower tar cigarettes produced lower risk or have made the recommendation that smokers who could not quit were "well advised to switch to cigarettes yielding less 'tar' and nicotine."<br><br>("Had that information been available to us, we would not have then offered the recommendation to the population of the United States that it would be a good idea to shift to these products. ("The Surgeon General clearly expressed a concern [in the 1981 Report] about reduced yield smoking leading to compensatory increases in smoking behaviors; but, at that time, the public health community was not aware of the role of nicotine addiction in altering puffing behavior, the | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | elasticity of delivery designed into cigarettes then on the market which facilitated compensation on the part of the smoker, or the observations made by the industry that showed compensation was essentially complete for some 'light' cigarettes. Had we known that, the recommendation would not have been made."); (indicating that "some of the same concerns [relating to the lack of a health benefit to lower tar cigarettes] were expressed in the 1989 Surgeon General's Report"). | | | |
| 445 ¶ 2108 | The 1981 Report<br><br>did not fully take into consideration the phenomenon of compensation, and how smokers smoke to get a certain amount of nicotine, and will even adjust their smoking behavior to get the amount of nicotine they seek or are accustomed to ... we didn't know in 1981 the extent to which smokers would compensate after switching to a 'low tar' and low nicotine yield product. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 445 ¶ 2109 | Dr. Burns provided the "three principal reasons" that "the traditional epidemiological approaches that were employed at the time of the 1981 Surgeon General's Report" yielded results erroneously suggesting that lower tar cigarettes provided less lung cancer risk:<br><br>(1) "[T]hat people who smoked low-tar and nicotine cigarettes" were smoking them largely "based on the understanding that these cigarettes ... offered less risk." As a result, the people who choose these cigarettes "have different health behaviors" and often "different smoking characteristics" than smokers of higher tar cigarettes, leading to different expectations of health outcomes.<br><br>(2) That "very few people in the epidemiologic studies started out smoking low tar and nicotine or even filtered cigarettes." Most smokers who smoke the high-tar cigarettes very intensely are not able to switch down to lower tar cigarettes, whereas people who do not smoke the higher tar cigarettes very intensely, "when they switched to a low-tar cigarette ... may be successful because they didn't have much nicotine intake that they needed to satisfy, and correspondingly they didn't have much tar intake. So the process of switching to low tar and nicotine starts to separate individuals who have different intensities of smoking, different amounts of tar that they are ingesting and, therefore, will have different risks."<br><br>(3) That "a substantial fraction of people who switch from high-tar and nicotine cigarettes to low-tar and nicotine cigarettes use increased numbers of cigarettes ... as a mechanism of compensation.... In order to control for intensity of smoking, the epidemiologic studies used the number of cigarettes smoked per day as a measure of intensity with the mistaken assumption that people wouldn't change the number of cigarettes they smoked per day. That leads us to | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | underestimate the actual number of cigarettes smoked per day as a measure of exposure in low-tar and nicotine cigarette smokers," because the epidemiological analysis compares people who smoke a higher number of cigarettes per day after switching to a lower tar cigarette to people who smoked this higher number of cigarettes per day of the higher tar cigarette. "That produces an erroneous, or incorrect, perception that switching to [the lower tar] cigarette lowered your lung cancer risk as an individual. | | | |
| 446 ¶ 2110 | Moreover, epidemiological studies may underestimate the risks for lower tar smokers because these smokers may have other characteristics - such as healthier lifestyles - that contribute to a reduction in risk regardless of the type of cigarette smoked:<br><br>Epidemiological studies often assume that smokers who switch to low-yield products are similar to smokers who do not. There is evidence that this may not be true. For example, switchers may smoke their cigarettes differently, they may have started smoking later as teenagers, they may attempt to quit more often. Switchers may have smoked less intensely before they switched, when compared to their high-yield, non-switching counterparts. Switchers may have smoked less at younger ages. When these aspects of smoking behavior are not accounted for, study results may be misleading. In addition, switchers are [a] generally healthier group in terms of diet, exercise, and lifestyle in comparison to smokers who do not switch to a low yield product. The cumulative effect of these group differences is that any reduction in the risks among switchers may be the result of these differences, rather than the fact that they switched to a low yield product. This was also an observation in Monograph 13. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 446 ¶ 2111 | Recent studies, including the National Cancer Institute's Monograph 13 and the 2004 Surgeon General's Report, have confirmed that low tar and filtered cigarettes are no less harmful than conventional delivery and unfiltered cigarettes. The 2001 NCI Monograph 13, "Risks Associated With Smoking Cigarettes With Low Machine Measured Yields of Tar and Nicotine" ("Monograph 13") concluded:<br><br>Epidemiological and other scientific evidence, including patterns of mortality from smoking-caused diseases, does not indicate a benefit to the public health from changes in cigarette design and manufacturing over the last fifty years.... Widespread adoption of lower yield cigarettes in the United States has not prevented the sustained increase in lung cancer among older smokers.... Considering the overall exposure data for individuals selecting their own brands, there is little reason to expect that smokers of low yield cigarettes will have a lower risk of disease than those who smoked higher yield cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 447 ¶ 2112 | Dr. Samet testified that: "The evidence is clear. We have tracked the risk of lung cancer closely | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | and not seen a fall in relative risks to smokers." | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 447 ¶ 2113 | The 2004 Surgeon General's Report reached the definitive conclusion: "[C]igarettes with lower machine-measured yields of tar and nicotine (i.e., low-tar/nicotine cigarettes) have not produced a lower risk of smoking-related diseases." In addition, the Report concluded that "[s]moking cigarettes with lower machine-measured yields of tar and nicotine provides no clear benefit to health" and that, "[a]lthough characteristics of cigarettes have changed during the last 50 years and yields of tar and nicotine have declined substantially, as assessed by the Federal Trade Commission's test protocol, the risk of lung cancer in smokers has not declined." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 447 ¶ 2114 | Both the 2004 Surgeon General's Report and the NCI's Monograph 13 were based on evidence "derived from research on human behavior and exposures, cigarette design and yields, smoke chemistry, epidemiological [and other] population-based data on human disease risk." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 447 ¶ 2115 | Extensive research into the relationship between research of biomarkers of nicotine in humans and FTC tar and nicotine yields demonstrates that lower tar cigarettes do not provide a reduction in harm:<br><br>Generally speaking, research using these biomarkers has indicated little, if any, correlation between the FTC-yield of tar or nicotine, and the levels of the biomarkers measured in smokers.... These results suggest that there is little difference in the levels of biomarkers comparing smokers of higher yield tar/nicotine cigarettes and lower yield tar/nicotine cigarettes, as measured by the FTC method. This implies that doses of carcinogens or other toxic materials that smokers ingest have little relationship, if any, to the FTC tar yield. This, in turn, suggests that the gradual reduction in tar yield over the past several decades has not resulted in a reduction in smokers' exposure to carcinogens, and that the FTC test method is not informative with respect to lung cancer risk or to the risk of smoking-caused diseases generally.... In fact, evidence with respect to smoker compensation and biomarkers shows that those smokers who switch to "Low Tar" cigarettes modify their pattern of smoking to obtain the same or similar amounts of tar and nicotine as from the "High Tar" cigarettes they used to smoke. The bottom line is that a "Low Tar" label-based brand under the FTC protocol does not mean that a smoker is actually ingesting "Lower Tar" than from any other cigarette. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 448 ¶ 2116 | The conclusions of Monograph 13 and the 2004 Surgeon General's Report-that lower tar cigarettes do not provide a health benefit-"represent[ ] the consensus view of the scientific community on this issue." ("Most authorities are now convinced that there is little if any benefit | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | with respect to health risk to smoking low yield versus regular cigarettes"); (Canadian Expert Panel, Putting an End to Deception: Proceedings of the International Expert Panel on Cigarette Descriptors. A report to the Canadian Minister of Health from the Ministerial Advisory Council on Tobacco Control 9) (2001) ("There is no convincing evidence of a meaningful health benefit to either individuals nor to the whole population resulting from cigarettes marketed as 'light' or mild' "). | | Enrichment | |
| 448 ¶ 2117 | In 2001, the Institute of Medicine published "Clearing the Smoke: Assessing the Science Base for Tobacco Harm Reduction," which concluded that "the public health of PREPs [potential reduced-exposure products] is unknown." The IOM report went on: The major concern for public health is that tobacco users who might otherwise quit will use PREPs instead, or others may initiate smoking, feeling that PREPs are safe. That will lead to less harm reduction for a population (as well as less risk reduction for that individual) than would occur without the PREP, and possibly to an adverse effect on the population. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 448 ¶ 2118 | In 2001, the World Health Organization Scientific Advisory Committee on Tobacco Product Regulation issued a report that concluded: 1. Tar, nicotine, and CO numerical ratings based upon current FTC methods and presented on cigarette packages and in advertising ... are misleading and should not be displayed.... 4. Banned terms should include light, ultra-light, mild and low-tar, and may be extended to other misleading terms. The ban should include not only misleading terms and claims but also, names, trademarks, imagery and other means of conveying the impression that the product provides a health benefit. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 448 ¶ 2119 | In 2004, the World Health Organization International Agency for Research on Cancer ("IARC") released its Monograph 83, "Tobacco Smoke and Involuntary Smoking," which concluded that "changes in cigarettes since the 1950s have probably tended to reduce the risk for lung cancer associated with the smoking of particular numbers of cigarettes at particular ages." However, the IARC Monograph attributed any reduced risk largely to the shift from unfiltered to filtered cigarettes which occurred in the 1950s, not the shift from high yield to low yield cigarettes which occurred in the last few decades. Moreover, the IARC's conclusion did not apply to individuals who increased the number of cigarettes they consumed as they shifted to low yield cigarettes. ("As we know, all too often the smoker who switches to a hi-fi cigarette winds up smoking more units in order to provide himself with the delivery which he had before."). The IARC Monograph went on: "the introduction of cigarettes that can be misperceived as 'safe' may well have adversely affected smoking uptake rates, cessation rates, and consumption per smoker." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 449 ¶ 2120 | All the major scientific bodies that have addressed this question in recent years have clearly | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | concluded that lower tar cigarettes provide "no clear benefit" to health:<br><br>I think there's no evidence of clear benefit.... I think the state of the evidence has been well summarized in the reports of the Surgeon General, IARC, the Institute of Medicine, each group that's looked at the question of whether today's lower yield cigarettes are likely to produce-are likely to produce lower risk of lung cancer, has said, you know, no clear benefit. | Conspiratorial Agreement | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 449 ¶ 2121 | Echoing the conclusions of Monograph 13 and the 2004 Surgeon General's Report, a January 2004 article in the British Medical Journal reported on a study intended "to assess the risk of lung cancer in smokers of medium tar filter cigarettes compared with smokers of low tar and very low tar cigarettes":<br><br>There was no difference in risk among men who smoked brands rated as very low tar ... or low tar ... compared with those who smoked medium tar brands. The same was seen for women.... Men and women who smoked very low tar ... and low tar ... brands had risks of lung cancer indistinguishable from those who smoked medium tar ... brands.... Our finding that there was no difference in the risk of lung cancer between people who smoked medium tar filter, low tar filter, and very low tar filter cigarettes is consistent with evidence of compensatory smoking. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 449 ¶ 2122 | Two very large American Cancer Society's Cancer Prevention Studies ("CPS"), "conducted approximately 20 years apart," which show that lung cancer death rates have not gone down as a result of the introduction of low-tar cigarettes, provide powerful confirmatory evidence. CPS-I was conducted in the late 1950s and early 1960s, and CPS-II was conducted in the 1980s. Because of this 20 year gap, the smokers in the CPS-I study were smoking mostly high-tar, unfiltered cigarettes, and the "vast majority" of the smokers in the CPS-II study were smoking filtered cigarettes with much lower machine-measured tar and nicotine yields. CPS-I and CPS-II are "the two largest studies of smoking and disease risks;" they included "over a million men and women each," and "followed those individuals for" 12 to 18 years. The results of these studies showed that, "[d]espite the substantive reduction in tar yield of the cigarettes smoked in CPS-II, lung cancer disease risks increased rather than decreased in comparison to CPS-I." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 449 ¶ 2123 | Despite the dramatic shift to filtered and "light" cigarettes in the last 50 years, the effect the public health community was expecting to see from a change in the type of cigarettes smoked in the U.S never materialized. To the contrary, health risks increased significantly. With reference to the CPS-I and CPS-II studies, Dr. Burns explained:<br><br>For males, when you look at the risk of smoking, you see that it just about doubled between CPS-I and CPS-II.... For females, it went up almost fourfold.... [E]ven after adjustment for differences | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | in number of cigarettes smoked and the duration of smoking, the rates increased for males and increased for females between these two studies that were conducted over a period of time when there was approximately a 50 to 60 percent decline in the tar value of the cigarettes being smoked and a dramatic increase in the number of smokers who were smoking filtered cigarettes. So, instead of seeing a reduction in the risk of smoking with the introduction of these products, we have seen the risk of smoking actually increase over that interval .... we had watched and waited for the decline in lung cancer to occur. It did not.<br><br>(depicting the "sales-weighted tar and nicotine values for U.S. cigarettes" over time); (depicting data from the CPS-I study); (comparison of lung cancer risk for nonsmokers and smokers based on CPS-I and CPS-II data); (graph showing that risk of lung cancer from smoking has not declined, notwithstanding the drastic shift to filtered cigarettes and those with lower machine-measured tar and nicotine deliveries). | | | |
| 450 ¶ 2124 | As Dr. Samet explained, "[i]f there were substantial benefits of the change in tar yield over the 20 years between [CPS-I in the 1960s and CPS-II in the 1980s], we would expect lower relative risks; instead they increased." Dr. Samet also explained that the British Physician's study, which was conducted over two 20-year periods, also "shows that the relative risk values [for lung cancer] have gone up comparing the first 20 years (1951-1971) to the second 20 years (1972-1991)." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 450 ¶ 2125 | Even if it were true that lower tar cigarettes result in some minor incremental reduction in tar, they do not provide any meaningful health benefit relative to higher tar cigarettes "from the perspective of human exposure ... or meaningful exposure." As Dr. Henningfield explained:<br><br>It would be a little bit like low fat cheese has 100 grams, lets say, of X, and then there is another type that gave you 98 grams, and you could say, yes, that's lower, and the next lower one is 97 grams, but that's a meaningless difference, even though it's accurate and reliable by a machine test and you can say it does go down, it's a meaningless difference.... In this case, what Benowitz['s] study, and then many other studies showed, is that if you looked at actual intake of people, there was virtually no difference at all in intake. And it wasn't just that the ranking was off a little bit, it was that, for example, the Marlboro Light, according to the Massachusetts data can get -give you about three times as much nicotine as it was rated, and more than twice as much as the Marlboro regular, so it's off by several orders of magnitude, but most importantly, it is just-if [a] consumer says, okay, I want to get lower tar and nicotine and they pick a light versus a regular, they're not getting biologically meaningful lower tar and nicotine.... There is no meaningful difference in exposure to people .... what U.K. realizes now, what U.S. realizes, | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | the World Health Organization realizes is that it is still a meaningless difference. And that's why ... the resistance to even using the ... label "light" cigarettes.<br><br>(explaining that the "light cigarette debacle" centers around the fact that the historical reduction in machine-measured tar "was biologically meaningless," citing NCI Monograph 13). | | | |
| 451 ¶ 2126 | Dr. Samet echoed these conclusions, stating that "while some earlier studies suggested a modest benefit in terms of lung cancer risk, late, more recent evidence suggests otherwise, namely that there is no benefit." He pointed out that, even excluding the more recent evidence and postulating some reduction in risk, the "overall risk [of smoking these cigarettes] is so high that even a small reduction is of no public health or medical significance." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 451 ¶ 2127 | Notwithstanding the widespread acceptance and independent validation in the scientific community of Monograph 13 and its conclusions, Defendants tried to challenge its conclusions and methodology, including the selection of its contributors. Defendants criticized the authors of Monograph 13 for not acknowledging the few scientists who expressed skepticism about its results. In addition, Defendants challenged NCI's selection of contributors to the Monograph, namely, that the scientists chosen were biased in favor of concluding that low tar cigarettes yield no clear benefit. However, as Dr. Burns noted, many of the contributors to Monograph 13 "represent some of the more distinguished scientists and experts on this issue in the country" and:<br><br>[T]he consensus statement of the organization, that is the NCI .... prevents individual opinion from being presented as the consensus of scientific thought.... The way that you know that [collective biases are not influencing the final document] is by taking it through a series of reviews by the governmental organization.... The organization that then produces the volume and puts its seal of consensus approval on it, that is the National Cancer Institute, that undergoes a series of reviews that it takes to ensure that the data contained in the volume are scientifically accurate and represent the consensus of scientific thought. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 451 ¶ 2128 | Defendants' scientists were not involved with the production of Monograph 13 because:<br><br>At the time which this was undertaken, the tobacco industry's position was still that ... there were no disease risks that were causally associated with cigarette smoking.... For that reason, the tobacco industry has not been included in the Surgeon General's Report process and various other processes because they weren't part of the consensus of scientific thought at that point in time. They were perceived as adopting positions that had so little scientific credibility that they could not be meaningfully utilized in the formation of a consensus. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | (explaining also that Monograph 7, in which RJR scientists participated, "was not a consensus document, it was simply the results of the proceedings of a meeting. Those proceedings come out under the author's name, are understood to be the individual opinions of the authors. That was not what was being requested with Monograph 13"). | | | |
| 451 ¶ 2129 | The Court finds that the testimony of Dr. Burns is totally credible and persuasive on each of the issues which he discussed, including low tar cigarettes and their relative health effects. Dr. Burns, qualified by the Court without objection as an expert in "[t]he science of tobacco and health, including disease causation," is a medical doctor and professor of family and preventive medicine with 30 years' experience studying the health consequences of smoking. Dr. Burns has extensive experience, including as a teacher, in various medical areas, including smoking and health, and has studied epidemiology, addiction, nicotine, cigarette design and ETS in the context of smoking and health. He has over 200 publications, most of which are peer-reviewed, in the area of smoking and health, including chapters in two of the leading medical textbooks. Furthermore, Dr. Burns has studied and taught extensively in the area of lung diseases, including lung cancer, and has personally participated in the treatment of thousands of patients with lung disease. In addition, he has served as "an author, editor or reviewer for each of the annual Reports of the U.S. Surgeon General on the Health Consequences of Smoking since 1975," and has served as contributing author and Senior Scientific Editor for several of the National Cancer Institute Tobacco Control Monographs. Dr. Burns has also received numerous award and honors for his work in the area of smoking and health, including the Surgeon General's Medallion. Finally, Dr. Burns's demeanor during his testimony, which spanned nearly two full days and consisted mostly of cross-examination, further demonstrated his credibility. He fully answered the questions posed to him by well-prepared counsel, he was totally versed in the complex scientific areas about which he was questioned, he was neither evasive nor combative, and demonstrated an enormous familiarity with the science of smoking and lung cancer, the history of the issue in this country as scientists learned more and more about the subject, and the manner in which preparation of the Surgeon General's Reports represented the most up-to-date scientific consensus on the topic being studied. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 452 ¶ 2130 | For the reasons set forth at length in previous Sections, the Court also finds that the testimony of Drs. Samet, Henningfield, Benowitz, and Farone is also highly credible and persuasive. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 452 ¶ 2131 | To rebut the compelling testimony of Drs. Burns, Samet, Henningfield, Benowitz, and Farone, Defendants called a statistician, William Wecker, who, by his own admission, has "never been qualified by a Court as an expert in the subject of smoking and health."[FN26] Because he is a statistician, and neither an epidemiologist nor a medical doctor, Dr. Wecker is "not able to offer opinions as to causation" relating to the relative health effects of low tar cigarettes. Moreover, Dr. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Wecker's statistical analyses are unconvincing because they are flawed in several ways.<br><br>FN26. Dr. Jerry Whidby and Dr. Joseph Mulholland also offered testimony criticizing Monograph 13. Their testimony was neither reliable nor persuasive. Called to testify by the United States as an adverse witness, Dr. Whidby admitted that he was a paid consultant for Philip Morris and would earn $2,800 per day (total amount $14,000 for five days) for preparing and delivering his fact testimony; and that his agreement with Philip Morris obligates him to testify on its behalf in litigation, and does not leave him the option of not testifying.<br><br>Dr. Whidby was repeatedly impeached with prior inconsistent statements during his live examination. In some instances, portions of Dr. Whidby's Corrected Written Direct Testimony were in conflict with each other. (impeached with prior inconsistent testimony relating to whether increased ventilation has an impact on biological activity); (impeached with prior inconsistent testimony relating to whether witness had any empirical evidence that Marlboro Reds sold today are any less harmful than those sold in 1960);(impeached with prior inconsistent testimony on whether witness had any evidence that Philip Morris's general reduction and selective reduction techniques have led to one less case of lung cancer in the United States); (impeached with prior inconsistent testimony on whether witness had any empirical evidence that Philip Morris's general and selective reduction techniques have in fact made its cigarettes less harmful).<br><br>Defendants offered the testimony of Joseph Mulholland as a fact witness, not as an expert. He is a long-time staff economist with the FTC Bureau of Economics, who personally does not agree with the conclusion of Monograph 13 that the introduction of low tar cigarettes has not materially reduced health risks from smoking, even though the FTC has never taken an official position on this issue. (Monograph 13 has not changed the FTC's position, as the FTC has not taken an official position on the issue); While recognizing that Dr. Mulholland has acquired extensive knowledge, in his capacity as an FTC staff economist, concerning cigarette-related matters, as the Court observed at the trial, his "testimony is not that overwhelmingly relevant." | | | |
