UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN RE: LIGHT CIGARETTES MARKETING AND SALES PRACTICES LITIGATION | )  **MDL  DOCKET NO.: 1:09-2068**<br>)<br>)  (Kathryn Domaingue v. Philip Morris, Inc.,<br>)  et al., Civil Action No. 1:09-cv-00432-JAW<br>)  Eastern District of New York)<br>)<br>)<br>)<br>) |

## FIRST AMENDED CLASS ACTION COMPLAINT
## FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Kathryn Domaingue, individually and on behalf of all other similarly situated consumers in the State of New York (the "Class"), by and through its attorneys Zraick, Nahas & Rich, Milstein, Adelman & Kreger, LLP, and Whatley, Drake & Kallas, LLC, for its Complaint, respectfully allege against Defendants Phillip Morris USA and Altria Group, Inc. (collectively "Defendants"), as follows:

### NATURE OF THE ACTION

1.     This is a class action for monetary damages and injunctive relief against Defendants for false, misleading and improper advertising practices in violation of, but not limited to, New York State General Business Law § 349 *et. seq.*  Defendants falsely, unfairly, and misleadingly advertised their "Light Cigarette" products.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a

1

citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs. Plaintiff alleges that the total claims of individual class members in this action are well in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). The plaintiff is a citizen of New York, whereas, as set forth above, Altria and Philip Morris are both citizens of Virginia. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, plaintiff alleges that more than two-thirds of all of the members of the proposed plaintiff Class in the aggregate are citizens of a state other than New York, where this action is originally being filed, and that the total number of members of the proposed plaintiff Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

3.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district, continue to occur in this district, and will occur in the future in this district if not enjoined, and Philip Morris may be found in, and is subject to, personal jurisdiction in this district. Numerous consumers of Philip Morris's "light" and "low tar and nicotine" cigarettes that are the subject of this action are situated in this district and are adversely affected, and will continue to be adversely affected, by the irreparable harms sought to be remedied and prevented by this Court's action upon this Complaint.

## PARTIES

4.     Plaintiff Kathryn Domaingue is an individual consumer who resides in the City of New York, New York. She brings this action on behalf of herself as an individual consumer and on behalf of all others similarly situated. At all times relevant herein she smoked and continues to smoke Marlboro "Light" and Parliament "Light" cigarettes.

5.     Philip Morris USA, Inc. ("Philip Morris") is a Virginia corporation. According to records of the California Secretary of State, Philip Morris maintains its principal executive offices at 6601 Broad Street, Richmond, Virginia 23230, and a registered agent listing of CT Corporation System, 818 W. Seventh Street, Los Angeles, California 90017. Philip Morris is a wholly-owned subsidiary of Altria Group, Inc., and is engaged in the manufacture and sale of cigarettes and other tobacco products in the United States. At all times relevant herein, Philip Morris manufactured, marketed and promoted the cigarette brands known as Accord, Alpine, Basic, Benson & Hedges, Bristol, Cambridge, Chesterfield, Collector's Choice, Commander, Daves, English Ovals, L&M, Lark, Marlboro, Merit, Parliament, Players, Saratoga, and Virginia Slims cigarettes, including "light," "ultralight" and/or "low tar" versions of certain of these brands. For purposes of diversity jurisdiction, Philip Morris is a "citizen" of Virginia.

6.     Altria Group, Inc. ("Altria") is a Virginia corporation, with its principal executive offices located at 6601 West Broad Street, Richmond, Virginia 23230; it lists a registered agent for service by the name of CT Corporation System, 4701 Cox Road, Suite 301, Glen Allen, Virginia 23060-0000. Altria Group, Inc.'s wholly-owned subsidiaries include Philip Morris USA Inc. For purposes of diversity jurisdiction, Altria is a "citizen" of Virginia.

## PRELIMINARY STATEMENT

7.     Plaintiff comes before this Court pursuant to FRCP 65 to seek a preliminary injunction and a permanent injunction. Plaintiff seeks to compel Philip Morris to refrain from:

> (a)     engaging in any act of unfair competition as defined in New York State General Business Law §§ 349 et. seq. and 350 et. seq., that is related in any way to manufacturing, marketing, promoting, or selling cigarettes in New York;

8.     To achieve this purpose, plaintiff seeks both a preliminary injunction and a permanent injunction prohibiting Philip Morris from making, or causing to be made in any way, any material, false, misleading or deceptive statement or representation, or to engage in any promotional campaigns, that portray "light" and "low tar" cigarettes as less harmful than full-flavor cigarettes including, but not limited to, the use of any cigarette descriptors in packaging, labeling, advertising, or any other method of communicating with new York consumers, that convey implicit and/or explicit health claims by use of the terms, "low tar," "light," "mild," "medium" and "ultra light," terms which create the false impression that such cigarettes are less harmful to smokers than full-flavored, conventional cigarettes. Plaintiff also seeks restitution and damages.

## GENERAL ALLEGATIONS

9.     All allegations in this Complaint are based on information and belief and/or are likely to have evidentiary support after reasonable opportunity for further investigation or discovery.

10.    As a wholly-owned subsidiary of Altria, Philip Morris was and is, at all times relevant herein, acting as the agent, servant and employee of Altria, and at all times herein mentioned, Philip Morris was acting within the purpose and scope of that agency and employment. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants was the agent, servant and employee of the other defendant, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Plaintiff is further informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants' employees was the agent, servant and employee of each employee's respective employer, and at all times herein

mentioned, each employee was acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of either of the defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of both defendants committed, knew of, performed, authorized, ratified and/or directed such act or transaction while actively engaged in the scope of their duties.

