# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| IN RE: LIGHT CIGARETTES MARKETING AND SALES PRACTICES LITIGATION | ) MDL  DOCKET NO.: 1:09-2068<br>)<br>) (Miles Tyrer v. Philip Morris, Inc., *et al.*, Civil Action No. 1:09-cv-00427-JAW, Southern District of California)<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED CLASS ACTION COMPLAINT
## INJUNCTIVE RELIEF SOUGHT

Plaintiff MILES TYRER ("Plaintiff"), individually and on behalf of all other similarly situated purchasers of "light" cigarettes manufactured by Philip Morris USA and/or Altria Group, Inc. (the "Class"), brings this complaint against PHILIP MORRIS USA, INC., a Virginia Corporation ("Philip Morris" or "Defendant") and ALTRIA GROUP, INC., a Virginia Corporation ("Altria" or "Defendant") (collectively referred to as "Defendants") and Does 1 through 100 ("Does") (sometimes collectively referred to as "Defendants") and alleges unlawful and deceptive business practices in violation of California Business and Professions Code section 17200, *et seq.* (the "UCL"), California Business and Professions Code section 17500, *et seq.* (the "FAL", California Civil Code section 1750, *et seq.* (the "CLRA").

## NATURE OF THE ACTION

1.      Defendants manufacture, package, market, promote and/or sell cigarettes that are labeled "light", "ultra light", "low tar" and "low nicotine"

under a variety of different brands, including but not limited to Marlboro. For purposes of this Complaint, these cigarettes shall collectively be referred to as "Light Cigarettes."

2.     For decades, Defendants have conducted numerous studies, as detailed below, that reveal that Light Cigarettes are just as harmful to smokers' health and just as addictive in nature as regular full-flavored cigarettes. Nonetheless, in manufacturing, packaging, marketing and/or promoting these Light Cigarettes, Defendants failed and continue to fail to disclose that these Light Cigarettes are not actually less harmful or less addictive than full-flavor cigarettes. Such failure to disclose is likely to deceive the reasonable consumer.

3.     Also, in manufacturing, packaging, marketing and/or promoting these Light Cigarettes, Defendants have misrepresented and continue to misrepresent that consumers of their Light Cigarettes would be exposed to less tar and/or less nicotine than users of full-flavored cigarettes of the same brand. Plaintiff, in choosing to purchase Light Cigarettes, reasonably relied on Defendants' claims that Light Cigarettes are light and/or contain less tar or nicotine, and thus that these cigarettes are in fact less harmful than full-flavor cigarettes.

4.     Accordingly, Plaintiff comes before this Court pursuant to FRCP 65 to seek a preliminary injunction and a permanent injunction. Plaintiff seeks to compel Defendants to refrain from:

> a. Engaging in any act of unfair competition as defined in California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 et seq.,[1] that is related in any way to manufacturing, marketing, promoting, or selling cigarettes in California;

---

[1] California Bus. & Prof. Code § 17200 provides that "unfair competition shall mean and include

b. Engaging in any act in violation of California's False Advertising Act ("FAL"), Bus. & Prof. Code § 17500 et seq.,[2] that is related in any way to manufacturing, marketing, promoting, or selling cigarettes in California;  and/or

c. Engaging in any act in violation of Section 1770(a)(5) of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 et seq.,[3] that is related in any way to manufacturing, marketing, promoting, or selling cigarettes in California.

5.    To achieve this purpose, plaintiff seeks both a preliminary injunction and a permanent injunction prohibiting Philip Morris from making, or causing to be made in any way, any material, false, misleading or deceptive statement or

---

any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [Business and Professions Code Section 17500, *et seq.*]".

[2] California Bus. & Prof. Code § 17500 provides in pertinent part that "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

[3] California Civil Code § 1770 provides in pertinent part that "The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:...Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which it do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or he does not have."

representation, or to engage in any promotional campaigns, that portray "light" and "low tar" cigarettes as less harmful than full-flavor cigarettes including, but not limited to, the use of any cigarette descriptors in packaging, labeling, advertising, or any other method of communicating with California consumers, that convey implicit and/or explicit health claims by use of the terms, "low tar," "light," "mild," "medium" and "ultra light," terms which create the false impression that such cigarettes are less harmful to smokers than full-flavored, conventional cigarettes. Plaintiff also seeks restitution.

## PARTIES

6.      Plaintiff MILES TYRER ("Plaintiff") is an individual consumer who resides in the City of San Diego, San Diego County, California. He brings this action on behalf of himself as an individual consumer and on behalf of all others similarly situated. At all times relevant herein he smoked and continues to smoke Marlboro "Light" cigarettes, which are manufactured, marketed and promoted by Defendants.

7.      PHILIP MORRIS USA, INC. ("Philip Morris" or "Defendant") is a Virginia corporation and holds itself out as the largest cigarette company in the United States, with approximately half of the U.S. cigarette market. (www.altria.com/about_altria/1_1_altriagroup.asp, last viewed December 6, 2009). Philip Morris is a wholly-owned subsidiary of Altria Group, Inc., and is engaged in the manufacture and sale of cigarettes and other tobacco products in the United States. According to records of the California Secretary of State, Philip Morris maintains its principal executive offices at 6601 Broad Street, Richmond, Virginia 23230, and a registered agent listing of CT Corporation System, 818 W. Seventh Street, Los Angeles, California 90017. At all times relevant herein, Philip Morris manufactured, marketed and promoted cigarette

brands, including but not limited to the following: Accord, Alpine, Basic, Benson & Hedges, Bristol, Cambridge, Chesterfield, Collector's Choice, Commander, Daves, English Ovals, L&M, Lark, Marlboro, Merit, Parliament, Players, Saratoga, and Virginia Slims cigarettes. Philip Morris also manufactured, marketed and promoted the "light," "ultralight" and/or "low tar" versions of some of these brands (hereinafter collectively referred to as "Light Cigarettes"). For purposes of diversity jurisdiction, Philip Morris is a "citizen" of Virginia.

8.    ALTRIA GROUP, INC. ("Altria" or "Defendant") is a Virginia corporation. Altria is the publicly-held parent company of Philip Morris, USA and maintains its principal executive offices located at 6601 West Broad Street, Richmond, Virginia 23230; it lists a registered agent for service by the name of CT Corporation System, 818 W. Seventh Street, Los Angeles, California 90017. Altria's website claims that it has a "deep understanding of adult tobacco needs". For purposes of diversity jurisdiction, Altria is a "citizen" of Virginia. Defendants Altria and Philip Morris shall be collectively referred to as "Defendants."

9.    As a wholly-owned subsidiary of Altria, Philip Morris was and is, at all times relevant herein, acting as the agent, servant and employee of Altria, and at all times herein mentioned, Philip Morris was acting within the purpose and scope of that agency and employment. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants was the agent, servant and employee of the other defendant, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Plaintiff is further informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants' employees was the agent, servant and employee of each employee's respective employer, and at all times

herein mentioned, each employee was acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of either of the defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of both defendants committed, knew of, performed, authorized, ratified and/or directed such act or transaction while actively engaged in the scope of their duties.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), codified in part 28 U.S.C. §§ 1332(d) and 1453. Jurisdiction under CAFA is met because: (1) the proposed number of putative class members exceeds 100; (2) at least one plaintiff and one defendant are citizens of different states, and in some instances, the principal defendant is not a citizen of the forum state; and (3) the amount in controversy, including, but not limited to the aggregate amount of relief sought by absent class members, exceeds $5 million. 28 U.S.C. § 1332(d)(2).

11.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district, continue to occur in this district, and will occur in the future in this district if not enjoined, and Philip Morris may be found in, and is subject to, personal jurisdiction in this district. Numerous consumers of Philip Morris's "light" and "low tar and nicotine" cigarettes that are the subject of this action are situated in this district and are adversely affected, and will continue to be adversely affected, by the irreparable harms sought to be remedied and prevented by this Court's action upon this Complaint.

