UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN RE: LIGHT CIGARETTES MARKETING AND SALES PRACTICES LITIGATION | ) MDL DOCKET NO.: 1:09-2068 )<br>) (Harrison Mulford, III, *et al.* v. Altria Group, Inc, *et al.*, Civil Action No. CV 05-659 MV/RHS, District of New Mexico)<br>)<br>)<br>) |

## THIRD AMENDED CLASS ACTION COMPLAINT

JURISDICTION AND VENUE

1.  Plaintiffs Harrison Mulford, III, Rhonda Newby, Richard DeLuna and Corey Fox are citizens and residents of the State of New Mexico who purchased Marlboro Lights and Ultra Lights brands of cigarettes in New Mexico.

2.  Defendant Altria Group, Inc. ("Altria") is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, N.Y. At all times relevant hereto, Altria, through its wholly owned subsidiary Philip Morris USA, Inc., engaged in the business of manufacturing, promoting, marketing, distributing and selling Cambridge Lights and Marlboro Lights brand cigarettes. Altria transacts business in Albuquerque, New Mexico, and in all states throughout the United States. Defendant Altria has significant contacts with New Mexico and the activities complained of herein occurred in New Mexico.

3.  Defendant Philip Morris USA, Inc. ("Philip Morris") is a Virginia corporation with its principal place of business at 6601 West Broad Street, Richmond, Virginia. Philip Morris is a

wholly owned subsidiary of Altria.  Philip Morris transacts business in Bernalillo County, New Mexico, and in all states throughout the United States. Defendant Philip Morris has significant contacts with New Mexico and the activities complained of occurred, in whole or in part, in New Mexico.

4. A substantial part of the trade and commerce occurred within the State of New Mexico, and affected persons of this state and within Bernalillo County, New Mexico.  Defendants transacted the business which is the subject of this complaint in New Mexico, and shipped products into, or caused them to be shipped into New Mexico, including Bernalillo County.  Plaintiffs purchased Marlboro Lights or Cambridge Lights manufactured by Defendants at all times relevant to this Complaint from retail stores located in New Mexico.

5. This court has subject matter jurisdiction of this matter under the Class Action Fairness Act and its corresponding amendment to diversity jurisdiction set forth in 28 U.S.C. Section 1332(2)(A) as a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which Plaintiffs are citizens of a state other than Defendants.

## FACTS OF THIS CASE

6. At all times relevant to this litigation, Defendants have manufactured so-called "lowered tar" or "Lights" filtered cigarettes under the brand names "Marlboro Lights" and "Marlboro Ultra Lights."

7. At all times relevant to this litigation, Defendants have distributed and sold Marlboro Lights and Ultra Lights throughout the state of New Mexico.

8. At all relevant times, Defendant sold, marketed and promoted packages of Marlboro Lights and Ultra Lights as "light," "ultra light," "low tar" and "low nicotine."

9. While marketing and promoting decreased tar and nicotine deliveries, Defendants deceptively designed Marlboro Light and Ultra Light cigarettes to register lower levels of tar and nicotine when tested on the "Cambridge" or "Ogg" testing apparatus – the testing machine that is, and has been, voluntarily used by the tobacco industry to "measure" tar and nicotine levels in cigarettes – than would be delivered to consumers of the product.

10. At all times, Defendants controlled and manipulated the tar and nicotine delivery of Marlboro Lights and Ultra Lights under machine testing conditions to achieve apparent, yet deceptive, support for their representations that Marlboro Lights and Ultra Lights cigarettes are "light" and provide "lowered tar and nicotine."

11. Defendants' representations that Marlboro Lights and Ultra Lights cigarettes are "light" and/or lower in tar and nicotine than regular cigarettes are deceptive, misleading and constitute an unfair business practice under applicable law, as set forth herein.

12. Indeed, in selling these cigarettes, Defendants engaged in and carried out a massive campaign of deception, through affirmative representations and fraudulent concealment, by which they falsely and deceptively claimed and/or implied that Marlboro Lights and Ultra Lights somehow provided lower tar and nicotine to the smoker.

13. In addition to their affirmative misrepresentations, and in furtherance of their endeavors to deceive consumers, Defendants also fraudulently concealed the true nature of their "Lights" and purportedly "Lowered Tar and Nicotine" cigarettes.

14. Namely, and among other things, Defendants concealed the fact that these cigarettes were not light and lowered in tar and nicotine, and that their Lights cigarettes were more mutagenetic than regular cigarettes.

