<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

</div>

| | |
|---|---|
| IN RE:  LIGHT CIGARETTES MARKETING SALES PRACTICES LITIGATION | ) ) )   **MDL Docket No.: 1:09-md-2068** |

| | |
|---|---|
| This case relates to: | ) ) |
| | )   E.D. Wisconsin |
| KEVIN E. KONKEL and CHARLES WYATT, Individually and on Behalf of All Others Similarly Situated, | )   Case No.: 09-cv-597-LA ) ) ) |
| Plaintiffs, | )   **FIRST AMENDED CLASS** )   **ACTION COMPLAINT** |
| vs. | ) ) |
| PHILIP MORRIS USA, INC., a Virginia corporation, | )   **Jury Trial Demanded** ) ) |
| ALTRIA GROUP, INC., a Virginia corporation, | ) ) ) |
| Defendants | ) ) |

NOW COME plaintiffs, Kevin E. Konkel and Charles Wyatt ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Ademi & O'Reilly, LLP, and for their First Amended Class Action Complaint against defendants, Philip Morris USA, Inc. ("Philip Morris"), and Altria Group, Inc. ("Altria"), (collectively "Defendants"), state as follows:

1.      This consumer class action concerns Defendants' manufacturing, marketing, advertising, promotion, distribution and sale of cigarettes labeled and represented as "Light", "Ultra-Light" "low tar" and "low nicotine" as delivering less nicotine to consumers and as being

less harmful to consumers than regular cigarettes of the same brand, despite Defendants'
knowledge that these representations were false, deceptive, misleading, and unfair.

## JURISDICTION

2.     This Court has subject matter jurisdiction over this action pursuant to the Class
Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because it is a class action filed pursuant to
Fed R. Civ. P 23, Plaintiffs and the Class members are of diverse citizenship from Defendants,
there are more than 100 Class members, and the aggregate amount in controversy, excluding
interest and costs, exceeds $5,000,000.

3.     Venue is proper within this District under 28 U.S.C. § 1391 because a substantial
part of the events giving rise to Plaintiffs' and the other Class members' claims occurred within
this District.

## NATURE OF THE ACTION

4.     Defendants manufacture, package, market, promote and/or sell cigarettes that are
labeled "light", "ultra light", "low tar" and "low nicotine" under a variety of different brands,
including but not limited to Marlboro.  For purposes of this Complaint, these cigarettes shall
collectively be referred to as "Light Cigarettes."

5.     For decades, Defendants have conducted numerous studies, as detailed below,
that reveal that Light Cigarettes are just as harmful to smokers' health and just as addictive in
nature as regular full-flavored cigarettes.  Nonetheless, in manufacturing, packaging,
marketing and/or promoting these Light Cigarettes, Defendants failed and continue to fail to
disclose that these Light Cigarettes are not actually less harmful or less addictive than full-
flavor cigarettes.

6.     Also, in manufacturing, packaging, marketing and/or promoting these Light Cigarettes, Defendants have misrepresented and continue to misrepresent that consumers of their Light Cigarettes would be exposed to less tar and/or less nicotine than users of full-flavored cigarettes of the same brand. In purchasing Defendants' Light Cigarettes, Plaintiffs and the Class did not receive what they paid for—a healthier alternative to smoking regular flavored cigarettes that would result in their receiving less tar and nicotine than smoking regular flavored cigarettes would.

7.     Plaintiffs seek both a preliminary injunction and a permanent injunction prohibiting Philip Morris from making, or causing to be made in any way, any material, false, misleading or deceptive statement or representation, or to engage in any promotional campaigns, that portray "light" and "low tar" cigarettes as less harmful than full-flavor cigarettes including, but not limited to, the use of any cigarette descriptors in packaging, labeling, advertising, or any other method of communicating with Wisconsin consumers, that convey implicit and/or explicit health claims by use of the terms, "low tar," "light," "mild," "medium" and "ultra light," terms which create the false impression that such cigarettes are less harmful to smokers than full-flavored, conventional cigarettes. Plaintiffs also seek restitution.

## PARTIES

8.     Plaintiff Kevin E. Konkel is a resident of Milwaukee County, Wisconsin.  He brings this action on behalf of himself as an individual consumer and on behalf of all others similarly situated. Plaintiff Konkel had been smoking Marlboro cigarettes for approximately two years prior to switching to Marlboro "Light" cigarettes approximately five years ago. Both Marlboro and Marlboro "Light" cigarettes are manufactured, marketed and promoted by Defendants.

9.      Plaintiff Charles Wyatt is a resident of Racine County, Wisconsin.  He brings this action on behalf of himself as an individual consumer and on behalf of all others similarly situated. Plaintiff Wyatt had been smoking Marlboro cigarettes for approximately ten years prior to switching to Marlboro "Light" cigarettes in approximately the summer of 2004. Both Marlboro and Marlboro "Light" cigarettes are manufactured, marketed and promoted by Defendants.

10.      Philip Morris USA Inc. ("Philip Morris" or "Defendant") is a Virginia corporation and holds itself out as the largest cigarette company in the United States, with approximately half of the U.S. cigarette market.   (www.altria.com/about_altria/1_1_altriagroup.asp, last viewed December 6, 2009). Philip Morris is a wholly-owned subsidiary of Altria Group, Inc., and is engaged in the manufacture and sale of cigarettes and other tobacco products in the United States.   At all times relevant herein, Philip Morris manufactured, marketed and promoted cigarette brands, including but not limited to the following: Accord, Alpine, Basic, Benson & Hedges, Bristol, Cambridge, Chesterfield, Collector's Choice, Commander, Daves, English Ovals, L&M, Lark, Marlboro, Merit, Parliament, Players, Saratoga, and Virginia Slims cigarettes. Philip Morris also manufactured, marketed and promoted the "light," "ultralight" and/or "low tar" versions of some of these brands (hereinafter collectively referred to as "Light Cigarettes"). For purposes of diversity jurisdiction, Philip Morris is a "citizen" of Virginia.

11.      Altria Group Inc. ("Altria" or "Defendant") is a Virginia corporation.  Altria is the publicly-held parent company of Philip Morris, USA and maintains its principal executive offices located at 6601 West Broad Street, Richmond, Virginia 23230. Altria's website claims that it has a "deep understanding of adult tobacco needs".  For purposes of diversity jurisdiction,

Altria is a "citizen" of Virginia.  Defendants Altria and Philip Morris shall be collectively referred to as "Defendants."

