# Exhibit 4

```
 1                UNITED STATES DISTRICT COURT
 2                     DISTRICT OF MAINE
 3
 4    _____
                                  )
 5    IN RE:  LIGHT CIGARETTES     ) MDL DOCKET NO.
      MARKETING AND SALES          ) 1-09-MD-2068
 6    PRACTICES LITIGATION         )
      _____)
 7                                 )
      THIS DOCUMENT RELATES TO:    )
 8                                 ) CASE NO.
      MILES TYRER, as an           ) 3:09-cv-00052-W-CAB
 9    idnividual and on behalf of  )
      all other similarly          )
10    situated,                    )
                                   )
11               Plaintiff,        )
                                   )
12          vs.                    )
                                   )
13    PHILIP MORRIS USA INC., a    )
      Virginia corporation, and    )
14    ALTRIA GROUP, INC., a        )
      Virginia corporation,        )
15                                 )
                 Defendants.       )
16    _____)
17
18
19     Videotaped Deposition of MILES CONRAD TYRER,
20     taken at 655 West Broadway, Suite 1900,
21     San Diego, California, at 9:01 a.m.,
22     Wednesday, December 16, 2009,
23     before Shuri Gray, CSR No. 3786.
24
25
```

Page 2

1  APPEARANCES:
2
3  FOR PLAINTIFF:
4  MILSTEIN, ADELMAN & KREGER, LLP
   BY:  WAYNE S. KREGER, ESQ.
5       SARA D. AVILA, ESQ.
   2800 Donald Douglas Loop North
6  Santa Monica, California 090405
   (310)396-9600
7  wkreger@maklawyers.com
8       - and -
9  EYSTER KEY
   BY:  NICHOLAS B. ROTH, ESQ.
10  402 E. Moulton Street
   Decatur, Alabama 35602
11  (256)353-6761
   nbroth@eysterkey.com
12
13  FOR DEFENDANTS:
14  MUNGER, TOLLES & OLSON LLP
   BY:  GREGORY P. STONE, ESQ.
15  355 South Grand Avenue
   35th Floor
16  Los Angeles, California 90007
   (213)683-9255
17  gregory.stone@mto.com
18
19
20
21
22
23
24
25

Page 3

1       SAN DIEGO, CALIFORNIA; DECEMBER 16, 2009; 9:01 A.M.
2       THE VIDEOGRAPHER:  My name is Cynthia Renteria
3  of Veritext.  The date today is December 16, 2009, and
4  the time is approximately 9:01 a.m.  This deposition is
5  being held in the office of Coughlin Stoia Geller,
6  located at 665 West Broadway, Suite 1900, San Diego,
7  California 92101.  The caption of this case is "In Re:
8  Light Cigarettes Marketing and Sales Practices
9  Litigation."  This document relates to Miles Tyrer
10  versus Philip Morris USA, Inc., et al., in the United
11  States District Court, District of Maine.  The name of
12  the witness is Miles Tyrer.
13       At this time the attorneys will identify
14  themselves and the parties they represent after which
15  our court reporter, Shuri Gray of Veritext, will swear
16  in the witness and we can proceed.
17       MR. STONE:  Good morning.  Gregory Stone on
18  behalf of Philip Morris USA.
19       MR. KREGER:  Wayne Kreger for plaintiffs
20  including Mr. Tyrer.
21       MR. ROTH:  Nick Roth for plaintiffs including
22  Mr. Tyrer.
23       MS. AVILA:  Sara Avila for plaintiffs including
24  Mr. Tyrer.
25  ///

Page 4

1            MILES CONRAD TYRER,
2  having been administered an oath, testified as follows:
3
4              EXAMINATION
5
6  BY MR. STONE:
7       Q.  Would you state your full name for the record,
8  please.
9       A.  Miles Conrad Tyrer.
10       Q.  Mr. Tyrer, you understand that the oath that
11  you took is the same or similar to the oath that you
12  would take if you were testifying in a court of law?
13       A.  Yes.
14       Q.  And the testimony you give here today, you
15  understand, is subject to the penalties of perjury?
16       A.  Yes.
17       Q.  And will you be able today to answer all of my
18  questions fully and completely and truthfully?
19       A.  That is my intention, yes.
20       Q.  Okay.  Is there any medical reason or other
21  reason that would prevent you from doing so?
22       A.  None.
23       Q.  If at any time you don't understand my
24  question, will you tell me you don't understand it, and
25  I'll try to rephrase it?

Page 5

1       A.  Yes, sir.
2       Q.  Okay.  This deposition is being taken in
3  connection with class certification proceedings, and as,
4  I think plaintiffs' counsel knows, we reserve the right
5  to take a further deposition of Mr. Tyrer with respect
6  to the substantive allegations in the case.
7       Mr. Tyrer, you in this case are the
8  representative of a class, correct?
9       A.  Correct.
10       Q.  And tell me a little bit about that class if
11  you would.  What do you know about it?
12       MR. KREGER:  Objection.  It's a vague and
13  ambiguous question.  You can answer if you understand
14  it.
15       THE WITNESS:  The class consists of people who
16  have smoked now or have smoked in the past or are still
17  smoking light cigarettes.
18  BY MR. STONE:
19       Q.  Okay.  How did you become the class
20  representative?
21       MR. KREGER:  Objection.  That's an overbroad
22  question.  You can answer if you understand it.
23       THE WITNESS:  I was associated with a lady who
24  works with Mr. Hal Hewell, who is an attorney.  She
25  introduced me to him, and I met the criteria.

1      MR. KREGER:  You may want to speak up a little
2   bit.  Speak up.
3      THE WITNESS:  Sorry.
4   BY MR. STONE:
5      Q.  So you are associated with a lady who knows --
6      A.  Attorney Hewell.
7      Q.  -- Mr. Hewell?
8      A.  Correct.
9      Q.  And he's a lawyer here in San Diego, correct?
10     A.  Correct.
11     Q.  Okay.  And what's the lady's name?
12     A.  Katherine Herzog.
13     Q.  H-E-R-Z-O-G?
14     A.  Correct.
15     Q.  And when you say you are associated with her,
16  what do you mean by "associated"?
17     A.  We went to law school together, and she works
18  in the same building as Mr. Hewell.
19     Q.  Okay.  And so you are also a lawyer?
20     A.  No, sir.  I have a law degree, but I did not
21  pass the bar.
22     Q.  What law school did you attend?
23     A.  Western Sierra.
24     Q.  And other than knowing Ms. Herzog from law
25  school, are you also a social friend?

1      A.  Yes.
2      Q.  And is your -- how often do you see her, would
3   you say?
4      A.  Since law school, possibly once a month.
5      Q.  And did she contact you about this case?
6      A.  No.  I think we were just having lunch one day,
7   and it came up in the conversation.
8      Q.  What did she say about this case?
9      MR. KREGER:  Objection.  At this point I am not
10  clear if she is a practicing attorney and if she is an
11  attorney working with Mr. Hewell, but if she is, the
12  attorney-client privilege would apply to any
13  conversations that they had regarding this case.  And so
14  I would instruct the witness not to answer until that's
15  been clarified.
16     MR. STONE:  You have no reasonable basis for
17  the instruction?
18     MR. KREGER:  Well, of course I disagree with
19  that.
20     MR. STONE:  Well, what's your basis?  Is she a
21  lawyer in this case?
22     MR. KREGER:  As I explained, he said that she
23  went to law school and is an attorney, and if she is and
24  she works with Mr. Hewell, and they discussed the case,
25  then the attorney-client privilege would apply to any

1   conversations they had about the case.
2   BY MR. STONE:
3      Q.  Is Ms. Herzog one of your attorneys?
4      A.  No, sir.
5      Q.  Okay.  What did Ms. Herzog tell you about the
6   case?
7      A.  Specifically at that time I really don't recall
8   other than it was something that we -- that came up in
9   our conversation.
10     Q.  When was this lunch?
11     A.  Over a year ago.
12     Q.  Where was this lunch?
13     A.  Good question.  I know it was somewhere in the
14  Kearny Mesa area, but I can't specifically recall.
15     Q.  Where does Ms. Herzog work?
16     A.  She is with a firm called Legal Support
17  Services in the same building as Mr. Hewell.
18     Q.  Does she have any relationship, social or
19  otherwise, with Mr. Hewell that you are aware of?
20     A.  Not that I am aware of.
21     Q.  After she told you about the case, what was the
22  next action you took with respect to becoming a
23  plaintiff in the case?
24     MR. KREGER:  Objection.  Lack of foundation and
25  misstates the testimony with regard to that she told him

1   about the case.  You can answer if you understand it.
2      THE WITNESS:  I didn't take any action.
3   Ms. Herzog discussed it with Mr. Hewell, and she called
4   me later, asked if this would be something I would be
5   interested in.
6   BY MR. STONE:
7      Q.  Okay.  And when she called you later, how long
8   was that after your lunch?
9      A.  I don't recall, but it was certainly probably
10  less than two weeks.
11     Q.  And what did she tell you at that time?
12     A.  Well, she just told me a little bit more about
13  the case and asked if I would be interested in talking
14  to Mr. Hewell about becoming lead plaintiff.
15     Q.  What more did she tell you?
16     A.  Nothing.  She, you know, knew that the case had
17  to do with cigarettes, and I smoked cigarettes.
18     Q.  When she told you a bit more about the case,
19  what did she tell you?
20     A.  Specifically I don't recall.
21     Q.  Do you have any recollection of anything she
22  said about the case?
23     A.  She did say that she was aware of the case.  It
24  had to do with cigarettes and would I like to talk to
25  Mr. Hewell about it, which I did.

Page 10

1    Q.   Did she tell you it had to do with light
2  cigarettes?
3    A.   I do not recall.
4    Q.   At the time you concluded your second
5  conversation with her, did you feel that you had any
6  claim against Philip Morris USA?
7         MR. KREGER:  Objection.  It calls for a legal
8  conclusion.  You can answer it if you understand it.
9         THE WITNESS:  At that time I was not aware that
10  I had a claim.
11  BY MR. STONE:
12    Q.   Okay.  Did she tell you anything that gave you
13  any reason to think you had a claim?
14    A.   She did not.
15    Q.   You were smoking a brand of cigarettes at that
16  time?
17    A.   I was.
18    Q.   What brand were you smoking at that time?
19    A.   Marlboro 100 Lights.
20    Q.   And are you still smoking cigarettes?
21    A.   Unfortunately, yes.
22    Q.   What brand are you smoking today?
23    A.   The same.
24    Q.   How long have you smoked Marlboro 100 Lights?
25    A.   Approximately seven years.

Page 11

1    Q.   And before that did you smoke another brand?
2    A.   I smoked Marlboro Regulars.
3    Q.   So you switched from Marlboro Regulars to
4  Marlboro Lights in around 2002?
5    A.   That would be correct.
6    Q.   And how long did you smoke Marlboro Regulars?
7    A.   Between two and three years.
8    Q.   And before that what did you smoke?
9    A.   I didn't.
10    Q.   So you started smoking then around 1999 or
11  2000?
12    A.   Let me back up.  I smoked briefly in my 20s,
13  probably for a six-month period, dropped it then.  In
14  '92 I went through a divorce, started smoking again,
15  stopped that after about three months and picked it up
16  again around, yes, '99, 2000.
17    Q.   What led you starting smoking again in 1999 or
18  2000?
19    A.   A relationship with a lady who is a serial
20  smoker.
21    Q.   What's her name?
22    A.   Kimberly Wood.
23    Q.   Do you still have a relationship with her?
24    A.   We do.
25    Q.   What's that relationship?

Page 12

1    A.   Friends and roommates.
2    Q.   Okay.  Would that be a romantic relationship
3  without --
4    A.   Not very often.
5    Q.   Okay.  And does she still smoke?
6    A.   Yes, she does.
7    Q.   What does she smoke?
8    A.   The Marlboro Regulars.  Excuse me, the Marlboro
9  Medium 100s.
10    Q.   Is she a member of the class?
11    A.   No.
12         MR. KREGER:  Objection.  Lack of foundation.
13  You can answer if you know.
14         THE WITNESS:  No.
15  BY MR. STONE:
16    Q.   She's not a member of the class?
17    A.   Not that I am aware of.
18    Q.   So let's go back a little bit on the class.
19  How many members are in the class that you are
20  representing, Mr. Tyrer?
21         MR. KREGER:  I am going to object to the
22  question, as I am not at all clear that a class has been
23  certified; so your reference to class, I would imagine,
24  would be a punitive class.  And if you have any
25  knowledge of who would be in the punitive class, you can

Page 13

1  answer.
2         MR. STONE:  So it would help us if you would
3  just make an objection, not a speaking objection, just
4  make your objection to the form of the question.  Try
5  not to use the objections to coach the witness or to
6  otherwise engage in colloquy, if you would, because we
7  are on a limited time frame, and I would really
8  appreciate that if you would do that for me.
9         MR. KREGER:  Well, I have no problem with the
10  limited time frame, but I am not trying to coach the
11  witness.  I am trying to give you the basis for my
12  objections so that we don't have to have a back and
13  forth as to what it's for.
14         MR. STONE:  And so your objection to that
15  question was what?
16         MR. KREGER:  My objection is that the question
17  calls for a legal conclusion, is overbroad and vague and
18  ambiguous, because you are referring to a class that has
19  not yet been certified.
20  BY MR. STONE:
21    Q.   Okay.  Mr. Tyrer, the class that you purport to
22  represent, how large is it?
23         MR. KREGER:  Same objections.  You can answer.
24         THE WITNESS:  I have no way of knowing, but I
25  would assume it would be probably several thousand

4 (Pages 10 to 13)

Page 14

1  people smoking Marlboro Lights.
2  BY MR. STONE:
3      Q.  What is the definition of the class that you
4  purport to represent?
5      A.  People who are smoking a light cigarette and
6  are doing so thinking that it is healthier or certainly
7  less harmful than a regular brand cigarette.
8      Q.  Does it include smokers of -- some smokers,
9  anyway, of Camel Lights?
10     A.  I don't know.
11     Q.  What light cigarettes does it include?
12     A.  Well, I know it includes the Marlboro Lights.
13     Q.  Any other ones?
14     A.  I don't know.
15     Q.  Does it include Marlboro Mediums?
16     A.  I -- no.
17     Q.  Does it include Marlboro Milds?
18     A.  I would be guessing to say yes.
19         MR. KREGER:  Then don't guess.
20  BY MR. STONE:
21     Q.  What effort did you make to determine the
22  appropriate scope of the class?
23     A.  It's just more personal observation, a lot of
24  people smoke light cigarettes.
25     Q.  Okay.  Did you limit the class to any one

Page 15

1  particular manufacturer of cigarettes?
2         MR. KREGER:  I am just going to object.  It
3  calls for a legal conclusion.  You can answer if you
4  know.
5         THE WITNESS:  I don't know.
6  BY MR. STONE:
7      Q.  Okay.  What do you understand your
8  responsibilities to be as a class representative?
9      A.  To serve in the best interests of the members
10 of the class.
11     Q.  So what have you done so far in an effort to
12 serve in the best interests of the members of the class?
13     A.  I have agreed to act as the plaintiff in the
14 case, and I am here for this deposition for that reason.
15     Q.  Have you made any investigation to see if the
16 class has any legitimate claims?
17     A.  I have not.
18     Q.  Do you believe you have a legitimate claim?
19     A.  I believe the class has a legitimate claim.
20     Q.  Okay.
21     A.  But it's not based on any research I have done.
22     Q.  Is it based on any facts that you know?
23     A.  From reading the complaint, I would say yes.
24     Q.  Other than reading the complaint, have you done
25 anything to determine whether there is a claim here or

Page 16

1  not?
2      A.  I have not.
3      Q.  Have you ever served as a class representative
4  before?
5      A.  No, sir.
6      Q.  You are aware that some smokers who smoke
7  Marlboro Lights don't have any belief that they are less
8  risky.
9         MR. KREGER:  Objection.
10 BY MR. STONE:
11     Q.  True?
12         MR. KREGER:  I'm sorry.  Objection.  Lack of
13 foundation.  Overbroad.
14         THE WITNESS:  What's that?
15         MR. KREGER:  Well, calls for speculation, I
16 suppose, is really the most appropriate objection, but
17 you can answer if you have any knowledge.
18         THE WITNESS:  Calls for speculation.
19         MR. KREGER:  Well, no, you don't have to
20 repeat; just if you have any knowledge.
21         THE WITNESS:  I'm sorry.  I do not have any --
22 could you repeat the question, sir, please.
23 BY MR. STONE:
24     Q.  Certainly.  Let me back up.
25     A.  Thank you.

Page 17

1      Q.  You know other people who smoke cigarettes?
2      A.  I do.
3      Q.  You know people who smoke light cigarettes?
4      A.  I do.
5      Q.  You know people who smoke low-tar cigarettes?
6      A.  I assume, yes.
7      Q.  You know people who smoke ultra-light
8  cigarettes?
9      A.  I do.
10     Q.  And you know people who smoke full-flavor
11 cigarettes?
12     A.  Correct.
13     Q.  And you have from time to time had
14 conversations with other smokers about smoking?
15     A.  That's correct.
16     Q.  It's a fact, is it not, that there are people
17 who smoke light cigarettes who do not believe that light
18 cigarettes are any less risky than full-flavored
19 cigarettes?
20         MR. KREGER:  Objection.  Calls for speculation,
21 vague and ambiguous and overbroad.  You can answer if
22 you know.
23         THE WITNESS:  I am trying to remember of
24 anybody that specifically made that statement to me, and
25 I can't recall.

5 (Pages 14 to 17)

Page 18

BY MR. STONE:
1   BY MR. STONE:
2       Q.   Well, earlier you told me the class consisted
3   of light cigarette smokers who believed that the
4   cigarettes they smoke are less risky or less harmful,
5   correct?
6       A.   Correct.
7       Q.   And you by that -- the definition, as you have
8   given it to me, excludes people who smoke light
9   cigarettes, but who do not think that they are any less
10  risky or less harmful, correct?
11          MR. KREGER:   Objection.   Misstates his
12  testimony.   You can answer.
13          THE WITNESS:   That would be an assumption on my
14  part, but --
15  BY MR. STONE:
16      Q.   But that's an assumption that you make in terms
17  of how you understand the class definition?
18          MR. KREGER:   Same objections.   You can answer.
19          THE WITNESS:   I'm sorry.   Could you --
20  BY MR. STONE:
21      Q.   Certainly.
22      A.   I am losing you here.   I apologize.
23      Q.   The class definition that you gave me earlier
24  included people, as you described it, who smoke light
25  cigarettes and believe that light cigarettes are less

Page 19

1   risky or less harmful than full-flavor cigarettes,
2   correct?
3       A.   Correct.
4       Q.   And that definition would not include people
5   who smoke light cigarettes, but who think they are not
6   any less risky or less harmful than a full-flavored
7   cigarette?
8           MR. KREGER:   Objection.   Misstates the
9   testimony, calls for speculation and is overbroad.   You
10  can answer if you know.
11          THE WITNESS:   Your definition would, yes,
12  exclude people who were aware that they were as harmful
13  as other cigarettes.
14  BY MR. STONE:
15      Q.   And that's the definition you gave me earlier,
16  correct?
17          MR. KREGER:   Objection.   Misstates testimony.
18          THE WITNESS:   My original definition
19  encompassed people who were smoking light cigarettes and
20  had the belief that they were less harmful than the
21  full-flavor cigarettes.   Your question now is would that
22  exclude people smoking light cigarettes who knew that
23  they were just as harmful as full-flavor cigarettes,
24  correct?
25  BY MR. STONE:

Page 20

1       Q.   Yes, sir.
2           MR. KREGER:   Same objections.   You can answer.
3           THE WITNESS:   I am sure there are people who
4   smoke light cigarettes who believe they are not as
5   harmful as -- or, excuse me, who believe they are as
6   harmful as full flavor, yes.
7   BY MR. STONE:
8       Q.   Okay.   Do you understand the concept of
9   typicality in connection with a class representative?
10          MR. KREGER:   Objection.   Calls for a legal
11  conclusion.   But you can answer if you know.   Don't
12  guess.
13          THE WITNESS:   I am not guessing.   I'm sorry.
14  Could you repeat the question.   I lost myself.
15  BY MR. STONE:
16      Q.   That's okay.
17          Do you understand the concept of typicality?
18      A.   Yes.
19      Q.   Okay.
20          MR. KREGER:   Same objections.   Go ahead.
21  BY MR. STONE:
22      Q.   Have you made any effort to determine whether
23  you are typical of the other members of the class as you
24  have defined it?
25          MR. KREGER:   Calls for a legal conclusion.   You

Page 21

1   can answer if you know.
2           THE WITNESS:   Based on the wording of the
3   complaint, I would say, yes, I am typical, and I have
4   suffered similar damages as other members of the class.
5   BY MR. STONE:
6       Q.   And have you talked to any other members of the
7   class to see whether the damages you claim you have are
8   damages they also claim they have?
9       A.   I don't know any other member of the class.
10      Q.   Okay.   Do you have any way of knowing whether
11  your claims are typical or different than the claims of
12  other members of the class if they have any claims?
13          MR. KREGER:   Objection.   Asked and answered and
14  calls for speculation.   You can answer if you know.
15          THE WITNESS:   Insofar as there isn't a class
16  yet per se.   I have talked to other smokers, of course.
17  BY MR. STONE:
18      Q.   Have any other smokers told you they think they
19  have any claims?
20          MR. KREGER:   Objection.   Incomplete
21  hypothetical and overbroad and calls for speculation.
22  You can answer if you know.   Actually, it's also vague
23  and ambiguous.   Smokers is undefined.   But you can
24  answer if you know.   Sorry.
25          THE WITNESS:   I'm sorry.

