## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| IN RE: LIGHT CIGARETTES MARKETING AND SALES PRACTICES LITIGATION | ) ) ) | MDL  DOCKET NO.: 1:09-2068  ALL CASES |
|---|---|---|

## PLAINTIFFS' MOTION FOR CLASS
## CERTIFICATION AND INCORPORATED MEMORANDUM OF LAW

**TABLE OF CONTENTS**

I.     **INTRODUCTION**........................................................................................................1

II.    **STATEMENT OF FACTS**......................................................................................2

     A.  **Factual Background** ..........................................................................................2

     B.  **Plaintiffs and the Proposed Classes** ...............................................................7

          1.    **The California Class** ..............................................................................7

          2.    **The District of Columbia Class**............................................................8

          3.    **The Illinois Class** ................................................................................10

          4.    **The Maine Class** .................................................................................11

     C.  **Prior Light Cigarettes Actions** ....................................................................13

III.    **ARGUMENT**.........................................................................................................15

     A.  **Certification of Each Class is Appropriate** .................................................15

     B.  **The Requirements of Rule 23(a) are satisfied**.............................................16

          1.    **Rule 23(a)'s Numerosity Requirement is Satisfied** ...........................16

          2.    **Rule 23(a)'s Commonality Requirement is Satisfied** ........................16

          3.    **Rule 23(a)'s Typicality Requirement is Satisfied** ..........................17

          4.    **Rule 23(a)'s Adequacy Requirement is Satisfied** ...........................19

               a.    *Plaintiffs are Adequate Class Representatives* .......................19

               b.    *Plaintiff Tyrer Satisfied the UCL's and FAL's Class Representative Standing Requirements* .........................................................20

               c.    *Plaintiffs' Counsel are Qualified, Experienced, and Able to Vigorously Conduct the Proposed Litigation* .......................23

     C.  **The Requirements of Rule 23(b)(3) are Satisfied** ......................................23

          1.    **Questions of Law and Fact Common to Each State Class Predominate Over Any Potential Individual Issues**.................................................24

i

               **a.**     *Issues of Law and Fact Common to All California Class Members Predominate Over Any Potential Individual Issues* ............................25

                        **i.**   **The California Class' UCL Claims** ...............................25

                        **ii.**  **The California Class' CLRA Claims**............................28

               **b.**     *Issues of Law and Fact Common to All District of Columbia Class Members Predominate Over Any Potential Individual Issues* .............31

                        **i.**   **The D.C. Class' CPPA Claims** .........................................31

                        **ii.**  **The D.C. Class' Unjust Enrichment Claims**..................35

               **c.**     *Issues of Law and Fact Common to All Illinois Class Members Predominate Over Any Potential Individual Issues* ............................36

                        **i.**   **The Illinois Class' ICFA Claims**....................................36

                        **ii.**  **The Illinois Class' Unjust Enrichment Claims**.............39

               **d.**     *Issues of Law and Fact Common to All Maine Class Members Predominate Over Any Potential Individual Issues* ............................41

         **2.**    **The Class Action Mechanism is the Superior Means to Adjudicate the Claims of Each Class**....................................................................................45

    **D.**  **Class Certification of the California Class is Proper Under Rule 23(b)(2)** ..........46

**IV.**   **CONCLUSION** ........................................................................................................47

# TABLE OF AUTHORITIES

Cases

*A.F.A.B., Inc. v. Town of Old Orchard Beach*,
610 A.2d 747 (Me. 1992) ................................................................................................41, 43

*Altria Group, Inc. v. Good*,
129 S. Ct. 538 (2008) ........................................................................................................3, 37

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ...........................................................................................15, 23, 24, 45

*Andrews v. Bechtel Power Corp.*,
780 F.2d 124 (1st Cir. 1985) ....................................................................................................19

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
552 F.3d 613 (7th Cir. 2009) ..................................................................................................16

*Aspinall v. Philip Morris Cos.*,
813 N.E.2d 476 (Mass. 2004) ..............................................................................13, 18, 19, 34

*Atwater v. D.C. Dep't of Consumer and Regulatory Affairs*,
566 A.2d 462 (D.C. 1989) .......................................................................................................31

*Bank of the W. v. Superior Court*,
833 P.2d 545 (Cal. 1992 ..........................................................................................................34

*Banks v. D.C. Dept' of Consumer & Regulatory Affairs*,
634 A.2d 433 (D.C. 1993) ..................................................................................................26, 34

*Boeken v. Philip Morris, Inc.*,
127 Cal. App. 4th 1640 (2005) ...........................................................................................21, 22

*Buller v. Sutter Health*,
160 Cal. App. 4th 981 (2008) ...................................................................................................26

*Carnegie v. Household Int'l, Inc*,
376 F.3d 656 (7th Cir. 2004) ...................................................................................................45

*Cartwright v. Viking Indus.*,
No. 2:07-cv-02159, 2009 WL 2982887 (E.D. Cal. Sept. 14, 2009) ...........................................29

*Cel-Tech Commc'n., Inc.v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ..............................................................................................................26

*City of Chicago v. Beretta U.S.A. Corp.*,
821 N.E.2d 1099 (Ill. 2004) ........................................................................38

*Cohen v. Chilcott Public Ltd. Co.*,
522 F. Supp. 2d 105 (D.D.C. 2007) ...........................................................35

*Combined Energies v. CCI, Inc.*,
628 F. Supp. 2d 226 (D. Me. 2009) ............................................................41

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,
35 Cal. 3d 197 (1983) ...........................................................................26, 27

*Connick v. Suzuki Motor Co.*,
675 N.E.2d 584 (Ill. 1996) ...............................................................36, 38, 39

*Craft v. Philip Morris Cos.*,
190 S.W.3d 368 (Mo. App. Ct. 2005).................................................13, 37, 38

*Curtis v. Comm'r Me. Dep't. of Human Servs.*,
159 F.R.D. 339 (D. Me. 1994) ....................................................................19

*Curtis v. Philip Morris Cos.*,
No. PI 01-018042, 2004 WL 2776228 (D. Minn. Nov. 29, 2004) .................13

*Davies v. Philip Morris USA Inc.*,
No. 04-2-08174-2, 2006 WL 1600067 (Wash. Sup. May 26, 2006) .............13

*Day v. AT&T Corp.*,
63 Cal. App. 4th 325 (1998) .......................................................................26

*De Bouse v. Bayer*,
No. 107528, 2009 WL 4843362 (Ill. Dec. 17, 2009)...................................38

*DesMarais v. Desjardins*,
664 A.2d 840 (Me. 1995)............................................................................41

*District of Columbia v. Cato Inst.*,
829 A.2d 237 (D.C. 2003) ..........................................................................34

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)...................................................................................46

*Engalla v. Permanente Med. Group, Inc.*,
938 P.2d 903 (Cal. 1997) ...........................................................................27

*Evans v. Shannon*,
776 N.E.2d 1184 (Ill. 2002) ................................................................38

*Fletcher v. Sec. Pac. Nat'l Bank*,
591 P.2d 51 (Cal. 1972) ................................................................26, 27

*Ford v. ChartOne*,
908 A.2d 72 (D.C. 2006) ................................................................31, 32

*Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*,
944 A.2d 1055 (D.C. 2008) ................................................................34

*Garcia-Rubiera v. Calderon*,
570 F.3d 443 (1st Cir. 2009)................................................................16

*Gerill Corp. v. Jack L. Hargrove Builders, Inc.*,
538 N.E.2d 530 (Ill. 1989) ................................................................39

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)................................................................18

*Gogasian v. Gulf Oil Corp.*,
561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086 (1978)................................24

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ................................................................18

*Howard v. Riggs Nat'l Bank*,
432 A.2d 701 (D.C. 1981) ................................................................32

*Howard & Bowie, P.A. v. Collins*,
759 A.2d 707 (Me. 2000)................................................................42

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
545 N.E.2d 672 (Ill. 1989) ................................................................39, 40

*In re Boston Scientific Corp. Secs. Litig.*,
604 F. Supp. 2d 275 (D. Mass. 2009) ................................................................18, 19

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 326 (E.D. Mich. 2001) ................................................................44

*In re Lorazepam & Clorazepate Antitrust Litig.*,
202 F.R.D. 12 (D.D.C., 2001)................................................................34

v

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
522 F.3d 6 (1st Cir. 2008) ............................................................................16, 17, 24, 28

*In re Pharma. Average Wholesale Price Litig.,*
252 F.R.D. 83 (D. Mass. 2008) ...................................................................................33

*In re Prudential Ins. Co. Am. Sales Litig.,*
148 F.3d 283 (3d Cir. 1998) .......................................................................................18

*In re Terazosin Hydrochloride Antitrust Litig.,*
220 F.R.D. 672 (S.D. Fla. 2004) ................................................................................43

*In re Tobacco II Cases,*
207 P.3d 23 (Cal. 2009) ...................................................................................... passim

*In re Visa Check/MasterMoney Antitrust Litig.,*
280 F.3d 124 (2d Cir. 2001) .......................................................................................24

*June Roberts Agency v. Venture Props.,*
676 A.2d 46 (Me. 1996) ..............................................................................................41

*Kennedy v. Tallant,*
710 F.2d 711 (11th Cir. 1983) ....................................................................................24

*Kraus v. Trinity Mgmt. Servs., Inc.,*
999 P.2d 718 (Cal. 2000) ......................................................................................20, 25

*Korea Supply Co. v. Lockheed Martin Corp.,*
63 P.3d 937 (2003) ......................................................................................................27

*Kristian v. Comcast Corp.,*
446 F.3d 25 (1st Cir. 2006) .........................................................................................45

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998) ................................................................................................16, 46

*Little Caesar Enter., Inc. v. Smith,*
172 F.R.D. 236 (E.D. Mich. 1997) .............................................................................15

*Lymburner v. U.S. Fin. Funds, Inc.,*
No. C-08-00325 EDL, 2010 WL 335791 (N.D. Cal. Jan. 22, 2010) ...........................26

*Mace v. Van Ru Credit Corp.,*
109 F.3d 338 (7th Cir. 1997) ......................................................................................45

vi

*Mass. Mut. Life Inc. Co. v. Superior Court*,
97 Cal. App. 4th 1282 (2002) ..................................................................................29

*Mazza v. Am. Honda Motor Co.*,
254 F.R.D. 610 (C.D. Cal. 2008) ...........................................................................29

*McAdams v. Monier, Inc.*,
No. C051841, 2010 WL 630973 (Cal. App. Ct. Feb. 24, 2010).................25, 29, 30, 31

*Me. Eye Care Assocs. v. Gorman*,
942 A.2d 707 (Me. 2008)........................................................................................41

*Meyer v. Sprint Spectrum L.P.*,
45 Cal. 4th 634 (2009) ............................................................................................29

*Mulford v. Altria Group, Inc.*,
242 F.R.D. 615 (D.N.M. 2007).................................................................................19

*New World Comm'ns, Inc. v. Thompsen*,
878 A.2d 1218 (D.C. 2005) .....................................................................................35

*Olszewski v. Scripps Health*,
30 Cal. 4th 798 (2003) ............................................................................................26

*Osbourne v. Capital City Mortgage Corp.*,
 667 A.2d 1321 (D.C. 1995) ....................................................................................34

*Overka v. Am. Airlines, Inc.*,
No. 08-10686-WGY, 2010 WL 517407 (D. Mass. Feb. 4, 2010) .........................43, 44

*Paffhausen v. Balano*,
708 A.2d 269 (Me. 1998).........................................................................................41

*Parkinson v. Hyundai Motor Am.*,
258 F.R.D. 580 (C.D. Cal. 2008).............................................................................29

*Pearson v. Philip Morris, Inc.*,
No. 0211-11819, 2006 WL 663004 (Or. Cir. Feb. 23, 2006) ......................................13

*Prata v. Superior Court*,
91 Cal. App. 4th 1128 (2001) ...................................................................................25

*Price v. Philip Morris, Inc.*,
848 N.E.2d 1 (Ill. 2005)............................................................................................37

vii

*Price v. Philip Morris, Inc.*,
No. 00-L-1122003, 2003 WL 22597608 (Ill. Cir. Ct. Mar. 21, 2003), *rev'd on federal preemption grounds by* 848 N.E.2d 1 (Ill. 2005)............................................6, 7, 13, 37

*Robinson v. Toyota Motor Credit Corp.*,
775 N.E.2d 951 (Ill. 2002)................................................................................36

*Schwartz v. Harp*,
108 F.R.D. 279 (C.D. Cal. 1985).......................................................................18

