# EXHIBIT I

to

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| IN RE: LIGHT CIGARETTES MARKETING AND SALES PRACTICES LITIGATION | MDL DOCKET NO. 1-09-MD-2068 ALL CASES |
|---|---|

**AFFIDAVIT OF JEFFREY E. HARRIS, M.D. Ph.D.**

I, Jeffrey E. Harris, being duly sworn on oath, state the following:

1.  Counsel for Plaintiffs has retained me as an expert in the above-captioned matter.  In that capacity, I have submitted an expert report dated December 6, 2009 [1] and given deposition testimony on January 20, 2010 [2].  (Numbers in brackets refer to end notes.)

**The Carlton Report: Shipment Data, Price Data, and Electronic Work Files**

2.  At the request of Counsel for Plaintiffs, I have reviewed the Declaration and Expert Disclosure Statement of Dennis W. Carlton (the "Carlton Report"), dated January 28, 2010 [3], which was subsequently submitted on behalf of Defendant in the above-captioned matter.  I received the Carlton Report on February 1, 2010.

3.  In his rendering his opinions, Prof. Carlton relied upon two very large electronic databases:  (a) historical data on cigarette shipments by date, manufacturer, brand packing and destination state from 1974–2008, which had been obtained from

Management Sciences Associates (the "shipment data"); and (b) historical data on the prices of a very large sample of retail cigarette purchases, by date, manufacturer, brand packing, state of purchase, market of purchase, and numbers of packs and cartons purchased from 1998–2008, which had been obtained from Information Resources Inc./Capstone (the "price data"). Notes 12 and 13, respectively, of Exhibit B of the Carlton Report made specific reference to compact discs that contained "SAS Transport Files," a standard format for cross-platform transmission of electronic databases. I received these SAS Transport Files on March 4, 2010 [4].

4. Section V of the Carlton Report described two computations that were performed on the shipment and price data, respectively. The first computation produced "Table 1: Marlboro Lights Share of Marlboro Cigarette Shipments: 1995–2008," which appeared on page 19 of the Carlton Report. The second computation produced "Figure 1: Average California Retail Prices for Major Marlboro Full Flavor and Light Cigarettes: 1998–2008," which appeared on page 18 of the Report. I received some but not all of the electronic files underlying these computations on March 4, 2010 [5].

**The Carlton Report: Principal Conclusions**

5. Prof. Carlton drew three principal conclusions, as summarized in paragraph 8 of his Report.

    a.    "Dr. Harris fails to connect his estimates of PM USA's sales or profits in any way to PM USA's alleged wrongful conduct."

    b.    "The Harris Report provides no basis from which to conclude that any common injury was experienced by members of the proposed class."

    c.    "Finally, my examination to date of industry data, which I discuss below, reveals that neither market prices nor consumption for Marlboro Lights fell relative to full-flavored Marlboros when the alleged acts were

> revealed, facts that run directly contrary to Plaintiffs' allegations that PM USA's bad conduct had a substantial impact on demand for a number of consumers of Marlboro Lights."

6. I briefly address conclusions (a) and (b) in the next section. I address conclusion (c) in detail below.

## The Carlton Report: Assessment of Damages and Evidence of Common Injury

7. I testified as an expert witness at trial on behalf of plaintiffs in Price v. Philip Morris, a class action concerning light cigarettes in the State of Illinois [6]. I have also submitted expert reports and undergone deposition testimony in Schwab v. Philip Morris et al. [7, 8] and Craft v. Philip Morris [9], both class actions. Accordingly, I have knowledge of a number of legal frameworks for assessing damages in class action litigation concerning the allegedly fraudulent marketing of light cigarettes. In the present litigation, however, counsel for Plaintiffs has asked me only to compute class-wide consumer expenditures on light cigarettes and class-wide manufacturer's profits from the sale of light cigarettes for specific jurisdictions. While it was not my assignment, I understand that my computations can be employed to assess damages under specific legal theories, such as restitution of the full purchase price and restitution of profits.

8. In addition to the foregoing cases, I testified as an expert witness at trial on behalf of plaintiff in United States v. Philip Morris et al [10]. Accordingly, I have knowledge of substantial evidence that plaintiffs in the present action sustained a common injury that resulted from Defendant's allegedly fraudulent marketing of light cigarettes. However, counsel for Plaintiffs in this matter has not asked me offer an opinion concerning such common injury.

### The Carlton Report: Before-and-After Analysis

9. Prof. Carlton's analyses of the shipment and price data hinge critically on the assumption that class members had been adequately apprised of the truth about Defendant's light cigarettes beginning in November 2001, when the U.S. National Cancer Institute (NCI) issued its Monograph 13, entitled "Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine." [11]  In further support of the assumption that class members were adequately apprised after November 2001, Prof. Carlton pointed to statements on Defendant's website in 2002, as well as the inclusion of onserts on some packages of Defendant's light cigarettes during 2002–2008. (See paragraph 24 of the Carlton Report.)

10. In comparing shipment trends (Table 1) and price trends (Figure 1) before and after November 2001, Prof. Carlton acknowledged that he was conducting a "before-and-after" analysis.  Footnote 4 on page 11 of the Carlton Report explicitly stated:

> "In implementing a 'before-and-after' analysis, one is implicitly assuming that no other important factors that influence the variable under analysis are changing, besides the factors controlled for in the analysis."

