UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

_____
                                                                )
IN RE:  LIGHT CIGARETTES MARKETING        )        MDL Docket No.: 1:09-MD-2068
SALES PRACTICES LITIGATION                        )        ALL CASES
_____   )

PLAINTIFFS' RESPONSE TO DEFENDANT PHILIP MORRIS
USA INC.'S STATEMENT OF MATERIAL UNDISPUTED FACTS IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON
PLAINTIFFS' CLAIMS FOR PURCHASES AFTER DECEMBER 1, 2002,
AND PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Rule 56(c) of the Local Rules for the United States District Court for the District of Maine, Plaintiffs submit this Response to Defendant Philip Morris USA Inc.'s ("PM USA") Statement of Material Undisputed Facts in Support of Defendant's Motion for Summary Judgment on Plaintiffs' Claims for Purchases After December 1, 2002, and Plaintiffs' Statement of Additional Material Facts.

Set forth below are the Material Facts contained in the Statement of Material Facts in Support of Defendant Philip Morris USA Inc's Motion for Summary Judgment on Plaintiffs' Claims for Purchases After December 1, 2002 ("PM USA's Statement"), and Plaintiffs' responses thereto.  Plaintiffs' Statement of Additional Facts is also set forth below.

**Material Facts from PM USA's Statement, and Plaintiffs' Responses Thereto:**

**I.      Low Tar Cigarettes**

1.      In 1966, to provide a uniform basis for advertising claims, the Federal Trade Commission ("FTC") began using a standardized test method for measuring tar and nicotine yields of all U.S. cigarettes.  62 Fed. Reg. 48158 (Sept. 12, 1997).

          **Plaintiffs' Response: ADMITTED.**

2.      This method – known as the "FTC Method" or the "Cambridge Method" – used a machine that smoked each cigarette the same way.  32 Fed. Reg. 11178 (Aug. 1, 1967).

          **Plaintiffs' Response: ADMITTED.**

3.      Starting in the 1960s and continuing into the 1990s, public health officials recommended reductions in FTC-measured yields as a means of reducing the risks of smoking. *See, e.g.,* U.S. Department of Health and Human Services, *The Health Consequences of Smoking: The Changing Cigarette – A Report of the Surgeon General*, at 15 (1981) (Ex. 2).

          **Plaintiffs' Response: QUALIFIED.**  The U.S. Department of Health and Human Services stated, in the excerpted report, that "The health risks of cigarette smoking can

only be eliminated by quitting.  For those who continue to smoke, some risk reduction may result from a switch to lower 'tar' and nicotine cigarettes, *provided that no compensatory changes in style of smoking occur*."  U.S. Department of Health and Human Services, *The Health Consequences of Smoking: The Changing Cigarette – A Report of the Surgeon General*, at 15 (1981) (Ex. 2 to Philip Morris's Motion) (emphasis added).

4.      Like any standardized testing methodology, the FTC Method could not predict the actual amount of tar and nicotine inhaled by any individual smoker because not everyone smoked like the machine.  *See* FTC News Release at 2 (Aug. 1, 1967) (Ex. 3); *see also* 48 Fed. Reg. 15953 (Apr. 13, 1983).

> **Plaintiffs' Response: QUALIFIED.**  The primary reason why the FTC Method could not predict the amount of tar and nicotine inhaled by any individual smoker was because of smoker compensation.  *U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 501 (D.D.C. 2006) "*DOJ*" (¶ 2349) ("Defendants withheld their long-held knowledge that the primary reason the FTC Method could yield misleading data was that nicotine addiction would drive smokers to obtain relatively stable nicotine intakes through smoker compensation.").  Moreover, "[c]igarette company Defendants, with the benefit of their much more sophisticated understanding of smoker compensation, as well as their knowledge of nicotine control, then intentionally developed and marketed cigarettes which, in actuality, delivered higher levels of nicotine than those measured by the FTC method."  *Id.* at 309 (¶ 1370).

5.      The FTC emphasized this fact to the public as early as 1967:

> The [FTC] Method does not and cannot measure the [] many variations in human smoking habits. . . .  It does not measure all of the tar and nicotine in any cigarette, but only that in the smoke drawn in the standardized

> machine according to a prescribed method.  Thus, the purpose of testing is not to determine the amount of tar and nicotine inhaled by any human smoker, but rather to determine the amount of tar and nicotine generated when a cigarette is smoked by machine in accordance with the prescribed method.

FTC News Release at 2 (Aug. 1, 1967) (Ex. 3); *see also* 48 Fed. Reg. 15953 (Apr. 13, 1983).

> **Plaintiffs' Response: ADMITTED.**

6.     The first cigarette labeled as "lights" was Marlboro Lights, which was introduced by PM USA in 1971 and "advertised as a cigarette for people 'who prefer the lighter taste of a low tar smoke.'" FTC, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 10 (1971) (Ex. 4).

> **Plaintiffs' Response: QUALIFIED.**   The FTC Report also includes additional information.  James Morgan, who was Brand Manager of Marlboro from 1969 to 1972, during the time when Philip Morris introduced Marlboro Lights, its first "light" cigarette, explained the intended meaning of the "lights" descriptor. Morgan stated that, from the very beginning, the "lights" descriptor was intended to communicate that the brand was low in tar-as opposed to a brand that was lighter in taste:

>> From the very beginning the phrase, "Lowered tar and nicotine" was going to be on the package [of Marlboro Lights]. That was the phrase that described to the consumer what the product was in our judgment.... We felt the brand name, Marlboro Lights, was a real help in terms of the description of the product being low in tar and nicotine which appeared on the pack from the inception of the project . . . . We are not talking, in my judgment, talking about light . . . as a taste. It's not a term that means anything in terms of taste, and the name Marlboro Lights as I said before, a word which we feel has appeal in a different sense than suggesting what the cigarette even tastes like . . . . It was our desire in this entire Marlboro Lights brand project to constantly position Marlboro Lights as being-as having lower tar and nicotine from Marlboro [Reds].

*DOJ* at 513 (¶ 2401).  Morgan also confirmed that Marlboro Lights were positioned as "lower in tar and lighter in taste than Marlboro Red," and were marketed to people seeking a low tar and nicotine cigarette, including smokers of both high and low tar cigarettes. A 1974-1975 Philip Morris magazine advertisement for Marlboro Lights stated: "Marlboro Lights. The spirit of a Marlboro in a low tar cigarette." Philip Morris has used the phrases "lowered tar and nicotine" and "Lights" in association with Marlboro Lights for over 30 years.  *DOJ* at 516 (¶ 2420).

II.   **PM USA's Communications to Smokers About Low Tar Cigarettes from 1999-2009**

7.     In the late 1990s, the public health recommendation in favor of reductions in FTC-measured tar and nicotine yields became increasingly controversial in light of concerns that smokers compensate when smoking low tar cigarettes and thus may not receive less tar and nicotine.  *National Cancer Institute Monograph 13, Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine* ("*NCI Monograph 13*"), at 13-64 (November 2001) (Ex. 5).

**Plaintiffs' Response: ADMITTED.**

8.     These concerns culminated in the 2001 publication of Monograph 13 by the National Cancer Institute ("NCI"), which concluded that public health officials should no longer recommend such reductions.  *See NCI Monograph 13.*

**Plaintiffs' Response: ADMITTED.**

9.     In response to these concerns, in 1999, the FTC acknowledged that its tar and nicotine ratings "tend to be relatively poor predictors of 'tar' and nicotine exposure . . . due primarily to compensation . . . ."  FTC, Tar, Nicotine and Carbon Monoxide of the Smoke of 1252 Varieties of Domestic Cigarettes For the Year 1997, at 1-2 (1999) (Ex. 6).

**Plaintiffs' Response: ADMITTED.**

10.     As a result, the FTC asserted "that all smokers should know the following facts":

"Tar" and nicotine ratings were never intended to reflect what any individual consumer would get from any particular cigarette;

How much "tar" and nicotine an individual gets from a cigarette depends on how he or she smokes it – smokers of cigarette brands with lower "tar" and nicotine ratings who take larger or more frequent puffs may get as much "tar" and nicotine as smokers of higher rated brands;

Many cigarettes have ventilation holes that, when blocked, substantially increase exposure to the harmful constituents in smoke;

There is no such thing as a safe smoke, no matter what the "tar" and nicotine ratings are; and

People who are concerned about the health effects of smoking should quit.

*Id.* at 3-4.  *See also* FTC, Up in Smoke, The Truth About Tar and Nicotine Ratings (May 2000) (available at http://www.ftc.gov/bcp/edu/pubs/consumer/alerts/alt069.pdf) (last visited 1/17/2010) (FTC consumer alert with this information).

**Plaintiffs' Response:  ADMITTED.**

11.     Since 1999, PM USA, in response to the FTC and public health concerns about low tar cigarettes, has taken extensive steps to provide consumers with this and other information about tar and nicotine yields, product descriptors and the relative risks of different cigarette products.  *See* Affidavit of Brendan McCormick ("McCormick Aff.") ¶¶ 4-28 (Ex. 7).

**Plaintiffs' Response: DENIED.**  While PM USA may have taken some steps to provide consumers with information, Plaintiffs deny that the steps it has taken can be characterized as "extensive."  PM USA states that it "has included [informational] onserts in approximately 130 million cigarette packs distributed nationwide in 2002, 109 million packs in 2003, 118 million packs in 2004, 145 million and then another 135 million packs in 2005, 140 million packs in 2006, 129 million packs in 2007 and 127 million packs in 2008."  McCormick Aff. ¶ 10.  Based upon data provided by PM USA, it has sold

approximately six billion packs of "non-full-flavor" (referred to herein as "Light") cigarettes nationwide each year since 2002. *See* Affidavit of Jeffrey E. Harris, M.D. Ph.D., at Table 1 [D.E. #186 at Exhibit I]. Accordingly, PM USA only included low tar/lights onserts in 2.4% of its packs of Light cigarettes distributed during the period from 2002 to 2008. *Id*; s*ee also* Additional Facts, *infra.*

A.     **Information on Packaging of Low Tar Cigarettes**

12.    Beginning in November 2002, and every year through 2008, PM USA has periodically included an "onsert" – a folded leaflet placed under the cellophane packaging on packs of low tar cigarettes – containing information about the meaning of "lights" descriptors, the significance of the FTC tar and nicotine yield measurements, and the possibility that smokers would compensate when smoking low tar cigarettes. McCormick Aff. ¶ 9.

