# EXHIBIT AA

IN THE UNITED STATES DISTRICT CIRCUIT COURT OF MAINE

| IN RE: LIGHT CIGARETTES MARKETING SALES PRACTICE LITIGATION | ) ) ) | MDL DOCKET NO. 1:09-MD-2068 ALL CASES |
| --- | --- | --- |

DEPOSITION OF BRENDAN MCCORMICK

March 12, 2000

9:32 a.m.

Taken at:

HUNTON & WILLIAMS, LLP

951 East Byrd Street, East Tower, Richmond, Virginia

DEPOSITION CONTAINS CONFIDENTIAL INFORMATION OF PHILIP MORRIS USA, INC. -- SUBJECT TO PROTECTIVE ORDER IN LIGHT CIGARETTES MARKETING SALES PRACTICES LITIGATION.

REPORTED BY: CHRISTINA S. BROWN, CCR

COOK & WILEY, INC.
Registered Professional Reporters
3751 Westerre Parkway, Suite D-1
Richmond, Virginia 23233
(804) 359-1984

APPEARANCES:

Samuel W. Lanham, Jr., Esquire
LANHAM BLACKWELL
470 Evergreen Woods
Bangor, Maine 04401
207.942.2898
slanham@lanhamblackwell.com
Counsel for the Plaintiff

Nancy G. Milburn, Esquire
ARNOLD & PORTER, LLP
399 Park Avenue
New York, NY 10022-4690
Nancy_Milburn@aporter.com

and

Erik W. Snapp, Esquire
WINSTON & STRAWN, LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
847.722.9527
esnapp@winston.com
Counsels for the Defendant

as three months?

**A I don't know specifically. I don't have independent knowledge of that, and don't have direct management responsibility for our distribution system.**

Q If in the chain of distribution the wholesaler or large retailer already has inventory that does not include the onserts, and now they are receiving in shipment packages that do include the onsert, in 2002 was there any process by which they were expected to put their inventory with the onserts ahead, if you will, of the inventory without the onserts for purposes of distribution ultimately to the smoking customer?

**A Not that I'm aware of.**

Q Are you aware of distribution agreements that would exist between Philip Morris USA and wholesalers?

**A I'm aware that we have distribution agreements or have agreements with many of our direct customers.**

Q And those direct customers for Philip Morris USA would be wholesalers or large retailers, correct?

**A Typically, yes.**

Q Anyone else by category?

**A Not that I'm aware of. I think those are the primary categories that you'll see in our direct customers.**

Q In your work over time, have you had occasion

Q Now, once you have delivered the product to your direct customers, which is to say wholesalers and large retailers, at that point in time do you -- and you being Philip Morris USA -- cease to have any control over the further distribution of the product?

**A That product at that point in time is in their possession.**

Q So however long they want to retain the product, store the product, or keep the product is entirely in their discretion; is that a fair statement?

**A I'm not sure if it is. Some of it may be addressed by the agreements we have with our wholesalers and our direct customers.**

Q Once the product makes its way through the distribution chain -- and let me use, if I may, for an example Wal-Mart, a Wal-Mart store that sells Philip Morris manufactured cigarettes -- once it is into the hands of the ultimate retailers, in my example, Wal-Mart, at that point does Philip Morris USA have any control over how soon the product is sold?

**A To my knowledge we don't have control over how the product is sold. We do have agreements with retailers, certain retailers throughout the country related to certain aspects of the sale of our products.**

Q What about the aspect of how soon the product

is to be sold after being received by that particular entity?

A To my knowledge, I am not aware of specific requirements that require them, for example, to sell the product during a certain period of time. I know that we have done things throughout the distribution chain -- I am not familiar with all of them because that's not an area that I work in -- to rotate for product freshness. There have also been instances where product that is not fresh has been removed from the shelves after a certain period of time.

Q Is what you just described something that is established between Philip Morris and the wholesaler or between Philip Morris and what I'm going to call the end retailer?

A It may or may not be addressed. I know we have agreements in place with both direct customers, as well as a number of retailers that participate in some of our programs. I'm not familiar with all of the details of those agreements; however, there are agreements that exist that may address some of these issues. But not being familiar with them, I can't give you specifics on that.

