# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN RE:  LIGHT CIGARETTES MARKETING SALES PRACTICES LITIGATION | MDL Docket No.  1:09-MD-2068 ALL CASES |

## DEFENDANT PHILIP MORRIS USA INC.'S REPLY TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Rule 56(d) of the Local Rules for the United States District Court for the District of Maine, defendant, Philip Morris USA Inc. ("PM USA"), submits this Reply to Plaintiffs' Statement of Additional Material Facts ("plaintiffs' SAF" or "pls. SAF").

## PRELIMINARY STATEMENT

In response to PM USA's 47-paragraph statement of material facts, most of which plaintiffs failed to dispute, plaintiffs have submitted *118 additional* paragraphs of supposed "additional material undisputed facts" in opposition to PM USA's motion for summary judgment.  The majority of plaintiffs' additional "facts," however, are not relevant -- let alone *material* -- to this Court's determination of whether, given PM USA's extensive disclosures after December 1, 2002, PM USA's use of the descriptors at issue in these cases can be deceptive as a matter of law.  Plaintiffs' SAF consists largely of quotations from past hearsay testimony that are either taken out of context and/or have nothing to do with the issues here, mischaracterized documents, and findings from a decision, *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1 (D.D.C.  2006), that this Court has ruled has no binding effect in this case.  In addition, much of plaintiffs' SAF relates to the issue of causation, which is not at issue

for purposes of this motion.  Rather than create a genuine issue of material fact, plaintiffs'

additional "facts" are immaterial and create unnecessary work for PM USA and the Court.

In addition, plaintiffs fail to comply with the basic requirements of Local Rule 56,

which requires that their statement of facts be *"a . . . short . . . and concise statement"* "of

*material* facts" each set forth "in . . . a separately numbered paragraph," and fail to support

many of their alleged "facts" with record citations.  Local Rule 56(c) (emphasis added).

Instead, many of plaintiffs' numbered paragraphs contain multiple sentences that are overly-

long and convoluted.  In addition, rather than state "facts," plaintiffs frequently offer argument,

comment, and improper characterizations of testimony and documents.  Indeed, many of

plaintiffs' "facts" are so laced with improper argument and mischaracterization that they in

effect are an end run around the page limit on plaintiffs' brief.  *E.g.*, Pls. SAF ¶¶ ■, 105, ■.

Plaintiffs' 118 additional "facts" violate the plain language of this Court's Rule 56(c), and PM

USA respectfully objects to plaintiffs' improper imposition of the obligation of an unduly

burdensome response upon it, and requests that plaintiffs' SAF be stricken in its entirety.

Local Rule 56(c); *see, e.g.*, *Stanley v. Hancock County Comm'rs*, 2004 ME 157,¶ 29, 864 A.2d

169, 179 (2004) (interpreting the identical requirement under the Maine Civil Rules and

indicating in dicta that "[i]f a party submits an unnecessarily long, repetitive, or otherwise

convoluted statement of material facts that fails to achieve the Rule's requirement of a

'separate, short and concise' statement, the court has the discretion to disregard the

statement . . . .").

## PM USA'S REPLIES TO PLAINTIFFS' SAF

Pursuant to this Court's Rule 56(d), PM USA replies to plaintiffs' SAF, interlineating its replies with plaintiffs' asserted facts:[1]

48.     PM USA's distribution of "low tar/lights" onserts in November 2002 was done in one week's volume of selected light brand styles from all "classes" of PM USA cigarettes, as categorized by PM USA based upon their sales volume, which included "Classes A, B, C & D Brands." McCormick Dep. Ex. 3, 3007287724-3007287727, at 3007287724 (attached hereto as Exhibit A); McCormick Dep. at 39:7-21, Exhibit AA.

**QUALIFIED:** PM USA's distribution of "low tar/lights" onserts in November 2002 was done based on "1 week's worth of average weekly sales volume per SKU" and included Classes A, B, C, and D Brands. Pls. Ex. A, 3007287724. In addition, the exhibit that plaintiffs cite makes clear that PM USA adjusted the "quantities for some low volume products . . . to facilitate national distribution." *Id.* Based on the exhibit, the onsert distribution included all but 19 low-tar packings, and included those labeled as "light," "ultra light," "medium," and "mild." *Id.*

49.     This involved 175 "packings" -- that is, low tar/lights onserts were included in the "packing" of "one week's volume" of packs of cigarettes in each of 175 different "SKUs," which

---

[1]     For ease of reading, PM USA has adopted the following citation conventions for *its* statements in reply. These are slightly different than those used in plaintiffs's SAF. Citations to "Pls. Ex. __" refer to the exhibits to plaintiffs' SAF. Additionally, although plaintiffs included excerpts from the McCormick Deposition as their Exhibit AA, PM USA has included as Exhibit 12 to its reply brief the full McCormick Deposition. Citations to PM USA's Exhibit 12 will appear in the text of PM USA's replies as "McCormick Dep. at ___." Additionally, citations to the "Harris Aff. ¶ __" refer to the affidavit submitted by Dr. Harris on March 31, 2010 as Exhibit A to plaintiffs' response to the summary judgment motion at issue here. Citations to other affidavits submitted by Dr. Harris in this multidistrict litigation, such as those submitted in support of Plaintiffs' Motion for Class Certification, will be identified specifically.

are product numbers identifying a unique product offering with a different pack.  McCormick Dep. at 40:10-42:13, Exhibit AA.

   **QUALIFIED:**  PM USA's distribution of "low tar/lights" onserts in November 2002 was done based on "1 week's worth of average weekly sales volume per SKU."  Pls. Ex. A, 3007287724.  In addition, the exhibit that plaintiffs cite makes clear that PM USA adjusted the "quantities for some low volume products . . . to facilitate national distribution."  *Id.*

   50.     Nineteen SKUs were excluded from this distribution of low tar/lights onserts. Exhibit A at 3007287724; McCormick Dep. at 42:14-43.  Accordingly, purchasers of those SKUs did not receive any low tar/lights onserts in this distribution.

   **QUALIFIED:** PM USA **ADMITS** the first sentence of paragraph 50.  PM USA objects to the second sentence of paragraph 50 as speculative argument unsupported by any citation to the record as required by Local Rule 56, and requests that it be **STRICKEN**.

   51.     In an Altria document entitled ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Exhibit C at

AC5000960458 (emphasis added).  █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ *See also* McCormick Dep. at 41:4-23 ("If one week's average sales volume was 1,000 packs, onserts would be put on 1,000 packs for that particular SKU.")

   **DENIED:**  PM USA **DENIES** the second sentence of paragraph 51 because on its face it is not supported by the record citation immediately following it, or by any other evidence of

record.  *See* Affidavit of Jeffrey Harris (Mar. 29, 2010) (Ex. I to Pls. Mot. Class Certification) ¶ 17

(reporting a higher percentage); Affidavit of Jeffrey Harris, M.D., Ph.D. (Mar.  31, 2010) (Ex. A.

to Pls. Resp.  Opp.  PM USA.  Mot.  Summary J.  Plaintiffs' Claims for Purchases After Dec.  1,

2002) ("Harris Aff."), Table 1 (reporting specific percentages per jurisdiction, the mean of which

is higher).  Further, it is a hypothetical statement that is not a statement of "material fact"

permitted by Local Rule 56.  Therefore, PM USA requests that the second sentence be

**STRICKEN**.  With respect to the first sentence of paragraph 51, PM USA **ADMITS** that the

quoted language appears in plaintiffs' Exhibit C.

52.  ██████████████████████████████████████████

████████████ (attached hereto as Exhibit D) ███████████████████████

███████████████████████████████████

**ADMITTED.**

53.    The distribution of low tar/lights onserts in the fourth quarter of 2003 was only

done in one week's volume of the top-selling brands, the "A and B Classes," due to limitations

in the factories' ability to include onserts in other brands.  McCormick Dep. Ex. 6

(5002612333- 5002612335) (attached hereto as Exhibit B), at 5002612333; McCormick Dep.

at 57:7-25, Exhibit AA.

**QUALIFIED:**  The distribution of low tar/lights onserts in the fourth quarter of 2003

was done in one week's average weekly sales volume per SKU of the top-selling brands, the

"A and B Classes," due to limitations in the factories' ability to include onserts in other brands.

Pls. Ex. B, 5002612333; McCormick Dep. at 57:7-25 (Ex. 12 to Def. Reply Br.).

54.     Instead of the 175 packings that included low tar/lights onserts in the previous year, only 45 packings included these onserts in 2003.  Exhibit B at 5002612333; McCormick Dep. at 56:10-11, Exhibit AA.

**QUALIFIED:**  The 45 packings constituted the vast majority of PM USA's low-tar cigarette sales in 2003, and the inclusion of the onsert with these products resulted in the distribution of 111,700,000 onserts in 2003.  *See* Pls. Ex. B., 5002612333.

