# Exhibit 12

IN THE UNITED STATES DISTRICT CIRCUIT COURT OF MAINE

| IN RE: LIGHT CIGARETTES MARKETING SALES PRACTICE LITIGATION | ) ) ) | MDL DOCKET NO. 1:09-MD-2068 ALL CASES |
|---|---|---|

DEPOSITION OF BRENDAN MCCORMICK

March 12, 2000

9:32 a.m.

Taken at:

HUNTON & WILLIAMS, LLP

951 East Byrd Street, East Tower, Richmond, Virginia

REPORTED BY: CHRISTINA S. BROWN, CCR

COOK & WILEY, INC.
Registered Professional Reporters
3751 Westerre Parkway, Suite D-1
Richmond, Virginia 23233
(804) 359-1984

APPEARANCES:

Samuel W. Lanham, Jr., Esquire
LANHAM BLACKWELL
470 Evergreen Woods
Bangor, Maine 04401
207.942.2898
slanham@lanhamblackwell.com
Counsel for the Plaintiff

Nancy G. Milburn, Esquire
ARNOLD & PORTER, LLP
399 Park Avenue
New York, NY 10022-4690
Nancy_Milburn@aporter.com

and

Erik W. Snapp, Esquire
WINSTON & STRAWN, LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
847.722.9527
esnapp@winston.com
Counsels for the Defendant

BRENDAN MCCORMICK

By Mr. Lanham..........................6

By Ms. Milburn.........................139

By Mr. Lanham..........................152

McCormick Deposition Exhibit No. 1......10

Mr. McCormick's affidavit.

McCormick Deposition Exhibit No. 2......33

Letter from Judy Bernstein-Gaeta, dated March 11, 2010.

McCormick Deposition Exhibit No. 3......38

Low Tar Onsert/Outsert, November 2002.

McCormick Deposition Exhibit No. 4......46

2002 Fourth Quarter Actuals, dated 6-8-2006.

McCormick Deposition Exhibit No. 5......48

Document entitled, "Low Tar Communication."

McCormick Deposition Exhibit No. 6......54

Document entitled, "Low Tar Onsert/Outsert, Q4, 2003."

McCormick Deposition Exhibit No. 7......59

Packaging chart for fourth quarter, 2004.

McCormick Deposition Exhibit No. 8......65

Document Bates stamped 5002613064 through 5002613071.

McCormick Deposition Exhibit No. 9......70

"PMUSA Ad Test (Phase II): Focus Group Results."

McCormick Deposition Exhibit No. 10.....82

Document from "Marketing Perceptions" to Jan Angel, dated 11-10-04.

McCormick Deposition Exhibit No. 11.....85

"PMUSA No Safe/Low Tar Communication Vehicle Awareness Study," February 2005.

McCormick Deposition Exhibit No. 12.....90

"PMUSA No Safe/Low Tar communication, Vehicle Awareness Study," January 2006.

McCormick Deposition Exhibit No. 13.....94

"PM USA HE/LT Communications Vehicle Awareness Research," January 2006.

McCormick Deposition Exhibit No. 14.....99

Letter to Jan Angel, dated 3-15-06, from Marketing Perceptions.

McCormick Deposition Exhibit No. 15.....108

Email string, starting with Jan Angel, Tuesday, May 2, 2006, 3:44 p.m.

McCormick Deposition Exhibit No. 16......113

"Draft PMUSA 2004 Onsert Proposal."

McCormick Deposition Exhibit No. 17.....131

Email string, "RE: May LOOK-Onserts."

McCormick Deposition Exhibit No. 18.....144

"Corporate Responsibility Television, Print, and Radio, June 2003-November 13, 2005."

McCormick Deposition Exhibit No. 19.....150

"Low Tar Communication."

BRENDAN MCCORMICK, a Witness, called by the Plaintiff, first being duly sworn, testified as follows:

EXAMINATION BY MR. LANHAM:

Q This is the deposition of Brendan McCormick in the MDL Docket 19-MD-2068, In Re: Light Cigarettes Marketing Sales Practices Litigation.

Mr. McCormick, we just met prior to the deposition. I'll introduce myself as Sam Lanham from Bangor, Maine, with the firm of Lanham, Blackwell, and I am representing the plaintiffs in the litigation. How are you today?

**A I'm well, and you?**

Q I'm fine, thank you. You've had the opportunity, I understand, to meet with your counsel before the deposition, correct?

**A Correct.**

Q And did you review any documents?

MS. MILBURN: Objection. Question calls for privileged information.

Q Did you review any documents that you used for purposes of preparing for the deposition? I've not

asked you to identify the documents, I'm asking you if you reviewed any documents.

MS. MILBURN: He can answer yes or no.

**A Yes.**

MR. LANHAM: Are you going to not allow me to ask him at all with regard to what documents he reviewed? I take the position that we're entitled to know what he reviewed if it's in preparation for the deposition.

MS. MILBURN: I think what he may have reviewed with counsel is privileged. You can certainly ask him with respect to particular documents, if he saw them before, and you can ask him what he may have reviewed on his own.

Q Before you met with counsel today, did you review any documents in preparation for the deposition?

**A Yes.**

Q What were they?

**A I reviewed a number of documents, for example, that I prepared -- used in preparation of the affidavit.**

Q Did you review anything other than the document you used in preparing the affidavit?

**A Yes, there were probably a few other documents that I reviewed.**

Q Would you describe them for me, please.

**A I don't remember all of them specifically, but they were documents that were appropriate and relevant to the issues that were discussed in the affidavit.**

Q You've had your deposition taken before, correct?

**A I've been deposed just once before.**

Q Just once before? Okay. Just so you and I are on the same page, as I ask you questions, I want to make sure that you understand my questions; if you don't understand it, I want you to tell me; is that fair?

**A Yes.**

Q And even though you may anticipate the answer to a question, please take the time to let me finish so the court reporter can take down everything. You understand that?

**A Yes.**

Q You're currently, as I understand from your affidavit, vice president of corporate communications at Altria Client Services, Inc.?

**A That's correct.**

Q And I believe you began your work with Philip Morris USA in July of 1993 as an intern in the public affairs department?

**A That's correct.**

Q What did you do prior to that by way of

employment?

**A I joined -- I graduated college in 1993.**

Q Where did you graduate from?

**A Hamilton College.**

Q In New York?

**A Yes, upstate New York.**

Q Great school. What was your degree in there?

**A Public policy.**

Q Where are you from, originally from, Mr. McCormick?

**A I was born in the Bronx, New York.**

Q So after graduating from Hamilton College in 1993 with a degree in public policy, your first job was as an intern with public affairs with Philip Morris USA?

**A That's correct.**

Q Have you worked with either Philip Morris USA or a subsidiary or related company, a Philip Morris and/or Altria ever since 1993?

**A Yes, I have.**

Q You moved into the media affairs department, and you say in your affidavit you held a number of increasingly responsible positions until your appointment as director in the media affairs department. When were you appointed director of the media affairs department?

**A I don't remember the exact date. Is that in the affidavit?**
Q Here's Exhibit 1, which is your affidavit.
**A Thank you.**

(McCormick Deposition Exhibit NO. 1 is marked.)

Q I'm at Paragraph 2. I'm just getting some background information, obviously.
**A Yeah. I don't recall the exact date of my appointment to director of media, director of the department.**
Q When you say you held a number of increasingly responsible positions, just tell me what you mean by that.
**A I started as an intern, moved my way up through the organization to coordinator specialist, manager, and ultimately to director within that department.**
Q Then from '04 to '06, you were director of business development and planning for Philip Morris USA. Tell me what your job responsibilities involved in that position.
**A It included speech writing and presentation**

**preparation for Philip Morris USA's senior executives for public presentations for updates to employees. There was some business analysis there and new business development and analysis.**
Q Then in November of '06, you were named senior director of corporate communications for Philip Morris USA. What were your responsibilities at that time?
**A In November of 2006, I supervised the media relations department.**
Q You say you supervised the media relations department as senior director of corporate communications?
**A Yes.**
Q And you were then promoted, I gather, to your current position in April of '08?
**A Correct.**
Q And what are your responsibilities as VP of corporate communications at Altria Client Services, Inc.?
**A I oversee the media relations department and the departments that have responsibility for communicating with employees, as well as our website and some of our corporate advertising.**
Q Where are you located presently?
**A Richmond, Virginia.**

Q With regard to your affidavit, Mr. McCormick, and specifically Paragraph 10, what information did you use to prepare your statement that is contained in Paragraph 10?
**A I reviewed information that summarized the extent of our onsert production, as well as the number of packs and the types of packs that the onserts were included in at that period of time, so I reviewed those documents for each of those years.**
Q When you state that, for example: "In November of 2002, the onsert was enclosed in approximately 130 million packs," where would that have been done in terms of the manufacturer?
**A It would have been done -- Philip Morris USA at the time had two primary manufacturing facilities, one in Richmond, Virginia, and one in Cabarrus, North Carolina.**
Q Where in North Carolina?
**A Cabarrus County, North Carolina.**
Q And that was done at that time by Philip Morris USA?
MS. MILBURN: Objection to form.
Q Was it done at the time by Philip Morris USA?
**A Is the question was the manufacturing of the cigarettes done by Philip Morris USA?**

Q Yes.
**A Yes, it was.**
Q Did there come a point in time over the course of -- from 2002 until 2008 where that was no longer done by Philip Morris USA?
MS. MILBURN: Objection to form. "That" meaning what?
MR. LANHAM: What we just referred to, insertion of the onserts.
**A Manufacturing of the cigarettes was done by Philip Morris USA.**
Q The inclusion of onserts in the packaging was done by whom?
**A I believe most of it was done during the manufacturing process. There may have been some that were inserted after; I do not know for sure whether that was done by Philip Morris USA.**
Q When you say that the onserts were enclosed in approximately 130 million packs in November 2002, does that mean that those packs were available for purchase in convenience stores or other retail stores across the nation during that month?
**A It may not have been exactly during that month.**
Q Could have been spread over a period of time?

**A Yes, it could. It would have been based on the distribution of how that product would flow through the distribution system.**

Q Would that product flow through the distribution system vary depending upon the geographic region?

**A I think the way I would describe it is to say that the product with the onserts would flow through the distribution system in the same way other cigarettes that we sold would flow through the distribution system.**

Q Okay. Now, I'd like you to -- I'm going to ask you a couple of questions in that regard to educate me with regard to that process. The cigarettes are manufactured, let's say, for example, here in Richmond, Virginia. Where do they go first in the chain of distribution?

**A They may go from our factory to a warehouse for storage, would typically be your first step.**

Q That would be local, as in the Richmond area?

**A I don't know exactly where all of the warehouses were located. Some could go immediately offsite to a location that's close to the factory. We also, then, have other public warehouses that we use for storage, which I understand are around the country.**

Q And then they go first to a warehouse, and

where do they then go next?

**A They would go to a direct customer of ours.**

Q To a direct customer of Philip Morris USA?

**A Of Philip Morris USA.**

Q And give me just a couple of direct customers in Virginia that you can think of by name, by way of example would be.

**A I would give you an example of the type of customers, if you would like me to.**

Q That's fine.

**A Which would typically be a wholesaler who ordered the product, or perhaps a large retailer that purchases directly from us.**

Q If it is a wholesaler, then what is the next step in the chain of distribution?

**A In most instances it would likely be the retail customers of that wholesaler.**

Q And a retail customer of the wholesaler would be in the nature of a convenience store owner or a supermarket owner and the like; is that correct?

**A Correct. It would be those retail stores that sell the product.**

Q The actual retail stores that sell the product?

**A Correct.**

Q And then the last step in that chain is to the customer, the smoking customer for purchase?

**A Correct.**

Q Now, in terms of what you've just described from manufacturer to being in the possession of the retailer who sells to the customer, can you give us a sense of the time frame within which that process generally occurs? And I mean a range of time frame, like the minimum would be what, and the maximum would be what, in your experience?

**A First let me say I'm not involved in managing our distribution system, so I would give you that context in which to consider my answer. It would depend on the brands that you were talking about. Brands that move more quickly and have a higher sales volume could move through -- you know, the earliest is probably around two weeks.**

**And then for brands with less of a sales volume, it would build up from there. I don't have a specific time frame around some of our other slower-moving brands, but based on what I've heard from others, it would be two weeks would probably be at the earlier end of the faster moving brands.**

Q With regard to the slower moving brands, have you heard anything to suggest that it could be as long

as three months?

**A I don't know specifically. I don't have independent knowledge of that, and don't have direct management responsibility for our distribution system.**

Q If in the chain of distribution the wholesaler or large retailer already has inventory that does not include the onserts, and now they are receiving in shipment packages that do include the onsert, in 2002 was there any process by which they were expected to put their inventory with the onserts ahead, if you will, of the inventory without the onserts for purposes of distribution ultimately to the smoking customer?

**A Not that I'm aware of.**

Q Are you aware of distribution agreements that would exist between Philip Morris USA and wholesalers?

**A I'm aware that we have distribution agreements or have agreements with many of our direct customers.**

Q And those direct customers for Philip Morris USA would be wholesalers or large retailers, correct?

**A Typically, yes.**

Q Anyone else by category?

**A Not that I'm aware of. I think those are the primary categories that you'll see in our direct customers.**

Q In your work over time, have you had occasion

to be involved with the preparation of such distribution agreements?

**A No.**

Q Have you had occasion to read them so that you would be familiar with them?

**A Yes.**

Q Based on your familiarity with them in that context, do those distribution agreements that you were familiar with contain provisions with regard to specifically the subject of onserts?

**A I don't recall one way or the other.**

Q So you don't have any memory as to whether the subject of packaging with onserts and their distribution was in any way addressed within the body of the distribution agreements; is that correct?

MS. MILBURN: Objection, asked and answered.

Q Go ahead.

**A I do not recall the specifics of the distribution agreements in regard to whether or not onserts were included in any type of agreement that I reviewed.**

Q Is there such a thing as a standard shelf life of a package of cigarettes?

**A As I understand it, there may be guidelines that are used. And I think it would also depend on how**

**the product was stored, the conditions under which the product was stored.**

Q Is there any -- in your business, is there any so-called standard shelf life, what is considered to be a normal shelf life under normal circumstances?

**A That's not something I'm involved in from a day-to-day basis, so I don't know the answer to that.**

Q Do you know if in 2002 and 2003 there were any plans that were in place to get onserted packs of cigarettes into retail stores at the same time?

**A Could you clarify that question, please.**

Q I certainly can. If you have a number of -- strike that.

At the time that you have in place for certain packaging -- and we'll get to that a little bit later -- for distribution in, let's say for example, the fourth quarter of 2002 -- that's the first reference you make in Paragraph 10 of your affidavit -- was there a plan in place whereby that distribution of those approximately 130 million packs would occur at the same time in the distribution network, or was it a plan that allowed for a staggered distribution of those 130 million packs?

MS. MILBURN: Objection to form.

**A What I can do is explain to you kind of the way in which the product moved through the distribution**

**system, which was the same way product would have moved through -- all of the product would have moved through the distribution system. So that would have been based on orders from wholesalers or other direct customers, and then based on orders from retailers.**

Q So it is based upon the orders of your large retailers and your wholesalers?

**A For the first step of the process.**

Q So if you are beginning the distribution of the 130 million packs in November of 2002, that distribution is dependent upon the orders that are being placed by the distributors and the large retailers?

MS. MILBURN: Objection. It mischaracterizes what he said.

Q Go ahead.

**A The products that were inserted would have moved from our factory to wholesalers and other direct customers when that product was ordered by them.**

Q So it is driven, then, by the orders placed by the wholesalers and retailers, large retailers, correct?

**A The movement of product from our possession to the possession of wholesalers and direct customers would be driven by them actually ordering the product from us.**

Q And was there any formal plan in place that established that process or is that just such a basic

manner of doing business that no such formal plan is needed?

**A Is the question as it relates to the onserts?**

Q No, it's a question as is distribution in general because you've said that the onserts is no different, it's order -- what I hear is it's order driven. So my question is simply is that something that is so well known and basic to the industry that no formal plan setting forth in writing what you just said exists?

MS. MILBURN: Objection to form. I think you're asking him an expert question.

MR. LANHAM: I'm going to ask you, Nancy, if you don't mind, to keep your objections to the form, foundation or directing the witness not to answer. No further explanation, clarification is necessary, please. Thank you.

Q Let's see, I'm not asking the question very well, be the first one to admit it. What I am interested in is simply knowing if the concept of the distribution being order driven as such is something that is so basic to the way business is done that no formal written document as to that very concept is necessary?

**A I'm not familiar with the processes. I know**

**that we have processes in place that govern the sale of our products. I haven't worked in that area so I'm not familiar with how that works. It seems that part of the question is based on what that process -- you know, we sell the product, we manufacture a product and sell it to those who order it. And again, we have standard processes that are in place that govern how that works. And as you noted, they're the same as it was for these -- this was handled the same way.**

Q I've been asking my questions so far, I've been focusing pretty much on November of 2002, that time frame. Would your testimony be the same with regard to the process being order driven through the second quarter of 2008, which is the last time frame referenced in your affidavit, Paragraph 10?

**A It's my understanding that the way we sell our products is largely the same, and has remained largely the same at the highest levels during that period of time.**

Q So nothing fundamentally to your knowledge changed in that time frame between 2002 and 2008?

MS. MILBURN: Objection to form.

