# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| IN RE:  LIGHT CIGARETTES MARKETING SALES PRACTICES LITIGATION | ) ) ) ) ) | **MDL Docket No.: 1:09-MD-2068** |
| This document relates to: | ) ) | |

|  |  |  |
|---|---|---|
| **LEONARDO BIUNDO,** | ) ) ) | |
| **Plaintiff,** | ) | **Case No. 09CV00118 [N.D. Ill.]** |
| v. | ) ) | |
| **PHILIP MORRIS USA INC. and ALTRIA GROUP, INC.,** | ) ) ) | |
| **Defendants;** | ) ) | |

|  |  |  |
|---|---|---|
| **STEPHANIE GOOD, LORI A. SPELLMAN, and ALLAIN L. THIBODEAU,** | ) ) ) ) | |
| **Plaintiffs,** | ) | **Case No. 1:05CV00127 [D. Me.]** |
| v. | ) ) | |
| **PHILIP MORRIS USA INC. and ALTRIA GROUP, INC.,** | ) ) ) | |
| **Defendants;** | ) ) | |

|  |  |  |
|---|---|---|
| **ALEXANDER SLATER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.  09CV02145 [D.D.C.]** |
| **v.** | ) | |
| | ) | |
| **PHILIP MORRIS USA INC. and ALTRIA GROUP, INC.,** | ) | |
| | ) | |
| **Defendants;** | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| **MILES TYRER,** | ) | |
| | ) | |
| **Plaintiff** | ) | **Case No. 1:09CV00427 [S.D. Cal.]** |
| **v.** | ) | |
| | ) | |
| **PHILIP MORRIS USA INC. and ALTRIA GROUP, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# DEFENDANTS' OPPOSITION TO
## <u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................6

I.    The Development Of The FTC Method
For Measuring Tar And Nicotine Yields ...................................................................6

II.    Evolving Concerns About Compensation
And The Ultimate Abandonment Of The FTC Method........................................9

III.    PM USA's Development And Sale Of Light
Cigarettes And Disclosures To Consumers ...................................................11

ARGUMENT ...................................................................................................................13

I.    Plaintiffs Bear The Burden Of Demonstrating With Proofs
(Not Allegations) That These Cases Can Be Tried As Class Actions ..............................13

II.    Individual Issues Predominate Over
Common Issues Defeating Class Certification ...................................................15

    A.    Whether The Alleged Deceptive Statement To A
Class Member Was True Because He Or She Received
What Was Allegedly Promised Requires Individual Proof ...............................18

        1.    Each Class Member Must Demonstrate
The Falsity Of A Statement To Him Or Her
By Showing A Personal Failure To Receive
Less Tar And Nicotine From Each Light Cigarette ...............................18

            a.    Illinois Consumer Fraud And Deceptive
Practices Act (ICFA) (At Issue In *Biundo*) ...................................19

            b.    California's Consumer Legal
Remedies Act (CLRA) And Unfair
Competition Law (UCL) (At Issue In *Tyrer*)................................19

            c.    D.C. Consumer Protection And
Procedures Act (CPPA) (At Issue In *Slater*)................................20

            d.    Unjust Enrichment (At Issue In *Biundo*
(Illinois), *Slater* (D.C.), And *Good* (Maine))................................21

i

2.       Many Light Smokers Received Less
Tar And Nicotine From Their Cigarettes ....................................................22

B.      Whether Each Class Member Suffered An
Injury Is A Predominating Individual Issue ................................................29

      1.       Each Alleged Claim Requires Proof Of An
Injury Resulting From The Alleged Misconduct .......................................30

           a.     ICFA (At Issue In *Biundo* (Illinois)) ...............................................30

           b.     CLRA /UCL (At Issue In *Tyrer* (California)) ...............................30

                 (i)     California Law Requires Each Class
Member To Prove Injury To Obtain
Monetary Relief Under the UCL ......................................31

                 (ii)    Article III and Rule 23
Independently Forbid The Assertion Of
These Claims Without Proof Of Injury ...........................33

           c.     CPPA (At Issue In *Slater* (D.C.)) ..................................................36

           d.     Unjust Enrichment (At Issue In *Biundo*
(Illinois), *Slater* (D.C.), And *Good* (Maine)) ...............................39

      2.       Plaintiffs Have Failed To Offer A
Viable Means Of Establishing Common Injury ........................................40

C.      Individual Proof Of Causation Would Be
Required Due To Different Beliefs About
And Reasons For Purchasing Light Cigarettes .......................................44

      1.       Each Claim Requires Proof That Each
Class Member Was Deceived By The Alleged
Misrepresentations And Purchased Lights As A Result ...........................44

           a.     IFCA (At Issue In *Biundo* (Illinois)) ............................................45

           b.     CLRA/UCL (At Issue In *Tyrer* (California)) ................................46

           c.     CPPA (At Issue In *Slater* (D.C.)) ..................................................49

d.      Unjust Enrichment (At Issue In *Biundo* (Illinois), *Slater* (D.C.), And *Good* (Maine)) .............................50

2.      Class Members Have Different Beliefs About And Reasons for Purchasing Light Cigarettes ..........................51

D.      Defendants' Affirmative Defenses Present Individual Issues Defeating Class Certification.....................................59

1.      Statute Of Limitations..............................................................59

2.      Voluntary Payment Doctrine ..................................................64

III.    A Class Action Is Not A Superior Method Of Resolving Plaintiffs' Claims ..................66

A.      Class-Wide Trials Of Plaintiffs' Claims Would Be Unmanageable ..................66

B.      Plaintiffs Offer No Justification For Ignoring These Manageability Problems ...............................................70

IV.     Plaintiffs' Proposed Class Representatives Are Inadequate ...............................................72

CONCLUSION..................................................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Aiello v. Providian Fin. Corp.*,
   239 F.3d 876 (7th Cir. 2001) ...................................................................................66

*Allison v. Citgo Petroleum Corp.*,
   151 F.3d 402 (5th Cir. 1998) ..................................................................................69

*Allstate Ins. Co. v. Mel Rapton, Inc.*,
   92 Cal. Rptr. 2d 151 (Ct. App. 2000) .....................................................................73

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................................................28

*Aspinall v. Philip Morris Cos. Inc.*,
   813 N.E.2d 476 (Mass. 2004) ...........................................................................28, 38

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   835 N.E.2d 801 (Ill. 2005)................................................................................19, 45

*Bakalar v. Vavra*,
   237 F.R.D. 59 (S.D.N.Y. 2006) ..............................................................................69

*Bank of the West v. Super. Ct.*,
   833 P.2d 545 (Cal. 1992) .................................................................................33, 43

*Banks v. District of Columbia Dep't of Consumer & Regulatory Affairs*,
   634 A.2d 433 (D.C. 1993) .......................................................................................37

*Barbara's Sales, Inc. v. Intel Corp.*,
   879 N.E.2d 910 (Ill. 2007)......................................................................................45

*Barnes v. Am. Tobacco Co.*,
   161 F.3d 127 (3d Cir. 1998).......................................................................... 17, 28-29

*Beck v. Test Masters Educ. Servs., Inc.*,
   2010 WL 322242 (D.D.C. 2010) .................................................................. 16-17, 37

*Bell Atl. Corp. v. AT&T Corp.*,
   339 F.3d 294 (5th Cir. 2003) ..................................................................................66

*Benedict v. Altria Group, Inc.*,
   241 F.R.D. 668 (D. Kan. 2007)....................................................................... passim

*Bennett v. Shahhal*,
   89 Cal. Rptr. 2d 272 (Ct. App. 1999) ...................................................................63

*Bethany Med. Ctr. v. Harder*,
   693 F. Supp. 968 (D. Kan. 1988).........................................................................17

*Birdsong v. Apple, Inc.*,
   590 F.3d 955 (9th Cir. 2009) ...............................................................19-20, 32-33

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ...............................................................................15

*Blair v. Nevada Landing Partnership, RBG, LP*,
   859 N.E.2d 1188 (Ill. App. Ct. 2006) ..................................................................64

*Boeken v. Philip Morris Inc.*,
   26 Cal. Rptr. 3d 638 (Ct. App. 2005) ..................................................................48

*Bozzuto v. Ouellette*,
   408 A.2d 697 (Me. 1979)................................................................................60, 64

*Buckland v. Threshold Enters., Ltd.*,
   66 Cal. Rptr. 3d 543 (Ct. App. 2007) .......................................................19, 30, 31

*Buford v. H & R Block, Inc.*,
   168 F.R.D. 340 (S.D. Ga. 1996) ..........................................................................15

*Carfagno ex rel. Centerline Holding Co. v. Schnitzer*,
   591 F. Supp. 2d 630 (S.D.N.Y. 2008)..................................................................31

*Caro v. Proctor & Gamble Co.*,
   22 Cal. Rptr. 2d 419 (Ct. App. 1993) ..................................................................46

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) .....................................................................15, 51, 71

*Cevenini v. Archbishop of Wash.*,
   707 A.2d 768 (D.C. 1998) ...................................................................................60

*Chamberlan v. Ford Motor Co.*,
   369 F. Supp. 2d 1138 (N.D. Cal. 2005) ...............................................................60

*Chin v. Chrysler Corp.*,
   182 F.R.D. 448 (D.N.J. 1998)..............................................................................71

*Clay v. Am. Tobacco Co.*,
   188 F.R.D. 483 (S.D. Ill. 1999) .....................................................................58, 73

*Cleary v. Philip Morris USA Inc.*,
 __ F.R.D. ___, 2010 WL 680957 (N.D. Ill. 2010)......................................................... passim

*Cocca v. Philip Morris Inc.*,
 2001 WL 34090200 (Ariz. Super. Ct. 2001) ..........................................................2, 25, 58, 68

*Coffin v. Bowater Inc.*,
 228 F.R.D. 397 (D. Me. 2005) ...................................................................................13

*Cohen v. DIRECTV, Inc.*,
 101 Cal. Rptr. 3d 37 (Ct. App. 2009) ....................................................................33, 46, 48

*Colgan v. Leatherman Tool Group, Inc.*,
 38 Cal. Rptr. 3d 36 (Ct. App. 2006) ......................................................................30

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,
 673 P.2d 660 (Cal. 1983) ........................................................................................33

*Consumers for Affordable Health Care v. Superintendent of Ins.*,
 2001 WL 1794974 (Me. Super. Ct. 2001) ..............................................................43

*Corbett v. Super. Ct.*,
 125 Cal. Rptr. 2d 46 (Ct. App. 2002) .....................................................................43

*Correa v. Pecos Valley Devel. Corp.*,
 617 P.2d 767 (Ariz. Ct. App. 1980)........................................................................50

*Cortez v. Purolator Air Filtration Prods. Co.*,
 999 P.2d 706 (Cal. 2000) ........................................................................................59

*Craft v. Philip Morris Cos. Inc.*,
 190 S.W.3d 368 (Mo. Ct. App. E.D. 2005) ...........................................................23

*Craft v. Philip Morris Cos. Inc.*,
 2003 WL 23355745 (Mo. Cir. Ct. 2003) ...............................................................23

*Crosby v. Soc. Sec. Admin.*,
 796 F.2d 576 (1st Cir. 1986)...................................................................................69

*Crowe v. Tull*,
 126 P.3d 196 (Colo. 2006)......................................................................................50

*Ctr. for Sci. in the Pub. Interest v. Burger King Corp.*,
 534 F. Supp. 2d 141 (D.D.C. 2008).......................................................................37

*Davies v. Philip Morris USA Inc.*,
 2006 WL 1600067 (Wash. Super. Ct. 2006) .....................................................2, 47, 52, 68

*De Bouse v. Bayer AG,*
    922 N.E.2d 309 (Ill. 2009) ..................................................................45

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006)..............................................................35

*Dhamer v. Bristol-Myers Squibb Co.,*
    183 F.R.D. 520 (N.D. Ill. 1998)........................................................29

*Dionne v. Bouley,*
    757 F.2d 1344 (1st Cir. 1985)...........................................................17

*Dugan v. Martel,*
    588 A.2d 744 (Me. 1991)...................................................................64

*Eisenberg v. Gagnon,*
    766 F.2d 770 (3d Cir. 1985)...............................................................15

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003)...............................................................45

*Emig v. Am. Tobacco Co.,*
    184 F.R.D. 379 (D. Kan. 1998)..........................................................29

*Endres v. Wells Fargo Bank,*
    2008 WL 344204 (N.D. Cal. 2008) ...................................................65

*Evans v. Lasco Bathware, Inc.,*
    101 Cal. Rptr. 3d 354 (Ct. App. 2009) ..............................................66

*Everest v. Leviton Mfg. Co.,*
    2006 WL 381832 (Me. Super. Ct. 2006) ...........................................51

*Feinstein v. Firestone Tire & Rubber Co.,*
    535 F. Supp. 595 (S.D.N.Y. 1982) ....................................................73

*Feitler v. Animation Celection, Inc.,*
    13 P.3d 1044 (Or. Ct. App. 2000)......................................................50

*Fletcher v. Sec. Pac. Nat'l Bank,*
    591 P.2d 51 (Cal. 1979) .....................................................................33

*Frederickson v. Blumenthal,*
    648 N.E.2d 1060 (Ill. App. Ct. 1995) ...............................................59

*Gariety v. Grant Thornton, LLP,*
    368 F.3d 356 (4th Cir. 2004) .............................................................14

*Gawry v. Countrywide Home Loans, Inc.*,
    640 F. Supp. 2d 942 (N.D. Ohio 2009)................................................................65

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)...............................................................................................13

*Gilles v. Ware*,
    615 A.2d 533 (D.C. 1992) .....................................................................................73

*Gintis v. Bouchard Transp. Co.*,
    596 F.3d 64 (1st Cir. 2010)...................................................................................13

*Golla v. Gen. Motors Corp.*,
    657 N.E.2d 894 (Ill. 1995)....................................................................................64

*Good v. Altria Group, Inc.*,
    436 F. Supp. 2d 132 (D. Me. 2006),
    *rev'd on other grounds*, 501 F.3d 29 (1st Cir. 2007),
    *aff'd*, 129 S. Ct. 538 (2008) ......................................................................... passim

*Grayson v. AT&T Corp.*,
    980 A.2d 1137 (D.C. 2009) ..................................................................................37

*Griffith v. Barnes*,
    560 F. Supp. 2d 29 (D.D.C. 2008)...........................................................39, 43, 51

*Grimes v. Rave Motion Pictures Birmingham, L.L.C.*,
    264 F.R.D. 659 (N.D. Ala. 2010)..........................................................................67

*Hamilton v. O'Connor Chevrolet, Inc.*,
    2006 WL 1697171 (N.D. Ill. 2006) .......................................................................71

*Hammett v. Am. Bankers Ins. Co. of Fla.*,
    203 F.R.D. 690 (S.D. Fla. 2001)...........................................................................71

*Harshbarger v. Philip Morris, Inc.*,
    2003 WL 23342396 (N.D. Cal. 2003) ...................................................................63

*Hershenow v. Enter. Rent-A-Car Co.*,
    840 N.E.2d 526 (Mass. 2006) ...............................................................................38

*Howard's Rexall Stores, Inc. v. Aetna U.S. Healthcare, Inc.*,
    2001 WL 501055 (D. Me. 2001) ...........................................................................51

*Hoyte v. Yum! Brands, Inc.*,
    489 F. Supp. 2d 24 (D.D.C. 2007).........................................................................37

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
   545 N.E.2d 672 (Ill. 1989) ...................................................................50

*Hurtado v. Purdue*,
   2005 WL 192351 (N.Y. Sup. Ct. 2005) ...............................................29

*IMS Health Inc. v. Ayotte*,
   550 F.3d 42 (1st Cir. 2008) ..................................................................34

*In re Baycol Prods. Litig.*,
   218 F.R.D. 197 (D. Minn. 2003) .....................................................21-22

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 326 (E.D. Mich. 2001) .......................................................39

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
   261 F. Supp. 2d 188 (E.D.N.Y. 2003) ..................................................61

*In re Estate of Miller*,
   960 A.2d 1140 (Me. 2008) ....................................................................60

*In re Firearm Cases*,
   24 Cal. Rptr. 3d 659 (Ct. App. 2005) ..................................................47

*In re Gen. Motors Corp., "Piston Slap" Prods. Liab. Litig.*,
   2006 WL 1049259 (W.D. Okla. 2006) ..................................................71

*In re Hotel Tel. Charges*,
   500 F.2d 86 (9th Cir. 1974) ...........................................................66, 70

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ...........................................................13, 14

*In re Initial Pub. Offerings Secs. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ...................................................................13

*In re K.S.*,
   850 N.E.2d 335 (Ill. App. Ct. 2006) ....................................................46

*In re LifeUSA Holding Inc.*,
   242 F.3d 136 (3d Cir. 2001) .................................................................58

*In re NCAA I-A Walk-On Football Players Litig.*,
   2006 WL 1207915 (W.D. Wash. 2006) .................................................71

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .............................................................. passim

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    588 F.3d 24 (1st Cir. 2009) ..........................................................................69

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
    214 F.R.D. 614 (W.D. Wash. 2003) ...........................................................67, 69

*In re Polymedica Corp. Sec. Litig.*,
    432 F.3d 1 (1st Cir. 2005) ............................................................................13

*In re Repetitive Stress Injury Litig.*,
    11 F.3d 368 (2d Cir. 1993)............................................................................70

*In re Rezulin Prods. Liab. Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002) ....................................................................22

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
    2007 WL 4287511 (N.D. Ill. 2007) ..............................................................50

*In re St. Jude Med., Inc.*,
    522 F.3d 836 (8th Cir. 2008) ........................................................................47

*In re Steroid Hormone Prod. Cases*,
    104 Cal. Rptr. 3d 329 (Ct. App. 2010) ........................................................33

*In re Terazosin Hydrochloride Antitrust Litig.*,
    220 F.R.D. 672 (S.D. Fla. 2004).....................................................................39

*In re Tobacco II Cases*,
    207 P.3d 20 (Cal. 2009) ....................................................................... passim

*In re Tobacco Cases II*,
    2004 WL 2445337 (Cal. Super. Ct. 2004), *tentatively vacated on other grounds*,
    *In re Tobacco Cases II*, Civ. No. JCCP4042 (Cal. Super. Ct. Mar. 11, 2010) .......................24

*In re Vioxx Class Cases*,
    103 Cal. Rptr. 3d 83 (Ct. App. 2009) .......................................................... passim

*Indep. Trust Corp. v. Fidelity Nat'l Title Ins. Co. of N.Y.*,
    577 F. Supp. 2d 1023 (N.D. Ill. 2008) ...................................................... 50-51

*Kamm v. Cal. City Dev. Co.*,
    509 F.2d 205 (9th Cir. 1975) ........................................................................71

*Keating v. Philip Morris Inc.*,
    417 N.W.2d 132 (Minn. Ct. App. 1987).......................................................66

*Kelly v. Sears Roebuck & Co.*,
    720 N.E.2d 683 (Ill. App. Ct. 1999) ............................................................19

x

*Kiefer v. Rust-Oleum Corp.*,
   916 N.E.2d 22 (Ill. App. Ct. 2009) ......................................................................72

*Knox Coll. v. Celotex Corp.*,
   430 N.E.2d 976 (Ill. 1981) ..................................................................................60

*Korea Supply Co. v. Lockheed Martin Corp.*,
   63 P.3d 937 (Cal. 2003) ............................................................................ passim

*Koronthaly v. L'Oreal USA, Inc.*,
   2010 WL 1169958 (3d Cir. 2010)........................................................................35

*Kraus v. Trinity Mgmt. Serv., Inc.*,
   999 P.2d 718 (Cal. 2000) .........................................................................32, 36, 47

*Krueger v. Wyeth, Inc.*,
   2008 WL 481956 (S.D. Cal. 2008) ......................................................................73

*Kwaak v. Pfizer, Inc.*,
   881 N.E.2d 812 (Mass. Ct. App. 2008) ..............................................................58

*Learner v. Marvin Lumber & Cedar Co.*,
   2008 WL 5285028 (D.N.H. 2008) .......................................................................52

*Lindsey v. Normet*,
   405 U.S. 56 (1972)...............................................................................................66

*Little Caesar Enter., Inc. v. Smith*,
   172 F.R.D. 236 (E.D. Mich. 1997) ......................................................................15

*Lloyd v. Gen. Motors Corp.*,
   916 A.2d 257 (Md. 2007) ....................................................................................50

*Ludke v. Philip Morris Cos. Inc.*,
   2001 WL 1673791 (Minn. Dist. Ct. 2001) ..........................................................67

*Luedke v. Delta Air Lines, Inc.*,
   1993 WL 313577 (S.D.N.Y. 1993).......................................................................68

*Luna v. A.E. Eng'g Servs., LLC*,
   938 A.2d 744 (D.C. 2007) ...................................................................................38

*MacDonald v. Texaco, Inc.*,
   713 S.W.2d 203 (Tex. Ct. App. 1986) .................................................................50

*Makuc v. Am. Honda Motor Co.*,
   835 F.2d 389 (1st Cir. 1987)................................................................................13

*Mank ex rel. Hannaford Health Plan v. Green*,
   297 F. Supp. 2d 297 (D. Me. 2003) ...................................................................43

*Martin v. Home Depot USA, Inc.*,
   225 F.R.D. 198 (W.D. Tex. 2004) ...................................................................73

*Mass. Mut. Life Ins. Co. v. Super. Ct.*,
   119 Cal. Rptr. 2d 190 (Ct. App. 2002) ...........................................................46

*Mayo v. Sears, Roebuck & Co.*,
   148 F.R.D. 576 (S.D. Ohio 1993) ...................................................................71

*McAdams v. Monier, Inc.*,
   105 Cal. Rptr. 3d 704 (Ct. App. 2010) .....................................................33, 46

*McInnis-Misenor v. Me. Med. Ctr.*,
   319 F.3d 63 (1st Cir. 2003) .............................................................................34

*McKnight v. Ideal Mut. Ins. Co.*,
   534 F. Supp. 362 (N.D. Tex. 1982) ................................................................28

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008).................................................................... passim

*Me. People's Alliance v. Holtrachem Mfg. Co.*,
   211 F. Supp. 2d 237 (D. Me. 2002) ................................................................34

*Meyer v. Sprint Spectrum L.P.*,
   200 P.3d 295 (Cal. 2009) .................................................................................59

*Miller v. Lakeside Vill. Condo. Assoc., Inc.*,
   2 Cal. Rptr. 2d 796 (Ct. App. 1991) ...............................................................63

*Millett v. Atl. Richfield Co.*,
   2000 WL 359979 (Me. Super. Ct. 2000) ........................................................73

*Morgan v. AT&T Wireless Servs., Inc.*,
   99 Cal. Rptr. 3d 768 (Ct. App. 2009) .............................................................19

*Mulford v. Altria Group, Inc.*,
   242 F.R.D. 615 (D.N.M. 2007)............................................................. passim

*Mulford v. Altria Group, Inc.*,
   506 F. Supp. 2d 733 (D.N.M. 2007) ...............................................................12

