Table of Contents

from January 1990 to the date of certification or potential certification of the proposed classes, plaintiffs in those actions alleged, individually and on behalf of putative class members in a particular state or individually and on behalf of class members in the applicable states, that UST and certain of its tobacco subsidiaries violated the antitrust laws, unfair and deceptive trade practices statutes and/or common law of those states. In connection with these actions, plaintiffs sought to recover compensatory and statutory damages in an amount not to exceed $75,000 per purported class member or per class member, and certain other relief. The indirect purchaser actions, as filed, were similar in all material respects.

The indirect purchaser actions have been settled in all jurisdictions. Pursuant to the settlements in all jurisdictions except California and Massachusetts, adult consumers received coupons redeemable on future purchases of USSTC's moist smokeless tobacco products, and UST agreed to pay all related administrative costs and plaintiffs' attorneys' fees. As of January 31, 2010, UST has recognized a liability of approximately $7.4 million, reflecting the costs attributable to coupons previously distributed to Kansas, New Hampshire, New York and Wisconsin class members, which are redeemable on future purchases of USSTC's moist smokeless tobacco products. The California and Massachusetts settlements were for cash only and did not involve distribution of coupons.

*Other Litigation*

In September 2008, plaintiffs filed a purported class action on behalf of a purported class of UST stockholders in Superior Court in Connecticut to enjoin the proposed acquisition of UST by Altria Group, Inc., alleging, among other things, that UST and/or nine of its directors had violated their fiduciary duties by agreeing to the terms of the acquisition and that Altria Group, Inc. had aided and abetted in the alleged violation. In October 2008, plaintiffs amended the complaint to add allegations concerning UST's definitive proxy statement and certain benefits payable to UST's officers in connection with the transaction. The amended complaint also included aiding and abetting claims against UST. In December 2008, the parties entered into a Memorandum of Understanding to settle this lawsuit and resolve all claims. The settlement received final court approval in October 2009. The settlement amount was immaterial.

## Certain Other Actions

*IRS Challenges to PMCC Leases :* The IRS concluded its examination of Altria Group, Inc.'s consolidated tax returns for the years 1996 through 1999, and issued a final Revenue Agent's Report ("RAR") in March 2006. The RAR disallowed benefits pertaining to certain PMCC leveraged lease transactions for the years 1996 through 1999. Altria Group, Inc. agreed with all conclusions of the RAR, with the exception of the disallowance of benefits pertaining to several PMCC leveraged lease transactions for the years 1996 through 1999. Altria Group, Inc. contests approximately $150 million of tax and net interest assessed and paid with regard to them. The IRS may in the future challenge and disallow more of PMCC's leveraged lease benefits based on Revenue Rulings, an IRS Notice and subsequent case law addressing specific types of leveraged leases (lease-in/lease-out ("LILO") and sale-in/lease-out ("SILO") transactions).

In October 2006, Altria Group, Inc. filed a complaint in the United States District Court for the Southern District of New York to claim refunds on a portion of these tax payments and associated interest for the years 1996 and 1997. In July 2009, the jury returned a unanimous verdict in favor of the IRS and subsequently Altria Group, Inc. filed motions for judgment as a matter of law or, in the alternative, for a new trial.

In March 2008, Altria Group, Inc. filed a second complaint in the United States District Court for the Southern District of New York seeking a refund of the tax payments and associated interest for the

-47-

Table of Contents

years 1998 and 1999 attributable to the disallowance of benefits claimed in those years with respect to the leases subject to the recent jury verdict and with respect to certain other leases entered into in 1998 and 1999.

Based on Notices of Proposed Adjustments received by Altria Group, Inc., we expect that the IRS will challenge and disallow tax benefits claimed by Altria Group, Inc. with respect to the leases subject to the recent jury verdict plus other PMCC leveraged lease transactions characterized by the IRS as LILOs and SILOs, including benefits claimed from LILO and SILO transactions entered into during both the 1996 – 1999 years and the 2000 – 2003 years. Altria Group, Inc. plans to contest proposed leveraged lease adjustments made by the IRS. The total disallowance for 2000 – 2003 for these leases in federal income tax and related interest would be approximately $1.0 billion.

If the tax benefits for the transactions entered into from 1996 to 2003 were similarly disallowed for the period January 1, 2004 through December 31, 2009, the disallowance for such period for these leases in federal income tax and related interest would be approximately $900 million, taking into account federal income tax paid or payable on gains associated with sales of leased assets during that period.

The payment, if any, of the foregoing amounts would depend upon the timing and outcome of the ongoing 2000 – 2003 audit and future IRS audits and any related administrative challenges or litigation.

LILO and SILO transactions represent approximately 40% of the Net Finance Assets of PMCC's lease portfolio. PMCC entered into no LILO or SILO transactions after 2003.

Should Altria Group, Inc. not prevail in these matters, Altria Group, Inc. may have to accelerate the payment of significant amounts of federal income tax, pay associated interest costs and significantly lower its earnings to reflect the recalculation of the income from the affected leveraged leases, which could have a material effect on the earnings and cash flows of Altria Group, Inc. in a particular fiscal quarter or fiscal year.

*Kraft Thrift Plan Case :* Four participants in the Kraft Foods Global, Inc. Thrift Plan ("Kraft Thrift Plan"), a defined contribution plan, filed a class action complaint on behalf of all participants and beneficiaries of the Kraft Thrift Plan in July 2008 in the United States District Court for the Northern District of Illinois alleging breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"). Named defendants in this action include Altria Corporate Services, Inc. (now Altria Client Services Inc.) and certain company committees that allegedly had a relationship to the Kraft Thrift Plan. Plaintiffs request, among other remedies, that defendants restore to the Kraft Thrift Plan all losses improperly incurred. The Altria Group, Inc. defendants deny any violation of ERISA or other unlawful conduct and intend to defend the case vigorously. Under the terms of a Distribution Agreement between Altria Group, Inc. and Kraft, Altria Client Services Inc. and related defendants may be entitled to indemnity against any liabilities incurred in connection with this case.

## Environmental Regulation

Altria Group, Inc. and its subsidiaries (and former subsidiaries) are subject to various federal, state and local laws and regulations concerning the discharge of materials into the environment, or otherwise related to environmental protection, including, in the United States: The Clean Air Act, the Clean Water Act, the Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation and Liability Act (commonly known as "Superfund"), which can impose joint and several liability on each responsible party. Subsidiaries (and former subsidiaries) of Altria Group, Inc. are involved in several matters subjecting them to potential costs of remediation and natural resource damages under Superfund or other laws and regulations. Altria Group, Inc.'s

-48-

Table of Contents

subsidiaries expect to continue to make capital and other expenditures in connection with environmental laws and regulations. Although it is not possible to predict precise levels of environmental-related expenditures, compliance with such laws and regulations, including the payment of any remediation costs or damages and the making of such expenditures, has not had, and is not expected to have, a material adverse effect on Altria Group, Inc.'s consolidated results of operations, capital expenditures, financial position, earnings or competitive position.

*Guarantees*

At December 31, 2009, Altria Group, Inc. had a $12 million third-party guarantee, related to a divestiture, which was recorded as a liability on its consolidated balance sheet. This guarantee has no specified expiration date. Altria Group, Inc. is required to perform under this guarantee in the event that a third party fails to make contractual payments. In the ordinary course of business, certain subsidiaries of Altria Group, Inc. have agreed to indemnify a limited number of third parties in the event of future litigation. At December 31, 2009, subsidiaries of Altria Group, Inc. were also contingently liable for $25 million of guarantees related to their own performance, consisting primarily of surety bonds. These items have not had, and are not expected to have, a significant impact on Altria Group, Inc.'s liquidity.

Under the terms of a distribution agreement between Altria Group, Inc. and PMI, entered into in connection with the PMI spin-off, liabilities concerning tobacco products will be allocated based in substantial part on the manufacturer. PMI will indemnify Altria Group, Inc. and PM USA for liabilities related to tobacco products manufactured by PMI or contract manufactured for PMI by PM USA, and PM USA will indemnify PMI for liabilities related to tobacco products manufactured by PM USA, excluding tobacco products contract manufactured for PMI. Altria Group, Inc. does not have a related liability recorded on its consolidated balance sheet at December 31, 2009 as the fair value of this indemnification is insignificant.

As more fully discussed in Note 23. *Condensed Consolidating Financial Information* to Altria Group, Inc.'s consolidated financial statements, which is incorporated herein by reference in the 2009 Annual Report, PM USA has issued guarantees relating to Altria Group, Inc.'s obligations under its outstanding debt securities and borrowings under its revolving credit agreements and its commercial paper program.

**Redeemable Noncontrolling Interest**

In September 2007, UST completed the acquisition of *Stag's Leap Wine Cellars* through one of its consolidated subsidiaries, Michelle-Antinori, LLC ("Michelle-Antinori"), in which UST holds an 85% ownership interest with a 15% noncontrolling interest held by Antinori California ("Antinori"). In connection with the acquisition of *Stag's Leap Wine Cellars*, UST entered into a put arrangement with Antinori. The put arrangement, as later amended, provides Antinori with the right to require UST to purchase its 15% ownership interest in Michelle-Antinori at a price equal to Antinori's initial investment of $27 million. The put arrangement becomes exercisable beginning September 11, 2010. As of December 31, 2009, the redemption value of the put arrangement did not exceed the noncontrolling interest balance. Therefore, no adjustment to the value of the redeemable noncontrolling interest was recognized in the consolidated balance sheet for the put arrangement.

The noncontrolling interest put arrangement is accounted for as mandatorily redeemable securities because redemption is outside of the control of UST. As such, the redeemable noncontrolling interest is reported in the mezzanine equity section in the consolidated balance sheet at December 31, 2009.

**Item 4.** *Submission of Matters to a Vote of Security Holders.*

None.

-49-

Table of Contents

**PART II**

**Item 5.**    *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.*

In September 2009, Altria Group, Inc. suspended indefinitely its $4.0 billion (2008 to 2010) share repurchase program in order to preserve financial flexibility and focus on interest expense reduction. Altria Group, Inc.'s share repurchase program is at the discretion of the Board of Directors.

Altria Group, Inc.'s share repurchase activity for each of the three months in the period ended December 31, 2009, was as follows:

| Period | Total Number of Shares Repurchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (2) | Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs (2) |
|---|---|---|---|---|
| October 1, 2009 – October 31, 2009 | 20,669 | $ 18.26 | — | $ 2,834,083,553 |
| November 1, 2009 – November 30, 2009 | 193,890 | $ 18.65 | — | $ 2,834,083,553 |
| December 1, 2009 – December 31, 2009 | — | $ — | — | $ 2,834,083,553 |
| For the Quarter Ended December 31, 2009 | 214,559 | $ 18.61 | | |

(1)   Represents shares tendered to Altria Group, Inc. by employees who vested in restricted and deferred stock, or exercised stock options, and used shares to pay all, or a portion of, the related taxes and/or option exercise price.

(2)   During 2008, Altria Group, Inc. repurchased 53.5 million shares of its common stock at an aggregate cost of approximately $1.2 billion, or an average price of $21.81 per share, pursuant to the $4.0 billion (2008 to 2010) share repurchase program announced on January 30, 2008, modified on September 8, 2008 and suspended indefinitely in September 2009. No shares were repurchased during 2009 under this program. Altria Group, Inc.'s share repurchase program is at the discretion of the Board of Directors.

The principal stock exchange on which Altria Group, Inc.'s common stock (par value $0.33 $1/3$ per share) is listed is the New York Stock Exchange. At January 29, 2010, there were approximately 93,000 holders of record of Altria Group, Inc.'s common stock.

The other information called for by this Item is hereby incorporated by reference to the paragraph captioned "Quarterly Financial Data (Unaudited)" on pages 79 to 80 of the 2009 Annual Report and made a part hereof.

**Item 6.**    *Selected Financial Data.*

The information called for by this Item is hereby incorporated by reference to the information with respect to 2005-2009 appearing under the caption "Selected Financial Data – Five Year Review" on page 18 of the 2009 Annual Report and made a part hereof.

-50-

Table of Contents

**Item 7.**     *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

The information called for by this Item is hereby incorporated by reference to the paragraphs captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations" on pages 81 to 106 of the 2009 Annual Report and made a part hereof.

**Item 7A.**     *Quantitative and Qualitative Disclosures About Market Risk.*

The information called for by this Item is hereby incorporated by reference to the paragraphs in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" captioned "Market Risk" on pages 103 to 104 of the 2009 Annual Report and made a part hereof.

**Item 8.**     *Financial Statements and Supplementary Data.*

The information called for by this Item is hereby incorporated by reference to the 2009 Annual Report as set forth under the caption "Quarterly Financial Data (Unaudited)" on pages 79 to 80 and in the Index to Consolidated Financial Statements and Schedules (see Item 15) and made a part hereof.

**Item 9.**     *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.*

None.

**Item 9A.**     *Controls and Procedures.*

(a)   Disclosure Controls and Procedures

Altria Group, Inc. carried out an evaluation, with the participation of Altria Group, Inc.'s management, including Altria Group, Inc.'s Chief Executive Officer and Chief Financial Officer, of the effectiveness of Altria Group, Inc.'s disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based upon that evaluation, Altria Group, Inc.'s Chief Executive Officer and Chief Financial Officer concluded that Altria Group, Inc.'s disclosure controls and procedures are effective. There have been no changes in Altria Group, Inc.'s internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, Altria Group, Inc.'s internal control over financial reporting.

See pages 107 to 108 of Exhibit 13 for the Report of Independent Registered Public Accounting Firm and the Report of Management on Internal Control over Financial Reporting incorporated herein by reference.

**Item 9B.**     *Other Information.*

None.

-51-

   Powered by Morningstar® Document Research℠

Table of Contents

PART III

Except for the information relating to the executive officers set forth in Item 10, the information called for by Items 10-14 is hereby incorporated by reference to Altria Group, Inc.'s definitive proxy statement for use in connection with its annual meeting of shareholders to be held on May 20, 2010 that will be filed with the SEC on or about April 9, 2010 (the "proxy statement"), and, except as indicated therein, made a part hereof.

**Item 10.     *Directors, Executive Officers and Corporate Governance.***

**Executive Officers as of February 24, 2010:**

| Name | Office | Age |
|---|---|---|
| Martin J. Barrington | Executive Vice President and Chief Compliance and Administrative Officer | 56 |
| David R. Beran | Executive Vice President and Chief Financial Officer | 55 |
| Nancy E. Brennan | Senior Vice President, Marketing, Altria Client Services Inc. | 57 |
| William F. Gifford, Jr. | President and Chief Executive Officer, Philip Morris USA Inc. | 39 |
| Louanna O. Heuhsen | Vice President, Corporate Governance and Associate General Counsel | 59 |
| Craig A. Johnson | Executive Vice President | 57 |
| Denise F. Keane | Executive Vice President and General Counsel | 58 |
| Salvatore Mancuso | Vice President and Treasurer | 44 |
| John R. Nelson | Executive Vice President and Chief Technology Officer | 58 |
| Peter P. Paoli | President and Chief Executive Officer, U.S. Smokeless Tobacco Company LLC | 52 |
| W. Hildebrandt Surgner, Jr. | Corporate Secretary and Senior Assistant General Counsel | 44 |
| Michael E. Szymanczyk | Chairman of the Board and Chief Executive Officer | 61 |
| Linda M. Warren | Vice President and Controller | 61 |
| Howard A. Willard III | Executive Vice President, Strategy and Business Development | 46 |

All of the above-mentioned officers have been employed by Altria Group, Inc. or its subsidiaries in various capacities during the past five years, except for Ms. Heuhsen, who joined in 2008 after serving as a partner in the law firm of Hunton & Williams LLP, and Mr. Surgner, who rejoined in 2006 after serving as Vice President, General Counsel and Corporate Secretary of Tredegar Corporation.

*Codes of Conduct and Corporate Governance*

Altria Group, Inc. has adopted the Altria Code of Conduct for Compliance and Integrity, which complies with requirements set forth in Item 406 of Regulation S-K. This Code of Conduct applies to all of its employees, including its principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. Altria Group, Inc. has also adopted a code of business conduct and ethics that applies to the members of its Board of Directors. These documents are available free of charge on Altria Group, Inc.'s website at www.altria.com.

In addition, Altria Group, Inc. has adopted corporate governance guidelines and charters for its Audit, Compensation and Nominating, Corporate Governance and Social Responsibility Committees and the other committees of the Board of Directors. All of these documents are available free of charge on Altria Group, Inc.'s web site at www.altria.com. Any waiver granted by Altria Group, Inc. to its principal executive officer, principal financial officer or controller under the code of ethics, or certain amendments to the code of ethics, will be disclosed on Altria Group, Inc.'s website at www.altria.com.

