Table of Contents

Altria Group, Inc. continues to have company-wide cost management programs, which include the largely completed restructuring programs discussed in Note 6. For the year ended December 31, 2009, Altria Group, Inc. achieved $398 million in cost savings for a total cost savings of $1,038 million since January 1, 2007. Altria Group, Inc. expects to achieve approximately $462 million in additional cost savings by 2011, for total anticipated cost reductions of $1.5 billion versus 2006, as shown in the table below.

| | Cost Reduction Initiatives | | | | |
|---|---|---|---|---|---|
| | Cost Savings Achieved For the Years Ended December 31, | | | Additional Cost Savings Expected by 2011 | Total Cost Savings Expected |
| (in millions) | 2007 | 2008 | 2009 | | |
| General corporate expense and selling, general and administrative | $401 | $ 239 | $ 398 | $    274 | $  1,312 |
| Manufacturing optimization program | | | | 188 | 188 |
| Total cost reduction initiatives | $401 | $ 239 | $ 398 | $    462 | $  1,500 |

Altria Group, Inc. expects to generate an estimated $300 million in UST integration cost savings by 2011. These integration cost savings are included in the "General corporate expense and selling, general and administrative" line item above.

PM USA's manufacturing optimization program, as discussed in Note 6, is expected to entail capital expenditures of approximately $210 million. Capital expenditures for the program of $86 million were made during the year ended December 31, 2009, for a total of $207 million since the inception of the program in 2007.

Altria Group, Inc. had a severance liability balance of $228 million at December 31, 2009 related to its restructuring programs, which is expected to be substantially paid out over the next two years.

■   *UST Acquisition-Related Costs* — In connection with the acquisition of UST, Altria Group, Inc. incurred pre-tax charges consisting of the following:

   ■   Transaction costs of $60 million, incurred in the first quarter of 2009, which consisted primarily of investment banking and legal fees. These amounts are included in marketing, administration and research costs on Altria Group, Inc.'s consolidated statement of earnings.

   ■   Increased cost of sales during the year ended December 31, 2009 of $36 million ($15 million and $21 million to the smokeless products and wine segments, respectively), relating to the fair value purchase accounting adjustment of UST's inventory at the acquisition date that was sold during 2009.

   ■   Structuring and arrangement fees of $91 million and $58 million, during 2009 and 2008, respectively, for borrowing facilities related to the acquisition of UST. These amounts are included in interest and other debt expense, net on Altria Group, Inc.'s consolidated statements of earnings.

■   *SABMiller Special Items* — Altria Group, Inc.'s earnings from its equity investment in SABMiller for year ended December 31, 2009 included gains on the issuance of 60 million shares of common stock by SABMiller in connection with its acquisition of the remaining noncontrolling interest in its Polish subsidiary, partially offset by intangible

asset impairment charges and costs for SABMiller's "business capability programme." Altria Group, Inc.'s earnings from its equity investment in SABMiller for the year ended December 31, 2008 included intangible asset impairment charges.

■   *Sales to PMI* — Subsequent to the PMI spin-off, PM USA recorded net revenues of $298 million, from contract volume manufactured for PMI under an agreement that terminated in the fourth quarter of 2008. For periods prior to the PMI spin-off, PM USA did not record contract volume manufactured for PMI in net revenues, but recorded the related profit, which was immaterial, for the years ended December 31, 2008 and 2007, in marketing, administration and research costs on Altria Group, Inc.'s consolidated statements of earnings. These amounts are reflected in the cigarettes segment.

■   *PMCC Allowance for Losses* — During 2009, PMCC increased its allowance for losses by $15 million based on management's assessment of its portfolio, including its exposure to GM. During 2008, PMCC increased its allowance for losses by $100 million, primarily as a result of credit rating downgrades of certain lessees and financial market conditions.

■   *Recoveries from Airline Industry Exposure* — As discussed in Note 9, during 2007, PMCC recorded pre-tax gains of $214 million on the sale of its ownership interests and bankruptcy claims in certain leveraged lease investments in aircraft, which represented a partial recovery, in cash, of amounts that had been previously written down.

■   *Gain on Sale of Corporate Headquarters Building* — In March 2008, Altria Group, Inc. sold its corporate headquarters building in New York City for $525 million and recorded a pre-tax gain on sale of $404 million.

■   *Loss on Early Extinguishment of Debt* — In connection with the spin-off of PMI in the first quarter of 2008, Altria Group, Inc. recorded a pre-tax loss of $393 million, on the early extinguishment of debt. See Note 11. *Long-Term Debt* to the consolidated financial statements ("Note 11").

■   *Income Tax Benefit* — The effective tax rate in 2009 of 34.2% included tax benefits of $88 million from the reversal of tax reserves and associated interest resulting from the

Table of Contents

execution of the closing agreement with the IRS discussed in Note 16. The benefit from the execution of the closing agreement with the IRS was offset by a reduction in a corresponding receivable from Kraft, included in marketing, administration and research costs on Altria Group, Inc.'s consolidated statement of earnings. As a result, there was no impact on Altria Group, Inc.'s net earnings. The effective tax rate in 2009 also included a benefit of $53 million from the utilization of net operating losses. The effective tax rate in 2008 included net tax benefits of $58 million primarily from the reversal of tax accruals no longer required. The effective tax rate in 2007 included net tax benefits of $168 million related to the reversal of tax reserves and associated interest resulting from the expiration of statutes of limitations, and the reversal of tax accruals no longer required.

■ *Discontinued Operations* — As a result of the PMI and Kraft spin-offs, which are more fully discussed in Note 1, Altria Group, Inc. has reclassified and reflected the results of PMI and Kraft prior to their respective distribution dates as discontinued operations on the consolidated statements of earnings and the consolidated statements of cash flows.

*2009 compared with 2008*

The following discussion compares consolidated operating results for the year ended December 31, 2009, with the year ended December 31, 2008.

Net revenues, which include excise taxes billed to customers, increased $4,200 million (21.7%), due primarily to higher revenues from the cigarettes, cigars and financial services segments, and the acquisition of UST in 2009. Cigarettes and cigars revenues increased, reflecting higher pricing related primarily to the April 1, 2009 federal excise tax ("FET") increase on tobacco products, partially offset by lower volume. In addition, 2008 net revenues included contract volume manufactured for PMI under an agreement that terminated in the fourth quarter of 2008.

Excise taxes on products increased $3,333 million (98.1%), due primarily to the impact of the FET increase and the acquisition of UST, partially offset by lower volume in the cigarettes segment.

Cost of sales decreased $280 million (3.4%), due primarily to lower cigarettes volume and the termination of contract volume manufactured for PMI, partially offset by the acquisition of UST and higher direct material and manufacturing costs.

Marketing, administration and research costs increased $178 million (6.5%), due primarily to the acquisition of UST (including transaction and integration costs) and the reduction of a Kraft receivable as discussed in Note 16, partially offset by lower marketing, administration and research costs in the cigarettes segment, a lower increase in the allowance for losses in the financial services segment and lower general corporate expenses. The lower marketing, administration and research costs in the cigarettes segment and lower general corporate expenses reflect the cost reduction initiatives discussed above.

Operating income increased $580 million (11.9%), due primarily to higher operating results from the cigarettes, financial services and cigars segments, the acquisition of UST in 2009, lower corporate asset impairment and exit costs, and lower general corporate expenses, partially offset by the gain in 2008 on the sale of the corporate headquarters building, UST acquisition-related transaction costs and the reduction of a Kraft receivable.

Interest and other debt expense, net, increased $1,018 million (100+%), due primarily to the issuance of senior unsecured long-term notes in November and December 2008, and February 2009 to finance the UST acquisition.

Earnings from Altria Group, Inc.'s equity investment in SABMiller increased $133 million (28.5%), due primarily to gains resulting from the issuances of common stock by SABMiller and higher ongoing equity earnings, partially offset by higher intangible asset impairment charges and costs for the previously mentioned "business capability programme" in 2009.

Altria Group, Inc.'s effective income tax rate decreased 1.3 percentage points to 34.2%, due primarily to the reversal of tax reserves and associated interest resulting from the execution of the closing agreement with the IRS discussed in Note 16 and the utilization of net operating losses.

Earnings from continuing operations of $3,208 million increased $118 million (3.8%), due primarily to higher operating income, a loss in 2008 on the early extinguishment of debt in connection with the PMI spin-off, higher earnings from Altria Group, Inc.'s equity investment in SABMiller and lower income taxes, partially offset by higher interest and other debt expense, net. Diluted and basic EPS from continuing operations of $1.54 and $1.55, respectively, increased by 4.1% and 4.0%, respectively.

Earnings from discontinued operations, net of income taxes decreased $1,901 million, reflecting the spin-off of PMI in the first quarter of 2008.

Net earnings attributable to Altria Group, Inc. of $3,206 million decreased $1,724 million (35.0%). Diluted and basic EPS from net earnings attributable to Altria Group, Inc. of $1.54 and $1.55, respectively, decreased by 34.7% and 34.6%, respectively. These decreases reflect the spin-off of PMI in the first quarter of 2008.

*2008 compared with 2007*

The following discussion compares consolidated operating results for the year ended December 31, 2008, with the year ended December 31, 2007.

Net revenues, which include excise taxes billed to customers, increased $692 million (3.7%) due primarily to the acquisition of Middleton ($367 million), revenues from contract volume manufactured for PMI ($298 million) and higher revenues from the financial services segment.

Excise taxes on products decreased $53 million (1.5%) due primarily to the impact of lower volume in the cigarettes segment, partially offset by the acquisition of Middleton.

88

Table of Contents

Cost of sales increased $443 million (5.7%), due primarily to higher ongoing resolution costs, the acquisition of Middleton, higher implementation costs (primarily accelerated depreciation) related to the closure of the Cabarrus manufacturing facility, higher leaf costs, contract volume manufactured for PMI and costs related to the reduction of volume produced for PMI, partially offset by lower volume.

Marketing, administration and research costs decreased $31 million (1.1%), due primarily to lower corporate, and general and administrative costs, mostly offset by the acquisition of Middleton, higher promotional costs and an increase in the allowance for losses in the financial services segment. The lower corporate, and general and administrative costs reflect the cost reduction initiatives discussed above.

Operating income increased $509 million (11.6%), due primarily to the gain on the sale of the corporate headquarters building, lower general corporate expenses, the acquisition of Middleton and higher operating results from the cigarettes segment, partially offset by lower financial services income due to cash recoveries in 2007 from assets that had previously been written down and an increase to the allowance for losses in 2008.

Interest and other debt expense, net, of $167 million decreased $38 million (18.5%), due primarily to lower average debt levels throughout most of 2008, partially offset by lower interest income and structuring and arrangement fees on borrowing facilities related to the acquisition of UST.

Earnings from Altria Group, Inc.'s equity investment in SABMiller decreased $43 million (8.4%), due primarily to intangible asset impairment charges in 2008.

Altria Group, Inc.'s effective tax rate increased 2.4 percentage points to 35.5%. The 2008 effective tax rate included net tax benefits of $58 million primarily from the reversal of tax accruals no longer required. The effective tax rate in 2007 included net tax benefits of $168 million related to the reversal of tax reserves and associated interest resulting from the expiration of statutes of limitations, and the reversal of tax accruals no longer required.

Earnings from continuing operations of $3,090 million decreased $41 million (1.3%), due primarily to the 2008 loss on early extinguishment of debt and a higher effective income tax rate, partially offset by higher operating income. Diluted and basic EPS from continuing operations of $1.48 and $1.49, respectively, remained unchanged.

Earnings from discontinued operations, net of income taxes (which represents the results of PMI and Kraft prior to the spin-offs), decreased $5,105 million (72.9%), due to the spin-offs of PMI in the first quarter of 2008 and Kraft in the first quarter of 2007.

Net earnings attributable to Altria Group, Inc. of $4,930 million decreased $4,856 million (49.6%). Diluted and basic EPS from net earnings attributable to Altria Group, Inc. of $2.36 and $2.37, respectively, each decreased by 48.9%. These decreases reflect the spin-offs of PMI and Kraft.

## Operating Results by Business Segment

### Tobacco Space

### Business Environment

*Taxes, Legislation, Regulation and Other Matters Regarding Tobacco and Tobacco Use*

The United States tobacco industry faces a number of challenges that may adversely affect the business and sales volume of our tobacco subsidiaries and our consolidated results of operations, cash flows and financial position. These challenges, which are discussed below and in *Cautionary Factors That May Affect Future Results,* include:

- pending and threatened litigation and bonding requirements as discussed in Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K;

- competitive disadvantages related to cigarette price increases attributable to the settlement of certain litigation;

- actual and proposed excise tax increases as well as changes in tax structures and tax stamping requirements;

- restrictions imposed by the FSPTCA enacted in June 2009, and restrictions that may be imposed by the FDA under this legislation and other actual and proposed restrictions affecting tobacco product manufacturing, design, packaging, marketing, advertising and sales;

- the sale of counterfeit tobacco products by third parties;

- the sale of tobacco products by third parties over the Internet and by other means designed to avoid the collection of applicable taxes;

- diversion into one market of products intended for sale in another;

- price gaps and changes in price gaps between premium and lowest price brands;

- the potential assertion of claims and other issues relating to contraband shipments of tobacco products;

- governmental investigations;

- governmental and private bans and restrictions on tobacco use;

- governmental restrictions on the sale of tobacco products by certain retail establishments, the use of characterizing flavors and the sale of tobacco products in certain packing sizes;

- the diminishing prevalence of cigarette smoking and increased efforts by tobacco control advocates to further restrict tobacco use;

- governmental requirements setting ignition propensity standards for cigarettes;

- potential adverse changes in tobacco leaf price, availability and quality; and

Table of Contents

■ other actual and proposed tobacco product legislation and regulation.

In the ordinary course of business, our tobacco subsidiaries are subject to many influences that can impact the timing of sales to customers, including the timing of holidays and other annual or special events, the timing of promotions, customer incentive programs and customer inventory programs, as well as the actual or speculated timing of pricing actions and tax-driven price increases.

_Excise Taxes_   Tobacco products are subject to substantial excise taxes in the United States. Significant increases in tobacco-related taxes or fees have been proposed or enacted and are likely to continue to be proposed or enacted at the federal, state and local levels within the United States.

Federal, state and local excise taxes have increased substantially over the past decade, far outpacing the rate of inflation. For example, in 2009, the FET on cigarettes increased from 39 cents per pack to approximately $1.01 per pack. Between the end of 1998 and the end of 2009, the weighted year-end average state and certain local cigarette excise taxes increased from $0.36 to $1.26 per pack. No additional state excise tax increases have taken effect in 2010.

Tax increases are expected to continue to have an adverse impact on sales of tobacco products by our tobacco subsidiaries, due to lower consumption levels and to a potential shift in consumer purchases from the premium to the non-premium or discount segments or to other low-priced or low-taxed tobacco products or to counterfeit and contraband products.

A majority of states currently tax moist smokeless tobacco products using an _ad valorem_ method, which is calculated as a percentage of the price of the product, typically the wholesale price. This _ad valorem_ method results in more tax being paid on premium products than is paid on lower-priced products of equal weight. Altria Group, Inc.'s subsidiaries support legislation to convert _ad valorem_ taxes on moist smokeless tobacco to a weight-based methodology because, unlike the _ad valorem_ tax, a weight-based tax results in cans of equal weight paying the same tax. As of February 19, 2010, eighteen states and Washington, D.C. have adopted a weight-based tax methodology for moist smokeless tobacco.

_FDA Regulation:_ The FSPTCA provides the FDA with broad authority to regulate the design, manufacture, packaging, advertising, promotion, sale and distribution of cigarettes, cigarette tobacco and smokeless tobacco products and disclosures of related information. The law also grants the FDA authority to extend its application, by regulation, to other tobacco products, including cigars. Among other measures, this law:

■ provides the FDA with authority to regulate nicotine yields and to reduce or eliminate harmful smoke constituents or harmful ingredients or other components of tobacco products;

■ bans descriptors such as "light," "mild" or "low" or similar descriptors unless expressly authorized by the FDA;

■ requires extensive ingredient disclosure to the FDA and may require more limited public ingredient disclosure;

■ requires FDA authorization of any express or implied claims that a tobacco product is or may be less harmful than other tobacco products;

■ authorizes regulations for imposing manufacturing standards for tobacco products and provides the FDA authority to inspect tobacco product manufacturing and other facilities;

■ establishes a framework for prior FDA authorization before the introduction of certain new or modified tobacco products;

■ provides the FDA the authority to impose tobacco product standards that are appropriate for the protection of the public health through a regulatory process including, among other possibilities, restrictions on ingredients, constituents or other properties, performance or design criteria as well as testing, measurement, reporting and disclosure requirements;

■ imposes new restrictions on the sale and distribution of tobacco products;

■ changes the language of the current cigarette and smokeless tobacco product health warnings, enlarges their size, requires the development by the FDA of graphic warnings for cigarette packages, and grants the FDA authority to require new warnings; and

■ prohibits cigarettes with characterizing flavors other than menthol and tobacco, and requires an FDA tobacco product scientific advisory committee to issue a report and recommendation on the use of the impact of the use of menthol in cigarettes on the public health.