| 453 ¶ 2132 | First, Dr. Wecker's core opinion-that smokers who switch to lower delivery cigarettes do not increase the number of cigarettes per day that they smoke-is flatly contradicted by Defendants' voluminous research reports and other documents, spanning decades, which demonstrate that smokers who switch to lower deliveries do smoke more cigarettes per day. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 453 ¶ 2133 | Second, Dr. Wecker testified that, in forming his opinion on this issue: "I don't reach my opinion by weighing all the evidence, but mainly on my own statistical work replicating and correcting figure 4-5" of NCI Monograph 13. Figure 4-5 illustrates one of the new statistical analyses of CPS-I data that were performed as part of the production of NCI Monograph 13 relating to change in number of cigarettes smoked per day by smokers switching down to obtain lower tar yield. However, the Conclusions of Chapter 4 of Monograph 13 did not rely on the new analyses. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 453 ¶ 2134 | Dr. Burns explained that the issue of "increases in number of cigarettes per day smoked by those who switch to lower tar brands of cigarettes" is "not the only [reason and], for that matter, it's not the princip[al] one" for Monograph 13's conclusion that lower tar cigarettes provide no reduction in harm relative to higher tar cigarettes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 453 ¶ 2135 | The first sentence in the Monograph under the heading for these new analyses of CPS-I data clearly states that the new analyses of cigarettes per day were inconclusive and, as such, were not the basis for Monograph 13's conclusions:<br><br>A reexamination of the CPS-I data set was inconclusive as to whether compensatory changes in the number of cigarettes smoked per day when smokers switched to a lower nicotine cigarette introduce a bias sufficient to explain the observed increased lung cancer risk among smokers of high yield cigarettes.<br><br>Consequently, Dr. Wecker's testimony, which relied on his critique of the new CPS-I analyses, was basically irrelevant since Monograph 13 did not rely on that data in reaching its conclusion. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 454 ¶ 2136 | Third, Dr. Wecker's analysis failed to refute, or even consider, the conclusions reached by several other prominent scientific bodies-including the 2004 Surgeon General's Report, the 2002 publication of the Scientific Advisory Committee on Tobacco Regulation to the World Health Organization, and the 2001 report to the Canadian Minister of Health from the Ministerial Advisory Counsel on Tobacco Control in Canada-which all reached the same conclusion as did the NCI in Monograph 13, namely that lower tar cigarettes provide no significant reduction in lung cancer or other health benefit-in direct contrast to Dr. Wecker's conclusions. Since Dr. Wecker was only a statistician and not qualified to address the subject of smoking and health, he could not have addressed the substance of NCI's scientific conclusions in Monograph 13. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 454 ¶ 2137 | Fourth, Dr. Wecker made several changes to the analyses in Monograph 13 that reflected his lack of understanding of the relevant subject matter. For instance, he included women in his analysis of Figure 4-5 and was unaware that the contributors to Monograph 13 excluded women because the later increase in smoking prevalence among women resulted in the lack of a valid baseline dose- | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | response relationship. (explaining the temporal differences in the rise of prevalence of male and female smoking, which led to exclusion of women in graph); (explaining the gender differences in prevalence in the United States and France). | | | |
| 454 ¶ 2138 | Fifth, Dr. Wecker acknowledged that many of his reanalyses of Figure 4-5 showed no statistically significant difference in risk for smokers at the various tar levels, which is entirely consistent with the conclusion of the authors of Monograph 13, quoted above, that the results on this issue were "inconclusive." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 454 ¶ 2139 | Sixth, Dr. Burns explained that studies done by Garfinkel *et al.* reported in the 1980 Banbury Product Liability and Health Risks report, which Dr. Wecker claimed were "consistent with [his] conclusions," were not "consistent with Dr. Wecker's findings ... because it's a different analysis." Dr. Burns also noted: "We cited both of the [Garfinkel] studies that examined cigarettes per day in Monograph 13. We looked at them carefully." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 454 ¶ 2140 | Dr. Samet explained that comparing Dr. Garfinkel's calculations, published more than 20 years ago, to those performed for Monograph 13, is a case of comparing apples to oranges, as the analyses sought to answer markedly different questions:<br><br>They're very different.... Dr. Garfinkel said: If people changed their brand, did they smoke more, the same or less? Just those three bins [categories], if you will. What [the Monograph 13] analysis says is: Let's look at whether there's a relationship between the reported numbers of cigarettes smoked on the first brand and on the second brand and the difference in nicotine yield on the first brand and the second brand. So [the Monograph 13 analysis] is a more quantitative analysis and Dr. Garfinkel's was more sort of: Did people change from smoking more than they used to [or] to less than they used to? | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 455 ¶ 2141 | Dr. Wecker maintained that examining lower tar and higher tar smokers' lung cancer rates, without controlling for cigarettes per day, provides "other empirical support" for his claim that epidemiological studies of the relative health effects of low tar cigarettes are not biased by controlling for cigarettes per day… However, Dr. Burns explained that neglecting to control for cigarettes per day fails to resolve "the core issue" necessary to have a reliable analysis, because it "introduce[s] other biases that are equally important":<br><br>The core issue is having comparable groups, that is, having groups [where] you can adjust for those characteristics other than the type of cigarettes that they smoke. If you include numbers of cigarettes for controlling, you over control. If you don't, then you're left with the two populations likely to have differences in intensity of smoking and no method by which you can control for that difference. Then you can't tell whether the difference you're seeing is due to a | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | difference in intensity of smoking, i.e. completely independent of the type of cigarette or is a characteristic of the cigarette that you've chosen to smoke.<br><br>("If you don't control for cigarettes per day, you have two different groups of individuals who have different intensities of smoking and, therefore, you can't compare their exposures without looking at intensity."). | | | |
| 455 ¶ 2142 | Finally, Dr. Wecker's analysis of actual versus predicted death rates was not done in the manner utilized in Monograph 13. He admitted on cross-examination that there were several discrepancies between his analysis and that described in Monograph 13. The discrepancies included the fact that Dr. Wecker used mortality data, taken from the National Health Interview Survey, from 1993 to 2000, that was not contained in the calculations in Monograph 13. Again, Dr. Wecker was unaware of a critical fact, namely that the contributors to Monograph 13 specifically excluded data after 1992 because the National Health Interview Survey "changed the definition of smoker in 1992," making the post-1992 data inconsistent with the pre-1992 data. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 455 ¶ 2143 | Dr. Wecker also acknowledged that, while Monograph 13 discussed a chart examining lung cancer death rates at ages under 50, he attempted to create the chart described in the Monograph but only included people aged 40-50, excluding death rates for all ages under 40. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 455 ¶ 2144 | Dr. Burns testified, upon review of a chart based on Dr. Wecker's calculations of actual versus predicted death rates, purportedly based on Monograph 13: "The data presented in this graph have essentially no meaning whatsoever. This is not the analysis that Sir Richard Doll was suggesting be done and it is not an analysis that has any valid, scientific or technical meaning." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 456 ¶ 2145 | In sum, there is an overwhelming consensus in the public health and scientific community, both here and abroad, that low tar cigarettes offer no clear health benefit to smokers, have not reduced the risk of lung cancer and heart disease for smokers using them, and have not produced any decrease in the incidence of lung cancer. Moreover, because of the misleading nature of the advertising for low tar cigarettes, smokers who might have quit have refrained from doing so in the belief that such cigarettes reduced their health risks. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **2. Based on Their Sophisticated Understanding of Compensation, Defendants Internally Recognized that Low Tar/Light Cigarettes Offer No Clear Health Benefit** | | | |
| | **a. Defendants Internally Recognized that Low Tar Cigarettes Are Not Less Harmful Than Full-Flavor Cigarettes**<br>**(1) Philip Morris** | | | |
| 456 ¶ 2146 | A March 1, 1977 Philip Morris memorandum by industry-funded scientist Stanley Schachter to Thomas Osdene, Director of Research, concluded that low tar/low nicotine cigarettes are not less | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | harmful:<br><br>[I]t would certainly seem that the campaign for low nicotine cigarettes is misguided and rests on a set of fallacious premises.... The question is crucial and particularly so in light of ... Ross's evidence that carbon monoxide, hydrogen cyanide, and nitrogen oxide delivery is considerably greater in most of the popular brands of low nicotine filter, [sic] cigarettes than in high nicotine, non-filter cigarettes.... It is ... clear ... that the major body of data that has been used to justify the campaign for low nicotine cigarettes does nothing of the sort. | False Representations | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 456 ¶ 2147 | Dr. Farone stated that Philip Morris's Marlboro full-flavor and Marlboro Lights cigarettes are "essentially identical except for dilution"-i.e., that Marlboro Lights have more dilution, dilution referring to ventilation that dilutes the smoke, particularly when machine-smoked by the FTC method, with ambient air. "[A]s you increase dilution, the toxicity in [the Ames] test increases, which is more likely than not associated with a toxicity increase in smokers." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 456 ¶ 2148 | In fact, Dr. Farone explained that the very Ames mutagenicity testing that Philip Morris has conducted for the past 25 years, and that "Philip Morris has concluded ... predicts carcinogenicity" has indicated that Philip Morris's Marlboro Lights cigarettes are, as designed, more mutagenic than Marlboro full-flavor cigarettes:<br><br>[I]n the case of Marlboro Lights, the Philip Morris test data that I have reviewed on that level of dilution for equivalent blends indicated that the product design for their Light cigarettes was more mutagenic than the full flavor Marlboro, Marlboro Reds, and therefore predictive of more potential cancer risk. These studies were repeated multiple times over the past 20 years and continue to be repeated to this day. The Philip Morris data, as was used by Philip Morris, was a strong warning that their product design change between a Marlboro Red and a Marlboro Light-increased ventilation-resulted in a potentially more dangerous product.<br><br>Philip Morris has not "changed the design of 'Light' cigarettes in response to its studies and knowledge concerning mutagenicity." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 457 ¶ 2149 | Philip Morris consultant and former employee Dr. Whidby agreed with Dr. Farone's basic analysis and acknowledged that "increased filter dilution," one of the techniques Philip Morris uses to lower the FTC tar yield of its cigarettes, "is associated with increased biological activity." Dr. Whidby explained that biological activity in the context of Philip Morris's biochemical testing reports generally refers to biological reactions such as tumor growth, cell mutations, and toxic reactions, and that it was "a bad thing" that should be reduced. Helmut Wakeham, of Philip Morris, acknowledged the same phenomenon as far back as March 1, 1974. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 457 ¶ 2150 | A November 1977 Philip Morris memorandum to Dr. Robert Pages from J. Booker and S. Drew about Ames testing stated: "The take home lesson from this experiment is that dilution of a cigarette appears to increase the activity of the WSC [whole smoke condensate] (more dramatically for some cigarettes than for others)." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 457 ¶ 2151 | By 1978, Philip Morris had substantial evidence that "filter dilution [which Philip Morris used to reduce FTC tar and nicotine yields] was somehow acting to increase" the "activity" of the whole smoke condensate ("WSC") collected from its cigarettes. Further experiments confirmed that the tar from ventilated low tar reference cigarettes, i.e., cigarettes used for research purposes and not actually sold in stores, measured higher on mutagenicity tests than non-ventilated products. Additional research conducted in 1979 yielded the same result. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 457 ¶ 2152 | A May 11, 1982 Philip Morris document from INBIFO (Philip Morris's overseas research facility in Switzerland) revealed that Philip Morris learned from its testing of low tar reference laboratory cigarettes in Europe that these cigarettes registered higher in standard biological tests than the full-flavor delivery reference cigarettes-i.e., were "more active"-and thus were more likely to cause cancer: "Low tar reference cigarette ... [m]ay be slightly more active than [the regular delivery reference cigarette] as a complete carcinogen." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 457 ¶ 2153 | A January 28, 1994 report from INBIFO to Philip Morris in Richmond, Virginia stated that increased cigarette filtration, porosity, and ventilation (primary methods used by Philip Morris to reduce the FTC Method tar and nicotine yields in its cigarettes) would result in an increase in the degree to which cigarette smoke was toxic to living cells *(i.e.,*cytotoxicity), the irritation it caused to smokers, and the likelihood that the smoke would generate mutations such as tumors and/or cancer*(i.e.,* mutagenicity). The document stated: "Increased filtration will result in a relative enrichment of gas phase constituents, leading to increased cytotoxicity and irritancy.... Increased porosity and ventilation will ... increase the specific mutagenicity." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 457 ¶ 2154 | In this case, A. Clifton Lilly, Senior Vice President of Technology, confirmed that data from tests run at Philip Morris's INBIFO facility showed that the Ames test for mutagenicity from Marlboro Lights produces significantly higher results than the tar from Marlboro full flavor products. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 458 ¶ 2155 | A 2001 document about Ames mutagenicity testing from Philip Morris's INBIFO laboratory in Germany demonstrated that, in every case, the mutagenicity of Marlboro Lights is higher than the mutagenicity of Marlboro full-flavor. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 458 ¶ 2156 | James Morgan, former President and CEO of Philip Morris, conceded in 2002 that, in his opinion, lower tar cigarettes are not any safer than higher tar cigarettes. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | | | Enrichment | |
| 458 ¶ 2157 | According to Nancy Brennan-Lund, Philip Morris Senior Vice President of Marketing, "what we say on our web site we believe to be true." Philip Morris's position is that low tar cigarettes are no less harmful than full-flavor cigarettes, "based on what the Monograph 13 came out with." Lund later qualified her statement: it has "not been proven" that light cigarettes are less harmful, so one cannot assume they are less harmful. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 458 ¶ 2158 | Ellen Merlo, then Philip Morris USA Senior Vice President of Corporate Affairs, agreed that in 2002 that Philip Morris's policy at the time was that lights or low tar cigarettes are not safe or safer than any other cigarettes. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **b. Internally, Defendants Had an Extensive and Sophisticated Understanding of Smoker Compensation** | | | |
| 461 ¶ 2173 | Defendants have known since at least the 1950s that the central component that drives the smoking habit is nicotine, an addictive substance. Accordingly, Defendants also have long been aware that the reason people smoke cigarettes is to obtain a sufficient "dose" of nicotine to sustain their addiction. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 461 ¶ 2174 | Defendants also have known since the 1960s and 1970s that, because smokers smoke to obtain the desired effects of nicotine, smokers of lower-yield cigarettes tend to adjust their smoking behavior to titrate (*i.e.*, control) their nicotine intake of nicotine to achieve the necessary levels of nicotine. That adjustment or titration of nicotine levels is called compensation. Defendants' internal understanding of compensation was decades ahead of that of employees and scientists of the Government and the scientific community. See Section V(B)(2)(b), *supra*. According to Dr. William Farone, Philip Morris employee from 1976 to 1984, who served as Director of Applied Research, and was accepted as an expert in "the chemistry and biochemistry of alkaloids and addictive drugs, the chemistry and physics of cigarette smoke, cigarette design and technology, and the chemistry and biochemistry of toxic substances and how they interact with living systems," during his employment at Philip Morris, the company had "a greater understanding of compensation than the outside scientific community," and, in his expert opinion, "the same is true for the other tobacco company Defendants." In 1966, when the FTC was considering the FTC Method, Defendants knew "that smokers smoked for nicotine" and "that smokers alter their smoking behavior to get nicotine." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 461 ¶ 2175 | When Dr. Farone was Director of Applied Research, Philip Morris's own research found that "if we adjusted the design to reduce the nicotine delivery, or if people were given a cigarette of lower nicotine delivery than their usual brand, smokers would 'compensate'-change how they smoked-to get the amount of nicotine they need." … (testifying that he knows Philip Morris was aware of | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | compensation for nicotine "[f]rom conversations that I had with many of my colleagues at Philip Morris while I was working there, including people working under Dr. Dunn in his behavioral research group," and that this knowledge "is evident from the company's own documents"). | | | |
| | **(1) Philip Morris** | | | |
| 461 ¶ 2176 | In a March 24, 1961 Philip Morris memorandum from Wakeham to Hugh Cullman, "Trends of Tar and Nicotine Deliveries over the last 5 Years," Wakeham stated: "As we know, all too often the smoker who switches to a hi-fi cigarette winds up smoking more units in order to provide himself with the delivery which he had before." ("[T]his research into and understanding of compensation influence[d] how Philip Morris designed cigarettes"). | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 461 ¶ 2177 | As Philip Morris marketing researcher Myron E. Johnston noted in a June 1966 Philip Morris report titled "Market Potential for a Health Cigarette":<br><br>[A]ny health cigarette must compromise between health implications on the one hand and flavor and nicotine on the other. It seems clear from the performance of existing health cigarette entries that flavor and nicotine are both necessary to sell a cigarette. A cigarette that does not deliver nicotine cannot satisfy the habituated smoker and cannot lead to habituation, and would therefore almost certainly fail. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 462 ¶ 2178 | A July 28, 1967 Philip Morris USA memorandum from W.L. Dunn, Jr., then Associate Principal Scientist, to R.B. Seligman, Director of Development, discussed ventilation holes and compensation:<br><br>An earlier study (Memo of June 27, 1967) established that lip contact with the tipping paper extended to 9.96 mm from the outer end of the tipping paper for the average smokers. Since the air dilution holes are located in a band from 8.0 to 9.7 mm from the outer end of the tipping paper, it follows that some of these holes are likely to be occluded under normal smoking conditions, whereas no occlusion is likely to occur when the cigarettes are machine smoked for analysis.<br><br>The memorandum also documents that "[s]mokers adjust puff intake in order to maintain TPM [total particulate matter] and/or nicotine constancy." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 462 ¶ 2179 | An August 11, 1967 Philip Morris USA document from Helmut Wakeham, Vice President of Corporate Research and Development, to Paul D. Smith, Vice President and General Counsel, stated that human smokers increased their smoke intake when switching from non-filter to filter | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | cigarettes:<br><br>Two tests conducted at Product Opinion Laboratories demonstrate that in smoking a dilution filter cigaret [sic], the smoker adjusts his puff to receive about the same amount of "undiluted" smoke in each case.... In the smoking machine the puff volume is constant so that with dilution the quantity of "equivalent undiluted smoke" delivered to the Cambridge filter is reduced. Not so with the human smoker who appears to adjust to the diluted smoke by taking a **larger puff** so that he still gets about the same amount of equivalent undiluted smoke.... The smoker is, thus, apparently defeating the purpose of dilution to give him less "smoke" per puff. He is certainly not performing like the standard smoking machine; and to this extent the smoking machine data appear to be erroneous and misleading. It has probably always been so for diluted smoke cigarettes, whether dilution is obtained by porous paper or holes in the filter.<br><br>*see also* Dr. Jerry Whidby (testifying that "Product Opinion Laboratories was a facility established by Philip Morris to evaluate smokers' reaction to the cigarette brands Philip Morris was selling, as well as to Philip Morris's prototype cigarettes," and that he is not "aware of any instance, at any time between when Dr. Wakeham wrote this document in 1967 and when [Dr. Whidby] left the company in 1998, in which Philip Morris informed the American public directly of Wakeham's conclusions that the FTC tar and nicotine yields are apparently 'erroneous and misleading,' " and "dilution filter cigarettes generated lower FTC yields than non-dilution cigarettes, but delivered about the same amount of smoke to smokers"). | | Enrichment | |