## FACTUAL ALLEGATIONS

11.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

12.     Philip Morris has known since the late 1950s of substantial evidence showing that smoking causes significant adverse health effects, particularly lung cancer. In 1964, the U.S. Surgeon General issued a report reviewing some 7,000 scientific articles on smoking and health, and stated that "cigarette smoking contributes substantially to mortality from certain specific diseases and to the overall death rate," that "[c]igarette] smoking is associated with a 70 percent increase in the age-specific death rates of males," that "[c]igarette smoking is causally related to lung cancer in men," and that the "data for women, though less extensive, point in the same direction." The Surgeon General concluded in 1968 that "cigarette smoking can contribute to the development of cardiovascular disease and particularly to death from coronary heart disease."[1]

13.     From at least 1953 until at least 2000, Philip Morris and other cigarette companies repeatedly, consistently, vigorously, and falsely denied that there were any adverse health

---

[1] This and other factual references are from the Final Opinion, *United States of America et al. v. Philip Morris USA, Inc., et al.* (2006) United States District Court for the District of Columbia, Civil Action No. 99-2496 (GK), ("Opinion").  All findings of fact in the Opinion are incorporated and re-alleged herein by reference.

effects from smoking. Philip Morris mounted a coordinated, well-financed and sophisticated public relations campaign to attack and distort scientific evidence demonstrating the link between smoking and disease, claiming it was still an "open question." In doing so, it ignored massive documentation of that link compiled by its own scientists and executives and maintained in its own internal corporate files.

14.     On January 4, 1954, the cigarette industry published a full-page advertisement in 448 newspapers throughout the United States titled, "A Frank Statement to Cigarette Smokers ("Frank Statement")." In the Frank Statement, subscribed to by Philip Morris, the industry stated that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. Philip Morris and other participating companies accepted in the Frank Statement "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." For more than forty years after publication of the Frank Statement in 1954, and for more than thirty years after the Surgeon General's first report on smoking and health, Philip Morris maintained a position that denied a causal relationship between smoking and disease.

15.     For approximately forty years, Philip Morris publicly, vehemently, and repeatedly denied smoking's addictiveness and nicotine's central role in smoking. The denials stemmed from the fear: that public acknowledgment of what had been extensively documented and widely accepted within its own corporate offices and laboratories could result in regulation by the U.S. Food and Drug Administration ("FDA"); that Philip Morris would suffer adverse liability judgments from addicted smokers suffering adverse health effects of

smoking; that the social acceptability of smoking would suffer; and ultimately, that Philip Morris would lose corporate profits.

16.     Overwhelming evidence shows that Philip Morris knew smoking is addictive and that nicotine is the agent that creates and sustains the addiction. Overwhelming evidence also indicates that even though Philip Morris has long known internally about cigarette addiction, it has endeavored to keep its extensive research and data out of the public domain and from the public health community by denying the existence of such data, by refusing to disclose it, and by closing or censoring laboratories and research projects investigating the mechanisms of nicotine.

17.     Extensive and overwhelming evidence also shows that Philip Morris has long known that nicotine creates and sustains smoking addiction and that cigarette sales and tobacco company profits depend on creating and maintaining that addiction.

18.     Given the link between nicotine and profits, Philip Morris has engaged in extensive research into the operation of nicotine in the human body and the effect of physical and chemical design parameters of cigarettes on nicotine delivery to smokers. Using knowledge gained by that research, Philip Morris designed cigarettes to precisely control nicotine delivery and provide nicotine doses at levels sufficient to create and sustain addiction. In doing so, Philip Morris concealed much of its nicotine-related research, and continuously and vigorously denied its efforts to control the levels of nicotine and nicotine delivery in its products.

19.     Philip Morris, individually, jointly with other cigarette companies, and through third parties has studied: smoking intake and inhalation; "compensation"; addiction physiology; smoker psychology; the pharmacological aspects of nicotine; the effects of nicotine on brain waves; and related subjects. As a result, Philip Morris has known for decades that cigarettes

are addictive and that this addiction is primarily caused by the delivery of nicotine at dependence-producing levels.

20.     Over the course of many years, Philip Morris sought to identify an "optimum" amount of nicotine, one that would meet smokers' demand for lower nicotine and tar products, but still provide enough nicotine to create and sustain addiction. Philip Morris focused on identifying a nicotine dose that would meet smokers' need for nicotine, thereby assuring continued smoking.

21.     As its understanding of nicotine delivery increased, Philip Morris developed more sophisticated product design techniques to assure a minimum nicotine dose sufficient to provide smokers with adequate "impact" and "satisfaction," regardless of the cigarette type.

22.     Internal documents of Philip Morris reveal that it used its knowledge of nicotine's pharmacological properties and addictive nature to create physical and chemical designs into its cigarettes that would assure nicotine delivery at the precise levels needed to assure taste, impact, and satisfaction, and thereby maintain smoker addiction.

23.     For decades, Philip Morris has recognized that a cigarette's commercial success depends upon its ability to deliver adequate levels of nicotine to smokers. The internal documents of Philip Morris have shown that it also understood that market position and the financial viability of the tobacco industry as a whole required development of cigarettes that delivered nicotine in sufficient amounts to ensure that smokers became and remained addicted. Accordingly, for an extended period of time, Philip Morris undertook steps to develop such cigarettes.

24.     Philip Morris has known of the need for effective measurement and control of the levels of nicotine in cigarettes since the 1940s, when it conducted studies on nicotine control in its Parliament cigarettes. In a 1954 document, Philip Morris discussed its program to

"ensur[e] the over-all quality and uniformity of the finished Parliament cigarette and thus maintain[] its appeal for discriminating smokers." The program was concentrated on "nicotine content, tar content, acid-base balance, and content of taste and aroma factors." The memorandum described the use of "informally constituted smoking panels and the results of nicotine analyses performed on the blends ... to establish a desirable level of nicotine concentration in the blend and hence also in the smoke."

25.     From the 1950s and 1960s, and on through the 1980s and 1990s, the most senior executives at Philip Morris reviewed various means for controlling nicotine delivery that included the optimal level of nicotine delivery, leaf blending to achieve nicotine control, and increasing nicotine delivery in cigarette smoke.

26.     In a 1990 inter-office memorandum, Philip Morris researchers reviewed the results of its Electrophysiological Studies Research Group, which explored and measured nicotine's effect on the brain. The memorandum listed, among the group's achievements, that it had "shown that there are optimal cigarette nicotine deliveries for producing the most favorable physiological and behavioral responses."