## FACTUAL ALLEGATIONS

12.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

## A.    BACKGROUND:    DEFENDANTS'    MISREPRESENTATIONS AND/OR OMISSIONS REGARDING LIGHT CIGARETTES

13.    Philip Morris has known since the late 1950s of substantial evidence showing that smoking causes significant adverse health effects, particularly lung cancer. In 1964, the U.S. Surgeon General issued a report reviewing some 7,000 scientific articles on smoking and health, and stated that "cigarette smoking contributes substantially to mortality from certain specific diseases and to the overall death rate," that "[c]igarette] smoking is associated with a 70 percent increase in the age-specific death rates of males," that "[c]igarette smoking is causally related to lung cancer in men," and that the "data for women, though less extensive, point in the same direction." The Surgeon General concluded in 1968 that "cigarette smoking can contribute to the development of cardiovascular disease and particularly to death from coronary heart disease."[4]

14.    From at least 1953 until at least 2000, Defendants repeatedly, consistently, vigorously, and falsely denied that there were any adverse health effects from smoking. Defendants mounted a coordinated, well-financed and sophisticated public relations campaign to attack and distort scientific evidence demonstrating the link between smoking and disease, claiming it was still an "open question." In doing so, it ignored massive documentation of that link

---

[4] This and other factual references are from the Final Opinion, *United States of America et al. v. Philip Morris USA, Inc., et al.* (2006) United States District Court for the District of Columbia, Civil Action No. 99-2496 (GK), ("Opinion"). All finding of facts in the Opinion are true and incorporated and re-alleged herein by reference.

compiled by its own scientists and executives and maintained in its own internal corporate files.

15. On January 4, 1954, the cigarette industry published a full-page advertisement in 448 newspapers throughout the United States titled, "A Frank Statement to Cigarette Smokers ("Frank Statement")." In the Frank Statement, subscribed to by Philip Morris, the industry stated that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. Philip Morris and other participating companies accepted in the Frank Statement "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." For more than forty years after publication of the Frank Statement in 1954, and for more than thirty years after the Surgeon General's first report on smoking and health, Philip Morris maintained a position that denied a causal relationship between smoking and disease.

16. For approximately forty years, Defendants publicly, vehemently, and repeatedly denied smoking's addictiveness and nicotine's central role in smoking. The denials stemmed from the fear: that public acknowledgment of what had been extensively documented and widely accepted within its own corporate offices and laboratories could result in regulation by the U.S. Food and Drug Administration ("FDA"); that Defendants would suffer adverse liability judgments from addicted smokers suffering adverse health effects of smoking; that the social acceptability of smoking would suffer; and ultimately, that Defendants would lose corporate profits.

17. Overwhelming evidence shows that Defendants knew smoking is addictive and that nicotine is the agent that creates and sustains the addiction. Overwhelming evidence also indicates that even though Defendants have long

known internally about cigarette addiction, it has endeavored to keep its extensive research and data out of the public domain and from the public health community by denying the existence of such data, by refusing to disclose it, and by closing or censoring laboratories and research projects investigating the mechanisms of nicotine.

18.     Extensive and overwhelming evidence also shows that Defendants have long known that nicotine creates and sustains smoking addiction and that cigarette sales and tobacco company profits depend on creating and maintaining that addiction.

19.     Given the link between nicotine and profits, Defendants have engaged in extensive research into the operation of nicotine in the human body and the effect of physical and chemical design parameters of cigarettes on nicotine delivery to smokers. Using knowledge gained by that research, Defendants designed cigarettes to precisely control nicotine delivery and provide nicotine doses at levels sufficient to create and sustain addiction. In doing so, Defendants concealed much of their nicotine-related research, and continuously and vigorously denied their efforts to control the levels of nicotine and nicotine delivery in their products.

20.     Defendants, individually, jointly and through third parties have studied: smoking intake and inhalation; "compensation"; addiction physiology; smoker psychology; the pharmacological aspects of nicotine; the effects of nicotine on brain waves; and related subjects. As a result, Defendants have known for decades that cigarettes are addictive and that this addiction is primarily caused by the delivery of nicotine at dependence-producing levels.

21.     Over the course of many years, Defendants sought to identify an "optimum" amount of nicotine, one that would meet smokers' demand for lower nicotine and tar products, but still provide enough nicotine to create and sustain

addiction. Defendants focused on identifying a nicotine dose that would meet smokers' need for nicotine, thereby assuring continued smoking.

22.     As its understanding of nicotine delivery increased, Defendants developed more sophisticated product design techniques to assure a minimum nicotine dose sufficient to provide smokers with adequate "impact" and "satisfaction," regardless of the cigarette type.

23.     Internal documents of Defendants reveal that they used their knowledge of nicotine's pharmacological properties and addictive nature to create physical and chemical designs into its cigarettes that would assure nicotine delivery at the precise levels needed to assure taste, impact, and satisfaction, and thereby maintain smoker addiction.

24.     For decades, Defendants have recognized that a cigarette's commercial success depends upon its ability to deliver adequate levels of nicotine to smokers. The internal documents of Defendants have shown that they also understood that market position and the financial viability of the tobacco industry as a whole required development of cigarettes that delivered nicotine in sufficient amounts to ensure that smokers became and remained addicted. Accordingly, for an extended period of time, Defendants undertook steps to develop such cigarettes.

25.     Philip Morris has known of the need for effective measurement and control of the levels of nicotine in cigarettes since the 1940s, when it conducted studies on nicotine control in its Parliament cigarettes. In a 1954 document, Philip Morris discussed its program to "ensur[e] the over-all quality and uniformity of the finihed Parliament cigarette and thus maintain[] its appeal for discriminating smokers." The program was concentrated on "nicotine content, tar content, acid-base balance, and content of taste and aroma factors." The memorandum described the use of "informally constituted smoking panels and

the results of nicotine analyses performed on the blends … to establish a desirable level of nicotine concentration in the blend and hence also in the smoke."

26.    From the 1950s and 1960s, and on through the 1980s and 1990s, the most senior executives at Altria and/or Philip Morris reviewed various means for controlling nicotine delivery that included the optimal level of nicotine delivery, leaf blending to achieve nicotine control, and increasing nicotine delivery in cigarette smoke.

27.    In a 1990 inter-office memorandum, Defendants' researchers reviewed the results of their Electrophysiological Studies Research Group, which explored and measured nicotine's effect on the brain. The memorandum listed, among the group's achievements, that it had "shown that there are optimal cigarette nicotine deliveries for producing the most favorable physiological and behavioral responses."

28.    The nicotine delivery levels of the cigarettes manufactured, marketed, advertised and sold by Defendants are not a matter of random variation. Instead, Defendants specifically design the products to deliver a range of nicotine levels that allow smokers to obtain an optimal dose from virtually any cigarette marketed, regardless of the result of the that cigarette's nicotine delivery level as measured by the U.S. Federal Trade Commission ("FTC") method. [5]

---

[5] In June 1966, the FTC announced that it was establishing a laboratory to measure the content of tar and nicotine in cigarette smoke. The FTC employed the "Cambridge Filter Method," which uses a machine to "smoke" the cigarette at a specific "puff volume" at designated intervals for a certain period of time. The machine passes the smoke over a filter known as a Cambridge pad that collects particulate tar matter which is measured to calculate tar and nicotine yields for the tested cigarette. This was developed to offer smokers relative rankings of nicotine, tar, and carbon monoxide yields from tested cigarettes. Opinion, ¶ 212, 2049.

29.     Efforts at nicotine control Defendants have not focused simply on delivering the highest nicotine levels possible, as large amounts of nicotine can cause cigarettes to taste harsh and unpalatable.

30.     Furthermore, an unsmoked cigarette already contains far more nicotine than is actually inhaled because all of the nicotine in the tobacco is not transferred to the smoke. According to FTC measurements, a cigarette that delivers approximately one milligram of nicotine in smoke typically retains "about 14-20 milligrams of nicotine in the unsmoked rod." Therefore, Defendants had to consider more than merely "spiking" cigarettes with additional nicotine in their efforts at nicotine delivery control. They have used a multitude of design parameters to manipulate and control the dose and form of nicotine that is delivered to mainstream cigarette smoke in its commercial products.

31.     In the 1950s and 1960s, Philip Morris became concerned that the increase in public awareness of the link between smoking and health could result in a call for lower levels of nicotine and tar in conventional commercial cigarettes. Philip Morris knew that if it sought to assuage smokers' health concerns by reducing levels of tar, it could result in a proportional drop in nicotine. It also realized that nicotine levels insufficient to sustain smokers' addiction could devastate the tobacco industry. In light of this concern, Philip Morris sought to develop commercial cigarettes that would deliver nicotine at a range of doses necessary to keep smokers addicted.

32.     In doing so, Philip Morris used its knowledge of "smoker compensation," the behavioral smoking changes employed by consumers to obtain desired amounts of nicotine, in its research on nicotine manipulation.

33.     The primary means Defendants have used to ensure that low-delivery cigarettes maintain smoker addiction is the use of physical design characteristics

and ingredients that allow smokers to readily obtain the reinforcing level of nicotine, regardless of the cigarettes' yield as was measured by the FTC. Internal documents of Defendants show that they designed cigarettes that increase the flexibility of smokers' nicotine and tar dosing capacity even while reducing the tar and nicotine yields as measured by that FTC method.