15. Defendants fraudulently concealed the matters set forth herein, including the facts, memos, and admissions contained within their own files, including information relating to the facts that people do not smoke like the testing machine, which Defendants voluntarily used to "measure" tar and nicotine yields; that people smoke in such a way that they get much more than predicted by the machine – i.e., they compensate; and that measured resistance to draw on unlit cigarettes is far from what the smoker experiences as he or she puffs a cigarette.

16. Philip Morris did not inform the public about the concept of compensation or the fact that consumers of Marlboro Lights and Ultra Lights could actually consume higher levels of tar and nicotine due to this phenomenon.

17. Moreover, at all times, Philip Morris knew of the inherent deception of the representations it made with respect to its so-called "Lights" cigarettes.

18. For example, a September 17, 1975 Philip Morris memorandum outlining the findings of its "Marlboro – Marlboro Lights study," evidences that Philip Morris was cognizant that smokers of Marlboro Lights did not receive any reduction in the delivery of particulate matter (i.e., tar and nicotine), because smokers smoked the "lights" cigarettes differently than the regular cigarettes. In pertinent part, this memorandum provides as follows:

> The smoker data collected in this study are in agreement with results found in other project studies. The panelists smoked the cigarettes according to physical properties; i.e., the dilution and the lower RTD [Resistance to Draw] of Marlboro Lights caused the smokers to take larger puffs on that cigarette than on Marlboro 85's [i.e., regular Marlboro cigarettes] The larger puffs, in turn, increased the delivery of Marlboro

  Lights proportionally. *In effect, the Marlboro 85 smokers in this study did not achieve any reduction in smoke intake by smoking a cigarette (Marlboro Lights) normally considered lower in delivery.* Conversely, the Marlboro lights smokers did not increase their smoke intake when they changed to the regular delivery cigarette. (Emphasis added).

19. In January 1972, Philip Morris' research department drafted an internal memoranda describing the phenomenon of smoker compensation, which Philip Morris concealed from smokers of "light" cigarettes in furtherance of its schemes to defraud:

  This finding supports the notion that smokers develop a daily nicotine intake quota and that when smoking cigarettes differing in nicotine delivery from that to which they are accustomed they tend to modify their consumption rate in order to maintain their normal quota.

20. An August 11, 1967 internal memorandum describes the fact that lights cigarettes do not provide lowered tar and nicotine:

  The smoker is, thus, apparently defeating the purpose of dilution to give him less "smoke" per puff. He is certainly not performing like the standard smoking machine; and to this extent the smoking machine data appear to be erroneous and misleading. It has probably always been so for diluted smoke cigarettes, whether dilution is obtained by porous paper or holes in the filter.

21. An April 1974 Philip Morris review of smoking and health literature discusses the absence in the market of any "low tar" cigarette that is actually less harmful, and acknowledges that low tar cigarettes may in fact be more harmful than regular cigarettes due to smoker compensation:

  If nicotine is the addictive compound in the tobacco smoke, cigarettes with low content of nicotine may even be more dangerous than the usual cigarette, due to their supposed higher degree inhalation [sic] . . .

22. A March 1, 1977 memorandum by Stanley Schacter of Philip Morris to Thomas Osdene, Philip Morris Director of Research, establishes that Philip Morris had a clear understanding

5

of compensation. Among the conclusions were: "Serious smokers smoke to prevent withdrawal. Smokers regulate nicotine intake . . . . The smoker who fails to regulate suffers withdrawal."

23. By 1978, Philip Morris had substantial evidence that "filter dilution [which Philip Morris used to reduce the test machine tar and nicotine yields] was somehow acting to increase" the "activity" (a measure of mutagenicity) of the whole smoke condensate collected from its cigarettes. Further experiments confirmed that the tar from ventilated low tar cigarettes measured higher on mutagenicity tests than non-ventilated products.

24. Additional research conducted in 1979 yielded the same result. Moreover, Clifton Lilly, Senior Vice President of Technology at Philip Morris, has confirmed that data from tests run at INBIFO, Philip Morris' research facility in Germany, showed that the Ames test for mutagenicity (to measure the degree to which a substance causes mutations such as tumors and/or cancer) from Marlboro Lights was significantly higher than the tar from Marlboro full flavor products.