12.     As a wholly-owned subsidiary of Altria, Philip Morris was and is, at all times relevant herein, acting as the agent, servant and employee of Altria, and at all times herein mentioned, Philip Morris was acting within the purpose and scope of that agency and employment. Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each of the defendants was the agent, servant and employee of the other defendant, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Plaintiffs are further informed and believe and thereon allege that, at all times herein mentioned, each of the defendants' employees was the agent, servant and employee of each employee's respective employer, and at all times herein mentioned, each employee was acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of either of the defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of both defendants committed, knew of, performed, authorized, ratified and/or directed such act or transaction while actively engaged in the scope of their duties.

## FACTUAL ALLEGATIONS

### BACKGROUND: DEFENDANTS' MISREPRESENTATIONS AND/OR OMISSIONS REGARDING LIGHT CIGARETTES

13.     Philip Morris has known since the late 1950s of substantial evidence showing that smoking causes significant adverse health effects, particularly lung cancer. In 1964, the U.S. Surgeon General issued a report reviewing some 7,000 scientific articles on smoking and health, and stated that "cigarette smoking contributes substantially to mortality from certain specific

diseases and to the overall death rate," that "[c]igarette] smoking is associated with a 70 percent increase in the age-specific death rates of males," that "[c]igarette smoking is causally related to lung cancer in men," and that the "data for women, though less extensive, point in the same direction." The Surgeon General concluded in 1968 that "cigarette smoking can contribute to the development of cardiovascular disease and particularly to death from coronary heart disease."[1]

14.     From at least 1953 until at least 2000, Defendants repeatedly, consistently, vigorously, and falsely denied that there were any adverse health effects from smoking. Defendants mounted a coordinated, well-financed and sophisticated public relations campaign to attack and distort scientific evidence demonstrating the link between smoking and disease, claiming it was still an "open question." In doing so, it ignored massive documentation of that link compiled by its own scientists and executives and maintained in its own internal corporate files.

15.     On January 4, 1954, the cigarette industry published a full-page advertisement in 448 newspapers throughout the United States titled, "A Frank Statement to Cigarette Smokers ("Frank Statement")." In the Frank Statement, subscribed to by Philip Morris, the industry stated that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. Philip Morris and other participating companies accepted in the Frank Statement "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." For more than forty years after publication of the Frank Statement in 1954, and for more than thirty years after

---

[1] This and other factual references are from the Final Opinion, *United States of America et al. v. Philip Morris USA, Inc., et al.* (2006) United States District Court for the District of Columbia, Civil Action No. 99-2496 (GK), ("Opinion").  All finding of facts in the Opinion are true and incorporated and re-alleged herein by reference.

the Surgeon General's first report on smoking and health, Philip Morris maintained a position that denied a causal relationship between smoking and disease.

16.     For approximately forty years, Defendants publicly, vehemently, and repeatedly denied smoking's addictiveness and nicotine's central role in smoking. The denials stemmed from the fear: that public acknowledgment of what had been extensively documented and widely accepted within its own corporate offices and laboratories could result in regulation by the U.S. Food and Drug Administration ("FDA"); that Defendants would suffer adverse liability judgments from addicted smokers suffering adverse health effects of smoking; that the social acceptability of smoking would suffer; and ultimately, that Defendants would lose corporate profits.

17.     Overwhelming evidence shows that Defendants knew smoking is addictive and that nicotine is the agent that creates and sustains the addiction. Overwhelming evidence also indicates that even though Defendants have long known internally about cigarette addiction, it has endeavored to keep its extensive research and data out of the public domain and from the public health community by denying the existence of such data, by refusing to disclose it, and by closing or censoring laboratories and research projects investigating the mechanisms of nicotine.

18.     Extensive and overwhelming evidence also shows that Defendants have long known that nicotine creates and sustains smoking addiction and that cigarette sales and tobacco company profits depend upon creating and maintaining that addiction.

19.     Given the link between nicotine and profits, Defendants have engaged in extensive research into the operation of nicotine in the human body and the effect of physical and chemical design parameters of cigarettes on nicotine delivery to smokers. Using knowledge gained by that research, Defendants designed cigarettes to precisely control nicotine delivery and

provide nicotine doses at levels sufficient to create and sustain addiction. In doing so, Defendants concealed much of their nicotine-related research, and continuously and vigorously denied their efforts to control the levels of nicotine and nicotine delivery in their products.

20.     Defendants, individually, jointly and through third parties have studied: smoking intake and inhalation; "compensation"; addiction physiology; smoker psychology; the pharmacological aspects of nicotine; the effects of nicotine on brain waves; and related subjects. As a result, Defendants have known for decades that cigarettes are addictive and that this addiction is primarily caused by the delivery of nicotine at dependence-producing levels.

21.     Over the course of many years, Defendants sought to identify an "optimum" amount of nicotine, one that would meet smokers' demand for lower nicotine and tar products, but still provide enough nicotine to create and sustain addiction. Defendants focused on identifying a nicotine dose that would meet smokers' need for nicotine, thereby assuring continued smoking.

22.     As its understanding of nicotine delivery increased, Defendants developed more sophisticated product design techniques to assure a minimum nicotine dose sufficient to provide smokers with adequate "impact" and "satisfaction," regardless of the cigarette type.

23.     Internal documents of Defendants reveal that they used their knowledge of nicotine's pharmacological properties and addictive nature to create physical and chemical designs into its cigarettes that would assure nicotine delivery at the precise levels needed to assure taste, impact, and satisfaction, and thereby maintain smoker addiction.

24.     For decades, Defendants have recognized that a cigarette's commercial success depends upon its ability to deliver adequate levels of nicotine to smokers. The internal documents of Defendants have shown that they also understood that market position and the

financial viability of the tobacco industry as a whole required development of cigarettes that delivered nicotine in sufficient amounts to ensure that smokers became and remained addicted. Accordingly, for an extended period of time, Defendants undertook steps to develop such cigarettes.

25.     Philip Morris has known of the need for effective measurement and control of the levels of nicotine in cigarettes since the 1940s, when it conducted studies on nicotine control in its Parliament cigarettes. In a 1954 document, Philip Morris discussed its program to "ensur[e] the over-all quality and uniformity of the finished Parliament cigarette and thus maintain[] its appeal for discriminating smokers." The program was concentrated on "nicotine content, tar content, acid-base balance, and content of taste and aroma factors." The memorandum described the use of "informally constituted smoking panels and the results of nicotine analyses performed on the blends … to establish a desirable level of nicotine concentration in the blend and hence also in the smoke."

26.     From the 1950s and 1960s, and on through the 1980s and 1990s, the most senior executives at Altria and/or Philip Morris reviewed various means for controlling nicotine delivery that included the optimal level of nicotine delivery, leaf blending to achieve nicotine control, and increasing nicotine delivery in cigarette smoke.