6 (Pages 18 to 21)

Page 22

```
 1  BY MR. STONE:
 2     Q.  Do you remember the question?
 3     A.  I am trying to.
 4     Q.  Would you like it read back?
 5     A.  I apologize.  Please.
 6     Q.  That's quite all right.
 7         (Last question read)
 8         MR. KREGER:  Same objections.
 9         THE WITNESS:  No.
10  BY MR. STONE:
11     Q.  Have you told any other smoker about the claims
12  you were bringing in this lawsuit?
13     A.  I have.
14     Q.  Who have you told?
15     A.  Kimberly Wood for one.  Four other people that
16  I know smoke light cigarettes.
17     Q.  Who else are they?
18     A.  Kimberly Johnson is one of the people.
19  Kimberly Woods' stepfather and mother both smoke the
20  ultra lights.  I have mentioned it to them.
21         MR. KREGER:  Just answer the question.  The
22  question was who.
23         THE WITNESS:  Oh.  And the other person I
24  mentioned it to, his name is Jack Fitzmaurice.
25  BY MR. STONE:
```

Page 23

```
 1     Q.  I'm sorry.  Jack?
 2     A.  Fitzmaurice.
 3     Q.  F-I-T-Z-M-O-R-R-I-S?
 4     A.  M-A-U-R-I-C-E.  Oh, and one other yesterday,
 5  David Demergian.
 6     Q.  Could you spell David's last name?
 7     A.  D-E-M-E-R-G-I-A-N.
 8     Q.  Okay.  When you told Kimberly Johnson about the
 9  case, did she express any view to you on whether she
10  felt she had a claim similar to the one you described to
11  her?
12     A.  She did.
13     Q.  What did she say to you?
14     A.  That she had been trying to quit for years and
15  has been unable to do so.  And as a matter of fact, we
16  got together with a specific objective of quitting
17  smoking.  Neither of us could.
18     Q.  When was that that you got together to quit
19  smoking?
20     A.  Approximately six months ago.
21     Q.  What does she smoke?
22     A.  The Marlboro Lights.
23     Q.  Did you ask her whether she had thought that
24  Marlboro Lights were less harmful or less risky than
25  Marlboro Full Flavor?
```

Page 24

```
 1     A.  I did.
 2     Q.  What did she say to you?
 3     A.  She said that's what she thought.
 4     Q.  And at that time did she talk to you about
 5  switching to a different brand?
 6     A.  No.
 7     Q.  Did you tell her that there were some
 8  cigarettes that were less risky?
 9     A.  No.
10     Q.  Why did you switch to Marlboro Lights in 2002?
11     A.  Initially, it was because that same lady, who
12  was at the time my neighbor, was smoking them, and she
13  had a pack, and she had told me that she thought they
14  were safer for me, so eventually I switched.
15     Q.  Kimberly Johnson told you?
16     A.  Correct.
17     Q.  She told you she thought they were safer?
18     A.  Correct.
19     Q.  Okay.  Did anybody else ever tell you that
20  Marlboro Lights were less harmful or less risky than
21  Marlboro Full Flavor other than Ms. Kimberly Johnson?
22     A.  Not that I can recall.
23     Q.  Did Philip Morris USA ever tell you that
24  Marlboro Lights were less harmful or less risky than
25  Marlboro Full Flavor?
```

Page 25

```
 1         MR. KREGER:  Objection.  It's vague and
 2  ambiguous.  You can answer if you know.
 3         THE WITNESS:  Well, certainly not directly.  I
 4  mean, nobody from the company came to me and said, hey,
 5  these are better for you.
 6  BY MR. STONE:
 7     Q.  Did anybody from Philip Morris USA tell you
 8  indirectly that Marlboro Lights were less risky or less
 9  harmful than Marlboro Full Flavor?
10         MR. KREGER:  It's vague and
11  ambiguous.  You can answer if you know.
12         THE WITNESS:  Would that include advertising
13  campaigns?
14  BY MR. STONE:
15     Q.  Yes, sir.
16     A.  Then the answer would be yes.
17     Q.  Okay.  How, in an advertising campaign, did
18  Philip Morris USA tell you directly or indirectly that
19  Marlboro Lights were less risky or less harmful?
20         MR. KREGER:  Objection.  It's a compound
21  question as to directly and indirectly.  But you can
22  answer if you know.
23         THE WITNESS:  Going back several years I was
24  interested in car racing and NASCAR, and I remember the
25  Marlboro ads plastered all over the, you know,
```

7 (Pages 22 to 25)

Page 26

1  particular car aficionado magazines.
2  BY MR. STONE:
3      Q.  So you remember Marlboro ads in car magazines,
4  automobile magazines, correct?
5      A.  Uh-huh.
6      Q.  You need to answer audibly.
7      A.  Oh, I'm sorry.  Yes, that is correct, sir.
8      Q.  Nodding works great for the video, but the
9  court reporter has a tougher time.
10     A.  I should have known better.
11     Q.  That's okay.
12         Now, you haven't seen any Marlboro ads in car
13  magazines since --
14     A.  Well, it's been several years, and I am not
15  interested in the sport anymore, so --
16     Q.  And the class period described in your
17  complaint in this case runs from 2005 up until the
18  present time; is that right?
19     A.  I thought it ran earlier.
20     MR. KREGER:  Just if you know, answer his
21  question.
22     THE WITNESS:  I will defer to somebody who
23  tells me that that is the case.  I am not sure of the
24  beginning period.
25  BY MR. STONE:

Page 27

1      Q.  Okay.  What about the Philip Morris USA
2  advertising campaign that you referred to, the ads you
3  saw in car racing magazines or car magazines, what about
4  that suggested or indicated to you that Marlboro Lights
5  were less harmful or less risky than Marlboro Full
6  Flavor?
7      A.  I believe they made the statement to that
8  effect of milder, I believe is the phrase they used.
9      Q.  What about milder indicates less risky to you?
10     A.  It's a descriptive word.  It -- if it's milder,
11  it must be less harsh or severe.
12     Q.  And do you use the word mild sometimes to
13  describe the weather?
14     A.  Certainly.
15     Q.  And does that have any connotation in terms of
16  safety to you?
17     A.  Well, yes.
18     Q.  What's the connotation in terms of the weather?
19     A.  If the weather is mild, then probably a lot
20  safer than if the weather is stormy.
21     Q.  And that's because of the risk of getting a
22  cold or the risk of slipping and falling or being in a
23  car accident or what?
24     MR. KREGER:  Just overbroad-question objection,
25  vague and ambiguous, incomplete hypothetical.  But you

Page 28

1  can answer if you understand it.
2      THE WITNESS:  All of the above I would say.
3  BY MR. STONE:
4      Q.  Okay.  And you are aware of the use of the term
5  mild in connection with hot sauces?
6      A.  Yes.
7      Q.  And you understand it to have a connotation
8  there that refers to the taste or the strength of the
9  taste?
10     A.  Yes.
11     Q.  And again does that have a safety connotation
12  to you?
13     A.  Oh, no.
14     Q.  Just a taste connotation?
15     A.  Correct.
16     Q.  And do different cigarettes have different
17  tastes to you?
18     MR. KREGER:  Objection.  Calls for perhaps an
19  expert opinion.  There's been no establishment as to
20  other brands being doctored, so I'll object on that basis.
21  If you have any knowledge, you can answer.
22     THE WITNESS:  Yes.  They are different tastes.
23  BY MR. STONE:
24     Q.  Okay.  Have you ever smoked a Sherman
25  cigarette?

Page 29

1      A.  Not that I am aware of.
2      Q.  Do you have a son?
3      A.  Do I have a son?  Yes.
4      Q.  Is his name Joe?
5      A.  Yes.
6      Q.  Does he smoke Sherman cigarettes?
7      A.  Not that I am aware of.
8      Q.  Does he smoke?
9      A.  No, unless he's hiding it pretty good from me.
10     MR. KREGER:  Just answer the question.
11     THE WITNESS:  No.
12     MR. KREGER:  Move to strike as nonresponsive
13  everything after "no."
14  BY MR. STONE:
15     Q.  What different brands have you smoked,
16  Mr. Tyrer?
17     A.  In the United States I have been pretty much
18  Marlboro.
19     Q.  Okay.
20     A.  You know, unless on occasion somebody gave me a
21  pack of something different or things like that, but I
22  haven't -- haven't had any relationship with any other
23  brand.
24     Q.  Okay.  And of the different Marlboro cigarettes
25  that you have smoked, you have smoked a Marlboro Full

8 (Pages 26 to 29)

Page 30

1  Flavor, correct?
2      A.  Yes.
3      Q.  And was that a king size?
4      A.  Yes.
5      Q.  Any other full flavor ones you have smoked?
6      A.  The mediums.
7      Q.  Okay.  And when did you smoke the mediums?
8      A.  Prior to the lights, I smoked the medium 100s.
9      Q.  I might have asked you, or you might have told
10  me this before, and I might have missed it in my notes,
11  but during what period of time did you smoke the
12  Marlboro Mediums, as best you recall?
13      A.  '99 through maybe 2001.
14      Q.  Okay.  Now, had you smoked Marlboro Lights
15  before 2002?
16      A.  Yes.
17      Q.  When did you smoke Marlboro Lights before that?
18      A.  I had another friend who smoked them, and she
19  spent a weekend in my house and had several packs of
20  them, so I smoked them then.
21      Q.  When would that be?
22      A.  Oh, boy, that would have been '90 -- no, after
23  '99.  Probably 2000.  I mean, that wasn't a long --
24      MR. KREGER:  Just answer the question.
25      THE WITNESS:  Sorry.

Page 31

1  BY MR. STONE:
2      Q.  Other than the few packs you smoked of Marlboro
3  Lights in 2000, did you smoke Marlboro Lights on any
4  other occasion up until 2002?
5      A.  Not that I can recall.
6      Q.  Okay.  Are there any Marlboro brand extensions
7  other than full flavor, mediums and lights that you have
8  ever smoked?
9      A.  I tried a menthol.
10      Q.  When was that?
11      A.  Didn't like it.  Probably in the -- I'd say
12  three or four months ago.  A neighbor's a Marine, and he
13  smoked them, and he gave me a pack.
14      Q.  What didn't you like about it?
15      A.  The taste.
16      Q.  Okay.  Now, what -- other than Marlboro --
17  well, let me back up for a minute.
18      Have you now told me about all the different
19  brand extensions or variations of Marlboro that you have
20  smoked?
21      A.  I believe so, yes.
22      Q.  When you are in Canada, do you smoke Marlboro?
23      A.  No.
24      Q.  What do you smoke when you are in Canada?
25      A.  Rothmans.

Page 32

1      Q.  Rothmans?
2      A.  Rothmans or Players.
3      Q.  And are those both full flavor that you smoke?
4      A.  They have again different gradations.  The
5  Rothmans are.  The Players you can get again different.
6      Q.  Which do you smoke when you are in Canada,
7  which level of tar?
8      A.  Let's see, I haven't been in Canada for the
9  past three years.  I -- I believe I just got the
10  Rothmans.
11      Q.  Okay.  So three years ago when you were there
12  you recall smoking the Rothmans?
13      A.  Yes.
14      Q.  And that was full flavor, the Rothmans was full
15  flavor?
16      A.  I believe so.
17      Q.  How long were you in Canada for?
18      A.  Two weeks.
19      Q.  And prior to that trip to Canada, the one you
20  took three years ago, when just prior to that were you
21  last in Canada?
22      A.  '96.
23      Q.  And were you smoking at the time?
24      A.  No, I wasn't.
25      Q.  Okay.  Are you -- you are a Canadian native; is

Page 33

1  that right?
2      A.  No, sir.
3      Q.  Where are you a native of, what country?
4      A.  England.
5      Q.  And did you maintain your English citizenship?
6      A.  I took Canadian citizenship.
7      Q.  When did you do that?
8      A.  1968, I believe.
9      Q.  And do you remain a Canadian citizen?
10      A.  Correct.
11      Q.  Have you become naturalized or obtained
12  citizenship in the United States?
13      A.  I have not.  I am a resident alien.
14      Q.  Permanent resident alien?
15      A.  Permanent alien resident, yes, sir.
16      Q.  When did you become a permanent resident alien
17  in the United States?
18      A.  It was either late '79 or early '80.
19      Q.  And you came to the United States to establish
20  a residence in about 1978.  Would that be correct?
21      A.  October 31st, 1977.
22      Q.  Other than the ads that you recalled that
23  referred to Marlboro Lights as mild, what else, if
24  anything, do you recall Philip Morris USA ever
25  communicating to you that indicated that Marlboro Lights

9 (Pages 30 to 33)

Page 34

1  would be less risky or less harmful than Marlboro Full
2  Flavor?
3      A.  It certainly seemed like a less macho image in
4  their advertising.
5      Q.  And what about the less macho image made you
6  think that they would be less harmful or less risky?
7      A.  Just the lack of the daring do.
8      Q.  Anything other than the use of the word mild
9  and the less macho image in the advertisements for
10  Marlboro that led you to think that Marlboro Lights
11  would be less harmful or less risky than Marlboro Full
12  Flavor?
13      A.  I can't think of anything else.
14      Q.  Okay.  The Surgeon General warnings are on the
15  side of the packs of Marlboro Lights that you are
16  smoking today, correct?
17      A.  I believe so, yes.
18      Q.  And there is no difference between the Surgeon
19  General's warnings on Marlboro Lights than the Surgeon
20  General's warnings on Marlboro Full Flavor, is there?
21      A.  No.
22      Q.  Packs of Marlboro Lights that you have obtained
23  since 2002 have from time to time had a little pamphlet
24  tucked under the cellophane, haven't they?
25      A.  Yes, they have.

Page 35

1      Q.  And that's something that you took out and
2  read, didn't you?
3      A.  No.  It was something I took out and threw
4  away.
5      Q.  Did you ever read one?
6      A.  I believe I have, yes.
7      Q.  Okay.  And you understood that pamphlet to
8  contain information that Philip Morris wanted to
9  communicate to you as a smoker of their product,
10  correct?
11      A.  Correct.
12      Q.  Was there anything -- when you read the
13  pamphlet, was there anything about the contents of the
14  pamphlet that you did not understand?
15      A.  No.
16      Q.  Have you ever visited Philip Morris' Web site?
17      A.  Would that be the Marlboro Web site?
18      Q.  Let's talk about it in terms of the Marlboro
19  Web site, then.  Have you ever visited the Marlboro Web
20  site?
21      A.  Yes.
22      Q.  And what was your reason for visiting the
23  Marlboro Web site?
24      A.  To download one of the application forms to
25  send in for the bonus reward gifts you got for what you

Page 36

1  had a mileage campaign at the time.
2      Q.  So you got for gear?
3      A.  Yes.
4      Q.  For other gifts?
5      A.  Uh-huh.
6      Q.  Other than visiting the Marlboro Web site to
7  get one of those forms, did you visit it on any other
8  occasion?
9      A.  Not that I can recall, no.
10      Q.  Did you ever read any information on the
11  Marlboro Web site about whether Marlboro Lights are less
12  harmful or less risky than Marlboro Full Flavor?
13      A.  No.
14      Q.  Did you ever look for any information on that
15  topic?
16      A.  No.
17      Q.  Okay.  Let me just ask it again and I'll finish
18  it off.  That's okay.
19          Did you ever look for any information on the
20  topic of whether Marlboro Lights are less risky or less
21  harmful than Marlboro Full Flavor on any Marlboro or
22  Philip Morris Web site?
23      A.  No.
24      Q.  And did you ever look for information on that
25  topic anywhere until you filed this lawsuit?

Page 37

1      A.  I believe I did, but I couldn't specify when or
2  where.
3      Q.  After you read the pamphlet that was tucked
4  inside the cellophane on a pack of Marlboro Lights, did
5  you make any effort to obtain any more information about
6  the topics discussed in that pamphlet?
7      A.  No.
8      Q.  Did you ever call the 800 number that Philip
9  Morris has available to smokers who want more
10  information?
11      A.  No.
12      Q.  Have you ever written a letter of complaint to
13  Philip Morris about anything?
14      A.  No.
15      Q.  Have you ever called their 800 number or their
16  hotline with any complaint?
17      A.  No.
18      Q.  Have you ever asked Philip Morris, other than
19  what you said in this lawsuit, to refund your money for
20  any cigarettes you purchased from them?
21      A.  No.
22      Q.  Have you ever asked any store where you have
23  purchased cigarettes to refund your money?
24      A.  Not that I can recall.
25      Q.  Okay.  Other than Kimberly Johnson, has any

10 (Pages 34 to 37)

Page 38

1  person ever told you that Marlboro Lights were less
2  harmful or less risky than Marlboro Full Flavor?
3      A.  No.
4      Q.  So is it a true statement, then, that the only
5  source of information you have for thinking Marlboro
6  Lights are less risky or less harmful than Marlboro Full
7  Flavor is what Ms. Johnson told you, the Marlboro ads
8  that describe Marlboro Lights as mild, and the less
9  macho image of the Marlboro Lights ads?
10      MR. KREGER:  Objection.  Misstates testimony
11  and is overbroad.  You can answer if you know.
12      THE WITNESS:  I am assuming the question was
13  are those the three main areas where I received
14  information regarding the less harmful effects?
15  BY MR. STONE:
16      Q.  Go ahead and answer it that way.
17      A.  Okay.  As far as I can recall, yes, that would
18  be the three areas where I received information that
19  they were less harmful.
20      Q.  And other than those three, are there any other
21  areas, even if they were minor, that you think caused
22  you to form a belief that Marlboro Lights are less
23  harmful or less risky than Marlboro Full Flavor?
24      A.  I don't know.  I'm sorry.
25      Q.  I'm sorry?

Page 39

1      A.  No, I can't think of anything.
2      Q.  And at the time Ms. Johnson told you about
3  Marlboro Lights, she was your neighbor?
4      A.  Correct.
5      Q.  And would that have been around 2002?
6      A.  Correct.
7      Q.  Where were you living in 2002?
8      A.  In Santee, California.
9      Q.  Is that where you are living still?
10      A.  No.
11      Q.  Where are you living today?
12      A.  Escondido, California.
13      Q.  If you could, could give me your current
14  address.
15      A.  Sure.  145 West El Norte Parkway --
16      Q.  Okay.
17      A.  -- Unit 127, Escondido, California 92026.
18      Q.  And how long have you lived there?
19      A.  Since June of 2008.
20      Q.  And before June of 2008, where did you live?
21      A.  I lived in Santee.
22      Q.  And what was your address in Santee?
23      A.  9423 Lake Canyon Road, Santee, California
24  92071.
25      Q.  How long were you there?

Page 40

1      A.  Since December of '94, briefly six months.  At
2  that time I lived in Encinitas, and then I moved back to
3  Santee.
4      Q.  Okay.  Do you own real property?
5      A.  Yes.
6      Q.  Where is the real property that you own?
7      A.  That is it.
8      Q.  You own the property in Santee?
9      A.  Yes.
10      Q.  And that's the only one?
11      A.  Yes.  I had another house, but unfortunately I
12  lost it through a short sale.
13      Q.  Do you presently have any romantic relations
14  other than Ms. Wood?
15      MR. KREGER:  Objection.  What's the relevance?
16  Don't answer that.  What's the relevance of that,
17  Counsel?
18      MR. STONE:  I'm trying to identify close
19  friends who could testify as to whether or not his
20  smoking habits are as he describes them.
21      MR. ROTH:  Well, what relevance does that have
22  to do with that?
23      MR. STONE:  Well, I am trying to identify
24  people who are otherwise close friends.  It seems to me
25  to be a reasonable way to get at it.

Page 41

1      MR. ROTH:  I think that's two questions.
2      MR. STONE:  I appreciate you may have a view
3  different than mine, but that's my purpose.
4      MR. KREGER:  I am just going to object that
5  it's argumentative and instruct him not to answer.
6  BY MR. STONE:
7      Q.  Are you going to follow your counsel's
8  instructions?
9      A.  Certainly.
10      MR. STONE:  Could we mark the transcript at
11  this point.
12      I want to advise you, Mr. Tyrer, that I reserve
13  the right to resume this deposition after filing a
14  motion, if we choose to do so, to compel a response to
15  that question.
16      MR. KREGER:  No answer.
17  BY MR. STONE:
18      Q.  Do you currently have close friends?
19      A.  Yes.
20      Q.  Could you name them for me, please.
21      A.  How many do you want?
22      Q.  How many would you consider close friends?
23      MR. KREGER:  Objection.  It's an overbroad
24  question.  It's also vague and ambiguous as to what you
25  mean by "close."

11 (Pages 38 to 41)

1  BY MR. STONE:
2      Q.  You can answer.
3      A.  I can give you 10 names if you want.
4      Q.  Okay.  Let's do that.
5      A.  Well, let's start with the ones you have on the
6  list, the two Kimberlys, Dave Demergian, Jack
7  Fitzmaurice.  Glen Barroga.
8      Q.  Would you mind spelling Barroga?
9      A.  B-A-R-R-O-G-A.
10     Q.  Thank you.
11     A.  Jessie Polk, P-O-L-K.  Ira Falk, F-A-L-K.
12     Q.  Okay.
13     A.  Teresa Rudessill, R-U-D-E-S-S-I-L-L.
14         MR. KREGER:  How many is that, Counsel?
15         MR. STONE:  I don't know.
16         MR. KREGER:  Well, the reason I ask is he said
17  he was going to give you 10, and I am going to limit it
18  to those 10, so I'm trying to make sure you get your 10.
19         MR. STONE:  Have you been keeping track?
20         MR. KREGER:  No.  There's five there, and
21  there's three or four on that side, right?
22         THE WITNESS:  I think we are at seven.
23         MR. KREGER:  Well, there's five there.  There's
24  two Kimberlys and a Fitzmaurice and Demores, or
25  whatever, so I think that's nine, so give him one more.

1         THE WITNESS:  Bre Brown.
2  BY MR. STONE:
3      Q.  B-R-E-E?
4      A.  B-R-E.
5      Q.  Brown?
6      A.  Actually her name is Bertha, but she hates
7  that.
8      Q.  Okay.
9         MR. KREGER:  And that's it.
10         MR. STONE:  And you are instructing him not to
11  give me any further names?
12         MR. KREGER:  Not without a demonstration as to
13  the reason for the necessity of having those names,
14  correct.
15         MR. STONE:  I don't have any obligation to
16  provide you with a demonstration.  So I just want to
17  make it clear that you are giving him an instruction not
18  to answer.
19         MR. KREGER:  Correct.
20         MR. STONE:  And are you going to follow your
21  counsel's instructions, Mr. Tyrer, and refuse to give me
22  any other names of close friends?
23         THE WITNESS:  Yes, sir.
24  BY MR. STONE:
25      Q.  And Ms. Wood's current residence address would

1  be 145 West El Norte?
2         MR. KREGER:  I am going to object.  These are
3  people that -- there has been no notice to third party
4  that personal and private information would be given
5  out, and without that I believe that the witness would
6  be -- is not obligated or required to give out addresses
7  and other personal information of people not related to
8  this lawsuit.  And I am not going to put him in a
9  position or having him be put in a position of violating
10  other people's personal rights, and so without a notice
11  to consumer or third party, I am going to object and
12  instruct him not to answer things like addresses, phone
13  numbers or whatever, of other people.
14         MR. STONE:  How would you propose we give
15  notice to third parties if we don't have their
16  addresses?
17         MR. KREGER:  Well, that's not my problem, but
18  I'm sure you'll find them yourself.
19         MR. STONE:  Well, I am going to ask him and
20  we're just going to go through it --
21         MR. KREGER:  That's fine.
22         MR. STONE:  -- because you are being
23  ridiculous.  You are a member of the California bar, I
24  take it?
25         MR. KREGER:  Well, I am not here to give a

1  deposition.  If you want to notice me up, I can answer
2  that question for you.  I am sure you will figure it
3  out.  My objection stands.  I'm not going to let him
4  give out personal information of people anymore.
5         MR. STONE:  I don't need to hear anymore.  I am
6  going to ask the questions.  You can instruct as you
7  want to instruct.
8  BY MR. STONE:
9      Q.  What is Ms. Kimberly Wood's current residence
10  address?
11         MR. KREGER:  Objection.
12  BY MR. STONE:
13      Q.  You can answer.
14         MR. KREGER:  Don't answer.
15         MR. STONE:  Are you instructing the witness not
16  to answer?
17         MR. KREGER:  As I said, don't answer.
18  BY MR. STONE:
19      Q.  Are you refusing to answer?
20      A.  I am going to follow my attorney's advice, yes,
21  sir, refusing to answer.
22         MR. ROTH:  Would there be a point that would be
23  convenient to take a break?
24         MR. STONE:  Any time you'd like.
25         THE WITNESS:  I was just going to ask that.