*Siegel v. Levy Org. Dev. Co.*,
607 N.E.2d 194 (Ill. 1992)................................................................................36

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003)...................................................................15, 23, 24

*Stewart v. Abraham*,
275 F.3d 220 (3d Cir. 2001)..............................................................................16

*Tardiff v. Knox County*,
365 F.3d 1 (1st Cir. 2004).................................................................................24

*The Firemen's Annuity and Benefit Fund v. The Municipal Employees', Officers, and Officials' Annuity and Benefit Fund*, 579 N.E.2d 1003 (Ill. App. Ct. 1991)........................40

*Ticconi v. Blue Shield of Cal. Life and Health Ins. Co.*,
160 Cal. App. 4th 528 (2008)............................................................................26

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009)...................................................................14, 15

*United States v. Philip Morris USA, Inc.*,
449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in part and rev'd in part*, 566 F.3d 1095 (D.C. Cir. 2009)....................................................passim

*Wells v. Allstate Ins. Co.*,
210 F.R.D. 1 (D.D.C. 2002)........................................................................33, 34

*Whiteley v. Philip Morris, Inc.*,
117 Cal. App. 4th 635 (2004) .......................................................................21, 22

*Vasquez v. Superior Court*,
4 Cal. 3d 800 (1971) ........................................................................................30

*Zekman v. Direct Am. Marketers, Inc.*,
695 N.E.2d 853 (Ill. 1998)................................................................................36

Statutes

18 U.S.C. §§ 1961-1968 ....................................................................................................14

28 U.S.C. §1407(a) ...........................................................................................................16

Fed. R. Civ. P. 23 ....................................................................................................... passim

Cal. Bus. & Prof. Code §§ 17200 *et seq.* .................................................................. passim

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ...........................................................8, 20, 25

Cal. Civ. Code §§ 1750 *et seq.*................................................8, 25, 27, 28, 29, 30, 31

D.C. Code §§ 28-3901 *et seq.* ...............................................10, 31, 32, 33, 34

805 ILCS §§ 505/1 *et seq.*.................................................11, 36, 37, 38, 39

Restatements and Treatises

7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,
Federal Practice and Procedure § 1763 (3d ed. 2005) ...........................................16, 17

1 Herbert B. Newberg and Alba Conte, *Newberg on Class Actions,* § 3-13 (3d ed. 1992).....17, 18

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, plaintiffs Leonardo Biundo, Stephanie Good, Aubrey Parsons, Alexander Slater, Lori Spellman, Allain Thibodeau, and Miles Tyrer (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through the undersigned counsel, respectfully submit this Motion for Class Certification and Incorporated Memorandum of Law, and in support thereof, state as follows:

## I.     INTRODUCTION

This MDL litigation concerns Plaintiffs' claims that Defendants marketed and promoted their "Light" and "Ultra-Light" branded cigarettes (hereinafter, "light cigarettes") as healthier to smoke than regular cigarettes, when in fact, Defendants have long known that their light cigarettes are not healthier to smoke than regular cigarettes, but rather, are actually more unhealthy and cancerous to smoke than regular cigarettes.[1] At the time of purchase, instead of receiving cigarettes that were "light" and healthier to smoke than regular cigarettes as Defendants represented, Plaintiffs and the other Class members received a fundamentally different and more harmful product:  cigarettes that when smoked as intended were actually more harmful and cancerous to smoke than regular cigarettes.

Plaintiffs seek certification of four classes, one for each state or district in which they reside:  California, the District of Columbia, Illinois, and Maine. Each Class will return to its transferor court at the completion of the MDL proceedings, with the exception of the Maine Class, which will remain before this Court for trial.

Plaintiffs' claims are well-suited for class action treatment. All claims sound in either consumer fraud or unjust enrichment, relate to a uniform set of conduct, and can be proven almost exclusively through the presentment of evidence that is common to all Class members. A

---

[1] As used herein, "Defendants" means Philip Morris USA Inc. (formerly Philip Morris Inc.) and Altria Group, Inc. (formerly Philip Morris Companies, Inc.).

1

class action is the only realistic mechanism to adjudicate the claims at issue, as the estimated

value of individual Class members' claims pales in comparison to the likely costs of litigating

this matter on an individual basis against Defendants—sophisticated, extraordinarily well-funded

corporations that reaped millions, if not billions, of dollars in profits from the schemes at issue.

Additionally, Plaintiffs seek disgorgement of the profits Defendants collected as a result of their

scheme to defraud consumers, the amount of which can be established through expert testimony.

## II.      STATEMENT OF FACTS

### A.      Factual Background

Defendants have manufactured, distributed, and sold cigarettes in the United States for

over a hundred years. Since the early 1970's, Defendants have manufactured, distributed, and

sold cigarettes branded as "Lights" and "Ultra-Lights." Defendants' light cigarette brands

include Marlboro Lights, Virginia Slims Lights, Parliament Lights, Merit Lights, Ultra Lights,

and Cambridge Lights.

In the 1950's, Defendants internally acknowledged that smoking caused disease and other

health hazards. *See United States v. Philip Morris USA, Inc.,* 449 F. Supp. 2d 1, 168 (D.D.C.

2006), *aff'd in part and rev'd in part*, 566 F.3d 1095 (D.C. Cir. 2009). In response, Defendants

spent over forty (40) years engaging in a coordinated, well-financed, and sophisticated public

relations campaign designed to attack and cast doubt on any scientific evidence determining that

there was a link between smoking and disease. *Id.* at 169-74. The cornerstone of this campaign

involved Defendants and other tobacco companies disseminating advertisements, publications,

and making public statements that denied the adverse health effects of smoking, while asserting

as an "open question" whether a link did in fact exist between smoking and disease. *Id.*[2]

---

[2] In its March 5, 2010 Order on Plaintiffs' Motion for Application of the Collateral Estoppel Doctrine [Doc. 178], the Court declined to adopt wholesale certain findings from *U.S. v. Philip Morris USA Inc.*¸ 449 F. Supp. 2d 1

Defendants conducted substantial research into the physiological impact of nicotine, how it operates within the human body, and how the physical and chemical design parameters of cigarettes influence the delivery of nicotine to smokers. *Philip Morris*, 449 F. Supp. 2d at 856-57. As a result of this research, Defendants internally recognized that smoking and nicotine were addictive and engineered their cigarettes to create and sustain this addiction. Defendants distorted the truth about the addictive nature of cigarettes, suppressed research revealing the addictiveness of nicotine, and denied their efforts to control nicotine levels and delivery. *See Id.* at 272 (noting that in a July 18, 1973 "60 Minutes" interview, Philip Morris Chairman James C. Bowling denied that cigarette smoking was an addiction and compared the choice to stop smoking to the choice to eat eggs or not); *id.* at 273 (noting that in the May 12, 1997 issue of Time magazine, then President and CEO of Philip Morris, James Morgan, was quoted from his deposition testimony as stating, "If [cigarettes] are behaviorally addictive or habit forming, they are much more like . . .  Gummi Bears, and I eat Gummi Bears, and I don't like it when I don't eat my Gummi Bears, but I'm certainly not addicted to them.") (citation omitted).

In the early 1970's, Defendants began using the brand descriptors "light" and "ultra-light." *Id.* at 430-31. These brand descriptors were intended to communicate reassuring messages that these were healthier cigarettes, and to suggest that smoking low tar cigarettes was an acceptable alternative to quitting. *Id.* at 475-81. In an increasingly health conscious era, Defendants marketed their light cigarettes to consumers with the intent that consumers rely upon their implicit and explicit representations that when smoked as intended, their light cigarettes

---

(D.D.C. 2006). In so doing, the Court acknowledged that, actions such as *U.S. v. Philip Morris USA Inc.*, 449 F. Supp. 2d (D.D.C. 2006), and the Supreme Court's decision in *Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008), which describes in detail the complex regulatory history of light cigarettes, "may reflect upon the Defendants' action within the [class] period." Order at 13 n.14, 16. The Court need not accept these fact findings and descriptions on the merits in order to decide on this class certification motion that they detail and describe important questions of fact and law that are common to the Class and susceptible of class-wide proof.

were healthier to smoke than regular cigarettes, and would result in the consumption of less tar and nicotine. *Id.* In addition to labeling their cigarettes as "light" and "ultra-light," Defendants used sophisticated marketing imagery such as lighter color cigarette packaging and white tipping paper, to reinforce the message that their light cigarettes were healthier to smoke than regular cigarettes of the same brand. *Id.* at 860. By making these claims and creating these impressions, Defendants intended to give health conscious smokers an acceptable alternative to quitting smoking, as well as an excuse for not quitting. *Id.* at 475-81. Defendants' representations were the primary—and for many years the only—source of information available to consumers regarding light cigarettes that Defendants' made, marketed, and sold.

Additionally, evidence establishes that Defendants deceived and misled the Federal Trade Commission ("FTC") and public health authorities—the only other possible sources of information about light cigarettes. In the early 1970's, the FTC developed a machine to measure tar and nicotine levels, commonly referred to as the "FTC method." At all relevant times, Defendants were aware that the FTC method did not accurately measure the amounts of nicotine and tar which smokers actually ingested. Defendants' internal documents illustrate their understanding that, in order to obtain an amount of nicotine sufficient to satisfy a smoker's addiction, smokers of their light cigarettes would modify their smoking behavior to compensate for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with their fingers or lips, and/or smoking more cigarettes. 449 F. Supp. 2d at 461-67. Defendants recognized that, as a result of this nicotine-driven smoker behavior, many smokers of their light cigarettes would actually boost their intake of tar, thus negating the reason smokers and potential smokers were

4

choosing to smoke light cigarettes as opposed to regular cigarettes—less harmful health effects.

*Id.*

At all relevant times, Defendants were aware that their light cigarettes were not healthier

to smoke than regular cigarettes, and would not result in consumers inhaling less tar and nicotine

than regular cigarettes of the same brand. *Id.* at 861. Recent studies, including the National

Cancer Institute's Monograph 13, *Risks Associated With Smoking Cigarettes With Low Machine*

*Measured Yields of Tar and Nicotine* ("Monograph 13"), and the 2004 Surgeon General's

Report, have confirmed that low tar and filtered cigarettes are no less harmful than regular.

Monograph 13 concluded:

> Epidemiological and other scientific evidence, including patterns of mortality
> from smoking-caused diseases, does not indicate a benefit to the public health
> from changes in cigarette design and manufacturing over the last fifty years . . . .
> Widespread adoption of lower yield cigarettes in the United States has not
> prevented the sustained increase in lung cancer among older smokers . . . .
> Considering the overall exposure data for individuals selecting their own brands,
> there is little reason to expect that smokers of low yield cigarettes will have a
> lower risk of disease than those who smoked higher yield cigarettes.

*See* 449 F. Supp. 2d at 446-47.

Despite the fact that tar deliveries, as measured by the FTC Method, decreased by more

than two-thirds between 1954 and 1994, lung cancer in smokers actually increased. *Id.* at 439.

An article published by the National Cancer Institute stated that "light cigarettes trick the

smoking machine" in the following ways:

  a. Tobacco companies designed light cigarettes with tiny pinholes on the filters.
     These "filter vents" dilute cigarette smoke with air when light cigarettes are
     "puffed" on by smoking machines, causing the machines to measure artificially
     low tar and nicotine levels.

  b. Many smokers do not know that their cigarette filters have vent holes. The filter
     vents are uncovered when cigarettes are smoked on smoking machines. However,
     filter vents are placed just millimeters from where smokers put their lips or

5

fingers when smoking. As a result, many smokers block the vent – which actually turns the light cigarette into a regular cigarette.

c. Some cigarette makers increased the length of the paper wrap covering the outside of the cigarette filter, which decreases the number of puffs that occur during the machine test. Although tobacco under the wrap is still available to the smoker, this tobacco is not burned during the machine test. The result is that the machine test measures less tar and nicotine levels than is available to the smoker.

d. Because smokers, unlike machines, crave nicotine, they may inhale more deeply; take larger, more rapid, or more frequent puffs; or smoke a few extra cigarettes each day to get enough nicotine to satisfy their craving. This is called "compensating," and it means that smokers end up inhaling far more tar, nicotine, and other harmful chemicals than the machine-based numbers suggest.

*The Truth About "Light" Cigarettes: Questions and Answers, National Cancer Institute,*

available at http://www.cancer.gov/cancertopics/factsheet/Tobacco/light-cigarettes (last visited

March 29, 2010).