11. In some instances, when a landmark expert consensus report has been issued or the results of a definitive clinical trial are published, the economic analyst can reasonably attribute changes in demand to the watershed event itself, without having to conduct an exhaustive analysis of all other factors that might have influenced demand before and after the critical event.  In the field of study of cigarette demand in the U.S., this was certainly the case for the landmark Surgeon General's Report of 1964 [12]. However, when it comes to the demand for light cigarettes, it is much less obvious that NCI Monograph 13 constituted such a watershed event, or that Defendant's website posts

4

and onsert distributions in themselves had a significant added effect on consumer awareness.

12.  During the time period before and after 2001, other important factors could have influenced the demand for light and ultra-light cigarettes. Data reported by Philip Morris USA to the Massachusetts Department of Public Health showed that Marlboro Box (full flavored) had a nicotine yield of 2.1 mg/cig in 1997, 2.2 mg/cig in 2001, and 1.94 mg/cig in 2008.  The corresponding data for Marlboro Lights Box were 1.6 mg/cig in 1997, 1.6 mg/cig in 2001, and 1.56 mg/cig in 2008, while the corresponding data for Marlboro Ultra Lights Box were 1.1 mg/cig in 1998, 1.3 mg/cig in 2001, and 1.11 mg/cig in 2008 [13].  An analysis of the MDPH data by researchers at the Harvard School of Public Health concluded that there was a statistically significant upward trend in nicotine yields of U.S. brands during 1997–2005 [14].  Trends in nicotine yield per cigarette were not considered in Prof. Carlton's analysis of cigarette demand.

13.  There is evidence of a relationship between advertising and sales of low-tar cigarettes [15].  Philip Morris USA does not report its advertising and promotional expenditures according to brand.  However, during the period from 1982–1996, the market shares of various categories of low-tar cigarettes (3mg or less, 6mg or less, 9mg or less, 12mg or less, 15mg or less) were closely correlated with the corresponding percentages of advertising and promotional expenditures in each low-tar category [16]. While the Federal Trade Commission no longer reports advertising and promotional expenditures by tar category, the most recent Commission report [17] indicates that total U.S. domestic cigarette advertising expenditures (in nominal terms) were $5.1 billion in 1996, $11.2 billion in 2001, and $13.1 billion in 2005.  Trends in brand-specific

advertising and promotional expenditures on cigarettes were not considered in Prof.

Carlton's analysis of cigarette demand.

14. The issuance of a government report, the posting of information on a company website, or the distribution of onserts on some packs of cigarettes do not automatically translate into consumer awareness. In a U.S. nationwide telephone survey conducted during September–October 1999, smokers estimated that light cigarettes provided a 25-percent reduction in risk, while ultra light cigarette provided a 33-percent reduction [18]. In the first wave (December 2002) of the International Tobacco Control (ITC) survey, 51 percent of U.S. smokers believed that light cigarettes offered some health benefit compared to regular cigarettes [19]. Among U.S. smokers, the mean level of endorsement on a 3-point scale of beliefs about the health benefit of light cigarettes declined from approximately 2.5 in the first wave (December 2002) to 2.3 in the fourth wave (January 2006) [20]. Research suggests that smokers' beliefs about the relative safety of light and ultra light cigarettes "are fed both by the idea that these brands deliver less tar and nicotine and by the sense that these brands are less harsh to smoke." [18] A 2007 survey in Ontario, Canada revealed that smokers interpreted such words as "light" and "ultra light" on the cigarette package as conveying lower risk [21]. Evidence on consumers' perceptions of the health risks of light and ultra light cigarettes was not considered in Prof. Carlton's analysis of demand.

15. Paragraph 25 of the Carlton Report noted:

"Additionally, beginning in 2002 and continuing through 2008, PM USA's light cigarette packages included explicit disclaimers against the assumption that smoking light cigarettes provides health benefits relative to smoking regular cigarettes."

6

This assertion does not provide any detail as the proportion of such light and ultra light cigarettes that contained the purported disclaimers.

16. Table 1 below compares the number of packs of PM USA cigarettes that contained onserts to the total number of non-full flavored packs shipped in each calendar quarter, beginning with the first quarter of 2002. The data on the numbers of packs shipped with onserts, broken down by calendar quarter, are derived from the Affidavit of Brendan McCormick [22]. In the two right-most columns of Table 1, for each calendar quarter from 2002–2009, I have calculated the corresponding total nationwide shipments of packs of Marlboro-brand non-full flavored cigarettes and the total nationwide shipments of packs of all Philip Morris USA ("PM USA") brands of non-full flavored cigarettes. In these calculations, non-full flavored cigarettes included Lights, Mediums, Milds and Ultra Lights. My calculations of total nationwide shipments relied upon the shipment data supplied in connection with the Carlton Report [23].

17. In paragraph 9 of his Affidavit, Mr. McCormick referred to onserts on "certain brands of cigarettes," from which I have concluded that the onserts were not restricted only to Marlboro brands. Since NCI Monograph 13 was issued in late 2001, I calculated total shipments of PM USA non-full flavored brands from the first quarter of 2002 onward. Accordingly, as shown in the row entitled "Total" in Table 1, a total of 1,037 million packs of PM USA cigarettes shipped during 2002–2008 contained an onsert, whereas a total of 43,333 million packs of PM USA non-full flavored cigarettes were shipped nationwide during the same period. That is, 2.4 percent of all packs of PM USA non-full flavored brands shipped in the U.S. during 2002–2008 contained a package onsert [24].