**Plaintiffs' Response: QUALIFIED.**  McCormick averred only that the onserts were placed on "certain brands." McCormick Aff. ¶ 9.  In fact, the distribution of onserts in 2002 excluded numerous brands (*see* "Low Tar Onsert/Outsert, Nov. 2002, McCormick Dep. Ex. 3 (3007287724-3007287727) (attached hereto as Exhibit A), at 3007287724), and the distribution of onserts in the fourth quarter of 2003 was only done in one week's volume of the top-selling brands, the "A and B Classes," due to limitations in the factories' ability to include onserts in other brands. McCormick Dep. Ex. 6 (5002612333-5002612335) (attached hereto as Exhibit B), at 5002612333; McCormick Dep. at 57:7-25.[1]  Instead of the 175 packings that were done the previous year, only 45 packings were done in 2003.  (Exhibit B at 5002612333; McCormick Dep. at 56:10-11).  Accordingly, only smokers of the top-selling brands of PM USA light cigarettes could

---

[1] Relevant pages of the Deposition Transcript of Brendan McCormick are attached hereto as Exhibit AA, and are referred to herein as "McCormick Dep. at __."

have received onserts in the cigarettes they purchased in and shortly after the fourth

quarter of 2003.  The remaining brands – all of those in the "C and D" classes – did *not*

include onserts.  Based upon the difference between the number of packings that included

onserts in 2002 and the number of packings that included onserts in 2003, it appears that

approximately 130 different SKUs, which had been included in the onsert distribution in

2002, were excluded from the onsert distribution in 2003.  *See* Exhibit B at 5002612333.

13.     These onserts have contained the following (or similarly-worded) statements:

There is no such thing as a safe cigarette, including this one.

The terms "Ultra Light," "Light," "Medium" and "Mild" are used as descriptors of strength of taste and flavor.  These terms also serve as a relative indication of the average tar and nicotine yield as measured by a standard government test method.

The tar and nicotine yield numbers are not meant to communicate the amount of tar and nicotine actually inhaled by any smoker, as individuals do not smoke like the machine used in the government test method.  The amount of tar and nicotine you inhale will be higher than the stated tar and nicotine yield numbers if, for example, you block ventilation holes, inhale more deeply, take more puffs or smoke more cigarettes.

Similarly, if you smoke brands with descriptors such as "Ultra Light", "Light," "Medium," or "Mild," you may not inhale less tar and nicotine than you would from other brands.  It depends on how you smoke.

You should not assume that cigarette brands using descriptors like "Ultra Light," "Light," "Medium" or "Mild" are less harmful than full flavor cigarette brands or that smoking such cigarette brands will help you quit smoking.

If you are concerned about the health effects of smoking, you should quit.

McCormick Aff. ¶ 9, Ex. B.

**Plaintiffs' Response: ADMITTED.**

14.     PM USA included these onserts in approximately 130 million cigarette packs

distributed nationwide in 2002, 109 million packs in 2003, 118 million packs in 2004, 145

million and then another 135 million packs in 2005, 140 million packs in 2006, 129 million packs in 2007 and 127 million packs in 2008.  McCormick Aff. ¶ 10.

> **Plaintiffs' Response: ADMITTED.**

15.    As of 2009 PM USA has also placed information regarding product descriptors on the cellophane tear tape on the outside of cigarette packages containing descriptors.  McCormick Aff. ¶ 12, Ex. C.

> **Plaintiffs' Response: ADMITTED.**

16.    For packages bearing a "Lights" descriptor the tear tape, which the smoker must pull off in order to open the package, states: "'Lights' does NOT mean safer.  It refers to taste.  'Lights' won't help you quit smoking."  McCormick Aff. ¶ 12, Ex. C.

> **Plaintiffs' Response: ADMITTED.**

17.    The tear tapes are used on packages bearing descriptors and they vary depending on the descriptor.  McCormick Aff. ¶ 12, Ex. C.

> **Plaintiffs' Response:  ADMITTED.**

18.    All express references to tar and nicotine on low tar cigarette packages – such as the words "Lowered Tar and Nicotine" on Marlboro Lights cigarettes – were removed from all low tar products manufactured by PM USA in the first quarter of 2003.  *See* Resp. of Def. PM USA Inc. to Pls.' June 24, 2009 Supplemental Set of Interrogs. and Reqs. for Production of Docs., *Craft v. Philip Morris Cos.*, No. 002-00406-02 (Mo. Cir. Ct. July 24, 2009), at 14 (Resp. to Interrog. 2) (Ex. 8).

> **Plaintiffs' Response: DENIED.**  The Response of Defendant Philip Morris USA Inc. to Plaintiffs' June 24, 2009 Supplemental Set of Interrogatories and Requests for Production of Documents, *Craft v. Philip Morris Cos.*, No. 002-00406-02 (Mo. Cir. Ct. July 24, 2009), at 14 (Resp. to Interrog. 2) states only that "Philip Morris USA further

states that, beginning in the first quarter of 2003, it ceased producing *Marlboro Lights* packs containing the phrase 'lowered tar and nicotine,'" (Ex. 8 to Philip Morris Motion)(emphasis added), not that such phrases were removed from "*all* low tar products manufactured by PM USA." (emphasis added).

**B.      Information Disseminated Through Newspapers and Other Media**

19.     At the same time it began its onset program, in November 2002, Philip Morris USA created a 20-page booklet known as a "free standing insert."  McCormick Aff. ¶ 4.

**Plaintiffs' Response:  ADMITTED.**

20.     Approximately 16.7 million booklets were included in more than 25 major U.S. newspapers, including newspapers distributed nationally such as *The New York Times*, the *Los Angeles Times*, *The Washington Post*, and *USA Today*.  McCormick Aff. ¶ 4; *see* also "Philip Morris U.S.A. Runs Advertising Highlighting its Website," PM USA Press Release (Nov. 13, 2002) (Ex. 9).

**Plaintiffs' Response:  ADMITTED.**

21.     The insert contained excerpts from PM USA's website concerning low tar cigarettes, including that "[a] smoker should not assume that brand descriptors such as 'light' or 'ultra-light' indicate with precision either the actual amount of tar and nicotine inhaled from any particular cigarette, or the relative amount as compared to competing cigarette brands," and that "[t]he amount of tar and nicotine inhaled will be higher if, for example, a smoker blocks ventilation holes, inhales more deeply, takes more puffs or smokes more cigarettes." McCormick Aff. ¶ 5.

**Plaintiffs' Response:  ADMITTED.**

22.     The insert also included an excerpt from an NCI press release entitled:  "Low Tar Cigarettes:  Evidence Does Not Indicate A Benefit to Public Health."  McCormick Aff. ¶ 6.

**Plaintiffs' Response:  ADMITTED.**

23.     The excerpt, based on Monograph 13, stated:

The Monograph clearly demonstrates that people who switch to low-tar or light cigarettes from regular cigarettes are likely to inhale the same amount of cancer-causing toxins and they remain at high risk for developing smoking-related cancers and other diseases.

McCormick Aff. ¶ 6, Ex. A.

**Plaintiffs' Response:  ADMITTED**.

24.     PM USA further publicized the distribution of the insert via a press-release issued on November 13, 2002.  *See* "Philip Morris U.S.A. Runs Advertising Highlighting its Website," PM USA Press Release (Nov. 13, 2002) (Ex. 9).

**Plaintiffs' Response:  ADMITTED.**

25.     In 2003, 2004, 2005, and 2006, PM USA ran national television and radio announcements advising the public of the smoking and health-related information available on its website, www.philipmorrisusa.com.  McCormick Aff. ¶ 8.

**Plaintiffs' Response: ADMITTED.**

26.     A number of these announcements addressed low tar cigarettes, stating that:

There is no "safe" cigarette.  "Light" and "ultra light" cigarettes are no exception.

The only proven way to reduce the health risks of smoking is to quit.

McCormick Aff. ¶ 8.

**Plaintiffs' Response:  QUALIFIED.**  McCormick has provided no information as to the precise "number of these announcements" that addressed low tar cigarettes, or as to the total number of announcements it made.  McCormick Aff. ¶ 8.

C.        **Internet Communications**

27.       PM USA launched its internet website, www.philipmorrisusa.com, on October 13, 1999.  McCormick Aff. ¶ 18.

     **Plaintiffs' Response: ADMITTED.**

28.       The original website contained a section entitled "Understanding Tar and Nicotine Numbers:   What They Mean and Don't Mean," which informed consumers about low tar cigarettes, tar and nicotine numbers and compensation, and included the following statements concerning low tar cigarettes:

> No two smokers smoke cigarettes exactly the same way.  The tar and nicotine yield numbers that are reported for cigarette brands are not meant (and never were intended) to communicate the precise amount of tar or nicotine inhaled by any individual smoker from any particular cigarette. These numbers come from standardized testing methods, which compare different brands when smoked by a machine under identical laboratory conditions.

>        \* \* \*

> Philip Morris frequently describes cigarette brands using terms such as "full flavor," "light," and "ultra-light."   These terms are commonly referred to as "descriptors," and facilitate consumers' ability to distinguish among different product offerings.