Q I understand, and I respect that. Do you have any familiarity at all in the context of such agreements

right?

A Correct.

Q And it indicates there were 175 packings, and the pack quantity was 131,244,500, which comports with your approximation of 130 million, doesn't it?

A That is correct.

Q Now, it refers to A, B, C and D Brands, and documents that we'll be looking at today break down brands by those letter categories. Would you explain, please, the distinction of an A Brand, a B Brand, a C Brand and a D Brand?

A I'll start by giving my understanding that those are terms that are used within our manufacturing organization, so they're not terms that I deal with in my day-to-day job. But my understanding is that within our manufacturing organization, they use those classes of brands to describe different categories of cigarette packings primarily based on their sales volume, with A and B Brands being those with the largest sales, or in their context production volume, and C and D Brands having a smaller production volume.

Q Do you know how they're further broken down between A and B and then C and D?

A I do not know precise distinctions. I believe that it flows from A being those with the highest volume

**and production quantities required, B being the second, C being next, and D following below that.**

Q On the left-hand column of this document on Page 1, it refers to one week's worth of average weekly sales volume per SKU. SKU is an acronym for stock keeping unit, isn't it?

**A That's my understanding.**

Q You're familiar with that term?

**A I'm familiar with that term.**

Q Would you explain what is meant by one week's worth of the average weekly sales volume per SKU?

**A It's my understanding -- and I didn't create this document -- that in preparing to look at the onserts, it was an estimate that we made based on historical sales volume for each of these SKUs.**

Q What is the time frame of that historical sales volume that you used for purposes of making that determination?

**A I don't know, I wasn't involved in making that specific determination.**

Q It does not refer to one week in terms of the calendar, like from November 10 to November 17, does it?

MS. MILBURN: Objection to the form.

**A Again, I was not involved in the preparation of this, but if you look at average weekly sales volume,**

**I imagine you would use the average based on your sales volume per week. I was not involved in the preparation of this.**

Q And perhaps a poor question. When it says one week's worth, that is an average of sales for one week using some time frame upon which to make that average, correct?

**A Yes. It's my understanding that you would look at your weekly sales over time, you would average that and come up with roughly one week's worth of volume based on that number.**

Q So if by way of example, and it's a hypothetical, in one week -- and this is a very artificially low number -- but by way of illustration, if your average for one week of sales was 1,000 packs, then this would reflect a distribution of onserts in 1,000 packs to comport with the one week of average sales?

MS. MILBURN: Objection to form.

**A My understanding is that we would rely on that. If one week's average sales volume was 1,000 packs, onserts would be put on 1,000 packs for that particular SKU.**

Q Thank you. And then per SKU, put that in context for me, please. When it says per SKU, what does

that mean in language that, you know, a layperson would understand?

**A My understanding of SKU is that each individual different product offering with different cigarette pack would be an individual SKU.**

Q Is that to say each one of these line items would be an individual SKU?

**A That's my understanding. So you would look at -- you would likely have 175 different packings, my understanding is that that would be similar to an SKU.**

Q Which is to say 175 SKUs?

**A That's my understanding, those terms would be used similarly.**

Q Now, on the left-hand side it says included packings, and on the right-hand side it says excluded low tar packings. Do you have an understanding as to why you have some that are included and some that are excluded?

**A I do not. I wasn't involved in the manufacturing operations at that time. So my understanding is on the left side -- I agree that the left side you have included packings, and on the right side seems to be excluded packings.**

Q And I fully understand that you weren't involved in the manufacturing process. When I ask

on October 21, 2002, that it makes it to wholesale by November 4th, 2002?

MS. MILBURN: Objection. He says he hasn't seen this document before.

MR. LANHAM: I understand. You've made your objection.

**A Yeah, I haven't looked at this document before, so I don't know exactly what they're referring to. I described the distribution channel earlier.**

Q Let me -- a broader stroke here, okay. You've described for me, and I appreciate it, the distribution system, okay. And now I have a document that appears to comport with the same 130 million packs distributed in November of 2002 per your affidavit, and it further appears in the column on the right-hand side, far right, that the timing of that distribution was from the point of public warehouse, October 21, 2002, to actual retail, was over a period of November 18th, 2002, to January 2003; do you understand that?