55.     The distribution of low tar/lights onserts in the fourth quarter of 2003 excluded all brands in PM USA's "C" and "D" classes.  *See* Exhibit B hereto at 5002612333; McCormick Dep. at 57:7-25, Exhibit AA.  Accordingly, only smokers of the top-selling brands of PM USA light cigarettes could have received low tar/lights onserts in the cigarettes they purchased in and shortly after the fourth quarter of 2003.

**QUALIFIED:**  The 45 class "A" and "B" products constituted the vast majority of PM USA's low-tar cigarette sales in 2003, and the inclusion of the onsert with these products resulted in the distribution of 111,700,000 onserts in 2003.  *See* Pls. Ex. B., 5002612333.  PM USA objects to the second sentence of paragraph 55 as speculation unsupported by any citation to the record as required by Local Rule 56 and requests that it be **STRICKEN**.

56.     The remaining brands -- those in the "C" and "D" classes -- did not include low tar/lights onserts.  Based upon the differences between the number of packings that included low tar/lights onserts in 2002, and the number of packings that included these onserts in 2003, it appears that approximately 130 different SKUs that were included in the low tar/lights onsert distribution in 2002 were excluded from the low tar/lights onsert distribution in 2003.  *Id.*

**QUALIFIED:**  The 45 class "A" and "B" products constituted the vast majority of PM USA's low-tar cigarette sales in 2003, and the inclusion of the onsert with these products resulted in the distribution of 111,700,000 onserts in 2003.  *See* Pls. Ex. B., 5002612333.

57.     While Philip Morris states that it has included [informational] onserts in approximately 130 million cigarette packs distributed nationwide in 2002, 109 million packs in 2003, 118 million packs in 2004, 149 million and then another 135 million packs in 2005, 140 million packs in 2006, 129 million packs in 2007, and 127 million packs in 2008 (McCormick Aff. ¶ 10), these numbers are miniscule compared to the number of packs of cigarettes PM distributes in a single *month*. ███████████████████

████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████ (attached hereto as Exhibit E), ██████████████

**DENIED:**  Although PM USA **ADMITS** that it distributed onserts in the approximate amounts stated in paragraph 57.  PM USA **DENIES** the characterization that "these numbers are miniscule compared to the number of packs of cigarettes PM USA distributes in a single month," and requests that this language be **STRICKEN** because it is not supported by citation to the record, is argumentative, and is not a proper statement of material fact under Local Rule 56.

████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████ *See*, *e.g.*, Aff. of Jeffrey Harris, M.D., Ph.D (Mar. 29, 2010) (Ex. I to Pls. Mot. Class Certification), Table 1 (reporting data that

indicates that the total number of low-tar packs distributed in the fourth quarter of 2002 was approximately 489 million.)

58.     Based upon data provided by PM USA, in each year PM USA has distributed the low tar/lights onserts at issue in PM USA's motion for each of the relevant MDL jurisdictions, such onserts have been included in anywhere as low as .88% of the packs of Light cigarettes PM USA sold in a particular state during a particular year (New Mexico 2004), but in no higher than 2.45% of such packs (Arkansas 2008).  *See* Affidavit of Jeffrey E.  Harris, M.D.  Ph.D.  ("Harris Aff."), at ¶5, Table 1, which is attached as Exhibit A to Plaintiffs' Response in Opposition to Philip Morris USA Inc's Motion for Summary Judgment on Plaintiffs' Claims for Purchases After December 1, 2002.

**DENIED:**  PM USA objects to paragraph 58, which purports to be plaintiffs' characterization of information contained in their expert, Dr.  Harris' Table 1, because it misstates the information provided in Table 1, and therefore is not a proper statement of material undisputed fact, is unsupported by the record citation, and should be **STRICKEN**.  PM USA **DENIES** paragraph 58.  *See* Harris Aff., Table 1.

59.     PM USA's estimates of the "reach" of their low tar/lights onserts program are unsubstantiated.  McCormick testified that PM USA determined in 2002, with respect to its first distribution of low tar/lights onserts, that it could reach 86% of the smokers of its light cigarettes through the use of low tar/lights onserts on a number of packs equal to one weeks' volume of sales.  McCormick Dep. at 125:14-126:20, Exhibit AA.

**DENIED:**  PM USA objects to the first sentence of paragraph 59 because it is argumentative, is not a proper statement of material fact under Local Rule 56, and is unsupported by any citation to the record as required by Local Rule 56, and requests that it be **STRICKEN**.

PM USA **DENIES** the first sentence of paragraph 59.  McCormick Dep. at 127:8-11

(explaining basis for determination); *see also* ███████████████████

██████████████████████████████████████████████

████████████████████████████; Pls. Ex. I, AC5001040751

(testimony of Michael Szymancyk similarly explaining process).  With respect to the second

sentence of paragraph 59, PM USA **QUALIFIES** that sentence to the extent that McCormick

testified that onserts were placed on a number of packs equal to a week's average sales volume

per brand/SKU.

     60.    ████████████████████████████

████████████████  *See* McCormick Dep. Ex. 19 █████████████

(attached hereto as Exhibit F), at ███████████

████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████

     61.    However, the basis for that estimate remains unclear.  McCormick stated that he

was not involved in the analysis that resulted in that estimate.  McCormick Dep. at 126:21-127:1,

Exhibit AA.

    **DENIED IN PART:**  PM USA objects to the first sentence of paragraph 61 as

argumentative and not supported by a citation to the record as required by Local Rule 56, and

requests that it be **STRICKEN**.  PM USA **DENIES** the first sentence of paragraph 61.

McCormick Dep. at 127:8-11 (explaining basis for determination); ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ Pls. Ex. I, AC5001040751 (testimony of Michael Szymancyk similarly explaining

process); *see also* ████████████████████████.  PM USA **ADMITS** the

second sentence of paragraph 61.

62.     Nor was he aware of any follow-up analysis to confirm whether the target "reach"

percentage of 86 percent was actually achieved.  *Id.*  at 127:5-17, Exhibit AA.

**ADMITTED.**

63.     Moreover, as McCormick used it, the term "reached" does not mean that the

message was actually read and accurately conveyed and understood by 86% of the smokers;

instead, it means simply that PM estimated that 86% of the smokers of its light cigarettes would

purchase a pack of cigarettes containing a low tar/lights onsert.  *Id.* at 128:11-17, Exhibit AA.

**DENIED:**  The statements in paragraph 63 are not supported by Mr. McCormick's

cited testimony, and are argumentative, and PM USA **DENIES** them on that basis.

McCormick Dep. at 128:11-17.

64.     PM USA's estimate of the "reach" of their television advertisements is

unsubstantiated.  PM USA has estimated that it reached 82% of the adult television watching

audience with a "No Safe/Low Tar" television advertisement that was to run from November

17 to December 21, 2003.  *See* McCormick Dep. Ex. 18 (3034014029 and 30072287612)

(attached hereto as Exhibit G), at 3034014029; McCormick Dep. at 147:6-11, Exhibit AA.

**DENIED IN PART:**  PM USA objects to the first sentence of paragraph 64 because it is argumentative, is not a proper statement of material fact under Local Rule 56, and is unsupported by any citation to the record as required by Local Rule 56, and requests that it be **STRICKEN**. PM USA **DENIES** the first sentence of paragraph 64.  McCormick Dep. at 145:24-148:22; Pls. Ex. G, 3034014029.  PM USA **ADMITS** the second sentence of paragraph 64.

65.     PM USA's estimate of the number of times consumers would see its television advertisements is unsubstantiated.  PM USA expected to have the adult television watching audience see the spot an average of 7.6 times.  Exhibit G at 3034014029.

**DENIED IN PART:**  PM USA objects to the first sentence of paragraph 65 because it is argumentative, is not a proper statement of material fact under Local Rule 56, and is unsupported by any citation to the record as required by Local Rule 56, and requests that it be **STRICKEN**.  PM USA **DENIES** the first sentence of paragraph 65.  McCormick Dep. at 145:24-148:22; Pls. Ex. G, 3034014029.  PM USA **ADMITS** the second sentence of paragraph 65.

66.     PM USA's estimate of the "reach" of their television advertisements is unsubstantiated.  When the advertisement ran again from October 25 to November 28, 2004, PM USA estimated it would reach 83% of the adult television watching audience, who would see it an average of nine times.  *Id.*

**DENIED IN PART:**  PM USA objects to the first sentence of paragraph 66 because it is argumentative, is not a proper statement of material fact under Local Rule 56, and is unsupported by any citation to the record as required by Local Rule 56, and requests that it be **STRICKEN**. PM USA **DENIES** the first sentence of paragraph 66.  *See* McCormick Dep. at 145:24-148:22; Pls. Ex. G, 3034014029.  PM USA **ADMITS** the second sentence of paragraph 66.