**A To my knowledge, between 2002 and 2008, the way in which our direct customers asked for and received our product remained essentially the same.**

Q Now, once you have delivered the product to your direct customers, which is to say wholesalers and large retailers, at that point in time do you -- and you being Philip Morris USA -- cease to have any control over the further distribution of the product?

**A That product at that point in time is in their possession.**

Q So however long they want to retain the product, store the product, or keep the product is entirely in their discretion; is that a fair statement?

**A I'm not sure if it is. Some of it may be addressed by the agreements we have with our wholesalers and our direct customers.**

Q Once the product makes its way through the distribution chain -- and let me use, if I may, for an example Wal-Mart, a Wal-Mart store that sells Philip Morris manufactured cigarettes -- once it is into the hands of the ultimate retailers, in my example, Wal-Mart, at that point does Philip Morris USA have any control over how soon the product is sold?

**A To my knowledge we don't have control over how the product is sold. We do have agreements with retailers, certain retailers throughout the country related to certain aspects of the sale of our products.**

Q What about the aspect of how soon the product

is to be sold after being received by that particular entity?

**A To my knowledge, I am not aware of specific requirements that require them, for example, to sell the product during a certain period of time. I know that we have done things throughout the distribution chain -- I am not familiar with all of them because that's not an area that I work in -- to rotate for product freshness. There have also been instances where product that is not fresh has been removed from the shelves after a certain period of time.**

Q Is what you just described something that is established between Philip Morris and the wholesaler or between Philip Morris and what I'm going to call the end retailer?

**A It may or may not be addressed. I know we have agreements in place with both direct customers, as well as a number of retailers that participate in some of our programs. I'm not familiar with all of the details of those agreements; however, there are agreements that exist that may address some of these issues. But not being familiar with them, I can't give you specifics on that.**

Q I understand, and I respect that. Do you have any familiarity at all in the context of such agreements

as to whether they address the subject of staleness or rotation with packages that include onserts?

**A Could you ask the question again?**

MR. LANHAM: Well, I'll have her read it back. The lights went out.

(Court reporter read back previous question.)

MS. MILBURN: Objection to form.

**A I am not aware of -- I believe you asked the question earlier about anything specific to onserts, and as I noted I was not aware of anything specific to onserts. And again I am not specifically familiar with the elements of the agreement that may or may not address how the product is rotated or whether that is in the agreements or not.**

Q In Paragraph 12 of your affidavit, you mention that in the beginning of the second quarter of 2009 information regarding descriptors, again, to appear on the tear tape of packs of Light cigarettes, just in terms of general background, what occurred that led -- how did it evolve to the point where that device, communication device was used?

MS. MILBURN: Objection to form.

Q You've been using onserts for a number of years, and now in 2009 you begin to use tear tape on the cellophane packaging. What was the thinking generally with regard to the evolution that led to using the tear tape?

MS. MILBURN: Objection to form.

**A I think if you look at the range of our communications over the years, we've regularly looked at a variety of different tools. It's my understanding that at around the second quarter of 2009, we had the ability and the option to include this message specifically on the tear tape of the product, and that was an option that we decided to pursue.**

Q When you say ability, do you mean in terms of manufacturing?

**A Yes. Putting that on the tear tape and incorporating it into the manufacturing process.**

Q Is that to say that it became at least to some extent a function of the manufacturing ability to be able to do so?

**A That would have been one factor, and it would have been an opportunity that would have been identified. What I don't know is -- I know that at that point in time our manufacturing folks would have said, yes, we have the ability to do this.**

Q Why was not the tear tape mechanism used before 2009?

**A I don't know.**

Q When was the first time that you became aware of that as a possible device to be used to communicate the descriptor language?

MS. MILBURN: Objection to form.

Q When did you first become aware of the existence of tear tape being used?

**A If the question is when did I become aware of tear tape being used to communicate this message, is that your question?**

Q I'm even going back to prior to that, Mr. McCormick. I'm not asking when it was first used on packaging, I'm asking when you first became aware of it even existing at all as a potential means to communicate this message?

**A My recollection is that I would have become aware that we were using the tear tape to communicate about this message probably in early 2009.**

Q And you would not have been involved in any way prior to 2009 with regard to the development of that vehicle?

**A I was not involved in the development of that specific vehicle.**

Q So you have no knowledge -- are you saying that you have no knowledge as to why it wasn't used earlier?

**A I have no knowledge as to why it wasn't used earlier.**

Q Once they started to be used in the second quarter of 2009, did they replace onserts or were they used together with -- or did onserts continue to be used also?

**A On this particular issue, in the beginning of second quarter of 2009, the tear tape was the only method that we were using; we did not use onserts in 2009.**

Q What about so far in 2010?

**A I do not believe we have used onserts to communicate these messages in 2010.**

Q Paragraph 10 of your affidavit stated -- the last phrase refers to the second quarter of 2008, the onsert was enclosed in 127 million packs. Is that the last quarter in which onserts were used in packaging?

**A To my knowledge that's the last quarter in which onserts were used to communicate a low tar message.**

Q All right. Paragraph 12 says beginning in the second quarter of 2009 you began to use the tear tape;

any other quarters in 2009 or just the second?

**A I believe that has been -- we began in the second quarter of 2009, and that information is still on the packs. So all of the packs after 2009 that bear "Lights" or certain other brand descriptors have included that language on the tear tape.**

Q All packs that we referred to as "Lights" starting in the second quarter of 2009 and continuing through the rest of 2009 used them?

**A Correct.**

Q Is the same true with regard to so far in 2010?

**A That's my understanding.**

MR. LANHAM: Could we go off the record for a moment, please.

(Discussion off the record.)

BY MR. LANHAM::

Q Mr. McCormick, are you familiar with the phrase that has been used in your marketing materials since 2001 and 2002, that the amount of tar and nicotine will vary depending on how you smoke?

**A That's similar to the language that's in the Exhibit D.**

Q Exhibit D to your affidavit?

**A We said "the amount of tar and nicotine you inhale will vary depending on how you smoke the cigarette."**

MR. LANHAM: And the record should reflect that while we took a break, defense counsel asked that we include the exhibits to Mr. McCormick's affidavit as part of the exhibit, and I had no objection to that, of course.

You said Exhibit D? Did you just say D?

**A Exhibit D. And the language is also in Paragraph 14 of my affidavit.**

Q This is my Exhibit D. You're looking at the bottom, it's very difficult to read: The amount of tar and nicotine you -- I think the word is "inhale" -- will vary depending on how you smoke the cigarette; is that what you're referring to?

MS. MILBURN: Objection to form.

Q Is that a yes?

**A The language is in -- you can find it in Paragraph 14 in my affidavit. I realize that photocopy may be difficult to read, but the language that's in the advertising when -- since 2001, the words "the amount of tar and nicotine you inhale will vary depending on how you smoke the cigarette," I know that they've appeared**

**in advertisements for low tar cigarettes that were run since 2001.**

Q That statement does not tell smokers that they may get as much or more tar and nicotine as in smoking full-flavored cigarettes, does it?

**A The statement tells smokers that the amount of tar and nicotine they inhale will vary on how they smoke the cigarette.**

Q Right. Are there any references made in the advertising to tell smokers that they may get as much or more tar and nicotine as they would in smoking a full-flavored cigarette? That's a different question.

**A What the advertisements do is direct smokers to the website where they can find more information, and there's extensive information on a range of issues on this that they can find on our website.**

Q And I hear you, but that's not my question. My question is, do these ads tell smokers, again, that they may get as much or more tar and nicotine as in smoking full-flavored cigarettes?

**A As I noted, the ad tells smokers: "The amount of tar and nicotine you inhale will vary depending on how you smoke the cigarette."**

Q But it doesn't say or doesn't indicate that there's the possibility that you may get as much or more

tar and nicotine as in smoking full-flavored cigarettes; do you agree with that?

MS. MILBURN: Objection, asked and answered.

**A Those words are not included in the advertisement we're discussing.**

Q Nor does the advertisement that we are discussing indicate that Philip Morris USA has known about compensation for years prior to 2001; is that fair?

**A Those words are not included in the advertisement.**

Q I received a letter last night from one of Nancy's colleagues, Judy Bernstein-Gaeta. Do you know her by any chance?

**A I do not.**

Q Okay. She is a lawyer in Washington, D.C. with Arnold Porter who we're working with in this litigation.

MR. LANHAM: What I'd like to do -- have you seen this letter?

MS. MILBURN: I'd have to take a look at it.

MR. LANHAM: Okay, fair enough.

MS. MILBURN: If you have a copy.

MR. LANHAM: I do.

Q Mr. McCormick, briefly by way of background --

and this is not a question, it's intended to create kind of the setting. We have been allowed to take some additional discovery under limited circumstances for a limited time by order of the court, so defense counsel have been providing us with information, and we've been provided information as recently as last night.

So I'm going to show you a letter, and what I'd like to do to help focus the question -- and this is Exhibit 2, and it is Judith Bernstein-Gaeta's letter to Dawn Barrett, Joe Whatley and to me dated March 11, 2010. And I'm going to highlight a couple of things and then provide it to you, and I'll ask you a question about it.

(McCormick Deposition Exhibit NO. 2 is marked.)

Q I'll hand you the letter. And the letter references several Excel spreadsheets that she has provided because I've not had the physical ability to print out the spreadsheets, which are voluminous. I don't have those with me here this morning; I do have the letter, however. And in Page 2, the top of the letter, if you could refer to it along with me, please.

**A If you don't mind, I'd like the opportunity to**

**read it before answering any questions. This is not a document that I've seen.**

Q Okay, fair enough.

MR. LANHAM: Could we go off the record while he reads it, please.

MS. MILBURN: No.

MR. LANHAM: I'm going to ask that we do for the reason that I got the letter late last night, and I think that's fair. This is a document in production that -- if it had some time beforehand, I can understand that.

MS. MILBURN: We don't consent to go off the record while he reads it.

Q Are you finished reading the letter?

**A Yes.**

Q Will you refer, sir, to Page 2, and read along with me where I've highlighted in yellow in the top paragraph: "From 2004 on, Philip Morris USA has the ability to track onserted packings as they are distributed to its direct customers, which is reflected in this spreadsheet. Thereafter, Philip Morris USA's direct customers distribute the onserted product in the customary trade channels to other smaller wholesalers or retail accounts which Philip Morris USA cannot track with the same mathematical precision. We have,

therefore, provided an estimate of the subsequent statewide distribution based upon each direct customer's current percentage of annual reported sales of all packings into these four states."

Are you with me so far?

**A I'm reading along with you.**

Q Do you agree with her representation that Philip Morris USA does not have the ability to track with mathematical precision the actual distribution of onserted product by state?

MS. MILBURN: Objection to form.

**A I don't think I would agree with how that was --**

Q I --

**A I don't think you're characterizing -- that you're saying what she's saying here.**

Q She's indicated in so many words that it cannot be tracked with mathematical precision, and we have therefore, quote, provided an estimate. Do you concur with her representation that those numbers can only be provided by way of an estimate?

MS. MILBURN: Objection to form and foundation.

**A The way I read this is she is saying that Philip Morris USA from 2004 on had the ability to track**

**onserted packings as they were distributed to direct customers. I have not seen the document and the spreadsheet that you're looking at, wasn't involved in the preparation of this document, but it seems like that information is, she says, is reflected in the spreadsheet.**

**What it seems to be saying is from that point on, the company cannot track to the retail level with the same mathematical precision. And because we cannot track with the same precision from wholesale to retail, this seems to indicate that she's providing an estimate.**

Q An estimate with regard to the distribution state by state?

MS. MILBURN: Objection to form.

**A She said we're providing an estimate of the subsequent statewide distribution that's based on each direct customer's current percentage of annual reported sales of all packings into those states.**

Q Those four states are four states that are involved right now with the current litigation.

**A I don't know which four states they are.**

Q I can tell you just so you know, they're Illinois, Maine, California, and the District of Columbia.

Do you know if Philip Morris USA has the

ability to determine the actual number of onserted packings that are distributed on a state-by-state basis, or in the alternative, can that information only be provided by way of an estimation in the manner described in this letter?

MS. MILBURN: Objection to form.

**A I have no reason to disagree with the statements that are made in this letter.**

Q Thank you. At the bottom of the letter, there's another highlight that I've made, bottom of Page 2 of the letter: "Because Philip Morris USA did not have the infrastructure to track the shipment of onserted product to its direct customers in 2002 and 2003," the document referenced "reflects an estimate of the amount of onserted packings provided to retailers in each of the eleven MDL" -- that means multi-district litigation states -- "for the years 2002 and 2003."

Do you have any reason to disagree with that representation?

MS. MILBURN: Objection.

**A I have no reason to disagree with the statements that are made in that section of the letter.**

THE WITNESS: Would you mind if I took a quick break to get some water?

MR. LANHAM: Of course not. Let's take a break.

(Break taken; off the record.)

(McCormick Deposition Exhibit NO. 3 is marked.)

BY MR. LANHAM:: (Continuing.)

Q Mr. McCormick, I'm handing you what is marked as McCormick No. 3. And we'll see that it is a Low Tar Onsert, slash, Outsert record for the quarter that you referred to in your affidavit, for November of 2002; do you understand that?

**A Could you repeat that one more time? Low Tar Onsert/Outsert, November of 2002?**

Q Yes. In this correspondence you mentioned in your affidavit, Paragraph 10, November of 2002, this corresponds with that; do you understand that?

MS. MILBURN: Objection to form.

**A Yes. I believe this is one of the documents or document like it that I would have reviewed in compiling the affidavit.**

Q And it gives a date of November of 2002,

right?

**A Correct.**

Q And it indicates there were 175 packings, and the pack quantity was 131,244,500, which comports with your approximation of 130 million, doesn't it?

**A That is correct.**

Q Now, it refers to A, B, C and D Brands, and documents that we'll be looking at today break down brands by those letter categories. Would you explain, please, the distinction of an A Brand, a B Brand, a C Brand and a D Brand?

**A I'll start by giving my understanding that those are terms that are used within our manufacturing organization, so they're not terms that I deal with in my day-to-day job. But my understanding is that within our manufacturing organization, they use those classes of brands to describe different categories of cigarette packings primarily based on their sales volume, with A and B Brands being those with the largest sales, or in their context production volume, and C and D Brands having a smaller production volume.**

Q Do you know how they're further broken down between A and B and then C and D?

**A I do not know precise distinctions. I believe that it flows from A being those with the highest volume**

**and production quantities required, B being the second, C being next, and D following below that.**

Q On the left-hand column of this document on Page 1, it refers to one week's worth of average weekly sales volume per SKU. SKU is an acronym for stock keeping unit, isn't it?

**A That's my understanding.**

Q You're familiar with that term?

**A I'm familiar with that term.**

Q Would you explain what is meant by one week's worth of the average weekly sales volume per SKU?

**A It's my understanding -- and I didn't create this document -- that in preparing to look at the onserts, it was an estimate that we made based on historical sales volume for each of these SKUs.**

Q What is the time frame of that historical sales volume that you used for purposes of making that determination?

**A I don't know, I wasn't involved in making that specific determination.**

Q It does not refer to one week in terms of the calendar, like from November 10 to November 17, does it?

MS. MILBURN: Objection to the form.

**A Again, I was not involved in the preparation of this, but if you look at average weekly sales volume,**

**I imagine you would use the average based on your sales volume per week. I was not involved in the preparation of this.**

Q And perhaps a poor question. When it says one week's worth, that is an average of sales for one week using some time frame upon which to make that average, correct?

**A Yes. It's my understanding that you would look at your weekly sales over time, you would average that and come up with roughly one week's worth of volume based on that number.**

Q So if by way of example, and it's a hypothetical, in one week -- and this is a very artificially low number -- but by way of illustration, if your average for one week of sales was 1,000 packs, then this would reflect a distribution of onserts in 1,000 packs to comport with the one week of average sales?

MS. MILBURN: Objection to form.

**A My understanding is that we would rely on that. If one week's average sales volume was 1,000 packs, onserts would be put on 1,000 packs for that particular SKU.**

Q Thank you. And then per SKU, put that in context for me, please. When it says per SKU, what does

that mean in language that, you know, a layperson would understand?

A **My understanding of SKU is that each individual different product offering with different cigarette pack would be an individual SKU.**

Q Is that to say each one of these line items would be an individual SKU?

A **That's my understanding. So you would look at -- you would likely have 175 different packings, my understanding is that that would be similar to an SKU.**

Q Which is to say 175 SKUs?

A **That's my understanding, those terms would be used similarly.**

Q Now, on the left-hand side it says included packings, and on the right-hand side it says excluded low tar packings. Do you have an understanding as to why you have some that are included and some that are excluded?

A **I do not. I wasn't involved in the manufacturing operations at that time. So my understanding is on the left side -- I agree that the left side you have included packings, and on the right side seems to be excluded packings.**

Q And I fully understand that you weren't involved in the manufacturing process. When I ask

questions like that, I'm asking you based on the totality of your education experience with the company. And in that context, do you have any understanding as to why there are some that are excluded and yet they're low tar?

A **I do not.**

Q On the left-hand side, the included packings, what I'd like to do is just run down some names to see if I have them correctly because these are abbreviated, and I'll go down the list, then ask if I have it correctly. And if there's something I don't know what it is, I'll ask you. Do you understand?