*Mulligan v. QVC, Inc.*,
   888 N.E.2d 1190 (Ill. App. Ct. 2008) ........................................................30, 41

*Murray v. Motorola, Inc.*,
   982 A.2d 764 (D.C. 2009) ............................................................................38

*Murray v. Wells Fargo Home Mortgage*,
   953 A.2d 308 (D.C. 2008) ............................................................................59

*Nelson v. Greater Gadsden Hous. Auth.*,
   802 F.2d 405 (11th Cir. 1986) ......................................................................70

*Newman v. RCN Telecom Servs., Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ....................................................................65

*News World Commc'ns, Inc. v. Thompsen*,
   878 A.2d 1218 (D.C. 2005) ..........................................................................50

*Nixon v. Alan Vester Auto Group, Inc.*,
   2009 WL 382743 (M.D.N.C. 2009).............................................................50

*O'Neil v. Simplicity*,
   574 F.3d 501 (8th Cir. 2009) ........................................................................21

*Oliveira v. Amoco Oil Co.*,
   776 N.E.2d 151 (Ill. 2002)............................................................................45

*Oliver v. R.J. Reynolds Tobacco Co.*,
   2000 WL 33598654 (Pa. Ct. Common Pleas 2000)...........................2, 25, 68

*Osbourne v. Capital City Mortgage Corp.*,
   667 A.2d 1321 (D.C. 1995) ..........................................................................37

*Oshana v. Coca-Cola Co.*,
   225 F.R.D. 575 (N.D. Ill. 2005), *aff'd*, 472 F.3d 506 (7th Cir. 2006) ........... passim

*Oshana v. Coca-Cola Co.*,
   2005 WL 1661999 (N.D. Ill. 2005) ..............................................................43

*Overka v. Am. Airlines, Inc.*,
   265 F.R.D. 14 (D. Mass. 2010)..............................................................39, 50

*Pattillo v. Schlesinger*,
   625 F.2d 262 (9th Cir. 1980) ........................................................................71

*Pearl v. Allied Corp.*,
   102 F.R.D. 921 (E.D. Pa. 1984)....................................................................73

*Pearson v. Philip Morris Inc.*,
   2006 WL 663004 (Or. Cir. Ct. 2006)............................................................ passim

*Perez v. Metabolife Int'l, Inc.*,
   218 F.R.D. 262 (S.D. Fla. 2003) ...................................................................68, 69

*Pfizer, Inc. v. Super. Ct.*,
   105 Cal. Rptr. 3d 795 (Ct. App. 2010) ...................................................................48

*Philip Morris Inc. v. Angeletti*,
   752 A.2d 200 (Md. 2000) ...................................................................29

*Philip Morris USA Inc. v. Hines*,
   883 So. 2d 292 (Fla. Ct. App. 2003) ...........................................................2, 25, 52

*Pokrass v. DIRECTV Group, Inc.*,
   2008 WL 2897084 (C.D. Cal. 2008) ................................................................ 46-47

*Poulos v. Caesars World, Inc.*,
   379 F.3d 654 (9th Cir. 2004) ...................................................................47, 51

*Price v. Philip Morris Inc.*,
   848 N.E.2d 1 (Ill. 2005) ..............................................................2, 29, 46, 54

*Price v. Philip Morris Inc.*,
   2003 WL 22597608 (Ill. Cir. Ct. 2003) ................................................................ 45-46

*Princess Cruise Lines, Ltd. v. Super. Ct.*,
   101 Cal. Rptr. 3d 323 (Ct. App. 2009) ...................................................................46

*Prohias v. Pfizer, Inc.*,
   485 F. Supp. 2d 1329 (S.D. Fla. 2007) ...................................................................35

*Ramirez v. DeCoster*,
   194 F.R.D. 348 (D. Me. 2000) ...................................................................16, 17

*Randazzo v. Harris Bank Palatine, N.A.*,
   262 F.3d 663 (7th Cir. 2001) ...................................................................64

*Regnery v. Meyers*,
   679 N.E.2d 74 (Ill. App. Ct. 1997) ...................................................................43

*Remsen Partners, Ltd. v. Stephen A. Goldberg Co.*,
   755 A.2d 412 (D.C. 2000) ...................................................................43

*Ries v. Humana Health Care Plan, Inc.*,
   1995 WL 669583 (N.D. Ill. 1995) ...................................................................21

*Rivera v. Wyeth-Ayerst Labs.*,
   283 F.3d 315 (5th Cir. 2002) ...................................................................21, 34

*Rule v. Fort Dodge Animal Health, Inc.*,
    604 F. Supp. 2d 288 (D. Mass. 2009) ...................................................................38

*Sandwich Chef of Tex., Inc., v. Reliance Nat'l Indem. Ins. Co.*,
    319 F.3d 205 (5th Cir. 2003) ...................................................................14, 47, 66

*Sanneman v. Chrysler Corp.*,
    191 F.R.D. 441 (E.D. Pa. 2000).........................................................................71

*Schnall v. AT&T Wireless Servs., Inc.*,
    225 P.3d 929 (Wash. 2010).........................................................................50, 65

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    130 S. Ct. 1431, 2010 WL 1222272 (2010).........................................................35

*Shannon v. Boise Cascade Corp.*,
    805 N.E.2d 213 (Ill. 2004).................................................................................45

*Shaw v. Marriott Int'l Inc.*,
    474 F. Supp. 2d 141 (D.D.C. 2007)....................................................................64

*Sikes v. Teleline, Inc.*,
    281 F.3d 1350 (11th Cir. 2002) .........................................................................47

*Small v. Lorillard Tobacco Co.*,
    679 N.Y.S.2d 593 (N.Y. App. Div. 1998) ......................................................29, 73

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003).................................................................................15

*Snapp & Assocs. Ins. Servs., Inc. v. Malcolm Bruce Burlingame Robertson*,
    117 Cal. Rptr. 331 (Ct. App. 2002)....................................................................60

*Solomon v. Bell Atl. Corp.*,
    777 N.Y.S.2d 50 (N.Y. App. Div. 2004) .............................................................65

*State v. McLeod*,
    2003 WL 1711657 (Me. Super. Ct. 2003) ...........................................................43

*Stern v. Philip Morris USA Inc.*,
    2007 WL 4841057, slip op. (N.J. Super. Ct. 2007) ..................................... passim

*Su Yeun Kim v. Carter's Inc.*,
    598 F.3d 362 (7th Cir. 2010) .............................................................................30

*Summers v. Earth Island Inst.*,
    129 S. Ct. 1142 (2009)......................................................................................34

*Szabo v. Bridgeport Machs. Inc.*,
   249 F.3d 672 (7th Cir. 2001) ...........................................................................14

*Tardiff v. Knox County*,
   365 F.3d 1 (1st Cir. 2004)..............................................................................14

*Thibeault v. Brackett*,
   938 A.2d 27 (Me. 2007)..................................................................................50

*Toomey v. Cammack*,
   345 A.2d 453 (D.C. 1975) ..............................................................................64

*Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*,
   955 F.2d 67 (D.C. Cir. 1992).........................................................................43

*United States Dep't of Justice v. Landano*,
   508 U.S. 165 (1993).......................................................................................47

*United States v. Philip Morris USA Inc.*,
   449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in part, vacated in part*,
   566 F.3d 1095 (D.C. Cir. 2009) (petitions for *certiorari* pending) ...........52

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982).......................................................................................34

*Vasquez v. Super. Ct.*,
   484 P.2d 964 (Cal. 1971) ...............................................................................47

*Verb. v. Motorola, Inc.*,
   672 N.E.2d 1287 (Ill. App. Ct. 1996) ............................................................19

*Vila v. Inter-Am. Inv., Corp.*,
   570 F.3d 274 (D.C. Cir. 2009)........................................................................59

*Vuyanich v. Republic Nat'l Bank of Dallas*,
   723 F.2d 1195 (5th Cir. 1984). ......................................................................36

*Vuyanich v. Republic Nat'l Bank of Dallas*,
   82 F.R.D. 420 (N.D. Tex. 1979) ....................................................................36

*W. States Wholesale, Inc. v. Synthetic Indus., Inc.*,
   206 F.R.D. 271 (C.D. Cal. 2002) ...................................................................73

*Wachtel v. Guardian Life Ins. Co. of Am.*,
   453 F.3d 179 (3d Cir. 2006)...........................................................................69

*Waldman v. Vill. of Kiryas Joel*,
   207 F.3d 105 (2d Cir. 2000)...........................................................................73

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ............................................................14, 16, 69

*Weinberg v. Sun Co.*,
    777 A.2d 442 (Pa. 2001) ............................................................................50

*Weinstat v. Dentsply Int'l, Inc.*,
    103 Cal. Rptr. 3d 614 (Ct. App. 2010) ......................................................33

*Wells v. Allstate Ins. Co.*,
    210 F.R.D. 1 (D.D.C. 2002) ........................................................................49

*Whiteley v. Philip Morris Inc.*,
    11 Cal. Rptr. 3d 807 (Ct. App. 2004) ........................................................48

*Whiting v. AARP*,
    __ F. Supp. 2d ___, 2010 WL 1189791 (D.D.C. 2010) ........................20, 21

*Wiegand v. Walser Auto. Groups, Inc.*,
    683 N.W.2d 807 (Minn. 2004) ....................................................................50

*Wiener v. Dannon Co.*,
    255 F.R.D. 658 (C.D. Cal. 2009) ..........................................................30, 41

*Williams v. Mohawk Indus. Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ..................................................................35

*Williams v. Purdue Pharma Co.*,
    297 F. Supp. 2d 171 (D.D.C. 2003) ..................................................... passim

**STATUTES**

815 ILCS § 505/7 ..................................................................................71, 72

815 ILCS § 505/10a ..............................................................................59, 71

14 M.R.S.A. § 752 ........................................................................................60

Cal. Bus. & Prof. Code § 17203 ..................................................................31

Cal. Bus. & Prof. Code § 17208 ..................................................................59

Cal. Civ. Code § 1780 ..................................................................................71

Cal. Civ. Code § 1783 ..................................................................................59

D.C. Code § 12-301 ......................................................................................59

D.C. Code § 28-3905 ................................................................37, 59, 67, 71

Pub. L. No. 111-31, 123 Stat. 1776 (June 22, 2009) ....................................................................11

**OTHER AUTHORITIES**

51 Am. Jur. 2d *Limitations of Actions* § 167 (2004).......................................................................63

Sheila Scheuerman, The Consumer Fraud Class Action:  Reining In Abuse By Requiring
    Plaintiffs To Allege Reliance As An Essential Element, 43 Harv. J. Legis. 1 (2006).............50

Restatement of Restitution § 3. ......................................................................................................39

Fed. R. Civ. P. 23 .................................................................................................................. passim

## INTRODUCTION

Plaintiffs seek to certify classes consisting of millions of individuals in four jurisdictions (California, Illinois, Maine, and the District of Columbia) who purchased light cigarettes[1] manufactured by Philip Morris USA Inc. (PM USA). Plaintiffs do not sue for illnesses suffered as a result of smoking. They instead assert claims of economic injury under consumer protection statutes or unjust enrichment doctrines.[2] Their claims rest on allegations that defendants acted wrongfully by representing that light cigarettes would deliver less tar and nicotine (and thus be safer) than full-flavored cigarettes. There is no dispute about two critical points of comparison between light cigarettes and their full-flavored counterparts: (1) light cigarettes, as purchased, measure lower in tar and nicotine according to the Federal Trade Commission's (FTC) testing methodology that was in place through 2008, and (2) light and full-flavored cigarettes have always been priced the same. Plaintiffs nevertheless assert that they suffered an economic loss because putative class members smoked light cigarettes in a way (*e.g.*, taking more or deeper puffs or smoking more cigarettes) that caused them to receive as much tar and nicotine as they would have from full-flavored cigarettes.

Courts across the country have rejected certification of lights classes. Every decision addressing class certification over the last four years – seven in all, including the Second Circuit – has concluded that economic loss claims based on the purchase of light cigarettes cannot be tried on a class-wide basis because they do not satisfy Rule 23's predominance or typicality

---

[1]   Defendants use "light cigarettes" to refer to brands of cigarettes bearing the descriptors "Lights" or "Ultra-Lights," as well as other low tar brands at issue here.

[2]   Plaintiffs in *Biundo* assert claims under the Illinois Consumer Fraud and Deceptive Practices Act, and based on Illinois unjust enrichment law. Plaintiffs in *Tyrer* assert claims under California's Consumer Legal Remedies Act, the California Unfair Competition Law, and the California False Advertising Law. Plaintiffs in *Slater* assert claims under the D.C. Consumer Protection and Procedures Act, and based on D.C. unjust enrichment law. Plaintiffs in *Good* seek certification only for unjust enrichment claims under Maine law.

requirements.[3]  Certification in fact has been rejected in every lights case pending in federal

court.  And these decisions add to the overwhelming precedent – including 57 decisions

involving PM USA – rejecting class certification in smoking and health cases.[4]  No federal court

has ever certified a tobacco class action that has withstood appeal.

As the Second Circuit recognized, lights claims present "numerous issues" requiring

"individualized inquiry," and cannot manageably be tried on a class-wide basis.  *McLaughlin*,

522 F.3d at 234.  Each element that class members must prove to establish liability on their

claims – a statement that was false as to them, causation, and injury, as well as damages or

entitlement to restitution – turns on the unique circumstances of each class member's smoking

behavior, knowledge, and reasons for purchasing light cigarettes.  Moreover, defendants'

affirmative defenses, such as statute of limitations and the voluntary payment doctrine, raise

further individualized issues that would make a class trial unmanageable.

These predominating individual issues include:

---

[3]    *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *Cleary v. Philip Morris USA Inc.*, __ F.R.D. ___, 2010 WL 680957 (N.D. Ill. 2010); *Stern v. Philip Morris USA Inc.*, 2007 WL 4841057, slip op. (N.J. Super. Ct. 2007) (Ex. 1); *Benedict v. Altria Group, Inc.*, 241 F.R.D. 668 (D. Kan. 2007); *Mulford v. Altria Group, Inc.*, 242 F.R.D. 615 (D.N.M. 2007) (plaintiffs subsequently granted leave to re-seek certification); *Davies v. Philip Morris USA Inc.*, 2006 WL 1600067 (Wash. Super. Ct. 2006); *Huntsberry v. R.J. Reynolds Tobacco Co.*, slip op. (Wash. Super. Ct. 2006) (Ex. 2); *Pearson v. Philip Morris Inc.*, 2006 WL 663004 (Or. Cir. Ct. 2006) (appeal pending); *Philip Morris USA Inc. v. Hines*, 883 So. 2d 292 (Fla. Ct. App. 2003); *Cocca v. Philip Morris Inc.*, 2001 WL 34090200 (Ariz. Super. Ct. 2001); *Oliver v. R.J. Reynolds Tobacco Co.*, 2000 WL 33598654 (Pa. Ct. Common Pleas 2000).  Plaintiffs note that an Illinois consumer protection claim like the one at issue in *Biundo* was certified by a trial court almost a decade ago.  Pls. Br. at 13.  But they ignore that the Illinois Supreme Court – in ordering judgment for PM USA there on other grounds – went out of its way to express "reservations about the existence of individual issues that might make class certification inappropriate," *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 53 (Ill. 2005), and that just two months ago an Illinois federal court refused to certify a similar lights class.  *Cleary*, 2010 WL 680957.

[4]    *See* Altria Group, Inc., Form 10-K at 31, U.S. Securities and Exchange Commission (Feb. 24, 2010) (Ex. 3).

***Whether alleged misrepresentations were in fact true because a class member received less tar and nicotine from smoking light cigarettes.***  Whether a class member, upon smoking light cigarettes, received what was allegedly promised – less tar and nicotine – is a key threshold issue.  If a class member received less tar and nicotine, there has been no misrepresentation because the statement was true as to that class member – he or she received what was allegedly promised.  That class member also has suffered no injury, because he or she received what he or she paid for.  This determination is necessarily individual because it turns on how each class member smoked light cigarettes.  Multiple studies have shown that most light smokers receive less tar and nicotine.  The only way to determine which smokers failed to receive less tar and nicotine would be to offer proof concerning each of them.  Plaintiffs do not attempt to address defendants' expert evidence on tar and nicotine deliveries.  Nor do they proffer any evidence showing how tar and nicotine deliveries could be tried on a class-wide basis.

***Whether a class member suffered an economic loss as a result of the alleged misconduct.***  Plaintiffs claim that each class member suffered an economic loss because light cigarettes delivering as much tar and nicotine as full-flavored cigarettes are worth less than what class members paid for them.  But the fact that the price of light and full-flavored cigarettes has always been the same refutes the existence of any economic injury and demonstrates that the market recognizes no difference in the value of cigarettes based on perceived differences in tar and nicotine deliveries.  Plaintiffs do not proffer any model that even purports to demonstrate how or why light cigarettes were worth less than their purchase price.

Instead, plaintiffs' sole expert ignores the issue of whether there is an injury in the first place and leaps ahead to calculate a monetary recovery in the form of a refund – the total amount that class members spent on purchases of light cigarettes (taxes and all) – and the amount of total

profits earned on the sale of light cigarettes.  These calculations generate huge numbers – over one billion dollars in California alone for a single year.  Expert Report of Jeffrey E. Harris, M.D., Ph.D. at ¶ 22 (Dec. 6, 2009) ("Harris Report") (Ex. 4).  But neither calculation establishes or measures any economic injury or demonstrates that any one plaintiff – let alone all of the millions of class members – paid too much for light cigarettes.  Plaintiffs cannot obtain certification without a viable "means of determining that each member of the class was in fact injured" that does not depend on "individual determinations for the many millions of potential class members."  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008).

> ***Whether a class member was deceived by and purchased light cigarettes as a result of the alleged misrepresentations.***  To establish causation on these claims, each class member must prove that he or she was deceived by the alleged misrepresentations and purchased light cigarettes as a result.  This will require proof about whether the class member believed light cigarettes delivered lower tar and nicotine and were safer and whether the class member purchased light cigarettes because of that belief.  That proof will be relevant on independent additional grounds because it will be needed to try the statute of limitations and voluntary payment defenses.

Plaintiffs have offered no expert or other evidence that purports to explain how the beliefs and purchasing motivations of millions of class members can be determined for these classes in a single stroke without individualized inquiry.  Nor could such issues be determined on a common basis.  During the class periods in these cases, PM USA was engaging in a substantial nationwide campaign to disclaim the alleged misrepresentations and inform smokers that they might not receive less tar and nicotine from light cigarettes.  Consistent with these efforts, the

record demonstrates that many smokers did not believe light cigarettes would deliver less tar and nicotine or would be safer, but purchased light cigarettes for other reasons, such as taste or image. Indeed, five of the class representatives at issue here continue to purchase light cigarettes even after they sued, demonstrating that they – and presumably other class members – have reasons to purchase light cigarettes other than the alleged misrepresentations. The only way to determine what any smoker believed about light cigarettes and why that smoker purchased light cigarettes would be through individual proof.

These and other individual issues show that plaintiffs cannot demonstrate that common issues predominate over individual issues nor that a class action would be a manageable – let alone superior – means of resolving these claims. This Court should follow the same path as the Second Circuit and every other federal court addressing similar lights claims – and deny plaintiffs' motion.

Below we first provide background on the history of light cigarettes and set forth the standards that plaintiffs must meet in moving for class certification. We then demonstrate that individual issues will predominate: we take each core individual issue in turn, showing first that the law of all four jurisdictions will require proof on the issue and then that the factual record on this motion establishes that any such proof would be individual for each class member. Finally, we explain why class treatment would be neither manageable nor superior, and why the proposed class representatives are inadequate.[5]

---

[5]    Altria Group, Inc. joins this opposition without prejudice to its affirmative defenses, including lack of personal jurisdiction, in any particular coordinated action.

# BACKGROUND

## I.   The Development Of The FTC Method For Measuring Tar And Nicotine Yields

The origin of light cigarettes can be traced back to the 1950s, when new studies suggested a link between smoking and diseases such as lung cancer, and the public health community began recommending reductions in tar and nicotine yields of cigarettes as a means of reducing the risks of smoking.  Declaration and Expert Disclosure of Dr. Peter C. English (English Decl.) ¶¶ 17-24 (Ex. 5).[6]  In 1966, the FTC responded by announcing that it would permit statements disclosing tar and nicotine yields, so long as those statements were based on a measurement method known as the "FTC Method."  *See Good v. Altria Group, Inc.*, 436 F. Supp. 2d 132, 136 (D. Me. 2006), *rev'd on other grounds*, 501 F.3d 29 (1st Cir. 2007), *aff'd*, 129 S. Ct. 538 (2008); *see also* English Decl. ¶¶ 29-35.  In 1967, the FTC began using that method to measure and report tar and nicotine yields for all U.S. cigarette brands.  English Decl. ¶¶ 33-35.[7]

The FTC Method used a machine that measures the tar and nicotine produced when a cigarette is smoked under a standardized set of conditions.  *See Good*, 436 F. Supp. 2d at 136; English Decl. ¶¶ 30, 33.  To the extent a person smokes differently from the machine – such as taking deeper or more frequent puffs – the smoker will not receive the amount of tar and nicotine indicated by the FTC's measurements.  Declaration and Expert Disclosure Statement of Peter A. Valberg, Ph.D. (Valberg Decl.) ¶¶ 23-26 (Ex. 6).[8]  If a smoker changes the way he or she smokes

---

[6]   Dr. English is a medical historian and a Professor of both History and Pediatric Medicine at Duke University who has researched the public health community's efforts on smoking and health issues, including the consideration of light cigarettes.  *Id.* ¶¶ 1, 5.

[7]   "Tar" refers to the collection of substances that are produced when tobacco is burned, apart from water, gases, and nicotine.  References in this brief to "light," "low tar," or "low yield" cigarettes are based on FTC-measured tar and nicotine yields.

[8]   Dr. Valberg is a public health professional specializing in health risk assessment, inhalation toxicology, epidemiology, and biological modeling of human exposure.  *Id.* ¶ 3.  He spent 23 years in the Department of Environmental Health at the Harvard School of Public Health, and

Footnote continued on next page

when switching to a cigarette with lower FTC Method yields – either smoking each cigarette more intensely or smoking more cigarettes – he or she might not receive less tar and nicotine. Valberg Decl. ¶¶ 30-32; *see also Pearson*, 2006 WL 663004, at *2 (explaining this phenomenon).

This act of changing how one smokes – known as "compensation" – may be complete or incomplete.  If a smoker compensates sufficiently to receive the same amount of tar and nicotine from a lower yield cigarette as he or she would receive from a higher yield cigarette, the smoker is compensating "completely" or "100%."  Valberg Decl. ¶ 31.  To the extent a smoker engages in incomplete compensation, the smoker is still receiving less tar and nicotine.  *Id*.  Compensation also may not be "permanent" – *i.e.*, the duration and degree of a smoker's compensation may vary over time.  *Id*. ¶ 48.