Source: ALTRIA GROUP INC, 10-K, February 24, 2010                                                                                      Powered by Morningstar® Document Research℠

Table of Contents

The information on the respective web sites of Altria Group, Inc. and its subsidiaries is not, and shall not be deemed to be, a part of this Report or incorporated into any other filings Altria Group, Inc. makes with the SEC.

**Item 11.**     *Executive Compensation.*

Refer to "Compensation Committee Matters" and "Compensation of Directors" sections of the proxy statement.

**Item 12.**     *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.*

Refer to "Ownership of Equity Securities" and "Equity Compensation Plan Information" sections of the proxy statement.

**Item 13.**     *Certain Relationships and Related Transactions, and Director Independence.*

Refer to "Related Person Transactions and Code of Conduct" and "Independence of Nominees" sections of the proxy statement.

**Item 14.**     *Principal Accounting Fees and Services.*

Refer to "Audit Committee Matters" section of the proxy statement.

-53-

Table of Contents

PART IV

Item 15.    *Exhibits and Financial Statement Schedules* .

(a)    Index to Consolidated Financial Statements and Schedules

|  | Reference | |
|---|---|---|
|  | Form 10-K Annual Report Page | 2009 Annual Report Page |
| Data incorporated by reference to Altria Group, Inc.'s 2009 Annual Report: | | |
| Consolidated Statements of Earnings for the years ended December 31, 2009, 2008 and 2007 | – | 19 |
| Consolidated Balance Sheets at December 31, 2009 and 2008 | – | 20 - 21 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2009, 2008 and 2007 | – | 22 - 23 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2009, 2008 and 2007 | – | 24 |
| Notes to Consolidated Financial Statements | – | 25 - 80 |
| Report of Independent Registered Public Accounting Firm | – | 107 |
| Report of Management on Internal Control Over Financial Reporting | – | 108 |
| Data submitted herein: | | |
| Report of Independent Registered Public Accounting Firm on Financial Statement Schedule | S-1 | |
| Financial Statement Schedule—Valuation and Qualifying Accounts | S-2 | |

Schedules other than those listed above have been omitted either because such schedules are not required or are not applicable.

(b)    The following exhibits are filed as part of this Report:

2.1    Distribution Agreement by and between Altria Group, Inc. and Kraft Foods Inc., dated as of January 31, 2007. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on January 31, 2007 (File No. 1-08940).

2.2    Distribution Agreement by and between Altria Group, Inc. and Philip Morris International Inc., dated as of January 30, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on January 30, 2008 (File No. 1-08940).

2.3    Agreement and Plan of Merger by and among UST Inc., Altria Group, Inc., and Armchair Merger Sub, Inc., dated as of September 7, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on September 8, 2008 (File No. 1-08940).

2.4    Amendment No. 1 to the Agreement and Plan of Merger, dated as of September 7, 2008, by and among UST Inc., Altria Group, Inc., and Armchair Merger Sub, Inc., dated as of October 2, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on October 3, 2008 (File No. 1-08940).

3.1    Articles of Amendment to the Restated Articles of Incorporation of Altria Group, Inc. and Restated Articles of Incorporation of Altria Group, Inc. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2002 (File No. 1-08940).

3.2    Amended and Restated By-laws of Altria Group, Inc. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on February 22, 2010 (File No. 1-08940).

4.1    Indenture between Altria Group, Inc. and The Bank of New York (as successor in interest to JPMorgan Chase Bank, formerly known as The Chase Manhattan Bank), as Trustee, dated as of December 2, 1996. Incorporated by reference to Altria Group, Inc.'s Registration Statement on Form S-3/A filed on January 29, 1998 (No. 333-35143).

4.2    First Supplemental Indenture to Indenture, dated as of December 2, 1996, between Altria Group, Inc. and The Bank of New York (as successor in interest to JPMorgan Chase Bank, formerly known as The Chase Manhattan Bank), as Trustee, dated as of February 13, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on February 15, 2008 (File No. 1-08940).

4.3    Indenture among Altria Group, Inc., as Issuer, Philip Morris USA Inc., as Guarantor, and Deutsche Bank Trust Company Americas, as Trustee, dated as of November 4, 2008. Incorporated by reference to Altria Group, Inc.'s Registration Statement on Form S-3 filed on November 4, 2008 (No. 333-155009).

4.4    5-Year Revolving Credit Agreement among Altria Group, Inc. and the Initial Lenders named therein and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Administrative Agents, Credit Suisse First Boston, Cayman Islands Branch and Deutsche Bank Securities Inc., as Syndication Agents and ABN AMRO Bank N.V., BNP Paribas, HSBC Bank USA, National Association and UBS Securities LLC, as Arrangers and Documentation Agents, dated as of April 15, 2005. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on April 20, 2005 (File No. 1-08940).

4.5    Consent and Waiver, dated as of June 25, 2009, to the 5-Year Revolving Credit Agreement, dated as of April 15, 2005, among Altria Group, Inc., the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as Administrative Agents, Credit Suisse First Boston, Cayman Islands Branch and Deutsche Bank Securities Inc., as Syndication Agents, and ABN AMRO Bank N.V., BNP Paribas, HSBC Bank USA, National Association and UBS Securities LLC, as Arrangers and Documentation Agents. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended June 30, 2009 (File No. 1-08940).

4.6    3-Year Revolving Credit Agreement among Altria Group, Inc. and the Initial Lenders named therein and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Administrative Agents, Barclays Capital, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Syndication Agents and Banco Santander, S.A., New York Branch, The Bank of Nova Scotia, HSBC Bank USA, National Association, Morgan Stanley Senior Funding, Inc. and The Royal Bank of Scotland plc, as Documentation Agents, dated as of November 20, 2009. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on November 23, 2009 (File No. 1-08940).

4.7    The Registrant agrees to furnish copies of any instruments defining the rights of holders of long-term debt of the Registrant and its consolidated subsidiaries that does not exceed 10 percent of the total assets of the Registrant and its consolidated subsidiaries to the Commission upon request.

10.1    Comprehensive Settlement Agreement and Release related to settlement of Mississippi health care cost recovery action, dated as of October 17, 1997. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 1997 (File No. 1-08940).

10.2    Settlement Agreement related to settlement of Florida health care cost recovery action, dated August 25, 1997. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on September 3, 1997 (File No. 1-08940).

Table of Contents

10.3    Comprehensive Settlement Agreement and Release related to settlement of Texas health care cost recovery action, dated as of January 16, 1998. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on January 28, 1998 (File No. 1-08940).

10.4    Settlement Agreement and Stipulation for Entry of Judgment regarding the claims of the State of Minnesota, dated as of May 8, 1998. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended March 31, 1998 (File No. 1-08940).

10.5    Settlement Agreement and Release regarding the claims of Blue Cross and Blue Shield of Minnesota, dated as of May 8, 1998. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended March 31, 1998 (File No. 1-08940).

10.6    Stipulation of Amendment to Settlement Agreement and For Entry of Agreed Order regarding the settlement of the Mississippi health care cost recovery action, dated as of July 2, 1998. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended June 30, 1998 (File No. 1-08940).

10.7    Stipulation of Amendment to Settlement Agreement and For Entry of Consent Decree regarding the settlement of the Texas health care cost recovery action, dated as of July 24, 1998. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended June 30, 1998 (File No. 1-08940).

10.8    Stipulation of Amendment to Settlement Agreement and For Entry of Consent Decree regarding the settlement of the Florida health care cost recovery action, dated as of September 11, 1998. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended September 30, 1998 (File No. 1-08940).

10.9    Master Settlement Agreement relating to state health care cost recovery and other claims, dated as of November 23, 1998. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on November 25, 1998, as amended by Form 8-K/A filed on December 24, 1998 (File No. 1-08940).

10.10   Stipulation and Agreed Order Regarding Stay of Execution Pending Review and Related Matters, dated as of May 7, 2001. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on May 8, 2001 (File No. 1-08940).

10.11   Stock Purchase Agreement by and among Altria Group, Inc., Bradford Holdings, Inc. and John Middleton, Inc., dated as of October 31, 2007. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended September 30, 2007 (File No. 1-08940).

10.12   Employee Matters Agreement by and between Altria Group, Inc. and Kraft Foods Inc., dated as of March 30, 2007. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on March 30, 2007 (File No. 1-08940).

10.13   Tax Sharing Agreement by and between Altria Group, Inc. and Kraft Foods Inc., dated as of March 30, 2007. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on March 30, 2007 (File No. 1-08940).

10.14   Transition Services Agreement by and between Altria Corporate Services, Inc. and Kraft Foods Inc., dated as of March 30, 2007. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on March 30, 2007 (File No. 1-08940).

10.15   Intellectual Property Agreement by and between Philip Morris International Inc. and Philip Morris USA Inc., dated as of January 1, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on March 28, 2008 (File No. 1-08940).

Source: ALTRIA GROUP, INC, 10-K, February 24, 2010          Powered by Morningstar® Document Research℠

Table of Contents

10.16    Employee Matters Agreement by and between Altria Group, Inc. and Philip Morris International Inc., dated as of March 28, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on March 28, 2008 (File No. 1-08940).

10.17    Tax Sharing Agreement by and between Altria Group, Inc. and Philip Morris International Inc., dated as of March 28, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on March 28, 2008 (File No. 1-08940).

10.18    Transition Services Agreement by and between Altria Corporate Services, Inc. and Philip Morris International Inc., dated as of March 28, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on March 28, 2008 (File No. 1-08940).

10.19    364-Day Bridge Loan Agreement among Altria Group, Inc. and the Initial Lenders named therein and Goldman Sachs Credit Partners L.P. and Lehman Commercial Paper Inc. as Administrative Agents, JPMorgan Chase Bank, N.A. and Citibank, N.A., as Syndication Agents and Credit Suisse, Cayman Islands Branch and Deutsche Bank Securities Inc., as Arrangers and Documentation Agents, dated as of January 28, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on February 1, 2008 (File No. 1-08940).

10.20    Guarantee made by Philip Morris USA Inc., in favor of the lenders party to the 5-Year Revolving Credit Agreement, dated as of April 15, 2005, among Altria Group, Inc., the lenders named therein, and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Administrative Agents, dated as of September 8, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on September 8, 2008 (File No. 1-08940).

10.21    Guarantee made by Philip Morris USA Inc., in favor of the lenders party to the Bridge Loan Agreement, dated as of January 28, 2008, among Altria Group, Inc., the lenders named therein, and Goldman Sachs Credit Partners L.P. and Lehman Commercial Paper Inc., as Administrative Agents, dated as of September 8, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on September 8, 2008 (File No. 1-08940).

10.22    Commitment Letter among Altria Group, Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Goldman Sachs Credit Partners L.P. and Goldman Sachs Bank USA, dated as of September 7, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on September 8, 2008 (File No. 1-08940).

10.23    Amended and Restated Commitment Letter among Altria Group, Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Goldman Sachs Credit Partners L.P. and Goldman Sachs Bank USA, dated as of October 20, 2008. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended September 30, 2008 (File No. 1-08940).

10.24    364-Day Bridge Loan Agreement among Altria Group, Inc. and the Initial Lenders named therein and JPMorgan Chase Bank, N.A. and Goldman Sachs Credit Partners L.P., as Administrative Agents, Citicorp North America, Inc., Barclays Bank PLC, Deutsche Bank Securities Inc., Santander Investment Securities Inc., HSBC Securities (USA) Inc. and The Bank of Nova Scotia, as Syndication Agents, and Citigroup Global Markets Inc., Barclays Bank PLC, Deutsche Bank Securities Inc., Santander Investment Securities Inc., HSBC Securities (USA) Inc. and The Bank of Nova Scotia, as Co-arrangers, dated as of December 19, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on December 22, 2008 (File No. 1-08940).

-57-

Table of Contents

| 10.25 | 364-Day Revolving Credit Agreement among Altria Group, Inc. and the Initial Lenders named therein and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Administrative Agents, Barclays Capital, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Syndication Agents and Banco Santander, S.A., New York Branch, The Bank of Nova Scotia, HSBC Bank USA, National Association, Morgan Stanley Senior Funding, Inc. and The Royal Bank of Scotland plc, as Documentation Agents, dated as of November 20, 2009. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on November 23, 2009 (File No. 1-08940). |
|---|---|
| 10.26 | Guarantee made by Philip Morris USA Inc., in favor of the lenders party to the 364-Day Revolving Credit Agreement, dated as of November 20, 2009, among Altria Group, Inc., the lenders named therein, and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Administrative Agents, dated as of November 20, 2009. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on November 23, 2009 (File No. 1-08940). |
| 10.27 | Guarantee made by Philip Morris USA Inc., in favor of the lenders party to the 3-Year Revolving Credit Agreement, dated as of November 20, 2009, among Altria Group, Inc., the lenders named therein, and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Administrative Agents, dated as of November 20, 2009. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on November 23, 2009 (File No. 1-08940). |
| 10.28 | Financial Counseling Program. |
| 10.29 | Benefit Equalization Plan, effective as of September 2, 1974, as amended. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-09840). |
| 10.30 | Form of Employee Grantor Trust Enrollment Agreement. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 1995 (File No. 1-08940). |
| 10.31 | Form of Supplemental Employee Grantor Trust Enrollment Agreement. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2005 (File No. 1-08940). |
| 10.32 | Automobile Policy. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 1997 (File No. 1-08940). |
| 10.33 | Supplemental Management Employees' Retirement Plan of Altria Group, Inc., effective as of October 1, 1987, as amended. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-08940). |
| 10.34 | Unit Plan for Incumbent Non-Employee Directors, effective January 1, 1996, as amended. |
| 10.35 | Form of Executive Master Trust between Altria Group, Inc., JPMorgan Chase Bank and Handy Associates. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 1994 (File No. 1-08940). |
| 10.36 | 1997 Performance Incentive Plan, effective on May 1, 1997. Incorporated by reference to Altria Group, Inc.'s definitive proxy statement filed on March 10, 1997 (File No. 1-08940). |
| 10.37 | Long-Term Disability Benefit Equalization Plan, effective as of January 1, 1989, as amended. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended June 30, 2009 (File No. 1-08940). |

Table of Contents

| | |
|---|---|
| 10.38 | Survivor Income Benefit Equalization Plan, effective as of January 1, 1985, as amended. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended June 30, 2009 (File No. 1-08940). |
| 10.39 | 2000 Performance Incentive Plan, effective on May 1, 2000. Incorporated by reference to Altria Group, Inc.'s definitive proxy statement filed on March 10, 2000 (File No. 1-08940). |
| 10.40 | 2000 Stock Compensation Plan for Non-Employee Directors, as amended and restated as of March 1, 2003. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2002 (File No. 1-08940). |
| 10.41 | 2005 Performance Incentive Plan, effective on May 1, 2005. Incorporated by reference to Altria Group, Inc.'s definitive proxy statement filed on March 14, 2005 (File No. 1-08940). |
| 10.42 | Deferred Fee Plan for Non-Employee Directors, as amended and restated effective April 24, 2008. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-08940). |
| 10.43 | Stock Compensation Plan for Non-Employee Directors, as amended and restated effective April 24, 2008. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-08940). |
| 10.44 | Kraft Foods Inc. Supplemental Benefits Plan I (including First Amendment adding Supplement A), as amended and restated effective as of January 1, 1996. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006 (File No. 1-08940). |
| 10.45 | Agreement among Altria Group, Inc., PM USA and Michael E. Szymanczyk, dated as of May 15, 2002. Incorporated by reference to Altria Group, Inc.'s Quarterly Report on Form 10-Q for the period ended June 30, 2002 (File No. 1-08940). |
| 10.46 | Form of Indemnity Agreement. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on October 30, 2006 (File No. 1-08940). |
| 10.47 | Form of Deferred Stock Agreement, dated as of January 25, 2006. Incorporated by reference to Altria Group, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2005 (File No. 1-08940). |
| 10.48 | Form of Restricted Stock Agreement, dated as of January 25, 2006. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on January 27, 2006 (File No. 1-08940). |
| 10.49 | Form of Deferred Stock Agreement, dated as of January 31, 2007. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on February 2, 2007 (File No. 1-08940). |
| 10.50 | Form of Deferred Stock Agreement, dated as of January 30, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on February 5, 2008 (File No. 1-08940). |
| 10.51 | Form of Restricted Stock Agreement, dated as of April 23, 2008. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on April 29, 2008 (File No. 1-08940). |
| 10.52 | Form of Restricted Stock Agreement, dated as of January 27, 2009. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on January 29, 2009 (File No. 1-08940). |
| 10.53 | Form of Restricted Stock Agreement, dated as of December 31, 2009. |

Table of Contents

| | |
|---|---|
| 10.54 | Time Sharing Agreement between Altria Group, Inc. and Michael E. Szymanczyk, dated January 28, 2009. Incorporated by reference to Altria Group, Inc.'s Current Report on Form 8-K filed on January 29, 2009 (File No. 1-08940). |
| 10.55 | First Amendment to the Time Sharing Agreement between Altria Group, Inc. and Michael E. Szymanczyk, dated November 12, 2009. |
| 12 | Statements regarding computation of ratios. |
| 13 | Pages 17 to 108 of the 2009 Annual Report, but only to the extent set forth in Items 1, 5-8, 9A, and 15 hereof. With the exception of the aforementioned information incorporated by reference in this Annual Report on Form 10-K, the 2009 Annual Report is not to be deemed "filed" as part of this Report. |
| 21 | Subsidiaries of Altria Group, Inc. |
| 23 | Consent of independent registered public accounting firm. |
| 24 | Powers of attorney. |
| 31.1 | Certification of the Registrant's Chief Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) of the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of the Registrant's Chief Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) of the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of the Registrant's Chief Executive Officer pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of the Registrant's Chief Financial Officer pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.1 | Certain Litigation Matters and Recent Developments. |
| 99.2 | Trial Schedule. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase. |

-60-

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ALTRIA GROUP, INC.