None of Altria Group, Inc.'s tobacco operating companies currently manufactures any products prohibited by the FSPTCA's ban on cigarettes with a characterizing flavor other than menthol or tobacco. The FDA may in the future promulgate regulations that would ban, restrict or otherwise regulate flavored tobacco products, including menthol cigarettes, in a manner that could affect products manufactured by one or more of Altria Group, Inc.'s tobacco operating companies.

The FSPTCA imposes on manufacturers reporting obligations relating to knowledge of suspected contraband activity and also grants the FDA the authority to impose certain other recordkeeping and reporting obligations to address counterfeit and contraband tobacco products.

The law imposes fees on tobacco product manufacturers and importers to pay for the cost of regulation and other matters. The cost of the FDA user fee is allocated first among tobacco product categories subject to FDA regulation according to a formula set out in the legislation, and then among manufacturers within each respective class based on their relative market share. The impact of the user fee on Altria Group, Inc. is discussed in _Debt and Liquidity_ . In addition, compliance with the law's regulatory requirements will result

90

Table of Contents

in additional costs for our tobacco businesses. The amount of those additional compliance and related costs is unknown and depends substantially on the nature of the requirements imposed by the FDA under the new statute. Those compliance and other related costs, however, could be substantial.

The FSPTCA imposes significant new restrictions on the advertising and promotion of tobacco products. For example, subject to further amendment by the FDA and constitutional or other legal challenge, the statute requires the re-promulgation by the FDA of certain advertising and promotion restrictions that were previously adopted by the FDA in 1996 (the "1996 Rule") (these previous restrictions were never imposed on tobacco product manufacturers due to a United States Supreme Court ruling). These 1996 regulations extended significantly beyond the restrictions agreed upon by participating manufacturers in connection with the state settlement agreements discussed below. The FDA has not yet promulgated the 1996 Rule.

The implementation of the FSPTCA will take place over time. Some provisions took effect when the President signed the bill into law. Others, however, will not take effect for some time. Several areas require the FDA to take action through rulemaking, which generally involves consideration of public comment and, for some issues, scientific review. Altria Group, Inc.'s tobacco subsidiaries are participating actively in processes established by the FDA to develop its regulatory framework.

Since enactment, several lawsuits have been filed challenging various provisions of the FSPTCA, including its constitutionality and the scope of FDA's authority thereunder. Altria Group, Inc. and its tobacco subsidiaries and affiliates are not parties to any of these lawsuits. On January 5, 2010, the district court in one such challenge struck down as unconstitutional the ban contained in the pending 1996 Rule on color and graphics in labels and advertising and the FSPTCA's ban on claims implying that a tobacco product is safer because of FDA regulation. One or more parties may appeal. It is not possible to predict the outcome of any such litigation or its effect on the extent of the FDA's authority to regulate tobacco products.

Regulations imposed by the FDA could adversely impact the business and sales volume of Altria Group, Inc.'s tobacco businesses in a number of different ways. For example, FDA's regulatory actions could impact the consumer acceptability of tobacco products, delay or prevent the launch of new or modified tobacco products, limit consumer choices, restrict communications to adult consumers, create a competitive advantage or disadvantage for certain tobacco companies, impose additional manufacturing requirements, or otherwise significantly increase the cost of doing business.

FDA regulation, including the failure to comply with FDA regulatory requirements, even by inadvertence, could have a material adverse effect on the business, financial condition and results of operation of Altria Group, Inc. and its subsidiaries.

*The World Health Organization's ("WHO's") Framework Convention on Tobacco Control (the "FCTC")*: The FCTC entered into force in February 2005. As of February 19, 2010, 168 countries, as well as the European Community,

have become parties to the FCTC. While the United States is a signatory of the FCTC, it is not currently a party to the agreement, as the agreement has not been submitted to, or ratified by, the United States Senate. The FCTC is the first international public health treaty and its objective is to establish a global agenda for tobacco regulation with the purpose of reducing initiation of tobacco use and encouraging cessation. The treaty recommends (and in certain instances, requires) signatory nations to enact legislation that would, among other things:

■  establish specific actions to prevent youth tobacco product use;

■  restrict or eliminate all tobacco product advertising, marketing, promotion and sponsorship;

■  initiate public education campaigns to inform the public about the health consequences of tobacco consumption and exposure to tobacco smoke and the benefits of quitting;

■  implement regulations imposing product testing, disclosure and performance standards;

■  impose health warning requirements on packaging;

■  adopt measures that would eliminate tobacco product smuggling and counterfeit tobacco products;

■  restrict smoking in public places;

■  implement fiscal policies (tax and price increases);

■  adopt and implement measures that ensure that descriptive terms do not create the false impression that one brand of tobacco product is safer than another;

■  phase out duty-free tobacco product sales;

■  encourage litigation against tobacco product manufacturers; and

■  adopt and implement guidelines for testing and measuring the contents and emissions of tobacco products.

In addition, there are a number of proposals currently under consideration by the governing body of the FCTC, some of which call for substantial restrictions on the manufacture and marketing of tobacco products. It is not possible to predict the outcome of these proposals or the impact of any FCTC actions on legislation or regulation in the United States, either directly as a result of the United States becoming a party to the FCTC, or whether or how these actions might indirectly influence FDA regulation and enforcement.

*State and Local Laws Addressing Certain Characterizing Flavors*: In a number of states and localities, legislation has been enacted or proposed that prohibits or would prohibit the sale of certain tobacco products with certain characterizing flavors. The legislation varies in terms of the type of tobacco products subject to prohibition, the conditions under which the sale of such products is or would be prohibited, and exceptions to the prohibitions. To date, the following jurisdictions have enacted such legislation:

*Maine* has enacted legislation that prohibits the sale of certain flavored cigar and cigarette products. As implemented,

Source: ALTRIA GROUP, INC, 10-K, February 24, 2010        Powered by Morningstar® Document Research℠

Table of Contents

this prohibition does not ban any PM USA, USSTC, or Middleton product presently being sold. Legislation has been proposed in 2010 that would modify the state's ban on flavored tobacco products in a manner that could affect certain Middleton cigar products.

*New Jersey* has enacted legislation banning the sale and marketing of cigarettes with a characterizing flavor other than menthol, mint or clove. This legislation does not ban any PM USA, USSTC or Middleton product.

*New York City* has adopted an ordinance that prohibits the sale of certain flavored tobacco products other than cigarettes. This legislation, which is scheduled to take effect on February 25, 2010, could affect certain USSTC and Middleton products. Certain subsidiaries of USSTC have filed a lawsuit in federal court challenging the New York City legislation on several grounds, including federal preemption by the FSPTCA. This litigation is pending. In a letter to the court dated February 10, 2010, the City stated that it intends not to enforce the ordinance during the pendency of its rulemaking process, which is in progress and will not be complete until at least the beginning of April.

Whether other states or localities will enact legislation in this area, and the precise nature of such legislation if enacted, cannot be predicted. See *FDA Regulation* above for a summary of the FSPTCA's regulation of certain tobacco products with characterizing flavors.

Tar and Nicotine Test Methods and Brand Descriptors : A number of public health organizations have determined that the Federal Trade Commission ("FTC") standardized methods for measuring tar and nicotine yields in cigarettes do not provide useful information about tar and nicotine deliveries and that such results were misleading to smokers. In the 2001 publication of Monograph 13, the United States National Cancer Institute ("NCI") concluded that measurements based on the FTC standardized method "do not offer smokers meaningful information on the amount of tar and nicotine they will receive from a cigarette" or "on the relative amounts of tar and nicotine exposure likely to be received from smoking different brands of cigarettes." In response, the FTC stated that it would work with the NCI to determine what changes should be made to its testing method to "correct the limitations" identified in Monograph 13. In 2002, PM USA petitioned the FTC to promulgate new rules governing the use of existing standardized machine-based methodologies for measuring tar and nicotine yields and descriptors.

More recently, in 2008, the FTC issued a notice rescinding its 1966 guidance that set forth the FTC's former position that it is generally not a violation of the Federal Trade Commission Act to make factual statements of the tar and nicotine yields of cigarettes when statements of such yields are supported by the FTC's standardized measurement methods. In May 2009, the United States Court of Appeals for the District of Columbia Circuit largely affirmed the judgment of a federal trial court in favor of the United States government in its lawsuit against various cigarette manufacturers and others, including PM USA and Altria Group, Inc., including that portion of the judgment that enjoined the defendants from using brand descriptors such as "lights," "ultra lights" and "low"

(except to the extent such injunction applied extraterritorially). See Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K.

As noted above, the FSPTCA bans "light," "mild" or "low" or similar descriptors (unless expressly authorized by the FDA) and gives FDA authority over the testing, reporting and disclosure to the public of smoke components such as tar and nicotine. In December 2009, the FTC denied PM USA's 2002 petition citing the new authority of the FDA under the FSPTCA and the May 2009 decision discussed above.

Tobacco Quota Buy-Out: In October 2004, FETRA was signed into law. FETRA eliminated the federal tobacco quota and price support program through an industry-funded buy-out of tobacco growers and quota holders. The cost of the buy-out is approximately $9.5 billion and is being paid over 10 years by manufacturers and importers of each kind of tobacco product. The cost is being allocated based on the relative market shares of manufacturers and importers of each kind of tobacco product. The quota buy-out payments will offset already scheduled payments to the National Tobacco Grower Settlement Trust (the "NTGST"), a trust fund established in 1999 by the major domestic tobacco product manufacturers to provide aid to tobacco growers and quota holders. For a discussion of the impact of FETRA payments on Altria Group, Inc., see *Debt and Liquidity*. For a discussion of the NTGST, see Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K. Manufacturers and importers of tobacco products were also obligated to cover any losses (up to $500 million) that the government incurred on the disposition of the tobacco pool stock accumulated under the previous tobacco price support program, which disposition is complete. PM USA, Middleton and USSTC are subject to the requirements of FETRA. We do not anticipate that the quota buy-out will have a material adverse impact on our consolidated results in 2010 and beyond.

Health Effects of Tobacco Consumption and Exposure to Environmental Tobacco Smoke ("ETS"): It is the policy of Altria Group, Inc. and its tobacco subsidiaries to defer to the judgment of public health authorities as to the content of warnings in advertisements and on product packaging regarding the health effects of tobacco consumption, addiction and exposure to ETS. Altria Group, Inc. and its tobacco subsidiaries believe that the public should be guided by the messages of the United States Surgeon General and public health authorities worldwide in making decisions concerning the use of tobacco products.

Reports with respect to the health effects of smoking have been publicized for many years, including in a June 2006 United States Surgeon General report on ETS entitled "The Health Consequences of Involuntary Exposure to Tobacco Smoke." Many jurisdictions within the United States have restricted smoking in public places. The pace and scope of public smoking bans have increased significantly. Some public health groups have called for, and various jurisdictions have adopted or proposed, bans on smoking in outdoor places, in private apartments and in cars with minors in them. It is not possible to predict the results of ongoing scientific research or the types of future scientific research into the health risks of tobacco exposure.

92

Powered by Morningstar® Document Research℠

Table of Contents

*Reduced Cigarette Ignition Propensity Legislation* : Legislation or regulation requiring cigarettes to meet reduced ignition propensity standards (first adopted by New York State in 2004) has been adopted in all states except Wyoming. PM USA has converted all cigarette production to cigarettes meeting reduced ignition propensity standards.

PM USA continues to support the enactment of federal legislation mandating a uniform and technically feasible national standard for reduced ignition propensity cigarettes that would preempt state standards that are different from the federal standard.

*Illicit Trade:* Altria Group, Inc. and its tobacco subsidiaries support reasonable regulations and enforcement measures to prevent illicit trade in tobacco products. For example, Altria Group, Inc.'s tobacco subsidiaries are engaged in a number of initiatives to help prevent trade in contraband tobacco products, including: enforcement of wholesale and retail trade programs and policies on trade in contraband tobacco products; engagement with and support of law enforcement and regulatory agencies; litigation to protect their trademarks; and support for a variety of federal and state legislative initiatives. Legislative initiatives to address trade in contraband tobacco products are designed to protect the legitimate channels of distribution, impose more stringent penalties for the violation of illegal trade laws and provide additional tools for law enforcement. Regulatory measures and related governmental actions to prevent the illicit manufacture and trade of tobacco products are being considered by a number of jurisdictions. For example, one bill that the United States House of Representatives passed in 2009 would address illegal Internet sales by, among other things, imposing a series of restrictions and requirements on the delivery and sale of such products and would make such products non-mailable to consumers through the United States Postal Service.

*State Settlement Agreements* : As discussed in Note 22, and Item 3. *Legal Proceedings*  to Altria Group, Inc.'s 2009 Form 10-K, during 1997 and 1998, PM USA and other major domestic tobacco product manufacturers entered into agreements with states and various United States jurisdictions settling asserted and unasserted health care cost recovery and other claims (collectively, the "State Settlement Agreements"). These settlements require participating manufacturers to make substantial annual payments. For a discussion of the impact of these payments on Altria Group, Inc., see *Debt and Liquidity* . The settlements also place numerous restrictions on participating manufacturers' business operations, including prohibitions and restrictions on the advertising and marketing of cigarettes and smokeless tobacco products. Among these are prohibitions of outdoor and transit brand advertising, payments for product placement, and free sampling (except in adult-only facilities). Restrictions are also placed on the use of brand name sponsorships and brand name non-tobacco products. The State Settlement Agreements also place prohibitions on targeting youth and the use of cartoon characters. In addition, the State Settlement Agreements require companies to affirm corporate principles directed at reducing underage use of cigarettes; impose requirements regarding lobbying activities; mandate public disclosure of certain industry

documents; limit the industry's ability to challenge certain tobacco control and underage use laws; and provide for the dissolution of certain tobacco-related organizations and place restrictions on the establishment of any replacement organizations.

In November 1998, USSTC entered into the Smokeless Tobacco Master Settlement Agreement (the "STMSA") with the attorneys general of various states and United States territories to resolve the remaining health care cost reimbursement cases initiated against USSTC. The STMSA required USSTC to adopt various marketing and advertising restrictions and make certain payments over a minimum of ten years for programs to reduce youth consumption of tobacco and combat youth substance abuse and for enforcement purposes. USSTC is the only smokeless tobacco manufacturer to sign the STMSA.

*Other Legislation or Governmental Initiatives*  : In addition to the actions discussed above, other regulatory initiatives affecting the tobacco industry have been adopted or are being considered at the federal level and in a number of state and local jurisdictions. For example, in recent years, legislation has been introduced or enacted at the state or local level to subject tobacco products to various reporting requirements and performance standards; establish educational campaigns relating to tobacco consumption or tobacco control programs, or provide additional funding for governmental tobacco control activities; restrict the sale of tobacco products in certain retail establishments and the sale of tobacco products in certain packing sizes; require tax stamping of moist smokeless tobacco products; require the use of state tax stamps using data encryption technology; and further restrict the sale, marketing and advertising of cigarettes and other tobacco products.

It is not possible to predict what, if any, additional legislation, regulation or other governmental action will be enacted or implemented relating to the manufacturing, design, packaging, marketing, advertising, sale or use of tobacco products, or the tobacco industry generally. It is possible, however, that legislation, regulation or other governmental action could be enacted or implemented in the United States that might materially adversely affect the business and volume of our tobacco subsidiaries and our consolidated results of operations and cash flows.

*Governmental Investigations* : From time to time, Altria Group, Inc. and its subsidiaries are subject to governmental investigations on a range of matters. Altria Group, Inc. and its subsidiaries cannot predict whether new investigations may be commenced.