| 462 ¶ 2180 | Dr. Farone explained the extraordinary significance of Wakeham's statements in this document:<br><br>It shows that Philip Morris understood the puff compensation phenomenon. This document shows that by 1967, Philip Morris recognized that when you have dilution or ventilation, the mechanism for compensation is puff adjustment ... this document [also] shows that Philip Morris knew in 1967 that human smokers compensated by increasing their smoke intake when switching from non-filter to filter cigarettes, and in doing so, smokers received the same amount of tar and nicotine from their filter cigarettes as from non-filter cigarettes. It also shows Wakeham's understanding that the FTC tar and nicotine yields for low tar cigarettes are erroneous and misleading. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 463 ¶ 2181 | Since roughly the mid-1970s, the "vast majority of the low tar and ultra-low tar cigarettes sold by Philip Morris in the United States ... are dilution cigarettes." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 463 ¶ 2182 | In an August 25, 1967 Report on Project 1600, William Dunn, Senior Scientist, outlined an additional study performed by Philip Morris on puffing, with findings that provided "further support to the postulate that smokers adjust puff intake in order to maintain constant smoke intake." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 463 ¶ 2183 | In a Fall 1969 speech, William Dunn reported to the Board of Philip Morris: "It would appear that smokers do modify their smoking habits in order to obtain a preferred [nicotine] intake level." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 463 ¶ 2184 | Helmut Wakeham presented a November 26, 1969 internal industry paper, titled "Smoker Psychology Research," to the Philip Morris Board of Directors stating:<br><br>This great variability among smokers results from the fact that a smoker tends to seek his own level of intake. Even while smoking a single cigaret [sic], he adjusts the volume of his puff as he goes down to the rod, compensating for the change in the density of the available smoke.... A smoker's intake level is determined by the smoker himself, not by the manufacturers of the cigarettes. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 463 ¶ 2185 | A September 2, 1970 Philip Morris memorandum from Ray Fagan to Wakeham confirmed Philip Morris's understanding that smokers compensated for lower deliveries by smoking more cigarettes:<br><br>In the last 15 years particulates in cigarette smoke have declined by 33%; however, the number of cigarettes per smoker has increased. Furthermore, experimental studies have shown that a smoker will increase the number of cigarets he smokes if the cigaret he is offered contains less particulates and less nicotine. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 463 ¶ 2186 | A November 1971 Philip Morris Special Research Report written by Tom Schori also addressed compensation by increasing the number of cigarettes smoked. The last sentence of the abstract of this report stated: "These findings support the hypothesis that the smoker does have daily intake quotas for tar and/or nicotine and that he titrates his smoke intake to meet these quotas." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 463 ¶ 2187 | A January 1972 document from Philip Morris Research Center, written by Tom Schori and William Dunn, reviewed Philip Morris's evidence indicating that smokers compensated when smoking brands supplying less nicotine in order to receive their "daily nicotine intake quota," stating:<br><br>Cigarette consumption rate, i.e., number of cigarettes smoked per day, was found to vary as a function of the nicotine delivery of these cigarettes. Specifically, as nicotine increased, cigarette | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

159

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | consumption decreased. These findings support the notion that smokers develop a daily nicotine intake quota and that when smoking cigarettes differing in nicotine delivery from that which they are accustomed they tend to modify their consumption rate in order to maintain their normal quota. No support was found for the analogous notion of a daily tar intake quota, however. | | | |
| 464 ¶ 2188 | A May 14, 1975 Philip Morris memorandum from William Dunn to Robert Seligman, Vice President for Tobacco Science and Research, stated:<br><br>Underlying all of our work in this area is the conviction what the smoker gets in the way of smoke is independent of smoke concentration levels as delivered within the range of commercially available cigarettes. He has a variety of regulatory maneuvers at his disposal for accommodating supply to a fairly constant need [for nicotine]. To monitor all of these maneuvers simultaneously is a major objective of our behavioral research program. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 464 ¶ 2189 | An August 19, 1977 Special Report from the Philip Morris USA Research Center written by Barbara Goodman, a Research Scientist, described Philip Morris's "Human Smoker Simulator," a mechanism the company used to replicate human smoking behavior. The Simulator recorded how smokers smoked particular cigarettes by measuring their puffing behavior, then played back the recording into a smoking machine so the machine could replicate-and then measure-the amount of smoke constituents and the chemical composition obtained from a cigarette when smoked the same way the human had smoked it. The document states: "The Smoker Simulator program has the instrumentation to measure those smoker variations that constitute a smoker's puffing profile and a programmable smoking machine to measure the resulting tar, nicotine, and water deliveries." ("The cassette tape impulses an electronic smoking machine which duplicates exactly the smoking behavior of a given individual with a given cigarette. Delivery of tar, nicotine, and other smoke components can then be determined at the same conditions."). | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 464 ¶ 2190 | A Philip Morris Report dated July 20, 198 1, written by Frank Gullotta and J.A. Jones and sent to William Dunn and 40 others, including Dr. Whidby, described Philip Morris's Human Smoker Simulator program as "a system ... which permits relatively unobtrusive monitoring of a smoker's inhalation patterns outside the laboratory setting," and indicated that "the system's accuracy was highly satisfactory throughout the experiment" and had "a mean accuracy reading of 96% ... for 70 experimental sessions." The Report also indicated:<br><br>A major barrier to investigations on smoke-laden inhalation patterns has been the lack of instrumentation which would accurately measure inhalation parameters, and yet be unobtrusive to the smoker. The system we have acquired breaks this barrier by permitting accurate and | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | relatively unobtrusive monitoring of inhalation patterns under natural smoking conditions. | | | |
| 465 ¶ 2191 | The July 20, 1981 Report includes a number of statements reflecting Philip Morris's understanding of smoker compensation:<br><br>That roughly 20% or less of smokers take puffs equal to or smaller to those taken by the FTC Method machine smoking protocol.<br><br>"The varying puff sizes in turn also give increased deliveries above those of" the FTC Method.<br><br>"Smoker profile characteristics have been found to be affected by the cigarette design parameters to varying degrees."<br><br>"A cigarette designed such that it causes the smoker to take larger puffs than the compared model could easily be perceived as having more impact (desirable or undesirable as the case may be)"<br><br>Lists low resistance to draw and "high filter dilution" as the top two "physical cigarette designs that have the effect of increasing a smoker's puff volumes."<br><br>"In conclusion, when a smoker is presented with a cigarette other than his normal brand, it is possible to estimate the maximum flow rate to a certain degree. The puff duration will increase with increasing RTD [resistance to draw] and/or filter dilution. Since the volume is based on both flow and duration, the puff volume will change accordingly."<br><br>Test results showing that smokers of full-flavor, light and ultra light cigarettes all took larger puffs than in the FTC Method, and that the smokers' puffs were increasingly large for lower tar cigarettes, so that, for full-flavor smokers, "average tar deliveries were 45% higher than" the FTC yields, low tar smokers' "showed a higher rate of increase, 81%," and, for ultra light cigarettes, "[t]he average tar delivery" was "more than three times that of" the FTC yield.<br><br>("Preliminary results suggest that inhalation patterns are modified in response to changes in the available nicotine in the cigarette smoked.... The results from studies which analyze blood plasma and urine nicotine concentrations ... suggest that nicotine compensation is fairly complete."). | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 465 ¶ 2192 | A September 17, 1975 Philip Morris document from Goodman to Leo F. Meyer, Philip Morris Director of Research, reflecting results of Philip Morris's studies with its Human Smoker | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Simulator, reported that, due to compensation, smokers got as much tar and nicotine from Marlboro Lights as from full-flavor Marlboros:<br><br>Marlboro Lights cigarettes were not smoked like regular Marlboros. There were differences in the size and frequency of the puffs, with larger volumes taken on Marlboro Lights by both regular Marlboro Smokers and Marlboro Lights smokers.... The panelists smoked the cigarettes according to physical properties; i.e., the dilution and the lower RTD of Marlboro Lights caused the smokers to take larger puffs on that cigarette than on Marlboro 85's. The larger puffs, in turn, increased the delivery of Marlboro lights proportionally. In effect, the Marlboro 85 smokers in this study did not achieve any reduction in smoke intake by smoking a cigarette (Marlboro Lights) normally considered lower in delivery.<br><br>The report's "Conclusions" section noted that "[t]he smoker data collected in this study are in agreement with results found in other project studies." (noting, in the context of this exhibit, that "Marlboro 85's" refers to Marlboro Reds, a full-flavor cigarette brand). | False Representations | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 466 ¶ 2193 | As Dr. Burns explained, "there are three things that are powerfully significant in this document":<br><br>(1) It "very clearly demonstrates that, in contrast to what we believed six years later when we wrote the 1981 Surgeon General's Report, smokers who smoked brands of cigarettes on the market in 1975 were not getting different yields when they smoked those products. We [in the public health community] believed they were."<br><br>(2) "[T]his is dated 1975, six years prior to the time the [1981] Surgeon General's Report reached its conclusion. And we did not have access to this information or comparable information."<br><br>(3) "[T]his study was done on a machine that mimicked actual smoking behaviors, that actually matched the behavior of the individual when the machine smoked the cigarette. In 1981, one of the recommendations that we made ... was that this type of machine should be developed so that we could develop a better understanding of the relationship between delivery of tar and nicotine of these cigarettes when they were actually smoked. So ... six years prior to the time we were reviewing that evidence for the Surgeon General, this information was available to Philip Morris." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 466 ¶ 2194 | One other Philip Morris Human Smoker Simulator report compared the deliveries of the full flavor and light versions of brands Philip Morris was selling. That report, dated September 23, 1976, measured the smoking behavior-and resulting tar and nicotine deliveries-of 150 full-flavor | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

162

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | cigarette smokers for several years. This Human Smoker study's results revealed that, while Marlboro 100s are both full-flavor cigarettes and longer in length than Marlboro Lights, "the tar and nicotine yields for these two brands are basically identical." | | Enrichment | |
| 466 ¶ 2195 | Philip Morris stopped all testing with the Human Smoker Simulator in 1981. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 466 ¶ 2196 | A March 1, 1977 Philip Morris memorandum from Stanley Schachter to Thomas Osdene, Director of Research, concluded: "Serious smokers smoke to prevent withdrawal. Smokers regulate nicotine intake.... The smoker who fails to regulate suffers withdrawal." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 466 ¶ 2197 | An October 16, 1981 memorandum from Jan Jones to William Dunn, titled "Nicotine Retention Research Proposal," stated:<br><br>Research on smoke-laden inhalation patterns, using the ambulatory monitoring instrumentation, has provided preliminary evidence that inhalation behavior is modifiable, and is altered as a function of changes in the nicotine delivery of the cigarette. We are observing changes in inhalation parameters in the direction which would suggest compensation for increases or decreases in nicotine relative to the subject's usual brand. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 467 ¶ 2198 | In a November 29, 1982 report, "The Effect of Cigarette Nicotine Content on Smoker Puff Parameters and Deliveries," Philip Morris scientists reported the results of their study of "puff number, puff volumes, puff durations, flow rates and puff intervals," which showed smokers "generally tended to decrease puff duration, puff number and puff volume and increase puff interval as the nicotine level of the cigarette increased." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 467 ¶ 2199 | Carolyn Levy, a research scientist for Philip Morris in its Behavioral Research Group from 1975-1980, testified that she "worked on the issue of whether individuals regulated the amount of nicotine they obtained from smoke," and as part of that work she "monitored how smokers inhaled smoke from cigarettes with varying tar and nicotine deliveries." Levy further testified that, as a result of this research, she was able to "gather evidence that some people change their smoking behavior in response to cigarettes with differing tar and nicotine deliveries." When Levy requested publication, she "was told not to publish or was not given approval to publish by the manuscript review board." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 467 ¶ 2200 | A November 1999 presentation, titled "PM USA Discount Brands," given to Geoffrey Bible, Chairman of the Board and CEO of Philip Morris Companies, noted in a Product Comparison chart that Ultra Light products have a higher puff count than Full Flavor products. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | | | Enrichment | |
| | **3. Defendants Internally Recognized that Smokers Switch to Low Tar/Light Cigarettes, Rather than Quit Smoking, Because They Believe They Are Less Harmful** | | | |
| 475 ¶ 2230 | The evidence shows that even though low tar smokers may have a greater desire to quit, the misperception of increased safety associated with low tar cigarettes persuades them to avoid quitting. Research shows that most low tar cigarette smokers have made a greater number of quit attempts than smokers of full flavor cigarettes, or were more likely to have considered quitting. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 475 ¶ 2231 | Many smokers who were concerned about the risks of smoking responded by switching to low tar cigarettes instead of quitting. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 475 ¶ 2232 | "There is profound harm" for people who smoke low tar cigarettes. As Dr. Burns explained:<br><br>The vast majority of people who smoke are addicted. They're interested in quitting but are unable to do so.... To provide smokers an alternative that says you don't have to quit, you can use this other type of cigarette, to intercept them on the way to quitting smoking is a profound harm because they continue to smoke longer than they might have otherwise. Some of those people who switched might have ... been successful in quitting, and when they did that, they would have in actuality reduced their disease risks. And those individuals have been profoundly harmed. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 475 ¶ 2233 | The 2004 Report of the Surgeon General noted that "[r]esearch has demonstrated that with the expectation of reducing risk, many smokers switched to low machine-measured tar/nicotine cigarettes, and may thus have been deterred from quitting". TLT0930001-0949 at 0911 (U.S. 88621). NCI Monograph 13 noted that "substantial numbers of smokers" switched to cigarettes with lower machine-measured tar yields "in an effort to reduce their disease risks," and that "[t]he switch to low machine-measured-yield cigarettes with the illusion of risk reduction was, therefore, substituted for a real risk reduction that would have occurred had the smoker quit smoking altogether." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 475 ¶ 2234 | As demonstrated below, Defendants conducted extensive research on quitting to help them identify and understand potential quitters (*i.e.,* smokers who were "concerned" and "uncomfortable" with the fact that they smoke) and design marketing that would dissuade them from quitting. Defendants' internal documents demonstrate their recognition that smokers interested in quitting smoking were instead switching to low tar cigarettes under the mistaken belief that doing so would either help them quit or be better for their health. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 475 ¶ 2235 | For example, a 1987 National Health Interview Survey showed that 44% of current smokers had, at some point, switched to low tar cigarettes to reduce their health risk. Weinstein WD, 53:19-22 | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | (citing, Giovino, *et al.*, 1996). Correspondingly, another national survey showed that 58% of ultra light smokers and 39% of light smokers chose those cigarettes to reduce their health risks without having to quit. Furthermore, 49% of ultra light smokers and 30% of light smokers did so as a step toward quitting. Weinstein WD, 53:23-54:7 (citing, Kozlowski, Goldberg, *et al.*, 1998). Finally, the 1993 Teenage Attitudes and Practices Survey showed that 21% of light or ultra light cigarette smokers chose those brands because they perceived them to be healthier. | False Representations | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 476 ¶ 2236 | According to Dr. William Farone, former Director of Applied Research at Philip Morris, one reason that low tar cigarettes "are more dangerous" than full-flavor cigarettes is that "they lead people to believe they are [safer] so that they smoke them in manners that cause them to get just as much toxins." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 476 ¶ 2237 | Dr. Farone explained that:<br><br>The problem is that when people see that word "light," it is my opinion that they believe it's safer and, in fact, it isn't, so that's what this is all about ... they are more dangerous because people are smoking them thinking they are doing themselves some good, they think they are safer ... there is no benefit to a smoker from Marlboro Lights compared to Marlboro. That's the main point. So that makes it more dangerous. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 476 ¶ 2238 | Smokers of light and ultra light cigarettes are more concerned about the risks of smoking than smokers of full flavor cigarettes. A 1986 CDC control study showed that 85% of those who switched from full flavored cigarettes to light or ultra light cigarettes were concerned about the health risks of smoking, as compared to 70% of full flavor smokers. Ultra light smokers are also more likely to use tar numbers in judging the relative risk of cigarettes. A study showed that 56% of ultra light smokers rely on tar numbers to determine cigarette safety, as compared to 14% of the overall sample. Moreover, 83% of the ultra light smokers believed that switching from a 20 mg cigarette to a 5 mg cigarette would significantly reduce health risks, whereas 50% of other smokers shared that same belief. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **a. Defendants Recognized that Smokers Choose Light/Low Tar Cigarettes for a Perceived Health Benefit** | | | |
| 476 ¶ 2239 | Defendants have stated publicly that they produce low tar cigarettes only to accommodate consumer taste preferences for "lighter," "milder" tasting cigarettes, and that they do not intend their use of brand descriptors or their marketing of low tar cigarettes to imply a less harmful product. See Section V(E)(5), *infra* (discussing Defendants' false statements regarding their low tar cigarette marketing). Contrary to their public statements, however, Defendants' internal marketing documents establish that Defendants have known for decades that even though consumers prefer the taste of regular cigarettes to low tar cigarettes, they are willing to forgo them | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | and smoke low tar cigarettes, which are less enjoyable and have a less appealing taste, because they believe low tar cigarettes are better for their health. | | | |
| | **(1) Philip Morris** | | | |
| 477 ¶ 2240. | According to Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, in her experience, "there is a general perception among consumers that as you go down in tar, cigarettes have less taste." For this reason, Philip Morris planned to produce a low tar Merit cigarette that tasted like a cigarette with higher tar. A June 30, 1993 document from a Philip Morris USA New Products Meeting, titled "Marlboro New Product Development," stated that the "Project" was to "[b]uild the Merit business by introducing a 3 mg product that tastes like a 5 mg." Philip Morris also planned to "[d]evelop a 6 mg Tar Cigarette with the Sensory Attributes of an 8-9 mg Tar Cigarette." (Philip Morris's 1992 R & D Operational Plans for the Product Development Department issued to Cliff Lilly of Philip Morris USA included the following objectives: "Design and develop an 3 mg [Merit] product with the subjective attributes of a 6 mg cigarette.... Design and develop a 6 mg [Merit] product with the subjective attributes of a[sic] 8 mg cigarette.... Develop 6 mg [Marlboro Ultra Lights] line extension ... providing enhanced subjective quality and Marlboro character.... LOW TAR HIGH FLAVOR Objective: Develop new technologies which will allow us, within the next two to four years, to produce 'Ultra Low' tar, 2 to 4 mg, cigarettes with the sensorial experience of 'Lights' or 'Full Flavored' cigarettes"). | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 477 ¶ 2241 | Bonhomme added that "Philip Morris's own marketing research shows that there are consumers who switch to low tar cigarettes even though they do not prefer the taste or flavor, because they believe it is better for them," and that "for those people the reason for switching to a low tar brand is not taste or flavor, but perceived health benefits." Bonhomme admitted that these smokers are willing to sacrifice taste for perceived health benefits. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 477 ¶ 2242 | Bonhomme explained that Philip Morris's Merit brand of cigarettes utilized a marketing strategy, titled "Merit Solutions," that was intended to communicate to consumers that "Merit was a solution to the problem of finding a low tar brand with good taste." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 477 ¶ 2243 | Defendants' own expert, A. Clifton Lilly, Vice President of Technology and Research for Philip Morris, demonstrated that Philip Morris did not intend to market Merit as a "lighter tasting" cigarette, but rather as one that tasted just like a full flavor cigarette, yet with a health benefit. Lilly testified that:<br><br>The Merit brand, as I remember, came out in 1976.... R & D did a lot of basic research on taking tobacco and actually getting compounds for a flavor system that were the most flavorful ones in smoke, so that the cigarette would be lower tar but taste like it was more like the popular | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | cigarettes, and they were all at that time full flavor. | | | |