27.     The nicotine delivery levels of the cigarettes manufactured, marketed, advertised and sold by Philip Morris are not a matter of random variation. Instead, Philip Morris specifically designs the products to deliver a range of nicotine levels that allow smokers to obtain an optimal dose from virtually any cigarette marketed, regardless of the result of the that cigarette's nicotine delivery level as measured by the U.S. Federal Trade Commission ("FTC") method.[2]

---

[2] In June 1966, the FTC announced that it was establishing a laboratory to measure the content of tar and nicotine in cigarette smoke. The FTC employed the "Cambridge Filter Method," which uses a machine to "smoke" the cigarette at a specific "puff volume" at designated intervals for a certain period of time. The machine passes the smoke over a filter known as a Cambridge pad that collects

28.     Efforts at nicotine control by Philip Morris have not focused simply on delivering the highest nicotine levels possible, as large amounts of nicotine can cause cigarettes to taste harsh and unpalatable.

29.     Furthermore, an unsmoked cigarette already contains far more nicotine than is actually inhaled because all of the nicotine in the tobacco is not transferred to the smoke. According to FTC measurements, a cigarette that delivers approximately one milligram of nicotine in smoke typically retains "about 14-20 milligrams of nicotine in the unsmoked rod." Therefore, Philip Morris has had to consider more than merely "spiking" cigarettes with additional nicotine in its efforts at nicotine delivery control. It has used a multitude of design parameters to manipulate and control the dose and form of nicotine that is delivered to mainstream cigarette smoke in its commercial products.

30.     In the 1950s and 1960s, Philip Morris became concerned that the increase in public awareness of the link between smoking and health could result in a call for lower levels of nicotine and tar in conventional commercial cigarettes. Philip Morris knew that if it sought to assuage smokers' health concerns by reducing levels of tar, it could result in a proportional drop in nicotine. It also realized that nicotine levels insufficient to sustain smokers' addiction could devastate the tobacco industry. In light of this concern, Philip Morris sought to develop commercial cigarettes that would deliver nicotine at a range of doses necessary to keep smokers addicted.

31.     In doing so, Philip Morris used its knowledge of "smoker compensation," the behavioral smoking changes employed by consumers to obtain desired amounts of nicotine, in its research on nicotine manipulation.

particulate tar matter which is measured to calculate tar and nicotine yields for the tested cigarette. This was developed to offer smokers relative rankings of nicotine, tar, and carbon monoxide yields from tested cigarettes. Opinion, ¶ 212, 2049.

32.     The primary means Philip Morris has used to ensure that low-delivery cigarettes maintain smoker addiction is the use of physical design characteristics and ingredients that allow smokers to readily obtain the reinforcing level of nicotine, regardless of the cigarettes' yield as was measured by the FTC. Internal documents of Philip Morris show that it designed cigarettes that increase the flexibility of smokers' nicotine and tar dosing capacity even while reducing the tar and nicotine yields as measured by that FTC method.

33.     Nicotine delivery control can be achieved by changing the amount and type of tobacco used in cigarettes. It also can be achieved by adding, eliminating, or reducing certain substances from the tobacco blend before it is used as filler. Tobacco blend is the main component contributing to nicotine delivery because it determines how much nicotine will be in the unsmoked cigarette "rod."

34.     As the market shifted to products marked as "low tar/low nicotine" cigarettes, Philip Morris engaged in extensive efforts to control the nicotine-to-tar ratio in order to deliver more nicotine while decreasing tar.

35.     To achieve this, Philip Morris developed and used filters in its light/low-tar products that allow smokers to control the level of nicotine they inhale and to increase the nicotine-to-tar ratio in that inhaled smoke. As industry researchers explored filters that would reduce tar levels, they understood that any resulting reduction in nicotine delivery could reduce the cigarettes' addictive properties. Therefore, Philip Morris worked to design a filter that would result in a lower FTC measurement of tar, but would not reduce nicotine transfer into the body. The goal was to create a filter that would target tar but deliver the requisite nicotine dose to sustain addiction.

36.     Design factors influencing the efficacy of the filter include: its physical design; density of the filter packing; filter length; filter wrapper porosity; ventilation holes and

11

channels; and a variety of potential ingredients. By working with these, Philip Morris controlled nicotine yield and absorption by the body, as well as the taste and palatability of the cigarette.

37.     Filters also are used to control the size of particulate matter in the smoke that enters the body. Filter density, length, and ventilation can affect the ability of the smoke particles to coagulate and form particles as the smoke passes from the tobacco to the smoker's mouth. Particles that are too large cannot get into smokers' lungs efficiently. Particles that are too small might not be transferred across lung membranes before the smoker exhales. Large particles cannot efficiently get into the deep alveoli of the lung regardless of the intensity of the smoker's inhalation. As with most addictive drugs, the faster the drug is delivered into the body and then to the brain, the stronger is its effect.

38.     Philip Morris also has used ventilation holes to maintain nicotine delivery while reducing tar levels. These are small perforations in the cigarette paper that dilute mainstream cigarette smoke with air during inhalation. By doing so, ventilation holes can reduce the tar and nicotine concentration in the smoke, thereby producing lower FTC readings for those substances when tested by FTC machine testing (the ventilation holes are usually located so they are not covered by the FTC smoking machine orifice). However, human smokers frequently block the ventilation holes with their lips or fingers. Therefore the FTC measurements of cigarettes with filter ventilation did not necessarily reflect the actual delivery of tar and nicotine to humans. Philip Morris has long known that the tar and nicotine yields measured under former FTC testing smoking conditions do not reflect those produced under human smoking conditions. Ventilation holes also change the chemistry of smoke by adding air to the smoke.

39.     Philip Morris also has changed paper porosity composition to affect the nicotine-to-tar ratio in smoke. Cigarette paper is treated with chemicals that can affect nicotine delivery and make the cigarettes burn hotter and faster.

40.     Cigarette papers used by Philip Morris are of controlled porosity. By controlling porosity, Philip Morris can lower the amount of nicotine in smoke measured by the FTC by changing the mix of gases in the smoke and affecting tobacco burning temperature, as well as by controlling the speed of cigarette burn.