34.     Nicotine delivery control can be achieved by changing the amount and type of tobacco used in cigarettes. It also can be achieved by adding, eliminating, or reducing certain substances from the tobacco blend before it is used as filler. Tobacco blend is the main component contributing to nicotine delivery because it determines how much nicotine will be in the unsmoked cigarette "rod."

35.     As the market shifted to products marked as "low tar/low nicotine" cigarettes, Defendants engaged in extensive efforts to control the nicotine-to-tar ratio in order to deliver more nicotine while decreasing tar.

36.     To achieve this, Defendants developed and used filters in their light/low-tar products that allow smokers to control the level of nicotine they inhale and to increase the nicotine-to-tar ratio in that inhaled smoke. As industry researchers explored filters that would reduce tar levels, Defendants understood that any resulting reduction in nicotine delivery could reduce the cigarettes' addictive properties. Therefore, Defendants worked to design a filter that would result in a lower FTC measurement of tar, but would not reduce nicotine transfer into the body. Defendants' goal was to create a filter that would target tar but deliver the requisite nicotine dose to sustain addiction.

37.     Design factors influencing the efficacy of the filter include: its physical design; density of the filter packing; filter length; filter wrapper porosity; ventilation holes and channels; and a variety of potential ingredients.

By working with these, Defendants controlled nicotine yield and absorption by the body, as well as the taste and palatability of the cigarette.

38.     Filters also are used to control the size of particulate matter in the smoke that enters the body. Filter density, length, and ventilation can affect the ability of the smoke particles to coagulate and form particles as the smoke passes from the tobacco to the smoker's mouth. Particles that are too large cannot get into smokers' lungs efficiently. Particles that are too small might not be transferred across lung membranes before the smoker exhales. Large particles cannot efficiently get into the deep alveoli of the lung regardless of the intensity of the smoker's inhalation. As with most addictive drugs, the faster the drug is delivered into the body and then to the brain, the stronger is its effect.

39.     Defendants have also used ventilation holes to maintain nicotine delivery while reducing tar levels. These are small perforations in the cigarette paper that dilute mainstream cigarette smoke with air during inhalation. By doing so, ventilation holes can reduce the tar and nicotine concentration in the smoke, thereby producing lower FTC readings for those substances when tested by FTC machine testing (the ventilation holes are usually located so they are not covered by the FTC smoking machine orifice). However, human smokers frequently block the ventilation holes with their lips or fingers. Therefore the FTC measurements of cigarettes with filter ventilation did not necessarily reflect the actual delivery of tar and nicotine to humans. Defendants long known that the tar and nicotine yields measured under former FTC testing smoking conditions do not reflect those produced under human smoking conditions. Ventilation holes also change the chemistry of smoke by adding air to the smoke.

40.    Defendants have also changed paper porosity composition to affect the nicotine-to-tar ratio in smoke. Cigarette paper is treated with chemicals that can affect nicotine delivery and make the cigarettes burn hotter and faster.

41.    Cigarette papers used by Defendants are of controlled porosity. By controlling porosity, Defendants can lower the amount of nicotine in smoke measured by the FTC by changing the mix of gases in the smoke and affecting tobacco burning temperature, as well as by controlling the speed of cigarette burn.

42.    Filter overwrap also can affect the nicotine-to-tar ratio of smoke delivered to smokers. A layer of tough, glued paper that attaches the filter to the tobacco rod, the overwrap is composed of materials that resist decomposition when held in the lips. FTC testing parameters require the machine to stop "smoking" 3 millimeters before reaching the overwrap, thereby leaving unburned tobacco. Smokers often smoke all the way to the overwrap, thereby inhaling extra nicotine and tar. These puffs contain more nicotine and tar than tobacco farther away from the overwrap.

43.    Defendants also has used chemical additives to modify the form of nicotine delivered to the smoker, and to enhance the speed of its absorption by the body. Alteration of cigarette smoke pH was a primary area of research for this purpose. By 1993, Defendants used some form of ammonia technology for this purpose in some of its cigarette products.

44.    Internal research documents of Defendants show that they have known at least since the 1960s of its ability to alter the amount and form of nicotine delivered by using cigarette design techniques intended to raise the pH of smoke. The documents also show that Defendants have used design techniques such as ammonia technology and alteration of tobacco blend to raise smoke pH to create cigarettes that deliver more free nicotine that is absorbed by

the body more quickly than cigarettes with lower smoke pH. Additionally, the documents reveal that Defendants took these actions in order to ensure that low-tar products would deliver doses of sufficient nicotine to create and sustain addiction.

45.    Despite overwhelming evidence to the contrary, Defendants have repeatedly and publicly denied that it manipulates nicotine content and delivery in cigarettes to create and sustain addiction. Defendants have repeatedly and publicly claimed that levels of nicotine delivered by cigarettes are determined by the levels of tar delivery.

46.    In 1994, the U.S. Congress held public hearings on the addictiveness of cigarettes and the design of cigarettes and manipulation of nicotine. The Chief Executive Officers of six cigarette manufacturers, including Philip Morris, appeared voluntarily at a Subcommittee hearing on April 14, 1994.

47.    At the April 14, 1994, hearing, Philip Morris President and Chief Executive Officer William I. Campbell denied that nicotine is addictive, denied that Philip Morris research establishes that smoking is addictive, and denied that Philip Morris manipulates the nicotine levels contained in cigarettes.

48.    Defendants have made the same or corresponding statements in other public statements, submissions to government authorities, at deposition and trial testimony, and in discovery responses, denying their ability and efforts to control nicotine.

49.    Defendants have made repeated, vigorous and impassioned public denials, before Congressional committees, in advertisements in the national print media, and on television, that neither smoking nor nicotine is addictive, and that it does not manipulate, alter, or control the nicotine levels in the cigarettes they manufacture. However, in light of overwhelming evidence to the contrary, those statements are false.

50.     Defendants have researched, developed, and used many different means of controlling the delivery and absorption of the optimum levels of nicotine that create and sustain smokers' addiction. These include, but are not limited to: altering the physical and chemical composition of tobacco leaf blends and filler; using filter design to maintain or increase the nicotine-to-tar ratio; using ventilation and air dilution methods; altering the porosity and composition of filter paper; speeding nicotine absorption to the central nervous system by adding ammonia to alter product pH; and by using other additives to increase the potency of nicotine.

51.     For many years Defendants denied that it manipulated nicotine levels in cigarettes to increase smoker addiction and dependence.

52.     For several decades, Defendants marketed and promoted their low-tar brands as being less harmful than conventional cigarettes, a claim that is false, given to clear evidence to the contrary. In making these false claims, Defendants gave smokers a purportedly acceptable alternative to quitting smoking, as well as an excuse for not doing so.

53.     Defendants used a combination of methods to market and promote low-tar brands. Their marketing has coupled claims of low tar and nicotine delivery with assertions that smoking these brands would reduce exposure to "controversial" elements of cigarette smoke, such as tar. Since the 1970s, Philip Morris also have used brand "descriptors" such as "light" and "ultra light" to convey the message that these brands are healthier, and an acceptable alternative to quitting. Additionally, Philip Morris has used sophisticated marketing imagery, including lighter color cigarette packaging and white tipping paper to reinforce that message.

54.     As it campaigned to market and promote filtered and low-tar cigarettes as less harmful, Defendants either lacked the evidence to substantiate

these claims or knew them to be false. In fact, internal industry documents show that cigarette companies were aware by the late 1960s and early 1970s that low-tar cigarettes are unlikely to provide any clear health benefit to human smokers as they do not actually result in lower tar and nicotine delivery.

55.     Defendants have long known that nicotine delivered by cigarettes is addictive. Internal documents demonstrate an understanding of smoker compensation behavior, behavior that boosts smokers' intake of tar, thereby negating the primary purported health-related benefit of Light Cigarettes as promoted by Defendants.

56.     Defendants withheld the full extent and depth of its knowledge and understanding of smoker compensation to the public health community and government regulators.

57.     Defendants' actions were intended to promote their overarching economic goal, which was to keep smokers smoking, to stop smokers from quitting, and to encourage others to start smoking, thereby maintaining or increasing corporate profits.

58.     Because of smoker compensation and smokers' need to obtain certain levels of nicotine, they can increase per-cigarette nicotine yield by, among other things, taking bigger and more frequent puffs, smoking more of the cigarette, or by blocking ventilation holes. Also, they can simply smoke more cigarettes.