25. Philip Morris went to such great lengths to misrepresent the cigarettes that it was producing that, in 1970, Helmut Wakeham, Philip Morris's Vice President for Research and Development, recommended that Philip Morris purchase INBIFO, a research facility in Germany, arguing that Germany "is a locale where we might do some of the things which we are reluctant to do in this country." Handwritten notes of Thomas Osdene, a senior Philip Morris research official, laid out the methodology for handling documents from INBIFO related to smoking, directing that sensitive information be sent to his home where he would review and destroy it:

(1) Ship all documents to Cologne . . .

(2) Keep in Cologne.

(3) OK to phone and telex (these will be destroyed)

6

(4)  Please make available a file cabinet. Jim will put into shape by end of August or Beginning of Sept.

(5)  We will monitor in person every 2-3 months.

(6)  If important letters have to be sent please send to home – I will act on them and destroy.

26. At all times, Defendants knew the truth about their purportedly "light," "ultra light" and "lowered tar and nicotine" cigarettes but took action in furtherance of their schemes to deceive the consuming public.

27. Indeed, in 2001, the U.S. Department of Health and Human Services, in a study entitled Monograph 13, *Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine*, concluded that the tobacco industry did in fact know that representations of a cigarette being "light" were inherently deceptive:

> Internal tobacco company documents demonstrate that the cigarette manufacturers recognized the inherent deception of advertising that offered cigarettes as "Light" or "Ultra-Light," or as having the lowest tar and nicotine yields.

28. Moreover, not only do consumers receive higher levels of tar and nicotine than the testing apparatus registers, but the smoke produced by the Marlboro Lights and Ultra Lights is more mutagenic (causing genetic and chromosomal damage) per milligram of tar than regular cigarettes.

29. Defendants engaged in a common course of unfair business practices and /or deceptive and unlawful conduct in connection with the manufacture, distribution, promotion, marketing and sale of Marlboro Lights and Ultra Lights by, among other things, the following:

   a.  Falsely and misleadingly representing that their product is "light," "ultra light" and/or delivers lowered tar and nicotine in comparison to regular cigarettes;

      b.      Fraudulently concealing the true nature of their so-called "Lights" and "Ultra Light" cigarettes;

      c.      Fraudulently concealing the matters set forth herein, including the facts, memos, and admissions contained within their own files, including information relating to the facts that people do not smoke like the testing machine, which Defendants voluntarily used to "measure" tar and nicotine yields; that people smoke in such a way that they get much more than predicted by the machine – i.e., they compensate; and that measured resistance to draw on unlit cigarettes is far from what the smoker experiences as he or she puffs a cigarette.

      d.      Describing the product as "light" and/or "ultra light" when the so-called lowered tar and nicotine deliveries depended on deceptive changes in cigarette design and composition that dilute the tar and nicotine content of the smoke per puff as measured by the industry standard testing apparatus, but not when used by the consumer;

      e.      Intentionally manipulating the design and content of Marlboro Lights and Ultra Lights cigarettes in order to maximize nicotine delivery while falsely and/or deceptively claiming lowered tar and nicotine. These manipulations include, but are not limited to, the modification of tobacco blend, weight, rod length, and circumference; the use of reconstituted tobacco sheets and/or expanded tobacco; and the increase of smoke pH levels by chemical processing and additives, such as ammonia, which resulted in the delivery of greater amounts of tar and nicotine when smoked under actual conditions than Defendants represent by use of the "light" description;

    f.  Employing techniques that purportedly reduced machine-measured levels of tar and nicotine in Marlboro Lights and Ultra Lights cigarettes, while the actual harmful biological effects, including mutagenicity (genetic and chromosomal damage) to the consumer were actually increased.

30. Through their longstanding fraudulent and unfair conduct, including their fraudulent concealments, Defendants willfully deceived consumers, including Plaintiffs named herein, regarding the nature and effect of their "light" and/or "ultra light" cigarettes.

31. Consumers of these cigarettes, including Plaintiffs, were led to believe that they were receiving a product that was "light" or "ultra light" regardless of how they smoked these cigarettes.

32. Plaintiffs believed that they were receiving a product different from that which they purchased.

33. Defendants' misleading practices induced Plaintiffs to purchase these cigarettes based on statements about the cigarettes that suggested that they delivered lower tar and nicotine to all smokers, which is untrue.