27.     In a 1990 inter-office memorandum, Defendants' researchers reviewed the results of their Electrophysiological Studies Research Group, which explored and measured nicotine's effect on the brain. The memorandum listed, among the group's achievements, that it had "shown that there are optimal cigarette nicotine deliveries for producing the most favorable physiological and behavioral responses."

28.    The nicotine delivery levels of the cigarettes manufactured, marketed, advertised and sold by Defendants are not a matter of random variation. Instead, Defendants specifically design the products to deliver a range of nicotine levels that allow smokers to obtain an optimal dose from virtually any cigarette marketed, regardless of the result of that cigarette's nicotine delivery level as measured by the U.S. Federal Trade Commission ("FTC") method. [2]

29.    Defendants' efforts at nicotine control have not focused simply on delivering the highest nicotine levels possible, as large amounts of nicotine can cause cigarettes to taste harsh and unpalatable.

30.    Furthermore, an unsmoked cigarette already contains far more nicotine than is actually inhaled because all of the nicotine in the tobacco is not transferred to the smoke. According to FTC measurements, a cigarette that delivers approximately one milligram of nicotine in smoke typically retains "about 14-20 milligrams of nicotine in the unsmoked rod." Therefore, Defendants had to consider more than merely "spiking" cigarettes with additional nicotine in their efforts at nicotine delivery control. They have used a multitude of design parameters to manipulate and control the dose and form of nicotine that is delivered to mainstream cigarette smoke in its commercial products.

31.    In the 1950s and 1960s, Philip Morris became concerned that the increase in public awareness of the link between smoking and health could result in a call for lower levels of nicotine and tar in conventional commercial cigarettes. Philip Morris knew that if it sought to

---

[2] In June 1966, the FTC announced that it was establishing a laboratory to measure the content of tar and nicotine in cigarette smoke. The FTC employed the "Cambridge Filter Method," which uses a machine to "smoke" the cigarette at a specific "puff volume" at designated intervals for a certain period of time. The machine passes the smoke over a filter known as a Cambridge pad that collects particulate tar matter which is measured to calculate tar and nicotine yields for the tested cigarette. This was developed to offer smokers relative rankings of nicotine, tar, and carbon monoxide yields from tested cigarettes. Opinion, ¶ 212, 2049.

assuage smokers' health concerns by reducing levels of tar, it could result in a proportional drop in nicotine. It also realized that nicotine levels insufficient to sustain smokers' addiction could devastate the tobacco industry. In light of this concern, Philip Morris sought to develop commercial cigarettes that would deliver nicotine at a range of doses necessary to keep smokers addicted.

32.     In doing so, Philip Morris used its knowledge of "smoker compensation," the behavioral smoking changes employed by consumers to obtain desired amounts of nicotine, in its research on nicotine manipulation.

33.     The primary means Defendants have used to ensure that low-delivery cigarettes maintain smoker addiction is the use of physical design characteristics and ingredients that allow smokers to readily obtain the reinforcing level of nicotine, regardless of the cigarettes' yield as was measured by the FTC. Internal documents of Defendants show that they designed cigarettes that increase the flexibility of smokers' nicotine and tar dosing capacity even while reducing the tar and nicotine yields as measured by that FTC method.

34.     Nicotine delivery control can be achieved by changing the amount and type of tobacco used in cigarettes. It also can be achieved by adding, eliminating, or reducing certain substances from the tobacco blend before it is used as filler. Tobacco blend is the main component contributing to nicotine delivery because it determines how much nicotine will be in the unsmoked cigarette "rod."

35.     As the market shifted to products marked as "low tar/low nicotine" cigarettes, Defendants engaged in extensive efforts to control the nicotine-to-tar ratio in order to deliver more nicotine while decreasing tar.

36.     To achieve this, Defendants developed and used filters in their light/low-tar products that allow smokers to control the level of nicotine they inhale and to increase the nicotine-to-tar ratio in that inhaled smoke. As industry researchers explored filters that would reduce tar levels, Defendants understood that any resulting reduction in nicotine delivery could reduce the cigarettes' addictive properties. Therefore, Defendants worked to design a filter that would result in a lower FTC measurement of tar, but would not reduce nicotine transfer into the body. Defendants' goal was to create a filter that would target tar but deliver the requisite nicotine dose to sustain addiction.

37.     Design factors influencing the efficacy of the filter include: its physical design; density of the filter packing; filter length; filter wrapper porosity; ventilation holes and channels; and a variety of potential ingredients. By working with these, Defendants controlled nicotine yield and absorption by the body, as well as the taste and palatability of the cigarette.

38.     Filters also are used to control the size of particulate matter in the smoke that enters the body. Filter density, length, and ventilation can affect the ability of the smoke particles to coagulate and form particles as the smoke passes from the tobacco to the smoker's mouth. Particles that are too large cannot get into smokers' lungs efficiently. Particles that are too small might not be transferred across lung membranes before the smoker exhales. Large particles cannot efficiently get into the deep alveoli of the lung regardless of the intensity of the smoker's inhalation. As with most addictive drugs, the faster the drug is delivered into the body and then to the brain, the stronger is its effect.

39.     Defendants have also used ventilation holes to maintain nicotine delivery while reducing tar levels. These are small perforations in the cigarette paper that dilute mainstream cigarette smoke with air during inhalation. By doing so, ventilation holes can reduce the tar and

nicotine concentration in the smoke, thereby producing lower FTC readings for those substances when tested by FTC machine testing (the ventilation holes are usually located so they are not covered by the FTC smoking machine orifice). However, human smokers frequently block the ventilation holes with their lips or fingers. Therefore the FTC measurements of cigarettes with filter ventilation did not necessarily reflect the actual delivery of tar and nicotine to humans. Defendants have long known that the tar and nicotine yields measured under former FTC testing smoking conditions do not reflect those produced under human smoking conditions. Ventilation holes also change the chemistry of smoke by adding air to the smoke.

40.     Defendants have also changed paper porosity composition to affect the nicotine-to-tar ratio in smoke. Cigarette paper is treated with chemicals that can affect nicotine delivery and make the cigarettes burn hotter and faster.

41.     Cigarette papers used by Defendants are of controlled porosity. By controlling porosity, Defendants can lower the amount of nicotine in smoke measured by the FTC by changing the mix of gases in the smoke and affecting tobacco burning temperature, as well as by controlling the speed of cigarette burn.