12 (Pages 42 to 45)

1    MR. STONE:  You certainly can.
2        Let's go off the record.  What's the time?
3        THE VIDEOGRAPHER:  Going off the record.  The
4    time is 9:59 a.m.
5        (Recess)
6        THE VIDEOGRAPHER:  We are back on the record at
7    9:58 a.m.
8    BY MR. STONE:
9        Q.  Okay.  Mr. Tyrer, when we broke earlier, I
10   think you had been instructed by your counsel not to
11   give me the residence address of Ms. Kimberly Wood, and
12   I was about to ask you whether you were going to follow
13   your counsel's instruction and refuse to give me her
14   residence address, and are you?
15       A.  Yes, sir.
16       Q.  And can you provide me the residence address of
17   Jack Fitzmaurice?
18       MR. KREGER:  Same objections.  Instruct you not
19   to answer.
20       MR. STONE:  And can we have a stipulation that
21   when you instruct the witness not to answer, he'll
22   follow your instruction?
23       MR. KREGER:  Yes.
24   BY MR. STONE:
25       Q.  Will you give me Mr. Fitzmaurice's business

1    address?
2        MR. KREGER:  Same objection.  Instruct you not
3    to answer.
4    BY MR. STONE:
5        Q.  And was the position the same, Mr. Tyrer, that
6    you will refuse to give me the business or residence
7    addresses for David Demergian, Glen Barroga, Jessie
8    Polk, Ira Falk, Teresa Rudessill and Bre Brown?
9        MR. KREGER:  Same objection.  Instruct you not
10   to answer.
11       (Exhibit 1 was marked for
12        identification.)
13   BY MR. STONE:
14       Q.  Okay.  Let me hand you what the reporter has
15   marked as Exhibit 1, Mr. Tyrer.
16       A copy for you, Counsel.
17       Do you recognize Exhibit 1, Mr. Tyrer, to be a
18   copy of the original complaint filed in this action on
19   your behalf in January of 2009?
20       A.  Yes, it certainly appears to be that.
21       Q.  Okay.  How did you come as the class
22   representative to have as your counsel Mr. Rubinstein
23   and Mr. Hewell?
24       MR. KREGER:  I am just going to object that to
25   some extent it's been asked and answered.  But you can

1    answer.
2        THE WITNESS:  Again Mr. Hewell contacted me
3    after Ms. Herzog had relayed our conversation, and I
4    agreed to -- after discussing it with him, I agreed to
5    be the representative.
6    BY MR. STONE:
7        Q.  And how did you come to decide that Mr. Hewell
8    would be an appropriate lawyer to represent the class?
9        MR. KREGER:  Objection.  I think it's a vague
10   and ambiguous question as to the word "appropriate."
11   But you can answer, if you know.
12       THE WITNESS:  I'm sorry.  Could you clarify
13   that for me by exactly what you mean by the question,
14   please.
15   BY MR. STONE:
16       Q.  How did you decide that Mr. Hewell would be an
17   appropriate lawyer to represent the class?
18       MR. KREGER:  Same objection.  You can answer,
19   if you know.
20       THE WITNESS:  Well, I knew that Mr. Hewell
21   wasn't going to be doing it on his own.  He seemed like
22   a diligent, forthright attorney, and again Ms. Herzog,
23   who I have faith in, had recommended him, so based on
24   those facts I agreed.
25   BY MR. STONE:

1        Q.  What, if anything, had Ms. Herzog told you
2    about Mr. Hewell's experience in handling class actions?
3        A.  I recall she said he had experience, but I
4    don't recall how much.
5        Q.  What did she tell you about Mr. Hewell that
6    caused you to think that Mr. Hewell would be an
7    appropriate lawyer to represent you and the class in
8    this case?
9        MR. KREGER:  Objection.  Misstates testimony.
10   You can answer, if you know.
11       THE WITNESS:  Well, I wasn't searching for an
12   attorney to represent me per se.  A lot of the spade
13   work on this had been done, and I fit the profile of a
14   plaintiff here.
15   BY MR. STONE:
16       Q.  What did you understand the profile to be?
17       A.  Somebody who smoked light cigarettes.  Somebody
18   who was doing so on the belief that they are milder,
19   safer, less tar, less nicotine, et cetera, et cetera,
20   and would be beneficial in the long run in reducing or
21   stopping smoking.
22       Q.  Okay.  Did you have any information about
23   Mr. Rubinstein that led you to think he would be an
24   appropriate lawyer to represent the class?
25       A.  I have no --

13 (Pages 46 to 49)

Page 50

1    MR. KREGER: Objection. Vague and ambiguous as
2  to the term "appropriate." But you can answer.
3    THE WITNESS: No.
4  BY MR. STONE:
5    Q. Okay. Let me ask you to turn to, if you would,
6  to Paragraph 106 of your original complaint, Exhibit 1.
7    A. Yes, sir.
8    Q. Here it says that you seek an order -- and I am
9  referring now to the language that begins on Line 3 --
10 "prohibiting Philip Morris from making or causing to be
11 made in any way any material, false, misleading or
12 deceptive statement or representation or to engage in
13 any promotional campaigns that portray light- and
14 low-tar cigarettes as less harmful than full-flavor
15 cigarettes including, but not to limited to, the use of
16 any cigarette descriptors in packaging, labeling,
17 advertising or any other method of communicating with
18 consumers that conveys implicit and/or explicit health
19 claims by use of the terms low tar, light, mild, medium
20 and ultra light." Do you see that language?
21    A. Yes, sir.
22    Q. Is there any statement or representation or
23 promotional campaign that Philip Morris engaged in at
24 any time that led you to conclude that Marlboro Lights
25 were less risky or less harmful than Marlboro Full

Page 51

1  Flavor other than the use of the word mild in
2  advertising, the less macho image, and the lack in the
3  light cigarettes ads of a daring dude?
4    A. That was do, not dude, but -- well, certainly.
5  I mean, they say they are lower in tar, lower in
6  nicotine. You know, all that just goes right to the
7  point of saying they are safer.
8    Q. And it wasn't dude. What was the word?
9    A. I'm sorry. It was an old expression, daring
10 do.
11    Q. Do?
12    A. Yes. Never mind. We should probably --
13    Q. Okay. So in addition, then, to the ads that
14 you used the word mild and the less macho image and the
15 lack of daring do, you are also claiming that the
16 statement that the light cigarettes are lower in tar and
17 nicotine --
18    A. Yes.
19    Q. -- led you to think that they were less risky
20 and less harmful?
21    A. Correct.
22    Q. When was that last time Philip Morris ever said
23 Marlboro Lights were lower in tar and nicotine?
24    A. I can't specifically recall, but I haven't seen
25 that claim in several years. I'd say three or four

Page 52

1  years, possibly longer.
2    Q. And what did you think when that language that
3  was on the pack went off the pack?
4    A. Tell the truth, I didn't even notice it had
5  gone off the pack for a long time.
6    Q. And after you noticed it, what did you think?
7    A. It's a list. I hadn't really given it any
8  thought. Packages are changed all the time.
9    Q. Now, do you think Marlboro Lights are not less
10 risky or less harmful than Marlboro Full Flavor?
11    A. Do I think they are not?
12    Q. I'm sorry. Bad question.
13    A. Thank you.
14    Q. Is it your opinion -- or let me strike it.
15    Do you believe that Marlboro Lights are not
16 less harmful than Marlboro Full Flavor?
17    MR. KREGER: I still think it's a bad question.
18 But if you can understand it, you can answer.
19    THE WITNESS: I can answer yes or no and it
20 would have the same meaning. Can you rephrase that?
21 BY MR. STONE:
22    Q. Sure. Earlier today you told me that you for
23 some period of time had a belief that Marlboro Lights
24 are harmful or less risky than Marlboro Full Flavor,
25 correct?

Page 53

1    A. Yes, sir.
2    Q. Do you still have that belief?
3    A. No, sir.
4    Q. Why not?
5    A. Partly because of the facts that have been
6  pored out in this particular complaint, and there have
7  been the fact that they had to take off the low tar and
8  less nicotine number must be indicative of the fact that
9  it was not true.
10    Q. Why do you say they had to take it off?
11    A. Well, otherwise they wouldn't have. I mean, if
12 you are --
13    MR. KREGER: You answered the question.
14 BY MR. STONE:
15    Q. So when they took it off, and you noticed it
16 for the first time, you assumed that what they had been
17 saying previously wasn't true because they had taken it
18 off the pack, correct?
19    A. I had no assumptions at the time, sir. I, you
20 know, was just picking up a pack of cigarettes and
21 smoking.
22    Q. Do you have that assumption today?
23    A. I do.
24    Q. What changed between the first time you noticed
25 it and today in terms of you having that assumption?

14 (Pages 50 to 53)

Page 54

1    A.   Again a lot of the information is here in the
2    complaint or the amended complaint.  Also my doctor told
3    me.
4    Q.   What did your doctor tell you about light
5    cigarettes?
6    A.   He said cigarettes were a serious health risk.
7    Q.   When did he first tell you that?
8    A.   Well, other than vague references from doctors
9    over the years, approximately a year and a half ago I
10   was told that.
11   Q.   Okay.  And did he say anything specific about
12   light cigarettes versus full flavor cigarettes when you
13   had this conversation with your doctor a year and a half
14   ago?
15   A.   Not that I recall.
16   Q.   Now, prior to the conversation with the doctor
17   a year and a half ago, you knew that cigarettes could
18   cause cancer in smokers, right?
19   A.   This is correct, yes, sir.
20   Q.   You were aware of it and had previously read
21   the Surgeon General's warnings on the side of the packs,
22   hadn't you?
23   A.   Yes, sir.
24   Q.   What, if anything, did your doctor tell you a
25   year and a half ago about the risks of smoking that you

Page 55

1    didn't already know?
2    A.   He said I had cancer and that could have been a
3    contributing factor.
4    Q.   Do you attribute your cancer that he told you
5    you had then to smoking?
6    A.   Partly.
7    Q.   Do you seek recovery in this case for any
8    health issues including cancer as a result of smoking?
9    A.   No, sir.
10   Q.   Do you know whether or not by filing this
11   lawsuit you have given up your ability to claim any
12   damage for any health issues that you have that are
13   attributable to smoking?
14       MR. KREGER:  Objection.  It's calls for a legal
15   conclusion.  But you can answer, if you know.
16       THE WITNESS:  Well, I didn't know, but --
17   BY MR. STONE:
18   Q.   Okay.  What is your doctor's name who gave you
19   this advice a year and a half ago?
20   A.   An oncologist.  His name was William Stanton.
21   Q.   Is he in the San Diego area?
22   A.   Yes, sir.
23   Q.   What type of cancer were you diagnosed with
24   then?
25   A.   Colorectal.

Page 56

1    Q.   Have you had any other health conditions at any
2    time that you attribute to smoking?
3    A.   Other than a sore throat, no, sir.
4    Q.   And have you had any other health conditions at
5    any time that any doctor has told you might be
6    associated in any way with smoking?
7    A.   I have to think about that for a minute.
8        MR. KREGER:  Just --
9        THE WITNESS:  I have to say no.
10   BY MR. STONE:
11   Q.   Okay.  Other than the statement on the pack of
12   cigarettes, lowered tar and nicotine, the ads that refer
13   to Marlboro Lights as mild, the less macho image of
14   Marlboro Lights in the advertising and the lack of
15   daring do, was there anything else about any Philip
16   Morris statements, promotions or advertising that led
17   you to think that Marlboro Lights were less harmful or
18   less risky than Marlboro Full Flavor?
19       MR. KREGER:  I am going to object that it
20   misstates his previous testimony.  You can answer, if
21   you know.
22       THE WITNESS:  The whole point of that
23   advertising was that you were producing a safer
24   cigarette, lower in nicotine, lower in tar, mild.
25   BY MR. STONE:

Page 57

1    Q.   Anything else?
2    A.   No, not now.
3    Q.   Why did you think lower in tar meant lower in
4    risk?
5    A.   Well, tar and nicotine or tar is a
6    carcinogenic.  It's no good in your lungs.  The less you
7    get in there, the better it would be.
8    Q.   Okay.  What about nicotine?  Does that have any
9    relationship to risk or harmfulness in your mind?
10   A.   Yes.
11   Q.   What's the relationship?
12   A.   It's an addictive substance.
13   Q.   Okay.  When you smoked Marlboro Lights, did you
14   consider yourself to be addicted to smoking?
15   A.   Unfortunately --
16       MR. KREGER:  Just objection as to time.
17   BY MR. STONE:
18   Q.   You can answer.
19       MR. KREGER:  If you understand the question.
20       THE WITNESS:  Unfortunately, yes, I was
21   addicted to smoking.
22   BY MR. STONE:
23   Q.   Okay.  What do you understand tar to be?
24   A.   It's a by product of the combustion.
25   Q.   How does tar get into your body when you smoke

15 (Pages 54 to 57)

Page 58

1  a cigarette?
2          MR. KREGER:  I am just going to object.  This
3  line of questioning seems to call for an expert opinion.
4  But if you have an understanding, you can give it.
5          THE WITNESS:  I'm not an expert, so --
6  BY MR. STONE:
7      Q.  What do you understand?
8      A.  I understand that the tar would enter with the
9  smoke through the filter.
10     Q.  Okay.  And is it your understanding that if you
11 smoke more cigarettes, you get more tar?
12     A.  Yes.
13     Q.  And if you take more puffs from a particular
14 cigarette, you get more tar than if you took fewer
15 puffs, true?
16     A.  Yes.
17     Q.  When you switched from smoking Marlboro Full
18 Flavor to Marlboro Lights, did you change the number of
19 cigarettes you smoked per day?
20     A.  No.
21     Q.  Okay.  Did you change the way in which you
22 smoked cigarettes?
23         MR. KREGER:  Hold on.  I am just going to
24 object.  To me, at least, it's vague and ambiguous as to
25 what you mean by the way in which you smoked.  You can

Page 59

1  answer if you understand.
2  BY MR. STONE:
3      Q.  When you switched from Marlboro Full Flavor to
4  Marlboro Lights, did you take more puffs of each
5  Marlboro Light cigarette than you had taken of Marlboro
6  Full Flavor cigarettes?
7      A.  No.
8      Q.  Did you change the size of the puffs that you
9  took?
10     A.  Yes.
11     Q.  And by how much did you increase the size of
12 the puffs?
13     A.  They were certainly -- you had to drag harder
14 to get -- that's just -- you have to drag harder on the
15 lights.
16     Q.  Okay.  So in order to draw smoke through the
17 cigarette, it took a little more pressure or effort on
18 your part?
19     A.  A little more vacuum, yes.
20     Q.  And was that in order to get a puff that felt
21 to you like it was the same size, the same amount of
22 smoke, or were you getting more smoke?
23         MR. KREGER:  Objection.  That's a compound
24 question.  But you can answer it if you understand.
25         THE WITNESS:  I don't believe I was getting

Page 60

1  more smoke.  It took more effort to get it.
2  BY MR. STONE:
3      Q.  So let me rephrase because of the compound
4  objection, just so we are clear.
5      A.  Yes, sir.
6      Q.  When you switched from smoking Marlboro Reds to
7  Marlboro Lights, was the amount of smoke that you took
8  in each puff the same or different?
9      A.  I'd say it was the same.
10     Q.  But in order to get the same amount of smoke,
11 you experienced that it took a stronger draw or more
12 vacuum?
13     A.  Yes, sir.
14     Q.  Okay.  Is there anything that Philip Morris
15 did, in terms of the information on the packet or
16 advertising campaigns or promotional campaigns, that led
17 you to believe that Marlboro Lights were less harmful or
18 less risky than Marlboro Full Flavor that you haven't
19 already told me about today?
20     A.  Well, again the less tar, the less nicotine,
21 the light, it all suggests healthier or less harmful.
22     Q.  Okay.  Other than that, is there anything else?
23     A.  Not that I can recall.
24     Q.  Okay.  If you got less tar from your Marlboro
25 Lights as compared to your Marlboro Full Flavor, would

Page 61

1  you have a claim against Philip Morris in your mind?
2          MR. KREGER:  I am just going to object.
3  Incomplete hypothetical and calls for speculation and is
4  vague and ambiguous.  But you can answer, if you know.
5          THE WITNESS:  Would I still have a claim?  Yes.
6  BY MR. STONE:
7      Q.  What would that claim be?
8      A.  The addiction continues.
9      Q.  Okay.  Let's talk about addiction for a moment.
10         Did Philip Morris ever suggest to you that
11 smoking would not be addictive?
12     A.  In the time frame that we are talking here?
13 No.  But previously, yes.
14     Q.  When did you first think smoking might not be
15 addictive?
16     A.  I believed there were hearings, if I recall, in
17 the mid '80s where the tobacco industry adamantly
18 claimed that smoking was not addictive.
19     Q.  At the time you switched to Marlboro Lights you
20 knew that smoking was addictive?
21     A.  Correct.
22     Q.  Did Philip Morris do or say anything to you
23 directly or indirectly that led you to think that
24 smoking Marlboro Lights would not be addictive?
25         MR. KREGER:  Objection again as to time frame.

16 (Pages 58 to 61)

Page 62

1   It's not clear.  You can answer if it's clear to you.
2        THE WITNESS:  No.  The answer would be no.
3   BY MR. STONE:
4        Q.  Okay.  So during the -- if you -- at the time
5   you switched to smoking Marlboro Lights, if you got
6   lower tar from those Marlboro Lights than you had gotten
7   from Marlboro Reds or Full Flavor, would you have any
8   claim, in your mind, that Philip Morris had done
9   something wrong?
10       MR. KREGER:  Objection.  Calls for a legal
11  conclusion, calls for speculation, and is an incomplete
12  hypothetical.  But you can answer if you understand it.
13       THE WITNESS:  Well, based on that, I don't
14  understand it.
15       MR. KREGER:  Tell him.
16  BY MR. STONE:
17       Q.  Let me try to rephrase it.
18       Did you get lower tar from the Marlboro Lights
19  that you smoked as compared to the amount of tar you got
20  from the Marlboro Full Flavor that you had previously
21  smoked?
22       MR. KREGER:  I am just going to object.  I
23  believe that calls for an expert opinion.  It might also
24  call for a medical conclusion.  But you can answer if
25  you have an understanding.

Page 63

1        THE WITNESS:  No.
2   BY MR. STONE:
3        Q.  Why do you say no?
4        MR. KREGER:  Same objections.  You can answer.
5        THE WITNESS:  Had I been delivering less tar
6   and nicotine into my body, I think I would have been
7   able to cut back on smoking, possibly even quit.
8   BY MR. STONE:
9        Q.  Why do you think that?
10       MR. KREGER:  Same objections again.  But you
11  can answer, if you know.
12       THE WITNESS:  It would be a weaning effect.
13  BY MR. STONE:
14       Q.  Has any doctor ever told you about a weaning
15  effect in connection with quitting smoking?
16       A.  Yes.
17       Q.  What doctor told you that?
18       A.  Adam McCann.
19       Q.  When was that?
20       A.  Oh, boy.  No, I'm sorry.  No, I take that back.
21  He worked with Adam McCann.  His name was Gregory
22  Glavonich.
23       Q.  Can you help me out with the spelling on
24  Glavonich?
25       A.  I was hoping you wouldn't ask.  Oh, I have his

Page 64

1   name on my phone.  I could probably spell his name, if
2   that's acceptable.
3        MR. KREGER:  That's okay.
4        MR. ROTH:  Put your phone in evidence.
5        THE WITNESS:  That's what I was afraid of.  I'm
6   sorry.  I am wasting time here.
7   BY MR. STONE:
8        Q.  That's okay.
9        A.  G-L-A-V-O-N-I-C-H.
10       MR. KREGER:  That's not what I thought at all.
11  BY MR. STONE:
12       Q.  Okay.  What did Dr. Glavonich tell you about
13  weaning as a way to quit smoking?
14       A.  He suggested a method where when I had a
15  craving for a cigarette, I extend the craving a certain
16  amount of time before I indulge, and each time I try to
17  extend it further and combine that with an elastic band
18  on my wrist, I believe.
19       Q.  And did you try that?
20       A.  I did.
21       Q.  When was that you tried it?
22       A.  That would be 2006.
23       Q.  Okay.  And how long did you undertake those
24  efforts to quit?
25       A.  A few weeks.

Page 65

1        Q.  And did he say anything to you about using
2   light cigarettes as a way to wean yourself from smoking?
3        A.  I was already smoking light cigarettes, so we
4   didn't make any comparisons.
5        Q.  Did he suggest to you that you try ultra
6   lights?
7        A.  He didn't.
8        Q.  Have you tried ultra lights?
9        A.  I have.
10       Q.  Why don't you smoke ultra lights?
11       A.  I have no reason.
12       Q.  Do they taste as good to you as lights?
13       A.  I haven't had one in a long time, but from what
14  I recall, there was a minor difference.
15       Q.  Do you understand ultra lights to be lower in
16  tar than lights?
17       A.  Well, yes.
18       Q.  And is it your belief that ultra lights would
19  be less harmful than lights?
20       A.  No.
21       Q.  The same?
22       A.  Uh-huh.
23       Q.  You need to answer yes or no.
24       A.  Oh, I'm sorry.  Yes.
25       Q.  Okay.  How much less tar did you think you

17 (Pages 62 to 65)

Page 66

1  would get from smoking a Marlboro Light than a Marlboro
2  Full Flavor?
3      MR. KREGER: Objection. Calls for speculation.
4  Incomplete as to time and vague and ambiguous. But you
5  can answer.
6      THE WITNESS: Again the ads and propaganda
7  didn't specify an amount that I can recall, but it just
8  simply said less tar.
9  BY MR. STONE:
10     Q. And how much less did you think you would get?
11     MR. KREGER: Same objections. But you can
12  answer.
13     THE WITNESS: I don't know, but if I was to --
14  no, I don't know.
15  BY MR. STONE:
16     Q. Okay. Did you at any time when you switched
17  from Marlboro Full Flavor to Marlboro Lights have any
18  belief as to how much less tar you would get?
19     A. I believed I would get less tar. A quantity, a
20  percentage, I can't give you.
21     Q. Okay. Did you look at any of the ads to see
22  what tar numbers were on the ads?
23     A. No.
24     Q. Did you look up on the Federal Trade
25  Commission's information to see the tar levels of

Page 67

1  different brands of cigarettes?
2      A. Actually, yes.
3      Q. Okay. When you looked it up on the Federal
4  Trade Commission's Web site, what did you find -- or
5  maybe not the Web site.
6      When you looked up the Federal Trade Commission
7  information, what did you find were the different levels
8  of tar?
9      A. I honestly can't recall. I do recall there
10  were gradations, but that's all I can recall.
11     Q. And was it your belief at the time that the
12  lower the tar level, the lower the risk?
13     A. Yes.
14     Q. So why didn't you understand, then, that ultra
15  lights would be less harmful than lights?
16     A. I don't know how long ultra lights have been
17  around. I think they are a relatively new phenomenon,
18  so I have just been staying with what I am doing.
19     Q. Did you try to pick the lowest tar cigarette
20  you could find?
21     A. No.
22     MR. KREGER: Objection. Incomplete as to time.
23  BY MR. STONE:
24     Q. In 2002, when you switched to Marlboro Lights
25  at that point in time, were you trying to pick the

Page 68

1  lowest tar cigarette you could find?
2      A. No.
3      Q. Why not?
4      A. It didn't occur to me. It just -- the lights
5  purported to be less tar and nicotine, so I went with
6  the lights.
7      Q. And you knew there were other cigarettes that
8  had even lower tar than that?
9      A. Correct.
10     Q. Why didn't you switch to them?
11     A. The loyalty to Marlboro.
12     Q. Marlboro Lights was available in the market --
13  Marlboro Ultra Lights was available in the market in
14  2002, wasn't it?
15     A. I don't know.
16     Q. Did you look for any Marlboro cigarettes that
17  had lower tar than Marlboro Lights?
18     A. No, sir.
19     Q. Why do you have loyalty to Marlboro?
20     A. The NASCAR image, sporting events.
21     Q. Okay. And when is the last time you saw
22  Marlboro associated with sporting events?
23     A. Oh, boy, that's a good question. It doesn't
24  seem that long ago that their names were on the side of
25  stock cars.