Substantial evidence supports that Defendants' light cigarettes are less healthy to smoke than regular cigarettes of the same brand. *See* 449 F. Supp. 2d at 456 (quoting a former Philip Morris employee stating that "Philip Morris's Marlboro Lights cigarettes are, as designed, more mutagenic than Marlboro full-flavor cigarettes"); *id.* at 457 (noting that another former Philip Morris employee acknowledged that the increased filter dilution is associated with increased biological activity, such as "tumor growth, cell mutations, and toxic reactions"); *id.* (stating that a May 11, 1982 Philip Morris document recognized that Defendants' light cigarettes registered higher in standard biological tests than regular cigarettes, and thus, were more likely to cause cancer); *id.* (noting that a January 28, 1994 Philip Morris document stated that increased cigarette filtration, porosity, and ventilation—the primary methods used by Philip Morris to reduce the FTC Method tar and nicotine yield of its cigarettes—would result in an increase in the degree to which cigarette smoke was toxic to living cells, the irritation it caused to smokers, and the likelihood that the smoke would generate mutations such as tumors and or cancer); *Price v.*

*Philip Morris Inc.*, No. 00-L-1122003, 2003 WL 22597608, at *12 (Ill. Cir. Ct. Mar. 21, 2003)

("The evidence at trial demonstrates not only that Marlboro Lights and Cambridge Lights are just

as harmful as their regular counterparts, but that these products are actually more harmful and

more hazardous than their regular counterparts."), *rev'd on federal preemption grounds by* 848

N.E.2d 1 (Ill. 2005).

### B.   Plaintiffs and the Proposed Classes

#### 1.   The California Class

Plaintiff Miles Tyrer ("Plaintiff Tyrer") is an individual consumer who resides in San

Diego County, California. Tyrer SAC[3] ¶ 6. Plaintiff Tyrer filed suit in the Southern District of

California on January 13, 2009. Plaintiff Tyrer brought this suit on behalf of himself and:

> All persons residing in the State of California who purchased for personal use and
> not for resale Defendants' cigarettes that are labeled "Light" and/or "Ultra Light"
> and/or purport to have lower tar and nicotine than conventional, full flavor
> cigarettes ("Light Cigarettes"), during the Class Period[4], through the present.[5]

Since 2002, Plaintiff Tyrer has regularly purchased and smoked Marlboro Lights cigarettes,

which are manufactured, marketed, and promoted by Defendants. Tyrer SAC ¶ 6; Tyrer Dep. at

10:18-25, the relevant portions of which are attached hereto as Exhibit A. Prior to smoking

Marlboro Lights, Plaintiff Tyrer smoked regular cigarettes for two or three years. Tyrer Dep. at

11:1-7. Since prior to 2002 and until recently, as the result of seeing and believing Defendants'

advertising and promotions of their light cigarettes, Plaintiff Tyrer believed that Defendants'

light cigarettes were healthier to smoke than regular cigarettes, and that smoking them would

result in his receiving less tar and nicotine, thereby making it easier for him to quit. *Id.* at 51:4-7,

---

[3] As used herein, the term "SAC" means Second Amended Complaint, and the term "FAC" means First Amended Complaint.
[4] The Class Period for Plaintiff Tyrer's Unfair Competition Law claims is January 13, 2005 to the present, and the Class Period for his Consumer Legal Remedies Act claims is January 13, 2006 through certification. *See* Tyrer SAC ¶ 102.
[5] Excluded from the California Class are Defendants' officers, directors, employees and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of Light Cigarettes.

13-18; 56:22-24; 60:20-21; 106:22-25; 107-10-16. Plaintiff Tyrer would not have begun

purchasing or smoking Marlboro Lights had he not believed that Defendants' light cigarettes

were healthier to smoke than regular cigarettes. Tyrer SAC ¶¶ 95-96; Tyrer Dep. at 87-89. In

purchasing Defendants' light cigarettes, Plaintiff Tyrer did not receive what he paid for:  a

cigarette that was healthier for him to smoke, and which would result in his receiving less tar and

nicotine than full-flavored cigarettes. Tyrer SAC ¶¶ 95-96; Tyrer Dep. at 150:9-14.

Plaintiff Tyrer alleges that Defendants engaged in deceptive, unlawful and unfair

business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* (the "UCL"), Cal. Bus.

& Prof. Code §§ 17500 *et seq.* (the "FAL"), and Cal. Civ. Code §§ 1750 *et seq.* (the "CLRA").

### 2.    The District of Columbia Class

Plaintiffs Aubrey Parsons ("Parsons") and Alex Slater ("Slater") (collectively, the "D.C.

Plaintiffs") are residents of the District of Columbia. The D.C. Plaintiffs seek to represent a Class

comprised of:

> All District of Columbia residents who from January 1, 2000, to the present,
> purchased, not for resale, Philip Morris USA Inc.'s and Altria Group Inc.'s
> cigarettes labeled as "Light," or "Ultra-Light."[6]

Plaintiff Slater began smoking Marlboro Reds in 1994. In 1995, Slater switched to

Defendants' light cigarettes due in part to his belief that smoking Defendants' light cigarettes

would make it easier for him to quit smoking. Slater Dep. at 34:10-14; 59:11-14, the relevant

portions of which are attached hereto as Exhibit B. From 1995 to 2004, Slater purchased and

smoked Defendants' light cigarettes on a daily basis. *Id.* at 34:4-14, 35:7-9. From 2004 to the

present, Plaintiff Slater purchased and smoked a pack of Defendants' light cigarettes

approximately once every three weeks. *Id.* at 36:5-12. From 1995 until approximately 2006, as

---

[6] The D.C. Class excludes all federal, state, and local governmental entities, and Philip Morris USA Inc.'s and Altria Group Inc.'s directors, officers, parent corporations, subsidiaries, and affiliates.

the result of seeing and believing Defendants' labeling and advertising of their light cigarettes as "light" and as healthier to smoke than regular cigarettes, Plaintiff Slater believed that Defendants' light cigarettes were healthier to smoke than regular cigarettes, and that smoking them would improve his chances of quitting smoking. *Id.* at 56:2-5, 14-22; 57:1-2, 16-20; 58:14-22; 59:1-3. Plaintiff Slater would not have purchased and begun smoking Defendants' light cigarettes but for Defendants' misrepresentations and omissions. Slater FAC ¶ 46; Slater Dep. at 22-23, 56-58, 62, 93. In purchasing Defendants' Light Cigarettes, Plaintiff Slater did not receive what he paid for:  a cigarette that was healthier for him to smoke than regular cigarettes, and which would result in his receiving less tar and nicotine than full-flavored cigarettes, thereby making it easier for him to quit smoking. Slater FAC ¶¶ 49-55; Slater Dep. at 23, 59, 83:18-84:2, 84:13-19.

Plaintiff Parsons began smoking regularly in 1998. For approximately two years, he purchased and smoked Camel regulars. Parsons Dep. at 33:11, the relevant portions of which are attached hereto as Exhibit C. In 2000, upset about being addicted to cigarettes, Plaintiff Parsons attempted to quit smoking. *Id.* at 34:5-10. After using nicotine gum and a nicotine inhaler, and as a result of seeing and believing Defendants' advertisements and promotions that their light cigarettes were safer and healthier to smoke than regular cigarettes, Plaintiff Parsons switched to Parliament Lights because he thought they were healthier to smoke than regular cigarettes. *Id.* at 34:7-12, 21-22; 35:1-4. At all times relevant, Plaintiff Parsons smoked and continues to smoke Defendants' Parliament "Light" cigarettes. Parsons FAC ¶ 38.  Plaintiff Parsons would not have purchased or begun smoking Defendants' light cigarettes but for Defendants' misrepresentations and omissions. Parsons FAC ¶ 46; Parsons Dep. at 9, 13, 38, 42-43, 48:19-22, 97. In purchasing Defendants' light cigarettes, Mr. Parsons did not receive what he paid for: a cigarette that was

healthier for him to smoke, and which would result in his receiving less tar and nicotine than full-flavored cigarettes. Parsons FAC ¶¶ 49-55; Parsons Dep. at 63-64, 98, 100.  The D.C. Plaintiffs were injured by purchasing Defendants' "Light" and "Ultra-light" cigarettes that were not as advertised, and were damaged "by an amount not less than the purchase price of Defendants' light cigarettes or portion thereof."  *See* Slater FAC ¶¶ 8, 38, 45, 48; Parsons FAC ¶¶ 8, 38, 45, 48.

The D.C. Plaintiffs allege that Defendants violated the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, and were unjustly enriched.

### 3.     The Illinois Class

Plaintiff Leonard Biundo ("Plaintiff Biundo") resides in Cook County, Illinois. Biundo SAC ¶ 4. From 1992 until early 2005, Plaintiff Biundo smoked Marlboro Reds. Buindo Dep. at 19:5-11, the relevant portions of which are attached hereto as Exhibit D. In early 2005, after seeing and relying upon Defendants' advertisements and promotions that their light cigarettes were healthier to smoke than regular cigarettes of the same brand, Plaintiff Biundo switched to Marlboro Lights because he believed that they were healthier to smoke than Marlboro Reds and would help him quit smoking. *See e.g., id.* at 41:6, 16-18; 44:2-7, 23-24; 45:1-5; 52:10-23; 88:8-24; 89:1-10. Plaintiff Buindo would never have begun purchasing Defendants' light cigarettes if not for Defendants' representations that their light cigarettes were "light" and healthier to smoke than regular cigarettes. In early 2009, Plaintiff Biundo stopped smoking Marlboro Lights after learning that they were not healthier to smoke than regular cigarettes of the same brand. *Id.* at 16:18-24; 17:1-4. Plaintiff Biundo brought suit against Defendants as the result of being defrauded, as he did not receive what he paid for when purchasing Defendants' light cigarettes: cigarettes that were "light" and healthier to smoke than regular cigarettes of the same brand, and

10

which would result in the inhalation of less tar and nicotine. *Id.* at 166:22-24. Plaintiff Buindo

seeks to represent an Illinois Class that includes:

> All Illinois residents who, from January 1, 2005, to the date of class certification, purchased, not for resale, Defendants' cigarettes labeled as "Light," or "Ultra-Light."[7]

Plaintiff Biundo alleges that Defendants' conduct violated the Illinois Consumer Fraud

and Deceptive Business Practices Act, 805 ILCS §§ 505/1 *et seq.*, and that Defendants were

unjustly enriched.

### 4.     The Maine Class

Plaintiffs Stephanie Good ("Good"), Lori Spellman ("Spellman"), and Allain Thibodeau

("Thibodeau") (collectively, the "Maine Plaintiffs") are Maine residents seeking certification of

the following Maine Class:

> All persons residing in the State of Maine who purchased for personal use Defendants' cigarettes labeled as "Light," or "Ultra-Light" ("Light Cigarettes"), during the Class Period[8], through the present.[9]

Good SAC ¶ 39. The Maine Plaintiffs allege that Defendants were unjustly enriched.[10]

At all times relevant herein, Plaintiff Good smoked and continues to smoke Marlboro

Lights, which are manufactured, marketed, and promoted by Defendants. Good SAC ¶ 7; Good

Dep. at 20:19-24; 24:7-9; 47:4-7, 13-15;  the relevant portions of which are attached hereto as

Exhibit E. Plaintiff Good saw and believed Defendants' representations that their light cigarettes

were healthier to smoke than regular cigarettes of the same brand, and would result in the

inhalation of less tar and nicotine. Good Dep. at 21:10-18; 72:1-14; 97:2-7; 121:13-18; 123:12-

---

[7] The Illinois Class excludes all federal, state, and local governmental entities, and Philip Morris USA, Inc.'s, and Altria Group, Inc.'s, directors, officers, parent corporations, subsidiaries, and affiliates. The Class seeks economic damages stemming from their purchases of Defendants' light cigarettes. The Class does not seek recovery in this case for any past, current, or future personal injury or healthcare claims.

[8] The Class Period extends six (6) years prior to the filing of the Complaint on August 12, 2005. Good SAC ¶ 40.

[9] Excluded from the Maine Class are Defendants, their subsidiaries and affiliates. Also excluded is any judge who may preside over this case. Good SAC ¶ 39.

[10] Maine Plaintiffs are not pursuing certification of their UTPA claims.