**The Carlton Report: Marlboro Lights Market Shares Before and After 2002**

18.  Table 1 of the Carlton Report shows the nationwide share of Marlboro Lights shipments as a fraction all Marlboro brand shipments for each year from 1995–2008. Commenting on the data in Table 1 of the Report, Prof. Carlton wrote in paragraph 37:

> "Between 2001 and 2008, the share of total Marlboro shipments accounted for by Marlboro Lights increased for both the top packing titles and for all packing titles."

The foregoing assertion does not accurately characterize the data in the Carlton's Table 1. As shown in Figure 1 below, which represents a graph of Carlton's Table 1 data, the Marlboro Lights share of all Marlboro shipments (the solid points) had been steadily increasing from 1995 through 2003, then peaked in 2003 and declined thereafter.  The Marlboro Lights share of shipments of the four leading packing titles (the open circles) declined transiently in 1998, the year when Marlboro Ultra Lights were introduced on a large scale.  From 2003 onward, this measure of Marlboro Lights shares has been flat.

19.  Contrary to Prof. Carlton's observation, the data in Carlton Table 1 and Figure 1 below suggest that the upward trend in the share of Marlboro Lights was abruptly halted after 2003, that is, after the first full year of onserts distribution.  To be sure, a number of other factors – including those specifically cited in the previous section – may have contributed to the abrupt reversal after 2003.  Nonetheless, the magnitude of the decline the Marlboro Lights share from its upward historical trend contradicts the conclusion in paragraph 36 of the Carlton Report that:

> "If, after customers learned about the health profile of light cigarettes, the total consumption of Marlboro Lights did not fall substantially relative to Marlboro Reds, then this would suggest that some customers were not affected by PM USA's alleged misrepresentations, and therefore, that there was no common injury to Plaintiffs based on additional purchases."

8

20. To investigate further the trends suggested in Figure 1, I carried out an econometric analysis of annual shipments of Marlboro Lights, Marlboro Ultra Lights, and Marlboro Full Flavored cigarettes to each of the 51 states and the District of Columbia from 1980–2008 [25]. The analysis is described in detail in Appendix 1 appended to this Affidavit. My econometric analysis did not explicitly quantify the possible effects of brand reformulation, advertising and promotional spending, or onsert distribution. Nor did the econometric analysis explicitly incorporate quantitative measures of consumer awareness. Nonetheless, I concluded that the share of Marlboro Lights relative to Marlboro Full Flavored cigarettes declined significantly from its long-term historical trend, and that by 2008 the decline was an estimated 37 percent below trend. This finding further belies Prof. Carlton's conclusion that "there was no common injury to Plaintiffs based on additional purchases."

**The Carlton Report: Prices of Marlboro Lights and Marlboro Regulars**

21. Figure 1 of the Carlton Report shows the average retail prices of the "King" and "100" sub-brands of Marlboro Full Flavored and Light cigarettes in California during 1998–2008. Noting (in paragraph 31) that the prices of Marlboro Full Flavored and Marlboro Light cigarettes were "very similar at all dates," Prof. Carlton concluded:

> "The fact that the retail prices of Lights and Reds did not diverge substantially after the widespread dissemination of health information about light cigarettes beginning in 2001 means that the evidence provides no support for any claim that the alleged bad acts elevated the price of Marlboro Lights by anything like the 47 cents that I derived earlier from Dr. Harris's calculations."

22. The cigarette industry has been and remains one of the most concentrated markets in the United States. In my trial testimony in <u>United States v. Philip Morris et al</u>, I calculated the Herfindahl-Hirschmann Index ("HHI") for the U.S. cigarette industry to

be 2,108 in 1973; 2,487 in 1983; 3,154 in 1993; and approximately 3,067 in 2003.  (See

pp. 31-32 of [10].)  The U.S. Justice Department and the Federal Trade Commission

consider industries with an HHI in the range of 1,000 to 1,800 to be "moderately

concentrated," while industries with an HHI over 1,800 are considered "highly

concentrated."  (See "1.5 Concentration and Market Shares" in [26].)

23.  It is well known in the field of industrial organization that oligopolistic firms

in concentrated industries set their prices strategically.  As a consequence, prices may not

readily respond to the forces of supply and demand as they would in a competitive

industry.  One well-known consequence is that prices in an oligopoly can be rigid and, in

fact, Prof. Carlton has himself observed that price rigidity is highly correlated with

industry concentration [27].

24.  The U.S. cigarette is no exception to the rule that firms in highly concentrated

oligopolistic markets set prices strategically.  (See Harris [28].)  In fact, cigarette

manufacturers' pricing strategies with respect to light and ultra light cigarettes were

intimately tied to their overall strategy of joint denial that smoking causes disease.  As I

delineated in my direct testimony in United States v. Philip Morris et al [10], cigarette

manufacturers competed within the narrow confines of the tar and nicotine "numbers."

They cooperated to avoid explicit claims that specific brands of cigarettes were safer or

healthier in order to avoid any admission that the remaining brands were unsafe.   Pricing

light and ultra light cigarettes differently than regular cigarettes would have been

inconsistent with such a cooperative strategy.

25.  As noted in paragraph 31 of the Carlton Report, "…PM USA has generally

set the same list prices for all similar-count cigarette packing titles within a brand family,

and with few exceptions, offers uniform discounts and price promotions within a brand family." That is, PM USA has charged the same wholesale prices for Marlboro Lights, Marlboro Ultra Lights, and Marlboro Full Flavored cigarettes. In fact, the uniform pricing of light, ultra light and full-flavored cigarettes within the same brand family has been a consistent practice of U.S. cigarette makers.