> Descriptors are generally used as a point of comparison (with respect to attributes such as strength of taste and flavor, and tar/nicotine yield as measured by a machine method) . . . .  **Smokers should not assume that brand descriptors such as "light" or "ultra-light" indicate with any precision either the actual amount of tar and nicotine they will inhale from any particular cigarette, or the relative amount as compared to competing cigarette brands**.   Some researchers report that consumers who smoke "light" cigarettes inhale as much tar and nicotine as from full-flavor brands.

>        \* \* \*

> **Generally speaking, the more intensely a smoker smokes a cigarette, the more tar and nicotine he or she will inhale from that cigarette.**

>        \* \* \*

- 11 -

> **Philip Morris does not imply in its marketing, and smokers should not assume, that lower-yielding brands are "safe," or are "safer" than full-flavor brands.**
>
> * * *
>
> **It is important to remember that, as of today, there is no cigarette on the market which the public health community endorses as offering reduced risk, and it continues to be the case that, if smokers are concerned about the risks of smoking, quitting is by far their best alternative for reducing those risks.**

McCormick Aff. ¶ 18, Ex. F (emphases in original).

> **Plaintiffs' Response: QUALIFIED.**  Following the language quoted above, the

exhibit also states:

> However, because smokers have varying preferences, Philip Morris offers products with differing yields of tar and nicotine, as measured by one of the machine methods.  We believe that it is appropriate to continue to differentiate our brands on this basis, and that descriptors such as 'light' and 'ultra light' help communicate these differences to adult smokers.

McCormick Aff., Ex. F.

29.    The website also contained images of a cigarette illustrating the precise location

of the ventilation holes in the filter, which are used to dilute the smoke with air (thus lowering

the FTC-measured yield) and which plaintiffs allege are blocked by smokers' fingers or lips:



12mm

> Cigarette filter ventilation is one way that tar yields (as measured by the machine test method) are reduced.  The ventilation holes utilized on some of our brands permit the controlled introduction of diluting air into the smoke stream during puffing by the smoker.  The diagram above depicts where, as a general matter, ventilation holes are placed on the cigarette filters of our brands that utilize this feature.  As noted in the diagram, the holes are placed approximately 12mm from the end of the filter, brands that utilize more than one row of holes place additional rows further from the end.

McCormick Aff. ¶ 22, Ex. H.

        **Plaintiffs' Response: ADMITTED**.

30.     The website provided links to websites maintained by the FTC, the U.S. Department of Health and Human Services, and other public health groups, which contained information concerning FTC tar and nicotine yields, compensation, and warned consumers that low tar cigarettes were no safer than full-flavor cigarettes.  McCormick Aff. ¶ 24, Exs. F, G.

        **Plaintiffs' Response:  QUALIFIED.**  The exhibits that Philip Morris attached to the McCormick Affidavit in support of this statement do appear to reflect links to the documents offered by the FTC, U.S. Department of Health, and other groups.  The exhibits do not "warn[] consumers that low tar cigarettes [are] no safer than full-flavor cigarettes," but rather state that the descriptors do not mean that they are safer.  *See* McCormick Aff. ¶ 24, Ex. F ("Although we believe that descriptors serve as useful points of comparison for cigarette brands regarding characteristics such as strength of taste and reported *tar yield*, we do not *imply* in our marketing, and smokers *should not assume*, that 'light' or 'ultra light' brands are 'safe,' or are 'safer' than full-flavored brands.") (emphasis added), Ex. G ("The terms 'Lights,' 'Ultra-Lights,' 'Medium' and 'Mild' do NOT mean that the product is safe, safer or less harmful.").

31.     Similar information has appeared consistently on the PM USA website since 1999, and is readily accessible at: http://www.philipmorrisusa.com/en/cms/Products/Cigarettes/Health_Issues/Cigarettes_with_Brand_Descriptors/default.aspx (last visited 1/16/2010).  McCormick Aff. ¶ 20.

        **Plaintiffs' Response:  QUALIFIED.**  PM USA does not provide a definition for its use of the word "consistently" here, and Plaintiffs deny that the information is "readily accessible."  To reach the URL address set forth above, one must search through two

levels of the PM USA website. *See* http://www.philipmorrisusa.com;
http://www.philipmorrisusa.com/en/cms/Products/Cigarettes/Health_Issues/default.aspx?
src=home (last visited 3/24/10).

**D.**     **Direct Mail Communications to Smokers**

32.     In June 2003, PM USA sent a direct mailing to certain adult smokers describing
its corporate website, www.philipmorrisusa.com.  McCormick Aff. ¶ 26, Ex. I.

>     **Plaintiffs' Response:  ADMITTED.**

33.     More than seven million mailings were sent to smokers in the MDL jurisdictions.
McCormick Aff. ¶ 26.

>     **Plaintiffs' Response: ADMITTED.**

34.     The direct mailing explained that information about "health issues for smokers"
and "tar and nicotine numbers" was available on the website. McCormick Aff. ¶ 27.

>     **Plaintiffs' Response:  ADMITTED.**

35.     For recipients who did not have access to a computer, the mailing provided a toll-
free telephone number that they could call to receive the information in hard copy form.
McCormick Aff. ¶ 27.

>     **Plaintiffs' Response: ADMITTED.**

**E.**     **Advertisements for Low Tar Cigarettes**

36.     At the end of 2000, PM USA added a legend to all product advertising for low tar
cigarettes that stated:  "[t]he amount of 'tar' and nicotine you inhale will vary depending on how
you smoke . . . ."  McCormick Aff. ¶ 14, Ex. D.

>     **Plaintiffs' Response:  QUALIFIED.**  The McCormick Affidavit does not state
>     that the legend was added to "all product advertising for low tar cigarettes," but rather
>     states only that the quoted language has "appeared on advertisements for low tar

- 14 -

cigarettes manufactured by Philip Morris USA." McCormick Aff. ¶ 14. The one print advertisement that Philip Morris attached as an exhibit to the McCormick Affidavit in support of this statement does contain the quoted language in small type at the bottom of the page. McCormick Aff., Ex. D.

37.    PM USA advertisements also invited smokers to visit PM USA's website or call a toll-free telephone number for more information. McCormick Aff., Ex. D.

  **Plaintiffs' Response: QUALIFIED.** The *one* advertisement that Philip Morris has attached to the McCormick Affidavit in support of this assertion does state, in small print at the bottom: "For more information about PM USA and its products, visit www.philipmorrisusa.com or call 1-877-PMUSAWEB." McCormick Aff. Ex. D.

38.    Since 2009, PM USA has distributed signage containing language for display at retail stores selling its cigarettes. McCormick Aff. ¶ 16, Ex. E.

  **Plaintiffs' Response: ADMITTED.**

39.    This signage contains the following (or substantially similar) language concerning low tar cigarettes:

> Terms such as "Lights" and "Ultra Lights" do NOT mean safer. These terms refer to taste. These cigarettes will NOT help you quit smoking. For more information about PM USA, its products or quitting smoking, visit www.philipmorrisusa.com.

McCormick Aff. ¶ 16, Ex. E.

  **Plaintiffs' Response: QUALIFIED.** The *one* example of signage that Philip Morris attached as an exhibit to the McCormick Affidavit in support of this statement does contain the quoted language. McCormick Aff., Ex. E.

- 15 -

III.   **Plaintiffs' Allegations**

40.   All but two of these cases were filed after the U.S. Supreme Court's ruling in *Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008).  *See Biundo v. Philip Morris USA Inc.*, No. 09cv0118; *Corse v. Philip Morris USA Inc.*, No. 09cv01122; *Domaingue v. Philip Morris USA Inc.*, No. 09cv01144; *Haubrich v. Philip Morris USA Inc.*, No. 09cv05867; *Mirick v. Philip Morris USA Inc.*, No. 09cv00386; *Nikolic v. Philip Morris USA Inc.*, No. 09cv00597; *Parsons v. Philip Morris USA Inc.*, No. 09cv02288; *Slater v. Philip Morris USA Inc.*, No. 09cv02145; *Tang v. Philip Morris USA Inc.*, No. 08cv5085; *Tyrer v. Philip Morris USA Inc.*, No. 09cv00052; *Williams v. Philip Morris USA Inc.*, No. 09cv471.

**Plaintiffs' Response: ADMITTED.**

41.   Virtually all of these lawsuits purport to address a period of time *after* the beginning of PM USA's disclosure program:  the class periods in *Biundo*, *Corse*, *Domaingue*, and *Tyrer* begin in 2005, *Williams* begins in 2004, *Nikolic* begins in 2003, *Mirick*, *Parsons, and Slater* begin in 2000, and *Good* begins in 1999.  *Biundo* Compl. ¶ 7; *Corse* Compl. ¶ 8; *Domaingue* Compl. ¶ 99; *Tyrer* Compl. ¶ 102; *Williams* Compl. ¶ 8; *Nikolic* Compl. ¶ 97; *Mirick* Compl. ¶ 8; *Parsons* Compl. ¶ 8; *Slater* Compl. ¶ 8; *Good* Compl. ¶ 40.

**Plaintiffs' Response: ADMITTED.**

42.   Only three cases – *Mulford*, *Tang*, and *Haubrich* – pre-date 1999.  *Mulford* Compl. ¶ 44; *Tang* Compl. ¶ 5; *Haubrich* Compl. ¶ 5.

**Plaintiffs' Response: ADMITTED.**

43.   Each of the cases is brought on behalf of a putative statewide class of low tar smokers and alleges (1) violations of state consumer protection statutes of the forum in which each lawsuit is filed, and/or (2) unjust enrichment.  As to (1):  *Biundo* Compl. ¶¶ 31-47; *Domaingue* Compl. ¶¶ 106-124; *Good* Compl. ¶¶ 50-57; *Mulford* Compl. ¶¶ 46-63; *Nikolic*

Compl. ¶¶ 107-119; *Parsons* Compl. ¶¶ 39-48; *Slater* Compl. ¶¶ 39-48; *Tang* Compl. ¶¶ 45-51; *Tyrer* Compl. ¶¶ 112-185; *Williams* Compl. ¶¶ 44-50; as to (2): *Biundo* Compl. ¶¶ 48-55; *Corse* Compl. ¶¶ 35-41; *Good* Compl. ¶¶ 58-62; *Haubrich* Compl. ¶¶ 44-50; *Mirick* Compl. ¶¶ 35-41; *Mulford* Compl. ¶¶ 64-68; *Nikolic* Compl. ¶¶ 124-132; *Parsons* Compl. ¶¶ 49-55; *Slater* Compl. ¶¶ 49-55; *Tang* Compl. ¶¶ 52-58; *Williams* Compl. ¶¶ 51-57.