**A I understand that that's what the document has, information related to that.**

Q And do you agree that the document would suggest that there is a time frame from distribution to the public warehouse to the end date of retail of January of 2003, at least on the face of the document?

MS. MILBURN: Objection. He says he hasn't seen the document before.

MR. LANHAM: I didn't ask him that. We don't need you to keep qualifying your objections. Form, foundation, instructions not to answer are appropriate.

Q My question is, on the face of this, does that appear to be the case?

**A It appears to be the case that this lays out rough time lines for the distribution of that product through the distribution system. That's all I can tell.**

Q And that's really all I'm interested in. And if you make that assumption, it's roughly a six- to ten-week time frame. They have retail here in November 18th, '02, to January '03, so that would be in a range of six to ten weeks?

MS. MILBURN: Objection.

Q Do you agree? Based upon --

**A What it says is November 18th, '02, through January of '03.**

Q Thank you.

(McCormick Deposition Exhibit NO. 6 is marked.)

Q I'm handing you exhibit -- McCormick 6. I

tar cigarette that was not listed on Exhibit 6, that that smoker would not have been purchasing a package that contained an onsert, correct?

**A The brands that are listed in the included packings would be the ones that contained the onserts, so smokers who purchased those packs would have a pack that included that onsert.**

Q And the other 130 packings would not have included onserts during that time frame, correct?

**A The only ones that included the onsert were the 45 packings. I don't exactly know how many packings we had that we were selling at that time.**

Q I'm simply subtracting the 175 from the fourth quarter of 2002, I'm subtracting from that the 45 in the fourth quarter of 2003, I come up with 130.

**A And my answer is --**

Q You would agree with me that -- she's doing that because I haven't asked the question yet -- you would agree with me that there's a difference of 130 packings?

MS. MILBURN: Mr. Lanham, I'm going to object because the version of Exhibit 6 that you were using is different than the version of Exhibit 6 that was produced to you. It appears to be a line that has been whited out, which is the subject matter of the witness's

testimony. So I would just ask that we use the version that was produced.

MR. LANHAM: Let's go off the record, please.

(Discussion off the record.)

MR. LANHAM: Let the record reflect that with regard to Exhibit No. 6, the copy that I had had a very faintly noted line under the word "classes" on the right-hand side that we just learned had not been picked up on photocopying on the copy being used by Mr. McCormick, so we've substituted it. And the line at issue is underneath the word "classes," is the language "A & B packings only due to factory onserting capability."

Q So you had testified -- I'm going to ask you a question now -- you testified earlier you thought it had to do with something concerning manufacturing, and you were right, weren't you, because of that?

**A What this document says is that production was limited to A and B packings only, and the rationale that's given in this document it was due to factory onserting capabilities, so it's a little bit more specific in terms of what the factors were that were impacting this, which were factory onserting capability.**

**A This is not a document I've seen before. Would you mind if I finished reading the document?**

Q Absolutely. Go right ahead.

**A Okay.**

Q Simply, can you tell us what the ad test concept is about?

**A What I can tell you is what I read from this document, which as I mentioned I don't think I've seen before. This appears to be a summary of focus groups that were conducted in -- let me see if these list when they were conducted -- it would be some time prior to the date of this document, which is dated April 2nd, 2003.**

Q And if you take a look at the second page, it states that, at least in the context of this document, the research objectives were to "Test developed advertising concepts to qualitatively explore message breakthrough;" in parens, "Does the ad communicate that PMUSA is addressing tobacco issues?"

Given your position, is that something that Philip Morris does from time to time with regard to certain issues, certain marketing matters, and that is to test whether a message is getting through that's done by focus groups, right?

MS. MILBURN: Objection to form.

A What this document -- based on my read of this document, what this refers to is television advertising, is my understanding.

Q And what do you base that understanding on?