67.     These efforts were part of PM USA's "ongoing efforts to communicate broadly about tobacco issues by incorporating TV into the mix specifically.  It enabled you to have a very broad reach in terms of the number of people who were exposed to the message . . . ." McCormick Dep. at 144:5-12, Exhibit AA.

**ADMITTED.**

68.     However, even taking these "reach" estimates at face value, which McCormick admitted were "at the higher end of what you would typically expect to see for a television campaign," (McCormick Dep. at 148:20-22, Exhibit AA), PM USA's documents and McCormick's testimony confirm that for the entire three and one-half year period between June 2003 and December 3, 2006, PM USA ran "No Safe/Low Tar" television spots only *twice* -- once from November 17 to December 21, 2003, and again from October 25 to November 28, 2004. Exhibit G at 3034014029; McCormick Dep. at 153:6-154:6, Exhibit AA.

**QUALIFIED:**  PM USA **ADMITS** that it ran a television campaign between November 17 and December 21, 2003 that reached 82 percent of adults an average of 7.6 times, and a television campaign between October 25 and November 28, 2004 that reached 83 percent of adults an average of 9 times.  *See* Pls. Exhibit G, 3034014029.  PM USA **QUALIFIES** paragraph 68 because Mr. McCormick was not characterizing the validity of the reach estimates, as plaintiffs suggest, but was rather noting that a campaign of the scope PM USA was undertaking was more extensive than most television advertising campaigns. McCormick Dep. at 148:5-22.

69.     Rather than this being an "ongoing effort[]," PM USA ceased airing the "No Safe/Low Tar" ads back in 2004, after only two brief periods of airing.  *Id.*

**DENIED:**  PM USA **DENIES** the characterizations in paragraph 69 that PM USA's television advertisements were not part of an ongoing effort and that the advertisements ran for only two brief periods on the grounds that those characterizations are argumentative and are not supported by the record.  *See* Pls. Ex. G, 3034014029 (demonstrating the extent of the advertising campaigns and their duration).  PM USA notes the ongoing efforts it made beginning in 1999, and continuing through the present, to which plaintiffs have already admitted.  *See* Pls. SAF ¶¶ 11-39 (generally admitting PM USA's efforts).

70. 

(attached hereto as Exhibit H), at

**ADMITTED.**

71.     One explanation for how PM USA came up with the 90% figure was provided in the written direct testimony of Michael E. Szymancyk, the Chairman and Chief Executive Officer of PM USA.  *See* AC5001040657-AC5001040756 (attached hereto as Exhibit I).  Mr. Szymancyk stated that when PM USA's low tar/lights onsert was distributed in the first quarter of 2004, PM "would have covered approximately 90 percent of Philip Morris USA's volume."  *Id.* at AC5001040751.  When asked how he was estimating that number, he explained:

> Most smokers purchase at least one pack per week.  We put the onserts on all of the major brands, which represent 90 percent of Philip Morris USA's volume.  The onserts were run for a week. So if you figure that most smokers of our major brands purchase one pack a week, they would have received the onsert.

*Id.*

**ADMITTED.**

72.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████t

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████  *See* McCormick Dep. Ex. 5

██████████████████ (attached hereto as Exhibit J).

**QUALIFIED:**  PM USA **QUALIFIES** paragraph 72 because it mischaracterizes both the testimony of Mr. Szymancyk and Mr. McCormick.  Mr. Szymancyk's statement that the onserts were "run for a week" is a correct general summary of the onsert distribution process that is entirely consistent with Mr. McCormick's more specific explanation.  Plaintiffs questioned Mr. McCormick at length on the distribution system.  *See* McCormick Dep. at 13:18-22:9.  Although Mr. McCormick stated that he did not have precise knowledge of PM USA's distribution chain, Mr. McCormick indicated that PM USA distributed to wholesalers who distributed to retailers, and that the process of distribution would not necessarily occur immediately for all products.  "Instead, it would depend on the brands," because for faster-moving brands, the distribution from wholesale to retail would run its course in as early as two weeks, while for slower-moving brands it would take longer.  *Id.* at 16:11-23; ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  Thus, although some slower moving *brands* containing onserts would have reached retail destinations later than others, McCormick Dep. at 13:18-24, the onsert process was designed, based on PM USA's knowledge of its consumers and distribution processes, so that the onserts on each brand would be released over approximately a week and reach approximately 86 percent of PM USA's low-tar consumers.  Pls. Ex. A, 3007287724; ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮; McCormick Dep. at 127:8-11.  PM USA also made quantity adjustments, where necessary, for lower volume brands "to facilitate national distribution."  Pls. Ex. A, 3007287724.

73.     McCormick admitted that the packs that did contain low tar/lights onserts did not all hit retail stores at once, and probably hit retail outlets over a span of two months or longer.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

**DENIED:**  PM USA **DENIES** paragraph 73 as unsupported by the cited testimony or referenced exhibit and as misleading in the absence of the additional information supplied in PM USA's reply to paragraph 72, which PM USA incorporates here by reference.  *See* McCormick Dep. at 50:9-53:19 (indicating lack of familiarity with the document and only indicating what document purported to show); Pls. Ex. J (██████████████████████████ ████████████████████; *supra* reply ¶ 72.

74.    Once packs of cigarettes leave PM USA's warehouse, PM USA ceases to have any control over the distribution of the product.  McCormick Dep. at 23:1-7, Exhibit AA.

**QUALIFIED**.  Mr. McCormick testified in the very next sentence after the cited testimony that PM USA has agreements with wholesalers and direct customers that address various aspects of the sale of PM USA products.  *See* McCormick Dep. at 23:8-13.

75.    Thus, PM USA has no control over how the product is sold (*id.* at 23:21-22); how soon the product is sold (*id.* at 23:25-24:11); or whether packs containing low tar/lights onserts were sold ahead of non-onserted packs (*id.* at 17:5-13).  *See* Exhibit AA.

**QUALIFIED**.  Mr. McCormick testified that PM USA has agreements with wholesalers and direct customers that address various aspects of the sale of PM USA products.  *See* McCormick Dep. at 23:8-13.

76.    Accordingly, there is no way for PM USA to know how quickly the low tar/lights onserted packs were sold, or, for that matter, how many were in fact sold before being removed

from the shelves for purposes of maintaining the freshness of retailers' stock.  *See id.* at 23:25-24:11, Exhibit AA.

      **DENIED:**  PM USA objects to paragraph 76 because it is argumentative and is not supported by the cited testimony or any part of the record, and requests that it be **STRICKEN**. PM USA otherwise **DENIES** paragraph 76.  *See* McCormick Dep. 127:8-11; ███████

███████████████████████

      77.     As Mr. Szymancyk confirmed that the distribution method for the low tar/lights onserts was the same in 2003 and 2004 as it had been in the initial distribution in 2002, *see* Exhibit I at AC5001040756, the same may be said for each of those distributions of low tar/lights onserts as well.

      **DENIED:  PM USA** objects to paragraph 77 because it is unsupported by the record citation, and therefore should be **STRICKEN**.  Mr. Szymancyk did not purport to discuss the subject-matter of either this paragraph or paragraph 76 in the cited portion of his testimony, which cannot be characterized as supporting the specific proposition asserted in either paragraph.  Therefore, PM USA **DENIES** paragraph 77.  *See* Pls. Ex. I, AC5001040752-AC500104756.

      78.     ████████████████████████████████████████ the *Wall Street Journal,* which published the description in an article about the low tar/lights onsert program:  "For a limited time, the pamphlet will be put on every pack of 'light,' 'ultra light,' 'mild' or 'medium cigarettes Philip Morris makes for sale in the U.S., and should reach about 86% of the smokers who buy those styles of its cigarettes, the company says."  *See* "Philip Morris Tells Smokers 'Light' Cigarettes Aren't Safer," *The Wall Street Journal* via Dow Jones,

███████████████████████████████████████████████████████

████████████ (attached hereto as Exhibit K), at ████████████.

**ADMITTED**.

79.   ████████████████████████████████████████████████

███████████████████████████████████████ (attached hereto as Exhibit L), ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

**ADMITTED.**

80.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.*

**ADMITTED.**

81.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ *Id.* at ████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

82.     PM USA's own research has long indicated that the use of "onserts," even when consumers do receive and read them, is not very effective in communicating complex ideas about the relative advantages and dangers of different types of cigarettes.  For example, a document entitled "PMUSA No safe/Low Tar Communication Vehicle Awareness Study" (McCormick Dep. Ex. 11) (PM3002997413-PM3002997418) (attached hereto as Exhibit M) which indicates it was "Conducted by MarketView Research, February 2005" (*id.*  at PM3002997413), states that its objective was "[t]o measure general awareness of PM USA's 'no safe/low tar' communication vehicles (onsert, television, and radio) among adult smokers of PM USA "low tar" brands, as measured by standard FTC testing methodology." *Id.* at PM3002997414.  It contains a graph entitled "PMUSA No Safe/Low Tar Communication Vehicle Awareness" listing "Onsert," "Television," and "Radio" along an axis from 0 to 100. Alongside "Onsert" is a bar with the number 39 at the end.  *Id.*  at PM3002997415.