A **I understand.**

Q Alpine, B & H is Benson & Hedges, Basic, Best Buy, Bristol, Bronson, Bucks, Cambridge, Dave's, Genco, Generals, Lark, Marlboro, Merit, No Frills, Parliament, Players, Premium Buy, and I believe the last is Virginia Slims.

A **That would be consistent with my understanding.**

Q Then within the Lights, the LTs, we have UL, which means Ultra Lights, correct?

A **That's my understanding.**

Q And MED is for Medium; is that true?

A **That's my understanding.**

Q If you take a look at the fourth page in the middle, you'll see the brand Players, and there's an FF. I understand FF to mean Full Flavor; is that correct?

A **That's my understanding.**

Q Do you have an understanding of why a full-flavored cigarette would be listed in the column of Lights?

MS. MILBURN: Objection to form.

A **I do not. What this would be would be the codes that are used to identify the product. What I do not know is what the reported tar and nicotine yields would be for that specific product.**

Q So that is to say that there's the possibility that a product that is identified as a Players FF might have a tar and nicotine level such that it is considered to be a low tar and nicotine cigarette?

A **I believe that would be possible, that the identifiers here which are the internal and ordering identifiers that people would use to order those products or manufacture them, some of those products may have been within a definition that was below perhaps 15 milligrams of tar.**

Q And speaking of that, Philip Morris considers any cigarette that is below 15 milligrams of tar to be a low tar product, correct?

A **Or a non full-flavor product.**

Q On the Virginia Slims, there's an LX, what does that stand for?

A **I believe that refers to Luxury.**

Q On the right-hand side on the first page under the excluded low tar packings, there's a product STGA, do you know what that means?

A **I do not.**

Q Then you come down, you see ACRD, do you know what that stands for?

A **I believe that stands for Accord.**

Q And L & M?

A **That's L & M.**

Q L & M cigarettes. Then AAV?

A **I believe that's All American Value.**

Q If you look at the lower left-hand corner of this document, you will see the name A. Wilson final, slash, confidential, June 6th, '06, revised June 9, '06. Do you see that?

A **I do see that.**

Q Do you have an explanation as to why this is indicated as being revised in June of 2006 if it is for data pertaining to November of 2002?

A **I do not. It's my understanding this is a summary of -- that would have been compiled at that**

**time.**

Q And would you expect a similar document to exist for each of the quarters that are referenced in Paragraph 10 of your affidavit?

**A In terms of a summary, I would expect that I have reviewed a summary document of our inclusion of onserts for each of the quarters that I mentioned in the affidavit.**

Q Similar to Exhibit 3?

**A They would have been similar in terms of types of information they would provide, yes.**

(McCormick Deposition Exhibit NO. 4 is marked.)

Q Let me show you what is marked as Exhibit No. 4. You'll see, Mr. McCormick, that in the upper left-hand corner, very top, "2002 4Q Actuals," that's referring to the fourth quarter of 2002, correct?

**A That's what it appears to refer to.**

Q Would you agree with me that this document shows the number of packs for each SKU in which onserts were placed in 2002?

**A I don't know. If you don't mind, I believe this is the first time I've seen this document.**

Q Go ahead.

**A Okay. I've reviewed it.**

Q Can you answer the question?

**A Can you repeat the question?**

Q Certainly. Do you agree this document shows the number of packs per SKU that included onserts for the fourth quarter of 2002?

**A I don't know the origin of the document. It appears that it references onsert quantities. This is the first time I've seen it. I'm not sure who created this document and in what context it was created.**

Q Fair enough, but I didn't ask you that. The last column indicates, does it not, pack onsert quantity, and it's listed per SKU, right?

**A That is what it appears to show, yes.**

Q If you look at the third page on the far right, the total for all packs is 132,087,900, correct?

**A That is the number listed at the bottom of the chart, yes.**

(McCormick Deposition Exhibit NO. 5 is marked.)

Q Show you what is marked as Exhibit No. 5, take

a look at that, please. This is a document -- I probably should have been referring to Bates numbers, but the total Bates number is AC5000979757. It's a document that has a descriptor at the top of "Low Tar Communication." This document -- have you had a chance to look at it now?

**A Yes.**

Q The document in the lower left-hand corner, Mr. McCormick, is dated September 11 of 2005, but it appears to contain information that pertains to the 2002 low tar onsert program. Do you see that?

MS. MILBURN: Objection. To the extent Exhibit 5 is part of a larger document, I would object to showing him just one page. And I believe the same objection may apply to Exhibit 4, which also looks like it may be part of a larger document.

MR. LANHAM: Objection is noted.

Q Go ahead. Do you have an understanding as to why there's the date of September 11, 2005, in the lower left-hand corner, and it looks to appear to pertain to the 2002 program?

**A I do not. This is not a document I've seen before.**

Q Okay. Under Program, pack onserts, slash, outsert, the far left column says "2.6 bln units;" does

that refer to 2.6 billion units?

**A I would assume that it does, but not having created the document, I'm not sure. But that would be a typical way to refer to units.**

Q Unit would mean one individual cigarette, correct?

**A That would be my understanding, is how we use that term.**

Q And that term is also used -- I believe I've seen documentation that a cigarette is referred to as a stick; is that true?

**A That would be another way that various entities track that. We typically would use unit more often than not.**

Q But if we see unit or we see stick, that refers to an individual cigarette as opposed to a package or a carton?

**A Those terms would typically refer to individual cigarettes, correct.**

Q So if there's 20 cigarettes in a pack, right?

**A The vast majority of packs are sold in packs of 20.**

Q So if you divide 2.6 billion by 20, you'd get about a 130 million packs, wouldn't you?

MS. MILBURN: Objection.

**A I believe that if you do 2.6 -- and I haven't done the math -- but based on the information that I reviewed, we presented it both as 130 million units would equal roughly 2.6 billion units.**

Q And that comports with your first line in your Paragraph 10 of your affidavit, 130 million packs?

**A Would be roughly the equivalent of 2.6 billion units, as I understand it.**

Q Under details, it says: One week's shipment, Philip Morris low tar products, and then under timing, that's -- strike that.

You see where it says under Details, one week's shipment, that comports with what we just referred to in an earlier exhibit as the one week average -- one week's worth of average weekly sales volume for SKU, doesn't it?

**A Again, not having been familiar with this document, I don't know who the author is or in what context it would be there. I would stick with what I referred to in the documents that I reviewed. That's what I'm most comfortable talking to.**

Q We've already identified that this 130 million packs comports with your own figure, and that this pertains to the 2002 fourth quarter program. So appreciating you haven't prepared the document, I'm

asking you based upon what we've gone and looked at before, that you'd testify in that context. And I recognize -- you don't have to keep telling me that you haven't seen this, you didn't prepare it; that's a given, and I acknowledge it.

Timing on the far right column, you see where it says: Public Warehouse, October 21, 2002?

**A I do see that.**

Q What is a public warehouse, would that be what you were referring to earlier?

**A I mentioned earlier that the product leaves our manufacturing facilities and would go to public warehouses around the country.**

Q And the reason I'm asking the question is you may have mentioned the word "public," but I did hear you say earlier "warehouse," and here they speak of public warehouses. Is it the same thing?

**A What I referred to earlier -- they would leave our facility and potentially go to our own warehouses. When I referred to warehouses that were located around the country, that would be the equivalent of public warehouses.**

Q Indeed you did. All right. When it next says Wholesale, November 4th, 2002, do you gather from this that from the time that it got to the public warehouse

on October 21, 2002, that it makes it to wholesale by November 4th, 2002?

MS. MILBURN: Objection. He says he hasn't seen this document before.

MR. LANHAM: I understand. You've made your objection.

**A Yeah, I haven't looked at this document before, so I don't know exactly what they're referring to. I described the distribution channel earlier.**

Q Let me -- a broader stroke here, okay. You've described for me, and I appreciate it, the distribution system, okay. And now I have a document that appears to comport with the same 130 million packs distributed in November of 2002 per your affidavit, and it further appears in the column on the right-hand side, far right, that the timing of that distribution was from the point of public warehouse, October 21, 2002, to actual retail, was over a period of November 18th, 2002, to January 2003; do you understand that?

**A I understand that that's what the document has, information related to that.**

Q And do you agree that the document would suggest that there is a time frame from distribution to the public warehouse to the end date of retail of January of 2003, at least on the face of the document?

MS. MILBURN: Objection. He says he hasn't seen the document before.

MR. LANHAM: I didn't ask him that. We don't need you to keep qualifying your objections. Form, foundation, instructions not to answer are appropriate.

Q My question is, on the face of this, does that appear to be the case?

**A It appears to be the case that this lays out rough time lines for the distribution of that product through the distribution system. That's all I can tell.**

Q And that's really all I'm interested in. And if you make that assumption, it's roughly a six- to ten-week time frame. They have retail here in November 18th, '02, to January '03, so that would be in a range of six to ten weeks?

MS. MILBURN: Objection.

Q Do you agree? Based upon --

**A What it says is November 18th, '02, through January of '03.**

Q Thank you.

(McCormick Deposition Exhibit NO. 6 is marked.)

Q I'm handing you exhibit -- McCormick 6. I

think I have two -- I have two there. This is a similar document, Mr. McCormick, as to Exhibit No. 3, this time it's for the fourth quarter of 2003. Do you see that?

**A I do.**

Q And you see where on the right-hand side the pack quantity for this quarter is 111,700,000?

**A Yes.**

Q And in your affidavit you said for the fourth quarter of 2003, the onsert was enclosed in approximately 109 million cigarette packs, didn't you?

**A. I did.**

Q Now, on the left-hand side of Exhibit No. 6, under "Packings" at the top, you see where it says "45 non-full-flavor packings"?

**A I do.**

Q And again, that is a reference to the 45 different SKUs per line item as listed on the document, correct?

**A That would be my understanding, that it refers to those included packings down the left-hand side.**

Q Now, in November of 2002, the packings were 175, and in the fourth quarter of 2003, they were 45. Do you have an explanation as to why the drop from 175 in 2002 to only 45 in 2003?

MS. MILBURN: Objection to form.

**A My recollection is that in fourth quarter 2003, there was some issues related to our manufacturing processes. I don't know the specifics of those. But I think if you look at what the difference was between November of 2002 and the fourth quarter of 2003, it was a difference between 130 million packs and approximately 109 million packs, or as this document says, 111 or 112 million packs.**

Q Could that be possibly because more packings that included onserts was with regard to the A and B Brands?

MS. MILBURN: Objection.

**A Could what be?**

Q The fact that you have a drop from 175 packings to 45 packings from '02 to '03, and your numbers are roughly 130 million down to 111 million.

**A Based on my review of this document, it appears that the 45 packings that are mentioned, without an indication here whether they are A or B Brands, certainly appear to be our largest volume brands, and the fact that on 45 packings, we had over 111 million packs distributed would indicate that those were likely to be on those larger selling brands.**

Q All right. And it follows from that that if a smoker in the fourth quarter of 2003, 2003, smoked a low

tar cigarette that was not listed on Exhibit 6, that that smoker would not have been purchasing a package that contained an onsert, correct?

**A The brands that are listed in the included packings would be the ones that contained the onserts, so smokers who purchased those packs would have a pack that included that onsert.**

Q And the other 130 packings would not have included onserts during that time frame, correct?

**A The only ones that included the onsert were the 45 packings. I don't exactly know how many packings we had that we were selling at that time.**

Q I'm simply subtracting the 175 from the fourth quarter of 2002, I'm subtracting from that the 45 in the fourth quarter of 2003, I come up with 130.

**A And my answer is --**

Q You would agree with me that -- she's doing that because I haven't asked the question yet -- you would agree with me that there's a difference of 130 packings?

MS. MILBURN: Mr. Lanham, I'm going to object because the version of Exhibit 6 that you were using is different than the version of Exhibit 6 that was produced to you. It appears to be a line that has been whited out, which is the subject matter of the witness's

testimony. So I would just ask that we use the version that was produced.

MR. LANHAM: Let's go off the record, please.

(Discussion off the record.)

MR. LANHAM: Let the record reflect that with regard to Exhibit No. 6, the copy that I had had a very faintly noted line under the word "classes" on the right-hand side that we just learned had not been picked up on photocopying on the copy being used by Mr. McCormick, so we've substituted it. And the line at issue is underneath the word "classes," is the language "A & B packings only due to factory onserting capability."

Q So you had testified -- I'm going to ask you a question now -- you testified earlier you thought it had to do with something concerning manufacturing, and you were right, weren't you, because of that?

**A What this document says is that production was limited to A and B packings only, and the rationale that's given in this document it was due to factory onserting capabilities, so it's a little bit more specific in terms of what the factors were that were impacting this, which were factory onserting capability.**

Q When these documents -- and when I say these documents, Mr. McCormick, I'm referring right now to Exhibit 3, fourth quarter of November 2002, and Exhibit 6, fourth quarter of 2003. When they refer to the volume indicated for the fourth quarter of each of those years, does that mean that there is no distribution of packages with onserts for the other three quarters of those same years?

**A In my affidavit I noted when these low tar messages were distributed on onserts. During other portions of the year, we included other messages over time that would typically be done on a quarterly basis.**

Q That's in the context of your overall onsert program, which includes the corporate responsibility piece that we'll talk about. But with regard to actual low tar onserts, it is limited in each of those years to the quarters mentioned in your affidavit; is that correct?

**A That is my understanding, yes.**

Q And even further within that limitation, it is limited to either a one-week sales volume distribution for A and B Brands, and a two-week for C and D Brands, correct?

**A For certain quarters, one week for A and B brands, and two weeks for -- I'm not sure if it's**

**universally true across these. As you note for 2002, it was one week's worth of average weekly sales volume. For other quarters I understand that A and B Brands were one week's worth of volume, and the C and D Brands for two weeks of average weekly sales volume.**

(McCormick Deposition Exhibit NO. 7 is marked.)

Q I'm going to show you what's been marked as Exhibit No. 7. This is a document, Mr. McCormick, that was provided to us, I think, two days ago by the same attorney that I mentioned earlier, Judith Bernstein-Gaeta. It purports to be a chart that goes back to the fourth quarter of 2004 with regard to the packaging that is mentioned.

Take as much time as you need to familiarize yourself with it. But my first question is, do you agree that the document purports to indicate the total number of packs with onserts shipped by year and quarter to California, District of Columbia, Illinois and Maine?

MS. MILBURN: Objection, foundation.

**A I'm not familiar with this document, so I don't know what it purports to show.**

Q Do you see that it refers to packs shipped in

four different jurisdictions?

**A I see that, yes.**

Q Do you see that it is separated out by different quarters in different years for low tar?

**A I see that they're labeled "low tar," but I'm not familiar with this document, so I'm not comfortable telling you exactly what it purports to show. I'm not sure the circumstances under which it was created, so I'm not comfortable talking to it.**

Q That's a real fair answer, and it's also a bit of a dilemma because it's what was provided to me by the counsel who represent your company. And so I have to ask questions about what they provided. So I want to proceed with that understanding.

I know, and I hear you, that you've never seen it, so you don't know how it came to be prepared. So let's proceed, if we can, just to talk about what it purports to say on its face. Is that fair?

MS. MILBURN: Objection.

Q Is that fair? Just a second. Between you and me, as far as a way to proceed with that understanding, is that okay?

**A What I want to do is do my best to answer your questions. I am not comfortable answering questions about a document that I don't know anything about. So I**

**hope you understand that.**

**This is one that I haven't seen, and because of that, I don't know the answer -- I can't answer really anything about this document. That's -- you know, I want to do my best to be as responsive as I can to your questions. The questions you've asked so far about this document, not having any knowledge as to how it was put together, I'm just simply not in a position to answer. So I hope you forgive me for not -- I don't want to speculate on something that I really don't know anything about.**

Q Would you go so far to agree with me that on the face of it, it has numbers and percentages for packs shipped to California, District of Columbia, Illinois and Maine for the quarters and the years indicated?

**A I see there's a label, "Pack Shipped." I see there's a label for each of those states. I see there's the percentage of the total. Again, without knowing what total program refers to or what numbers were used here, I'm just simply not in a position to respond intelligently to the document.**

Q If you take a look, please, by way of comparison to your affidavit in Paragraph 10, in the third sentence, you state, "In the fourth quarter of 2004, the onsert was enclosed in approximately 118

million cigarette packs."

If you will then look at Exhibit 7, for the fourth quarter of 2004, low tar, upper left-hand corner, you'll see "Total Program," and underneath that is the number "118,539,500." Do you agree that they appear to be correlated?

**A I agree that those numbers are similar.**

Q For the fourth quarter of 2004, correct?

**A For the fourth quarter of 2004, my affidavit says 118 million cigarette packs, this document says 118,539,500 under a term that says "Total Program."**

Q And in your affidavit, for the second quarter of 2005 you state that "the onsert was enclosed in approximately 149 million cigarette packs," and on Exhibit 7, for the second quarter of 2005, under "Total Program" is the number "147,307,200," correct?

**A Those numbers are correct --**

Q And in your --

**A -- as you described them.**

Q Thank you. In your affidavit you state that "for the fourth quarter of 2005, the onsert was enclosed in 135 million cigarette packs." And on Exhibit 7 under fourth quarter 2005, low tar, underneath the words "Total Program," is the number "135,162,600," correct?

**A Those are the numbers as you described them in**

**the documents, yes.**

Q Those are similar to the numbers in your affidavit, aren't they?