Compensation was reported in the scientific literature as early as 1945.  *Id*. ¶ 33.  Before the FTC began its measurement program in 1967, PM USA advised the FTC that there was considerable variability in smoking behavior and that the FTC Method would not reflect these differences.  *Good*, 436 F. Supp. 2d at 136; English Ex. 24; English Decl. ¶¶ 31-32.  The FTC acknowledged this limitation, issuing a press release when it began testing repeating PM USA's warnings virtually verbatim.  English Ex. 27; English Decl. ¶ 33.

The FTC nevertheless adopted and retained its method based on a determination that it provided a "reasonable standardized method" that was "capable of being presented to the public in a manner that is readily understandable."  English Ex. 27; English Decl. ¶ 34.  The FTC explained that it supported the disclosure of these measurements to encourage "competition

---

Footnote continued from previous page

has served in an advisory capacity to a number of governmental organizations, including the National Institutes of Health.  *Id*. ¶¶ 5, 8-9.

among the cigarette companies" and to promote "those varieties which rank low in tar and nicotine."  English Ex. 85; English Decl. ¶¶ 87-88.  Indeed, in 1970, the FTC compelled an industry agreement requiring a legend in all cigarette advertising disclosing the brand's tar and nicotine yields and stating that those measurements were on "av[erage]" per the "FTC" Method. Industry Agreement on Advertising Disclosure of Federal Trade Commission Test Determinations of Tar and Nicotine Content (Sept. 23, 1970) (Ex. 7); English Decl. ¶ 89; *see also* Parliament Lights Advertisement (Ex. 8) (sample advertisement with legend).  As the Supreme Court summarized, the FTC "endeavored to inform consumers of the comparative tar and nicotine content of different cigarette brands."  *Good*, 129 S. Ct. at 550.

The FTC Method was also supported by epidemiologic studies comparing the disease risk of smokers of lower yield cigarettes (as measured by the FTC Method) with that of smokers of higher yield cigarettes.  These studies – which inherently took the effects of compensation into account, English Decl. ¶¶ 49-50 – consistently found that reducing FTC-measured yields lowered smokers' lung cancer risk.  *Id*. ¶¶ 37-45.  The FTC concluded that its method, despite limitations, not only provided a standardized system of comparison, but also provided a measure of tar and nicotine yields that was statistically linked to human disease risk (*i.e.*, as tar and nicotine yields decreased, so did risk of disease).  *Id*. ¶¶ 94-99.

Based on these studies, the public health community between the 1970s and 1990s encouraged the development of lower yield cigarettes and advised smokers who would not quit to switch to such cigarettes.  *Id*. ¶¶ 54-83; Declaration and Expert Disclosure Statement of Janette Thomas Greenwood (Greenwood Decl.) at 16-23, ¶¶ 9-23 (Ex. 9).[9]  For example, in

---

[9]    Dr. Greenwood is a Professor of History at Clark University specializing in American social history.  *Id*. at 1, ¶ 1.

1981, the U.S. Surgeon General stated that "smokers who are unwilling or as yet unable to quit are well advised to switch to cigarettes yielding less 'tar' and nicotine, provided they do not increase their smoking or change their smoking in other ways."  English Ex. 63 at v; English Decl. ¶ 62.  Similarly, a 1992 American Cancer Society pamphlet advised:  "Can't quit yet?  Smoke less, especially low tar and nicotine cigarettes."  English Ex. 76; English Decl. ¶ 72.  Likewise, in 1996, the National Cancer Institute (NCI) published a report that reaffirmed the public health consensus that "[t]oday's filter-tipped, lower 'tar' and nicotine cigarettes produce lower rates of lung cancer than do their higher 'tar' and nicotine predecessors."  English Ex. 50 at 86; English Report ¶ 66.

## II.    Evolving Concerns About Compensation And The Ultimate Abandonment Of The FTC Method

Notwithstanding these recommendations in favor of low yield cigarettes, some public health authorities expressed concerns from the beginning of the FTC's testing program that the FTC Method did not address the variability of smokers' behavior.  English Decl. ¶¶ 76-83.  As early as the 1960s, public health authorities warned the public about compensation, advising smokers that light cigarettes might not deliver less tar and nicotine and might not be any safer for smokers who fully compensated.  Greenwood Decl. at 23-56, ¶¶ C1-C23; English Decl. ¶¶ 46-53.

These warnings were repeated in the popular media.  For example, in 1976 – 23 years before the earliest class period at issue here – *Consumer Reports* published an article, "Less Tar, Less Nicotine:  Is That Good?," which explained that because "[n]icotine is the addicting agent for most smokers," "[w]hen cigarette smoke contains less nicotine than such smokers are accustomed to, their bodies simply contrive ways to get more smoke."  English Ex. 78; English Decl. ¶ 77.  The article advised that smokers "do not necessarily smoke a low-nicotine cigarette

9

in the same way that they smoke a high-nicotine cigarette," and identified the mechanisms by

which smokers "compensate for a drop in nicotine yield."  English Ex. 78; English Decl. ¶ 78.

Similarly, a 1983 *Newsweek* article, "Light Cigarettes Have Just As Much Nicotine," reported on

research that "smokers who switch to 'light' cigarettes absorb as much nicotine as before."

English Ex. 80; English Decl. ¶ 82.  The article concluded that "[t]he widely touted notion that

low-tar-and-nicotine cigarettes are safer than stronger brands is a pipe dream."  English Ex. 80;

English Decl. ¶ 82; *see also* Television News Stories (July 1983) (Ex. 10) (collection of TV

coverage of the same study).

In 2001, NCI published *Monograph 13:  Risks Associated With Smoking Cigarettes With

Low Machine-Measured Yields Of Tar And Nicotine* (Monograph 13).  English Ex. 102; English

Decl. ¶¶ 105-08; *see also* Pls. Br. at 5.  After conducting new analyses of the same data that had

previously been used to support yield-based risk reductions, Monograph 13 determined that

those epidemiologic findings might be the result of biases.  English Decl. ¶ 106.  Accordingly,

Monograph 13 reversed the prior public health recommendations in favor of low tar cigarettes,

concluding that there was "no convincing evidence that changes in cigarette design between

1950 and the mid 1980s have resulted in an important decrease in the disease burden caused by

cigarette use either for smokers as a group or for the whole population."  *Id*. ¶ 105.  Monograph

13's conclusions were widely publicized in the popular media.  Greenwood Decl. at 53-54,

¶¶ 72-73.[10]

In 2008, in response to these concerns, the FTC rescinded its original guidance

establishing the FTC Method as the means of measuring tar and nicotine yields.  English Decl.

---

[10]    In response, PM USA filed a petition with the FTC requesting that the FTC reconsider its
existing regulatory regime in light of Monograph 13.  *See* In re Petition for Rulemaking
Concerning Tar and Nicotine Testing and Disclosure (filed Sept. 18, 2002) (Ex. 11).

¶ 101; English Ex. 99.  In 2009, Congress enacted a bill giving substantial regulatory authority over cigarettes to the Food & Drug Administration (FDA).  *See* Pub. L. No. 111-31, 123 Stat. 1776 (June 22, 2009).  This bill prohibits the use of descriptors such as "lights" and "ultra lights" as of June 2010 without prior FDA approval.  *Id*. at 1812.

### III.  PM USA's Development And Sale Of Light Cigarettes And Disclosures To Consumers

In 1971, four years after the FTC's measurement program began, PM USA introduced the first brand of cigarettes using the descriptor "lights" – Marlboro Lights.  *See Good*, 436 F. Supp. 2d at 139.  PM USA has since introduced other products bearing the descriptors "lights" or "ultra lights" with lower FTC-measurements as compared to the other cigarette types within the same brand family.  Those products have always been priced the same as the full-flavored counterparts within their brand family.  Declaration of Bruce Neidle (Neidle Decl.) ¶ 4 (Ex. 12).[11]

Since 1999 – at the beginning of the earliest class period at issue here – PM USA has disclaimed any representation about the amount of tar and nicotine inhaled by any smoker or the health effects of light cigarettes.  For example:

- In 1999, PM USA launched its website, on which it posted information about low tar cigarettes, including that the descriptor "lights" does not imply a safe cigarette and that compensation could result in smokers inhaling as much tar from light cigarettes as from a full-flavored brand.  Affidavit of Brendan McCormick (McCormick Aff.) ¶ 18 (Ex. 13);

---

[11]   Mr. Neidle is the Senior Director of Forecasting & Business Analysis at Altria Client Services, Inc.  *Id*. ¶ 1.  His responsibilities include tracking the retail selling price and market share of light cigarettes.  *Id*. ¶ 2.

McCormick Ex. F.[12]  The website also contained illustrations of the location of ventilation holes in cigarette filters, which are used to dilute the smoke with air (lowering FTC-measured yields), and which plaintiffs allege are blocked by smokers' fingers or lips.  McCormick Aff. ¶ 22; McCormick Ex. H.

- In 2000, PM USA began adding language to the FTC-yield legend discussed above that stated:  "[t]he amount of 'tar' and nicotine you inhale will vary depending on how you smoke."  McCormick Aff. ¶ 14; McCormick Ex. D.

- In 2002, and again in every year through 2008, PM USA provided periodic "onserts" on hundreds of millions of cigarette packages advising consumers that:  (1) "lights" descriptors are intended to refer to taste and flavor and the relative measurements under the FTC Method; (2) smokers may compensate while smoking light cigarettes so as to eliminate any reduction in tar and nicotine; and (3) as a result, smokers should not assume light cigarettes are safer than other cigarettes.  McCormick Aff. ¶¶ 9-10; McCormick Ex. B.  PM USA also provided similar information in 16.7 million booklets in over 25 major newspapers, direct mailings to over 7 million consumers in the MDL jurisdictions, and in TV and radio advertisements.  McCormick Aff. ¶¶ 4-6, 26-28; McCormick Ex. A; PM USA Advertisement (Ex. 14) (sample TV advertisement).

- In early 2003, PM USA removed all express references to tar and nicotine on packages – such as the words "Lowered Tar and Nicotine" on Marlboro Lights.  *See Mulford v. Altria Group, Inc.*, 506 F. Supp. 2d 733, 745 (D.N.M. 2007).  In addition, PM USA now adds to all packages with "lights" or certain other brand descriptors a "tear tape" that

---

[12]   Mr. McCormick is the Vice-President of Corporate Communications at Altria Client Services, Inc.  McCormick Aff. ¶ 1.

includes disclaimers such as:  "Lights' does NOT mean safer.  It refers to taste."

McCormick Aff. ¶ 12; McCormick Ex. C.

## ARGUMENT

### I.   Plaintiffs Bear The Burden Of Demonstrating With Proofs (Not Allegations) That These Cases Can Be Tried As Class Actions

Plaintiffs bear the burden of establishing all of the class certification requirements.  *See*, *e.g.*, *Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987); *Coffin v. Bowater Inc.*, 228 F.R.D. 397, 401 (D. Me. 2005) (Carter, J.).  Plaintiffs must satisfy each of Rule 23(a)'s threshold elements:  numerosity, commonality, adequacy, and typicality.  Because plaintiffs seek certification under Rule 23(b)(3), they must also demonstrate that common questions "predominate over any questions affecting only individual members" of the class, and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The Court must conduct a "rigorous analysis" to determine whether plaintiffs have met this burden.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see also*, *e.g.*, *Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 66-67 (1st Cir. 2010).  Courts apply a preponderance of the evidence standard as part of this analysis.  *See*, *e.g.*, *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 37 (2d Cir. 2006) ("*IPO*"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008).  The Court should not accept plaintiffs' allegations as true, but instead must "look beyond the pleadings," *In re Polymedica Corp. Sec. Litig.*, 432 F.3d 1, 7 (1st Cir. 2005), and conduct an "inquiry into the merits . . . to the extent that the merits overlap the Rule 23

13

criteria." *Canadian Exp.*, 522 F.3d at 24; *see also*, *e.g.*, *Tardiff v. Knox County*, 365 F.3d 1, 4-5 (1st Cir. 2004); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 297-99 (1st Cir. 2000).[13]

For example, when a Rule 23 requirement depends on "a novel or complex theory as to injury . . . the district court must engage in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed." *Canadian Exp.*, 522 F.3d at 26; *see also Gintis*, 596 F.3d at 66 (requiring a "searching evaluation" of the evidence). Certification is not appropriate without a "thorough explanation of how the pivotal evidence behind plaintiff's theory can be established," because "[i]f there is no realistic means of proof, many resources will be wasted setting up a trial that plaintiffs cannot win." *Canadian Exp.*, 522 F.3d at 29; *see also Hydrogen Peroxide*, 552 F.3d at 323 ("Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral.") (collecting cases). Applying this principle, *Canadian Export* reversed a certification order where the plaintiffs failed to provide a record demonstrating that injury could be tried for all class members using common proof. 522 F.3d at 27-29.

Plaintiffs ignore both this standard and their obligations in moving for class certification, offering no expert proof or other evidence with respect to how they would prove the core elements of their claims on a class-wide basis. Instead, they mistakenly contend that, "when a court is in doubt as to whether to certify a class action, it should err in favor of allowing the class." Pls. Br. at 15 (citation omitted). To the contrary, "[a] court that is not satisfied that the

---

[13]   In this respect, the First Circuit is in line with the overwhelming weight of federal authority. *See*, *e.g.*, *Hydrogen Peroxide*, 552 F.3d at 316 ("An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met."); *IPO*, 471 F.3d at 41-42; *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365-66 (4th Cir. 2004); *Sandwich Chef of Tex., Inc.*, *v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003); *Szabo v. Bridgeport Machs. Inc.*, 249 F.3d 672, 677 (7th Cir. 2001).

requirements of Rule 23 have been met should refuse certification until they have been met."

*Canadian Exp.*, 522 F.3d at 26 n.27 (quoting Fed. R. Civ. P. 23 advisory committee's note

(2003)).[14]

## II.     Individual Issues Predominate Over Common Issues, Defeating Class Certification

Plaintiffs cannot establish that common issues predominate over individual issues for any

of the claims at issue here.  For purposes of the predominance requirement, an issue is

"individual" where, "to make a prima facie showing on a given question, the members of a

proposed class will need to present evidence that varies from member to member."  *Blades v.

Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).  By contrast, an issue is "common" when it

can be resolved for the class as a whole "using computer records, clerical assistance, and

objective criteria – thus rendering unnecessary an evidentiary hearing on each claim."  *Smilow v.

Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003).

Predominance is not a mere "numerical test" that compares the number of common and

individual issues.  *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 356 (S.D. Ga. 1996).  Rather,

the Court "must formulate some prediction as to how specific issues will play out."  *Canadian

Exp.*, 522 F.3d at 20 (citation omitted); *see also*, *e.g.*, *Castano v. Am. Tobacco Co.*, 84 F.3d 734,

744 (5th Cir. 1996) (courts must consider "how the plaintiffs' . . . claims would be tried,

individually or on a class basis").  The Court must consider both the proofs that plaintiffs would

present in support of their claims and how defendants would defend against those proofs,

---

[14]     In support of this proposition, plaintiffs cite *Little Caesar Enterprises, Inc. v. Smith*, 172
F.R.D. 236, 341 (E.D. Mich. 1997).  That decision in turn relied upon a reading of *Eisenberg v.
Gagnon*, 766 F.2d 770 (3d Cir. 1985), that the Third Circuit disclaimed after the 2003
amendments to Rule 23.  *Hydrogen Peroxide*, 552 F.3d at 321 ("*Eisenberg* should not be
understood to encourage certification in the face of doubt as to whether a Rule 23 requirement
has been met.").

including the assertion of affirmative defenses. *See*, *e.g.*, *Mowbray*, 208 F.3d at 295. If "any trial on 'class' issues will quickly erode into a series of individual trials focused on issues specific to each" class member, then individual issues predominate. *Ramirez v. DeCoster*, 194 F.R.D. 348, 353 (D. Me. 2000) (Hornby, J.).

Plaintiffs try to satisfy predominance by wishing away the elements of the claims they must prove. For example, they assert that relief under the California Unfair Competition Law at issue in *Tyrer* "is available without individualized proof of deception, reliance, and injury." Pls. Br. at 26 (citation omitted).[15] They make similar assertions with respect to the D.C. Consumer Protection and Procedures Act (at issue in *Slater*), and the law of unjust enrichment in Illinois (*Biundo*), D.C. (*Slater*), and Maine (*Good*). Pls. Br. at 31-35, 39-44.[16] They do so because, faced with the individual variations in each smoker's proofs, plaintiffs do not, and cannot, offer any common method of proving these core elements for each class member.

Defendants demonstrate below that plaintiffs are wrong in their interpretation of state law and that plaintiffs cannot overcome the overwhelming evidence that every element of their claims would require individualized proof. Moreover, even if plaintiffs were correct in their interpretation of state law – *i.e.*, that plaintiffs could proceed in *state court* without proof that a misrepresentation caused them injuries – such claims could not be asserted in *federal court* because they would fail the standing requirement of Article III. *See*, *e.g.*, *Beck v. Test Masters Educ. Servs., Inc.*, 2010 WL 322242, at *2 (D.D.C. 2010) (contrasting claims brought in state

---

[15]   The *Tyrer* plaintiffs also assert claims under the False Advertising Law, *Tyrer* Compl. ¶¶ 172-81, which is a counterpart provision to the Unfair Competition Law that focuses on deceptive advertising. For purposes of plaintiffs' motion, the analysis under the two statutes is the same, and we use "Unfair Competition Law" or "UCL" to refer to both claims.

[16]   Plaintiffs concede that they need to prove an injury resulting from the alleged misconduct under the Illinois Consumer Fraud and Deceptive Practices Act (*Biundo*) and the California Consumer Legal Remedies Act (*Tyrer*). *See id.* at 29, 38. They offer no demonstration of how they could do this without individual proof. *See infra* at 40-44.

and federal court and ruling that "[i]n this federal court, however, which is an Article III court and which lacks jurisdiction of claims that do not present a case or controversy, . . . plaintiffs' CPPA claim is fatally deficient and must be dismissed") (citation omitted).

To establish liability and obtain relief under each of their claims, each class member must establish a misrepresentation as to him or her, injury, and causation, as well as survive all affirmative defenses asserted by the defendant. Here, this means that each class member must establish that he or she (1) failed to receive what was allegedly promised (*i.e.*, less tar and nicotine); (2) suffered an economic injury; (3) was deceived by the alleged misrepresentation and purchased light cigarettes as a result; and (4) is not barred by defenses such as statute of limitations or the voluntary payment doctrine. Each of these elements and defenses can only be tried with unique evidence concerning each class member. Thus, each alone presents a predominating individual issue that would "erode" any class trial "into a series of individual trials." *Ramirez*, 194 F.R.D. at 353.[17]

---

[17]   Mr. Tyrer's alternative request that the Court should certify a class for injunctive relief under Rule 23(b)(2), *see* Pls. Br. at 46, also fails in light of these individual issues. Rule 23(b)(2) requires a showing that the class is "cohesive," which is an even more demanding standard than predominance. *See*, *e.g.*, *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998). Moreover, any request for an injunction prohibiting the use of descriptors such as "lights" is moot because Congress has already prohibited such descriptors absent prior FDA approval as of June 2010. *See supra* at 11; *see also*, *e.g.*, *Bethany Med. Ctr. v. Harder,* 693 F. Supp. 968, 975 (D. Kan. 1988) ("[i]ssuing an injunction ordering the state to do what Congress has already mandated would be a mere academic exercise"). And, in any event, there would be no need to certify a Rule 23(b)(2) class because the "same relief" would benefit the proposed class if sought instead by an individual plaintiff. *See Dionne v. Bouley*, 757 F.2d 1344, 1356 (1st Cir. 1985).

**A.  Whether The Alleged Deceptive Statement To A Class Member Was True Because He Or She Received What Was Allegedly Promised Requires Individual Proof**

**1.  Each Class Member Must Demonstrate The Falsity Of A Statement To Him Or Her By Showing A Personal Failure To Receive Less Tar And Nicotine From Each Light Cigarette**

For each claim asserted here, the first step in a class member's proof of liability would be establishing that defendants' alleged representations were not true – that he or she failed to receive what was allegedly promised.  Without such proof, there has been no misrepresentation.

Allegedly, defendants represented that a light cigarette "would result in [plaintiff] receiving less tar and nicotine than full-flavored cigarettes," and thus was a "cigarette that was healthier for [plaintiff] to smoke."  Pls. Br. at 8.  As a result, as courts have consistently recognized in lights cases, each claimant must demonstrate that he or she failed to receive less tar and nicotine.  *See*, *e.g.*, *Mulford*, 242 F.R.D. at 626 ("In this case, Plaintiffs must show that Marlboro Lights cigarettes did not deliver the promised lower tar and nicotine . . ."); *Benedict*, 241 F.R.D. at 680 ("the actual amount of tar and nicotine received by individual smokers, *i.e.*, whether and how those individuals compensated when smoking light cigarettes, is relevant"); *Stern*, 2007 WL 4841057, slip op. at 16 ("defendant's alleged misrepresentations would not have been false" as to "any member [who] did in fact get less tar and nicotine from Marlboro Lights"); *Pearson*, 2006 WL 663004, at *7 ("each plaintiff, and each member of the proposed class, must prove that the Marlboro Lights he or she purchased did not deliver lowered tar and nicotine to the person who smoked them").  Such proof would be required for each of the causes of action at issue here.

### a.    Illinois Consumer Fraud And Deceptive Practices Act (ICFA) (At Issue In *Biundo*)

"To succeed in a private cause of action under [ICFA], a plaintiff must prove . . . a deceptive act or practice by the defendant." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 856 (Ill. 2005) (internal quotations omitted). That some smokers may not have received less tar and nicotine is insufficient to establish this element; each plaintiff must prove that he or she *personally* failed to receive what was promised. For example, in *Kelly v. Sears Roebuck & Co.*, 720 N.E.2d 683 (Ill. App. Ct. 1999), the court rejected an ICFA claim as a matter of law where the plaintiff "allege[d] that Sears had a practice of selling used batteries as new, but he does not allege that he actually received one of those used batteries." *Id.* at 692. The court explained that the "risk" that the plaintiff received a used battery because some consumers received such a battery could not establish liability; plaintiff would have to prove that he received a used battery. *See id.* at 690-92; *see also Verb v. Motorola, Inc.*, 672 N.E.2d 1287, 1294-96 (Ill. App. Ct. 1996) (that "somebody" may be injured by cell phone use does not give rise to an ICFA claim for all cell phone purchasers).