By:        /s/   MICHAEL E. SZYMANCZYK
.........................................................................

(Michael E. Szymanczyk
Chairman of the Board and
Chief Executive Officer)

Date: February 24, 2010

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated:

| Signature | Title | Date |
|---|---|---|
| /s/   MICHAEL E. SZYMANCZYK<br>(Michael E. Szymanczyk) | Director, Chairman of the Board and Chief Executive Officer | February 24, 2010 |
| /s/   DAVID R. BERAN<br>(David R. Beran) | Executive Vice President and Chief Financial Officer | February 24, 2010 |
| /s/   LINDA M. WARREN<br>(Linda M. Warren) | Vice President and Controller | February 24, 2010 |
| * ELIZABETH E. BAILEY,<br>GERALD L. BALILES,<br>JOHN T. CASTEEN III,<br>DINYAR S. DEVITRE,<br>THOMAS F. FARRELL II,<br>ROBERT E. R. HUNTLEY,<br>THOMAS W. JONES,<br>GEORGE MUÑOZ,<br>NABIL Y. SAKKAB | Directors | |

*By:        /s/   MICHAEL E. SZYMANCZYK
.........................................................................

(MICHAEL E. SZYMANCZYK
ATTORNEY-IN-FACT)                                   February 24, 2010

-61-

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Altria Group, Inc.:

Our audits of the consolidated financial statements and of the effectiveness of internal control over financial reporting referred to in our report dated January 28, 2010 appearing in the 2009 Annual Report to Shareholders of Altria Group, Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10-K) also included an audit of the financial statement schedule listed in Item 15(a) of this Form 10-K. In our opinion, this financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/ PricewaterhouseCoopers LLP

Richmond, Virginia
January 28, 2010

S-1

Table of Contents

**ALTRIA GROUP, INC. AND SUBSIDIARIES**

**VALUATION AND QUALIFYING ACCOUNTS**
**For the Years Ended December 31, 2009, 2008 and 2007**
**(in millions)**

| Col. A | Col. B | Col. C | | Col. D | Col. E |
|---|---|---|---|---|---|
| | | Additions | | | |
| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
| | | | (a) | (b) | |
| **2009:** | | | | | |
| CONSUMER PRODUCTS: | | | | | |
| Allowance for discounts | $ — | $ 593 | $ — | $ 593 | $ — |
| Allowance for doubtful accounts | 3 | — | — | — | 3 |
| Allowance for returned goods | 4 | 104 | 15 | 76 | 47 |
| | $ 7 | $ 697 | $ 15 | $ 669 | $ 50 |
| FINANCIAL SERVICES: | | | | | |
| Allowance for losses | $ 304 | $ 15 | $ — | $ 53 | $ 266 |
| **2008:** | | | | | |
| CONSUMER PRODUCTS: | | | | | |
| Allowance for discounts | $ — | $ 492 | $ — | $ 492 | $ — |
| Allowance for doubtful accounts | 3 | — | — | — | 3 |
| Allowance for returned goods | 2 | 6 | — | 4 | 4 |
| | $ 5 | $ 498 | $ — | $ 496 | $ 7 |
| FINANCIAL SERVICES: | | | | | |
| Allowance for losses | $ 204 | $ 100 | $ — | $ — | $ 304 |
| **2007:** | | | | | |
| CONSUMER PRODUCTS: | | | | | |
| Allowance for discounts | $ — | $ 493 | $ — | $ 493 | $ — |
| Allowance for doubtful accounts | 6 | — | 1 | 4 | 3 |
| Allowance for returned goods | 1 | 3 | — | 2 | 2 |
| | $ 7 | $ 496 | $ 1 | $ 499 | $ 5 |
| FINANCIAL SERVICES: | | | | | |
| Allowance for losses | $ 480 | $ — | $ — | $ 276 | $ 204 |

Notes:

(a)   Primarily related to acquisitions.

(b)   Represents charges for which allowances were created.

S-2

Exhibit 10.28

ALTRIA GROUP, INC.

Financial Counseling Program

Altria Group, Inc. has a program that has existed since January 1, 1980 to provide for financial counseling services for key executives. This program currently provides for reimbursement to senior management or payment directly to the chosen advisor for expenditures they incur in connection with their personal financial and estate planning and preparation of tax returns for them and/or their dependent children, subject to the following annual limits:

1. $15,000 for the Chairman and Chief Executive Officer;

2. $10,000 for salary bands B and C; and

3. Lesser amounts for certain subordinate salary bands.

Rather than limit individuals to specific advisors, each eligible executive may seek his own reputable advisor to perform such services. Reimbursement shall be limited to the services set forth above and will not include, for example, fees related to the execution of financial transactions (e.g., a broker's fee for the purchase and/or sale of a mutual fund or individual stock). Also, it shall be necessary for invoices to reflect in reasonable detail the nature and extent of the services performed.

Payments by Altria Group, Inc. under this program will be included in the executive's taxable compensation in the year in which reimbursement occurred.

Exhibit 10.34

**Unit Plan For Incumbent Non-Employee Directors**
**(as amended effective August 31, 2007)**

**SECTION 1. Introduction**

The Unit Plan for Incumbent Non-Employee Directors provides for a Stock Unit Account, an Equity Index Account and an Interest Income Account for each Incumbent Director, the value of which will be paid to the Incumbent Director or, in the case of his or her death, a Beneficiary, upon such Incumbent Director's ceasing to be a Director after January 1, 1996. This Plan was initially effective November 29, 1995. No additional amounts, other than earnings, have been credited since January 1, 1996.

**SECTION 2. Definitions**

For purposes of the Plan, the following terms are defined as set forth below:

a.    "*Account*" means the Stock Unit Account, the Equity Index Account or the Interest Income Account, and "Accounts" means more than one of the Accounts.

b.    "*Altria Stock Fund*" means the Altria Stock Fund of the Profit-Sharing Plan or the predecessor thereto (such predecessor fund was referred to as the Philip Morris Stock Fund).

c.    "*Beneficiary*" means any person or entity designated as such in a current Beneficiary Designation Form on file with the Corporate Secretary of the Company. If there is no valid designation or if no designated Beneficiary survives the Participant, the Beneficiary is the Participant's estate.

d.    "*Beneficiary Designation Form*" means a Plan Beneficiary Designation Form properly completed and signed.

e.    "*Board*" means the Board of Directors of the Company.

f.    "*Common Stock*" means the common stock, $0.331/3 par value, of the Company.

g.    "*Company*" means Altria Group, Inc., a corporation organized under the laws of the Commonwealth of Virginia, or any successor corporation.

h.    "*Director*" means a person serving on the Board.

i.    "*Distribution Election Form*" means a Plan Distribution and Special Transfer Election Form properly completed and signed.

j.    "*Equity Index Account*" means the unfunded deferred compensation account established by the Company in accordance with Section 3 of the Plan.

1

k.    "*Equity Index Fund*" means the Equity Index Fund of the Profit-Sharing Plan.

l.    "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations thereunder.

m.    "*Interest Income Account*" means the unfunded deferred compensation account established by the Company in accordance with Section 3 of the Plan.

n.    "*Interest Income Fund*" means the Interest Income Fund of the Profit-Sharing Plan.

o.    "*Incumbent Director*" means a Director on January 1, 1996 who is not entitled to receive a pension or similar benefit from the Company or any corporation in which the Company owns, or at any time owned, directly or indirectly, stock possessing at least fifty percent (50%) of the total combined voting power of all classes of stock entitled to vote; provided, however, if an Incumbent Director is eligible for a Pension Allowance (as defined in the Pension Plan) if he or she ceases to be a Director, he or she waives, before December 20, 1995, his or her right to such Pension Allowance.

p.    "*Participant*" means an Incumbent Director, and a person who was, but is no longer, serving on the Board as long as an Account is being maintained for his or her benefit.

q.    "*Pension Plan*" means the Pension Plan for Directors of Philip Morris Companies Inc.

r.    "*Plan*" means the Unit Plan for Incumbent Non-Employee Directors.

s.    "*Profit-Sharing Plan*" means the Altria Group, Inc. Deferred Profit-Sharing Plan, effective as of January 1, 1956, as amended from time to time.

t.    "*Stock Unit*" means a notional entry that is the equivalent of one share of Common Stock.

u.    "*Stock Unit Account*" means the unfunded deferred compensation account established by the Company in accordance with Section 3 of the Plan.

## SECTION 3. Accounts

On January 1, 1996, the Company shall establish a Stock Unit Account for each Incumbent Director and shall credit thereto a number of Stock Units equal to that resulting from a theoretical investment of $285,000 on December 29, 1995 in the Altria Stock Fund; provided, however, if, before December 20, 1995, a Director shall have elected to credit an amount, not in excess of $142,500 in the aggregate, to one or both of the Equity Index Account and the Interest Income Account, the Company shall establish for each such Incumbent Director on January 1, 1996 such Accounts in the amounts specified and shall credit to a Stock Unit Account for such Incumbent Director that number of Stock Units equal to that resulting from a theoretical investment on December

2

29, 1995 in the Altria Stock Fund of $285,000, less the amounts credited to such other Accounts.

The Stock Unit Account shall be a bookkeeping account whose value shall be based on a theoretical investment in the Altria Stock Fund. If as a result of adjustments or substitutions in connection with an event described in the second paragraph of Section 4 of the Company's Stock Compensation Plan for Non-Employee Directors or the comparable provision of any successor to such plan, a participant has received or receives with respect to his or her Stock Unit Account rights or amounts measured by reference to stock other than Common Stock, (i) such rights or amounts shall be accounted for in an additional account under the Plan but treated as subject to the elections made with respect to the Stock Unit Account under the Plan and (ii) within 12 months following the event described in such Section 4, the participant shall be offered the opportunity to convert the portion of his or her account measured by reference to such other stock to an amount credited under the Stock Unit Account having the same fair market value (rounded as necessary to reflect fractional shares) as of the date of such conversion.

The Equity Index Account shall be a bookkeeping account whose value shall be based on a theoretical investment in the Equity Index Fund of the Profit-Sharing Plan.

The Interest Income Account shall be a bookkeeping account whose value shall be based on a theoretical investment in the Interest Income Fund of the Profit-Sharing Plan.

Each Account shall be credited with earnings and charged with losses, if any, on the same basis as the corresponding Fund, as the same may be changed from time to time, under the Profit-Sharing Plan. The value of any Account at any relevant time shall be determined as if all amounts credited thereto had been invested in the corresponding Fund; provided, however, that if as a result of adjustments or substitutions in connection with an event described in the second paragraph of Section 4 of the Company's Stock Compensation Plan for Non-Employee Directors or the comparable provision of any successor to such plan, a participant has received or receives with respect to his or her Stock Unit Account rights or amounts measured by reference to stock other than Common Stock, then any crediting of amounts to reflect dividends with respect to such other stock shall be allocated among and treated as invested proportionately in the Accounts most recently selected and in effect for investment by the Participant.

Except as provided in Section 4 below, no transfer shall be permitted among Accounts.

**SECTION 4. Distribution and Special Transfer Election**

Unless the Participant has filed a Distribution Election Form with the Corporate Secretary of the Company no later than one year and one day preceding the date he or she ceases to be a Director, the Participant's Accounts shall be distributed in a lump sum on

3

the first day of the second month following the date the Participant ceases to be a Director.

A Participant may file a Distribution Election Form, which shall be irrevocable, providing that distribution from his or her Accounts may be made (i) in no more than one-hundred eighty (180) monthly, sixty (60) quarterly or fifteen (15) annual installments or (ii) in a combination of a lump sum and installments. The first such payment shall be made on the first day of the second month following the date the participant ceases to be a Director. Each installment shall be determined by dividing the sum of the Account balances by the number of remaining installments. If a Participant or a Beneficiary is receiving distributions in installments, the Accounts shall continue to accrue earnings and incur losses in accordance with Section 3.

A Participant who elects a distribution in installments shall be entitled to make a special investment election on his or her Distribution Election Form pursuant to which transfers from the Participant's Stock Unit Account will be made, effective the first day of the second month following the date the Participant ceases to be a Director, to an Equity Index Account or an Interest Income Account or both.

If a distribution occurs by reason of the Participant's death or, if at the time of death, the Participant was receiving distributions in installments, the balance remaining in the Participant's Accounts shall be payable to his or her Beneficiaries designated in, and in the manner of payment set forth on, the Participant's Beneficiary Designation Form in effect on the date of the Participant's death. Any lump sum distributions to Beneficiaries shall be without interest.

All distributions shall be paid in cash.

**SECTION 5. Beneficiary Designation**

A Participant may at any time file a Beneficiary Designation Form with the Corporate Secretary of the Company. Such Beneficiary Designation Form may be revoked or modified at any time by filing a new Beneficiary Designation Form.

**SECTION 6. General Provisions**

**6.1 Unfunded Plan.**

It is intended that the Plan constitute an "unfunded" plan for deferred compensation. The Company may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan; provided, however, that, unless the Company otherwise determines, the existence of such trusts or other arrangements is consistent with the "unfunded" status of the Plan. Any liability of the Company to any person with respect to any grant under the Plan shall be based solely upon any contractual obligations that may be created pursuant to the Plan. No such obligation of the Company shall be

4

deemed to be secured by any pledge of, or other encumbrance on, any property of the Company.

**6.2 Rules of Construction.**

Headings are given to the sections of the Plan solely as a convenience to facilitate reference. The reference to any statute, regulation, or other provision of law shall be construed to refer to any amendment to or successor of such provision of law.

**6.3 Withholding.**

No later than the date as of which an amount first becomes includible in the gross income of the Participant or Beneficiary for Federal income tax purposes with respect to any participation under the Plan, the Participant or Beneficiary shall pay to the Company, or make arrangements satisfactory to the Company regarding the payment of, any Federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount.

**6.4 Amendment.**

The Plan may be amended by the Board, but no amendment shall be made that would impair the rights of a Participant to his or her Accounts without his or her consent.

**6.5 Duration of Plan.**

There shall be no time limitation with respect to the Plan. The Board may terminate the Plan at any time. Upon termination of the Plan, amounts credited to each Account shall be distributed in accordance with the Distribution Election Form applicable to each such Account or as otherwise provided in Section 4.

**6.6 Assignability.**

No Participant or Beneficiary shall have the right to assign, pledge or otherwise transfer any payments to which such Participant or Beneficiary may be entitled under the Plan other than by will or by the laws of descent and distribution or pursuant to a "qualified domestic relations order" (as defined by Title I of ERISA).

**6.7 Construction.**

The Plan shall be construed and interpreted in accordance with Virginia law. Headings are given to the sections of the Plan solely as a convenience to facilitate reference. The reference to any statute, regulation, or other provision of law shall be construed to refer to any amendment to or successor of such provision of law. The Plan is intended to be construed so that participation in the Plan will be exempt from Section 16(b) of the

5

Exchange Act pursuant to regulations and interpretations issued from time to time by the Securities and Exchange Commission.

6

Exhibit 10.53

**THE ALTRIA GROUP, INC.**
**2005 PERFORMANCE INCENTIVE PLAN**

**RESTRICTED STOCK AGREEMENT**
**(December 31, 2009)**

ALTRIA GROUP, INC. (the "Company"), a Virginia corporation, hereby grants to the employee identified in the 2009 Restricted Stock Award section of the Award Statement (the "Employee") under the Altria Group, Inc. 2005 Performance Incentive Plan (the "Plan") a Restricted Stock Award (the "Award") dated December 31, 2009, with respect to the number of shares set forth in the 2009 Restricted Stock Award section of the Award Statement (the "Shares") of the Common Stock of the Company (the "Common Stock"), all in accordance with and subject to the following terms and conditions:

1. Book Entry Registration. The Shares shall be evidenced by a book entry account maintained by the Company's Transfer Agent for the Common Stock. Upon the vesting of Shares, no certificates will be issued except upon a separate written request made to such Transfer Agent or other agent as determined by the Company.