*Tobacco Price, Availability and Quality* : Shifts in crops driven by economic conditions and adverse weather patterns, government mandated prices and production control programs may increase or decrease the cost or reduce the quality of tobacco and other agricultural products used to manufacture our products. As with other agriculture commodities, the price of tobacco leaf can be influenced by economic conditions and imbalances in supply and demand and crop quality and availability can be influenced by variations in weather patterns. Tobacco production in certain countries is subject to a variety of controls, including governmental mandated prices

93

Table of Contents

and production control programs. Changes in the patterns of demand for agricultural products and the cost of tobacco production could cause tobacco leaf prices to increase and could result in farmers growing less tobacco. Any significant change in tobacco leaf prices, quality or availability could affect our tobacco subsidiaries' profitability and business.

## Operating Results

| (in millions) | Net Revenues | | | Operating Companies In | | |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | 2007 | 2009 | 2008 | 2007 |
| Cigarettes | $20,919 | $18,753 | $18,470 | $5,055 | $ 4,866 | $ 4,511 |
| Smokeless products | 1,366 | | | 381 | | |
| Cigars | 520 | 387 | 15 | 176 | 164 | 7 |
| Total tobacco space | $22,805 | $19,140 | $18,485 | $5,612 | $ 5,030 | $ 4,518 |

### 2009 compared with 2008

The following discussion compares tobacco space operating results for the year ended December 31, 2009 with the year ended December 31, 2008.

**Cigarettes segment.** Net revenues, which include excise taxes billed to customers, increased $2,166 million (11.6%), reflecting higher pricing related primarily to the FET increase ($5,241 million), partially offset by lower volume ($3,061 million). Net revenues for 2008 included contract volume manufactured for PMI of $298 million.

Operating companies income increased $189 million (3.9%), due primarily to higher list prices ($1,592 million), lower marketing, administration and research costs ($308 million) and lower promotional allowances ($269 million), partially offset by lower volume ($1,614 million), higher direct material and manufacturing costs ($167 million), higher exit and implementation costs ($88 million) primarily related to the previously announced closure of its Cabarrus, North Carolina manufacturing facility, an increase in per unit settlement charges ($60 million) and FDA user fees ($38 million). Lower marketing, administration and research costs primarily reflect the cost reduction initiatives discussed above.

Marketing, administration and research costs include PM USA's cost of administering and litigating product liability claims. Litigation defense costs are influenced by a number of factors, including those discussed in Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K. Principal among these factors are the number and types of cases filed, the number of cases tried annually, the results of trials and appeals, the development of the law controlling relevant legal issues, and litigation strategy and tactics. For the years ended December 31, 2009, 2008 and 2007, product liability defense costs were $220 million, $179 million and $200 million, respectively. The factors that have influenced past product liability defense costs are expected to continue to influence future costs. PM USA does not expect future product liability defense costs to be significantly different from past defense costs.

For 2009, PM USA's domestic cigarette shipment volume of 148.7 billion units was 12.2% lower than 2008, but was estimated to be down about 10.5% when adjusted for changes in trade inventories and calendar differences. Total cigarette industry volume was down an estimated 8% when adjusted for trade inventory changes and calendar differences. The difference in PM USA's volume decline rate versus the total cigarette industry is due primarily to volume lost during the period of FET-related price gap dislocation, share losses on its portfolio brands, as well as higher trade inventory declines on PM USA's brands. PM USA estimates that trade inventories for its cigarettes declined by 17% from the beginning to the end of the year. In the first quarter of 2009, the trade significantly reduced cigarette inventories in anticipation of the April 1, 2009 FET increase. In the second quarter of 2009, the trade rebuilt their inventories, but reduced them again in the second half of the year as they adjusted to lower cigarette category volume and the higher costs associated with maintaining cigarette inventories. This decline disproportionately impacted PM USA's high volume brands. In the premium segment, PM USA's shipment volume decreased 11.8%. *Marlboro* shipment volume decreased 15.0 billion units (10.6%) to 126.5 billion units. In the discount segment, PM USA's shipment volume decreased 17.4%. *Basic* shipment volume decreased 2.9 billion units (23.9%) to 9.2 billion units.

The following table summarizes 2009 and 2008 cigarettes segment volume performance by brand, which includes units sold, as well as promotional units, but excludes Puerto Rico, U.S. Territories, Overseas Military, Philip Morris Duty Free Inc. and 2008 contract manufacturing for PMI (terminated in the fourth quarter of 2008):

| (in billion units) | Shipment Volume For the Years Ended December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Marlboro | 126.5 | 141.5 |
| Parliament | 4.0 | 5.5 |
| Virginia Slims | 5.2 | 6.3 |
| Basic | 9.2 | 12.1 |
| Other | 3.8 | 4.0 |
| Total Cigarettes | 148.7 | 169.4 |

*Marlboro*'s retail share for 2009 declined 0.1 share point versus 2008, driven primarily by higher levels of competitive promotional spending. *Marlboro* focused on maximizing its profitability by moderately spending targeted promotional money in response to heightened competitive spending, and grew its margins in 2009 versus 2008. PM USA also profitably reset the retail share positions of the balance of its brand portfolio, which held a relatively stable combined retail share in the second half of 2009 at a higher profit level than prior to the FET increase.

Effective in the first quarter of 2009, cigarettes segment retail share results are based on data from the Information Resources, Inc. ("IRI")/Capstone Integrated Retail Panel, which is a customized retail tracking service that uses a

94

Table of Contents

sample of stores to project market share performance in retail stores selling cigarettes. The panel was not designed to capture sales through other channels, including the Internet and direct mail. This service was developed to provide a comprehensive measure of market share in retail outlets selling cigarettes similar to the previous service. Market share data for 2008 in the table below have been restated to reflect this service.

The following table summarizes cigarettes segment retail share performance based on this retail tracking service:

| | Retail Share For the Years Ended December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Marlboro | 41.8% | 41.9% |
| Parliament | 1.6 | 1.9 |
| Virginia Slims | 1.8 | 2.0 |
| Basic | 3.4 | 3.8 |
| Other | 1.3 | 1.3 |
| Total Cigarettes | 49.9% | 50.9% |

During the years ended December 31, 2009, 2008 and 2007 PM USA executed the following pricing and promotional allowance actions:

■  Effective October 28, 2009, PM USA increased the list price on *Marlboro*, *Basic* and *L&M* by $0.06 per pack. In addition, PM USA increased the list price on all of its other brands by $0.08 per pack.

■  Effective March 9, 2009, PM USA increased the list price on *Marlboro*, *Parliament*, *Virginia Slims*, *Basic* and *L&M* by $0.71 per pack. In addition, PM USA increased the list price on all of its other premium brands by $0.81 per pack.

■  Effective February 9, 2009, PM USA increased the list price on *Marlboro*, *Parliament*, *Virginia Slims*, *Basic* and *L&M* by $0.09 per pack. In addition, PM USA increased the list price on all of its other premium brands by $0.18 per pack.

■  Effective December 29, 2008, PM USA increased its wholesale promotional allowance on *L&M* by $0.29 per pack, from $0.26 to $0.55.

■  Effective December 15, 2008, PM USA reduced its wholesale promotional allowances on *Marlboro* and *Basic* by $0.05 per pack, from $0.26 to $0.21, and raised the price on its other brands, except for *L&M*, by $0.05 per pack.

■  Effective May 5, 2008, PM USA reduced its wholesale promotional allowances on *Marlboro*, *Basic* and *L&M* by $0.09 per pack, from $0.35 to $0.26, and eliminated the $0.20 per pack wholesale promotional allowances on *Parliament*. In addition, PM USA increased the list price on its other brands by $0.09 per pack.

■  Effective January 7, 2008, PM USA reduced its wholesale promotional allowances on *Parliament* by $0.15 per

pack from $0.35 to $0.20, and eliminated the $0.20 per pack wholesale promotional allowances on *Virginia Slims*.

■  Effective September 10, 2007, PM USA reduced its wholesale promotional allowances on *Marlboro*, *Parliament* and *Basic* by $0.05 per pack, from $0.40 to $0.35, and *Virginia Slims* by $0.20 per pack, from $0.40 to $0.20. In addition, PM USA raised the list price on its other brands by $0.05 per pack effective September 10, 2007 and by $0.20 per pack effective February 12, 2007.

**Smokeless products segment.** Altria Group, Inc. acquired UST and its smokeless tobacco business, USSTC, on January 6, 2009. As a result, USSTC's financial results from January 6 through December 31, 2009 are included in Altria Group, Inc.'s 2009 consolidated and segment results. In addition, the smokeless products segment includes PM USA's smokeless products.

Net revenues, which include excise taxes billed to customers, were $1,366 million. Operating companies income was $381 million. Results were negatively impacted by costs related primarily to the acquisition of UST. These costs primarily consisted of employee separation costs ($166 million), asset impairments ($27 million), integration costs ($43 million) and inventory adjustments ($15 million), as well as costs associated with PM USA's smokeless products, and actions taken to enhance the value equation on USSTC's moist smokeless tobacco ("MST") brands. In March 2009, USSTC announced a national wholesale incentive program that lowered the list price of some of USSTC's brands, including *Copenhagen* and *Skoal*, by $0.62 per can, effective March 29, 2009.

The smokeless products segment domestic shipment volume for the period January 6 through December 31, 2009 was 634.7 million units (measured in cans and packs). Including the volume of 10.9 million cans shipped from January 1 through January 5, 2009, which was prior to the acquisition of UST, total volume for the full year ended December 31, 2009 was 645.6 million units (measured in cans and packs). The smokeless products segment domestic shipment volume for 2009 (full year results) declined 2.4% versus 2008, due primarily to changes in trade inventories. USSTC believes disproportionate trade inventory declines on its products were due to a number of factors, including the discontinuation of multi-can promotional deals and its *Rooster* brand, and the change in the shipping unit from ten to five can rolls. These volume declines were partially offset by the introduction of *Copenhagen* Long Cut Wintergreen in November 2009.

After adjusting for trade inventory changes, pipeline volume for the expansion of *Marlboro* snus and the discontinuation of USSTC's *Rooster* brand, the smokeless products segment shipment volume for 2009 was estimated to be up approximately 1%. USSTC believes that the overall smokeless category's volume grew at an estimated rate of approximately 7% in 2009.

95

Table of Contents

The following table summarizes smokeless products segment volume performance by brand (full year results), which includes cans and packs sold, as well as promotional units, but excludes international volume. Other includes *Marlboro* snus, a PM USA spit-less tobacco product. One pack of snus is equivalent to a can of MST. Volume from 2008 represents only domestic volume shipped by USSTC prior to the UST acquisition.

| | Shipment Volume For the Years Ended December 31, | |
|---|---|---|
| (cans and packs in millions) | 2009 | 2008 |
| Copenhagen | 280.6 | 276.9 |
| Skoal | 265.4 | 271.8 |
| Copenhagen and Skoal | 546.0 | 548.7 |
| Red Seal/Other | 99.6 | 112.7 |
| Total Smokeless products | 645.6 | 661.4 |

In the fourth quarter of 2009, USSTC and PM USA's combined retail share of smokeless products increased 0.9 share points versus the third quarter of 2009. *Copenhagen*'s retail share grew 1.5 share points versus the third quarter of 2009 as the brand benefited from the introduction of *Copenhagen* Long Cut Wintergreen. *Skoal*'s retail share declined 0.2 share points versus the third quarter of 2009.

The following table summarizes the smokeless products segment sequential retail share performance (full quarterly results, excluding international volume), based on data from IRI, InfoScan Smokeless Tobacco Database for Food, Drug, Mass Merchandisers (excluding Wal-Mart) and Convenience trade classes, which tracks smokeless products market share performance. Smokeless products are defined as MST and spit-less tobacco products. One pack of snus or other spit-less tobacco product is equivalent to a can of MST for share measurement purposes. It is IRI's standard practice to periodically refresh their InfoScan syndicated services, and therefore prior period retail share results have been restated.

| | Retail Share For the Three Months Ended | | | |
|---|---|---|---|---|
| | December 31, 2009 | September 30, 2009 | June 30, 2009 | March 31, 2009 |
| Copenhagen | 24.7% | 23.2% | 23.0% | 23.8% |
| Skoal | 23.4 | 23.6 | 23.9 | 24.1 |
| RedSeal/Other | 6.6 | 7.0 | 7.4 | 8.4 |
| Total Smokeless products | 54.7% | 53.8% | 54.3% | 56.3% |

**Cigars segment.** Net revenues, which include excise taxes billed to customers, increased $133 million (34.4%), reflecting higher pricing related primarily to the FET increase ($148 million), partially offset by lower volume ($15 million).

Operating companies income increased $12 million (7.3%), due primarily to higher pricing ($45 million) and lower integration costs ($9 million), partially offset by higher manufacturing costs primarily related to new products ($22 million), lower volume ($12 million) and higher marketing, administration and research costs ($8 million).

For 2009, Middleton's cigar shipment volume declined 3.6% versus 2008, due primarily to declines in trade inventories. Middleton believes that trade inventory declines on its products were due partially to the movement to the more efficient Altria Sales & Distribution system, which significantly reduced wholesale delivery lead times. After adjusting for changes in trade inventories, Middleton's shipment volume was estimated to be up slightly for 2009. Middleton believes that the machine-made large cigars category's growth slowed after the FET increase, resulting in a category that slightly declined. Middleton defines machine-made large cigars as cigars made by machine that weigh greater than three pounds per thousand, except cigars sold at retail in packages of 20 cigars.

The following table summarizes cigars segment volume performance:

| | Shipment Volume For the Years Ended December 31, | |
|---|---|---|
| (units in millions) | 2009 | 2008 |
| Black & Mild | 1,228 | 1,266 |
| Other | 31 | 41 |
| Total Cigars | 1,259 | 1,307 |

Middleton achieved strong retail share results for 2009 behind the strength of its leading brand, *Black & Mild*. Middleton achieved a 30.5% retail share of the machine-made large cigars segment for 2009, up 1.2 share points versus 2008. *Black & Mild*'s retail share increased 1.3 share points in 2009 versus 2008 to 29.9% of the machine-made large cigar segment.

Effective with the first quarter of 2009, cigar retail share results are based on data from IRI, InfoScan Cigar Database for Food, Drug, Mass Merchandisers (excluding Wal-Mart) and Convenience trade classes, which tracks machine-made large cigars market share performance using Middleton's definition of machine-made large cigars. This service was developed to provide a representation of retail business performance in key trade channels. Market share data for 2008 in the table below have been restated to reflect this service. It is IRI's standard practice to periodically refresh their InfoScan syndicated services.

The following table summarizes cigars segment retail share performance:

| | Retail Share For the Years Ended December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Black & Mild | 29.9% | 28.6% |
| Other | 0.6 | 0.7 |
| Total Cigars | 30.5% | 29.3% |

During the years ended December 31, 2009 and 2008, Middleton executed the following pricing actions:

- Effective March 4, 2009, Middleton executed various list price increases across substantially all of its brands resulting in a weighted-average increase of approximately $0.40 per five-pack.

96

Table of Contents

■ Effective February 11, 2009, Middleton increased the list price on all of its brands by approximately $0.20 per five-pack.

■ Effective January 28, 2009, Middleton increased the list price on substantially all of its brands by $0.08 per five-pack.

■ Effective September 02, 2008, Middleton increased the list price on substantially all of its brands by approximately $0.07 per five-pack.

■ Effective February 18, 2008, Middleton increased the list price on substantially all of its brands by approximately $0.07 per five-pack.

Subsequent to year end, effective January 11, 2010, Middleton executed various list price increases across substantially all of its brands resulting in a weighted-average increase of approximately $0.18 per five-pack.

### 2008 compared with 2007

The following discussion compares tobacco space operating results for the year ended December 31, 2008 with the year ended December 31, 2007.

**Cigarettes.** Net revenues, which include excise taxes billed to customers, increased $283 million (1.5%) due primarily to lower wholesale promotional allowance rates ($679 million), partially offset by lower volume ($390 million). Net revenues for 2008 included contract manufacturing for PMI of $298 million.