| 477 ¶ 2244 | An undated Philip Morris document, titled "Background Information on Philip Morris Brands," included "Benefit Statements" for Philip Morris's various "light" brands that revealed Philip Morris's intent was not to market these cigarettes as "lighter" tasting, but rather as cigarettes that taste like full-flavor cigarettes with the extra purported benefit of low tar and nicotine:<br><br>• Marlboro Medium: "gives you a flavorful smoke in a low tar cigarette" and "bridges the flavor gap between low tar and full flavor cigarettes."<br><br>• Benson & Hedges 100's Lights: "premium tobacco flavor in a satisfying low tar smoke."<br><br>• Benson & Hedges 100's Deluxe Ultralights: "only 5 mg tar, yet is rich enough to be called Deluxe ... is an ultra low tar cigarette that gives you satisfying taste ... delivers cool, rich taste with 5 mg tar."<br><br>• Merit: "You'll enjoy low tar and good flavor.... At only 7 mg tar, Merit delivers the rich flavor of leading cigarettes with twice the tar ... get rich menthol flavor at only 8 mg tar."<br><br>• Merit 100's: "flavor that makes low tar and good taste a reality for 100's smokers."<br><br>• Merit Ultra Lights: "cool, flavorful smoke with only 5mg tar."<br><br>• Merit Ultra Lights 100's: "an ultra light with flavor."<br><br>• Virginia Slims Ultra Lights: "gives flavor and taste-and is an ultra low tar smoke."<br><br>• Parliament Lights: "enjoyable taste in a low tar cigarette." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 478 ¶ 2245 | A November 15, 1971 document to James Morgan, former CEO of Philip Morris, from the Marketing Research Department, bearing the letterhead "Philip Morris U.S.A. Inter-Office Correspondence," set forth results of a Philip Morris consumer research study on Marlboro Lights. Under the heading "Likes and Dislikes," the report stated: "Complaints continued to center around taste mentions (23%) and too mild (22%)." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 478 ¶ 2246 | According to Morgan, Philip Morris did not intend for the name Marlboro Lights to communicate that it had light or lighter taste: | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | I have trouble in describing what light taste really means.... Light taste, first of all, is not a positive attribute if it does mean anything ... in my judgment, light taste is really a meaningless and nebulous claim ... the bigger proposition is the lower tar and nicotine.... We are not talking, in my judgment, talking about light ... as a taste. It's not a term that means anything in terms of taste, and the name Marlboro Lights as I said before, a word which we feel has appeal in a different sense than suggesting what the cigarette even tastes like. | False Representations | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 478 ¶ 2247 | Around the time of the launch of Marlboro Lights in 1974, a marketing dilemma existed for Philip Morris: on the one hand, the fact that a cigarette had a "lighter taste" was a negative limitation in the minds of consumers that made the cigarettes more difficult to sell, but, on the other hand, the term "light" also conveyed the beneficial message of low tar. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 478 ¶ 2248 | Philip Morris's Marketing and Research and Development departments held regularly scheduled meetings where they discussed, among other things, how to increase the market for low tar cigarettes through research and development. Many discussions focused on the poor taste of low tar cigarettes:<br><br>marketing ... kept saying people don't like the taste of a low tar cigarette. They are finding it unsatisfactory.... What can we do to develop a low tar cigarette that really tastes good. That to me looks like the great market opportunity. I remember lots of discussions about that. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 479 ¶ 2249 | According to Ellen Merlo, then Senior Vice President of Corporate Affairs at Philip Morris USA, "there was a general perception that low tar cigarettes did not taste as good as full flavor cigarettes." Merlo added that Philip Morris's Merit cigarette "was the first free standing cigarette entry in the light category that was positioned as tasting good." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 479 ¶ 2250 | An October 1975 Philip Morris USA Special Report distributed widely throughout the Research Center, titled "Low Delivery Cigarettes and Increased Nicotine/Tar Ratios, a Replication," urged development of a "low delivery cigarette that will both look and taste like a regular filter cigarette and thus will appeal to current regular filter smokers." The document further stated:<br><br>If a low delivery cigarette with impact and flavor were developed, it may cause the segment of current regular filter smokers who are concerned about their health but demand a flavorful cigarette to voluntarily switch to the low delivery cigarette.... Furthermore, some portion of current low delivery smokers may desire to switch to a more flavorful cigarette and others may follow as consumer experience results in changing the image of low delivery cigarettes so that smokers believe a flavorful cigarette can really be 'healthy'. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 479 ¶ 2251 | Draft remarks of the Philip Morris Merit cigarette team, dated January 7, 1976, acknowledged | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | explicitly that low tar cigarettes appealed to smokers because of their purported reduced harmfulness:<br><br>Undoubtedly because of the health allegations against cigarettes, many smokers have clearly wanted cigarettes that deliver less and less tar.... [D]espite the intense promotion efforts and the strong interest among smokers, ... [t]hey have been tried and rejected by the overwhelming majority of smokers. Obviously, there has been a conflict between the desire for low tar and the desire for the rich, satisfying taste that until now has been associated with higher tar delivery. | Conspiratorial Agreement; False Representations | Consumer Protection Action Violations; Unjust Enrichment | *Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 479 ¶ 2252 | A 1979 Philip Morris Merit advertisement, titled "Merit Taste Eases Low Tar Decision," appeared in national magazines, stating:<br><br>"Enriched Flavor" tobacco proving real alternative to high tar smoking.... Confirmed: Majority of high tar smokers rate MERIT taste equal to-or better than-leading high tar cigarettes tested! *Cigarettes having up to twice the tar.* [Merit's] ability to satisfy over long periods of time could be the most important evidence to date that MERIT science has produced what it claims: The first real alternative for high tar smokers. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 479 ¶ 2253 | A January 1979 study prepared for Philip Morris by Goldstein/Krall Marketing Resources, Inc., discusses consumers' perception of light cigarettes: "There appears to be a concept involved that might be called 'limiting.' They have moved to limit their tar and nicotine intake. At the same time they have accepted a limit on taste." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 479 ¶ 2254 | According to Nancy Lund, Senior Vice President of Marketing for Philip Morris, when light cigarettes were first introduced, their largest drawback was that consumers disliked their taste. In fact, nine out of ten consumers reported dissatisfaction with the taste of light/low tar cigarettes. She acknowledged that smokers were buying them, nonetheless, because they were perceived to be less harmful. An April 20, 1987 memorandum on Leo Burnett letterhead from Elinor Bowen of Leo Burnett and Carolyn Levy of Philip Morris addressed to Nancy Brennan (later Nancy Brennan-Lund) of Philip Morris, among others, commented on light cigarettes generally: "Thus far in the cigarette category, lightness has been associated with low tar or ultra low tar products which represent, for many smokers, an absence of taste and an avoidance of problems associated with smoking." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 480 ¶ 2255 | A Philip Morris document circa 1979 prepared by Judy John and Helmut Wakeham, titled "Breakthrough of the High Taste, Low Tar Cigarette: A Case History of Innovation," stated that although consumer demand for low tar cigarettes was spurred by indications that cigarette smoking caused disease in humans, "market research analysis ha[d] shown that nine out of ten smokers had tried low-tar brands, but had failed to accept them as their choice of cigarette." The | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | document also stated: "Apparently not enough smokers could adapt to the diminished 'flavor' of the highly filtered low-tar cigarettes available at that time." 1000208603-8625 at 8605 (U.S. 85010) (internal citation omitted). | | | |
| 480 ¶ 2256 | A September 1991 Philip Morris document, titled "Background Information on PM Brands," stated that, notwithstanding the introduction of Marlboro Lights in 1972 and the introduction of several variations on Marlboro Lights in 1978, 1980 and 1984, when Marlboro Medium was introduced in 1991, "consumers [were] still looking for a satisfying low tar cigarette with flavor." Marlboro Medium apparently "was successful in bridging the flavor gap between full flavor Marlboro and Marlboro Lights." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 480 ¶ 2257 | A June 1, 1994 document prepared for Philip Morris by Kane, Bortree & Associates, Inc., in its "Conclusions Product/Positionings" section, reported that Merit's "We Lowered The Tar ... But Kept The Taste" slogan "generated interest among male Low Tar Seekers because of the fact that they are committed to lowering their tar consumption." The concept of lowering the tar, but keeping the taste, was referred to as a "product improvement." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 480 ¶ 2258 | A March 26, 1996 memorandum from Shari Teitelbaum, to Jodi Sansone, then Brand Manager for Merit cigarettes, accompanying a consumer research report commissioned by Philip Morris, explained that once consumers made the decision to switch down to the category of low tar cigarettes based on health concerns, they then select their low tar brand within that category based on taste preference. Under the heading "Reasons for and Perceived Benefits of Smoking Lowest Brands," the document stated: "Although many of these smokers made the decision to go lighter based on perceived health concerns, taste seemed the major reason to choose or stay within a particular brand." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 480 ¶ 2259 | A February 9, 1998 draft research report prepared for Philip Morris by the research firm Kane, Bortree & Associates, titled "Merit Strategic Revitalization Plan, Stage I Learnings," analyzed ways to "build Merit's share of the low tar segment." The report labeled as "Taste Compromisers" low tar smokers who find the taste of light cigarettes unsatisfying but feel comfortable smoking them because of perceived health benefits. An example of their thought process is the following:<br><br>I feel that I can really taste the difference between cigarettes. I try to smoke the best tasting light since I know that smoking a light is better for me. I feel that smoking a light is a huge tradeoff but I know that it's worth it. I much prefer full flavor taste and do not think it's too strong. I choose my brand on taste. I feel like I am on a permanent "diet" because I smoke a light.<br><br>The report listed Winston Lights, Marlboro Lights, and Camel Lights as brands for taste compromisers. indicating that a goal of Kane Bortree was to "[i]dentify marketable positioning | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | opportunity(ies) for revitalizing Merit via low tar technology (3 mg tar cigarette that smokes like a 5 mg tar or possibly higher levels)"). | | | |
| 481 ¶ 2260 | Under the heading "Consumer Learnings," the February 1998 draft report noted that "Merit can secondarily target Taste Compromisers by promoting taste," under the heading "Preliminary Recommendations," the report recommended that Merit "[p]romote the benefits of light flavor rather than 'apologizing' for the fact that it is less than full flavor." Under the heading "Positioning Learnings" and the subheading "Exploratory Positionings," the report stated: " 'Low tar' should not be highlighted, but may be needed as reassurance to more health conscious smokers." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 481 ¶ 2261 | An October 5, 1998 internal Philip Morris presentation regarding Philip Morris's premium cigarette brands discussed the Merit brand's positioning. Under the heading "Merit-Brand Essence," the document stated that "[s]ince the brand's introduction twenty-two years ago, the core Merit proposition has been low tar with satisfying good taste. Merit is the brand that understands the desire to seek a lower tar alternative." Under the heading "Merit-Brand Strategy," the document said that Merit's strategy was to "Convince: Smokers who want to switch to a low tar alternative, but won't sacrifice taste completely, That: With Merit, you can switch down to lower tar and still enjoy smoking Because: Merit delivers satisfying taste at every level of low tar." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **b. Defendants Internally Recognized that Smokers Rely on the Claims Made for Low Tar/Light Cigarettes as an Excuse/ Rationale for Not Quitting Smoking** | | | |
| | **(2) Philip Morris** | | | |
| 488 ¶ 2295 | Philip Morris conducted research on former smokers to assist it in marketing purportedly less harmful cigarettes to draw them back into the market and to dissuade potential quitters from actually quitting. According to Carolyn Levy, who worked as a research scientist for Philip Morris in its Behavioral Research Group from 1975-1980 and as the Assistant Director and later Director of Consumer Research from 1986-1991, when she was in the Consumer Research Department, she "performed research on quitting on behalf of Philip Morris," and when she was in the Behavioral Research Department in the late 1970s, "[q]uitting was also a subject of interest and research to Philip Morris." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 488 ¶ 2296 | A report titled "Exit-Brand Cigarettes: A Study of Ex-Smokers,"written by F.J. Ryan and approved by Dr. William Dunn, dated March 1978 and distributed to certain Philip Morris employees, including Levy, stated: "If the industry's introduction of acceptable low-nicotine products *does* make it easier for dedicated smokers to quit, then the wisdom of the introduction is open to debate." The report further stated that "experience in dealing with 'quitters' suggests that most people who quit smoking will resume after a while. Hunt and Matarazzo show data | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | suggesting that 50% of quitters resume smoking within 3 months and 70% resume within a year." Levy said that she was "aware when [she was] studying quitters that most quitters resume smoking." | | | |
| 489 ¶ 2297 | Levy stated that Philip Morris was "studying the factors that influence quitting," including whether "people quit because of health concerns," so that Philip Morris could "design products or line extensions of existing brands that addressed those factors." Levy testified that "[t]o the extent we determined that people quit because of health concerns, that would be very important in reaffirming Philip Morris' commitment to develop cigarettes with lower harm or risk." Asked if the purpose was "[s]o that people would keep smoking Philip Morris cigarettes rather than quitting," Levy answered: "Yes, if Philip Morris could design new products to address those concerns." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 489 ¶ 2298 | An August 14, 1978 consumer research report prepared for Philip Morris by Wells, Rich, Greene, Inc. regarding Benson & Hedges stated:<br><br>Those who are currently smoking "Lights" do so because "... they are better for you ..." than full flavor cigarettes. Although some experience that they actually smoke more Lights, they perceive that they are cutting down and it is an alternative to quitting-which most cannot accomplish. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 489 ¶ 2299 | A January 1979 study prepared for Philip Morris stated:<br><br>[W]ith respect to ultra low tar brands there appear to be particular additional motivations for smoking this type of cigarette ... [h]ealth problem forcing a change to a safer cigarette (as an alternative to not being able to quit) ... [p]eer and family pressure to smoke a safer cigarette (as an alternative to not being able to stop smoking).... Characteristics of ultra low tar smokers were: people who want to quit.... In point of fact, smoking an ultra low tar cigarette seems to relieve some of the guilt of smoking and provide an excuse not to quit. All of these smokers expressed an awareness of a health hazard from smoking, but felt that they had alleviated some of this hazard by smoking an ultra low tar brand. They described these cigarettes as 'safer'.... With these justifications, there may be less of a compulsion to quit smoking.... | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 489 ¶ 2300 | A March 1979 report prepared for Philip Morris, titled "A Study of Smokers' Habits and Attitudes With Special Emphasis on Low Tar and Menthol Cigarettes," stated:<br><br>The percentage of adults who smoke has stabilized for the first time since 1965-at 34%. This could well be due to the greater perceived safety of low tar cigarettes and their resultant neutralization of the health threat.... The number of cigarettes smoked per day per smoker | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | continues to climb, in part at least because low tar cigarettes seem to cause people to increase the number of cigarettes they smoke. | | | |
| 489 ¶ 2301 | In a September 28, 1987 inter-office memorandum written by Levy and sent to David Dangoor, Executive Vice President at Philip Morris, titled "Critical Consumer Research Issues," Levy outlined what she called "the most important consumer-related questions which should be addressed in 1988." This document contained "information about some of the types of research that Philip Morris planned to conduct in the upcoming year." Among the questions Levy posed in the memorandum were: "Can we determine the relative importance of various factors which influence *quitting?* "; "What are the factors which influence brand choice of smokers reentering the market? Can we capitalize on these?"; and "Which new product options will ... appeal to former smokers?" | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 490 ¶ 2302 | Philip Morris conducted a "major study" on quitting in 1988, titled "Critical Issues -1988 Progress Report," which Levy described in a September 26, 1988 memorandum she sent to John Zoler, then Director of Market Research. Under the heading "Smoker Dynamics," Levy wrote: "Conducted a major study on quitting showing: demographics of quitters, quitting by brand, reasons for quitting, methods used to quit, substitutes used for cigarettes." There were 506 people surveyed in the Philip Morris study, and "[t]he research results indicated that the number one reason for people quitting smoking was health concerns." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 490 ¶ 2303 | A June 20, 1988 memorandum on Philip Morris USA letterhead from consumer researcher Jan Jones to Dr. Ed Gee, titled "Statement of Position on the Social Pressures Construct," discussed Philip Morris's goal of introducing a "socially acceptable cigarette" that "could capture the trend-setters who might find such a product preferred over current cigarettes, be a welcomed alternative to quitting, and might attract new smokers who would not otherwise choose to become product users." The memorandum further stated:<br><br>With the recent attrition rate of smokers, attaining "new" smokers is no longer synonymous with capturing young smokers. We already have Marlboro as the brand of choice for young smokers entering the market. We do not have a product that meets the needs [sic] of the growing population of ex-smokers. Many of these ex-smokers will resume smoking, and the product that they choose could cause a swing in market share. These quitters (and those who are soon to become quitters) are dissatisfied with certain aspects of a product that previously met their needs.... These consumers have not yet as a group found a satisfactory replacement for their previous product-a textbook example of a market opportunity. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 490 ¶ 2304 | A March 1993 Philip Morris document, titled "Quitting Dynamics," showed statistics from "Smoker Tracking" that indicated that more Low Tar smokers did not try to quit (53.5%) | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | compared to Full Flavor smokers (43.2%). | False Representations | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 490 ¶ 2305 | In a July 1993 Philip Morris presentation, titled "Merit Franchise," prepared by Norma Suter Drew, Brand Manager and Marketing Director for Merit cigarettes from 1992-1994, she reported that the "Intended Audience" of Merit advertising was "self-conscious low tar smokers who want to cut down on tar and nicotine but who won't sacrifice taste completely." ("Merit's consumers are self-described 'Uncomfortable Smokers' who tell us they are self-conscious about the fact that they smoke"); | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 491 ¶ 2306 | In November 1994, Philip Morris commissioned a study from the research firm Guiles & Associates, titled "B & H Qualitative Research Exploring Out-Switching," to "understand more about how Benson & Hedges smokers exit the franchise." One of the conclusions reported in the study was:<br><br>For many smokers, the ultimate ramification of all the anti-smoking rhetoric has been their heightened commitment to quit (or at least reduce) their smoking. For these, the greatest evidence of this commitment has been in shifting tar levels (even to different brands, as necessary).... For many, lowering tar levels is the next best thing to quitting.<br><br>(Jan. 18, 1994 document prepared for Philip Morris USA indicating that Merit is perceived as a "quitters brand) | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 491 ¶ 2307 | Philip Morris's 1994-1998 Plan Overview stated:<br><br>If ultra low tar segment growth accelerates, we will launch Marlboro Ultra Lights to prevent Marlboro from losing smokers. Marlboro Ultra Lights will reinforce Marlboro's appeal among tar 'conscious' Lights smokers and improve Marlboro's ability to retain smokers as they age. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 491 ¶ 2308 | An internal July 1995 draft presentation, titled "Marlboro Women," bearing the handwritten notation "Approved as Revised, VMM [Virginia Murphy, a Philip Morris attorney] 8/9/95," includes a section titled "The Marlboro Lights Female." The presentation stated that "[p]opularity and low tar are why they initially smoke the brand." The presentation further noted that for female Marlboro Lights smokers, 27% of 18-24 year olds, 29% of 25-29 year olds, and 34% of 30-39 year olds were "Under Pressure To Not Smoke," and that 21%, 16%, and 30% of each age group, respectively, "Intends to Quit." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 491 ¶ 2309 | In a March 26, 1996 cover memorandum, Shari Teitelbaum delivered to Jodi Sansone, then Brand Manager for Merit cigarettes, a consumer research report commissioned by Philip Morris to "gain an understanding of consumers perceptions of the lowest category, as well as the motivations and | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | wants of smokers of Carlton, Now, and Merit Ultima, and potential down-switchers to this category." Under the heading "The Decision to Enter the Lowest Category," the attached consumer research report found:<br><br>At some point in their smoking histories, these smokers decided or became more receptive to the idea of a lighter or lower brand than the one they were currently smoking. Some cited perceived health concerns. Others had been "bugged" by family members at home to cut down, or stop smoking. | | Enrichment | |