41.     Filter overwrap also can affect the nicotine-to-tar ratio of smoke delivered to smokers. A layer of tough, glued paper that attaches the filter to the tobacco rod, the overwrap is composed of materials that resist decomposition when held in the lips. FTC testing parameters require the machine to stop "smoking" 3 millimeters before reaching the overwrap, thereby leaving unburned tobacco. Smokers often smoke all the way to the overwrap, thereby inhaling extra nicotine and tar. These puffs contain more nicotine and tar than tobacco farther away from the overwrap.

42.     Philip Morris also has used chemical additives to modify the form of nicotine delivered to the smoker, and to enhance the speed of its absorption by the body. Alteration of cigarette smoke pH was a primary area of research for this purpose. By 1993, Philip Morris used some form of ammonia technology for this purpose in some of its cigarette products.

43.     Internal research documents of Philip Morris show that it has known at least since the 1960s of its ability to alter the amount and form of nicotine delivered by using cigarette design techniques intended to raise the pH of smoke. The documents also show that Philip Morris has used design techniques such as ammonia technology and alteration of tobacco blend to raise smoke pH to create cigarettes that deliver more free nicotine that is absorbed

by the body more quickly than cigarettes with lower smoke pH. Additionally, the documents reveal that Philip Morris took these actions in order to ensure that low-tar products would deliver doses of sufficient nicotine to create and sustain addiction.

44.     Despite overwhelming evidence to the contrary, Philip Morris has repeatedly and publicly denied that it manipulates nicotine content and delivery in cigarettes to create and sustain addiction. Philip Morris also has repeatedly and publicly claimed that levels of nicotine delivered by cigarettes are determined by the levels of tar delivery.

45.     In 1994, the U.S. Congress held public hearings on the addictiveness of cigarettes and the design of cigarettes and manipulation of nicotine. The Chief Executive Officers of six cigarette manufacturers, including Philip Morris, appeared voluntarily at a Subcommittee hearing on April 14, 1994.

46.     At the April 14, 1994, hearing, Philip Morris President and Chief Executive Officer William I. Campbell denied that nicotine is addictive, denied that Philip Morris research establishes that smoking is addictive, and denied that Philip Morris manipulates the nicotine levels contained in cigarettes.

47.     Philip Morris has made the same or corresponding statements in other public statements, submissions to government authorities, at deposition and trial testimony, and in discovery responses, denying its ability and efforts to control nicotine.

48.     Philip Morris has made repeated, vigorous and impassioned public denials, before Congressional committees, in advertisements in the national print media, and on television, that neither smoking nor nicotine is addictive, and that it does not manipulate, alter, or control the nicotine levels in the cigarettes it manufactures. However, in light of overwhelming evidence to the contrary, those statements are false.

49.     Philip Morris has researched, developed, and used many different means of controlling the delivery and absorption of the optimum levels of nicotine that create and sustain smokers' addiction. These include, but are not limited to: altering the physical and chemical composition of tobacco leaf blends and filler; using filter design to maintain or increase the nicotine-to-tar ratio; using ventilation and air dilution methods; altering the porosity and composition of filter paper; speeding nicotine absorption to the central nervous system by adding ammonia to alter product pH; and by using other additives to increase the potency of nicotine.

50.     Philip Morris has for many years denied that it manipulated nicotine levels in cigarettes to increase smoker addiction and dependence.

51.     For several decades, Philip Morris has marketed and promoted its low-tar brands as being less harmful than conventional cigarettes, a claim that is false, given clear evidence to the contrary. In making these false claims, Philip Morris gave smokers a purportedly acceptable alternative to quitting smoking, as well as an excuse for not doing so.

52.     Philip Morris used a combination of methods to market and promote low-tar brands. Its marketing has coupled claims of low tar and nicotine delivery with assertions that smoking these brands would reduce exposure to "controversial" elements of cigarette smoke, such as tar. Since the 1970s, Philip Morris also have used brand "descriptors" such as "light" and "ultra light" to convey the message that these brands are healthier, and an acceptable alternative to quitting. Additionally, Philip Morris has used sophisticated marketing imagery, including lighter color cigarette packaging and white tipping paper to reinforce that message.

53.     As it campaigned to market and promote filtered and low-tar cigarettes as less harmful, Philip Morris either lacked the evidence to substantiate these claims or knew them

to be false. In fact, internal industry documents show that cigarette companies were aware by the late 1960s and early 1970s that low-tar cigarettes are unlikely to provide any clear health benefit to human smokers as they do not actually result in lower tar and nicotine delivery.

54.    Philip Morris has long known that nicotine delivered by cigarettes is addictive. Internal documents demonstrate an understanding of smoker compensation behavior, behavior that boosts smokers' intake of tar, thereby negating the primary purported health-related benefit of "light" cigarettes as promoted by Philip Morris.

55.    Philip Morris withheld the full extent and depth of its knowledge and understanding of smoker compensation to the public health community and government regulators.

56.    Philip Morris's actions were intended to promote its overarching economic goal, which was to keep smokers smoking, to stop smokers from quitting, and to encourage others to start smoking, thereby maintaining or increasing corporate profits.

57.    Because of smoker compensation and smokers' need to obtain certain levels of nicotine, they can increase per-cigarette nicotine yield by, among other things, taking bigger and more frequent puffs, smoking more of the cigarette, or by blocking ventilation holes. Also, they can simply smoke more cigarettes.

58.    Smoker compensation behavior has been discussed in scientific literature since at least the 1940s.

59.    Because each smoker seeks to obtain a certain nicotine quota, smokers end up inhaling essentially the same amount of both tar and nicotine from so-called "low-tar and nicotine" cigarettes as they would from regular "full-flavor" cigarettes. More than 95 percent compensate for nicotine.

60.     The amount of nicotine needed to sustain smokers' nicotine addiction does not change over time, which means that smoker compensation for reduced nicotine deliveries is permanent and lasts as long as the smoker smokes the low-tar product.

61.     In short, "light" and "ultra-light" cigarettes do not actually reduce the health risks of smoking.

62.     Dr. Jonathan Samet, a physician and epidemiologist with extensive experience treating patients with lung cancer and chronic obstructive pulmonary disease (COPD), is Chair of the Department of Epidemiology at the Johns Hopkins University Bloomberg School of Public Health. He is the author and/or editor of several Surgeon Generals' Reports spanning more than 25 years, and has contributed to several National Cancer Institute Tobacco Control Monographs. He has concluded that smoking lower tar and lower nicotine cigarettes "has had no clear benefit on the health risks of active smoking."