59.     Smoker compensation behavior has been discussed in scientific literature since at least the 1940s.

60.     Because each smoker seeks to obtain a certain nicotine quota, smokers end up inhaling essentially the same amount of both tar and nicotine from so-called "low-tar and nicotine" cigarettes as they would from regular "full-flavor" cigarettes. More than 95 percent compensate for nicotine.

61.    The amount of nicotine needed to sustain smokers' nicotine addiction does not change over time, which means that smoker compensation for reduced nicotine deliveries is permanent and lasts as long as the smoker smokes the low-tar product.

62.    In short, "light" and "ultra-light" cigarettes do not actually reduce the health risks of smoking.

63.    Dr. Jonathan Samet, a physician and epidemiologist with extensive experience treating patients with lung cancer and chronic obstructive pulmonary disease (COPD), is Chair of the Department of Epidemiology at the Johns Hopkins University Bloomberg School of Public Health. He is the author and/or editor of several Surgeon Generals' Reports spanning more than 25 years, and has contributed to several National Cancer Institute Tobacco Control Monographs. He has concluded that smoking lower tar and lower nicotine cigarettes "has had no clear benefit on the health risks of active smoking."

64.    Despite a significant shift to filtered and "light" cigarettes over the last 50 years, the public health community has not seen any expected benefit. Instead, smoking-related health risks have increased significantly.

65.    Defendants, because of their sophisticated understanding of smoker compensation, internally recognized that low-tar and light cigarettes offer no clear health benefit. A March 1, 1977, Philip Morris memorandum by an industry-funded scientist concluded that low-tar and low-nicotine cigarettes are not less harmful.

66.    Research indicates that, compared with smokers of conventional, full-flavored cigarettes, low-tar cigarette smokers make more attempts to quit smoking. However, evidence shows that the false perception that low-tar cigarettes are safer than conventional cigarettes persuades them from doing so.

67.    Many smokers who were concerned about the risks of smoking responded by switching to low-tar cigarettes instead of quitting.

68.    The 2004 Report of the Surgeon General stated that "[r]esearch has demonstrated that with the expectation of reducing risk, many smokers switched to low machine-measured tar/nicotine cigarettes, and may thus have been deterred from quitting."

69.    Defendants have conducted extensive research to help them identify and understand potential quitters, and to design marketing to persuade them from doing so. Industry documents evidence its recognition that smokers who were interested in quitting smoking were instead switching to low-tar cigarettes on the basis of the false belief that this would either help them quit or be healthier.

70.    The cigarette industry has stated publicly that it produce low-tar cigarettes solely to meet consumer demand for "lighter," "milder" tasting cigarettes, and that it does not intend the use of brand descriptors or its marketing to imply that the product is less harmful than conventional cigarettes. However, Defendants' internal marketing documents show that Philip Morris has known for decades that consumers prefer the taste of regular cigarettes to low-tar cigarettes, but are willing to forgo them for low-tar cigarettes because they believe them to be healthier.

71.   A May 1978 Tobacco Institute[6] document, entitled "A Study of Public Attitudes Toward Cigarette Smoking and the Tobacco Industry in 1978 Volume I," which was prepared for the Tobacco Institute by the Roper Organization, stated that: "low tar cigarette smokers . . . are potential cigarette quitters. . . . And more of them than the average have tried to quit smoking. Since low tar smokers are an expanding share of the market, its greater desire to quit smoking poses a special problem for the cigarette industry."

72.   Defendants have made, and continue to make, false and misleading statements about low-tar cigarettes to reassure smokers, and to dissuade them from quitting. These include: assertions that low-tar cigarettes deliver "low," "lower," or "less" tar and nicotine than conventional, full-flavor cigarettes; claims that the low-tar cigarettes are "mild" or deliver "clean" taste; and the use of brand names with descriptors such as "light" and "ultra light." These claims were made with the full knowledge that consumers interpret such claims and descriptors as meaning a reduced risk of harm.  Defendants also fail to disclose that their Light Cigarettes did not and do not deliver less tar and/or nicotine than non-Light Cigarettes of the same brand(s).

---

[6] The formation of the Tobacco Institute was announced in January 1958, by twelve manufacturers of cigarettes, smoking and chewing tobacco, and snuff. The companies forming the Tobacco Institute included Philip Morris American, B&W, Liggett, Lorillard, Philip Morris, and Reynolds. The Tobacco Institute was a trade association. According to its 1958 Certificate of Incorporation, the Tobacco Institute was formed "to promote a better understanding by the public of the tobacco industry and its place in the national economy; to cooperate with governmental agencies and public officials with reference to the tobacco industry; to collect and disseminate information relating to the use of tobacco; to collect and disseminate scientific and medical material relating to tobacco; to collect and disseminate information relating to the tobacco industry published or released by any governmental agency, federal or state, or derived from other sources independent of the industry; to collect and disseminate information relating to legislative and administrative developments, federal or state, affecting the tobacco industry; to promote public good will." Opinion, ¶ 113, 115.

73.     Over the last five decades, Defendants introduced both stand-alone cigarette brands purported to be low in tar and low-tar "brand extensions" of existing full-flavor cigarette brands, such as "Marlboro Lights" and "Ultra Lights." Defendants have also used brand descriptors such as "light," "medium," "mild," and "ultra light" to market both the new brands and the brand extensions as low in tar. Virtually every major brand undertook line extensions. By 1980, more that 50 percent of all cigarettes sold were "low tar" (with an FTC Method tar yield of 15 mg. or less). Defendants continue to manufacture and sell low-tar brands and brand extensions in both the "light" and "ultra light" categories.

74.     However, the terms "light" and "low tar," as used by Defendants, are essentially meaningless and arbitrary.

75.     Relatively few consumers realize that smoking low-tar or light cigarettes can be, and often is, just as harmful as smoking full-flavor cigarettes. A peer-reviewed, published study showed that 70 percent of low-tar cigarette smokers believe that low-tar cigarettes decrease their daily intake of tar. Another study showed that approximately half of all those responding did not know the number of light cigarettes that would have to be smoked to achieve the same level of tar intake as obtained one full-flavor cigarette. In that study, less than 10 percent believed that it would be one light cigarette.

76.     Defendants used this false perception to its advantage. A 1996 article in the American Journal of Public Health cited a 1993 Gallup survey showing 56 percent of smokers believed the term "low tar" conveyed relative safety when compared to full-flavor cigarettes. That same article also cited a 1987 National Health Interview Survey finding that 46 percent of smokers of cigarettes with tar yields of 6 mg. or lower (per the FTC Method) believed they had reduced their risk of cancer from smoking as compared with smokers of cigarettes with higher

FTC tar yields. Consumer misperceptions have persisted despite the accumulation of data to the contrary.

77. Since the 1970s, Philip Morris has used brand descriptors such as "light" and "ultra light" to communicate that certain brands of cigarettes are low in tar and nicotine. James Morgan, who was Brand Manager of Marlboro from 1969 to 1972, during the time when Philip Morris introduced Marlboro Lights, its first "light" cigarette, explained the intended meaning of the "lights" descriptor. Morgan stated that, from the very beginning, the "light" descriptor was intended to communicate that the brand was low in tar, as opposed to a brand that was lighter in taste.

78. At one point, Philip Morris changed the name of Merit Filters to Merit Lights, even though there was no difference in the cigarette. Philip Morris also marketed a 15 mg. cigarette as both Virginia Slims and Virginia Slims Lights.

79. Over the last five decades, Philip Morris and/or Altria have engaged in extensive consumer research to perfect delivery of their Light Cigarette brands' marketing messages and/or omissions in order to reassure smokers regarding smoking-related health issues and offer an alternative to quitting.

80. Defendants' internal research documents, reports, memoranda, and letters, make it clear that Philip Morris and/or Altria have known for decades that there is no clear health benefit to be gained by smoking low-tar/low-nicotine cigarettes instead of conventional full-flavor cigarettes. It is also clear that although Defendants knew that the FTC method of measuring tar and nicotine accurately compared nicotine and tar percentages of different cigarettes, Defendants also knew that that the FTC method was completely unreliable for determining the actual nicotine and tar levels absorbed by smokers because it did not factor in smoker compensation. Defendants also knew of the concerns of

smokers over the health effects of smoking; that a significant number of them would trade flavor for reassurance of purportedly lower health risks, and that many of those concerned smokers would rely on purported health claims made for low-tar cigarettes to avoid quitting smoking. Indeed, Altria's own website claims that it has a "deep understanding of adult consumer needs[.]"