34. Plaintiffs purchased and consumed Marlboro Lights and/or Ultra Light cigarettes daily over a period of years. Plaintiffs were without knowledge of the conduct by Defendants alleged in this Complaint, or from any facts from which it might be reasonably concluded that Defendants were so acting, or which could have lead to the discovery of such action, until 2003, when there was public knowledge of the misleading representations of Defendants.

35. Defendants have unfairly and unjustly profited from the deceptive and misleading representations regarding their so-called "light" and "ultra light" cigarettes.

## CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a Class action against Defendants pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of a Class consisting of all persons who purchased Defendants' Marlboro Lights and Ultra Lights cigarettes in New Mexico.  The class period commences on the first date the Defendants placed their Marlboro Lights and Ultra Lights cigarettes into the stream of commerce through the date the Court certifies this suit as a class action.  Excluded from the class are Defendants, any parent, subsidiary, affiliate, or controlled person of Defendants, as well as officers, directors, agents, servants or employees of Defendants, and the immediate family member of any such person. Also excluded is any judge who may preside over this case.

37.     Plaintiffs are members of the Class and each will fairly and adequately assert and protect the interests of the Class.

38.     Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of members of the Class whose identities can be ascertained from the records and files of Defendants and from other sources.

39.     Common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to, the following:

    a.     Whether Defendant misrepresented the actual tar and nicotine delivered to consumers of "light" and "ultra light" cigarettes they manufactured, marketed, and/or distributed;

    b.     Whether Defendants intentionally designed "light" and "ultra light" cigarettes to register misleading tar and nicotine measurements on the testing apparatus utilized by the tobacco industry;

   c. Whether Defendants fraudulently concealed the matters set forth herein, including the facts, memos, and admissions contained within their own files, including information relating to the fact that many people do not smoke like the testing machine and therefore, these measurements did not apply to all smokers;

   d. Whether Defendants broad use of the terms "light" and "ultra light" to generally market and sell these cigarettes deceived the public into believing that the cigarettes would deliver lower tar and nicotine for all smokers, regardless of how they were smoked;

   e. Whether as a result of Defendants' deceptive use of the terms "light" and "ultra light" without more, Plaintiffs were led to believe that they were purchasing a healthier cigarette that would deliver lower tar and nicotine regardless of how the cigarette was smoked;

   f. Whether this deception resulted in Plaintiffs' purchasing a product that was not what they believed they were purchasing and which was not as valuable to the Plaintiffs as Defendants led them to believe;

   g. Whether the Defendants violated the New Mexico Unfair Practices Act through their course of unfair and/deceptive conduct as alleged herein;

   h. Whether the Defendants were unjustly enriched at the expense of the Class members; and

   i. Whether the Class has been damaged and, if so, the extent of the damages.

40. The prosecution of separate actions by individual members of the Class would create risk of:

    a. Inconsistent or varying adjudications with respect to individual members of the Class; and

    b. Adjudication with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

  41. The claims of each Plaintiff, and the anticipated defenses raised by Defendants are typical of the claims or defenses of the class, and the class action method is appropriate for the fair and adequate prosecution of this action.

  42. Individual litigation of claims which might be assessed by all Class members would produce a multiplicity of cases such that the judicial system having jurisdiction of the claims would remain congested for years. Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid conclusion to all litigation of all claims arising out of the conduct of Defendants.

  43. The certification of a class would allow litigation of claims that, in view of the expense of litigation, may be an insufficient in amount to support separate claims.

  44. Accordingly, Plaintiffs bring this action on behalf of themselves and on behalf of all other members of the Class defined as follows:

> All persons who purchased Defendants' Cambridge Lights and Marlboro Lights in New Mexico, from the first date that Defendants sold Marlboro cigarettes and Cambridge Lights in New Mexico through the date of the certification of this class.
>
> Excluded from the class are Defendants, any parent, subsidiary, affiliate, or controlled person of Defendants, as well as officers, directors, agents, servants or employees of Defendants, and the

immediate family member of any such person. Also excluded is any judge who may preside over this case.

45. Plaintiffs and the proposed Class expressly disclaim any claim for damages for personal injuries as a potential cause of action contained within this suit.

COUNT I:
VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,
NMSA (1978), §57-12-1.

46. Plaintiffs reallege each of the preceding paragraphs as though set forth in full herein.

47. Plaintiffs bring this action pursuant to the New Mexico Unfair Practices Act, including but not limited to 57-12-1 *et seq*. This act prohibits deception, fraud, false pretenses, false promises, and misrepresentations, unfair practices, or the concealment, suppression or omission of any material facts with the intent that others may rely thereupon in connection with the sale or the advertisement of goods and services within the State of New Mexico.