42.     Filter overwrap also can affect the nicotine-to-tar ratio of smoke delivered to smokers. A layer of tough, glued paper that attaches the filter to the tobacco rod, the overwrap is composed of materials that resist decomposition when held in the lips. FTC testing parameters require the machine to stop "smoking" 3 millimeters before reaching the overwrap, thereby leaving unburned tobacco. Smokers often smoke all the way to the overwrap, thereby inhaling extra nicotine and tar. These puffs contain more nicotine and tar than tobacco farther away from the overwrap.

43.     Defendants also have used chemical additives to modify the form of nicotine delivered to the smoker, and to enhance the speed of its absorption by the body. Alteration of cigarette smoke pH was a primary area of research for this purpose. By 1993, Defendants used some form of ammonia technology for this purpose in some of their cigarette products.

44.     Internal research documents of Defendants show that they have known at least since the 1960s of their ability to alter the amount and form of nicotine delivered by using cigarette design techniques intended to raise the pH of smoke. The documents also show that Defendants have used design techniques such as ammonia technology and alteration of tobacco blend to raise smoke pH to create cigarettes that deliver more free nicotine that is absorbed by the body more quickly than cigarettes with lower smoke pH. Additionally, the documents reveal that Defendants took these actions in order to ensure that low-tar products would deliver doses of sufficient nicotine to create and sustain addiction.

45.     Despite overwhelming evidence to the contrary, Defendants have repeatedly and publicly denied that they manipulate nicotine content and delivery in cigarettes to create and sustain addiction. Defendants have repeatedly and publicly claimed that levels of nicotine delivered by cigarettes are determined by the levels of tar delivery.

46.     In 1994, the U.S. Congress held public hearings on the addictiveness of cigarettes, the design of cigarettes, and manipulation of nicotine. The Chief Executive Officers of six cigarette manufacturers, including Philip Morris, appeared voluntarily at a Subcommittee hearing on April 14, 1994.

47.     At the April 14, 1994, hearing, Philip Morris President and Chief Executive Officer William I. Campbell denied that nicotine is addictive, denied that Philip Morris research

establishes that smoking is addictive, and denied that Philip Morris manipulates the nicotine levels contained in cigarettes.

48.     Defendants have made the same or corresponding statements in other public statements, submissions to government authorities, at deposition and trial testimony, and in discovery responses, denying their ability and efforts to control nicotine.

49.     Defendants have made repeated, vigorous and impassioned public denials, before Congressional committees, in advertisements in the national print media, and on television, that neither smoking nor nicotine is addictive, and that they do not manipulate, alter, or control the nicotine levels in the cigarettes they manufacture. However, in light of overwhelming evidence to the contrary, those statements are false.

50.     Defendants have researched, developed, and used many different means of controlling the delivery and absorption of the optimum levels of nicotine that create and sustain smokers' addiction. These include, but are not limited to: altering the physical and chemical composition of tobacco leaf blends and filler; using filter design to maintain or increase the nicotine-to-tar ratio; using ventilation and air dilution methods; altering the porosity and composition of filter paper; speeding nicotine absorption to the central nervous system by adding ammonia to alter product pH; and by using other additives to increase the potency of nicotine.

51.     For many years Defendants denied that they manipulated nicotine levels in cigarettes to increase smoker addiction and dependence.

52.     For several decades, Defendants marketed and promoted their low-tar brands as being less harmful than conventional cigarettes, a claim that is false, given the clear evidence to the contrary. In making these false claims, Defendants gave smokers a purportedly acceptable alternative to quitting smoking, as well as an excuse for not doing so.

53.    Defendants used a combination of methods to market and promote low-tar brands. Their marketing has coupled claims of low tar and nicotine delivery with assertions that smoking these brands would reduce exposure to "controversial" elements of cigarette smoke, such as tar. Since the 1970s, Philip Morris also have used brand "descriptors" such as "light" and "ultra light" to convey the message that these brands are healthier, and an acceptable alternative to quitting. Additionally, Philip Morris has used sophisticated marketing imagery, including lighter color cigarette packaging and white tipping paper to reinforce that message.

54.    As it campaigned to market and promote filtered and low-tar cigarettes as less harmful, Defendants either lacked the evidence to substantiate these claims or knew them to be false. In fact, internal industry documents show that cigarette companies were aware by the late 1960s and early 1970s that low-tar cigarettes are unlikely to provide any clear health benefit to human smokers as they do not actually result in lower tar and nicotine delivery.

55.    Defendants have long known that nicotine delivered by cigarettes is addictive. Internal documents demonstrate an understanding of smoker compensation behavior, behavior that boosts smokers' intake of tar, thereby negating the primary purported health-related benefit of Light Cigarettes as promoted by Defendants.

56.    Defendants withheld the full extent and depth of their knowledge and understanding of smoker compensation to the public health community and government regulators.

57.    Defendants' actions were intended to promote their overarching economic goal, which was to keep smokers smoking, to stop smokers from quitting, and to encourage others to start smoking, thereby maintaining or increasing corporate profits.

58.     Because of smoker compensation and smokers' need to obtain certain levels of nicotine, they can increase per-cigarette nicotine yield by, among other things, taking bigger and more frequent puffs, smoking more of the cigarette, or by blocking ventilation holes. Also, they can simply smoke more cigarettes.

59.     Smoker compensation behavior has been discussed in scientific literature since at least the 1940s.

60.     Because each smoker seeks to obtain a certain nicotine quota, smokers end up inhaling essentially the same amount of both tar and nicotine from so-called "low-tar and nicotine" cigarettes as they would from regular "full-flavor" cigarettes. More than 95 percent of smokers compensate for nicotine.

61.     The amount of nicotine needed to sustain smokers' nicotine addiction does not change over time, which means that smoker compensation for reduced nicotine deliveries is permanent and lasts as long as the smoker smokes the low-tar product.

62.     In short, "light" and "ultra-light" cigarettes do not actually reduce the health risks of smoking.

63.     Dr. Jonathan Samet, a physician and epidemiologist with extensive experience treating patients with lung cancer and chronic obstructive pulmonary disease (COPD), is Chair of the Department of Epidemiology at the Johns Hopkins University Bloomberg School of Public Health. He is the author and/or editor of several Surgeon Generals' Reports spanning more than 25 years, and has contributed to several National Cancer Institute Tobacco Control Monographs. He has concluded that smoking lower tar and lower nicotine cigarettes "has had no clear benefit on the health risks of active smoking."

64. Despite a significant shift to filtered and "light" cigarettes over the last 50 years, the public health community has not seen any expected benefit. Instead, smoking-related health risks have increased significantly.