Page 69

1      Q. Okay. Other than seeing their names on the
2  side of stock cars, when is the last time you saw them
3  associated with any sporting event?
4      A. I don't recall.
5      Q. Okay. Why are you loyal to Marlboro today?
6      A. I wish I could answer that.
7      Q. Okay.
8      A. I can't.
9      Q. Do Marlboro cigarettes taste different to you
10  than other brands like Camel or Winston or Pall Mall?
11     A. There are different tastes, yes.
12     Q. Do you prefer some tastes to other tastes in
13  terms of cigarettes?
14     A. Yes.
15     Q. Which taste of cigarette do you prefer?
16     A. The Marlboro Lights 100s.
17     Q. Okay. In 2002, if you had gotten less tar and
18  nicotine from the Marlboro Lights that you started
19  smoking then, as compared to the Marlboro Full Flavor,
20  would you agree that the statement lower tar and
21  nicotine was not misleading?
22     MR. KREGER: Objection. Calls for speculation.
23  Calls for a legal conclusion. It's vague and ambiguous.
24  You can answer.
25     THE WITNESS: I'm not sure I understand. I'm

18 (Pages 66 to 69)

1   sorry.
2   BY MR. STONE:
3       Q.   One of the things you mentioned to me that you
4   thought was that -- let me strike it.
5           You have told me several things that you
6   thought led you to form the belief that Marlboro
7   Lights were less harmful, correct?
8       A.   Correct.
9       Q.   Those all relate to getting lower tar and
10  nicotine compared to a Marlboro Full Flavor, correct?
11      A.   Yes, sir.
12      Q.   If in fact you had gotten lower tar and
13  nicotine from the Marlboro Lights when you started
14  smoking them in 2002, as compared to the Marlboro Full
15  Flavor you had been smoking prior to that time, would
16  you agree that you had gotten the less harmful or
17  reduced risk that you expected?
18          MR. KREGER:   Objection.   Calls for speculation.
19  It's an incomplete hypothetical.   It's vague and
20  ambiguous.   Calls for a legal conclusion, potentially an
21  expert opinion.   You can answer, if you know.
22          THE WITNESS:   No.
23  BY MR. STONE:
24      Q.   Why not?
25      A.   Again, if the product had actually delivered

1   less tar, less nicotine, then I should have certainly
2   been able to lessen, if not get rid of the addiction I
3   had to cigarettes.
4       Q.   How much less tar and nicotine did you think
5   you needed to get to lessen your addiction?
6           MR. KREGER:   Objection.   Calls for a legal
7   conclusion and expert opinion, possibly a medical
8   opinion, and is vague and ambiguous.   You can answer if
9   you have an understanding.
10          THE WITNESS:   Well, in laymen's terms, if I was
11  getting half of the tar and nicotine, I would logically
12  think I could probably cut out half of cigarettes, and
13  that's certainly not what happened.
14  BY MR. STONE:
15      Q.   I didn't follow the logic of that.
16          If you got -- let's say you got half the tar
17  and nicotine from a Marlboro Light that you had been
18  getting from a Marlboro Full Flavor, is that the
19  assumption that was in your question?
20      A.   Yes.
21          MR. KREGER:   Objection.   It's an incomplete
22  hypothetical.
23          THE WITNESS:   Okay.
24          MR. KREGER:   And it calls for an expert
25  conclusion and a medical opinion.

1   BY MR. STONE:
2       Q.   What led you to think that you would then smoke
3   only half as many cigarettes?
4           MR. KREGER:   Same objections.   You can answer.
5           THE WITNESS:   If I could live on half of the
6   tar and nicotine I was getting before -- I don't mean
7   live on, but, you know, put up with it -- I should
8   therefore be able to again wean myself off this stuff.
9   BY MR. STONE:
10      Q.   Has the number of cigarettes you have smoked
11  per day varied over time?
12      A.   Yes.
13      Q.   How many cigarettes per day are you smoking
14  currently?
15      A.   A pack.
16      Q.   And have there been times when you have smoked
17  more than that?
18      A.   No.   That's the maximum.
19      Q.   Okay.   And have there been times when you have
20  smoked less than that?
21      A.   Yes.
22      Q.   During the time period 2002 until today, have
23  there been times when you have smoked less than a pack a
24  day?
25      A.   Yes.

1       Q.   When have those times been?
2       A.   When I was hospitalized.
3       Q.   When was that?
4       A.   October 2008.   I spent 13 days in the hospital
5   and didn't smoke there.
6       Q.   Okay.   And then when you came out of the
7   hospital in October of 2008, did you start smoking
8   again?
9       A.   Not for about a month.
10      Q.   So it would have been sometime in November
11  before you resumed?
12      A.   Yes, sir.
13      Q.   And why did you resume?
14      A.   Again the proximity to a smoker, it just got to
15  me one day.
16      Q.   And when you started back again, did you start
17  with a less than a pack a day?
18      A.   Yes.
19      Q.   For how long did you stay at less than a pack a
20  day?
21      A.   I'd say I gradually ramped up probably over a
22  month until I reached that level again.
23      Q.   Do you enjoy smoking?
24      A.   Sometimes.
25      Q.   When you first started smoking, did you enjoy

19 (Pages 70 to 73)

Page 74

1  smoking?
2      A.  It was a social thing.
3      Q.  Is it still a social thing?
4      A.  No.
5      Q.  What is it now?  How would you describe it now?
6      A.  A curse.
7      Q.  And was it a curse in 2008 when you had stopped
8  smoking and started again?
9      A.  I'm not sure I understand what you mean.
10     Q.  Did you -- was there still a social pleasure,
11  or was it still a social thing in 2008 when you started
12  back?
13     A.  No.  No, it certainly wasn't.
14     Q.  Was it a social thing in 2002 when you switched
15  to Marlboro Lights?
16     A.  Yes.  Mainly.
17     Q.  When did it stop becoming a social thing?
18     A.  When I realized, A, it was harmful to me; and,
19  B, I couldn't put it down.
20     Q.  When was that?
21     A.  I have probably known since 2002 it was a nasty
22  habit.  It didn't hit me as hard until 2008.
23     Q.  What happened, if anything, in 2008 that caused
24  it to hit you?
25     A.  My health.

Page 75

1      Q.  Had anybody in your family had any health
2  issues that you associated with smoking prior to 2008?
3      A.  My father, no.  My mother, possibly.  She died
4  quite young of cancer, but I -- that was back in '69, so
5  I don't know if there is any evidence.
6      Q.  Did both your parents smoke?
7      A.  My mother did; my father only briefly when he
8  was in World War II.
9      Q.  Do you have siblings?
10     A.  I do not.
11     Q.  You have been married twice?
12     A.  No, sir.
13     Q.  Once?
14     A.  Yes.
15     Q.  Did your wife smoke?
16     A.  Again we both smoked briefly, but we quit
17  together.
18     Q.  When did you quit?
19     A.  Sometime in the '70s.
20     Q.  When were you married?
21     A.  In 1970.
22     Q.  And when were you divorced?
23     A.  '92.
24     Q.  And are there children of that marriage?
25     A.  Yes.

Page 76

1      Q.  How many?
2      A.  Two.
3      Q.  What are their names?
4      A.  One you know.
5      Q.  Joe?
6      A.  And Jennifer.
7      Q.  Jennifer.  And when were they born?
8      A.  Joe in '74; Jennifer, '75.
9      Q.  Okay.  Do either of them smoke?
10     A.  No.
11     Q.  Insofar as you know, have either of them
12  smoked?
13     A.  Joe, briefly; Jennifer, never.
14     Q.  Okay.  When did Joe smoke?
15     A.  When he was 16.
16     Q.  Okay.  I want you to assume, Mr. Tyrer, that
17  when you switched to Marlboro Lights, you did, in fact,
18  get lower tar and nicotine than when you had been
19  smoking Marlboro Full Flavor.
20         MR. KREGER:  Objection.  Incomplete
21  hypothetical.  Vague and ambiguous.  Calls for
22  speculation.
23  BY MR. STONE:
24     Q.  Can you make that assumption for me?
25     A.  Yes.

Page 77

1      Q.  If you make that assumption, then did Marlboro
2  Lights deliver what you expected from them?
3         MR. KREGER:  Same objections.
4         THE WITNESS:  On that hypothetical, yes.
5  BY MR. STONE:
6      Q.  Okay.  In your first, your original complaint,
7  Exhibit 1, if you would turn to Page 28, there's also
8  of on the bottom right-hand corner, but it's also
9  Paragraph 120, if that's easier to find.
10     A.  Yes.
11     Q.  There is a claim there, the third cause of
12  action for fraudulent concealment.  Do you see that?
13     A.  Yes, I do.
14     Q.  That cause of action is not included in your
15  first amended complaint, correct?
16         MR. KREGER:  Just from your memory.
17         THE WITNESS:  I don't recall from my memory.  I
18  didn't -- okay.
19         MR. KREGER:  Objection.  The document speaks
20  for themselves.
21  BY MR. STONE:
22     Q.  Why was it that, as the representative of a
23  punitive class of smokers, you dropped the fraudulent
24  concealment cause of action when you filed your first
25  amended complaint?

20 (Pages 74 to 77)

Page 78

1    MR. KREGER: Objection. Calls for a legal
2  conclusion. If you have knowledge, you can give it.
3  Don't speculate; just from what you know.
4    THE WITNESS: I can't say.
5  BY MR. STONE:
6    Q. Okay. If you turn to the next page, Page 29 of
7  Exhibit 1, you'll see there the fourth cause of action,
8  for breach of implied warranty of fitness for purpose.
9  Do you see that?
10   A. Yes, I do.
11   Q. Why was it, when you filed your first amended
12 complaint on your own behalf and on behalf of the
13 punitive class, you dropped the claim or cause of action
14 for breach of implied warranty of fitness for purpose?
15   MR. KREGER: Objection. Calls for a legal
16 conclusion. You can answer, if you know.
17   THE WITNESS: I don't know.
18 BY MR. STONE:
19   Q. Okay. Do you agree that today you are not
20 pursuing any claim against Philip Morris for fraudulent
21 concealment?
22   A. Today, yes.
23   Q. And do you agree that you are not pursuing any
24 claim for breach of implied warranty of fitness for
25 purpose?

Page 79

1    A. Today, yes.
2    Q. Did you make any determination on behalf of the
3  punitive class that it was appropriate that they not
4  pursue claims for fraudulent concealment or implied
5  warranty of fitness for purpose?
6    MR. KREGER: Objection. Calls for a legal
7  conclusion. You can answer, if you know.
8    THE WITNESS: I don't know.
9  BY MR. STONE:
10   Q. You don't know whether you did that or not?
11   A. Correct.
12   Q. Do you claim to have been damaged by any of the
13 ads or promotions or statements on packs that you have
14 referred to?
15   MR. KREGER: Objection. Calls for a legal
16 conclusion. But you can answer, if you know.
17   THE WITNESS: Yes.
18 BY MR. STONE:
19   Q. How do you claim to have been damaged? What
20 damage do you claim to have suffered?
21   MR. KREGER: Same objections. But you can
22 answer.
23   THE WITNESS: Well, the damage is that I am
24 still smoking, and the -- a campaign was designed to say
25 that the lighter cigarettes were healthier. This is not

Page 80

1  proving to be the case.
2  BY MR. STONE:
3    Q. You don't have any evidence it's not the case,
4  right?
5    MR. KREGER: Objection. Calls for a legal
6  conclusion, possibly expert opinion. But you can
7  answer, if you know.
8    THE WITNESS: I think if you read the amended
9  complaint, there are several references to the fact that
10 the lighter cigarettes are no safer than the full flavor
11 ones.
12 BY MR. STONE:
13   Q. Do you have any evidence that they are not
14 safer other than what you have read in the complaint or
15 the first amended complaint?
16   MR. KREGER: Objection. Misstates testimony,
17 and it calls for a legal conclusion. But you can
18 answer, if you know.
19   THE WITNESS: No, I don't know.
20 BY MR. STONE:
21   Q. Okay. So how have you been damaged as a result
22 of the promotions and advertisements for Marlboro
23 Lights?
24   MR. KREGER: Objection. Asked and answered.
25 You can answer if you like.

Page 81

1    THE WITNESS: Asked and answered.
2  BY MR. STONE:
3    Q. I am trying to understand how you have been
4  damaged as a result of the ads and promotions that you
5  have told me about earlier.
6    MR. KREGER: Objection. Asked and answered.
7  You can answer.
8    THE WITNESS: Again, it was an inducement to go
9  to a cigarette that was supposed to be safer, healthier,
10 and it simply wasn't the case.
11 BY MR. STONE:
12   Q. Why are you still smoking it today?
13   A. Because I can't quit.
14   Q. Why don't you switch to another brand?
15   A. There is no reason other than habit.
16   Q. Why don't you switch to Marlboro Full Flavor?
17   A. Again habit. I used to love the full flavor,
18 but now I like the light.
19   Q. Have you tried a full flavor since January of
20 2009?
21   A. Yes.
22   Q. You prefer the lights to the full flavor you
23 have tried since January of 2009?
24   A. Yes.
25   Q. Since January of 2009, your belief has been

Page 82

1  that you are not getting any lower tar or lower nicotine
2  from the lights, correct?
3      A.  Correct.
4      Q.  But you still purchase the product, correct?
5      A.  Correct.
6      Q.  Have you considered switching to an ultra
7  light?
8      A.  Considered, yes; done, no.
9      Q.  When was the first time you considered it?
10     A.  Again my friend's parents smoke the ultra
11 lights, and they tried a couple of those.
12     Q.  And put that in a time frame for me if you
13 would.
14     A.  Oh, I'm sorry.  I'd say about a year ago.
15     Q.  And why didn't you switch to ultra lights?
16     A.  Again habit.
17     Q.  Okay.
18         MR. KREGER:  So would this be a good time for a
19 break, Counsel?
20         MR. STONE:  Sure.
21         THE VIDEOGRAPHER:  Going off the record.  The
22 time is 10:45 a.m.
23         (Recess)
24         THE VIDEOGRAPHER:  We are back on the record at
25 10:58 a.m.

Page 83

1         MR. STONE:  Mr. Tyrer, I am going to hand you a
2  copy of the first amended complaint that we have marked
3  for identification as Exhibit 2.
4         (Exhibit 2 was marked for
5         identification.)
6         THE WITNESS:  Thank you.
7         MR. STONE:  Counsel.
8         MR. KREGER:  Thank you.
9  BY MR. STONE:
10     Q.  Do you recognize Exhibit 2 as a copy of the
11 first amended class action complaint that was filed on
12 your behalf?
13     A.  Yes.
14     Q.  In this complaint, a new law firm was added,
15 Mr. Kreger's firm and Ms. Avila's firm which is
16 Milstein, Adelman & Kreger.  You are aware of that?
17     A.  Yes.
18     Q.  Did you make a decision to add them?
19     A.  I relied on the other attorneys to make that
20 decision.  I am very pleased they did.
21     Q.  Did you make any analysis or determination on
22 your own as to whether that firm was an appropriate one
23 to represent the punitive class in this case?
24         MR. KREGER:  It's objection as to the term
25 "appropriate."  But you can answer, if you know.

Page 84

1         THE WITNESS:  Oh, I did no independent
2  evaluation to the firm, if that's your question.
3  BY MR. STONE:
4      Q.  Okay.  Did you have any information about them
5  before they were added?
6      A.  No, sir.
7      Q.  Okay.  Did anybody consult for your approval of
8  adding them?
9      A.  No, sir.
10     Q.  Okay.  What do you understand to be the
11 financial, the potential cost to you of this litigation?
12     A.  Hopefully, minimal.
13     Q.  Do you understand that if the defendants in
14 this case should prevail, that you might be liable for
15 certain costs that they incur?
16     A.  Yes, I am aware of that.
17     Q.  And do you have any agreement with anyone that
18 you will be reimbursed for those costs?
19     A.  I do not.
20     Q.  What do you understand the potential amount of
21 those costs to be?
22         MR. KREGER:  Objection.  Calls for speculation.
23 Incomplete hypothetical.  You can answer, if you know.
24         THE WITNESS:  To me personally?
25 BY MR. STONE:

Page 85

1      Q.  Yes, sir.
2      A.  Could you elaborate a little bit?
3      Q.  Sure.  If the defendants prevail in this
4  case --
5      A.  Yes.
6      Q.  -- what do you understand is the potential
7  amount of money that you might have to pay the
8  defendants?
9         MR. KREGER:  Same objections.  You can answer.
10        THE WITNESS:  Oh, well into the seven figures.
11 BY MR. STONE:
12     Q.  Do you have that much money?
13     A.  No.
14     Q.  Why are you willing, then, to risk your entire
15 net worth in this case?
16        MR. KREGER:  Objection.  Calls for speculation.
17 Incomplete hypothetical.  The question is overbroad,
18 among other things.  You can answer.
19        THE WITNESS:  Because it's a just case.  There
20 is a lot of people who have been wronged here, and I'd
21 like to help them, as well as myself.
22 BY MR. STONE:
23     Q.  Have you looked at other cases that have been
24 brought raising similar claims?
25     A.  Similar claims?

22 (Pages 82 to 85)

Page 86

1    Q. To yours.
2    A. No, I have looked at some of the -- actually
3  the answer is no.
4    Q. Okay. Are you aware that there is a class
5  action in California that was certified that included
6  claims about light cigarettes?
7    A. I was not aware of that.
8    Q. Did you do any investigation in advance of
9  filing this case to determine whether other cases had
10 been filed previously?
11   A. Briefly, yes.
12   Q. What investigation did you do?
13   A. Just simply hit, you know, class action plus
14 cigarettes on a search engine in the computer.
15   Q. And what did you find?
16   A. It seems there's been several of them.
17   Q. Are you aware that you are a member of the
18 class that brought a lights claim in California?
19       MR. KREGER: Objection. Calls for a legal
20 conclusion. You can answer, if you know.
21       THE WITNESS: I'm not sure I understand what
22 you mean.
23 BY MR. STONE:
24   Q. Are you aware that a case was brought in
25 California raising issues about light cigarettes and

Page 87

1  that you were a member of that class?
2    A. I am not aware of that.
3    Q. Until I just mentioned it, were you aware that
4  a lights class action had been brought in California?
5    A. No, sir.
6    Q. In the first amended complaint, Exhibit 2,
7  turn, if you would, to Paragraph 95, which is on
8  Page 27. It says here that in the first sentence:
9  "Plaintiff would not have purchased and begun smoking
10 Marlboro Light Cigarettes but for Defendants'
11 misrepresentations and omissions." Do you see that?
12   A. I do.
13   Q. Okay. And does this refer to you would not
14 have purchased and begun smoking Marlboro Light
15 cigarettes in 2002 or to some other time?
16   A. I would say 2002.
17   Q. And in 2002 you began smoking Marlboro Light
18 cigarettes because of information you received from
19 Ms. Johnson?
20   A. Uh-huh.
21   Q. Because of the ads that you have described
22 earlier, and because the packs said lower tar and
23 nicotine; is that right?
24   A. That's correct.
25   Q. Okay.

Page 88

1        MR. KREGER: Late objection. Misstates
2  testimony.
3  BY MR. STONE:
4    Q. And what about --
5    A. Sorry.
6    Q. And you have here both a claim that there were
7  defendants' misrepresentations. Let me ask you just
8  about that first.
9        Is that a claim that what was misrepresented
10 was that they were, in fact, lower tar compared to
11 Marlboro Full Flavor?
12   A. Yes.
13   Q. Is there any other misrepresentation that is
14 referred to here?
15   A. Well, the obvious thought that they would be
16 healthier or less harmful.
17   Q. Okay. Anything else?
18   A. I think that paragraph covers it.
19   Q. And then it says, the very last phrase of that
20 first sentence: "Plaintiff would not have purchased and
21 begun smoking Marlboro Light Cigarettes but for
22 Defendants' misrepresentations and omissions." Do you
23 see the words "and omissions"?
24   A. Yes, I do.
25   Q. What are the things that you claim defendants

Page 89

1  omitted to tell you?
2    A. That this wasn't going to be healthier for me.
3    Q. Okay. It then goes on to say --
4        And is there anything else besides that that
5  they omitted to tell you other than it wouldn't be
6  healthier for you?
7    A. At that point or at that time, no.
8    Q. And when you say "healthier for you," you
9  certainly knew in 2002 it wasn't at all healthy to be
10 smoking?
11   A. Of course.
12   Q. So what you really mean is they didn't tell you
13 that it might not be less harmful or less risky?
14   A. That, yes.
15   Q. Okay. And it says then that: "Plaintiff
16 typically purchases approximately one pack each per day
17 at locations near his home." Do you see that sentence?
18   A. I do.
19   Q. And so is that a true statement that you
20 purchased approximately one pack of cigarettes per day?
21   A. That's a true statement, yes.
22   Q. What are the places you usually purchase?
23   A. CVS Pharmacy, because they are the cheapest.
24 El Norte Liquor, because that's the closest to my house.
25 7-Eleven. Those would be the three locations.