17; 141:17-24. Plaintiff Good's belief that Defendants' light cigarettes were healthier to smoke than regular cigarettes was a factor in her purchasing Defendants' light cigarettes. Good SAC ¶¶ 2-3; Good Dep. at 141:25-142:1-12. In purchasing Defendants' light cigarettes, Plaintiff Good did not receive what she paid for: a cigarette that was healthier for her to smoke, and which would result in receiving less tar and nicotine than regular cigarettes. Good SAC ¶ 3; Good Dep. at 109:3-7

At all times relevant herein, Plaintiff Spellman smoked and continues to smoke Defendants' Marlboro Lights cigarettes. Good SAC ¶ 8; Spellman Dep. at 21:15-18, the relevant portions of which are attached hereto as Exhibit F. Plaintiff Spellman saw and believed Defendants' advertisements and promotions that light cigarettes are healthier to smoke than regular cigarettes. Spellman Dep. 94:22-25. Plaintiff Spellman purchased Defendants' light cigarettes for the first time because she thought they were less unhealthy than regular cigarettes. Spellman Dep. at 87:18-19; 89:6-8. Plaintiff Spellman would not have purchased and begun smoking Marlboro Light Cigarettes but for Defendants' misrepresentations and omissions. Good SAC ¶¶ 2-3. In purchasing Defendants' Light Cigarettes, Plaintiff Spellman did not receive what she paid for:  a cigarette that was healthier for her to smoke, and which would result in her receiving less tar and nicotine than full-flavored cigarettes. Good SAC ¶ 3; Spellman Dep. at 142:2-3; 144:22-25.

At all times relevant herein, Plaintiff Thibodeau smoked and continues to smoke Marlboro "Light" cigarettes, which are manufactured, marketed, and promoted by Defendants. Good SAC ¶ 9; Thibodeau Dep. at 32:21-25, the relevant portions of which are attached hereto as Exhibit G. Mr. Thibodeau saw and believed Defendants' representations, promotions, and advertisements that their light cigarettes were light and healthier to smoke than regular cigarettes. Thibodeau

Dep. at 17:19-23; 18:3-11; 19:16-20; 23:12-17; 33:3-13; 48:3-5. Mr. Thibodeau continued to purchase and smoke Defendants' Marlboro Light Cigarettes because he thought that they were less unhealthy to smoke than regular cigarettes. Good SAC ¶¶ 2-3. Mr. Thibodeau alleges that Defendants' representations are false, and that Defendants' light cigarettes are not healthier to smoke than regular cigarettes, but rather, are more unhealthy to smoke than regular cigarettes. Thibodeau Dep. at 23:12-13. When purchasing Defendants' light cigarettes, Plaintiff Thibodeau did not receive what he paid for:  a cigarette that was healthier for him to smoke, and which would result in his receiving less tar and nicotine than full-flavored cigarettes. Good SAC ¶ 3.

### C.    Prior Light Cigarettes Actions

Several consumer class actions have been instituted against Defendants relating to their marketing and sale of light cigarettes. *See Aspinall v. Philip Morris Cos.,* 813 N.E.2d 476 (Mass. 2004) (approving class certification; defendants' common course of conduct predominated over variations in damages; "pragmatically, [a class action] is the only method whereby purchasers of ["light" cigarettes] can seek redress for the alleged deception"); *Curtis v. Philip Morris Cos.,* No. PI 01-018042, 2004 WL 2776228, at *4 (D. Minn. Nov. 29, 2004) (granting class certification); *Craft v. Philip Morris Cos.,* 190 S.W.3d 368 (Mo. App. Ct. 2005) (same); *Price v. Philip Morris Inc.*, No. 00-L-112, 2003 WL 22597608 (Ill. Cir. Ct. Mar. 21, 2003) (granting certification of ICFA Unfair Practices claim and entering judgment in favor of the plaintiffs and the class), *rev'd on federal preemption grounds by* 848 N.E.2d 1 ( Ill. 2005); *but see Davies v. Philip Morris USA Inc.,* No. 04-2-08174-2, 2006 WL 1600067, at *3 (Wash. Sup. May 26, 2006) (finding that individual causation questions predominated over common questions of defendants' conduct); *Pearson v. Philip Morris, Inc.,* No. 0211-11819, 2006 WL 663004, at *7, 10 (Or. Cir. Feb. 23, 2006) (placing burden on each plaintiff to demonstrate that he or she was not receiving less tar;

13

individual questions predominated because plaintiffs did not present any evidence purporting to prove reliance and causation on class-wide basis).

In *United States v. Philip Morris USA, Inc.*, nine cigarettes manufacturers, including Defendants, and two tobacco related trade organizations, were found to be in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. 449 F. Supp. 2d 1 (2005). The court found that Defendants had engaged in a scheme to defraud smokers and potential smokers by, *inter alia*:

> (1) falsely denying the adverse health effects of smoking; (2) falsely denying that nicotine and smoking are addictive; (3) falsely denying that they manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction; (4) falsely representing that light and low tar cigarettes deliver less nicotine and tar and therefore present fewer health risks than full flavor cigarettes; (5) falsely denying that they marketed to youth; (6) falsely denying that secondhand smoking causes disease; and (7) suppressing documents, information, and research to prevent the public from learning the truth about these subjects and to avoid or limit liability in litigation.

*U.S. v. Philip Morris USA Inc.,* 566 F.3d 1095, 1108 (D.C. Cir. 2009) (citations omitted) (summarizing the holding of the district court).

The district court held that the defendants, including Defendants herein, had "engaged in massive, sustained, and highly sophisticated marketing and promotional campaigns to portray their light brands as less harmful than regular cigarettes." 449 F. Supp. 2d at 860. In addition to misleading brand descriptors such as "light" and "low tar," the court found that Defendants' public statements regarding light cigarettes were "blatantly false." *Id.* at 861. The court found that Defendants had known for decades that these claims were false and misleading. *Id.*

In the court's own words:

> [The case was about] an industry, and in particular these Defendants, that survives, and profits, from selling a highly addictive product which causes diseases that lead to a staggering number of deaths per year, an immeasurable amount of human suffering and economic loss, and a profound burden on our

14

national health care system. Defendants have known many of these facts for at least 50 years or more. Despite that knowledge, they have consistently, repeatedly, and with enormous skill and sophistication, denied these facts to the public, to the Government, and to the public health community. Moreover, in order to sustain the economic viability of their companies, Defendants have denied that they marketed and advertised their products to children under the age of eighteen and to young people between the ages of eighteen and twenty-one in order to ensure an adequate supply of "replacement smokers," as older ones fall by the wayside through death, illness, or cessation of smoking. In short, Defendants have marketed and sold their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted.

*Id.* at 28. In *United States v. Philip Morris USA Inc.*, the D.C. Circuit Court of Appeals affirmed the lower court's decision with respect to Defendants' liability. 556 F.3d 1095 (D.C. Cir. 2009).

## III.   ARGUMENT

### A.   Certification of Each Class is Appropriate

To obtain class certification, a party must establish the four requirements of Rule 23(a). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). The party must also establish the requirements of either Rule 23(b)(1), (2), or (3). *Id.* "The class certification prerequisites should be construed in light of the underlying objectives of class actions." *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003). "When a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class." *Little Caesar Enter., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D. Mich. 1997).

As illustrated below, each Class satisfies the requirements of Rule 23(a). All Class members' claims can be proven almost exclusively by evidence common to all Class members. The key liability issues involving Defendants' knowledge and conduct, the materiality of their misrepresentations and omissions, and the magnitude of Defendants' profits from their sales and marketing conduct, are entirely common, and thus, common issues of law and fact predominate over any potential individual issues. Additionally, the superiority requirement of Rule 23(b)(3)

15

and the purpose of class actions support that certification of each Class is appropriate, as the

claims of the individual Class members are small when compared to the likely expenses of

litigating this matter, and a class action the only realistic mechanism to adjudicate their claims.

As such, certification of each Class is appropriate.[11]

### B.     The Requirements of Rule 23(a) are Satisfied

Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is

impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class; and (4)

the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ.

P. 23(a).

#### 1.     Rule 23(a)'s Numerosity Requirement is Satisfied

Each Class is estimated to include thousands of members. Thus, each of the Classes is

"so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As such,

the numerosity requirement of Rule 23(a)(1) is easily satisfied with respect to each Class. *See*

*Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (citing *Stewart v. Abraham,* 275

F.3d 220, 226-27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a

suit as a class action, but generally if the named plaintiff demonstrates that the potential number

of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.") (citations omitted).

#### 2.     Rule 23(a)'s Commonality Requirement is Satisfied

Rule 23 requires that there be questions of law or fact common to the class. Rule 23(a)'s

requirement of commonality is a low bar, and courts have generally given it a "permissive

---

[11] In an MDL such as this one, absent the agreement of the parties for trial of transferred actions in the transferee forum (the so-called "*Lexecon* waiver") the underlying actions will be transferred back to the districts in which they were originally brought for trial. *See* 28 U.S.C. §1407(a); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 32 (1998) (holding MDL judge cannot ordinarily "self-transfer" unresolved MDL cases to herself for trial); *Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613, 615-16 (7th Cir. 2009) (presumption that case is remanded back to transferor court).

16

application." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d at 18-19

(quoting 7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and*

*Procedure* § 1763, at 221 (3d ed. 2005)).

Questions of law and fact common to each member of the proposed Classes exist, and

include, *inter alia*:

a.    Whether Defendants' light cigarettes were not healthier to smoke than regular cigarettes;

b.    Whether Defendants intended to mislead the public about the relative risk of their light cigarettes as compared to regular cigarettes;

c.    Whether Defendants knew that their light cigarettes were not less harmful than their regular cigarette counterparts (and when they knew it);

d.    Whether Defendants intentionally designed their light cigarettes to enable smokers to compensate;

e.    Whether Defendants misleadingly portrayed their light cigarettes as less harmful than their regular cigarette counterparts;  and

f.    Whether members of the Classes suffered damage and/or Defendants were unjustly enriched as the result of Defendants misrepresenting the qualities and attributes of their light cigarettes, and if so, what the proper measure of said damages and/or disgorgement is for each Class.

As such, the commonality requirement of Rule 23 is satisfied for each Class.

### 3.    Each Plaintiffs' Claims are Typical of the Class They Seek to Represent

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be]

typical of the claims or defenses of the class."

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

17

1 Herbert B. Newberg and Alba Conte, *Newberg on Class Actions,* § 3-13, at 3-75, 76 (3d ed.

1992) (internal quotations omitted). Generally, the class representative "must be part of the class

and possess the same interest and suffer the same injury as the class members." *Gen Tel. Co. of*

*Sw. v. Falcon*, 457 U.S. 147, 156 (1982). The typicality requirement is met where plaintiffs show

that their "injuries arise from the same events or course of conduct as do the injuries of the class,

and that [their] legal claims are based on the same legal theory as those of the class." *In re*

*Boston Scientific Corp. Secs. Litig.*, 604 F. Supp. 2d 275, 282 (D. Mass. 2009) (certifying class)

(quoting *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 311 (3d Cir. 1998)). "The

typicality requirement does not mandate that the products purchased, methods of purchase, or

even damages of the named plaintiffs must be the same as those of the absent class members."

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108

F.R.D. 279, 282 (C.D. Cal. 1985)). "Under the rule's permissive standards, representative claims

are 'tyipcal' if they are reasonably co-extensive with those of absent class members; they need

not be substantially identical." *Hanon*, 150 F.3d at 1020.

All Class members' claims arise from the same course of standardized conduct:

Defendants' uniform practice of misrepresenting their light cigarettes as healthier to smoke than

regular cigarettes of the same brand. Plaintiffs and all other Class members purchased

Defendants' light cigarettes and, contrary to Defendants' representations, did not receive light

cigarettes that were healthier to smoke than regular cigarettes. To the contrary, all Class

members received a carefully designed and deceptively marketed product that is more harmful

and cancerous to smoke than regular cigarettes. At some point, the ingredients of an item are so

inconsistent with its marketed image that the image is a mirage, and that what is being sold is not

the product held out for sale—this point was far surpassed in this case. *See, e.g., Aspinall v.*

18

*Philip Morris Co., Inc.*, 813 N.E.2d 476, 486 (Mass. 2004) ("The plaintiffs are similarly situated to other consumers of Marlboro Lights, and, because the injury claimed is an economic, and not a personal injury, all have been similarly injured."); *Mulford v. Altria Group, Inc.*, 242 F.R.D. 615, 623 (D.N.M. 2007) ("Defendants' alleged false representations regarding Marlboro Lights were made in the identical manner to Plaintiffs and other members of the proposed class of Marlboro Lights purchasers. Thus, Plaintiffs are similarly situated to other consumers of Marlboro Lights and the interests of the class representatives align with the interests of that class").