26. The prices of cigarettes paid by consumers at retail reflect the combined effect of five underlying components: (a) the wholesale prices charged by PM USA and other manufacturers to their distributors; (b) cigarette excise taxes and general sales taxes imposed by federal, state and local governments; (c) markups added by distributors and retailers; (d) promotional payments by manufacturers to retailers for prominent shelf display of their brands; and (e) rebates offered by manufacturers directly to consumers. It is well known that differences in manufacturers' pricing strategies (components (a), (d) and (e)) and governmental taxes (component (b)) are the principal determinants of the variation in retail cigarette prices. (See Figure 2 in Harris and Chan [29].) While cigarette manufacturing is highly concentrated, the wholesale and retail distribution of cigarettes is much more competitive. Wholesalers and retailers, whom economists call "downstream firms," set prices essentially by adding a markup to their net costs (components (a), (b), (d) and (e)).

27. In short, the prices of Marlboro Lights, Marlboro Ultra Lights and Marlboro Full Flavored cigarettes have been nearly equal for many years not because consumers have attached equal economic value to these brands, but because Philip Morris USA has made – and continues to make – a strategic decision to set their prices equal. Figure 1 of the Carlton Report does no more than confirm this conclusion.

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*          March 29, 2010

Dated 3/29/2010
Cambridge, Massachusetts

_____
                                              Jeffrey E. Harris

Subscribed and sworn to before me this 29th day of _____March_____, 2010.

My Commission Expires _____Theresa Benevento_____

**Theresa Benevento**
**Notary Public**
My Commission Expires 4/22/2016

12

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*          March 29, 2010

**Table 1.  Volume of Philip Morris USA Onserts and Total Shipments of Marlboro and All Non-Full Flavor Cigarettes, 2002–2008**

| Year | Quarter | Onserts (millions of packs)[a] | Marlboro Non-Full Flavor Shipments (millions of packs)[b] | All PM USA Non-Full Flavor Shipments (millions of packs)[c] |
|---|---|---|---|---|
| 2002 | 1 | | 1,309 | 1,734 |
| 2002 | 2 | | 1,141 | 1,548 |
| 2002 | 3 | | 1,262 | 1,655 |
| 2002 | 4[d] | 130 | 1,097 | 1,466 |
| 2003 | 1 | | 1,134 | 1,496 |
| 2003 | 2 | | 1,273 | 1,657 |
| 2003 | 3 | | 1,298 | 1,682 |
| 2003 | 4 | 109 | 1,238 | 1,595 |
| 2004 | 1 | | 1,148 | 1,465 |
| 2004 | 2 | | 1,291 | 1,658 |
| 2004 | 3 | | 1,287 | 1,648 |
| 2004 | 4 | 118 | 1,259 | 1,602 |
| 2005 | 1 | | 1,145 | 1,457 |
| 2005 | 2 | 149 | 1,321 | 1,673 |
| 2005 | 3 | | 1,290 | 1,634 |
| 2005 | 4 | 135 | 1,223 | 1,543 |
| 2006 | 1 | | 1,173 | 1,475 |
| 2006 | 2 | 140 | 1,279 | 1,607 |
| 2006 | 3 | | 1,294 | 1,623 |
| 2006 | 4 | | 1,232 | 1,539 |
| 2007 | 1 | | 1,098 | 1,376 |
| 2007 | 2 | 129 | 1,227 | 1,531 |
| 2007 | 3 | | 1,274 | 1,582 |
| 2007 | 4 | | 1,124 | 1,412 |
| 2008 | 1 | | 1,077 | 1,337 |
| 2008 | 2 | 127 | 1,192 | 1,458 |
| 2008 | 3 | | 1,227 | 1,506 |
| 2008 | 4 | | 1,114 | 1,374 |
| Total | | 1,037 | 34,027 | 43,333 |

a. Affidavit of Brendan McCormick [22], Paragraphs 9-10, referring to "certain brands of cigarettes."

b. Total nationwide shipments of Marlboro Lights, Mediums, Milds and Ultra Lights, calculated from MSA shipment data.  (See *Marlboro Non-Full Flavor Shipments.log*.)

c. Total nationwide shipments of all PM USA Lights, Mediums, Milds and Ultra Lights, calculated from MSA shipment data.  (See *PM Non-Full Flavor Shipments.log*.)

d. McCormick Affidavit [22] refers to onserts in Nov. 2002 only.  Shipments are for entire quarter.

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*                    March 29, 2010

## Figure 1.  Graph of the Data in Table 1 of Carlton Report



## Appendix A: Econometric Analysis of Marlboro Shipment Data, 1980–2008

28.  The motivation for this econometric analysis is the data on the market shares of Marlboro Lights provided in Carlton's Table 1 and graphed in Figure 1 of this Affidavit.  My study, however, amplifies the original Carlton analysis along several dimensions.