> **Plaintiffs' Response: QUALIFIED.** Plaintiffs in *Good, et al. v. Philip Morris USA, Inc. et al.*, alleged a claim for violation of Maine's Unfair Trade Practices Act, but are no longer pursuing this cause of action on a class-wide basis. Otherwise, **ADMITTED**.

44.     Plaintiffs allege that PM USA engaged in unfair or deceptive conduct by marketing low tar cigarettes to consumers as delivering less tar and nicotine than full flavored cigarettes and as less harmful than they were. *See Biundo* Compl. ¶ 1; *Corse* Compl. ¶ 1; *Domaingue* Compl. ¶ 88; *Good* Compl. ¶ 2; *Haubrich* Compl. ¶ 3; *Mirick* Compl. ¶ 1; *Mulford* Compl. ¶¶ 9-13; *Nikolic* Compl. ¶ 1; *Parsons* Compl. ¶ 1; *Slater* Compl. ¶ 1; *Tang* Compl. ¶ 3; *Tyrer* Compl. ¶¶ 3-4; *Williams* Compl. ¶ 1.

> **Plaintiffs' Response: ADMITTED.**

45.     The complaints allege that PM USA made misrepresentations in its marketing of low tar cigarettes:

> Philip Morris has made, and continues to make, false and misleading statements about low-tar cigarettes to reassure smokers, and to dissuade them from quitting. These include: assertions that low-tar cigarettes deliver "low," "lower," or "less" tar and nicotine than conventional, full-flavor cigarettes; claims that the low-tar cigarettes are "mild" or deliver "clean" taste; and the use of brand names with descriptors such as "light" and "ultra light." These claims were made with the full knowledge that consumers interpret such claims and descriptors as meaning a reduced risk of harm.

*Domaingue* Compl. ¶ 71; *see also Biundo* Compl. ¶ 31; *Corse* Compl. ¶ 12; *Good* Compl. ¶ 32; *Haubrich* Compl. ¶ 29; *Mirick* Compl. ¶ 12; *Mulford* Compl. ¶¶ 11, 12, 29; *Nikolic* Compl. ¶¶ 72, 108; *Parsons* Compl. ¶¶ 12, 36, 42; *Slater* Compl. ¶¶ 12, 36, 42; *Tang* Compl. ¶¶ 9, 22, 26; *Tyrer* Compl. ¶¶ 3, 72; *Williams* Compl. ¶¶ 12, 38.

     **Plaintiffs' Response: ADMITTED.**

  46. The complaints allege further that PM USA marketed low tar cigarettes without disclosing to consumers that they may compensate and thus fail to receive less tar and nicotine:

> Defendants were aware, through their own internal research, that consumers of their light cigarettes often inhale as much or more nicotine and tar than consumers of their non-light cigarettes through unconsciously covering filter ventilation holes with their lips or fingers, taking larger or more frequent puffs, and through holding smoke in their lungs longer than smokers of non-light cigarettes . . . .
> . . . .
> Defendants failed to disclose to Plaintiff and the Class that consumers of their light cigarettes would not be exposed to less tar and nicotine than consumers of non-light cigarettes of the same brand.

*Parsons* Compl. ¶¶ 30, 35; *see also Biundo* Compl. ¶¶ 25, 29; *Corse* Compl. ¶¶ 29, 32; *Domaingue* Compl. ¶¶ 55, 93, 108; *Good* Compl. ¶¶ 24-26, 33; *Haubrich* Compl. ¶¶ 22, 25; *Mirick* Compl. ¶¶ 29, 32; *Mulford* Compl. ¶¶ 13-16; *Nikolic* Compl. ¶¶ 54-56, 72; *Slater* Compl. ¶¶ 30, 35, 42; *Tang* Compl. ¶¶ 17, 20-27; *Tyrer* Compl. ¶¶ 39, 65, 72, 80; *Williams* Compl. ¶¶ 32, 35-37.

     **Plaintiffs' Response: ADMITTED.**

  47. According to plaintiffs, these representations and omissions were false and misleading because consumers compensate when smoking low tar cigarettes so that they obtain the same amount of tar and nicotine that they would receive from its full-flavor counterpart, and thus no risk reduction. *See Biundo* Compl. ¶¶ 1, 25, 29; *Corse* Compl. ¶¶ 1, 29, 32; *Domaingue* Compl. ¶¶ 55, 88, 93, 108; *Good* Compl. ¶¶ 2, 24-26, 33; *Haubrich* Compl. ¶¶ 3, 22, 25; *Mirick*

- 18 -

Compl. ¶¶ 1, 29, 32; *Mulford* Compl. ¶¶ 9-16; *Nikolic* Compl. ¶¶ 1, 54-56, 72; *Parsons* Compl. ¶¶ 1, 30, 35; *Slater* Compl. ¶¶ 1, 30, 35, 42; *Tang* Compl. ¶¶ 3, 17, 20-27; *Tyrer* Compl. ¶¶ 3-4, 39, 65, 72, 80; *Williams* Compl. ¶¶ 1, 32, 35-37.

> **Plaintiffs' Response: ADMITTED.**

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL UNDISPUTED FACTS

48.     PM USA's distribution of "low tar/lights" onserts in November 2002 was done in one week's volume of selected light brand styles from all "classes" of PM USA cigarettes, as categorized by PM USA based upon their sales volume, which included "Classes A, B, C & D Brands." McCormick Dep. Ex. 3, 3007287724-3007287727, at 3007287724 (attached hereto as Exhibit A); McCormick Dep. at 39:7-21, Exhibit AA.

49.     This involved 175 "packings"—that is, low tar/lights onserts were included in the "packing" of "one week's volume" of packs of cigarettes in each of 175 different "SKUs," which are product numbers identifying a unique product offering with a different pack. McCormick Dep. at 40:10-42:13, Exhibit AA.

50.     Nineteen SKUs were excluded from this distribution of low tar/lights onserts. Exhibit A at 3007287724; McCormick Dep. at 42:14-43. Accordingly, purchasers of those SKUs did not receive any low tar/lights onserts in this distribution.

51.     In an Altria document entitled ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████ Exhibit C at ██████████ (emphasis added). ███████████████████████ ███████████████████████████████████████████

███████   *See also* McCormick Dep. at 41:4-23 ("If one week's average sales volume was 1,000 packs, onserts would be put on 1,000 packs for that particular SKU.")

52. ████████████████████████████████████████████████

████████ (attached hereto as Exhibit D) ██████████████████████████

████████████████████████████████████████████

53.   The distribution of low tar/lights onserts in the fourth quarter of 2003 was only done in one week's volume of the top-selling brands, the "A and B Classes," due to limitations in the factories' ability to include onserts in other brands.  McCormick Dep. Ex. 6 (5002612333-5002612335) (attached hereto as Exhibit B), at 5002612333; McCormick Dep. at 57:7-25, Exhibit AA.

54.   Instead of the 175 packings that included low tar/lights onserts in the previous year, only 45 packings included these onserts in 2003.  Exhibit B at 5002612333; McCormick Dep. at 56:10-11, Exhibit AA.

55.   The distribution of low tar/lights onserts in the fourth quarter of 2003 excluded all brands in PM USA's "C" and "D" classes.  *See* Exhibit B hereto at 5002612333; McCormick Dep. at 57:7-25, Exhibit AA.  Accordingly, only smokers of the top-selling brands of PM USA light cigarettes could have received low tar/lights onserts in the cigarettes they purchased in and shortly after the fourth quarter of 2003.

56.   The remaining brands—those in the "C" and "D" classes—did not include low tar/lights onserts.  Based upon the difference between the number of packings that included low tar/lights onserts in 2002, and the number of packings that included these onserts in 2003, it appears that approximately 130 different SKUs that were included in the low tar/lights onsert distribution in 2002 were excluded from the low tar/lights onsert distribution in 2003.  *Id.*

- 20 -

57.     While Philip Morris states that it has included [informational] onserts in approximately 130 million cigarette packs distributed nationwide in 2002, 109 million packs in 2003, 118 million packs in 2004, 149 million and then another 135 million packs in 2005, 140 million packs in 2006, 129 million packs in 2007, and 127 million packs in 2008 (McCormick Aff. ¶ 10), these numbers are miniscule compared to the number of packs of cigarettes PM distributes in a single *month*.  In sworn testimony in the *DOJ* Action before Judge Kessler,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ (attached hereto as Exhibit E), at ████████████.

58.     Based upon data provided by PM USA, in each year PM USA has distributed the low tar/lights onserts at issue in PM USA's motion for each of the relevant MDL jurisdictions, such onserts have been included in anywhere as low as .88% of the packs of Light cigarettes PM USA sold in a particular state during a particular year (New Mexico 2004), but in no higher than 2.45% of such packs (Arkansas 2008).  *See* Affidavit of Jeffrey E. Harris, M.D. Ph.D. ("Harris Aff."), at ¶5, Table 1, which is attached as Exhibit A to Plaintiffs' Response in Opposition to Philip Morris USA Inc's Motion for Summary Judgment on Plaintiffs' Claims for Purchases After December 1, 2002.