A That it's labeled "Ad Test Results," that the descriptions of the ads that are used are similar to the descriptions that were used in other documents I've seen describing the television advertising, particularly some of the ones that were run, although not all of them, as I know -- appears to have multiple versions -- so it appears to be similar to -- it's based on the description of ad tests, based on the 2003 timing of the document, and based on the descriptors that are used of the advertising that was tested, that would lead me to conclude that this is likely a document that was done specifically related to television ad executions.

Q Take a look at -- near the end, Bates at the end is 1446, it's entitled, "No Safe (Radio)," isn't it? So it would also encompass radio ads?

A It could potentially encompass radio, which we also would have been running, as I noted in my affidavit, from 2003 to 2006, there was both television and radio. So, yes, I appreciate you pointing that out.

Q So it wouldn't be limited to TV?

A It appears not to have been. And actually as

**there is no -- I'm looking to see, having just got the document, whether there's any specific reference to television. Knowing that the types of ads that would have been prepared around that time for television, radio, and print, some of these share the same descriptions of the television and radio spots.**

Q And if you look at the document we were referring to a moment ago with the numbers 1443, that's the one labeled "Tar and Nicotine (Onsert)," that would have referred specifically to focus groups in addressing onserts, right?

MS. MILBURN: Objection to form.

**A Because it says -- again, it says "'Tar and Nicotine' ad" which would lead me to believe that we are testing an advertising execution.**

Q Through an onsert. The second bullet point says, "The onsert does not provide the proof point credibility expected," that doesn't refer to a television ad, does it?

**A It could.**

Q An onsert would refer to a television ad?

**A What you were referring to, which my guess is that you're referring to here is two different executions of a tar and nicotine ad. One of which you are likely referring to as "no safe," and I believe that**

is a term that we've used in terms of the documents I've seen, looking at the ads that we have placed related to this issue, so that one I am much more comfortable on.

I don't know but would guess that what we were testing here is an ad that potentially would have included that, but wouldn't know for sure without seeing the documents that were tested at the time, or advertising executions. It does refer to a tar and nicotine ad that included information on the onsert. So that's -- I would base my description -- based on the description in the line above, I would guess that would refer to an ad that included information on the onsert.

Q You agree with me that the second bullet point specifically says, "The onsert does not provide the proof point credibility expected." It does say that, right?

MS. MILBURN: Objection, asked and answered.

Q Yes?

A I'm reviewing the document -- I'm reviewing this page of the document, and I think that that's -- by picking one line, you're not giving a complete description of what the document seems to say.

Q Well, the document is not limited to TV advertising because it takes into account radio and onserts also, doesn't it?

A I don't believe that it takes into account onserts. And based on the information I'm seeing, I do not share the same conclusion that you have as to what's potentially being tested here.

Q Is there any other manner in which the term "onsert" is used in the manufacturing of cigarettes by Philip Morris other than that small leaflet that is inserted in the package that we refer to as an onsert, is there any other way it's used?

A We use "onsert" to describe a small leaflet that attached to the cigarette pack.

Q Is it used to describe anything else other than that?

A Not to my knowledge.

Q Given the timing of this report, Exhibit 9, is April 2, 2003, do you believe it has any relationship to the first onsert campaign in the fourth quarter of 2002?

A Relationship in what sense?

Q Determining by way of focus groups the efficacy of the onsert insertion campaign in the fourth quarter of 2002?

A My best guess on this document based on my experience in dealing with focus groups and some of the terms that are used in the document, and the timing of this document, is this appears to be a document that

would have tested advertising concepts.

We use the term -- we do not use the term "advertising" to refer to onserts, we use that term distinctly. So my best guess on this document based on the terms I am familiar with of what you're looking at here is a document that would have been done prior to launching television and radio campaigns right around that period of time in 2003.

Q If you'll look at the same exhibit, the document with the Bates numbers at the end of 1435, and there's a statement to the effect, (as read), quote: The focus on the website is seen as advertising the company name rather than advertising the company's, apostrophe s, positions, closed quote.

Do you believe that that also pertains to a TV advertising campaign focus group process?

A The page as contained in this entire document that you've shared with me that's entitled "PMUSA Ad Test, Focus Group Results."