**DENIED:**  PM USA **DENIES** paragraph 82 on grounds that it mischaracterizes PM USA's research, is argumentative, is not a proper statement of material fact under Local Rule 56, and is unsupported by the provided citation to the record as required by Local Rule 56, and therefore should be **STRICKEN**.  *See* McCormick Dep. 127:8-11; *See* Pls. Ex. M, at PM3002997415; ████████████████████.  PM USA **ADMITS** that the referenced document contains the quoted language.

83.     When asked whether he thought this graph indicated that only 39 percent of those interviewed in the study were aware of the low tar/lights onserts, McCormick stated, "I would interpret that as being a percent.  I don't know the specific question that was asked, but based on the label, 'Vehicle Awareness,' that's probably pretty close." McCormick Dep. at 88:5-14, Exhibit AA.

**ADMITTED.**

84.     Other evidence demonstrates that PM USA had market research indicating that onserts were not effective in conveying their intended message.  According to McCormick, a document entitled "PMUSA Ad Test (Phase II):  Focus Group Results," (McCormick Dep. Ex. 9) (PM3000181427- PM3000181449) (attached hereto as Exhibit N), which indicates that it was "Prepared By:  Lombardo Consulting Group, 2 April 2003," "appears to be a summary of focus groups that were conducted in . . . some time prior to the date of this document, which is dated April 2nd, 2003." McCormick Dep. at 71:9-13, Exhibit AA.  In this document, a page with the heading "Tar and Nicotine (Onsert)" states:  "The 'Tar and Nicotine' ad that included information on the onsert fell out of the mix."  *See* Exhibit N at PM3000181443.

**DENIED:**  PM USA objects to the first sentence of paragraph 84 on grounds that it mischaracterizes PM USA's research, is argumentative, is not a proper statement of material fact under Local Rule 56, and is unsupported by the provided citation to the record as required by Local Rule 56, and therefore should be **STRICKEN**.  PM USA **DENIES** the first sentence of paragraph 84.  *See* McCormick Dep. at 127:8-11; Pls. Ex. M, PM3002997415; ▄▄▄▄▄▄▄ ▄▄▄▄▄▄▄▄.  With respect to the remainder of paragraph 84, PM USA **ADMITS** that the referenced document contains the quoted language.

85.     The summary further states, "The onsert does not provide the proof point credibility expected." *Id.*

**DENIED:**  PM USA **DENIES** paragraph 85 to the extent it implies that the referenced document is referring to the onsert rather than an "ad that included information on the onsert." *See* Pls. Ex. N, PM3000181443; *see also* McCormick Dep. 73:24-76:16.  PM USA **ADMITS** that the document referenced in paragraph 85 contains the quoted language.

86.     The summary also states, "While people rationally understand the importance of communicating ingredients on packaging, it is not relevant or a stand out statement." *Id.*

**ADMITTED.**

87.     In his sworn deposition testimony, McCormick was unable to offer any insight into what these statements meant, and indeed, he insisted that, despite the heading "Tar and Nicotine (*Onsert*)" and the express statement that "The *onsert* does not provide the proof point credibility expected," (emphasis added), this page did not deal with onserts at all, as the entire document, including this page, dealt only with television and radio advertising.  McCormick Dep. at 76:1-80:8, Exhibit AA.

**DENIED:**  PM USA objects to the first two clauses of paragraph 87 because they are argumentative, are not proper statements of material fact under Local Rule 56, and are unsupported by the provided citation to the record as required by Local Rule 56, and requests that they be **STRICKEN**.  PM USA **DENIES** the first two clauses of paragraph 87.  *See* McCormick Dep. at 76:1-80:8.  PM USA **ADMITS** the remainder of paragraph 87 but **DENIES** any implication that Mr. McCormick's testimony is not correct.  *See* Pls. Ex. N, PM3000181443; *see also* McCormick Dep. 73:24-76:16.

88.     On direct examination by his attorney, McCormick once again stated that, despite the "onserts" language, "They were not testing onserts, they're testing advertising." *Id.* at 142:2-3, Exhibit AA.

**ADMITTED.**

89.     McCormick suggested that the reference to "onserts" was "a television spot that [we're] calling 'onsert.'"  *Id.* at 142:20-21, Exhibit AA.

**ADMITTED.**

90. ███████████████████████████████████████████

████████████████████████████████ (attached hereto as Exhibit O), ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ *Id.* ████████████.

████████ ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ *See, e.g.*, McCormick Dep. at 127:8-11; *See* Pls. Ex. M, PM3002997415;

███████████████████████████████████████████████

██████████████████████████

91. ███████████████████████████████████████████

██████████████████

**ADMITTED.**

92. ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

**ADMITTED.**

93.     McCormick confirmed that this "seemed to state" that 44% of those interviewed in the study were aware of PM USA's "No Safe/Low Tar" onsets.  McCormick Dep. at 92:19- 24.

**ADMITTED.**

94.     Yet another study was conducted, this one entitled "PM USE HE/LT Communications Vehicle Awareness Research, January 2006" a draft report of which was identified as Exhibit 13 to the McCormick Dep. (3035122090-3035122095) (attached hereto as Exhibit P).

**DENIED:**  PM USA **DENIES** paragraph 94 to the extent it suggests that the referenced document is "another study" and not merely a summary of the previous studies referenced in plaintiffs' Exhibits M ████.  *Compare* Pls. Ex. P *with* Pls. Exs. M ████ (containing overlapping data).

95.     Under "Background/Objectives," it listed the following:  "In February 2005, a study was conducted to measure overall awareness of PM USA's 'No Safe/Low Tar' communications among adult smokers of PM USA Low Tar brands."  *Id.* at 3035122091.

**DENIED:**  PM USA **DENIES** paragraph 95 to the extent it may be read to suggest that an additional study was performed beyond those referenced in plaintiffs' Exhibits M ████, which plaintiffs' Exhibit P summarizes.  *Compare* Pls. Ex. P *with* Pls. Exs. M ████ (containing overlapping data).  PM USA **ADMITS** that the document referenced in paragraph 95 contains the quoted language.

96.     A similar study was conducted in January 2006 to gauge awareness of "PM USA's 'Health Effects/Low Tar' communications," including the "'PM USA Low Tar (LT)' Onsert (found on PM USA non-full flavor cigarette packs only)."  *Id.* at 3035122091.

**DENIED:**  PM USA **DENIES** paragraph 96 to the extent it may be read to suggest that an additional study was performed beyond those referenced in plaintiffs' Exhibits M ███, which plaintiffs' Exhibit P summarizes.  *Compare* Pls. Ex. P *with* Pls. Exs. M ███ (containing overlapping data).  PM USA **ADMITS** that the document referenced in paragraph 96 contains the quoted language.

97.     This study showed that, as of January 2006 -- that is, more than three years after PM USA first started periodically placing low tar onserts onto its light cigarette products -- 53% of the adult smokers of PM USA Low Tar brands interviewed stated that they had never seen the onset before.  *Id.* at 3035122093

**DENIED:**  PM USA **DENIES** paragraph 97 to the extent it may be read to suggest that an additional study was performed beyond those referenced in plaintiffs' Exhibits M ███, which plaintiffs' Exhibit P summarizes.  *Compare* Pls. Ex. P *with* Pls. Exs. M ███ (containing overlapping data).  PM USA **ADMITS** that the document referenced in paragraph 97 contains the statistic referenced.

98.     Another 3% either did not know if they had seen the onset before, or gave no answer.  *Id.*

**DENIED:**  PM USA **DENIES** paragraph 98 to the extent it may be read to suggest that an additional study was performed beyond those referenced in plaintiffs' Exhibits M ███, which plaintiffs' Exhibit P summarizes.  *Compare* Pls. Ex. P *with* Pls. Exs. M ███ (containing overlapping data).  PM USA **ADMITS** that the document referenced in paragraph 98 contains the statistic referenced.

99.     Additionally, some 70% of the adult smokers of PM USA Low Tar brands interviewed stated that they had never seen PM USA's "Health Effects" TV commercial before. *Id.* at 3035122094.

**DENIED:**  PM USA **DENIES** paragraph 99 to the extent it may be read to suggest that an additional study was performed beyond those referenced in plaintiffs' Exhibits M ▮▮▮, which plaintiffs' Exhibit P summarizes. *Compare* Pls. Ex. P *with* Pls. Exs. M ▮▮▮ (containing overlapping data).  PM USA **ADMITS** that the document referenced in paragraph 99 contains the statistic referenced.