**A They are similar.**

Q If you look at your affidavit for the second quarter of 2006, you say "the onsert was enclosed in 140 million packs," and on Exhibit 7 is the number under second quarter '06, "140,884 200." Again, it's similar, isn't it?

**A Those numbers are similar.**

Q And in the interest of time, if you would take a look yourself at your numbers in your affidavit, compare them to the numbers in Exhibit 7 for the second quarter of 2007, second quarter of 2008, and the fourth quarter of -- strike that.

Compare them only, sir, for the second quarter of 2007 and the second quarter of 2008. Do you agree that they're similar?

**A I agree that the numbers in the affidavit are similar and in close range to the numbers that are mentioned in this document.**

Q Do you have any understanding as to how -- strike that.

Have you had reason to become familiar during your career with Philip Morris with regard to the

determination of how many packs are shipped to a particular state for a particular period of time?

**A Not in any precision. I have a general familiarity with our distribution system.**

Q Would you answer the question, sir, in the context of your general familiarity, then.

**A Could you ask the question again.**

MR. LANHAM: Could you please read it back.

(Court reporter read back as requested.)

**A I'm not sure what you mean by determination of how many packs are shipped for a particular period of time.**

Q How the calculations are made.

**A In what context?**

Q In any particular period of time that the number of packs are determined and are shipped to a particular state for that period of time.

**A Wholesalers within a state would order product, and we would know which wholesalers ordered that product at the highest level. That would be my understanding of how we would determine what product to ship to a given state.**

(McCormick Deposition Exhibit NO. 8 is marked.)

Q I'm going to show you what has been marked as McCormick No. 8. If you will take a look, Mr. McCormick, at Page 1, which is Bates stamped 5002613064. And come down to the second paragraph which starts, "Enclosed are approved production ..." Do you see that?

**A I see that phrase, yes.**

Q I'm going to read it out loud, (as read): Enclosed are approved production requirements for the 2005 PM USA fourth corporate responsibility, quote, low tar, closed quote, onsert communication. The grand total of 135,162,600 packs, or 2.7 billion cigarettes, will be distributed with pack onserts, slash, outserts. Requested quantities are equivalent to one week of sales volume for, quote, capital A, closed quote, and, quote, capital B, closed quote, class brands, and two weeks of sales volume for, quote, capital C, closed quote, and, quote, capital D, closed quote, class brands.

My first question is for you to compare that figure given of 135,162,699 packs, do you agree with me that that comports with your affidavit where you represent 135 million cigarette packs for the fourth quarter of 2005?

**A Yes, those numbers are similar.**

Q And likewise, it refers, as we've already been talking about this morning, the distinction between the A and B class brands for a one week's sales volume, and the C and D class brands for a two-week sales volume, that's the same thing we've been talking about earlier; correct?

**A The language here is similar to what we've been discussing.**

Q If you look, please, at Page 2 of the document, and this is a -- it appears to be the same kind of information as before but in a bit of a different format, so that's why I want to ask you a few questions about it.

This chart on Page 2 identifies the four classes at the middle column, "Total Requirements: A Class, B Class, C Class, D Class," and then another line for "C Class." Do you see that?

**A I do.**

Q And do you know how -- and let's use this particular document. You'll see that they're further broken down, like underneath that there's 12 packings for Class A, and then there's a longer -- well, actually, you know what, take a look at the top left under the column, "Factory Produced SKU." And there are

12 items for A Class, 22 items for B Class, 45 items for C Class, 101 items for D Class, and two outsert items for C Class. Do you see that?

**A I see that column and those numbers.**

Q Do you know how those classes are determined? You testified generally that it's higher sales product compared to lower sales product; can you elaborate on that as to --

**A I've testified to the extent of my knowledge on that.**

Q Are the classes determined by the volume sold?

MS. MILBURN: Objection.

**A I think I answered earlier about my understanding of that.**

Q All right. How are -- the classes are not -- how are they determined?

**A As I said earlier, I don't work in the manufacturing operations. So as I said earlier, it's my understanding that those categories are used within our production environment to guide production of those products and classify them roughly by volume sold. But it's used, is my understanding, in a production context.**

Q Production context by the volume sold?

**A You would guide your production based on -- you would only produce product that you intend to sell,**

**so that production numbers would be linked to sales.**

Q If you look at the A items, Class A, the very first one is Marlboro Light, Regular KS. Do you know what KS means?

**A I believe it refers to King Size.**

Q HP, do you know what that means?

**A I believe HP refers to Hard Pack.**

Q It's 39,081,000. Do you see that?

**A I do.**

Q That's packs, the pack column. Yes?

**A Yes.**

Q Then the very next line is Marlboro Light Regular King Size, Hard Pack is 6M. Six millimeter?

**A I believe 6M refers to the size of the case in which the product was packaged.**

Q Then it says 1,800 packs. Do you have any understanding as to why such a significant difference between the two and why both would be considered A Class?

MS. MILBURN: Objection to form.

**A My understanding, if you look at -- look at those two columns, the product being manufactured is the same. And as I read this, the only difference, as I understand it, would be the type of box it is packed in for shipment to wholesalers, so it would be at the case**

**level that 6M refers to. You would include 6,000 cigarettes, as I understand it, in that case. But the product is the same as I read the lines going across.**

Q Do you know why Philip Morris offers so many different packagings when some of them have a relatively small volume?

MS. MILBURN: Objection to form.

**A I would say that we offer, in a very general sense, we offer packagings that consumers are interested in, is what you hope to do when you design and offer products for sale to consumers.**

Q Look at the first page, again, please, of the document. And coming up from the bottom, the language, "Cases will be alpha identified with the "L" suffix," L is in quotes. "Factory requirements are ongoing with distribution upon receipt at the offsite facility." What does that refer to?

**A I don't know.**

Q You don't know what it means?

**A I don't.**

Q Reading on, it says, "Retail visibility is scheduled for October through December of 2005." Does this mean that the 134 million packs would be in retail stores for three months in 2005?

**A I don't know what specifically it means. My**

**best guess is that it means that is when you would expect to see that product at retail.**

Q You've testified to the A and B Brands being distributed with onserts on a one-week sales average basis, and the C and D Brands on a two-week's sales average basis. Why the longer duration, i.e., the two-week's worth for a lower demand cigarette?

MS. MILBURN: Objection to form.

**A Let me just clarify the first piece. I indicated that that was not necessarily true for each individual execution of this. For this one, as we were noting, you do have one week for the A and B Brands and two weeks of sales volume of C and D Brands. But as I indicated earlier, that was probably not the case for all of these. And I don't know why the reason for that -- why we included for two weeks on B Brands.**

(McCormick Deposition Exhibit NO. 9 is marked.)

Q Show you what's marked as Exhibit 9. This is a document that on the cover page states, "PMUSA Ad Test," in parentheses, "Phase II, Focus Group Results, Prepared By Lombardo Consulting Group," 2nd of April, 2003. Can you tell me what this ad test is about?

**A This is not a document I've seen before. Would you mind if I finished reading the document?**

Q Absolutely. Go right ahead.

**A Okay.**

Q Simply, can you tell us what the ad test concept is about?

**A What I can tell you is what I read from this document, which as I mentioned I don't think I've seen before. This appears to be a summary of focus groups that were conducted in -- let me see if these list when they were conducted -- it would be some time prior to the date of this document, which is dated April 2nd, 2003.**

Q And if you take a look at the second page, it states that, at least in the context of this document, the research objectives were to "Test developed advertising concepts to qualitatively explore message breakthrough;" in parens, "Does the ad communicate that PMUSA is addressing tobacco issues?"

Given your position, is that something that Philip Morris does from time to time with regard to certain issues, certain marketing matters, and that is to test whether a message is getting through that's done by focus groups, right?

MS. MILBURN: Objection to form.

**A I would say what this appears to be and would certainly not be unusual would be if you were going to run television advertising, before you would run that advertising, you would test it to get some reaction to it to make sure it was accomplishing what you'd hoped it would do.**

Q Because the converse is true, if it's not going to accomplish what you hope to do, then that's a good indication not to do it, correct?

**A You would prefer to learn as much about reaction to those ads prior to them running, and focus groups would be one of the ways in which to do that.**

Q On the third page with regard to this particular focus group project, where it says "Methodology," it involved conducting ten mini focus groups and two traditional size focus groups in two markets, San Francisco and Los Angeles, with opinion leaders and general public. You're familiar with the whole focus group process, aren't you?

**A I'm familiar generally with how focus groups are conducted, and I've attended various focus groups over the years.**

Q When it says "10 mini focus groups and 2 traditional size focus groups," what does that tell you?

**A I don't know.**

Q You looked at -- it's Bates stamped 1433, the last numbers, entitled "Executive Summary: Overall Campaign. People want to know ..." Do you see that?

**A Yes.**

Q Okay. It states, "Executive Summary: Overall Campaign. People want to know why," and "why" is in quotation marks, "Philip Morris USA is communicating what are perceived as counter intuitive messages."

And there's a further indentation with the following: Some respondents received the message, quote, don't smoke, closed quote, from the concepts, which leads to discussions of, quote, hypocrisy, closed quote.

Then another bullet item: "Without context for the communications, many are skeptical and cynical."

Do you have any familiarity with or understanding as to what occurred in that regard in this particular campaign?

MS. MILBURN: Objection to form.

**A As you look at this particular document, I wasn't involved, I don't believe, in those focus groups, so the summary -- I'm going off the same summary that you've got.**

Q If you go on to Bates number, the last numbers are 1443 some ways in, and the top line is "Tar and

Nicotine," and in parens, "Onsert." Do you have that?

**A I see the page 1443, yes.**

Q The first bullet point states, quote, Tar and nicotine, closed quote, ad that included information on the onsert fell out of the mix. Do you know what that means?

**A I do not know what "fell out of the mix" means. It appears, if you look at the document before, that there were two different tar and nicotine ads, at least, that were tested as part of this.**

Q In the context of your position and -- positions with Philip Morris USA and Altria over time, are you familiar with the use of the phrase "fell out of the mix"?

**A It's not a phrase that's very specific, so no, I'm not exactly sure what that would mean.**

Q The second bullet point: "The onsert does not provide the proof point credibility expected." Do you know what is meant by that phrase, "does not provide the proof point credibility expected"?

**A I don't know specifically what that phrase means. But if you compare it with the page before it, I would guess that what we were doing would be testing two different ads. And the no-safe ads appears to be one based on the comments that are on that page, and based**

**on the summary that it's important information for smokers to know, it appears that the reaction to that ad in this focus group was different from the reaction to the second execution which is described a little bit differently.**

Q The one on the page you're referring to with 1442, that's a tar and nicotine, no safe ad?

**A That's what the descriptor says, yes.**

Q And the next page, 1443, is a tar and nicotine onsert ad, correct?

**A Yes. They're described differently, which would lead me to conclude they're different ads.**

Q They're two different ads, correct?

**A That would be my understanding.**

Q The document is dated, as you indicated, April 2 of 2003. And in 2003, according to your affidavit, the onsert distribution was in the fourth quarter -- strike that.

Starting again. The document you're looking at, Exhibit 9, is dated April 2, 2003. In your affidavit in referring to the first onsert campaign, that was in November of 2002, fourth quarter of 2002. Do you know if this summary of Exhibit 9, which is dated April 2, 2003, is referring to the low tar onsert distribution in the fourth quarter of 2002?

**A What this document -- based on my read of this document, what this refers to is television advertising, is my understanding.**

Q And what do you base that understanding on?

**A That it's labeled "Ad Test Results," that the descriptions of the ads that are used are similar to the descriptions that were used in other documents I've seen describing the television advertising, particularly some of the ones that were run, although not all of them, as I know -- appears to have multiple versions -- so it appears to be similar to -- it's based on the description of ad tests, based on the 2003 timing of the document, and based on the descriptors that are used of the advertising that was tested, that would lead me to conclude that this is likely a document that was done specifically related to television ad executions.**

Q Take a look at -- near the end, Bates at the end is 1446, it's entitled, "No Safe (Radio)," isn't it? So it would also encompass radio ads?

**A It could potentially encompass radio, which we also would have been running, as I noted in my affidavit, from 2003 to 2006, there was both television and radio. So, yes, I appreciate you pointing that out.**

Q So it wouldn't be limited to TV?

**A It appears not to have been. And actually as**

**there is no -- I'm looking to see, having just got the document, whether there's any specific reference to television. Knowing that the types of ads that would have been prepared around that time for television, radio, and print, some of these share the same descriptions of the television and radio spots.**

Q And if you look at the document we were referring to a moment ago with the numbers 1443, that's the one labeled "Tar and Nicotine (Onsert)," that would have referred specifically to focus groups in addressing onserts, right?

MS. MILBURN: Objection to form.

**A Because it says -- again, it says "'Tar and Nicotine' ad" which would lead me to believe that we are testing an advertising execution.**

Q Through an onsert. The second bullet point says, "The onsert does not provide the proof point credibility expected," that doesn't refer to a television ad, does it?

**A It could.**

Q An onsert would refer to a television ad?

**A What you were referring to, which my guess is that you're referring to here is two different executions of a tar and nicotine ad. One of which you are likely referring to as "no safe," and I believe that**

is a term that we've used in terms of the documents I've seen, looking at the ads that we have placed related to this issue, so that one I am much more comfortable on.

I don't know but would guess that what we were testing here is an ad that potentially would have included that, but wouldn't know for sure without seeing the documents that were tested at the time, or advertising executions. It does refer to a tar and nicotine ad that included information on the onsert. So that's -- I would base my description -- based on the description in the line above, I would guess that would refer to an ad that included information on the onsert.

Q You agree with me that the second bullet point specifically says, "The onsert does not provide the proof point credibility expected." It does say that, right?

MS. MILBURN: Objection, asked and answered.

Q Yes?

A I'm reviewing the document -- I'm reviewing this page of the document, and I think that that's -- by picking one line, you're not giving a complete description of what the document seems to say.

Q Well, the document is not limited to TV advertising because it takes into account radio and onserts also, doesn't it?

A I don't believe that it takes into account onserts. And based on the information I'm seeing, I do not share the same conclusion that you have as to what's potentially being tested here.

Q Is there any other manner in which the term "onsert" is used in the manufacturing of cigarettes by Philip Morris other than that small leaflet that is inserted in the package that we refer to as an onsert, is there any other way it's used?

A We use "onsert" to describe a small leaflet that attached to the cigarette pack.

Q Is it used to describe anything else other than that?

A Not to my knowledge.

Q Given the timing of this report, Exhibit 9, is April 2, 2003, do you believe it has any relationship to the first onsert campaign in the fourth quarter of 2002?

A Relationship in what sense?

Q Determining by way of focus groups the efficacy of the onsert insertion campaign in the fourth quarter of 2002?

A My best guess on this document based on my experience in dealing with focus groups and some of the terms that are used in the document, and the timing of this document, is this appears to be a document that

would have tested advertising concepts.

We use the term -- we do not use the term "advertising" to refer to onserts, we use that term distinctly. So my best guess on this document based on the terms I am familiar with of what you're looking at here is a document that would have been done prior to launching television and radio campaigns right around that period of time in 2003.

Q If you'll look at the same exhibit, the document with the Bates numbers at the end of 1435, and there's a statement to the effect, (as read), quote: The focus on the website is seen as advertising the company name rather than advertising the company's, apostrophe s, positions, closed quote.

Do you believe that that also pertains to a TV advertising campaign focus group process?

A The page as contained in this entire document that you've shared with me that's entitled "PMUSA Ad Test, Focus Group Results."

Q It's a -- I'm sorry, are you finished?

A Yes.

Q And it says on this particular page, "The focus on the website is seen as advertising ..." So it's possible that this is not just limited to focus group analysis of TV and radio ads, correct?

A Our television and radio ads at the time featured our web address as a place where people could go for more information on these issues.

Q On the document that is Bates stamped 1438 at the end, top line is "'Parent Resource' & Raising Kids Who Don't Smoke," do you have that one?

A It's 1438. Yes, I do.

Q There's reference there to "Brochure ads credibility as a 'hands on tool.' Brochure ad has stronger start with emphasis on statistical fact indicating parent's role in YSP, more visual (images of parents and children are positive)."

How does a focus group evaluation of a brochure tie into a television ad campaign?

A Again, I think you're potentially -- what I would describe is in a context of a television -- this is a document that evaluates television ad campaign, that would be similar to how you would describe an advertising execution that offers a brochure or that includes a reference to a brochure in some way.

Q Within the TV ad?

A The use of the term "brochure ad" leads me to believe that you are testing the ad in that instance versus an individual brochure.

Q Take a look at the page that's Bates stamped

1447, it's the third from the end. There's a big black arrow pointing to the right to something that is labeled "ETS Parent Resource," and then in parens, "Brochure." Do you have an understanding of the context of that?

**A I don't.**

Q Do you have any understanding as to how that might relate to a TV ad focus group analysis?

**A I don't find it to be particularly descriptive so I'm not sure what it's recommending or showing.**

MR. LANHAM: You wanted a break for lunch?

THE WITNESS: If this is an appropriate time.

MR. LANHAM: Is that okay with you?

THE WITNESS: Yes, that would be perfect.

MR. LANHAM: Half hour?

MS. MILBURN: Sure.

(Lunch break taken; off the record.)

(McCormick Deposition Exhibit NO. 10 is marked.)