### b.    California's Consumer Legal Remedies Act (CLRA) And Unfair Competition Law (UCL) (At Issue In *Tyrer*)

Similarly, both the CLRA and the UCL require that a plaintiff establish a false statement or a representation designed to create a false impression as to him or her. *See*, *e.g.*, *Buckland v. Threshold Enters., Ltd.*, 66 Cal. Rptr. 3d 543, 550 (Ct. App. 2007) ("plaintiffs in a CLRA action [must] show . . . that defendant's conduct was deceptive . . .") (citation and internal quotations omitted); *Morgan v. AT&T Wireless Servs., Inc.*, 99 Cal. Rptr. 3d 768, 785 (Ct. App. 2009) (misleading or deceptive statements are actionable under the UCL). As with ICFA, each plaintiff must demonstrate that he or she personally failed to receive what was allegedly promised. *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 960 (9th Cir. 2009) (rejecting UCL claim because "[a]t

19

most, the plaintiffs plead a potential risk of hearing loss not to themselves, but to other

unidentified iPod users who might *choose* to use their iPods in an unsafe manner.  The risk of

injury the plaintiffs allege is not concrete and particularized *as to themselves.*") (emphases in

original).

c.    **D.C. Consumer Protection And
Procedures Act (CPPA) (At Issue In *Slater*)**[18]

Likewise, to recover under the CPPA, plaintiffs must establish that there was a false or

misleading statement.  *See*, *e.g.*, *Whiting v. AARP*, __ F. Supp. 2d ___, 2010 WL 1189791, at *7

(D.D.C. 2010) (rejecting CPPA claims where "[a]ll statements that [plaintiff] points to as

misleading are in fact either accurate, not misleading to a reasonable consumer, or mere

puffery").  And again, each plaintiff must demonstrate that he or she personally failed to receive

what was promised.  For example, in *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171

(D.D.C. 2003), plaintiffs brought a CPPA claim alleging that the defendant misrepresented the

efficacy and addictive nature of OxyContin.  *Id.* at 172-73.  Plaintiffs did not contend that the

drug was ineffective for them or that they became addicted.  *Id.* at 173.  Instead, they argued that

because *others* suffered these problems, plaintiffs had purchased a product that was not as it was

represented to be and were injured by paying an inflated price.  *Id.* at 175.  The court rejected

this theory, holding that, as a matter of both D.C. law and Article III standing, a plaintiff who

personally has received what was promised cannot obtain relief.  *Id.* at 176-78.

---

[18]    After *Slater* was filed and chosen by plaintiffs to be heard in this motion, a second action
was filed bringing the same claims.  *See Parsons* Compl.  Plaintiffs have indicated that they
intend formally to consolidate the two cases, but have not done so yet.  For convenience,
references to *Slater* include *Parsons*.

20

### d.   Unjust Enrichment (At Issue In *Biundo* (Illinois), *Slater* (D.C.), And *Good* (Maine))[19]

Like the consumer fraud claims at issue here, unjust enrichment claims based on allegations of fraud fail where the plaintiff cannot establish a misrepresentation as to him or her. For example, in *Whiting*, the court rejected an unjust enrichment claim under D.C. law alleging misrepresentations relating to insurance coverage based on a finding that the plaintiff "received the benefits she paid for."  2010 WL 1189791, at *9.  As a result, there was no "misrepresentation of coverage," and the defendant "was *justly* enriched."  *Id.* (emphasis in original); *see also Ries v. Humana Health Care Plan, Inc.*, 1995 WL 669583, at *9 (N.D. Ill. 1995) (under Illinois law, "[a] person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed the . . . other should give in return") (citation omitted) (ellipses in original).[20]  And again, courts across the country have made clear that plaintiffs proceeding on such an unjust enrichment theory must prove that they personally failed to receive what was promised.  *See*, *e.g.*, *O'Neil v. Simplicity*, 574 F.3d 501, 503 (8th Cir. 2009) (rejecting unjust enrichment and other claims; "It is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect."); *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319-20 (5th Cir. 2002) (pharmaceutical users could not recover simply because others did not receive what was represented); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 213-14 (D. Minn. 2003) (denying certification where some individuals received the

---

[19]   Plaintiffs' unjust enrichment claims need not be considered for certification purposes to the extent that this Court grants Philip Morris USA Inc.'s Motion for Judgment on the Pleadings on Plaintiffs' Unjust Enrichment Claims and Other Requests for Equitable Relief (Mar. 29, 2010).

[20]   Although we have not found unjust enrichment cases in Maine addressing this precise issue, there is no reason to believe that the law there is any different.

benefit of the drug at issue and therefore "received their money's worth"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68-69 (S.D.N.Y. 2002) (same).

### 2.    Many Light Smokers Received Less Tar And Nicotine From Their Cigarettes

The need for each class member to prove that he or she personally failed to receive less tar and nicotine creates predominating individual issues.  Plaintiffs suggest that this inquiry is common because it somehow focuses only on the condition of the product "at the time of purchase."  Pls. Br. at 31.  But at the time of purchase, it is undisputed that light cigarettes measure less in tar and nicotine than full-flavored cigarettes under the FTC Method.  And if an individual were to smoke a light and a full-flavored cigarette in the same manner, the individual would obtain less tar and nicotine from the light cigarette.  Accordingly, to prove a disparity between what plaintiffs contend was promised and what was received, each class member would have to prove that he or she compensated "completely" when smoking each light cigarette – *i.e.*, that the class member changed his or her smoking behavior such that he or she received as much tar and nicotine (and thus no reduction in risk) as he or she would have from a full-flavored cigarette.  *See supra* at 6-7 (defining compensation).  As *Pearson* explained in requiring this proof:  "[t]he tar and nicotine yield of a cigarette . . . depends not upon what is contained in the unlit tobacco in the column, *but upon the way the cigarette is smoked*."  2006 WL 663004, at *2 (emphasis added); *see also id.* at *6 ("Plaintiffs here do not allege that Marlboro Lights cigarettes do not *contain* lowered tar and nicotine as they sit in their packages.  Instead, plaintiffs' allegations are cast in terms of how much tar and nicotine the cigarettes '*deliver*' when they are

smoked.") (emphases in original).[21]

Moreover, the particular forms of compensation that each class member engaged in (if any) are critical in determining whether the class member failed to receive what was allegedly promised.  Smokers can compensate in two different ways:  (1) changing the way they smoke each cigarette, such as taking deeper puffs or blocking ventilation holes ("per cigarette" compensation), or (2) increasing the number of cigarettes smoked each day ("per day" compensation).  Valberg Decl. ¶ 30; *see also Good*, 436 F. Supp. 2d at 148 n.25.  To establish that they failed to receive what was allegedly promised – a "lighter" cigarette – class members must demonstrate that they compensated completely *on a per cigarette basis*.  Under plaintiffs' theory, smokers compensate because their addiction requires them to maintain a set amount of nicotine each day.  *See*, *e.g.*, *Biundo* Compl. ¶ 22(d) (smokers compensate "to get enough nicotine to satisfy their craving").  Accordingly, to the extent smokers compensate by smoking more cigarettes, they do so precisely because they are receiving less tar and nicotine from each cigarette.  Valberg Decl. ¶ 39.  These individuals therefore receive exactly what was allegedly promised – a cigarette delivering less tar and nicotine – and cannot recover.  *See*, *e.g.*, *Pearson*, 2006 WL 663004, at *7 (light smoker must show he or she "receiv[ed] as much tar and nicotine

---

[21]    Plaintiffs cite to a Missouri court that they imply held that each consumer's smoking behavior is irrelevant to a claim under the Missouri statute.  *See* Pls. Br. at 37-38 (quoting *Craft v. Philip Morris Cos. Inc.*, 190 S.W.3d 368, 383 (Mo. Ct. App. E.D. 2005)).  To the contrary, in the quoted language, the court was merely describing the "*allegations*" in that case.  190 S.W.3d at 382 (emphasis added).  The court did not determine that plaintiffs could establish liability without proof that they failed to receive less tar and nicotine.  Indeed, the court held – in contrast with federal certification law, *see supra* at 13-14 – that it would be improper under Missouri law to determine even what the elements of a claim are for purposes of determining certification.  *See Craft*, 190 S.W.3d at 384.  Notably, despite certifying the class, the trial court there explained that class members must demonstrate that they received less tar and nicotine in order to recover.  *See Craft v. Philip Morris Cos. Inc.*, 2003 WL 23355745, at *4-5 (Mo. Cir. Ct. 2003).  In doing so, the court assumed (without the benefit of Dr. Valberg's affidavit here) that there might be sufficient evidence to establish universal complete compensation, despite plaintiffs' lack of proofs and without undertaking the rigorous analysis as required here.  *Id.*  For these reasons, *Craft* has no bearing on whether these claims may be certified.

from [light cigarettes] as he or she would have received from the *same number* of Marlboro

Reds") (emphasis added); *In re Tobacco Cases II*, 2004 WL 2445337, at *20 (Cal. Super. Ct.

2004) ("[N]o reasonable smoker (even if addicted and therefore vulnerable) can believe that the

amount of tar and nicotine consumed by smoking does not depend on the actual number of

cigarettes smoked, regardless of whether they are regular or Lights."), *tentatively vacated on*

*other grounds*, *In re Tobacco Cases II*, Civ. No. JCCP4042 (Cal. Super. Ct. Mar. 11, 2010) (Ex.

15).  Nor can plaintiffs claim that this form of compensation was "unconscious," since it is

obvious to smokers when they are smoking more cigarettes.  *See, e.g.*, Deposition of Alexander

Slater (Slater Dep.) at 41:10-42:15 (Taylor App. Att.) (recognized that he increased from five to

over twenty cigarettes per day after switching to light cigarettes).[22]

　　　　Courts have consistently found that many smokers receive less tar and nicotine from light

cigarettes; individual proof therefore would be required to determine which smokers failed to

receive what was allegedly promised.  *See, e.g.*, *Mulford*, 242 F.R.D. at 627 ("a significant

---

[22]    Similarly, plaintiffs' allegations that the tar of certain light cigarettes may be more
dangerous because the smoke of those cigarettes is more mutagenic, *see* Pls. Br. at 6, do not
eliminate the individual issues inherent in proving that each plaintiff failed to receive what was
allegedly promised.  To the contrary, these allegations merely create additional individual issues.
Plaintiffs allege only that *each milligram* of tar from a light cigarette is more mutagenic.  *See,
e.g.*, *Good* Compl. ¶ 29.  Thus, to the extent light cigarette smokers inhale less tar, they are
receiving *less* mutagenic material for each cigarette smoked.  Declaration and Expert Disclosure
Statement of Errol Zeiger, Ph.D. (Zeiger Decl.) ¶¶ 68, 94 (Ex. 16).  Accordingly, the only way to
determine how much mutagenic material a plaintiff is receiving would be to determine how that
individual smoked.

　　　　Moreover, plaintiffs do not – and cannot – establish that higher scores in mutagenicity tests
have any relevance to human health.  Plaintiffs have offered no expert proofs with respect to
their novel mutagenicity allegations, as they are required to do.  *See supra* at 13-14.  By contrast,
PM USA has submitted the declaration of Dr. Zeiger, who previously directed genetic toxicology
research at FDA and the National Institute of Environmental Health Sciences.  Zeiger Decl. ¶ 3.
Dr. Zeiger explains that mutagenicity tests merely measure bacteria in petri dishes and cannot be
used to determine relative differences in carcinogenic potency.  *Id.* ¶¶ 20, 27-29.  This is
confirmed by the International Agency for Research on Cancer, which has concluded that
"[r]elative potency in tests for mutagenicity and related effects *is not a reliable indicator of
carcinogenic potency*."  *Id.* ¶ 30 (emphasis added).

number of persons in the purported class received the promised lower tar and nicotine from

Marlboro Lights cigarettes"); *Pearson*, 2006 WL 663004, at *6-7 (light smokers "on average"

receive less tar and nicotine); *Stern*, 2007 WL 4841057, slip op. at 16 ("whether a person

received less tar and nicotine from Marlboro Lights, as allegedly promised, depends upon the

individual consumer's behavior in using the product"); *Benedict*, 241 F.R.D. at 680 (rejecting

certification in part because determining whether smokers received less tar and nicotine would

require individual inquiries); *Hines*, 883 So. 2d at 294-95 ("whether or not a smoker reaped the

benefits of a lower tar and nicotine cigarette depended upon how the cigarettes were

smoked"); *Oliver*, 2000 WL 33598654, at *6 n.6 (individual trials would be required "to

determine which smokers actually cover the [ventilation holes] when they smoke, and which

smokers smoke more cigarettes to achieve the same tar and nicotine levels [as] regular

cigarettes"); *Cocca*, 2001 WL 34090200, at *3 ("'[c]ompensation' in smoking habits, and

increasing the numbers of cigarettes smoked, varied").

 In the face of these repeated court findings, plaintiffs present no expert or other evidence

even purporting to establish that all light cigarette smokers compensated completely.  Nor have

they attempted to explain how they could prove compensation on a class-wide basis.  Instead,

their sole expert, Dr. Harris, proposes a damages model that would provide a monetary recovery

to all class members, regardless of whether each class member failed to receive less tar and

nicotine.  *See* Deposition of Jeffrey Harris (Harris Dep.) at 70:13-17 (Ex. 17).  Plaintiffs' failure

to meet their burden of establishing a class-wide means of proving this critical element of their

claims is reason alone to deny certification.  *See supra* at 13-15.

 Moreover, the unrefuted evidence submitted by PM USA confirms that many putative

class members received less tar and nicotine from light cigarettes and thereby provides another

reason to deny certification.  Dr. Valberg has conducted an analysis of 19 published studies examining the smoking behavior of switchers to lower yield cigarettes, which found that the "overwhelming majority of smokers exhibit less than complete compensation."  Valberg Decl. ¶¶ 53-54.  He also analyzed two large, nationally representative cross-sectional studies, including one (NHANES) conducted by the Centers for Disease Control and Prevention.  Valberg Decl. ¶¶ 60-78.  These analyses found that, on average, smokers of light cigarettes received less tar and nicotine (both on a "per cigarette" and "per day" basis).  *Id*. ¶ 78.  For example, his NHANES analysis found that light smokers on average measured having 11% less serum cotinine (a biomarker that is used as a proxy for tar and nicotine exposure) than full-flavored smokers, and that ultra-light smokers measured having 18% less serum cotinine.  *Id*. ¶ 75.  He found the same results when comparing Marlboro Lights and Marlboro Ultra Lights smokers to full-flavored Marlboro smokers.  *Id*. ¶ 76.

Based on these analyses, Dr. Valberg concludes that "[i]n a population of smokers of low tar and ultra-low tar cigarettes, including Marlboro Lights and Marlboro Ultra Lights, there will be some smokers who compensate and some smokers who do not."  *Id*. ¶ 4.  Dr. Valberg further explains that "[a]mong individual smokers who compensate, the degree of compensation is highly variable" and that "compensation is 'incomplete' for the overwhelming majority of smokers, meaning that such smokers get lower tar and nicotine after switching to cigarettes with lower FTC yields."  *Id*.  Plaintiffs do not address these analyses or conclusions.

Dr. Valberg's conclusions are also consistent with the testimony of light smokers in these and other cases.[23] Some class representatives in these consolidated cases testified that they compensated by smoking more cigarettes – which indicates under plaintiffs' theory that they were receiving less tar and nicotine from each cigarette. *See*, *e.g.*, Slater Dep. at 41:10-42:15; Deposition of Kathryn Domaingue (Domaingue Dep.) at 38:13-40:1 (Taylor App. Att.); Deposition of David Williams (Williams Dep.) at 140:8-141:11 (Taylor App. Att.). Others from similar lights cases testified that they did not change their smoking behavior in any way when smoking light cigarettes, and believe they actually received less tar and nicotine. *See*, *e.g.*, Deposition of William Reed at 35:4-36:2, 71:22-74:8 (Taylor App. Att.) (did not change "anything about the way [he] smoked" after switching to Marlboro Lights and believes he was receiving less tar and nicotine); Deposition of Brian Weinman at 23:7-25 (Taylor App. Att.) (did not change smoking habits after switching to low tar cigarettes); Deposition of William Hall (Hall Dep.) at 52:1-12 (Taylor App. Att.) (smoking practices are not dependent on "what kind of cigarette I'm holding in my hand"); Deposition of C. Susie Swanson at 61:18-62:10 (Taylor App. Att.) (smoked light and full-flavored cigarettes in the same way). Still others acknowledged that because they were receiving less tar and nicotine from light cigarettes, they took measures to increase their tar and nicotine consumption, such as intentionally blocking ventilation holes. *See*, *e.g.*, Deposition of Thomas Geanacopoulos at 64:21-65:3 (Taylor App. Att.) (used scotch tape to cover ventilation holes when smoking certain light cigarettes); Deposition of David Rogers at 149:2-151:17 (Taylor App. Att.) (intentionally covered ventilation holes to make the cigarette

---

[23]   *See generally* Declaration and Expert Disclosure Statement of Charles R. Taylor, Ph.D. (Taylor Decl.) (Ex. 34) at App. A (containing relevant deposition testimony of over 100 light smokers in other cases). In addition, complete deposition transcripts are attached to Dr. Taylor's Appendix A and are submitted herewith electronically. *See* Attachment to Taylor Decl., Appendix A (Taylor App. Att.). Dr. Taylor is a professor of marketing at Villanova University and the Past-President of the American Academy of Advertising. Taylor Decl. at 2-3.

stronger and inhale more smoke); Deposition of Linda McHatton at 74:25-75:18 (Taylor App.

Att.) (knew she would "plug the holes up" and get the same tar and nicotine from lights as full-

flavored cigarettes, "[b]ecause you can taste it").[24]

The need for individual proof is compounded by plaintiffs' contention that smokers

compensate "in order to obtain an amount of nicotine sufficient *to satisfy a smoker's addiction.*"

Pls. Br. at 4 (emphasis added); *see also*, *e.g.*, *Good* Compl. ¶ 24 (smokers "engage in

compensatory smoking behavior *due to the addictive nature of nicotine*") (emphasis added).  These

claims thus depend on a showing of addiction because, under plaintiffs' theory, to the extent a

class member is not addicted, he or she would have no need to compensate to maintain a set

amount of nicotine each day.  Declaration and Expert Disclosure Statement of Eric M. Kaplan

(Kaplan Decl.) ¶¶ 18-19, 56 (Ex. 18);[25] Valberg Decl. ¶ 34.  This too is an individual issue

because it is undisputed that many smokers are not addicted.  Kaplan Decl. ¶ 55; Valberg Decl.

¶¶ 43-45.  As a result, individual inquiries would be needed to determine which class members

were addicted.  *See*, *e.g.*, *Barnes*, 161 F.3d at 144 (whether a smoker is addicted requires a

---

[24]   Another court that did not have the benefit of Dr. Valberg's affidavit purported to alleviate lights plaintiffs from having to prove that they received less tar and nicotine based on speculation that "the actual level of tar and nicotine received by an individual smoker is a factor that cannot be measured by any test."  *Aspinall v. Philip Morris Cos. Inc.*, 813 N.E.2d 476, 489 (Mass. 2004).  This speculation is wrong; there are tests designed to measure this issue.  *See*, *e.g.*, Valberg Decl. ¶¶ 96-101.  It is also fundamentally improper to eliminate a critical aspect of plaintiffs' proofs to facilitate class certification simply because it may be difficult for plaintiffs to prove their case.  *See*, *e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("rules of procedure 'shall not abridge, enlarge or modify any substantive right'") (quoting 28 U.S.C. § 2072(b)); *McKnight v. Ideal Mut. Ins. Co.*, 534 F. Supp. 362, 366 (N.D. Tex. 1982) ("Plaintiffs' right to recovery is related to the determination of a fact, not to the ease or difficulty of proving it.").  Finally, even the *Aspinall* court recognized that "a class action consisting of all purchasers would obviously not be appropriate" where "most consumers actually receive the promised benefit, as may be ascertained by objective tests."  813 N.E.2d at 489 n.21.  Here, the undisputed evidence in the record is that "on average," light smokers *receive less tar and nicotine*.  *See supra* at 25-26; *see also Mulford*, 242 F.R.D. at 628 (rejecting *Aspinall* because "a significant number of smokers received the promised lower tar and nicotine from Marlboro Lights").

[25]   Dr. Kaplan is a psychiatrist specializing in the treatment of substance abuse and dependence disorders.  Kaplan Decl. ¶¶ 1, 5-6.

"highly individualistic inquiry").[26]  For instance, 25 percent of smokers are "chippers":  part-time smokers who do not smoke daily or who smoke less than five cigarettes per day.  Valberg Decl. ¶ 45.  Chippers are not regarded as addicted and would have no need to compensate for reductions in FTC-measured nicotine yields.  *Id.*

Finally, plaintiffs' theory of compensation is that a smoker who *switches* to a light cigarette will smoke the light cigarette more intensely to make up for the reduction in FTC-measured yields.  *See* Pls. Br. at 3-4; Valberg Decl. ¶ 30.  As a result, courts have recognized that compensation does not apply to smokers who initiated with light cigarettes, an issue that would require additional individual inquiries.  *Price*, 848 N.E.2d at 53 ("[W]e question whether the members of the class who never smoked prior to smoking Marlboro Lights would have felt the need to compensate when they lacked a prior habit to compensate for.").

### B.   Whether Each Class Member Suffered An Injury Is A Predominating Individual Issue

Under each state's law, each class member must establish that he or she suffered an injury (or "harm," "fact of damage," or "actual damage," as courts sometimes refer to it) as a result of the alleged misconduct.  Plaintiffs have failed to make the necessary showing of class-wide injury because:  (1) as is true to establish a deceptive statement, there is no class-wide proof that each class member failed to receive what was allegedly promised (less tar and nicotine), *and* (2) there is no class-wide proof of economic loss.

---

[26]   *See also*, *e.g.*, *Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 389 (D. Kan. 1998) ("Determining addiction requires numerous individual inquiries about class members."); *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 599 (N.Y. App. Div. 1998), *aff'd*, 94 N.Y.2d 43 (N.Y. 1999); *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 236 (Md. 2000); *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 531 (N.D. Ill. 1998); *Hurtado v. Purdue*, 2005 WL 192351, at *8 (N.Y. Sup. Ct. 2005).

1. **Each Alleged Claim Requires Proof Of An Injury Resulting From The Alleged Misconduct**

   a. **ICFA (At Issue In *Biundo* (Illinois))**

Plaintiffs do not dispute that a private plaintiff suing under ICFA "must prove that she suffered actual damage as a result of a violation of the Act." *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196 (Ill. App. Ct. 2008). This requires a showing of an "actual pecuniary loss." *Su Yeun Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010). Where the plaintiff received a product worth at least as much as he or she paid for it, there is no injury. *Mulligan*, 888 N.E.2d at 1198 (plaintiff "paid less than the actual value of the property and, therefore, had no pecuniary loss").

   b. **CLRA/UCL (At Issue In *Tyrer* (California))**

Plaintiffs concede that the CLRA requires proof that "defendant's deceptive conduct *caused them harm*." Pls. Br. at 29 (emphasis added) (citation omitted); *see also*, *e.g.*, *Buckland*, 66 Cal. Rptr. 3d at 550. As with ICFA, this requires proof that plaintiffs paid more for light cigarettes than those cigarettes were worth. *See*, *e.g.*, *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 58 (Ct. App. 2006); *Wiener v. Dannon Co.*, 255 F.R.D. 658, 670 (C.D. Cal. 2009).