2. Restrictions. Subject to Section 3 below, the restrictions on the Shares shall lapse and the Shares shall vest on the Vesting Date set forth in the 2009 Restricted Stock Award section of the Award Statement (the "Vesting Date"), provided that the Employee remains an employee of the Company (or a subsidiary or affiliate) during the entire period (the "Restriction Period") commencing on the Award Date set forth in the Award Statement and ending on the Vesting Date.

3. Termination of Employment During Restriction Period. In the event of the termination of the Employee's employment with the Company (and with all subsidiaries and affiliates of the Company) prior to the Vesting Date due to death or Disability, or upon the Employee reaching eligibility for Normal Retirement, the restrictions on the Shares shall lapse and the Shares shall become fully vested on the date of death, Disability, or eligibility for Normal Retirement.

If the Employee's employment with the Company (and with all subsidiaries and affiliates of the Company) is terminated for any reason other than death or Disability prior to the end of the Restriction Period, the Employee shall forfeit all rights to the Shares. Notwithstanding the foregoing, the Compensation Committee of the Board of Directors of the Company may, in its sole discretion, waive the restrictions on, and the vesting requirements for, the Shares.

4. Voting and Dividend Rights. During the Restriction Period, the Employee shall have the rights to vote the Shares and to receive any cash dividends payable with respect to the Shares, as paid, less applicable withholding taxes (it being understood that such dividends will generally be taxable as ordinary compensation income during such Restriction Period).

5. Transfer Restrictions. This Award and the Shares (until they become unrestricted pursuant to the terms hereof) are non-transferable and may not be assigned, hypothecated or otherwise pledged and shall not be subject to execution, attachment or similar process. Upon any attempt to effect any such disposition, or upon the levy of any such process, the Award shall immediately become null and void and the Shares shall be forfeited.

6. Withholding Taxes. The Company is authorized to satisfy the actual minimum statutory withholding taxes arising from the granting or vesting of this Award, as the case may be, by deducting the number of shares having an aggregate value equal to the amount of withholding taxes due from the total

number of shares awarded or the number of shares vesting or otherwise becoming subject to current taxation. The Company is also authorized to satisfy the actual withholding taxes arising from the granting or vesting of this Award, or hypothetical withholding tax amounts if the Employee is covered under a Company tax equalization policy, as the case may be, by the remittance of the required amounts from any proceeds realized upon the open-market sale of vested Shares by the Employee. Shares deducted from this Award in satisfaction of actual minimum withholding tax requirements shall be valued at the Fair Market Value of the Shares on the date as of which the amount giving rise to the withholding requirement first became includible in the gross income of the Employee under applicable tax laws. If the Employee is covered by a Company tax equalization policy, the Employee also agrees to pay to the Company any additional hypothetical tax obligation calculated and paid in accordance with such tax equalization policy.

7. Death of Employee . If any of the Shares shall vest upon the death of the Employee, they shall be registered in the name of the estate of the Employee except that, to the extent permitted by the Compensation Committee, if the Company shall have theretofore received in writing a beneficiary designation, the Shares shall be registered in the name of the designated beneficiary.

8. Board Authorization in the Event of Restatement . Notwithstanding anything in this Agreement to the contrary, if the Board of Directors of the Company or an appropriate Committee of the Board determines that, as a result of a restatement of the Company's financial statements, the Employee has received greater compensation in connection with the Award than would been received absent the incorrect financial statements, the Board or Committee, in its discretion, may take such action with respect to this Award as it deems necessary or appropriate to address the events that gave rise to the restatement and to prevent its recurrence. Such action may include, to the extent permitted by applicable law, causing the full or partial cancellation of this Award and, with respect to Shares that have vested, requiring the Employee to repay to the Company the full or partial Fair Market Value of the Award determined at the time of vesting, and the Employee agrees by accepting this Award that the Board or Committee may make such a cancellation, impose such a repayment obligation, or take other necessary or appropriate actions in such circumstances.

9. Other Terms and Provisions. The terms and provisions of the Plan (a copy of which will be furnished to the Employee upon written request to the Office of the Secretary, Altria Group, Inc., 6601 West Broad Street, Richmond, Virginia 23230) are incorporated herein by reference. To the extent any provision of this Award is inconsistent or in conflict with any term or provision of the Plan, the Plan shall govern. Capitalized terms not otherwise defined herein have the meaning set forth in the Plan. In the event of any merger, share exchange, reorganization, consolidation, recapitalization, reclassification, distribution, stock dividend, stock split, reverse stock split, split-up, spin-off, issuance of rights or warrants or other similar transaction or event affecting the Common Stock after the date of this Award, the Board of Directors of the Company is authorized, to the extent it deems appropriate, to make adjustments to the number and kind of shares of stock subject to this Award, including the substitution of equity interests in other entities involved in such transactions, to provide for cash payments in lieu of Shares, and to determine whether continued employment with any entity resulting from such a transaction will or will not be treated as continued employment with the Company and its subsidiaries and affiliates, in each case subject to any Board or Committee action specifically addressing any such adjustments, cash payments, or continued employment treatment.

For purposes of this Agreement, (a) the term "Disability" means permanent and total disability as determined under procedures established by the Company for purposes of the Plan, and (b) the term "Normal Retirement" means retirement from active employment under a pension plan of the Company or any subsidiary or affiliate of the Company or under an employment contract with the Company or any subsidiary or affiliate of the Company on or after the date specified as the normal retirement age in the

2

pension plan or employment contract, if any, under which the Employee is at that time accruing pension benefits for his or her current service (or, in the absence of a specified normal retirement age, the age at which pension benefits under such plan or contract become payable without reduction for early commencement and without any requirement of a particular period of prior service). In any case in which (i) the meaning of "Normal Retirement" is uncertain under the definition contained in the prior sentence or (ii) a termination of employment at or after age 65 would not otherwise constitute "Normal Retirement," an Employee's termination of employment shall be treated as a "Normal Retirement" under such circumstances as the Committee, in its sole discretion, deems equivalent to retirement. Generally, for purposes of this Agreement, (x) a "subsidiary" includes only any company in which the Company, directly or indirectly, has a beneficial ownership interest of greater than 50 percent and (y) an "affiliate" includes only any company that (A) has a beneficial ownership interest, directly or indirectly, in the Company of greater than 50 percent or (B) is under common control with the Company through a parent company that, directly or indirectly, has a beneficial ownership interest of greater than 50 percent in both the Company and the affiliate.

IN WITNESS WHEREOF, this Restricted Stock Agreement has been duly executed as of December 31, 2009.

ALTRIA GROUP, INC.

By:  /s/   W. Hildebrandt Surgner, Jr.
W. Hildebrandt Surgner, Jr.
Corporate Secretary

3

Exhibit 10.55

## FIRST AMENDMENT TO TIME SHARING AGREEMENT

On January 28, 2009, Altria Client Services Inc. ("Operator") and Michael E. Szymanczyk ("User") entered into a Time Sharing Agreement (the "Agreement"). Pursuant to paragraph 12 of the Agreement, Operator and User amend the Agreement as set forth below, effective November 12, 2009:

1. The first "WHEREAS" clause on page 1 of the Agreement is deleted in its entirety and replaced with the following language:

"WHEREAS, Operator owns or leases the aircraft more particularly described on  Exhibit A  attached hereto (collectively, the "Aircraft");".

2. The following aircraft is added to Exhibit A of the Agreement:

| Registration Number | Serial Number | Aircraft Description |
|---|---|---|
| N802AG | 5245 | 2009 Gulfstream Aerospace Corporation G550 Aircraft |

All other terms and conditions of the Agreement remain in full force and effect. The persons signing below warrant their authority to sign.

Operator:                                                              User:

ALTRIA CLIENT SERVICES INC.                          MICHAEL E. SZYMANCZYK

By:      /s/ Kevin P. Benner                                   /s/ Michael E. Szymanczyk
Name:   Kevin P. Benner
Title:    Senior Vice President, Human Resources

1 of 1

Exhibit 12

ALTRIA GROUP, INC. AND SUBSIDIARIES
Computation of Ratios of Earnings to Fixed Charges
(in millions of dollars)

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| Earnings from continuing operations before income taxes | $4,877 | $4,789 | $4,678 | $4,753 | $4,123 |
| Add (deduct): | | | | | |
| Equity in net earnings of less than 50% owned affiliates | (601) | (471) | (516) | (466) | (447) |
| Dividends from less than 50% owned affiliates | 254 | 249 | 224 | 193 | 168 |
| Fixed charges | 1,249 | 529 | 888 | 1,613 | 1,881 |
| Interest capitalized, net of amortization | 5 | (9) | (5) | | 5 |
| Earnings available for fixed charges | $5,784 | $5,087 | $5,269 | $6,093 | $5,730 |
| Fixed charges: | | | | | |
| Interest incurred (A): | | | | | |
| Consumer products | $1,210 | $  451 | $  697 | $1,283 | $1,525 |
| Financial services | 20 | 38 | 54 | 81 | 107 |
| | 1,230 | 489 | 751 | 1,364 | 1,632 |
| Portion of rent expense deemed to represent interest factor | 19 | 40 | 137 | 249 | 249 |
| Fixed charges | $1,249 | $  529 | $  888 | $1,613 | $1,881 |
| Ratio of earnings to fixed charges (B) | 4.6 | 9.6 | 5.9 | 3.8 | 3.0 |

(A)   Altria Group, Inc. includes interest relating to uncertain tax positions in its provision for income taxes, therefore such amounts are not included in fixed charges in the computation.

(B)   Computation includes interest incurred and the portion of rent expense deemed to represent the interest factor from the discontinued operations of Philip Morris International Inc. and Kraft Foods Inc. in fixed charges. Excluding these amounts from fixed charges, the ratio of earnings to fixed charges from continuing operations would have been 12.5, 9.5, 7.6, and 5.7 for the years ended December 31, 2008, 2007, 2006, and 2005, respectively.

**Exhibit 13**

# Financial Review

## Financial Contents

Selected Financial Data — Five-Year Review                                                          page 18

Consolidated Statements of Earnings                                                                 page 19

Consolidated Balance Sheets                                                                         page 20

Consolidated Statements of Cash Flows                                                               page 22

Consolidated Statements of Stockholders' Equity                                                     page 24

Notes to Consolidated Financial Statements                                                          page 25

Management's Discussion and Analysis of Financial Condition and Results of Operations               page 81

Report of Independent Registered Public Accounting Firm                                             page 107

Report of Management on Internal Control Over Financial Reporting                                   page 108

## Guide To Select Disclosures

For easy reference, areas that may be of interest to investors are highlighted in the index below.

Acquisitions — Note 3                                                                               page 29

Asset Impairment, Exit, Implementation and Integration Costs — Note 6                               page 32

Benefit Plans — Note 18 includes a discussion of pension plans                                      page 43

Contingencies — Note 22 includes a discussion of the litigation environment                         page 50

Finance Assets, net — Note 9 includes a discussion of leasing activities                            page 34

Goodwill and Other Intangible Assets, net — Note 5                                                  page 31

Long-Term Debt — Note 11                                                                            page 36

Segment Reporting — Note 17                                                                          page 42

Stock Plans — Note 13 includes a discussion of stock compensation                                   page 38

17

Table of Contents

# Selected Financial Data — Five-Year Review
(in millions of dollars, except per share data)

| | 2009 | 2008 | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|
| **Summary of Operations:** | | | | | |
| Net revenues | $ 23,556 | $ 19,356 | $ 18,664 | $ 18,790 | $ 18,452 |
| Cost of sales | 7,990 | 8,270 | 7,827 | 7,387 | 7,274 |
| Excise taxes on products | 6,732 | 3,399 | 3,452 | 3,617 | 3,659 |
| Operating income | 5,462 | 4,882 | 4,373 | 4,518 | 4,104 |
| Interest and other debt expense, net | 1,185 | 167 | 205 | 225 | 427 |
| Earnings from equity investment in SABMiller | 600 | 467 | 510 | 460 | 446 |
| Earnings from continuing operations before income taxes | 4,877 | 4,789 | 4,678 | 4,753 | 4,123 |
| Pre-tax profit margin from continuing operations | 20.7% | 24.7% | 25.1% | 25.3% | 22.3% |
| Provision for income taxes | 1,669 | 1,699 | 1,547 | 1,571 | 1,574 |
| Earnings from continuing operations | 3,208 | 3,090 | 3,131 | 3,182 | 2,549 |
| Earnings from discontinued operations, net of income taxes | | 1,901 | 7,006 | 9,463 | 8,442 |
| Net earnings | 3,208 | 4,991 | 10,137 | 12,645 | 10,991 |
| Net earnings attributable to Altria Group, Inc. | 3,206 | 4,930 | 9,786 | 12,022 | 10,435 |
| Basic EPS    — continuing operations | 1.55 | 1.49 | 1.49 | 1.52 | 1.23 |
| — discontinued operations | | 0.88 | 3.15 | 4.22 | 3.80 |
| — net earnings attributable to Altria Group, Inc. | 1.55 | 2.37 | 4.64 | 5.74 | 5.03 |
| Diluted EPS — continuing operations | 1.54 | 1.48 | 1.48 | 1.51 | 1.22 |
| — discontinued operations | | 0.88 | 3.14 | 4.19 | 3.77 |
| — net earnings attributable to Altria Group, Inc. | 1.54 | 2.36 | 4.62 | 5.70 | 4.99 |
| Dividends declared per share | 1.32 | 1.68 | 3.05 | 3.32 | 3.06 |
| Weighted average shares (millions) — Basic | 2,066 | 2,075 | 2,101 | 2,087 | 2,070 |
| Weighted average shares (millions) — Diluted | 2,071 | 2,084 | 2,113 | 2,101 | 2,084 |
| Capital expenditures | 273 | 241 | 386 | 399 | 299 |
| Depreciation | 271 | 208 | 232 | 255 | 269 |
| Property, plant and equipment, net (consumer products) | 2,684 | 2,199 | 2,422 | 2,343 | 2,259 |
| Inventories (consumer products) | 1,810 | 1,069 | 1,254 | 1,605 | 1,821 |
| Total assets | 36,677 | 27,215 | 57,746 | 104,531 | 107,949 |
| Total long-term debt | 11,185 | 7,339 | 2,385 | 5,195 | 6,459 |
| Total debt  — consumer products | 11,960 | 6,974 | 4,239 | 4,580 | 6,462 |
| — financial services | | 500 | 500 | 1,119 | 2,014 |
| Total stockholders' equity | 4,072 | 2,828 | 19,320 | 43,317 | 39,848 |
| Common dividends declared as a % of Basic EPS | 85.2% | 70.9% | 65.7% | 57.8% | 60.8% |
| Common dividends declared as a % of Diluted EPS | 85.7% | 71.2% | 66.0% | 58.2% | 61.3% |
| Book value per common share outstanding | 1.96 | 1.37 | 9.17 | 20.66 | 19.12 |
| Market price per common share — high/low | 20.47- | 79.59- | 90.50- | 86.45- | 78.68- |
| | 14.50 | 14.34 | 63.13 | 68.36 | 60.40 |
| Closing price of common share at year end | 19.63 | 15.06 | 75.58 | 85.82 | 74.72 |
| Price/earnings ratio at year end — Basic | 13 | 6 | 16 | 15 | 15 |
| Price/earnings ratio at year end — Diluted | 13 | 6 | 16 | 15 | 15 |
| Number of common shares outstanding at year end (millions) | 2,076 | 2,061 | 2,108 | 2,097 | 2,084 |
| Number of employees | 10,000 | 10,400 | 84,000 | 175,000 | 199,000 |

The Selected Financial Data should be read together with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 1.
*Background and Basis of Presentation* to the consolidated financial statements. Certain prior year amounts in the table above have been reclassified to conform with the current year's presentation due to the adoption of the Financial Accounting Standards Board's authoritative guidance which requires (i) transactions between an entity and a noncontrolling interest to be accounted for as equity transactions and (ii) unvested share-based payment awards containing nonforfeitable rights to dividends be included as participating securities in the earnings per share ("EPS") calculation pursuant to the two class method.