Operating companies income increased $355 million (7.9%), due primarily to lower wholesale promotional allowance rates, net of higher ongoing resolution and leaf costs ($532 million), lower pre-tax charges in 2008 for asset impairment, exit and implementation costs related to the announced closing of the Cabarrus, North Carolina cigarette manufacturing facility ($253 million), and lower general and administrative expenses ($168 million, which includes a $26 million provision for the *Scott* case in Louisiana in 2007), partially offset by lower volume ($359 million), higher promotional costs ($101 million), costs related to the reduction of volume produced for PMI ($100 million), and exit costs related to the company-wide integration and restructuring program ($48 million). Lower general and administrative expenses primarily reflect the cost reduction initiatives discussed above.

PM USA's shipment volume was 169.4 billion units, a decrease of 3.2% or 5.7 billion units, and was estimated to be down approximately 4% when adjusted for changes in trade inventories and calendar differences. In the premium segment, PM USA's shipment volume decreased 3.0%. *Marlboro* shipment volume decreased 2.9 billion units (2.0%) to 141.5 billion units. In the discount segment, PM USA's shipment volume decreased 6.5%, with *Basic* shipment volume down 8.5% to 12.1 billion units.

The following table summarizes cigarettes segment volume performance by brand, which includes units sold, as well as promotional units, but excludes Puerto Rico, U.S. Territories, Overseas Military, Philip Morris Duty Free Inc. and

contract manufacturing for PMI (terminated in the fourth quarter of 2008), for 2008 and 2007:

|  | Shipment Volume For the Years Ended December 31, | |
|---|---|---|
| (in billion units) | 2008 | 2007 |
| Marlboro | 141.5 | 144.4 |
| Parliament | 5.5 | 6.0 |
| Virginia Slims | 6.3 | 7.0 |
| Basic | 12.1 | 13.2 |
| Other | 4.0 | 4.5 |
| Total Cigarettes | 169.4 | 175.1 |

The following table summarizes cigarettes segment retail share performance, based on data from the IRI/Capstone Total Retail Panel, which was a tracking service that used a sample of stores to project market share performance in retail stores selling cigarettes. This panel was not designed to capture sales through other channels, including Internet and direct mail:

|  | Retail Share For the Years Ended December 31, | |
|---|---|---|
|  | 2008* | 2007* |
| Marlboro | 41.6% | 41.0% |
| Parliament | 1.8 | 1.9 |
| Virginia Slims | 2.0 | 2.2 |
| Basic | 3.9 | 4.1 |
| Other | 1.4 | 1.4 |
| Total Cigarettes | 50.7% | 50.6% |

* Due to the commencement date of the new cigarettes tracking service discussed above, the 2007 share data was not restated. For comparative purposes, the 2008 share data presented in this table is reported on the same basis as the 2007 share data.

**Cigars.** In December 2007, Altria Group, Inc. acquired Middleton. Earnings from December 12, 2007 to December 31, 2007, the amounts of which were insignificant, were included in Altria Group, Inc.'s consolidated operating results. For the year ended December 31, 2008, net revenues, which include excise taxes billed to customers, were $387 million. Operating companies income was $164 million, which includes a pre-tax charge of $18 million for integration costs.

For 2008, cigars shipment volume increased 6.2% versus 2007 to 1,307 million units, driven by Middleton's leading brand *Black & Mild*. The following table summarizes cigars segment volume performance:

|  | Shipment Volume For the Years Ended December 31, | |
|---|---|---|
| (units in millions) | 2008 | 2007 |
| Black & Mild | 1,266 | 1,181 |
| Other | 41 | 49 |
| Total Cigars | 1,307 | 1,230 |

Middleton achieved a retail share of 29.1% of the machine-made large cigar segment in 2008 which represents an increase of 2.5 share points versus the prior-year period, driven by *Black & Mild*. Retail share for *Black & Mild* increased 2.8 share points versus the prior-year to 28.3% of

97

Table of Contents

the machine-made large cigar segment. Retail share performance is based on the 52-week periods ending December 21, 2008 and December 23, 2007 from the IRI Cigar Database for Food, Drug, Mass Merchandise (excluding Wal-Mart) and Convenience trade classes, which tracks cigar market share performance.

The following table summarizes cigars segment retail share performance:

| | Retail Share For the Years Ended December 31, | |
|---|---|---|
| | 2008* | 2007* |
| Black & Mild | 28.3% | 25.5% |
| Other | 0.8 | 1.1 |
| Total Cigars | 29.1% | 26.6% |

* Due to the commencement date of the new cigar tracking service discussed above, the 2007 share data was not restated. For comparative purposes, the 2008 share data presented in this table is reported on the same basis as the 2007 share data.

## Wine segment

### Business Environment

Ste. Michelle is a leading producer of Washington state wines, primarily *Chateau Ste. Michelle* and *Columbia Crest*, and owns wineries in or distributes wines from several other wine regions. As discussed in Note 22, and Item 3. Legal Proceedings to Altria Group, Inc.'s 2009 Form 10-K, Ste. Michelle holds an 85% ownership interest in Michelle-Antinori, LLC, which owns *Stag's Leap Wine Cellars* in Napa Valley. Ste. Michelle also owns *Conn Creek* in Napa Valley and *Erath* in Oregon. In addition, Ste. Michelle distributes Antinori and Villa Maria Estate wines and *Champagne Nicolas Feuillatte* in the United States. A key element of Ste. Michelle's strategy is expanded domestic distribution of its wines, especially in certain account categories such as restaurants, wholesale clubs, supermarkets, wine shops and mass merchandisers.

Ste. Michelle's business is subject to significant competition, including competition from many larger, well-established domestic and international companies, as well as from many smaller wine producers. Wine segment competition is primarily based on quality, price, consumer and trade wine tastings, competitive wine judging, third-party acclaim and advertising.

Federal, state and local governmental agencies regulate the alcohol beverage industry through various means, including licensing requirements, pricing, labeling and advertising restrictions, and distribution and production policies. Further regulatory restrictions or additional excise or other taxes on the manufacture and sale of alcoholic beverages may have an adverse effect on Ste. Michelle's wine business.

### Operating Results

Altria Group, Inc. acquired UST and its premium wine business, Ste. Michelle, on January 6, 2009. As a result, Ste. Michelle's financial results from January 6 through December 31, 2009 are included in Altria Group, Inc.'s con -

solidated and segment results for the year ended December 31, 2009. For the year ended December 31, 2009, net revenues for the wine segment were $403 million. Operating companies income was $43 million, which included pre-tax charges of $30 million related to the UST acquisition, consisting of inventory adjustments, exit and integration costs.

For the year ended December 31, 2009, Ste. Michelle's wine shipment volume of 6.0 million cases was 2.1% lower than 2008. This decrease was due primarily to wholesale inventory reductions, and lower on-premise channel volume that includes restaurants and bars. In addition, Ste. Michelle's wine shipment volume was negatively impacted by the suspension of shipments during the first week of January 2009 to take inventory prior to the closing of the UST acquisition, and wholesalers built inventories in the last few weeks of 2008 in advance of this suspension.

The following table summarizes wine segment case shipment volume performance by brand. Volume from 2008 represents volume shipped by Ste. Michelle prior to the UST acquisition:

| | Shipment Volume For the Years Ended December 31, | |
|---|---|---|
| (cases in thousands) | 2009 | 2008 |
| Chateau Ste. Michelle | 2,034 | 1,931 |
| Columbia Crest | 1,968 | 2,137 |
| Other | 2,003 | 2,066 |
| Total Wine | 6,005 | 6,134 |

In 2009, Ste. Michelle's retail volume, as measured by Nielsen Total Wine Database – U.S. Food & Drug (Nielsen), increased 10% versus 2008. The total wine industry's retail volume for 2009, as measured by Nielsen, increased 2% versus 2008.

## Financial services segment

### Business Environment

In 2003, PMCC ceased making new investments and began focusing exclusively on managing its existing portfolio of finance assets in order to maximize gains and generate cash flow from asset sales and related activities. Accordingly, PMCC's operating companies income will fluctuate over time as investments mature or are sold. During 2009, 2008 and 2007, proceeds from asset sales and bankruptcy recoveries totaled $793 million, $403 million and $486 million, respectively, and gains included in operating companies income totaled $257 million, $87 million and $274 million, respectively.

Included in the proceeds for 2007 were partial recoveries of amounts previously charged to earnings in the allowance for losses related to PMCC's airline exposure. The operating companies income associated with these recoveries, which is included in the gains shown above, was $214 million for the year ended December 31, 2007.

98

Table of Contents

The activity in the allowance for losses on finance assets for the years ended December 31, 2009, 2008 and 2007 was as follows:

| (in millions) | 2009 | 2008 | 2007 |
|---|---|---|---|
| Balance at beginning of year | $304 | $204 | $ 480 |
| Increase (decrease) to provision | 15 | 100 | (129) |
| Amounts written-off | (53) | | (147) |
| Balance at end of year | $266 | $304 | $ 204 |

PMCC leases under several lease arrangements various types of automotive manufacturing equipment to GM, which filed for bankruptcy on June 1, 2009. Since GM's bankruptcy filing, PMCC has not recorded income on the GM leases. In the third quarter of 2009, GM rejected one of the leases, which resulted in a $49 million write-off against PMCC's allowance for losses. The remaining GM leases, which expire from 2012 through 2023, represent approximately 3% of PMCC's portfolio of finance assets at December 31, 2009.

On October 30, 2009 General Motors LLC ("New GM"), which is the successor of GM's North American automobile business, signed several agreements with PMCC. Pursuant to these agreements, New GM has agreed to lease substantially all the remaining equipment under the same terms as GM, except for a rebate of a portion of future rents. The agreements will become effective upon court approval of the assignment of the leases to New GM, which PMCC anticipates will occur in the first quarter 2010. GM will reject one additional lease that will not be assigned to New GM. The impact of the rent rebates and the additional lease rejection have been factored into PMCC's assessment of the allowance for losses at December 31, 2009. Foreclosure of rejected lease properties will result in an acceleration of deferred tax payments on such leases.

All other PMCC lessees are current on their lease payment obligations. PMCC continues to monitor economic and credit conditions, and the individual situations of its lessees, and may have to increase its allowance for losses if such conditions worsen.

During 2009, PMCC increased its allowance for losses by $15 million based on management's assessment of its portfolio, including its exposure to GM. During 2008, PMCC increased its allowance for losses by $100 million primarily as a result of credit rating downgrades of certain lessees and financial market conditions.

The net impact to the allowance for losses for 2007 related primarily to various airline leases. Amounts recovered of $129 million in 2007 related to partial recoveries of amounts charged to earnings in the allowance for losses in prior years. In addition in 2007, PMCC recovered $85 million related to amounts previously charged to earnings and written-off in prior years. In total, these recoveries resulted in additional operating companies income of $214 million for the year ended December 31, 2007. Acceleration of taxes on the foreclosures of leveraged leases written off amounted to approximately $50 million in 2007. There were no foreclosures in 2009 and 2008.

PMCC's portfolio remains diversified by lessee, investment category and asset type. As of December 31, 2009, 74% of PMCC's lessees were investment grade as defined by Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services ("Standard & Poor's"). Excluding aircraft lease investments, 87% of PMCC's lessees were investment grade.

At December 31, 2009 PMCC's portfolio included five aircraft under leveraged leases with Mesa Airlines, Inc. ("Mesa") with a finance asset balance of $21 million. PMCC's interest in these leases was secured by letters of credit issued by Citicorp North America, Inc. On January 5, 2010, Mesa filed for Chapter 11 bankruptcy protection. As a result of the bankruptcy filing PMCC drew on the letters of credit and recovered its outstanding investment.

PMCC has one remaining transaction with indirect exposure to Ambac Assurance Corporation, a credit support provider whose credit rating remains below investment grade. This risk is mitigated by the underlying strength of the lessee and the quality of the leased asset.

See Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K for a discussion of the IRS disallowance of certain benefits pertaining to several PMCC leveraged lease transactions.

## Operating Results

| (in millions) | Net Revenues | | | Operating Companies Income | | |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | 2007 | 2009 | 2008 | 2007 |
| Financial services | $348 | $216 | $179 | $270 | $ 71 | $380 |

PMCC's net revenues for 2009 increased $132 million (61.1%) from 2008, due primarily to higher gains on asset sales, partially offset by lower lease revenues as a result of lower investment balances. PMCC's operating companies income for 2009 increased $199 million (100+%) from 2008, due primarily to higher gains on asset sales and a lower increase to the allowance for losses, partially offset by lower lease revenues.

PMCC's net revenues for 2008 increased $37 million (20.7%) from 2007, due primarily to higher gains on asset sales. PMCC's operating companies income for 2008 decreased $309 million (81.3%) from 2007, due primarily to 2007 cash recoveries of $214 million on aircraft leases which had been previously written down, as well as an increase in 2008 to the allowance for losses of $100 million related to credit rating downgrades of certain lessees and financial market conditions.

Powered by Morningstar® Document Research℠

Table of Contents

## Financial Review

Net Cash Provided by Operating Activities, Continuing Operations

During 2009, net cash provided by operating activities on a continuing operations basis was $3.4 billion, compared with $3.2 billion during 2008. The increase in cash provided by operating activities was due primarily to lower income taxes paid during 2009.

During 2008, net cash provided by operating activities on a continuing operations basis was $3.2 billion, compared with $4.6 billion during 2007. The decrease in cash provided by operating activities was due primarily to the return of the escrow bond for the *Engle* tobacco case in 2007 and higher settlement charge payments in 2008, partially offset by payments for the reimbursement of Kraft's federal income tax contingencies in 2007.

Net Cash Provided by (Used in) Investing Activities, Continuing Operations

Altria Group, Inc. and its subsidiaries from time to time consider acquisitions as evidenced by the acquisitions of UST in January 2009 and Middleton in December 2007. For further discussion, see Note 3.

During 2009, net cash used in investing activities on a continuing operations basis was $9.8 billion, compared with net cash provided of $796 million during 2008. This change was due primarily to the acquisition of UST in January 2009 and proceeds from the sale of Altria Group, Inc.'s corporate headquarters building in New York City during 2008, partially offset by higher proceeds from finance asset sales in 2009.

During 2008, net cash provided by investing activities on a continuing operations basis was $796 million, compared with net cash used of $2.7 billion during 2007. This change was due primarily to the acquisition of Middleton in December 2007, proceeds from the sale of Altria Group, Inc.'s corporate headquarters building in New York City during 2008 and lower capital expenditures in 2008.

Capital expenditures for 2009 increased 13.3% to $273 million. The expenditures were primarily for modernization and consolidation of manufacturing facilities and expansion of certain production capacity. Capital expenditures for 2010 are expected to be under $250 million, and are expected to be funded from operating cash flows.

Net Cash Provided by (Used in) Financing Activities, Continuing Operations

During 2009, net cash provided by financing activities on a continuing operations basis was $276 million, compared with net cash used of $937 million during 2008. This change was due primarily to the following:
  ■ lower dividends paid on Altria Group, Inc. common stock during 2009 as a result of the PMI spin-off;

  ■ cash used in 2008 to repurchase common stock under the share repurchase program which was suspended indefinitely in September 2009;

  ■ debt tender offers during the first quarter of 2008 which resulted in the repayment of debt, as well as the payment of tender and consent fees; and

  ■ a payment of $449 million to PMI during 2008 as a result of the spin-off related modifications to Altria Group, Inc. stock awards;

partially offset by:

  ■ dividends received from PMI during the first quarter of 2008; and

  ■ lower issuances of long-term debt during 2009.

During 2008 and 2007, net cash used in financing activities on a continuing operations basis was $937 million and $148 million, respectively. The increase of $789 million was due primarily to the following:

  ■ lower dividends received from PMI during 2008;

  ■ debt tender offers during the first quarter of 2008 which resulted in the repayment of debt, as well as the payment of tender and consent fees;

  ■ cash used in 2008 to repurchase common stock;

  ■ dividends received from Kraft in 2007; and

  ■ a payment of $449 million to PMI during 2008 and a receipt of $179 million from Kraft during 2007 as a result of the spin-off related modifications to Altria Group, Inc. stock awards;

partially offset by:

  ■ $6.8 billion issuance of long-term notes in 2008, the proceeds of which were used to partially fund the acquisition of UST in January 2009; and

  ■ lower dividends paid on Altria Group, Inc. common stock during 2008 as a result of the Kraft and PMI spin-offs.