| 491 ¶ 2310 | In August 1996, Natalie Ellis, Senior Manager at Philip Morris, and Urvashi Kohli distributed a June 1996 consumer research study, titled "Marlboro Ultra Lights: A History," to a long list of Philip Morris employees, including Norma Suter Drew, then Director of New Products for Marlboro, gauging consumer reactions to the contemplated launch of Marlboro Ultra Lights. The study found that Marlboro Red smokers see Marlboro Ultra Lights as "a brand for quitters and people who are trying to cut down." | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 492 ¶ 2311 | In an October 4, 1999 letter, titled "Schedule for Merit Competitive Lights and Ultra Lights Study," Beth Hooper of Leo Burnett discussed an upcoming Philip Morris study being conducted to "[e]xplore adult smoker attitudes toward the Lights/Ultra Lights category" and to "[b]etter understand the impact of Marlboro Ultra Lights on the category overall." Under the heading "Background," Hooper noted:<br><br>The dynamics of the Lights/Ultra Lights category have changed significantly over the past several years, particularly with the entry of Marlboro Ultra Lights. In the past, Lights and Ultra Lights were stops on the way to leaving the tobacco category. However, today, we are seeing that both segments are the destination of choice for many adult smokers. | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 492 ¶ 2312 | According to Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, the company was aware that some "consumers who wanted to quit were switching to several of its light cigarette brands instead of quitting | Scheme to Defraud, Conspiratorial Agreement; False Representations | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **4. Despite Their Internal Knowledge, Defendants Publicly Denied that Compensation Is Nearly Complete and that the FTC Method is Flawed** | | | |
| 500 ¶ 2346 | Despite evidence spanning multiple decades showing Defendants' extensive knowledge of compensation, Defendants concealed that knowledge and disseminated false and misleading statements to downplay its existence and prevalence. As part of their attempt to portray low tar cigarettes as less harmful, Defendants publicly endorsed retaining the FTC Method well into the 1990s because of its usefulness to consumers. (1994-B & W, American Tobacco, Lorillard and | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Liggett defending the validity and usefulness of the FTC Method to consumers); (1994-various public statements by RJR employees defending the validity of the FTC Method); (1996-Defendants' statements defending the utility to consumers of the FTC Method). | | | |
| 500 ¶ 2347 | As Defendants knew, the smoking regimen used in the FTC Method was designed to approximate smoking behavior in the 1930s, when cigarettes were relatively simple devices: few had filters, and perforated filter ventilation cigarettes were not in production. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 501 ¶ 2348 | When the FTC Method was adopted, it was understood that, while it was intended to provide a useful measure of the amount of tar and nicotine that particular brands generate when smoked in a uniform fashion, so that smokers could compare brands, the standardized FTC Method-or any standardized testing procedure for that matter-would not totally accurately represent the amount of tar and nicotine that any particular smoker would ingest. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 501 ¶ 2349 | As noted in Section V(E)(1)(c), *supra,* while the FTC contemplated at the time it adopted its Method that numerous potential variations among individuals in everyday smoking behavior could have some effect on tar and nicotine yields, it did not have a full understanding of smoker compensation-that smokers' addiction to nicotine would cause them to smoke low tar cigarettes more intensely to satisfy their nicotine addiction, and thereby inhale amounts of tar and nicotine comparable to those inhaled by smokers of full flavor cigarettes. Defendants withheld their long-held knowledge that the primary reason the FTC Method could yield misleading data was that nicotine addiction would drive smokers to obtain relatively stable nicotine intakes through smoker compensation. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 501 ¶ 2350 | When the FTC Method was adopted, the Tobacco Institute offered several criticisms in an August 1, 1967 press release, but none of those criticisms related to smoker compensation. Instead, the Tobacco Institute criticized the number of cigarettes tested, the length of the cigarette smoked, and the lack of dissemination of tar yields per cigarette puff. The Tobacco Institute stated that "there is no valid scientific evidence to show that ... 'tar' and nicotine [ ] are responsible for any human illness" and then proposed several changes to the FTC Method, most of which were based on claims that FTC tar and nicotine yields were inaccurately high. The Tobacco Institute argued that twice as many sample cigarettes should be tested to arrive at FTC yields, that the FTC Method should use a longer butt-length (which would have lowered FTC tar and nicotine yields by smoking less of the cigarette), and that tar and nicotine yields should be disclosed on a per-puff, as well as a per-cigarette, basis. For these reasons, the Tobacco Institute claimed that the FTC Method "may be deceptive because a smoker may assume his cigarette is delivering the amount of 'tar' and nicotine reported by the FTC when in fact it will be delivering much less, the way he smokes." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 501 ¶ 2351 | Even at the time it was developed, scientists understood that the FTC method, like any standardized method, would provide an imperfect measure of the exact amount of tar and nicotine that a particular smoker would ingest from a particular cigarette. Instead, the method was intended to give representative approximations of the amounts of tar and nicotine generated by different brand cigarettes when smoked under identical conditions. Those approximations could then provide a useful comparison of the tar and nicotine a human smoker would receive from smoking different brands. For example, the FTC stated in 1983: "If consumers avoid blocking ventilation holes, cigarettes smoked in the same fashion will yield 'tar', nicotine, and carbon monoxide in general accordance with their relative FTC rankings." 48 Fed.Reg. 15,953 at 15,954 (Commission Determination Re Barclay Cigarettes; Amendment of Report of "Tar," Nicotine, and Carbon Monoxide Content of 208 Varieties of Cigarettes; Request for Comment on Possible Testing Modifications). While the FTC Method does provide a means by which to compare brands, the comparison does not meaningfully relate to the reality of smoking. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 502 ¶ 2352 | In a November 29, 1994 written statement submitted for the December 5-6, 1994 NCI Conference on the FTC Cigarette Test Method, B & W, American Tobacco, Lorillard, and Liggett defended the FTC Method, stating that "The FTC's Test Method Provides Useful and Reliable Information About the Relative 'Tar' and Nicotine Yields of Cigarettes," and contending that FTC yields are a "useful predictor" of the amount of tar and nicotine smokers will inhale. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 502 ¶ 2353 | RJR employees, David Townsend and Donald de Bethizy, maintained at the same Conference, in both their written and oral statements, that the FTC Method was a valid and accurate test method that approximates human smoking. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 502 ¶ 2354 | In his written statement, Townsend asserted that the FTC Method "provides accurate and reliable information" that "is a key factor for consumers to make objective choices in the marketplace" and stated that "implementation of the FTC testing for 'tar' and nicotine ... was an important step in providing data for the consumer to use to make an informed decision in the marketplace." Townsend further stated that<br><br>it is clear from the information, I believe, that the FTC test method does provide accurate and reliable information for the consumer to use in the marketplace; that is, to compare yields of various brands and make objective choices. The consumer makes choices based on the FTC information, or the rankings derived from that information.... The FTC method was established to provide accurate and reliable comparative smoke yield information, and has been very successful in doing that. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 502 ¶ 2355 | De Bethizy stated: "The FTC method provides an accurate and meaningful ranking of cigarettes.... | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | On average, smokers absorb approximately the yield of nicotine predicted by the FTC method, and smokers of lower yielding products absorb less nicotine ...." He also stated: "The FTC method provides an accurate and meaningful ranking of cigarettes.... [T]he compensation phenomenon does not undermine the FTC method." | Conspiratorial Agreement | Consumer Protection Act Violation | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 502 ¶ 2356 | In their 1996 comments on the FDA's proposed tobacco Rule, Defendants continued to maintain that there is a meaningful relationship between the FTC ratings and smoker tar and nicotine exposure. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 502 ¶ 2357 | While defending the FTC Method and resisting proposed changes to it, Defendants have made repeated public assertions that they have substantially reduced the tar and nicotine deliveries of cigarettes, citing the FTC ratings as their primary support for this assertion. (1996 Comments of B & W, Liggett, Lorillard, Philip Morris, Inc., RJR & Tobacco Institute before the U.S. FDA, Vol. III) (claiming that "over the years, the average yield of cigarettes generally has declined markedly.... The fact is that from 1950 to the present, U.S. cigarette manufacturers have reduced 'tar' and nicotine yields by more than 60 percent"); (U.S. 85067) (Philip Morris 1994 submission to NCI regarding the FTC Method, asserting "an overall decrease in the 'tar' and nicotine intake of smokers" as a result of reduced FTC yields); (1994 RJR employee's statement that "all cigarettes are substantially lower in 'tar' yields than they were in past years" and his claim that "[c]igarette design changes have resulted in an overall major reduction in smoke yields."). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 503 ¶ 2358 | A February 7, 1996 Covington & Burling memorandum, from Tobacco Institute attorney David H. Remes to attorneys and senior employees from Philip Morris and B & W and attorneys from the law firms of Arnold & Porter and Collier Shannon, summarized a meeting held earlier that day between Remes and C. Lee Peeler, Director of Advertising Practices in the Bureau of Consumer Protection at the FTC. At this meeting, Remes relayed to Peeler the industry's claim that low tar cigarettes actually do deliver less tar and nicotine to smokers, and that consumers need not be informed about changes in smoking behavior related to smoker compensation. Remes communicated his "observation that in many cases low-yield brands contain so much tobacco than higher-yield brands that any compensation could not begin to erase the difference." Remes also said that he had made a "suggestion that smokers do not need to have it explained to them that smoking a lot of low-yield cigarettes will result in greater T & N deliveries, just as people do not need to be told that eating a lot of low-fat cookies can make them fat." Remes noted that Mr. Peeler "responded that the analogy does not hold because we know how much fat is 'delivered' in each cookie but not how much T & N is delivered by each cigarette." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 503 ¶ 2359 | Over the years, there has been discussion in the scientific community about revising the FTC Method to make it a more accurate measure of the tar and nicotine that human smokers actually ingest. Defendants have opposed changing the FTC Method, arguing that it provides a way for | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | consumers to choose cigarettes and meaningfully compare them in terms of the tar and nicotine exposure from smoking. | | Enrichment | |
| 503 ¶ 2360 | For instance, in September 1997, the FTC solicited public comment on a proposal to replace the existing FTC test method with a methodology that would "provide information on the tar, nicotine, and carbon monoxide yields obtained under two different smoking conditions" to provide "a range of yields for individual cigarettes smoked under less intensive and more intensive smoking conditions," and to convey to smokers that "a cigarette's yield depends on how it is smoked." FTC Cigarette Testing; Request for Public Comment, 62 Fed.Reg. 48,158, 48,159 (Sept. 12, 1997). In response, Philip Morris, RJR, B & W, and Lorillard submitted joint comments to the agency defending the current FTC Method and opposing the proposed change, stating: "The manufacturers believe that the current test method should continue to be used. They are not convinced that it should be supplemented with a second test method." Comments of Philip Morris Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., and Lorillard Tobacco Co. on the Proposal Titled FTC Cigarette Testing Methodology Request for Public Comment (62 Fed.Reg. 48,158) ("Joint Comments"). | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 504 ¶ 2361 | The comments further stated that: "Smokers are familiar with the ratings produced by the current test method, and continued use of the current test method assures historical continuity of the data. For these reasons, testing under the current FTC test method should continue." *Id.* at 4. The comments referred to compensation as a "hypothesized" and "weakly documented phenomenon" and stated: "The testing protocol should not be modified to reflect 'compensatory' smoking," in part because "current knowledge about these behaviors is too sparse to be usable for modeling purposes. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 504 ¶ 2362 | Defendants' comments urged that "[t]he protocol should not be modified to incorporate a vent-blocking condition." In response to the FTC's question: "What kinds of consumer education messages should be created to inform smokers of the presence of filter vents and the importance of not blocking them with their fingers or lips?" Defendants' 1998 comments stated: "The manufacturers are not convinced that vent-blocking is a sufficiently common or documented phenomenon that smokers should be alerted to the presence of filter vents and instructed not to block the vents." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 504 ¶ 2363 | In response to the FTC's question: "If the effect of compensatory smoking behavior is not incorporated in the tar and nicotine ratings, should a disclosure warning smokers about compensatory smoking behavior be required in all advertisements?" Defendants' 1998 comments stated: "The manufacturers are not convinced that compensatory smoking behavior is a sufficiently common or documented phenomenon that consumers should be alerted to its existence | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | **b. Philip Morris** | | | |
| 504 ¶ 2365 | In a June 29, 1988 "Statement of Philip Morris, U.S.A." to Congress, Philip Morris made statements equating machine measured tar and nicotine deliveries with actual smoker intake:<br><br>From the 1940s to today, Philip Morris has similarly spent millions on its own research program to modify its cigarettes. As a result, the "tar" and nicotine yields of today's cigarettes-the principal concern of the scientists who believe cigarettes pose health risks-have been reduced as much as 95% from the 1957 averages.... [I]t was Philip Morris scientists who perfected the instrument that was used for many years by the Federal Trade Commission and other groups around the world for the measurement of "tar" and nicotine yielded by cigarettes ... [filter] ventilation techniques also contributed to an overall reduction in 'tar' and nicotine levels.... As a result of these advances in filtration and ventilation, Philip Morris and the other cigarette companies were able to reduce "tar" and nicotine levels substantially in the late 1950s.... As a result of these dramatic reductions in the "tar" and nicotine levels of the leading brands, as well as the introduction of entirely new low-delivery cigarettes, the overall intake of "tar" and nicotine by American smokers decreased dramatically even before the Surgeon General's Report against smoking in 1964.... As a result of all this research, Philip Morris succeeded in reducing "tar" and nicotine levels even more in the years following the 1964 Surgeon General's Report. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 505 ¶ 2366 | In his April 14, 1994 written Statement before the House of Representatives Subcommittee on Health and the Environment of the House of Representatives Energy and Commerce Committee, William Campbell, President and CEO of Philip Morris USA, stated, contrary to extensive information developed by and known to Philip Morris USA, that "consumers are not misled by the published nicotine deliveries as measured by the FTC method." Campbell also claimed that "tar and nicotine levels have decreased dramatically over the past 40 years. Today, the market is populated with a number of 'ultra low' brands which deliver less than 5% of the tar and nicotine of popular brands 20 years ago." In a statement carefully worded to refer only to the number of cigarettes smoked, ignoring all other methods of smoker compensation, Campbell both misrepresented the evidence about whether downswitchers smoke more cigarettes per day and denied that smoker compensation rendered the FTC tar and nicotine yields misleading:<br><br>Commissioner [David] Kessler suggested that the FTC figures were misleading because smokers might "compensate" for lower tar and lower nicotine brands by smoking those cigarettes differently. In fact, the data indicates that, despite the dramatic reductions in tar and nicotine levels over the past decades, the number of cigarettes smoked by an individual has remained | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | constant, and even declined slightly. More importantly, the data shows no difference in the number of cigarettes smoked by those who favor higher and lower yield brands.<br><br>("As we know, all too often the smoker who switches to a hi-fi cigarette winds up smoking more units in order to provide himself with the delivery which he had before."). | | | |
| 505 ¶ 2367 | An October 1994 document that Philip Morris submitted to the United States National Cancer Institute, titled "Submission of Philip Morris Incorporated to the National Cancer Institute Consensus Conference on the FTC Cigarette Testing Methodology and Rating System," stated:<br><br>A number of the FTC's questions ... relate to "compensation," a term used to suggest that some smokers of lower yield cigarettes may sometimes alter their smoking behavior in ways that may tend to reduce the differences in yields among brands and styles implied by their relative FTC method ratings. While there is a fair amount of recent literature on compensation, few studies have been performed that provide reliable data to establish the occurrence of this suggested phenomenon. We appreciate the interest people have in possible  compensation. But there can be no real dispute that, to date, the scientific literature on compensation is limited and inconclusive.... [W]hatever conclusions may be reached about compensation, the FTC method remains an appropriate standard for measuring cigarette properties. The reporting of FTC method yields ... remains a useful source of information to consumers choosing among cigarette brands and styles. | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 506 ¶ 2368 | A document, titled "Philip Morris Management Corp., Worldwide Regulatory Affairs Department, 1996 Core Issues Plan," discussed under the topic of "Core Issue # 2 Federal Trade Commission," Philip Morris's response to an NCI Conference recommendation to change the FTC Method and to provide more information to consumers: "Preserv[ing] our ability to ... advertise low tar/light and ultra low tar/ultra light cigarettes as such; avoid changes in the FTC method for as long as possible; [and] minimize changes in the FTC method to the extent possible...." | Scheme to Defraud, Conspiratorial Agreement | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **5. Despite Their Internal Knowledge, Defendants' Marketing and Public Statements About Low Tar Cigarettes Continue to Suggest that They Are Less Harmful than Full-Flavor Cigarettes** | | | |
| 507 ¶ 2377 | As detailed below, Defendants made, and continue to make, false and misleading statements regarding low tar cigarettes in order to reassure smokers and dissuade them from quitting. These actions include: assertions that low tar cigarettes deliver "low," "lower," or "less" tar and nicotine than full-flavor cigarettes; claims that low tar cigarettes are "mild" or deliver "clean" taste; and use of brand names with descriptors such as "light" and "ultra light," with full knowledge that consumers interpret these claims and descriptors to convey reduced risk of harm. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 508 ¶ 2378 | Low tar cigarettes have captured an enormous share of the total cigarette market. The percentage | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | of low tar cigarettes (*i.e.*, cigarettes with an FTC-reported tar yield of 15 mg. or less) has increased from 2% in 1967 to 81.9% of total cigarette sales in 1998. | Conspiratorial Agreement; Intent to defraud or deceive | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 508 ¶ 2379 | From the 1960s to the present, Defendants' marketing of their health reassurance brands has featured claims of lowered tar and nicotine accompanied by written statements that implied a health benefit as a result of the lowered tar levels. Defendants have also used marketing imagery, such as lighter color cigarette packaging and white tipping paper, to communicate to smokers that Defendants' health reassurance brands were "lighter" and lower in tar. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 508 ¶ 2380 | Over the last five decades, Defendants have not only introduced numerous standalone cigarette brands that purport to be low in tar (*e.g.*, Merit, Vantage, and Carlton), but have also introduced low tar "brand extensions" of existing full flavor cigarette brands (*e.g.*, Marlboro Lights and Ultra Lights as extensions of the full flavor Marlboro brand). Defendants have used so-called brand descriptors such as "light," "medium," "mild," and "ultra light" to market both their new brands, as well as their brand extensions as low in tar. Virtually every major brand undertook line extensions and by 1980 over 50% of cigarettes sold were "low tar" (with an FTC Method tar yield of 15 mg or less). Dolan WD, 123:21-124:7. Defendants acknowledge that, today, every major manufacturer continues to manufacture and sell low tar brands and brand extensions in both the "light" and "ultra light" categories. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 508 ¶ 2381 | Although the FTC does not formally classify cigarettes according to tar or nicotine yield, industry practice, according to Denise Keane, Philip Morris General Counsel, has long been to apply the "light" descriptor to cigarettes with 7 to 14 milligrams of tar, and the "ultra light" descriptor to cigarettes with fewer than 7 milligrams of "tar." These brand descriptors "have been developed by cigarette manufacturers through their advertising." (testifying that the FTC has no "control over which cigarettes Defendants advertise as 'light' or 'ultra light' "). | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 508 ¶ 2382 | The terms "Light" and "Low Tar," as they are used by Defendants, are essentially "meaningless" and "arbitrary." As Dr. Farone explained:<br><br>[T]here are lights of certain brands with higher tar levels than regulars of other brands from the same company, and there are also lights and regulars of the same brand that have the same FTC tar rating. So therefore the term "light" is not related to tar or taste. For example, according to the most recent FTC report of tar and nicotine yields, Philip Morris sells versions of Virginia Slims and Virginia Slims Lights that both deliver 15 mg of tar by the FTC method. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 509 ¶ 2383 | The FTC's 1967 report to Congress concluded that Defendants were using the word "mild" in advertising "as a euphemism for cloaking the dangers of increased cigarette smoking." The | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Report noted, in particular, the following ads:<br><br>Carlton filters have "Good mild taste ... created for those who are interested in the amount of tar and nicotine in the smoke of their cigarette...." "Montclair (menthol filter) cigarettes are made especially for smokers who seek exceptional mildness...." "You get Pall Mall's famous extra length of fine tobaccos ... and a filter tip. Result? A new longer length, a full 100 millimeters long and a new milder taste ..." and "(Chesterfield kings) made to taste even milder through longer length." | Intent to defraud or deceive | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 509 ¶ 2384 | In its 1968 report, the FTC concluded that Defendants' use of the phrase "mild taste" in advertising is just another way to communicate the term "less harmful" to smokers:<br><br>Advertising in 1966 featured the phrase "mild taste" to describe the satisfactions obtained from smoking and also as a euphemism to cloak the dangers of cigarette smoking. The euphemistic effect derives from the possibility that the public assumes "mild" tasting cigarettes to be less strong, i.e. lower in tar and nicotine than many cigarettes, and hence less hazardous. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 509 ¶ 2385 | The 1971 FTC report noted that "[r]elieving anxieties about the risks to health posed by cigarette smoking" was among Defendants' three main advertising themes and that "[c]laims of low tar and nicotine content present yet another appeal to relieve concern about the dangers to health associated with cigarette smoking." In 1975 and 1976 reports, the FTC reported that this theme, used separately or with themes regarding taste or desirable personality characteristics, "continued to predominate in 1975," and "continued to dominate in 1976, with little variation in format and copy except in the greatly increased promotional emphasis given to the lower and lowered 'tar' varieties." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 509 ¶ 2386 | The 1981 FTC report on cigarette advertising noted, many of Defendants' advertising campaigns had, over the course of the preceding four decades, "impl [ied] that smoking a particular brand solves the health problem or at least minimizes the risk." The report noted that Philip Morris's Parliament and American Tobacco's (subsequently B & W's) Tareyton cigarettes "imply that their special filters minimize the risks of smoking." The report also cited the advertisements for RJR's Vantage, B & W's Viceroy, and Lorillard's True cigarettes as examples of advertising campaigns implying that the brands marketed are either not harmful or less harmful. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment . | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 509 ¶ 2387 | Similarly, the 2001 Institute of Medicine report cited the advertisements of Defendants Philip Morris, RJR, B & W, American Tobacco, Lorillard, and Liggett as examples of advertisements that relate health benefits to particular low tar cigarette brands. (Institute of Medicine, Clearing the Smoke: Assessing the Science Base for Tobacco Harm Reduction) (K. Stratton, et al., eds., National Academy Press 2001). | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| 510 ¶ 2388. | The FTC noted in a 1976 report that "[t]he lower and lowered 'tar' and nicotine cigarettes have in the last year been the subject of an intensive promotional effort by cigarette manufacturers." Defendants' spending on the advertising and marketing of low tar cigarettes (*i.e.*, cigarettes yielding 15 mg. or less tar per the FTC Method) has been disproportionately high compared to their domestic market share. The FTC's report for 1997 revealed that for every single year from 1967 to 1992, Defendants' advertising and promotional spending for low tar cigarettes exceeded their domestic market share. According to one marketing expert, low tar cigarettes came to "substantially reshape and define the cigarette market," explaining that:<br><br>[T]he real "boom: time for these cigarettes is the late 1970s". In 1974, manufacturers devoted about 15% of their advertising and promotion dollars to these products. By 1979, this spending grew to 67%. At the time, the percent of sales represented by low tar was only 30%, so spending was disproportionately high on these "health reassurance" brands. These products, which accounted for less than 15% of cigarette sales in 1975 came to hold the majority of the market by 1981.<br><br>It was not until the mid-1990s that the percentage of sales made by low tar brands finally equaled the amount that Defendants were spending to promote them, which was about 70% of the industry total. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 510 ¶ 2389 | According to Dr. Henningfield, who among his many other credentials headed the National Institute of Drug Abuse from 1994 to 1996, smokers are not always familiar with the FTC rating of their cigarette, but are aware of whether their cigarettes are "light" cigarettes or "regular." There is little, if any, dispute that consumers believe that "light" cigarettes deliver less tar and nicotine than regular cigarettes, and that consumers believe that regular cigarettes are more hazardous than "light" cigarettes. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 510 ¶ 2390 | Relatively few people understand that smoking low tar or light cigarettes can be -and often is-just as dangerous as smoking full flavor cigarettes. A peer-reviewed, published study showed that 70% of low tar cigarette smokers believe that such cigarettes decrease one's daily intake of tar. (citing Kozlowski *et al.*, Smoker reactions to a "radio message" that Light cigarettes are as dangerous as regular cigarettes. *Nicotine & Tobacco Research,* Similarly, another study showed that approximately half of all respondents did not know how many light cigarettes would have to be smoked to get the same level of tar intake as from one full flavor cigarette. Fewer than 10% believed that it would be one light cigarette. (citing Kozlowski, L.T., Goldberg, M.E., Yost, B.A., White, E.L., Sweeney, C.T., Pillitteri, J.L. Smokers' misperceptions of light and ultra-light cigarettes may keep them smoking. *American Journal of Preventive Medicine,* ("Kozlowski, | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Goldberg, *et al.,* 1998")). | | | |
| 510 ¶ 2391 | Defendants have used this misperception to their advantage. A 1996 article in the American Journal of Public Health cited a 1993 Gallup survey in which 56% of smokers believed use of the term "low tar" conveyed relative safety compared to full-flavor cigarettes. The American Journal of Public Health article also cited a 1987 National Health Interview Survey finding that 46% of smokers of cigarettes with tar yields of 6 mg. or lower (per the FTC Method) believed they had reduced cancer risk compared with smokers of cigarettes with higher FTC tar yields. (2001 Institute of Medicine study stating "When filtered and low-yield cigarettes were introduced into U.S. markets, they were heavily promoted and marketed with both explicit and implicit claims of reducing the risk of smoking. Even as data accumulated, albeit slowly, that these products did not result in much-if any-decrease in risk, consumers have continued to believe otherwise.... Consumer misunderstanding is explained in part by the ways in which these products are marketed.... [T]he tobacco companies have appealed to health concerns of smokers at least since 1927. Claims about tar and nicotine levels appeared as early as 1942"). | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 511 ¶ 2392 | Defendants continue to disseminate false and misleading public statements regarding their true intent in marketing low tar cigarettes. For example, Defendants Philip Morris, RJR, B & W, and Lorillard jointly stated to the FTC in February 1998: "The manufacturers do not claim that lower-yield cigarettes are 'safe' or are 'safer' than higher yield cigarettes." Comments of Philip Morris Inc., RJR Tobacco Co., Brown & Williamson Tobacco Corp., and Lorillard Tobacco Co. on the Proposal Titled FTC <u>Cigarette Testing Methodology Request for Public Comment (62 Fed.Reg. 48,158)</u> | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 511 ¶ 2393 | Defendants have publicly committed to refrain from marketing with implied health claims. In April 1964, the Cigarette Company Defendants adopted the Cigarette Advertising and Promotion Code ("Code"), which includes provisions prohibiting "advertising which makes a representation with respect to health." The Cigarette Company Defendants have claimed publicly that they have obeyed and continue to obey the 1964 Code, last revised in December 1990. Krugman WD, 164:6-21. Each cigarette company Defendant continues to state on its website and in other public statements that it has adopted the Code and that it follows the Code in planning and executing its cigarette marketing. *See* Section V(F)(7)(a)((1)) regarding the total lack of enforcement of the Code. More recently, Defendants agreed in the 1998 Master Settlement Agreement not to make "anymaterial misrepresentation of fact regarding the health consequences of using any tobacco product." Section III(r) of the Agreement states: | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Prohibition on Material Misrepresentations. No Participating Manufacturer may make any material misrepresentation of fact regarding the health consequences of using any Tobacco Product, including any tobacco additives, filters, paper or other ingredients. | | | |
| 511 ¶ 2394 | Defendants also told the FTC in their 1998 testimony: "Smokers are familiar with the ratings produced by the current test method, and continued use of the current test method assures historical continuity of the data. For these reasons, testing under the current FTC test method should continue | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 511 ¶ 2395 | In response to the FTC's question regarding the need for official guidance on brand descriptors, Defendants stated: "The manufacturers are not convinced that there is a need for official guidance with respect to the terms used in marketing lower rated cigarettes." As to terms, such as "light" and "ultra light," "[t]he manufacturers believe smokers understand that these descriptors are terms of comparison rather than signifiers of absolute value." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 512 ¶ 2396 | In response to the following FTC query:<br><br>What data, evidence, or other relevant information on consumer interpretation and understanding of terms such as "ultra low tar," "ultra light," "low tar," "light," "medium," "extra light," and "ultima," as used in the context of cigarettes exists? Do consumers believe they will get significantly less tar from cigarettes described as "light" or "low tar" than from regular full flavor cigarettes, and do they believe they will get significantly less tar from cigarettes described as "ultra low tar" or "ultra light" than from "light" or "low tar" cigarettes? Do the brand descriptors convey implied health claims?<br><br>Defendants Philip Morris, RJR, B & W, and Lorillard jointly stated in their joint comments to the FTC:<br>The manufacturers believe that consumers choose "light" or "ultra" products for a variety of reasons, including lighter flavor, lighter taste, less menthol (or other flavor) taste, and smoother smoking characteristics. Some consumers may choose such products for other reasons. The manufacturers do not intend the descriptors to convey any level of 'safety' with regard to their products.<br><br>Defendants' joint comments further stated: "The manufacturers are not aware of evidence that consumers use descriptors in lieu of the FTC numbers as their primary source of information about the 'tar' and nicotine yields of different brand styles." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment. | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 512 ¶ 2397 | In response to the FTC's question: | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | What available evidence exists concerning how consumers view cigarettes with relatively low tar and nicotine ratings and their perception of the relative risks of smoking such cigarettes rather than full flavor cigarettes?<br><br>Defendants Philip Morris, RJR, B & W, and Lorillard jointly stated:<br>The manufacturers are unaware of evidence concerning such consumer views and perceptions except to the extent that such evidence is presented in [the National Cancer Institute's Smoking and Tobacco Control Monograph No. 7]. | Intent to defraud or deceive | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 512 ¶ 2398 | Defendants' testimony to the FTC fails to make any reference to the vast amounts of consumer research Defendants conducted, and had conducted for them by their numerous advertising and marketing consultants, that expressly found that many consumers strongly disliked the taste of low tar cigarettes, but were smoking them because they believed they were healthier for them. (November 29, 1994 submission to the National Cancer Institute on behalf of B & W, American Tobacco, Lorillard, and Liggett contending that smokers use FTC tar and nicotine ratings primarily for information relating to taste considerations, referring to what Defendants called "the well-established significance of the FTC's machine-determined yields for comparing the flavor, richness and satisfaction of different brands of cigarettes," and predicting that if modifications to the FTC Method occurred, "[c]onsumers ... would be deprived of important information about the flavor, taste and feel of cigarettes -information consumers consider to be highly relevant in distinguishing among" brands). | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 513 ¶ 2399 | As detailed below, Defendants' public statements about low tar cigarettes on their websites, the statements of their executives, and their internal documents are false and misleading. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **a. Philip Morris**<br>**(1) Philip Morris's Low Tar Cigarette Marketing Techniques** | | | |
| 513 ¶ 2400 | Over the last 50 years Philip Morris has used a variety of marketing techniques to reassure smokers that certain brands and types of cigarettes would reduce their health risk from smoking by reducing their exposure to tar. Philip Morris advertisements in the early 1950s made explicit claims of reduced harm, such as the following:<br><br>1952: "If, like millions today, you are turning to filter cigarettes for pleasure plus protection ... it's important that you know the Parliament Story."<br><br>1952: "Parliament's exclusive Filter Mouthpiece gives you the important extra protection of the | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | Parliament 'Safety-Zone' Construction.... As the irritants, brown tars and colorless nicotine are trapped, they remain where they belong-in the recessed filter, completely out of contact with your lips." <br><br> 1954: "You're *So Smart* to Smoke Parliaments." (1956 Parliament advertisement in Sports Illustrated magazine noting same). <br><br> 1954: "The cigarette that takes the FEAR out of smoking!" | | | |
| 513 ¶ 2401 | In addition to making explicit health claims, since the 1970s Philip Morris has used brand descriptors such as "light" and "ultra light" to communicate that certain brands of cigarettes are low in tar and nicotine. James Morgan, who was Brand Manager of Marlboro from 1969 to 1972, during the time when Philip Morris introduced Marlboro Lights, its first "light" cigarette, explained the intended meaning of the "lights" descriptor. Morgan stated that, from the very beginning, the "lights" descriptor was intended to communicate that the brand was low in tar-as opposed to a brand that was lighter in taste: <br><br> From the very beginning the phrase, "Lowered tar and nicotine" was going to be on the package [of Marlboro Lights]. That was the phrase that described to the consumer what the product was in our judgment.... We felt the brand name, Marlboro Lights, was a real help in terms of the description of the product being low in tar and nicotine which appeared on the pack from the inception of the project.... We are not talking, in my judgment, talking about light ... as a taste. It's not a term that means anything in terms of taste, and the name Marlboro Lights as I said before, a word which we feel has appeal in a different sense than suggesting what the cigarette even tastes like.... It was our desire in this entire Marlboro Lights brand project to constantly position Marlboro Lights as being-as having lower tar and nicotine from Marlboro [Reds]. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 513 ¶ 2402 | According to Morgan, Philip Morris made a calculated decision to use the phrase "lower tar and nicotine" even though its own marketing research indicated that consumers interpreted that phrase as meaning that the cigarettes not only contained comparatively less tar and nicotine, but also that they were a healthier option. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 514 ¶ 2403 | Morgan, who later became CEO of Philip Morris, further explained in 2002 that rather than relying on the tar and nicotine numbers from the FTC Method, "the major influence in people's perceptions in the tar of a cigarette would have come from the marketing positioning of a brand as opposed to people literally reading the FTC [tar and nicotine figures]." Morgan also stated that, <br><br> if you took the advertising, the point of sale, whatever may have been said on the racks or the | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | cartons, the whole panoply of what the consumer saw about a cigarette brand would be more influential in that consumer's perception of the tar of that brand ... than the fact that they may or may not have sat down and looked at a newspaper that had the latest Federal Trade Commission report.<br><br>Part of the image that Philip Morris was marketing was the concept of lowered tar and nicotine. | | | |
| 514 ¶ 2404 | 2404. Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, echoed these views:<br><br>Philip Morris aims its low tar cigarette marketing at least in part at smokers of regular cigarettes who are concerned about the amount of tar they are inhaling and want to reduce it.... Philip Morris was aware that consumers understood the "lights" brand descriptor from its advertising and marketing pieces to be equated with low tar. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 514 ¶ 2405 | In or around 1995, Philip Morris considered changing the name of Merit to Merit Lights, because "Philip Morris was concerned that consumer research showed that Merit marketing no longer effectively conveyed to consumers that Merit was low in tar." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 514 ¶ 2406 | This contemplated name change is documented in a June 23, 1995 internal Philip Morris memorandum, titled "Merit 'Filter' vs. 'Lights' Test-Research Proposal," from Lauren Schwed, Philip Morris Analyst, to Jodi Sansone, then Brand Manager for Merit at Philip Morris USA, and Rebecca Gordon, a Philip Morris USA Assistant Brand Manager under Sansone. The memorandum described the motivation behind an attached consumer research study as follows:<br><br>Merit is considering changing the name on the Parent pack from "Filter" to "Lights" in order to clarify the tar level of the cigarette. There is a thought that changing the wording on the pack to replace the word "Filter" with the word "Lights" would help clarify what the true tar level is for Merit Parent. However, there is some concern that changing the name to "Lights" could possibly detract from the brand's flavor heritage. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment. | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 514 ¶ 2407 | In a memorandum dated November 27, 1995, Shari Teitelbaum, a consumer researcher for Philip Morris, summarized the results of the "Merit 'Filter' vs 'Lights'-Final Report" for Sansone. Teitelbaum noted that the name change affected Merit smokers' perceptions: "Before tasting the cigarette, Merit smokers seemed to think that Merit Lights was lower in tar than Merit Filter." Teitelbaum noted that changing the name to Merit Lights caused one third of current Merit smokers to "alter their perception of  Merit in terms of taste and tar level." The study also confirmed Philip Morris's fear that changing the name to Merit Lights would imply a poor-tasting cigarette: for current Merit smokers, "[t]he name change did seem to have a significantly adverse | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | impact on perceptions of the brand's taste." | | | |
| 515 ¶ 2408 | Philip Morris did finally change the name of Merit Filters to Merit Lights, even though there was no difference in the cigarette. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 515 ¶ 2409 | Similarly, Philip Morris marketed a 15 mg. cigarette as both Virginia Slims and Virginia Slims Lights. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 515 ¶ 2410 | Jeanne Bonhomme verified that Philip Morris has known for years from its consumer research that some smokers "interpret brand descriptors as communicating a less hazardous cigarette than full-flavor brands." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 515 ¶ 2411 | In an October 21, 1994 memorandum, titled "Marlboro Medium Smoker Image Study," Marian Halpern, an employee in the Philip Morris consumer marketing research department, reported to Tom Keim, a Philip Morris brand manager, that the "Reasons for Smoking Medium" were as follows:<br><br>Most smokers said they chose Medium because of its perceived health benefit. Over half of the Medium smokers said they started smoking Medium because they wanted a cigarette with lower tar and nicotine (56%). For many respondents, the name "Medium" communicated information on this product feature, with almost one quarter (24%) of these smokers saying that 'Medium' refers to the cigarette's lower tar and nicotine. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 515 ¶ 2412 | Philip Morris tries to create marketing pieces that communicate certain brands are low in tar, not just with words like the "lights" brand descriptors, but also with the imagery they present to consumers, such as the color it selects for the cigarette pack and tipping paper. When packaging decisions are made at Philip Morris, it is recognized that the color influences peoples' perception of the strength and tar level of the product. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 515 ¶ 2413 | For example, Philip Morris knows that consumers perceive a blue cigarette pack and white tipping paper as an indication that a cigarette is low in tar, and that generally speaking, the lighter the cigarette package color, the lower its tar content is perceived to be by consumers. Philip Morris continues to this day to market and sell Marlboro Lights and Marlboro Ultra Lights with lighter color packaging and tipping paper. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 515 ¶ 2414 | Nancy Brennan-Lund, Philip Morris Senior VP of Marketing, confirmed that, in order to | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | communicate low tar in cigarettes, Philip Morris USA has used a "lighter, more white background" and a "white filter as opposed to a cork colored filter." Susan Norris, Marlboro Brand Manager from 1995-1999, also noted that, in her experience, colors such as silver and light blue communicate to consumers that a cigarette is an ultra light brand. | Conspiratorial Agreement; Intent to defraud or deceive | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 515 ¶ 2415 | Over the last five decades, Philip Morris has conducted extensive consumer research to perfect the delivery of its "light" and low tar cigarette brand marketing message to ensure it provided smokers with health reassurance and offered an alternative to quitting. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 516 ¶ 2416 | *Marlboro Lights.* With respect to Marlboro Lights, Philip Morris designs the packaging to distinguish it from Marlboro Red and communicate to consumers that it provides "the best of both worlds,"-low tar and good taste. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 516 ¶ 2417 | A November 15, 1971 "Philip Morris U.S.A. Inter-Office Correspondence" to James Morgan from the Philip Morris USA Marketing Research Department set forth results of a Philip Morris consumer study on Marlboro Lights. Under the heading "Advertising Awareness," the report stated that "[l]ow tar and nicotine remained the most frequently mentioned comment." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 516 ¶ 2418 | A December 1971 Marlboro Lights "Product Promotion Plan" distributed to the Philip Morris sales force discussed the introduction of Marlboro Lights and ways to market and maximize sales of the brand. It stated:<br><br>The introduction of Marlboro Lights is a very timely move on the part of your company. The consumer is becoming increasingly aware of tar and nicotine contents in cigarettes and many are searching for one with low tar and nicotine content and full flavor. Marlboro Lights fill this need. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 516 ¶ 2419 | A retrospective Philip Morris document dated September 1991, titled "Background Information on PM Brands," stated:<br><br>To capitalize on the booming low tar market, Marlboro Lights was introduced in 1972. It became the first successful low tar line extension in the industry ... Marlboro further broadened its appeal to low tar smokers with the addition of Marlboro Lights 100's in 1978, Marlboro Lights King Size Flip-Top Box in 1980 and Marlboro Lights 100's Flip-Top Box in 1984. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 516 ¶ 2420 | James Morgan, former President and CEO of Philip Morris USA, confirmed that Marlboro Lights were positioned as "lower in tar and lighter in taste than Marlboro Red" and were marketed to people seeking a low tar and nicotine cigarette, including smokers of both high and low tar cigarettes. A 1974-1975 Philip Morris magazine advertisement for Marlboro Lights stated: | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | "Marlboro Lights. The spirit of a Marlboro in a low tar cigarette." Philip Morris has used the phrases "lowered tar and nicotine" and "Lights" in association with Marlboro Lights for over 30 years. | | | |