63.     Despite a significant shift to filtered and "light" cigarettes over the last 50 years, the public health community has not seen any expected benefit. Instead, smoking-related health risks have increased significantly.

64.     Philip Morris, because of its sophisticated understanding of smoker compensation, internally recognized that low-tar and light cigarettes offer no clear health benefit. A March 1, 1977, Philip Morris memorandum by an industry-funded scientist concluded that low-tar and low-nicotine cigarettes are not less harmful.

65.     Research indicates that, compared with smokers of conventional, full-flavored cigarettes, low-tar cigarette smokers make more attempts to quit smoking. However, evidence shows that the false perception that low-tar cigarettes are safer than conventional cigarettes persuades them from doing so.

66.     Many smokers who were concerned about the risks of smoking responded by switching to low-tar cigarettes instead of quitting.

67.     The 2004 Report of the Surgeon General stated that "[r]esearch has demonstrated that with the expectation of reducing risk, many smokers switched to low machine-measured tar/nicotine cigarettes, and may thus have been deterred from quitting."

68.     Philip Morris has conducted extensive research to help them identify and understand potential quitters, and to design marketing to persuade them from doing so. Industry documents evidence its recognition that smokers who were interested in quitting smoking were instead switching to low-tar cigarettes on the basis of the false belief that this would either help them quit or be healthier.

69.     The cigarette industry has stated publicly that it produce low-tar cigarettes solely to meet consumer demand for "lighter," "milder" tasting cigarettes, and that it does not intend the use of brand descriptors or its marketing to imply that the product is less harmful than conventional cigarettes. However, Philip Morris's internal marketing documents show that Philip Morris has known for decades that consumers prefer the taste of regular cigarettes to low-tar cigarettes, but are willing to forgo them for low-tar cigarettes because they believe them to be healthier.

70.     A May 1978 Tobacco Institute[3] document, entitled "A Study of Public Attitudes Toward Cigarette Smoking and the Tobacco Industry in 1978 Volume I," which was

---

[3] The formation of the Tobacco Institute was announced in January 1958, by twelve manufacturers of cigarettes, smoking and chewing tobacco, and snuff. The companies forming the Tobacco Institute included Philip Morris American, B&W, Liggett, Lorillard, Philip Morris, and Reynolds. The Tobacco Institute was a trade association. According to its 1958 Certificate of Incorporation, the Tobacco Institute was formed "to promote a better understanding by the public of the tobacco industry and its place in the national economy; to cooperate with governmental agencies and public officials with reference to the tobacco industry; to collect and disseminate information relating to the use of tobacco; to collect and

18

prepared for the Tobacco Institute by the Roper Organization, stated that: "low tar cigarette smokers . . . are potential cigarette quitters. . . . And more of them than the average have tried to quit smoking. Since low tar smokers are an expanding share of the market, its greater desire to quit smoking poses a special problem for the cigarette industry."

71.     Philip Morris has made, and continues to make, false and misleading statements about low-tar cigarettes to reassure smokers, and to dissuade them from quitting. These include: assertions that low-tar cigarettes deliver "low," "lower," or "less" tar and nicotine than conventional, full-flavor cigarettes; claims that the low-tar cigarettes are "mild" or deliver "clean" taste; and the use of brand names with descriptors such as "light" and "ultra light." These claims were made with the full knowledge that consumers interpret such claims and descriptors as meaning a reduced risk of harm.

72.     Over the last five decades, Philip Morris has introduced both stand-alone cigarette brands purported to be low in tar and low-tar "brand extensions" of existing full-flavor cigarette brands, such as "Marlboro Lights" and "Ultra Lights." Philip Morris also has used brand descriptors such as "light," "medium," "mild," and "ultra light" to market both the new brands and the brand extensions as low in tar. Virtually every major brand undertook line extensions. By 1980, more that 50 percent of all cigarettes sold were "low tar" (with an FTC Method tar yield of 15 mg. or less). Every major manufacturer continues to manufacture and sell low-tar brands and brand extensions in both the "light" and "ultra light" categories.

---

disseminate scientific and medical material relating to tobacco; to collect and disseminate information relating to the tobacco industry published or released by any governmental agency, federal or state, or derived from other sources independent of the industry; to collect and disseminate information relating to legislative and administrative developments, federal or state, affecting the tobacco industry; to promote public good will." Opinion, ¶ 113, 115.

73.     However, the terms "light" and "low tar," as used by Philip Morris, are essentially meaningless and arbitrary.

74.     Relatively few consumers realize that smoking low-tar or light cigarettes can be, and often is, just as harmful as smoking full-flavor cigarettes. A peer-reviewed, published study showed that 70 percent of low-tar cigarette smokers believe that low-tar cigarettes decrease their daily intake of tar. Another study showed that approximately half of all those responding did not know the number of light cigarettes that would have to be smoked to achieve the same level of tar intake as obtained one full-flavor cigarette. In that study, less than 10 percent believed that it would be one light cigarette.

75.     Philip Morris has used this false perception to its advantage. A 1996 article in the American Journal of Public Health cited a 1993 Gallup survey showing 56 percent of smokers believed the term "low tar" conveyed relative safety when compared to full-flavor cigarettes. That same article also cited a 1987 National Health Interview Survey finding that 46 percent of smokers of cigarettes with tar yields of 6 mg. or lower (per the FTC Method) believed they had reduced their risk of cancer from smoking as compared with smokers of cigarettes with higher FTC tar yields. Consumer misperceptions have persisted despite the accumulation of data to the contrary.

76.     Since the 1970s, Philip Morris has used brand descriptors such as "light" and "ultra light" to communicate that certain brands of cigarettes are low in tar and nicotine. James Morgan, who was Brand Manager of Marlboro from 1969 to 1972, during the time when Philip Morris introduced Marlboro Lights, its first "light" cigarette, explained the intended meaning of the "lights" descriptor. Morgan stated that, from the very beginning, the "light" descriptor was intended to communicate that the brand was low in tar, as opposed to a brand that was lighter in taste.