81.    Despite this, Defendants extensively and successfully marketed and promoted Light Cigarettes as a less harmful alternative. Defendants also opposed any changes to the FTC measurement method which would more accurately reflect the effects of smoker compensation, and denied they were making any health claims for their Light Cigarettes.

82.    By engaging in this deception, Defendants dramatically increased sales of its low-tar and light cigarettes, reassured smokers regarding smoking health risks, and sustained corporate revenues.

83.    Defendants sought to, and at times was successful in, preventing and stopping ongoing research, hiding existing research, and destroying sensitive documents to protect its public positions on smoking and health so as to avoid or limit litigation liability for smoking and health-related claims, and to prevent regulatory limitations on its industry.

84.    Defendants suppressed and concealed many scientific research documents, even sending some to a foreign affiliate in order to prevent their disclosure in litigation and in federal regulatory proceedings.

85.    Philip Morris's attorneys exerted significant control over nicotine research. In a 1980 document entitled "The Nicotine Receptor Program," William L. Dunn, a Philip Morris scientist, wrote that despite the fact that the psychopharmacology of nicotine is "where the action is for those doing fundamental research on smoking" and where "most likely will come significant

scientific developments profoundly influencing the industry, … it is where our attorneys least want us to be…."

86.     Over approximately fifty years, Philip Morris and/or Altria took a variety of actions to maintain its public positions on smoking and disease-related issues, nicotine addiction, nicotine manipulation, and low-tar cigarettes. Philip Morris and/or Altria did this to protect themselves from litigation claims regarding smoking and health, and to avoid regulation it considered harmful. Philip Morris and/or Altria suppressed, concealed, and halted scientific research; destroyed documents, including scientific reports and studies; and repeatedly and intentionally asserted the attorney-client and work product privileges improperly to thwart disclosure of many thousands of documents to consumers and to federal regulatory agencies.

87.     For more than 50 years, Philip Morris and/or Altria lied, misrepresented, and deceived the American public, including smokers and young people it sought as "replacement smokers," about the health effects of smoking. Defendants suppressed research, destroyed documents, manipulated the use of nicotine so as to increase and perpetuate addiction, distorted the truth about low tar and light cigarettes to discourage smokers from quitting, and abused the legal system to achieve its goal of making money with little regard for individual illness and suffering, soaring health costs, or the integrity of the legal system.

88.     Defendants participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain their industry.

89.     In order to carry this out, Defendants made false and deceptive statements that included: deceiving consumers into starting and continuing to

buy and smoke cigarettes by misrepresenting and concealing the adverse health effects caused by smoking; maintaining that there was an "open question" as to whether smoking cigarettes causes disease and other adverse effects, despite the fact that they knew otherwise; ensuring that their research, development, and marketing of cigarettes remained consistent with their core public positions; deceiving consumers into becoming or staying addicted to cigarettes by maintaining that neither smoking nor nicotine is addictive, despite the fact that it knew these positions were false; deceiving consumers into becoming or staying addicted to cigarettes by manipulating the cigarette design and the delivery of nicotine to smokers, while at the same time denying that it had engaged in such efforts; and deceiving consumers through deceptive marketing and cigarette design modifications to exploit smokers' desire for less hazardous and "low-tar" cigarettes which Defendants knew were no safer than full-flavor cigarettes.

90.    Defendants engaged in an extensive effort to defraud consumers and potential consumers of cigarettes. Among other things, they coordinated its public relations, research, cigarette design and marketing efforts in order to advance this fraud by: denying the adverse health effects of active smoking; denying the addictiveness of nicotine and cigarette smoking; denying its manipulation of cigarette nicotine content; misrepresenting the health risks associated with light and low-tar cigarettes; and suppressing, concealing, and destroying information and documents related to the adverse health effects of smoking.

91.    Conduct by Defendants overwhelmingly indicates the likelihood of future unlawful activity. This conduct was not technical in nature, as the many misstatements and acts of concealment and deception were made by Defendants intentionally and deliberately as part of a multi-faceted, sophisticated effort to defraud. Furthermore, Defendants' ongoing manufacturing, selling and

marketing of tobacco products presents opportunities to continue this deceptive conduct in the future.

92.    Defendants continue to engage in conduct that is materially indistinguishable from its previous actions, including the marketing of Light Cigarettes to California consumers seeking to reduce health risks or quit.

93.    Evidence also demonstrates Defendants have not materially changed its practices with regard to most of its activities.

**B.    PLAINTIFF    REASONABLY    RELIED    ON    DEFENDANTS' MISREPRESENTATIONS AND/OR OMISSIONS.**

94.    Plaintiff purchased Marlboro Light cigarettes, which is one of Defendants' Light Cigarettes.

95.    Plaintiff would not have purchased and begun smoking Marlboro Light Cigarettes but for Defendants' misrepresentations and omissions. Plaintiff typically purchases approximately one package per day at locations near his home. In purchasing Defendants' Light Cigarettes, Plaintiff did not receive what he paid for: a cigarette that was healthier for him to smoke, and which would result in his receiving less tar and nicotine than full-flavored cigarettes.

**C.    DEFENDANTS HAVE BEEN UNJUSTLY ENRICHED.**

96.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

97.    Defendants were enriched by their Acts and wrongful conduct as alleged above.  Namely, Defendants received money and other benefits as a result of Defendants' false, misleading and/or deceptive statements, claims and/or omissions regarding the nicotine and/or tar levels contained in their Light Cigarettes.

98.    Defendants were enriched at the expense of Plaintiff and members of the Class.  Specifically, Plaintiff and members of the Class purchased Light

Cigarettes and lost money.  If not for Defendants' conduct, as described above, Defendants would not have otherwise received the benefits described above.

99.    Defendants were enriched under circumstances that make retaining their enrichment unjust.    That is, Defendants' enrichment was caused by Defendants' intentional and/or grossly negligent misrepresentations and/or omissions regarding their Light Cigarettes.    It would be inequitable for Defendants to retain the benefits received from these transactions with California consumers, including Plaintiff and the Class, in light of Defendants' conduct.

100.   Accordingly, Plaintiff and the Class are entitled to restitution and disgorgement.

## CLASS ALLEGATIONS

101.   Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

102.   Plaintiff brings this action on behalf of himself and the proposed plaintiff Class members under Federal Rule of Civil Procedure Rule 23(b)(2) and Rule 23(b)(3).  The proposed Class consists of:

> All persons residing in the State of California who purchased for personal use and not for resale Defendants' cigarettes that are labeled "Light" and/or "Ultra Light" and/or purport to have lower tar and nicotine than conventional, full flavor cigarettes ("Light Cigarettes"), during the Class Period, through the present.

Excluded form the Class are Defendants' officers, directors, employees and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of Light Cigarettes.  The Class Period is the time period between January 13, 2005 to the present.

103.   The Class comprises of thousands of persons, the joinder of whom is impracticable, and disposition of their claims in a Class Action will benefit the parties and the Court.   The Class is sufficiently numerous because millions of units of Defendants' Light Cigarettes" have been sold in the State of California during the Class Period.

104.   There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.   The questions of law and fact involved affecting the parties to be represented.   The questions of law and fact common to the Class predominate over questions which may affect individual Class members.   Common questions of law and fact include, but are not limited to, the following:

a.   Whether Defendants' policies, practices, representations and omissions in connection with the advertising, marketing, promotion and sales of its Light Cigarettes, including but not limited to the use of descriptors such as "low tar", "light", "mild", "medium" and "ultra light" were applied uniformly to all members of the Class;

b.   Whether Defendants' practices, representations and omissions made in connection with the advertising, marketing, promotion and sales of its Light Cigarettes, including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were deceptive in any respect, thereby violating California's Unfair Competition Law ("UCL"), California Bus. & Prof. Code § 17200 *et seq.*;

c.   Whether Defendants' practices, representations and omissions made in connection with the advertising, marketing, promotion and sales of its Light Cigarettes, including but not limited to the

use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were unlawful in any respect, thereby violating California's Unfair Competition Law ("UCL), California Bus. & Prof. Code § 17200 *et seq.*;

d. Whether Defendants' practices, representations and omissions made in connection with the advertising, marketing, promotion and sales of its Light Cigarettes, including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were unfair in any respect, thereby violating California's Unfair Competition Law ("UCL), California Bus. & Prof. Code § 17200 *et seq.*;

e. Whether Defendants' practices, representations and omissions made in connection with the advertising, marketing, promotion and sales of its Light Cigarettes, including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were fraudulent in any respect, thereby violating California's Unfair Competition Law ("UCL), California Bus. & Prof. Code § 17200 *et seq.*;