48. Beginning the first date that Defendant placed their Marlboro Lights and Ultra Lights cigarettes into the steam of commerce and continuing through the present, Defendants, individually and/or jointly, by and through their employees, agents and/or brokers, engaged in misrepresentations, concealments, unlawful schemes and courses of conduct intended to induce the Plaintiff and members of the Class to purchase Defendants' Marlboro Lights and Ultra Lights cigarettes through one or more of the following deceptive acts and practices:

    a. Falsely and/or misleadingly representing that their product is "light," "ultra light" and/or delivers "lowered tar and nicotine" in comparison to regular cigarettes;

    b. Designing cigarettes to register lowered tar and nicotine levels under machine testing conditions while actually delivering higher levels of these compounds when smoked

by consumers, thereby rendering the "light" and/or "ultra light" product descriptor deceptive and misleading;

  c. Fraudulently concealing the true nature of their "Lights" and "Ultra Lights" cigarettes from Plaintiffs;

  d. Fraudulently concealing the matters set forth herein, including the facts, memos, and admissions contained within their own files, including information relating to the facts that people do not smoke like the testing machine, which Defendants voluntarily used to "measure" tar and nicotine yields; that people smoke in such a way that they get much more than predicted by the machine – i.e., they compensate; and that measured resistance to draw on unlit cigarettes is far from what the smoker experiences as he or she puffs a cigarette;

  e. Placing ventilation holes on the filter of light cigarettes that are covered or blocked by the smoker's lips or fingers under normal use, thereby negating the represented effects of the light brand;

  f. Manipulating the nicotine levels in their "light" and "ultra light" cigarettes;

  g. Employing techniques that purportedly reduce machine-measured levels of tar in their Marlboro Lights and Ultra Lights cigarettes, including increased air dilution through the use of ventilation holes in or near the filter, but which actually increase the mutagenicity (genetic and chromosomal damage) of tar delivered to the consumer and thereby increase the level of harmful toxins per milligram of nicotine by the consumer; and

  h. Manipulating the design of their Marlboro Lights and Ultra Lights cigarettes, including but not limited to, modifying the tobacco blend, weight, rod length and

circumference; using reconstituted tobacco sheets and/or expanded tobacco; increasing smoke pH levels by chemical processing and additives, such as ammonia, in such a way that resulted in delivery of greater amounts of tar and nicotine when smoked under actual conditions than Defendants represent by use of the "light" and "ultra light" product descriptor.

49. The facts which Defendants misrepresented as alleged in the preceding paragraph were material in that they would have been important to a reasonable consumer in making a decision whether to purchase Marlboro Lights and Ultra Lights cigarettes.

50. As a result of Defendants' deceptive practices, Plaintiffs believed that they were purchasing a cigarette that would deliver lower tar and nicotine to all who smoked them, which made them more attractive to Plaintiffs than other cigarettes that delivered regular levels of tar and nicotine.

51. Plaintiffs were induced to purchase these cigarettes based on Defendants' deceptive acts and Plaintiffs did not receive the product for which they bargained.

52. Defendants' deceptive acts and practices alleged in the preceding paragraphs occurred in connection with Defendants' conduct of trade and commerce in New Mexico.

53. The transactions that constitute the subject matter of this litigation are subject to the New Mexico Unfair Practices Act, NMSA (1978), §57-12-7, which states that these statutes "apply in all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent."

54. Defendants intended for Plaintiffs and members of the Class to purchase Defendants' Marlboro Lights and Ultra Lights cigarettes in reliance upon Defendants' deceptive acts and practices in the marketing and sale of their Marlboro Lights and Ultra Lights cigarettes.

55. Defendants' deceptive acts and practices were committed with willful and wanton disregard for whether or not Plaintiff and members of the Class would actually receive less tar and nicotine than they would have from a regular cigarette.

56. The conduct described above constitutes deceptive practices predominantly affecting the conduct of trade or commerce in violation of Section 57-12-1, *et seq.*, especially, and among other provisions, Section 57-12-10, which provides for private remedies to "a person who is likely to be damaged by an unfair or deceptive trade practice or by an unconscionable trade practice of another."