65. Defendants, because of their sophisticated understanding of smoker compensation, internally recognized that low-tar and light cigarettes offer no clear health benefit. A March 1, 1977, Philip Morris memorandum by an industry-funded scientist concluded that low-tar and low-nicotine cigarettes are not less harmful.

66. Research indicates that, compared with smokers of conventional, full-flavored cigarettes, low-tar cigarette smokers make more attempts to quit smoking. However, evidence shows that the false perception that low-tar cigarettes are safer than conventional cigarettes persuades them from doing so.

67. Many smokers who were concerned about the risks of smoking responded by switching to low-tar cigarettes instead of quitting.

68. The 2004 Report of the Surgeon General stated that "[r]esearch has demonstrated that with the expectation of reducing risk, many smokers switched to low machine-measured tar/nicotine cigarettes, and may thus have been deterred from quitting."

69. Defendants have conducted extensive research to help them identify and understand potential quitters, and to design marketing to persuade them from doing so. Industry documents evidence their recognition that smokers who were interested in quitting smoking were instead switching to low-tar cigarettes on the basis of the false belief that this would either help them quit or be healthier.

70. The cigarette industry has stated publicly that it produce low-tar cigarettes solely to meet consumer demand for "lighter," "milder" tasting cigarettes, and that it does not intend

the use of brand descriptors or its marketing to imply that the product is less harmful than conventional cigarettes. However, Defendants' internal marketing documents show that Philip Morris has known for decades that consumers prefer the taste of regular cigarettes to low-tar cigarettes, but are willing to forgo them for low-tar cigarettes because they believe them to be healthier.

71.     A May 1978 Tobacco Institute[3] document, entitled "A Study of Public Attitudes Toward Cigarette Smoking and the Tobacco Industry in 1978 Volume I," which was prepared for the Tobacco Institute by the Roper Organization, stated that: "low tar cigarette smokers . . . are potential cigarette quitters. . . . And more of them than the average have tried to quit smoking. Since low tar smokers are an expanding share of the market, its greater desire to quit smoking poses a special problem for the cigarette industry."

72.     Defendants have made, and continue to make, false and misleading statements about low-tar cigarettes to reassure smokers, and to dissuade them from quitting. These include: assertions that low-tar cigarettes deliver "low," "lower," or "less" tar and nicotine than conventional, full-flavor cigarettes; claims that the low-tar cigarettes are "mild" or deliver "clean" taste; and the use of brand names with descriptors such as "light" and "ultra light." These

---

[3] The formation of the Tobacco Institute was announced in January 1958, by twelve manufacturers of cigarettes, smoking and chewing tobacco, and snuff. The companies forming the Tobacco Institute included Philip Morris American, B&W, Liggett, Lorillard, Philip Morris, and Reynolds. The Tobacco Institute was a trade association. According to its 1958 Certificate of Incorporation, the Tobacco Institute was formed "to promote a better understanding by the public of the tobacco industry and its place in the national economy; to cooperate with governmental agencies and public officials with reference to the tobacco industry; to collect and disseminate information relating to the use of tobacco; to collect and disseminate scientific and medical material relating to tobacco; to collect and disseminate information relating to the tobacco industry published or released by any governmental agency, federal or state, or derived from other sources independent of the industry; to collect and disseminate information relating to legislative and administrative developments, federal or state, affecting the tobacco industry; to promote public good will." Opinion, ¶ 113, 115.

claims were made with the full knowledge that consumers interpret such claims and descriptors as meaning a reduced risk of harm.  Defendants also fail to disclose that their Light Cigarettes did not and do not deliver less tar and/or nicotine than non-Light Cigarettes of the same brand(s).

73.     Over the last five decades, Defendants introduced both stand-alone cigarette brands purported to be low in tar and low-tar "brand extensions" of existing full-flavor cigarette brands, such as "Marlboro Lights" and "Ultra Lights." Defendants have also used brand descriptors such as "light," "medium," "mild," and "ultra light" to market both the new brands and the brand extensions as low in tar. Virtually every major brand undertook line extensions. By 1980, more that 50 percent of all cigarettes sold were "low tar" (with an FTC Method tar yield of 15 mg. or less). Defendants continue to manufacture and sell low-tar brands and brand extensions in both the "light" and "ultra light" categories.

74.     However, the terms "light" and "low tar," as used by Defendants, are essentially meaningless and arbitrary.

75.     Relatively few consumers realize that smoking low-tar or light cigarettes can be, and often is, just as harmful as smoking full-flavor cigarettes. A peer-reviewed, published study showed that 70 percent of low-tar cigarette smokers believe that low-tar cigarettes decrease their daily intake of tar. Another study showed that approximately half of all those responding did not know the number of Light Cigarettes that would have to be smoked to achieve the same level of tar intake as obtained one full-flavor cigarette. In that study, less than 10 percent believed that it would be one light cigarette.

76.     Defendants used this false perception to their advantage. A 1996 article in the American Journal of Public Health cited a 1993 Gallup survey showing 56 percent of smokers believed the term "low tar" conveyed relative safety when compared to full-flavor cigarettes.

That same article also cited a 1987 National Health Interview Survey finding that 46 percent of smokers of cigarettes with tar yields of 6 mg. or lower (per the FTC Method) believed they had reduced their risk of cancer from smoking as compared with smokers of cigarettes with higher FTC tar yields. Consumer misperceptions have persisted despite the accumulation of data to the contrary.

77.     Since the 1970s, Philip Morris has used brand descriptors such as "light" and "ultra light" to communicate that certain brands of cigarettes are low in tar and nicotine. James Morgan, who was Brand Manager of Marlboro from 1969 to 1972, during the time when Philip Morris introduced Marlboro Lights, its first "light" cigarette, explained the intended meaning of the "lights" descriptor. Morgan stated that, from the very beginning, the "light" descriptor was intended to communicate that the brand was low in tar, as opposed to a brand that was lighter in taste.

78.     At one point, Philip Morris changed the name of Merit Filters to Merit Lights, even though there was no difference in the cigarette. Philip Morris also marketed a 15 mg. cigarette as both Virginia Slims and Virginia Slims Lights.

79.     Over the last five decades, Philip Morris and/or Altria have engaged in extensive consumer research to perfect delivery of their Light Cigarette brands' marketing messages and/or omissions in order to reassure smokers regarding smoking-related health issues and offer an alternative to quitting.