23 (Pages 86 to 89)

Page 90

1    Q.   Okay.  And the CVS is located where?
2    A.   318 El Norte Parkway.
3    Q.   And El Norte Liquor is where?
4    A.   It's 225, I believe, El Norte Parkway.
5    Q.   And where is the 7-Eleven?  Also on El Norte
6  Parkway?
7    A.   No.  The 7-Eleven is just anywhere.  You know,
8  that would be where I would stop to get them if I was
9  out and about.
10    Q.   Okay.  And have you retained receipts or other
11  evidence of your purchases?
12    A.   Yes.
13    Q.   Beginning when did you retain evidence of your
14  purchases?
15    A.   I don't usually keep them, so probably the last
16  few weeks.
17    Q.   Okay.
18    A.   Maybe not even that long.  The liquor store and
19  7-Elevens.  Oh, 7-Elevens would give you a receipt.  The
20  liquor stores don't.  I have CVS receipts.
21    Q.   How many receipts have you collected?
22    A.   A couple.
23    Q.   Did you bring them with you?
24    MR. KREGER:  Just answer the question.
25    THE WITNESS:  Yes.

Page 91

1  BY MR. STONE:
2    Q.   Are you going to produce copies today?
3    A.   I'll leave that to my attorneys.
4    Q.   Okay.
5    A.   Is that --
6    MR. KREGER:  Oh, no.  Go ahead and answer.
7    THE WITNESS:  Fine, yes.
8  BY MR. STONE:
9    Q.   Do you want to go ahead and hand them over?
10    A.   I don't have them with me.
11    MR. ROTH:  Well, was there a request for
12  production?
13    MR. KREGER:  I was just going to ask.  You are
14  asking him the question, and he's answered it, but --
15    MR. STONE:  So I am just following up with what
16  he said.  He said he had produced them today, so I just
17  asked if he would hand them over.  I'll make copies.
18  We'll mark them as exhibits.
19    MR. KREGER:  I think what he said is he'd leave
20  it up to his attorneys, and what my concern is, I just
21  don't recall, if you have the depo notice, we can look
22  at it, I don't know if there was a request for
23  production of documents.
24    MR. ROTH:  There is no request for production.
25    MR. KREGER:  Well, then we won't produce them.

Page 92

1    MR. STONE:  Then let me just go back here.
2  BY MR. STONE:
3    Q.   Will you produce them?
4    A.   No.
5    Q.   Okay.  You brought them with you today,
6  correct?
7    A.   Yes.
8    MR. KREGER:  Objection.  That misstates his
9  testimony.
10  BY MR. STONE:
11    Q.   Did that misstate your testimony?
12    A.   No, I have those receipts.
13    Q.   Okay.  You have them with you?
14    A.   Well, downstairs in my car.
15    Q.   Okay.  And you won't produce them today?
16    A.   Correct.
17    Q.   Okay.  And you have them you think two or three
18  receipts?  How many do you think you have?
19    A.   Yeah, just a couple.
20    Q.   And what do they show as the price you paid?
21    A.   Let's see.  At CVS they are 4.57 plus tax, so
22  that comes to just under $5.
23    Q.   And those are for Marlboro Lights?
24    A.   Yes.
25    Q.   And is that the same price you would pay if you

Page 93

1  bought Marlboro Full Flavor?
2    A.   Sometimes.
3    Q.   Have you ever found that the price of Marlboro
4  Lights and Marlboro Full Flavor was different?
5    A.   Constantly.
6    Q.   Really?  Where is that that you found that?
7    A.   Marlboro are always putting up promotions with
8  a dollar off; so the lights would be a dollar off one
9  week, and then the full flavor would be a dollar off
10  some other time, and then all the other variations of
11  Marlboro.  They seem to rotate on a dollar-off
12  inducement basis.
13    Q.   Did you keep receipts back at the time you
14  first filed the lawsuit?
15    A.   No.
16    Q.   Why not?
17    A.   Paper clutter.
18    Q.   Are you claiming that you should get back money
19  you spent?
20    A.   No.
21    Q.   You are not claiming you should get back money
22  you spent?
23    MR. KREGER:  I'll just object.  It calls for a
24  legal conclusion.
25    THE WITNESS:  Well --

24 (Pages 90 to 93)

Page 94

1    MR. KREGER:  Give me a chance to object.  Go
2  ahead.
3    THE WITNESS:  Unless that is included in the
4  prayer for relief, no.
5  BY MR. STONE:
6    Q.  What do you think, Mr. Tyrer, you are entitled
7  to get from Philip Morris?
8    MR. KREGER:  Objection.  Calls for a legal
9  conclusion.  But you can answer, if you know.
10    THE WITNESS:  Hopefully an end to deceptive
11  practices.
12  BY MR. STONE:
13    Q.  What, in your mind, would result in an end in
14  deceptive practices?  What should Philip Morris do
15  differently?
16    A.  Stop making cigarettes.  That's a lethal
17  product.
18    Q.  So your view is all cigarettes should no longer
19  be manufactured including full flavor?
20    A.  In an ideal world, yes.
21    Q.  Okay.  Other than stopping making cigarettes,
22  is there anything else that you think should happen to
23  end the deceptive practices as you have described it?
24    A.  Well, certainly some kind of punishment for the
25  miscreance here which in my mind are Philip Morris.

Page 95

1    Q.  And what type of punishment, in your mind, is
2  appropriate?
3    A.  Well, it seems the only type of punishment that
4  would get attention is monetary.
5    Q.  And how much monetary punishment do you think
6  is appropriate?
7    A.  For me personally or --
8    MR. KREGER:  Hold on.  Just give me a chance.
9    THE WITNESS:  Sorry.
10    MR. KREGER:  Objection.  Calls for a legal
11  conclusion.  Go ahead.
12    THE WITNESS:  Are you talking about for me
13  personally or for the class?
14  BY MR. STONE:
15    Q.  What punishment of Philip Morris would be
16  appropriate?
17    A.  Punishment of Philip Morris?
18    Q.  Yes, sir.
19    MR. KREGER:  Objection.  Calls for a legal
20  conclusion.  You can answer.
21    THE WITNESS:  An amount sufficient to cover the
22  damage that they have caused.
23  BY MR. STONE:
24    Q.  And what damage has been caused to you
25  personally?

Page 96

1    A.  I was lied to.  I was induced to buy light
2  cigarettes on the purported theory that they are
3  healthier, less tar, less nicotine, et cetera, et
4  cetera.
5    Q.  And how would you quantify that damage?
6    MR. KREGER:  Objection.  Calls for a legal
7  conclusion.  You can answer.
8    THE WITNESS:  Quantify in terms of what now?
9  I'm sorry.
10  BY MR. STONE:
11    Q.  How much money should you get to punish Philip
12  Morris?
13    A.  Me personally?
14    Q.  Yes, sir.
15    A.  I would be happy with a penny if it would shut
16  the place down, but I can't answer that because I really
17  don't know.
18    Q.  Okay.  If you had known in 2002 that Marlboro
19  Lights were not less risky or were not any less harmful
20  to you, what would you have done differently?
21    MR. KREGER:  Objection.  Calls for speculation.
22  It's an incomplete hypothetical and it's overbroad.  You
23  can answer, if you know.
24    THE WITNESS:  I probably would have continued
25  to buy the Medium 100s.

Page 97

1    MR. KREGER:  What's this?
2    MR. STONE:  A napkin for the water spill.
3    MR. KREGER:  It's on the record, I am a slob.
4    MR. STONE:  The record should reflect we all
5  smiled at that.
6  BY MR. STONE:
7    Q.  So I am confused again, and I apologize,
8  Mr. Tyrer.
9    A.  My fault.
10    Q.  The Medium 100s is what you were smoking just
11  before you started in 2002 to smoke Marlboro Lights?
12    A.  Correct.
13    Q.  You had been smoking them for a relatively
14  short period of time?
15    A.  A couple of years.  I believe I said that at
16  the beginning.
17    Q.  I am not suggesting you didn't.  I am just
18  suggesting I am confused.
19    A.  I --
20    MR. KREGER:  You answered the question.
21  BY MR. STONE:
22    Q.  Why did you -- okay.  So let me make sure I
23  understand the chronology, if you would indulge me.
24    You were smoking Marlboro Full Flavor in 1999
25  or so when you switched to Marlboro Medium?

25 (Pages 94 to 97)

Page 98

1    A.  No, no.  I was smoking the Marlboro Medium
2  100s.  I don't think I smoked the full -- well, actually
3  I did smoke the full flavor briefly, but then I went to
4  the mediums almost immediately.
5    Q.  And why did you go to the mediums?
6    A.  Because that's what my live-in girlfriend was
7  smoking and --
8    Q.  Any other reason for going to the mediums?
9    A.  Again, just the term medium makes it sound a
10  little less onerous than full flavor.
11    Q.  Did you find any difference in the taste of a
12  medium versus a full flavor?
13    A.  Not really.
14    Q.  Did you expect lower tar from a medium than a
15  full flavor?
16    A.  I hadn't given it any thought at the time to
17  tell the truth.
18    Q.  Okay.  The claims that you are making in this
19  case relate to Marlboro Lights, not to Marlboro Mediums;
20  is that right?
21    A.  Yes, sir.
22    Q.  If you would turn to Page 48 of the first
23  amended complaint, Paragraph 185?
24    A.  Yes.
25    Q.  You'll see a reference there right at the

Page 99

1  beginning, it says "Plaintiff notified Defendants in
2  writing of the particular violations of Section 1770 of
3  the CLRA," and then it says in parentheses "the notice."
4  Do you see that?
5    A.  Yes, I do.  I was looking elsewhere.
6    Q.  Did you do anything to notify the defendants of
7  any violations of Section 1770 of the CLRA?
8    MR. KREGER:  Objection.  Calls for a legal
9  conclusion.  You can answer.
10    THE WITNESS:  No.
11  BY MR. STONE:
12    Q.  Did you send a letter to the defendants
13  regarding this?
14    A.  Personally, no.
15    Q.  And did your lawyer send a letter, to your
16  knowledge?
17    A.  I don't know.
18    Q.  Are you aware of anyone giving notice to the
19  defendants as referred to in Paragraph 185 of Exhibit 2?
20    A.  I don't have an independent knowledge of that,
21  no.
22    Q.  Do you know what the reference here to the
23  notice refers to?
24    A.  Oh, boy.
25    MR. KREGER:  Don't speculate.

Page 100

1    THE WITNESS:  Actually I did know, and I have
2  forgotten, so I have to say no.
3    MR. STONE:  Okay.  We need to change the tape,
4  so why don't we go off the record.
5    THE VIDEOGRAPHER:  This marks the end of tape
6  No. 1 of Miles Tyrer.  Going off the record at
7  11:17 a.m.
8    (Recess)
9    THE VIDEOGRAPHER:  We are back on the record at
10  11:20 a.m., and this marks the beginning of media No. 2
11  in the deposition of Miles Tyrer.
12    MR. STONE:  I'm sorry.  The time was?
13    THE VIDEOGRAPHER:  11:20.
14  BY MR. STONE:
15    Q.  Thank you.  Mr. Tyrer, let me hand you what the
16  reporter has marked for identification as Exhibit 3.
17    A.  Thank you.
18    Q.  And do you recognize this to be a copy of one
19  of those pamphlets we talked about earlier that was
20  tucked inside the cellophane on some packs of Marlboro
21  Lights?
22    A.  I don't recognize anything yet.
23    Q.  It's just two pages.
24    A.  Oh, oh, I'm sorry.  I was expecting a longer.
25  Yes.

Page 101

1    (Exhibit 3 was marked for
2    identification.)
3  BY MR. STONE:
4    Q.  Okay.  Let me direct your attention to the
5  second page of Exhibit 3 where it says:  "There is no
6  such thing as a safe cigarette.  The terms Ultra Light,
7  Light, Medium and Mild are used as descriptors of the
8  strength of taste and flavor.  These terms as well as
9  low tar or lowered tar and nicotine also serve as a
10  relative indication of the average tar and nicotine
11  yield per cigarette, as measured by a standard
12  government test method."  Do you see that language?
13    A.  Yes, I do.
14    Q.  This was the language that you read on one of
15  the pamphlets in or about 2002, correct?
16    A.  Yes.
17    Q.  And it also goes on to say:  "The tar and
18  nicotine yield numbers are not meant to communicate the
19  amounts of tar or nicotine actually inhaled by any
20  smoker, as individuals do not smoke like the machine
21  used in the government test method."  Do you see that
22  language?
23    A.  No.  Where are you reading that?
24    Q.  That would be the next paragraph down.
25    A.  Oh, I'm sorry.  Okay.

26 (Pages 98 to 101)

Page 102

1    Q.  It is the first sentence of the --
2    A.  Yes, I have it.  Thank you.
3    Q.  Okay.
4    A.  All right.
5    Q.  Okay.  And that's something you read back in
6  2002 as well, correct?
7    A.  It must have been if it's part of the same
8  insert because I certainly recognize the first
9  paragraph.
10    Q.  Okay.  And then it goes on to say:  "The amount
11  of tar and nicotine you inhale will be higher than
12  the" --
13    A.  Than the stated tar.
14    Q.  -- "stated tar and nicotine yield numbers if,
15  for example, you block ventilation holes, inhale more
16  deeply, take more puffs or smoke more cigarettes."  Do
17  you see that?
18    A.  I do.
19    Q.  And at the time you read this, and as you told
20  me earlier today, you had never inhaled larger puffs,
21  you never took more puffs, and you never smoked more
22  cigarettes when you switched to Marlboro Lights,
23  correct?
24    MR. KREGER:  Objection.  Misstates testimony.
25  You can answer.

Page 103

1    THE WITNESS:  No, I actually said I did take
2  larger puffs.
3  BY MR. STONE:
4    Q.  Okay.  Let's go back to the puff issue just for
5  a moment and make sure we are clear.
6    A.  Certainly.
7    Q.  I think -- let me ask it this way.
8    Your prior testimony was that you puffed harder
9  or with more force or created more of a vacuum?
10    A.  That is correct.
11    Q.  But you thought the size of the amount of smoke
12  that you actually got in your mouth was the same,
13  correct?
14    A.  It doesn't sound logical, does it, but I
15  believe that's what I said.
16    Q.  Okay.  And does the phrase resistance to draw
17  have meaning to you?
18    A.  No.
19    Q.  Okay.  Your earlier testimony was that -- let
20  me strike that.
21    Are you now testifying that you think you took
22  more smoke in in each puff?
23    A.  No.  And it logically doesn't make sense, but
24  to my mind I didn't take in any more smoke.  I just
25  chugged harder.

Page 104

1    Q.  Okay.  When you read this pamphlet back in
2  2002, did you have any reason to think that you were
3  blocking the ventilation holes when you smoked?
4    A.  I had no idea there were ventilation holes to
5  tell the truth.
6    Q.  Did you look to see if you could see
7  ventilation holes?
8    A.  No.  At the time it never even occurred to me.
9    Q.  And have you since then?
10    A.  Yes.
11    Q.  And what have you found?
12    A.  Ventilation holes.
13    Q.  And have you looked to see how you hold a
14  cigarette and whether you block those ventilation holes?
15    A.  Yes.
16    Q.  And what did you find?
17    A.  I partially block them, yes.
18    Q.  With what?
19    A.  With my fingers.
20    Q.  So when you hold a cigarette between your
21  fingers, you believe that you are partially blocking the
22  holes?
23    A.  Yes, sir.
24    Q.  And when you read this in 2002, did you look to
25  see if you were blocking the holes?

Page 105

1    A.  Back then I didn't -- no, candidly, I never
2  even knew there were holes there until quite recently.
3    Q.  And do you hold a Marlboro Light any
4  differently than you held a Marlboro Medium or a
5  Marlboro Full Flavor?
6    A.  No.
7    Q.  And then it goes on to say -- and I am now
8  reading still in the second paragraph, the last
9  sentence:  "Similarly, if you smoked brands with
10  descriptors such as Ultra Light, Light, Medium or Mild,
11  you may not inhale less tar and nicotine than you would
12  from other brands.  It depends on how you smoke."  Do
13  you see that?
14    A.  I do indeed.
15    Q.  And that's something, all of these statements
16  that are in the first two paragraphs of Exhibit 3 are
17  things that you were aware of at least by 2002 when you
18  first read one of these pamphlets, correct?
19    A.  No.  Should I have been aware?  Probably.  Was
20  I?  No.  As I said, I didn't even realize there were
21  ventilation holes until probably less than two years
22  ago.  Never occurred to me to look.
23    Q.  Other than the ventilation holes mentioned
24  here, you were aware of everything else that is stated
25  in the first two paragraphs at least by the time you

27 (Pages 102 to 105)

1 read the first pamphlet, correct?
2     A.  The first paragraph I am very familiar with.
3 The others I simply don't recall them that well.  The
4 first one is clear.
5     Q.  Let's look at the third paragraph.
6     A.  Sure, please.
7     Q.  It says: "You should not assume that cigarette
8 brands using descriptors like Ultra Light, Light, Medium
9 or Mild are less harmful than full flavor cigarette
10 brands or that smoking such cigarette brands will help
11 you quit smoking."  Do you see that sentence?
12    A.  I do.
13    Q.  Now, if you read this in 2002, would you have
14 continued to assume that your Marlboro Lights were less
15 risky or less harmful?
16        MR. KREGER:  Objection.  Calls for speculation
17 and misstates testimony.  You can answer, if you know.
18        THE WITNESS:  Yes.
19 BY MR. STONE:
20    Q.  Why would you have assumed it after reading
21 this statement?
22    A.  Because they say right on them less tar, less
23 nicotine, light.  That's almost a given.  If you are
24 advertising in that way, you are purporting them to be
25 healthier --

1 that when somebody says you should not assume that
2 cigarette brands using descriptors like light are less
3 harmful than full flavor cigarette brands, or that
4 smoking such cigarette brands will help you quit
5 smoking, you understand somebody was trying to warn you
6 that if you thought otherwise you might be incorrect?
7        MR. KREGER:  Objection.  Calls for speculation.
8 You can answer, if you know.
9        THE WITNESS:  I don't know if it was
10 particularly trying to warn me after the massive
11 campaigns and the light, ultra light, less tar.  I think
12 they are more like weasel words in the package
13 disclaimer.
14 BY MR. STONE:
15    Q.  So did you continue after getting this pamphlet
16 to think that light cigarettes were less harmful?
17    A.  Unfortunately, yes.
18    Q.  Have you asked anybody who is a member of the
19 punitive class whether they also read this pamphlet?
20    A.  No, I have not.
21    Q.  And do you know whether anybody -- let me
22 strike that.
23        It goes on to say:  "If you are concerned about
24 the health effects of smoking you should quit."  Do you
25 see that language?

1     Q.  And when somebody said --
2     A.  -- or less harmful.
3     Q.  I'm sorry.  I didn't mean to interrupt.
4     A.  No, my fault.
5     Q.  And when you read the statement in 2002 that
6 you should not assume that cigarette brands using
7 descriptors like light are less harmful than full flavor
8 cigarettes, did you disbelieve that statement?
9        MR. KREGER:  Objection.  Misstates testimony.
10 I believe he said that he didn't know if he had read
11 that.  You can answer, if you know.
12        THE WITNESS:  Well, that's -- it's a
13 disclaimer.  It's like a disclaimer on a hammer saying
14 don't hit yourself on the head with it or something.
15 BY MR. STONE:
16    Q.  So when you describe them as a disclaimer, what
17 does that mean to you as -- what's a disclaimer mean to
18 you?
19    A.  It means that you knew there were problems
20 coming down the road and you are looking for a way out
21 by putting that in there a long time ago.
22    Q.  And this is information that was being passed
23 on to smokers, correct?
24    A.  Yes, sir.
25    Q.  And in your experience, you would understand

1     A.  Yes, I do.
2     Q.  And you knew that, right?
3     A.  Oh, of course.
4     Q.  And then it says for more information about the
5 numbers, brand descriptors or quitting smoking, please
6 go to www.pmusa.com or call an 800 number.  Do you see
7 that?
8     A.  I do.
9     Q.  And so as far as you can recall, you never went
10 to that Web site or called that number, did you?
11    A.  That's correct.  I did not.
12    Q.  Prior to 2002, you knew that if you smoked more
13 cigarettes you'd get more tar, right?
14    A.  Yes.
15    Q.  And you knew that if you took more puffs from
16 cigarettes, you'd get more tar than if you took fewer
17 puffs?
18    A.  Yes.
19    Q.  And you knew that if the puffs you took had
20 more smoke in them, you'd get more tar than if the puffs
21 were smaller in terms of their volume?
22    A.  Sounds logical, yes.
23    Q.  Okay.  Now, you continued to see pamphlets or
24 inserts like Exhibit 3 in years after 2002, correct?
25    A.  Correct.

1    Q.  And they continued to have generally the same
2  information, correct?
3         MR. KREGER:  Objection.  Misstates testimony
4  and calls for speculation.  You can answer, if you know.
5         THE WITNESS:  I'd say I don't know.  These are
6  again as things you just usually tear off the
7  cellophane and I'll throw it away.
8         MR. STONE:  Let me ask the reporter to mark as
9  Exhibit 4 another pamphlet.
10        (Exhibit 4 was marked for
11        identification.)
12 BY MR. STONE:
13   Q.  Let me hand you what the reporter has marked
14 for identification as Exhibit 4, Mr. Tyrer.
15   A.  Thank you, Mr. Stone.
16   Q.  Do you recognize this to be another, a copy of
17 another one of the pamphlets that were tucked inside the
18 cellophane on Marlboro Lights packs?
19   A.  Yes.
20   Q.  And this one, if you look to the second page,
21 you'll see it has a copyright date of 2003 in the lower
22 right-hand corner?
23   A.  Yes.
24   Q.  And this one you'll see was folded horizontally
25 as opposed to the first one we looked at, Exhibit 3,

1  which was folded vertically?
2    A.  Correct.
3    Q.  And is that consistent with your recollection
4  of how the pamphlets from time to time were folded
5  differently?
6    A.  Yes.
7    Q.  Okay.  I want to direct your attention to
8  Exhibit 4, the first two paragraphs.  You'll notice in
9  Exhibit 4 there is no reference to lower tar or lowered
10 tar and nicotine.  Do you see those phrases?  We are in
11 Exhibit 3, but they are no longer in Exhibit 4?
12        MR. KREGER:  Excuse me, one moment.  Are you
13 asking him to compare the two?
14        MR. STONE:  I am.
15        MR. KREGER:  And the question is?
16        MR. STONE:  If he sees that those terms are not
17 there.
18        THE WITNESS:  In Paragraph 2 here it says, it
19 refers to the tar and nicotine numbers, and they are
20 omitted from the second one.
21 BY MR. STONE:
22   Q.  Now, I am confusing you, so let me help you out
23 where I was directing you, Mr. Tyer.
24   A.  Thank you.
25   Q.  If you look at Exhibit 3, that's the vertical

1  one?
2    A.  Yes.
3    Q.  The third sentence in the first paragraph says:
4  "These terms as well as, quote, low tar or lowered tar
5  and nicotine, close quote, also serve as a relative
6  indication of the average tar and nicotine yield."  Do
7  you see that?
8    A.  Actually I don't.  It's in the middle
9  paragraph?
10   Q.  It's in the first paragraph.
11   A.  Oh, in the first paragraph.  I apologize.
12 Okay.
13   Q.  Do you see where it has quotes around low tar
14 and lowered tar and nicotine?
15   A.  Oh, okay.  Yes, low tar or lowered tar and
16 nicotine, yes.
17   Q.  And then if you look to Exhibit 4 in the same
18 paragraph, you'll see those phrases have been dropped.
19 Do you see that?
20   A.  Yes.
21   Q.  Okay.  And is that consistent with your
22 recollection that it was about 2003 when the phrase
23 lowered tar and nicotine was taken off the Marlboro
24 Lights packs?
25        MR. KREGER:  Objection.  Misstates testimony.