### 4.   Rule 23(a)'s Adequacy Requirement is Satisfied

Rule 23(a)(4)'s adequacy requirement is satisfied where: (1) the interests of the named plaintiff "will not conflict with the interests of the class members" and (2) the named plaintiff's counsel "is qualified, experienced and able to vigorously conduct the proposed litigation." *In re Boston Scientific Corp. Secs. Litig.*, 604 F. Supp. 2d at 282 (citing *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir. 1985)); *see also Curtis v. Comm'r Me. Dep't. of Human Servs.,* 159 F.R.D. 339, 341 (D. Me. 1994) (finding adequacy where named representative and class members share the same alleged legal injury). No Plaintiffs' interests will conflict with that of the Class members they seek to represent. Also, Plaintiffs' counsel are well-qualified, have substantial experience litigating consumer class actions, and are able to vigorously conduct the proposed litigation.

### a.   *Plaintiffs are Adequate Class Representatives*

No Plaintiffs' interests are antagonistic to that of the Class they seek to represent. *See* Fed. R. Civ. P. 23(a)(4). Plaintiffs' claims are the same of the Class members they seek to represent, and arise from the same course of conduct as the other Class members. Plaintiffs each

testified and declared their wish to serve as class representatives.[12] Also, each Plaintiff is actively

involved in this litigation, as they each participated and reviewed in the drafting of complaints,

and appeared for their depositions, wherein each demonstrated substantial knowledge of this

case.[13] Altogether, Plaintiffs are adequate class representatives.

> **b.** ***Plaintiff Tyrer Satisfies the UCL's and FAL's Class Representative Standing Requirements***

California's UCL is an essentially equitable claim that provides restitutionary relief to

consumers through the disgorgement of Defendants' unjust enrichment, e.g., unfair profits.  The

California Supreme Court has emphasized the importance of UCL actions "in the enforcement of

consumers' rights." *Kraus v. Trinity Mgmt. Servs., Inc.*, 999 P.2d 718, 724-25 (Cal. 2000)

(quoted by *In re Tobacco II* Cases, 207 P.3d 23, 30 (Cal. 2009)).

California's UCL and FAL include a unique class representative standing requirement

not found in the other jurisdictions at bar. To have standing to bring a class action under the UCL

or FAL, a representative plaintiff must show that he or she has "suffered injury in fact and has

lost money or property as a result of the unfair competition." *In re Tobacco II Cases*, 207 P.3d

23, 39-40 (Cal. 2009) (quoting Cal. Bus. & Prof. Code § 17204). Plaintiff Tyler satisfies this

requirement.

To have standing to bring a class action under the fraud prong of the UCL, a plaintiff

must establish that he relied upon a defendant's misrepresentation or nondisclosure, which was

"an immediate cause" of the plaintiff's injury-producing conduct. *In re Tobacco II Cases*, 207

P.3d 23, 39-40 (Cal. 2009). To satisfy the "immediate cause" requirement, a plaintiff is not

required to allege that the injury-causing conduct was the sole or even the decisive cause of the

---

[12] *See* Buindo Dep. at 174:2-17; Good Dep. at 112:13-24, 113:1-24, 114:1-4; Parsons Dep. at 131:13-22, 132:1-8; Spellman Dep. at 147:3-25, 148:1-23; Thibodeau Dep. at 77:15-25, 78:1-9; Tyrer Dep. at 5:7-9, 15:7-10.
[13] *See* Buindo Dep. at 156:7-24; Good Dep. at 18:1-24, 19:1, 96:16-25, 108:9-25; Parsons Dep. at 131:1-5; Slater Dep. at 14:21-22; 15:1-2; Spellman Dep. at 19:11-25, 20:13-25; Thibodeau Dep. at 14:1-24; 15:1; Tyrer Dep. at 15:11-23, 171:19-25, 172:1-25.

injury-causing conduct; it is enough that the representation played a substantial part, and so had been a substantial factor, in influencing his decision. *Id.* Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. *Id.* at 39. A misrepresentation is judged to be "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* (quotation omitted). Additionally, where, as here, Plaintiff Tyrer alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on any particular advertisements or statements. *Id.* at 40. An allegation of reliance is not defeated merely because there was alternative information available to a plaintiff. *Id.*

The *Tobacco II* court specifically relied upon *Boeken v. Philip Morris, Inc.*, 127 Cal. App. 4th 1640 (2005), and *Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635 (2004); a pair of personal injury tobacco cases in delineating the scope of the UCL's reliance requirement. *Id.* at 40-41. In both *Boeken v. Philip Morris, Inc.* and *Whiteley v. Philip Morris, Inc.,* evidence was admitted to prove the decades-long campaign of the tobacco industry to conceal the health risks of its product while minimizing the growing consensus regarding the link between cigarette smoking and lung cancer and, simultaneously, engaging in "saturation advertising targeting adolescents, the age group from which new smokers must come." *Boeken v. Philip Morris, Inc.*, 127 Cal. 4th 1640 (2005); *Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635 (2004). In each case, the "plaintiffs testified that their decision to begin smoking was influenced and reinforced by cigarette advertising, though neither could point to specific advertisements," and that "despite awareness of the controversy surrounding smoking, he or she believed the tobacco industry's assurances that there was no definitive connection between cigarette smoking and

various diseases." *Boeken*, 127 Cal. App. 4th at 1662-65; *Whiteley*, 117 Cal. App. 4th at 679. In each case, the court held that the plaintiff had relied upon the defendant's false statements, and rejected the defendants' argument that the evidence was insufficient to support the judgments because the plaintiffs had failed to prove they heard and had relied on specific misrepresentations about the health hazards of cigarette smoking. *Boeken*, 127 Cal. App. 4th at 1664-67 (concluding there was substantial evidence that Boeken began to smoke "for reasons that track Philip Morris's advertising of the time" notwithstanding his inability to recall specific advertisements, that he relied on the defendant's false statements regarding the health risks of cigarette smoking notwithstanding his awareness of contrary statements, and that his reliance was justified); *Whiteley,* 117 Cal. App. 4th at 679 (concluding that evidence supported the conclusion that Whiteley justifiably relied on the defendant's "false assurances and denials" regarding the hazard of smoking").

Plaintiff Tyrer satisfies the UCL's class representative reliance requirement. Plaintiff Tyrer alleges that Defendants engaged in a decades-long advertising campaign through which it misrepresented that their light cigarettes were healthier and less harmful to smoke than regular cigarettes. Tyrer SAC at ¶¶ 52-53. Plaintiff Tyrer saw and relied on Defendants' false representations, promotions, and advertisements that their light cigarettes were healthier to smoke than regular cigarettes. Tyrer SAC at ¶ 95. Defendants' misrepresentations and omissions were material in that they concern the actual nature and health risks associated with Defendants' light cigarettes, and because Plaintiff Tyrer would not have begun purchasing Defendants' light cigarettes had he known that they were not healthier to smoke than regular cigarettes. Tyrer SAC ¶¶ 120, 160, 178. Plaintiff Tyrer was harmed when purchasing Defendants' light cigarettes because he did not receive what he paid for:  a cigarette that was healthier and less-harmful to

22

smoke than regular cigarettes. Tyrer SAC ¶72; Tyrer Dep. at 150:9.

> **c.** ***Plaintiffs' Counsel are Qualified, Experienced, and Able to Vigorously Conduct the Proposed Litigation***

Plaintiffs have retained highly capable and experienced counsel. Plaintiffs' counsel have successfully prosecuted numerous consumer class action cases, and are capable of, and committed to, prosecuting this action vigorously on behalf of the Classes. *See* Biographical Statements and Curriculum Vitae of Plaintiffs' Executive Committee [Doc. 17]. Accordingly, Plaintiffs and their counsel satisfy the adequacy requirement.

## C.   The Requirements of Rule 23(b)(3) are Satisfied

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members of the class, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3)'s predominance and superiority requirements were added "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amendment). "The core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003). Thus, classes of consumers are "especially likely to satisfy the predominance requirement." *Id.* (citing *Amchem Prods. Inc.*, 521 U.S. at 625).

### 1. Questions of Law and Fact Common to Each State Class Predominate Over Any Potential Individual Issues

The predominance "inquiry trains on legal or factual questions that qualify each class member's case as a genuine controversy." *Amchem*, 521 U.S. at 623. "Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Id.* at 625. Class certification is proper where, as here, Defendants "committed the same unlawful acts in the same method against an entire class." *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983). The requirement demands only a predominance of common questions, not exclusivity or unanimity of them.  Rule 23(b)(3); *Smilow*, 323 F. 3d at 39 (citations omitted); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001).

Moreover, "[p]redominance is not defeated by individual damages questions as long as liability is still subject to common proof." *In re New Motor Vehicles Canadian Export Antitrust*, 522 F.3d 6, 28 (1st Cir. 2008) (citing *Tardiff v. Knox County*, 365 F.3d 1, 6 (1st Cir. 2004)). Indeed, if "'common questions predominate regarding liability, then the courts generally find the predominance requirement to be satisfied even if individual damages issues remain.'" *In re New Motor Vehicles*, 522 F.3d at 23 (quoting *Smilow*, 323 F.3d at 40). Thus, "the mere fact that there are differences among members of a class regarding their individual amounts of damages does not preclude class certification."  *In re New Motor Vehicles*, 522 F.3d at 23 (citing *Smilow*, 323 F.3d at 40); *Gogasian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086 (1978) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate").

a.      *Issues of Law and Fact Common to All California Class Members Predominate Over Any Potential Individual Issues*

Common issues predominate over the claims of the California Class. Plaintiff Tyrer alleges that Defendants violated California's Unfair Competition Law (the "UCL"), False Advertising Law (the "FAL"), and Consumer Legal Remedies Act (the "CLRA"). This Class is well-suited for class treatment, as the elements of all California Class members' claims can be proven almost exclusively through the presentment of evidence of Defendants' conduct and expert testimony—evidence that is common to all California Class members.

i.   **The California Class' UCL Claims**

The purpose of the UCL is to deter unfair business practices and "protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *McAdams v. Monier, Inc.*, 2010 WL 630973, at *19 (Cal. App. Ct. Feb. 24, 2010). The UCL extends a "substantive" right to the public: "the right to protection from fraud, deceit, and unlawful conduct." *In re Tobacco II Cases¸* 207 P.3d at 37-38 (quoting *Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1137 (2001)). The "focus of the [UCL] is on the defendant's conduct." *In re Tobacco II Cases*, 207 P.3d at 38. The California Supreme Court recently recognized, in *In re Tobacco II* Cases, that:

> consumer class actions and representative UCL actions serve important roles in the enforcement of consumers' rights. [They] make it economically feasible to sue when individual claims are too small to justify the expense of litigation, and thereby encourage attorneys to undertake private enforcement actions. Through the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices in order to protect the public and restore to the parties in interest money or property taken by means of unfair competition. These actions supplement the efforts of law enforcement and regulatory agencies. This court has repeatedly recognized the importance of these private enforcement efforts.

207 P.3d 20, 30 (Cal. 2009) (quoting *Kraus v. Trinity Mgmt. Servs., Inc.*, 999 P.2d 718 (Cal. 2000)).

25

Under the UCL, "there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent." *In re Tobacco II Cases*, 207 P.3d at 29. To state a UCL claim based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived. *Id.* at 30. A business practice is unlawful under the UCL if it is forbidden by any law—federal, state, or local. *Ticconi v. Blue Shield of Cal. Life and Health Ins. Co.*, 160 Cal. App. 4th 528, 539 (2008). An "unfair" practice under the UCL is one whose harm to the victim outweighs its benefits. *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 331-32 (1998).[14]

Relief under the UCL is available without individualized proof of deception, reliance, and injury. *In re Tobacco II Cases*, 207 P.3d at 39. The UCL is construed by the California Supreme Court in light of the "concern that wrongdoers not retain the benefits of their misconduct" and has led California "courts repeatedly and consistently to hold that relief under the UCL is available without individualized proof of deception, reliance and injury." *In re Tobacco II Cases*, 207 P.3d at 35 (citing *Fletcher v. Sec. Pac. Nat'l Bank*, 591 P.2d 51, 57 (Cal. 1972); *Bank of the W. v. Superior Court*, 833 P.2d 545, 546 (Cal. 1992); *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983)). The rule established by the California Supreme Court most recently in *Tobacco II*, defines the broad scope and public purpose of the UCL's disgorgement remedy, as restitution may be ordered "without individualized proof of deception, reliance, and injury if necessary to prevent the use or employment of an unfair practice." *In re Tobacco II Cases*, 207 P.3d at 36 (citing *Bank of the West*, 833 P.2d at 546; *Comm. on*

---

[14] "[A] business practice may be unfair or fraudulent in violation of the UCL even if it does not violate any law." *Lymburner v. U.S. Fin. Funds, Inc.*, No. C-08-00325 EDL, 2010 WL 335791, at * 7 (N.D. Cal. Jan. 22, 2010) (granting class certification of UCL claims) (citing *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 827 (2003); *Buller v. Sutter Health*, 160 Cal. App. 4th 981, 990 (2008)). The unfairness prong is intentionally broad to give "courts maximum discretion to prohibit new schemes to defraud." *Ticconi*, 160 Cal. App. 4th at 539. Determining whether conduct is "unfair" under the UCL is a completely objective standard and courts are not permitted to apply subjective notions of fairness. *Cel-Tech Commc'n, Inc.v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999).