29.  First, I study the longer period from 1980–2008 in order to assess more accurately the background long-term trends in the market share of Marlboro Lights. Second, my analysis is disaggregated into shipments to each of the 51 states and the District of Columbia.  This approach avoids possible errors of inference due to the relatively small number of annual observations at only the national level.  Third, I distinguish between the three most important brand subgroups of the Marlboro family, namely, Marlboro Full Flavor (or Regular), Marlboro Lights, and Marlboro Ultra Lights. By partitioning the market for Marlboro cigarettes along these lines, I avoid artificial market definitions such as "the top four packings" that were employed in the Carlton Report.  Finally, my analysis is based on an underlying model of choice, namely, the multinomial logit model and its extension to the nested logit model [30].  By contrast, the Carlton Report is purely descriptive and has no underpinning in basic economic theory.

*Multinomial Logit Market Model*

30.  A Marlboro smoker selects one of three products: Marlboro Full Flavored (product 0); Marlboro Lights (product 1); and Marlboro Ultra Lights (product 2).  Let $X$ denote a vector of explanatory variables.  Let $\pi_i$ denote the probability that the Marlboro

smoker selects product $i = 0, 1, 2$. Following the well-known multinomial logit model, I specify:

(1)     $$\pi_0 = \frac{\exp\left(X'\beta_0\right)}{\exp\left(X'\beta_0\right) + \exp\left(X'\beta_1\right) + \exp\left(X'\beta_2\right)}$$

(2)     $$\pi_1 = \frac{\exp\left(X'\beta_1\right)}{\exp\left(X'\beta_0\right) + \exp\left(X'\beta_1\right) + \exp\left(X'\beta_2\right)}$$

(3)     $$\pi_2 = \frac{\exp\left(X'\beta_2\right)}{\exp\left(X'\beta_0\right) + \exp\left(X'\beta_1\right) + \exp\left(X'\beta_2\right)}$$

In equations (1)–(3), the unknown parameters are $\left\{\beta_0, \beta_1, \beta_2\right\}$. It is well known that in the absence of restrictions on the vector $X$ of explanatory variables, the econometrician cannot separately identify the three parameters $\left\{\beta_0, \beta_1, \beta_2\right\}$. In what follows, I restrict the parameter $\beta_1 \equiv 0$. Equivalently, only the differences $\beta_0 - \beta_1$ and $\beta_2 - \beta_1$ are identified.

31. It is also well known that the individual choice model of equations (1)–(3) can be applied to the analysis of market share data under certain testable assumptions concerning the heterogeneity of consumers' preferences [31]. To that end, I consider a database consisting of observations $S_{ikt}$ of the market shares of products $i = 0, 1, 2$ in geographic locations $k = 1, \ldots, K$ during time periods $t = 1, \ldots, T$. The market shares $S_{ikt}$ correspond to the consumer-level probabilities $\pi_i$ in equations (1)–(3). Let $X_{kt}$ be the corresponding values of the explanatory variables at location $k$ during time $t$. I then have the two-equation econometric specification

(5)     $$\ln S_{2kt} - \ln S_{1kt} = X'_{kt}\beta_2 + \varepsilon_{kt}$$

(6)     $$\ln S_{0kt} - \ln S_{1kt} = X'_{kt}\beta_0 + v_{kt}$$

16

In equations (5) and (6), I assume that the error terms $\varepsilon_{kt}$ and $v_{kt}$ are i.i.d. normally distributed.

32. Equation (5) implies that the logarithm of the market share ratio of Marlboro Ultra Lights to Marlboro Lights cigarettes is a linear function of certain explanatory variables $X_{kt}$. Similarly, equation (6) implies that the logarithm of the market share ratio of Marlboro Full Flavored cigarettes to Marlboro Lights cigarettes is a linear function of the same explanatory variables $X_{kt}$. In my empirical analysis, the explanatory variables $X_{kt}$ included fixed effects for each location $k$, a linear time trend $t$, interactions between the fixed effects and the linear time trend, and binary indicator variables for each year from 2002 through 2008.

*Nested Logit Market Model*

33. I tested the foregoing multinomial logit model against an alternative nested logit model. In such a model, Marlboro smokers choose first whether or not to smoke a Full Flavored cigarette (product 0). If the smoker does not choose Marlboro Full Flavored cigarettes, then he chooses between Marlboro Lights (product 1) and Marlboro Ultra Lights (product 2). The hierarchy of choices is shown in the standard decision tree diagram below.



17

34. Again let $X$ denote a vector of explanatory variables, and let $\pi_i$ denote the probability that a consumer will select product $i = 0,1,2$. Following the well-known nested logit model, I specify:

(7)    $$\pi_0 = \frac{\exp\left(X'\beta_0\right)}{\exp\left(X'\beta_0\right) + \exp\left(\lambda Y\right)}$$

(8)    $$\pi_1 = \frac{\exp\left(X'\beta_1/\lambda\right)\exp\left(\lambda Y\right)}{\exp\left(Y\right)\left(\exp\left(X'\beta_0\right) + \exp\left(\lambda Y\right)\right)}$$

(9)    $$\pi_2 = \frac{\exp\left(X'\beta_2/\lambda\right)\exp\left(\lambda Y\right)}{\exp\left(Y\right)\left(\exp\left(X'\beta_0\right) + \exp\left(\lambda Y\right)\right)}$$

In equations (7)–(9), the unknown parameters are $\left\{\beta_0,\beta_1,\beta_2,\lambda\right\}$ and the so-called inclusive value $Y$ is defined as

(10)    $$Y = \ln\left(\exp\left(X'\beta_1/\lambda\right) + \exp\left(X'\beta_2/\lambda\right)\right)$$

35. It is well known that when $\lambda = 1$, the nested logit model of equations (7)–(10) collapses to the standard multinomial logit model of equations (1)–(3). While the standard multinomial logit model adheres to the axiom of the "independence of irrelevant alternatives," the nested model does not. As in the standard multinomial logit model, the econometrician cannot separately identify the three parameters $\left\{\beta_0,\beta_1,\beta_2\right\}$, and therefore I restrict the parameter $\beta_1 \equiv 0$.