59.     PM USA's estimates of the "reach" of their low tar/lights onserts program are unsubstantiated.  McCormick testified that PM USA determined in 2002, with respect to its first distribution of low tar/lights onserts, that it could reach 86% of the smokers of its light cigarettes through the use of low tar/lights onserts on a number of packs equal to one weeks' volume of sales.  McCormick Dep. at 125:14 – 126:20, Exhibit AA.

60.   ███████████████████████████████████████████

███████████████████████ *See* McCormick Dep. Ex. 19 (██████████████████████████)

(attached hereto as Exhibit F), at ██████████.

61.   However, the basis for that estimate remains unclear.  McCormick stated that he
was not involved in the analysis that resulted in that estimate.  McCormick Dep. at 126:21-127:1,
Exhibit AA.

62.   Nor was he aware of any follow-up analysis to confirm whether the target "reach"
percentage of 86 percent was actually achieved.  *Id.* at 127:5-17, Exhibit AA.

63.   Moreover, as McCormick used it, the term "reached" does not mean that the
message was actually read and accurately conveyed and understood by 86% of the smokers;
instead, it means simply that PM estimated that 86% of the smokers of its light cigarettes would
purchase a pack of cigarettes containing a low tar/lights onsert.  *Id.* at 128:11-17, Exhibit AA.

64.   PM USA's estimate of the "reach" of their television advertisements is
unsubstantiated.  PM USA has estimated that it reached 82% of the adult television watching
audience with a "No Safe/Low Tar" television advertisement that was to run from November 17
to December 21, 2003.  *See* McCormick Dep. Ex. 18 (3034014029 and 30072287612) (attached
hereto as Exhibit G), at 3034014029; McCormick Dep. at 147:6-11, Exhibit AA.

65.   PM USA's estimate of the number of times consumers would see its television
advertisements is unsubstantiated.  PM USA expected to have the adult television watching
audience see the spot an average of 7.6 times.  Exhibit G at 3034014029.

66.   PM USA's estimate of the "reach" of their television advertisements is
unsubstantiated.  When the advertisement ran again from October 25 to November 28, 2004, PM
USA estimated it would reach 83% of the adult television watching audience, who would see it
an average of nine times.  *Id.*

- 22 -

67.     These efforts were part of PM USA's "ongoing efforts to communicate broadly about tobacco issues by incorporating TV into the mix specifically.  It enabled you to have a very broad reach in terms of the number of people who were exposed to the message  . . . ." McCormick Dep. at 144:5-12, Exhibit AA.

68.     However, even taking these "reach" estimates at face value, which McCormick admitted were "at the higher end of what you would typically expect to see for a television campaign," (McCormick Dep. at 148:20-22, Exhibit AA), PM USA's documents and McCormick's testimony confirm that for the entire three and one-half year period between June 2003 and December 3, 2006, PM USA ran "No Safe/Low Tar" television spots only *twice*—once from November 17 to December 21, 2003, and again from October 25 to November 28, 2004. Exhibit G at 3034014029; McCormick Dep. at 153:6-154:6, Exhibit AA.

69.     Rather than this being an "ongoing effort[]," PM USA ceased airing the "No Safe/Low Tar" ads back in 2004, after only two brief periods of airing.  *Id.*



██████████████████████████████████████████████████
██████████████████████████████ (attached hereto as Exhibit H), at ██████████████.

71.    One explanation for how PM USA came up with the 90% figure was provided in the written direct testimony of Michael E. Szymancyk, the Chairman and Chief Executive Officer of PM USA.  *See* AC5001040657-AC5001040756 (attached hereto as Exhibit I).  Mr. Szymancyk stated that when PM USA's low tar/lights onsert was distributed in the first quarter of 2004, PM "would have covered approximately 90 percent of Philip Morris USA's volume." *Id.* at AC5001040751.  When asked how he was estimating that number, he explained:

> Most smokers purchase at least one pack per week.  We put the onserts on all of the major brands, which represent 90 percent of Philip Morris USA's volume.  The onserts were run for a week.  So if you figure that most smokers of our major brands purchase one pack a week, they would have received the onsert.

*Id.*

72.    However, according to McCormick, this is not an accurate description of how distribution of low tar/lights onserts occurred.  ████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████ *See* McCormick Dep. Ex. 5 (██████████████) (attached hereto as Exhibit J).

- 24 -

73.     McCormick admitted that the packs that did contain low tar/lights onserts did not all hit retail stores at once, and probably hit retail outlets over a span of two months or longer.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  McCormick Dep. Ex. 5, attached hereto as Exhibit J, at ████████████████ (████████████████████████████████████████); McCormick Dep. at 52:22-53:20, Exhibit AA (confirming a six to ten week distribution period at the retail level).

74.     Once packs of cigarettes leave PM USA's warehouse, PM USA ceases to have any control over the distribution of the product.  McCormick Dep. at 23:1-7, Exhibit AA.

75.     Thus, PM USA has no control over how the product is sold (*id.* at 23:21-22); how soon the product is sold (*id.* at 23:25-24:11); or whether packs containing low tar/lights onserts were sold ahead of non-onserted packs (*id.* at 17:5-13).  *See* Exhibit AA

76.     Accordingly, there is no way for PM USA to know how quickly the low tar/lights onserted packs were sold, or, for that matter, how many were in fact sold before being removed from the shelves for purposes of maintaining the freshness of retailers' stock.  *See id.* at 23:25-24:11, Exhibit AA.

77.     As Mr. Szymancyk confirmed that the distribution method for the low tar/lights onserts was the same in 2003 and 2004 as it had been in the initial distribution in 2002, *See* Exhibit I at AC5001040756, the same may be said for each of those distributions of low tar/lights onserts as well.

78.     PM USA repeated its description of how the onserts were distributed to the *Wall Street Journal,* which published the description in an article about the low tar/lights onsert program: ████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ (attached hereto as Exhibit K), at ████████.

79.    ████████████████████████████████████

████████████████████████████ (attached hereto as Exhibit L), ████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

80.    The memorandum goes on: ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

81.    The memorandum ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

82.    PM USA's own research has long indicated that the use of "onserts," even when consumers do receive and read them, is not very effective in communicating complex ideas about the relative advantages and dangers of different types of cigarettes.  For example, a document entitled "PMUSA No safe/Low Tar Communication Vehicle Awareness Study" (McCormick Dep. Ex. 11) (PM3002997413-PM3002997418) (attached hereto as Exhibit M),

- 26 -

which indicates it was "Conducted by MarketView Research, February 2005" (*id.* at PM3002997413), states that its objective was "[t]o measure general awareness of PM USA's 'no safe/low tar' communication vehicles (onsert, television, and radio) among adult smokers of PM USA "low tar" brands, as measured by standard FTC testing methodology."   *Id.* at PM3002997414.   It contains a graph entitled "PMUSA No Safe/Low Tar Communication Vehicle Awareness" listing "Onsert," "Television," and "Radio" along an axis from 0 to 100. Alongside "Onsert" is a bar with the number 39 at the end. *Id.* at PM3002997415.

83.     When asked whether he thought this graph indicated that only 39 percent of those interviewed in the study were aware of the low tar/lights onserts, McCormick stated, "I would interpret that as being a percent.  I don't know the specific question that was asked, but based on the label, 'Vehicle Awareness,' that's probably pretty close."   McCormick Dep. at 88:5-14, Exhibit AA.

84.     Other evidence demonstrates that PM USA had market research indicating that onserts were not effective in conveying their intended message.  According to McCormick, a document entitled "PMUSA Ad Test (Phase II): Focus Group Results," (McCormick Dep. Ex. 9) (PM3000181427- PM3000181449) (attached hereto as Exhibit N), which indicates that it was "Prepared By: Lombardo Consulting Group, 2 April 2003," "appears to be a summary of focus groups that were conducted in . . . some time prior to the date of this document, which is dated April 2nd, 2003." McCormick Dep. at 71:9-13, Exhibit AA.  In this document, a page with the heading "Tar and Nicotine (Onsert)" states:  "The 'Tar and Nicotine' ad that included information on the onsert fell out of the mix." *See* Exhibit N at PM3000181443.

85.     The summary further states, "The onsert does not provide the proof point credibility expected." *Id.*

86.     The summary also states, "While people rationally understand the importance of communicating ingredients on packaging, it is not relevant or a stand out statement." *Id.*

87.     In his sworn deposition testimony, McCormick was unable to offer any insight into what these statements meant, and indeed, he insisted that, despite the heading "Tar and Nicotine (*Onsert*)" and the express statement that "The *onsert* does not provide the proof point credibility expected," (emphasis added), this page did not deal with onserts at all, as the entire document, including this page, dealt only with television and radio advertising.   McCormick Dep. at 76:1-80:8, Exhibit AA.

88.     On direct examination by his attorney, McCormick once again stated that, despite the "onserts" language, "They were not testing onserts, they're testing advertising." *Id.* at 142:2-3, Exhibit AA.

89.     McCormick suggested that the reference to "onserts" was "a television spot that [we're] calling 'onsert.'" *Id.* at 142:20-21, Exhibit AA.

90.     Yet another study also indicates the ineffectiveness of the onserts. *See* McCormick Dep. Ex. 12 (███████████████) (attached hereto as Exhibit O), ████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

91.     ████████████████████████████████████
██████████████████

92.   ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

93.   McCormick confirmed that this "seemed to state" that ███████████████
██████████████████████████████████████ McCormick Dep. at 92:19-
24.

94.   Yet another study was conducted, this one entitled "PM USE HE/LT Communications Vehicle Awareness Research, January 2006" a draft report of which was identified as Exhibit 13 to the McCormick Dep. (3035122090-3035122095) (attached hereto as Exhibit P).

95.   Under "Background/Objectives," it listed the following:  "In February 2005, a study was conducted to measure overall awareness of PM USA's 'No Safe/Low Tar' communications among adult smokers of PM USA Low Tar brands." *Id.* at 3035122091.