Q It's a -- I'm sorry, are you finished?

A Yes.

Q And it says on this particular page, "The focus on the website is seen as advertising ..." So it's possible that this is not just limited to focus group analysis of TV and radio ads, correct?

States?

A It's not clear from there, but it's -- they're geographically dispersed. I don't know necessarily what those markets were based on this one line.

Q Look at the next page, the last numbers of Bates stamp are 7415. It has for vehicle awareness, it has "Onsert, 39," and then you'll see over here the number "100," the bar is 0 to 100. Do you interpret that to mean that 39 percent of those who were interviewed were aware of the onserts?

A I would interpret that as being a percent. I don't know the specific question that was asked, but based on the label, "Vehicle Awareness," that's probably pretty close. But I don't know exactly what it's capturing there.

Q I fully accept and understand that you don't know the particulars. But based on the objective and the methodology in this bar graph, it appears that of these folks interviewed, 39 percent were aware of the onserts?

MS. MILBURN: Objection, asked and answered.

A I answered that question. I agree.

Q You agree?

A No, I answered the question. I agree with my attorney that I answered the question.

included those onserts that are labeled as information for smokers, correct?

**A Yes. That was Exhibit B in my affidavit.**

Q Yeah. Back to Exhibit 12, same page where it says "Television" under "Stimuli," it says: CR advertising, quote, what tobacco issues, colon, health effects, closed quote, ad. Do you know what that is referring to?

**A I don't remember specifically the content of that ad.**

Q What do the initials CR stand for in front of advertising?

**A Probably corporate responsibility advertising.**

Q And you see under "Methodology" where again this was "Mall intercept interviews conducted across 50 geographically disperse markets" with 407 interviews. Do you see that?

**A I see that.**

Q If you turn to the next page, similar to the other exhibit that we looked at on the 0 to 100 scale, it appears that with regard to the onsert prong of this, 44 percent of those interviewed had awareness, and on the television, 24 percent had awareness, correct?

**A That's what that document seems to state. Again, I'm not sure exactly how that research was**

don't they?

A We have used onserts to communicate a range of different messages, yes.

Q Within the corporate responsibility program, there are different messages, only one of which is no safe, low tar, correct?

A That is correct.

Q And outside of the corporate responsibility program, onserts are used for branding messages and marketing purposes, aren't they?

A Or to communicate product information, and that appears to be what this document is referring to.

Q And so the onserts, whether it's within the context of the corporate responsibility program or it's outside the corporate responsibility program, there are any number of different messages communicated through onserts; true?

A We use onserts to communicate a range of different messages.

Q And no message is effectively communicated unless somebody opens the onsert and reads it; would you agree with that?

A We communicate a message generally, particularly our message on low tar cigarettes, in a broad range of different ways; onserts is one of the

Q Let me ask it even more basically: Are you even aware at all that its use was expanded beyond just low tar messages?

**A I am aware generally that from time to time that we have used onserts for marketing communications, that's probably the extent of my knowledge. It is not nearly as deep as it is on some of these other issues; it's not an issue that I was directly involved in.**

Q Okay. Take a look at this exhibit, please.

**A Okay.**

Q The last time the onserts were used, I believe you said earlier, was the second quarter of 2008; is that correct?

**A 2008 was the last time we used -- we had a low tar message on our onserts.**

Q And up until that time, were you involved in the operation of the use of onserts? I mean, did you continue -- I'm not asking it well. Did you continue to be involved with that aspect of the company's business up until the time you stopped using them, you personally?

MS. MILBURN: Objection to form.

**A I think the first -- you seem to have multiple questions in there.**

Q I'll ask it again. When did your involvement

Q Why is it in the context of the use of no safe, low tar onserts, that in a particular quarter, as those quarters mentioned in your affidavit, an onsert that was used for one week in terms of the average sales volume that we talked about earlier was not used for two weeks or three weeks or four weeks?

**A Can you repeat the question?**

MS. MILBURN: Objection.

Q Yes. You've answered questions earlier with regard to onserts, the low tar onserts being used in packaging based upon the one-week and two-week average sales. You've testified earlier about the distinction between A and B Brands and C and D Brands.