100.    In the same study, 49% of the adult smokers of PM USA Low Tar brands interviewed stated that they were not aware of *either* the onset *or* the TV commercial.  *Id.* at 3035122095.

**DENIED:**  PM USA **DENIES** paragraph 100 to the extent it may be read to suggest that an additional study was performed beyond those referenced in plaintiffs' Exhibits M ▮▮▮, which plaintiffs' Exhibit P summarizes. *Compare* Pls. Ex. P *with* Pls. Exs. M ▮▮▮ (containing overlapping data).  PM USA **ADMITS** that the document referenced in paragraph 100 contains the statistic referenced.

101.    

(McCormick Dep. Ex. 14) ▮▮▮ (attached hereto as Exhibit Q) ▮▮▮

[redacted]

[redacted]

102. [redacted]

**ADMITTED.**

103. [redacted]

[redacted]



[redacted]

104. [redacted]

[redacted]

105. As far back as 1995, Philip Morris had evidence suggesting that onserts (or "outserts," as they were referred to in this study) on cigarette packs were ineffective as a means of communicating with consumers. In a document entitled "Dave's Focus Groups: Denver Summary Findings, A Qualitative Research Study Conducted for Philip Morris," 2040130163-2040130178 (attached hereto as Exhibit S), dated June 1995, the reactions to outserts

on packs of Dave's cigarettes that were recorded included:  "Some said they read the outsert on the first pack purchased, but felt no need to read outserts on other packs purchased, just assuming they were all the same."  *Id.* at 2040130173.

**DENIED:**  PM USA objects to the first sentence of paragraph 105 because it is argumentative, is not a proper statement of material fact under Local Rule 56, and is unsupported by the provided citation to the record as required by Local Rule 56, and requests that it be **STRICKEN**.  The document referenced in paragraph 105 has nothing to do with, and cannot possibly be used to draw conclusions regarding, the onserts first distributed in 2002.  *See* Pls. Ex. S, 2040130163-2040130178.  PM USA **DENIES** the first sentence of paragraph 105 as a mischaracterization of PM USA's research and the referenced document.   McCormick Dep. at 127:8-11; Pls. Ex. M, PM3002997415; ██████████████████████████.  PM USA **ADMITS** that the document referenced in paragraph 105 contains the quoted language.

106.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

█████████████████████████████

████████████████████████████████████████

█████████████████████████████████ The document referenced in paragraph 106 has nothing to do with, and cannot possibly be used to draw conclusions regarding, the onserts first distributed in 2002.  *See* Pls. Ex. S, 2040130163-2040130178.  █████████████████████████████

███████████████████████ *See* McCormick Dep. at 127:8-11; Pls. Ex. M,

PM3002997415; ████████████████████████████████

████████████████████████████

107.    Other people in the 1995 study "said they saw the outsert but paid no further attention to it, figuring it was 'just some advertising' or 'something like the Camel Cash.'" Exhibit S at 2040130173.

**ADMITTED.**

108.    "A few said they did not recall even seeing an outsert on their pack." *Id.*

**ADMITTED.**

109.    "A few recalled that the outsert ripped when they opened their pack, so they 'tossed it.'" *Id.*

**ADMITTED.**

110.    The last time PM USA used onserts to convey their "low tar message" was in 2008.  McCormick Dep. at 115:14-15, Exhibit AA.

**ADMITTED.**

111.    Onserts are used to convey a variety of different messages, only one of which is the low tar message.  *Id.* at 103:18-19, Exhibit AA.

**ADMITTED.**

112.     A PM document entitled "Corporate Responsibility Communications 2004 Budget Breakdown" (501262283 8-5012622844) (attached hereto as Exhibit T), indicates that the budget for "onserts" in 2004 was only $75,000 -- $30,000 in the first and second quarters, $15,000 in the third quarter, and none in the fourth quarter.  *Id.*  at 5012622838.

**QUALIFIED:**  The document purports to indicate only the budget for production of onserts relating to corporate responsibility communications as that term is used in the

document.  Pls. Ex. T., 5012622838.  The same document elsewhere indicates a different budget for "low tar program" onserts, of $1.2 million.  *See* Pls. Ex. T, 5012622844.

113.    An internal email dated March 19, 2004 (3011394048-3011394051) (attached hereto as Exhibit U) from Zane Gibbs from New Products Marketing at Philip Morris USA (*see* 3011394050), indicated that onserts were to be used for both "Corporate Responsibility messages," which includes "highlighting the resources available on our website, information and resources related to our Youth Smoking Prevention efforts, and information about Low Tar cigarettes," and also "branded Marketing communications."  *See id.* at 3011394049 (emphasis in original).

**ADMITTED.**

114.    The email goes on to state that, for both "Corporate Responsibility and Marketing onsert programs," PM USA's goal was "to have onserts appear on about 20% of our forecasted domestic volume throughout the year."  *Id.*

**ADMITTED.**

115.    ████████████████████████████████████

████████████████████ (McCormick Dep. Ex. 16 ███████████████████████

(attached hereto as Exhibit V), █████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

**ADMITTED.**

116. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**ADMITTED.**

117.    The "Corporate Responsibility 2005-2006 Onsert Plan" (5012622794-5012622828) (attached hereto as Exhibit W) expressly states that PM USA did not want the "Total Combined Annual Onsert Production" -- again, including both "Corporate Responsibility" and branded onsert -- to be included in greater than 25% of their packages.  *Id.* at 5012622804.

**ADMITTED.**

118.    Moreover, the "Corporate Responsibility 2005-2006 Onsert Plan" indicated that "[e]quipment limitations excluded certain packings from onserting," and therefore "onserts [were] not being applied to all PM USA SKUs."  *Id.* at 5012622816.

**QUALIFIED:**  The document does not refer to any particular distribution of onserts and indicates that the issue had been resolved.  *See* Pls. Ex. W, 5012622816.

119.    The PM USA onserts did not disclose as much as the onserts distributed by competitor Star Tobacco Company in the onserts they distributed in packs of Advance.  *See* "Update:  new Competitive Tobacco - Related Technologies" (2067184459-2067184467) (attached hereto as Exhibit X), at 2067184466.

**DENIED:**  PM USA objects to paragraph 119 because it is argumentative and a matter of opinion and not a proper statement of material fact under Local Rule 56, and requests that it be

**STRICKEN**.  PM USA **DENIES** paragraph 119.  McCormick Aff. Ex. B (onsert example); Pls.

SAF ¶ 13 (admitting to content of onserts).

120.    The Advance onserts stated:  "By adding filters and putting tiny ventilation

holes in the filters, cigarette makers developed many brands which tested as having reduced tar

and nicotine, even though the tobacco itself was relatively unchanged."  *Id.*

**ADMITTED.**

121.    ██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████

122.    ██████████████████████████████████

██████████████████████████████████████████

████████████████████████████

**ADMITTED.**

123. ███████████████████████████████████████

███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████

124. ███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

125. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████

126.    Geoffrey Bible, former CEO of Philip Morris Companies until April 2002, who
then served as chairman of Philip Morris Companies until September 2002, testified in his
deposition in the *DOJ* Action ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ (attached hereto as Exhibit Z) ███████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

- 34 -

[redacted]

127. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]





[redacted]

128. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

████████████████████████████████████████

███████████████████████████

129.    The *DOJ* court found as follows:  "For several decades, Defendants have marketed

and promoted their low tar brands as being less harmful than conventional cigarettes.  That

claim is false, as these Findings of Fact demonstrate.  By making these false claims,

Defendants have given smokers an acceptable alternative to quitting smoking, as well as an

excuse for not quitting." *DOJ*, 449 F. Supp. 2d at 430 (J 2023).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to

apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 129 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 129 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

quoted language appears in the *DOJ* opinion.