BY MR. LANHAM:: (Continuing.)

Q Mr. McCormick, we're back from our lunch break, and I've just handed you what's been marked as

Exhibit No. 10. I'd like you to take a look at that. And you'll see that it's regarding a Marlboro Ultra Lights onsert in-depth interviews project in November of 2004. It's authored by a Jan Angel, A-N-G-E-L. Do you know that name?

**A It is addressed to Jan Angel, so she is the recipient rather than the author.**

Q You're right.

**A Jan currently works in the market information, market research area.**

Q Do you know her?

**A Would you give me a second to read this?**

Q Sure. Do you know her?

**A I do know Jan, yes.**

Q Okay. It purports to have as a research objective, "Qualitative research will be conducted to explore adult Marlboro Ultra Lights smokers' thoughts as to what a test-onsert-concept conveys to them." Are you familiar with that term, "test onsert concept"?

**A It's not a term I use in my day-to-day work. What it seems to indicate to me, though, is it's an onsert that is being tested before being finalized or used.**

Q Okay. And it says within the design perimeters, "A total of (15) individual, in-depth

interviews each scheduled for 15-20 minutes will be conducted among adult male and female smokers 21+ who consider Marlboro Kings Ultra Lights Kings or 100's to be their main brand."

Is it typical with these kinds of interviews to single out just a particular brand?

MS. MILBURN: Objection, foundation.

**A I'm not sure what you're saying with "these particular interviews." I think the research -- it would be typical for a research plan to be tailored to the objectives that you were trying to achieve.**

Q Have you been involved in the formulation of these kinds of research projects?

**A I've been involved in working with those in our market information organization on developing research -- having them help me develop research projects.**

Q With regard to onserts?

**A Not specifically with onserts, no.**

Q I'm not saying exclusively onserts, but have onserts been included with work that you've done in that regard?

**A No. But I've worked with them generally on other types of research projects where I've asked for their services to help me -- where I've asked for them**

**to help me test a proposition.**

Q Do you have any way of knowing from looking at this particular document what particular onsert was used? I ask that question because it refers to showing them a concept onsert and asking them to comment on it.

My question is, do you know what the concept onsert that was used here is?

MS. MILBURN: Objection. This document is not consecutively Bates numbered, these actually appear to be two separate documents. So it's fine for him to answer your question with respect to the first page, but the second page is a separate document.

MR. LANHAM: Thank you. You have an eagle eye.

**A Based on the information that's provided here, I have no way of knowing what the onsert was -- was referring to in the content of that onsert.**

Q Do you know if -- do you have any way of knowing if it was a low tar onsert?

**A As I just said, I have no idea what the content of that onsert was.**

(McCormick Deposition Exhibit NO. 11 is marked.)

Q Show you what has been marked as Exhibit 11. This is entitled a "PMUSA No Safe, slash, Low Tar Communication Vehicle Awareness Study," conducted by MarketView Research, February of 2005. Are you familiar generally with the concept of a communication vehicle awareness study?

**A In a very general sense. I was not involved with the development of this document.**

Q In a general sense, how are you familiar with it?

**A One of the ways in which I might do things -- again, I'm not sure if that's how this research was conducted, it's not clear from the -- that there's a number of ways in which you can measure awareness of a specific vehicle.**

Q And in this instance, second page, you'll see that the background objective was "To measure general awareness," as you've just said, "of PM USA's 'no safe/low tar'" -- and that's in quotes, no safe, slash, low tar -- communication vehicles, open paren, onsert, television, and radio, closed paren, among adult smokers of PM USA, quote, low tar, closed quote, brands, as measured by standard FTC testing methodology.

What does the term "no safe" refer to?

**A It appears to be an umbrella term for**

**communications that would describe specific executions of the onsert television and radio. So it appears to be an umbrella term to describe subjects that address those issues.**

Q The words "no safe," what do they refer to?

MS. MILBURN: Objection.

**A I'm not clear exactly what they refer to here. I know that we have used -- in our low tar communications there is a specific phrase: There's no such thing as a safe cigarette, or something like that, and that was included in some of the executions that mentioned low tar in radio. And I'd refer you back to the affidavit for the specific language there.**

Q The methodology, at least as described here on this particular study, is "Mall intercept interviews conducted across 50 geographically disperse markets" with 400 interviews. Does that refer to shopping malls?

**A I don't know specifically. That would probably be one example, I don't know if it's exclusive. I would read it the same way you would, but have never delved in to figure out exactly what types of specific stores or places it would be located in.**

Q It refers to 50 geographically disperse markets, do you have any way of knowing if that's intended to comport with 50 states within the United

States?

**A It's not clear from there, but it's -- they're geographically dispersed. I don't know necessarily what those markets were based on this one line.**

Q Look at the next page, the last numbers of Bates stamp are 7415. It has for vehicle awareness, it has "Onsert, 39," and then you'll see over here the number "100," the bar is 0 to 100. Do you interpret that to mean that 39 percent of those who were interviewed were aware of the onserts?

**A I would interpret that as being a percent. I don't know the specific question that was asked, but based on the label, "Vehicle Awareness," that's probably pretty close. But I don't know exactly what it's capturing there.**

Q I fully accept and understand that you don't know the particulars. But based on the objective and the methodology in this bar graph, it appears that of these folks interviewed, 39 percent were aware of the onserts?

MS. MILBURN: Objection, asked and answered.

**A I answered that question. I agree.**

Q You agree?

**A No, I answered the question. I agree with my attorney that I answered the question.**

Q Okay.

**A And I would direct you back to my exact prior answer as how I would answer it if it were asked again.**

Q Which is to suggest another question, that 61 percent of those were not aware of the low tar, no safe cigarette onsert; that's the converse of that, isn't it?

**A That would be the converse of it, yes.**

Q Do you know if there is a breakout between a low tar onsert and a no safe onsert, or is this referring to a single onsert that is referred to in the documentation as no safe, slash, low tar?

And I'm going beyond this document, Mr. McCormick. I'm asking for you to respond to that question based upon your use of the term, awareness of the term and so forth.

MS. MILBURN: Objection to form.

**A What I would -- again, not having written this document, I'll have to make a guess what these terms are referring to. What this appears to be is a study that measures general awareness of these types of communications, vehicles, onsert television and radio among adult smokers.**

Q My next question is beyond this document. When one sees reference to in any literature of Philip Morris the phrase "no safe, slash, low tar," in the

context of onserts, is that referring to a single onsert identified as such, or are there separate onserts, those that address no safe and those that address low tar?

A I would not -- the first part of your question I have an issue with, but I would not make any broad generalizations about every time you see a phrase -- I'm not comfortable making any broad generalizations like that.

My understanding of our onsert executions is that we had a low tar onsert that included language that said there's no safe cigarette. And that language is included in -- the complete language of that onsert is included in the affidavit. And it leads with: There's no such thing as a safe cigarette, in this example, including this one. I am not aware of a separate and distinct onsert that had a different message. This appears to be measuring awareness of that onsert, along with related television and radio with similar types of communications.

(McCormick Deposition Exhibit NO. 12 is marked.)

Q Show you Exhibit No. 12. And you will see

once you review it, Mr. McCormick, that this is a similar awareness study conducted by the same firm, MarketView Research, but now this is January of 2006, and the one we just looked at in Exhibit 11 is February of 2005. Are you finished reviewing it?

A I am.

Q Again, the background objectives are similar to the other one, To measure general awareness of PM USA's no safe, slash, low tar communication vehicles, open paren, onsert and television, closed paren, among adult smokers of PM USA low tar brands as measured by standard FTC testing methodology. Do you see that?

A I see that on the document, yes.

Q The difference compared to the other one that we just looked at, that one was onsert television and radio, this one is onsert and television, correct?

A Yes, that's the difference in that section called "Background/Objectives."

Q Under the section "Stimuli," there are two explanations for -- there's one for onsert, one for television. Onsert says, PM USA's, quote, information for smokers, closed quote, low tar onsert. Do you see that?

A I do.

Q You had some exhibits in your affidavit that

included those onserts that are labeled as information for smokers, correct?

A Yes. That was Exhibit B in my affidavit.

Q Yeah. Back to Exhibit 12, same page where it says "Television" under "Stimuli," it says: CR advertising, quote, what tobacco issues, colon, health effects, closed quote, ad. Do you know what that is referring to?

A I don't remember specifically the content of that ad.

Q What do the initials CR stand for in front of advertising?

A Probably corporate responsibility advertising.

Q And you see under "Methodology" where again this was "Mall intercept interviews conducted across 50 geographically disperse markets" with 407 interviews. Do you see that?

A I see that.

Q If you turn to the next page, similar to the other exhibit that we looked at on the 0 to 100 scale, it appears that with regard to the onsert prong of this, 44 percent of those interviewed had awareness, and on the television, 24 percent had awareness, correct?

A That's what that document seems to state. Again, I'm not sure exactly how that research was

conducted.

Q Then if you look at the page Bates stamped 6585, there's a -- read for "Aware One Vehicle Only," for example, "Onsert Only" or "Television Only," then it gives the figures there. So for those who were aware of only one of them on the onserts, 27 percent were aware, and television, 7 percent were aware. Is that a fair interpretation of that on its face?

MS. MILBURN: Objection to form.

A If you look at this single page, it's labeled "Aware One Vehicle Only, 34" percent, "Onsert Only, 27; Television Only, 7." There's also a page that you skipped over which indicates awareness of at least one vehicle, that in this document has that 51 percent were aware of at least one vehicle. And then the other document, you skipped that page as well, that indicates that 63 percent were aware of at least one vehicle.

Q The page with the Bates stamp 6584?

A Yes.

Q That indicates that 51 percent were aware of at least one vehicle?

A Correct, in Document 12. And the second place I was referring you back to the document we just looked at, since we're looking at the two side by side, in Document 11, for a similar page in that one, 63 percent

**are aware of at least one vehicle.**

(McCormick Deposition Exhibit NO. 13 is marked.)

Q I've handed you Exhibit 13, entitled: PM USA HE, slash, LT Communications Vehicle Awareness Research, January 2006, Draft Report, January 2006. Have you finished reviewing it?

**A I have.**

Q You'll see at the top of the first page, there's a logo "MV," MarketView Research, and of course Exhibits 11 and 12 indicate they were conducted by MarketView Research. And then on Page 2 of Exhibit 13, states, "In February 2005, a study was conducted to measure overall awareness of PM USA's 'No Safe/Low Tar' communications among adult smokers of PM USA Low Tar brands." That appears to refer to what is Exhibit 11, correct?

**A It appears to refer to that, yes.**

Q Then continuing on, "A similar study was conducted in January of 2006 to gauge awareness of PM USA's 'Health Effects/Low Tar' communications." That appears to refer to Exhibit 12; do you agree?

**A I'm not sure if it refers to Exhibit 12, but I**

**haven't done a complete comparison of the documents. But it seems like a study described in this document is similar to the study described in there in terms of the number of people that were reached, as well as the dates for the study in Exhibit 12.**

Q And in Exhibit 13, it makes reference on Page 2 to the: PM USA Low Tar (LT) onsert, then in parens, found on PM USA non-full-flavor cigarette packs only, correct?

**A I'm sorry?**

Q Page 2, sir.

**A Is it the one labeled Page 1?**

Q Yes, you're right. It's page two of the exhibit, it's Page 1 here.

**A That's why I lost you. Could you read it again?**

Q I'm just asking you to confirm it's referring to -- as to the onsert, it's referring to the PM USA Low Tar LT onsert found on PM USA non-full-flavor cigarette packs only?

**A Yes, that's what it says under "Background/Objectives" on this page.**

Q And again, on page three of the exhibit, Page 2 in the lower right-hand corner, again, it describes the one-on-one interviews in 50 geographically dispensed

markets among adult smokers of low tar PM brands from January 13 to January 22, 2006, correct?

**A That's what that says, yes.**

Q If you just simply go to the next page, it lays the numbers out in a different format than the other exhibit. And here those indicating that they had seen the no safe, low tar leaflet were 44 percent of the total. Do you see that?

**A I do.**

Q And 53 percent had not seen the no safe, low tar leaflet before, and 3 didn't know, right?

**A That's what that says.**

MS. MILBURN: Objection to form.

Q So on the face of this awareness study, more people than not -- strike that.

On the face of this study, more people had not seen the leaflet than had seen it; true?

**A In the context of just this specific page, yes. But I'll note that some of these studies also look at the other types of communications that we have done. This specific page is specifically --**

Q And I'm moving to the next page --

MS. MILBURN: Objection. Let him finish his answer, please.

**A This specific page, as I noted, is only**

**referring to the low tar onsert. This study is also looking at at least one other means of communications when it refers to the 2006 piece.**

Q Right. And I did not mean to cut you off, I had my head down. I don't believe in doing that. Okay.

Let's see, the next page. This has to do with the health effects TV commercial, appears that of the total, 24 percent had seen the commercial and 70 percent had not, and 6 percent didn't know or had no answer, correct?

**A That's what the study says in terms of 24 percent saying that they saw that specific commercial before, 70 percent saying they have not seen it before, and 6 percent don't know or no answer.**

Q With regard to that TV commercial that's referred to in here as health effects in quotes, do you know if that commercial made any reference to anything about low tar cigarettes?

**A It's tough to tell specifically from here what commercial that is -- that is referring to.**

Q Do you have any way independent of looking at this of knowing?

**A The way you would look at that would be to, you know, figure out exactly what the ad is labeled in the context of the story board or something along those**

**lines.**

Q So just having it referred to as "health effects" is not enough, is it?

**A It's not enough for me to know specifically what ad you're talking about right now.**

Q They refer in this document to a leaflet, that's the same thing as the onsert, isn't it?

MS. MILBURN: Objection. This document -- you're on 13 now?

MR. LANHAM: I am.

**A Which page are you looking at?**

Q Where they have -- well, it's Page 3, lower right-hand corner, but page four of the exhibit.

**A Yes, the term "leaflet" is used there.**

Q That's synonymously used with or interchangeably used with onsert?

MS. MILBURN: Objection.

**A It's tough for me to tell whether it's interchangeably used, but that's how I would read those results. If you're trying to give a consumer who is not familiar with a term that we use from a manufacturing standpoint of an onsert to help -- it seems similar to how you would describe that in that context.**

(McCormick Deposition Exhibit NO. 14 is marked.)

Q Hand you exhibit -- just a minute. Again, Exhibit No. 14 with all the pages, and a copy for counsel. This is from the firm Marketing Perceptions, Strategic Planning Research to, again, Jan Angel, who you mentioned earlier. A memo dated March 15, 2006. The reference line is "Marlboro Ultra Lights Qualitative Research-Arizona."

Research objectives are indicated as "Qualitative research was conducted among adult smokers to explore their perceptions of Marlboro Ultra Lights, including thoughts as to any differences noticed when smoking the brand over the past few months." Are you familiar with this project?

**A I'm not familiar with the specific research project. This is the first time I've seen this document.**

Q You're familiar with projects like it, though?

**A I am, again, generally familiar. I worked with our research group on a range of projects over the years.**

Q The research design for this particular one was indicated as, quote, Individual in-depth interviews

were conducted among 41 adult male and female smokers ages 21 to 64 who have smoked Marlboro Ultra Lights non-menthol box in the past three months. Nearly all the respondents consider Marlboro Ultra Lights to be their main brand. Do you know -- closed quote.

Do you know if when these kinds of studies are done if an effort is made to identify interviewees who consider the cigarette at issue to be their main brand?

MS. MILBURN: Objection, form and foundation.

**A What this says is "Nearly all of the respondents consider Marlboro Ultra Lights to be their main brand."**

Q My question is, the product, Marlboro Ultra Lights, non-menthol box is what is the focus of the study. And when the company decides to have a study that is going to be devoted to a particular brand, whatever it is, is there an effort made to make sure that the interviewees see that brand as their main brand that they smoke?

**A That would depend on the type of research that you were conducting, as well as the ability to find the audience you're looking for to test that. The way we would do that is if you were doing that type of study, you would work closely with those research partners and the market information group and some of their vendors,**

**and they would help you tailor the study based on what could be accomplished and based on what would help you learn the information you were looking to learn through that research.**

Q The memo purports to address several subject areas. First is product quality, the second availability experiences, and the third onsert awareness. I'm only going to ask you a few questions with regard to the last category entitled, "Onsert Awareness," sub category C.

The memo reads that in the first paragraph, (as read): Quote, Asked if they had noticed any type of onsert or small pamphlet on the cigarette packs, almost all the adult smokers participating in this research recalled that they had seen some type of material under the cellophane on their packs. Some thought they had seen this fairly recently, while most felt that -- strike that -- while most felt they had not noticed this on their packs for, quote, maybe it's been a month or so since they had that on there, closed quote.

Do you think that that kind of representation is suggestive that the use of onserts is a good means of communication during the time frame that this was conducted?

MS. MILBURN: Objection, form and foundation.

A I'm not sure, I would have to take that -- if you're asking about this specific study, is that your question?

Q Based upon that kind of comment, does that kind of comment suggest that it's a good form of communication?

MS. MILBURN: Same objection, form and foundation.

A I believe that onserts is, you know, one of the most effective ways we have to directly communicate with the smoker of any specific pack. I would also add tear tape to kind of that direct-to-consumer communications, as well as some of other things that we do because it gives you the ability to take that message and put it directly in the hands of your intended audience.