In contrast, plaintiffs contend that *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009), allows the class to obtain monetary relief under the UCL without any injury. Pls. Br. at 26. Under plaintiffs' view, so long as they prove a capacity to deceive some consumers, even a plaintiff who was not injured may still obtain relief. *Id.* As demonstrated below, plaintiffs are misreading the elements of a UCL claim. Moreover, even if this reading were correct as a matter of state law, it could not apply in an action in federal court subject to Article III and Rule 23.

(i)    **California Law Requires Each Class Member To Prove
<u>Injury To Obtain Monetary Relief Under The UCL</u>**

At issue in *Tobacco II* was a voter-approved amendment – Proposition 64 – that tightened

the state-law standing requirements for prosecuting UCL actions.  207 P.3d at 25.[27]  Before

Proposition 64, some courts had concluded that officious plaintiffs who did not purport to claim

injury could sue as class representatives.  *See Buckland*, 66 Cal. Rptr. 3d at 553.  The *Tobacco II*

court held that, under Proposition 64, the named plaintiffs in a class action must demonstrate that

they relied on the alleged fraudulent advertising in order to have standing to prosecute a UCL

action based on that conduct.  207 P.3d at 39.  The court concluded, however, that neither

Proposition 64's text, nor California's general class-action principles, required absent class

members to demonstrate that they also met these standing requirements.  *Id*. at 30-38.[28]  Because

the issues in *Tobacco II* related solely to the nature and scope of Proposition 64's new standing

requirements, the court did not address the elements of a UCL claim required for an individual to

recover money.  Indeed, the court was explicit that the questions before it related only to

"standing," and that Proposition 64 "did not change the substantive law" of a UCL claim.  207

P.3d at 25, 38.

Prior to Proposition 64, the California Supreme Court discussed the substantive elements

of a claim for monetary relief under the UCL in *Korea Supply Co. v. Lockheed Martin Corp.*, 63

---

[27]    Proposition 64 amended Cal. Bus. & Prof. Code § 17203 to provide that:  "[a]ny person may
pursue representative claims or relief on behalf of others only if the claimant meets the standing
requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure
[California's class action rule]."  Proposition 64 also amended section 17204 to provide that any
person "who has suffered injury in fact and has lost money or property as a result of such unfair
competition" has standing to sue under the UCL.

[28]    Plaintiffs' contention that class representative Tyrer satisfies this standing requirement, Pls.
Br. at 20, is addressed in Philip Morris USA, Inc.'s Motion For Summary Judgment On
Plaintiffs' Claims For Lack Of Causation.  No class can be certified if Tyrer lacks standing.  *See*,
*e.g.*, *Carfagno ex rel. Centerline Holding Co. v. Schnitzer*, 591 F. Supp. 2d 630, 631 (S.D.N.Y.
2008).

P.3d 937 (Cal. 2003) – which *Tobacco II* cited, 207 P.3d at 29.  The *Korea Supply* court rejected an attempt to obtain disgorgement of profits untethered to any showing of loss to the plaintiff caused by a UCL violation.  63 P.3d at 44.  Instead, the court held that only "[a]ctual direct victims" may obtain restitution under the UCL.  *Id*.  The court explained, moreover, that the only form of monetary relief available under the UCL is a "*restitutionary* form of disgorgement" (not damages), which is "*limited to restoring money or property to direct victims*" that was "acquired through unfair practices."  *Id*. at 41-44 (emphases added); *see also Kraus v. Trinity Mgmt. Serv., Inc.*, 999 P.2d 718, 724-32 (Cal. 2000) (UCL authorizes restitution only to specific persons from whom money was obtained by means of unfair practice).  Obviously, a class member who has not suffered any injury as a result of the alleged misconduct is not a "direct victim" and there would be nothing to "restore" to that class member.

Plaintiffs ignore these decisions.  Instead, they focus on a single *dictum* sentence in *Tobacco II* in which the court suggested that "relief under the UCL is available without *individualized* proof of deception, reliance and injury." 207 P.3d at 35 (emphasis added).  The *Tobacco II* court did not hold, as plaintiffs argue, that a UCL plaintiff is entitled to a monetary recovery without *any* showing of injury (or deception or causation) – a holding that would be inconsistent with *Korea Supply* and *Kraus*.  In this *dictum*, the *Tobacco II* court merely noted that in certain prior cases, courts had determined based on the circumstances, and on the record presented in those cases, that the class members did not need to demonstrate "individualized" proof to satisfy those elements.  Indeed, in the cases cited by *Tobacco II*, the courts deemed there to be adequate proof that all of the class members were necessarily affected by the alleged

misrepresentations and suffered economic harm in the same way such that injury could be presumed for the entire class.[29]

California Court of Appeal decisions have rejected the precise interpretation of *Tobacco II* offered by plaintiffs here. In *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83 (Ct. App. 2009), the court recognized that "Proposition 64 'affected the standing of representative plaintiffs *but did not change the underlying elements of the causes of action*.'" *Id*. at 93 n.11 (emphasis added) (citation omitted); *see also Cohen v. DIRECTV, Inc.*, 101 Cal. Rptr. 3d 37, 48-49 (Ct. App. 2009) (same). *Vioxx* thus made clear that in the context of that analogous case – involving alleged misrepresentations about a product's health effects – plaintiffs were required to show that they paid more than the product was worth to establish the necessary element of injury. 103 Cal. Rptr. 3d at 96.[30]

### (ii) Article III And Rule 23 Independently Forbid The Assertion Of These Claims Without Proof Of Injury

Not only is plaintiffs' reading of *Tobacco II* incorrect as a matter of California law, it also is not a viable theory under federal law for two independent reasons. *First*, as the Ninth Circuit recognized, plaintiffs suing under the UCL in federal court "must *also* satisfy the federal

---

[29]   *See Fletcher v. Sec. Pac. Nat'l Bank*, 591 P.2d 51, 54 (Cal. 1979) (defendant bank overcharged all class members interest); *Bank of the West v. Super. Ct.*, 833 P.2d 545, 547-48 (Cal. 1992) (defendant bank allegedly made loans to all class members without disclosing interest rates, fees, and penalties that applied to the loans); *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 673 P.2d 660, 670-71 (Cal. 1983) (allowing plaintiffs to survive a motion to dismiss where plaintiff alleged that all children who consume sugared cereal are harmed); *see also infra* at 47 n.42 (discussing when class-wide inference or presumption may be appropriate).

[30]   In contrast to these decisions, a few state courts have relied on the single *dictum* sentence in *Tobacco II* as addressing the elements of plaintiffs' proofs in a UCL claim. *See, e.g.*, *McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704, 717 (Ct. App. 2010); *In re Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d 329, 336-37 (Ct. App. 2010); *Weinstat v. Dentsply Int'l, Inc.*, 103 Cal. Rptr. 3d 614, 622-24 (Ct. App. 2010). This conclusion is erroneous for the reasons stated above. And even if any of these decisions were read as eliminating certain elements of plaintiffs' proofs, they would have no bearing on an action in federal court subject to the requirements of Article III and Rule 23, as demonstrated below.

standing requirements under Article III." *Birdsong*, 590 F.3d at 960 n.4 (emphasis added); *see also*, *e.g.*, *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) ("[Plaintiff] bears the burden of showing that he has standing for each type of relief sought."); *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 48 (1st Cir. 2008) (same).   Regardless of provisions of state law, Article III's standing requirement demands that the class member at trial "'show that he *personally has suffered some actual or threatened injury as a result of* the putatively illegal conduct of the defendant.'"  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (emphasis added) (citation omitted); *see also*, *e.g.*, *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 67 (1st Cir. 2003) (same); *Me. People's Alliance v. Holtrachem Mfg. Co.*, 211 F. Supp. 2d 237, 252 (D. Me. 2002) (Carter, J.) (same).

This Article III requirement independently dooms plaintiffs' "no injury" theory of the UCL.  A plaintiff cannot proceed in federal court on behalf of a class – as these plaintiffs seek to do – with a confessed intention never to satisfy the independent standing requirements of Article III.  For example, in *Rivera*, 283 F.3d 315, the Fifth Circuit reversed an order certifying a class of pharmaceutical purchasers who sought their "money back" based on allegations that "other patients" – not members of the class – had been injured.  *Id.* at 319-20.  The court explained that "[s]tanding is an inherent prerequisite to the class certification inquiry."  *Id.* at 319 (citation omitted).  The allegation that the defendant may have violated state-law duties generally was insufficient to confer standing; instead, the court held that plaintiffs who did not allege they personally had been injured by the alleged misconduct lacked standing to sue, and thus the class could not go forward on this no-injury theory.  *Id.* at 320 ("plaintiffs must show that Wyeth violated a legal duty owed to them," which requires that "the injury be personal") (citation omitted); *see also*, *e.g.*, *Williams*, 297 F. Supp. 2d at 176-78 (following *Rivera* as "instructive

and persuasive"); *Koronthaly v. L'Oreal USA, Inc*., 2010 WL 1169958, at *2 (3d Cir. 2010)

(affirming dismissal of class action complaint on standing grounds because without "any

allegation that she received a product that failed to work for its intended purpose or was worth

objectively less than what one could reasonably expect, [plaintiff] has not demonstrated a

concrete injury-in-fact"); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1337 (S.D. Fla. 2007)

(dismissing class claims where plaintiffs' theory of injury was "too speculative to be the premise

of an 'actual injury' under Article III").

    *Second*, if plaintiffs' interpretation of *Tobacco II* were correct, it is based on a *procedural*

determination that – as a matter of California class action law – only the named representatives

need standing.  *See*, *e.g.*, 207 P.3d at 33 (acknowledging that the ruling turns on "issues of class

action procedure"); *id*. at 36 (rejecting defendants' arguments as to the requirements that are

"mandated by class action principles").  By contrast, this case is governed not by California's

class action procedural requirements, but rather by Rule 23.  *Shady Grove Orthopedic Assocs.,*

*P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 2010 WL 1222272, at *4-5 (2010).

    As a matter of federal Rule 23 procedure, a class action leaves "the parties' legal rights

and duties intact and the rules of decision unchanged" from what they would be if the absent

class members had brought individual suits.  *Id*. at *8.  Federal Rule 23 law thus requires absent

class members to have the same standing that would be required if they had sued individually.

*See*, *e.g.*, *Williams v. Mohawk Indus. Inc.*, 568 F.3d 1350, 1360 (11th Cir. 2009) (recognizing

need to limit the class only to those who "have standing"); *Denney v. Deutsche Bank AG*, 443

F.3d 253, 264 (2d Cir. 2006) (under federal class action principles, "no class may be certified

that contains members lacking Article III standing"); *Oshana v. Coca-Cola Bottling Co.*, 225

F.R.D. 575, 580 (N.D. Ill. 2005) (denying certification where "the proposed class definition is

overly inclusive and encompasses millions of potential members without any identifiable basis for standing"), *aff'd*, 472 F.3d 506 (7th Cir. 2006).[31]  Plaintiffs concede that a named plaintiff must establish injury (and deception and causation) under Proposition 64 to have standing to bring a UCL action.  Pls. Br. at 20.  Accordingly, these Rule 23 principles mandate that absent class members proceeding in federal court must satisfy these same requirements, and this independently requires each UCL class member to establish an injury.[32]

### c.   CPPA (At Issue In *Slater* (D.C.))

As with the UCL, plaintiffs contend that they may establish liability under the CPPA without any showing of injury.  Pls. Br. at 32.  Plaintiffs' interpretation of the CPPA confuses what is necessary to prove a *violation* of the statute – triggering, for example, the right of the D.C. government to sue to enjoin the practice – with what is necessary to establish a private cause of action for monetary relief.  That a defendant in some circumstances may have engaged in a deceptive practice even if consumers were not injured does not mean that those uninjured consumers have a valid claim or Article III standing.  Indeed, the very case upon which plaintiffs rely notes the critical distinction between the "administrative remedies available for redress of

---

[31]   To be sure, the *Tobacco II* court suggested that its holding was consistent with federal class-action law, but that statement was erroneous, as the cases cited above establish.  Notably, the court relied upon *Vuyanich v. Republic National Bank of Dallas*, 82 F.R.D. 420, 428 (N.D. Tex. 1979) (cited at 207 P.3d at 34).  The judgment in that case later was vacated by the Fifth Circuit, which found certification was improper because, among other problems, it "violate[d] rudimentary principles of . . . standing."  *Vuyanich v. Republic National Bank of Dallas*, 723 F.2d 1195, 1199-1201 (5th Cir. 1984).

[32]   The trial court's original order certifying a class in *Brown v. American Tobacco Co.*, the matter in which *Tobacco II* was decided, included a lights theory.  2001 WL 34136870 (Cal. Super. Ct. 2001).  The California Supreme Court did not address the propriety of that theory – at the time of its consideration of the matter, the lights claim had been dismissed by the trial court as preempted.  *See In re Tobacco Cases II*, Civ. No. JCCP4042 (Cal. Super. Ct. Mar. 11, 2010) (tentative ruling reinstating lights claim in light of *Good* ruling).  The trial court's original certification was in 2001 and before *Korea Supply*, *Kraus*, and many of the other subsequent decisions.  The trial court has not revisited class certification.  In any event, the court did not consider the Article III and Rule 23 requirements that are implicated in actions pending in federal court.

such violations and the availability of a court action" by a private plaintiff.  *Osbourne v. Capital City Mortgage Corp.*, 667 A.2d 1321, 1330 (D.C. 1995) (cited in Pls. Br. at 34).[33]

Like the other consumer protection statutes at issue here, a CPPA plaintiff who has not suffered any injury as a result of the alleged deceptive conduct has not established a cognizable injury under the CPPA and lacks Article III standing.  *See*, *e.g.*, *Williams*, 297 F. Supp. 2d at 178 ("The invasion of a purely legal right without harm to the consumer – in this case . . . freedom from alleged false and misleading advertising – can be addressed through the administrative process of the Government of the District of Columbia."); *Beck*, 2010 WL 322242, at *2 (granting summary judgment where "plaintiffs have advanced no competent evidence to establish that they have been injured by the conduct of which they complain"); *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 28 (D.D.C. 2007) ("[a]bsent a claim of injury, [plaintiff] has no standing to present his DCCPPA claim"); *Ctr. for Sci. in the Pub. Interest v. Burger King Corp.*, 534 F. Supp. 2d 141, 143 (D.D.C. 2008) ("even a cursory review of plaintiff's complaint reveals that [it] has failed to allege an injury in fact sufficient to establish Article III standing").[34]

Plaintiffs note that the CPPA authorizes the recovery of minimum statutory penalties in the event that plaintiffs' actual damages are less than $1,500.  *See* Pls. Br. at 32; D.C. Code § 28-3905(k)(1).  But this provision merely addresses the form of relief that may be available to a

---

[33]   For this reason, plaintiffs' citation to *Banks v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 634 A.2d 433 (D.C. 1993) (cited in Pls. Br. at 34), is misplaced, as that decision addresses only the proof required to establish a violation of the statute, not the elements of liability.  *Id.* at 440.

[34]   In *Grayson v. AT&T Corp.*, 980 A.2d 1137, 1154 (D.C. 2009), a panel of the D.C. Court of Appeals suggested that a plaintiff might be able to obtain relief in a CPPA action brought in D.C. court without a showing of injury.  *En banc* review has since been granted in that case, and that decision has been vacated and has no legal effect.  989 A.2d 709 (D.C. 2010).  But, in any event, *Grayson* expressly recognized that its holding was limited to D.C. court proceedings that were not subject to the limitations of Article III.  980 A.2d at 1155 n.78 (justifying its ruling because "this court is not bound by the case or controversy requirement of Article III").

plaintiff once liability is established.  *See*, *e.g.*, *Murray v. Motorola, Inc.*, 982 A.2d 764, 783 (D.C. 2009) (describing statutory damages as a form of "relief" that is available to a "successful plaintiff"); *Luna v. A.E. Eng'g Servs., LLC*, 938 A.2d 744, 750 (D.C. 2007) (minimum damages would have been available if plaintiffs had established liability).  The mere existence of a statutory floor for the amount of damages that a plaintiff may recover cannot obviate the elements required to establish liability; nor can it eliminate the requirements of Article III standing.

Plaintiffs rely further on *Aspinall*, 813 N.E.2d 476, which they imply held – in the course of certifying a lights claim under Massachusetts law – that a plaintiff who has not suffered any injury could nonetheless obtain civil penalties under the Massachusetts statute in an action proceeding in state court.  *See* Pls. Br. at 34.  That decision has no bearing on the interpretation of the D.C. statute in an action proceeding in federal court and subject to Article III.  Moreover, plaintiffs' reading of Massachusetts law was subsequently rejected by the Massachusetts Supreme Judicial Court in *Hershenow v. Enterprise Rent-A-Car Co.*, 840 N.E.2d 526 (Mass. 2006), which held that "[a] consumer is not, however, entitled to redress under [the provision at issue in *Aspinall*], where no loss has occurred."  *Id*. at 535; *see also*, *e.g.*, *Rule v. Fort Dodge Animal Health, Inc.*, 604 F. Supp. 2d 288, 302 (D. Mass. 2009) ("[T]he *Hershenow* court expressly rejected the proposition, suggested by some language in *Aspinall*, that a misrepresentation can qualify as an 'injury' to consumers who are influenced by it simply because it is 'deceptive.'  In so doing, the court emphasized that 'deception' and 'injury' are independently required elements of a Chapter 93A claim, and that the invasion of a legal interest is not by itself sufficient to establish an 'injury.'") (internal citations omitted).

38

**d.    Unjust Enrichment (At Issue In *Biundo* (Illinois), *Slater* (D.C.), And *Good* (Maine))**

Plaintiffs' similar suggestion that unjust enrichment claims do not require any injury resulting from the alleged misconduct, Pls. Br. at 35, 39-44, was explicitly rejected by *Cleary* in the context of addressing an identical lights claim brought under Illinois law (the same claim at issue in *Biundo*):

> To be entitled to restitution, [plaintiffs] contend, they need not demonstrate causation or injury to any individual class member . . . This is incorrect.  A claim of unjust enrichment based on a theory of restitution *also requires a plaintiff to establish she was harmed*.

2010 WL 431670, at *3 (emphasis added) (citation omitted).  This ruling is based on the common sense notion that without proof of an injury resulting from the alleged misconduct, the plaintiff cannot demonstrate that it would be unjust for the defendant to retain the money earned from the sale of light cigarettes (nor would the plaintiff have Article III standing).  *See, e.g.*, *Oshana*, 472 F.3d at 513-15 (finding that an Illinois "unjust enrichment claim carries similar shortcomings" to an ICFA claim where class members "could not show any damage"); *Griffith v. Barnes*, 560 F. Supp. 2d 29, 35 (D.D.C. 2008); *see generally* Restatement of Restitution § 3, cmt. a ("a person who receives property as the result of a tort committed by him against another has a duty of compensating the other *for the loss suffered*, at least to the extent of the benefit received") (emphasis added).[35]

---

[35]    Although we have not found a decision squarely addressing this issue for purposes of an unjust enrichment claim brought under Maine law, there is no reason to believe Maine law would be any different.  Indeed, even the unjust enrichment cases cited by plaintiffs recognize the existence of an injury requirement by holding that the plaintiff must establish that the defendant was enriched "at the expense of plaintiff."  *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 21 (D. Mass. 2010); *see also In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 (S.D. Fla. 2004) (same); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 351-52 (E.D. Mich. 2001) (same).

2.      **Plaintiffs Have Failed To Offer A
Viable Means Of Establishing Common Injury**

As the *Canadian Export* court explained, the question of whether each class member

suffered a cognizable injury as a result of the alleged misconduct is distinct from how plaintiffs

would prove the amount of damages for each class member.  522 F.3d at 28.  The court made

clear that plaintiffs cannot obtain certification unless they "include some means of determining

that each member of the class was in fact injured" that does not depend on "individual

determinations for the many millions of potential class members."  *Id*.  To do this, plaintiffs must

provide a sufficient record of "*how*" they would establish class-wide injury to enable the Court

"to test the viability of" plaintiffs' theory.  *Id*. at 29 (emphasis in original).  Applying these

principles, the *Canadian Export* court reversed a certification order where the viability of

plaintiffs' injury model was "unclear," and the court had "concerns" about whether plaintiffs

could prove injury on a class-wide basis.  *Id*. at 27-28.  Consistent with *Canadian Export*, courts

have rejected certification of other lights cases because plaintiffs had no viable means of

establishing an injury caused by the alleged misconduct on a class-wide basis.  *See McLaughlin*,

522 F.3d at 227-30; *Benedict*, 241 F.R.D. at 680.  This case is no different.

In these cases, *Canadian Export* requires these plaintiffs to come forward with a means

of establishing on a class-wide basis two separate aspects of injury.  *First*, they must proffer a

method for showing that the class did not receive what was allegedly promised (less tar and

nicotine) and thus did not receive what it paid for – the same proof that is also required to prove

a misrepresentation.  Obviously, if a class member received less tar and nicotine from a light

cigarette, that class member has suffered no injury.  Yet plaintiffs have come forward with no

proof or plan to prove this issue on a common basis.  Nor could they in light of the

demonstration above that many smokers in fact received less tar and nicotine. *See supra* at 25-29 (explaining why this proof is individual).

*Second*, even if plaintiffs surmounted that hurdle, they would have to proffer a method for proving that a class member who did not receive less tar and nicotine from a light cigarette compared to a full-flavored cigarette somehow suffered an "economic injury" when both cigarettes cost the same. In short, plaintiffs must prove on a common basis that the class "paid more for light cigarettes than they would have but for defendants' misrepresentation." *McLaughlin*, 522 F.3d at 227. This aspect of injury requires proof that the class paid an overcharge – *i.e.*, it bought light cigarettes that were worth less than their purchase price. *See, e.g.*, *Mulligan*, 888 N.E.2d at 1197-98 (under ICFA, plaintiff suffers an injury by paying too much for a product); *Wiener*, 255 F.R.D. at 670 (same for CLRA); *Vioxx*, 103 Cal. Rptr. 3d at 96 (same for UCL); *see generally* Declaration and Expert Disclosure Statement of Dennis W. Carlton (Carlton Decl.) ¶¶ 18-22 (Ex. 19).[36] Plaintiffs have failed to provide any class-wide means of satisfying this aspect of injury either.

Plaintiffs' fundamental problem is a record showing that the class suffered no common economic injury at all. Plaintiffs allege that they received a cigarette that did not deliver less tar and nicotine and, as a result, was essentially no different from a full-flavored cigarette. *See, e.g.*, *Good* Compl. ¶ 3; *Tyrer* Compl. ¶¶ 2-3. Were this true, plaintiffs would have to show that they paid more than the value of what they contend they actually received – a full-flavored cigarette. But the evidence is undisputed that light and full-flavored cigarettes *have always been priced the same*. Neidle Decl. ¶ 4; Carlton Decl. ¶¶ 31-32; *see also McLaughlin*, 522 F.3d at 228 ("Lights

---

[36]   Dr. Carlton is a Professor of Economics at the University of Chicago and the former Deputy Assistant Attorney General for Economic Analysis at the Department of Justice. *Id*. ¶¶ 1-2.

have always been priced the same as full-flavored cigarettes."). As a result, any allegation that the price of light cigarettes is "inflated fails as a matter of law": "[d]efendants' misrepresentation could in no way have reduced the value of the cigarettes that plaintiffs actually purchased." *McLaughlin*, 522 F.3d at 227, 229; *see also* Carlton Decl. ¶ 32.