18

Table of Contents

# Consolidated Statements of Earnings

(in millions of dollars, except per share data)

| for the years ended December 31, | 2009 | 2008 | 2007 |
|---|---|---|---|
| Net revenues | $23,556 | $19,356 | $18,664 |
| Cost of sales | 7,990 | 8,270 | 7,827 |
| Excise taxes on products | 6,732 | 3,399 | 3,452 |
| Gross profit | 8,834 | 7,687 | 7,385 |
| Marketing, administration and research costs | 2,931 | 2,753 | 2,784 |
| Asset impairment and exit costs | 421 | 449 | 442 |
| Gain on sale of corporate headquarters building | | (404) | |
| Recoveries from airline industry exposure | | | (214) |
| Amortization of intangibles | 20 | 7 | |
| Operating income | 5,462 | 4,882 | 4,373 |
| Interest and other debt expense, net | 1,185 | 167 | 205 |
| Loss on early extinguishment of debt | | 393 | |
| Earnings from equity investment in SABMiller | (600) | (467) | (510) |
| Earnings from continuing operations before income taxes | 4,877 | 4,789 | 4,678 |
| Provision for income taxes | 1,669 | 1,699 | 1,547 |
| Earnings from continuing operations | 3,208 | 3,090 | 3,131 |
| Earnings from discontinued operations, net of income taxes | | 1,901 | 7,006 |
| Net earnings | 3,208 | 4,991 | 10,137 |
| Net earnings attributable to noncontrolling interests | (2) | (61) | (351) |
| Net earnings attributable to Altria Group, Inc. | $ 3,206 | $ 4,930 | $ 9,786 |
| Amounts attributable to Altria Group, Inc. stockholders: | | | |
| Earnings from continuing operations | $ 3,206 | $ 3,090 | $ 3,131 |
| Earnings from discontinued operations | | 1,840 | 6,655 |
| Net earnings attributable to Altria Group, Inc. | $ 3,206 | $ 4,930 | $ 9,786 |
| Per share data: | | | |
| Basic earnings per share: | | | |
| Continuing operations | $ 1.55 | $ 1.49 | $ 1.49 |
| Discontinued operations | | 0.88 | 3.15 |
| Net earnings attributable to Altria Group, Inc. | $ 1.55 | $ 2.37 | $ 4.64 |
| Diluted earnings per share: | | | |
| Continuing operations | $ 1.54 | $ 1.48 | $ 1.48 |
| Discontinued operations | | 0.88 | 3.14 |
| Net earnings attributable to Altria Group, Inc. | $ 1.54 | $ 2.36 | $ 4.62 |

See notes to consolidated financial statements.

Source: ALTRIA GROUP INC, 10-K, February 24, 2010                                        Powered by Morningstar® Document Research℠

Table of Contents

# Consolidated Balance Sheets

(in millions of dollars, except share and per share data)

| at December 31, | 2009 | 2008 |
|---|---:|---:|
| **Assets** | | |
| **Consumer products** | | |
| Cash and cash equivalents | $ 1,871 | $ 7,916 |
| Receivables (less allowances of $3 in 2009 and 2008) | 96 | 44 |
| Inventories: | | |
|     Leaf tobacco | 993 | 727 |
|     Other raw materials | 157 | 145 |
|     Work in process | 293 | 9 |
|     Finished product | 367 | 188 |
| | 1,810 | 1,069 |
| Deferred income taxes | 1,336 | 1,690 |
| Other current assets | 660 | 357 |
|     **Total current assets** | 5,773 | 11,076 |
| | | |
| Property, plant and equipment, at cost: | | |
|     Land and land improvements | 366 | 174 |
|     Buildings and building equipment | 1,909 | 1,678 |
|     Machinery and equipment | 3,649 | 3,122 |
|     Construction in progress | 220 | 370 |
| | 6,144 | 5,344 |
| Less accumulated depreciation | 3,460 | 3,145 |
| | 2,684 | 2,199 |
| | | |
| Goodwill | 5,174 | 77 |
| Other intangible assets, net | 12,138 | 3,039 |
| Investment in SABMiller | 4,980 | 4,261 |
| Other assets | 1,097 | 1,080 |
|     **Total consumer products assets** | 31,846 | 21,732 |
| **Financial services** | | |
| Finance assets, net | 4,803 | 5,451 |
| Other assets | 28 | 32 |
|     **Total financial services assets** | 4,831 | 5,483 |
|     **Total Assets** | $ 36,677 | $ 27,215 |

See notes to consolidated financial statements.

20

Table of Contents

| at December 31, | 2009 | 2008 |
|---|---|---|
| **Liabilities** | | |
| **Consumer products** | | |
| Current portion of long-term debt | $ 775 | $ 135 |
| Accounts payable | 494 | 510 |
| Accrued liabilities: | | |
| Marketing | 467 | 374 |
| Taxes, except income taxes | 318 | 98 |
| Employment costs | 239 | 248 |
| Settlement charges | 3,635 | 3,984 |
| Other | 1,354 | 1,128 |
| Dividends payable | 710 | 665 |
| Total current liabilities | 7,992 | 7,142 |
| Long-term debt | 11,185 | 6,839 |
| Deferred income taxes | 4,383 | 351 |
| Accrued pension costs | 1,157 | 1,393 |
| Accrued postretirement health care costs | 2,326 | 2,208 |
| Other liabilities | 1,248 | 1,208 |
| **Total consumer products liabilities** | **28,291** | **19,141** |
| **Financial services** | | |
| Debt | | 500 |
| Deferred income taxes | 4,180 | 4,644 |
| Other liabilities | 102 | 102 |
| **Total financial services liabilities** | **4,282** | **5,246** |
| **Total liabilities** | **32,573** | **24,387** |
| Contingencies (Note 22) | | |
| Redeemable noncontrolling interest | 32 | |
| **Stockholders' Equity** | | |
| Common stock, par value $0.33 1/3 per share | | |
| (2,805,961,317 shares issued) | 935 | 935 |
| Additional paid-in capital | 5,997 | 6,350 |
| Earnings reinvested in the business | 22,599 | 22,131 |
| Accumulated other comprehensive losses | (1,561) | (2,181) |
| Cost of repurchased stock (729,932,673 shares in 2009 | | |
| and 744,589,733 shares in 2008) | (23,901) | (24,407) |
| Total stockholders' equity attributable to Altria Group, Inc. | 4,069 | 2,828 |
| Noncontrolling interests | 3 | |
| **Total stockholders' equity** | **4,072** | **2,828** |
| **Total Liabilities and Stockholders' Equity** | **$ 36,677** | **$ 27,215** |

21

Table of Contents

# Consolidated Statements of Cash Flows

(in millions of dollars)

| for the years ended December 31, | | 2009 | 2008 | 2007 |
|---|---|---|---|---|
| **Cash Provided by (Used in) Operating Activities** | | | | |
| Earnings from continuing operations | — Consumer products | **$3,054** | $ 3,065 | $ 2,910 |
| | — Financial services | **154** | 25 | 221 |
| Earnings from discontinued operations, net of income taxes | | | 1,901 | 7,006 |
| Net earnings | | **3,208** | 4,991 | 10,137 |
| Impact of earnings from discontinued operations, net of income taxes | | | (1,901) | (7,006) |
| Adjustments to reconcile net earnings to operating cash flows: | | | | |
| **Consumer products** | | | | |
| Depreciation and amortization | | **291** | 215 | 232 |
| Deferred income tax provision | | **499** | 121 | 101 |
| Earnings from equity investment in SABMiller | | **(600)** | (467) | (510) |
| Dividends from SABMiller | | **254** | 249 | 224 |
| Escrow bond for the *Engle* tobacco case | | | | 1,300 |
| Asset impairment and exit costs, net of cash paid | | **(22)** | 197 | 333 |
| Gain on sale of corporate headquarters building | | | (404) | |
| Loss on early extinguishment of debt | | | 393 | |
| Cash effects of changes, net of the effects from acquired and divested companies: | | | | |
| Receivables, net | | **(7)** | (84) | 162 |
| Inventories | | **51** | 185 | 375 |
| Accounts payable | | **(25)** | (162) | (82) |
| Income taxes | | **130** | (201) | (900) |
| Accrued liabilities and other current assets | | **218** | (27) | (247) |
| Accrued settlement charges | | **(346)** | 5 | 434 |
| Pension plan contributions | | **(37)** | (45) | (37) |
| Pension provisions and postretirement, net | | **193** | 192 | 165 |
| Other | | **232** | 139 | 302 |
| **Financial services** | | | | |
| Deferred income tax benefit | | **(456)** | (259) | (320) |
| Allowance for losses | | **15** | 100 | |
| Other | | **(155)** | (22) | (83) |
| Net cash provided by operating activities, continuing operations | | **3,443** | 3,215 | 4,580 |
| Net cash provided by operating activities, discontinued operations | | | 1,666 | 5,736 |
| Net cash provided by operating activities | | **3,443** | 4,881 | 10,316 |

See notes to consolidated financial statements.

22

Table of Contents

| for the years ended December 31, | 2009 | 2008 | 2007 |
|---|---|---|---|
| **Cash Provided by (Used in) Investing Activities** | | | |
| **Consumer products** | | | |
| Capital expenditures | $ (273) | $ (241) | $ (386) |
| Acquisition of UST LLC, net of acquired cash | (10,244) | | |
| Proceeds from sale of corporate headquarters building | | 525 | |
| Acquisition of John Middleton Co., net of acquired cash | | | (2,898) |
| Other | (31) | 110 | 108 |
| **Financial services** | | | |
| Investments in finance assets | (9) | (1) | (5) |
| Proceeds from finance assets | 793 | 403 | 486 |
| Net cash (used in) provided by investing activities, continuing operations | (9,764) | 796 | (2,695) |
| Net cash used in investing activities, discontinued operations | | (317) | (2,560) |
| Net cash (used in) provided by investing activities | (9,764) | 479 | (5,255) |
| **Cash Provided by (Used in) Financing Activities** | | | |
| **Consumer products** | | | |
| Net (repayment) issuance of short-term borrowings | (205) | | 2 |
| Long-term debt issued | 4,221 | 6,738 | |
| Long-term debt repaid | (375) | (4,057) | (500) |
| **Financial services** | | | |
| Debt repaid | (500) | | (617) |
| Repurchase of Altria Group, Inc. common stock | | (1,166) | |
| Dividends paid on Altria Group, Inc. common stock | (2,693) | (4,428) | (6,652) |
| Issuance of Altria Group, Inc. common stock | 89 | 89 | 423 |
| Kraft Foods Inc. dividends paid to Altria Group, Inc. | | | 728 |
| Philip Morris International Inc. dividends paid to Altria Group, Inc. | | 3,019 | 6,560 |
| Financing fees and debt issuance costs | (177) | (93) | |
| Tender and consent fees related to the early extinguishment of debt | | (371) | |
| Changes in amounts due to/from Philip Morris International Inc. | | (664) | (370) |
| Other | (84) | (4) | 278 |
| Net cash provided by (used in) financing activities, continuing operations | 276 | (937) | (148) |
| Net cash used in financing activities, discontinued operations | | (1,648) | (3,531) |
| Net cash provided by (used in) financing activities | 276 | (2,585) | (3,679) |
| Effect of exchange rate changes on cash and cash equivalents: | | | |
| Discontinued operations | | (126) | 347 |
| Cash and cash equivalents, continuing operations: | | | |
| (Decrease) increase | (6,045) | 3,074 | 1,737 |
| Balance at beginning of year | 7,916 | 4,842 | 3,105 |
| Balance at end of year | $ 1,871 | $ 7,916 | $ 4,842 |
| Cash paid, continuing operations:   Interest   — Consumer products | $ 904 | $ 208 | $ 348 |
| — Financial services | $ 38 | $ 38 | $ 62 |
| Income taxes | $ 1,606 | $ 1,837 | $ 2,241 |

23

**Table of Contents**

# Consolidated Statements of Stockholders' Equity

(in millions of dollars, except per share data)

| | Attributable to Altria Group, Inc. | | | | | | | |
| | Common Stock | Additional Paid-in Capital | Earnings Reinvested in the Business | Accumulated Other Comprehensive Earnings (Losses) | Cost of Repurchased Stock | Comprehensive Earnings | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| Balances, January 1, 2007 | $  935 | $  6,356 | $  59,879 | $  (3,638) | $  (23,743) | $  — | $  3,528 | $  43,317 |
| Comprehensive earnings: | | | | | | | | |
| Net earnings | | | 9,786 | | | 9,786 | 351 | 10,137 |
| Other comprehensive earnings (losses), net of income taxes: | | | | | | | | |
| Currency translation adjustments | | | | 736 | | 736 | 46 | 782 |
| Change in net loss and prior service cost | | | | 744 | | 744 | 6 | 750 |
| Change in fair value of derivatives accounted for as hedges | | | | (18) | | (18) | (2) | (20) |
| Ownership share of SABMiller other comprehensive earnings | | | | 178 | | 178 | | 178 |
| Total other comprehensive earnings | | | | | | 1,640 | 50 | 1,690 |
| Total comprehensive earnings | | | | | | 11,426 | 401 | 11,827 |
| Adoption of FASB authoritative guidance for income taxes | | | 711 | | | | 22 | 733 |
| Exercise of stock options and other stock award activity | | 528 | | | 289 | | 22 | 839 |
| Cash dividends declared ($3.05 per share) | | | (6,430) | | | | | (6,430) |
| Payments/other related to noncontrolling interests | | | | | | | (483) | (483) |
| Spin-off of Kraft Foods Inc. | | | (29,520) | 2,109 | | | (3,072) | (30,483) |
| Balances, December 31, 2007 | 935 | 6,884 | 34,426 | 111 | (23,454) | | 418 | 19,320 |
| Comprehensive earnings: | | | | | | | | |
| Net earnings | | | 4,930 | | | 4,930 | 61 | 4,991 |
| Other comprehensive earnings (losses), net of income taxes: | | | | | | | | |
| Currency translation adjustments | | | | 233 | | 233 | 7 | 240 |
| Change in net loss and prior service cost | | | | (1,385) | | (1,385) | | (1,385) |
| Change in fair value of derivatives accounted for as hedges | | | | (177) | | (177) | | (177) |
| Ownership share of SABMiller other comprehensive losses | | | | (308) | | (308) | | (308) |
| Total other comprehensive (losses) earnings | | | | | | (1,637) | 7 | (1,630) |
| Total comprehensive earnings | | | | | | 3,293 | 68 | 3,361 |
| Exercise of stock options and other stock award activity | | (534) | | | 213 | | | (321) |
| Cash dividends declared ($1.68 per share) | | | (3,505) | | | | | (3,505) |
| Stock repurchased | | | | | (1,166) | | | (1,166) |
| Payments/other related to | | | | | | | | |

Powered by Morningstar® Document Research℠

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| noncontrolling interests | | | | | | (130) | (130) |
| Spin-off of Philip Morris International Inc. | | | (13,720) | (655) | | (356) | (14,731) |
| Balances, December 31, 2008 | 935 | 6,350 | 22,131 | (2,181) | (24,407) | | — | 2,828 |
| Comprehensive earnings: | | | | | | | | |
| Net earnings | | | 3,206 | | | 3,206 | 1(a) | 3,207(a) |
| Other comprehensive earnings, net of income taxes: | | | | | | | | |
| Currency translation adjustments | | | | 3 | | 3 | | 3 |
| Change in net loss and prior service cost | | | | 375 | | 375 | | 375 |
| Ownership share of SABMiller other comprehensive earnings | | | | 242 | | 242 | | 242 |
| Total other comprehensive earnings | | | | | | 620 | — | 620 |
| Total comprehensive earnings | | | | | | 3,826 | 1 | 3,827 |
| Exercise of stock options and other stock award activity | | (353) | | | 506 | | | 153 |
| Cash dividends declared ($1.32 per share) | | | (2,738) | | | | | (2,738) |
| Other | | | | | | | 2 | 2 |
| Balances, December 31, 2009 | $ 935 | $ 5,997 | $ 22,599 | $ (1,561) | $ (23,901) | | $ 3 | $ 4,072 |

(a) Net earnings attributable to noncontrolling interests excludes $1 million related to the redeemable noncontrolling interest which is reported in the mezzanine equity section in the consolidated balance sheet at December 31, 2009.

See notes to consolidated financial statements.

24

Powered by Morningstar® Document Research℠

Table of Contents

# Notes to Consolidated Financial Statements

## Note 1.

### Background and Basis of Presentation:

■ **Background:** At December 31, 2009, Altria Group, Inc.'s wholly-owned subsidiaries included Philip Morris USA Inc. ("PM USA"), which is engaged in the manufacture and sale of cigarettes and certain smokeless products in the United States; UST LLC ("UST"), which through its subsidiaries is engaged in the manufacture and sale of smokeless products and wine; and John Middleton Co. ("Middleton"), which is engaged in the manufacture and sale of machine-made large cigars and pipe tobacco. Philip Morris Capital Corporation ("PMCC"), another wholly-owned subsidiary of Altria Group, Inc., maintains a portfolio of leveraged and direct finance leases. In addition, Altria Group, Inc. held a 27.3% economic and voting interest in SABMiller plc ("SABMiller") at December 31, 2009. Altria Group, Inc.'s access to the operating cash flows of its subsidiaries consists principally of cash received from the payment of dividends by its subsidiaries.

*UST Acquisition:* As discussed in Note 3. *Acquisitions,* on January 6, 2009, Altria Group, Inc. acquired all of the outstanding common stock of UST, whose direct and indirect wholly-owned subsidiaries include U.S. Smokeless Tobacco Company LLC ("USSTC") and Ste. Michelle Wine Estates Ltd. ("Ste. Michelle"). As a result of the acquisition, UST has become an indirect wholly-owned subsidiary of Altria Group, Inc. The UST acquisition was accounted for using new authoritative guidance issued by the Financial Accounting Standards Board ("FASB") effective January 1, 2009. In accordance with this guidance, previous acquisitions were not restated.