Debt and Liquidity

*Credit Ratings* – At December 31, 2009, the credit ratings and outlook for Altria Group, Inc.'s indebtedness by major credit rating agencies were:

| | Short-term Debt | Long-term Debt | Outlook |
|---|---|---|---|
| Moody's | P-2 | Baa1 | Negative |
| Standard & Poor's | A-2 | BBB | Stable |
| Fitch | F2 | BBB+ | Stable |

*Credit Lines* – At December 31, 2009 and 2008, Altria Group, Inc. had no short-term borrowings under its credit lines.

100

Powered by Morningstar® Document Research℠

Table of Contents

At December 31, 2009, the credit lines for Altria Group, Inc. and related activity were as follows:

| (in billions) Type | Credit Lines | Amount Drawn | Commercial Paper Outstanding | Lines Available |
|---|---|---|---|---|
| 364-Day Agreement | $ 0.6 | $ — | $ — | $ 0.6 |
| 3-Year Agreement | 2.4 | | | 2.4 |
| | $ 3.0 | $ — | $ — | $ 3.0 |

On November 20, 2009, Altria Group, Inc. entered into a senior unsecured 364-day revolving credit agreement (the "364-Day Agreement") and a senior unsecured 3-year revolving credit agreement (the "3-Year Agreement" and, together with the 364-Day Agreement, the "Revolving Credit Agreements"). The 364-Day Agreement provides for borrowings up to an aggregate principal amount of $0.6 billion and expires on November 19, 2010. The 3-Year Agreement provides for borrowings up to an aggregate principal amount of $2.4 billion and expires on November 20, 2012. Pricing under the Revolving Credit Agreements may be modified in the event of a change in the rating of Altria Group, Inc.'s long-term senior unsecured debt. Interest rates on borrowings under the Revolving Credit Agreements will be based on the London Interbank Offered Rate ("LIBOR") plus a percentage equal to Altria Group, Inc.'s credit default swap spread subject to certain minimum rates and maximum rates based on the higher of the rating of Altria Group, Inc.'s long-term senior unsecured debt from Standard & Poor's and Moody's. The applicable minimum and maximum rates based on Altria Group, Inc.'s long-term senior unsecured debt ratings at December 31, 2009 are 2.0% and 4.0%, respectively. The Revolving Credit Agreements do not include any other rating triggers, nor do they contain any provisions that could require the posting of collateral.

The Revolving Credit Agreements replace Altria Group, Inc.'s prior $3.4 billion 5-year revolving credit agreement, which was due to expire on April 15, 2010, but was terminated effective November 20, 2009. The Revolving Credit Agreements will be used for general corporate purposes and to support Altria Group, Inc.'s commercial paper issuances. The Revolving Credit Agreements require that Altria Group, Inc. maintain (i) a ratio of debt to earnings before interest, taxes, depreciation and amortization ("EBITDA") of not more than 3.0 to 1 and (ii) a ratio of EBITDA to interest expense of not less than 4.0 to 1. At December 31, 2009, the ratios of debt to EBITDA and EBITDA to interest expense, calculated in accordance with the Revolving Credit Agreements, were 1.9 to 1.0 and 5.3 to 1.0, respectively. Altria Group, Inc. expects to continue to meet its covenants associated with the Revolving Credit Agreements.

In connection with the acquisition of UST, Altria Group, Inc. had in place at December 31, 2008, a 364-day term

bridge loan facility ("Bridge Facility"). On January 6, 2009, Altria Group, Inc. borrowed the entire available amount of $4.3 billion under the Bridge Facility to fund in part the acquisition of UST (see Note 3). As discussed in Note 11, in February 2009, Altria Group, Inc. issued $4.2 billion of senior unsecured long-term notes. The net proceeds from the issuance of these notes, along with available cash, were used to prepay all of the outstanding borrowings under the Bridge Facility. Upon such prepayment, the Bridge Facility was terminated.

Any commercial paper of Altria Group, Inc. and borrowings under the Revolving Credit Agreements are fully and unconditionally guaranteed by PM USA as further discussed in Note 23. *Condensed Consolidating Financial Information* to the consolidated financial statements ("Note 23").

*Financial Market Environment* – Despite volatile financial market conditions, Altria Group, Inc. believes it has adequate liquidity and access to financial resources to meet its anticipated obligations in the foreseeable future. Altria Group, Inc. continues to monitor the credit quality of its bank group and is not aware of any potential non-performing credit provider in that group. Altria Group, Inc. believes the lenders in its bank group will be willing and able to advance funds in accordance with their legal obligations.

*Debt* — Altria Group, Inc.'s total consumer products debt was $12.0 billion and $7.0 billion at December 31, 2009 and December 31, 2008, respectively. As discussed in Note 11, the increase in total consumer products debt relates to the February 2009 issuance of $4.2 billion of long-term notes, and the recording of UST's debt, partially offset by repayments. Financial services debt of $500 million at December 31, 2008 matured and was repaid in July 2009. All consumer products debt was fixed-rate debt at December 31, 2009. Approximately 98% of total consumer products debt was fixed-rate debt at December 31, 2008. The weighted average interest rate on total consumer products debt was approximately 9.0% at December 31, 2009 and 2008, respectively. For further details on long-term debt, see Note 11.

Off-Balance Sheet Arrangements and Aggregate Contractual Obligations

Altria Group, Inc. has no off-balance sheet arrangements, including special purpose entities, other than guarantees and contractual obligations that are discussed below.

*Guarantees and Redeemable Noncontrolling Interest* – As discussed in Note 22, *and Item 3. Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K, Altria Group, Inc. had guarantees (including third-party guarantees) and a redeemable noncontrolling interest outstanding at December 31, 2009. In addition, as discussed in Note 23, PM USA has issued guarantees related to Altria Group, Inc.'s indebtedness.

101

Table of Contents

*Aggregate Contractual Obligations* – The following table summarizes Altria Group, Inc.'s contractual obligations at December 31, 2009:

| (in millions) | Total | 2010 | 2011-2012 | 2013-2014 | 2015 and Thereafter |
|---|---|---|---|---|---|
| Long-term debt (1) – Consumer products | $12,001 | $ 775 | $ 600 | $1,984 | $ 8,642 |
| Interest on borrowings (2) | 14,507 | 1,058 | 2,061 | 1,838 | 9,550 |
| Operating leases (3) | 302 | 61 | 74 | 39 | 128 |
| Purchase obligations (4): | | | | | |
| Inventory and production costs | 2,028 | 683 | 891 | 280 | 174 |
| Other | 834 | 544 | 226 | 64 | |
| | 2,862 | 1,227 | 1,117 | 344 | 174 |
| Other long-term liabilities (5) | 2,464 | 138 | 320 | 343 | 1,663 |
| | $32,136 | $3,259 | $4,172 | $4,548 | $ 20,157 |

(1) Amounts represent the expected cash payments of Altria Group, Inc.'s long-term debt.

(2) Amounts represent the expected cash payments of Altria Group, Inc.'s interest expense on its long-term debt, including the current portion of long-term debt. Interest on Altria Group, Inc.'s debt, which is all fixed-rate debt at December 31, 2009, is presented using the stated interest rate. Amounts exclude the amortization of debt discounts, the amortization of loan fees and fees for lines of credit that would be included in interest expense in the consolidated statements of earnings.

(3) Amounts represent the minimum rental commitments under non-cancelable operating leases.

(4) Purchase obligations for inventory and production costs (such as raw materials, indirect materials and supplies, packaging, storage and distribution) are commitments for projected needs to be utilized in the normal course of business. Other purchase obligations include commitments for marketing, capital expenditures, information technology and professional services. Arrangements are considered purchase obligations if a contract specifies all significant terms, including fixed or minimum quantities to be purchased, a pricing structure and approximate timing of the transaction. Most arrangements are cancelable without a significant penalty, and with short notice (usually 30 days). Any amounts reflected on the consolidated balance sheet as accounts payable and accrued liabilities are excluded from the table above.

(5) Other long-term liabilities consist of postretirement health care costs. The following long-term liabilities included on the consolidated balance sheet are excluded from the table above: accrued pension and postemployment costs, income taxes and tax contingencies, insurance accruals and other accruals. Altria Group, Inc. is unable to estimate the timing of payments (or contributions in the case of accrued pension costs) for these items. Currently, Altria Group, Inc. anticipates making pension contributions of approximately $20 million to $50 million in 2010, based on current tax law (as discussed in Note 18).

The State Settlement Agreements and related legal fee payments, payments for tobacco growers and FDA user fees, as discussed below and in Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K, are excluded from the table above, as the payments are subject to adjustment for several factors, including inflation, market share and industry volume. Litigation escrow deposits, as discussed below and in Note 22, and Item 3. *Legal Proceed ings* to Altria Group, Inc.'s 2009 Form 10-K, are also excluded from the table above since these deposits will be returned to PM USA should it prevail on appeal.

*Payments Under State Settlement and Other Tobacco Agreements, and FDA Regulation* – As discussed previously and in Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K, PM USA has entered into State Settlement Agreements with the states and territories of the United States and also entered into a trust agreement to provide certain aid to U.S. tobacco growers and quota holders, but PM USA's obligations under this trust have now been eliminated by the obligations imposed on PM USA by FETRA. USSTC and Middleton are also subject to obligations imposed by FETRA. In addition, in June 2009, PM USA and a subsidiary of USSTC became subject to quarterly user fees imposed by the FDA as a result of the FSPTCA. The State Settlement Agreements, FETRA, and the FDA user fees call for payments that are based on variable factors, such as volume, market share and inflation, depending on the subject payment. Altria Group, Inc.'s subsidiaries account for the cost of the State Settlement Agreements, FETRA and FDA user fees as a component of cost of sales. As a result of the State Settlement Agreements, FETRA and FDA user fees, Altria Group, Inc.'s subsidiaries recorded charges to cost of sales for the years ended December 31, 2009, 2008 and 2007 of $5.0 billion, $5.5 billion and $5.5 billion, respectively.

Based on current agreements, 2009 market share and the five-year compounded annual industry volume decline rate for 2003-2008 (2009 industry volume decline rate is excluded due to the one time volume impacts of the federal excise tax increase), the estimated amounts that Altria Group, Inc.'s subsidiaries may charge to cost of sales for these payments will be approximately as follows:

| (in billions) | |
|---|---|
| 2010 | $5.1 |
| 2011 | 5.2 |
| 2012 | 5.2 |
| 2013 | 5.2 |
| 2014 | 5.2 |
| Thereafter | 5.0 annually |

The estimated amounts due under the State Settlement Agreements and FETRA charged to cost of sales in each of the years above would generally be paid in the following year. The amounts charged to cost of sales for the FDA user fees are paid in the quarter in which the fees are incurred. As previously stated, the payments due under the terms of the State Settlement Agreements, FETRA and FDA user fees are subject to adjustment for several factors, including volume, inflation and certain contingent events and, in general, are allocated based on each manufacturer's market share. The amounts shown in the table above are estimates, and actual amounts will differ as underlying assumptions differ from actual future results. See Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K, *for a discussion of proceedings* that may result in a downward adjustment of amounts


Table of Contents

paid under State Settlement Agreements for the years 2003 to 2008.

*Litigation Escrow Deposits* — With respect to certain adverse verdicts currently on appeal, as of December 31, 2009, PM USA has posted various forms of security totaling approximately $97 million, the majority of which have been collateralized with cash deposits, to obtain stays of judgments pending appeals. These cash deposits are included in other assets on the consolidated balance sheets.

As discussed in Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K, in December 2007, $1.2 billion of funds held in an interest-bearing escrow account in connection with obtaining a stay of execution in the *Engle* class action were returned to PM USA. In addition, the $100 million relating to the bonding requirement in the same case has been discharged. Interest income on the $1.2 billion escrow account, prior to its return to PM USA, was paid to PM USA quarterly and was being recorded as earned in interest and other debt expense, net, in the consolidated statements of earnings.

Although litigation is subject to uncertainty and could result in material adverse consequences for the financial condition, cash flows or results of operations of PM USA, UST or Altria Group, Inc. in a particular fiscal quarter or fiscal year, management expects cash flow from operations, together with its Revolving Credit Agreements, to provide sufficient liquidity to meet the ongoing needs of the business.

Equity and Dividends

As discussed in Note 1, on March 28, 2008, Altria Group, Inc. distributed all of its interest in PMI to Altria Group, Inc. stockholders in a tax-free distribution. The PMI distribution resulted in a net decrease to Altria Group, Inc.'s total stockholders' equity of $14.7 billion on March 28, 2008. On March 30, 2007, Altria Group, Inc. distributed all of its remaining interest in Kraft on a pro-rata basis to Altria Group, Inc. stockholders in a tax-free distribution. The Kraft distribution resulted in a net decrease to Altria Group, Inc.'s total stockholders' equity of $30.5 billion on March 30, 2007.

As discussed in Note 13. *Stock Plans* to the consolidated financial statements, during 2009, Altria Group, Inc. issued 5.7 million shares of restricted and deferred stock to eligible employees.

At December 31, 2009, the number of shares to be issued upon exercise of outstanding stock options and vesting of deferred stock was 15.7 million, or 0.8% of shares outstanding.

Dividends paid in 2009 and 2008 were $2.7 billion and $4.4 billion, respectively, a decrease of 39.2%, primarily reflecting an adjusted dividend rate as a result of the PMI spin-off. Following the PMI spin-off, Altria Group, Inc. lowered its dividend so that holders of both Altria Group, Inc. and PMI shares would receive initially, in the aggregate, the same dividends paid by Altria Group, Inc. prior to the PMI spin-off.

During the third quarter of 2009, Altria Group, Inc.'s Board of Directors approved a 6.3% increase in the quarterly dividend to $0.34 per common share. In January 2010, Altria Group, Inc. changed its dividend payout ratio target from approximately 75% to approximately 80% of adjusted diluted EPS beginning with its next declared dividend. Con -

sistent with this payout ratio target change, on February 24, 2010, Altria Group, Inc.'s Board of Directors approved a 2.9% increase in the quarterly dividend to $0.35 per common share. The present annualized dividend rate is $1.40 per Altria Group, Inc. common share. Future dividend payments remain subject to the discretion of Altria Group, Inc.'s Board of Directors.

In September 2009, Altria Group, Inc. suspended indefinitely its $4.0 billion (2008 to 2010) share repurchase program in order to preserve financial flexibility and focus on interest expense reduction. Altria Group, Inc.'s share repurchase program is at the discretion of the Board of Directors. During 2008, Altria Group, Inc. repurchased 53.5 million shares of its common stock at an aggregate cost of approximately $1.2 billion, or an average price of $21.81 per share. No shares were repurchased during 2009 under this share repurchase program.

Market Risk

As discussed in Note 20. *Financial Instruments* to the consolidated financial statements, derivative financial instruments are used by Altria Group, Inc. and its subsidiaries principally to reduce exposures to market risks resulting from fluctuations in interest rates and foreign exchange rates by creating offsetting exposures. Altria Group, Inc. is not a party to leveraged derivatives and, by policy, does not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. Altria Group, Inc. formally documents the nature and relationships between the hedging instruments and hedged items, as well as its risk-management objectives, strategies for undertaking the various hedge transactions and method of assessing hedge effectiveness. Additionally, for hedges of forecasted transactions, the significant characteristics and expected terms of the forecasted transaction must be specifically identified, and it must be probable that each forecasted transaction will occur. If it were deemed probable that the forecasted transaction will not occur, the gain or loss would be recognized in earnings currently. During the years ended December 31, 2009, 2008 and 2007, ineffectiveness related to fair value hedges and cash flow hedges was not material. At December 31, 2009, Altria Group, Inc. had no derivative financial instruments.

*Interest Rate Sensitive Financial Instruments* – At December 31, 2009 and 2008, the fair value of Altria Group, Inc.'s total debt was $14.4 billion and $8.6 billion, respectively. The fair value of Altria Group, Inc.'s debt is subject to fluctuations resulting from changes in market interest rates. A 1% increase in market interest rates at December 31, 2009 and 2008, would decrease the fair value of Altria Group, Inc.'s total debt by approximately $0.9 billion and $0.5 billion, respectively. A 1% decrease in market interest rates at December 31, 2009 and 2008, would increase the fair value of Altria Group, Inc.'s total debt by approximately $1.0 billion and $0.6 billion, respectively.