| 516 ¶ 2421 | A May 31, 1988 Philip Morris USA Marketing Research Department report from Philip Morris's primary advertising agency, Leo Burnett, and Philip Morris consumer researchers Karen Eisen and Jeanne Bonhomme, recited focus group results and stating that "many felt that Marlboro Lights was gaining in favor because of health concerns." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 516 ¶ 2422 | *Benson & Hedges.* A 1974-1975 advertisement for Philip Morris's Benson & Hedges Multifilter brand stated: "Today people not only want a great tasting cigarette, but one that's low in 'tar' and nicotine. Nothing's simple anymore ... [w]e've managed to lower the 'tar' and nicotine and still give you a cigarette with full rich flavor for you to enjoy." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 517 ¶ 2423 | A September 1991 Philip Morris document, titled "Background Information on PM Brands," stated: <br> Benson & Hedges 100's Lights and Lights Menthol were introduced in 1977 in response to consumer preference for a milder, lower tar cigarette ... today Benson & Hedges is among the leading low tar cigarettes. In mid-1982, Benson & Hedges Deluxe Ultra Lights was launched to take advantage of dynamic growth in both the 100mm and ultra low tar markets. The regular and menthol packings, both at 5mg tar, were instant successes. Fueled by distinctive packaging and taste richer than that of other ultra low (hence the ad slogan "rich enough to be called deluxe"), Deluxe Ultra Lights is a major contributor to the image and sales strength of Benson & Hedges. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 517 ¶ 2424 | *Cambridge.* Tom Goodale's handwritten notes from an October 15, 1979 meeting, the regular "new products" meeting of Philip Morris scientists, reflect Philip Morris's plan to create an impression in consumers' minds of Cambridge as being extremely low in tar. The plan was to introduce Cambridge with a tar level below the then-lowest FTC tar brand sold-Carlton-and then to raise the tar level over time. The notes reveal, under the heading Project Trinity (Cambridge's project name prior to commercial introduction), "Hit mkt [market] below Carlton tar-afterwards can drift higher." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 517 ¶ 2425 | According to Dr. Farone, former Director of Applied Research at Philip Morris USA, based on his participation in numerous monthly meetings in 1979 relating to Cambridge: <br><br> The long-range plan [for marketing Cambridge] was to introduce the product as a low tar product and then eventually to increase the tar of the product.... [I]t was anticipated that the product would not sell very well at that low tar and eventually they would increase the tar, and having sold it as a low tar product people still would think of it as a low tar product. In my view, and | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | from my experience, the lowest yielding version of many brands, including the original Cambridge, but also B & W's Carlton, RJR's NOW, etc., were created to give the brands a lowest tar image, while the sales are in the higher tar and nicotine versions of those brands. Those lowest yield versions of the brand are very hard to find in stores. | | | |
| 517 ¶ 2426 | In 1979, Philip Morris promoted Cambridge as a low tar brand yielding 0.0 mg tar (less than 0.1 mg tar) on the FTC test. The 0.0 mg tar Cambridge cigarette was removed from the market and replaced by Cambridge light and ultra light brands, all of which had considerably more tar than the original Cambridge cigarette. Dr. Farone made it clear that:<br><br>The plan all along was to deceive the public into thinking that the Cambridge Light cigarette was a low tar cigarette, when in fact it was not ... the trend to increasing tar deliveries in the product is very clear and there is no advertising that says that such increases are being made. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 518 ¶ 2427 | Dr. Farone explained that "Philip Morris never even bothered to consumer test the 0.0 mg [Cambridge] version against the similar variant of Carlton and this is a major piece of evidence that they had no plans to keep it on the market." A September 20, 1979 Philip Morris memorandum, titled "Project Trinity," states that with respect to the 0.0 mg tar version of Cambridge: "Consumer testing is not required for this model." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 518 ¶ 2428. | Nancy Brennan-Lund, Senior Vice President of Marketing at Philip Morris, admitted that Cambridge Lights had more tar and nicotine than the original Cambridge. She further admitted that, as the tar and nicotine numbers were not identified on the packs of Cambridge Lights cigarettes, the only way consumers could possibly know that Cambridge Lights had more tar than Cambridge regular was by a perceived taste difference. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichmen | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 518 ¶ 2429 | *Merit.*In 1976, Philip Morris introduced a new brand, Merit, at 9 milligrams tar with "enriched flavor." Merit formed the basis for line extensions to Merit Ultra at 4 milligrams and later Merit Ultima at 1 milligram. The three were jointly advertised in a "low, lower, lowest" presentation of the product line. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment, | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 518 ¶ 2430 | Philip Morris's marketing for some of its low tar cigarette brands, including Merit, "encouraged consumers [whom Philip Morris referred to as potential 'down-switchers'] to switch from regular cigarettes to low tar cigarettes." Historically, "Philip Morris targeted potential down-switchers with its marketing for Merit," and "Merit [consumer] research is used to target potential down-switchers." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 518 ¶ 2431 | Philip Morris's marketing for Merit cigarettes targeted "self-conscious" and "uncomfortable" smokers. A Philip Morris memorandum, titled "The Uncomfortable Merit Smoker," dated January 6, 1993, stated: " 'Self-conscious' smokers are defined as people who are uneasy with their status as smokers. They see smoking as a sign of personal weakness and are starting to feel ashamed that | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | they smoke." | | | |
| 518 ¶ 2432 | According to Suzanne LeVan, Philip Morris Vice-President of Premium Brands from 1991-2001 with responsibility for Merit, "the Merit strategy is to convince smokers who are switching down [in tar levels] and who are looking for a good tasting cigarette that Merit is a brand that they should try." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 518 ¶ 2433 | According to a retrospective Philip Morris document dated September 1991 and titled "Background Information on PM Brands," the "Benefits Statement" of Merit was: "You'll enjoy low tar and good flavor with Merit." "At only 7 mg. of tar, Merit delivers the rich flavor of leading cigarettes with twice the tar." "With Merit Menthol you get rich menthol flavor at only 8 mg tar." The document indicated that Merit Ultra Lights and Merit Ultra Lights 100's were introduced in 1981. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 518 ¶ 2434. | Philip Morris's targeting strategy was recorded in a retrospective June 13, 1995 document from Leo Burnett-Philip Morris USA's long-time marketing agency-titled "Merit Advertising Overview Historical and Current for Jodi Sansone." Under the heading "Merit –Current 'You've Got Merit' Campaign," the document stated: "Strategy: Convince Self-conscious and uncomfortable smokers who want to switch to a low tar alternative but won't sacrifice taste completely,""With Merit, you can switch down to lower tar and still enjoy smoking,""Because: Merit delivers satisfying taste at every level of low tar." The document described the "Merit Brand Essence" as follows: "Since the brand's introduction twenty years ago, the core Merit proposition has been low tar with good taste. Once a smoker has made the decision to switch to a lower tar product, they are faced with the challenge of finding one that delivers on taste. Merit offers a positive solution-they *can* switch down to lower tar and still get satisfying taste." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 519 ¶ 2435 | Philip Morris's strategy for Merit was successful. Norma Suter Drew, Philip Morris Vice President for Portfolio Brands and former Brand Manager and Marketing Director for Merit cigarettes from 1992-1994, delivered a July 1993 presentation, titled "Merit Franchise," in which she reported that "Merit is a brand smokers switch to in order to reduce tar/nicotine." Elsewhere in the presentation, Drew wrote that one of the top two "Goals" for Merit advertising was to achieve a "[s]ignificant increase in Merit's highest brand image statement, 'Are among the lowest in tar/nicotine', versus Carlton and Now."The presentation also noted that "70% of industry switching is between tar levels." Under the heading "Merit Advertising," the presentation noted that "Merit smokers tell us that they come to the franchise because they desire a lower tar cigarette that still tastes good - switching down makes them feel better about the fact that they smoke." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 519 ¶ 2436 | The following Merit advertisements, in conformity with the internal marketing documents detailed above, communicated to consumers that, with Merit, they could reduce their tar intake | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | and thus reduce their health risk, without sacrificing taste:<br><br>1976: "New Low Tar Entry Packs Taste of Cigarettes Having 60% More Tar<br><br>1976: "The greatest challenge to cigarette-makers in the last two decades has been how to make a low tar cigarette that wasn't 'low'; in taste. It seemed impossible. *Until now.* After twelve long, hard, often frustrating years, Philip Morris has developed the way to do it. The cigarette is called MERIT. It delivers only 9 mg. tar. One of the lowest tar levels in smoking today<br><br>1977: "New MERIT 100's. Only 12 mg. of tar. Yet packed with extra flavor. The kind of flavor that makes 'low tar, good taste' a reality for 100's smokers<br><br>1978: "Merit Solving Smoker Dilemma."<br><br>1978: " 'Best Move Yet.' MERIT['s] .... ability to satisfy over long periods of time could be the most important evidence to date that MERIT is what it claims to be: The first real alternative for high tar smokers."<br><br>1978: "Research concludes MERIT taste makes move from high tar to low tar smoking unexpectedly easy<br><br>1988: "You Won't Miss What You'll Miss."<br><br>1988: "Our Less Is Your Gain."<br><br>1989: "Smoke This Page. If That Reminds You of Your Ultra Lights, Read This Ad."(no bates) (U.S. 8711).<br><br>1994: "You can do it! You really can switch down to lower tar and enjoy satisfying taste."<br><br>1994: "Yes you can! You *can* switch down to lower tar and still get satisfying taste. You've got MERIT | Intent to defraud or deceive | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 520 ¶ 2437 | A September 16, 1987 Leo Burnett U.S.A. research report for Philip Morris, titled "Merit Brand Image Study," noted in the section "Attitudes Toward Smoking" that "[w]hile health concerns are | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | motivating factor, taste/enjoyment are still key." A summary at the end of the report stated: "Merit smokers we sampled are committed smokers ... However, they have mixed feelings about smoking-health concerns/loss of control ..." and their switching to Merit "provides health reassurance." | Intent to defraud or deceive | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 520 ¶ 2438 | A January 1991 document, titled "Merit Positioning Study," assessed "perceptions of Merit's positioning within the low tar category." Under the heading "What Down Switchers want in a cigarette," the document noted that approximately half of downswitchers found "very low tar" (50%) and "very low nicotine" (48%) to be "absolutely essential." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 520 ¶ 2439 | Consumer feedback confirmed the successful delivery of Philip Morris's intended message. An August 1991 report prepared for Philip Morris, titled "Merit Positioning Strategy Development," observed that, "[i]n addition to advantages associated with lesser tar and nicotine delivery, low tar users note that such brands allow higher volume, deeper inhalation smoking with few tradeoffs." The report also commented that Ultra Light users "note their further downswitching to ultralights from lights for health benefits primarily." The report noted that Merit users "like perceiving [Merit cigarettes] as rather safe, sensible, middle-of-the-road, non-threatening, and generating the feeling that they aren't doing anything wrong." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 520 ¶ 2440 | An internal Philip Morris memorandum dated May 16, 1995 from Lauren Herman, an employee in the market information and planning group, to Norma Suter Drew, then acting Brand Manager for Merit cigarettes, titled "Merit Alternative Campaign Qualitative Exploratory-Final Report," discussed the results of research conducted to gauge consumer interest and appeal of Merit marketing campaigns. Under the heading "Key Findings," Herman reported that "Competitive smokers appear to be most likely to respond to the concepts that offer the clearest product cues. These smokers require the most rational reason why they should smoke Merit, (e.g. lower tar)." Under the heading "Implications," Herman recommended that "[s]ince low tar is essentially the core of these alternative concepts, the low tar message should be more pronounced." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 521 ¶ 2441 | A September 4, 1996 Leo Burnett document reported on an August 27, 1996 meeting held in New York between Leo Burnett and Philip Morris (Jose de Castro, Suzanne LeVan, and Jodi Sansone) to discuss Merit marketing for 1997. The document acknowledged that past Merit marketing focused more heavily on communicating that it is low in tar, and less on sending a message about the brand's taste. Under the heading "Discussion/Agreements Reached," the document stated: "Client/agency agreed that we need to move the bar forward in terms of taste communication, as currently it is not as recognizable/prominent as low tar in Merit awareness ratings, yet it is a key driver of consumer choice/purchase." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 521 ¶ 2442 | A February 9, 1998 draft research report prepared for Philip Morris by the research firm Kane, Bortree & Associates, titled "Merit Strategic Revitalization Plan, Stage I Learnings," analyzed | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | ways to "build Merit's share of the low tar segment." 2063687348-7527 at 7350, 73537356 (U.S. 39820*); *see also* 2063686921-6942 at 6934 (U.S. 88629) ("Kane Bortree makes use of a variety of innovative, psychologically derived techniques. These techniques allow us to get inside the consumers' heads"). The 1998 report discussed two types of low tar smokers who find the taste of light cigarettes unsatisfying and do not feel comfortable smoking: "Quitters" and "Validation Seekers." The report cited Merit Ultima, Merit Ultra Lights, Camel Lights, and Marlboro Ultra Lights as brands for those who do not feel comfortable smoking. | Intent to defraud or deceive | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 521 ¶ 2443 | The February 1998 draft research report was followed by a March 31, 1998 draft report by Kane, Bortree & Associates, titled "Merit Strategic Revitalization Plan, Stage II Learnings/Stage III Recommendations." Under the heading "Positioning Learnings to Date," the March report noted that " 'Light' is a bigger promise than low-tar with opportunity for broad appeal" because it conveys "Tastes light," "Feels light," "Low tar," and "Better for you." The report recommended that Merit's "positioning should convey acceptability of smoking." The report further discussed a contemplated "Additive Free" Merit line extension, and noted that: "Additive-free is an excellent fit with 'light' " because it "[r]einforces 'better for you.' " | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 521 ¶ 2444 | A May 14, 1998 internal Philip Morris document, titled "Merit Brand Initiatives," incorporated the findings of the March 31, 1998 Kane, Bortree & Associates study, recreating that study's representation of the four segments of the lights market and stated, under the heading "Merit Strategic Positioning Copy Strategy": "What we would like smokers to believe-Merit offers a viable alternative to Light brands with full flavor heritage." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 521 ¶ 2445 | *Marlboro Ultra Lights.* A June 1979 draft report prepared for Philip Morris by Goldstein/Krall Marketing Resources, Inc., titled "Smokers' Reactions to an Ultra Light Brand Extension for Marlboro," discloses that Philip Morris began conducting consumer marketing research on a new cigarette line extension of the Marlboro brand, Marlboro Ultra Lights, as early as 1979. Discussing the reactions of Marlboro Red smokers to the concept of Marlboro Ultra Lights, the report stated:<br><br>The introduction of a Marlboro Ultra Light brand appeared to be viewed in the following manner:<br>... An attempt to produce a safer cigarette for those interested in cutting down their smoking and in a lighter cigarette.... A "smart" way to prevent the loss of or switching of Marlboro smokers to other brands if they are currently unsatisfied in their quest for a lighter/safer cigarette. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment. | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 522 ¶ 2446 | Under the heading "How Marlboro Ultra Lights Were Positioned," the report stated: The following is a description of a brand image developed from the discussions [with consumers] in all three groups: ... Safer cigarette-less tar and nicotine.... Probably a "better/innovative filter." The report further stated: "With regard to smoker image, respondents suggested: ... People cutting | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | down for health reasons/people trying to quit. More concerned people (about health). More aware people (those reading the numbers in the ads)." | | | |
| 522 ¶ 2447 | On May 1, 1989, Philip Morris began test marketing Marlboro Ultra Lights, which it positioned as delivering 6 mg. of tar (per the FTC Method). In a February 8, 1989 internal Philip Morris memorandum, Richard Camisa delivered to colleagues at Philip Morris the "Marlboro Ultra Lights Marketing Plan Overview." The overview set forth the target audience for Marlboro Ultra Lights, noting that<br><br>[c]onsumer research suggests that there are vast numbers of smokers, including Marlboro smokers, who are seeking lower tar but who are also unwilling to sacrifice flavor and/or smoking satisfaction in return. The opportunity for Marlboro lies in its ability to offer smokers the lower tar they seek with less trade off in taste. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 522 ¶ 2448 | The document further stated: "A blue/gray pack with white tipping ... provides traditional ultra low tar reassurance." Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, confirmed that "low tar reassurance," as used in the document, referred to the fact that:<br><br>Within the context of selecting a pack color for Marlboro Ultra Lights there was discussion about what pack color would make it readily apparent that the brand was an ultra low tar. Many of the lights and low tar products used blue packaging as a signal of being lower tar, so there were discussions about making sure that advertising and packaging easily communicated that Marlboro Ultra Lights was an ultra low tar. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 522 ¶ 2449 | Philip Morris conducted research to determine how cigarette pack and tipping color influenced consumer perceptions of Marlboro Ultra Lights' strength and tar level. In a June 25, 1990 memorandum from Jeanne Bonhomme, then a contract consumer marketing researcher for Philip Morris, to Richard Camisa, titled "Marlboro Ultra Lights Portfolio Test," Bonhomme reported the results of a cigarette ad pack test conducted on consumers for Marlboro Ultra Lights. Bonhomme reported that for consumers tested, "[p]redictably, expectations about [Marlboro Ultra Lights'] strength and tar level were influenced by the pack and tipping color. Red/Cork was viewed as being strongest tasting and higher in tar than the two white tipped options, particularly Blue/White." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2450 | Marlboro Ultra Lights was launched nationally on January 28, 1998, and Philip Morris continues to market and sell Marlboro Ultra Lights to this day. Philip Morris targeted all Marlboro smokers with Marlboro Ultra Lights, not just current low tar smokers. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2451 | *Marlboro Medium.* In June 1991, Philip Morris launched Marlboro Medium, a lower tar line | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | extension of the Marlboro brand. A September 1991 Philip Morris document, titled "Background Information on PM Brands," stated that Marlboro Medium was aimed at "consumers still looking for a satisfying low tar cigarette with flavor." | Conspiratorial Agreement; Intent to defraud or deceive | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2452 | Philip Morris's November 1994 continuous smoker tracking survey (a random smoker phone survey Philip Morris has conducted continuously since the 1980s) discusses Philip Morris's targeting of health-conscious smokers. The document stated that male smokers of Marlboro Medium age 18-24 "need affirmation as smokers" and may be candidates for ultra lights. In this survey, Philip Morris created a profile of 18-24 year old male Marlboro Flavor Low (Marlboro Medium) smokers as individuals who are less comfortable with smoking, feel pressure to quit, and do not enjoy some of the "image benefits" to the same degree as other smokers. The Marlboro Flavor Low (Marlboro Medium) male smokers age 18-24 are more likely to cite the low tar level as influential in determining their regular brand. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2453 | An internal February 10, 1995 Philip Morris memorandum from Marian Wood to Tom Keim, titled "Marlboro Medium Brand Imagery," revealed that in 1991, Philip Morris spent $50 million on advertising for Marlboro Medium, 36% of Marlboro's total advertising budget for that year. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2454 | Philip Morris continues to sell Marlboro Medium. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2455 | *Parliament.*Philip Morris marketed the Parliament brand as a low tar brand featuring a "recessed" filter. A Philip Morris document, titled "Background Information on PM Brands," dated September 1991, stated:<br><br>It was during the proliferation of filtered cigarettes in the 1950's that Philip Morris gave Parliament its hallmark of today-the recessed filter. Unlike ordinary filter tip cigarettes, Parliament's famous recessed filter kept tar from touching the smoker's lips. Since the addition of this unique filter, Parliament smokers have enjoyed their brand's approach to smoking: clean, sophisticated, and distinctive. In 1979, Parliament's name was changed to Parliament Lights. This change reflected the brand's low tar status and helped capitalize on a growing low tar trend.<br><br>A "Benefit Statement" in the document was: "Parliament Lights-since tar on the filter tip never touches your lips, the taste is refreshingly light." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2456 | A 1975 Parliament advertisement in Sports Illustrated magazine stated that, although cigarette | Scheme to Defraud, | Scheme to Defraud; | *United States v. Philip Morris USA* |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | holders gave "cleaner taste," there was "[n]o need for a cigarette holder today. Parliament's filter is recessed, so you taste only rich, clean tobacco flavor. It's the neatest trick in smoking." | Conspiratorial Agreement; Intent to defraud or deceive | Consumer Protection Action Violations; Unjust Enrichment | *Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 523 ¶ 2457 | A 1977 Parliament advertisement in Cosmopolitan magazine stated:<br><br>As you smoke, tar builds up on the tip of your cigarette filter. That's "filter feedback." Ordinary flush-tipped cigarettes put that tar build-up against your lips. And that's where Parliament has the advantage. Parliament's filter is recessed to keep tar buildup from touching your lips. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 524 ¶ 2458 | As noted in the 1981 FTC Report on cigarette advertising, Philip Morris's Parliament advertisements from the time period preceding the Report (*i.e.*, late 1970s-1981) implied that its "special filters minimize the risks of smoking." FTC, 1981 Report at 2-12 | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 524 ¶ 2459 | Jeanne Bonhomme observed that although the recessed nature of the filter did not further reduce the tar delivery or make the cigarette any less harmful, she could "recall learning that some consumers believed that a recessed filter produced a cigarette that was better for you because it reduced tar and less tar was perceived to be less of a health risk." A November 23, 1988 Philip Morris USA memorandum co-written by Bonhomme and Karen Eisen, with the subject heading "Parliament Super Lights In-Depths," confirmed that "[f]or many, the recessed filter implied a health benefit-'keeps tar away.'" | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **(2) Philip Morris's Research on the Low Tar Cigarette Category** | | | |