77.     At one point, Philip Morris changed the name of Merit Filters to Merit Lights, even though there was no difference in the cigarette. Philip Morris also marketed a 15 mg. cigarette as both Virginia Slims and Virginia Slims Lights.

78.     Over the last five decades, Philip Morris has engaged in extensive consumer research to perfect delivery of its "light" and low-tar cigarette brand marketing message in order to reassure smokers regarding smoking-related health issues and offer an alternative to quitting.

79.     Philip Morris's internal research documents, reports, memoranda, and letters, make it clear that Philip Morris has known for decades that there is no clear health benefit to be gained by smoking low-tar/low-nicotine cigarettes instead of conventional full-flavor cigarettes. It is also clear that although Philip Morris knew that the FTC method of measuring tar and nicotine accurately compared nicotine and tar percentages of different cigarettes, Philip Morris also knew that that the FTC method was completely unreliable for determining the actual nicotine and tar levels absorbed by smokers because it did not factor in smoker compensation. Philip Morris also knew of the concerns of smokers over the health effects of smoking; that a significant number of them would trade flavor for reassurance of purportedly lower health risks, and that many of those concerned smokers would rely on purported health claims made for low-tar cigarettes to avoid quitting smoking.

80.     Despite this, Philip Morris extensively and successfully marketed and promoted low-tar/light cigarette brands as a less harmful alternative. Philip Morris also opposed any changes to the FTC measurement method which would more accurately reflect the effects of smoker compensation, and denied it was making any health claims for its low-tar and light cigarettes.

81.    By engaging in this deception, Philip Morris dramatically increased sales of its low-tar and light cigarettes, reassured smokers regarding smoking health risks, and sustained corporate revenues.

82.    Philip Morris sought to, and at times was successful in, preventing and stopping ongoing research, hiding existing research, and destroying sensitive documents to protect its public positions on smoking and health so as to avoid or limit litigation liability for smoking and health-related claims, and to prevent regulatory limitations on its industry.

83.    Philip Morris suppressed and concealed many scientific research documents, even sending some to a foreign affiliate in order to prevent its disclosure in litigation and in federal regulatory proceedings.

84.    Philip Morris's attorneys exerted significant control over nicotine research. In a 1980 document entitled "The Nicotine Receptor Program," William L. Dunn, a Philip Morris scientist, wrote that despite the fact that the psychopharmacology of nicotine is "where the action is for those doing fundamental research on smoking" and where "most likely will come significant scientific developments profoundly influencing the industry, … it is where our attorneys least want us to be…."

85.    Evidence demonstrates that, over approximately fifty years, Philip Morris took a variety of actions to maintain its public positions on smoking and disease-related issues, nicotine addiction, nicotine manipulation, and low-tar cigarettes. Evidence demonstrates that Philip Morris did this to protect itself from litigation claims regarding smoking and health, and to avoid regulation it considered harmful. Evidence also demonstrates that Philip Morris suppressed, concealed, and halted scientific research; destroyed documents, including scientific reports and studies; and repeatedly and intentionally asserted the attorney-client

and work product privileges improperly to thwart disclosure of many thousands of documents to plaintiff and to federal regulatory agencies.

86.    For more than 50 years, Philip Morris lied, misrepresented, and deceived the American public, including smokers and young people it sought as "replacement smokers," about the health effects of smoking. Philip Morris suppressed research, destroyed documents, manipulated the use of nicotine so as to increase and perpetuate addiction, distorted the truth about low tar and light cigarettes to discourage smokers from quitting, and abused the legal system to achieve its goal of making money with little regard for individual illness and suffering, soaring health costs, or the integrity of the legal system.

87.    Philip Morris participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain its industry.

88.    In order to carry this out, Philip Morris and other cigarette companies made false and deceptive statements that included: deceiving consumers into starting and continuing to buy and smoke cigarettes by misrepresenting and concealing the adverse health effects caused by smoking; maintaining that there was an "open question" as to whether smoking cigarettes causes disease and other adverse effects, despite the fact that they knew otherwise; ensuring that their research, development, and marketing of cigarettes remained consistent with their core public positions; deceiving consumers into becoming or staying addicted to cigarettes by maintaining that neither smoking nor nicotine is addictive, despite the fact that it knew these positions were false; deceiving consumers into becoming or staying addicted to cigarettes by manipulating the cigarette design and the delivery of nicotine to smokers, while at the same time denying that it had engaged in such efforts; and deceiving consumers

through deceptive marketing and cigarette design modifications to exploit smokers' desire for less hazardous and "low-tar" cigarettes which Philip Morris knew were no safer than full-flavor cigarettes.

89.     The cigarette industry engaged in an extensive effort to defraud consumers and potential consumers of cigarettes. Among other things, it coordinated its public relations, research, cigarette design and marketing efforts in order to advance this fraud by: denying the adverse health effects of active smoking; denying the addictiveness of nicotine and cigarette smoking; denying its manipulation of cigarette nicotine content; misrepresenting the health risks associated with light and low-tar cigarettes; and suppressing, concealing, and destroying information and documents related to the adverse health effects of smoking.

90.     Conduct by Philip Morris and other cigarette industry members overwhelmingly indicates the likelihood of future unlawful activity. This conduct was not isolated, but instead includes approximately 100 acts spanning more than 50 years. This conduct was not technical in nature, as the many misstatements and acts of concealment and deception were made by Philip Morris and the cigarette industry intentionally and deliberately as part of a multi-faceted, sophisticated effort to defraud. Furthermore, Philip Morris's ongoing manufacturing, selling and marketing of tobacco products presents opportunities to continue this deceptive conduct in the future.

91.     Evidence demonstrates that such conduct by Philip Morris and other members of the cigarette industry has not ceased. Philip Morris continues to engage in conduct that is materially indistinguishable from its previous actions, including the marketing of "light" cigarettes to consumers seeking to reduce health risks or quit.

92.     Evidence also demonstrates Philip Morris has not materially changed its practices with regard to most of its activities.