f. Whether Defendants' practices and representations made in connection with the advertising, marketing, promotion and sales of its Light Cigarettes including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were deceptive and/or false in any respect, thereby violating California's False Advertising Law ("FAL"), California Bus. & Prof. Code § 17500 *et seq.*;

g. Whether Defendants deceptively concealed the health risks associated with smoking its Light Cigarettes, including but not

limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," in its marketing, advertisement, promotion, labeling and sale of the products;

h.  Whether Defendants' practices and representations made in connection with the advertising, marketing, promotion and sales of its Light Cigarettes, including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were false and/or misleading;

i.  Whether Defendants knew or should have known that the representations were false;

j.  Whether Defendants possess competent and reliable scientific evidence to support its label and advertising claims;

k.  Whether a reasonable consumer understands Defendants' advertising, marketing, promotion and sales of its Light Cigarettes, including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," to make claims that the Light Cigarettes are less harmful then full-flavor cigarettes;

l.  Whether Defendants misrepresented that consumers of Light Cigarettes would be exposed to less tar and/or nicotine than users of non-Light cigarettes of the same brand(s);

m.  Whether Defendants represented that Light Cigarettes have characteristics, benefits, uses or quantities which they do not have, thereby violating California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.*;

n.  Whether Defendants' conduct as set forth above injured consumers, and if so, the extent of the injury.

105. Plaintiff's claims are typical of the claims of the Class, and Plaintiff will fairly and adequately represent and protect the interest of the Class. Plaintiff does not have any interests which are antagonistic to those of the proposed Class. Plaintiff has retained competent and experienced counsel in class action and other complex litigation. The questions of law and fact are common to the Class members, some of which are set out above, predominate over any questions affecting only individual Class members.

106. Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendants' false and/or misleading representations and/or omissions. Indeed, Plaintiff purchased Light Cigarettes on numerous occasions because of the representations by Defendants that Light Cigarettes are less harmful than full-flavored cigarettes. Plaintiff would not have purchased Light Cigarettes if he had known that the representations in Defendants' advertising, marketing and promotion of Philip Morris' Light Cigarettes as described herein were false.

107. A class action is superior to other available methods for fair and sufficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually.

108. The trial and litigation of Plaintiff's claims is manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct could increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

109. Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory

relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

110.   Absent a class action, Defendants will likely retain the benefits of their wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.

111.   Absent a representative action, the Class members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of their ill-gotten gains.

## COUNT 1
### FOR VIOLATION OF BUS & PROF. CODE § 17200 *ET SEQ.*
### (with respect to the unlawful prong of the Unfair Competition Act)
### (By Plaintiff and the Class as Against All Defendants, including Does 1-100)

112.   Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

113.   This cause of action is brought pursuant to California Bus. & Prof. Code § 17200 *et seq* on behalf of Plaintiff and members of a Class consisting of all persons who purchased Light Cigarettes in the State of California for personal use and not for resale during the Class Period. Excluded from the Class are Defendants' officers, directors and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of Light Cigarettes.

114.   Plaintiff contends that Defendants have committed unlawful business acts and practices.

115.   The utility of Defendants' actions with regard to the advertising, marketing and promotion of its "light cigarettes," including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light" ("Acts") described in detail above and incorporated herein is negligible, if any, when weighed against the extent of harm to the general public, Plaintiff and Class members.

116.   The harmful impact upon members of the general public and the Class who were and are misled and deceived by Defendants' Acts far outweighs any reasons or justifications by Defendants in not disclosing the truth about their Light Cigarettes in their advertising, marketing and promotion of such products.

117.   Defendants had an improper motive in the conduct of their Acts as alleged above in that it participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain its industry.

118.   The utilization of these unfair practices was and is under the sole control of Defendants, and was deceptively and deceptively hidden from members of the general public in Defendants' advertising, promotion and marketing of their Light Cigarettes.

119.   As a purchaser and consumer of Defendants' Light Cigarettes and as a member of the general public in California who has been injured by Defendants' unfair practices, plaintiff is entitled to, and does bring, this class action seeking all available remedies under the UCL, including declaratory and injunctive relief and restitution, as well as attorneys' fees and costs.

120.   By their Acts described in detail above and incorporated herein, Defendants committed deceptive business acts and practices by making written and oral material representations and material omissions that have a capacity, tendency, and likelihood to deceive or confuse reasonable consumers regarding the actual nature and health risks associated with their Light Cigarettes as set forth in detail above. Plaintiff and members of the Class were and are likely to be deceived by Defendants Acts.

121.   By their Acts, Defendants have also committed unlawful business acts and practices within the scope of the UCL by violating the CLRA, the FAL and violating common law as set forth below. The violations of the FAL and CLRA serve as predicate violations of this prong of the UCL.

122.   The deceptive and unlawful Acts of Defendants present a threat to members of the general public in that Defendants are able to carry on their misrepresentations and omissions and cause additional future harm. Defendants continue these unfair, deceptive and unlawful business practices as alleged herein.

123.   Defendants' Acts constitute unlawful business practices within the meaning of California Bus. & Prof. Code § 17200 et seq.

124.   Pursuant to California Bus. & Prof. Code § 17203 and Fed.Rule Civ.Pro. 65, Plaintiff, individually and on behalf of members of the Class, seeks an order of this Court prohibiting Defendants from making, or causing to be made in any way, any material, false, misleading or deceptive statement or representation, or to engage in any promotional campaigns, that portray "light" and "low-tar" cigarettes as less harmful than full-flavor cigarettes, including, but not limited to, the use of any cigarette descriptors in packaging, labeling, advertising, or any other method of communicating with consumers, that

conveys implicit and/or explicit health claims by use of the terms, "low tar," "light," "mild," "medium" and "ultra light"

125. There were reasonably available alternatives to further Defendants' legitimate business interest, other than the conduct described herein.

126. All of Defendants' conduct as described herein occur and continue to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

127. As a result of Defendants' wrongful conduct, Plaintiff and the Class have suffered injury in fact and lost money. Indeed, Plaintiff purchased Light Cigarettes on numerous occasions because of Defendants' false, misleading, and/or deceptive statements, claims, representations and/or omissions. Plaintiff would not have purchased Light Cigarettes if he had known that the claims and advertising described herein were false.

128. Pursuant to California Bus. & Prof. Code § 17203 and 1735, Plaintiff, individually and on behalf of members of the general public, seeks an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising the sale and use of Light Cigarettes. Likewise, Plaintiff, individually and on behalf of the Class, seeks an order requiring Defendants to disclose such misrepresentations and/or omissions.

129. Plaintiff and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unlawful and deceptive acts and practices of Defendants, as described above, present a serious, ongoing and future threat to Plaintiff and members of the general public.

130. Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, individually and on behalf of members of the general public, further seeks an

order of this Court seeks an award of restitution of all monies that may have been acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said wrongful conduct.

131. Pursuant to Civil Code § 3287(a), Plaintiff, individually and on behalf of the Class, seeks pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.

## COUNT 2
### FOR VIOLATION OF BUS & PROF. CODE § 17200 *ET SEQ.*
### (with respect to the unfair prong of the Unfair Competition Act)
### (By Plaintiff and the Class as Against All Defendants, Including Does 1-100)

132. Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

133. This cause of action is brought pursuant to California Bus. & Prof. Code § 17200 *et seq* on behalf of Plaintiff and members of a Class consisting of all persons who purchased Light Cigarettes in the State of California for personal use and not for resale during the Class Period. Excluded from the Class are Defendants' officers, directors and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of Light Cigarettes.

134. Plaintiff contends that Defendants have committed unfair business acts and practices.

135. The utility of Defendants' actions with regard to the advertising, marketing and promotion of its "light cigarettes," including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light" ("Acts") described in detail above and incorporated herein is negligible, if any,

when weighed against the extent of harm to the general public, Plaintiff and Class members.

136.   The harmful impact upon members of the general public and the Class who were and are misled and deceived by Defendants' Acts far outweighs any reasons or justifications by Defendants in not disclosing the truth about their Light Cigarettes in their advertising, marketing and promotion of such products.

137.   Defendants had an improper motive in the conduct of their Acts as alleged above in that it participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain its industry.

138.   The utilization of these unfair practices was and is under the sole control of Defendants, and was deceptively and deceptively hidden from members of the general public in Defendants' advertising, promotion and marketing of their Light cigarettes.