57. As a direct and proximate cause of Defendants' deceptive acts and practices, Plaintiff and members of the Class were economically damaged in that Plaintiffs and members of the Class did not receive "light" (lower tar and nicotine) cigarettes when they purchased Marlboro Lights and/or Ultra Lights cigarettes.

58. Plaintiffs and members of the Class have suffered actual damages in an amount to be proven at trial, but not less than $100,000,000, exclusive of interest, punitive or exemplary damages, attorneys' fees and costs.

59. Plaintiffs and the proposed Class expressly disclaim any claim for damages for personal injuries as a potential cause of action contained within this class action lawsuit.

60. Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations as the facts alleged above reveal.

61. Such affirmative acts of fraudulent concealment include, but are not limited to, failing to disclose and suppressing information concerning the above described misconduct. Through such acts of fraudulent concealment, the Defendants have been able to conceal from the public the truth about their misconduct, thereby tolling the running of any applicable statutes of limitation.

62. The public could not reasonably have discovered the Defendants' deceptive practices, the truth having been fraudulently and knowingly concealed by Defendants.

63. Because of the self-concealing nature of Defendants' actions, and their affirmative acts of concealment, Plaintiffs assert the tolling of any applicable statutes of limitation affecting claims by Plaintiffs and the Proposed Class.

## COUNT II
## UNJUST ENRICHMENT

64. Plaintiff realleges all of the preceding paragraphs.

65. As stated with more particularity above, Defendants embarked on and carried out a common scheme of marketing and selling light cigarettes by falsely and deceptively representing that the cigarettes were "lights," "ultra lights" or contained "lowered tar and nicotine."

66. Defendants' practices resulted in Plaintiffs and members of the Class purchasing what Defendants represented to be a low tar, low nicotine alternative to regular cigarettes for all smokers who smoked them, but that was not the product sold to Plaintiffs.

67. Defendants' practices further resulted in Plaintiff and members of the Class purchasing light cigarettes without understanding the true nature of Defendants' product or that Defendants manipulated their Marlboro Lights and Ultra Lights cigarettes to increase their own ill-gotten profits.

68. The monies paid by Plaintiffs and members of the Class to Defendants in the purchase of Marlboro Lights and Ultra Lights cigarettes conferred substantial benefits upon Defendants. Defendants knew of and appreciated the benefits conferred upon them by Plaintiff and the Class and accepted and retained these benefits, which, in justice and fairness, should be refunded and paid over to Plaintiff and members of the Class, in an amount to be proven at trial but less not than $100,000,000, not including interest, punitive or exemplary damages, attorneys' fees and costs. Plaintiffs and the proposed Class expressly disclaim any claim for damages for personal injuries.

WHEREFORE,

1. Plaintiffs pray that the Court enter Judgment on their behalf, and on behalf of the Proposed Class, against Defendants in whatever amount Plaintiffs are found to be entitled, but for not less than $100,000,000.

2. Plaintiffs further pray that this Court declare and determine that Defendants have violated NMSA (1978), Section 57-12-1, *et seq*.

3. Plaintiffs pray for a judgment awarding aforementioned damages plus pre and post judgment interest, costs, and attorneys' fees, punitive and exemplary damages.

4. In the event that there remain unclaimed funds in the compensatory award rendered herein, then said unclaimed funds shall be distributed to the University of New Mexico School of Medicine and University of New Mexico School of Law and to legal and medical programs designed to benefit lower economic groups, to be designated by the Court.

5. Other beneficiaries, if any, may be named at an appropriate time before trial.

Respectfully submitted,

**WILL FERGUSON & ASSOCIATES**

/s/ Deena B. Beard
WILLIAM  S. FERGUSON
DEENA B. BEARD
1720 Louisiana Blvd., N.E., #100
Albuquerque, N.M. 87110
Phone 505-243-5566
Fax 505-243-5699

GERARD MANTESE
Gerard V. Mantese & Mark Rossman
Mantese, Honigman, Rossman & Williamson
1361 Big Beaver Road
Troy, Michigan 48083
Tel: 248-457-9200
Fax: 248-457-9201

Attorneys for Plaintiffs

I HEREBY CERTIFY that on December 10, 2009, I filed the foregoing pleadings electronically through the CM/EMF system, which caused all counsel of record to be served by electronic means,

WILL FERGUSON & ASSOCIATES

 /s/ Deena B. Beard
DEENA B. BEARD