80.     Defendants' internal research documents, reports, memoranda, and letters, make it clear that Philip Morris and/or Altria have known for decades that there is no clear health benefit to be gained by smoking low-tar/low-nicotine cigarettes instead of conventional full-flavor cigarettes. It is also clear that although Defendants knew that the FTC method of measuring tar

and nicotine accurately compared nicotine and tar percentages of different cigarettes, Defendants also knew that that the FTC method was completely unreliable for determining the actual nicotine and tar levels absorbed by smokers because it did not factor in smoker compensation. Defendants also knew of the concerns of smokers over the health effects of smoking; that a significant number of them would trade flavor for reassurance of purportedly lower health risks, and that many of those concerned smokers would rely on purported health claims made for low-tar cigarettes to avoid quitting smoking. Indeed, Altria's own website claims that it has a "deep understanding of adult consumer needs[.]"

81.     Despite this, Defendants extensively and successfully marketed and promoted Light Cigarettes as a less harmful alternative. Defendants also opposed any changes to the FTC measurement method which would more accurately reflect the effects of smoker compensation, and denied they were making any health claims for their Light Cigarettes.

82.     By engaging in this deception, Defendants dramatically increased sales of its low-tar and Light Cigarettes, reassured smokers regarding smoking health risks, and sustained corporate revenues.

83.     Defendants sought to, and at times were successful in, preventing and stopping ongoing research, hiding existing research, and destroying sensitive documents to protect their public positions on smoking and health so as to avoid or limit litigation liability for smoking and health-related claims, and to prevent regulatory limitations on its industry.

84.     Defendants suppressed and concealed many scientific research documents, even sending some to a foreign affiliate in order to prevent their disclosure in litigation and in federal regulatory proceedings.

85.     Philip Morris's attorneys exerted significant control over nicotine research. In a 1980 document entitled "The Nicotine Receptor Program," William L. Dunn, a Philip Morris scientist, wrote that despite the fact that the psychopharmacology of nicotine is "where the action is for those doing fundamental research on smoking" and where "most likely will come significant scientific developments profoundly influencing the industry, … it is where our attorneys least want us to be…."

86.     Over approximately fifty years, Philip Morris and/or Altria took a variety of actions to maintain their public positions on smoking and disease-related issues, nicotine addiction, nicotine manipulation, and low-tar cigarettes. Philip Morris and/or Altria did this to protect themselves from litigation claims regarding smoking and health, and to avoid regulation it considered harmful. Philip Morris and/or Altria suppressed, concealed, and halted scientific research; destroyed documents, including scientific reports and studies; and repeatedly and intentionally asserted the attorney-client and work product privileges improperly to thwart disclosure of many thousands of documents to consumers and to federal regulatory agencies.

87.     For more than 50 years, Philip Morris and/or Altria lied, misrepresented, and deceived the American public, including smokers and young people it sought as "replacement smokers," about the health effects of smoking. Defendants suppressed research, destroyed documents, manipulated the use of nicotine so as to increase and perpetuate addiction, distorted the truth about low tar and Light Cigarettes to discourage smokers from quitting, and abused the legal system to achieve its goal of making money with little regard for individual illness and suffering, soaring health costs, or the integrity of the legal system.

88.     Defendants participated in an effort to defraud smokers and potential smokers in order to maximize profits by preserving and enhancing the market for cigarettes, to avoid costly judgments, to derail efforts to make smoking socially unacceptable, and to sustain their industry.

89.     In order to carry this out, Defendants made false and deceptive statements that included: deceiving consumers into starting and continuing to buy and smoke cigarettes by misrepresenting and concealing the adverse health effects caused by smoking; maintaining that there was an "open question" as to whether smoking cigarettes causes disease and other adverse effects, despite the fact that they knew otherwise; ensuring that their research, development, and marketing of cigarettes remained consistent with their core public positions; deceiving consumers into becoming or staying addicted to cigarettes by maintaining that neither smoking nor nicotine is addictive, despite the fact that it knew these positions were false; deceiving consumers into becoming or staying addicted to cigarettes by manipulating the cigarette design and the delivery of nicotine to smokers, while at the same time denying that it had engaged in such efforts; and deceiving consumers through deceptive marketing and cigarette design modifications to exploit smokers' desire for less hazardous and "low-tar" cigarettes which Defendants knew were no safer than full-flavor cigarettes.

90.     Defendants engaged in an extensive effort to defraud consumers and potential consumers of cigarettes. Among other things, they coordinated their public relations, research, cigarette design and marketing efforts in order to advance this fraud by: denying the adverse health effects of active smoking; denying the addictiveness of nicotine and cigarette smoking; denying their manipulation of cigarette nicotine content; misrepresenting the health risks associated with light and low-tar cigarettes; and suppressing, concealing, and destroying information and documents related to the adverse health effects of smoking.

91.     Conduct by Defendants overwhelmingly indicates the likelihood of future unlawful activity. This conduct was not technical in nature, as the many misstatements and acts of concealment and deception were made by Defendants intentionally and deliberately as part of a multi-faceted, sophisticated effort to defraud. Furthermore, Defendants' ongoing manufacturing, selling and marketing of tobacco products presents opportunities to continue this deceptive conduct in the future.

92.     Defendants continue to engage in conduct that is materially indistinguishable from its previous actions, including the marketing of Light Cigarettes to Wisconsin consumers seeking to reduce health risks or quit.

93.     Evidence also demonstrates Defendants have not materially changed their practices with regard to most of their activities.

94.     Plaintiffs purchased and continue to purchase Marlboro Light cigarettes, which is one of Defendants' Light Cigarettes.

95.     Plaintiffs began to purchase Marlboro Lights because they reasonably relied on Defendants' representations that the cigarettes are "light" and thus less harmful than full-flavored cigarettes. In purchasing Marlboro Lights, Plaintiffs did not get what they paid for—cigarettes that were healthier to smoke than regular cigarettes of the same brand.

96.     Plaintiffs would not have begun smoking Light Cigarettes if Philip Morris had disclosed that they are not less harmful than full-flavored cigarettes.

## CLASS ALLEGATIONS

97.     Plaintiffs bring this action on behalf of themselves and the proposed plaintiff Class members under Federal Rule of Civil Procedure Rule 23(b)(2) and Rule 23(b)(3). The proposed Class consists of:

> All persons residing in the State of Wisconsin who purchased for
> personal use and not for resale Defendants' cigarettes that are
> labeled "Light" and/or "Ultra Light" and/or purport to have lower
> tar and nicotine than conventional, full flavor cigarettes ("Light
> Cigarettes"), during the Class Period, through the present.

Excluded form the Class are Defendants' officers, directors, employees and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of Light Cigarettes. The Class period is the time period between June 16, 2003, to the present.