1  Lack of foundation.  You can answer if you know.
2         THE WITNESS:  It would be an approximation.
3         MR. KREGER:  Well, don't guess.
4         THE WITNESS:  I don't know.
5  BY MR. STONE:
6    Q.  Okay.  Was there anything stated in either
7  Exhibit 3 or Exhibit 4 that when you -- that you didn't
8  understand?
9         MR. KREGER:  Excuse me, one second.  Could I
10 just hear that back, please.
11 BY MR. STONE:
12   Q.  Was there anything in Exhibit 3 or Exhibit 4
13 that you did not understand?
14        MR. KREGER:  I am just going to object.  First
15 of all, it's vague and ambiguous as to time as to when
16 the understanding occurred or lack of understanding, and
17 I think it calls for a legal conclusion, and I think
18 it's an incomplete hypothetical.
19        Well, I guess, what I am confused about,
20 Counsel, are you talking about whether he has this
21 understanding today reading them or at some point in the
22 past?
23 BY MR. STONE:
24   Q.  In 2002 and 2003 at the time when you were
25 getting Marlboro Lights packs that had pamphlets tucked

29 (Pages 110 to 113)

Page 114

1  inside the cellophane and you read the language of them,
2  was there anything about the pamphlets that you read at
3  that time that you didn't understand?
4       MR. KREGER:  Let me just object.  He's
5  previously testified that in '03 he only remembers
6  the -- or in '02 he only remembers the first paragraph,
7  and I don't believe there has been any testimony about
8  seeing the '03 other than he recognizes that it's
9  vertical or horizontal.  So I am just going to object
10  that it misstates testimony, there is lack of
11  foundation, and it's vague and ambiguous.  It's also
12  compound.  You can answer if you understand the
13  question.
14       THE WITNESS:  Frankly, you know, I didn't buy
15  cigarettes to read the inserts.  I just generally tossed
16  them.  I mean, today it's clear as can be reading this.
17  BY MR. STONE:
18    Q.  So today when you read them, you understand
19  them completely?
20    A.  Absolutely.
21    Q.  There is nothing about them today that you
22  don't understand?
23    A.  That would be correct.
24    Q.  And back in 2002 do you recall at that time, to
25  whatever extent you recall reading the pamphlet, recall

Page 115

1  anything that you didn't understand then?
2    A.  I candidly don't even recall ever reading a
3  full pamphlet.  Again the first paragraph is -- stands
4  out, because if I recall, that was projected through the
5  cellophane.  But had I read it carefully at the time?
6       MR. KREGER:  Hold on.  No speculation.  Just
7  answer his question.
8  BY MR. STONE:
9    Q.  So let me --
10    A.  I understand it now.  I did not then.
11    Q.  Okay.  And is there anything, as you read it
12  now, that you think if you had read it in 2002 that you
13  wouldn't have understood then?
14    A.  No.
15    Q.  Okay.  And similarly, with respect to
16  Exhibit 4, is there anything in Exhibit 4 that if you
17  had read it in 2003 you would not have understood in
18  2003?
19       MR. KREGER:  Objection.  Calls for speculation.
20  You can answer.
21       THE WITNESS:  No.
22  BY MR. STONE:
23    Q.  Okay.  Are you currently employed, Mr. Tyrer?
24    A.  That would be no other than my --
25       MR. KREGER:  Hold on.  Just answer the

Page 116

1  question.
2       THE WITNESS:  No.
3  BY MR. STONE:
4    Q.  Okay.  When were you last employed?
5    A.  2007, I believe.
6    Q.  And what was your last employment?
7    A.  Sales for -- I am trying to remember the name
8  of the company -- American Extreme Sports.
9    Q.  What kind of product did American Extreme
10  Sports sell?
11    A.  Sports videos, disks, CDs.
12    Q.  What are the videos of?  What are the extreme
13  sports?
14    A.  Oh, surfing, rollerblading, snowboarding,
15  crashing golf carts.  I'm serious.
16    Q.  And did you work out of an office or out of
17  your home at that time?
18    A.  I worked out of an office.
19    Q.  And where was that office?
20    A.  It was in San Marcos.
21    Q.  And were you doing outside sales, inside sales,
22  or would you describe it some other way?
23    A.  Inside sales and other clerical duties.
24    Q.  How long did you have that job?
25    A.  Oh, about four months.

Page 117

1    Q.  And before that were you employed?
2    A.  Yes.
3    Q.  What was your employment just prior to American
4  Extreme Sports?
5    A.  It was divided between the law firm of Seifer &
6  Associates and the law firm of Fitzmaurice and
7  Demergian.
8    Q.  Okay.  And what did you do for those two law
9  firms?
10    A.  Again clerical issues.
11    Q.  Is it in the nature of a paralegal's job?
12    A.  Correct.
13    Q.  Would you do research for them?
14    A.  Some, yes.
15    Q.  Okay.  Did you do anything that was legal
16  oriented when you were at American Extreme Sports?
17    A.  Yeah, I rewrote some of their employee manuals.
18    Q.  Okay.  Did you advise them in connection with
19  any types of litigation or unemployment compensation or
20  workers' comp claims or anything like that?
21    A.  No, I did not.
22    Q.  Did you give them any advice on employee
23  relations or labor law other than rewriting their
24  manuals?
25    A.  No, I did not.

Page 118

1    Q.   What types of cases did you work on when you
2  were doing research and paralegal work at Seifer &
3  Associates and Fitzmaurice & Demergian?
4    A.   Construction defect at Seifer, and it was
5  transactional at Fitzmaurice.
6    Q.   And did you work during the same period of time
7  at both places splitting your time?
8    A.   Yes.
9    Q.   During what period of time were you working at
10  one or both of those law firms?  When to when?
11    A.   Off and on from probably '96 to 2006 or '7.
12    Q.   Okay.  In that time period, '96 to 2006 or '7,
13  did you have other employment other than at those two
14  law firms?
15    A.   Yes.
16    Q.   What else did you have?
17    A.   I worked for Santa Fe Orthopedic Surgery
18  Center.  I was the administrator there.
19    Q.   Anything else in this time period?
20    A.   Nothing leaps to mind.
21    Q.   And when you say you were the administrator
22  there, what were your job responsibilities?
23    A.   It was in charge of the nonmedical end of the
24  business.
25    Q.   So all of the other nonmedical staff reported

Page 119

1  to you?
2    A.   Correct.
3    Q.   And you were in charge of billing and so on?
4    A.   Budgeting, planning, you know, the usual
5  administrative duties.
6    Q.   And what period of time were you at Santa Fe
7  Orthopedic Surgery?
8    A.   Wow, I think it was like '94 through maybe
9  2000.  Again it was not a full time.
10    Q.   It was a part-time position?
11    A.   I divided my -- uh-huh.
12        MR. KREGER:  You are talking into your hands.
13  Make sure you speak loudly.
14        THE WITNESS:  Sorry.
15  BY MR. STONE:
16    Q.   When did you attend law school?
17    A.   '96 through 2001.
18    Q.   Okay.  And you did that part time while you
19  were working?
20    A.   Yes.
21    Q.   Did you go to law school at night?
22    A.   Yes.
23    Q.   And what's your educational background prior to
24  the time you went to law school?
25    A.   I have a bachelor of arts from Sir George

Page 120

1  Williams University in Montreal, which is now called
2  Concordia, and a fellowship in Canadian Banking from
3  Miguel University in Montreal, and I have a JD from
4  Western Sierra.
5    Q.   And the fellowship from Miguel, is that the
6  equivalent of a master's degree?
7    A.   Not necessarily.  Specifically banking.  The
8  various Canadian banks sponsored, I guess you could call
9  it, a master's in banking or --
10    Q.   Was that a one-year program, a two-year
11  program?  What was the duration?
12    A.   No.  It was again in the evenings, and it was
13  about a two-year program.
14    Q.   And when did you get that fellowship?
15    A.   '76, I believe.
16    Q.   And then when did you --
17    A.   Oh, wait a minute.  '75.
18    Q.   When did you get your bachelor of arts from Sir
19  George?
20    A.   '69.
21    Q.   And were you employed in Canada up until 1977?
22    A.   Yes, sir.
23    Q.   And briefly, what was your employment in
24  Canada?
25    A.   You want it all?

Page 121

1    Q.   Was there a lot?
2    A.   Tons.
3    Q.   When did you start after '69?  What was your
4  first job after you graduated?
5    A.   Well, I worked for a mutual fund company and --
6  for about a two-year period, and then I joined Canadian
7  Imperial Bank of Commerce, and I was with them up
8  through -- well, I was still with them when I lived here
9  in San Diego.  I got transferred to San Diego by them in
10  '77.  So that's the major employer.
11    Q.   Okay.  And how long did you continue to work
12  for -- which bank was it?
13    A.   Canadian Imperial Bank of Commerce.
14    Q.   How long did you continue to work for Canadian
15  Imperial Bank of Commerce?
16    A.   I worked for them from late '69 through '87.
17    Q.   So then, if you would, fill in your employment
18  from '87 until 1994.
19    A.   '87, '88 I worked for another Canadian bank
20  called Commercial Center Bank.
21    Q.   Okay.
22    A.   Maybe it was longer than that.  I'm sorry.
23  Yeah, it was longer than that.  It was two and a half
24  years.
25    Q.   So until '89, roughly?

31 (Pages 118 to 121)

1    A.   It sounds about right.
2    Q.   Okay.
3    A.   I went to work for Arcwel Corporation.
4    Q.   A-R-C-W-E-L-L?
5    A.   A-R-C-W-E-L.
6    Q.   What did they do?
7    A.   They were a ship builder here in San Diego.
8    Q.   How long did you work for them?
9    A.   Roughly two years I would say.
10   Q.   And when you left Canadian Imperial Bank of
11   Commerce, what was your position?
12   A.   Vice president.
13   Q.   And when you joined Commercial Center Bank,
14   what was your position?
15   A.   Vice president.
16   Q.   And what were your areas of responsibilities as
17   vice presidents of those two banks?  Were they the same?
18   A.   No.  They were more -- they were larger with
19   the Canadian Imperial Bank of Commerce, but the bank
20   made the decision to leave California, shut down trade
21   deal operations and just have them as needed in Los
22   Angeles.  The job at the Commercial Center Bank was as
23   vice president was basically branch manager here in
24   San Diego, and a commercial loan officer would be out of
25   the Santa Ana office.

1    Q.   And when you were at Canadian Imperial Bank,
2    did you have retail responsibilities?
3    A.   Yes.
4    Q.   For how many branches?
5    A.   Well, I was in charge of one, but it was the
6    main branch here, so I -- I won't say I oversaw the
7    other branches, but I did in a manner of speaking.
8    Q.   Okay.  And at Arcwel, what was your position?
9    A.   Chief financial officer.
10   Q.   And after Arcwel, where did you go?
11   A.   A company called CSA Contract Services
12   Associates.
13   Q.   What do they do?
14   A.   They were government contractors.  They were
15   airplane guidance and stuff.
16   Q.   What was your position there?
17   A.   Chief financial officer.
18   Q.   And how long were you there?
19   A.   A year.
20   Q.   Okay.  So that takes us to '90 or '91?
21   A.   Sounds about right.  It could be a little
22   later.
23   Q.   Yeah.
24   A.   I think it would be a little later than that.
25   Q.   Okay.  And then did you have any other jobs

1    between then and starting at Santa Fe Orthopedic
2    Surgery?
3    A.   Not that I can recall.
4    Q.   And then when you first started at Santa Fe
5    Orthopedic Surgery, was that full time?
6    A.   No.
7    Q.   Did you have any full-time employment after
8    CSA?
9    A.   No.  I avoided full-time employment.
10   Q.   So all your other jobs were part time, and that
11   was your desire?
12   A.   Yes.
13   Q.   Okay.
14   A.   Although --
15        MR. KREGER:  You answered the question.
16   BY MR. STONE:
17   Q.   Was there a time when you sort of considered
18   yourself retired?
19   A.   Now.
20   Q.   When did you enter that blissful state of
21   retirement?
22   A.   It was less than blissful.  It was medically
23   induced a year or so ago.
24   Q.   Okay.  And was that --
25   A.   A year and three months.

1    Q.   -- the surgery that we talked about earlier?
2    A.   Yes, the cancer, correct.
3        MR. STONE:  If now is convenient for you, do
4    you want to take the lunch break at this point?
5        MR. KREGER:  Sure.
6        THE VIDEOGRAPHER:  Going off the record.  The
7    time is 11:51 a.m.
8              - - -
9           (Luncheon recess)
10             - - -
11       THE VIDEOGRAPHER:  We are back on the record at
12   12:46 p.m.
13   BY MR. STONE:
14   Q.   Mr. Tyrer, you understand you are still under
15   oath?
16   A.   Yes, sir.
17   Q.   During the time that you have lived in the
18   United States, have you traveled to other states within
19   the United States?
20   A.   Yes, I have.
21   Q.   What other states do you recall having traveled
22   to since 2002?
23   A.   Since 2002.  Arizona, Nevada, Minnesota.  I
24   wouldn't say I traveled to but layovers in Chicago a
25   couple of times, Illinois.  That's it.

1    Q.   Okay.  And when was it you traveled to Arizona?
2    A.   I'd say 2005.
3    Q.   How long were you there?
4    A.   About a week.
5    Q.   Okay.  Did you purchase cigarettes in Arizona
6  while you were there?
7    A.   I must have.
8    Q.   And that would have been purchased the Marlboro
9  Lights?
10   A.   Yes, sir.
11   Q.   And when did you travel to Nevada?  Again I am
12  focusing on since 2002.
13   A.   2006.
14   Q.   And how long were you in Nevada?
15   A.   Oh, that was just a three-day weekend,
16  silliness.
17   Q.   And did you purchase Marlboro Lights while you
18  were there?
19   A.   I believe I did, yes.
20   Q.   And when were you in Minnesota?
21   A.   2005.
22   Q.   Okay.  And how long were you in Minnesota?
23   A.   Two weeks.
24   Q.   I hope it wasn't the middle of winter.
25   A.   It was.

1    Q.   I'm sorry.
2    A.   A long story.
3    Q.   Did you purchase Marlboro Lights when you were
4  in Minnesota in 2005?
5    A.   Yes, I did.
6    Q.   And during the time you made these trips to
7  these other states, would your purchasing have been at
8  roughly the rates that you described for me earlier,
9  about a pack a day?
10   A.   Nevada, yes; the others, no, it would have been
11  less.
12   Q.   How much less was it when you were in Arizona?
13   A.   Probably half the normal amount.
14   Q.   And what about Minnesota?
15   A.   Probably the same, half or less.
16   Q.   And do you recall whether on the layovers in
17  Chicago you purchased Marlboro Lights?
18   A.   I do not recall, sir.
19   Q.   Okay.  Since 2002 have you purchased Marlboro
20  Lights in any states other than California, Arizona,
21  Nevada and Minnesota?
22   A.   No, sir.
23   Q.   And in visits to Canada since 2002, there's
24  only been two?
25   A.   Since -- no, only one since 2002.

1    Q.   Okay.  And on that one visit you didn't
2  purchase Marlboro Lights in Canada.
3    A.   No.
4    Q.   As best you recall, you purchased Rothmans?
5    A.   As best I recall, that's correct, sir.
6       MR. KREGER:  Wait until he finishes his
7  questions.
8       THE WITNESS:  Sorry.
9  BY MR. STONE:
10   Q.   When did you smoke your first cigarette,
11  Mr. Tyrer?
12   A.   My very first?
13   Q.   Yes, sir.
14   A.   I believe I was about 15 or 16 years old.
15   Q.   Okay.  And what was it?
16   A.   Who knows.  I know I stole it from my dad, and
17  it was unfiltered.
18   Q.   Okay.
19      MR. KREGER:  Just answer the question.
20  BY MR. STONE:
21   Q.   And was that with some of your friends?
22   A.   Yes.
23   Q.   And you were born in what year?
24   A.   1944.
25   Q.   Did you commence smoking regularly at that

1  time?
2    A.   Oh, no.
3    Q.   When do you first recall smoking cigarettes on
4  a regular basis, if not every day, at least once a week
5  or something like that?
6    A.   It would have been in my mid 20s to late 20s.
7    Q.   And can you place that in time in terms of what
8  your job was at the time or where you were living or
9  anything like that that would help put it in a time
10  perspective?
11   A.   I was living in Alongey, and I was working at
12  Canadian Imperial Bank of Commerce.
13   Q.   And does that help you place it in terms of the
14  year?
15   A.   That would have been in the early '70s.
16   Q.   Okay.  And what brand were you smoking then?
17   A.   I honestly don't recall.
18   Q.   Was it a --
19   A.   Probably Rothmans or Players.
20   Q.   Okay.
21   A.   And again it was not for --
22   Q.   It was not -- I'm sorry.  You said it was not?
23   A.   No, I answered the question.  Not for a long
24  period of time I was going to say.
25   Q.   Oh, okay.

33 (Pages 126 to 129)

Page 130

1    A.  Excuse me.
2    Q.  And you smoked then from that, beginning at
3  that point in time for how long?  A few years?
4    A.  Probably two years or so.  When my wife became
5  pregnant, we both quit.
6    Q.  Okay.  And she first became pregnant in 1973
7  with your son that was born in '74?
8    A.  Correct.
9    Q.  And then did you resume smoking after your son
10  was born?
11    A.  No.  There might have been an occasional
12  cigarette, but it was nothing really.
13    Q.  When did you first -- when did you then resume
14  smoking on a regular basis after 19 -- the early 1970s?
15    A.  Again there was an episode in '92.  When I was
16  going through a divorce, I smoked for probably three
17  months or so, and then I stopped.
18    Q.  And this was Marlboro Full Flavor at that time
19  that you were smoking?
20    A.  Yes, sir.
21    Q.  And then did you resume again in the late '90s?
22    A.  Yes, sir, in '99.
23    Q.  And nothing in between?
24    A.  Again maybe the occasional puff, but, no, I
25  didn't buy any.

Page 131

1    Q.  And you resumed again in about 1999?
2    A.  Yes, sir.
3    Q.  And that was generally with medium, Marlboro
4  Medium?
5    A.  Correct.
6    Q.  Now, have you tried over the years other brands
7  of cigarettes?
8    A.  Yes.
9    Q.  Can you identify for me or would you please
10  identify for me the other brands that you recall trying
11  other than Rothmans, Players, Marlboro Full Flavor,
12  Marlboro Medium, Marlboro Light and Marlboro Ultra
13  Light?
14    A.  American Spirit.
15    Q.  Okay.  Any other brands you recall?
16    A.  Occasionally I would buy one of the generic,
17  cheapest-on-the-rack brands.
18    Q.  Any others?
19    A.  Nothing specific comes to mind.
20    Q.  Do you recall ever smoking Carlton?
21    A.  I don't recall that, no.
22    Q.  Parliament?
23    A.  No.
24    Q.  Camel?
25    A.  Yes.

Page 132

1    Q.  Winston?
2    A.  Yes.
3    Q.  Pall Mall?
4    A.  I don't believe so.
5    Q.  How would you distinguish American Spirit from
6  Marlboro Light?
7      MR. KREGER:  Objection.  Vague and ambiguous as
8  to the term "distinguish."  If you understand the
9  question, you can answer it.
10      THE WITNESS:  I thought the American Spirit
11  would be some form of an epiphany, because they
12  advertised everything as all natural and et cetera, et
13  cetera, but it didn't grab me, put it that way.
14  BY MR. STONE:
15    Q.  Did you notice a difference in taste or flavor
16  between it and a Marlboro Light?
17    A.  Yes, there is a difference in taste.
18    Q.  Did you prefer Marlboro Light to American
19  Spirit or American Spirit to Marlboro Light?
20    A.  It was just a different taste.  I wouldn't say
21  there was a preference.  I probably stopped with the
22  American Spirit because they were more expensive than
23  the Marlboro Light.
24    Q.  Okay.
25      MR. KREGER:  Just answer the question.

Page 133

1  BY MR. STONE:
2    Q.  When was it that you smoked American Spirit?
3    A.  In 2005.
4    Q.  You mentioned you from time to time would smoke
5  a generic, the cheapest that you saw in the shelf.
6  During what periods of time was that that you would
7  purchase the generics?
8    A.  When I was low on money.  It was occasionally.
9  I wouldn't --
10    Q.  And was that a period of time when you were
11  purchasing the generic light cigarette, or was it a
12  generic full flavor or something else?
13    A.  Light if they had it available, yes.
14    Q.  And you don't recall which particular brands
15  that was?
16    A.  Oh, they had -- not particularly.  It had silly
17  names like Rave or Rage.
18    Q.  When was it that you recall purchasing Camel?
19    A.  Oh, I don't think I ever purchased Camel.
20    Q.  My mistake.  When was it that you recall
21  smoking Camel?
22    A.  Two months ago.
23    Q.  Okay.
24    A.  On the golf course.
25    Q.  Lights or regular?

34 (Pages 130 to 133)

Page 134

1    A.  I think they were regular.
2    Q.  And can you describe the differences in the
3   smoking experience between a Camel regular you smoked
4   and a Marlboro?
5        MR. KREGER:  Objection.  Vague and ambiguous as
6   to "smoking experience."  But you can answer, if you
7   know.
8        THE WITNESS:  I didn't like the Camels, but I
9   had forgotten to bring my own cigarettes along that day.
10  BY MR. STONE:
11   Q.  And what didn't you like about the Camels?
12   A.  This may sound silly.  They were too short.
13   Q.  Okay.  Anything else you didn't like about
14  them?
15   A.  They just didn't feel right.
16   Q.  If somebody gave you a sort of a blind taste,
17  you know, blindfolded your eyes so you couldn't see and
18  you smoked a Camel and a Marlboro, would you be able to
19  tell the difference?
20   A.  Yes.
21       MR. KREGER:  Calls for speculation.  You can
22  answer, if you know.
23       THE WITNESS:  Sorry.  Yes.
24  BY MR. STONE:
25   Q.  Okay.  And when would --

Page 135

1        MR. KREGER:  Wait.  I'm sorry.  Objection.
2   Incomplete hypothetical as well.  You can answer.
3   BY MR. STONE:
4    Q.  When was it you smoked a Winston?
5    A.  I have no idea.  It just sounds like something
6   I did.
7    Q.  Okay.  Did you expect there to be a difference
8   in the amount of tar and nicotine that you received from
9   a Marlboro Light as compared to a Marlboro Medium?
10   A.  Yes, sir.
11   Q.  And did you expect there to be a difference in
12  the amount of tar and nicotine that you received from a
13  Marlboro Medium as compared to a Marlboro Full Flavor?
14   A.  Yes, sir.
15   Q.  And did you expect you would get less tar and
16  nicotine from a Marlboro Ultra Light as compared to a
17  Marlboro Light?
18   A.  Yes.
19   Q.  Did you, in your mind, ever quantify the
20  differences between any of the tar and nicotine amounts
21  that you expected to get from any of those different
22  brands that we just talked about?
23       MR. KREGER:  Objection.  Calls for an expert
24  opinion and incomplete hypothetical and calls for
25  speculation.  But you can answer, if you know.