*Children's Television, Inc.*, 35 Cal. 3d at 211; *Fletcher*, 591 P.2d at 55-59 (1972)). *Tobacco II* affirmed the requirement that the UCL representative plaintiff (but not the class members), prove reliance, and did so consistent with California's long-established substantive law on how the reliance element of any fraud-related claim may be proved.  The plaintiff need not demonstrate that the fraud was the only cause:

> It is not . . . necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct . . . . It is enough that the misrepresentation has played a substantial part, and so has been a substantial factor, in influencing his decision  . . . Moreover, a presumption, or at least an inference, of reliance arises whenever there is a showing that a misrepresentation was material.

207 P.3d at 39.[15]

"To achieve its goal of deterring unfair business practices in an expeditious manner, the Legislature limited the scope of the remedies available under the UCL," and prevailing plaintiffs are generally limited to restitution and injunctive relief. *Id.* at 29 (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (2003)). Thus, subject to the class representative standing requirements addressed above, *supra* at 20-22, relief under the UCL focuses entirely upon the conduct of the defendant, and is available without individual proof of deception, reliance and injury. *In re Tobacco II Cases*, 207 P.3d at 35. All California Class members' claims are based on a uniform course of deceptive conduct by Defendants: the identical misrepresentations and omissions uniformly made by Defendants regarding every single light cigarette product they sold to the California Class—that their light cigarettes were healthier and less harmful to smoke than

---

[15] "A misrepresentation is judged to be 'material' if a reasonable man would attach importance to its existence or non-existence in delivering his choices of action in the transaction in question and as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not find that a reasonable harm would have been influenced by it.'" *In re Tobacco II Cases,* 207 P.3d at 39 (quoting *Engalla v. Permanente Med. Group, Inc.*, 938 P.2d 903, 919 (Cal. 1997)).

regular cigarettes. Issues common to all California Class members' UCL claims predominate over any potential individual issues, including, *inter alia*:

1.  Whether Defendants' representations related to their light cigarettes were likely to deceive the public;

2.  Whether Defendants' representations and/or omissions in connection with advertising and marketing their light cigarettes violated any California or federal law(s); and

3.  Whether Defendants' representations and/or omissions in connection with advertising and marketing their light cigarettes was unfair.

These questions can be resolved through the presentment of evidence relating to Defendants' conduct, and are common to all California Class members.

"Predominance is not defeated by individual damages questions as long as liability is still subject to common proof." *In re New Motor Vehicles Canadian Export Antitrust*, 522 F.3d 6, 28 (1st Cir. 2008). Regardless, the California Class seeks disgorgement of the profits Defendants' earned as the result of their violating the UCL, the amount of which can be established through expert testimony. *See* Expert Report of Jeffrey Harris, M.D. Ph.D. ¶¶ 23-32 ("Harris Expert Report) attached hereto as Exhibit H; Affidavit of Jeffrey Harris, M.D. Ph.D. ¶ 7 (Harris Affidavit) attached hereto as Exhibit I.

### ii.  **The California Class' CLRA Claims**[16]

The California Legal Remedies Act was designed "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Cal. Civ. Code § 1760.  "Any consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice declared to be unlawful by [the CLRA, pursuant to] section 1770 may bring an action against that person to recover actual

---

[16] Plaintiff Tyrer brings his CLRA claim on behalf of himself and a subclass of the putative class who purchased Light Cigarettes within three (3) years prior to the commencement of this action.

damages, injunctive relief, restitution of property, punitive damages, and any other relief the

court deems proper. Cal. Civ. Code § 1780(d). "[I]n order to bring a CLRA action, not only must

a consumer be exposed to an unlawful practice, but some kind of damage must result." *Meyer v.*

*Sprint Spectrum L.P.*, 45 Cal. 4th 634, 641 (2009).

      The deceptive nature of Defendants' conduct can be proven through the presentment of

evidence relating to Defendants' long-term campaign to promote their light cigarettes as

healthier to smoke than regular cigarettes of the same brand. Also, whether Defendants' failure

to disclose that their light cigarettes were not healthier to smoke than regular cigarettes of the

same brand constitutes a material fact is a question common to all California Class members. *See*

*Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1294 (2002) (finding that

questions of materiality of omitted information predominate for purposes of certifying a class).

      Plaintiffs in a CLRA action must show that a defendant's deceptive conduct caused them

harm. *Mass. Mut. Life Ins.*, 97 Cal. App. 4th at 1293. The CLRA's "causation requirement can be

satisfied if the record permits an inference of common reliance to the class." *McAdams v.*

*Monier, Inc.*, 2010 WL 630973, at *6 (Cal. App. Ct. Feb. 24, 2010). An inference of reliance is

made on an objective "reasonable person" standard, and is appropriate when a defendant omits

facts that would have been material to any reasonable person contemplating the purchase of the

defendant's product. *See McAdams v. Monier, Inc.*, 2010 WL 630973, at *6 (Cal. App. Ct. Feb.

24, 2010); *Mass. Mut. Life Ins. Co.*, 97 Cal. App. 4th at 1293; *Parkinson v. Hyundai Motor Am.*,

258 F.R.D. 580, 596 (C.D. Cal. 2008) (certifying the plaintiffs' CLRA claim pursuant to Rule

23(b)(3)); *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610 (C.D. Cal. 2008) (same); *Cartwright*

*v. Viking Indus.*, No. 2:07-cv-02159, 2009 WL 2982887 (E.D. Cal. Sept. 14, 2009) (same).

California's seminal decision on the manner of proof of reliance in a consumer class

action is *Vasquez v. Superior Court*, in which the California Supreme Court articulated the

controlling standard:

> The fact of reliance upon alleged false representations may be inferred from the
> circumstances attending the transaction which oftentimes afford much stronger
> and more satisfactory evidence of the inducement which prompted the party
> defrauded to enter into the contract than his direct testimony to the same effect . . .
> If the court finds that a reasonable man would have relied upon the alleged
> misrepresentations, an inference of justifiable reliance by each class member
> would arise.

4 Cal. 3d 800, 964 (1971) (citations omitted). Whether Defendants omitted material facts that a

reasonable  person would have relied upon when contemplating whether to purchase their light

cigarettes is an issue common to all California Class members, as Defendants' conduct in this

matter was uniform. Thus, common issues predominate with respect to the California Class

members' CLRA claims.

The California appellate court's opinion in *McAdams v. Monier, Inc.*, is instructive on

this issue. 2010 WL 630973, at *6. In *McAdams*, the court reversed a trial court's order denying

the plaintiff's motion for class certification, holding that an inference of class-wide reliance was

appropriate, as the "plaintiff's CLRA class action is based on an alleged failure to disclose a

material fact that is misleading in light of other facts (affirmative representations) that [the

defendant] did disclose."  *Id.* at 6 (noting that the defendant in that action "disclosed certain facts

regarding its roof tiles—50 year/lifetime; permanent color; and maintenance-free—which were

likely to mislead consumers in light of [the defendant's] failure to disclose the allegedly known

fact that the color composition of its roof tiles would erode to bare concrete well before the

represented 50-year life of the tiles.").

Similar to the facts at issue in *McAdams*, Defendants labeled and promoted their light

cigarettes as healthier to smoke than regular cigarettes of the same brand, when in fact, their light cigarettes are actually less healthy to smoke than regular cigarettes of the same brand; a fact that would have been material to reasonable persons contemplating whether to purchase Defendants' light cigarettes. Tyrer SAC ¶¶ 182-84. Thus, an inference of reliance is appropriate in this case.

Proving harm to the California Class will focus on whether, at the time of purchase, California Class members received cigarettes with the qualities and attributes that Defendants represented them to have—mainly, cigarettes that were healthier to smoke than regular cigarettes, resulting in smokers inhaling less tar and nicotine than regular cigarettes, and making it easier for them to quit. Additionally, the California Class seeks disgorgement of the profits Defendants' earned as the result of their violation of the CLRA, the amount of which can be established through expert testimony. *See* Harris Expert Report ¶¶ 23-32; Harris Affidavit ¶ 7. Thus, common issues predominate over the California Class' CLRA claims.

      **b.**    ***Issues of Law and Fact Common to All D.C. Class Members Predominate Over Any Potential Individual Issues***

The D.C. Plaintiffs allege that Defendants violated the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, and that Defendants were unjustly enriched. Common issues of fact and law predominate with respect to each of these claims.

      **i.**    <u>**The D.C. Class' CPPA Claims**</u>

The CPPA "is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Atwater v. D.C. Dep't of Consumer and Regulatory Affairs*, 566 A.2d 462, 465 (D.C. 1989). It provides "a panoply of strong remedies, including treble damages, punitive damages and attorney's fees, to consumers who are victimized by unlawful trade practices." *Ford v. ChartOne*, 908 A.2d 72, 80-81 (D.C. 2006).

31

The CPPA states that its purpose is to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices," and that the Act should be interpreted "liberally to promote its purpose." D.C. Code § 28-3901(b)-(c). The statute has been characterized as "an ambitious piece of legislation which seeks to prohibit a long list of 'unlawful trade practices.'" *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 708 (D.C. 1981).

Section 3904 of the CPPA states that it is a violation, whether or not any consumer is in fact misled, deceived, or damaged thereby, to:

a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

. . .

d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

e) misrepresent as to a material fact which has a tendency to mislead;

f) fail to state a material fact if such failure tends to mislead.

D.C. Code § 28-3904.[17]

The remedies available to consumers under the CPPA are: treble damages or $1500 per violation, whichever is greater; reasonable attorney's fees; punitive damages; injunctive relief; and, in representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice. *See* D.C. Code § 28-3905(k)(1).

Issues of fact and law common to all D.C. Class members predominate over any potential individual issues because liability is based almost entirely on Defendants' conduct and objective

---

[17] Preliminarily, the CPPA only applies to transactions arising out of the consumer-merchant relationship. *See Ford*, 908 A.2d at 81. This requirement is clearly met in the instant case. This is a consumer class action brought on behalf of residents of the District of Columbia who purchased Light cigarettes, and it explicitly excludes those who purchased Lights for resale. *See* Slater FAC ¶¶ 1, 8; Parsons FAC ¶¶ 1, 8.

factors—issues not specific to any D.C. Class member. For example, Plaintiffs can establish

liability by proving that Defendants misrepresented, through use of the terms "Light" and "Ultra-

light" on packaging materials and elsewhere that smokers of their light cigarettes would receive

less nicotine and tar, and a less harmful product than smokers of regular full-flavored cigarettes

of the same brand.  D.C. Class members can also establish that Defendants failed to state the

material fact that consumers of their light cigarettes would not be exposed to less tar or nicotine

than consumers of non-light cigarettes of the same brand—and that such misrepresentations and

omissions are "material" and have a "tendency to mislead." *See* Slater FAC ¶¶ 41-42; Parsons

FAC ¶¶ 41-42; D.C. Code § 28-3904 (e)-(f). Alternatively, Plaintiffs could establish that

Defendants represented that their light cigarettes delivered less nicotine and tar, and were

otherwise less harmful, than regular cigarettes, and that these were characteristics, ingredients,

uses, benefits, or quantities that Defendants' light cigarettes do not have. *See* D.C. Code § 28-

3905(k)(1)(a).

Indeed, the D.C. Class' CPPA claims are particularly well-suited to class treatment

because, under the relevant case law for establishing liability under the statute, there are *no*

differences between the D.C. Class members that may be relevant to establish liability. The

statute, by its terms, does not require proof of reliance or causation. *See* §§ 28-3904; 28-

3905(k)(1); *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 8-9 (D.D.C. 2002); *see also In re Pharma.