36. It is also well known that the nested logit model of equations (1)–(4) is a special case of the multinomial logit model with random coefficients [32], which can be applied to the analysis of aggregate market data [31]. Again, consider a database

18

consisting of observations $S_{ikt}$ of the market shares of products $i = 0, 1, 2$ in geographic locations $k = 1, \ldots, K$ during time periods $t = 1, \ldots, T$. The market shares $S_{ikt}$ now correspond to the consumer-level probabilities $\pi_i$ in equations (7)–(9). As before, let $X_{kt}$ be the corresponding values of the explanatory variables at location $k$ during time $t$. I denote $\theta = \beta_2 / \lambda$ and $Y_{kt} = \ln\left(1 + \exp\left(X'_{kt}\theta\right)\right)$. Then the analogue to the two-equation econometric specification of equations (5)–(6) is:

$$(11) \qquad \ln S_{2kt} - \ln S_{1kt} = X'_{kt}\theta + \varepsilon_{kt}$$

$$(12) \qquad \ln S_{0kt} - \ln S_{1kt} = X'_{kt}\beta_0 + \left(1 - \lambda\right)Y_{kt} + v_{kt}$$

In equations (11) and (12), I assume that the error terms $\varepsilon_{kt}$ and $v_{kt}$ are i.i.d. normally distributed.

    37. The econometric model in equations (11)–(12) has the advantage that the parameters can be estimated recursively. First, I estimate the linear regression in equation (11) to obtain a parameter estimate $\hat{\theta}$, which I then use to compute the quantities $\hat{Y}_{kt} = \ln\left(1 + \exp\left(X'_{kt}\hat{\theta}\right)\right)$. Second, I estimate the linear regression in equation (12) as

$$(13) \qquad \ln S_{0kt} - \ln S_{1kt} = X'_{kt}\beta_0 + \left(1 - \lambda\right)\hat{Y}_{kt} + v_{kt}$$

The linear model of equation (13) yields the parameter estimates $\hat{\beta}_0$ and $\hat{\lambda}$. A test of the null hypothesis that $1 - \lambda = 0$ in equation (13) is thus equivalent to a test of the standard multinomial logit model versus the alternative of the nested logit [33].

19

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*          March 29, 2010

*Results*

38.  I ran equation (5) of the multinomial logit market model, where the dependent variable is the log of the share ratios of Marlboro Ultra Lights to Marlboro Lights, on data for the years 1998–2008.  I ran equation (6), where the dependent variable is the log of the share ratios of Marlboro Full Flavor to Marlboro Lights, on data for the years 1990–2008, and alternatively on data for the years 1980–2008 and 1998–2008. Here, I report the results form 1990–2008, which were the most conservative.  Table 2 shows the estimated coefficients and standard errors of the binary indicator variables for each year from 2002 to 2008.  The full results are given in *Marlboro_MNL.log*.

| Table 2.  Standard Multinomial Logit Market Model: Estimates of Coefficients of Indicator Variables for Each Year from 2002–2008* | | | | |
|---|---|---|---|---|
| Indicator for Year | Equation (5) | | Equation (6) | |
| | $\hat{\beta}_2$ | S.E. | $\hat{\beta}_0$ | S.E. |
| 2002 | −0.0673 | 0.0089 | 0.0257 | 0.0060 |
| 2003 | −0.1507 | 0.0109 | 0.0333 | 0.0063 |
| 2004 | −0.2274 | 0.0130 | 0.1085 | 0.0065 |
| 2005 | −0.3316 | 0.0153 | 0.1654 | 0.0067 |
| 2006 | −0.4193 | 0.0177 | 0.2213 | 0.0070 |
| 2007 | −0.4935 | 0.0200 | 0.3116 | 0.0073 |
| 2008 | −0.5643 | 0.0224 | 0.3685 | 0.0076 |

*Source: *Marlboro_MNL.log*.

39.  Table 2 shows that during 2002–2008, the share ratio of Marlboro Ultra Lights to Marlboro Lights increasingly deviated below its expected linear trend. Moreover, the share ratio of Marlboro Full Flavor to Marlboro Lights increasingly deviated above its expected linear trend.  Equivalently, by the year 2008, the share ratio of Marlboro Lights to Marlboro Full Flavored cigarettes was nearly 37 percent below the value predicted by a linear trend.

20

40. When I ran the nested logit model of equations (11)–(12) for the years 1998–2008, I obtained an estimate of $\hat{\lambda} = 0.1052$ with a standard error of $0.8832$, and thus I could not reject the null hypothesis that $\lambda = 1$ (significance level, $P = 0.312$). I also ran alternative nested logit models, in which the Marlboro smoker first decides whether or not to smoke Marlboro Lights, and in which the Marlboro smoker first decides whether or not to smoke Marlboro Ultra Lights. But in each case, I could not reject the standard multinomial model of equations (5) and (6) against the nested market alternative. (See *Marlboro_MNL.log.*)

41. Figures 2 and 3, respectively, show the observed and predicted values of the share ratios for the states of Illinois and Maine. In order to facilitate comparison with Prof. Carlton's results in Figure 1, I have graphed the share ratio of Marlboro Lights to Marlboro Regular (Full Flavor) cigarettes along with the share ratio of Marlboro Ultra Lights to Marlboro Regular (Full Flavor Cigarettes). The solid lines show the predicted values from the multinomial logit market model. The dashed lines show the linear trend for the share ratio of Marlboro Lights to Marlboro Full Flavor, which I calculated by setting all of the indicator variables for the years 2002–2008 equal to zero.