96.   A similar study was conducted in January 2006 to gauge awareness of "PM USA's 'Health Effects/Low Tar' communications," including the "'PM USA Low Tar (LT)' Onsert (found on PM USA non-full flavor cigarette packs only)." *Id.* at 3035122091.

97.   This study showed that, as of January 2006—that is, more than three years after PM USA first started periodically placing low tar onserts onto its light cigarette products—53% of the adult smokers of PM USA Low Tar brands interviewed stated that they had never seen the onsert before. *Id.* at 3035122093.

98.   Another 3% either did not know if they had seen the onsert before, or gave no answer. *Id.*

- 29 -

99.     Additionally, some 70% of the adult smokers of PM USA Low Tar brands interviewed stated that they had never seen PM USA's "Health Effects" TV commercial before. *Id.* at 3035122094.

100.    In the same study, 49% of the adult smokers of PM USA Low Tar brands interviewed stated that they were not aware of *either* the onsent *or* the TV commercial. *Id.* at 3035122095.

101.    

(McCormick Dep. Ex. 14) (

) (attached hereto as Exhibit Q),

(emphasis in original).

102.    The document continued:

*Id.* (emphasis in original).

103.    , and marked as

Exhibit 15 to the McCormick Deposition (                    ) (attached hereto as

Exhibit R),

- 30 -

104. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ *Id.*

105.   As far back as 1995, Philip Morris had evidence suggesting that onserts (or "outserts," as they were referred to in this study) on cigarette packs were ineffective as a means of communicating with consumers.   In a document entitled "Dave's Focus Groups: Denver Summary Findings, A Qualitative Research Study Conducted for Philip Morris," 2040130163-2040130178 (attached hereto as Exhibit S), dated June 1995, the reactions to outserts on packs of Dave's cigarettes that were recorded included:  "Some said they read the outsert on the first pack purchased, but felt no need to read outserts on other packs purchased, just assuming they were all the same." *Id.* at 2040130173.

106.   This is consistent with what PM USA would later hear in their ████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ Exhibit Q at ██████████████ (emphasis in original).

107.   Other people in the 1995 study "said they saw the outsert but paid no further attention to it, figuring it was 'just some advertising' or 'something like the Camel Cash.'" Exhibit S at 2040130173.

108.   "A few said they did not recall even seeing an outsert on their pack." *Id.*

109.   "A few recalled that the outsert ripped when they opened their pack, so they 'tossed it.'" *Id.*

110.   The last time PM USA used onserts to convey their "low tar message" was in 2008.  McCormick Dep. at 115:14-15, Exhibit AA.

111.    Onserts are used to convey a variety of different messages, only one of which is the low tar message. *Id.* at 103:18-19, Exhibit AA.

112.    A PM document entitled "Corporate Responsibility Communications 2004 Budget Breakdown" (5012622838-5012622844) (attached hereto as Exhibit T), indicates that the budget for "onserts" in 2004 was only $75,000—$30,000 in the first and second quarters, $15,000 in the third quarter, and none in the fourth quarter. *Id.* at 5012622838.

113.    An internal email dated March 19, 2004 (3011394048-3011394051) (attached hereto as Exhibit U) from Zane Gibbs from New Products Marketing at Philip Morris USA (*see* 3011394050), indicated that onserts were to be used for both "Corporate Responsibility messages," which includes "highlighting the resources available on our website, information and resources related to our Youth Smoking Prevention efforts, and information about Low Tar cigarettes," and also "branded Marketing communications." *See id.* at 3011394049 (emphasis in original).

114.    The email goes on to state that, for both "Corporate Responsibility and Marketing onsert programs," PM USA's goal was "to have onserts appear on about 20% of our forecasted domestic volume throughout the year." *Id.*

115.    ████████████████████████████████████████████████
████████████████████ (McCormick Dep. Ex. 16 (████████████████████))
(attached hereto as Exhibit V), ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

116. █████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

117. The "Corporate Responsibility 2005-2006 Onset Plan" (5012622794-5012622828) (attached hereto as Exhibit W) expressly states that PM USA did not want the "Total Combined Annual Onsert Production"– again, including both "Corporate Responsibility" and branded onserts—to be included in greater than 25% of their packages.  *Id.* at 5012622804.

118. Moreover, the "Corporate Responsibility 2005-2006 Onset Plan" indicated that "[e]quipment limitations excluded certain packings from onserting," and therefore "onserts [were] not being applied to all PM USA SKUs." *Id.* at 5012622816.

119. The PM USA onserts did not disclose as much as the onserts distributed by competitor Star Tobacco Company in the onserts they distributed in packs of Advance.  *See* "Update: new Competitive Tobacco - Related Technologies" (2067184459-2067184467) (attached hereto as Exhibit X), at 2067184466.

120. The Advance onserts stated: "By adding filters and putting tiny ventilation holes in the filters, cigarette makers developed many brands which tested as having reduced tar and nicotine, even though the tobacco itself was relatively unchanged." *Id.*

121. █████████████████████████████████████
████████████████████████████████████  *See* Exhibit E at ████████████ .

122. █████████████████████████████████████
████████████████████████████████████████████
████████████████████████

123. ████████████████████████████████████████████████████████

████████ *Id.*

124. ████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*

125. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ (attached hereto as Exhibit Y), ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ *See, e.g., id.* at █████████████████████.

126.   Geoffrey Bible, former CEO of Philip Morris Companies until April 2002, who then served as chairman of Philip Morris Companies until September 2002, testified in his deposition in the *DOJ* Action that ██████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████ (attached hereto as Exhibit Z) at █████████████.

██████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

- 34 -





On examination by the Government's counsel in the *DOJ* Action, Ms. Keane also made it clear that, with respect to the information it provides to consumers regarding Light cigarettes,

Exhibit H at ▮▮▮▮▮▮▮.

129.   The *DOJ* court found as follows: "For several decades, Defendants have marketed and promoted their low tar brands as being less harmful than conventional cigarettes. That claim is false, as these Findings of Fact demonstrate. By making these false claims, Defendants have given smokers an acceptable alternative to quitting smoking, as well as an excuse for not quitting." *DOJ,* 449 F. Supp. 2d at 430 (¶ 2023).

130.   The *DOJ* court found as follows:  "Defendants used a combination of techniques to market and promote their low tar brands. Defendants' marketing has emphasized claims of low tar and nicotine delivery accompanied by statements that smoking these brands would reduce exposure to the "controversial" elements of cigarette smoke *(i.e.,* tar). Since the 1970s, Defendants also have used so-called brand descriptors such as 'light' and 'ultra light' to communicate reassuring messages that these are healthier cigarettes and to suggest that smoking low tar cigarettes is an acceptable alternative to quitting. In addition to appealing advertising and easily-remembered brand descriptors, Defendants have used sophisticated marketing imagery such as lighter color cigarette packaging and white tipping paper to reinforce the same message that these brands were low in tar and therefore less harmful." *Id.* at 430 (¶ 2024).

131.   The *DOJ* court found as follows:  "Even as they engaged in a campaign to market and promote filtered and low tar cigarettes as less harmful than conventional ones, Defendants either lacked evidence to substantiate their claims or knew them to be false. Indeed, internal industry documents reveal Defendants' awareness by the late 1960s/early 1970s that, because low tar cigarettes do not actually deliver the low levels of tar and nicotine which are advertised, they are unlikely to provide any clear health benefit to human smokers, as opposed to the FTC smoking machine, when compared to regular, full flavor cigarettes." *Id.* at 430 (¶ 2025).

132.   The *DOJ* court found as follows:  "As Defendants have long been aware, nicotine delivered by cigarettes is addictive. Defendants' internal documents demonstrate their

understanding that, in order to obtain an amount of nicotine sufficient to satisfy their addiction, smokers of low tar cigarettes modify their smoking behavior, or 'compensate,' for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with fingers or lips, and/or smoking more cigarettes. As a result of this nicotine-driven smoker behavior, smokers of light cigarettes boost their intake of tar, thus negating what Defendants have long promoted as the primary health-related benefit of light cigarettes: lower tar intake." *Id.* at 430 (¶ 2026).

133.   Philip Morris never publicly explained its position that cigarette smoking is not addictive, because, according to Denise Keane, General Counsel for Defendant Philip Morris USA, the company believes it should properly be characterized as a drug dependence. Keane TT, 1/18/05, 10447:23-10448:7; *DOJ*, 449 F. Supp. 2d at 288 (¶ 1259).

134.   While Philip Morris told people that it agrees that cigarette smoking is addictive, it has not told the public that it agrees that it is the nicotine delivered in cigarette smoking that is addictive.  Ms. Keane admitted this was material information that the public should possess. Keane TT, 1/18/05, 10533:5-10534:4; *DOJ*, 449 F. Supp. 2d at 288-89 (¶ 1262).

135.   Ms. Keane also admitted that when Philip Morris purchased three Liggett brands in 1999—L & M, Lark, and Chesterfield—it removed the pre-existing package labels stating that smoking is addictive. Keane TT, 1/18/05, 10457:5-10460:16; *DOJ*, 449 F. Supp. 2d at 288 (¶ 1260).

136.   While Philip Morris replaced the pre-existing package labels with onserts, these onserts did not contain the statement that Philip Morris agrees that smoking is addictive, even though Philip Morris had publicly stated this view in 2000, as already noted. Keane TT, 1/18/05, 10460:17-10462:15; *DOJ*, 449 F. Supp. 2d at 288 (¶ 1261).

137.    The *DOJ* court found as follows:  "In spite of the overwhelming medical and scientific evidence, only one cigarette manufacturer Defendant, Liggett, has placed a warning on its packages flatly and clearly stating that nicotine is addictive. Liggett advertising and packaging state, 'Smoking is Addictive.'" LeBow TT, 2/7/05, 12375:21-12376:1; *DOJ*, 449 F. Supp. 2d at 289 (¶ 1263).