And my question is, if there was a decision made to use one-week average sales for A and B Brands, why not use -- do the same for two weeks, or even three or four; why one week?

MS. MILBURN: Objection to form, compound.

**A The reason we used -- it came up with an average weekly sales volume for the onsert communications, because based on our estimates, we believe that that particular execution, using one-week's average sale volume per SKU across all of our packings that were listed on the documents that we went through earlier was because that enabled us to reach by our**

first -- for estimates related to that first distribution in 2002, we estimated that we would be able to reach 86 percent of the smokers of those brands by making it available for that period of time.

Q By making it available for one week based upon average sales for that brand?

A By using an average weekly sales volume calculation to determine the amount of product that we made that would include the onsert.

Q If one-week average sales would provide that kind of reach, would not two-week's average sales potentially result in even a greater reach?

MS. MILBURN: Objection.

A What I don't know is whether it would be -- this was -- reminder that this was one of the communications vehicles in which we were using, it was not the only one. What the 86 percent measures is for that specific execution. I don't know how much higher adding another week's worth of volume would have gotten you in terms of the percentage of specific smokers.

Q Were you personally involved in the analysis to make the determination that the one-week average that you've just described would reach 86 percent of the smokers?

A I was not involved in conducting that

**analysis. I was involved in drafting a communication that included that number, a press release that was developed at the time, so would have verified that number to make sure I understood it.**

Q Do you know if any research was done after the fact to confirm that the target percentage of 86 was in fact accomplished?

**A What that was was an estimate based on -- what we know is that we hit 130 million packs of volume, and we know enough about our consumer purchasing habits that we believe that to be a reliable estimate. I am not aware that we did any follow-up research with individual smokers. To do that type of research would be -- you know, to confirm that number exactly would be very extensive. What we relied on were the estimates in terms of what we thought we could reach, and we executed a plan to do that.**

Q You had a plan that you developed based upon assumptions, based upon data, and you projected you'd be able to reach 86 percent, correct?

**A Based on the factors that I laid out earlier, we estimated that packs with the onserts would reach 86 percent of the smokers of those low tar brands.**

Q And sitting here today, are you able to tell us if you in fact reached that goal?

A I can tell you that we put the onsert on 130 million packs of cigarettes. And based on that, we believe that that product was purchased by tens of millions of smokers.

Q You believe that product --

MR. LANHAM: I'm sorry, I didn't mean to interrupt.

MS. MILBURN: I would ask you to let him finish.

A Tens of millions of smokers.

Q When you use the phrase "reached," you mean somebody purchased the pack with the onsert on it, don't you?

A That was the goal of our communication was to make a pack with that onsert communication available to smokers during that period of time and to reach as many as possible.

Q And in 2002 and 2003, did that program -- strike that.

If you'd look at Page 17, please, the 17 at the bottom, the last four Bates numbers are 7292. This particular plan included a recommendation of six unique onsert messages for execution in 2004, didn't it?

A That's what this document -- that first line says "Recommend six (6) unique onsert messages in 2004"

study, were they testing onserts?

A They were not testing onserts, they're testing advertising.

Q And one of the ad's titles that you read off was tar and nicotine, slash, onsert?

A That's correct.

Q Going back to Page 1443, is that ad described on that page?

A Not in detail, but at the top page it describes it as an ad -- it says: (as read), The tar and nicotine -- those are in quotes -- ad that included information on the onsert fell out of the mix. So based on my experience in working with advertising, it's not unusual to have two different executions of an ad that you're trying to test.

The label that we would put in parentheses would be -- you would try to distinguish them in some way internally, and that would be the way in which you would distinguish the difference between your television spot that you're calling "no safe" and your television spot that you're calling "onsert." So what this says is it included information in some way, shape, or form on the onsert.

Q If the focus group were testing onserts themselves, as opposed to ads that refer to onserts,

**appeared on many of the news broadcasts, both the Today Show, Good Morning America, and I believe also on some of the evening news broadcasts as well.**

Q What was the goal of this TV campaign?