130.    The *DOJ* court found as follows:  "Defendants used a combination of techniques

to market and promote their low tar brands.  Defendants' marketing has emphasized claims

of low tar and nicotine delivery accompanied by statements that smoking these brands would

reduce exposure to the "controversial" elements of cigarette smoke (*i.e.,* tar).  Since the 1970s,

Defendants also have used so-called brand descriptors such as 'light' and 'ultra light' to

communicate reassuring messages that these are healthier cigarettes and to suggest that smoking

low tar cigarettes is an acceptable alternative to quitting.  In addition to appealing advertising and

easily-remembered brand descriptors, Defendants have used sophisticated marketing imagery

such as lighter color cigarette packaging and white tipping paper to reinforce the same message that these brands were low in tar and therefore less harmful." *Id.* at 430 (J 2024).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore Plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 130 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 130 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

131.    The *DOJ* court found as follows:  "Even as they engaged in a campaign to market and promote filtered and low tar cigarettes as less harmful than conventional ones, Defendants either lacked evidence to substantiate their claims or knew them to be false. Indeed, internal industry documents reveal Defendants' awareness by the late 1960s/early 1970s that, because low tar cigarettes do not actually deliver the low levels of tar and nicotine which are advertised, they are unlikely to provide any clear health benefit to human smokers, as opposed to the FTC smoking machine, when compared to regular, full flavor cigarettes." *Id.* at 430 (J 2025).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 131 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 131 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

132.    The *DOJ* court found as follows:  "As Defendants have long been aware, nicotine delivered by cigarettes is addictive.  Defendants' internal documents demonstrate their understanding that, in order to obtain an amount of nicotine sufficient to satisfy their addiction, smokers of low tar cigarettes modify their smoking behavior, or 'compensate,' for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with fingers or lips, and/or smoking more cigarettes.  As a result of this nicotine-driven smoker behavior, smokers of light cigarettes boost their intake of tar, thus negating what Defendants have long promoted as the primary health- related benefit of light cigarettes:  lower tar intake."  *Id.* at 430 (J 2026).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 132 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 132 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

133.    Philip Morris never publicly explained its position that cigarette smoking is not addictive, because, according to Denise Keane, General Counsel for Defendant Philip Morris

USA, the company believes it should properly be characterized as a drug dependence. Keane TT, 1/18/05, 10447:23-10448:7; *DOJ*, 449 F. Supp. 2d at 288 (J 1259).

**DENIED:** Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion. *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010). PM USA **DENIES** paragraph 133 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material. PM USA **ADMITS** that the finding appears in the *DOJ* decision.

134.    While Philip Morris told people that it agrees that cigarette smoking is addictive, it has not told the public that it agrees that it is the nicotine delivered in cigarette smoking that is addictive. Ms. Keane admitted this was material information that the public should possess. Keane TT, 1/18/05, 10533:5-10534:4; *DOJ*, 449 F. Supp. 2d at 288-89 (J 1262).

**DENIED:** Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion. *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010). PM USA **DENIES** paragraph 134 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material. PM USA **ADMITS** that the finding appears in the *DOJ* opinion.

135.    Ms. Keane also admitted that when Philip Morris purchased three Liggett brands in 1999 -- L & M, Lark, and Chesterfield -- it removed the pre-existing package labels stating that

smoking is addictive.  Keane TT, 1/18/05, 10457:5-10460:16; *DOJ*, 449 F. Supp. 2d at 288 (J 1260).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 135 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that this finding appears in the *DOJ* opinion.

136.  While Philip Morris replaced the pre-existing package labels with onserts, these onserts did not contain the statement that Philip Morris agrees that smoking is addictive, even though Philip Morris had publicly stated this view in 2000, as already noted.  Keane TT, 1/18/05, 10460:17-10462:15; *DOJ*, 449 F. Supp. 2d at 288 (J 1261).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA therefore **DENIES** paragraph 136.  PM USA **ADMITS** that this finding appears in the *DOJ* opinion.

137.  The *DOJ* court found as follows:  "In spite of the overwhelming medical and scientific evidence, only one cigarette manufacturer Defendant, Liggett, has placed a warning on its packages flatly and clearly stating that nicotine is addictive.  Liggett advertising and

packaging state, 'Smoking is Addictive.'" LeBow TT, 2/7/05, 12375:21-12376:1; *DOJ*, 449 F. Supp. 2d at 289 (¶ 1263).

**DENIED:** Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion. *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010). PM USA **DENIES** paragraph 137 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material. PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

138.    The *DOJ* court found as follows: "The primary means by which Defendants have ensured that their low delivery products will sustain smoking addiction is by incorporation of physical design characteristics and ingredients that enable the human smoker to easily obtain his or her reinforcing level of nicotine, regardless of the cigarette's nominal FTC machine-measured yield. Internal documents reveal that Defendants designed their cigarettes to increase the flexibility of their nicotine and tar dosing capacity to smokers even as they reduced nicotine and tar yields as determined by the FTC machine method." *DOJ*, 449 F. Supp. 2d at 339 (¶ 1516).

**DENIED:** Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion. *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010). PM USA **DENIES** paragraph 138 in the absence of an appropriate record citation. PM USA further **DENIES** paragraph 138 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

139.    Defendants' own internal documents demonstrate that the lights descriptor was placed on their light cigarettes to convey to consumers that they are healthier to smoke than regular cigarettes.  *DOJ*, 449 F. Supp. 2d at 513 (¶ 2401) ("James Morgan, who was Brand Manager of Marlboro from 1969 to 1972, during the time when Philip Morris introduced Marlboro Lights, its first 'light' cigarette, explained the intended meaning of the 'lights' descriptor.  Morgan stated that, from the very beginning, the 'lights' descriptor was intended to communicate that the brand was low in tar-as opposed to a brand that was lighter in taste.") (N.B.:  James Morgan was President and CEO of Philip Morris from 1994 until 1997).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 139 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 139 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

140.    The *DOJ* court found as follows:  "So that Philip Morris could market its Light cigarettes as yielding less tar and nicotine than full-flavored cigarettes, Philip Morris set out to 'trick' the Federal Trade Commission ("FTC") and, thus, the public at large, about the actual levels of nicotine and tar that smokers would receive from these Light cigarettes." *Id.*  at 500 (J 2346).

**DENIED:**  The quoted language does not appear in the *DOJ* opinion.  PM USA **DENIES** the assertion in the absence of a record citation.

141.    The *DOJ* court found as follows:  "In the early 1970s, the Federal Trade Commission developed a machine to measure tar and nicotine levels.  Even though it became the accepted mechanism for taking such measurements, it became widely known in both the public health community and by the cigarette company Defendants that the FTC method did not accurately measure the amounts of nicotine and tar which a smoker actually ingested.  Cigarette company Defendants, with the benefit of their much more sophisticated understanding of smoker compensation, as well as their knowledge of nicotine control, then intentionally developed and marketed cigarettes, which, in actuality, delivered higher levels of nicotine than those measured by the FTC method.  Those levels of nicotine were sufficient to create and sustain addiction in smokers."  *Id.* at 309 (J 1370).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 141 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 141 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

142.    The *DOJ* court found that Defendant developed and marketed Light cigarettes precisely to lure smokers of regular cigarettes who were contemplating quitting for health reasons away from quitting and towards this purportedly healthier alternative.  *See id.*  at 860.

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 142 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 142 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the finding appears in the *DOJ* opinion.

143.    The *DOJ* court further found that the defendants there knew that, "*because of nicotine addiction,*" former smokers of regular cigarettes, who switched to Light cigarettes based on the belief that they were less harmful to their health, would compensate for the reduced nicotine yield from such cigarettes through a variety of means, including taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with their fingers or lips, and/or smoking more cigarettes.  *Id.*  at 860, 461-67 (JJ 2173-200)(emphasis added).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 143 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 143 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the finding appears in the *DOJ* opinion.

144.    The *DOJ* court found that the Defendants opposed any changes in the FTC Method that would more accurately reflect the effects of compensation on the actual tar and nicotine received by smokers (*id.* at 560-61 (J 2628)), and that by engaging in this deception, Defendants dramatically increased their sales of Light cigarettes, assuaged the fears of smokers about the health risks of smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking. *Id.* at 561 (J 2629).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar.  5, 2010).  PM USA **DENIES** paragraph 144 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 144 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the finding appears in the *DOJ* opinion.

145.    The *DOJ* court found as follows:  "In sum, there is an overwhelming consensus in the public health and scientific community, both here and abroad, that low tar cigarettes offer no clear health benefit to smokers, have not reduced the risk of lung cancer and heart disease for smokers using them, and have not produced any decrease in the incidence of lung cancer. Moreover, because of the misleading nature of the advertising for low tar cigarettes, smokers who might have quit have refrained from doing so in the belief that such cigarettes reduced their health risks."  *Id.* at 456 (J 2145).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 145 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 145 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

quoted language appears in the *DOJ* opinion.

146.     The *DOJ* court found as follows:  "A March 1, 1977 Philip Morris

memorandum by industry-funded scientist Stanley Schachter to Thomas Osdene, Director of

Research, concluded that low tar/low nicotine cigarettes are not less harmful:

> [I]t would certainly seem that the campaign for low nicotine
> cigarettes is misguided and rests on a set of fallacious
> premises . . . . The question is crucial and particularly so in light of
>  . . .Ross's evidence that carbon monoxide, hydrogen cyanide, and
> nitrogen oxide delivery is considerably greater in most of the
> popular brands of low nicotine filter, [sic] cigarettes than in high
> nicotine, non-filter cigarettes . . . . It is  . . . clear . . . that the major
> body of data that has been used to justify the campaign for low
> nicotine cigarettes does nothing of the sort."

*Id.* at 456 (J 2146).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to

apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 146 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 146 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

quoted language appears in the *DOJ* opinion.