So I think what this indicates is that our approach of -- with onserts of putting it in is indicating that people are recalling that, they're recalling that it's incidental in nature throughout the course of the year. Almost all of them are realizing that it's there. And what this is indicating is that they're recognizing that the information is provided, not 100 percent of the time, but from time to time.

Q Onserts vary in message that they convey,

don't they?

A We have used onserts to communicate a range of different messages, yes.

Q Within the corporate responsibility program, there are different messages, only one of which is no safe, low tar, correct?

A That is correct.

Q And outside of the corporate responsibility program, onserts are used for branding messages and marketing purposes, aren't they?

A Or to communicate product information, and that appears to be what this document is referring to.

Q And so the onserts, whether it's within the context of the corporate responsibility program or it's outside the corporate responsibility program, there are any number of different messages communicated through onserts; true?

A We use onserts to communicate a range of different messages.

Q And no message is effectively communicated unless somebody opens the onsert and reads it; would you agree with that?

A We communicate a message generally, particularly our message on low tar cigarettes, in a broad range of different ways; onserts is one of the

ways in which we communicate that. It wouldn't be the only way that people are exposed to that. But the goal is that they have that information in there. And the reason we provide it is we do want them to read that information, but we also provide it in a range of other ways.

Q And it's not communicated ultimately unless somebody opens it and reads it; do you agree with that?

MS. MILBURN: Objection, asked and answered.

MR. LANHAM: I don't believe he answered it.

A The goal is -- which we're talking specifically about an onsert, I think the message can be communicated and is communicated in a range of different ways. With respect to an onsert, your goal is to have them read the information inside that onsert.

Q Otherwise it's not effective, is it?

MS. MILBURN: Objection, asked and answered.

A Otherwise they're not reading that information that's in there, but it is communicated in a range of different ways.

Q Next paragraph here says, "Most respondents commented that they had 'probably read one of these at some point some time ago.' Few felt compelled to continue to look at this material, since, as was often said during these interviews, 'I just assume they're all

pretty much going to say the same thing.'"

Based upon that comment that is purportedly attributable to one of the persons interviewed, do you think that onserts that convey different messages at different times are an effective form of communication in the context of a no safe, low tar onsert message?

MS. MILBURN: Objection to form.

A I believe that onserts are an effective way of communicating, and certainly -- even though this is a very small research group with 41 smokers, it's nonscientific as the research limitations notes. It's not projectionable, not necessarily representative of the broader market of smokers, so this document puts those qualifiers on anything that you gather from this research approach.

I think the fact that most respondents are commenting that they have probably read one of these at some point is a very good sign, and I think it's the right thing to do for us to continue to put that type of message out there in a range of different ways, including on onserts.

Q How do you address the potential problem that people say, oh, there's another onsert, I've read that before, I'm go not going to bother to read it again; and in fact, it's a different variation or it's a different

message in the onsert that they're choosing not to read?

MS. MILBURN: Objection to form and foundation.

**A The onserts that we have used to communicate on issues look different. So the onsert communication on low tar is different from our communication on the website, is different from our communication on quitting smoking, so those would appear different when placed in the cigarette pack.**

Q How do you address the issue of smokers not appreciating the distinction that you just made, and instead they interpret what they see as just one more of the same thing yet again?

**A I wouldn't disagree with your characterization of the research and what smokers are -- the group of smokers are saying in this research.**

Q How do you get around that in terms of wanting to have more effective communication?

**A Again, I wouldn't agree with the first part so I'm not quite sure what you're asking me to get around. So I would answer the second part of the question and indicate what we do to communicate as effectively as we can in as broad a way as possible. I think that's laid out in my affidavit, where the sum of our communications on this issue starts with making information available**

**on our website, continues with a range of communications that are on-pack, including onserts, communications in our advertising, tear tape, the broad range of television advertising. So what we've done over the years has been to communicate in multiple forms, in multiple ways.**

**On this issue we're communicating essentially the same message, and we're communicating it in kind of a sustained way over time by making that information available to consumers in a range of different ways. And we continue to put the web address out there in a range of different ways to encourage those who are interested in more information on that and other issues, to tell them where they can find that, which is on the company website.**

Q You do that, as you've just described it, at least in part because you know that there is a possibility that smokers don't appreciate that there are different messages in different onserts. And there is the risk that they will see those onserts as being the same thing yet again, and therefore, not read them, so you do these other things to respond to that; is that true?

MS. MILBURN: Objection to form and foundation.

**A I don't agree with the first part of your question. Again, the reason we do that is we have a range of communications vehicles at our disposal. I do not agree with the projections you're making from a small sample of folks about what the research conclusions are for smokers in general. I don't agree with the way you characterized why we communicate. What we have tried to do is to communicate in a range of different ways to make this information available in a wide range of ways that we believe are accessible to smokers and potential smokers.**

(McCormick Deposition Exhibit NO. 15 is marked.)

Q I want to show you an exhibit marked 15, which is an email string. Again, it involves the same person, Jan Angel, that we've been referring to earlier. Have you finished looking at it?

**A I have.**

Q Starting at the bottom of Page 1, which is the first in the email string, is from Jan Angel to a number of folks, dated March 21, 2006, and the subject is "Marlboro Ultra Lights Qualitative Research Study -- Arizona Test Market."

The exhibit that we just referred to is No. 14, it is with reference to "Marlboro Ultra Lights Qualitative Research -- Arizona," Dated March 15, 2006.

Do you agree with me that the email string relates to the document that we just were looking at that is marked as Exhibit 14?

**A I haven't done a full comparison, but I would note that the Phoenix location, the Marlboro Ultra Lights focus, the dates of the survey and the number of smokers are identical.**

Q So at least on its face, it looks to be the same?

**A Based on those factors, it's appears to be based on the same research project.**

Q And she says in her email that this was research conducted in Phoenix March 6 and 7, 2006, who among smokers 21 to 64 who have smoked Marlboro Ultra Lights non-menthol box as their main brand in the past three months. That's the same one identified in the other, isn't it?

**A Yes.**

Q Then she lists a number of key findings. If you'll take a look at Page 2 of the email, she writes: "When asked if they had noticed any type of onsert or small pamphlet on their cigarette packs," the first

bullet point, "Almost all of the adult smokers interviewed recalled seeing some type of pamphlet on their packs." Second bullet point, "Most commented they had 'probably read one of these at some point,' and most recalled topics related to the Corporate insert." Then she --

MS. MILBURN: Onsert.

MR. LANHAM: I'm sorry, what did I say?

MS. MILBURN: Insert.

MR. LANHAM: Thank you. I meant onsert.

Q Then she adds another item, "None among these adult respondents recall noticing a flavor message." That's consistent with the report that we just looked at, isn't it?

**A In the sense that most of those -- she appears to be testing for recall on a specific flavor execution in this particular market on this particular product. And in the context, what people are remembering is that they have seen -- probably read one of these at some point, and that most are recalling topics, not specifically on a flavor communication that she appears to be testing, but on the topics that are related to the corporate onsert, which would include the low tar message.**

Q In fact, she's saying that none among the

respondents recall noticing a flavor message, right?

**A That's what it says regarding that specific execution that she appears to be trying to test.**

Q If you come up the email string, the next email message right up from that first one is from her to a James -- a Doug James on May 2, five or six weeks later. And she says to him: "This was the study that mgmt. attended in Phoenix."

And if you keep going up, Mr. James responds to her that same day: "Thanks for all this Jan. They all look pretty consistent in both markets." Then he has four bullet items, and the fourth one is: "Generally not much attention is paid to the onserts." Do you see that?

MS. MILBURN: Objection to form.

**A I see the line in that email that says "Generally not much attention is paid to the onserts," yes.**

Q Who is Doug James?

**A I don't know.**

Q You've never heard of him?

**A No.**

Q Okay. Do you have any reason to know whether he works with Jan Angel?

MS. MILBURN: Objection, asked and answered.

**A I don't know who he is.**

Q What is Jan Angel's present position, if you know?

**A I don't know specifically, but I know what department she works in, which is a group that's generally described as the market information group. It may have a slightly different title, but she works in the market information group.**

Q Is that within your chain of command of responsibility?

**A It's not.**

Q It is not?

**A Before we move off that, I think you're also missing Jan's response to his email where she disagrees with his assumption that generally not much attention is paid to the onserts. She says she's rephrasing that to say most Marlboro Ultra Light adult nonsmokers associated onserts with the corporate onsert, which they already know the messaging. So that would be referring to the low tar piece, and I think that's an important piece to understand this document in context.**

Q Brand loyalty is a concept that is valued at Philip Morris, isn't it?

**A Yes. I think any consumer products company would prefer to have consumers who are loyal to their**

**brand rather than those who are not.**

Q And one of Philip Morris's goals is to foster brand loyalty among Philip Morris brand smokers; do you agree with that?

**A We certainly aim to promote and foster brand loyalty among our smokers, yes.**

THE WITNESS: Can we take a quick break while we've have a natural transition among documents?

MR. LANHAM: We can. Then maybe we can go into the home stretch.

THE WITNESS: Thank you.

(Break taken; off the record.)

BY MR. LANHAM:: (Continuing.)

Q What do you understand the phrase "brand equity" to mean?

**A I'm not a marketing expert, but my understanding of it is, it's the value -- you know, equity is used in other contexts in values, so I think it's used as kind of a broader term that encompass many elements that give value to a brand.**

(McCormick Deposition Exhibit NO. 16 is marked.)

Q Let me show you what's marked as Exhibit 16. And before you review it, look at it, and I'll start asking you questions about it. You know that starting in 2004, the idea of the use of onserts in the context of branding and brand equity became a new marketing piece for Philip Morris, didn't it?

MS. MILBURN: Objection. Form, foundation, calls for an expert opinion.

**A I am not familiar with the -- I'm certainly not as familiar with our use of onserts for marketing purposes as I am for some of the messages that are contained in my affidavit. So I am -- I would disagree with the statement that you made. The date piece, there's no -- it's inaccurate with regard to my knowledge. My knowledge -- I have very little knowledge of how we've used pack onserts for marketing purposes.**

Q You do know that starting in 2004 the use of onserts was expanded beyond just low tar and nicotine issues, don't you?

MS. MILBURN: Objection. Form, foundation, calls for an expert opinion.

**A I don't have specific knowledge of either the date or the overall approach as to how our marketing -- how onserts were used for marketing communications.**

Q Let me ask it even more basically: Are you even aware at all that its use was expanded beyond just low tar messages?

**A I am aware generally that from time to time that we have used onserts for marketing communications, that's probably the extent of my knowledge. It is not nearly as deep as it is on some of these other issues; it's not an issue that I was directly involved in.**

Q Okay. Take a look at this exhibit, please.

**A Okay.**

Q The last time the onserts were used, I believe you said earlier, was the second quarter of 2008; is that correct?

**A 2008 was the last time we used -- we had a low tar message on our onserts.**

Q And up until that time, were you involved in the operation of the use of onserts? I mean, did you continue -- I'm not asking it well. Did you continue to be involved with that aspect of the company's business up until the time you stopped using them, you personally?

MS. MILBURN: Objection to form.

**A I think the first -- you seem to have multiple questions in there.**

Q I'll ask it again. When did your involvement

with onserts cease?

MS. MILBURN: Objection to form.

**A Whose involvement?**

Q Yours. You personally.

**A My personally?**

Q Yeah.

**A I've never been directly involved in any aspect of the onsert program. I'm aware of what we've been doing, so I would put my involvement more in the aspect of awareness and having an understanding of the scope of the company's efforts and the messages that were being communicated.**

Q And it's in that context that you provided your affidavit, that is your awareness of what was being communicated, and how and when?

MS. MILBURN: Objection. Misstates his testimony, and form.

**A My affidavit communicates what I know about the onsert program: The scope of the program and the timing of the program.**

Q This exhibit that I've handed you, on the very front page refers to a preliminary proposal for cross-functional consideration. Do you have an understanding of what that means?

**A In a general sense, based on this document, I**

**would view the words both "preliminary" for discussion purposes only, and "cross-functional consideration" to mean this was a document that was designed to be shared with others for input. But my sense is it's very early in the process. And it's also labeled "Draft."**

Q What does cross-functional consideration mean?

**A When I would use the term "cross-functional," it would mean I would involve that with other functions or departments outside of my own.**

Q And your department in 2003 and four was what; where were you working?

**A I was working within the communications department through probably September 2004, I believe. So in 2003, probably through the tail end, probably through the first three quarters, I was in that media relations group and worked in the media affairs department.**

Q Media relations, media affairs department. Take a look -- I'm going to go through some pages here -- the third page in. Refers to "Brand Communication Using Pack Onserts." And the goal was to develop onserts that enhanced brand equity directly to adult smokers. Are you familiar with that concept -- you're familiar with that --

MS. MILBURN: Objection, form.

MR. LANHAM: Let me finish my question, please.
Q Are you familiar with the concept of enhancing brand equity?
**A We had talked about that earlier. In the context in which I described it earlier is my familiarity with it.**
Q And are you familiar with it in the context of developing onserts in order to enhance brand equity?
**A I am familiar generally with the concept of brand equity. As I mentioned earlier, I was not involved in specific efforts, and I'm not aware of the specific nature of our efforts to use onserts as a vehicle to do that other than I believe we've done it from time to time.**
Q Okay. And I'm not asking you about your awareness of specific efforts, I'm asking you if you are aware generally of the use of onserts for the purpose of enhancing brand equity? I think that can be answered yes or no.
**A And I said what I am familiar with is that we have used onserts to communicate marketing messages in a very general sense, and that's probably the extent of my knowledge in that area.**
Q If you'd look at the next page, please, on

that exhibit, it's Page 4 at the bottom. Are you aware of these five brand onsert communication examples of brand equity, name generation, coupon, sweepstakes, and contest?
**A In the context of this document, what this appears to be is a suggestion for ways -- for things they could possibly do.**
Q With onserts?
MS. MILBURN: Objection to form.
**A That's the context in which the overall -- this is a 2004 onsert proposal. And the document says "Brand Onsert Communication Examples," so it appears to be samples of things that this individual is recommending and plans to share with others for consideration.**
Q On the next page, Page 5, as part of what is being considered in the context of what is called "Planning Information," is "Onsert Name, Communication Type, Launch Geography, Duration of Volume at Retail, Indication of Promotion Assembly, Brand Packings."
My question is, do you understand what the phrase "Duration of Volume at Retail" refers to?
**A When it comes to planning information in the context of this document, I'm not sure in its entirety that I can describe what any of those individual terms**

**describe in detail.**
Q We were talking earlier in your deposition about the one-week, two-week average sales distinction in the context of Class A and B cigarettes, and Class C and D cigarettes. In that context, do you know if the phrase "Duration of Volume at Retail" has any relationship?
MS. MILBURN: Objection to form.
**A Again, because I'm not specific with the -- I'm not comfortable describing the relationship between this document and the statements I made earlier, I am comfortable letting you know how we -- and have described how we looked at those terms, how we described the scope of our efforts when it came to onsert production in areas that include the low tar message. I was not involved in any of this, so I don't know for sure whether they were looking at it the same way or not.**
Q If you'd look at Page 7, do you recognize that as being the form of an onsert?
**A Perhaps. I don't know for sure.**
Q Could you explain to me, please, why you don't know for sure? What is it about what you see on that Page 7 that leads you to say that you don't know for sure?

**A It's the entire document, which is because this is a document that I am unfamiliar with, I'm uncomfortable telling you exactly what the author of this document included and what they were trying to communicate, so I would just be guessing.**
Q Does what is shown on Page 8 appear to be an example of an onsert?
MS. MILBURN: Objection. I think it's been asked and answered.
MR. LANHAM: It's a different page.
MS. MILBURN: It's a different page, but it's the same -- it's a picture in the same document.
MR. LANHAM: No, no, don't direct the witness, just object, please, form or foundation. Let him answer.
MS. MILBURN: I believe I can state my reasons.
**A Can you repeat the question?**
Q Yeah. Is what is depicted on Page 8 an example of an onsert?
**A I can't tell what's depicted on Page 8.**
Q Next page, please. Left-hand column under "Brand," it says "Marlboro (Main Line)." What is main line Marlboro?
**A I'm not exactly sure. I believe it probably**

**refers to lights and full flavor, but I don't know for sure.**

Q Do you know what percentage of Marlboros sold in the United States are low tar?

**A Not off the top of my head I don't.**

Q Do you have a reasonable estimate?

**A I don't.**

Q There's no number on it, but the bottom of the page -- the Bates number, the last four is 7285, if you would turn to that one. The very top it says, "Proposed 2004 Onsert Launch Overview." Do you have that?

**A I see the page that -- you're on 7285?**

Q Yes, I am.

**A I'm on that page.**

Q It lists a cigarette called Basic. Is the brand Basic a low tar product?

**A Basic, I believe, has a range of different offerings.**

Q Including low tar?

**A I believe it includes low tar. I believe it includes full flavor.**

Q In looking at that page that is entitled "Proposed 2004 Onsert Launch Overview," I don't see any reference to low tar or the NS, no safe, slash, LT, low tar, onsert; do you have an explanation for that?

MS. MILBURN: Objection, foundation.

**A Again, this is not a document I'm familiar with. What I've told you, though, is when we've conducted our low tar onsert communications in 2004, and that information is in my affidavit. So that's a reflection of what we did --**

MS. MILBURN: Let him finish his answer.