In the face of this evidence, plaintiffs do not try to proffer a common means of showing that they paid too much for light cigarettes. Indeed, their expert, Dr. Harris, acknowledges that he did not attempt to measure an economic injury: *i.e.*, any "difference between the price paid by the consumer and the price they would have paid, but for the alleged misconduct." Harris Dep. at 81:20-82:1. This concession alone makes clear that plaintiffs have not even attempted to satisfy their burden under *Canadian Export* and is dispositive of any contention that plaintiffs suffered an injury by paying "more for light cigarettes than they would have but for defendants' misrepresentation." *McLaughlin*, 522 F.3d at 227.[37]

Instead of attempting to show an injury by calculating a class-wide economic loss, plaintiffs asked Dr. Harris to go in an entirely different – and legally insufficient – direction. Dr. Harris opines that he can develop two models: (1) a model that purports to calculate the *full purchase price* that class members spent on light cigarettes (the "restitution" theory), and (2) a model that purports to calculate *the amount of profits* that defendants earned from the sale of light cigarettes (the "disgorgement of profits" theory). *See* Harris Report ¶ 8. Neither approach establishes an economic injury suffered as a result of the alleged misconduct. Instead, restitution of the full purchase price and disgorgement of profits are merely "*forms of relief*" that may be

---

[37]   Dr. Harris in other lights cases has attempted to construct a model (albeit a legally flawed one) that purports to calculate "the difference between the price paid [for light cigarettes] and the value to the consumer of the good that was actually delivered." Harris Dep. at 82:4-12. Yet plaintiffs did not ask Dr. Harris to attempt to conduct such an analysis here, *see id.* at 18:7-20:13; 82:2-3, presumably because his model was expressly rejected by the Second Circuit as invalid. *See McLaughlin*, 522 F.3d at 228-29.

available under some claims, but only after the plaintiff – unlike these plaintiffs – has established

all of the elements of liability, including injury. *Corbett v. Super. Ct.*, 125 Cal. Rptr. 2d 46, 64

(Ct. App. 2002) (emphasis added); *see also Oshana v. Coca-Cola Co.*, 2005 WL 1661999, at *10

(N.D. Ill. 2005) ("the focus in a disgorgement scenario is on the defendant's gain, *not the

plaintiff's loss*") (emphasis added), *aff'd*, 472 F.3d 506 (7th Cir. 2006); *Remsen Partners, Ltd. v.

Stephen A. Goldberg Co.*, 755 A.2d 412, 413 n.2 (D.C. 2000) (describing disgorgement as a form

of relief); *Consumers for Affordable Health Care v. Superintendent of Ins.*, 2001 WL 1794974, at

*2 (Me. Super. Ct. 2001) (same); *Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*,

955 F.2d 67, 75 (D.C. Cir. 1992) ("restitution" or "consumer refunds" are "a form of equitable

relief"); *Mank ex rel. Hannaford Health Plan v. Green*, 297 F. Supp. 2d 297, 301-02 (D. Me.

2003) (Carter, J.) (same).[38]

Moreover, Dr. Harris' disgorgement model suffers from additional flaws that foreclose its

use as a basis for certification.  Disgorgement only permits recovery for "*wrongfully obtained*"

profits. *Bank of the West*, 833 P.2d at 552-53 (emphasis added).[39]  Determining whether profits

were wrongfully obtained as a result of the alleged fraud would require evaluating if each class

member was deceived, purchased as a result of that deception, and thereafter failed to receive

less tar and nicotine, which can only be done on an individual basis.  Dr. Harris admitted that he

made no attempt to limit disgorgement to those profits that were wrongfully obtained, but rather

---

[38]   In addition, these forms of relief are equitable and would not be available to plaintiffs to the extent that this Court grants Philip Morris USA Inc.'s Motion for Judgment on the Pleadings on Plaintiffs' Unjust Enrichment Claims and Other Requests for Equitable Relief (Mar. 29, 2010).

[39]   *See also*, *e.g.*, *Remsen Partners*, 755 A.2d at 413 n.2 (disgorgement involves an act of "giv[ing] up illicit or ill-gotten gains"); *Griffith*, 560 F. Supp. 2d at 35 ("court must distinguish between illegally and legally obtained profits"); *State v. McLeod*, 2003 WL 1711657 at *2 (Me. Super. Ct. 2003) (disgorgement "prevent[s] a wrongdoer from profiting from his wrongdoing"); *Regnery v. Meyers*, 679 N.E.2d 74, 81 (Ill. App. Ct. 1997) (ordering disgorgement of wrongfully obtained profits).

43

simply assumed that all profits were wrongfully obtained.  Harris Dep. at 69:21-70:17, 76:5-13, 79:6-80:9.  For this reason, even if disgorgement were available under some of the claims here, it cannot resolve or avoid the other individual issues raised by plaintiffs' claims.

Finally, contrary to plaintiffs' claims, Pls. Br. at 20, 28, Dr. Harris' disgorgement model cannot provide a basis for certifying their California UCL claims because "nonrestitutionary disgorgement of profits *is not an available remedy* in an individual action under the UCL." *Korea Supply*, 63 P.3d at 949 (emphasis added).  UCL plaintiffs are instead limited to a form of restitution that is intended to "restore the status quo" by "restor[ing] to the plaintiffs funds that were directly owed to them by the defendant."  *Id*. at 947-48.  Again, as *Vioxx* held, in the context of allegations that a defendant misrepresented the health effects of its product, the "proper measure of restitution" is not the profit received by the defendant, but rather the "difference between what the plaintiff paid and the value of what the plaintiff received."  103 Cal. Rptr. 3d at 96.  Thus, even if plaintiffs were correct in their reading of *Tobacco II*, that plaintiffs have not even attempted to provide such a restitution model – as would be required under the UCL – is reason alone to deny certification of that claim.  *See Canadian Exp.*, 522 F.3d at 28-30.

      **C.**      **Individual Proof Of Causation Would Be Required Due To Different
              Beliefs About And Reasons For Purchasing Light Cigarettes**

              **1.**      **Each Claim Requires Proof That Each Class Member
                     Was Deceived By The Alleged Misrepresentations
                     And Purchased Light Cigarettes As A Result**

To prove each of the claims at issue here, each class member also must establish – as part of the burden of establishing causation – that he or she purchased light cigarettes as a result of being deceived by the alleged misrepresentations.  This requires proof that each class member

(1) believed light cigarettes delivered less tar and nicotine and thus were safer, and (2) purchased light cigarettes because of that belief, and not for other reasons such as taste or image.[40]

### a.   IFCA (At Issue In *Biundo* (Illinois))

Citing an 18-year old decision, plaintiffs contend that ICFA does not require proof that "plaintiff[s] have relied on the deception."  Pls. Br. at 36 (citing *Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 198 (Ill. 1992)).  Plaintiffs argue that, to satisfy causation, each class member instead need only demonstrate that he or she "receiv[ed] misleading communications."  *Id*. at 38 (citing *De Bouse v. Bayer AG*, 922 N.E.2d 309 (Ill. 2009)).

To the contrary, the very case upon which plaintiffs rely – *De Bouse* – expressly rejects plaintiffs' position.  That court explained that "we have repeatedly emphasized that in a consumer fraud action, *the plaintiff must actually be deceived by a statement or omission*."  922 N.E.2d at 316 (emphasis added).  A plaintiff who "cannot have *relied* on the statement . . . *cannot prove proximate cause*."  *Id*. (emphases added).  *De Bouse* is the latest in a long line of Illinois Supreme Court decisions that have held that to establish liability under ICFA, each plaintiff must prove he or she "actually saw *and was deceived by* the statements in question." *Barbara's Sales, Inc. v. Intel Corp*., 879 N.E.2d 910, 927 (Ill. 2007) (emphasis added).[41]

Plaintiffs ignore this authority.  Instead, they cite to the trial court decision in *Price*, a lights action brought under ICFA.  *See* Pls. Br. at 37 (citing *Price v. Philip Morris Inc*., 2003 WL

---

[40]   This requirement often is described as "transaction causation" or "reliance," which refers to the causal link between the defendant's misconduct and the plaintiff's decision to enter into the transaction (in this case, purchasing light cigarettes).  *See, e.g.*, *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

[41]   *See also*, *e.g.*, *Avery*, 835 N.E.2d at 861 (same); *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002) (same); *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 219 (Ill. 2004) (rejecting ICFA claim where plaintiff may have "'kn[own] the truth' but elected to use [the defendant's] product anyway"); *Kremers v. Coca-Cola Co.*, No. 3:09-cv-00333, slip op. at 14-16 (S.D. Ill. 2010) (Ex. 20).

22597608 (Ill. Cir. Ct. 2003)).  Plaintiffs disregard that on appeal, the Illinois Supreme Court

vacated the judgment (rendering it a legal nullity, *In re K.S.*, 850 N.E.2d 335, 345 (Ill. App. Ct.

2006)).  Moreover, in so doing, the court made clear that, to establish causation in a lights claim,

each class member would have to demonstrate that he or she "ha[s] actually been deceived," and

"question[ed] whether it can reasonably be said that the words 'light' and 'lowered tar and

nicotine' actually deceived over a million people."  848 N.E.2d at 52.

**b.**      **CLRA/UCL (At Issue In *Tyrer* (California))**

Plaintiffs concede that the CLRA requires proof of reliance.  Pls. Br. at 29; *see also*, *e.g.*,

*Cohen*, 101 Cal. Rptr. 3d at 47-48 (CLRA requires "actual reliance"); *Princess Cruise Lines, Ltd.*

*v. Super. Ct.*, 101 Cal. Rptr. 3d 323, 331 (Ct. App. 2009) (same).  In their next breath, however,

plaintiffs seek effectively to eliminate this requirement.  They contend they are entitled to an

"inference" that every one of the millions of purchasers at issue relied on the representation, and

they need not demonstrate that anyone actually relied.  Pls. Br. at 29-31.

That is not the law.  As the cases plaintiffs cite make clear, such an "inference of

common reliance" under the CLRA is proper only under limited circumstances and "*if the record*

*permits.*"  *McAdams*, 105 Cal. Rptr. at 710 (emphasis added) (citation omitted) (cited in Pls. Br.

at 29); *see also*, *e.g.*, *Mass. Mut. Life Ins. Co. v. Super. Ct.*, 119 Cal. Rptr. 2d 190, 198 n.5 (Ct.

App. 2002) (court rejects presumption or inference when the evidence shows that "class

members were provided with a variety of information") (cited in Pls. Br. at 29).  Where the

record demonstrates that consumers have different beliefs about or reasons for purchasing the

product, each claimant must establish that he or she relied to establish liability under the CLRA.

*See*, *e.g.*, *Vioxx*, 103 Cal. Rptr. 3d at 98-99 (refusing to infer that all plaintiffs relied); *Caro v.*

*Proctor & Gamble Co.*, 22 Cal. Rptr. 2d 419, 433 (Ct. App. 1993) (same); *Pokrass v. DIRECTV*

46

*Group, Inc.*, 2008 WL 2897084, at *5 (C.D. Cal. 2008) (same).[42]  As shown below, an inference

of universal reliance on the unrefuted record here would be improper because of the enormous

variability of consumer beliefs and purchasing motivations.  *See infra* 51-57.[43]

Plaintiffs also incorrectly contend that, under *Tobacco II*, they may establish liability and

obtain monetary relief under the UCL without any showing of causation – again, according to

plaintiffs, all that matters is whether some other "members of the public are likely to be

deceived."  Pls. Br. at 26.  As discussed above, *Tobacco II* did not address the elements

necessary to establish monetary liability under the UCL, but rather only whether the standing

requirements imposed by Proposition 64 applied to absent class members.  *See supra* at 31-33.

The elements of a UCL claim were set forth in *Korea Supply*, which held that only "direct

victims" may recover restitution under the UCL to restore money or property that was "*acquired

through* unfair practices."  63 P.3d at 44 (emphasis added); *see also Kraus*, 999 P.2d at 724-32

(same); *In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 665 (Ct. App. 2005) (the UCL requires a

"causal connection" between the alleged violation and the injuries for which redress is sought).

---

[42]   This principle is consistent with the law across the country.  *See*, *e.g.*, *McLaughlin*, 522 F.3d at 225-26 & n.7 (collecting cases); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665-66 (9th Cir. 2004) (rejecting reliance presumption where plaintiffs are not always "similarly situated" and cannot be expected to "share a common universe of knowledge and expectations – one motivation does not 'fit all'"); *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1362-64 (11th Cir. 2002) (same); *see generally United States Dep't of Justice v. Landano*, 508 U.S. 165, 175 (1993) (no inference or presumption is proper whenever "common sense and probability" dictate otherwise).

[43]   Even if plaintiffs were entitled to an inference to make their *prima facie* showing, defendants would still have the right to rebut by showing that individual class members did not rely.  *See Vasquez v. Super. Ct.*, 484 P.2d 964, 973 (Cal. 1971) ([d]efendants may, of course, introduce evidence in rebuttal" to the inference) (cited in Pls. Br. at 30).  This right of rebuttal would itself create predominating individual issues.  *See*, *e.g.*, *In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008) ("the right of a defendant to present evidence negating" a presumption of reliance defeats certification); *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 220-21 (5th Cir. 2003) (same); *Davies*, 2006 WL 1600067, at *3 (rejecting certification of lights claim because "Defendant is entitled to an opportunity to rebut the presumption of reliance.  Defendant would be entitled to challenge each and every class member as to causation.").

A claimant who was not deceived by the alleged misrepresentation or would have purchased light cigarettes regardless of the alleged misrepresentation cannot show that any property was "acquired through" the misconduct; nor is that claimant a "direct victim."

Recognizing this principle, the *Cohen* court rejected a similar attempt to read causation out of the UCL, holding that "factual questions associated with [class members'] reliance on [defendant's] alleged false representations was a proper criterion for the court's consideration" in assessing certification, "even after *Tobacco II*."  101 Cal. Rptr. 3d at 49; *see also Pfizer, Inc. v. Super. Ct.*, 105 Cal. Rptr. 3d 795, 803 (Ct. App. 2010) (individual who was not exposed to the alleged misrepresentation "could not possibly have lost money or property as a result of the unfair competition" and "is not entitled to restitution" under the UCL).

Plaintiffs alternatively suggest that, even if they need to prove that they were deceived and purchased light cigarettes as a result, this requirement would be satisfied under the UCL by the mere existence of a "decades long advertising campaign."  Pls. Br. at 22.  In support, plaintiffs rely on two individual smoker personal injury cases that were cited in *Tobacco II*.  *Id.* at 21 (citing *Boeken v. Philip Morris Inc.*, 26 Cal. Rptr. 3d 638 (Ct. App. 2005), *Whiteley v. Philip Morris Inc.*, 11 Cal. Rptr. 3d 807 (Ct. App. 2004)).  Plaintiffs distort those decisions.  The courts in those cases merely upheld plaintiff verdicts as consistent with the specific evidence in the record.  In so doing, they concluded that where the defendants' advertising was particularly extensive, plaintiffs need not identify the precise statements upon which they relied – it was sufficient that plaintiffs testified that they were deceived.  *See Whiteley*, 11 Cal. Rptr. 3d at 843-45; *Boeken*, 26 Cal. Rptr. 3d at 654-55; *see also* Pls. Br. at 21 (conceding that, in both cases, plaintiffs testified that they were "influenced" by cigarette advertising).  Neither decision

suggests that the issue of whether class members were deceived could be tried without individual proof.

        c.        **CPPA (At Issue In *Slater* (D.C.))**

As with the UCL, plaintiffs seek to eliminate any causation requirement from the CPPA, noting that the statute provides that there may be a "violation" regardless of "whether or not any consumer is in fact misled [or] deceived . . . ."  Pls. Br. at 33 (quoting D.C. Code § 28-3904).  Once again, this argument confuses the elements required to establish a "violation" of the statute, with the elements required to establish a successful private cause of action.  *See supra* at 36-38.

The D.C. Court of Appeals has not resolved whether private CPPA plaintiffs need to establish that they were deceived by, and purchased the product as a result of, the misrepresentation.  Two federal courts have addressed the issue, with conflicting results.  *Compare Williams*, 297 F. Supp. 2d at 176-77 (complaint failed to plead a viable CPPA claim where it did not "plead that these [plaintiffs] were in any way deceived – or even saw – any of that advertising") *with Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 8-9 (D.D.C. 2002) (noting in *dictum* and without analysis that the 2000 amendment to the CPPA eliminated any required showing of causation).

*Williams* is better reasoned and should be followed here.  It makes no sense to allow a claimant who knew the "truth" about the alleged misrepresentation yet decided to purchase the product – for reasons entirely unrelated to the alleged misrepresentation – to obtain monetary relief.  For this reason, courts have overwhelmingly interpreted consumer protection statutes to require proof of a causal nexus between the alleged misrepresentation and the decision to

purchase the product.[44]  (In any event, even if this showing were not required, the other

individual issues identified here each provide sufficient grounds to reject class certification.).

**d.      Unjust Enrichment (At Issue In *Biundo*
(Illinois), *Slater* (D.C.), And *Good* (Maine))**

Unjust enrichment claims require proof that, under the circumstances, it would be

"inequitable for the defendant to retain the benefit [conferred by plaintiff]."  *Thibeault v.*

*Brackett*, 938 A.2d 27, 32 (Me. 2007); *see also News World Commc'ns, Inc. v. Thompsen*, 878

A.2d 1218, 1222 (D.C. 2005) (same); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,

545 N.E.2d 672, 679 (Ill. 1989) (same).  To the extent a class member purchased with

knowledge of, or for reasons unrelated to, the alleged fraud, it would not be inequitable for PM

USA to retain any alleged benefit from that class member.

*Cleary* thus rejected certification of an Illinois unjust enrichment-based lights claim in

part because some class members "purchased Marlboro Lights for reasons wholly unrelated to its

purportedly less-unhealthy qualities – for example, because they preferred the flavor over other

brands" and would not have successful claims.  265 F.R.D. at 293; *see also In re Sears, Roebuck*

*& Co. Tools Mktg. & Sales Practices Litig.*, 2007 WL 4287511, at *9 (N.D. Ill. 2007) (unjust

enrichment claim based on fraudulent conduct requires proof "that each class member purchased

the [product] . . . as a result of defendant's deception"); *Indep. Trust Corp. v. Fidelity Nat'l Title*

---

[44]     *See*, *e.g.*, *Schnall v. AT&T Wireless Servs., Inc.*, 225 P.3d 929, 940-41 (Wash. 2010); *Nixon
v. Alan Vester Auto Group, Inc.*, 2009 WL 382743, at *2 (M.D.N.C. 2009); *Lloyd v. Gen. Motors
Corp.*, 916 A.2d 257, 277 (Md. 2007); *Crowe v. Tull*, 126 P.3d 196, 210 (Colo. 2006); *Wiegand
v. Walser Auto. Groups, Inc.*, 683 N.W.2d 807, 811-12 (Minn. 2004); *Weinberg v. Sun Co.*, 777
A.2d 442, 446 (Pa. 2001); *Feitler v. Animation Celection, Inc.*, 13 P.3d 1044, 1047 (Or. Ct. App.
2000); *MacDonald v. Texaco, Inc.*, 713 S.W.2d 203, 205 (Tex. Ct. App. 1986); *Correa v. Pecos
Valley Devel. Corp.*, 617 P.2d 767, 771 (Ariz. Ct. App. 1980); *see generally* Sheila Scheuerman,
The Consumer Fraud Class Action:  Reining in Abuse By Requiring Plaintiffs To Allege
Reliance As An Essential Element, 43 Harv. J. Legis. 1 (2006) (consumer protection statutes
should be interpreted to include reliance requirements).

50

*Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1051 (N.D. Ill. 2008) (same); *Everest v. Leviton Mfg. Co.*,

2006 WL 381832, at *3 (Me. Super. Ct. 2006) (unjust enrichment claim premised on fraud must

allege that plaintiff was induced to purchase the product in reliance upon defendant's false

representations); *Griffith*, 560 F. Supp. 2d at 35 (in an unjust enrichment claim under D.C. law,

"a court's equitable power is restricted to property causally related to the wrongdoing," and

plaintiff "has the burden of demonstrating that the proposed disgorgement figure reasonably

approximates the amount of illegally obtained profits") (citations omitted).

### 2.     Class Members Have Different Beliefs About And Reasons For Purchasing Light Cigarettes

Courts in this district and elsewhere have consistently held that claims – including

consumer fraud act and unjust enrichment claims – cannot be resolved on a class-wide basis

where the class members are likely to have different beliefs about and reasons for purchasing the

product or service in question.[45]  The same principles apply here.  Smokers have widely varying

beliefs about and reasons for purchasing light cigarettes.  *See, e.g., McLaughlin*, 522 F.3d at 223

("Individualized proof is needed to overcome the possibility that a member of the purported class

purchased Marlboro Lights for some reason other than the belief that Marlboro Lights were a

healthier alternative – for example, if a Marlboro Lights smoker was unaware of that

representation, preferred the taste of Marlboro Lights, or chose Marlboro Lights as an expression

of personal style."); *Stern*, 2007 WL 4841057, slip op. at 14 ("The record before this Court

reveals that consumers have reasons other than the alleged deception or misrepresentation to

---

[45]     *See, e.g., Sanford v. Nat'l Ass'n for the Self-Employed, Inc.*, slip op. at 10 (D. Me. Feb. 9, 2010) (Hornby, J.) (Ex. 21); *Howard's Rexall Stores, Inc. v. Aetna U.S. Healthcare, Inc.*, 2001 WL 501055, at *4 (D. Me. 2001) (Kravchuk, M.J.); *Poulos*, 379 F.3d at 666; *Castano*, 84 F.3d at 745; *see generally* Fed. R. Civ. P. 23 advisory committee's note ("a fraud case may be unsuited for treatment as a class action if there was material variation . . . in the kinds or degrees of reliance").

choose Marlboro Lights."); *Davies*, 2006 WL 1600067, at *3 ("the record shows" there are "numerous non-health-related reasons that people buy light cigarettes"); *Hines*, 883 So. 2d at 293 ("[A] substantial number of smokers purchase low tar cigarettes for the 'taste,' rather than for any perceived health related reasons."). Recognizing this variability, the *Good* plaintiffs themselves conceded that "if Plaintiffs are required to prove subjective reliance by each member of the class, individualized issues will likely predominate over common questions and certification will likely be denied." Pls. Mot. to Certify Questions of State Law to the Law Court of Maine, at 7, *Good*, No. 05-CV-127 (D. Me. Feb. 27, 2009).