*PMI Spin-Off:* On March 28, 2008 (the "PMI Distribution Date"), Altria Group, Inc. distributed all of its interest in Philip Morris International Inc. ("PMI") to Altria Group, Inc. stockholders of record as of the close of business on March 19, 2008 (the "PMI Record Date"), in a tax-free distribution. Altria Group, Inc. distributed one share of PMI common stock for every share of Altria Group, Inc. common stock outstanding as of the PMI Record Date. Following the PMI Distribution Date, Altria Group, Inc. does not own any shares of PMI stock. Altria Group, Inc. has reflected the results of PMI prior to the PMI Distribution Date as discontinued operations on the consolidated statements of earnings and the consolidated statements of cash flows for the years ended December 31, 2008 and 2007. The distribution resulted in a net decrease to Altria Group, Inc.'s total stockholders' equity of $14.7 billion on the PMI Distribution Date.

Holders of Altria Group, Inc. stock options were treated similarly to public stockholders and, accordingly, had their stock awards split into two instruments. Holders of Altria Group, Inc. stock options received the following stock options, which, immediately after the spin-off, had an aggregate

intrinsic value equal to the intrinsic value of the pre-spin Altria Group, Inc. options:

■ a new PMI option to acquire the same number of shares of PMI common stock as the number of Altria Group, Inc. options held by such person on the PMI Distribution Date; and

■ an adjusted Altria Group, Inc. option for the same number of shares of Altria Group, Inc. common stock with a reduced exercise price.

As set forth in the Employee Matters Agreement between Altria Group, Inc. and PMI (the "PMI Employee Matters Agreement"), the exercise price of each option was developed to reflect the relative market values of PMI and Altria Group, Inc. shares, by allocating the share price of Altria Group, Inc. common stock before the spin-off ($73.83) to PMI shares ($51.44) and Altria Group, Inc. shares ($22.39) and then multiplying each of these allocated values by the Option Conversion Ratio as defined in the PMI Employee Matters Agreement. The Option Conversion Ratio was equal to the exercise price of the Altria Group, Inc. option, prior to any adjustment for the spin-off, divided by the share price of Altria Group, Inc. common stock before the spin-off ($73.83).

Holders of Altria Group, Inc. restricted stock or deferred stock awarded prior to January 30, 2008, retained their existing awards and received the same number of shares of restricted or deferred stock of PMI. The restricted stock and deferred stock will not vest until the completion of the original restriction period (typically, three years from the date of the original grant). Recipients of Altria Group, Inc. deferred stock awarded on January 30, 2008, who were employed by Altria Group, Inc. after the PMI Distribution Date, received additional shares of deferred stock of Altria Group, Inc. to preserve the intrinsic value of the award. Recipients of Altria Group, Inc. deferred stock awarded on January 30, 2008, who were employed by PMI after the PMI Distribution Date, received substitute shares of deferred stock of PMI to preserve the intrinsic value of the award.

To the extent that employees of Altria Group, Inc. after the PMI Distribution Date received PMI stock options, Altria Group, Inc. reimbursed PMI in cash for the Black-Scholes fair value of the stock options received. To the extent that PMI employees held Altria Group, Inc. stock options, PMI reimbursed Altria Group, Inc. in cash for the Black-Scholes fair value of the stock options. To the extent that employees of Altria Group, Inc. received PMI deferred stock, Altria Group, Inc. paid to PMI the fair value of the PMI deferred stock less the value of projected forfeitures. To the extent that PMI employees held Altria Group, Inc. restricted stock or deferred stock, PMI reimbursed Altria Group, Inc. in cash for the fair value of the restricted or deferred stock less the value of projected forfeitures and any amounts previously charged to PMI for the restricted or deferred stock. Based upon the number of

25

Table of Contents

Altria Group, Inc. stock awards outstanding at the PMI Distribution Date, the net amount of these reimbursements resulted in a payment of $449 million from Altria Group, Inc. to PMI. The reimbursement to PMI is reflected as a decrease to the additional paid-in capital of Altria Group, Inc. on the December 31, 2008 consolidated balance sheet.

In connection with the spin-off, PMI paid to Altria Group, Inc. $4.0 billion in special dividends in addition to its normal dividends to Altria Group, Inc. PMI paid $3.1 billion of these special dividends in 2007 and paid the additional $900 million in the first quarter of 2008.

Prior to the PMI spin-off, PMI was included in the Altria Group, Inc. consolidated federal income tax return, and PMI's federal income tax contingencies were recorded as liabilities on the balance sheet of Altria Group, Inc. Altria Group, Inc. reimbursed PMI in cash for these liabilities. See Note 16. *Income Taxes* for a discussion of the Tax Sharing Agreement between Altria Group, Inc. and PMI that is currently in effect.

Prior to the PMI spin-off, certain employees of PMI participated in the U.S. benefit plans offered by Altria Group, Inc. The benefits previously provided by Altria Group, Inc. are now provided by PMI. As a result, new plans were established by PMI, and the related plan assets (to the extent that the benefit plans were previously funded) and liabilities were transferred to the PMI plans. Altria Group, Inc. paid PMI in cash for these transfers.

A subsidiary of Altria Group, Inc. previously provided PMI with certain corporate services at cost plus a management fee. After the PMI Distribution Date, PMI independently undertook most of these activities. All remaining limited services provided to PMI ceased in 2008. The settlement of the intercompany accounts as of the PMI Distribution Date (including amounts related to stock awards, tax contingencies and benefit plans discussed above) resulted in a net payment from Altria Group, Inc. to PMI of $332 million. In March 2008, Altria Group, Inc. made an estimated payment of $427 million to PMI, thereby resulting in PMI reimbursing $95 million to Altria Group, Inc. in the second quarter of 2008.

*Kraft Spin-Off:* On March 30, 2007 (the "Kraft Distribution Date"), Altria Group, Inc. distributed all of its remaining interest in Kraft Foods Inc. ("Kraft") on a pro-rata basis to Altria Group, Inc. stockholders of record as of the close of business on March 16, 2007 (the "Kraft Record Date") in a tax-free distribution. The distribution ratio was 0.692024 of a share of Kraft for each share of Altria Group, Inc. common stock outstanding. Altria Group, Inc. stockholders received cash in lieu of fractional shares of Kraft. Following the Kraft Distribution Date, Altria Group, Inc. does not own any shares of Kraft. Altria Group, Inc. has reflected the results of Kraft prior to the Kraft Distribution Date as discontinued operations on the consolidated statements of earnings and the consolidated statements of cash flows for the year ended December 31, 2007. The distribution resulted in a net decrease to Altria Group, Inc.'s total stockholders' equity of $30.5 billion on the Kraft Distribution Date.

Holders of Altria Group, Inc. stock options were treated similarly to public stockholders and, accordingly, had their

stock awards split into two instruments. Holders of Altria Group, Inc. stock options received the following stock options, which, immediately after the spin-off, had an aggregate intrinsic value equal to the intrinsic value of the pre-spin Altria Group, Inc. options:

- a new Kraft option to acquire the number of shares of Kraft Class A common stock equal to the product of (a) the number of Altria Group, Inc. options held by such person on the Kraft Distribution Date and (b) the distribution ratio of 0.692024 mentioned above; and

- an adjusted Altria Group, Inc. option for the same number of shares of Altria Group, Inc. common stock with a reduced exercise price.

The new Kraft option has an exercise price equal to the Kraft market price at the time of the distribution ($31.66) multiplied by the Option Conversion Ratio, which represents the exercise price of the original Altria Group, Inc. option divided by the Altria Group, Inc. market price immediately before the distribution ($87.81). The reduced exercise price of the adjusted Altria Group, Inc. option is determined by multiplying the Altria Group, Inc. market price immediately following the distribution ($65.90) by the Option Conversion Ratio.

Holders of Altria Group, Inc. restricted stock or deferred stock awarded prior to January 31, 2007, retained their existing award and received restricted stock or deferred stock of Kraft Class A common stock. The amount of Kraft restricted stock or deferred stock awarded to such holders was calculated using the same formula set forth above with respect to new Kraft options. All of the restricted stock and deferred stock will vest at the completion of the original restriction period (typically, three years from the date of the original grant). Recipients of Altria Group, Inc. deferred stock awarded on January 31, 2007, did not receive restricted stock or deferred stock of Kraft. Rather, they received additional deferred shares of Altria Group, Inc. to preserve the intrinsic value of the original award.

To the extent that employees of Altria Group, Inc. after the Kraft Distribution Date received Kraft stock options, Altria Group, Inc. reimbursed Kraft in cash for the Black-Scholes fair value of the stock options received. To the extent that Kraft employees held Altria Group, Inc. stock options, Kraft reimbursed Altria Group, Inc. in cash for the Black-Scholes fair value of the stock options. To the extent that holders of Altria Group, Inc. deferred stock received Kraft deferred stock, Altria Group, Inc. paid to Kraft the fair value of the Kraft deferred stock less the value of projected forfeitures. Based upon the number of Altria Group, Inc. stock awards outstanding at the Kraft Distribution Date, the net amount of these reimbursements resulted in a payment of $179 million from Kraft to Altria Group, Inc. in April 2007. The reimbursement from Kraft is reflected as an increase to the additional paid-in capital of Altria Group, Inc. on the December 31, 2007 consolidated balance sheet.

Prior to the Kraft spin-off, Kraft was included in the Altria Group, Inc. consolidated federal income tax return, and Kraft's federal income tax contingencies were recorded as liabilities on the balance sheet of Altria Group, Inc. Altria Group, Inc.

26

Powered by Morningstar® Document Research℠

Table of Contents

reimbursed Kraft in cash for these liabilities. See Note 16. *Income Taxes* for a discussion of the Tax Sharing Agreement between Altria Group, Inc. and Kraft that is currently in effect.

A subsidiary of Altria Group, Inc. previously provided Kraft with certain services at cost plus a management fee. After the Kraft Distribution Date, Kraft independently undertook most of these activities, and any remaining limited services provided to Kraft ceased during 2007. All intercompany accounts were settled in cash within 30 days of the Kraft Distribution Date. The settlement of the intercompany accounts as of the Kraft Distribution Date (including amounts related to stock awards and tax contingencies discussed above) resulted in a net payment from Kraft to Altria Group, Inc. of $85 million in April 2007.

*Dividends and Share Repurchases:* Following the Kraft spin-off, Altria Group, Inc. lowered its dividend so that holders of both Altria Group, Inc. and Kraft shares would receive initially, in the aggregate, the same dividends paid by Altria Group, Inc. prior to the Kraft spin-off. Similarly, following the PMI spin-off, Altria Group, Inc. lowered its dividend so that holders of both Altria Group, Inc. and PMI shares would receive initially, in the aggregate, the same dividends paid by Altria Group, Inc. prior to the PMI spin-off.

During the third quarter of 2009, Altria Group, Inc.'s Board of Directors approved a 6.3% increase in the quarterly dividend to $0.34 per common share. The present annualized dividend rate is $1.36 per Altria Group, Inc. common share. Future dividend payments remain subject to the discretion of Altria Group, Inc.'s Board of Directors.

During the second quarter of 2008, Altria Group, Inc. repurchased 53.5 million shares of its common stock at an aggregate cost of approximately $1.2 billion, or an average price of $21.81 per share. In September 2009, Altria Group, Inc. suspended indefinitely its $4.0 billion (2008 to 2010) share repurchase program, which is at the discretion of its Board of Directors.

■ **Basis of presentation:** The consolidated financial statements include Altria Group, Inc., as well as its wholly-owned and majority-owned subsidiaries. Investments in which Altria Group, Inc. exercises significant influence (20%-50% ownership interest) are accounted for under the equity method of accounting. All intercompany transactions and balances have been eliminated.

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent liabilities at the dates of the financial statements and the reported amounts of net revenues and expenses during the reporting periods. Significant estimates and assumptions include, among other things, pension and benefit plan assumptions, lives and valuation assumptions of goodwill and other intangible assets, marketing programs, income taxes, and the allowance for loan losses and estimated residual values of finance leases. Actual results could differ from those estimates. As part of the preparation of the consolidated financial

statements, Altria Group, Inc. performed an evaluation of subsequent events occurring after the consolidated balance sheet date of December 31, 2009, through January 28, 2010, the date the consolidated financial statements were issued. Additionally, Altria Group, Inc. has updated this evaluation of subsequent events from January 28, 2010, through February 24, 2010 (unaudited).

Balance sheet accounts are segregated by two broad types of business. Consumer products assets and liabilities are classified as either current or non-current, whereas financial services assets and liabilities are unclassified, in accordance with respective industry practices.

On January 1, 2009, Altria Group, Inc. adopted new FASB authoritative guidance, which changed the reporting for certain minority interests by reporting these as noncontrolling interests within equity. Moreover, any transactions between an entity and a noncontrolling interest are accounted for as equity transactions. As a result, Altria Group, Inc. (i) adjusted earnings from discontinued operations to include $61 million and $351 million of net earnings attributable to noncontrolling interests for the years ended December 31, 2008 and 2007, respectively; (ii) disclosed the net earnings attributable to the noncontrolling interests and net earnings attributable to Altria Group, Inc. on the consolidated statements of earnings and (iii) reclassified to stockholders' equity $418 million and $3,528 million of noncontrolling interests reported at December 31, 2007 and 2006, respectively, as long-term liabilities of discontinued operations.

Beginning with the first quarter of 2009, Altria Group, Inc. revised its reportable segments to reflect the change in the way in which Altria Group, Inc.'s chief operating decision maker reviews the business as a result of the acquisition of UST. Altria Group, Inc.'s segments, which are reflected in these financial statements, are cigarettes, smokeless products, cigars, wine and financial services.

Certain prior year amounts have been reclassified to conform with the current year's presentation, due primarily to the adoption of the FASB's authoritative guidance that requires transactions between an entity and a noncontrolling interest to be accounted for as equity transactions.

## Note 2.

## Summary of Significant Accounting Policies:

■ **Cash and cash equivalents:** Cash equivalents include demand deposits with banks and all highly liquid investments with original maturities of three months or less. Cash equivalents are stated at cost plus accrued interest, which approximates fair value.

■ **Depreciation, amortization and intangible asset valuation:** Property, plant and equipment are stated at historical cost and depreciated by the straight-line method over the estimated useful lives of the assets. Machinery and equipment are depreciated over periods up to 15 years, and buildings and building improvements over periods up to 50 years.

Definite-lived intangible assets are amortized over their estimated useful lives. Altria Group, Inc. is required to conduct an annual review of goodwill and indefinite-lived intangible assets for potential impairment. Goodwill impair -

27

**Table of Contents**

ment testing requires a comparison between the carrying value and fair value of each reporting unit. If the carrying value exceeds the fair value, goodwill is considered impaired. The amount of impairment loss is measured as the difference between the carrying value and implied fair value of goodwill, which is determined using discounted cash flows. Impairment testing for indefinite-lived intangible assets requires a comparison between the fair value and carrying value of the intangible asset. If the carrying value exceeds fair value, the intangible asset is considered impaired and is reduced to fair value. During 2009, 2008 and 2007, Altria Group, Inc. completed its annual review of goodwill and indefinite-lived intangible assets, and no charges resulted from these reviews.

■  **Environmental costs:** Altria Group, Inc. is subject to laws and regulations relating to the protection of the environment. Altria Group, Inc. provides for expenses associated with environmental remediation obligations on an undiscounted basis when such amounts are probable and can be reasonably estimated. Such accruals are adjusted as new information develops or circumstances change.

While it is not possible to quantify with certainty the potential impact of actions regarding environmental remediation and compliance efforts that subsidiaries of Altria Group, Inc. may undertake in the future, in the opinion of management, environmental remediation and compliance are not expected to have a material adverse effect on Altria Group, Inc.'s consolidated financial position, results of operations or cash flows.

■  **Finance leases:** Income attributable to leveraged leases is initially recorded as unearned income and subsequently recognized as revenue over the terms of the respective leases at constant after-tax rates of return on the positive net investment balances. Investments in leveraged leases are stated net of related nonrecourse debt obligations.

Income attributable to direct finance leases is initially recorded as unearned income and subsequently recognized as revenue over the terms of the respective leases at constant pre-tax rates of return on the net investment balances.

Finance leases include unguaranteed residual values that represent PMCC's estimates at lease inception as to the fair values of assets under lease at the end of the non-cancelable lease terms. The estimated residual values are reviewed annually by PMCC's management, which includes analysis of a number of factors, including activity in the relevant industry. If necessary, revisions are recorded to reduce the residual values. Such reviews resulted in no adjustments in 2009 and 2008. A decrease of $11 million to PMCC's net revenues and results of operations was recorded in 2007.