Interest rates on borrowings under the Revolving Credit Agreements will be based on the LIBOR plus a percentage equal to Altria Group, Inc.'s credit default swap spread subject

103

Table of Contents

to certain minimum rates and maximum rates based on the higher of the rating of Altria Group, Inc.'s long-term senior unsecured debt from Standard & Poor's and Moody's. The applicable minimum and maximum rates based on Altria Group, Inc.'s current long-term senior unsecured debt ratings at December 31, 2009 are 2.0% and 4.0%, respectively. At December 31, 2009 Altria Group, Inc. had no borrowings under its Revolving Credit Agreements.

Contingencies

See Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K for a discussion of contingencies.

Cautionary Factors That May Affect Future Results

*Forward-Looking and Cautionary Statements*

We* may from time to time make written or oral forward-looking statements, including statements contained in filings with the SEC, in reports to security holders and in press releases and investor webcasts. You can identify these forward-looking statements by use of words such as "strategy," "expects," "continues," "plans," "anticipates," "believes," "will," "estimates," "intends," "projects," "goals," "targets" and other words of similar meaning. You can also identify them by the fact that they do not relate strictly to historical or current facts.

We cannot guarantee that any forward-looking statement will be realized, although we believe we have been prudent in our plans and assumptions. Achievement of future results is subject to risks, uncertainties and inaccurate assumptions. Should known or unknown risks or uncertainties materialize, or should underlying assumptions prove inaccurate, actual results could vary materially from those anticipated, estimated or projected. Investors should bear this in mind as they consider forward-looking statements and whether to invest in or remain invested in Altria Group, Inc.'s securities. In connection with the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, we are identifying important factors that, individually or in the aggregate, could cause actual results and outcomes to differ materially from those contained in any forward-looking statements made by us; any such statement is qualified by reference to the following cautionary statements. We elaborate on these and other risks we face throughout this document, particularly in the "Business Environment" sections preceding our discussion of operating results of our subsidiaries' businesses. You should understand that it is not possible to predict or identify all risk factors. Consequently, you should not consider the following to be a complete discussion of all potential risks or uncertainties. We do not undertake to update any forward-looking statement that we may make from time to time.

Tobacco-Related Litigation. Legal proceedings covering a wide range of matters are pending or threatened in various

* This section uses the terms "we," "our" and "us" when it is not necessary to distinguish among Altria Group, Inc. and its various operating subsidiaries or when any distinction is clear from the context.

United States and foreign jurisdictions against Altria Group, Inc. and its subsidiaries including PM USA and UST, as well as their respective indemnitees. Various types of claims are raised in these proceedings, including product liability, consumer protection, antitrust, tax, contraband shipments, patent infringement, employment matters, claims for contribution and claims of competitors and distributors.

Litigation is subject to uncertainty and it is possible that there could be adverse developments in pending cases. An unfavorable outcome or settlement of pending tobacco related litigation could encourage the commencement of additional litigation. Damages claimed in some tobacco-related litigation are significant and, in certain cases, range in the billions of dollars. The variability in pleadings, together with the actual experience of management in litigating claims, demonstrate that the monetary relief that may be specified in a lawsuit bears little relevance to the ultimate outcome.

Although PM USA has historically been able to obtain required bonds or relief from bonding requirements in order to prevent plaintiffs from seeking to collect judgments while adverse verdicts have been appealed, there remains a risk that such relief may not be obtainable in all cases. This risk has been substantially reduced given that 43 states now limit the dollar amount of bonds or require no bond at all.

Altria Group, Inc. and its subsidiaries have achieved substantial success in managing litigation. Nevertheless, litigation is subject to uncertainty and significant challenges remain. It is possible that the consolidated results of operations, cash flows or financial position of Altria Group, Inc., or one or more of its subsidiaries, could be materially affected in a particular fiscal quarter or fiscal year by an unfavorable outcome or settlement of certain pending litigation. Altria Group, Inc. and each of its subsidiaries named as a defendant believe, and each has been so advised by counsel handling the respective cases, that it has valid defenses to the litigation pending against it, as well as valid bases for appeal of adverse verdicts. Each of the companies has defended, and will continue to defend, vigorously against litigation challenges. However, Altria Group, Inc. and its subsidiaries may enter into settlement discussions in particular cases if they believe it is in the best interests of Altria Group, Inc. to do so. See Note 22, and Item 3. *Legal Proceedings* and Exhibit 99.1 to Altria Group, Inc.'s 2009 Form 10-K for a discussion of pending tobacco-related litigation.

Tobacco Regulation and Control Action in the Public and Private Sectors. Our tobacco subsidiaries face significant governmental action, including efforts aimed at reducing the incidence of tobacco use, restricting marketing and advertising, imposing regulations on packaging, warnings and disclosure of flavors or other ingredients, prohibiting the sale of tobacco products with certain characterizing flavors or other characteristics, limiting or prohibiting the sale of tobacco products by certain retail establishments and the sale of tobacco products in certain packing sizes, and seeking to hold them responsible for the adverse health effects associated with both smoking and exposure to environmental tobacco smoke. Governmental actions, combined with the diminishing social acceptance of smoking and private actions to restrict smoking, have resulted in reduced industry volume, and we

Table of Contents

expect that these factors will continue to reduce consumption levels.

PM USA, USSTC and other Altria Group, Inc. subsidiaries are now subject to extensive regulation by the FDA, as discussed further in *Tobacco Space – Business Environment – FDA Regulation*. We cannot predict how the FDA might implement and enforce its statutory authority, including by promulgating additional regulations and pursuing possible enforcement actions, but such implementation and enforcement may impact the consumer acceptability of tobacco products, limit adult consumer choices, delay or prevent the launch of new or modified tobacco products, restrict communications to adult consumers, create a competitive advantage or disadvantage for certain tobacco companies, impose additional manufacturing requirements, or otherwise significantly increase the cost of doing business, all or any of which may have a material adverse impact on the results of operations or financial condition of Altria Group, Inc.

Excise Taxes. Tobacco products are subject to substantial excise taxes and significant increases in tobacco product-related taxes or fees have been proposed or enacted and are likely to continue to be proposed or enacted within the United States at the state, federal and local levels. Tax increases are expected to continue to have an adverse impact on sales of our tobacco products due to lower consumption levels and to a potential shift in consumer purchases from the premium to the non-premium or discount segments or to other low-priced or low-taxed tobacco products or to counterfeit and contraband products. For further discussion, see *Tobacco Space – Business Environment – Excise Taxes*.

Increased Competition in the United States Tobacco Categories. Each of Altria Group, Inc.'s tobacco subsidiaries operates in highly competitive tobacco categories. Settlements of certain tobacco litigation in the United States have resulted in substantial cigarette price increases. PM USA faces competition from lowest priced brands sold by certain United States and foreign manufacturers that have cost advantages because they are not parties to these settlements. These manufacturers may fail to comply with related state escrow legislation or may avoid escrow deposit obligations on the majority of their sales by concentrating on certain states where escrow deposits are not required or are required on fewer than all such manufacturers' cigarettes sold in such states. Additional competition has resulted from diversion into the United States market of cigarettes intended for sale outside the United States, the sale of counterfeit cigarettes by third parties, the sale of cigarettes by third parties over the Internet and by other means designed to avoid collection of applicable taxes, and increased imports of foreign lowest priced brands. USSTC faces significant competition in the smokeless tobacco category, both from existing competitors and new entrants, and has experienced consumer down-trading to lower-priced brands.

Governmental Investigations. From time to time, Altria Group, Inc. and its subsidiaries are subject to governmental investigations on a range of matters. We cannot predict whether new investigations may be commenced or the outcome of such investigations, and it is possible that our sub -

sidiaries' businesses could be materially affected by an unfavorable outcome of future investigations.

New Tobacco Product Technologies. Altria Group, Inc.'s tobacco subsidiaries continue to seek ways to develop and to commercialize new tobacco product technologies that may reduce the health risks associated with current tobacco products, while continuing to offer adult tobacco consumers products that meet their taste expectations. Potential solutions being researched include tobacco products that reduce or eliminate exposure to cigarette smoke and/or constituents identified by public health authorities as harmful. Our tobacco subsidiaries may not succeed in these efforts. If they do not succeed, but one or more of their competitors does, our subsidiaries may be at a competitive disadvantage. Further, we cannot predict whether regulators, including the FDA, will permit the marketing of tobacco products with claims of reduced risk to consumers or whether consumers' purchase decisions would be affected by such claims, which could affect the commercial viability of any tobacco products that might be developed.

Adjacency Strategy. Altria Group, Inc. and its subsidiaries have adjacency growth strategies involving moves and potential moves into complementary products or processes. We cannot guarantee that these strategies, or any products introduced in connection with these strategies, will be successful.

Tobacco Price, Availability and Quality. Any significant change in tobacco leaf prices, quality or availability could affect our tobacco subsidiaries' profitability and business. For a discussion of factors that influence leaf prices, availability and quality, see *Tobacco Space – Business Environment – Tobacco Price, Availability and Quality*.

Key Facilities; Supply Security. Altria Group, Inc.'s tobacco subsidiaries face risks inherent in reliance on a few significant facilities and a small number of significant suppliers. A natural or man-made disaster or other disruption that affects the manufacturing facilities of any of Altria Group, Inc.'s tobacco subsidiaries or the facilities of any significant suppliers of any of Altria Group, Inc.'s tobacco subsidiaries could adversely impact the operations of the affected subsidiaries. An extended interruption in operations experienced by one or more Altria Group, Inc. subsidiaries or significant suppliers could have a material adverse effect on the results of operations and financial condition of Altria Group, Inc.

Attracting and Retaining Talent. Our ability to implement our strategy of attracting and retaining the best talent may be impaired by the decreasing social acceptance of tobacco usage. The tobacco industry competes for talent with the consumer products industry and other companies that enjoy greater societal acceptance. As a result, our tobacco subsidiaries may be unable to attract and retain the best talent.

Competition and Economic Downturns. Each of our tobacco and wine subsidiaries is subject to intense competition, changes in consumer preferences and changes in economic conditions. To be successful, they must continue to:

■ promote brand equity successfully;

■ anticipate and respond to new and evolving consumer preferences;

105

Table of Contents

- develop new products and markets and to broaden brand portfolios in order to compete effectively with lower-priced products;

- improve productivity; and

- protect or enhance margins through cost savings and price increases.

The willingness of adult consumers to purchase premium consumer product brands depends in part on economic conditions. In periods of economic uncertainty, adult consumers may purchase more discount brands and/or, in the case of tobacco products, consider lower-priced tobacco products. The volumes of our tobacco and wine subsidiaries could suffer accordingly.

Our finance subsidiary, PMCC, holds investments in finance leases, principally in transportation (including aircraft), power generation and manufacturing equipment and facilities. Its lessees are also subject to intense competition and economic conditions. If parties to PMCC's leases fail to manage through difficult economic and competitive conditions, PMCC may have to increase its allowance for losses, which would adversely affect our earnings.

Acquisitions. Altria Group, Inc. from time to time considers acquisitions. From time to time we may engage in confidential acquisition negotiations that are not publicly announced unless and until those negotiations result in a definitive agreement. Although we seek to maintain or improve our debt ratings over time, it is possible that completing a given acquisition or other event could impact our debt ratings or the outlook for those ratings. Furthermore, acquisition opportunities are limited, and acquisitions present risks of failing to achieve efficient and effective integration, strategic objectives and anticipated revenue improvements and cost savings. There can be no assurance that we will be able to continue to acquire attractive businesses on favorable terms, that we will realize any of the anticipated benefits from an acquisition or that acquisitions will be quickly accretive to earnings.

UST Acquisition. There can be no assurance that we will achieve the synergies expected of the UST acquisition.

Capital Markets. Access to the capital markets is important for us to satisfy our liquidity and financing needs. Disruption and uncertainty in the capital markets and any resulting tightening of credit availability, pricing and/or credit terms may negatively affect the amount of credit available to us and may also increase our costs and adversely affect our earnings or our dividend rate.

Exchange Rates. For purposes of financial reporting, the equity earnings attributable to Altria Group, Inc.'s investment in SABMiller are translated into U.S. dollars from various local currencies based on average exchange rates prevailing during a reporting period. During times of a strengthening U.S. dollar against these currencies, our reported equity earnings in SABMiller will be reduced because the local currencies will translate into fewer U.S. dollars.

Asset Impairment. We periodically calculate the fair value of our goodwill and intangible assets to test for impairment. This calculation may be affected by the market conditions noted above, as well as interest rates and general economic conditions. If an impairment is determined to exist, we will incur impairment losses, which will reduce our earnings. For further discussion, see *Critical Accounting Policies and Estimates – Depreciation, Amortization and Intangible Asset Valuation*.

IRS Challenges to PMCC Leases. The Internal Revenue Service has challenged the tax treatment of certain of PMCC's leveraged leases. Should Altria Group, Inc. not prevail in any one or more of these matters, Altria Group, Inc. may have to accelerate the payment of significant amounts of federal income tax, pay associated interest costs and significantly lower its earnings to reflect the recalculation of the income from the affected leveraged leases, which could have a material effect on the earnings and cash flows of Altria Group, Inc. in a particular fiscal quarter or fiscal year. For further discussion see Note 22, and Item 3. *Legal Proceedings* to Altria Group, Inc.'s 2009 Form 10-K.

Wine – Competition; Grape Supply; Regulation and Excise Taxes. Ste. Michelle's business is subject to significant competition, including from many large, well-established national and international organizations. The adequacy of Ste. Michelle's grape supply is influenced by consumer demand for wine in relation to industry-wide production levels as well as by weather and crop conditions, particularly in eastern Washington state. Supply shortages related to any one or more of these factors could increase production costs and wine prices, which ultimately may have a negative impact on Ste. Michelle's sales. In addition, federal, state and local governmental agencies regulate the alcohol beverage industry through various means, including licensing requirements, pricing, labeling and advertising restrictions, and distribution and production policies. New regulations or revisions to existing regulations, resulting in further restrictions or taxes on the manufacture and sale of alcoholic beverages, may have an adverse effect on Ste. Michelle's wine business. For further discussion, see *Wine Segment – Business Environment*.

106

Table of Contents

# Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Altria Group, Inc.:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of earnings, stockholders' equity, and cash flows, present fairly, in all material respects, the financial position of Altria Group, Inc. and its subsidiaries at December 31, 2009 and 2008, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, Altria Group, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Altria Group, Inc.'s management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on Altria Group, Inc.'s internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

In fiscal 2009, Altria Group, Inc. changed the manner in which it accounts for business combinations and noncontrolling interests as discussed in Note 1. In fiscal 2007, Altria Group, Inc. changed the manner in which it accounts for uncertain tax positions as discussed in Note 2.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*/s/ PricewaterhouseCoopers LLP*

Richmond, Virginia
January 28, 2010

107

Table of Contents

# Report of Management on Internal Control Over Financial Reporting

Management of Altria Group, Inc. is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. Altria Group, Inc.'s internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes those written policies and procedures that:

■  pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Altria Group, Inc.;

■  provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America;

■  provide reasonable assurance that receipts and expenditures of Altria Group, Inc. are being made only in accordance with the authorization of management and directors of Altria Group, Inc.; and

■  provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting includes the controls themselves, monitoring and internal auditing practices and actions taken to correct deficiencies as identified.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become

inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of Altria Group, Inc.'s internal control over financial reporting as of December 31, 2009. Management based this assessment on criteria for effective internal control over financial reporting described in "*Internal Control – Integrated Framework*" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included an evaluation of the design of Altria Group, Inc.'s internal control over financial reporting and testing of the operational effectiveness of its internal control over financial reporting. Management reviewed the results of its assessment with the Audit Committee of our Board of Directors.

Based on this assessment, management determined that, as of December 31, 2009, Altria Group, Inc. maintained effective internal control over financial reporting.

PricewaterhouseCoopers LLP, independent registered public accounting firm, who audited and reported on the consolidated financial statements of Altria Group, Inc. included in this report, has audited the effectiveness of Altria Group, Inc.'s internal control over financial reporting as of December 31, 2009, as stated in their report herein.