| 524 ¶ 2460 | Internal Philip Morris documents show that Philip Morris conducted consumer marketing research not just on individual low tar cigarette brands, but on low tar cigarettes as a category. These documents establish that Philip Morris has long known and intended that its advertisements and marketing for low tar cigarettes, featuring claims of lowered tar and nicotine and "light" and "ultra light" brand descriptors, contributed to and reinforced consumers' mistaken belief that low tar cigarettes are better for their health, and encouraged consumers to smoke them for this reason. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 524 ¶ 2461 | According to Nancy Lund, Senior Vice President of Marketing at Philip Morris, Philip Morris was aware in the 1970s and 1980s that some consumers believed that light/low tar cigarettes were safer than full-flavored cigarettes. She also noted that, during this time period, Philip Morris marketed such cigarettes to these consumers and profited from those sales. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 524 ¶ 2462 | James Morgan, the former CEO of Philip Morris, acknowledged that the trend in the 1970s toward low tar cigarettes was due in large part to consumer perception that they were less hazardous to health than higher tar cigarettes, and specifically admitted that "the consumer was perceiving in the 1970s lower tar as tied to less hazardous." Although Morgan conceded that "we were aware of that," he admitted that, despite being armed with this knowledge, Philip Morris | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | took no additional steps to counter that mistaken perception. | | | |
| 524 ¶ 2463 | A May 1976 study prepared for Philip Morris by The Roper Organization, titled "A Study of Smokers' Habits and Attitudes With Special Emphasis on Low Tar Cigarettes," stated:<br><br>[T]his study shows that the smoking public is convinced that to the extent any brands are better for health, it is the low tar brands that are.... Low tar brand smokers cite as the most liked characteristic of their brand ... as compared with smokers of flavor filters, they say it is "better for your health" and cite its "more effective filter...." Brands Thought Better For Health-The low tar brands have cornered opinion that to the extent any brands are better for your health, they are.... Three in ten of all smokers said some brands were better for health than others, and almost half of the low tar brand smokers said this.... Furthermore, it is the lower tar content of these brands that make people say they are better for your health. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 525 ¶ 2464 | A January 1979 study prepared for Philip Morris stated:<br><br>These ultra low tar smokers indicated that they are aware of the low tar levels in their brands and that they switched to them specifically because of advertising calling this fact to their attention.... As lower and lower tar brands become available, it would appear smokers are subject to advertising pressure and brand availability, and the opportunity for switching obviously occurs.... Characteristics of ultra low tar smokers were: people who want to quit ... more interested in health.... When asked how they happened to switch to the brand they are now smoking many of the Carlton smokers cited advertising and tar and nicotine ratings.... When Carlton ads were shown in the groups, it was obvious that most respondents had seen them and were aware of the copy claims. It was these claims and other Carlton ads to which smokers referred prior to exposure and when discussing the fact that advertising had been one of the factors causing them to try the brand. This would seem to indicate that ultra low tar smokers are paying attention to and being attracted by the advertising. Respondents ... appeared to react favorably to the Triumph ads. They said that 3 mg. tar was within the ultra low tar range implying that it represented a safer cigarette. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 525 ¶ 2465 | A March 1979 report prepared for Philip Morris, titled "A Study of Smokers' Habits and Attitudes With Special Emphasis on Low Tar and Menthol Cigarettes," stated:<br><br>The appeal of low tars is simple and single-better for you, less harmful, easier on the lungs, throat, etc. The weakness or objection to low tars is also simple-tasteless, lacking in satisfaction, and the related factor of hard to draw on. At the same time there is clear evidence that if the appeal-safety-is strong enough, people can over time grow used to, and in some cases come to actually like, the | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | main objection to low tars-low taste. | | | |
| 525 ¶ 2466 | A June 1979 draft report prepared for Philip Morris by Goldstein/Krall Marketing Resources, Inc., titled "Smokers' Reactions to an Ultra Light Brand Extension for Marlboro," stated, under the heading "Awareness of Tar and Nicotine Levels": One of the points on which respondents were probed when first shown the array of packs used as stimuli was their awareness of tar and nicotine levels for the brands. While most smokers in the groups could not give correct tar figures for each brand, they seemed to know a general range in which brands fell.... Respondents attributed their knowledge ... to advertising. Evidently, the heavy weight of advertising concentrated against tar claims has penetrated these  various groups of smokers to some extent. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 526 ¶ 2467 | A July 27, 1987 Philip Morris Asia letter from Joe Tcheng to Cecil Yow stated: The mild/lights segment is the fastest growing segment in the Hong Kong market.... There is definitely a growing health consciousness in the market due to regular Government anti-smoking campaign.... Research shows that Lights = Mild = Less Harmful. Government's anti-smoking measures will intensify and ... [t]his may further increase health concern and it is very likely that the mild/lights segment will continue its rapid growth. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 526 ¶ 2468 | A 1990 Philip Morris transcript of a conversation between Richard Carchman, then Principal Scientist, and John Tindall acknowledged that Philip Morris had used filters and claims of low tar as health reassurance mechanisms and that cigarette sales were tied to health concerns. Tindall stated: [T]he things that happened in the market in the past I put under basically three groups. One has to do with people's health concerns which we addressed first through filters and then through low tar and ultra low tar.... The main thing that has happened in the market over which we have some control is that we have addressed peoples' health concerns through the number of steps I have mentioned .... the[re] are opportunities in the market now in the area of smoking and health. People's perceptions of cigarettes with regard to their effects on them.... [I]f we are going to do something significant enough to possibly even reverse the declining sales in the market, we're going to have to make advances in the area of people's health. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 526 ¶ 2469 | A 1990 Philip Morris document relating to "New Brand Development" in Pakistan revealed Philip Morris's knowledge that cigarette packaging can communicate "mildness" to consumers anxious about the "health/safety issue": | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | There was little doubt that the pack design with its reliance upon the central gold panel against a white background effectively projected the impression of a very mild cigarette.... The evidence as a whole seemed to indicate, in fact, that anxiety about the health safety issue had not yet reached the level where avowedly very mild cigarettes ... could expect an extensive franchise.... Over time, anxiety levels would rise, as they have done in other markets and when this happened mild/light brands ... would begin to achieve respectable sales. | | | |
| 526 ¶ 2470 | Philip Morris USA's 1992-1996 Strategic Plan for Research and Development stated, under the heading "Perceived Health Concerns," that: "An analysis of the cigarette market over the last 50 years suggests that there have been only two major influences on smokers buying patterns; namely smokers seeking to address their perceived health concerns and smokers seeking price relief." The document further stated:<br><br>The development of products which address perceived health concerns ... is very much an R & D issue. Previous product changes driven by "perceived health concerns" were the growth of filtered products from 3 to 70% of the market between 1945 and 1953, and the growth of the low tar segment to nearly 50% of the market by 1985.... Filtered cigarettes now make up over 96% of the market. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **(3) Philip Morris's Public Statements About Low Tar Cigarettes** | | | |
| 527 ¶ 2471 | Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, stated that to her knowledge:<br><br>• "Philip Morris has always denied publicly that it markets low tar cigarettes as safe or safer than full-flavor brands;" and<br><br>• "Philip Morris has always denied publicly that it uses brand descriptors such as 'light' and 'ultra light' to communicate they are safe or safer than full-flavor brands." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 527 ¶ 2472 | A November 14, 1994 fax from Censydiam USA to Philip Morris advised that with respect to the "Health & Fitness" trend: "Outside pressures have made consumers more concerned about health and fitness. They are interested in finding 'user friendly' ways of making their lives healthier without making dramatic changes in their current lifestyles." As examples of the consumer health trend, the document noted increased consumer interest in package labeling that included references to "low/no fat/salt" and "all natural," as well as an increase in the sale of products considered "good for you" such as fruits and vegetables. A 1994 Strategic Trend Analysis prepared for Philip Morris by Censydiam USA illustrating the "Health & Fitness" trend recognized how Defendants had capitalized on this trend, noting that: "Implications for Tobacco Companies: While the trend toward health and fitness is still alive, it has tapered off from its rage | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | in the 1980's. The 1990's focus on moderation. The importance of low/ultra low products should continue in the near future." | | | |
| 527 ¶ 2473 | Faxes dated November 17, 1994 and December 7, 1994 from Thomas R. Keen of the consumer research company Censydiam USA to Marian Halpern, an employee in the Philip Morris consumer marketing research department, described an agreement with Philip Morris whereby Censydiam would produce "write-ups" to Philip Morris on consumer "trends," including, among others, "Health & Fitness," "Delusions of Youth & Beauty," "Dieting Dilemma," and "Quality of Life." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 527 ¶ 2474 | In May 1996, representatives from Philip Morris, including Philip Morris General Counsel, Denise Keane, RJR, B & W, and Lorillard met with the FTC to discuss in part "how Philip Morris and other tobacco companies use FTC test results in their advertising," and "whether the FTC test method could be modified to more accurately reflect actual smoker intake." At that meeting, "the FTC referred to published research showing that smokers believe brand descriptors like 'low tar'and 'light' convey relative safety messages." The FTC requested that the industry representatives provide the FTC with "any information the companies had concerning the issue of consumer perception of low tar, so-called 'light' cigarettes." Despite the decades of consumer and marketing research conducted or commissioned by Philip Morris concerning consumers' interpretation of these terms (*see* Section V(E)(3)(a), *supra* ), Keane testified that "Philip Morris did not provide any such information" to the FTC. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 527 ¶ 2475 | A September 10, 1999 Davis Polk & Wardwell memorandum to Mark Berlind of Philip Morris includes "a series of questions that might arise, as well as possible answers, relating to low delivery cigarettes and brand descriptors." In answer to the question "If the brand descriptors do not indicate what smokers actually inhale or serve as a point of comparison among competing brands, what purpose do they serve?," the memorandum proposed responding that Philip Morris's brand descriptors do communicate that Philip Morris's lower tar brands deliver less tar and nicotine than full-flavor brands: "For example, the 'Lights' in Marlboro Lights indicates that the smoke yields for Marlboro Lights is lower than that for Marlboro, and Marlboro Ultra Lights delivers less smoke 'tar' and nicotine than Marlboro Lights." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 528 ¶ 2476 | This document's proposed response to the question whether "Philip Morris ever intend[ed] to or propose[d] to take advantage of" the "perception" of consumers that "lower-yielding brands [are] 'safe' or 'safer' than full-flavor brands" was that "Philip Morris has never intended [to] or proposed to take advantage of this perception. (although over time various individuals in the Company may have suggested that the Company do so)[.]" | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 528 ¶ 2477 | Following publication of the NCI's Monograph 13 in November 2001, ABC News.com requested information from Philip Morris regarding low tar cigarettes and, as stated in a November 26, 2001 | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | email from Philip Morris employee Christina Malito, "whether or not there are real health benefits to them." In an internal e-mail reply sent that same day, Ellen Merlo, then Senior Vice President of Corporate Affairs at Philip Morris and a decades-long Philip Morris employee, wrote that Philip Morris's response to the inquiry should be: "[W]e make no claims. Started producing them in response to consumer demand for lighter tasting cigarettes." | Intent to defraud or deceive | Violations; Unjust Enrichment | 1125 (D.C. Cir. 2009). |
| 528 ¶ 2478 | Merlo later stated:<br><br>[A]s far as Philip Morris's position publicly, we would advise people not to in any way infer that light or lighter cigarettes are any safer than full flavor cigarettes ... my communication, both through our website and in any public statements that I make, would be that the general public should not in any way infer that light or lighter means that that cigarette is safer than a full-flavor cigarette. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 528 ¶ 2479 | According to Nancy Brennan-Lund, then Senior Vice President of Marketing at Philip Morris USA, Philip Morris's use of the word "lights" in its marketing of low tar cigarettes is intended to mean a lighter tasting cigarette. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 528 ¶ 2480 | As recently as 2003 and 2004, the Board of Directors of Altria (formerly known as Philip Morris Companies), publicly made misleading statements to its shareholders and to the U.S. Securities and Exchange Commission ("SEC") in documents filed with the SEC. In a March 17, 2003 Proxy Statement, a group of Altria shareholders proposed to the Altria Board of Directors that "the Board find appropriate ways of informing our customers about the actual health risks of smoking 'light and ultra light' cigarettes to disassociate them from any belief that such products are safer and deliver less tar and nicotine." The shareholder proposal cited Monograph 13 which found that "most smokers believe 'Lights' and 'Ultra Lights' are less harsh and deliver less tar and nicotine," and that, "on average, smokers believe that Lights afford a 25% reduction in risk, and Ultra Lights a 33% reduction in risk;" the Canadian Government's conclusion that the terms low tar, light and ultra light are deceptive to the consumer; and the World Health Organization's recommendation that the terms light and ultra light be banned as misleading. The Board of Directors of Altria recommended that shareholders vote against this proposal, stating: "for those adults who choose to smoke, PM USA and PMI believe descriptors such as 'low-tar,' 'mild,' and 'light' serve as useful points of comparison for cigarette brands regarding characteristics such as strength of taste and reported tar yield." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 529 ¶ 2481 | In May 2004, Philip Morris placed the following statement on its website: "Philip Morris USA does not imply in its marketing, and smokers should not assume, that lower-yielding brands are safe or safer than full-flavor brands. There is no safe cigarette." (counsel for Defendants referring | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | to Philip Morris website and stating "we don't tell people that these cigarettes are safer." | | Enrichment | |
| 529 ¶ 2482 | Philip Morris further states on its website: Because smokers have varying preferences, Philip Morris USA offers products with differing yields of tar and nicotine, as measured by machine methods. We believe that it is appropriate to continue to differentiate our brands on this basis and that descriptors such as "lights," "ultra-lights," "medium" and "mild" help communicate these differences to adult smokers. (June 2003 Philip Morris website stating same and further stating "we believe that [low tar brand] descriptors serve as useful points of comparison for cigarette brands regarding characteristics such as strength of taste and reported tar yields ...") | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 529 ¶ 2483 | Similarly, on August 22, 2002, although Geoffrey Bible, former CEO of Philip Morris Companies, claimed he had never been presented with any data as to how consumers actually perceive brand descriptors, he testified that he believes that they "simply convey taste preferences." | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| | **6. Conclusions** | | | |
| 560 ¶ 2626 | The evidence set forth above overwhelmingly establishes the following facts. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1119, 1120, 1125 (D.C. Cir. 2009). |
| 560 ¶ 2627 | It is clear, based on their internal research documents, reports, memoranda, and letters, that Defendants have known for decades that there is no clear health benefit from smoking low tar/low nicotine cigarettes as opposed to conventional full-flavor cigarettes. It is also clear that while Defendants knew that the FTC Method for measuring tar and nicotine accurately compared the nicotine/tar percentages of different cigarettes, they also knew that that Method was totally unreliable for measuring the actual nicotine and tar any real-life smoker would absorb because it did not take into account the phenomenon of smoker compensation. Defendants also knew that many smokers were concerned and anxious about the health effects of smoking, that a significant percentage of those smokers were willing to trade flavor for reassurance that their brands carried lower health risks, and that many smokers who were concerned and anxious about the health risks from smoking would rely on the health claims made for low tar cigarettes as a reason, or excuse, for not quitting smoking. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009). |
| 560 ¶ 2628. | Despite this knowledge, Defendants extensively-and-successfully-marketed and promoted their low tar/light cigarettes as less harmful alternatives to full-flavor cigarettes. Moreover, Defendants opposed any changes in the FTC Method which would more accurately reflect the effects of | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust | *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009). |

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | compensation on the actual tar and nicotine received by smokers, denied that they were making any health claims for their low tar/light cigarettes, and claimed that their marketing for these cigarettes was based on smokers' preference for a "lighter," "cleaner" taste. | | Enrichment | |
| 561 ¶ 2629 | By engaging in this deception, Defendants dramatically increased their sales of low tar/light cigarettes, assuaged the fears of smokers about the health risks of smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095 (D.C. Cir. 2009). |
| | **H. At Various Times, Defendants Attempted to and Did Suppress and Conceal Scientific Research and Destroy Documents Relevant to Their Public and Litigation Positions** | | | |
| 801 ¶ 3863 | Defendants attempted to and, at times, did prevent/stop ongoing research, hide existing research, and destroy sensitive documents in order to protect their public positions on smoking and health, avoid or limit liability for smoking and health related claims in litigation, and prevent regulatory limitations on the cigarette industry. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment. | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1107,[15] 1125[16] (D.C. Cir. 2009). |
| 801 ¶ 3864 | The evidence of Defendants' suppression of research and destruction of documents consists of events which often seem to be unrelated and to lack a unifying thread. Defendants claim these facts, most of which are undisputed, amount to no more than a string of isolated instances which prove nothing. This explanation misses the point. The evidence is clear that on a significant number of occasions, Defendants did in fact suppress research and destroy documents to protect themselves and the industry. The fact that much additional evidence may be lacking because Defendants were successful in their efforts to suppress, conceal, and destroy materials that would have reflected adversely on their corporate interests is hardly a justification for ignoring the evidence that does exist. Moreover, in those instances where Defendants did successfully suppress, conceal, and destroy materials, it is most unlikely that there would be any evidence to reflect that since it would no longer exist. By destroying evidence, Defendants make it virtually impossible to know what materials existed prior to their destruction. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1107, 1125 (D.C. Cir. 2009). |
| | **1. Suppression and Concealment of Scientific Research** | | | |
| 801 ¶ 3865. | At various times, Defendants suppressed or otherwise concealed documents and information adverse to their public or litigation positions. For example, notes of a November 5, 1975 CTR | Scheme to Defraud, Conspiratorial Agreement; | Scheme to Defraud; Consumer Protection Action | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1107, 1125 |

---

[15] Evidence at trial suggested that despite this internal knowledge, for decades Defendants publicly denied and distorted the truth about the addictive nature of their products, suppressed research revealing the addictiveness of nicotine, and denied their efforts to control nicotine levels and delivery.   449 F. Supp.2d at 209-309.

[16] The district court went on to find that "[a]s part of the Enterprise's scheme to defraud smokers, Defendants withheld and suppressed their extensive knowledge and understanding of nicotine-driven smoker compensation." 449 F. Supp.2d at 861.  These findings reveal that fraudulent activity surrounding "light" cigarettes was not merely limited to the use of misleading descriptors. In addition to the fact that the descriptors were not authorized by the FTC, the district court relied on other fraudulent activity by Defendants.

| Page & ¶ No. | Finding | Necessary Elements in DOJ Case | Identical Issues in MDL | Reviewed and affirmed by Court of Appeals |
|---|---|---|---|---|
| | meeting of a subcommittee of the Research Liaison Committee reveal that Ed Jacobs of Jacobs & Medinger directed that "no further formal minutes be made-also all should remove notes & previous minutes from corporate files." | Intent to defraud or deceive | Violations; Unjust Enrichment | (D.C. Cir. 2009). |
| | **c. Philip Morris** | | | |
| 809 ¶ 3907 | Defendant Philip Morris suppressed and concealed many scientific research documents, even going so far as to send them to a foreign affiliate in order to prevent the disclosure of documents in litigation and in federal regulatory proceedings. | Scheme to Defraud, Conspiratorial Agreement; Intent to defraud or deceive | Scheme to Defraud; Consumer Protection Action Violations; Unjust Enrichment | *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1107, 1125 (D.C. Cir. 2009). |