## FRAUDULENT CONCEALMENT

93.     Throughout the Class Period, Defendant effectively, affirmatively, and fraudulently concealed from consumers of their products, including Plaintiffs, their knowing misrepresentations about the nature and effect of their "light" cigarettes.

94.     Defendant's wrongful conduct was carried out in part through means and methods that were designed and intended to avoid detection, and which, in fact, successfully precluded detection.

95.     Defendant publicly admitted that there is no such thing as a safe cigarette, including its "light" cigarettes, and launched an advertisement campaign to educate the public about the risks of smoking through information placed on their website, newspaper inserts, and "onserts" placed in their cigarette packages.

96.     Plaintiff and members of the Class could not have discovered Defendant's misrepresentations and were without knowledge of the conduct by Defendant alleged in this Complaint, or of any facts from which it might reasonably be concluded that Defendant was so acting, or which would have led to the discovery of such action.

97.     Plaintiffs could not have discovered their cause of action against Defendant because Defendant's fraudulent concealment of its deceptive conduct was effective.


## CLASS ALLEGATIONS

98.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

99.     Pursuant to Federal Rule of Civil Procedure ("FRCP") 23, plaintiff brings this action on behalf of herself and on behalf of all other proposed plaintiff Class members under

Federal Rule of Civil Procedure Rule 23(b)(2) and Rule 23(b)(3). The proposed Class consists of:

> All persons residing in the State of New York who purchased for personal use and not for resale Philip Morris cigarettes that are purported to have lower tar and nicotine than conventional, full flavor cigarettes ("Light Cigarettes"), during the Class Period, through the present.

The Class Period, which extends four years prior to the filing date of the Complaint. Philip Morris's practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All putative Class members were and are similarly affected by having purchased Philip Morris's cigarettes that are purported to be "light" and "low-tar," and the relief sought herein is for the benefit of plaintiff and members of the putative Class. Plaintiff are informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that joinder of all members would be impractical.

100. Based on the annual sales of Philip Morris's "light cigarettes" and the popularity of those products, it is apparent that the number of consumers who have purchased Philip Morris's "light cigarettes" would at least be in the many thousands, thereby making joinder impossible.

101. Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including, inter alia, the following:

> (a)   whether Philip Morris's practices and representations made in connection with the advertising, marketing, promotion and sales of its "light cigarettes," including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were deceptive, unlawful or unfair in any respect, thereby violating New York State General Business Law §§ 349 et. seq. and 350 et. seq;

(c)      whether Philip Morris deceptively concealed the health risks associated with smoking its "light cigarettes" in its marketing, advertisement, promotion, labeling and sale of the products;

(d)      whether Philip Morris breached the implied warranty of fitness for purpose as the result of the health risks associated with smoking its "light cigarettes";

(e)      whether Philip Morris's practices and representations made in connection with the advertising, marketing, promotion and sales of its "light cigarettes," including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were false and/or misleading;

(f)      whether Philip Morris's conduct as set forth above injured consumers, and if so, the extent of the injury.

102.    The claims asserted by plaintiff in this action are typical of the claims of the members of the Plaintiff Class as the claims arise from the same course of conduct by Philip Morris, and the relief sought is common.

103.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Plaintiff Class. Plaintiff have retained counsel competent and experienced in both consumer protection and class action litigation.

104.    Certification of this class action is appropriate under FRCP 23(b), because the questions of law or fact common to the respective Class members predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative plaintiff or any other Class member would be able to protect its own interests because the cost of litigation through individual lawsuits might exceed expected recovery. Certification is also appropriate because Philip Morris acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole. Further, given the large number of consumers of Philip Morris's "Light

Cigarettes," allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

105.   A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## FIRST CAUSE OF ACTION
## DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF NEW YORK STATE GENERAL BUSINESS LAW § 349 et. seq.
### (By Plaintiff against all Defendants)

106.   Plaintiff repeats and realleges Paragraphs 1 through 105, inclusive, and incorporates the same as if set forth herein at length.

107.   Plaintiff contends that Philip Morris has committed unfair business acts and practices. The utility of Philip Morris's actions with regard to the advertising, marketing and promotion of its "light cigarettes," including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light" ("Acts") described in detail above and incorporated herein is negligible, if any, when weighed against the extent of harm to the general public, Plaintiff and Class members.

108.   The harmful impact upon members of the general public and the Class who were and are misled and deceived by Philip Morris's Acts far outweighs any reasons or justifications by Philip Morris in not disclosing the truth about its "light cigarettes" in its advertising,

marketing and promotion of its "light cigarettes." Philip Morris had an improper motive in the conduct of its Acts as alleged above in that it participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain its industry.

109.    The utilization of these unfair practices was and is under the sole control of Philip Morris, and was deceptively and deceptively hidden from members of the general public in Philip Morris's advertising, promotion and marketing of its "light cigarettes." As a purchaser and consumer of Philip Morris's "light cigarettes" and as a member of the general public in New York who has been injured by Philip Morris's unfair practices, plaintiff is entitled to, and does bring, this class action seeking all available remedies under New York State General Business Law § 349, et seq., including declaratory and injunctive relief and restitution, as well as attorneys' fees and costs.

110.    As alleged in the preceding paragraphs, the misrepresentations by Defendants of the material facts detailed above constitutes deceptive acts and an unfair and fraudulent business practice within the meaning of New York State General Business Law § 349 et. seq.

111.    In addition, Defendants' use of various forms of advertising media to advertise, call attention to or give publicity to the sale of goods or merchandise which are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of New York State General Business Law § 350 et. seq., which advertisements have deceived and are likely to deceive the consuming public.

112.    Pursuant to New York State General Business Law §§ 349 et. seq. and 350 et. seq., Plaintiff and the members of the Class seek an order of this Court enjoining Defendants

from continuing to engage, use, or employ their practice of advertising the sale and use of "Light Cigarettes". Likewise, Plaintiff and the members of the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Defendants by Defendants' failure to disclose the existence and significance of said misrepresentations.

113.    The claims of the representative Plaintiff are typical of the claims of the Class, and the representative Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are competent and experienced in class action and other complex litigation.