139.   As a purchaser and consumer of Defendants' Light Cigarettes and as a member of the general public in California who has been injured by Philip Morris's unfair practices, plaintiff is entitled to, and does bring, this class action seeking all available remedies under the UCL, including declaratory and injunctive relief and restitution, as well as attorneys' fees and costs.

140.   By its Acts described in detail above and incorporated herein, Defendants committed deceptive business acts and practices by making written and oral material representations and material omissions that have a capacity, tendency, and likelihood to deceive or confuse reasonable consumers regarding the actual nature and health risks associated with their Light Cigarettes as set forth in detail above.

141.   By their Acts, Defendants have also committed unfair business acts and practices within the scope of the UCL.

142.   The unfair, deceptive and unlawful Acts of Defendants present a threat to members of the general public in that Defendants are able to carry on their misrepresentations and omissions and cause additional future harm. Defendants continue these unfair, deceptive and unlawful business practices as alleged herein.

143.   Defendants' Acts constitute unfair and deceptive business practices within the meaning of California Bus. & Prof. Code § 17200 et seq. Plaintiff and members of the Class were and are likely to be deceived by Defendants' Acts.

144.   Pursuant to California Bus. & Prof. Code § 17203 and Fed.R.Civ.Pro. Rule 65, plaintiff, individually and on behalf of the Class, seeks an order of this Court prohibiting Defendants from making, or causing to be made in any way, any material, false, misleading or deceptive statement, claim, representation and/or omission, or to engage in any promotional campaigns, that portray Light Cigarettes as less harmful than full-flavor cigarettes, including, but not limited to, the use of any cigarette descriptors in packaging, labeling, advertising, or any other method of communicating with consumers, that conveys implicit and/or explicit health claims by use of the terms, "low tar," "light," "mild," "medium" and "ultra light"

145.   There were reasonably available alternatives to further Defendants' legitimate business interest, other than the conduct described herein.

146.   All of Defendants' conduct as described herein occurs and continues to occur in Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

147. As a result of Defendants' wrongful conduct, Plaintiff and the Class have suffered injury in fact and lost money. Indeed, Plaintiff purchased Light Cigarettes on numerous occasions because of Defendants' false, misleading, and/or deceptive statements and/or representations and omissions. Plaintiff would not have purchased Light Cigarettes if he had known that the claims and advertising described herein were false.

148. Pursuant to California Bus. & Prof. Code § 17203 and 1735, Plaintiff, individually and on behalf of members of the general public, seeks an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising the sale and use of Light Cigarettes. Likewise, Plaintiff, individually and on behalf of the Class, seeks an order requiring Defendants to disclose such misrepresentations and/or omissions.

149. Plaintiff and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. Defendants' unlawful, unfair and/or deceptive acts and practices, as described above, present a serious, ongoing and future threat to Plaintiff and members of the general public.

150. Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, individually and on behalf of members of the general public, further seeks an order of this Court seeks an award of restitution of all monies that may have been acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said wrongful conduct.

151. Pursuant to Civil Code § 3287(a), Plaintiff, individually and on behalf of the Class, seeks pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.

## COUNT 3

## FOR VIOLATION OF BUS & PROF. CODE § 17200 *ET SEQ.*

## (with respect to the fraudulent prong of the Unfair Competition Act)

## (By Plaintiff and the Class as Against All Defendants, Including Does 1-100)

152.   Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

153.   This cause of action is brought pursuant to California Bus. & Prof. Code § 17200 *et seq* on behalf of Plaintiff and members of a Class consisting of all persons who purchased Light Cigarettes in the State of California for personal use and not for resale during Class Period.   Excluded from the Class are Defendants' officers, directors and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of Light Cigarettes.

154.   Plaintiff contends that Defendants have committed fraduelent business acts and practices.

155.   The utility of Defendants' actions with regard to the advertising, marketing and promotion of their Light Cigarettes, including but not limited to the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light" ("Acts") described in detail above and incorporated herein, is negligible, if any, when weighed against the extent of harm to the general public, Plaintiff and Class members.

156.   The harmful impact upon members of the general public and the Class who were and are misled and deceived by Defendants' Acts far outweighs any reasons or justifications by Defendants in not disclosing the truth about their Light Cigarettes in their advertising, marketing and promotion of Light Cigarettes.

157. Defendants had an improper motive in the conduct of their Acts as alleged above in that they participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain their industry.

158. The utilization of these unfair practices was and is under the sole control of Defendants, and was deceptively and deceptively hidden from members of the general public in Defendants' advertising, promotion and marketing of their Light Cigarettes.

159. As a purchaser and consumer of Defendants' Light Cigarettes and as a member of the general public in California who has been injured by Defendants' unfair practices, Plaintiff is entitled to, and does bring, this class action seeking all available remedies under the UCL, including declaratory and injunctive relief and restitution, as well as attorneys' fees and costs.

160. By their Acts described in detail above and incorporated herein, Defendants committed deceptive business acts and practices by making written and oral material representations and material omissions that have a capacity, tendency, and likelihood to deceive or confuse reasonable consumers regarding the actual nature and health risks associated with their Light Cigarettes as set forth in detail above.

161. By their Acts, Defendants have also committed unlawful business acts and practices within the scope of the UCL by violating the CLRA and the FAL as set forth below. The CLRA and FAL violations serve as a predicate violation of this prong of the UCL.

162. The unfair, deceptive and unlawful Acts of Defendants present a threat to members of the general public in that Defendants are able to carry on their misrepresentations and omissions and cause additional future harm.

Defendants continue these unfair, deceptive and unlawful business practices as alleged herein.

163.   Defendants' Acts constitute unlawful, unfair and deceptive business practices within the meaning of California Bus. & Prof. Code § 17200 et seq. Plaintiff and members of the general public were and are likely to be deceived by Defendants' Acts.

164.   Pursuant to California Bus. & Prof. Code § 17203 and F.R.Civ.P. 65, Pplaintiff, individually and on behalf of members of the general public, seeks an order of this Court prohibiting Defendants from making, or causing to be made in any way, any material, false, misleading or deceptive statement, claim, representation and/or omission, or to engage in any promotional campaigns, that portray Light Cigarettes as less harmful than full-flavor cigarettes, including, but not limited to, the use of any cigarette descriptors in packaging, labeling, advertising, or any other method of communicating with consumers, that conveys implicit and/or explicit health claims by use of the terms, "low tar," "light," "mild," "medium" and/or "ultra light."

165.   There were reasonably available alternatives to further Defendants' legitimate business interest, other than the conduct described herein.

166.   All of Defendants' conduct as described herein occurs and continues to occur in Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

167.   As a result of Defendants' wrongful conduct, Plaintiff and the Class have suffered injury in fact and lost money.  Indeed, Plaintiff purchased Light Cigarettes on numerous occasions because of Philip Morris' false, misleading, and/or deceptive statements, claims, representations and/or omissions.  Plaintiff

would not have purchased Light cigarettes if he had known that the claims and advertising described herein were false.

168.   Pursuant to California Bus. & Prof. Code § 17203 and 1735, Plaintiff, individually and on behalf of members of the general public, seeks an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising the sale and use of Light Cigarettes. Likewise, Plaintiff, individually and on behalf of the Class, seeks an order requiring Defendants to disclose such misrepresentations and/or omissions.

169.   Plaintiff and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unlawful, unfair and/or deceptive acts and practices of Defendants, as described above, present a serious, ongoing and future threat to plaintiff and members of the general public.

170.   Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, individually and on behalf of members of the general public, further seeks an order of this Court seeks an award of restitution of all monies that may have been acquired by Philip Morris by means of responsibility attached to Philip Morris' failure to disclose the existence and significance of said wrongful conduct.

171.   Pursuant to Civil Code § 3287(a), Plaintiff, individually and on behalf of the Class, seeks pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.

## COUNT 4

### FOR VIOLATION OF BUS. & PROF. CODE § 17500 ET SEQ.

### (By Plaintiff and the Class as Against All Defendants, Including Does 1-100)

172. Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

173. In violation of California Bus. & Prof. Code § 17500, Defendants have disseminated, or caused to be disseminated, false, deceptive and misleading statements, claims, representations and/or omissions in advertisements, promotion and/or marketing for Light Cigarettes by their Acts described in detail above and incorporated herein.

174. Defendants' Acts and their representations and/or omissions in advertisements, promotions and marketing related to Light Cigarettes are false, deceptive and misleading as set forth in detail above and incorporated herein.

175. Defendants caused, and continues to cause, the dissemination of such false, deceptive and misleading statements as alleged herein.