98.     The Class comprises of thousands of persons, the joinder of whom is impracticable, and disposition of their claims in a Class Action will benefit the parties and the Court.  The Class is sufficiently numerous because millions of units of Defendants' "Light Cigarettes" have been sold in the State of Wisconsin during the Class Period.

99.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.  The questions of law and fact common to the Class predominate over questions which may affect individual Class members.   Common questions of law and fact include, but are not limited to, the following:

    a.   Whether Defendants' policies, practices, and representations in connection with the advertising, marketing, promotion, identification, labeling, and sales of their Light Cigarettes, including but not limited to, the use of descriptors such as "low tar", "light", "mild", "medium" and "ultra light" were applied uniformly to all members of the Class;

    b.   Whether Defendants' policies, practices, and representations made in connection with the advertising, marketing, promotion, identification, labeling, and sales of their Light Cigarettes, including but not limited to, the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were deceptive in any

respect, thereby violating Wisconsin Statute § 100.18 *et seq*. and/or Wisconsin Statute § 100.20 *et seq*.;

c.   Whether Defendants' policies, practices, and representations made in connection with the advertising, marketing, promotion, identification, labeling, and sales of their Light Cigarettes, including but not limited to, the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were unlawful in any respect, thereby violating Wisconsin Statute § 100.18 *et seq*. and/or Wisconsin Statute § 100.20 *et seq*.;

d.   Whether Defendants' practices, representations and omissions made in connection with the advertising, marketing, promotion, identification, labeling, and sales of their Light Cigarettes, including but not limited to, the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were unfair in any respect, thereby violating Wisconsin Statute § 100.18 *et seq*. and/or Wisconsin Statute § 100.20 *et seq*.;

e.   Whether Defendants' practices, representations and omissions made in connection with the advertising, marketing, promotion, identification, labeling, and sales of their Light Cigarettes, including but not limited to, the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were fraudulent in any respect, thereby violating Wisconsin Statute § 100.18 *et seq*. and/or Wisconsin Statute § 100.20 *et seq*.;

f.   Whether Defendants' practices and representations made in connection with the advertising, marketing, promotion, identification, labeling, and sales of their Light Cigarettes, including but not limited to, the use of descriptors such as "low

tar," "light," "mild," "medium" and "ultra light," were deceptive and/or false in any respect, thereby violating Wisconsin Statute § 100.18 *et seq*. and/or Wisconsin Statute § 100.20 *et seq*.;

g.  Whether Defendants deceptively concealed the health risks associated with smoking their Light Cigarettes, including but not limited to, the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," in their marketing, advertisement, promotion, labeling and sale of the products;

h.  Whether Defendants' practices and representations made in connection with the advertising, marketing, promotion, identification, labeling, and sales of their Light Cigarettes, including but not limited to, the use of descriptors such as "low tar," "light," "mild," "medium" and "ultra light," were false and/or misleading;

i.  Whether Defendants knew or should have known that the representations were false;

j.  Whether Defendants possess competent and reliable scientific evidence to support their label and advertising claims;

k.  Whether Defendants misrepresented that consumers of Light Cigarettes would be exposed to less tar and/or nicotine than users of non-Light Cigarettes of the same brand(s);

l.  Whether Defendants represented that Light Cigarettes have characteristics, benefits, uses or quantities which they do not have, thereby violating Wisconsin Statute § 100.18 *et seq*.;

m.  Whether Defendants' conduct as set forth above injured consumers, and if so, the extent of the injury.

100.   Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and adequately represent and protect the interest of the Class.  Plaintiffs do not have any interests which are antagonistic to those of the proposed Class.  Plaintiffs have retained competent and experienced counsel in class action and other complex litigation.  The questions of law and fact that are common to the Class members, some of which are set out above, predominate over any questions affecting only individual Class members.

101.   Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' false and/or misleading representations and/or omissions.  Indeed, Plaintiffs purchased Light Cigarettes on numerous occasions because of the representations by Defendants that Light Cigarettes are less harmful than full-flavored cigarettes.  Plaintiffs would not have purchased Light Cigarettes if they had known that the representations in Defendants' advertising, marketing and promotion of Philip Morris' Light Cigarettes as described herein were false.

102.   A class action is superior to other available methods for fair and sufficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually.

103.   The trial and litigation of Plaintiffs' claims is manageable.  Individual litigation of the legal and factual issues raised by Defendants' conduct could increase delay and expense to all parties and the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

104.   Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with

respect to the Class as a whole.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

105.    Absent a class action, Defendants will likely retain the benefits of their wrongdoing.  Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.

106.    Absent a representative action, the Class members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of their ill-gotten gains.

<div align="center">

**COUNT I**
**Fraudulent Representations and Deceptive**
**Trade Practices in Violation of § 100.18(1), Wis. Stats.**

</div>

107.    Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

108.    Through advertisements and marketing representations featured on their light cigarette products, including, *inter alia*, the terms "Light" and "Ultra-light," Defendants intended to and did misrepresent to Plaintiffs and the Class, at the time of retail purchase and at all relevant times, that light cigarette smokers would receive less nicotine and tar, and a less harmful product, than smokers of regular full-flavored cigarettes of the same brand.

109.    After and due to seeing Defendants' advertisements and marketing representations, Plaintiffs reasonably believed, and Plaintiffs and the Class were reasonably likely to believe, that consuming Defendants' Light Cigarettes was less harmful and resulted in the inhalation of less nicotine and tar than regular full-flavored cigarettes of the same brand.

110.    Plaintiffs and the Class would not have purchased Defendants' Light Cigarettes altogether, or would have paid less for these products, had they known that Defendants' Light Cigarettes did not deliver less nicotine and tar and were not less harmful than regular cigarettes of the same brand.

111.    As a result of Defendants' deceptive conduct and practices, Plaintiffs and the Class were damaged in an amount not less than the purchase price of Defendants' Light Cigarettes or a portion thereof, plus interest.

<div align="center">

**COUNT II**
**Unfair Methods of Competition and Trade Practices in Business**
**in Violation of § 100.20(1), Wis. Stats.**

</div>

112.    Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

113.    ATCP 90.02(1), Wis. Admin. Code requires Defendants to label and identify their cigarettes that they sell in Wisconsin.

114.    ATCP 90.02(3), Wis. Admin. Code prohibits such identifications from being false, deceptive, or misleading.

115.    Defendants' labeling of their products as, *inter alia*, "Light" and "Ultra-light" cigarettes was false, deceptive, and/or misleading, insofar as it represented to consumers that they would receive less nicotine and tar, and a less harmful product, than smokers of regular full-flavored cigarettes of the same brand.