Page 136

1        THE WITNESS:  I just expected the terms light,
2   ultra light, to be incrementally less tar and nicotine
3   than the full flavor or the medium.
4   BY MR. STONE:
5    Q.  Okay.  And when you expected them to be
6   incrementally less, did you have, in your mind, any
7   expectation in terms of a percentage or an amount of
8   difference that would be the increment?
9    A.  Nothing that I could -- no, I don't.
10   Q.  Okay.  Over the years have you obtained
11  Marlboro gear?
12   A.  Yes.
13   Q.  Have you participated in various of the
14  Marlboro promotional programs involving miles?
15   A.  Yes.
16   Q.  What types of gear do you recall having
17  obtained?
18   A.  I have a duffel bag or had.  We got those as
19  gifts.  And a backpack, I believe.
20   Q.  Okay.  And did you get them at a time when they
21  were still branded with the name Marlboro?
22   A.  Oh, yes.
23   Q.  Have you obtained any coupons or other discount
24  or promotions through the mail from Philip Morris?
25   A.  Not that I can recall.

Page 137

1    Q.  Okay.  Have you ever signed up, other than in
2   connection with the Marlboro miles programs, for any --
3   on any sort of mailing list of Philip Morris to get
4   catalogs or other things besides those for the Marlboro
5   miles?
6    A.  Oh, no, just the mileage.
7    Q.  During what years did you collect your miles
8   and turn them in?
9    A.  That would have been the mid 2000s, so it would
10  have been probably 2003 through 2006 maybe.  They
11  stopped it right after that, I believe.
12   Q.  And did anybody else collect miles for you and
13  give them to you so you'd have more miles to redeem?
14   A.  Yes.
15   Q.  Who did that?
16   A.  Kimberly Wood.
17   Q.  Anybody else?
18   A.  No.
19   Q.  During the time that you have lived in the
20  San Diego area, have you regularly subscribed to or read
21  a newspaper?
22   A.  Yes.
23   Q.  Which one?
24   A.  The Union-Tribune, San Diego.
25   Q.  Is that something you generally read every day?

35 (Pages 134 to 137)

Page 138

1   A.  Yes.
2   Q.  Other than the Union-Tribune, are there any
3   other newspapers you have regularly read or subscribed
4   to?
5   A.  I used to subscribe to the Transcript.
6   Q.  And was that when you were working at the law
7   firms?
8   A.  Correct.
9   Q.  Do you recall reading about the lawsuit the
10  California Attorney General brought against the tobacco
11  industry?
12      MR. KREGER:  Objection as to time.  You can
13  answer, if you know.
14      THE WITNESS:  I remember reading about it, but
15  I can't think of any specifics.
16  BY MR. STONE:
17  Q.  Do you remember that when that case was
18  settled, that the settlement of that case occurred here
19  in San Diego?
20  A.  I was not aware of that.
21  Q.  Have you followed any of the tobacco litigation
22  that has been filed in San Diego as part of one of two
23  coordinated actions either In Re: Tobacco Cases One or
24  In Re: Tobacco Cases Two?
25  A.  No, I have not.

Page 139

1   Q.  Do you recall reading articles in the
2   Union-Tribune about light cigarettes?
3   A.  No, I don't.
4   Q.  Are there any TV programs, news type programs
5   that you watch regularly?
6   A.  I watch the evening news, sometimes Fox News.
7   Q.  Okay.  And you are you one of the people who
8   like, for example, watch 60 Minutes or one of the sort
9   of investigative news programs on a regular basis?
10  A.  I do not.
11  Q.  Okay.  Would you -- do you have your cigarettes
12  with you?  Would you show me how you hold it and how you
13  described earlier you blocked -- you think you blocked
14  the vent holes?
15      MR. KREGER:  Objection.  Are you asking for
16  some sort of demonstration?
17      MR. STONE:  I think that was pretty clear, yes.
18      MR. KREGER:  Okay.  Well, I am going to object
19  to that on several grounds.  I don't think that's
20  appropriate in this setting.  I don't think he's any
21  type of expert; and, frankly, it's my understanding he's
22  trying to quit.  I don't really think that it's
23  appropriate to put a cigarette in his hand any more than
24  is necessary.  And absent some other reason why it would
25  be necessary, I am going to object and instruct him not

Page 140

1   to do that.
2       MR. STONE:  Well, the reason is that he's
3   testified he holds it in a particular way.  How he holds
4   the cigarette and whether or not he blocks the holes
5   obviously impacts the extent to which there is any
6   reduction in the dilution that is facilitated by the
7   vent holes.  So if your claim is the vent hole blocking
8   is a potential way in which smokers can avoid receiving
9   a lower tar of a light cigarette, then we are entitled
10  to see how he holds the cigarette.  I'm not asking him
11  to smoke it.  I am simply asking him to hold it with a
12  cigarette in his hand as he described earlier.  I am not
13  asking for expert testimony.  I am simply asking for
14  factual evidence about how this plaintiff would hold a
15  cigarette and whether or not there is any blockage of
16  the holes as he holds it.
17      MR. KREGER:  Well, I appreciate you giving me
18  the explanation.  However, I just don't see that asking
19  him to demonstrate it versus asking how he held it with
20  some photograph or something of him in the past, I don't
21  think a demonstration in a deposition would be
22  dispositive of whether in the past when he smoked them
23  he blocked the holes inadvertently or whatever.  And so
24  I just -- I have to object to that and instruct him not
25  to do it.

Page 141

1   BY MR. STONE:
2   Q.  Mr. Tyrer, you still smoke, right?
3   A.  Yes, sir.
4   Q.  Have you smoked today?
5   A.  Yes, sir.
6   Q.  When most recently?
7   A.  Walking back from Karl Strauss.
8   Q.  And do you hold the cigarette today the same
9   way you were holding them in 2002?
10  A.  I don't know.
11  Q.  Do you know of any differences?
12  A.  I am not aware of any differences, no.
13  Q.  Do you have any objection, other than the
14  objections your lawyer has stated, to just holding the
15  cigarette for me the way you currently hold it?
16  A.  Do I have an objection?
17  Q.  Yes, sir.
18  A.  No, but I will be guided by the instructions of
19  my attorney.
20  Q.  I understand you will, and I'm not quibbling
21  with that.  If he insists on that objection, we'll deal
22  with that, but let me just ask.
23      Does holding an unlit cigarette cause you in
24  any way to interfere with your present attempts to quit?
25  A.  No.

1        MR. STONE:  Okay.  I would request that you
2    allow him with an unlit cigarette to demonstrate on
3    camera the way in which he holds it in his fingers and
4    lips so that we can see if there is any hole blockage.
5    I don't know how else to get that evidence other than
6    for him to hold a cigarette.
7        MR. KREGER:  At this point I have to stay with
8    the objection that I will instruct him not to do it.
9        MR. STONE:  Would you object to the use of
10   something which is not a cigarette, but which is just an
11   artificial like a prop cigarette?
12       MR. KREGER:  You mean something that looks like
13   a cigarette but isn't a cigarette?
14       MR. STONE:  Yes, sir.
15       MR. ROTH:  You mean like a pen or something?
16       MR. STONE:  No, I have what is referred to as a
17   prop cigarette.
18       MR. KREGER:  I think -- I'll take a look at it,
19   but I think -- my inclination is that I don't want him
20   demonstrating with a cigarette or something that looks
21   like a cigarette how he may have smoked or held a
22   cigarette in the past.  And I don't see the relevance of
23   it.  It actually sounded -- if you want him to do it
24   with a pen, I think that would be a compromise I could
25   live with, or a pencil, I guess.  But something that is

1    a cigarette or looks like a cigarette, I don't feel
2    comfortable with.
3        MR. STONE:  But the question is not -- the
4    class period continues to today, correct?
5        MR. KREGER:  True.
6        MR. STONE:  Your claim is that today he's not
7    getting lower tar and nicotine, correct?
8        MR. KREGER:  My concern is the holding of a
9    cigarette and trying to demonstrate whether it was
10   something he did 10 minutes ago when we came back from
11   lunch or last year or three years ago or when the
12   lawsuit was filed or when the class period started.
13       My concern is you are asking him to show you --
14   it's kind of like, I don't know, a demonstrative
15   evidence that really isn't appropriate in a deposition.
16       MR. STONE:  What grounds?  What evidence ground
17   do you have for saying a demonstration is not
18   appropriate in a deposition?
19       MR. KREGER:  I just stated it.  I think that
20   it's inappropriate to ask him to display for you how he
21   held the cigarette or how he is going to hold it or how
22   he smoked it, and to try to infer something from that, I
23   don't think is appropriate.
24       MR. STONE:  What evidence rule?  What case or
25   evidence rule do you cite in support of that?

1        MR. KREGER:  I am not citing anything, but
2    we'll brief it.  If you file a motion to compel, we'll
3    brief it.
4        MR. STONE:  Is there any law that says a
5    demonstration is not appropriate when the manner in
6    which the witness smokes apparently is an issue that you
7    intend to make relevant to the case?
8        MR. KREGER:  Well, we can put the law books out
9    if you want and I can give it to you.
10       MR. ROTH:  It sounds like a merit discovery
11   issue rather than a class cert discovery issue.  And as
12   you have said, you have reserved the right to a merits
13   discovery deposition, so it would seem to me that it
14   would be a more appropriate time to address this.
15       MR. STONE:  And I appreciate all the comments
16   from everybody on your side of the table.  I would note
17   that in California our general practice, which I think
18   is the same in Georgia, is one lawyer speaks for the
19   parties at each event, so --
20       MR. ROTH:  I'll honor that, and I am from
21   Alabama.
22       MR. STONE:  Oh, Alabama.  I'm sorry.
23       Would you object then to us using what is
24   called an Easy Quit Artificial Cigarette?
25       MR. KREGER:  I would.  As I said, I think one

1    of the suggestions was something about a pen or a
2    pencil, and to try to get through this, I would agree to
3    have you -- to have him do that as a compromise.
4    BY MR. STONE:
5        Q.  Okay.  And just so we are clear, Mr. Tyrer, are
6    you going to follow your attorney's instructions and
7    refuse to demonstrate with either a real cigarette or
8    the Easy Quit Artificial Cigarette?
9        A.  Yes, sir, I am.
10       Q.  Let me hand you my pen, if I can.  You pick
11   which end you want to treat as the filter.  Okay.  So
12   can we just on the camera, can you turn sideways so we
13   can see.  What I want to see is the distance from end of
14   the filter, or the end of the pen in this case, where
15   you place your fingers.  So if would you would just show
16   us that's where you normally place your fingers.  Then
17   when you take a smoke, a puff, do you continue to hold
18   it between both fingers like that, or do you change your
19   grip?
20       A.  I will occasionally change my grip.
21       Q.  And you have demonstrated for us now, as best
22   you can, using a pen as opposed to a cigarette how you
23   hold it when you take a puff.  I know it has a different
24   weight and heft.
25       A.  Different heft, yeah, exactly that.

Page 146

1    Q.  I can't help that.  I apologize.
2    A.  It's like choking up on a baseball bat.
3    Q.  Okay.  But you have shown us then as best you
4  can; is that right?
5    A.  Yes, sir.
6    Q.  Thank you, Mr. Tyrer.
7       Okay.  Other than the quit attempt that you
8  described for us in 2008, are there other occasions
9  where you have attempted to quit smoking?
10   A.  Yes.
11   Q.  Okay.  I realize you have described for us that
12  you quit successfully in 1973 and you quit again in
13  1992?
14   A.  Yes.
15   Q.  So coming forward in time then to 1999 --
16   A.  Yes.
17   Q.  -- how many occasions since 1999, other than
18  the 2008 one that you have already told me about, did
19  you attempt to quit?
20   A.  Several.
21   Q.  Okay.  And in time, can you tell me the years
22  of each of those attempts?
23   A.  I'd say I make a stab minimum of once a year.
24   Q.  Okay.  Have you ever sought a doctor's
25  assistance in quitting?

Page 147

1    A.  I have.
2    Q.  And when was that?
3    A.  On three different occasions.  I'd be guessing.
4  I think it's 2004, and subsequently, let's see.  I know
5  there was a second attempt in 2008.  I was prescribed
6  nicotine patches.
7    Q.  Okay.  So two tries in 2008?
8    A.  Uh-huh.
9    Q.  And you need to say yes or no, if you would.
10   A.  Oh, I'm sorry.  Yes.
11   Q.  Okay.  And what -- in each instance, what
12  assistance did you get from the physician?
13   A.  Kaiser gave me a hotline to call to have
14  somebody try to talk me out of it when I wanted a
15  cigarette.  The other doctor prescribed the nicotine
16  patches, and another doctor had described -- I'm
17  sorry -- prescribed something, Wellbutrin.
18   Q.  Okay.  How long did you use the nicotine patch,
19  if at all?
20   A.  Let's see, I had a month's supply; so, yeah, a
21  month.
22   Q.  Okay.  And did that have an effect on your
23  smoking when you had that patch?
24   A.  It had a minor effect, yes.
25   Q.  Did you reduce the smoking during the time you

Page 148

1  used the patch?
2    A.  Yes.
3    Q.  And did Wellbutrin have an effect?
4    A.  Not that I could notice, no.
5    Q.  How long did you take it?
6    A.  It was over a month, I know that.
7    Q.  And have you used nicotine gum or other --
8    A.  I have used Nicorette, yes.
9    Q.  And did that make a difference?
10   A.  It was only when it was in my mouth.  As soon
11  as I took it out, I wanted a cigarette.
12   Q.  Since 1999, other than the period of time in
13  2008 that you described earlier, has there ever been a
14  period of time when you have gone, let's say, two weeks
15  without a cigarette?
16   A.  Two weeks, no.
17   Q.  Okay.  How important, in your purchasing
18  decisions of cigarettes, was the price of the cigarettes
19  you purchased?
20   A.  Until recently it wasn't a significant factor,
21  but it certainly is becoming.
22   Q.  And are you looking at today for the best price
23  you can find on the Marlboro Lights when you buy?
24   A.  Oh, yes.
25   Q.  Are you considering switching today; that is by

Page 149

1  today, I don't mean just today, but during the present
2  time frame, to generic brands or others that cost less
3  than Marlboro?
4    A.  No.
5    Q.  Why not?
6    A.  I don't like them as much.
7    Q.  Have you ever considered the price of Marlboros
8  to be a good deal; in other words, that you were getting
9  something to you had a lot more value than what you paid
10  for?
11      MR. KREGER:  Objection.  Vague and ambiguous as
12  to "good deal."  You can answer.
13      THE WITNESS:  No.
14  BY MR. STONE:
15   Q.  Have you generally over time seen the price of
16  cigarettes go up?
17   A.  Yes.
18   Q.  Earlier I had asked you about whether you were
19  seeking any monetary relief in this case, and we talked
20  about you individually.  Do you recall that?
21   A.  I do.
22   Q.  Are you seeking on behalf of the class any
23  monetary relief?
24   A.  Oh, yes.  The class is definitely seeking
25  monetary relief.

38 (Pages 146 to 149)

Page 150

1     Q.   And what monetary relief are you seeking on
2 behalf of the class?
3     A.   Possibly to get the money back that I spent on
4 the cigarettes.
5     Q.   And why would the class, in your mind, be
6 entitled to get money back?
7      MR. KREGER: Objection. Calls for a legal
8 conclusion. You can answer, if you know.
9      THE WITNESS: I believe they were misled by the
10 advertising and the representations made by Philip
11 Morris as with regard to the lower tar, less nicotine
12 healthier, lighter, et cetera, and they should be
13 reimbursed for that.
14 BY MR. STONE:
15     Q.   And how would you calculate, in your mind, the
16 amount they should be reimbursed?
17      MR. KREGER: Objection. It calls for a legal
18 conclusion and possibly expert opinion. But you can
19 answer, if you know.
20      THE WITNESS: Well, if you just throw out,
21 let's say, a mean price of $4 a pack, and I have eight
22 years of smoking, that would be roughly $1,700 a year
23 times eight.
24 BY MR. STONE:
25     Q.   So in your view they should get back the full

Page 151

1 amount they paid?
2     A.   I --
3      MR. KREGER: Same objections. But you can
4 answer.
5      THE WITNESS: I'd certainly like to see it.
6 BY MR. STONE:
7     Q.   Do you think that's fair?
8      MR. KREGER: Objection. Vague and ambiguous as
9 to "fair" and calls for a legal conclusion. But you can
10 answer.
11      THE WITNESS: I don't know there is a legal
12 definition of fair, to tell the truth, but do I think
13 it's likely to happen? Probably not.
14 BY MR. STONE:
15     Q.   If a smoker of Marlboro Lights didn't think
16 that the Marlboro Lights were going to be any safer than
17 Marlboro Full Flavor, should they get their money back,
18 in your opinion?
19     A.   If --
20      MR. KREGER: Same objections. But you can
21 answer.
22      THE WITNESS: If they are considered a member
23 of the class, yes. If they are excluded from the class,
24 no.
25 BY MR. STONE:

Page 152

1     Q.   And if they got lower tar and nicotine from a
2 Marlboro Light as compared to a Marlboro Full Flavor,
3 should they get their money back, in your view?
4      MR. KREGER: Same objections. You can answer.
5      THE WITNESS: Well, if is the leading word in
6 there. I think it's been pretty much established that
7 there was no lower nicotine and tar.
8 BY MR. STONE:
9     Q.   Bear with me, if you would, and assume for the
10 moment that there are indeed scientific studies that
11 establish that people do get lower tar and nicotine. I
12 am not asking you to believe me; just assume for the
13 moment that there are studies that say that smokers of
14 light cigarettes get lower tar and nicotine as compared
15 to smokers of full-flavor cigarettes.
16      In that case, would smokers who actually got
17 lower tar and nicotine be ones who you think would be
18 entitled to get their money back?
19      MR. KREGER: Objection. Incomplete
20 hypothetical. Calls for a legal conclusion and expert
21 opinion. But you can answer, if you know.
22      THE WITNESS: Yes.
23 BY MR. STONE:
24     Q.   Why?
25     A.   Again their expectations were not met. In your

Page 153

1 hypothetical, you are saying they knew that they were
2 going to get the same amount of tar and nicotine,
3 correct?
4     Q.   No, I'm sorry. In my hypothetical I am saying
5 they actually got lower tar and nicotine from a Marlboro
6 Light compared to a Marlboro Full Flavor.
7     A.   I apologize.
8     Q.   Let me start all over. I'll rephrase my
9 question, Mr. Tyrer, because I think I wasn't clear
10 earlier.
11     A.   Thank you.
12     Q.   Assume, if you would, for purposes of this
13 question, that there are a group of smokers of Marlboro
14 Lights who actually get lower tar and nicotine from the
15 Marlboro Light cigarette as compared to a Marlboro Full
16 Flavor. Would those smokers, in your view, be entitled
17 to get their money back spent on Marlboro Lights?
18      MR. KREGER: Objection. Incomplete
19 hypothetical. Calls for speculation, expert opinion and
20 legal conclusion. But you can answer, if you know.
21      THE WITNESS: Again, yes.
22 BY MR. STONE:
23     Q.   And again why?
24     A.   Because there must have been some reason they
25 switched to the lower tar and nicotine other than just

39 (Pages 150 to 153)

Page 154

1  the fact that they felt it was lower tar and nicotine.
2  Motivation, such as helping them quit smoking, by going
3  that route. And if that didn't happen, even though they
4  got a lesser amount of tar and nicotine, it looks like
5  their goals might not have been met.
6       Q. So is it your view that all of the members of
7  the class switched to Marlboro Lights not only because
8  they wanted to get lower tar and nicotine, but because
9  they also wanted it to help them quit smoking?
10       MR. KREGER: Objection. Misstates testimony,
11  calls for a legal conclusion, is an incomplete
12  hypothetical and calls for speculation. You can answer,
13  if you know.
14       THE WITNESS: No.
15  BY MR. STONE:
16       Q. Okay. So there are some people who, in your
17  opinion, switched to Marlboro Lights to get lower tar
18  and nicotine, correct?
19       MR. KREGER: Objection. Calls for speculation.
20  But you can answer, if you know.
21       THE WITNESS: I would say yes.
22  BY MR. STONE:
23       Q. And if those people actually got lower tar and
24  nicotine, in your view, are they entitled to get their
25  money back?

Page 155

1       MR. KREGER: Objection. Incomplete
2  hypothetical. Calls for a legal conclusion, medical
3  opinion, speculation and expert opinion. But you can
4  answer, if you know.
5       THE WITNESS: Again, yes, for the same reasons.
6  BY MR. STONE:
7       Q. Okay. But tell me why, if you would, in that
8  situation they are entitled to get their money back?
9       MR. KREGER: Same objections. You can answer.
10  Asked and answered as well.
11       Oh, you can answer.
12       THE WITNESS: I was waiting.
13       MR. KREGER: Sorry.
14       THE WITNESS: Excuse me. Again I would have to
15  say they would be entitled to a compensation.
16  BY MR. STONE:
17       Q. Okay. So what I am going to get at is why.
18  What's your reasoning, if they didn't have any reason to
19  buy it except they wanted to get lower tar and nicotine,
20  and if they actually got lower tar and nicotine, how do
21  you reason, in thinking through your answer, that they
22  should still get their money back?
23       MR. KREGER: Same objections. You can answer.
24       THE WITNESS: Well, again they switched to
25  lights, and I would have to say there's more to it than

Page 156

1  just less tar and nicotine. Obviously that was the push
2  from the company, but -- I'm trying to figure out how to
3  word this. There must be more expectations than just
4  the lower tar and nicotine.
5  BY MR. STONE:
6       Q. If the only expectation was lower tar and
7  nicotine, and if they got lower tar and nicotine, in
8  your view would they still be entitled to get their
9  money back?
10       MR. KREGER: Objection. Incomplete
11  hypothetical. Calls for speculation, expert opinion,
12  and legal conclusion, and it's overbroad as well. And I
13  think it's asked and answered a couple of times. But
14  you can answer, if you know.
15       THE WITNESS: Based on a hypothesis, I wouldn't
16  be the one to make that determination. I think the
17  people in that particular subcategory class would have
18  to be somehow questioned as to their reasons for
19  switching to lights other than the lower tar and
20  nicotine.
21  BY MR. STONE:
22       Q. And if they had no other reasons for switching,
23  after that questioning was completed, in your view,
24  would they be entitled to get their money back spent on
25  lights?