Average Wholesale Price Litig.*, 252 F.R.D. 83, 98 (D. Mass. 2008).  D.C. Code § 28-3904 states

that it "shall be a violation . . . *whether or not any consumer is in fact misled, deceived or

damaged thereby*, for any person to [engage in the proscribed enumerated acts.]") (emphasis

added).[18]  The CPPA only requires a plaintiff to establish the failure of a defendant to disclose a

---

[18] Any person, "whether acting for the interests of itself . . . or the general public" can bring an action for a violation.
*See* 28-3905(k)(1). Historically, the applicable section of the CPPA provided that "[a]ny consumer who suffers any

33

material fact—or the misrepresentation of a material fact—which has a *tendency* to mislead. *See* 28-3904(k)(1)(e)-(f). Given this language, the plain meaning of the statutory language is unambiguous, the intent of the legislature is clear, and the Court need go no further. *District of Columbia v. Cato Inst.*, 829 A.2d 237, 240 (D.C. 2003). Nonetheless, courts have gone further to confirm that reliance is not required under this statute. *See Osbourne v. Capital City Mortgage Corp.*, 667 A.2d 1321, 1330 (D.C. 1995) (holding that plaintiffs, under the pre-2000 statute, need only show damage as a result of misrepresentation "which has a tendency to mislead."); *Banks v. D.C. Dept' of Consumer & Regulatory Affairs*, 634 A.2d 433, 438 (D.C. 1993) (finding CPPA violations despite explicit conclusion that aggrieved party did not rely on defendant's misrepresentations). As exemplified by the D.C. Court of Appeals' holding in *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, the CPPA should be read according to its plain meaning and additional requirements should not be added where they do not exist. 944 A.2d 1055, 1073 n.20 (D.C. 2008).

Common questions predominate in this case because the CPPA does not require the calculation of damages. Section 3905(k)(1) contains a statutory damages provision providing that consumers are entitled to a minimum of $1,500 per violation, making predominance even more clear because it minimizes even the limited import of damage calculations. *See* D.C. Code § 28-3905(k)(1)(A); *see also Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476 (Mass. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 30 (D.D.C., 2001) (calculation of damages does not defeat class certification even in non-CPPA class actions). Under the CPPA, damages need not be calculated for class certification purposes because liability is established by the violation itself and entitles purchasers to the statutory minimum.

---

damage as a result of" the unlawful trade practice could bring an action. *See Wells*, 210 F.R.D. at 8-9. However, the D.C. Council's October 22, 2000 amendment to the CPPA eliminated "these requirements of injury in fact and causation." *Id.*

34

### ii.   The D.C. Plaintiffs' Unjust Enrichment Claims

The elements of the D.C. Class' unjust enrichment claims focus on Defendants' standardized conduct, as opposed to any specific facts relating to any specific D.C. Class member, and thus, common issues predominate.

As stated by the District of Columbia Court of Appeals, "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *New World Comm'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1223 (D.C. 2005). Here, the benefit that Plaintiffs and class members have conferred upon Defendants is the same as to every class member—the money they spent on Defendants' light cigarettes as a result of Defendants' concealments, misrepresentation, and failure to disclose that their light cigarettes did not deliver less tar and nicotine and were not less harmful than regular cigarettes of the same brand. Slater FAC  ¶¶ 50-51. Defendants had knowledge of, voluntarily accepted, and retained that benefit from every class member. *Id.* ¶ 52. For the reasons described in detail in the Complaint, the retention of that benefit is indeed unjust. *Id.* ¶ 54.

None of the foregoing elements of a claim for unjust enrichment involves any questions specific to any particular class member.  Accordingly, the many common questions of law and fact discussed above would predominate over any possible individual issues Defendants could come up with. *See Cohen v. Chilcott Public Ltd. Co.,* 522 F. Supp. 2d 105, 116 (D.D.C. 2007) (certifying the unjust enrichment claims of a nationwide class).

Furthermore, the D.C. Plaintiffs can establish the amount of profits that Defendants earned as the result of their unjust enrichment through expert testimony. *See* Harris Expert Report ¶¶ 23-32; Harris Affidavit ¶ 7.

    c.       *Issues of Law and Fact Common to All Illinois Class Members Predominate Over Any Potential Individual Issues*

The Illinois Class' consumer fraud and unjust enrichment claims focus upon Defendants' uniform conduct. Thus, common issues of law and fact predominate over these claims.

    i.    **The Illinois Class' ICFA Claims**

To state a claim under the Illinois Consumer Fraud Act ("ICFA" or "the Act"), a plaintiff must allege: (1) an unfair or deceptive act or practice; (2) intent by the defendant that the plaintiff rely on the unfair practice or deception; (3) that the deception occurred in the course of conduct involving trade or commerce; and (4) actual damage to the plaintiff that is; (5) a result of the unfair practice or deception. *See e.g., Zekman v. Direct Am. Marketers, Inc.,* 695 N.E.2d 853, 860-61 (Ill. 1998); 815 ILCS 505/2, 10a. The Act must be broadly and liberally construed to affect its remedial purpose to eradicate all forms of deceptive and unfair business practices, and to grant appropriate remedies to defrauded consumers. *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 594 (Ill. 1996). Unlike common law fraud, the Consumer Fraud Act does not require that the plaintiff have relied on the deception. *Siegel v. Levy Org. Dev. Co.,* 607 N.E.2d 194, 198 (Ill. 1992).

Plaintiff Biundo alleges that Defendants violated the ICFA: (1) through misrepresenting that their light cigarettes were healthier to smoke than regular cigarettes, when in fact, they are as or more harmful to smoke than regular cigarettes; (2) through omitting the material fact that their light cigarettes were not in fact light, but were actually as harmful or more harmful to smoke than regular cigarettes; and (3) that the aforementioned conduct constitutes an unfair practice[19] under the ICFA. The intentional, unfair, and deceptive nature of Defendants' conduct can be

---

[19] Under the ICFA, an unfair practice: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002). "All three factors do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (citation omitted).

proven through the presentment of evidence common to all Illinois Class members and relating

to Defendants' conduct, including, *inter alia*:

    a.    Whether Defendants intentionally marketed and promoted their light cigarettes as being healthier to smoke than regular cigarettes;

    b.    Whether Defendants labeled their cigarettes "Lights" with "lowered tar and nicotine" in order to establish in the individual and collective consumer consciousness the concept that said cigarettes were more healthful (or, at least, less unhealthful) to smoke than regular cigarettes;

    c.    Whether Defendants were aware that their light cigarettes were as or more unhealthy to smoke than regular cigarettes;

    d.    Whether Defendants' light cigarettes are less healthy and more cancerous to smoke than regular cigarettes;  and

    e.    Whether Plaintiff Biundo and the other members of the Illinois Class were harmed as a result of Defendants' scheme to defraud.

Notably, in *Price v. Philip Morris, Inc.*, after a two-and-a-half month trial, an Illinois trial

court held that common issues of law and fact predominated over the ICFA unfairness claims of

an Illinois class relating to Defendants' marketing and sale of their light cigarettes as healthier to

smoke than regular cigarettes. 2003 WL 22597608 (Ill. Cir. Ct., Mar. 23, 2003). The court found

Defendants guilty of violating the ICFA, and awarded the class over ten billion dollars in

damages, including three billion dollars in punitive damages. *Id.* at 29. The Illinois Supreme

Court later reversed the trial court's order on federal preemption grounds. *Price v. Philip Morris,

Inc.*, 848 N.E.2d 1 (Ill. 2005); *but see Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008) (holding

that the Maine Plaintiffs' consumer fraud claim was not expressly preempted by the Federal

Cigarettes Labeling and Advertising Act or impliedly preempted by the FTC's policy regarding

light cigarettes).

The Illinois Class members' ICFA claims are similar to the claims at issue in *Craft v.

Philip Morris Cos.,* where a Missouri appellate court reaffirmed a trial court's granting of the

plaintiff's motion for class certification. 190 S.W.3d 368, 383 (Mo. App. Ct. 2005). In that matter, the court recognized that:

> Plaintiff's claim with respect to liability is that she purchased a product designed and manufactured to manipulate test results, resulting in a misrepresented and mislabeled product. Plaintiff's allegations go to the condition and labeling of the product at the time it was sold; they do not make defendant's liability dependent on each consumer's individual smoking behavior. Plaintiff also alleges that she failed to receive the qualities and economic value of a low tar, low nicotine cigarette. Again, this allegation goes to the condition of the product at the time of the purchase transaction and would require proof that the product did not have the value of a truly low tar and low nicotine cigarette.

*Id.* at 383.

Evidence of Defendant's conduct and expert testimony can be used to establish that all Illinois Class members suffered actual damage as a result of Defendants' unfair and deceptive conduct. To state a valid ICFA claim a private plaintiff must show that the consumer fraud proximately caused them actual damage. *See, e.g., Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 585, 595 (Ill. 1996). In the context of a fraud claim, as in a negligence claim, cause-in-fact is "but for" cause.[20] That is, the relevant inquiry is whether the harm would have occurred absent the defendant's conduct. *Evans v. Shannon,* 776 N.E.2d 1184, 1191 (Ill. 2002). The proximate cause determination "is best left to the trier of fact." *Connick*, 675 N.E.2d at 595.

Common evidence can be used to establish that the Illinois Class would not have been injured "but for" the Defendants' deceptive conduct. ICFA's proximate causation requirement is satisfied when consumers are harmed as the result of receiving misleading communications from a defendant that conceals material information. *See De Bouse v. Bayer*, No. 107528, 2009 WL 4843362, at *5 (Ill. Dec. 17, 2009) (analyzing *Connick*, 675 N.E.2d 584). Whether the Illinois

---

[20] In addition to cause-in-fact, legal cause is also a required element of proximate causation. As noted in *City of Chicago v. Beretta U.S.A. Corp.*, "the proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." 821 N.E.2d 1099, 1127 (Ill. 2004). Whether the harm that Illinois Class members suffered was foreseeable requires an objective determination common to all Illinois Class members.

Class received deceptive communications from Defendants as a result of Defendants' cigarettes being labeled "light" and/or "ultra-light" is a question common to all Class members. Similarly, whether Defendants intentionally concealed that their light cigarettes were actually more harmful and cancerous to smoke than regular cigarettes is likewise a question common to all Illinois Class members.

Common evidence can also be used to establish that all Illinois Class members were injured as the result of Defendants' conduct. Illinois recognizes that a consumer is damaged when they receive a product that is more harmful and worth less than represented. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 537-38 (Ill. 1989). Thus, Plaintiff can establish harm to all Illinois Class members through submitting expert testimony to establish that the Illinois Class purchased cigarettes that were more harmful, addictive, and cancerous to smoke than Defendants represented them to be.

Once the elements of an ICFA claim are established, "[t]he court, in its discretion may award actual economic damages or any other relief which the court deems proper." 815 ILCS 515/10a. In this matter, Plaintiff Biundo seeks disgorgement of the profits that Defendants collected as the result of selling their light cigarettes to the Illinois Class. These damages can be established on a class-wide basis through expert testimony. *See* Harris Expert Report ¶¶ 23-32; Harris Affidavit ¶ 7.

### ii.   The Illinois Class' Unjust Enrichment Claims

To state a cause of action for unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill.

1989). "[U]njust enrichment . . . does not require fault or illegality on the part of the defendant; rather, the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment." *The Firemen's Annuity and Benefit Fund v. The Mun. Employees', Officers, and Officials' Annuity and Benefit Fund*, 579 N.E.2d 1003, 1007 (Ill. App. Ct. 1991); *HPI*, 545 N.E.2d at 679 ("to state a cause of action under an unjust enrichment theory, [Plaintiff is] required to set out specific factual allegations which . . . support the conclusion that [Defendant's] conduct . . . was wrongful").

The fact that Defendants unjustly retained a benefit can be determined through the presentment of proof common to all Illinois Class members. This element is dependent upon whether it was unjust for Defendants to receive and retain the millions of dollars that the Illinois Class paid for their light cigarettes—products that Defendants intentionally misrepresented as being healthier to smoke than regular cigarettes. The unjust nature of Defendants' conduct can be established through the presentment of evidence relating to, *inter alia*: the explicit and implicit representations that Defendants made to the Illinois Class regarding their light cigarettes; whether Defendants concealed and/or omitted material facts from the Illinois Class regarding their light cigarettes; and when Defendants' learned that their light cigarettes were as or more unhealthy to smoke than regular cigarettes.

That the Illinois Class suffered a detriment can also be established through the presentment of generalized evidence common to all Illinois Class members. All Illinois Class members received a product that was not what it was represented to be: cigarettes that were "light" and healthier to smoke than regular cigarettes, which would make it easier for members of the Illinois Class to quit.

Whether Defendants' retention of benefits violates "fundamental principles of justice,

40

equity, and good conscience," is an objective standard that, considering the uniform nature of

Defendants' conduct, can be established on a class-wide basis through the presentment of

evidence common to all Illinois Class members.

The amount of Defendants' unjust enrichment, via the profits it collected as the result of

its unlawful conduct, can be established through expert testimony that will be common to all

Illinois Class members. *See* Harris Expert Report ¶¶ 23-32; Harris Affidavit ¶ 7.

### d. *Issues of Law and Fact Common to All Maine Class Members Predominate Over Any Potential Individual Issues*

Under the Maine unjust enrichment claim,[21] common issues predominate over any

individualized issues.  An unjust enrichment claim is brought to recover "the value of the benefit

retained when there is no contractual relationship, but when, on the grounds of fairness and

justice, the law compels performance of a legal and moral duty to pay." *Paffhausen v. Balano*,

708 A.2d 269, 271 (Me. 1998). To establish a claim for unjust enrichment, Plaintiffs and the

Class must show: (1) that they conferred a benefit on Defendants, (2) that Defendants had

appreciation or knowledge of the benefit, and (3) that the acceptance or retention of the benefit

was under circumstances that make it inequitable for Defendants to retain the benefit. *Me. Eye*

*Care Assocs. v. Gorman*, 942 A.2d 707, 712 (Me. 2008). Of these elements for an unjust

enrichment claim, the predominating issue is the third element – whether it would be inequitable

for Defendants to retain the benefit. The Supreme Judicial Court of Maine (the "Law Court") has

---

[21] The Maine Plaintiffs are not pursuing certification of their UTPA claims. There can be no doubt that unjust enrichment is not merely a remedy but a freestanding cause of action under Maine law. A party may plead unjust enrichment in the alternative to a breach of contract or tort claim, or may plead unjust enrichment alone. *See June Roberts Agency v. Venture Props.*, 676 A.2d 46, 49 n.1 (Me. 1996) (recognizing existence of contract precludes recovery on unjust enrichment theory, but holding party not precluded from pleading both theories because fact finder may determine no contract exists); *DesMarais v. Desjardins*, 664 A.2d 840, 845 (Me. 1995) (noting unjust enrichment claim is separate and distinct from tortious interference with expectation of a legacy claim); *Combined Energies v. CCI, Inc.*, 628 F. Supp. 2d 226, 235 (D. Me. 2009) ("the Court is unaware of any authority for the proposition that an unjust enrichment claim cannot be brought contemporaneously with tort claims"); *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 610 A.2d 747 (Me. 1992) (unjust enrichment is the only claim brought against Town).

instructed, "[t]he most significant element of the doctrine [of unjust enrichment] is whether the enrichment of the defendant is unjust." *Howard & Bowie, P.A. v. Collins*, 759 A.2d 707, 710 (Me. 2000).

Here, common issues predominate with respect to each element of the unjust enrichment claim. First, Maine Plaintiffs and each member of the proposed Maine Class, by definition, conferred a benefit on Defendants when they "purchased for personal use Defendants' cigarettes labeled as 'Light,' or 'Ultra-Light' ('Light Cigarettes'), during the Class Period, through the present." Good SAC ¶ 39. The second element of an unjust enrichment claim, that Defendants were aware of the benefit Maine Plaintiffs conferred, is also subject to common proof. Evidence will be presented at trial that Defendants knew that the profits they realized from the sale of their light cigarettes in Maine came from the pockets of Maine Class members.

Third, common issues predominate with regard to the inequity factor because the focus is on Defendants' conduct, not Plaintiffs' conduct. Numerous of the common questions identified above relate to the inequity factor, including, *inter alia*:

a. Whether Defendants' light cigarettes were not healthier to smoke than regular cigarettes;

b. Whether Defendants knew that their light cigarettes were not appreciably less harmful than their regular cigarette counterparts;

c. Whether Defendants intentionally designed their light cigarettes to enable smokers to compensate; and

d. Whether Defendants misleadingly portrayed their light cigarettes as less harmful than their regular cigarette counterparts.

All of these issues are subject to common proof. Each individual Maine Class member need not prove these common issues. Instead, proof by Class representatives is proof for the Class. Because the issue of whether Defendants' retention of the benefit is unjust is subject to common proof, common questions predominate with respect to the Maine Class' unjust enrichment claim.

The type of damages sought by Plaintiffs, disgorgement of profits, is ideally suited as a remedy under Maine's unjust enrichment law. Under Maine law, the measure of damages for unjust enrichment is the "value of the benefits that the plaintiff proves are actually received and retained by the defendant." *A.F.A.B., Inc. v Town of Old Orchard Beach,* 639 A.2d 103, 106 (Me. 1994). Maine Plaintiffs allege they and the other members of the Maine Class did not get what they paid for when they purchased Defendants' light cigarettes—a safer, healthier cigarette that would result in receiving less tar and nicotine than regular cigarettes. They did, however, receive cigarettes that they smoked, and the cost to Defendants of manufacturing, marketing, and distributing that pack of cigarettes would be offset against the purchase price because Defendants did not retain that portion of the benefit conferred. The damages that Plaintiffs' expert, Dr. Harris, Ph.D., describes, *i.e.*, the amount of Defendants' "cumulative before-tax profit" from the sale of their light cigarettes to Maine smokers during the Class period, would therefore be a proper measure of damages under Maine's unjust enrichment law. *See* Harris Expert Report ¶ 8.

Federal courts have certified unjust enrichment class actions on a number of occasions. In *In re Terazosin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672 (S.D. Fla. 2004), for example, the Court certified a state-wide class of indirect purchaser End Payers for, among others, the State of Maine under Maine's antitrust statute and unjust enrichment law. With respect to the unjust enrichment claim, the Court held that "the question of whether Defendants were unjustly enriched is susceptible to proof using common, generalized evidence." *Id.* at 697. The Court further noted that "as is the nature of unjust enrichment claims, this common evidence will focus on the defendant's gain and not on the plaintiff's loss." *Id.* at 698.[22]

In *Overka v. American Airlines, Inc.*, No. 08-10686-WGY, 2010 WL 517407 (D. Mass.

---

[22] *See In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, MDL No. 1827, Order Granting Indirect Purchaser Plaintiffs' Motion for Class Certification (Mar. 28, 2010) (certifying, *inter alia*, a Maine Class seeking solely disgorgement and restitution) (attached hereto as Exhibit J).

Feb. 4, 2010), the court certified a nationwide class of skycaps alleging claims of tortious

interference and unjust enrichment. While Maine was not among the 34 jurisdictions involved in

*Overka*, the elements of the unjust enrichment claim analyzed by the Court were identical to the

elements of Maine's unjust enrichment cause of action: "(1) the plaintiff conferred a benefit upon

the defendant, (2) the defendant appreciated or knew of the benefit, and (3) the defendant

accepted the benefit under such circumstances as to make non-payment inequitable." *Id*. at *14.

      In *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich. 2001), the Court

certified a class alleging claims of unjust enrichment. In that case, the defendants argued that

unjust enrichment claims are not appropriate for class treatment because individual issues

concerning liability and damages predominate over common issues. The defendants argued that

if a particular class member was not overcharged, there is no injury and, therefore, no unjust

enrichment. *Id*. at 352. The court rejected this argument, holding that "the nature of Plaintiffs'

restitution claim for unjust enrichment and disgorgement is undivided and integrated, and the

disgorgement remedy would inure to the benefit of the class rather than vindicate any alleged

violations of individual rights." *Id*. (internal citations and quotation marks omitted). Common

issues predominated because "Plaintiffs' success or failure in proving this unjust enrichment

claim will mean success or failure for the class as a whole; not individual class members." *Id*.

      The resolution of the Maine Class members' unjust enrichment claims turn on issues that

are amenable to common proof. Plaintiffs' unjust enrichment claim does not depend upon

vindication of the individual rights of the Maine Class members. Instead, the unjust enrichment

claim arises from the fact that, *because of Defendants' conduct*, it would be inequitable for

Defendants to retain the benefit conferred on them by the Class members. No individualized

issues are implicated in this claim.

44

### 2.     The Class Action Mechanism is the Superior Means to Adjudicate the Claims of Each Class

A class action is superior to other available methods for fairly and efficiently adjudicating this litigation. *See* Fed. R. Civ. P. 23(b)(3). Matters pertinent to Rule 23(b)(3)'s superiority requirement include:

> a.     the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> b.     the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> c.     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> d.     the likely difficulties in managing a class action.

Each of these factors supports that the class action mechanism is the superior, and likely the only mechanism, through which to litigate the claims of individual Class members.

A class action is the only efficient and realistic means for Class members to pursue this litigation. *See Kristian v. Comcast Corp.*, 446 F.3d 25, 54 (1st Cir. 2006) (quoting *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004) ("The more claimants there are, the more likely a class action is to yield substantial economies in litigation . . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis original)); *Amchem Prods., Inc. v. Windsor,* 521 U.S. at 617 (1997) ("[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997)). Defendants are each multi-billion dollar companies that have a history of vigorously litigating matters related to their tobacco products. When compared to the likely expense of

45

litigating this matter, each Class members' damages are minimal. Thus, individual Class members have very little interest in prosecuting or controlling this matter.

To Plaintiffs' knowledge, excluding Plaintiffs, no Class member has instituted litigation against Defendants on an individual basis relating to the facts and time periods at issue. Additionally, Plaintiffs submit that it is highly desirable to concentrate the claims of each Class in the same forum, because they relate almost exclusively to the conduct of Defendants.

The manageability factor of Rule 23(b)(3) "encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164 (1974). Plaintiffs seek to certify four Classes based upon the governing law of those states or districts, including statutory consumer claims and unjust enrichment. Upon completion of the pretrial proceedings, the underlying actions will be returned to the transferor districts for trial and a decision on the merits. *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 32 (1998). Thus, litigating the claims of each Class will be manageable.

**D.     Class Certification of the California Class is Proper Under Rule 23(b)(2)**

Pursuant to Rule 23(b)(2), class certification is proper where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Plaintiff Tyrer, on behalf of himself and the California Class, seeks an order enjoining Defendants from continuing to engage in, use, or employ their practice of advertising and selling their light cigarettes as "light" and healthier to smoke than regular cigarettes, and requiring Defendants to disclose such misrepresentations and/or omissions. Tyler SAC ¶ 128. Here, Defendants acted in precisely the same manner toward every California Class member, and every

California Class member would benefit from injunctive relief. As demonstrated by Defendants'

blatant failure to comply with Judge Kessler's findings in the DOJ case, the threat of injury to the

California Class continues. The injunctive relief sought is common to all California Class

members. Accordingly, certification pursuant to Rule 23(b)(2) is appropriate.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court: (1)

certify the Classes as requested herein; (2) appoint Plaintiffs as Class Representatives for their

respective Classes; and (3) enter any other such relief that it deems just and appropriate.


Dated:  March 29, 2010                          Respectfully submitted,



   */s/ Samuel W. Lanham, Jr.*
Samuel W. Lanham, Jr.
**LANHAM BLACKWELL, P.A.**
470 Evergreen Woods
Bangor, ME 04401

Ben Barnow
**BARNOW AND ASSOCIATES, P.C.**
One North LaSalle Street, Suite 4600
Chicago, IL 60602

Don Barrett
**BARRETT LAW OFFICE, P.A.**
404 Court Square
Lexington, MS 39095-0987

Kent Caperton
**BEN BARNES GROUP**
1215 19th Street, NW
Washington, DC 20036

Marian S. Rosen
**MARIAN S. ROSEN**
  **& ASSOCIATES**
5065 Westheimer, Suite 840
Houston, TX 77056

Howard Rubinstein
**LAW OFFICE OF**
**HOWARD WEIL RUBINSTEIN**
P.O. Box 4869
Aspen, CO 81611

Walter Umphrey
**PROVOST UMPHREY**
  **LAW FIRM, LLP**
P.O. Box 4905
Beaumont, TX 77704-4905

Joe R. Whatley, Jr.
**WHATLEY, DRAKE & KALLAS**
1540 Broadway, 37th Floor
New York, NY 1036

John Eddie Williams
**WILLIAMS, KHERKER, HART,**
  **BOUNDAS, LLP**
8441 Gulf Freeway, Suite 600
Houston, TX 77017

*Plaintiffs' Executive Committee*

48

## CERTIFICATE OF SERVICE

Service of Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law has been made through the Court's ECF system on all those registered to receive ECF service, and on all others not registered but listed on the Court's Manual Notice List by regular mail.

Date:   March 29, 2010

 /s/ Samuel W. Lanham, Jr.
Samuel W. Lanham, Jr.
**LANHAM BLACKWELL, P.A.**
470 Evergreen Woods
Bangor, ME 04401