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*                    March 29, 2010

**Figure 2.  Market Share Ratios of Marlboro Lights to Marlboro Regulars and Marlboro Ultra Lights to Marlboro Regulars, Shipments to Illinois, 1990–2008**



The filled circles show the market share ratios of Marlboro Lights to Marlboro Regulars (above) and Marlboro Ultra Lights to Marlboro Regulars (below).  The solid lines show the fitted values based on the multinomial logit market model.  The dashed line shows the predicted values of the share ratio of Marlboro Lights to Marlboro Regulars, based on the fitted linear trend.  Source: *Marlboro_MNL.log*.

22

Harris, J.E., Affidavit       *In Re: Light Cigarettes, MDL No. 2068*       March 29, 2010

**Figure 3.  Market Share Ratios of Marlboro Lights to Marlboro Regulars and Marlboro Ultra Lights to Marlboro Regulars, Shipments to Maine, 1990–2008**



The filled circles show the market share ratios of Marlboro Lights to Marlboro Regulars (above) and Marlboro Ultra Lights to Marlboro Regulars (below).  The solid lines show the fitted values based on the multinomial logit market model.  The dashed line shows the predicted values of the share ratio of Marlboro Lights to Marlboro Regulars, based on the fitted linear trend. Source: *Marlboro_MNL.log*

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*          March 29, 2010

**End Notes and References**

1.  Harris, J.E., *Expert Report*, in *In Re: Light Cigarettes Marketing and Sales Practices Litigation*. 2009, MDL Docket No. 1-09-MD-2068, All Cases: United States District Court, District of Maine, December 6.

2.  Harris, J.E., *Deposition Testimony*, in *In Re: Light Cigarettes Marketing and Sales Practices Litigation*. 2010, MDL Docket No. 1-09-MD-2068, All Cases: United States District Court, District of Maine, January 20.

3.  Carlton, D.F., *Declaration and Expert Disclosure Statement*, in *In Re: Light Cigarettes Marketing and Sales Practices Litigation*. 2010, MDL Docket No. 1-09-MD-2068, All Cases: United States District Court, District of Maine, January 28.

4.  On February 24, 2010, I received a compact disc containing data that were supposedly "formatted for SAS." (See email from Peter Del Blanco Jr. to Samuel Lanham, Subject: "Carleton CDs," dated February 19, 2010, 6:11 A.M.) However, these were not the "SAS Transport Files" referenced in the Carlton Report. In fact, the files were formatted for a specific computer platform (VMS) and were unreadable by standard cross-platform software.

5.  On March 4, 2010, I received seven compact discs (CDs), five of which contained the underlying data (in the form of SAS Transport Files), and two of which contained computer programs. The latter two CDs (labeled *Compass Lexecon Programs 2/26/10* and *Programs and Header Files*, respectively) contained the same computer programs. Three of the programs were named *program1.sas*, *program2.sas*, and *program3.sas*. These programs created the following

24

intermediate data files: *smokingdata*, *smokingdata1*, *smokingdata2*, *california*, *cali_1*, *cali_2*, *figure1*, and *test*. None of these intermediate data files were produced. Nor did I receive the output/log files of these computer programs. A fourth computer program was named *newey.do*, which presumably carried out the statistical procedure described in footnote 8 at page 14 of the Carlton Report. The latter program loaded data from the input file named *test.dta*, which was likewise not produced. Nor was the output/log file produced, either.

6.    Harris, J.E., *Trial Testimony*, in *Price et al v. Philip Morris Companies Inc.* 2003: Circuit Court, Third Judicial Circuit, Madison County, Illinois, February 6, February 11, March 6.

7.    Harris, J.E., *Deposition Testimony*, in *Schwab v Philip Morris et al.* 2005, United States District Court, Eastern District of New York, Civil Action No. CV-0401945(JBW)(SMG): June 5.

8.    Harris, J.E., *Deposition Testimony*, in *Schwab v Philip Morris et al.* 2006, United States District Court, Eastern District of New York, Civil Action No. CV-0401945(JBW)(SMG): March 9-10.

9.    Harris, J.E., *Deposition Testimony*, in *Craft v Philip Morris.* 2010, Missouri Circuit Court, Twenty-Second Judicial Court (City of St. Louis): Case No. 002-00406-02, January 8.

10.   Harris, J.E., *Trial Testimony*, in *United States of America v. Philip Morris Incorporated et al.* 2004, Civil Action No. 99-2496(GSK), United States District Court for the District of Columbia:

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*                    March 29, 2010

http://www.usdoj.gov/civil/cases/tobacco2/Writtend%20Direct%20of%20Dr.%20 Jeffrey%20E.%20Harris.pdf, October 14-21.

11. Shopland, D.R., et al., *Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine.* Smoking and Tobacco Control Monographs. 2001, Bethesda MD: US Department of Health and Human Services, National Cancer Institute Smoking and Tobacco Control Monograph 13, November.

12. Surgeon General's Advisory Committee on Smoking and Health, *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service.* 1964, Washington DC: United States. Public Health Service. Office of the Surgeon General, Public Health Service Publication No. 1103, January.

13. Philip Morris USA, *Philip Morris USA 2008 Cigarette Nicotine Yield Rating Report (to Massachusetts Department of Public Health).* 2008, http://www.philipmorrisusa.com/en/cms/Products/Cigarettes/Regulatory_Reportin g/pdfs/MA_2008_Submission.pdf.aspx, November 20.

14. Connolly, G.N., et al., *Trends in nicotine yield in smoke and its relationship with design characteristics among popular US cigarette brands, 1997-2005.* Tob Control, 2007. **16**(5): p. e5.

15. Reed, M.B., C.M. Anderson, and D.M. Burns, *The temporal relationship between advertising and sales of low-tar cigarettes.* Tob Control, 2006. **15**(6): p. 436-41.

16.   Federal Trade Commission, *Federal Trade Commission Cigarette Report for 1997*. 1999, Washington DC:
      http://www.ftc.gov/os/1999/07/1997cigarettereport.pdf.

17.   Federal Trade Commission, *Federal Trade Commission Cigarette Report for 2006 (August 2009)*. 2009, Washington DC:
      http://www.ftc.gov/os/2009/08/090812cigarettereport.pdf.

18.   Shiffman, S., et al., *Smokers' beliefs about "Light" and "Ultra Light" cigarettes.* Tob Control, 2001. **10 Suppl 1**: p. i17-23.

19.   Borland, R., et al., *Use of and beliefs about light cigarettes in four countries: findings from the International Tobacco Control Policy Evaluation Survey.* Nicotine Tob Res, 2004. **6 Suppl 3**: p. S311-21.

20.   Borland, R., et al., *What happened to smokers' beliefs about light cigarettes when "light/mild" brand descriptors were banned in the UK? Findings from the International Tobacco Control (ITC) Four Country Survey.* Tob Control, 2008. **17**(4): p. 256-62.

21.   Hammond, D. and C. Parkinson, *The impact of cigarette package design on perceptions of risk.* J Public Health (Oxf), 2009. **31**(3): p. 345-53.

22.   McCormick, B., *Affidavit*, in *In Re: Light Cigarettes Marketing and Sales Practices Litigation*. 2010, MDL Docket No. 1-09-MD-2068, All Cases: United States District Court, District of Maine, January 21.

23.   The details of my computations of Marlboro-brand non-full flavored cigarette shipments are given in the output file *Marlboro Non-Full Flavor Shipments.log*. The corresponding details of my computations of all PM USA non-full flavored

cigarette shipments are given in the output file *PM Non-Full Flavor Shipments.log*.  These computations do not rely upon any data designated as confidential or highly confidential by counsel for Defendant.

24.    The corresponding percentages for each calendar year were: 2.0% in 2002; 1.7% in 2003; 1.9% in 2004; 4.5% in 2005; 2.2% in 2006; 2.2% in 2007; and 2.2% in 2008.

25.    I use the terms "Marlboro Regulars" and "Marlboro Full Flavored cigarettes" interchangeably.  I assume that Prof. Carlton likewise used the term "Marlboro Reds" as interchangeable with "Marlboro Regulars" and "Marlboro Full Flavored cigarettes."

26.    US Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*. 1997, Washington DC: http://www.justice.gov/atr/public/guidelines/hmg.htm. Issued April 2, 1992; Revised April 8, 1997.

27.    Carlton, D.F., *The Rigidity of Prices*. American Economic Review, 1986. **76**(4): p. 647-658.

28.    Harris, J.E., *The 1983 Increase in the Federal Excise Tax on Cigarettes*, in *Tax Policy and the Economy, Volume 1*, L. Summers, Editor. 1987, MIT Press: Cambridge. p. 87-111.

29.    Harris, J.E. and S.W. Chan, *The continuum-of-addiction: cigarette smoking in relation to price among Americans aged 15-29*. Health Econ, 1999. **8**(1): p. 81-6.

30.    Hausman, J. and D. McFadden, *Specification Tests for the Multinomial Logit Model*. Econometrica, 1984. **52**(5): p. 1219-1240.

Harris, J.E., Affidavit          *In Re: Light Cigarettes, MDL No. 2068*          March 29, 2010

31.    Berry, S.T., *Estimating Discrete-Choice Models of Product Differentiation.* Rand Journal of Economics, 1994. **25**(2): p. 242-262.

32.    Cardell, N.S., *Variance Components Structures for the Extreme-Value and Logistic Distributions with Application to Models of Heterogeneity.* Econometric Theory, 1997. **13**(2): p. 185-213.

33.    The two-equation model (12)–(13) resembles that derived by Berry, *op. cit.*, who derived the following equation in the present notation

$$\ln S_{0kt} - \ln S_{1kt} = X'_{kt}\beta_0 - \frac{\lambda}{1-\lambda}\ln\left(\frac{S_{0kt}}{1-S_{0kt}}\right) + \varsigma_{kt}$$

(See equation 28 in [31].)  The principal difficulty with this formulation is that the right-hand side term $\ln\left(\dfrac{S_{0kt}}{1-S_{0kt}}\right)$ will not be independent of the error term $\varsigma_{kt}$

and therefore a search for the appropriate instrumental variables will be required.