138.    The *DOJ* court found as follows:  "The primary means by which Defendants have ensured that their low delivery products will sustain smoking addiction is by incorporation of physical design characteristics and ingredients that enable the human smoker to easily obtain his or her reinforcing level of nicotine, regardless of the cigarette's nominal FTC machine-measured yield. Internal documents reveal that Defendants designed their cigarettes to increase the flexibility of their nicotine and tar dosing capacity to smokers even as they reduced nicotine and tar yields as determined by the FTC machine method."  *DOJ*, 449 F. Supp. 2d at 339 (¶ 1516).

139.    Defendants' own internal documents demonstrate that the lights descriptor was placed on their light cigarettes to convey to consumers that they are healthier to smoke than regular cigarettes. *DOJ*, 449 F. Supp. 2d at 513 (¶ 2401) ("James Morgan, who was Brand Manager of Marlboro from 1969 to 1972, during the time when Philip Morris introduced Marlboro Lights, its first 'light' cigarette, explained the intended meaning of the 'lights' descriptor. Morgan stated that, from the very beginning, the 'lights' descriptor was intended to communicate that the brand was low in tar-as opposed to a brand that was lighter in taste.") (N.B.: James Morgan was President and CEO of Philip Morris from 1994 until 1997).

140.    The *DOJ* court found as follows:  "So that Philip Morris could market its Light cigarettes as yielding less tar and nicotine than full-flavored cigarettes, Philip Morris set out to 'trick' the Federal Trade Commission ("FTC") and, thus, the public at large, about the actual

levels of nicotine and tar that smokers would receive from these Light cigarettes." *Id.* at 500 (¶ 2346).

141.    The *DOJ* court found as follows:  "In the early 1970s, the Federal Trade Commission developed a machine to measure tar and nicotine levels. Even though it became the accepted mechanism for taking such measurements, it became widely known in both the public health community and by the cigarette company Defendants that the FTC method did not accurately measure the amounts of nicotine and tar which a smoker actually ingested.  Cigarette company Defendants, with the benefit of their much more sophisticated understanding of smoker compensation, as well as their knowledge of nicotine control, then intentionally developed and marketed cigarettes, which, in actuality, delivered higher levels of nicotine than those measured by the FTC method.  Those levels of nicotine were sufficient to create and sustain addiction in smokers." *Id.* at 309 (¶ 1370).

142.    The *DOJ* court found that Defendant developed and marketed Light cigarettes precisely to lure smokers of regular cigarettes who were contemplating quitting for health reasons away from quitting and towards this purportedly healthier alternative. *See id.* at 860.

143.    The *DOJ* court further found that the defendants there knew that, "*because of nicotine addiction,*" former smokers of regular cigarettes, who switched to Light cigarettes based on the belief that they were less harmful to their health, would compensate for the reduced nicotine yield from such cigarettes through a variety of means, including taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with their fingers or lips, and/or smoking more cigarettes. *Id.* at 860, 461-67 (¶¶ 2173-200)(emphasis added).

144.    The *DOJ* court found that the Defendants opposed any changes in the FTC Method that would more accurately reflect the effects of compensation on the actual tar and

nicotine received by smokers (*id.* at 560-61 (¶ 2628)), and that by engaging in this deception, Defendants dramatically increased their sales of Light cigarettes, assuaged the fears of smokers about the health risks of smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking. *Id.* at 561 (¶ 2629).

145.   The *DOJ* court found as follows:  "In sum, there is an overwhelming consensus in the public health and scientific community, both here and abroad, that low tar cigarettes offer no clear health benefit to smokers, have not reduced the risk of lung cancer and heart disease for smokers using them, and have not produced any decrease in the incidence of lung cancer. Moreover, because of the misleading nature of the advertising for low tar cigarettes, smokers who might have quit have refrained from doing so in the belief that such cigarettes reduced their health risks." *Id.* at 456 (¶ 2145).

146.   The *DOJ* court found as follows:  "A March 1, 1977 Philip Morris memorandum by industry-funded scientist Stanley Schachter to Thomas Osdene, Director of Research, concluded that low tar/low nicotine cigarettes are not less harmful:

> [I]t would certainly seem that the campaign for low nicotine cigarettes is misguided and rests on a set of fallacious premises.... The question is crucial and particularly so in light of ... Ross's evidence that carbon monoxide, hydrogen cyanide, and nitrogen oxide delivery is considerably greater in most of the popular brands of low nicotine filter, [sic] cigarettes than in high nicotine, non-filter cigarettes.... It is ... clear ... that the major body of data that has been used to justify the campaign for low nicotine cigarettes does nothing of the sort."

*Id.* at 456 (¶ 2146).

147.   The *DOJ* court found as follows:  "Dr. Farone stated that Philip Morris's Marlboro full-flavor and Marlboro Lights cigarettes are 'essentially identical except for dilution'-i.e., that Marlboro Lights have more dilution, dilution referring to ventilation that dilutes the smoke, particularly when machine-smoked by the FTC method, with ambient air.

'[A]s you increase dilution, the toxicity in [the Ames] test increases, which is more likely than

not associated with a toxicity increase in smokers'." *Id.* at 456 (¶ 2147).

      148.   The *DOJ* court found as follows: "In fact, Dr. Farone explained that the very

Ames mutagenicity testing that Philip Morris has conducted for the past 25 years, and that

"Philip Morris has concluded . . . predicts carcinogenicity" has indicated that Philip Morris's

Marlboro Lights cigarettes are, as designed, more mutagenic than Marlboro full-flavor cigarettes:

> [I]n the case of Marlboro Lights, the Philip Morris test data that I
> have reviewed on that level of dilution for equivalent blends
> indicated that the product design for their Light cigarettes was
> more mutagenic than the full flavor Marlboro, Marlboro Reds, and
> therefore predictive of more potential cancer risk. These studies
> were repeated multiple times over the past 20 years and continue to
> be repeated to this day. The Philip Morris data, as was used by
> Philip Morris, was a strong warning that their product design
> change between a Marlboro Red and a Marlboro Light- increased
> ventilation-resulted in a potentially more dangerous product.
>
> Philip Morris has not 'changed the design of "Light" cigarettes in
> response to its studies and knowledge concerning mutagenicity'."

*Id.* at 456 (¶ 2148).

      149.   The *DOJ* court found as follows: "A 2001 document about Ames mutagenicity

testing from Philip Morris's INBIFO laboratory in Germany demonstrated that, in every case, the

mutagenicity of Marlboro Lights is higher than the mutagenicity of Marlboro full-flavor." *Id.* at

458 (¶ 2155).

      150.   The *DOJ* court found as follows: "James Morgan, former President and CEO of

Philip Morris, conceded in 2002 that, in his opinion, lower tar cigarettes are not any safer than

higher tar cigarettes." *Id.* at 458 (¶ 2156).

      151.   The *DOJ* court found as follows: "According to Nancy Brennan-Lund, Philip

Morris Senior Vice President of Marketing, 'what we say on our web site we believe to be true.'

Philip Morris's position is that low tar cigarettes are no less harmful than full-flavor cigarettes,

'based on what the Monograph 13 came out with.' Lund later qualified her statement: it has 'not been proven' that light cigarettes are less harmful, so one cannot assume they are less harmful." *Id.* at 458 (¶ 2157).

152.    The *DOJ* court found as follows:  "Ellen Merlo, then Philip Morris USA Senior Vice President of Corporate Affairs, agreed that in 2002 that Philip Morris's policy at the time was that lights or low tar cigarettes are not safe or safer than any other cigarettes."  *Id.* at 458 (¶ 2158).

153.    The *DOJ* court found as follows:  "Defendants have stated publicly that they produce low tar cigarettes only to accommodate consumer taste preferences for 'lighter,' 'milder' tasting cigarettes, and that they do not intend their use of brand descriptors or their marketing of low tar cigarettes to imply a less harmful product. See Section V(E)(5), *infra* (discussing Defendants' false statements regarding their low tar cigarette marketing). Contrary to their public statements, however, Defendants' internal marketing documents establish that Defendants have known for decades that even though consumers prefer the taste of regular cigarettes to low tar cigarettes, they are willing to forgo them and smoke low tar cigarettes, which are less enjoyable and have a less appealing taste, because they believe low tar cigarettes are better for their health."  *Id.* at 476 (¶ 2239).

154.    The *DOJ* court found as follows:  "According to Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, in her experience, 'there is a general perception among consumers that as you go down in tar, cigarettes have less taste.' For this reason, Philip Morris planned to produce a low tar Merit cigarette that tasted like a cigarette with higher tar. A June 30, 1993 document from a Philip Morris USA New Products Meeting, titled 'Marlboro New Product Development,' stated that the 'Project' was to '[b]uild the Merit business by introducing a 3 mg product that tastes like a 5 mg.' Philip Morris also planned to '[d]evelop a 6 mg Tar Cigarette

with the Sensory Attributes of an 8-9 mg Tar Cigarette.' (Philip Morris's 1992 R & D Operational Plans for the Product Development Department issued to Cliff Lilly of Philip Morris USA included the following objectives: 'Design and develop an 3 mg [Merit] product with the subjective attributes of a 6 mg cigarette.... Design and develop a 6 mg [Merit] product with the subjective attributes of a[sic] 8 mg cigarette.... Develop 6 mg [Marlboro Ultra Lights] line extension ... providing enhanced subjective quality and Marlboro character.... LOW TAR HIGH FLAVOR Objective: Develop new technologies which will allow us, within the next two to four years, to produce 'Ultra Low' tar, 2 to 4 mg, cigarettes with the sensorial experience of "Lights" or "Full Flavored" cigarettes')." *Id.* at 477 (¶ 2240).

155.    The *DOJ* court found as follows:  "Bonhomme added that 'Philip Morris's own marketing research shows that there are consumers who switch to low tar cigarettes even though they do not prefer the taste or flavor, because they believe it is better for them,' and that 'for those people the reason for switching to a low tar brand is not taste or flavor, but perceived health benefits.' Bonhomme admitted that these smokers are willing to sacrifice taste for perceived health benefits." *Id.* at 477 (¶ 2241).

156.    The *DOJ* court found as follows:  "Bonhomme explained that Philip Morris's Merit brand of cigarettes utilized a marketing strategy, titled 'Merit Solutions,' that was intended to communicate to consumers that 'Merit was a solution to the problem of finding a low tar brand with good taste'." *Id.* at 477 (¶ 2242).

157.    The *DOJ* court found as follows:  "An undated Philip Morris document, titled 'Background Information on Philip Morris Brands,' included 'Benefit Statements' for Philip Morris's various 'light' brands that revealed Philip Morris's intent was not to market these cigarettes as 'lighter' tasting, but rather as cigarettes that taste like full-flavor cigarettes with the extra purported benefit of low tar and nicotine:

> • Marlboro Medium: 'gives you a flavorful smoke in a low tar cigarette' and 'bridges the flavor gap between low tar and full flavor cigarettes.'
>
> • Benson & Hedges 100's Lights: 'premium tobacco flavor in a satisfying low tar smoke.'
>
> • Benson & Hedges 100's Deluxe Ultralights: 'only 5 mg tar, yet is rich enough to be called Deluxe ... is an ultra low tar cigarette that gives you satisfying taste ... delivers cool, rich taste with only 5 mg tar.'
>
> • Merit: 'You'll enjoy low tar and good flavor.... At only 7 mg tar, Merit delivers the rich flavor of leading cigarettes with twice the tar ... get rich menthol flavor at only 8 mg tar.'
>
> • Merit 100's: 'flavor that makes low tar and good taste a reality for 100's smokers.'
>
> • Merit Ultra Lights: 'cool, flavorful smoke with only 5mg tar.'
>
> • Merit Ultra Lights 100's: 'an ultra light with flavor.'
>
> • Virginia Slims Ultra Lights: 'gives flavor and taste-and is an ultra low tar smoke.'
>
> • Parliament Lights: 'enjoyable taste in a low tar cigarette.'"

*Id.* at 477 (¶ 2244).

158.    The *DOJ* court found as follows:  "According to James Morgan, former CEO of Philip Morris, Philip Morris did not intend for the name Marlboro Lights to communicate that it had light or lighter taste:

> I have trouble in describing what light taste really means.... Light taste, first of all, is not a positive attribute if it does mean anything ... in my judgment, light taste is really a meaningless and nebulous claim ... the bigger proposition is the lower tar and nicotine.... We are not talking, in my judgment, talking about light ... as a taste. It's not a term that means anything in terms of taste, and the name Marlboro Lights as I said before, a word which we feel has appeal in a different sense than suggesting what the cigarette even tastes like."

*Id.* at 478 (¶ 2246).

- 44 -

159.    The *DOJ* court found as follows:  "Nevertheless, Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, stated that to her knowledge:

> • 'Philip Morris has always denied publicly that it markets low tar cigarettes as safe or safer than full-flavor brands;' and

> • 'Philip Morris has always denied publicly that it uses brand descriptors such as "light" and "ultra light" to communicate they are safe or safer than full-flavor brands.'"

*Id.* at 527 (¶ 2471). *Id.* at 478 (¶ 2246).

160.    The *DOJ* court found as follows:  "A September 10, 1999 Davis Polk & Wardwell memorandum to Mark Berlind of Philip Morris includes 'a series of questions that might arise, as well as possible answers, relating to low delivery cigarettes and brand descriptors.' In answer to the question 'If the brand descriptors do not indicate what smokers actually inhale or serve as a point of comparison among competing brands, what purpose do they serve?,' the memorandum proposed responding that Philip Morris's brand descriptors do communicate that Philip Morris's lower tar brands deliver less tar and nicotine than full-flavor brands: 'For example, the "Lights" in Marlboro Lights indicates that the smoke yields for Marlboro Lights is lower than that for Marlboro, and Marlboro Ultra Lights delivers less smoke 'tar' and nicotine than Marlboro Lights.'" *Id.* at 527 (¶ 2475).

161.    The *DOJ* court found as follows:  "This document's proposed response to the question whether 'Philip Morris ever intend[ed] to or propose[d] to take advantage of' the 'perception' of consumers that 'lower-yielding brands [are] "safe" or "safer" than full-flavor brands' was that 'Philip Morris has never intended [to] or proposed to take advantage of this perception. (although over time various individuals in the Company may have suggested that the Company do so)[.]'" *Id.* at 528 (¶ 2476).

- 45 -

162.    The *DOJ* court found as follows:  "As recently as 2003 and 2004, the Board of Directors of Altria (formerly known as Philip Morris Companies), publicly made misleading statements to its shareholders and to the U.S. Securities and Exchange Commission ('SEC') in documents filed with the SEC. In a March 17, 2003 Proxy Statement, a group of Altria shareholders proposed to the Altria Board of Directors that 'the Board find appropriate ways of informing our customers about the actual health risks of smoking "light and ultra light" cigarettes to disassociate them from any belief that such products are safer and deliver less tar and nicotine.' The shareholder proposal cited Monograph 13 which found that 'most smokers believe "Lights" and "Ultra Lights" are less harsh and deliver less tar and nicotine,' and that, 'on average, smokers believe that Lights afford a 25% reduction in risk, and Ultra Lights a 33% reduction in risk;' the Canadian Government's conclusion that the terms low tar, light and ultra light are deceptive to the consumer; and the World Health Organization's recommendation that the terms light and ultra light be banned as misleading. The Board of Directors of Altria recommended that shareholders vote against this proposal, stating: 'for those adults who choose to smoke, PM USA and PMI believe descriptors such as "low-tar," "mild," and "light" serve as useful points of comparison for cigarette brands regarding characteristics such as strength of taste and reported tar yield.'"  *Id.* at 528 (¶ 2480).

163.    The *DOJ* court found as follows:  "Defendant Philip Morris suppressed and concealed many scientific research documents, even going so far as to send them to a foreign affiliate in order to prevent the disclosure of documents in litigation and in federal regulatory proceedings." *Id.* at 809 (¶ 3907).

164.    The *DOJ* court enjoined the Defendants there from the following activities: "further use of deceptive brand descriptors which implicitly or explicitly convey to the smoker and potential smoker that they are less hazardous to health than full flavor cigarettes, including

- 46 -

the popular descriptors 'low tar,' 'light,' 'ultra light,' 'mild,' and 'natural.' The Court is also ordering Defendants to issue corrective statements in major newspapers, on the three leading television networks, on cigarette "onserts," and in retail displays, regarding (1) the adverse health effects of smoking; (2) the addictiveness of smoking and nicotine; (3) the lack of any significant health benefit from smoking 'low tar,' 'light,' 'ultra light,' 'mild,' and 'natural' cigarettes; (4) Defendants' manipulation of cigarette design and composition to ensure optimum nicotine delivery; and (5) the adverse health effects of exposure to secondhand smoke." *Id.* at 27.

165.    The D.C. Circuit Court of Appeals upheld the *DOJ* court's findings that the Defendants there engaged in a scheme to defraud smokers and potential smokers by, *inter alia*: "(1) falsely denying the adverse health effects of smoking; (2) falsely denying that nicotine and smoking are addictive; (3) falsely denying that they manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction; (4) falsely representing that light and low tar cigarettes deliver less nicotine and tar and therefore present fewer health risks than full flavor cigarettes; (5) falsely denying that they marketed to youth; (6) falsely denying that secondhand smoking causes disease; and (7) suppressing documents, information, and research to prevent the public from learning the truth about these subjects and to avoid or limit liability in litigation." *U.S. v. Philip Morris USA Inc.,* 566 F.3d 1095, 1108 (D.C. Cir. 2009) (citations omitted)


Dated:  March 31, 2010                              Respectfully submitted,


                                                     _/s/ Samuel W. Lanham, Jr._
                                                     Samuel W. Lanham, Jr.
                                                     **LANHAM BLACKWELL, P.A.**
                                                     470 Evergreen Woods
                                                     Bangor, ME 04401

Ben Barnow
**BARNOW AND ASSOCIATES, P.C.**
One North LaSalle Street, Suite 4600
Chicago, IL 60602

Don Barrett
**BARRETT LAW OFFICE, P.A.**
404 Court Square
Lexington, MS 39095-0987

Kent Caperton
**BEN BARNES GROUP**
1215 19th Street, NW
Washington, DC 20036

Marian S. Rosen
**MARIAN S. ROSEN
  & ASSOCIATES**
5065 Westheimer, Suite 840
Houston, TX 77056

Howard Rubinstein
**LAW OFFICE OF
HOWARD WEIL RUBINSTEIN**
P.O. Box 4869
Aspen, CO 81611

Walter Umphrey
**PROVOST UMPHREY
  LAW FIRM, LLP**
P.O. Box 4905
Beaumont, TX 77704-4905

Joe R. Whatley, Jr.
**WHATLEY, DRAKE & KALLAS**
1540 Broadway, 37th Floor
New York, NY 1036

John Eddie Williams
**WILLIAMS, KHERKER, HART,
  BOUNDAS, LLP**
8441 Gulf Freeway, Suite 600
Houston, TX 77017

*Plaintiffs' Executive Committee*

- 48 -

## CERTIFICATE OF SERVICE

Service of Plaintiffs' Response to Defendant Philip Morris USA Inc's Statement of Material Undisputed Facts in Support of Defendant's Motion for Summary Judgment on Plaintiffs' Claims for Purchases After December 1, 2002, and Plaintiffs' Statement of Additional Material Facts has been made through the Court's ECF system on all those registered to receive ECF service.

Date:   March 31, 2010

                                         */s/ Samuel W. Lanham, Jr.*
                                         Samuel W. Lanham, Jr.
                                         **LANHAM BLACKWELL, P.A.**
                                         470 Evergreen Woods
                                         Bangor, ME 04401