**A The goal was part of our ongoing efforts to communicate broadly about tobacco issues by incorporating TV into the mix specifically. It enabled you to have a very broad reach in terms of the number of people who were exposed to the message that enabled you to reach both the general public, and then certainly as a subset of that, smokers with information that was interesting to them as well.**

(McCormick Deposition Exhibit NO. 18 is marked.)

Q Mr. McCormick, showing you what's been marked as Exhibit 18, which is a two-page document. First page is Bates numbered 3034014029. The second page bears a Bates number of 3007287612. Ask if you have ever seen these two documents before?

**A Yes. I would just note that they're two separate documents.**

Q Yes, you are correct. I've marked them together because we're going to speak about them

**A We expected that viewers would see that ad approximately 7.6 times, would be the frequency that we were shooting for.**

Q What percentage of viewers did you expect to reach?

**A Based on the buy, with a national buy, we expected to reach 82 percent of that 18-plus audience from a reach standpoint. So to put that in shorthand to sum it up, we expected to reach 82 percent of the adult television watching audience and have them see this spot on average 7.6 times.**

Q And the column immediately to the left of the reach columns labeled "A18+ TRPs," what are TRPs?

**A TRPs is a term used in the advertising business, particularly as it relates, in this context, of television. It means total rating points, and it's a measure of your total audience. And I understand that's calculated by multiplying your frequency times your estimated reach. So that number is the result -- the product of those other two factors put together.**

Q So it's a product of multiplying 82 percent times 7.6?

**A That's my understanding.**

Q And the number given for Line No. 5 is 624?

**A That's correct.**

Q Based on your knowledge of ad campaigns and determining ratings for those campaigns, how do you value this -- evaluate this particular advertisement?

MR. LANHAM: Objection to form.

**A I would say based -- let me kind of first describe my experiences in this regard to give a context on which to evaluate my answer. I'll base my response on two things, you know, general involvement in the communications field, and, you know, what is occasional benchmarking against other campaigns and asking questions to gain an understanding of it, as well as conversations I had at the time with those who are involved in planning this -- this campaign.**

**And at those levels, this is designed to be a campaign that is broad in its reach. It is likely to have a greater frequency than many other campaigns that are out there, but is probably on the lines of some of the more prominent ads that are on TV. And when you look at kind of those rating points for that point in time, it's very significant in its scope, and it's at the higher end of what you would typically expect to see for a television campaign.**

Q If you would take a look at No. 11 and tell us what the information on that line is telling us.

**A This is -- it says, (as read): No safe,**

there are no more no safe, low tar ads, are there? There are other no safes, but there is no no safe, low tar, correct?

**A That specific ad is not listed in Lines 12 through 21.**

Q And if you look at Page 2, which takes us through December 3, 2006, Lines 12 through 25; likewise, there are no more no safe, low tar ads, are there?

**A That specific ad is not listed there, no.**

Q So with regard to the two that you are being questioned about, with regard to line items 1 through 21 on the first page, and Lines 1 through 25 on the second page, there are two no safe, slash, low tar ads, correct?

**A That is the description used for those ads, yes.**

Q And each -- the first one ran November 17th to December 21 in 2003, right?

**A Yes.**

Q And the second one ran October 25 to November 28th, 2004, correct?

**A That's correct.**

Q And so from June 2003 until December 3 of 2006, two-and-a-half-year span, there are two runs for that ad, aren't there?

**A For that specific ad. And then the second version of that appears to be slightly different, so they may be two slightly different ads.**

Q But that's it for that two-and-a-half-year time frame, isn't it?

**A For that specific ad. Again, what I don't know is whether those issues -- the other issues that are general health messages, general smoking cessation messages, what I don't know just from the shorthand here is whether those specifically mentioned low tar cigarettes at all. Some of them reference a no safe message, and all of them direct people back to the website, which was available in this time with extensive information on smoking and health issues and low tar -- including low tar.**

Q Some of them reference addiction, causation, and quitting, don't they?

**A They do.**

Q Others, parent resource center?

**A Yes.**

Q Others, actions omnibus?

**A Yes. Those are the titles for the ads, the internal titles.**

Q Another ad, pregnancy, slash, no safe?

**A Yes.**