147.    The *DOJ* court found as follows:  "Dr.  Farone stated that Philip Morris's Marlboro full-flavor and Marlboro Lights cigarettes are 'essentially identical except for dilution'-- *i.e.*, that Marlboro Lights have more dilution, dilution referring to ventilation that dilutes the smoke, particularly when machine-smoked by the FTC method, with ambient air. '[A]s you increase dilution, the toxicity in [the Ames] test increases, which is more likely than not associated with a toxicity increase in smokers'." *Id.*  at 456 (¶ 2147).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 147 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 147 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

148.    The *DOJ* court found as follows:  "In fact, Dr.  Farone explained that the very Ames mutagenicity testing that Philip Morris has conducted for the past 25 years, and that "Philip Morris has concluded . . . predicts carcinogenicity" has indicated that Philip Morris's Marlboro Lights cigarettes are, as designed, more mutagenic than Marlboro full-flavor cigarettes:

> [I]n the case of Marlboro Lights, the Philip Morris test data that I have reviewed on that level of dilution for equivalent blends indicated that the product design for their Light cigarettes was more mutagenic than the full flavor Marlboro, Marlboro Reds, and therefore predictive of more potential cancer risk.  These studies were repeated multiple times over the past 20 years and continue to be repeated to this day.  The Philip Morris data, as was used by

> Philip Morris, was a strong warning that their product design
> change between a Marlboro Red and a Marlboro Light- increased
> ventilation-resulted in a potentially more dangerous product.
>
> Philip Morris has not 'changed the design of "Light" cigarettes in
> response to its studies and knowledge concerning mutagenicity'."

*Id.* at 456 (¶ 2148).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 148 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 148 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

149.   The *DOJ* court found as follows:  "A 2001 document about Ames mutagenicity testing from Philip Morris's INBIFO laboratory in Germany demonstrated that, in every case, the mutagenicity of Marlboro Lights is higher than the mutagenicity of Marlboro full-flavor." *Id.* at 458 (¶ 2155).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 149 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 149 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

150.    The *DOJ* court found as follows:  "James Morgan, former President and CEO of Philip Morris, conceded in 2002 that, in his opinion, lower tar cigarettes are not any safer than higher tar cigarettes." *Id.*  at 458 (¶ 2156).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 150 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 150 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

151.    The *DOJ* court found as follows:  "According to Nancy Brennan-Lund, Philip Morris Senior Vice President of Marketing, 'what we say on our web site we believe to be true.' Philip Morris's position is that low tar cigarettes are no less harmful than full-flavor cigarettes, 'based on what the Monograph 13 came out with.' Lund later qualified her statement:  it has 'not been proven' that light cigarettes are less harmful, so one cannot assume they are less harmful." *Id.*  at 458 (¶ 2157).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar.  5, 2010).  PM USA

**DENIES** paragraph 151 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 151 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

quoted language appears in the *DOJ* opinion.

152.    The *DOJ* court found as follows:  "Ellen Merlo, then Philip Morris USA Senior

Vice President of Corporate Affairs, agreed that in 2002 that Philip Morris's policy at the time

was that lights or low tar cigarettes are not safe or safer than any other cigarettes." *Id.*  at 458 (¶

2158).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to

apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 152 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 152 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

quoted language appears in the *DOJ* opinion.

153.    The *DOJ* court found as follows:  "Defendants have stated publicly that they

produce low tar cigarettes only to accommodate consumer taste preferences for 'lighter,'

'milder' tasting cigarettes, and that they do not intend their use of brand descriptors or their

marketing of low tar cigarettes to imply a less harmful product.  See Section V(E)(5), *infra*

(discussing Defendants' false statements regarding their low tar cigarette marketing).  Contrary

to their public statements, however, Defendants' internal marketing documents establish that

Defendants have known for decades that even though consumers prefer the taste of regular

cigarettes to low tar cigarettes, they are willing to forgo them and smoke low tar cigarettes, which are less enjoyable and have a less appealing taste, because they believe low tar cigarettes are better for their health." *Id.* at 476 (¶ 2239).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 153 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 153 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

154.    The *DOJ* court found as follows:  "According to Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, in her experience, 'there is a general perception among consumers that as you go down in tar, cigarettes have less taste.'  For this reason, Philip Morris planned to produce a low tar Merit cigarette that tasted like a cigarette with higher tar.  A June 30, 1993 document from a Philip Morris USA New Products Meeting, titled 'Marlboro New Product Development,' stated that the 'Project' was to '[b]uild the Merit business by introducing a 3 mg product that tastes like a 5 mg.'  Philip Morris also planned to '[d]evelop a 6 mg Tar Cigarette with the Sensory Attributes of an 8-9 mg Tar Cigarette.' (Philip Morris's 1992 R & D Operational Plans for the Product Development Department issued to Cliff Lilly of Philip Morris USA included the following objectives:  'Design and develop an 3 mg [Merit] product with the subjective attributes of a 6 mg cigarette . . . . Design and develop a 6 mg [Merit] product with the subjective attributes of a[sic] 8 mg cigarette . . . . Develop 6 mg [Marlboro

Ultra Lights] line extension . . . providing enhanced subjective quality and Marlboro character

. . . LOW TAR HIGH FLAVOR Objective:  Develop new technologies which will allow us,

within the next two to four years, to produce 'Ultra Low' tar, 2 to 4 mg, cigarettes with the

sensorial experience of "Lights" or "Full Flavored" cigarettes')."  *Id.* at 477 (J 2240).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to

apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 154 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 154 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

quoted language appears in the *DOJ* opinion.

155.    The *DOJ* court found as follows:  "Bonhomme added that 'Philip Morris's own

marketing research shows that there are consumers who switch to low tar cigarettes even though

they do not prefer the taste or flavor, because they believe it is better for them,' and that 'for

those people the reason for switching to a low tar brand is not taste or flavor, but perceived

health benefits.'  Bonhomme admitted that these smokers are willing to sacrifice taste for

perceived health benefits." *Id.*  at 477 (J 2241).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to

apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 155 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 155 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

156.    The *DOJ* court found as follows:  "Bonhomme explained that Philip Morris's Merit brand of cigarettes utilized a marketing strategy, titled 'Merit Solutions,' that was intended to communicate to consumers that 'Merit was a solution to the problem of finding a low tar brand with good taste.'"  *Id.* at 477 (J 2242).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 156 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 156 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

157.    The *DOJ* court found as follows:  "An undated Philip Morris document, titled 'Background Information on Philip Morris Brands,' included 'Benefit Statements' for Philip Morris's various 'light' brands that revealed Philip Morris's intent was not to market these cigarettes as 'lighter' tasting, but rather as cigarettes that taste like full-flavor cigarettes with the extra purported benefit of low tar and nicotine:

> Marlboro Medium:  'gives you a flavorful smoke in a low tar cigarette' and 'bridges the flavor gap between low tar and full flavor cigarettes.'
>
> Benson & Hedges 100's Lights:  'premium tobacco flavor in a satisfying low tar smoke.'

> Benson & Hedges 100's Deluxe Ultralights: 'only 5 mg tar, yet is rich
> enough to be called Deluxe . . . is an ultra low tar cigarette that
> gives you satisfying taste . . . delivers cool, rich taste with only 5 mg
> tar.'
>
> Merit: 'You'll enjoy low tar and good flavor . . . . At only 7 mg tar,
> Merit delivers the rich flavor of leading cigarettes with twice the tar
> . . . get rich menthol flavor at only 8 mg tar.'
>
> Merit 100's: 'flavor that makes low tar and good taste a reality for
> 100's smokers.'
>
> Merit Ultra Lights: 'cool, flavorful smoke with only 5mg tar.'
>
> Merit Ultra Lights 100's: 'an ultra light with flavor.'
>
> Virginia Slims Ultra Lights: 'gives flavor and taste-and is an ultra low
> tar smoke.'
>
> Parliament Lights: 'enjoyable taste in a low tar cigarette.'"

*Id.* at 477 (¶ 2244).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to

apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 157 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 157 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

quoted language appears in the *DOJ* opinion.

158.    The *DOJ* court found as follows:  "According to James Morgan, former CEO

of Philip Morris, Philip Morris did not intend for the name Marlboro Lights to communicate

that it had light or lighter taste:

> I have trouble in describing what light taste really means . . . .  Light
> taste, first of all, is not a positive attribute if it does mean anything
> . . . in my judgment, light taste is really a meaningless and nebulous
> claim  . . . the bigger proposition is the lower tar and nicotine . . . .
> We are not talking, in my judgment, talking about light . . . as a
> taste.  It's not a term that means anything in terms of taste, and the
> name Marlboro Lights as I said before, a word which we feel has
> appeal in a different sense than suggesting what the cigarette even
> tastes like."

*Id.* at 478 (¶ 2246).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 158 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 158 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion, although plaintiffs have added the word "James" and the phrase "former CEO of Philip Morris" without bracketing.

159.    The *DOJ* court found as follows:  "Nevertheless, Jeanne Bonhomme, Director of Consumer Insights for Philip Morris, stated that to her knowledge:

> 'Philip Morris has always denied publicly that it markets low tar
> cigarettes as safe or safer than full-flavor brands;' and

> 'Philip Morris has always denied publicly that it uses brand
> descriptors such as "light" and "ultra light" to communicate they are
> safe or safer than full-flavor brands.'"

*Id.* at 527 (¶ 2471).  *Id.* at 478 (¶ 2246).

**DENIED:** Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion. *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010). PM USA **DENIES** paragraph 159 in the absence of an appropriate record citation. PM USA further **DENIES** paragraph 159 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material. PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion, although plaintiffs added the word "nevertheless" without bracketing and appear to have added an extra citation at the end of the quotation.

160.    The *DOJ* court found as follows: "A September 10, 1999 Davis Polk & Wardwell memorandum to Mark Berlind of Philip Morris includes 'a series of questions that might arise, as well as possible answers, relating to low delivery cigarettes and brand descriptors.' In answer to the question 'If the brand descriptors do not indicate what smokers actually inhale or serve as a point of comparison among competing brands, what purpose do they serve?,' the memorandum proposed responding that Philip Morris's brand descriptors do communicate that Philip Morris's lower tar brands deliver less tar and nicotine than full-flavor brands: 'For example, the "Lights" in Marlboro Lights indicates that the smoke yields for Marlboro Lights is lower than that for Marlboro, and Marlboro Ultra Lights delivers less smoke 'tar' and nicotine than Marlboro Lights.'" *Id.* at 527 (¶ 2475).

**DENIED:** Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion. *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010). PM USA

**DENIES** paragraph 160 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 160 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the

finding appears in the *DOJ* opinion.

161.    The *DOJ* court found as follows:  "This document's proposed response to the

question whether 'Philip Morris ever intend[ed] to or propose[d] to take advantage of' the

'perception' of consumers that 'lower-yielding brands [are] "safe" or "safer" than full-flavor

brands' was that 'Philip Morris has never intended [to] or proposed to take advantage of this

perception.  (although over time various individuals in the Company may have suggested that the

Company do so)[.]'" *Id.*  at 528 (¶ 2476).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to

apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See*

Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA

**DENIES** paragraph 161 in the absence of an appropriate record citation.  PM USA further

**DENIES** paragraph 161 on the ground that it does not relate to the public disclosures that are

the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that quoted

language appears in the *DOJ* opinion.

162.    The *DOJ* court found as follows:  "As recently as 2003 and 2004, the Board of

Directors of Altria (formerly known as Philip Morris Companies), publicly made misleading

statements to its shareholders and to the U.S. Securities and Exchange Commission ('SEC') in

documents filed with the SEC.  In a March 17, 2003 Proxy Statement, a group of Altria

shareholders proposed to the Altria Board of Directors that 'the Board find appropriate ways of

informing our customers about the actual health risks of smoking "light and ultra light" cigarettes to disassociate them from any belief that such products are safer and deliver less tar and nicotine.'  The shareholder proposal cited Monograph 13 which found that 'most smokers believe "Lights" and "Ultra Lights" are less harsh and deliver less tar and nicotine,' and that, 'on average, smokers believe that Lights afford a 25% reduction in risk, and Ultra Lights a 33% reduction in risk;' the Canadian Government's conclusion that the terms low tar, light and ultra light are deceptive to the consumer; and the World Health Organization's recommendation that the terms light and ultra light be banned as misleading.  The Board of Directors of Altria recommended that shareholders vote against this proposal, stating:  'for those adults who choose to smoke, PM USA and PMI believe descriptors such as "low-tar," "mild," and "light" serve as useful points of comparison for cigarette brands regarding characteristics such as strength of taste and reported tar yield.'"  *Id.* at 528 (J 2480).

  **DENIED:**  Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 162 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 162 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

  163. The *DOJ* court found as follows:  "Defendant Philip Morris suppressed and concealed many scientific research documents, even going so far as to send them to a foreign

affiliate in order to prevent the disclosure of documents in litigation and in federal regulatory proceedings." *Id.* at 809 (J 3907).

**DENIED:** Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion. *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010). PM USA **DENIES** paragraph 163 in the absence of an appropriate record citation. PM USA further **DENIES** paragraph 163 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material. PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

164.   The *DOJ* court enjoined the Defendants there from the following activities: "further use of deceptive brand descriptors which implicitly or explicitly convey to the smoker and potential smoker that they are less hazardous to health than full flavor cigarettes, including the popular descriptors 'low tar,' 'light,' 'ultra light,' 'mild,' and 'natural.' The Court is also ordering Defendants to issue corrective statements in major newspapers, on the three leading television networks, on cigarette "onserts," and in retail displays, regarding (1) the adverse health effects of smoking; (2) the addictiveness of smoking and nicotine; (3) the lack of any significant health benefit from smoking 'low tar,' 'light,' 'ultra light,' 'mild,' and 'natural' cigarettes; (4) Defendants' manipulation of cigarette design and composition to ensure optimum nicotine delivery; and (5) the adverse health effects of exposure to secondhand smoke." *Id.* at 27.

**DENIED**: Pursuant to this Court's order dated March 5, 2010, plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and

therefore plaintiffs cannot rely on findings from *DOJ* as support for this factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** paragraph 164 in the absence of an appropriate record citation.  PM USA further **DENIES** paragraph 164 on the ground that it does not relate to the public disclosures that are the subject of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted language appears in the *DOJ* opinion.

165.  The D.C. Circuit Court of Appeals upheld the *DOJ* court's findings that the Defendants there engaged in a scheme to defraud smokers and potential smokers by, *inter alia*: "(1) falsely denying the adverse health effects of smoking; (2) falsely denying that nicotine and smoking are addictive; (3) falsely denying that they manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction; (4) falsely representing that light and low tar cigarettes deliver less nicotine and tar and therefore present fewer health risks than full flavor cigarettes; (5) falsely denying that they marketed to youth; (6) falsely denying that secondhand smoking causes disease; and (7) suppressing documents, information, and research to prevent the public from learning the truth about these subjects and to avoid or limit liability in litigation."  *U.S. v. Philip Morris USA Inc.,* 566 F.3d 1095, 1108 (D.C. Cir. 2009) (citations omitted).

**DENIED:**  Pursuant to this Court's order dated March 5, 2010, Plaintiffs' motion to apply non-mutual issue preclusion to the facts found by the court in *DOJ* was denied, and therefore Plaintiffs cannot rely on findings from *DOJ* as support for any factual assertion.  *See* Order on Pls. Motion for Application of Collateral Estoppel Doctrine (Mar. 5, 2010).  PM USA **DENIES** the assertion in the absence of a record citation.  PM USA further **DENIES** paragraph 165 on the ground that it does not relate to the public disclosures that are the subject

of PM USA's motion, and therefore is not material.  PM USA **ADMITS** that the quoted

language appears in the Court of Appeals opinion.

Dated:  April 14, 2010

                                                    Respectfully submitted,

                                                    ___/s/H. Peter Del Bianco, Jr._____
                                                    H. Peter Del Bianco, Jr.
                                                    LAMBERT COFFIN
                                                    P.O. Box 15215
                                                    477 Congress Street
                                                    Portland, Maine  04112-5215
                                                    (207) 874-4000

                                                    Philip H. Curtis
                                                    Nancy G. Milburn
                                                    ARNOLD & PORTER LLP
                                                    399 Park Avenue
                                                    New York, NY  10022
                                                    (212) 715-1000

                                                    Judith Bernstein-Gaeta
                                                    James M. Rosenthal
                                                    ARNOLD & PORTER LLP
                                                    555 12th Street, N.W.
                                                    Washington, D.C.  20004
                                                     (202) 942-5000

                                                    John H. Beisner
                                                    SKADDEN, ARPS, SLATE, MEAGHER
                                                    & FLOM & AFFILIATES
                                                    1440 New York Avenue, N.W.
                                                    Washington, D.C.  20005
                                                    (203) 371-7000

                                                    Counsel to Defendant Philip Morris USA Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2010, I electronically filed the foregoing Philip Morris USA's Reply to Plaintiffs' Statement of Additional Material Facts using the EM/ECF system which will send notification of such filing to all counsel of record registered with the ECF system.


/s/ H. Peter Del. Bianco, Jr., Esq.

H. Peter Del Bianco, Jr., Esq.
LAMBERT COFFIN
P.O. Box 15215
477 Congress Street
Portland, Maine 04101
Telephone:  (207) 874-4000
pdelbianco@lambertcoffin.com