**A -- that's a reflection of what we did.**

Q In that regard, do you have -- have you had any involvement in any discussion as to where the use of the no safe, low tar onserts would fit into the broader onsert program that includes the use of onserts for other messaging purposes?

MS. MILBURN: Objection to form.

**A As I noted earlier, the area that I'm most familiar with is how it's been used in some of those other communications, specifically with low tar as the area that I've delved deepest in in preparation for this. So I have not had, as I noted earlier, detailed communications or awareness about the marketing component of how they used onserts.**

Q Let me try to ask it a different way. I respectfully suggest that that's not the question I asked. You have particular expertise with regard to onserts; agree?

MS. MILBURN: Objection. Misstates his testimony.

**A I have an understanding of the extent of our efforts to use onsert communications on certain types of messages, particularly the low tar message.**

Q You have an understanding of the extent of your communications with regard to the use of the onserts, right?

MS. MILBURN: Objection.

**A With regard to low tar.**

Q Low tar.

**A Specifically as the area where I've got the greatest knowledge in terms of the scope of our efforts.**

Q And I understand that, and I hear that, and I'm just trying to get a sense from you as to whether -- given that understanding, have you had occasion at any time to be involved in where that use of onserts, i.e., low tar messaging, fits into the bigger picture, if you will, of using onserts for other purposes?

MS. MILBURN: Objection, form and foundation.

Q That's really all I'm asking.

**A I feel I've answered -- the short answer is no. I think I've given you enough context around why not, that I believe I've answered the questions both times you've asked it previously.**

Q Why is it in the context of the use of no safe, low tar onserts, that in a particular quarter, as those quarters mentioned in your affidavit, an onsert that was used for one week in terms of the average sales volume that we talked about earlier was not used for two weeks or three weeks or four weeks?

**A Can you repeat the question?**

MS. MILBURN: Objection.

Q Yes. You've answered questions earlier with regard to onserts, the low tar onserts being used in packaging based upon the one-week and two-week average sales. You've testified earlier about the distinction between A and B Brands and C and D Brands.

And my question is, if there was a decision made to use one-week average sales for A and B Brands, why not use -- do the same for two weeks, or even three or four; why one week?

MS. MILBURN: Objection to form, compound.

**A The reason we used -- it came up with an average weekly sales volume for the onsert communications, because based on our estimates, we believe that that particular execution, using one-week's average sale volume per SKU across all of our packings that were listed on the documents that we went through earlier was because that enabled us to reach by our**

**first -- for estimates related to that first distribution in 2002, we estimated that we would be able to reach 86 percent of the smokers of those brands by making it available for that period of time.**

Q By making it available for one week based upon average sales for that brand?

**A By using an average weekly sales volume calculation to determine the amount of product that we made that would include the onsert.**

Q If one-week average sales would provide that kind of reach, would not two-week's average sales potentially result in even a greater reach?

MS. MILBURN: Objection.

**A What I don't know is whether it would be -- this was -- reminder that this was one of the communications vehicles in which we were using, it was not the only one. What the 86 percent measures is for that specific execution. I don't know how much higher adding another week's worth of volume would have gotten you in terms of the percentage of specific smokers.**

Q Were you personally involved in the analysis to make the determination that the one-week average that you've just described would reach 86 percent of the smokers?

**A I was not involved in conducting that**

**analysis. I was involved in drafting a communication that included that number, a press release that was developed at the time, so would have verified that number to make sure I understood it.**

Q Do you know if any research was done after the fact to confirm that the target percentage of 86 was in fact accomplished?

**A What that was was an estimate based on -- what we know is that we hit 130 million packs of volume, and we know enough about our consumer purchasing habits that we believe that to be a reliable estimate. I am not aware that we did any follow-up research with individual smokers. To do that type of research would be -- you know, to confirm that number exactly would be very extensive. What we relied on were the estimates in terms of what we thought we could reach, and we executed a plan to do that.**

Q You had a plan that you developed based upon assumptions, based upon data, and you projected you'd be able to reach 86 percent, correct?

**A Based on the factors that I laid out earlier, we estimated that packs with the onserts would reach 86 percent of the smokers of those low tar brands.**

Q And sitting here today, are you able to tell us if you in fact reached that goal?

**A I can tell you that we put the onsert on 130 million packs of cigarettes. And based on that, we believe that that product was purchased by tens of millions of smokers.**

Q You believe that product --

MR. LANHAM: I'm sorry, I didn't mean to interrupt.

MS. MILBURN: I would ask you to let him finish.

**A Tens of millions of smokers.**

Q When you use the phrase "reached," you mean somebody purchased the pack with the onsert on it, don't you?

**A That was the goal of our communication was to make a pack with that onsert communication available to smokers during that period of time and to reach as many as possible.**

Q And in 2002 and 2003, did that program -- strike that.

If you'd look at Page 17, please, the 17 at the bottom, the last four Bates numbers are 7292. This particular plan included a recommendation of six unique onsert messages for execution in 2004, didn't it?

**A That's what this document -- that first line says "Recommend six (6) unique onsert messages in 2004"**

**for PM USA messaging.**

Q And if you look at the next page, "Potential PMUSA Messaging Topics," it included: "Cessation/Addiction," that's one; "Cigarette Smoking and Disease," that's two; "Compensation (Lights)," that's three; "ETS," that's four. Do you know what "ETS" stands for?

**A I believe it stands for environmental tobacco smoke.**

Q Number five, "Reduce Youth Smoking;" and six "Reduce Environmental Impact." There's a seventh there, "Banded Paper (NY State)," do you what that refers to?

**A That refers, I believe, to a certain type of cigarette paper that was designed related to fire safety tests, and bands were included on the paper. And New York State had a law that may have taken place in 2003. I don't recall the specific date that that went into effect, but New York was the first state to require cigarettes to meet a certain fire safety test, and we made it with banded paper.**

Q The third item down, Compensation, in parens, Lights, that refers to the onserts that you were involved with, the low tar, right?

**A I'm not sure specifically what it refers to in the context of this document. Again, what it seems to be is a potential list of topics. But as I look further**

**back in the document, much of the stuff in here does not appear to have been executed, so I don't know which context that -- exactly what that refers to.**

Q Take a look, please, at Page 23, the top, "Approximate 2004 Onsert Volume Projections." And what is approximated here with regard to the "PMUSA Message" is 22 billion cigarettes, that includes -- the "PMUSA Message" encompasses the low tar onserts, doesn't it?

MS. MILBURN: Objection.

**A Again, if you look at this document, what this is -- this is a draft document, so I don't know what this -- to my knowledge, based on the limited pieces I've seen, I know it includes a range of things that were never enacted. I think if you're interested in knowing what percent -- you know, what number of specific executions of different onserts were included, this is not the document I would use to rely on that.**

**For the Lights document, I would rely on the information that I included in my affidavit. So I have no context in which to evaluate this because this is just a proposal. And based on what's in it, I can see that there were elements of it that weren't executed.**

Q Apart from this document, when reference is made to "PMUSA Message," that includes, among other things, the low tar onsert message, though, doesn't it,

apart from this document?

MS. MILBURN: Objection. Overbroad and vague.

**A I would not be comfortable saying what that term would be used outside of the context of this document. As I noted earlier in other questions, I'm not comfortable taking words from any single document and applying them company-wide.**

Q Do you know who Ellen McCormick is?

**A Ellen McCormick? No.**

Q No relation to you, Ellen C. McCormick?

**A No relation. I don't know who that is.**

(McCormick Deposition Exhibit NO. 17 is marked.)

Q Give you Exhibit 17, which is an email string. This refers in the Re line to "May LOOK," and Look is all capital letters, L-O-O-K, dash, onserts. Do you know what that is referring to?

**A I'd like to read the document first.**

Q Sure.

**A Okay.**

Q Starting at the bottom, which is the first email in the string, it is from a Craig Furtney to a Laura Skarie. Do you know who Mr. Furtney is?

**A I don't know him specifically. I believe he was somewhere in our sales organization.**

Q How about Laura Skarie?

**A I don't remember where she is. I vaguely remember the name, but I don't know her personally.**

Q Do you know what the reference to "May LOOK," L-O-O-K, dash, onserts is referring to?

**A I don't know specifically. But if you look at the first line, he's saying "1 page of the May LOOK," that seems to be it's a May issue of a specific publication. It says it's "to share information with the field." The field would refer to our sales organization. So based on that, I would assume that it's some type of communication that's used to send to our sales force.**

Q And he's referring to share information "about our onsert program," right?

**A That's what the second part of that sentence says, "to share information, with the field, about our onsert program."**

Q At the very bottom, it's described as, "What are they?" meaning onserts, "New vehicle to communicate with adults who choose to smoke." You agree with that, right?

MS. MILBURN: Objection.

**A I agree that what Craig is doing there, as he notes in a note earlier, is that he's trying to come up with a definition of what that is. And there's some other points in here that probably answer that a little bit more completely.**

Q As the email continues, eventually there is one from a Zane Gibbs to Mr. Furtney and this Ellen McCormick. Do you know who Mr. Gibbs is?

**A I know who Mr. Gibbs is.**

Q Who is he?

**A I know who he is, he's somebody that works in our company. I don't know what position he would have been in at that point in time.**

Q Do you know what position he's in now?

**A I don't.**

Q He says to this Craig Furtney and Ellen McCormick: "In addition to Craig's comments below, let me provide a somewhat lengthy discussion of onserts that the two of you can edit." Do you see the first Q and A? He has a series of Q and As; do you see those?

**A I see his Q and A in the email that appears to have been sent on March 19th at 6:05.**

Q The first question is: "What are onserts?" Would you read the answer there, please.

**A The document says, "What are onserts?" is the**

Q. The A is, (as read): Onserts are small, open quotes, brochures, closed quotes, that are attached to the back face of a pack of cigarettes. They are affixed directly on the pack and then overwrapped with our cellophane film wrap.

Q From your perspective -- and what I mean by that is your work with onserts -- is that a correct way of describing them?

MS. MILBURN: Objection to reference to "work with onserts."

Q Is that a correct way of describing onserts?

**A I would say that the way in which onserts are described here are similar to the way I would describe them.**

Q The next question, "What is the purpose of using onserts?" Would you read the answer, please.

**A The answer is: "Onserts are a new communication tool that allows us to provide both branded and non-branded information directly to adult smokers. The onserts add another element to each brand's promotion mix and also provide an additional dimension to our Corporate Responsibility communications mix."**

Q Do you agree with that description or answer to that question?

**A I agree that onserts are a communications tool that enables us to communicate directly with adult smokers. In this context, Zane appears to be kind of tailoring the answer to a specific context that's in response to Greg's request. But the notion that onserts are an effective way to directly reach adult smokers is certainly something that I would agree with.**

Q And the next question, the question is: "What is the advantage of using onserts to communicate branded messages?" Would you read that answer, please.

**A Answer is: "For the brand groups, they provide a much broader reach than direct mail because adult smokers who are not currently on our database can receive the communications. In addition, these messages are also available to competitive adult smokers who may be considering one of our brands. Onserts are also more cost effective than other promotional communications like direct mail."**

Q Do you agree with that answer as drafted?

**A In the context of how we used onserts to communicate in the low tar situation, as I noted before, it gives you really a broad reach with all of the people who potentially purchase your brands at retail. So in that sense, that is broader than what you would be able to accomplish with direct mail alone.**

**And I believe -- I'm not that familiar with the entire cost, this would be based on having general knowledge -- generally, I believe direct mail pieces are more expensive than a specific brochure included in the manufacturing operations, although I don't have a full understanding of all the manufacturing costs.**

Q Take a look at the second page of the exhibit, please, continuation of questions and answers. The second question down -- hold on, I'm sorry. Withdraw that.

The second question down, the question as worded here is: "How is PMUSA using this new onsert capability to communicate to adult smokers?" Would you read the answer, please.

**A The answer is: "There are two distinct and different types of communication to adult smokers with the onsert vehicle. The first is PMUSA Corporate Responsibility messages. The Corporate Responsibility onserts provide adult smokers with non-branded" -- the words "non-branded" are bolded -- "information on a range of CR topics, including highlighting the resources available on our website, information and resources related to our Youth Smoking Prevention efforts and information about Low Tar cigarettes."**

**(As read): The second type of communication**

**-- separate paragraph -- second type of communication to adult smokers using onserts is branded -- that word is bolded -- marketing communications. The marketing communications appear on our focus on four -- those words are in quotes -- brands, plus Chesterfield. In 2004 the brands will be using -- this is actually how it reads -- using to -- TO -- messages in a variety of ways including, comma, pure equity, open parentheses, primarily visuals, closed parentheses, messages, comma, contests, slash, comma, sweepstakes, comma, bounce-back offers to sign up on a direct mail data base, comma, and communications about catalog items and other special offers.**

Q Do you know what the "Focus on Four" brands refers to?

**A The "Focus on Four" brands would have been our four largest selling brands. At the time I believe that refers to Marlboro, Basic, Parliament, and Virginia Slims. So those are our four brands where at the brand level they have the highest market share, and those were the brands that were most likely to have promotional and marketing support from us at the time.**

Q The next question here in the email is: "How often will onserts appear on packs at retail?" Would you read that answer, please.

**A Answer here is, (as read): The timing of both the corporate responsibility and marketing onsert programs is somewhat complicated, however, comma, the current plan is to have onserts appear on about 20 percent of our forecasted domestic volume throughout the year.**

**In 2004 there are currently four CR messages, open parentheses, one per quarter, closed parentheses, in the plan that would appear at retail for about one week on a variety of SKUs. For marketing communications by each brand, typical retail durations of each onsert message are one to four weeks, however, comma, some messages may appear for as long as eight weeks.**

**One brand, comma, Chesterfield, comma, is unique in that nearly all of its volume will be onserted each month in 2004.**

Q Says that "In 2004, there are currently four CR messages (one per quarter)." CR stands for corporate responsibility, right?

**A In this context it appears to do that, yes.**

Q And is one of the four the message of low tar, no safe?

**A It would appear that it would be since in the fourth quarter of 2004, we enclosed an onsert with that message on approximately 118 million cigarette packs.**

Q And that would be one of the four referenced here as one of the four CR messages, right?

**A I believe that to be the case, yes.**

Q I have three minutes to go, but I'm not going to use it. Thank you, sir. I'm done.

**A Okay. Thank you.**

MS. MILBURN: Can we take a quick break, and we may have some redirect.

(Break taken; off the record.)

EXAMINATION BY MS. MILBURN:

Q Good afternoon, Mr. McCormick.

**A Good afternoon.**

Q I'm going to ask you a few questions to follow up on plaintiff's questions of you. Ask you to pull out Exhibit 9, which we looked at earlier today. And turn your attention to the page of that document that is Bates numbered 1443, are the last four digits.

The document is entitled "PMUSA Ad Test (Phase II) Focus Group Results." Do you have the page?

**A My 1443 is this one.**

Q Yes.

**A Entitled "Tar and Nicotine (Onsert)."**

Q Yes, that's the correct page. Mr. Lanham asked you earlier in connection with Exhibit 9, he directed your attention to this page and asked if this focus group that's described in this document was evaluating a tar and nicotine or low tar onsert itself.

Do you remember that question and answer series?

**A I do, and I told him that I didn't believe it did.**

Q Based on your experience when you look at focus group studies, is there typically a section or a summary that describes the types of communications that are being tested in that focus group?

**A You would expect to see, either in some type of overview of methodology or research design, an overview of what was tested and how that -- what it was designed to do. In this instance, in the page that ends in Bates numbers 1431, there's a page called "Research Design."**

Q Yes. You've anticipated my next question. What does that page describe where the communications that were being tested and that were the subject of this focus group report?

**A The description there indicates that groups were first exposed to what are described as campaign**

**rollout ads, which if you look at the timing of this was just prior to rolling out television and radio spots. It specifically, in parentheses, puts no safe in quotes, ACQ in quotes, and non MSA omnibus in quotes. And my belief is that those are references to various executions under those categories.**

**And it describes that respondents were then shown and discussed multiple developed concepts, which again I take to refer to those types of advertising. It lists the ads tested, so it lists specifically that there is a no safe, slash, low tar print ad, a print omnibus ad, two versions of a parent resource center ad, raising kids who don't smoke, something that's called ETS, colon, kids. There another ETS version in parentheses, guided by conclusions. There are two tar and nicotine spots, one tar and nicotine, slash, no safe, and the second spot is described as tar and nicotine, slash, onsert. There are other spots that are we card, no safe, slash, MSA, and a no safe radio spot.**

Q So am I correct that the list of ads that you've read off include a number of TV ads and one radio spot?

**A And it also appears to include two print executions.**

Q And based on the research design of this

study, were they testing onserts?

A They were not testing onserts, they're testing advertising.

Q And one of the ad's titles that you read off was tar and nicotine, slash, onsert?

A That's correct.

Q Going back to Page 1443, is that ad described on that page?

A Not in detail, but at the top page it describes it as an ad -- it says: (as read), The tar and nicotine -- those are in quotes -- ad that included information on the onsert fell out of the mix. So based on my experience in working with advertising, it's not unusual to have two different executions of an ad that you're trying to test.

The label that we would put in parentheses would be -- you would try to distinguish them in some way internally, and that would be the way in which you would distinguish the difference between your television spot that you're calling "no safe" and your television spot that you're calling "onsert." So what this says is it included information in some way, shape, or form on the onsert.

Q If the focus group were testing onserts themselves, as opposed to ads that refer to onserts,

would you expect to see a reference to onserts on the research design page?

MR. LANHAM: Objection, foundation.

A I would expect to see, based on my experience with past documents, the type of information that we were testing to be clarified based on the material. So in this instance, based on my experience, we do not use the words "onsert" in advertising interchangeably. So the use of the word "advertising" leads me to believe, along with the other points that I've mentioned -- and mentioned earlier -- that what we were testing here -- as well as the timing of this -- what we are testing here are concepts of a print, radio, and television campaign that rolled out shortly after that point in time. And as I noted in my affidavit, it began in 2003.

Q I'd like to ask you another question about the TV ads that you just referred to. When did PM USA start showing low tar, no safe cigarette ads on TV?

A The year they began running was 2003.

Q And where did those ads appear?

A They ran nationwide. They were designed to be broad in their reach. As I recall, they ran on a range of prime time programs; at the time it was probably programs like Fear Factor, whatever movie was on the major networks, and a range of cable programs. It

appeared on many of the news broadcasts, both the Today Show, Good Morning America, and I believe also on some of the evening news broadcasts as well.

Q What was the goal of this TV campaign?

A The goal was part of our ongoing efforts to communicate broadly about tobacco issues by incorporating TV into the mix specifically. It enabled you to have a very broad reach in terms of the number of people who were exposed to the message that enabled you to reach both the general public, and then certainly as a subset of that, smokers with information that was interesting to them as well.

(McCormick Deposition Exhibit NO. 18 is marked.)

Q Mr. McCormick, showing you what's been marked as Exhibit 18, which is a two-page document. First page is Bates numbered 3034014029. The second page bears a Bates number of 3007287612. Ask if you have ever seen these two documents before?

A Yes. I would just note that they're two separate documents.

Q Yes, you are correct. I've marked them together because we're going to speak about them

together.

A Okay. Yeah, I've seen them before.

Q Let's look first at the document ending with the Bates number 4029. What is this document?

A What this appears to be is a summary of the extent of our efforts, summarizing the placements that we had in our television, print, and radio campaigns. It lists the end market dates, the markets, and then includes some measures and indexes that look at the reach of those ads and the frequency of those ads.

Q Was this the corporate responsibility ad campaign?

A Yes.

Q Was it for the period June of 2003 through November 13th, 2005?

A The first date I see is June 23, 2003. The last date on this document that we are sticking to is November 13th, 2005. The other document has some different numbers.

Q And did the corporate responsibility television, print, and radio ad campaign include no safe, low tar ads?

A Yes, it did.

Q I just would call your attention to No. 5, and could you tell us what that line of the document is

telling us?

A Sure. What that refers to is the no safe, low tar 30 second television ad, which would have been the most visible, in terms of TV, element of this campaign with that message. This line refers to the fact that it was in market during that period of time from November 17th to December 21st of 2003. It was in market at both the national level, and then on some spot television in the state of California as well.

Q Now, the next three columns I want to ask you about individually. What is the -- do you know what the column that's called "Frequency" refers to?

A It's my understanding that refers to the estimated amount of times that our intended audience is estimated to have seen that ad based on the buy.

Q And what does the column immediately to the left called "A18+ Reach," what does that category refer to?

A What that refers to is the estimated population of those adults who are 18 and over that watch TV that you're estimated to reach with your advertising.

Q So for No. 5, the low tar 30 second ad, what was the frequency that was expected viewers -- the number of times viewers would see the ad?

A We expected that viewers would see that ad approximately 7.6 times, would be the frequency that we were shooting for.

Q What percentage of viewers did you expect to reach?

A Based on the buy, with a national buy, we expected to reach 82 percent of that 18-plus audience from a reach standpoint. So to put that in shorthand to sum it up, we expected to reach 82 percent of the adult television watching audience and have them see this spot on average 7.6 times.

Q And the column immediately to the left of the reach columns labeled "A18+ TRPs," what are TRPs?

A TRPs is a term used in the advertising business, particularly as it relates, in this context, of television. It means total rating points, and it's a measure of your total audience. And I understand that's calculated by multiplying your frequency times your estimated reach. So that number is the result -- the product of those other two factors put together.

Q So it's a product of multiplying 82 percent times 7.6?

A That's my understanding.

Q And the number given for Line No. 5 is 624?

A That's correct.

Q Based on your knowledge of ad campaigns and determining ratings for those campaigns, how do you value this -- evaluate this particular advertisement?

MR. LANHAM: Objection to form.

A I would say based -- let me kind of first describe my experiences in this regard to give a context on which to evaluate my answer. I'll base my response on two things, you know, general involvement in the communications field, and, you know, what is occasional benchmarking against other campaigns and asking questions to gain an understanding of it, as well as conversations I had at the time with those who are involved in planning this -- this campaign.

And at those levels, this is designed to be a campaign that is broad in its reach. It is likely to have a greater frequency than many other campaigns that are out there, but is probably on the lines of some of the more prominent ads that are on TV. And when you look at kind of those rating points for that point in time, it's very significant in its scope, and it's at the higher end of what you would typically expect to see for a television campaign.

Q If you would take a look at No. 11 and tell us what the information on that line is telling us.

A This is -- it says, (as read): No safe,

slash, low tar, slash, REV, which I would interpret as to indicate that it was slightly different from the prior spot; it was a 30 second spot. That spot ran from October 25th to November 28th, 2004, on national TV.

And then if you continue down that column, you had total rating points of 750. A reach estimating that you are reaching eighty-three percent of your adult audience with a frequency of about nine times.

Q So again, you're reaching eighty-three percent of viewers who are viewing that particular ad nine times?

A You would expect that they would see it nine times, yes.

Q And multiplying those two numbers together, the 83 times 9 gives you the 750?

A Gets you roughly the 750, as I understand it.

Q If you would look at the second page of Exhibit 18, which bears the last four digits 7612. And calling your attention to Lines 5 and Lines 11, do those basically contain the same information as we just reviewed on the previous page?

A It includes everything up until the TRP point, but the TRP numbers listed here -- for Line 5 are the same that are listed in the previous page you gave me.

Q So it lists the TRPs, but it does not list the

reach or frequency?

A That's correct.

Q But your understanding is that the TRP is a function of multiplying reach and frequency together?

A And the TRP is the same number that you have here exactly, so that's just a little bit more detail in that first document that was presented to me.

Q Mr. McCormick, Mr. Lanham showed you a document that was marked as Exhibit 5, which was a one-page document. And I noted at the time that it appeared to be part of a document. I would like to show you the entire document and have that marked as Exhibit 19.

(McCormick Deposition Exhibit NO. 19 is marked.)

Q You can take a moment to look at it. Calling your attention to the second page of the document, you testified in response to Mr. Lanham's questions that the onsert program was intended to reach 80 percent of the smokers of the onserted brands. And in fact, is that number referenced on the second page?

A On the second page there's a chart that lists the estimated reach of both the pack onsert and outsert,

as well as media, which in this context -- or the prior page refers to the free-standing insert that's mentioned in my affidavit. The estimated reach for the pack onsert here is listed as 86 percent of Philip Morris low tar adult smokers. The number that's given there is 12.5 million adult smokers, so the 86 number is consistent with my recollection.

And then the media with the free-standing insert, which is a newspaper communication referred to in my affidavit, was estimated to reach 27.8 million adults. On the first page they estimate that that would reach 6.1 million adult smokers. And then based on this analysis, they estimate that eliminating any overlapping -- it looks like they're eliminating any overlap, an additional two percent of Philip Morris low tar smokers are another 300,000, for a total reach for those two communications of about 88 percent of Philip Morris adult low tar smokers. So that would be 12.8 million, and they note their total estimate here is 14.5.

MS. MILBURN: Thank you. That's all I have.

MR. LANHAM: I have a couple of follow-up questions, Mr. McCormick, with regard to Exhibit No. 18.

EXAMINATION BY MR. LANHAM:

Q First of all, do you know whose handwriting is at the bottom of Page 1, which ends with Bates 4029?

A I do not know whose handwriting that is.

Q Okay. I want you to take both pages, and I want you to put them side by side. And Page 2 encompasses the dates of June 2003 to December 3 of 2006. Do see that at the top?

A Page 2, June 2003 to December 3, 2006, yes.

Q And then Page 1 at the top, June 2003 to November 13, 2005. See that?

A I do see that.

Q Now, Line 5 on the first page that you were just questioned about has an end market date of November 17th to December 21, 2003. That is the same end market date as on Page 2, isn't it?

A In Line 5, yes.

Q If you look at Line 11 on Page 1, no safe, slash, low tar, slash, Rev, the end market date is October 25 to November 28th, 2004, and that's the exact same date on Page 2 at Line 11, isn't it?

A Yes, it is.

Q If you look at Page 1, Lines 12 through 21,

there are no more no safe, low tar ads, are there? There are other no safes, but there is no no safe, low tar, correct?

A That specific ad is not listed in Lines 12 through 21.

Q And if you look at Page 2, which takes us through December 3, 2006, Lines 12 through 25; likewise, there are no more no safe, low tar ads, are there?

A That specific ad is not listed there, no.

Q So with regard to the two that you are being questioned about, with regard to line items 1 through 21 on the first page, and Lines 1 through 25 on the second page, there are two no safe, slash, low tar ads, correct?

A That is the description used for those ads, yes.

Q And each -- the first one ran November 17th to December 21 in 2003, right?

A Yes.

Q And the second one ran October 25 to November 28th, 2004, correct?

A That's correct.

Q And so from June 2003 until December 3 of 2006, two-and-a-half-year span, there are two runs for that ad, aren't there?

A For that specific ad. And then the second version of that appears to be slightly different, so they may be two slightly different ads.

Q But that's it for that two-and-a-half-year time frame, isn't it?

A For that specific ad. Again, what I don't know is whether those issues -- the other issues that are general health messages, general smoking cessation messages, what I don't know just from the shorthand here is whether those specifically mentioned low tar cigarettes at all. Some of them reference a no safe message, and all of them direct people back to the website, which was available in this time with extensive information on smoking and health issues and low tar -- including low tar.

Q Some of them reference addiction, causation, and quitting, don't they?

A They do.

Q Others, parent resource center?

A Yes.

Q Others, actions omnibus?

A Yes. Those are the titles for the ads, the internal titles.

Q Another ad, pregnancy, slash, no safe?

A Yes.

Q PRC, slash, raising?

A Yes.

Q What is PRC?

A PRC is the parent resource center.

Q Another one, no safe, slash, ACQ. What does ACQ mean?

A I believe that is shorthand for addiction, causation, and quitting.

Q Another one for PRC, slash, peer review, right?

A The version -- are you looking at Line 10?

Q I am.

A PRC, slash, Peer Pressure.

Q Sorry, I misstated that. That has nothing to do with low tar, does it?

A That's a parent resource center spot.

Q Doesn't have anything to do with low tar, no safe, does it?

A It does not.

Q Line 12, "Access Prevention," right?

A Correct.

Q Line 13, "Access Prevention Revised." They have nothing to do low tar, no safe, do they?

A They probably do not.

Q And Line 14 says "Three Points," what is that

referring to?

A I don't know.

Q Line 21, WTI, slash, Health Effects; what does WTI stand for?

A I don't know.

Q Doesn't have anything to do with no safe, low tar, does it?

A I couldn't say for sure.

Q Okay, fair enough. Now, when you look at Page 2, compare it to Page 1, it takes us beyond the -- let me back up. The end date on Page 1 is November 13th, 2005; do you see that?

A Yes, that's the last date I see on that.

Q And if you look at Page 2, the end date is December 3th, 2006, which is just a little more than an additional year, isn't it?

A Yes.

Q And in that additional year, there's not one single TV ad that was run entitled no safe, slash, low tar, is there?

A As I mentioned earlier, the specific low tar spot that was run earlier was not there. What I can't say for certain is whether the ads that reference health effects or quitting, for example, may have also included reference to that information from a television

standpoint. What I also don't know is whether any of the print spots that ran during that 2005 period of time with serious health effects, they may also have included references to low tar cigarettes, but I don't know for sure.

Q I didn't ask you about print ads, did I?

A You were asking me about advertising, I wanted to make sure I was being responsive to your question.

Q Let me ask the question again: Limiting your answer to TV ads, for that extra -- little more than one year that takes us to that end date of December 3, 2006, there's not a single ad that is listed as no safe, slash low tar?

MS. MILBURN: Objection, asked and answered.

A I did answer that question. There are four more ads, I believe, that are listed there. And as I mentioned, there's a quitting ad and a health effects ad. This specific ad, as I noted, was not running at that period of time, but I could not tell you whether or not a low tar message was included in two of those other ads.

MR. LANHAM: Okay. I have nothing further. Thank you.

AND FURTHER THIS DEPONENT SAITH NOT

MS. MILBURN: During the deposition today there was testimony concerning highly confidential documents, and also such documents were marked as exhibits. So under the protective order, I ask that the whole deposition be deemed highly confidential and ask the court reporter to place a legend on the first page of the transcript --

-- and I will give you the language of the legend and give you a copy as well.

MR. LANHAM: I have to respond to that, and here's what has occurred: I used a document that is what you understand to be highly confidential that we obtained from the litigation website, not as highly confidential but as confidential.

The documents that you provided me today that were the highly confidential documents that I had e-mailed Judy about included one and the same for which I used. So I did not use -- it's the same document, it's the exact same document, but I accessed it initially off of the litigation website as a confidential document.

Then this morning when -- you remember I reviewed these, and I was going through them, I realized that, well, the one that I am going to use here as an

exhibit is already in my stack that is not highly confidential.

Does that -- if that makes sense to you, I'd have to take the position it's not a highly confidential document because it has, by your client's own website, a confidential designation; and therefore, we do not have to term or deem the entire transcript highly confidential.

MS. MILBURN: My position is still that the document is highly confidential. And what I would suggest that we do, given that you say that you found a copy on the website, is keep this transcript highly confidential for the present and see if we can sort out why you were able to find it on the website. But my understanding, it is a highly confidential document, and the testimony about it would be also be highly confidential. So I do want to seal the transcript for that reason.

MR. LANHAM: Can we seal the transcript with regard to the line of questioning that pertained to that particular document and his testimony? That would be very fair until we sort this out. There's no reason to seal the entire transcript when only one item and one line of questioning concerning the one item is at issue. And I'm perfectly agreeable to having that portion of

the transcript sealed for now in order to protect and respect what may be a legitimate issue for you.

MS. MILBURN: I think the protective order speaks to that, and what it says is that there is a period -- the transcript is sealed in its entirety, and then there is a period to do exactly what you've described.

And what I would prefer to do, and what I recommended that we do is we seal it in its entirety, and then we proceed when the process that you described, which is consistent with the protective order, which is narrow any sealing so the entire transcript need not be permanently sealed.

MR. LANHAM: Let me explain on the record why this is important, and I think you know where I'm headed. We have a deadline of March 31st to prepare our opposition. And the way the thing is set up right now is only a select number of lawyers are allowed to have access to highly confidential documents, of which I'm one of them. But there are going to be other lawyers in other law firms that are working on the opposition submission that are not necessarily on that list of lawyers who are entitled to have access to highly confidential documents. And with the days literally running, and here it is March the 12th, and our

opposition is due the 31st, we have to be preparing it ahead of time, we have to circulate drafts, you fully understand how that works. You know, if you can represent to me that we can resolve this without having to prolong it by Monday, by the close of business on Monday, then I will go along with that way of dealing with it.

MS. MILBURN: I will represent to you that we will address this immediately on Monday morning.

MR. LANHAM: Well, you can't beat that. Okay.

MS. MILBURN: What I'm not sure of, and I'm just going through the exhibits, is to determine whether there was only one highly confidential document. I believe there may have been two.

Mr. Lanham, there is just the one document, Exhibit 8, which is highly confidential. And we should be able to resolve this by close of business Monday.

MR. LANHAM: Who do I deal with, you or someone else?

MS. MILBURN: You will in the first instance deal with me, and I will bring my colleague, Judy Bernstein-Gaeta, in on this as well.

MR. LANHAM: Very good. Thank you.

MS. MILBURN: Thank you.

(Deposition was concluded at 3:31 p.m.)

COMMONWEALTH OF VIRGINIA,

CITY/COUNTY OF ________________to-wit:

I, Brendan McCormick, do hereby certify that I have read the foregoing pages of typewritten matter numbered 6 through 162, and that the same contains a true and correct transcription of the deposition given by me on the 12th day of March, 2010, with the exception of the noted corrections, to the best of my knowledge and belief.

______________________ ______________________

Date Brendan McCormick

Subscribed and sworn to before me this _____ day of ________________________, 2010.

My commission expires______________________

______________

Notary Public

Registration No. ______________

COMMONWEALTH OF VIRGINIA,

CITY OF RICHMOND, to wit:

I, Christina S. Brown, CCR, a Notary Public for the State of Virginia at Large, do hereby certify that the foregoing deposition of BRENDAN MCCORMICK was duly sworn to before me at the time and place set out in the caption hereto.

Further, that the transcript of the deposition is true and correct, and that there were 19 exhibits filed with me during the taking hereof.

Given under my hand this 17th day of March, 2010.

Christina S. Brown, CCR
Notary Public for the
State of Virginia at Large

My Commission expires:
June 30, 2010
Notary No. 269323