Plaintiffs have come forward with no expert evidence, nor other proof, that demonstrates that all class members believed that light cigarettes deliver less tar and nicotine or are safer, or that all class members purchased light cigarettes based on such beliefs. Nor do they attempt to explain how these issues can be resolved for millions of class members on a common basis. And Dr. Harris concedes that his "model" makes no effort to distinguish between those class members who were deceived and purchased as a result of that deception and those who were not. Harris Dep. at 70:4-12.[46]

---

[46] Plaintiffs rely almost exclusively on the court's findings in *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in part, vacated in part*, 566 F.3d 1095 (D.C. Cir. 2009) (petitions for *certiorari* pending) (*"DOJ"*), but do not – and cannot – identify any finding there that all light smokers were deceived by and relied upon the alleged misrepresentations. *See* Pls. Br. at 2-5. To the contrary, the *DOJ* court repeatedly found that many smokers did not believe that light cigarettes were safer or purchased light cigarettes for other reasons. *See, e.g.*, 449 F. Supp. 2d at 476 (only "21% of light or ultra light cigarette smokers chose those brands because they perceived them to be healthier"); *id.* ("another national survey showed that . . . 39% of light smokers chose those cigarettes to reduce their health risks without having to quit"). In any event, in light of the First Circuit's directive that plaintiffs must offer proofs and not mere allegations in support of their class certification showing, *see supra* at 13-15, plaintiffs cannot rely on the findings of a single judge, particularly where this Court has already declined to apply any preclusion to those findings. *See* Order (Mar. 5, 2010). Indeed, such findings here would be impermissible hearsay. *See, e.g.*, *Learner v. Marvin Lumber & Cedar Co.*, 2008 WL 5285028, at *2 n.3 (D.N.H. 2008) ("Apart from its potential collateral estoppel effect . . . the finding of [a previous] court has no evidentiary value, because prior judicial findings are inadmissible hearsay.").

In light of their burden to establish that the requirements of Rule 23 are met, plaintiffs' failure to offer any showing of how they could prove these issues on a class-wide basis is reason alone to deny their motion.  *See supra* at 13-15.  And the unrefuted evidence in the record confirms that the vast majority of class members here would not be able to make the necessary causation showing:

**Testimony of light smokers.**  Five of the class representatives at issue in this motion continue to purchase light cigarettes today.  *See* Deposition of Stephanie Good (Good Dep.) at 20:19-22, 99:4-13 (Taylor App. Att.); Deposition of Lori Spellman (Spellman Dep.) at 117:10-21 (Taylor App. Att.); Deposition of Allain Thibodeau at 23:11-20, 62:15-63:7 (Taylor App. Att.); Deposition of Miles Tyrer (Tyrer Dep.) at 52:22-53:3, 10:18-23 (Taylor App. Att.); Slater Dep. at 83:9-84:8.[47]  Indeed, five years after she filed her lawsuit, Ms. Spellman (a plaintiff in *Good*) conceded that "[i]f Marlboro Lights weren't in the store," she would simply "[g]o to another store."  Spellman Dep. at 106:10-12.  Likewise, Mr. Tyrer testified that he prefers the taste of light cigarettes, and he has not changed cigarettes because he "like[s] the light."  Tyrer Dep. at 69:12-16, 81:16-24.  That a class member continues to purchase light cigarettes even after learning of the alleged fraud demonstrates that there are other legitimate reasons why an individual would purchase light cigarettes.  *See*, *e.g.*, *McLaughlin*, 522 F.3d at 226 ("Three of the six named plaintiffs even continued to purchase Lights after filing the complaint in this case, suggesting the influence of some other motivation."); *Stern*, 2007 WL 4841057, slip op. at 15

---

[47]   Several other representatives in the actions consolidated here continue to purchase light cigarettes.  Williams Dep. at 153:3-154:17; Domaingue Dep. at 101:20-102:2; Deposition of Carol Corse (Corse Dep.) at 52:13-53:6 (Taylor App. Att.); Deposition of Melanie Haubrich (Haubrich Dep.) at 22:10-14 (Taylor App. Att.).  In the only lights case ever tried, 17 of the 23 class members who testified for plaintiffs continued to smoke light cigarettes at the time to trial.  *See* Opening Brief of Appellant Philip Morris USA Inc., *Price v. Philip Morris Inc.*, No. 96236, 2003 WL 25291623, at *10 & n.3 (Ill. Dec. 10, 2003) (collecting testimony).

(relying on fact that "some consumers continue to smoke 'light' cigarettes despite believing they are just as dangerous as full flavor cigarettes" in rejecting certification); *Price*, 848 N.E.2d at 57 ("[Plaintiff's] continued purchase of [Marlboro Lights] even after being alerted to their lack of health benefits suggests that she was entirely satisfied with the value of what she received for her cigarette-purchasing dollar.") (Karmeier, J., concurring).[48]

Moreover, testimony taken in virtually identical lights cases confirms that there are marked differences among the beliefs and purchasing decisions of light smokers. Many testified unequivocally that they do not believe that light cigarettes deliver less tar and nicotine or are safer. For example, one light smoker "laugh[ed]" at the idea that his cigarettes are healthier "[b]ecause that's insane to me." Deposition of Robert Ross (Ross Dep.) at 131:25-132:11 (Taylor App. Att.). He explained that in the "mid '90s" he watched a television report about compensation that "basically confirmed" what he already believed. *Id*. at 46:20-49:2. And he was adamant that differences in tar and nicotine deliveries had no impact on his purchasing decisions:

> Q:    Is it fair to say that the tar and the nicotine levels are
>        irrelevant to your choice of cigarette brands?
>
> A:    Yes.  It's not fair to say.  It's exactly.  It is irrelevant. . . .
>        Cigarettes are going to kill you, plain and simple.  Doesn't
>        matter what it is.

*Id*. at 56:22-57:9; *see also*, *e.g.*, *id*. at 55:9-18; Hall Dep. at 25:7-26:6 (agreed that it would be "silly" to think that the low tar cigarettes he smoked were safer than any other

---

[48]    Plaintiffs cannot justify their continued purchases of light cigarettes on addiction because there is no evidence that plaintiffs are addicted to a particular brand of cigarettes, as several plaintiffs concede. *See*, *e.g.*, Haubrich Dep. 118:7-18 (although she believes she "can't quit" smoking, she acknowledges she can quit smoking Marlboro Ultra Lights); Corse Dep. 56:21-22 ("I can't say that I am addicted to that brand."); Good Dep. at 78:3-79:2 (knows she is addicted to nicotine generally rather than to Marlboro Lights specifically).

cigarettes); Deposition of Kevin Hagan (Hagan Dep.) at 58:9-18 (Taylor App. Att.)
(understood "all my life" that he "'should not assume that cigarette brands using
descriptions like 'ultra light,' 'light,' 'medium,' or 'mild' are less harmful than full flavor
cigarette brands'") (Taylor App. Att.).

Instead of correlating light cigarettes with tar and nicotine deliveries or health, many
smokers explained that they believed that descriptors such as "lights" and "ultra lights" referred
to taste or flavor.  *See* Hagan Dep. at 35:10-16, 57:24-58:8 ("light" meant "it's not as full of
flavor" – and nothing else; believed "light" referred to "taste and flavor" from "the first day I
picked up a cigarette"); Deposition of Latasha Kelly at 86:10-13 (Taylor App. Att.) ("light"
means "just less harsh of an inhale or a pull," and does not mean less "harm to my health"); *id.* at
113:8-9 ("My personal belief is that the light or the ultra light has nothing to do with the tar.");
Deposition of Allison Watson at 58:23-59:4 (Taylor App. Att.) ("light" means "flavor" and
"taste").

Many smokers explained further that they purchased light cigarettes for reasons such as
taste.  For example, one light smoker used an analogy to coffee brands to explain the differences
in flavor and harshness between full-flavor cigarettes and their light counterparts:

> Q.    Now, when you switched to Marlboro Lights, could you
> tell a difference between not just the harshness of the
> Marlboro Lights compared to the Marlboro Reds, but the
> taste of the two cigarettes, or did they taste the same?

> A.    Slightly. You notice it's not as burnt.  It's not as harsh. It
> sort of would be the difference between Starbucks coffee
> and Caribou coffee.  I prefer Caribou coffee because I don't
> get the same burnt taste.  Starbucks is known for a stronger,
> more burnt coffee bean.  It's – really almost that's the
> distinction I would make as closest – the closest analogy I
> could make to it.

Deposition of Doug Landau at 16:2-14 (Taylor App. Att.); *see also* Hall Dep. at 109:19-110:10, 117:18-19 (chooses light cigarettes because they "taste better," relating the difference in taste to the comparison between au jus and cream sauces).[49]

      ***Publicly disseminated information and the market's response to that information.***  In addition, if smokers were deceived and purchased light cigarettes because of the alleged misrepresentations, one would expect to see a decline in either the sales or price of light cigarettes after the alleged "truth" was revealed.  Carlton Decl. ¶¶ 18-21.  As discussed above, there have been reports about the risks of light cigarettes and the possibility of compensation as early as the 1960s – decades before the proposed class periods in these cases.  *See supra* at 9-10.  Moreover, during these class periods, PM USA (in response to public health concerns about low tar cigarettes, including Monograph 13) has used a variety of media, including its website, freestanding inserts in newspapers, "onserts," and TV and radio ads, to advise consumers about compensation, that light descriptors are intended to refer to taste and flavor, and that smokers should not assume that light cigarettes are safer.  *See supra* at 11-13.  Plaintiffs do not dispute that at least a substantial portion of class members saw these communications – indeed, the essential premise of their opposition to PM USA's summary judgment motion based on these communications is that it is a fact issue as to how individual consumers responded.  *See, e.g.*, Pls. Resp. to Defs. Statement of Material Undisputed Facts in Supp. of Defs. Mot. For Summ. J. on Pls. Claims for Purchases After December 1, 2002, and Pls. Statement of Additional Material

---

[49]   *See also*, *e.g.*, Deposition of Fergal Furlong at 228:25-230:11 (Taylor App. Att.) (smokes light cigarettes out of brand loyalty, even though he believes they are more dangerous); Deposition of John Zimmatore at 114:22-25 (Taylor App. Att.) ("preferred the taste of the Marlboro Light over the Marlboro Red"); Deposition of Emily Zimmatore (Zimmatore, E. Dep.) at 81:23-82:13 (Taylor App. Att.) (Marlboro Lights "is what I smoke.  This tastes good to me.  I like this.  So no, you can't take them off the market."); Deposition of Cheryl Curtis  at 23:21-24:7 (Taylor App. Att.) (chose Marlboro Lights because "that's what my friends were smoking" and not for any other reason, including reduced tar).

Facts, ¶ 100 (Mar. 31, 2010) (relying on a study that 51% of "adult smokers of PM USA Low Tar brands" were aware of either the onsert or the TV commercial).

Notwithstanding these disclosures, an analysis conducted by PM USA's expert economist – and unrefuted by plaintiffs – demonstrates that there has been no decline in either the sales or price of light cigarettes since the disclosure of the alleged "truth." Carlton Decl. ¶¶ 29-39; *supra* at 41-42. As the Second Circuit explained, "that the market did not shift away from light cigarettes after the publication of Monograph 13 is compelling evidence that plaintiffs had other, non-health-related reasons for purchasing Lights." *McLaughlin*, 522 F.3d at 226.

**Survey Data.** Consumers' varying beliefs about and reasons for purchasing light cigarettes are also confirmed by the unrefuted survey evidence. *See* Taylor Decl. at 14-18, 22-25 (compiling survey evidence). For example:

- A 2003 NCI survey found that only 18% of light smokers reported that their "main" reason for choosing such cigarettes was "to reduce the health risks of smoking." In contrast, 42% responded that they chose light cigarettes "because of the taste." Taylor Ex. 3I at IV-I; Taylor Decl. at 25.

- A 2002 survey found that only 27.5% of smokers agreed that light cigarettes are less harmful than full-flavored cigarettes. Taylor Ex. 3L at 316; Taylor Decl. at 17.

- A 2001 survey found that only 16% of smokers believed that light cigarettes are safer than full flavored cigarettes. Taylor Ex. 3F ¶ 28; Taylor Decl. at 16.

**Multiple brands and marketing schemes.** Finally, this variability is heightened here, where plaintiffs base their claims on numerous different cigarette brands. *See*, *e.g.*, *Biundo* Compl. ¶ 13 ("Defendants marketed, distributed and sold light cigarettes in Illinois and throughout the United States under the brand names Ashford, Basic, Bond Street, Chesterfield,

F6, Lark, Longbeach, Marlboro, Merit, Next, Parliament, and Virginia Slims.").  Some of these

brands bear descriptors such as "lights" and "ultra lights," whereas others do not use any

descriptors.  *See*, *e.g.*, *Tyrer* Compl. ¶¶ 7, 102.  Moreover, these brands had different marketing

campaigns and packages.  Taylor Decl. at 30-33.  For example, during various points in time,

PM USA marketed Alpine Lights jointly with its full-flavored counterpart, emphasizing lower

price and refreshing taste, whereas it marketed Cambridge Lights as lower in FTC-measured tar

as compared to other brands.  *Id*. at 32-33.  Indeed, plaintiffs themselves concede that, in light of

the number of brands at issue here and the disparate marketing campaigns, their claims are based

on so many different alleged misrepresentations relating to light cigarettes that they cannot

identify all of them.  *See Biundo* Supp. Interrogatory Resp. No. 1 (Ex. 22).[50]  This creates

additional reasons why class members' beliefs and motivations are neither universal nor

otherwise amenable to class-wide resolution.  *See*, *e.g.*, *Cocca*, 2001 WL 34090200, at *1

(rejecting certification of lights claim because "there are significant differences in . . . the

advertising used"); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 492 (S.D. Ill. 1999) (rejecting

certification due to variation in cigarette advertising among brands at issue); *Kwaak v. Pfizer,

Inc.*, 881 N.E.2d 812, 818 (Mass. Ct. App. 2008) (where proposed class included consumers with

exposure to a variety of different advertisements, "it is difficult to conclude that the class

certified consists of consumers similarly situated and similarly injured by a common deceptive

act or practice"); *In re LifeUSA Holding Inc.*, 242 F.3d 136, 146-47 (3d Cir. 2001) (same).

---

[50]   *See also Good* Supp. Interrogatory Resp. No. 1 (same) (Ex. 23); *Slater* Supp. Interrogatory
Resp. No. 1 (same) (Ex. 24); *Tyrer* Supp. Interrogatory Resp. No. 1 (same) (Ex. 25).

### D.   Defendants' Affirmative Defenses Present Individual Issues Defeating Class Certification

"[A]ffirmative defenses should be considered in making class certification decisions." *Mowbray*, 208 F.3d at 295.  Here, defenses such as statute of limitations and the voluntary payment doctrine present yet additional predominating individual issues.

### 1.   Statute Of Limitations

The claims at issue here are all subject to statute of limitations defenses:

*Biundo* **(Illinois).**  ICFA claims are subject to a three-year limitations period.  *See* 815 Ill. Comp. Stat. 505/10a(e).  Unjust enrichment claims in Illinois are governed by a five-year statutory period.  *See Frederickson v. Blumenthal*, 648 N.E.2d 1060, 1063 (Ill. App. Ct. 1995). As a result, to the extent a *Biundo* class member's claims accrued before December 23, 2003 (five years before the filing date of the complaint), his or her claims would be barred in their entirety.

*Tyrer* **(California).**  The CLRA is governed by a three-year limitations period.  *See* Cal. Civ. Code § 1783; *Meyer v. Sprint Spectrum L.P.*, 200 P.3d 295, 302 (Cal. 2009).  The UCL is subject to a four-year statute of limitations.  *See* Cal. Bus. & Prof. Code § 17208; *Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706, 709 (Cal. 2000).  As a result, to the extent a *Tyrer* class member's claims accrued before January 14, 2005 (four years before the filing date of the complaint), his or her claims would be barred in their entirety.

*Slater* **(D.C.).**  Both the CPPA claims and the unjust enrichment claims are subject to a three-year statute of limitations.  *See* D.C. Code §§ 28-3905(a), 12-301(8); *Murray v. Wells Fargo Home Mortgage*, 953 A.2d 308, 324 (D.C. 2008); *Vila v. Inter-Am. Inv., Corp.*, 570 F.3d 274, 283-84 (D.C. Cir. 2009).  Accordingly, a *Slater* class member's claims would be barred to

the extent they accrued before November 12, 2006 (three years before the filing date of the complaint).

**Good (Maine).**  Plaintiffs' unjust enrichment claims have a six-year limitations period. *See In re Estate of Miller*, 960 A.2d 1140, 1146 (Me. 2008); 14 M.R.S.A. § 752.  As a result, a *Good* class member's claims would be barred to the extent they accrued before August 12, 1999 (six years before the filing date of the complaint).

In each of these jurisdictions, at the latest, the statute of limitations begins to run once the plaintiff is first on notice of his or her claims, *i.e.*, when he or she suspects that light cigarettes may not deliver less tar and nicotine and, as a result, may not be safer than full-flavored cigarettes.[51]  Plaintiffs do not even attempt to refute that at least some class members in each of these cases would have had such notice well before August 12, 1999 – the earliest limitations period in any of these cases.  Nor could they.  No less than four lights cases – raising identical allegations to these cases – were filed in 1998, before the limitations period in any of these

---

[51]   *See, e.g.*, *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1148 (N.D. Cal. 2005) (for CLRA claims, "statute of limitations runs from the time a reasonable person would have discovered the basis for a claim") (citation and internal quotations omitted); *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 771 (D.C. 1998) ("This court has repeatedly held that a claim accrues when the plaintiff knows of (1) an injury, (2) its cause, and (3) some evidence of wrongdoing."); *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1981) (statute of limitations begins to run "when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused").  Other claims accrue at the time of injury – regardless of notice – unless a plaintiff can establish equitable tolling.  *See, e.g.*, *Snapp & Assocs. Ins. Servs., Inc. v. Malcolm Bruce Burlingame Robertson*, 117 Cal. Rptr. 331, 335 (Ct. App. 2002) (for UCL claims, "statute begins to run . . . irrespective of whether plaintiff knew of its accrual, unless plaintiff can successfully invoke the equitable tolling doctrine"); *Bozzuto v. Ouellette*, 408 A.2d 697, 699 (Me. 1979) ("cause of action accrues . . . when plaintiff received a judicially recognizable injury") (citation and internal quotation omitted).

cases.[52]  And similar cases raising lights claims were filed in California, D.C., and Illinois

several years before the limitations periods governing the claims in *Tyrer*, *Slater*, and *Biundo*.[53]

*See In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 225 (E.D.N.Y.

2003) (claims time-barred where "identical complaints were filed against some of the defendants

in several state courts" before the limitations period).

      Moreover, as discussed above, information about the risks of compensation and light

cigarettes was publicly disseminated as early as the 1970s.  *See supra* at 9-10; *see also*

Greenwood Decl. at 23-30,  ¶¶ 1-20.  Light smokers have testified that they concluded that light

cigarettes were not safer long before 1999.  *See, e.g.*, Deposition of Audrey Weber at 39:25-

40:21 (Taylor App. Att.) (read articles in the 1980s stating that light cigarettes were not safer

than full-flavored cigarettes); Ross Dep. at 46:20-49:2 (saw report about compensation in the

mid-1990s that confirmed his existing beliefs); Zimmatore, E. Dep. at 52:7-53:7 (learned light

cigarettes were not safer in approximately 1994); Deposition of Corey Fox at 188:2-189:15

(Taylor App. Att.) (realized that light cigarettes were not safer than full-flavored cigarettes

"around 1995" because it was "just common sense").  And survey literature demonstrated that

many smokers decades ago did not believe that light cigarettes were any safer.  Taylor Decl. at

14-15.

---

[52]    *See* Compl., *Aspinall v. Philip Morris Cos.*, No. 98-6002-H (Mass. Super. Ct. filed Nov. 25, 1998) (Ex. 26); Compl., *Gesser v. Philip Morris Cos.*, No. MSX-L-1526-99 (N.J. Super. Ct. filed July 9, 1998) (Ex. 27); Compl., *Trombino v. R.J. Reynolds Tobacco Co.*, No. L11263-98 (N.J. Super. Ct. filed Nov. 18, 1998) (Ex. 28); Compl., *Oliver v. R.J. Reynolds Tobacco Co.*, No. 268 (Pa. Ct. Com. Pl. filed Mar. 6, 1998) (Ex. 29).

[53]    *See* Ninth Am. Compl. ¶¶ 96-97, *In re Tobacco Cases II* (*Brown*), Case No. 711400 (Cal. Super. Ct. Oct. 15, 2001) (Ex. 30); Class Action Compl., *Dahlgren v. Philip Morris Cos., Inc.*, Case No. 0003218 (D.C. Super. Ct. Nov. 17, 1999) (Ex. 31); Compl., *Price v. Philip Morris Cos., Inc.*, No. 00-L-000182 (Ill. Cir. Ct. Feb. 10, 2000) (Ex. 32); Am. Compl. ¶¶ 167-76, *Cleary v. Philip Morris USA Inc*, No. 98 L6427 (Ill. Cir. Ct. Jan. 19, 2000) (Ex. 33).

Based on a similar record, the Second Circuit rejected an attempt to circumvent the individual issues presented by the statute of limitations through "a presumption of unawareness by the plaintiff class," explaining that "some members of the class almost certainly were aware *long before 2000* that 'light' cigarettes were not appreciably safer for them than regular cigarettes." *McLaughlin*, 522 F.3d at 233 (emphasis added) (citations omitted); *see also*, *e.g.*, *Mulford*, 242 F.R.D. at 630 (existence of "highly individualized affirmative defenses," such as the statute of limitations, "weighs heavily against class certification"); *Benedict*, 241 F.R.D. at 680 (same).[54]

Clearly cognizant of these individual issues, plaintiffs purport to restrict the class periods in their cases to the limitations periods. *See* Pls. Br. at 7 n.4 (*Tyrer* class period is limited to 2006 to the present for the CLRA claims and 2005 to the present for the UCL claims); *id*. at 8 (*Slater* class period is limited to 2000 to the present); *id*. at 11 (*Biundo* class period is limited to 2005 to the date of certification); *id*. at 11 n.8 (*Good* class period is limited to 1999 to the present). As an initial matter, the proposed class period in *Slater* starts in 2000, six years before the limitations period begins in August 2006. *See supra* at 59-60. But even if this error were corrected so that the proposed class period in *Slater* matches the limitations period, plaintiffs'

---

[54] Indeed, the procedural history in *Biundo* demonstrates precisely why this defense presents individual issues. PM USA moved to dismiss as time-barred the claims of the original representative there (Ms. Goins) based on her allegation that she was injured when she started smoking Marlboro Lights in 2002 – outside the limitations period. *See* Memorandum of Law In Support of Defendant's Motion to Dismiss Based on the Statute of Limitations and Issue Preclusion in *Goins v. Philip Morris USA*, Civil Action No. 09CV118. Plaintiff responded not by arguing that Ms. Goins' claims were timely, but rather by substituting a new plaintiff (Mr. Biundo) who alleged that he had smoked light cigarettes only during the limitations period. *See* Plaintiff's Motion for Leave to File an Amended Class Action Complaint to Substitute Named Plaintiff (N.D. Ill. Apr. 15, 2009). That plaintiffs themselves recognized that a different class member would be affected differently by the statute of limitations based on his smoking history highlights the unquestionable conclusion that this defense presents individual issues.

attempt to restrict the class period in each case does not enable plaintiffs to circumvent the individual issues created by the statute of limitations.

Plaintiffs' misconception is their assumption that each cigarette purchase by each class member constitutes a separate claim with a separate statute of limitations clock.  In other words, plaintiffs assume that an individual who was on notice of his or her claims long before the limitations period can still recover for purchases within the limitations period, on the theory that each of the thousands of purchases made by that individual creates a new cause of action.

This assumption is wrong.  Each jurisdiction at issue here follows the "single injury" rule.  Under that rule, "all injuries caused by a single transaction or series of transactions by a tortfeasor *are part of a single cause of action*" for purposes of calculating when the limitations clock begins.  51 Am. Jur. 2d *Limitations of Actions* § 167 (2004) (emphasis added).  Thus, once the cause of action first accrues for a lights claimant – under the applicable legal standard in each state – the limitations clock begins to run for all purchases made by that claimant.

For example, in *Harshbarger v. Philip Morris, Inc.*, 2003 WL 23342396 (N.D. Cal. 2003), plaintiff sought restitution under the UCL for cigarette purchases dating back to 1962.  *Id.* at *6.  The court found that plaintiff was on notice of his claims long before the limitations period.  *See id.* at *7.  Therefore, the court held that the UCL claim was barred in its entirety – including for the purchases made within the limitations period.  *Id.*; *see also*, *e.g.*, *Bennett v. Shahhal*, 89 Cal. Rptr. 2d 272, 276-77 (Ct. App. 1999) (multiple injuries related to brain surgery malpractice constituted single cause of action for statute of limitations purposes); *Miller v. Lakeside Vill. Condo. Assoc., Inc.*, 2 Cal. Rptr. 2d 796, 802 (Ct. App. 1991) ("if the statute of limitations bars an action based upon harm immediately caused by defendant's wrongdoing, a

separate cause of action based on a subsequent harm arising from that wrongdoing would normally amount to splitting a cause of action").

Similarly, in *Blair v. Nevada Landing Partnership, RBG, LP*, 859 N.E.2d 1188 (Ill. App. Ct. 2006), the plaintiff sued based on repeated unlawful displays of his photograph – which had taken place both within and outside the limitations period. *Id.* at 1193. The court concluded that the limitations period began at the first display of the photograph, and thus the claims were completely barred, notwithstanding the fact that the plaintiff had continued to suffer injury within the limitations period. *Id.* at 1193-94; *see also*, *e.g.*, *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894, 902 (Ill. 1995) (rejecting theory that "would allow injured parties to bring a separate cause of action for each newly discovered injury"); *Dugan v. Martel*, 588 A.2d 744, 746 (Me. 1991) (rejecting argument that "the statute of limitations applies only to that portion of the ongoing harm that occurs before the statutory period and not to the ongoing harm that occurs within the statutory period"); *Bozzuto*, 408 A.2d at 699 (statute of limitations begins to run "when plaintiff was *first* entitled to sue") (emphasis added) (citation and internal quotations omitted); *Toomey v. Cammack*, 345 A.2d 453, 455 (D.C. 1975) ("[A]n actionable claim accrues, and the statute of limitations begins to run, when a suit thereon could *first* be maintained to a successful conclusion.") (emphasis added).

Plaintiffs do not even acknowledge the statute of limitations defense in their motion, let alone explain how it could be resolved for the class on a common basis. This is another reason to deny certification.

### 2.   **Voluntary Payment Doctrine**

At least three of the jurisdictions (Illinois, California, and D.C.) recognize that the voluntary payment doctrine bars recovery where "a person . . . voluntarily pays another with full

knowledge of the facts." *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667 (7th Cir. 2001) (applying Illinois law) (citation omitted); *see also*, *e.g.*, *Shaw v. Marriott Int'l Inc.*, 474 F. Supp. 2d 141, 150 (D.D.C. 2007) (same); *Endres v. Wells Fargo Bank*, 2008 WL 344204, at *12 (N.D. Cal. 2008) (denying certification of CLRA and UCL claims in part because "the voluntary-payment doctrine . . . may bar any claims made by class members who continued to incur and voluntarily pay the overdraft protection fees").

Here, those class members who purchased light cigarettes with knowledge of the alleged fraud should be barred by this defense from recovering for those purchases, and the record demonstrates that numerous class members purchased light cigarettes with such knowledge. *See supra* at 61.  As with the statute of limitations, defendants are entitled to present this defense against each class member, which raises inherently individual inquiries further defeating class certification.  *See*, *e.g.*, *Endres*, 2008 WL 344204, at *11-12 (relying on voluntary payment defense to reject certification); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 78-79 (S.D.N.Y. 2006) (same); *Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50, 56 (N.Y. App. Div. 2004) (same); *Schnall v. AT&T Wireless Servs., Inc.*, 225 P.3d 929, 937 (Wash. 2010) (same); *Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 942, 957 (N.D. Ohio 2009) (same).[55]

---

[55] For the same reasons that the individual issues discussed above predominate, all of the proposed class representatives also fail to meet Rule 23(a)(3)'s typicality requirement.  The typicality "requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large."  *Oshana*, 472 F.3d at 514 (citation and internal quotations omitted).  As the *Cleary* court recognized, there could not be any "typical" plaintiff to assert lights claims due to the substantial differences among putative class members with respect to the critical issues in these cases.  2010 WL 680957, at *3-4.

**III.** <u>A Class Action Is Not A Superior Method Of Resolving Plaintiffs' Claims</u>

    **A.**      <u>Class-Wide Trials Of The Claims Would Be Unmanageable</u>

      Plaintiffs' motion also fails because they cannot satisfy Rule 23(b)(3)'s independent superiority requirement.  Plaintiffs' proposed class actions are not even feasible, let alone superior to individual actions.  In light of the individual issues discussed above and the number of class members who would not have valid claims if they sued individually, determination of these claims would inevitably devolve into "'extensive individualized proceedings," defeating any efficiencies of class-wide treatment.  *Oshana*, 225 F.R.D. at 586-87 (citation omitted).  Defendants would have a due process right to demonstrate that each plaintiff could not satisfy all of the elements of his or her claims or was otherwise barred by defenses.  *See*, *e.g.*, *Sandwich Chef*, 319 F.3d at 220 (reversing certification where procedures denied defendants the opportunity to dispute individual issues on an individual basis); *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense") (internal quotations and citation omitted).  The result would be "a gigantic burden on the Court's resources beyond its capacity to manage or effectively control."  *In re Hotel Tel. Charges*, 500 F.2d 86, 91 (9th Cir. 1974) (internal quotations and citation omitted).

      Indeed, even the threshold determination of who qualifies as members of these classes – as well as the precise amount of damages to which any class member would be entitled – would require such individualized fact-finding that it would render a class action trial unmanageable.[56]

---

[56]    Contrary to plaintiffs' suggestions, Pls. Br. at 24, individual issues relating to the amount of damages should be considered in addressing the propriety of certification.  Although the "mere fact that there are differences . . . [in] individual amounts of damages does not preclude class certification," this is because "[o]ften those variations can be determined according to a universal mathematical or formulaic calculation, obviating the need for evidentiary hearings on each individual claim."  *Canadian Exp.*, 522 F.3d at 23.  By contrast, courts reject certification where calculating damages is not a mechanical task that can be easily accomplished on a formulaic

Footnote continued on next page

Under each of the proposed class definitions, *see* Pls. Br. at 7-11, individuals can establish class membership only by showing that they purchased and smoked at least one pack of light cigarettes manufactured by PM USA within a relevant state and class period. *See*, *e.g.*, *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 617 (W.D. Wash. 2003) (proof of membership in product liability class requires proof of purchase); *Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 665 (N.D. Ala. 2010) ("Without a receipt, no plaintiff would have proof of a claim, the *sine qua non* of class membership."). Similarly, because the amount of damages (if any) owed to each claimant would depend on how much that person spent on cigarettes in the relevant period, each claimant would also need to establish the number of purchases made in the relevant state and the price of those purchases.[57]

Cigarettes are relatively inexpensive and smokers typically purchase light cigarettes on a frequent basis, and thus class members are unlikely to possess any objective proof of purchasing history. As one court explained in rejecting certification of a class of cigarette purchasers:

---

Footnote continued from previous page

basis. *See*, *e.g.*, *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) ("Class treatment, however, may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation."); *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (relying on "the cost of the individualized hearings that would in consequence be required for assessing damages"); *Evans v. Lasco Bathware, Inc.*, 101 Cal. Rptr. 3d 354, 363 (Ct. App. 2009) ("class treatment was inappropriate because individualized trials for each class member's damages would be required to determine the appropriate award for each class member"); *Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 137 (Minn. Ct. App. 1987) (courts refuse to certify where "proof of damages would result in thousands of mini-trials").

[57]    Plaintiffs incorrectly suggest that under the CPPA, the presence of minimum statutory damages would obviate the need to undertake individual inquiries to determine the amount of damages. *See* Pls. Br. at 34. As plaintiffs themselves note, "[t]he remedies available to consumers under the CPPA are: treble damages or $1500 per violation, *whichever is greater*." *Id.* (emphasis added). Individual inquiries would thus still be necessary to determine the amount of each class member's damages and whether this amount exceeds $1,500. Moreover, any suggestion to accept statutory damages and to abandon individual damages awards (plus trebling, D.C. Code § 28-3905(k)(1)(A)) to avoid these individual inquiries would render the representatives and their counsel inadequate.

> [C]ertification of the proposed class here would be an invitation for
> fraud . . .  People who purchase cigarettes do so frequently and as a
> matter of course.  They purchase them in various places.  They buy
> cartons and single packages.  They do not generally keep receipts
> or any other proof of purchase.  They may well not know how
> many cigarettes they consume.

*Ludke v. Philip Morris Cos. Inc.*, 2001 WL 1673791, at *3 (Minn. Dist. Ct. 2001).  Indeed, only

one of the fourteen class representatives in the consolidated cases was able to produce even a

single record of his or her purchases.  *See Tyrer* Supp. Resp. to Request for Prod. No. 1 (Ex. 35).

As one plaintiff explained, "why would somebody keep a receipt for a pack of cigarettes?  That's

like keeping a receipt for a pack of gum . . . .  Nobody does it."  Deposition of Leonardo Biundo

at 73:9-15 (Taylor App. Att.).

Given the number of potential class members at issue here, these determinations would

result in countless mini-trials on class membership and damages and an overwhelming burden on

the judicial system for years to come.  *See*, *e.g.*, *Benedict*, 241 F.R.D. at 680 (identifying

purchasers of low tar cigarettes in a particular state and time period "would be a *very* difficult

task") (emphasis in original).  Due process requires that defendants be permitted to cross-

examine potential class members before the trier of fact could determine whether they had

purchased light cigarettes in the relevant state and time period and the amount of those

purchases.  *See*, *e.g.*, *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003)

(refusing to identify class members "through affidavits and fact sheets" because "any written

submissions that do not give the Defendant an opportunity to challenge the memory or credibility

of the individual making that averment would provide inadequate procedural protection");

*Luedke v. Delta Air Lines, Inc.*, 1993 WL 313577, at *5 (S.D.N.Y. 1993) (refusing to identify the

class "by having potential class members fill out a questionnaire" because it would lead to "an

unmanageable number of individual credibility determinations").  Courts have rejected

certification of lights claims because "determining and assessing damages . . . [is] an unmanageable task." *Davies*, 2006 WL 1600067, at *5; *see also Oliver*, 2000 WL 33598654, at *7 ("there can be no class-wide method of determining damages that does not require individual proofs"); *Cocca*, 2001 WL 34090200, at *1 (same).  Courts have similarly recognized that class actions are not manageable where "individualized mini-trials would be required even on the limited issue of class membership." *Perez*, 218 F.R.D. at 269.[58]  The same reasoning applies here.

Notably, at the certification stage, "an increasing number of courts require a party requesting certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof."  Fed. R. Civ. P. 23 advisory committee notes (2003 amendments); *see also*, *e.g.*, *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 186 (3d Cir. 2006); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 n.15 (5th Cir. 1998) (certification denied where plaintiffs failed to provide "any workable plan" for class trial).  Plaintiffs themselves acknowledged that "it's a good practice" to provide such a trial plan.  Hr'g Tr. at 32 (Oct. 21, 2009) (statement of Mr. Barrett).  Yet plaintiffs failed to provide a trial plan in support of this motion – a clear indication that they could not formulate a manageable way to try these claims on a class-wide basis.  Indeed, plaintiffs do not even try to articulate how they would address the due process and the Rules Enabling Act issues that arise from their proposal to seek an aggregated monetary award for the class or how they propose to assess and

---

[58]     *See also*, *e.g.*, *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579-80 (1st Cir. 1986) (denying certification because of the need for individualized fact-finding regarding class membership); *In re Phenylpropanolamine*, 214 F.R.D. at 619-20 ("Because the vast majority of putative class members are unlikely to possess proof of purchase . . . the individualized inquiries surrounding class identification . . . would defy the court's ability to effectively and efficiently manage the litigation."); *Bakalar v. Vavra*, 237 F.R.D. 59, 64-66 (S.D.N.Y. 2006) (denying certification of a class of current and former owners of certain artwork because of the absence of ownership records).

distribute any damages recovery to the millions of class members at issue here in a manner consistent with those requirements.  *See, e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 34 (1st Cir. 2009) ("[c]ourt-mandated cy pres distributions, as opposed to court-approved settlements using cy pres, are controversial"); *McLaughlin*, 522 F.3d at 231 (rejecting aggregate damages award proposal on due process and Rules Enabling Act grounds); *Nelson v. Greater Gadsden Hous. Auth.*, 802 F.2d 405, 409 (11th Cir. 1986) (aggregate damages award cannot "relieve plaintiff classes of the burden of proving individual damages or to avoid the dismissal of unmanageable class actions"); *In re Hotel Tel. Charges*, 500 F.2d at 90 ("allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights" and would violate Rules Enabling Act).  That there is no manageable way to try these claims on a class-wide basis or distribute any damages recovery to absent class members is an independent reason to deny plaintiffs' motion.

### B.   Plaintiffs Offer No Justification For Ignoring These Manageability Problems

Plaintiffs argue that this Court should simply ignore these manageability issues because "the estimated value of individual Class members' claims pales in comparison to the likely costs of litigating this matter on an individual basis."  Pls. Br. at 2.  But the mere fact that some class members' claims may be relatively small cannot justify disregarding the individual issues presented by those claims and the insurmountable hurdles they present for any manageable class-wide trial.  *See, e.g.*, *In re Hotel Tel. Charges*, 500 F.2d at 90 ("[T]he desirability of allowing small claimants a forum to recover for large-scale antitrust violations does not eclipse the problem of unmanageability."); *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to

individual justice, and we must take care that each individual plaintiff's – and defendant's – cause not be lost in the shadow of a towering mass litigation.") (citation and quotations omitted).

Moreover, plaintiffs in each of these cases seek to recover attorneys' fees and costs,[59] and several of the statutes at issue here provide such relief under appropriate circumstances.[60] The availability of such recovery "provides substantial incentives to bring meritorious individual suits." *Hamilton v. O'Connor Chevrolet, Inc*., 2006 WL 1697171, at *11 (N.D. Ill. 2006); *see also Castano*, 84 F.3d at 748 ("The expense of litigation does not necessarily turn this case into a negative value suit, in part because the prevailing party may recover attorneys' fees under many consumer protection statutes.").[61]

Finally, any superiority analysis must consider the possibility of actions by government entities based on the same alleged misconduct.  *See*, *e.g.*, *Pattillo v. Schlesinger*, 625 F.2d 262, 265 (9th Cir. 1980) ("[T]he use of a class action procedure is not superior to the ongoing administrative proceedings for the notification and payment of former service personnel."); *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 211 (9th Cir. 1975) (class action was not superior where state had instituted representative litigation); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 (D.N.J. 1998) ("The court concludes that there is insufficient justification to burden the judicial system with Plaintiffs' claims while there exists an administrative remedy that has been established to assess the technical merits of such claims . . . .").

---

[59]    *See Tyrer* Compl. at Prayer for Relief ¶ 4; *Good* Compl. at Prayer ¶ 2(c); *Biundo* Compl. at Prayer for Relief ¶ F; *Slater* Compl. at Prayer for Relief ¶ G.

[60]    *See* D.C. Code § 28-3905(k)(1)(B); 815 Ill. Comp. Stat. 505/10a(c); Cal. Civ. Code § 1780(e).

[61]    *See also*, *e.g.*, *Andrews*, 95 F.3d at 1025; *In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *14 (W.D. Wash. 2006); *In re Gen. Motors Corp., "Piston Slap" Prods. Liab. Litig.*, 2006 WL 1049259, at *12 (W.D. Okla. 2006); *Hammett v. Am. Bankers Ins. Co. of Fla.*, 203 F.R.D. 690, 701 (S.D. Fla. 2001); *Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576, 583 (S.D. Ohio 1993); *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 456 (E.D. Pa. 2000).

For example, the state attorneys general for the jurisdictions at issue are authorized to seek relief under their consumer protection statutes. *See*, *e.g*., 815 ILCS § 505/7 (authorizing Attorney General to bring action for injunctive relief and civil penalties). During the early 1990s, 40 state attorneys general filed suit against PM USA and other tobacco companies seeking reimbursement for health care costs. *See*, *e.g.*, Robert L. Rabin, *The Third Wave of Tobacco Tort Litigation*, Regulating Tobacco at 176, 190 (2001) (Ex. 36). Many of these attorney general actions included virtually identical allegations to those here. *See*, *e.g.*, Compl. for Recovery of Medi-Cal Costs and Civil Penalties And Injunctive Relief for Violations of the Cartwright Act; the California False Claims Act; and the Unfair Competition Act ¶ 45, *California v. Philip Morris Inc*., No. 97AS03031 (Cal. Super. Ct. Jun. 12, 1997) (Ex. 37) ("In furtherance of selling their 'lite' or 'light' cigarettes, the defendants have represented that these products are healthier and have less tar and nicotine than regular cigarettes.").[62] These actions settled in 1998, resulting in the states receiving billions of dollars and other relief. *See* Master Settlement Agreement, at §§ IV. That the state attorneys general did bring claims similar to those in this case further undermines plaintiffs' contention that a class action would be superior.

## IV. Plaintiffs' Proposed Class Representatives Are Inadequate

Plaintiffs also cannot bear their burden of demonstrating that the class representatives are adequate, as required by Rule 23(a)(4). By seeking damages only for purported economic injury, the class representatives have waived potentially more lucrative personal injury claims against PM USA resulting from smoking. If any of these cases were certified, any subsequent judgment

---

[62] *See also*, *e.g.*, Compl., *Massachusetts v. Philip Morris Inc.*, No. 95-7378 ¶¶ 153-66 (alleging that light cigarettes are a "marketing hoax") (Mass. Super. Ct. filed Dec. 19, 1995) (Ex. 38); First Am. Compl. and Election for Jury Trial, *Maryland v. Philip Morris Inc.* No. 96-122017 ¶ 140 (Md. Cir. Ct. filed May 1, 1996) (Ex. 39); Plaintiff's Compl., *Oregon v. Philip Morris*, No. 9706-04457 ¶ 32(d) (Or. Cir. Ct. filed June 9, 1997) (Ex. 40).

would preclude class members from bringing such claims under principles of *res judicata* and claim splitting. *See, e.g., Kiefer v. Rust-Oleum Corp.*, 916 N.E.2d 22, 28 (Ill. App. Ct. 2009); *Millett v. Atl. Richfield Co.*, 2000 WL 359979, at *9 (Me. Super. Ct. 2000); *Allstate Ins. Co. v. Mel Rapton, Inc.*, 92 Cal. Rptr. 2d 151, 155-56 (Ct. App. 2000); *Gilles v. Ware*, 615 A.2d 533, 543-44 (D.C. 1992). The claim-splitting prohibition would apply because, regardless of the type of relief sought, both this lawsuit and any later personal injury lawsuit would be based on the same "nucleus of operative fact," "related in time, space, origin, or motivation." *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 110 (2d Cir. 2000).

The class representatives are free to split their own claims, but they may not make that decision on behalf of absent class members, and their willingness to do so renders them inadequate. *See, e.g., Small*, 679 N.Y.S.2d at 600-01 (rejecting certification in part because "[s]hould these plaintiffs prevail, they will preclude all New York smokers' chances of bringing more lucrative damages claims for personal injury and emotional distress from nicotine addiction"); *Thompson*, 189 F.R.D. at 550-51 (plaintiffs' efforts to reserve personal injury claims jeopardized the ability of putative class members later to assert those claims, thereby rendering the putative class representatives inadequate).[63]

## **CONCLUSION**

For the foregoing reasons, plaintiffs' motion for class certification should be denied.

---

[63]    *See also, e.g., Clay*, 188 F.R.D. at 493; *Krueger v. Wyeth, Inc.*, 2008 WL 481956, at *4 (S.D. Cal. 2008); *Martin v. Home Depot USA, Inc.*, 225 F.R.D. 198, 203-04 (W.D. Tex. 2004); *W. States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002); *Pearl v. Allied Corp.*, 102 F.R.D. 921, 923-24 (E.D. Pa. 1984); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982).

DATED this 3rd day of May, 2010.

Respectfully submitted,


   /s/H. Peter Del Bianco, Jr.            
H. Peter Del Bianco, Jr.
LAMBERT COFFIN
P.O. Box 15215
477 Congress Street
Portland, Maine  04112-5215
(207) 874-4000

Philip H. Curtis
Nancy G. Milburn
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY  10022
(212) 715-1000

Judith Bernstein-Gaeta
James M. Rosenthal
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004
(202) 942-5000

John H. Beisner
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP & AFFILIATES
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

Counsel to Defendant Philip Morris USA Inc.


   /s/David C. King                 
David C. King
RUDMAN & WINCHELL
84 Harlow Street
P O. Box 1401
Bangor, ME  04401
(207) 992-2414

Guy Miller Struve
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4192

Counsel to Defendant Altria Group, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2010, I electronically filed the foregoing Defendants' Opposition to Plaintiffs' Motion for Class Certification using the EM/ECF system which will send notification of such filing to all counsel of record registered with the ECF system.  As reflected in the Exhibit notations, certain Exhibits or portions thereof where filed with the clerk in the form of CDs or DVDs.

<u>/s/ H. Peter Del. Bianco, Jr.</u>

H. Peter Del Bianco, Jr.
LAMBERT COFFIN
P.O. Box 15215
477 Congress Street
Portland, Maine 04101
Telephone:  (207) 874-4000
pdelbianco@lambertcoffin.com

76