■  **Foreign currency translation:** Altria Group, Inc. translated the results of operations of its foreign subsidiaries using average exchange rates during each period, whereas balance sheet accounts were translated using exchange rates at the end of each period. Currency translation adjustments were recorded as a component of stockholders' equity. The accumulated currency translation adjustments related to Kraft and PMI were recognized and recorded in connection with the Kraft and PMI distributions. Transaction gains and losses

were recorded in the consolidated statements of earnings and were not significant for any of the periods presented.

■  **Guarantees:** Altria Group, Inc. recognizes a liability for the fair value of the obligation of qualifying guarantee activities. See Note 22. *Contingencies* for a further discussion of guarantees.

■  **Hedging instruments:** Derivative financial instruments are recorded at fair value on the consolidated balance sheets as either assets or liabilities. Changes in the fair value of derivatives are recorded each period either in accumulated other comprehensive earnings (losses) or in earnings, depending on whether a derivative is designated and effective as part of a hedge transaction and, if it is, the type of hedge transaction. Gains and losses on derivative instruments reported in accumulated other comprehensive earnings (losses) are reclassified to the consolidated statements of earnings in the periods in which operating results are affected by the hedged item. Cash flows from hedging instruments are classified in the same manner as the affected hedged item in the consolidated statements of cash flows. At December 31, 2009, Altria Group, Inc. had no derivative financial instruments remaining.

■  **Impairment of long-lived assets:** Altria Group, Inc. reviews long-lived assets, including definite-lived intangible assets, for impairment whenever events or changes in business circumstances indicate that the carrying amount of the assets may not be fully recoverable. Altria Group, Inc. performs undiscounted operating cash flow analyses to determine if an impairment exists. For purposes of recognition and measurement of an impairment for assets held for use, Altria Group, Inc. groups assets and liabilities at the lowest level for which cash flows are separately identifiable. If an impairment is determined to exist, any related impairment loss is calculated based on fair value. Impairment losses on assets to be disposed of, if any, are based on the estimated proceeds to be received, less costs of disposal.

■  **Income taxes:** Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax bases of assets and liabilities, using enacted tax rates in effect for the year in which the differences are expected to reverse. Significant judgment is required in determining income tax provisions and in evaluating tax positions.

On January 1, 2007, Altria Group, Inc. adopted the provisions of the FASB authoritative guidance which prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. As a result of the January 1, 2007 adoption, Altria Group, Inc. lowered its liability for unrecognized tax benefits by $1,021 million. This resulted in an increase to stockholders' equity of $857 million

28

Table of Contents

UST's financial position and results of operations have been consolidated with Altria Group, Inc. as of January 6, 2009. The following unaudited supplemental pro forma data present consolidated information of Altria Group, Inc. as if the acquisition of UST had been consummated on January 1, 2008. The pro forma results are not necessarily indicative of what actually would have occurred if the acquisition and related borrowings had been consummated on January 1, 2008.

| (in millions, except per share data) | Pro Forma Year Ended December 31, 2008 |
|---|---|
| Net revenues | $ 21,339 |
| Earnings from continuing operations | $ 2,677 |
| Net earnings | $ 4,578 |
| Net earnings attributable to Altria Group, Inc. | $ 4,515 |
| Per share data: | |
| Basic earnings per share: | |
| Continuing operations | $ 1.29 |
| Discontinued operations | 0.88 |
| Net earnings attributable to Altria Group, Inc. | $ 2.17 |
| Diluted earnings per share: | |
| Continuing operations | $ 1.28 |
| Discontinued operations | 0.88 |
| Net earnings attributable to Altria Group, Inc. | $ 2.16 |

Pro forma results of Altria Group, Inc., for the year ended December 31, 2009 assuming the acquisition had occurred on January 1, 2009, would not be materially different from the actual results reported for the year ended December 31, 2009.

The pro forma amounts reflect the application of the following adjustments as if the acquisition had occurred on January 1, 2008:

■  additional depreciation and amortization expense that would have been charged assuming the fair value adjustments to property, plant and equipment, and intangible assets had been applied from January 1, 2008;

■  additional interest expense and structuring and arrangement fees that would have been incurred assuming all borrowing arrangements used to fund the acquisition had been in place as of January 1, 2008;

■  restructuring costs incurred to restructure and integrate UST operations;

■  transaction costs associated with the acquisition; and

■  increased cost of sales, reflecting the fair value adjustment of UST's subsidiaries' inventory sold during the year.

During the fourth quarter of 2009, the allocation of purchase price relating to the acquisition of UST was completed.

30

The following amounts represent the fair value of identifiable assets acquired and liabilities assumed in the UST acquisition:

| (in millions) | |
|---|---|
| Cash and cash equivalents | $ 163 |
| Inventories | 796 |
| Property, plant and equipment | 688 |
| Other intangible assets: | |
| Indefinite-lived trademarks | 9,059 |
| Definite-lived (20-year life) | 60 |
| Short-term borrowings | (205) |
| Current portion of long-term debt | (240) |
| Long-term debt | (900) |
| Deferred income taxes | (3,535) |
| Other assets and liabilities, net | (540) |
| Noncontrolling interests | (36) |
| Total identifiable net assets | 5,310 |
| Total purchase price | 10,407 |
| Goodwill | $ 5,097 |

The excess of the purchase price paid by Altria Group, Inc. over the fair value of identifiable net assets acquired in the acquisition of UST primarily reflects the value of adding USSTC and its subsidiaries to Altria Group, Inc.'s family of tobacco operating companies (PM USA and Middleton), with leading brands in cigarettes, smokeless products and machine-made large cigars. The acquisition is anticipated to generate approximately $300 million in annual synergies by 2011, driven primarily by reduced selling, general and administrative, and corporate expenses. None of the goodwill or other intangible assets will be deductible for tax purposes.

The assets acquired, liabilities assumed and noncontrolling interests of UST have been measured as of the acquisition date. In valuing trademarks, Altria Group, Inc. estimated the fair value using a discounted cash flow methodology. No material contingent liabilities were recognized as of the acquisition date because the acquisition date fair value of such contingencies cannot be determined, and the contingencies are not both probable and reasonably estimable. Additionally, costs incurred to effect the acquisition, as well as costs to restructure UST, are being recognized as expenses in the periods in which the costs are incurred. For the years ended December 31, 2009 and 2008, Altria Group, Inc. incurred acquisition-related charges, as well as restructuring and integration costs, consisting of the following:

| (in millions) | For the Years Ended December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Asset impairment and exit costs | $ 202 | $ — |
| Integration costs | 49 | |
| Inventory adjustments | 36 | |
| Structuring and arrangement fees | 91 | 58 |
| Transaction costs | 60 | |
| Total | $ 438 | $ 58 |

Table of Contents

In 2010, Altria Group, Inc. expects to incur approximately $50 million of restructuring and integration costs related to the acquisition of UST.

■ **Middleton Acquisition:** On December 11, 2007, Altria Group, Inc. acquired all of the outstanding stock of Middleton, a manufacturer of machine-made large cigars and pipe tobacco, for $2.9 billion in cash. The acquisition was financed with existing cash. Middleton's balance sheet was consolidated with Altria Group, Inc.'s as of December 31, 2007. Earnings from December 12, 2007 to December 31, 2007, the amounts of which were insignificant, were included in Altria Group, Inc.'s consolidated operating results for the year ended December 31, 2007.

During the first quarter of 2008, the allocation of purchase price relating to the acquisition of Middleton was completed. Assets purchased consist primarily of indefinite-lived intangible assets related to acquired brands of $2.6 billion, definite-lived intangible assets of $0.1 billion, goodwill of $0.1 billion and other assets of $0.1 billion, partially offset by accrued liabilities assumed in the acquisition.

## Note 4.

### Divestitures:

As discussed in Note 1. *Background and Basis of Presentation*, on March 28, 2008, Altria Group, Inc. distributed all of its interest in PMI to Altria Group, Inc. stockholders in a tax-free distribution, and on March 30, 2007, Altria Group, Inc. distributed all of its remaining interest in Kraft on a pro-rata basis to Altria Group, Inc. stockholders in a tax-free distribution.

Summarized financial information for discontinued operations for the years ended December 31, 2008 and 2007 were as follows:

| | 2008 |
| --- | --- |
| (in millions) | PMI |
| Net revenues | $15,376 |
| Earnings before income taxes | $ 2,701 |
| Provision for income taxes | (800) |
| Earnings from discontinued operations, net of income taxes | 1,901 |
| Net earnings attributable to noncontrolling interests | (61) |
| Earnings from discontinued operations | $ 1,840 |

| | 2007 | | |
| --- | --- | --- | --- |
| (in millions) | PMI | Kraft | Total |
| Net revenues | $55,137 | $8,586 | $63,723 |
| Earnings before income taxes | $ 8,852 | $1,059 | $ 9,911 |
| Provision for income taxes | (2,549) | (356) | (2,905) |
| Earnings from discontinued operations, net of income taxes | 6,303 | 703 | 7,006 |
| Net earnings attributable to noncontrolling interests | (273) | (78) | (351) |
| Earnings from discontinued operations | $ 6,030 | $ 625 | $ 6,655 |

## Note 5.

### Goodwill and Other Intangible Assets, net:

Goodwill and other intangible assets, net, by segment were as follows:

| | Goodwill | | Other Intangible Assets, net | |
| --- | --- | --- | --- | --- |
| (in millions) | December 31, 2009 | December 31, 2008 | December 31, 2009 | December 31, 2008 |
| Cigarettes | $ — | $ | $ 272 | $ 283 |
| Smokeless products | 5,023 | | 8,845 | |
| Cigars | 77 | 77 | 2,750 | 2,756 |
| Wine | 74 | | 271 | |
| Total | $ 5,174 | $ 77 | $ 12,138 | $ 3,039 |

Intangible assets were as follows:

| | December 31, 2009 | | December 31, 2008 | |
| --- | --- | --- | --- | --- |
| (in millions) | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Indefinite-lived intangible assets | $ 11,701 | | $ 2,642 | |
| Definite-lived intangible assets | 464 | $ 27 | 404 | $ 7 |
| Total intangible assets | $ 12,165 | $ 27 | $ 3,046 | $ 7 |

Indefinite-lived intangible assets consist substantially of trademarks from the January 2009 acquisition of UST ($9.1 billion) and the December 2007 acquisition of Middleton ($2.6 billion). Definite-lived intangible assets consist primarily of customer relationships and certain cigarette trademarks. Pre-tax amortization expense for definite-lived intangible assets during the years ended December 31, 2009 and 2008, was $20 million and $7 million, respectively. There was no pre-tax amortization expense for intangible assets during the year ended December 31, 2007. Annual amortization expense for each of the next five years is estimated to be approximately $20 million, assuming no additional transactions occur that require the amortization of intangible assets.

Goodwill relates to the January 2009 acquisition of UST and the December 2007 acquisition of Middleton. The change in goodwill and gross carrying amount of other intangible assets is as follows:

| | 2009 | | 2008 | |
| --- | --- | --- | --- | --- |
| (in millions) | Goodwill | Other Intangible Assets | Goodwill | Other Intangible Assets |
| Balance at January 1 | $ 77 | $ 3,046 | $ 76 | $ 3,049 |
| Changes due to: | | | | |
| Acquisition of UST | 5,097 | 9,119 | | |
| Purchase price revisions | | | 1 | (3) |
| Balance at December 31 | $ 5,174 | $ 12,165 | $ 77 | $ 3,046 |

31

Powered by Morningstar® Document Research℠

Table of Contents

The changes in goodwill and other intangible assets during 2008 resulted from revisions to the purchase price allocation as appraisals for the acquisition of Middleton were finalized during the first quarter of 2008. See Note 3. *Acquisitions* for a discussion of the UST and Middleton acquisitions .

**Note 6.**

## Asset Impairment, Exit, Implementation and Integration Costs:

Pre-tax asset impairment, exit, implementation and integration costs for the years ended December 31, 2009, 2008 and 2007 consisted of the following:

| (in millions) | For the Year Ended December 31, 2009 | | | |
| | Asset Impairment and Exit Costs | Implementation Costs | Integration Costs | Total |
|---|---|---|---|---|
| Cigarettes | $ 115 | $ 139 | $ — | $254 |
| Smokeless products | 193 | | 43 | 236 |
| Cigars | | | 9 | 9 |
| Wine | 3 | | 6 | 9 |
| Financial services | 19 | | | 19 |
| General corporate | 91 | | | 91 |
| Total | $ 421 | $ 139 | $ 58 | $618 |

| (in millions) | For the Year Ended December 31, 2008 | | | |
| | Exit Costs | Implementation Costs | Integration Costs | Total |
|---|---|---|---|---|
| Cigarettes | $ 97 | $ 69 | $ — | $166 |
| Cigars | | | 18 | 18 |
| Financial services | 2 | | | 2 |
| General corporate | 350 | | | 350 |
| Total | $ 449 | $ 69 | $ 18 | $536 |

| (in millions) | For the Year Ended December 31, 2007 | | | |
| | Asset Impairment and Exit Costs | Implementation Costs | Integration Costs | Total |
|---|---|---|---|---|
| Cigarettes | $ 344 | $ 27 | $ — | $371 |
| General corporate | 98 | | | 98 |
| Total | $ 442 | $ 27 | $ — | $469 |

The movement in the severance liability and details of asset impairment and exit costs for Altria Group, Inc. for the years ended December 31, 2009 and 2008 was as follows:

| (in millions) | Severance | Other | Total |
|---|---|---|---|
| Severance liability balance, January 1, 2008 | $ 279 | $ — | $ 279 |
| Charges, net | 216 | 233 | 449 |
| Cash spent | (149) | (103) | (252) |
| Liability recorded in pension and postretirement plans, and other | 2 | (130) | (128) |
| Severance liability balance, December 31, 2008 | 348 | — | 348 |
| Charges | 185 | 236 | 421 |
| Cash spent | (307) | (119) | (426) |
| Liability recorded in pension and postretirement plans, and other | 2 | (117) | (115) |
| Severance liability balance, December 31, 2009 | $ 228 | $ — | $ 228 |

Other charges in the table above for 2009 and 2008 primarily represent other employee termination benefits including pension and postretirement, as well as PMI spin-off fees in 2008. Charges, net, in the table above include the reversal of $14 million of severance associated with the Manufacturing Optimization Program in 2008.

***Integration and Restructuring Program:*** Altria Group, Inc. has largely completed a restructuring program that commenced in December 2008, and was expanded in August 2009. Pursuant to this program, Altria Group, Inc. has restructured its corporate, manufacturing, and sales and marketing services functions as it completes the integration of UST into its operations and continues to focus on optimizing company-wide cost structures in light of ongoing declines in U.S. cigarette volumes. As part of this restructuring, Altria Group, Inc. created two new service organizations during the second quarter of 2009. Altria Sales & Distribution Inc. serves as agent for Altria Group, Inc.'s three tobacco operating companies in their interactions with tobacco wholesalers and retailers. Altria Consumer Engagement Services Inc. executes

32

Table of Contents

one-to-one adult consumer programs for the three tobacco operating companies.

As a result of this restructuring program, Altria Group, Inc. incurred aggregate pre-tax charges of $328 million in 2009 and expects to incur approximately $50 million in 2010. The 2009 charges are primarily related to employee separation costs, lease exit costs, relocation of employees, asset impairments and other costs related to the integration of UST operations. Substantially all of these charges will result in cash expenditures. The $328 million in pre-tax charges for this program was reported in the cigarettes segment, smokeless products segment, wine segment, financial services
segment and Altria Group, Inc. as pre-tax charges of $18 million, $236 million, $9 million, $4 million and $61 million, respectively. These charges included total exit costs of $250 million, integration costs of $49 million and asset impairment charges of $29 million. For the year ended December 31, 2008, the cigarettes segment, financial services segment and Altria Group, Inc. reported pre-tax charges for this program of $48 million, $2 million and $76 million, respectively, for total exit costs of $126 million.

The pre-tax integration costs were included in marketing, administration and research costs on Altria Group, Inc.'s consolidated statements of earnings for the year ended December 31, 2009. Total pre-tax charges incurred since the inception of the program were $454 million. Cash payments related to the program of $221 million were made during the year ended December 31, 2009, for a total of $221 million since inception.

*Headquarters Relocation:* During 2008, in connection with the spin-off of PMI, Altria Group, Inc. restructured its corporate headquarters, which included the relocation of Altria Group, Inc.'s corporate headquarters functions to Richmond, Virginia. During the years ended December 31, 2009 and 2008, Altria Group, Inc. incurred pre-tax charges of $30 million and $219 million, respectively, for this program. Total pre-tax charges incurred since the inception of this restructuring were $249 million as of December 31, 2009. These charges consist primarily of employee separation costs. Substantially all of these charges will result in cash expenditures. Cash payments related to this restructuring of $65 million and $136 million were made during the years ended December 31, 2009 and 2008, respectively, for a total of $201 million since inception.

For the years ended December 31, 2008 and 2007, general corporate exit costs also included $55 million and $81 million, respectively, of investment banking and legal fees associated with the PMI and Kraft spin-offs, as well as $17 million for the streamlining of various corporate functions in 2007.

*Manufacturing Optimization Program:* PM USA ceased production at its Cabarrus, North Carolina manufacturing facility and completed the consolidation of its cigarette manufacturing capacity into its Richmond, Virginia facility on July 29, 2009. PM USA took this action to address ongoing cigarette volume declines including the impact of the FET increase enacted in early 2009. PM USA expects to complete the de-commissioning of the Cabarrus facility during 2010.

As a result of this program, which commenced in 2007, PM USA expects to incur total pre-tax charges of approximately $785 million, of which $725 million have been incurred as of December 31, 2009 and are reflected in the cigarettes segment. Total pre-tax charges for this program consist of employee separation costs of $343 million, accelerated depreciation of $282 million and other charges of $160 million, primarily related to the relocation of employees and equipment, net of estimated gains on sales of land and buildings. Approximately $400 million of the total pre-tax charges are expected to result in cash expenditures.

PM USA recorded pre-tax charges for this program as follows:

|  | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| (in millions) | 2009 | 2008 | 2007 |
| Exit costs | $ 97 | $ 49 | $ 309 |
| Asset impairment | | | 35 |
| Implementation costs | 139 | 69 | 27 |
| Total | $ 236 | $ 118 | $ 371 |

Pre-tax implementation costs related to this program were primarily related to accelerated depreciation and were included in cost of sales in the consolidated statements of earnings for the years ended December 31, 2009, 2008 and 2007, respectively.

Pre-tax charges of approximately $100 million are expected during 2010 for the program. Cash payments related to the program of $210 million, $85 million and $11 million were made during the years ended December 31, 2009, 2008 and 2007, respectively, for a total of $306 million since inception.

## Note 7.

## Inventories:

The cost of approximately 75% and 94% of inventories in 2009 and 2008, respectively, was determined using the LIFO method. The stated LIFO amounts of inventories were approximately $0.8 billion and $0.7 billion lower than the current cost of inventories at December 31, 2009 and 2008, respectively.

33

 Powered by Morningstar® Document Research℠

Table of Contents

## Note 8.

### Investment in SABMiller:

At December 31, 2009, Altria Group, Inc. held a 27.3% economic and voting interest in SABMiller. Altria Group, Inc.'s investment in SABMiller is being accounted for under the equity method.

Earnings from Altria Group, Inc.'s equity investment in SABMiller consisted of the following:

| (in millions) | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| Equity earnings | $ 407 | $ 467 | $ 510 |
| Gains on issuances of common stock by SABMiller | 193 | | |
| | $ 600 | $ 467 | $ 510 |

Altria Group, Inc.'s earnings from its equity investment in SABMiller for the year ended December 31, 2009 included pre-tax gains of $193 million due primarily to the issuance of 60 million shares of common stock by SABMiller in connection with its acquisition of the remaining noncontrolling interest in its Polish subsidiary.

## Note 9.

### Finance Assets, net:

In 2003, PMCC ceased making new investments and began focusing exclusively on managing its existing portfolio of finance assets in order to maximize gains and generate cash flow from asset sales and related activities. Accordingly, PMCC's operating companies income will fluctuate over time as investments mature or are sold. During 2009, 2008 and 2007, proceeds from asset sales and bankruptcy recoveries totaled $793 million, $403 million and $486 million, respectively, and gains included in operating companies income totaled $257 million, $87 million and $274 million, respectively.

Summary financial data of SABMiller is as follows:

| (in millions) | At December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Current assets | $ 4,495 | $ 4,266 |
| Long-term assets | $33,841 | $30,007 |
| Current liabilities | $ 5,307 | $ 5,403 |
| Long-term liabilities | $13,199 | $12,170 |
| Non-controlling interests | $ 672 | $ 660 |

| (in millions) | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| Net revenues | $ 17,020 | $ 20,466 | $ 20,825 |
| Operating profit | $ 2,173 | $ 2,854 | $ 3,230 |
| Net earnings | $ 1,473 | $ 1,635 | $ 1,865 |

The fair value, based on market quotes, of Altria Group, Inc.'s equity investment in SABMiller at December 31, 2009, was $12.7 billion, as compared with its carrying value of $5.0 billion. The fair value, based on market quotes, of Altria Group, Inc.'s equity investment in SABMiller at December 31, 2008, was $7.3 billion, as compared with its carrying value of $4.3 billion.

Included in the proceeds for 2007 were partial recoveries of amounts previously charged to earnings in the allowance for losses related to PMCC's airline exposure. The operating companies income associated with these recoveries, which is included in the gains shown above, was $214 million for the year ended December 31, 2007.

At December 31, 2009, finance assets, net, of $4,803 million were comprised of an investment in finance leases of $5,069 million, reduced by the allowance for losses of $266 million. At December 31, 2008, finance assets, net, of $5,451 million were comprised of an investment in finance leases of $5,743 million and an other receivable of $12 million, reduced by the allowance for losses of $304 million.

A summary of the net investment in finance leases at December 31, before allowance for losses, was as follows:

| (in millions) | Leveraged Leases | | Direct Finance Leases | | Total | |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 | 2009 | 2008 |
| Rentals receivable, net | $ 5,137 | $ 6,001 | $ 274 | $ 324 | $ 5,411 | $ 6,325 |
| Unguaranteed residual values | 1,411 | 1,459 | 87 | 89 | 1,498 | 1,548 |
| Unearned income | (1,816) | (2,101) | (23) | (26) | (1,839) | (2,127) |
| Deferred investment tax credits | (1) | (3) | | | (1) | (3) |
| Investment in finance leases | 4,731 | 5,356 | 338 | 387 | 5,069 | 5,743 |
| Deferred income taxes | (4,126) | (4,577) | (155) | (180) | (4,281) | (4,757) |
| Net investment in finance leases | $ 605 | $ 779 | $ 183 | $ 207 | $ 788 | $ 986 |

For leveraged leases, rentals receivable, net, represent unpaid rentals, net of principal and interest payments on third-party nonrecourse debt. PMCC's rights to rentals receivable are subordinate to the third-party nonrecourse debtholders, and the leased equipment is pledged as collateral to

the debtholders. The payment of the nonrecourse debt is collateralized by lease payments due under the lease and the leased property, and is nonrecourse to the general assets of PMCC. As required by U.S. GAAP, the third-party nonrecourse debt of $9.2 billion and $11.5 billion at December 31, 2009

34

Table of Contents

and 2008, respectively, has been offset against the related rentals receivable. There were no leases with contingent rentals in 2009 and 2008.

At December 31, 2009, PMCC's investment in finance leases was principally comprised of the following investment categories: rail and surface transport (28%), aircraft (25%), electric power (23%), manufacturing (12%), and real estate (12%). Investments located outside the United States, which are all U.S. dollar-denominated, represent 22% and 23% of PMCC's investment in finance leases at December 31, 2009 and 2008, respectively.

Rentals receivable in excess of debt service requirements on third-party nonrecourse debt related to leveraged leases and rentals receivable from direct finance leases at December 31, 2009, were as follows:

| (in millions) | Leveraged Leases | Direct Finance Leases | Total |
|---|---|---|---|
| 2010 | $ 155 | $ 44 | $ 199 |
| 2011 | 100 | 50 | 150 |
| 2012 | 140 | 50 | 190 |
| 2013 | 190 | 50 | 240 |
| 2014 | 285 | 45 | 330 |
| Thereafter | 4,267 | 35 | 4,302 |
| Total | $ 5,137 | $ 274 | $5,411 |

Included in net revenues for the years ended December 31, 2009, 2008 and 2007, were leveraged lease revenues of $341 million, $210 million and $163 million, respectively, and direct finance lease revenues of $7 million, $5 million and $15 million, respectively. Income tax expense on leveraged lease revenues for the years ended December 31, 2009, 2008 and 2007, was $119 million, $72 million and $57 million, respectively.

Income from investment tax credits on leveraged leases, and initial direct and executory costs on direct finance leases were not significant during the years ended December 31, 2009, 2008 and 2007.

The activity in the allowance for losses on finance assets for the years ended December 31, 2009, 2008 and 2007 was as follows:

| (in millions) | 2009 | 2008 | 2007 |
|---|---|---|---|
| Balance at beginning of year | $304 | $204 | $ 480 |
| Increase (decrease) to provision | 15 | 100 | (129) |
| Amounts written-off | (53) | | (147) |
| Balance at end of year | $266 | $304 | $ 204 |

PMCC leases under several lease arrangements various types of automotive manufacturing equipment to Motors Liquidation Company, formerly known as General Motors Corporation ("GM"), which filed for bankruptcy on June 1, 2009. Since GM's bankruptcy filing, PMCC has not recorded income on the GM leases. In the third quarter of 2009, GM rejected one of the leases, which resulted in a $49 million write-off against PMCC's allowance for losses. The remaining GM leases, which expire from 2012 through 2023, represent approximately 3% of PMCC's portfolio of finance assets at December 31, 2009.

On October 30, 2009 General Motors LLC ("New GM"), which is the successor of GM's North American automobile business, signed several agreements with PMCC. Pursuant to these agreements, New GM has agreed to lease substantially all the remaining equipment under the same terms as GM, except for a rebate of a portion of future rents. The agreements will become effective upon court approval of the assignment of the leases to New GM, which PMCC anticipates will occur in the first quarter 2010. GM will reject one additional lease that will not be assigned to New GM. The impact of the rent rebates and the additional lease rejection have been factored into PMCC's assessment of the allowance for losses at December 31, 2009. Foreclosure of rejected lease properties will result in an acceleration of deferred tax payments on such leases.

All other PMCC lessees are current on their lease payment obligations. It is possible that adverse developments may require PMCC to increase its allowance for losses in the future.

During 2008, PMCC increased its allowance for losses by $100 million primarily as a result of credit rating downgrades of certain lessees and financial market conditions.

The net impact to the allowance for losses for 2007 related primarily to various airline leases. Amounts recovered of $129 million in 2007 related to partial recoveries of amounts charged to earnings in the allowance for losses in prior years. In addition in 2007, PMCC recovered $85 million related to amounts previously charged to earnings and written-off in prior years. In total, these recoveries resulted in additional operating companies income of $214 million for the year ended December 31, 2007. Acceleration of taxes on the foreclosures of leveraged leases written off amounted to approximately $50 million in 2007. There were no foreclosures in 2009 and 2008.

PMCC's portfolio remains diversified by lessee, investment category and asset type. As of December 31, 2009, 74% of PMCC's lessees were investment grade as defined by Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services ("Standard & Poor's"). Excluding aircraft lease investments, 87% of PMCC's lessees were investment grade.

At December 31, 2009 PMCC's portfolio included five aircraft under leveraged leases with Mesa Airlines, Inc. ("Mesa") with a finance asset balance of $21 million. PMCC's interest in these leases was secured by letters of credit issued by Citicorp North America, Inc. On January 5, 2010, Mesa filed for Chapter 11 bankruptcy protection. As a result of the bankruptcy filing PMCC drew on the letters of credit and recovered its outstanding investment.

PMCC has one remaining transaction with indirect exposure to Ambac Assurance Corporation, a credit support provider whose credit rating remains below investment grade. This risk is mitigated by the underlying strength of the lessee and the quality of the leased asset.

See Note 22. *Contingencies*, for a discussion of the Internal Revenue Service ("IRS") disallowance of certain benefits pertaining to several PMCC leveraged lease transactions.

35

Table of Contents

**Note 10.**

## Short-Term Borrowings and Borrowing Arrangements:

At December 31, 2009 and 2008, Altria Group, Inc. had no short-term borrowings.

At December 31, 2009, the credit lines for Altria Group, Inc. and related activity were as follows:

| (in billions) Type | Credit Lines | Amount Drawn | Commercial Paper Outstanding | Lines Available |
|---|---|---|---|---|
| 364-Day Agreement | $ 0.6 | $ — | $ — | $ 0.6 |
| 3-Year Agreement | 2.4 | | | 2.4 |
| | $ 3.0 | $ — | $ — | $ 3.0 |

On November 20, 2009, Altria Group, Inc. entered into a senior unsecured 364-day revolving credit agreement (the "364-Day Agreement") and a senior unsecured 3-year revolving credit agreement (the "3-Year Agreement" and, together with the 364-Day Agreement, the "Revolving Credit Agreements"). The 364-Day Agreement provides for borrowings up to an aggregate principal amount of $0.6 billion and expires on November 19, 2010. The 3-Year Agreement provides for borrowings up to an aggregate principal amount of $2.4 billion and expires on November 20, 2012. Pricing under the Revolving Credit Agreements may be modified in the event of a change in the rating of Altria Group, Inc.'s long-term senior unsecured debt. Interest rates on borrowings under the Revolving Credit Agreements will be based on the London Interbank Offered Rate ("LIBOR") plus a percentage equal to Altria Group, Inc.'s credit default swap spread subject to certain minimum rates and maximum rates based on the higher of the rating of Altria Group, Inc.'s long-term senior unsecured debt from Standard & Poor's and Moody's. The applicable minimum and maximum rates based on Altria Group, Inc.'s long-term senior unsecured debt ratings at December 31, 2009 are 2.0% and 4.0%, respectively. The Revolving Credit Agreements do not include any other rating triggers, nor do they contain any provisions that could require the posting of collateral.

The Revolving Credit Agreements replace Altria Group, Inc.'s prior $3.4 billion 5-year revolving credit agreement, which was due to expire on April 15, 2010, but was terminated effective November 20, 2009. The Revolving Credit Agreements will be used for general corporate purposes and to support Altria Group, Inc.'s commercial paper issuances. The Revolving Credit Agreements require that Altria Group, Inc. maintain (i) a ratio of debt to earnings before interest, taxes, depreciation and amortization ("EBITDA") of not more than 3.0 to 1 and (ii) a ratio of EBITDA to interest expense of not less than 4.0 to 1. At December 31, 2009, the ratios of debt to EBITDA and EBITDA to interest expense, calculated in accordance with the Revolving Credit Agreements, were 1.9 to 1.0 and 5.3 to 1.0, respectively. Altria Group, Inc. expects to continue to meet its covenants associated with the Revolving Credit Agreements.

In connection with the acquisition of UST, Altria Group, Inc. had in place at December 31, 2008, the Bridge Facility. On January 6, 2009, Altria Group, Inc. borrowed the entire

available amount of $4.3 billion under the Bridge Facility to fund in part the acquisition of UST (see Note 3. *Acquisitions*). As discussed in Note 11. *Long-Term Debt*, in February 2009, Altria Group, Inc. issued $4.2 billion of senior unsecured long-term notes. The net proceeds from the issuance of these notes, along with available cash, were used to prepay all of the outstanding borrowings under the Bridge Facility. Upon such prepayment, the Bridge Facility was terminated.

Any commercial paper of Altria Group, Inc. and borrowings under the Revolving Credit Agreements are fully and unconditionally guaranteed by PM USA (see Note 23. *Condensed Consolidating Financial Information*).

**Note 11.**

## Long-Term Debt:

At December 31, 2009 and 2008, Altria Group, Inc.'s long-term debt consisted of the following:

| (in millions) | 2009 | 2008 |
|---|---|---|
| Consumer products: | | |
| Notes, 5.75% to 10.20% (average interest rate 9.1%), due through 2039 | $11,918 | $6,797 |
| Debenture, 7.75% due 2027 | 42 | 42 |
| Other | | 135 |
| | 11,960 | 6,974 |
| Less current portion of long-term debt | (775) | (135) |
| | $11,185 | $6,839 |
| Financial services: | | |
| Eurodollar bonds, 7.50%, due 2009 | $ — | $ 500 |

Aggregate maturities of long-term debt are as follows:

| (in millions) | Altria Group, Inc. | UST | Total Long-Term Debt |
|---|---|---|---|
| 2010 | $ 775 | | $ 775 |
| 2012 | | $ 600 | 600 |
| 2013 | 1,459 | | 1,459 |
| 2014 | 525 | | 525 |
| 2018 | 3,100 | 300 | 3,400 |
| 2019 | 2,200 | | 2,200 |
| Thereafter | 3,042 | | 3,042 |

The aggregate fair value, based substantially on readily available quoted market prices, of Altria Group, Inc.'s long-term debt at December 31, 2009, was $14.4 billion, as compared with its carrying value of $12.0 billion. The aggregate fair value, based substantially on readily available quoted market prices, of Altria Group, Inc.'s long-term debt at December 31, 2008, was $8.6 billion, as compared with its carrying value of $7.5 billion.

*Altria Group, Inc. Senior Notes:* Altria Group, Inc. issued the following notes in 2008 and 2009:

**November 2008 Issuance**

■ $1.4 billion at 8.50%, due 2013, interest payable semi-annually;

36