January 28, 2010

Exhibit 21

## ALTRIA GROUP, INC. SUBSIDIARIES

Certain active subsidiaries of the Company and their subsidiaries as of December 31, 2009, are listed below. The names of certain subsidiaries, which considered in the aggregate would not constitute a significant subsidiary, have been omitted.

| Name | State or Country of Organization |
| --- | --- |
| Altria Client Services Inc. | New York |
| Altria Consumer Engagement Services Inc. | Virginia |
| Altria Corporate Services International, Inc. | Delaware |
| Altria Enterprises II LLC | Virginia |
| Altria Enterprises LLC | Virginia |
| Altria Sales & Distribution Inc. | Virginia |
| Col Solare, LLP | Washington |
| Cormorant Energy Investment Corp. | Delaware |
| Dart Resorts Inc. | Delaware |
| F.W. Rickard Seeds, Inc. | Kentucky |
| General Foods Credit Corporation | Delaware |
| General Foods Credit Investors No. 1 Corporation | Delaware |
| General Foods Credit Investors No. 2 Corporation | Delaware |
| General Foods Credit Investors No. 3 Corporation | Delaware |
| Grant Holdings, Inc. | Pennsylvania |
| Grant Transit Co. | Delaware |
| HNB Investment Corp. | Delaware |
| International Smokeless Tobacco Company Inc. | Delaware |
| International Wine & Spirits Ltd. | Delaware |
| John Middleton Co. | Pennsylvania |
| Management Subsidiary Holdings Inc. | Virginia |
| Michelle-Antinori, LLC | California |
| Michigan Investment Corp. | Delaware |
| National Smokeless Tobacco Company Ltd. | Canada |
| One Channel Corp. | Delaware |
| Philip Morris Capital Corporation | Delaware |
| Philip Morris Duty Free Inc. | Delaware |
| Philip Morris USA Inc. | Virginia |
| PMCC Investors No. 1 Corporation | Delaware |
| PMCC Investors No. 2 Corporation | Delaware |
| PMCC Investors No. 3 Corporation | Delaware |
| PMCC Investors No. 4 Corporation | Delaware |
| PMCC Leasing Corporation | Delaware |
| Profigen do Brazil LDTA | Brazil |
| Profigen Inc. | Delaware |
| SB Leasing Inc. | Delaware |
| Ste. Michelle Wine Estates Ltd. | Washington |
| TMLLC, Inc. | Virginia |
| Trademarks LLC | Delaware |
| Trimaran Leasing Investors, L.L.C.-II | Delaware |
| U.S. Smokeless Tobacco Brands Inc. | Delaware |
| U.S. Smokeless Tobacco Company LLC | Delaware |
| U.S. Smokeless Tobacco Manufacturing Company LLC | Delaware |
| UST LLC | Delaware |

**Exhibit 23**

<u>CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</u>

We hereby consent to the incorporation by reference in Post-Effective Amendment No. 13 to the Registration Statement of Altria Group, Inc. on Form S-14 (File No. 2-96149) and in Altria Group, Inc.'s Registration Statements on Form S-3 (File Nos. 333-35143 and 333-155009) and Form S-8 (File Nos. 333-28631, 33-10218, 33-13210, 33-14561, 33-40110, 33-48781, 33-59109, 333-43478, 333-43484, 333-128494, 333-139523, 333-148070 and 333-156188), of our report dated January 28, 2010 relating to the consolidated financial statements and the effectiveness of internal control over financial reporting of Altria Group, Inc., which appears in the Annual Report to Shareholders, which is incorporated in this Annual Report on Form 10-K ("Form 10-K"). We also consent to the incorporation by reference of our report dated January 28, 2010 relating to the financial statement schedule, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Richmond, Virginia
February 24, 2010

Exhibit 24

### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENT THAT  the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, her true and lawful attorney, for her and in her name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

IN WITNESS WHEREOF, the undersigned has hereunto set her hand and seal this 24th day of February, 2010.


/S/   ELIZABETH E. BAILEY
Elizabeth E. Bailey

## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.

/S/   GERALD L. BALILES
Gerald L. Baliles

## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.

/S/   JOHN T. CASTEEN III
————————————————————————
John T. Casteen III

## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.

/S/    THOMAS F. FARRELL II
Thomas F. Farrell II

## POWER OF ATTORNEY

 **KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

 **IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.

<div align="right">

/S/ Dinyar S. Devitre
_____
Dinyar S. Devitre

</div>

Powered by Morningstar® Document Research℠

## POWER OF ATTORNEY

    **KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

    **IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.

/S/   ROBERT E. R. HUNTLEY
Robert E. R. Huntley

## POWER OF ATTORNEY

      **KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

      **IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.

 

                                /S/   THOMAS W. JONES

                                Thomas W. Jones

## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.

/S/   GEORGE MUÑOZ
—————————————————————
George Muñoz

## POWER OF ATTORNEY

      **KNOW ALL MEN BY THESE PRESENT THAT** the undersigned, a Director of Altria Group, Inc., a Virginia corporation (the "Company"), does hereby constitute and appoint Michael E. Szymanczyk, Denise F. Keane, David R. Beran, and W. Hildebrandt Surgner, Jr., or any one or more of them, his true and lawful attorney, for him and in his name, place and stead, to execute, by manual or facsimile signature, electronic transmission or otherwise, the Annual Report on Form 10-K of the Company for the year ended December 31, 2009 and any amendments or supplements to said Annual Report and to cause the same to be filed with the Securities and Exchange Commission, together with any exhibits, financial statements and schedules included or to be incorporated by reference therein, hereby granting to said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite or desirable to be done in and about the premises as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all acts and things which said attorneys may do or cause to be done by virtue of these present.

      **IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this 24th day of February, 2010.


/S/   NABIL Y. SAKKAB
Nabil Y. Sakkab

**Exhibit 31.1**

<div align="center">Certifications</div>

I, Michael E. Szymanczyk, certify that:

1.   I have reviewed this annual report on Form 10-K of Altria Group, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2010

/s/ MICHAEL E. SZYMANCZYK
Michael E. Szymanczyk
Chairman and Chief Executive Officer

**Exhibit 31.2**

Certifications

I, David R. Beran, certify that:

1.   I have reviewed this annual report on Form 10-K of Altria Group, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2010

/s/ DAVID R. BERAN
David R. Beran
Executive Vice President and Chief Financial Officer

Exhibit 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Altria Group, Inc. (the "Company") on Form 10-K for the period ended December 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael E. Szymanczyk, Chairman and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ MICHAEL E. SZYMANCZYK

Michael E. Szymanczyk
Chairman and Chief Executive Officer
February 24, 2010

*A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Altria Group, Inc. and will be retained by Altria Group, Inc. and furnished to the Securities and Exchange Commission or its staff upon request .*

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Altria Group, Inc. (the "Company") on Form 10-K for the period ended December 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David R. Beran, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ DAVID R. BERAN
_____
David R. Beran
Executive Vice President and Chief Financial Officer
February 24, 2010

*A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Altria Group, Inc. and will be retained by Altria Group, Inc. and furnished to the Securities and Exchange Commission or its staff upon request .*

**Exhibit 99.1**

CERTAIN LITIGATION MATTERS AND RECENT DEVELOPMENTS

As described in Item 3. *Legal Proceedings* of this Form 10-K and Note 22. *Contingencies* ("Note 22") to Altria Group, Inc.'s consolidated financial statements, there are legal proceedings covering a wide range of matters pending or threatened in various United States and foreign jurisdictions against Altria Group, Inc., its subsidiaries, including Philip Morris USA Inc. ("PM USA"), and their respective indemnitees. Various types of claims are raised in these proceedings, including product liability, consumer protection, antitrust, tax, contraband shipments, patent infringement, employment matters, claims for contribution and claims of competitors and distributors. Pending claims related to tobacco products generally fall within the following categories: (i) smoking and health cases alleging personal injury brought on behalf of individual plaintiffs, (ii) smoking and health cases primarily alleging personal injury or seeking court-supervised programs for ongoing medical monitoring and purporting to be brought on behalf of a class of individual plaintiffs, including cases in which the aggregated claims of a number of individual plaintiffs are to be tried in a single proceeding, (iii) health care cost recovery cases brought by governmental (both domestic and foreign) and non-governmental plaintiffs seeking reimbursement for health care expenditures allegedly caused by cigarette smoking and/or disgorgement of profits, (iv) class action suits alleging that the uses of the terms "Lights" and "Ultra Lights" constitute deceptive and unfair trade practices, common law fraud or RICO violations, (v) international cases, and (vi) other tobacco-related litigation.

The following lists certain of the pending claims against Altria Group, Inc., PM USA and/or UST LLC ("UST") and/or UST's subsidiaries included in these categories. Certain developments in these cases since October 26, 2009 are also described.

SMOKING AND HEALTH LITIGATION

The following lists the consolidated individual smoking and health cases as well as smoking and health class actions pending against PM USA and, in some cases, Altria Group, Inc. and/or its other subsidiaries and affiliates, as of February 19, 2010, and describes certain developments in these cases since October 26, 2009. See *International Cases* below for a reference to one individual smoking and health action pending in Israel and four smoking and health class actions pending in Canada.

Consolidated Individual Smoking and Health Cases

*In re: Tobacco Litigation (Individual Personal Injury cases), Circuit Court, Ohio County, West Virginia, consolidated January 11, 2000.* In West Virginia, all smoking and health cases in state court alleging personal injury have been transferred to the State's Mass Litigation Panel. The transferred cases include individual cases and putative class actions. All individual cases filed in or transferred to the court by September 13, 2000 were consolidated for pretrial proceedings and trial. John Middleton Co. and U.S. Smokeless Tobacco Company were named as defendants in this action but they, along with other non-cigarette manufacturers, have been severed from this case. Currently pending are 711 civil actions (of which 405 are actions against PM USA). In December 2005, the West Virginia Supreme Court of Appeals ruled that the United States Constitution does not preclude a trial in two phases in this case. Issues related to defendants' conduct, plaintiffs' entitlement to punitive damages and a punitive damages multiplier, if any, would be determined in the first phase. The second phase would consist of individual trials to determine liability, if any, and compensatory damages. In May 2007, the trial court denied defendants' motion to vacate the trial court's trial plan based on the United States Supreme Court's decision in *Williams v. Philip Morris.* In November 2007, the West Virginia Supreme Court of Appeals denied defendants' renewed motion for review of the trial plan. In December 2007, defendants filed a petition for *writ of certiorari* with the United States Supreme Court, which was denied in February 2008. The first phase of the trial is now scheduled for June 1, 2010.

Flight Attendant Litigation

The settlement agreement entered into in 1997 in the case of *Broin, et al. v. Philip Morris Companies Inc., et al.*, which was brought by flight attendants seeking damages for personal injuries allegedly caused by environmental tobacco smoke, allows members of the *Broin* class to file individual lawsuits seeking compensatory damages, but prohibits them from seeking punitive damages. In October 2000, the trial court ruled that the flight attendants will

1

not be required to prove the substantive liability elements of their claims for negligence, strict liability and breach of implied warranty in order to recover damages, if any, other than establishing that the plaintiffs' alleged injuries were caused by their exposure to environmental tobacco smoke and, if so, the amount of compensatory damages to be awarded. Defendants' initial appeal of this ruling was dismissed as premature. Defendants appealed the October 2000 rulings in connection with their appeal of the adverse jury verdict in the *French* case. In December 2004, the Florida Third District Court of Appeal affirmed the judgment awarding plaintiff in the *French* case (*Lorillard Tobacco Co. v. French*) $500,000, and directed the trial court to hold defendants jointly and severally liable. Defendants' motion for rehearing was denied in April 2005. In December 2005, after exhausting all appeals, PM USA paid $328,759 (including interest of $78,259) as its share of the judgment amount and interest in *French* and, in August 2007, PM USA paid $229,293.11 (including interest of $7,380.48) representing its share of attorneys' fees. PM USA, in March 2008, paid additional attorneys' fees of $4,700. In May 2009, after appellate proceedings, PM USA paid $157,065.51, representing its share of interest on the attorneys' fees, thereby concluding *French*. In November 2007, a jury found in favor of the defendants in a case brought by a flight attendant. As of February 19, 2010, 2,595 cases were pending in the Circuit Court of Dade County, Florida against PM USA and three other cigarette manufacturers.

Domestic Class Actions

*Engle, et al. v. R.J. Reynolds Tobacco Co., et al., Circuit Court, Eleventh Judicial Circuit, Dade County, Florida, filed May 5, 1994.* See Item 3. *Legal Proceedings* for a discussion of this case and the *Engle* progeny litigation.

*Scott, et al. v. The American Tobacco Company, et al., Civil District Court, Orleans Parish, Louisiana, filed May 24, 1996.* See Item 3. *Legal Proceedings* for a discussion of this case.

*Young, et al. v. The American Tobacco Company, et al., Civil District Court, Orleans Parish, Louisiana, filed November 12, 1997.*

*Parsons, et al. v. A C & S, Inc., et al., Circuit Court, Kanawha County, West Virginia, filed February 27, 1998.*

*Cypret, et al. v. The American Tobacco Company, et al., Circuit Court, Jackson County, Missouri, filed December 22, 1998.*

*Simms, et al. v. Philip Morris Incorporated, et al., United States District Court, District of Columbia, filed May 23, 2001* . In May 2004, plaintiffs filed a motion for reconsideration of the court's 2003 ruling that denied their motion for class certification. In September 2004, plaintiffs renewed their motion for reconsideration. This motion was denied by the court in December 2006.

*Caronia, et al. v. Philip Morris USA Inc., United States District Court, Eastern District, New York, filed January 13, 2006.* See Item 3. *Legal Proceedings* for a discussion of this case.

*Donovan, et al. v. Philip Morris, United States District Court, District of Massachusetts, filed March 2, 2007.* See Item 3. *Legal Proceedings* for a discussion of this case.

*Peoples, et al. v. Reynolds America, Inc. et al., United States District Court, Northern District, Georgia, filed November 17, 2009.* See Item 3. *Legal Proceedings* for a discussion of this case.

*Jackson, et al. v. U.S. Dept. of Health and Human Services, et al., Northern District, Georgia, filed May 1, 2009.* See Item 3. *Legal Proceedings* for a discussion of this case.

HEALTH CARE COST RECOVERY LITIGATION

The following lists the health care cost recovery actions pending against PM USA and, in some cases, Altria Group, Inc. and/or its other subsidiaries and affiliates as of February 19, 2010 and describes certain developments in these cases since October 26, 2009. See *International Cases* below for a list of international health care cost recovery actions.

As discussed in Item 3. *Legal Proceedings*, in 1998, PM USA and certain other United States tobacco product manufacturers entered into a Master Settlement Agreement (the "MSA") settling the health care cost recovery claims of 46 states, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the United States Virgin Islands, American Samoa and the Northern Marianas. Settlement agreements settling similar claims had previously been entered into with the states of Mississippi, Florida, Texas and Minnesota. PM USA believes that some or all of the claims in certain of the health care cost recovery actions listed below are released in whole or in part by the MSA, or that recovery in any such actions should be subject to the offset provisions of the MSA.

2

Source: ALTRIA GROUP, INC., 10-K, February 26, 2010

City of St. Louis Case

*City of St. Louis, et al. v. American Tobacco, et al., Circuit Court, City of St. Louis, Missouri, filed November 23, 1998* . In November 2001, the court granted in part and denied in part defendants' motion to dismiss and dismissed three of plaintiffs' eleven claims. In June 2005, the court granted in part defendants' motion for summary judgment limiting plaintiffs' claims for past compensatory damages to those that accrued after November 16, 1993, five years prior to the filing of the suit. In June 2009, the court denied two of defendants' motions for summary judgment. The trial is scheduled to begin no earlier than January 2011. See Item 3. *Legal Proceedings* for further discussion of this case.

Department of Justice Case

*The United States of America v. Philip Morris Incorporated, et al., United States District Court, District of Columbia, filed September 22, 1999* . See Item 3. *Legal Proceedings* for a discussion of this case.

Medicare Secondary Payer Act Case

*National Committee to Preserve Social Security and Medicare, et al. v. Philip Morris USA, et al., United States District Court, Eastern District, New York, filed May 20, 2008.* See Item 3. *Legal Proceedings* for a discussion of this case.

"LIGHTS/ULTRA LIGHTS" CASES

The following lists the "Lights/Ultra Lights" cases pending against Altria Group, Inc. and/or its various subsidiaries and others as of February 19, 2010, and describes certain developments since October 26, 2009. See *International Cases* below for a reference to one "Lights" action pending in Israel.

*Cleary, et al. v. Philip Morris Incorporated, et al., United States District Court, Northern District, Illinois, filed June 3, 1998.* See Item 3. *Legal Proceedings* for a discussion of this case.

*Aspinall, et al. v. Philip Morris Companies Inc. and Philip Morris Incorporated, Superior Court, Suffolk County, Massachusetts, filed November 24, 1998.* In October 2001, the court granted plaintiffs' motion for class certification, and defendants appealed. In May 2003, the single Justice sitting on behalf of the Massachusetts Court of Appeals decertified the class. In August 2004, Massachusetts' highest court affirmed the trial court's ruling and reinstated the class certification order. See Item 3. *Legal Proceedings* for further discussion of this case.

*Marrone v. Philip Morris Companies, Inc., et al., Court of Common Pleas, Medina County, Ohio, filed November 8, 1999.* On August 10, 2009, the plaintiffs voluntarily dismissed this case. See Item 3. *Legal Proceedings* for additional reference to this case.

*Price, et al v. Philip Morris Inc., Circuit Court, Third Judicial Circuit, Madison County, Illinois, filed February 10, 2000.* See Item 3. *Legal Proceedings* for a discussion of this case.

*Craft, et al. v. Philip Morris Companies Inc., et al., Circuit Court, City of St. Louis, Missouri, filed February 15, 2000* . In December 2003, the trial court granted plaintiffs' motion for class certification. In September 2004, the court granted in part and denied in part PM USA's motion for reconsideration. In August 2005, the Missouri Court of Appeals affirmed the trial court's class certification order. See Item 3. *Legal Proceedings* for further discussion of this case.

*Hines, et al. v. Philip Morris Companies Inc., et al., Circuit Court, Fifteenth Judicial Circuit, Palm Beach County, Florida, filed February 23, 2001* . In February 2002, the court granted plaintiffs' motion for class certification, and defendants appealed. In December 2003, a Florida District Court of Appeal decertified the class. In March 2004, plaintiffs filed a motion for rehearing, *en banc* review or certification to the Florida Supreme Court. In December 2004, the Florida Supreme Court stayed further proceedings pending the resolution of the *Engle* case discussed in Item 3. *Legal Proceedings*. In January 2008, the Florida Supreme Court rejected plaintiffs' petition for further review.

3

*Moore, et al. v. Philip Morris Incorporated, et al.,* Circuit Court, Marshall County, West Virginia, filed September 17, 2001.

*Curtis, et al. v. Philip Morris Companies Inc., et al.,* Fourth Judicial District Court, Minnesota, filed November 28, 2001 . See Item 3. *Legal Proceedings* for a discussion of this case.

*Lawrence, et al. v. Philip Morris Incorporated (formerly known as Tremblay, et al., v. Philip Morris Incorporated),* Superior Court, Rockingham County, New Hampshire, filed March 29, 2002. The case has been consolidated with another "Lights/Ultra Lights" case.

*Pearson v. Philip Morris Incorporated, et al.,* Circuit Court, Multnomah County, Oregon, filed November 20, 2002 . See Item 3. *Legal Proceedings* for a discussion of this case.

*Virden v. Altria Group, Inc., et al.,* Circuit Court, Hancock County, West Virginia, filed March 28, 2003.

*Stern, et al. v. Philip Morris USA Inc., et al.,* Superior Court, Middlesex County, New Jersey, filed April 4, 2003. In March 2006, the court granted PM USA's motion to strike plaintiffs' class certification motion, and plaintiffs filed a motion for reconsideration. A renewed motion for class certification was denied in November 2007.

*Arnold, et al. v. Philip Morris USA Inc.,* Circuit Court, Madison County, Illinois, filed May 5, 2003.

*Watson, et al. v. Altria Group, Inc., et al.,* Circuit Court, Pulaski County, Arkansas, filed May 29, 2003. See Item 3. *Legal Proceedings* for a discussion of this case.

*Holmes, et al. v. Philip Morris USA Inc., et al.,* Superior Court, New Castle County, Delaware, filed August 18, 2003. In June 2006, PM USA filed a motion for summary judgment on preemption and consumer protection statutory exemption grounds. PM USA later withdrew this motion, but in April 2009, PM USA filed a renewed motion for summary judgment on consumer protection statutory exemption grounds. This motion was denied on December 4, 2009.

*Schwab, et al. v. Philip Morris USA Inc., et al.,* United States District Court, Eastern District, New York, filed May 11, 2004 . See Item 3. *Legal Proceedings* for a discussion of this case.

*Miner, et al. v. Altria Group, Inc., et al.,* Circuit Court, Franklin County, Arkansas, filed December 29, 2004. See Item 3. *Legal Proceedings* for a discussion of this case.

*Mulford, et al. v. Altria Group, Inc., et al.,* United States District Court, New Mexico, filed June 9, 2005 . See Item 3. *Legal Proceedings* for a discussion of this case.

*Good, et al. v. Altria Group, Inc., et al.,* United States District Court, Maine, filed August 15, 2005. See Item 3. *Legal Proceedings* for a discussion of this case.

*Tang v. Philip Morris USA Inc.,* United States District Court, Eastern District, New York, filed December 17, 2008.

*Biundo, et al. v. Philip Morris USA Inc., et al., (formerly known as Goins, et al. v. Philip Morris USA Inc., et al.),* United States District Court, Northern District, Illinois, filed December 23, 2008. The case was removed to federal court. In May 2009, plaintiff's motion to amend the complaint was granted after the claims of the initial class representative were dismissed without prejudice.

*Tyrer, et al. v. Philip Morris USA Inc., et al.,* United States District Court, Southern District, California, filed January 14, 2009.

*Domaingue, et al. v. Philip Morris USA Inc., et al.,* United States District Court, Eastern District, New York, filed March 19, 2009.

*Wyatt, et al. v. Philip Morris USA Inc., et al., (formerly Nikolic, et al. v. Philip Morris USA Inc., et al.),* United States District Court, Eastern District, Wisconsin, filed June 16, 2009.

*Mirick, et al. v. Philip Morris USA Inc., et al.,* United States District Court, Southern District, Mississippi, filed July 2, 2009.

*Williams v. Altria Group, Inc.,* United States District Court, Eastern District, Arkansas, filed July 6, 2009.

4

*Slater, et al. v. PM USA, et al., United States District Court, District of Columbia, filed November 12, 2009.*

*Corse, et al. v. PM USA, et al., United States District Court, Middle District, Tennessee, filed November 25, 2009.*

*Parsons, et al. v. PM USA, et al., United States District Court, District of Columbia, filed December 2, 2009.*

*Haubrich, et al. v. Philip Morris USA Inc., United States District Court, Eastern District, Pennsylvania, filed December 9, 2009.*

*Kelly v. Martin & Bailey, Inc. et al., Circuit Court, Madison County, Illinois, filed February 4, 2005.* This case is an individual smoker lawsuit brought in Illinois state court on behalf of an alleged smoker of "Lights" cigarettes. See Item 3. *Legal Proceedings* for a discussion of this case.

Many of the cases above have been consolidated by the Judicial Panel on Multidistrict Litigation in the United States District Court for the District of Maine. For a discussion of this consolidation, see Item 3. *Legal Proceedings*.

INTERNATIONAL CASES

**Canada**

*Her Majesty the Queen in Right of British Columbia v. Imperial Tobacco Limited, et al., Supreme Court, British Columbia, Vancouver Registry, Canada, filed January 24, 2001.* In June 2003, the trial court granted defendants' motion to dismiss the case, and plaintiff appealed. In May 2004, the appellate court reversed the trial court's decision. Defendants appealed. In September 2005, the Supreme Court of Canada ruled that the legislation permitting the lawsuit is constitutional, and, as a result, the case will proceed before the trial court. In September 2006, the British Columbia Court of Appeal rejected PM USA's motion seeking dismissal from the case on jurisdictional grounds. In April 2007, the Supreme Court of Canada denied PM USA's motion seeking leave to appeal the jurisdictional decision. In June 2007, several defendants filed Third Party Notices against the Federal Government of Canada seeking contribution and indemnification from the Federal Government. In April 2008, the trial court dismissed the Third Party Notices and PM USA joined in an appeal of the dismissal to the British Columbia Court of Appeals. On December 8, 2009, the British Columbia Court of Appeals ruled that defendants can proceed against the Federal Government as a third party on the theory that the Federal Government negligently misrepresented to defendants the efficacy of a low tar tobacco variety that the Federal Government developed and licensed to defendants, a decision that the Federal Government has appealed.

*Her Majesty the Queen in Right of the Province of New Brunswick v. Rothmans, Inc. et al., Court of the Queen's Bench, New Brunswick, Fredericton, Canada, filed March 13, 2008.* The complaint alleges deceit and misrepresentation, failure to warn, marketing to minors, negligent design and manufacture, conspiracy and concerted actions and seeks reimbursement for past, present and future healthcare costs of individuals with tobacco-related injuries. Defendants have filed with the Canadian Supreme Court a motion for leave to appeal the trial court's ruling that a contingency fee arrangement between the Province and U.S. litigation counsel is not unlawful.

*Her Majesty the Queen in Right of Ontario v. Rothmans Inc., et al., Superior Court of Ontario, Canada, filed on or about September 30, 2009.* This health care cost recovery action is nearly identical in substance and named defendants to the suits brought in British Columbia and New Brunswick.

*Adams, et al. v. Canadian Tobacco Manufacturers' Council, et al., Court of Queen's Bench for Saskatchewan, Judicial Centre of Regina, Canada, filed July 10, 2009.* The defendants named in this smoking and health class action lawsuit include PM USA and Altria Group, Inc. See Item 3. *Legal Proceedings* for a discussion of this case.

Suits have been filed in three other Provinces in Canada that seek similar relief against the same defendants as in *Adams*. The cases are: *Dorion, et al. v. Canadian Tobacco Manufacturers' Council, et al., Court of Queen's Bench of Alberta, Judicial District of Calgary, Canada, filed on or about June 17, 2009; Kunta, et al. v. Canadian Tobacco Manufacturers' Council, et al., Court of Queen's Bench, Winnipeg Centre, Canada, filed on an unknown date in June 2009;* and *Semple, et al. v. Canadian Tobacco Manufacturers' Council, et al., Supreme Court of Nova Scotia, Canada, filed on or about June 18, 2009.*

5

**Israel**

*Kupat Holim Clalit v. Philip Morris USA, et al., Jerusalem District Court, Israel, filed September 28, 1998* . Defendants' motion to dismiss this health care cost recovery case was denied by the district court. In June 2004, defendants filed a motion with the Israel Supreme Court for leave to appeal. The appeal was heard by the Supreme Court in March 2005, and the parties are awaiting the court's decision.

*El-Roy, et al. v. Philip Morris Incorporated, et al., District Court of Tel-Aviv/Jaffa, Israel, filed January 18, 2004.*  Hearings on plaintiffs' motion for class certification were held in November and December 2008.

*Dr. Eliezer Amsterdam v. Philip Morris Ltd., et al., Jerusalem District Court, Israel, filed July 20, 2009* . Plaintiff has not yet served his refiled individual smoking and health complaint on PM USA.

See Item 3. *Legal Proceedings* for a discussion of the Distribution Agreement between Altria Group, Inc. and PMI, which provides for indemnities for certain liabilities concerning tobacco products.

CERTAIN OTHER TOBACCO-RELATED ACTIONS

The following lists certain other tobacco-related litigation pending against Altria Group, Inc. and/or its various subsidiaries and others as of February 19, 2010, and describes certain developments since October 26, 2009.

Tobacco Price Cases

*Smith, et al. v. Philip Morris Companies Inc., et al., District Court, Seward County, Kansas, filed February 9, 2000.*  In November 2001, the court granted plaintiffs' motion for class certification. The case is pending; there is no trial date.

*Romero, et al. v. Philip Morris Companies Inc., et al., First Judicial District Court, Rio Arriba County, New Mexico, filed April 10, 2000* . Plaintiffs' motion for class certification was granted in April 2003. In February 2005, the New Mexico Court of Appeals affirmed the class certification decision. In June 2006, defendants' motion for summary judgment was granted and the case was dismissed. Plaintiffs appealed the trial court's grant of summary judgment. In November 2008, the New Mexico Court of Appeals reversed the summary judgment decision. In February 2009, the New Mexico Supreme Court granted the petition for *writ of certiorari*  filed by PM USA and other defendants. Argument before the New Mexico Supreme Court was held on February 22, 2010.

Cases under the California Business and Professions Code

*Brown, et al. v. The American Tobacco Company, Inc., et al., Superior Court, San Diego County, California, filed June 10, 1997.* See Item 3. *Legal Proceedings* for a discussion of this case.

MSA-Related Cases

PM USA is one of several defendants in a case filed in Kentucky by an MSA-participating manufacturer that is not an original participating manufacturer. There are other cases in a number of states in which plaintiffs have challenged the MSA and/or legislation implementing it, but PM USA is not a defendant in these cases. See Item 3. *Legal Proceedings* for discussion of these proceedings.

Possible Adjustments in MSA Payments for 2003 to 2008

See Item 3. *Legal Proceedings* for a description of these proceedings.

Ignition Propensity Cases

*Sarro v. Philip Morris USA Inc., United States District Court, Massachusetts, filed December 20, 2007* . Plaintiff contends that a *Marlboro* cigarette caused a fire that led to an individual's death. Plaintiff seeks $250,000 for property damage and an unspecified amount in damages for wrongful death. In August 2009, PM USA's motion to dismiss the case was granted in part, but the trial court ruled that two claims unrelated to product design could go forward. On January 13, 2010, plaintiff filed a motion for reconsideration or to certify questions to the Massachusetts Supreme Judicial Court.

6

*Walker, et al. v. Philip Morris USA, Inc., et al., United States District Court, Western District, Kentucky, filed February 1, 2008.* Plaintiffs are the representatives and heirs of nine of the ten individuals who died in a house fire allegedly caused by a *Marlboro Lights* cigarette. Plaintiffs seek unspecified amounts in actual damages, punitive damages and interest. In addition to PM USA, the defendants named in the complaint include Altria Group, Inc. In February 2009, the court, upon motion of the defendants, dismissed plaintiffs' claims. Plaintiffs filed a notice of appeal in March 2009. The appeal currently is pending before the United States Court of Appeals for the Sixth Circuit.

*Kerr v. PM USA, et al., United States District Court, Southern District, Mississippi, filed February 27, 2009 in the Circuit Court, Jackson County, Mississippi.* Plaintiff is the representative of the estate of an individual whose death was caused by a fire allegedly arising from a cigarette. PM USA removed the case to federal court in July 2009. PM USA's motion for summary judgment is pending.

*Green v. PM USA, et al., Circuit Court, Colbert County, Alabama, filed April 7, 2009.* Plaintiff is the representative of an individual whose death was caused by a fire allegedly arising from a cigarette.

*Hallmark v. PM USA, et al., Circuit Court, Colbert County, Alabama, filed April 7, 2009.* Plaintiff is the representative of the estate of an individual whose death was caused by a fire allegedly arising from a cigarette.

*Villarreal v. Altria Group, Inc., et al., District Court, Nueces County, Texas (Corpus Christi), filed July 1, 2009.* Plaintiff is the representative of the estate of an individual whose death was caused by a fire allegedly arising from a cigarette. PM USA removed the case to federal court in August 2009. Plaintiff's motion to remand to state court was granted on January 29, 2010.

UST LITIGATION

The following lists certain actions pending against UST and/or its subsidiaries as of February 19, 2010.

*Vassallo v. United States Tobacco Co., et al, Circuit Court of the Judicial District, Miami-Dade County, Florida , filed November 12, 2002.*

*Hill, et al. v. U.S. Smokeless Tobacco Company,* Connecticut Superior Court, filed March 7, 2005. Trial in the case is scheduled to commence in December 2010.

7

**Exhibit 99.2**

TRIAL SCHEDULE FOR CERTAIN CASES

Below is a schedule, as of February 19, 2010, setting forth by month the number of individual smoking and health cases against PM USA that are scheduled for trial through the end of 2010.

2010

Individual Smoking & Health

| May (1) | November (1) |
|---|---|
| June (2) | December (1) |

*Engle* progeny

| March (2) | June (5) | September (6) |
|---|---|---|
| April (4) | July (9) | October (9) |
| May (6) | August (7) | November (8) |

As of February 19, 2010, no *Engle* progeny cases were in trial.

Source: ALTRIA GROUP, INC , 10-K, February 24, 2010

Powered by Morningstar® Document Research℠

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com