114.    Defendants' actions as described in this Complaint were done with conscious disregard of Plaintiff's rights and Defendants were wanton and malicious in their concealment of same. Defendants' actions were committed in order to swindle Plaintiff. Plaintiff is therefore entitled, in the court's discretion, to an increase in the award of damages not to exceed three times the actual damages up to one thousand dollars.

## SECOND CAUSE OF ACTION
## FALSE AND MISLEADING ADVERTISING IN VIOLATION OF NEW YORK STATE GENERAL BUSINESS LAW § 349 et. seq.
### (By Plaintiff against all Defendants)

115.    Plaintiff repeats and realleges Paragraphs 1 through 114, inclusive, and incorporates the same as if set forth herein at length.

116.    Defendants, in their labeling and advertising of the "Light Cigarettes", made false and misleading statements regarding the ingredients and harmfulness of the "Light Cigarettes".

117.    Plaintiff contends that Philip Morris has committed unfair business acts and practices. The utility of Philip Morris's actions with regard to the advertising, marketing and promotion of its "light cigarettes," including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light" ("Acts") described in detail above and incorporated herein is negligible, if any, when weighed against the extent of harm to the general public, Plaintiff and Class members.

118.    The harmful impact upon members of the general public and the Class who were and are misled and deceived by Philip Morris's Acts far outweighs any reasons or justifications by Philip Morris in not disclosing the truth about its "light cigarettes" in its advertising, marketing and promotion of its "light cigarettes." Philip Morris had an improper motive in the conduct of its Acts as alleged above in that it participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain its industry.

119.    The utilization of these unfair practices was and is under the sole control of Philip Morris, and was deceptively and deceptively hidden from members of the general public in Philip Morris's advertising, promotion and marketing of its "light cigarettes." As a purchaser and consumer of Philip Morris's "light cigarettes" and as a member of the general public in New York who has been injured by Philip Morris's unfair practices, plaintiff is entitled to, and does bring, this class action seeking all available remedies under New York State General Business Law § 349, et seq., including declaratory and injunctive relief and restitution, as well as attorneys' fees and costs.

120.    As alleged in the preceding paragraphs, the misrepresentations by Defendants of the material facts detailed above constitutes an unfair and fraudulent business practice within the meaning of New York State General Business Law § 349 et. seq.

121.    In addition, Defendants' use of various forms of advertising media to advertise, call attention to or give publicity to the sale of goods or merchandise which are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of New York State General Business Law § 350 et. seq., which advertisements have deceived and are likely to deceive the consuming public.

122.    Pursuant to New York State General Business Law §§ 349 et. seq. and 350 et. seq., Plaintiff and the members of the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising the sale and use of "Light Cigarettes". Likewise, Plaintiff and the members of the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Defendants by Defendants' failure to disclose the existence and significance of said misrepresentations.

123.    The claims of the representative Plaintiff are typical of the claims of the Class, and the representative Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are competent and experienced in class action and other complex litigation.

124.    Defendants' actions as described in this Complaint were done with conscious disregard of Plaintiff's rights and Defendants were wanton and malicious in their concealment of same. Defendants' actions were committed in order to swindle Plaintiff.

Plaintiff is therefore entitled, in the court's discretion, to an increase in the award of damages not to exceed three times the actual damages up to one thousand dollars.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the Class defined herein, pray for judgment and relief on all Causes of Action as follows:

A.      A determination that this action is a proper class action maintainable under Federal Rule of Civil Procedure 23 and certifying an appropriate Plaintiff Class; certifying Plaintiff as Class representative; and appointing Plaintiff's counsel as counsel for the Class;

B.      Compensatory damages in an amount to be proven at trial;

C.      An increase in the compensatory damages to an amount not to exceed three times the actual damages up to one thousand dollars;

D.      An order enjoining Defendants from pursuing the policies, acts, and practices complained of herein and requiring Defendants to pay restitution to Plaintiffs and all members of the Class;

E.      Reasonable attorneys' fees;

F.      Costs of this suit; and

G.      Such other and further relief as the Court may deem necessary or appropriate.

DATED: December 6, 2009

Yours, etc.

**WHATLEY, DRAKE & KALLAS, LLC**

By:  /s/ Joe Whatley
Joe R. Whatley
1540 Broadway, 37th Floor
New York, NY 10036

**ZRAIC   K, NAHAS & RICH**

By:   /s/ Stuart Nehas
Stuart E. Nahas, Esq.
Attorneys for Plaintiffs
303 Fifth Avenue
New York, New York 10016
(212) 686-0855

**MILSTEIN, ADELMAN & KREGER, LLP**

By: /s/ Wayne S. Kreger
Wayne S. Kreger, Esq.
Sara D. Avila, Esq.
Attorneys for Plaintiffs
2800 Donald Douglas Loop North
Santa Monica California 90405
(310) 396-9600

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all issue so triable.

DATED:  December 6, 2009

Yours, etc.

**WHATLEY, DRAKE & KALLAS, LLC**

By:  /s/ Joe Whatley
Joe R. Whatley
1540 Broadway, 37th Floor
New York, NY 10036

**ZRAICK, NAHAS & RICH**

By:   /s/ Stuart Nehas
Stuart E. Nahas, Esq.
Attorneys for Plaintiffs
303 Fifth Avenue
New York, New York 10016
(212) 686-0855

**MILSTEIN, ADELMAN & KREGER, LLP**

By:  /s/ Wayne S. Kreger
Wayne S. Kreger, Esq.
Sara D. Avila, Esq.
Attorneys for Plaintiffs
2800 Donald Douglas Loop North
Santa Monica California 90405
(310) 396-9600

## **CERTIFICATE OF SERVICE**

Service of the above Plaintiffs' First Amended Class Action Complaint For Damages and Injunctive Relief has been made through the Court's ECF system on all those registered to receive ECF service, and on all others, not registered but listed on the Court's Manual Notice List, by regular mail.

Date: December 9, 2009

*/s/ Sara D. Avila*
Sara D. Avila, Esq.
MILSTEIN, ADELMAN &
KREGER, LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Attorney for Plaintiffs