176. Defendants are disseminating advertising concerning their Light Cigarettes which by its very nature is false, deceptive and misleading within the meaning of California Bus. & Prof. Code § 17500 et seq. Such advertisements are likely to mislead and deceive, and continue to mislead and deceive the consuming public.

177. In making and disseminating the false, deceptive and misleading statements, claims, representations and/or omissions regarding their Light Cigarettes and by their Acts described in detail above and incorporated herein, Defendants knew that the statements were false, deceptive and misleading, and acted in violation of California Bus. & Prof. Code § 17500 et seq.

178. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class Members have suffered substantial monetary and non-

monetary damages. Pursuant to California Business and Professions Code §
17535 and F.R.Civ.P. 65, Plaintiff, individually and on behalf of members of the
general public, seeks an order of this Court prohibiting Defendants from making,
or causing to be made in any way, any material, false, misleading or deceptive
statement, claim, representation and/or omission, or to engage in any
promotional campaigns, that portray Light Cigarettes as less harmful than full-
flavor cigarettes, including, but not limited to, the use of any cigarette
descriptors in packaging, labeling, advertising, or any other method of
communicating with California consumers, that convey implicit and/or explicit
health claims by use of the terms, "low tar," "light," "mild," "medium" and
"ultra light"

179. Plaintiff and members of the general public may be irreparably
harmed and/or denied an effective and complete remedy if such an order is not
granted. The false, deceptive and misleading statements by Defendants, as
described above, present a serious, ongoing and future threat to Plaintiff and
members of the general public.

180. As a result of Defendants' violations of the FAL, Plaintiff and the
Class are entitled to restitution for out-of-pocket expenses, economic harm and
Defendants' unjust enrichment. Accordingly, Plaintiff, individually and on
behalf of members of the general public, also seeks an order of this Court
restoring all monies that may have been acquired by Defendants as a result of
such unlawful, unfair, or deceptive act or practices.

181. Pursuant to Civil Code section 3287(a), Plaintiff and Class members
are further entitled to pre-judgment interest as a direct and proximate result of
Defendants' wrongful conduct. The amount of funds paid by Plaintiff and Class
members as a result of said acts is a sum certain and capable of calculation, and

plaintiff and Class members are entitled to interest in an amount to be set forth according to proof.

## COUNT 5
## VIOLATIONS OF CIVIL CODE § 1750, *ET SEQ.*
**(By Plaintiff and the Class as Against All Defendants, Including Does 1-100)**

182. Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

183. Defendants' Acts described in detail above and incorporated herein were undertaken by Defendants in connection with "transactions" (as defined in Civil Code §1761(e)) which were intended to and did result in the sale of "goods" (as defined in Civil Code §1761(a)) to "consumers" (as defined in Civil Code §1761(d)). Those Acts violated and continue to violate Section 1770(a)(5) of the CLRA in that Defendants represented and continue to represent that their Light Cigarettes have characteristics, uses and benefits regarding purported lower tar and nicotine delivery and purported related health benefits that it do not have, as set forth in detail above. Defendants also fail to disclose that Light Cigarettes do not in fact deliver less tar and/or nicotine than non-Light Cigarettes of the same brand(s).

184. Plaintiff and Class members seek and are entitled to equitable relief in the form of an order:

      a. pursuant to California Civil Code § 1780(a)(2) and F.R.Civ.P. prohibiting Defendants from making, or causing to be made in any way, any material, false, misleading or deceptive statement, claim, representation and/or omission, or to engage in any promotional campaigns, that portray Light Cigarettes as less harmful than full flavor cigarettes, including but not limited to the

use of any cigarette descriptors in packaging, labeling, advertising, or any other method of communicating with California consumers, that convey implicit and/or explicit health claims by use of the terms, "low tar," "light," "mild," "medium" and "ultra light";

b. pursuant to California Civil Code § 1780(a)(3) requiring Defendants to make full restitution of all monies wrongfully obtained as a result of the conduct described above; and

c. pursuant to California Civil Code § 1780(a)(2) requiring Defendants to disgorge all ill-gotten gains flowing from the conduct described above.

185.  Pursuant to Section 1782 of the CLRA, Plaintiff notified Defendants in writing of the particular violations of Section 1770 of the CLRA (the "Notice") and demanding, among other things, that Philip Morris cease using any cigarette descriptors in packaging, labeling, advertising, or any other false, deceptive and misleading method of communicating with California consumers, that convey implicit and/or explicit health claims by indicating lower tar and/or nicotine delivery by its cigarettes, including, but not limited to use of the terms, "low tar," "light," "mild," "medium" and "ultra light." Plaintiff sent Notice by means of certified mail, return-receipt requested to Defendants at their principal places of business, and to their registered agents for service as set forth above prior to seeking money damages. Should Defendants fail to respond to Plaintiff's demands within the thirty-day statutory period set forth for doing so in the CLRA,[7] Plaintiff will seek leave of Court to amend this First Amended Complaint pursuant to § 1782 of the CLRA to request statutory damages, actual

---

[7] This thirty-day statutory period will expire on or about December 24, 2009.

damages, plus punitive damages, interest and attorney's fees. Regardless of such an amendment to seek damages, Plaintiff seeks herein, as it is entitled to, pursuant to § 1780(a)(2) of the CLRA, an order as set forth herein enjoining the above-described wrongful acts and practices of Defendants, plus costs and attorney's fees and any other relief which the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually, and on behalf of all others similarly situated, and for members of the general public, prays for relief pursuant to each cause of action set forth in this Complaint as follows:

1. For an order certifying that the action may be maintained as a class action;

2. For an order enjoining Defendants from pursuing the policies, acts and practices complained of herein;

3. For an order requiring Defendants to pay restitution to Plaintiff and all members of the Class as available under the First, Second, Third, Fourth counts;

4. For an award of attorney's fees and costs pursuant to, *inter alia*, Code of Civil Procedure § 1021.5;

5. For pre- and post-judgment interest on any amounts awarded; and,

6. For such other and further relief as the Court deems just and proper.


DATED: December 7, 2009        /s/ Wayne S. Kreger

MILSTEIN, ADELMAN & KREGER, LLP
WAYNE S. KREGER, State Bar No. 154759
wkreger@maklawyers.com
SARA D. AVILA, State Bar No. 263213
savila@maklawyers.com
2800 Donald Douglas Loop North
Santa Monica, California 90405
Telephone (310) 396-9600
Facsimile (310) 396-9635
*Attorneys for Plaintiff Miles Tyrer*

/s/ Howard Rubinstein
Howard Rubinstein (Fla. SBN: 104108)
howardr@pdq.net
914 Waters Avenue, Suite 20
Aspen, Colorado 81611
Tel.: (832) 715-2788
*Attorney for Plaintiff Miles Tyrer*

/s/ Harold M. Hewell
HEWELL LAW FIRM
Harold M. Hewell, State Bar No. 171210
105 West F Street, Suite 213
San Diego, California 92101
Tel: (619) 235-6854 ✦ Fax: (888) 298-0177
*Attorney for Plaintiff Miles Tyrer*

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure, Rule 38(b), Plaintiff demands a trial by jury of all triable issues herein.

DATED: December 7, 2009   /s/ Wayne S. Kreger

MILSTEIN, ADELMAN & KREGER, LLP
WAYNE S. KREGER, State Bar No. 154759
wkreger@maklawyers.com
SARA D. AVILA, State Bar No. 263213
savila@maklawyers.com
2800 Donald Douglas Loop North
Santa Monica, California 90405
Telephone (310) 396-9600
Facsimile (310) 396-9635
*Attorneys for Plaintiff Miles Tyrer*

/s/ Howard Rubinstein
Howard Rubinstein (Fla. SBN: 104108)
914 Waters Avenue, Suite 20
Aspen, Colorado 81611
Tel.: (832) 715-2788
*Attorney for Plaintiff Miles Tyrer*

/s/ Harold M. Hewell
HEWELL LAW FIRM
Harold M. Hewell, State Bar No. 171210
105 West F Street, Suite 213
San Diego, California 92101
Tel: (619) 235-6854 ⬧ Fax: (888) 298-0177
*Attorney for Plaintiff Miles Tyrer*

## <u>CERTIFICATE OF SERVICE</u>

Service of the above Unopposed Motion to Amend Complaint Pursuant to Federal Rule of Civil Procedure 15(a)(2) has been made through the Court's ECF system on all those registered to receive ECF service, and on all others, not registered but listed on the Court's Manual Notice List, by regular mail.

Date: December 9, 2009

*/s/ Sara D. Avila*
Sara D. Avila, Esq.
MILSTEIN, ADELMAN &
KREGER, LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Attorney for Plaintiffs