116.    After and due to seeing Defendants' false, deceptive, and/or misleading labeling and identification of their products, Plaintiffs reasonably believed, and Plaintiffs and the Class were reasonably likely to believe, that consuming Defendants' Light Cigarettes was less harmful

and resulted in the inhalation of less nicotine and tar than regular full-flavored cigarettes of the same brand.

117.    Plaintiffs and the Class would not have purchased Defendants' Light Cigarettes altogether, or would have paid less for these products, had they known that Defendants' Light Cigarettes did not deliver less nicotine and tar and were not less harmful than regular cigarettes of the same brand.

118.    As a result of Defendants' false, deceptive, and/or misleading labeling and identification of their products, Plaintiffs and the Class were damaged in an amount not less than the purchase price of Defendants' Light Cigarettes or a portion thereof, plus interest.

119.    As Defendants' false, deceptive, and/or misleading labeling and identification of their products is a violation of ATCP 90.02, Wis. Admin. Code, Plaintiffs and the Class are entitled to twice the amount of their aforementioned damages under § 100.20(5), Wis. Stats.

### COUNT III
### Punitive Damages Under §895.043, Wis. Stats.

120.    Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

121.    § 895.043(3), Wis. Stats. provides for an award of punitive damages in cases in which the defendant acts maliciously towards the plaintiff, or acts in intentional disregard of the rights of the plaintiff.

122.    Defendants' false, deceptive, and/or misleading labeling, identification, marketing, representations and general trade and business practices concerning their Light Cigarettes constitute malicious actions towards the Plaintiffs and Class, and an intentional disregard of their rights.

123.    Defendants have violated § 895.043, Wis. Stats.

## COUNT IV
### Unjust Enrichment

124.     Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

125.     To the detriment of the Plaintiffs and the Class, Defendants benefited from and were unjustly enriched by their receipt of monies as a result of Plaintiffs' and the other Class members' purchases of their Light Cigarettes, due to Defendants' concealment and failure to disclose that their Light Cigarettes did not deliver less tar and nicotine and were not less harmful than regular cigarettes of the same brand.

126.     To the detriment of the Plaintiffs and the Class, Defendants benefited from and were unjustly enriched by their receipt of monies as a result of Plaintiffs' and the other Class members' purchases of their Light Cigarettes, due to Defendants' misrepresentation that their Light Cigarettes delivered less tar and nicotine and were less harmful than regular cigarettes of the same brand.

127.     To the detriment of the Plaintiffs and the Class, Defendants benefited from and were unjustly enriched by their receipt of monies as a result of Plaintiffs' and the other Class members' purchases of their Light Cigarettes, due to Defendants' false, deceptive, and/or misleading labeling and identification of their cigarettes as "Light" and "Ultra-light," indicating that their Light Cigarettes delivered less tar and nicotine and were less harmful than regular cigarettes of the same brand.

128.     Defendants had knowledge of, voluntarily accepted, and retained these benefits.

129.     Defendants received these benefits to Plaintiffs' and the Class' detriment.

130.    Plaintiffs relied on Defendants' above-described misrepresentations and false, deceptive, and/or misleading labeling in believing that Defendants' Light Cigarettes delivered less tar and nicotine and were less harmful than regular cigarettes of the same brand.

131.    It would be inequitable, unconscionable, unfair, unlawful, and unjust for Defendants to retain these ill-gotten benefits.

132.    As a result of Defendants' unjust enrichment, Plaintiffs and the Class are entitled to restitution in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court:

A.      Certify the proposed Wisconsin Class under Federal Rule of Civil Procedure 23(a) and (b)(3), and appoint Plaintiffs and Plaintiffs' counsel of record to represent the Class;

B.      Find that Defendants violated §100.18, Wis. Stats., violated §100.20, Wis. Stats., violated §895.043, Wis. Stats., engaged in fraudulent concealment, and that Defendants were unjustly enriched as alleged herein.

C.      Award actual, compensatory and consequential damages, including double damages under §100.20(5), Wis. Stats.

D.      Award restitution of monies or portions thereof that Plaintiffs and the Class paid at retail for Defendants' Light Cigarettes, and disgorgement of profits Defendants received from their sale of Light Cigarettes to Plaintiffs and the Class, including interest, as provided under applicable law;

E.      Establish a constructive trust consisting of monies Defendants unlawfully received from the sale of Light Cigarettes to Plaintiffs and the Class as alleged herein, for purposes of establishing a smoker cessation program for their benefit;

F.      Award punitive damages under §895.043, Wis. Stats., and treble damages as provided under applicable law;

G.      Award reasonable attorneys' fees, costs, and expenses pursuant to §§ 100.18 & 100.20, Wis. Stats. and any other applicable law; and

H.      Grant any such other relief as it deems appropriate.

Dated:  December 10, 2009

                                        **ADEMI & O'REILLY, LLP**

                              By:    /S/ DAVID J. SYRIOS
                                        Guri Ademi (SBN 1021729)
                                        Shpetim Ademi (SBN 1026973)
                                        David J. Syrios (SBN 1045779)
                                        Corey Mather (SBN 1046210)
                                        3620 East Layton Avenue
                                        Cudahy, WI 53110
                                        (414) 482-8000
                                        (414) 482-8001 (fax)
                                        gademi@ademilaw.com
                                        sademi@ademilaw.com
                                        dsyrios@ademilaw.com
                                        cmather@ademilaw.com

Of Counsel:

Ben Barnow
**Barnow and Associates, P.C.**
One North LaSalle Street
Suite 4600
Chicago, IL 60602
(312) 621-2000

Larry D. Drury
**Larry D. Drury, Ltd.**
205 West Randolph, Suite 1430
Chicago, Illinois 60606
(312) 346-7950

Burton Finkelstein

**Finkelstein Thompson LLP**
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
(202) 337-8000

## CERTIFICATE OF SERVICE

Service of the above Plaintiffs' First Amended Class Action Complaint has been made through the Court's ECF system on all those registered to receive ECF service, and on all others, not registered but listed on the Court's Manual Notice List, by regular mail.


Date:    December 10, 2009               **ADEMI & O'REILLY, LLP**

                                         By:    /S/ DAVID J. SYRIOS
                                                Guri Ademi (SBN 1021729)
                                                Shpetim Ademi (SBN 1026973)
                                                David J. Syrios (SBN 1045779)
                                                Corey Mather (SBN 1046210)
                                                3620 East Layton Avenue
                                                Cudahy, WI 53110
                                                (414) 482-8000
                                                (414) 482-8001 (fax)
                                                gademi@ademilaw.com
                                                sademi@ademilaw.com
                                                dsyrios@ademilaw.com
                                                cmather@ademilaw.com