Page 157

1       MR. KREGER: Objection. Incomplete
2  hypothetical. Calls for speculation, expert opinion,
3  and legal conclusion, and is overbroad. You can answer,
4  if you know.
5       THE WITNESS: Again I'd have to say yes. They
6  would be members of the class in good standing, and as
7  such entitled to the same treatment as the rest of the
8  class.
9  BY MR. STONE:
10       Q. Other than a desire on your part to get lower
11  tar and nicotine when you switched to Marlboro Lights
12  from Marlboro Mediums, what else did you expect to get?
13       A. As I previously said, I was hoping that I could
14  wean myself off cigarettes, and if there was less tar
15  and nicotine going into my system, then the cravings
16  would somehow subside.
17       Q. When did you realize that you weren't able to
18  wean yourself off of smoking by switching to Marlboro
19  Lights?
20       A. After due to my frustration, I went to Kaiser
21  and got their smoking cessation classes and hotline.
22  Subsequent to that I got patches which again didn't do
23  it, so --
24       Q. And the first time you went to Kaiser to get
25  their hotline information and assistance was 2004?

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424                                                      (212) 490-3430

Page 158

1    A.  Approximately, yes, sir.
2    Q.  And so you knew at that time that just
3  switching to Marlboro Lights wasn't helping you quit
4  smoking, right?
5    A.  Correct.
6    Q.  And you knew at that time that you hadn't
7  reduced the number of cigarettes you were smoking every
8  day, correct?
9    A.  Other than on the rare occasions when I used
10  the patch or the Wellbutrin, and I grated my teeth a
11  lot, yes, sir.
12    MR. STONE:  Okay.  I ask the reporter to mark
13  as Exhibit 5 a copy of a Marlboro Lights ad.
14    THE WITNESS:  Can I ask an off-the-record
15  question?
16    MR. KREGER:  No.
17    THE WITNESS:  Sorry.
18    (Exhibit 5 was marked for
19    identification.)
20  BY MR. STONE:
21    Q.  Mr. Tyrer, the reporter has handed you what we
22  have marked for identification as Exhibit 5.
23    A.  Yes.
24    Q.  Because it's a color print, I apologize that it
25  gets a little blurry when I tried to make color copies,

Page 159

1  but is this familiar to you as an ad for Marlboro
2  Lights?
3    A.  Yes.
4    Q.  Okay.  And if you look down on the lower
5  right-hand corner, you'll see there the surgeon -- one
6  of the four Surgeon General's rotating warnings is
7  there.  Do you see that?
8    A.  I do.
9    Q.  And you are familiar with the warnings that
10  rotate.  There's different ones at different times on
11  the packs?
12    A.  Correct.
13    Q.  And then, if you would, you'll see on the left
14  of that box you'll see, and it's a little hard to read,
15  it says "11 milligrams tar, 0.8 milligrams nicotine per
16  cigarette by FTC method."  Do you see that?
17    A.  I do.
18    MR. KREGER:  Counsel, if you don't mind, it
19  looks like there's some letters between "nicotine" and
20  "per" which I can't make out.  Do you know what that is,
21  or is it just a smudge or something?  Do you see where
22  it says "nicotine"?
23    MR. STONE:  I see that, and, you know, that's a
24  fair question.  I don't know if I can read it on
25  anything else.  Average.  It says "AV."

Page 160

1    THE WITNESS:  Ah.
2  BY MR. STONE:
3    Q.  So let's -- let's read that again.
4    "11 milligrams tar, 0.8 milligrams nicotine
5  average AV per cigarette by FTC method."  Do you see
6  that language?
7    A.  Yes, sir.
8    Q.  Do you recall ever seeing that language or
9  similar language in any of the ads that you described
10  earlier as suggesting milder or less risky or in some
11  other fashion communicating to you a message of less
12  risk or less harmful?
13    A.  I don't recall those specific numbers, no, sir.
14    Q.  Do you recall ever seeing anything about the
15  FTC method before?
16    A.  Yes.
17    Q.  Did you have any understanding at the times you
18  have seen that previously of what the FTC method is or
19  was?
20    A.  It was controlled tests on cigarettes to
21  measure the tar and nicotine.
22    Q.  Okay.  Do you have any reason to think the
23  results of that test are not accurately reported by
24  Philip Morris in its ads?
25    A.  I would have no reason to think that they

Page 161

1  falsified that.
2    Q.  And then do you see where it says below that:
3  "The amount of tar and nicotine you inhale will vary
4  depending on how you smoke the cigarette."  Do you see
5  that?
6    A.  Yes, sir.
7    Q.  Have you seen that language in ads before?
8    A.  Well, I saw it earlier on today.
9    Q.  Let's go back in time before today if we can.
10    A.  Specifically, I don't recall.
11    Q.  Is there anything surprising about that
12  information to you, or is that something that you would
13  have understood in any event?
14    A.  I would have understood that in any event,
15  yeah.
16    Q.  Okay.  Is there anything in this particular ad
17  for Marlboro Lights that causes you to think that
18  Marlboro Lights are going to be less risky or less
19  harmful than Marlboro Full Flavor?
20    A.  Yes.
21    Q.  Tell me what that is if you could, please.
22    A.  Well, starting with the term "lights," and then
23  the fact that you specified the amounts of tar and
24  nicotine must be significant in that regard.
25    Q.  And are the amounts of tar and nicotine that

41 (Pages 158 to 161)

Page 162

1  are set forth in the ads for various products at various
2  points in time, is that something that you ever looked
3  at?
4      A. No, sir.
5      Q. And did the actual numbers reported in any of
6  the ads ever make any difference to you in selecting
7  which cigarette to buy?
8      A. No.
9      MR. STONE: Let me ask the reporter to mark as
10 Exhibit 6 a document that is from the Federal Trade
11 Commission, the FTC Web site.
12     (Exhibit 6 was marked for
13     identification.)
14 BY MR. STONE:
15     Q. Okay. Have you had a chance to look at it?
16     A. Oh, yes, sir.
17     Q. Referring you to the first thing where it says
18 "Attachment A," and then it says "there is no such thing
19 as a safe smoke." Do you see that language?
20     A. I do.
21     Q. Is that something you have known for many
22 years?
23     A. Yes.
24     Q. Certainly before 2002 you knew that?
25     A. Yes.

Page 163

1      Q. The next sentence says: "Even cigarettes with
2  low ratings can give you high amounts of tar and
3  nicotine." And then the next sentence says, "It depends
4  on how you smoke." Do you see that?
5      A. Yes.
6      Q. And is that something you have known for many
7  years?
8      A. I am becoming aware of it more now, but I'd say
9  I have known it for a while, yes.
10     Q. You knew that before 2002, didn't you?
11     A. I don't believe so.
12     Q. You didn't know before 2002 that you could get
13 more tar and nicotine if you smoked more cigarettes?
14     A. Oh, I'm sorry. I misunderstood. Yes. The
15 more you smoke, the more tar and nicotine you'll get.
16     Q. And you knew that if you smoked more puffs from
17 a cigarette, you could get more tar and nicotine. You
18 knew that before 2002 and before, right?
19     A. That would be logical, yes.
20     Q. And then the Attachment B, it says "how much
21 tar and nicotine you get from a cigarette depends on how
22 intensely you smoke it." Do you see that?
23     A. Yes.
24     Q. The word "intensely" in the context of this
25 particular statement from the Federal Trade Commission,

Page 164

1  what does that mean to you?
2      A. How hard you drag or draw on a cigarette when
3  you smoke it.
4      Q. Okay. And is it new to you? Is it new
5  information to you that how hard you drag on a cigarette
6  or smoke it can make a difference on how much tar and
7  nicotine you get?
8      A. No.
9      Q. Is that something you have known for many years
10 including back in 2002?
11     A. Again it's logical that the more smoke I
12 inhale, the more tar and nicotine I would get, yes, sir.
13     Q. Okay. Switching subjects slightly, Mr. Tyrer.
14 Have you ever been involved in any other litigation
15 besides this case?
16     A. I sued the Bank of America.
17     MR. KREGER: Counsel, I just want to clarify.
18 Do you mean as a party or as a --
19 BY MR. STONE:
20     Q. Yes, as a party.
21     A. Yes.
22     Q. What other litigation have you been involved in
23 as a party?
24     A. I sued the Bank of America this year.
25     Q. For what? What's the nature of that case?

Page 165

1      A. For wrongful handling of my account.
2      Q. I guess not because they put too much money in
3  it, right?
4      A. No. The other way around.
5      Q. Okay. And who represents you in that lawsuit?
6      A. Oh, it was Small Claims Court. It was on my
7  own.
8      Q. Okay. Is that resolved?
9      A. Yes.
10     Q. Okay. Other than the Small Claims action
11 against Bank of America that happened recently, have you
12 been involved in any other lawsuit where you have been a
13 party, either a plaintiff or a defendant?
14     A. Does my divorce count?
15     Q. Okay. Sure, that's one. Other than your
16 divorce --
17     A. I don't know that it was actually a lawsuit. I
18 mean, we did the MSA, shook hands and walked away, so --
19     Q. Other than the divorce, which may or may not
20 have been a lawsuit, and other than the Small Claims
21 Court case against Bank of America, have you been a
22 party, either a plaintiff or a defendant, in any other
23 lawsuit?
24     A. I must have. Oh, yes. After my divorce in
25 '92, I lost the house through a foreclosure, and then

42 (Pages 162 to 165)

1 they tried to sue for deficiency balance. It went no
2 where.
3     Q.  Okay. So there was litigation over the
4 foreclosure?
5     A.  Yes.
6     Q.  Okay. Other than the Small Claims Court case,
7 the divorce and the foreclosure action and the effort to
8 recover the -- it's a deficiency judgment, right, that
9 they were after, or am I using the right words?
10    A.  Yes, that's correct.
11    Q.  Other than those three, have you been a party,
12 either a plaintiff or a defendant, in any other lawsuit?
13    A.  I'm trying to remember. I'm sorry. I can't
14 recall.
15    Q.  Okay. Have you ever filed for bankruptcy?
16    A.  Yes, I have.
17    Q.  When was that?
18    A.  Right around the time of my divorce. That's in
19 1990.
20    Q.  And that's the only time?
21    A.  '90, '91. Yes, sir.
22    Q.  Have you ever sued any -- have you ever rented
23 your properties?
24    A.  Yes.
25    Q.  Have you ever had any litigation with any of

1 your tenants?
2     A.  No.
3     Q.  Okay. And other than the foreclosure action
4 where they sought to recover the deficiency between the
5 value and the amount on the loan, I guess, have you ever
6 been involved in any effort to collect money from you?
7     A.  By way of a lawsuit you mean?
8     Q.  By way of a lawsuit.
9     A.  No, not that I can recall.
10    Q.  Have you ever been -- had any criminal charges
11 brought against you?
12    A.  No, sir.
13    Q.  Have you ever been involved in any --
14    A.  Oh, I did have a DUI in January 1st, 1997.
15    Q.  You talked earlier about some of the social
16 aspects of smoking, and directing you back to that for a
17 moment, do you find that you smoke more cigarettes when
18 you are drinking alcohol, less or the same?
19         MR. KREGER: Objection. Calls for speculation.
20 It's an incomplete hypothetical. It's overbroad. It's
21 vague and ambiguous as to more and less. But you can
22 answer, if you know. Also incomplete as to time.
23         THE WITNESS: Probably less.
24 BY MR. STONE:
25    Q.  Okay. And do you find that you smoke

1 cigarettes more, less or the same amount in connection
2 with drinking coffee?
3         MR. KREGER: Same objections.
4         THE WITNESS: I'd --
5         MR. KREGER: You can answer.
6         THE WITNESS: Oh, I'd say about the same.
7 BY MR. STONE:
8     Q.  And in a setting like in a bar, a social
9 setting, but in a bar environment, before the laws
10 against smoking at bars, did you find that you smoked
11 more or less in that environment than if you were at
12 home?
13         MR. KREGER: Same objections. You can answer.
14         THE WITNESS: You know, I don't recall any bars
15 you could smoke in over the last seven or eight years.
16         MR. KREGER: Don't speculate.
17         THE WITNESS: Sorry.
18 BY MR. STONE:
19    Q.  Other than the -- so go back further in time to
20 when you could. Did you find there was a difference --
21 in the environment you were in made a difference in how
22 much you would smoke?
23         MR. KREGER: Same objections.
24         THE WITNESS: I wasn't smoking then.
25 BY MR. STONE:

1     Q.  Okay. During the time that you were working
2 since 2002 at your various jobs, which would have
3 included the two law firms and American Extreme Sports,
4 were there any limits on your ability to smoke in the
5 office space that you used?
6     A.  Oh, absolutely.
7     Q.  And what were those limits?
8     A.  You can't do it.
9     Q.  Okay. And so during those time periods when
10 you were at work, where would you go to smoke?
11    A.  I'd smoke at lunchtime and after work and
12 before work.
13    Q.  And would you sometimes take a break and smoke
14 outside?
15    A.  That would be rare.
16    Q.  Okay. And do you now restrict yourself, now
17 that you are retired, do you restrict yourself as to
18 locations where you can and can't smoke other than to
19 the extent that the law would impose those restrictions?
20    A.  I won't smoke in my house.
21    Q.  So do you go outside to smoke when you are at
22 home?
23    A.  I do.
24    Q.  And do you allow other people to smoke inside
25 your house?

43 (Pages 166 to 169)

Page 170

1    A.  Inside?  No.
2    Q.  So anybody who wants to smoke has to go
3  outside?
4    A.  Correct.
5        MR. STONE:  Let's go off the record for a
6  second.
7        THE VIDEOGRAPHER:  Going off the record.  The
8  time is 1:44 p.m.
9        (Recess)
10       THE VIDEOGRAPHER:  We are back on the record at
11  1:46 p.m.
12  BY MR. STONE:
13   Q.  Mr. Tyrer, when, if you experience stress,
14  would that affect whether or not you smoked or the
15  amount of cigarettes you smoke?
16   A.  Yes.
17       MR. KREGER:  Objection.  I'm sorry.  Go ahead.
18       THE WITNESS:  Excuse me.
19  BY MR. STONE:
20   Q.  And what was the effect of stress on whether or
21  not you smoked or the amount you smoked?
22       MR. KREGER:  Objection.  Vague and ambiguous as
23  to stress, as to time and incomplete hypothetical.  You
24  can answer, if you know.
25       THE WITNESS:  It's kind of a two-part answer.

Page 171

1  I mean, when I was trying to recuperate at home and not
2  smoking, I was under an awful lot of stress.  I held off
3  smoking as long as I could now when I experience stress.
4        MR. KREGER:  That wasn't the question.  It was
5  as to the past.  So you have answered it.
6        MR. STONE:  No, it wasn't, but --
7        MR. KREGER:  Well, I guess it was incomplete as
8  to time, so I assumed it was as to the past.
9  BY MR. STONE:
10   Q.  It covered all times.  What's the effect of
11  stress on the amount you smoke or whether you smoke?
12       MR. KREGER:  So it's vague and ambiguous as to
13  time.  You can answer.
14       THE WITNESS:  Stress does make me want to have
15  a cigarette, yes, sir.
16  BY MR. STONE:
17   Q.  Okay.  What did you do to prepare for your
18  deposition?
19   A.  I read the amended complaint.
20   Q.  Okay.  Did you read any other materials besides
21  that?
22   A.  No, not to prepare for the deposition.
23   Q.  Okay.  And then in connection with this
24  lawsuit, have you read anything other than the original
25  complaint, Exhibit 1, and the amended complaint,

Page 172

1  Exhibit 2?
2    A.  I saw the request for admissions and the
3  general list of questions and interrogatories.
4    Q.  Okay.  And have you started working on
5  preparing answers to those?
6        MR. KREGER:  Objection.  Potentially violates
7  the attorney work product privilege.  Just answer as to
8  anything you have done on your own.
9        THE WITNESS:  No.
10  BY MR. STONE:
11   Q.  Okay.  And other than reading the discovery
12  requests and the original complaint, Exhibit 1, and the
13  amended complaint, Exhibit 2, have you read any other
14  materials in connection with this case?
15   A.  No, I have not.
16   Q.  Okay.  And did you meet with anyone in
17  preparation for your deposition?
18   A.  Yes.
19   Q.  Who did you meet with?
20   A.  My three attorneys here.
21   Q.  Okay.  And when did that occur?
22   A.  Yesterday.
23   Q.  And how long did that last?
24       MR. KREGER:  Objection.  I believe that
25  violates the attorney-client privilege.  I instruct him

Page 173

1  not to answer.
2        MR. STONE:  How long did the meeting occur?
3        MR. KREGER:  Correct.
4        MR. STONE:  Okay.
5        MR. KREGER:  I'll allow him to answer it.
6  BY MR. STONE:
7    Q.  Okay.
8    A.  It was a couple of hours.
9    Q.  Where did it occur?
10   A.  Right here.
11   Q.  In this office?
12   A.  Yes.
13   Q.  And other than the meeting yesterday in this
14  office that lasted for a couple of hours, did you meet
15  with anyone else in preparation for your deposition?
16   A.  I did not.
17   Q.  Who have you told about your deposition?
18   A.  Who have I -- I'm not sure.
19   Q.  Have you told anybody else that you were being
20  deposed in connection with this case?
21   A.  Oh, yes.
22   Q.  Who did you tell about?  Who did you tell that
23  to?
24   A.  Kimberly Woods.  She wanted to know where I
25  would be today.

44 (Pages 170 to 173)

Page 174

1 Q. Okay. Anybody else?
2 A. Yes.
3 Q. Who else?
4 A. Greg Glavonich.
5 Q. Anyone else?
6 A. Kathy Herzog.
7 Q. And who is Greg Glavonich?
8 A. He's a doctor friend of mine that's chastising
9 me for smoking all the time.
10 Q. Okay. Have you told any light smokers or ultra
11 light smokers that you think they are not getting any
12 less tar and nicotine from their cigarette than they
13 would get from a full flavor?
14 A. Yes.
15 Q. Who have you told?
16 A. Specifically, I remember telling Kimberly
17 Johnson, who is name is now Coleman. And Kimberly
18 Woods' mother and stepfather.
19 Q. Okay. Kimberly Johnson is now Coleman you
20 said?
21 A. Yes.
22 Q. Okay. Other than those three people, have you
23 told anyone else, who is a light or ultra light smoker,
24 that you think they are not getting any lower tar and
25 nicotine from that cigarette as compared to a full

Page 175

1 flavor?
2 A. No, I haven't.
3 MR. STONE: Okay. Thank you, Mr. Tyrer.
4 Subject to possible motions with respect to the
5 instructions not to answer, and subject to the fact that
6 we reserve the right to depose -- take a substantive
7 deposition at some later point in time, I have completed
8 my questioning. So thank you.
9 THE WITNESS: Thank you, Mr. Stone.
10 MR. STONE: Do you have any questions?
11 MR. KREGER: No questions.
12 MR. STONE: So let's go off the -- well, let's
13 go off the record for a second, but let's not quit yet.
14 THE VIDEOGRAPHER: Going off the record. The
15 time is 1:51 p.m.
16 (Recess)
17 THE VIDEOGRAPHER: We are back on the record at
18 1:53 p.m.
19 MR. STONE: We have had a discussion off the
20 record, and I think there will probably be a stipulation
21 with regard to the signing of the transcripts from the
22 group of depositions that have been taken across the
23 country, and we'll await that, and otherwise we'll work
24 something out separately if need be, and I think
25 otherwise we have concluded the deposition.

Page 176

1 MR. KREGER: Agreed.
2 THE VIDEOGRAPHER: This concludes today's
3 videotaped deposition of Miles Tyrer. The number of
4 media used was two. We are off the record at 1:53 p.m.
5 THE REPORTER: Would you like a copy?
6 MR. KREGER: We'll be asking for a copy, yes.
7 THE REPORTER: And would you like a rough?
8 MR. KREGER: Yes.
9 (TIME NOTED: 1:53 p.m.)
10 * * * * *
11
12 _____
13 MILES CONRAD TYRER
14
15
16 Subscribed and sworn to before me
17 this ____ day of _____, 20___.
18
19 _____
20 Notary Public
21
22
23
24
25

Page 177

1 I N D E X
2
3 WEDNESDAY, DECEMBER 16, 2009
4
5 WITNESS                          EXAMINATION
6 MILES CONRAD TYRER
7
8 BY MR. STONE                          4
9
10
11 DEPOSITION EXHIBITS
12 NUMBER          DESCRIPTION          IDENTIFIED
13 Exhibit 1    Complaint for Injunctive    47
                Relief, Restitution and Damages
14
    Exhibit 2    First Amended Class Action    83
15               Complaint Injunctive Relief
                 Sought
16
    Exhibit 3    Two-page Philip Morris USA    101
17               Information for Smokers
18  Exhibit 4    Two-page Philip Morris USA    110
                 Information for Smokers
19
    Exhibit 5    Color photocopy of Marlboro ad   158
20
    Exhibit 6    Document titled "Attachment A"   162
21               from the Federal Trade
                 Commission Web site
22
23
24
25

Page 178

1              INDEX (Continued)
2
3        INSTRUCTION NOT TO ANSWER
4            PAGE    LINE
5             40      13
6             43      10
7             45      9
8             46      16
9             46      25
10            47      5
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

1   STATE OF CALIFORNIA        ) ss:
2   COUNTY OF SAN DIEGO        )
3
4       I do hereby certify:
5       That the foregoing deposition was taken before me
6   at the time and place therein set forth, at which time
7   the witness was put under oath by me;
8       That the testimony of the witness and all
9   objections made at the time of the examination were
10  recorded stenographically by me, were thereafter
11  transcribed under my direction and supervision and that
12  the foregoing is a true record of same.
13      I further certify that I am neither counsel for nor
14  related to any party to said action, nor in anywise
15  interested in the outcome thereof.
16       IN WITNESS WHEREOF, I have subscribed my name
17  this 21st day of December, 2009.
18
19
20
21
22  _____
23        SHURI GRAY, C.S.R. NO. 3786
24
25

Page 179

1          ERRATA SHEET
           VERITEXT REPORTING COMPANY
2            1350 BROADWAY
           NEW YORK, NEW YORK 10018
3            800-362-2520
4   CASE: TYRER VS. PHILIP MORRIS USA INC.
    DEPOSITION DATE: DECEMBER 16, 2009
5   DEPONENT: MILES CONRAD TYRER
6   PAGE LINE(S)  CHANGE        REASON
7   ___|___|_____|_____
8   ___|___|_____|_____
9   ___|___|_____|_____
10  ___|___|_____|_____
11  ___|___|_____|_____
12  ___|___|_____|_____
13  ___|___|_____|_____
14  ___|___|_____|_____
15  ___|___|_____|_____
16  ___|___|_____|_____
17  ___|___|_____|_____
18  ___|___|_____|_____
19  ___|___|_____|_____
20
21  _____
        MILES CONRAD TYRER
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20___.
24
    _____     _____
25  (NOTARY PUBLIC)     MY COMMISSION EXPIRES: