# Exhibit 16

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN RE:  LIGHT CIGARETTES MARKETING SALES PRACTICES LITIGATION | ) ) ) ) |

MDL Docket No. 1:09-MD-2068 ALL CASES

DECLARATION AND EXPERT DISCLOSURE
STATEMENT OF ERROL ZEIGER, PH.D.

Errol Zeiger, having been duly sworn and upon his oath deposes and states as follows:

1.     I am over eighteen years of age and am competent to testify to the matters contained herein.

2.     I have personal knowledge of the matters contained herein.

I.     Summary of Opinions

3.     I am Errol Zeiger, Ph.D.  I performed and directed genetic toxicology (e.g., chemical mutagenicity) testing and research at the FDA for 7 years and then for 24 years at the National Institute of Environmental Health Sciences (NIEHS) of the National Institutes of Health (NIH).  I retired from the U.S. government in December 2000, to work as an independent consultant in Chapel Hill, N.C.  My education, experience, and background are summarized in section II below.  My Curriculum Vitae is attached as Exhibit A.  I have not testified as an expert at trial or by deposition within the preceding four years.  I am being compensated in this lawsuit at a rate of $450/hour for testimony as an expert at trial or by deposition, and a rate of $350/hour for other services.

4.     I have been asked to render expert opinions on issues relating to the purpose, use, interpretation, and toxicological significance of toxicity tests (including

mutagenicity tests), smoke constituent measurements, and carcinogenicity tests, from both a present-day and historical perspective, both in general and as applied specifically to cigarettes of varying designs and varying machine-measured tar and nicotine yields. In addition to matters specifically discussed herein, I may also comment on the opinions of plaintiff's expert witnesses and on the scientific basis for those opinions, including any documents used to support those opinions, to the extent related to my areas of expertise.

5.       My conclusions in this declaration are based on my knowledge, training, research, and experience, and on my analysis and interpretation of the scientific literature and internal research studies conducted by Philip Morris USA, including documents that have been used as exhibits, and other research studies. My conclusions in this declaration are stated to a reasonable degree of scientific certainty. These conclusions are summarized as follows:

- The fact that a substance is mutagenic, as measured by the Ames test and other tests, provides an indication that it is more likely than not to be an animal carcinogen in a subsequent laboratory animal test. Importantly, however, neither the magnitude of the mutagenic response (i.e., its "potency") for a sample, nor differences in mutagenic potency among different samples, predict differences in biological responses, including cancer risk, in laboratory animals or in humans.

- On a per cigarette basis, many low tar and ultra-low tar cigarettes, such as lights and ultra lights cigarettes, including Philip Morris low tar Marlboro Lights and ultra low tar Marlboro Ultra Lights cigarettes, are less mutagenic in the Ames test and deliver lower yields of individual smoke constituents than their higher tar counterparts, when compared under the same smoking conditions.

- When smoke constituent yields are calculated on a per milligram tar or per milligram nicotine basis, some constituent yields increase, some decrease, and others are equivalent between various tar grades of Philip Morris cigarettes, including, for example, Marlboro Lights, Marlboro Ultra Lights, and Marlboro Full-Flavor. The majority of smoke constituents decrease on a per milligram tar or nicotine basis when a cigarette is smoked under more intense conditions than the standard FTC/ISO method. These differences in individual smoke constituent yields per milligram tar or per milligram nicotine do not establish

that low tar or ultra low tar cigarettes are "more dangerous" than their full-flavor counterparts.

- Testing data specific to Marlboro Full Flavor, Marlboro Ultra Lights, and Marlboro Lights demonstrate that the mutagenicity in the Ames test of tars from these brands is equivalent. Although there are numerical differences in mutagenicity per milligram tar between Marlboro Lights, Marlboro Ultra Lights, and Marlboro Full Flavor, and between low- and high-tar reference cigarettes with comparable FTC yields, and although some of these differences may be statistically significant, they are relatively small and not biologically relevant. Differences among positive mutagenic responses in the Ames test, even when statistically significant, cannot be used to predict differences in responses to cigarette tars in other biological systems, such as other genetic toxicity tests, rodent cancer tests, or an exposed human. It can be reasonably extrapolated in accordance with scientific principles that this testing data would be consistent with a comparison between all lights and ultra lights versus all full-flavor Philip Morris cigarettes.

- The in vitro, mammalian cell cytotoxicity per milligram tar is similar among tars produced by Marlboro Full Flavor, Marlboro Lights, and Marlboro Ultra Lights cigarettes, as are in vivo toxicity effects in male and female rats following 90-days of inhalation of smoke from these three cigarette types smoked to similar nicotine levels. These results are consistent with my conclusions regarding the Ames mutagenicity test data to the effect that the in vitro effects of the tars from regular, full-flavor cigarettes, like Marlboro Full Flavor, and light cigarettes, like Marlboro Lights, and ultra light cigarettes, like Marlboro Ultra Lights, are equivalent, as are the in vivo effects.

- Both the relative proportions of the chemical constituents of tar, and the tar's mutagenicity on a per-milligram basis, vary based on how a cigarette is smoked. To the extent that cigarettes are smoked differently (by different people or different smoking machine protocols), the relative chemical compositions of the tar and its mutagenicity per milligram tar will vary as well. In most studies, more intense smoking patterns have been shown to reduce the mutagenicity per milligram tar both in lights (e.g., Marlboro Lights) and regular (e.g., Marlboro Full Flavor) cigarettes.

- The levels of the individual smoke constituents and mutagenicity obtained from a cigarette depend on the cigarette itself and on the total amount of smoke constituents (e.g., tar, nicotine, other constituents) that are produced when the cigarette is smoked. For example, a light (e.g., Marlboro Lights) cigarette that delivers less total smoke than a regular, full-flavor (e.g., Marlboro Full Flavor) cigarette would also deliver lower amounts of smoke constituents and mutagenicity. Similarly, an ultra light (e.g., Marlboro Ultra Lights) cigarette that delivers less total smoke than a regular, full-flavor (e.g., Marlboro Full

3

Flavor) cigarette would also deliver lower amounts of smoke constituents and mutagenicity.

- By no later than the mid-1970s, it was public scientific knowledge based upon data from U.S. government reports, the peer-reviewed scientific literature, and the popular press, that cigarettes with lower total tar and nicotine yields could, and in some instances did, produce higher levels of individual smoke constituents on a per cigarette basis, and also on a per milligram TPM, tar or nicotine basis, as well as higher mutagenicity per milligram tar in the Ames test.

- To the extent that there is variability within and among smokers with respect to (a) their levels of total smoke intake, (b) the existence or extent of compensation, and/or (c) the various methods of compensation, I conclude to a reasonable degree of scientific certainty, that there will also be variability within and among smokers with respect to the total amounts of smoke constituents and mutagenicity that will be produced when smoking Philip Morris low tar and ultra low tar cigarettes. This variability would preclude sweeping generalizations that all low tar and ultra low tar smokers are exposed to higher levels of smoke constituents and mutagenicity.

- The hypothesis that small differences in Ames test mutagenicity per milligram tar, or in levels of particular smoke constituents per milligram tar (or per milligram nicotine), demonstrate that low tar or ultra low tar cigarettes, such as Marlboro Lights and Marlboro Ultra Lights, are "more dangerous" with respect to cancer than full-flavor cigarettes, such as Marlboro Full Flavor, would be inconsistent with laboratory animal studies showing no correlation between mutagenic and carcinogenic potency. It would also be inconsistent with epidemiological evidence indicative of a reduction (or even no reduction) in lung cancer risk for lower tar, lights or ultra lights cigarettes as compared to higher tar, full-flavor cigarettes.

- There is no scientific basis for a claim that smoke produced by Marlboro Lights and other lower tar cigarettes is, or may be, more dangerous than smoke produced by Marlboro Full Flavor and other regular cigarettes. Small reported differences in mutagenicity and smoke constituent yields per milligram tar or nicotine do not support that claim. Based upon the available evidence, and in the absence of any persuasive evidence to the contrary, I conclude that smoke produced by Marlboro Lights is not inherently more dangerous than smoke produced by Marlboro Full Flavor. The chemical composition of cigarette smoke and tar, and its toxicological impact at equal dose levels, is essentially the same for all conventional tobacco-burning cigarettes, including Marlboro Full Flavor and Marlboro Lights regardless of how they are smoked. In that context, I would agree with the simple statement that: "tar is tar." This means, based on traditional dose-response principles, that smokers who get lower tar from smoking Marlboro Lights (or other lower tar cigarettes) are likely to reduce their risk of disease.

4

- In the absence of specific data to the contrary, my conclusions expressed herein with respect to Marlboro Full Flavor and Marlboro Lights and Marlboro Ultra Lights cigarettes will also be valid with respect to other Philip Morris regular, full-flavor and lights/ultra lights cigarettes.

## II.    Education, Experience, and Background

6.    I have M.S. and Ph.D. degrees in microbiology from George Washington University in Washington, D.C., a J.D. from North Carolina Central University School of Law, and am currently an inactive member of the North Carolina State Bar, and I have never practiced law.  I have more than 40 years experience in biology and toxicology as a laboratory researcher, project director, and scientific program manager.  I performed and directed genetic toxicology (e.g., chemical mutagenicity) testing and research at the Food & Drug Administration (FDA) for 7 years and then at the National Institute of Environmental Health Sciences (NIEHS), NIH, for 24 years, until retiring in December 2000 to work as a consultant in Chapel Hill, NC.

7.    I began doing research in genetic toxicology in 1969, prior to its being recognized as a separate research field, and before it was adopted by regulatory agencies, and I am intimately familiar with the scientific development of the field from that period to the present day.  Much of my scientific career has been in the design and direction of laboratory validation studies to determine the effectiveness of short-term genetic toxicity tests and develop standardized test protocols; the use of genetic toxicity tests to measure mutagenicity and predict carcinogenicity; the evaluation, interpretation, and integration of toxicological test data; structure-activity relationships in mutagenicity and carcinogenicity; and the study of mechanisms of chemical mutagenesis.

8.    Much of my work was performed under the auspices of the U.S. National Toxicology Program (NTP).  The NTP is a cooperative DHHS program among

5

the NIEHS, FDA, and NIOSH, and headquartered at NIEHS, to test chemicals of interest for toxic effects, including mutagenicity and carcinogenicity.  I was responsible for developing, implementing, and managing the genetic toxicology testing program for the NTP and evaluating the test data, most of which was produced by contract laboratories under my direction.  The results from this testing program are considered authoritative by government regulatory authorities and industry in the U.S. and internationally.  During my tenure in this program, from its inception in 1979 through 2000, I was responsible for the testing of more than 3,000 test samples (representing more than 2,000 individual chemicals) in the Ames (*Salmonella typhimurium*) test, more than 600 chemicals in mammalian cell chromosome aberration tests, and more than 100 in rodent chromosome damage tests.  During this time, other scientists under my supervision were responsible for conducting and supervising genetic toxicology tests using other test systems, including yeast and fruit flies, and my own laboratory at NIEHS was also responsible for the testing of chemicals in the Ames test, and research relevant to the evaluation and further understanding of the Ames test procedures.  The data and results from all these tests are publicly available, and I have authored or co-authored peer-reviewed scientific publications containing the results from more than 1,500 Ames test chemicals and 300 in vitro chromosome aberration test chemicals.  Two of the Ames test data evaluation papers I co-authored received awards from the American Statistical Association as best papers of the year in 1982 and 1986.

9.      During my government career, I was the project officer or co-project officer for more than 40 U.S. Government research and development contracts and inter-agency agreements.  In this capacity I was responsible for the development, management,

6

and/or technical direction, of contract awards to contract research organizations, universities, and national laboratories. The contracts were primarily for the development, validation, and use of short-term genetic toxicity tests for large-scale testing of chemicals, identification and isolation of mutagens from chemical mixtures, support of genetic toxicology databases, and preparation of toxicology literature searches and summary documents for chemicals of interest. My contract-related responsibilities included the development of contract work descriptions, pre-award site visits to evaluate laboratory capabilities, recommendations for award, development of test procedures and evaluation of data, and ongoing contract supervision using post-award laboratory site visits and laboratory data submissions to monitor and evaluate performance and trouble-shoot problems, and preparation of testing reports for internal use and for publication in the peer-reviewed scientific literature.

    10.    I was involved with the development and implementation of the NIH Congressional mandate to implement test validation principles and procedures. As a charter member of the DHHS Interagency Coordinating Committee on the Validation of Alternative Methods (ICCVAM), I also served as Chair of its Method Validation Workgroup which was responsible for developing the guidelines for validating tests, which were incorporated into the Committee's report on Validation and Regulatory Acceptance of Toxicological Test Methods. I spent much of my time while on detail at the Organization for Economic Cooperation and Development (OECD) in 1999-2000, and subsequently as an independent consultant, in the drafting and re-drafting of the OECD Guidance Document on the Harmonization and Acceptance Criteria for Alternative Toxicological Test Methods, and assembling and responding to comments on

the initial drafts of the document from the member countries.  After retiring from NIH, I served as a Consultant to the OECD for directing and evaluating animal test validation studies.  I have published articles on the procedures and criteria for validating new test methods, am recognized as a coauthor of the U.S. and OECD validation documents, and have been invited to lecture on issues relating to scientific validation at various scientific conferences. I continue to serve as a consultant to ICCVAM for review and evaluation of validation study documents.

      11.      I am a member of a number of scientific societies, including the Environmental Mutagen Society (since its year of inception, 1969); Genetics and Environmental Mutagen Society (Charter member), and the Society of Toxicology, and have more than 200 publications in the scientific literature, including more than 160 in peer-reviewed journals.  I serve or have served on a number of editorial boards (including Mutation Research, Environmental and Molecular Mutagenesis, and Environmental Health Perspectives), was Editor-in-Chief of the scientific journal, Environmental and Molecular Mutagenesis, serve as a peer reviewer for other scientific journals, and was co-editor and contributor to the 1997 HANDBOOK OF CARCINOGENIC POTENCY AND GENOTOXICITY DATABASES.[1]  Since 1978 (not every year), I have been a volunteer lecturer in the graduate programs in the Pharmacology Department of Duke University or the Toxicology Program at N.C. State University on topics that have included genetic toxicology, the uses of short-term toxicology tests in carcinogen screening, metabolism of carcinogens and mutagens, and scientific publication and peer review.  I continue to receive invitations to present lectures on genetic toxicity testing and data evaluation, and

on the scientific validation of new test systems at scientific conferences and to various organizations, and to serve on expert committees.

12.       Since January 2001, I have been working from a home office as an independent toxicology consultant, with clients in the U.S., Canada, and Europe.  My clients have included U.S. Government and military organizations; chemical, pharmaceutical, and cosmetic companies; contract research organizations; database development companies; other consultants; a multi-national organization; and law firms.

**III.    Analysis and Discussion**

      **A.       Mutagenicity Testing Background and Principles**

13.       A substantial portion of my report addresses mutagenicity studies of cigarette smoke tars.  For this  reason, it is important to begin with a discussion of the background and principles of mutagenicity testing.  After providing brief context on mutations in general, I will address the appropriate scientific use and relevance of the Ames mutagenicity test, and its relevance to potential health effects such as cancer.

      **1.       Mutations**

14.       Mutagenicity is a natural event and mutagens are present in our everyday lives.  Mutagenicity is a change in DNA or chromosomes that is, or can be, inherited in future generations of the cell or the organism.  DNA is present in all cells of the body except red blood cells and informs the structure and activity of other body substances, such as enzymes and hormones, that have a direct effect on the functioning of an individual.  DNA is constructed from four chemical bases arranged in paired configurations on two complementary DNA strands.  In a mammalian cell, the DNA, in combination with proteins and other molecules, forms structures called chromosomes.

As a point of reference, the DNA in a human cell contains approximately 3 billion base pairs [65],[66],[79] arranged in 46 chromosomes, as compared to a Salmonella cell of the type used in the Ames test, which contains approximately 5 million base pairs on its single chromosome.[64]  A mutation can be the replacement, gain, or loss of a single chemical base, or a rearrangement or loss of one or more sections of the chromosome. Such effects, if they do not cause the cell to die, will lead to a heritable change in the DNA structure.  The majority of the single-base changes are neutral, meaning that they have no adverse effect on the cell's structure or function.  Other mutations, if they occur in critical genes for cancer development, can lead to the formation of a cancer cell or to genetic diseases or anomalies in future generations.

15.     Mutations appear constantly as a result of mistakes that occur naturally during the normal cell replication process or from substances to which the body is constantly exposed.  These substances – or mutagens – can be formed in the body during normal metabolic processes, inhaled or ingested through their presence in the air[68] or water[69, 70], formed during the processing or cooking of food[72,73], in addition to those that people are exposed to from pharmaceuticals, industrial chemicals, some plant products, and smoke. [67]  Common mutagens include sunlight and fluorescent light [80], house dust [71], coffee and tea [81-82], cooking oil fumes [83], and broiled [84-87] or boiled [88-89] meat.

16.     The interaction of a chemical with DNA is not sufficient to form a mutation; the mutation is formed when the cell's DNA repair systems fail to remove the damage or when, during the repair of the damage, the cell inadvertently induces the mutation.  A mutation is considered to be necessary, but not sufficient, to produce a

cancer.  In addition to occurring in a gene that is critical for cancer formation, a number of additional cell mutations, or other changes, some of which are termed "epigenetic," are required for a cell to progress to a tumor cell.[76, 77]  As a result, a mutation is not equivalent to a cancer, not all substances that can cause mutations cause cancer, and not all cells that contain mutations progress to the formation of a cancer.

## 2.   Uses and Relevance of the Ames Test

17.     The following discussion addresses the results of studies of the mutagenicity of cigarette smoke tars.  For this reason, a brief description of the primary test used (the Ames test), and its relevance to potential health effects such as cancer, is presented prior to discussion of the interpretation and implications of the test's results.

18.     The Salmonella mutagenicity test (commonly called the "Ames test") was developed by Professor Bruce Ames, University of California, Berkeley, in the early 1970s.[2-5]  The test uses a number of strains of genetically-engineered Salmonella bacteria to identify substances that can cause mutations in their DNA.  Substances that can cause mutations in these bacteria are of interest because there is of a correlation between the ability to cause mutations and the ability to cause cancer in laboratory animals.  On the other hand, there are significant differences between Salmonella bacteria cells and human cells, most specifically in the amount of DNA, as explained above, and metabolism, as explained below.

19.     Normally, Salmonella bacteria can synthesize all the amino acids and vitamins needed for growth and survival, and can grow and form colonies in a petri dish if their only source of energy is glucose or other sugars.  Professor Ames and his colleagues developed a number of different Salmonella strains that could not synthesize

11

the amino acid histidine because of mutations in the genes that control its synthesis.
Because of these mutations in their DNA, the Ames test bacteria can grow and form
colonies only if they are supplied with histidine or if they undergo a further mutation that
allows them to synthesize histidine.  There are a number of different tester strains of the
Salmonella bacteria (e.g., TA98, TA100), each with a different mutation, which makes
them susceptible to different classes of chemical mutagens.  Professor Ames also
increased the sensitivity of the bacteria to DNA-damaging chemicals by engineering
additional changes into the cells to make them more susceptible to mutagens and
mutations.

        20.      The Ames test measures the ability of pure chemicals or mixtures of
chemicals to produce a mutation in the bacteria that will allow them to synthesize
histidine. When performing the test, the bacteria are mixed in a test tube with the test
substance and agar containing glucose (which will allow only the cells that can
synthesize histidine to grow), placed in a petri dish, and allowed to grow for two days.
Chemicals that are mutagens will cause the bacteria to revert to the condition where they
can again synthesize histidine and grow and form colonies, and the number of colonies of
these histidine-synthesizing bacteria on the agar will be an indication of the mutagenicity
of the test substance.

        21.      Humans and most other animals metabolize most chemicals primarily in
their livers (though also in other organs), and metabolism is required to activate many
environmental chemicals to their toxic forms; it is also required to inactivate other active
chemicals.  Because these Salmonella bacteria do not have the liver enzymes for these
metabolic reactions, Professor Ames mixed a rat liver extract (called "S9") with the test

12

chemical before placing it in the petri dish.  The S9 extract mimics the metabolism of an animal and enables the chemicals that have to be metabolized to form mutagens to be active and produce colonies in the Ames test.  Detailed protocols for the performance of the Ames test have been published.[6-8]

22.       The initial studies using the Ames test reported that it was approximately 90% accurate in identifying chemicals that can cause cancer in experimental animals [9-11], although it did not predict the levels of cancer.  Subsequent studies, including those that I was involved in conducting, and that were published in peer-reviewed scientific journals [12-15], used a wider range of chemical classes and showed that approximately 50% of known laboratory animal carcinogens are not mutagenic in this test, and that the test has a false positive prediction rate of 20-25%.

23.       It has been well documented since the 1980s in the scientific literature that a high proportion of the identified rodent carcinogens are not Ames test mutagens (e.g. 31% of 33 carcinogens).[78]  Among the more recent values published were, 43% of 292 carcinogens [74] and 46% of 205 carcinogens.[14]  An examination of the 2009 International Agency for Research on Cancer (IARC) list of chemicals that are carcinogenic in humans [90] similarly shows that not all known human carcinogens are mutagenic in the Ames test.  There are 244 chemicals that are classified as known, possible, and probable (i.e., IARC Groups 1, 2A, and 2B) human carcinogens[90], for which Ames test data are available in the NTP [91], IARC, or Gold [1, 92] databases; of these, approximately 30% are negative in the Ames test.  Despite these limitations, the Ames test is appropriately still considered to be a predictor of presumptive animal or human carcinogens.  As a consequence of these studies of test performance, the U.S.

13

FDA and EPA, and international regulatory authorities generally require that Ames test data be available as a part of the regulatory approval process before a food additive, drug, pesticide, and, in some countries, commercial chemicals, can be marketed.[16-21]  To support these testing requirements, EPA, FDA, and international test guidelines have been developed to direct the conduct of the test.[22-27]  The Ames test is also used by industry as a preliminary screening test to characterize products in development before they are considered for submission to a regulatory agency.  Other uses of the test include the monitoring of chemical production processes to follow the presence of mutagenic contaminants, and selection of specific chemicals to develop for potential commercial applications given the choice of mutagenic and nonmutagenic possibilities.

24.     A positive result in the Ames test, sometimes in concert with positive results in other tests, indicates that further testing is appropriate to determine whether or not the substance would cause cancer in laboratory animals.  When the test is used as part of a research program, further testing is not necessary if the substance is already known to be a carcinogen.

25.     The Ames mutagenicity test is one of a number of genetic toxicity tests that are routinely used to evaluate chemicals, drugs, and environmental samples for potential hazard and for regulatory submissions.  In determining whether or not a chemical or product should be allowed to be marketed, the Ames test results are used by U.S. and international regulatory authorities along with the results of other genetic toxicity tests and animal toxicity and carcinogenicity tests, in a weight-of-evidence approach, to determine the potential risk to humans.[16-20]

### 3.      Potency of Response in the Ames Mutagenicity Test

26.      When testing for mutagenicity, the results are typically summarized as "positive" or "negative."  Among the positives, there is a wide range of "potency" of the responses.  As a simple example, substance X may produce 100 mutants in the Ames test, while an equal weight (in milligrams) of substance Y may produce 1000 mutants.  These values of mutants per milligram sample are considered the "potency."  Substance Y in this example is 10-times "more potent" in the Ames test than substance X, but both results are considered positive responses.  Regardless of its potency, a positive response in the Ames test or other mutagenicity tests provide an indication that the substance is more likely than not to be a carcinogen – that is, capable of producing cancer in a laboratory animal test.  However, substances that are more potent in the Ames test are not more likely to cause cancer than substances that are less potent in the Ames test.  A higher level of mutagenicity between two positive Ames test mutagens is no more predictive than flipping a coin, in terms of predicting whether one substance "may be more dangerous" or "may cause more cancer" than the other.

27.      It has been published scientific knowledge for decades that (i) cigarette smoke tars are consistently positive in the Ames test, and (ii) some cigarette tars produce a more potent mutagenic response per milligram tar in the Ames test than other cigarette tars.  I will discuss examples of that published knowledge later in this report.  Here, I address an allegation that I understand has been made in various lawsuits – in substance, that among Ames test positives, increased mutagenic potency is, or could be, indicative of increased cancer risk in people.  That allegation is wrong.  The potency of the Ames

15

test response has no predictive value for the potency of the response in animals or humans, including carcinogenicity.

28.     The U.S. and international regulatory communities that require Ames test data for regulatory approval of food additives, drugs, pesticides, and other chemicals, are concerned only with whether the test is positive or negative, and do not consider the potency of the responses.  In the U.S. and international test guidelines [22-27], the Ames test results are used only at the level of "yes" or "no", i.e., "mutagenic" or "nonmutagenic"; the potency of the mutagenic response (e.g., the number of Salmonella mutants per milligram) is not addressed.  For instance, in Redbook 2000, which sets forth FDA's guidelines for assessing the safety of food additives, FDA states that "This [Salmonella] test therefore does not provide direct information on the mutagenic and carcinogenic potency of a substance in mammals."[23]  Substances that produce low-level positive responses are treated similarly to those that produce more potent responses.  The presumption of human carcinogenicity from a positive Ames test can be rebutted by experimental evidence showing the substance to be noncarcinogenic in laboratory animals, or by showing that the carcinogenic effect in laboratory animals is by a mechanism of action that is not relevant to humans.

29.     Regulatory agencies use only the qualitative (positive/negative) response because, as explained above, the potency of a positive mutagenic response is not predictive of cancer, and carcinogenic potency cannot be inferred from mutagenic potency.  My research, and research from other laboratories, has shown that a finding that one substance is more mutagenic than another does not imply that it will also be more carcinogenic.  The most potent mutagens are not necessarily most potent carcinogens,

and vice versa, and the potencies of Ames-test mutagens that are not carcinogens (i.e., the false positive responses) are in the same range as the potencies of mutagens that are carcinogens. For example, in (unpublished) data evaluations I have performed using rodent cancer and Ames test mutagenicity data from more than 100 chemicals tested by the U.S. National Toxicology Program, the potency range of the Ames test responses for chemicals that *were not* animal carcinogens was equivalent to the potency range of responses for the chemicals that *were* animal carcinogens. In other words, noncarcinogens can be more, less, or as mutagenic as carcinogens. This simple example provides compelling evidence that the level of mutagenicity is in no way predictive of the level of carcinogenicity.

30.     Based on my research and experience with the Ames test, studies I have published and presented at scientific meetings, and published studies from other laboratories, it is clear that differences in mutagenic potency of chemicals as measured by the Ames test do not demonstrate or predict differences in carcinogenic potency in laboratory animal cancer tests or in humans. [31-33] Accordingly, differences in mutagenic potency in the Ames test are not used within the U.S. and international regulatory communities either as a basis to require further testing or for other regulatory decisions. In support of my opinion that the potency of the Ames test response cannot be used as an indicator of the potency of carcinogenicity in laboratory animals or humans, I also note the conclusions of a U.S. DHEW (Department of Health, Education & Welfare) Government committee in 1977 [28], of the U.S. National Academy of Sciences in 1983 [29], and the WHO-International Agency for Research on Cancer (IARC) in 2004 [30], and numerous publications in the scientific literature, including some of my own, on this

subject [28, 31-33], that have addressed the question. Of particular relevance is a statement by the IARC in the Preamble to its 2004 monograph on tobacco smoke and cancer, which states "Relative potency in tests for mutagenicity and related effects is not a reliable indicator of carcinogenic potency."[30] Similarly, during a deposition in the Schwab case, Dr. Shields testified that he could not "state to a reasonable degree of scientific certainty" that relative potency in tests for mutagenicity is a reliable indicator of carcinogenic potency either in animals, or in people.[110]

31.     Public health experts around the world continue to call into question the suitability of the Ames assay for the evaluation of risk differentials between cigarette types. For example, in May 2009, the U.K. Ministry of Health's Committees on Toxicity, Carcinogenicity and Mutagenicity, issued its 2008 Annual Report, in which its Committee on Mutagenicity stated that "existing toxicological tests (Ames Assay, Neutral Red Cytotoxicity Assay and Micronucleus assay being the most commonly used) … are inadequate in evaluating tobacco products, as they were not intended to measure the biological or epidemiological activity of these products." [94] Similarly, the U.K. Ministry of Health's Committees on the Toxicity of Chemicals in Food, Consumer Products and the Environment reported in 2008:

> Currently, there are no adequate and reliable methods by which to … evaluate the total toxicity of tobacco products … The Committee commented that the tests may be scientifically valid for product comparison, but that extrapolation of the results, particularly of some of the *in vitro* tests, to human exposure was not possible. All tobacco products are harmful and the Committee queries whether there was any evidence that data from toxicological testing of tobacco products could differentiate usefully between different products. [94]

The reference in the preceding quote to "*in vitro* tests" is a reference to Ames

18

mutagenicity tests and other similar biological tests.

32.     Similarly, the World Health Organization study group on Tobacco Product Regulation (TobReg) determined that, while "measures of cellular or organ changes consistent with tobacco related injury and disease … have been suggested as potential biomarkers of tobacco-related injury, … to date, none has been validated since it has not been demonstrated that a change in the biomarker reliably predicts a difference in disease risk."[95]  The reference in the preceding sentence to "cellular changes" is a reference that would include *in vitro* genetic toxicity tests, including the Ames test.

33.     In the context of cigarettes and tobacco, a simple example illustrates the principle that increased mutagenic potency in the Ames test does not demonstrate, predict, or suggest an actual or potential increase in carcinogenic potency in animals or in humans.  Cigarettes in the U.S. typically contain a mixture of different agricultural varieties of tobacco, including Burley tobacco and Bright (also called Virginia or flue-cured) tobacco.  As early as 1977, Mizusaki et al. reported that in the Ames test, Burley tobacco is approximately two-times more mutagenic per milligram tar than Bright tobacco.[44]  It had been previously shown, however, in 1963, that the opposite was true in mouse skin painting carcinogenicity studies  –  i.e., Bright tobacco is significantly more carcinogenic than Burley tobacco.[114]  Thus, by the late 1970s, it was evident that tobacco smoke condensate that is *more mutagenic* in the Ames test is *less carcinogenic* in animal cancer tests.

34.     This analysis can be extended by an examination of epidemiological data, which provide additional evidence that higher mutagenicity in the Ames test does not predict increased disease risk in humans.  In 2006, Lee *et al.* examined the risk of

lung cancer associated with various cigarettes, finding a reduced risk from low tar
cigarettes. [96]   Among their conclusions were "[t]he decline [in lung cancer rates in men
and women] was better fitted by models assuming little compensation" and
"[i]nterpretation [of the data] is not straightforward, but the findings suggest declines in
[tar] yields have contributed to the recent declines in rates in young U.S. men and
women."  A more recent, 2009, epidemiology study published by Lee and colleagues is
significant because it shows that differences in mutagenicity in the Ames test between
different cigarette types do not translate into differences in disease in humans. [97]   The
authors used smoking and disease data from 1971 to 2000 to compare the risks of lung
cancer and chronic obstructive pulmonary disease in countries (e.g., Canada) where flue-
cured cigarettes (containing essentially 100% Bright tobacco) are smoked by the
overwhelming majority of smokers with the same risks in countries where virtually only
blended cigarettes (which contain a blend of Burley, Bright, and Oriental tobaccos and
flavorings) are smoked, i.e., the U.S.  Previous studies had shown that the total particulate
matter ("TPM," defined as the substance that is collected on the pad of standardized tests,
such as the FTC test) from flue-cured cigarettes is less mutagenic in the Ames test than
from blended cigarettes, whereas flue-cured was more cytotoxic to cells *in vitro* and
produced more tumors than blended tars on mouse skin.  Based on their analyses, the
authors concluded that there was little indication of any difference between smokers of
these cigarette types with respect to their risks of lung cancer or COPD.  These
epidemiological data, in concert with the mutagenicity data, provide additional evidence
that higher mutagenicity in the Ames test associated with certain cigarette types does not
translate into increased disease risk in humans.

B.     **Evaluation of Cigarette Testing Data**

35.     I understand that it has been claimed that smoke from Marlboro Lights is more dangerous, or "may be" be more dangerous, than smoke from Marlboro Full Flavor cigarettes.  I understand also that similar allegations have been made comparing lower tar with higher tar cigarettes generally, and that these claims are based on Ames test mutagenicity data and smoke constituent analysis data.  As addressed below, these claims have no scientific basis and are contrary and inconsistent with existing data and generally-accepted scientific principles.  In this section of my report, I examine the evidence and provide my weight of evidence evaluation of the relative overall toxicity per milligram tar for these cigarettes.

1.     **Mutagenicity Results Per Milligram Tar for Lower Tar and Light Cigarettes vs. Full Flavor Cigarettes**

36.     It has been known since 1974 that cigarette smoke tars are mutagenic in the Ames test [34], and subsequent studies showed that they are also mutagenic in other in vitro genetic tests.  Studies using model reference cigarettes on smoking machines show that the total mutagenicity from a cigarette is less for low-tar than for high-tar cigarettes, but that, on a per-milligram basis, the Ames test mutagenicity of low tar cigarettes tends to be equivalent to or higher than the mutagenicity of high-tar cigarettes.  Other in vitro genetic toxicity tests using bacterial and mammalian cells performed by Philip Morris USA and others show patterns of responses that are different from the Ames test, e.g., the tar from high-tar cigarettes is of equivalent mutagenicity, or more mutagenic, than the tar from low-tar cigarettes.

37.     A study published in 2004 in a peer-reviewed scientific journal by scientists affiliated with Philip Morris USA compared the smoke constituent

21

compositions and mutagenicities of tars from a variety of commercial and reference cigarettes, including Marlboro Full Flavor and Marlboro Lights, when smoked according to two different machine-smoking methods – the FTC and Massachusetts Department of Public Health (MDPH) methods.[35]  The MDPH method, which is a more intense smoking method than the FTC method, was designed to more closely approximate how cigarettes are actually smoked by people who may be compensating for the lower-tar product.  This study used two different Ames tester strains, both of which are known to be responsive to cigarette smoke tar.  The tar from Marlboro Full Flavor cigarettes was statistically less mutagenic per milligram than from Marlboro Lights in one tester strain using the FTC smoking method, but the results for the other strain using the FTC method, and for both strains using the more intense MDPH method, showed that the Lights had equivalent mutagenicity per milligram tar as the Full Flavor.  In all cases, the numerical differences among the mutagenicity responses were very small.  The results of this study show that the mutagenicity of tars from Marlboro Lights and Marlboro Full Flavor cigarettes is equivalent.

38.     A similar study, published in 2006 by scientists from Philip Morris Research Laboratories in Germany, compared the mutagenicities of tars produced by various cigarettes when smoked according to the FTC and MDPH methods using a mammalian cell mutation test.[58]  This test – specifically, the mouse lymphoma thymidine kinase assay – is part of the basic genetic toxicity testing battery used by U.S. regulatory agencies and worldwide and is regarded by them to be an effective and relevant mammalian screen for identifying carcinogens.  Under FTC method conditions, Marlboro Full Flavor and Marlboro Lights cigarettes produced equivalent mutagenic

responses in mammalian cells on a per milligram tar basis. Statistically significant differences between these two cigarettes were reported when the MDPH method was used; however, these differences were minimal, and in different directions, i.e., the mutagenicity per milligram tar was lower in Marlboro Full Flavor when metabolic activation was used, but lower in Marlboro Lights in the absence of metabolic activation. The mutagenicity per milligram tar of cigarettes smoked under MDPH conditions was consistently less than that of the same cigarettes smoked under FTC conditions.

39.     Another study supported by Philip Morris USA, published in 2008, compared Marlboro Full Flavor and Marlboro Lights, and Marlboro Ultra Lights (with tar yields of 15.3, 10.8, and 6.2 mg, respectively) in both in vitro and in vivo toxicity tests.[78] In vitro toxicity was evaluated using the Ames mutagenicity test and a mammalian cell cytotoxicity (toxic to cells) test to compare the tars of these cigarettes when smoked using the ISO method (which is comparable to the FTC method). An inhalation test with rats compared the in vivo toxicity of these cigarettes in rats exposed to cigarette smoke at similar nicotine levels by inhalation, 6 hrs/day for 90 days. The levels of ventilation used in the Marlboro Full Flavor, Marlboro Lights, and Marlboro Ultra Lights cigarettes tested in this study were, approximately, 10%, 20%, and 50%, respectively.

40.     The results from these Ames studies support my judgment that differences in specific mutagenicity (i.e., mutagenicity per milligram tar) between Marlboro Full Flavor, Marlboro Lights, and Marlboro Ultra Lights cigarettes are small and not always statistically significant. Two batches of tar from each cigarette type were tested, and the differences in mutagenicity between the two batches from the same

cigarette type were equivalent to, or greater than, the differences in mutagenicity between the different cigarette types.  When both tests were combined, the tar from the Ultra Lights cigarette was the most mutagenic, and the tar from the Full Flavor cigarette was the least mutagenic.  If only the first of the two tests is examined, the tar from the Lights cigarette was more mutagenic than the tar from the Ultra Lights, but the differences were not always statistically significant.[79]  These small differences in responses between different cigarette types and between separate batches of the same cigarette type support and extend my scientific opinion that decreases in FTC tar levels per cigarette and increases in ventilation do not necessarily lead to increased mutagenicity per milligram tar.

41.     The results from this study also support my judgment that the in vitro, mammalian cell cytotoxicity per milligram tar is similar among tars produced by Marlboro Full Flavor, Marlboro Lights, and Marlboro Ultra Lights cigarettes [78], as are in vivo toxicity effects in male and female rats following 90-days of inhalation of smoke from these three cigarette types when these rats were exposed to similar nicotine levels.[78]

42.     This study is noteworthy, in part, because it contains peer-reviewed, published research data that focus on Marlboro brand variants using a generally-accepted, animal toxicity test. [78]  After rats were exposed to equal doses of smoke from the three cigarette types for 90 days in a typical toxicology study, the pathology results from the nasal cavities, throat, and lungs of male and female rats showed that the smoke from the Marlboro Full Flavor, Marlboro Lights, and Marlboro Ultra Lights cigarettes produced similar effects.  The authors concluded that there were "no toxicologically meaningful

differences between the [toxicology] of profiles evaluated at similar smoke concentrations for the three commercial cigarettes." These results support my conclusions regarding the Ames mutagenicity test data, to the effect that the in vitro effects of the tars from Marlboro Full Flavor and Marlboro Lights cigarettes are equivalent, as are the in vivo effects.

43.     It is my scientific opinion that, although some of the differences in mutagenicity per milligram tar between Marlboro Lights/Marlboro Ultra Lights and Marlboro Full Flavor cigarettes, and low- and high-tar reference cigarettes with comparable FTC yields, may be statistically significant, they are not biologically relevant. Among other reasons for this opinion, the differences seen in Ames test mutagenicity results are not reflected in comparable differences in other relevant biological tests, including mammalian cell tests and mouse cancer tests. It is noted that the EPA, FDA, and international regulatory test guidelines for the Ames test stress that the biological relevance of the test results is most important and that statistical significance is considered to be useful only as supporting information.[22-27] These guidelines state, in the sections on evaluation and interpretation of results, "There are several criteria for determining a positive result, …. Biological relevance of the results should be considered first. Statistical methods may be used as an aid in evaluating the test results []."[26, 22-23] The FDA's pharmaceutical test guidelines similarly stress the need to evaluate test results for their biological relevance.[24-25]

44.     As will be elaborated in the following paragraphs, a number of facts and scientific studies support my conclusion that the relatively small differences in mutagenicity between tars from full-flavored and light cigarettes are not biologically

relevant – among them, the wide range in mutagenic potencies of substances, the variability in responses for the same samples among repeat Ames tests, and the divergent responses for the same samples in other relevant biological tests.

45.     First, Ames tests results extend over a potency range of more than a million-fold.  Laboratory animal cancer test results show a similar, broad range of potencies.  The differences in estimated mutagenic potency per milligram tar comparing Marlboro Full Flavor and Marlboro Lights/Marlboro Ultra Lights cigarettes is *de minimis* by contrast – tending to range up to only 1.5-fold.[35] [78]

46.     Second, there are variabilities inherent in the methods used to smoke cigarettes, to measure the cigarette constituents, and to measure the mutagenicity of the cigarette tars.  In addition, a study using the FTC method showed that there are differences in the relative proportions of the smoke chemicals in the Marlboro Full Flavor and Marlboro Lights cigarettes produced in different years, and differences in the mutagenicities of different batches of tar collected from the same cigarette type within the same research study.[78] The available mutagenicity data demonstrate that the differences in tar and mutagenicity among different tobacco blends, or following different machine smoking methods, are at least as great, or greater, than the differences in mutagenicity between Marlboro Full Flavor and Marlboro Lights/Marlboro Ultra Lights cigarettes.  It is my scientific opinion that, as a result of this inherent variability in the measurements of tar and mutagenicity, it is not possible to ascribe biological relevance to the relatively small differences in mutagenicity per milligram tar between Marlboro Full Flavor and Marlboro Lights/Marlboro Ultra Lights cigarettes, or between low- and high-tar reference cigarettes with FTC yields comparable to those brands.

47.     Third, in addition to the Ames test, a number of other genetic toxicity tests are routinely required by regulatory authorities for testing substances for regulatory submissions.  These other tests, many of which are in mammalian cells in vitro or in rats and mice in vivo, measure gene mutations, similar to those measured in the Ames test, and/or chromosome damage.  These different mutagenicity tests often yield different results for the same test samples.  Like the Ames test, these tests are also considered relevant by regulatory authorities for identifying potential carcinogens, and are required for regulatory approval of drugs, food additives, pesticides and, in some countries, industrial chemicals.

48.     Philip Morris USA studies in the 1970s have shown that Ames test results are not consistent with the results of testing the same tars in other biological test systems used to predict carcinogenicity.  For example, when the relative mutagenicities of different tar samples in the Ames test are compared to *E. coli* and yeast genetic test systems that were widely used in the 1970s and 1980s, the *E. coli* and yeast systems showed the opposite relative activities – i.e., the more potent tar samples in Salmonella were less potent in *E. coli* and yeast.  As another example, although Burley tobacco tar is less carcinogenic than Bright tobacco tar in mouse skin cancer studies, Burley is approximately twice as mutagenic per milligram tar as Bright in the Ames test.  In contrast, Bright is about one-third more mutagenic than Burley in the mouse lymphoma cell mutation test[58]; in a yeast test, Bright is almost twice as potent in producing chromosome damage and slightly more potent in producing mutations as Burley.[59]  In a recent study supported by the Centers for Disease Control and Prevention and published in a peer-reviewed journal, cigarette smoke condensate (CSC) from a Burley tobacco

27

cigarette was more mutagenic than CSC from a Bright tobacco cigarette in the Ames test and in a mammalian cell micronucleus test (a measure of chromosome damage, discussed below), but the Burley CSC was completely inactive in a chromosome aberration test using a different mammalian cell line.[62]  These data demonstrate that differences in mutagenicity of cigarette tars in the Ames test cannot be used to predict differences in responses to cigarette tars in other biological systems, such as other genetic toxicity tests, rodent cancer tests, or by inference to an exposed human.

49.     Cytogenetics tests are another category of in vitro tests routinely used to measure the capacity of substances to induce genetic damage.  A brief description of these tests, and of their results in studies involving cigarette smoke, provides important context for assessing the biological relevance of Ames mutagenicity test data and for emphasizing the point that the potency of the responses in any one of these in vitro genetic toxicity tests is not predictive of the anticipated response in any other in vitro test, in animal tests, or in humans.

50.     Cytogenetics tests measure the effects of chemicals on the integrity of chromosomes.  Chromosomes, which are found in all cells (except mammalian red blood cells), are composed of DNA, proteins, and other molecules.  An advantage to studying chromosomes is that they can be observed under the microscope, and defects or damage such as chromosome breaks, structural rearrangements, and the loss or gain of chromosomes can be readily identified.  The three types of chromosome effects most often measured in cytogenetics tests are sister chromatid exchange (SCE), chromosome aberrations, and micronuclei.

51.     SCE refers to the exchange of genetic material between the two

28

chromatids ("sister" chromatids) that make up a chromosome. SCE tests were used extensively in the 1970s and 1980s as a presumptive replacement or alternative for chromosome aberration tests because, similar to aberration tests, they measured structural changes in chromosomes but were easier to perform and took less time. As a result, SCE tests were included in the US-EPA and international testing guidelines and regarded as equivalent to the Ames test in terms of their ability to distinguish potential carcinogens from noncarcinogens. Subsequently, studies in the 1980s and 1990s, including some that I published, showed that the SCE test produced a high rate of false positives – that is, positive responses for a large proportion of substances that were not in fact carcinogens. Additionally, unlike chromosome aberrations, the mechanism of SCE formation was not understood, and the association of SCE with cancer was not as strong as originally thought. As a result, in the late 1980s and early 1990s, SCE tests fell out of favor, and today they are no longer required or recommended by US regulatory agencies.

52.      Chromosome aberration tests examine chromosomes for specific types of damage, including chromosome breaks and rearrangements. Such damage often leads to the death of the affected cell; however, cells can survive and multiply while carrying some chromosomal damages, and there are a number of cancers that have been associated with specific chromosome damage of the types studied in chromosome aberration tests. These aberrations are considered to be one step in the production of tumors in humans and animals. They can also be more easily measured in vivo than gene mutations of the type measured by the Ames test. U.S. regulatory agencies like FDA and EPA, as well as international regulatory authorities, give equivalent weight to a positive result in the chromosome aberration test as they give to a positive result in the Ames test. Both tests

are used by the agencies to distinguish potential carcinogens from noncarcinogens, and a positive result in either test is sufficient to designate substances as a presumptive carcinogen. However, as with the Ames test results, the potency of the chromosome aberration (or SCE) test responses are not predictive of differences in carcinogenic potency.[60]

53.    The micronucleus (MN) test has been proposed as a regulatory alternative to the chromosome aberration test because it also provides a measure of chromosome breaks and rearrangements, but requires less training, is easier to perform and evaluate, and can also be used as an indicator of chromosome loss. When a cell divides, broken chromosomes do not always distribute evenly between the two daughter nuclei and, as a result, the broken chromosome fragment can appear in one of the daughter cells as a micronucleus. Similarly, if an entire chromosome is not incorporated into the nucleus after nuclear division because of extensive damage or interference with the nuclear division apparatus, it also can remain in one of the daughter cells as a micronucleus. These micronuclei are readily visualized using special stains and can easily be scored using a microscope or an automatic "flow" cell apparatus. A number of national and international validation studies for the MN test have been performed during the past few years and formal test guidelines are being prepared for use by regulatory authorities in the US and elsewhere.[111]

54.    A number of published research studies have examined the genetic effects produced by cigarettes with a range of tar yields in SCE and chromosome aberration tests, and recently in a MN test. In the SCE studies, there was no correlation between cigarette tar yield and the potency of the SCE response per milligram tar. In two

of these studies, each of which used human lymphocytes exposed in vitro, the potency of the SCE response per milligram tar was equivalent regardless of cigarette tar yield, and in a third study using rodent cells, differences in SCE potency were not related to differences in cigarette tar yield. Specifically, Hopkins and Evans reported in 1984 that low, middle, and high tar cigarettes – including cigarettes with ventilated filters – produced similar SCE effects per milligram tar in cultured human lymphocytes.[56] Similarly, Sorsa et al. reported in 1982 that cigarettes ranging in tar yield from 5 to 28 mg did not produce significant differences in SCE responses per milligram tar in cultured human lymphocytes.[55] Interestingly, Sorsa et al., also reported that a 1 mg tar cigarette produced the highest SCE, but the 5 mg cigarette produced the numerically least potent response, and overall there was no predictive trend between cigarette tar yield and SCE response per milligram tar. In a third study, published in 1978 by De Raat, the potency of SCE response per milligram tar was likewise not correlated with cigarette tar yield.[54]

55.     Two subsequent research studies have examined the effects of cigarettes with different tar yields in the chromosome aberration test, and one of these studies also examined cigarettes with different levels of filter ventilation. A study published by Lafi and Parry in 1991 reported that tar from higher tar yield cigarettes was more potent than tar from lower yield cigarettes on a per milligram tar basis in producing chromosome aberrations in hamster lung cells, and that tar from ventilated cigarettes was less potent than tar from unventilated cigarettes.[57] Of note, these results are opposite from the responses typically seen in the Ames test.

56.     The other study, supported by the Centers for Disease Control, and

published by DeMarini et al., in 2008, found no correlation between CSC from "a diverse set of cigarettes" with a wide range of FTC tar yields and the potency of response in either the chromosome aberration or the MN test.[62]  Of note, although the chromosome aberration and MN tests measure the same biological endpoint, there was incomplete agreement among them with respect to the potency of their responses; the highest potency sample in the MN test was completely inactive in the chromosome aberration test, and the highest potency sample in the chromosome aberration test had the second-to-lowest potency in the MN test.

57.     DeMarini also evaluated these cigarettes in the Ames test and the comet assay (a widely used measure of DNA damage that is being considered by the FDA and international authorities for inclusion in the drug testing guidelines).[112], [113]  The results included a comparison between two (unnamed) commercial full flavor and light cigarettes, and the tar from the full flavor cigarette was more potent than the tar from the light cigarette in the Ames, chromosome aberration, and MN tests.

58.     DeMarini concluded that "[t]here was no relationship among the genotoxic potencies of the CSCs across the assays," that "quantitative results showed limited or no relationship to the type of cigarettes from which the CSCs were produced," and that these assays "have at best only qualitative value in assessing risks of CSCs for human health."[62]

59.     In sum, positive results from different in vitro tests – the Ames, mammalian cell mutation, and chromosome aberration tests – are currently given equal weight by regulatory agencies with respect to their ability to predict whether or not a substance is a potential carcinogen.  Each of these tests has been used to compare the

genetic toxicity of cigarettes with higher and lower tar yields.  When the results of these tests are compared, they tend to show divergent responses, with no clear pattern emerging within and among tests.  Similar divergences in responses have been reported in other in vitro genetic toxicity tests (e.g., the yeast test, *E. coli* repair test, sister chromatid exchange test) commonly used in the past, but not widely used in the past 20 years. Notwithstanding divergent results comparing lower and higher tar cigarettes in general, data specific to Marlboro Full Flavor and Marlboro Lights cigarettes demonstrate that the mutagenicities of tars from these brands are equivalent in both the Ames test and the mammalian cell tests.

60.     When all the available data are evaluated, there is no clear pattern between changes in cigarette tar yield (or filter ventilation) and the potencies of the responses in various genetic toxicity tests, and no basis upon which to conclude that one type of cigarette tar is or may be more or less harmful than another.  Indeed, these data strengthen my conclusions that: (i) the potency of the responses in any one of these in vitro tests cannot be used as a predictor or surrogate for the potency of the anticipated responses in any other in vitro test, in animal tests, or in humans, (ii) the reported differences in mutagenicity per milligram tar in the Ames test between Marlboro Full Flavor and Marlboro Lights/Marlboro Ultra Lights cigarettes are not biologically relevant, and (iii) the in vitro effects of the tars from Marlboro Full Flavor and Marlboro Lights/Marlboro Ultra Lights cigarettes are equivalent, as are the in vivo effects at equal doses.

2.      **Smoke Constituents Data for Lower Tar
        and Light Cigarettes vs. Full Flavor Cigarettes**

61.      I have been asked to comment on an analysis by Dr. Jeffrey Harris concerning yields of various cigarette smoke constituents as measured in the Massachusetts Benchmark Study for Marlboro Full Flavor and Marlboro Lights.[86]  I conclude that the differences in individual smoke constituent yields per milligram tar (or per milligram nicotine) described by Dr. Harris do not establish that Marlboro Lights are more dangerous or potentially more dangerous than Marlboro Full Flavor cigarettes.  My conclusion is based upon my integrated assessment of all of the evidence that I have examined, including the results of in vitro and in vivo biological tests discussed throughout this report, and on additional points noted immediately below, and is consistent with the analysis of scientists and organizations studying smoking and health issues.  First, smoke constituent measurements cannot, standing alone, demonstrate that one cigarette is safer or more dangerous than another.  Dr. Harris noted that fact during his testimony in Miles/Price in 2003:

Q.      Let me ask you the question this way.  Your calculations
        don't prove that Marlboro Reds are safer to human health
        than Marlboro Lights, do they?

A.      No, I don't think any scientist would say that.

Q.      The converse is also true, isn't it, your calculations don't
        prove that Marlboro Lights are more harmful to human
        health than Marlboro Reds; correct?

A.      Based on the standards of evidence scientists would use to
        apply to the word prove, no, they don't show that.[107]

62.      Even more recently, in a letter from Dr. Peter Shields to scientists at the National Cancer Institute, dated May 6, 2008, Dr. Shields wrote, "While the point is

extremely well taken about linking [specific smoke constituents] to risk, it is almost impossible to address.  There is almost a complete gap in knowledge about how to relate individual smoke constituents, and smoke as a complex mixture, to disease risk." [108] Likewise, in 2004, the United Kingdom Committees on Toxicology, Carcinogenicity, and Mutagenicity (COT, COC, COM) released a report that concluded that "… analysis of tobacco smoke constituents was not useful in comparing tobacco-based [Potential Reduced Exposure Products] or predicting risks associated with tobacco smoking."[63]

63.    Second, as recognized by a number of studies and reports, significantly reducing – or even eliminating – specific constituents from tobacco or tobacco smoke cannot be assumed to have an impact on overall disease risk.  For example, an Institute of Medicine report[98] concluded "There is little direct evidence that removal of specific substances from tobacco smoke or tobacco actually reduces risk or harm to human health."  Similarly, Hatsukami et al., 2007 [109] , pointed out that "Modification of tobacco in cigarettes as a means to reduce toxicant exposure is unlikely to result in significant reductions in disease risk in general because of the number of toxicants associated with the burning of tobacco."  In published summaries of research on cancer risks from smoking regular and lights cigarettes, Pankow et al. (2007) [99] and Watanabe et al. (2009) [100] concluded that removal of the known human carcinogens from cigarette smoke may not lead to a reduction of cancer risk.

64.    By logic, if reducing or completely eliminating specific cigarette smoke constituents are not expected to reduce disease risk, then small increases in some smoke constituents per milligram tar or nicotine, such as those reported by Dr. Harris, would not be expected to increase disease risk.

65.     Third, Dr. Harris' analysis expressly relies on an assumption that is not valid.  As part of his analysis, Dr. Harris endeavors to calculate the percent compensation that would be required in order to get the same amount of various smoke constituents from a Marlboro Lights as from a Marlboro Full Flavor.  Dr. Harris states that his calculations are based on an assumption that toxicant yields per milligram nicotine are independent of smoking intensity.  He assumes, in other words, that constituent-to-nicotine ratios are constant and do not change as a function of the specific manner in which an individual cigarette is smoked.  That assumption is incorrect.  Numerous studies have shown, as summarized in Section III.D. below, that constituent-to-nicotine ratios vary depending on how a cigarette is smoked.  In fact, more intense smoking (e.g., taking larger puffs, blocking ventilation holes) has been shown to reduce the concentration of some constituents per milligram nicotine (or per milligram tar).

66.     Finally, it is important to note that Dr. Harris' analysis is based on data from analytical methods that have not been validated.  As concluded by the World Health Organization (WHO)[40] , the analytical chemistry procedures used for identifying and measuring most cigarette smoke constituent – including those reported in the Massachusetts Benchmarking Study and analyzed by Dr. Harris – have never been validated.  Such test validation is necessary to ensure that all laboratories measuring individual smoke constituents will use the same test methods for the different constituents, and that the reproducibility of the various methods within and among laboratories will be known.  Currently, in the absence of validation, different laboratories and researchers can use different test methods, and this can lead to different measurements of the same constituent from the same sample in different laboratories.  In

36

addition, in the absence of validation, there are no data to show how reproducible the analytical methods are from day-to-day in the same laboratories or among different laboratories. It has been shown that analysis of different samples of cigarettes can lead to different concentrations of the individual tar components. Given the relatively small differences in constituent yields per milligram nicotine reported in Dr. Harris' analysis, it is difficult in the absence of data on the reproducibility of the chemical analysis procedures to evaluate the extent to which such differences represent actual differences in constituent levels or are due to variability in the unvalidated analytical procedures. The need to validate chemical tests has also been addressed by the U.S. Association of Official Analytical Chemists. [101]

### 3.  Overall Weight of Evidence Toxicological Assessment

67.    There is no scientific basis for a claim that smoke produced by Marlboro Lights and other lower tar cigarettes is, or may be, more dangerous than smoke produced by Marlboro Full Flavor and other regular cigarettes. Small reported differences in mutagenicity and smoke constituent yields per milligram tar do not support that claim. Based upon the available evidence, and in the absence of any persuasive evidence to the contrary, I conclude that smoke produced by Marlboro Lights is not inherently more dangerous than smoke produced by Marlboro Full Flavor.

68.    The chemical composition of cigarette smoke and tar, and its toxicological impact at equal dose levels, is essentially the same for all conventional tobacco-burning cigarettes, including Marlboro Full Flavor and Marlboro Lights regardless of how they are smoked. In that context, I would agree with the simple statement that: "tar is tar." This means, based on traditional dose-response principles, that smokers who get lower tar

from smoking Marlboro Lights (or other lower tar cigarettes) are likely to reduce their risk of disease.

**C.**     **Ventilation and "Further Testing"**

69.     I have considered claims by plaintiffs' experts, including Dr. Peter Shields, to the effect that Philip Morris' toxicological testing and mutagenicity findings (particularly in the Ames test) should have led it to either refrain from using increased ventilation or to conduct additional testing.  I disagree with that claim, for a number of reasons.

70.     First, I reject the underlying premise of the claim, which seems to be that Philip Morris' data suggested that per milligram tar, cigarettes with increased ventilation were potentially more dangerous to smokers.  I have seen no evidence to substantiate that premise.  To the contrary, as discussed in sections B and C above, that premise does not reflect an accurate historical or present-day understanding of the purpose, capabilities, limitations, and scientific and regulatory uses of the Ames test and other tests used by Philip Morris.

71.     Second, I find that Philip Morris has, in fact, conducted an extensive amount of additional testing, including other biological tests.  Moreover, Philip Morris scientists were as entitled as other scientists to rely upon the findings of in vitro and animal tests conducted outside Philip Morris and published in the literature or otherwise made available.  For example, the documents I have reviewed indicated that Philip Morris began to test ventilated cigarettes in the Ames test in the mid-1970s.  At this time, the test was new, and many laboratories, including Philip Morris, were learning to do the test and, at the same time, were developing it for use in-house.  Also at approximately the

38

same time, in 1977, the National Cancer Institute issued an official report concluding that ventilation reduces the tumorigenicity of cigarette smoke condensate in mouse skin painting tests. [50] That conclusion provides context for the results of Philip Morris' mutagenicity testing and contradicts the hypothesis that increased mutagenicity per milligram tar in the Ames test, resulting from higher levels of ventilation, predicts increased carcinogenicity in higher-order animal tests or people. As noted by the Surgeon General in 1981, "The mouse skin carcinogenesis assay is thus far the most fruitful method of evaluating smoke condensates from the different types of cigarettes for carcinogenic potency for the human lung." [47] I am not aware of any additional in vitro or in vivo toxicological testing, beyond the tests that were conducted by Philip Morris or otherwise known to it, that would have provided additional scientifically meaningful information.

72.    Third, I conclude that it would also be appropriate for Philip Morris to rely on the results of human studies, including exposure studies and epidemiological evidence. For example, studies finding that ventilated, lower tar cigarettes delivered less smoke and tar to human smokers would provide evidence that these cigarettes would also be less mutagenic per cigarette and deliver lower levels of mutagens and other smoke constituents per cigarette. I am generally aware that human exposure testing, including compensation studies, were conducted by Philip Morris and others over the years, and that the results of this testing will be addressed by other experts in this litigation.

73.    Epidemiological studies measure the disease risks of cigarettes as actually smoked in populations of smokers over time. Differences in the levels of particular smoke constituents and mutagenicity per milligram tar, to the extent they are significant

to human disease risk, would be reflected by the results of epidemiological studies.  For example, the hypothesis that small differences in Ames test mutagenicity per milligram tar, or in levels of particular smoke constituents per milligram tar (or per milligram nicotine), demonstrate that Marlboro Lights/Marlboro Ultra Lights are "more dangerous" with respect to cancer than Marlboro Full Flavor cigarettes would be inconsistent with any epidemiological evidence indicative of a reduction (or even no reduction) in lung cancer risk for lower tar, lights cigarettes as compared to higher tar, full-flavor cigarettes.[30]

**D.**  **Publicly Available Scientific Information regarding Mutagenicity and Smoke Constituent Yields of Lower Tar Cigarettes since the 1970s**

74.  I was asked to consider the claim that the scientific and public health communities did not know that light and lower tar cigarettes, including cigarettes with increased ventilation, could be more mutagenic in some tests and could produce higher levels of various smoke constituents per milligram tar (or nicotine) than higher tar cigarettes.  I conclude that there is no basis for this claim, as demonstrated by the public documents described throughout this report and in the sections immediately below, many of which date back to the 1970s.  It is similarly baseless to speculate that Philip Morris' testing data, had it been contemporaneously published, would have been interpreted by scientists as evidence that smoke and tar from ventilated, light and lower tar cigarettes was potentially more dangerous.  Publicly-available data consistent with Philip Morris' internal data were not interpreted as evidence that lower tar cigarettes were potentially more dangerous than higher tar cigarettes, and did not provoke action by the scientific or public health communities.  There is no basis on which to assume that Philip Morris' internal data would have been interpreted differently than data from other sources that

40

were contemporary, consistent, and publicly-available.

**1.      Examples of Public Reports regarding Mutagenicity**

75.      As discussed below, published scientific information has been available for more than 30 years that the mutagenicity per milligram tar of a lower yield cigarette can be greater, less than, or comparable to the specific mutagenicity of a higher yield cigarette, depending on the test.  The magnitude of historically-reported differences in mutagenicity per milligram tar between cigarette types was, in many cases, greater than the present-day reported differences between lower and higher tar cigarettes, including Marlboro Full Flavor and Marlboro Lights.

76.      A study published in 1977 by Sato et al. in an internationally distributed, peer-reviewed scientific journal evaluated the mutagenicity in the Ames test of 8 U.S. commercial cigarette brands (not identified) with cigarette smoke condensate (CSC) yields ranging from 2.1 to 19.8 mg.[43]  Ten brands from Europe and Japan with varying CSC yields, were also included in the testing.  The results for the U.S. brands, as well as for the brands from other countries, showed that mutagenicity per mg CSC varied from brand to brand and was not predicted by total CSC yield.  On a per mg CSC basis, lower yield cigarettes were either more mutagenic or less mutagenic than higher yield cigarettes, depending on the specific brands being compared.  For example, two U.S. cigarettes that produced essentially the same amount of CSC (10.3 mg and 10.4 mg, respectively) differed in mutagenic potency by 1.3-fold.  Comparing the most and least mutagenic U.S. brands, there was a 1.7-fold difference in mutagenic potency per mg CSC.  In contrast, there was a 9.4-fold difference in CSC yields among US brands.

77.      Of note, the differences in mutagenic potency reported by Sato et al. are

41

equivalent to, or greater than, differences between high- and low-tar model cigarettes as reported by internal Philip Morris USA studies conducted at or about the time this study by Sato et al. was published, or thereafter.  Based on these results, Sato et al. concluded that "the mutagenicity of a unit amount of smoke condensate from a very low-tar cigarette, such as brand 1 [2.1 mg CSC], almost equaled that of a medium-tar cigarette, such as brand 4 [10.4 mg CSC], or a high-tar cigarette, such as brand 8 [19.8 mg CSC]. This indicates that the specific mutagenic activity of cigarette smoke condensate does not depend on the amount of tar in the cigarette."

78.     Two years after Sato published the comparison of the mutagenicities of tars from cigarettes with different yields, DeRaat compared the Ames test mutagenicity of cigarette smoke condensate (CSC) from the high (23.0 mg), medium (18.3 mg), and low (7.0 mg) commercial cigarettes.[54]  In this study, the CSC from the high tar cigarette was the most mutagenic, the CSC from the medium tar cigarette was the least cigarette, and the CSC from the low tar cigarette was in the middle.

79.     Other studies published in the 1970s demonstrated that changes in cigarette design parameters produced measurable changes in the mutagenicity of tar. Studies published in peer-reviewed scientific journals demonstrated, for example, that specific mutagenicity in the Ames test could be reduced by changing tobacco blend (e.g., reducing levels of burley tobacco relative to bright tobacco), reducing resistance to draw, or adding sugars to the tobacco.[44]

80.     The results of these (and other) published mutagenicity studies on tobacco and tobacco smoke condensate were discussed in a 1986 monograph on tobacco smoking published by WHO-IARC, which stated that "[Cigarette smoke condensate] and

42

its fractions have been tested extensively in *S. typhimurium* and shown to be mutagenic."
[45] Table 39 of the 1986 IARC monograph listed 23 published studies (including the Sato and DeRaat studies) on the mutagenicity in the Ames test of tobacco and tobacco smoke condensates between 1977 and 1984; Table 40 lists an additional 42 published studies that were conducted using other in vitro and in vivo genotoxicity tests in other test organisms between 1958 and 1983.

81.     This 1986 IARC monograph specifically noted the study of commercial cigarette brands published by Sato et al. in 1977, discussed above.  Based on that study, IARC concluded that "[t]he mutagenic potency of CSC on a weight-to-weight basis was similar for low-tar and high-tar cigarettes."  That conclusion is consistent with and supportive of my conclusion that the mutagenicity in the Ames test of tars from Marlboro Full Flavor and Marlboro Lights cigarette is equivalent.  As noted above, the difference in mutagenic potency between the tars of Marlboro Full Flavor and Marlboro Lights cigarettes tends to range up to 1.5-fold.  That 1.5-fold difference is less than, or equivalent to, differences in mutagenic potency between cigarette brands that were described by Sato et al. and IARC, respectively, as "almost equal" or "similar."  Also consistent with my opinions, IARC did not conclude that the measured differences in mutagenic potency between cigarette brands established or predicted that one brand was or might be more carcinogenic or dangerous than another.  IARC specifically noted that "short-term tests should not be used by themselves to conclude whether or not an agent is carcinogenic nor can they predict reliably the relative potencies of compounds as carcinogens in intact animals."

82.     Mutagenicity studies on cigarette tars continued to be published in the

1990s.  In a study published in 1990, and supported by R.J. Reynolds Tobacco Company, the Ames test mutagenicity, mammalian cell chromosome aberrations and sister chromatid exchange assays, and rat liver cell (hepatocyte) DNA damage assay, were compared for the CSC of a reference cigarette (1R4F) containing 12.6 mg TPM per cigarette with two, unidentified, retail, low-tar cigarettes containing 1.6 and 1.2 mg TPM, respectively. [102]  In the Ames test, the 12.6 and 1.6 mg TPM cigarettes were equally mutagenic, while the 1.2 TPM cigarette had slightly lower mutagenicity.  In contrast, the 1.6 mg TPM cigarette produced the highest proportion of chromosome aberrations, followed by the 1.2 mg cigarette, while the 12.6 mg TPM cigarette was the least effective in this assay.  All three cigarettes were equally effective in the sister chromatid exchange assay, and all three were negative in the rat hepatocyte DNA damage assay.  One other genetic toxicity assay, a mammalian cell mutagenicity test (CHO-HPRT assay) was performed, but all CSC samples were negative.  This study, like other studies discussed in this report, illustrated that a lower tar cigarette may be more or less mutagenic per milligram tar than a higher tar cigarette, depending on the test.  Again, the potency of one genetic test endpoint is not predictive of other genetic endpoints, even when they are performed in the same cells (i.e., the mammalian cell chromosome aberration and sister chromatid exchange assays).

83.    A study published in 1995 by Steele et al.[46] at R.J. Reynolds Tobacco Company reported that low-tar cigarettes with increased levels of ventilation were correlated with higher mutagenicity in the Ames test: "The variables most highly correlated with mutagenicity on a revertants/mg condensate basis were mg condensate/cigarette and air dilution, with mg condensate/cigarette being negatively

44

correlated and air dilution being positively correlated.  One hypothesis is that increased air dilution, which generally produces cigarettes with lower mg condensate/cigarette, alters the way the cigarette burns.  Increased air dilution . . . could yield slightly more mutagenic condensate.  However, mutagenicity on a per cigarette basis is lower for the low condensate products since total condensate yield is lower . . . ." [46]

## 2.   Examples of Public Reports Regarding Smoke Constituents

84.      As noted, I was asked to consider the claim that the scientific and public health communities did not know that light, lower tar cigarettes could produce higher yields of individual smoke constituents on a per milligram tar basis than higher tar cigarettes.  That claim, like the similar claims about mutagenicity, is invalid.  As discussed below, published scientific information has been available for more than 30 years that lower tar cigarettes could, and in some instances did, produce higher levels of individual smoke constituents on a per cigarette basis, and also on a per milligram TPM, tar, or nicotine basis.

85.      The relative concentrations (levels) of individual smoke constituents per milligram tar, or nicotine, although not the constituents, themselves, differ among different types and brands of cigarettes.  This was confirmed by analyses of the constituents of cigarette smoke and tar that were contemporaneously published in U.S. Government reports, the peer-reviewed scientific literature, and the popular press in the 1970s and 1980s.  Based on these published analyses, several examples of which are addressed below, it was evident that: (i) cigarettes with lower FTC yields did not necessarily produce the same or lower levels – and in some instances, produced higher levels – of individual smoke constituents on a per milligram tar or nicotine basis; and (ii)

45

whether the levels of individual smoke constituents went up, went down, or stayed the same on a per milligram tar or nicotine basis was not necessarily predicted by the overall FTC tar and nicotine yield of the cigarette, but varied among cigarettes with different, or the same, FTC yields.

86.     Articles characterizing the chemical composition and carcinogenicity of cigarette smoke began to appear in the peer-reviewed scientific literature beginning in the 1950s.  In 1967, Drs. Wynder and Hoffmann from the Sloan Kettering Institute for Cancer Research in New York published a book that summarized studies on tobacco chemistry and carcinogenesis from the 1950s and 1960s.[41]  They included a chapter (Chapter VIII) in which they identified an extensive number of constituents in cigarette smoke and tar from different cigarette types and blends, the levels found in various smoke and tar samples, the chemical classes to which they belonged, and their toxicity and carcinogenicity, where tested.  Included in this compilation of constituents are 25 of the 38 (66%) studied by the 1999 Massachusetts Benchmark Study[39], 15 of the 18 (83%) constituents recently identified by a World Health Organization Study Group (TobReg) as "priority toxicants," and all 9 of the constituents identified by the same WHO Study Group as "most hazardous."[40]  They also postulated the presence of the tobacco-specific nitrosamines, NNN and NAB, although they were not able to specifically identify them because of limitations of the chemical analysis techniques at the time.  In a subsequent, major review article published in the journal, Science, in 1968, Wynder and Hoffmann summarized the "identified or suspected tumorigenic agents in cigarette smoke" which include polynuclear aromatic hydrocarbons, N-nitrosamines, beta-naphthylamine, and Polonium-210.[42]

87.     Following these studies, in 1976, the Reader's Digest published two articles on the levels of carbon monoxide (CO), nitrous oxides ($NO_x$), hydrogen cyanide (HCN), and nicotine that were produced by 21 commercial cigarettes (identified by brand) with different tar levels when they were tested according to FTC method conditions, or under more intense smoking conditions meant to simulate compensation.[48] At about the same time, the National Cancer Institute (NCI) engaged Oak Ridge National Laboratory (ORNL; a U.S. government laboratory) to "measure the deliveries of selected smoke constituents for 17 domestic low tar and nicotine commercial filter cigarettes," the majority of which were identified as having air dilution holes in the filters.[49] The NCI/ORNL analysis measured the same constituents as the Reader's Digest studies, as well as carbon dioxide ($CO_2$) and acrolein.

88.     The Reader's Digest studies focused on cigarettes that (with one exception) produced more than 15 milligrams tar, while all of the cigarettes studied by NCI/ORNL produced less than 15 milligrams tar.  I have analyzed the data from both of these studies and calculated constituent levels per milligram tar and per milligram nicotine.  Within each of these data sets, constituent levels per milligram tar (or nicotine) varied according to the constituent and from brand to brand, regardless of FTC yield, and did not consistently increase, decrease, or stay the same when cigarettes with higher, lower, or similar FTC yields were compared.  In some instances, lower yield brands had higher levels of individual constituents per milligram tar or nicotine than higher yield brands; in other instances the opposite was true.  The same conclusions are evident when the constituent measurements from both of these studies are combined, which provides a broad range of high- and low-tar cigarettes on the market as of 1976.

89.     The following year (1977), NCI released a report entitled "Report No. 3, Toward Less Hazardous Cigarettes" that included measurements of various constituents produced by a series of experimental, standardized cigarettes that differed in cigarette design and FTC yields.[50]  This report includes data for the same constituents that were measured in the NCI/ORNL and the Reader's Digest studies discussed above, plus data for a number of additional organic chemical constituents.  I specifically examined constituents data from repeated measurements of the unfiltered reference cigarette, which provided an indication of the variability inherent to the analytical method and the tobacco blend used in these cigarettes.  I also examined data from three experimental cigarettes that differed only in paper porosity, and data from two experimental cigarettes that had either a dilution filter or a cellulose acetate filter.  As paper porosity increased and, correspondingly, TPM yields declined, some constituents per milligram TPM increased, others decreased, and others increased or decreased depending on the level of porosity.  Similarly, a dilution filter increased the yields of some constituents per milligram TPM, while reducing others, relative to a cellulose acetate filter.

90.     Other relevant studies were published in the 1980s.  One such study was published in 1980 by Drs. Dietrich Hoffmann (American Health Foundation), T.C. Tso (U.S. Dept. of Agriculture), and Gio B. Gori (NCI), in the peer-reviewed journal Preventive Medicine.[51]  This study reported "the delivery of smoke components of the average types of cigarette manufactured before 1960 versus the current average brands, as well as smoke delivery of a 1978/1979 low-tar cigarette."  This timeframe corresponds with the time during which tar and nicotine yields were substantially reduced as a result of changes in cigarette design.  Specific constituents measured in this study, other than

TPM and nicotine, included CO, $NO_x$, cyanide (HCN), acrolein, phenol, and benzo[a]pyrene.  My calculations showed that levels of some of these constituents per milligram TPM (or nicotine) increased as TPM and nicotine yields were reduced, and also over time, while others decreased.  For example, on a per milligram TPM basis, all constituents were higher in the "1978/1979 low-tar cigarette" than the "Before 1960" cigarette, and the same was true for constituent levels per milligram nicotine, except for phenol, which was the same for both cigarettes.  Comparing the 1978/1979 "current average" cigarettes with the 1978/1979 low-tar cigarette, three constituents (HCN, acrolein, and benzo[a]pyrene) were higher per milligram TPM (or nicotine) in the low-tar cigarette, while other constituents were higher in the "current average" cigarette.  On a per cigarette basis, all constituents (except $NO_x$) consistently declined as TPM and nicotine yields were reduced.

91.     A subsequent study, published in 1987 by Dr. Hoffmann and other American Health Foundation scientists in the peer-reviewed journal <u>Carcinogenesis</u>, compared amounts of a series of smoke constituents from four U.S. commercial cigarettes that were selected on the basis of their tar yield and type of filter: a nonfilter cigarette (20.1 milligram tar, 2.04 milligram nicotine), a filter cigarette (15.6 milligram tar, 1.50 milligram nicotine), another filter cigarette (6.8 milligram tar, 0.81 milligram nicotine), and a perforated filter cigarette (0.9 milligram tar, 0.15 milligram nicotine).[52] On a per cigarette basis, levels of some constituents (<u>e.g.</u>, catechol, ammonia, and certain nitrosamines and tobacco-specific nitrosamines) did not consistently decrease with declining FTC yields, signaling that the levels of these constituents per milligram tar or nicotine would vary, and in some instances be higher, on a per milligram tar or nicotine

49

basis.  My calculations based on these data confirm that constituent levels per milligram tar (or nicotine) might be higher or lower in a lower-yield cigarette, depending on the specific constituents and cigarettes being compared.  Of all the cigarettes tested in this study, the cigarette with the lowest tar and nicotine yield produced the highest levels of individual constituents per milligram tar for 9 out of 11 constituents measured, and on a per milligram nicotine basis, the highest levels of 7 of these 11 constituents.  The differences in constituent levels per milligram tar among the filter cigarettes was as great or greater than the differences in these levels between filtered and non-filtered cigarettes.

92.      In summary, data from U.S. Government reports, the peer-reviewed scientific literature, and the popular press showed by no later than the mid-1970s that cigarettes with lower total tar and nicotine yields could, and in some instances did, produce higher levels of individual smoke constituents on a per cigarette basis, and also on a per milligram TPM, tar or nicotine basis.  Patterns of response that were evident in these data are also evident in more current data, such as the 1999 Massachusetts Benchmark Study.

E.      **Variability in Mutagenicity and Individual Smoke Constituents Yields under Different Smoking Conditions**

93.      The mutagenicity per milligram of cigarette tar depends on how the cigarette is smoked and on the chemical composition of the tar.  Chemical composition refers not only to the individual chemical components of the tar, but also their relative concentrations.  Because the tar is a complex mixture of chemical constituents, some of which are mutagenic, and some of which are toxic but not mutagenic, it is not possible to accurately predict or estimate how changes in the relative proportions of these constituents will affect changes in mutagenicity.  Although the responses of some

50

chemical combinations may be additive or synergistic (i.e., more than additive), other combinations may be inhibitory, that is, the combination will produce less mutagenicity than the sum of the individual chemicals.

94.    The total amount of smoke constituents and mutagenicity that will be produced by a cigarette depends on the total amount of smoke (e.g., tar and nicotine) that is produced when it is smoked.  To the extent that the total amount of smoke produced from a cigarette varies, so do the total amounts of smoke constituents and mutagenicity. For example, if a Marlboro Full Flavor smoker switches to Marlboro Lights and gets less total smoke, that smoker will also get fewer total smoke constituents and less mutagenicity.  The same trend is also true for Marlboro Ultra Light cigarettes.  And, consistent with my previous statements, this conclusion would be similar with respect counterpart Philip Morris cigarettes.

95.    It can be reasonably concluded that lower tar cigarettes, for example, Marlboro Lights and Marlboro Ultra Lights cigarettes, are less mutagenic per cigarette in the Ames test and deliver lower yields of individual smoke constituents than higher tar cigarettes, such as Marlboro Full Flavor (Regular) cigarettes, when compared under the same smoking conditions.

96.    It has been reported that activities collectively called "compensation" can affect the total amount of smoke that people get from the cigarettes they smoke. There appear to be many different methods by which smokers can compensate, including blocking ventilation holes, increasing puff volume and duration, and smoking more cigarettes.  I am not rendering a scientific opinion on the prevalence, degree, or methods of compensation among cigarette smokers, although I am generally familiar with these

issues, and the variability and questions associated with them, as a result of documents that I have reviewed in connection with the opinions stated herein (see, e.g., NCI Monograph 13) . [37]

97.     Machine smoking studies have attempted to reproduce some of the procedures used during compensation.  These studies rely on the use of smoking parameters of increasing intensity compared to the FTC method.  The MDPH smoking procedure, for example, machine-smokes cigarettes more intensely by blocking some of the ventilation holes and increasing the size and frequency of puffs relative to the FTC method.  The Health Canada Intensive (HCI) procedure is similar but even more intense, in that it blocks 100% of the ventilation holes on every puff.  The FTC, MDPH, HCI, and other more intense machine-smoking methods have been used in various studies, some of which are summarized below, to examine the impact of more intense smoking procedures on the constituents, in vitro mutagenicity, in vitro toxicity, and animal carcinogenicity of cigarette smoke and tar.

98.     Foy et al., 2004 [38], examined the effects of blocking vents and changing puffing regimens (puff volume and duration) to more closely approximate an increased number of puffs by smokers.  They found, using Marlboro Ultra Lights, that increasing the blockage of ventilation holes led to increased tar per cigarette and decreased mutagenicity per milligram tar.  Increasing the puff volume and decreasing the interval between puffs also led to increased tar per cigarette but decreased mutagenicity per milligram tar.

99.     In a study reported by Roemer et al., 2004 [35] from Philip Morris Research Laboratories in Germany and the US, mutagenicity per milligram tar in the

Ames test was reduced when cigarettes were smoked according to the more intense MDPH smoking protocol relative to when they were smoked according to the less intense FTC smoking protocol.  Additionally, these results are consistent with a study published in 2006 by other scientists from Philip Morris Research Laboratories in Germany, which used a mammalian cell mutation test to compare the mutagenicities of tars produced by various cigarettes when smoked according to the FTC and MDPH methods and found that mutagenicity per milligram tar of cigarettes smoked under the more intense MDPH conditions was consistently less than that of the same cigarettes smoked under FTC conditions.[58]

100.    More recently, in 2007, Rickert et al. published a study that compared low and ultra-low tar cigarettes smoked under ISO (equivalent to FTC) and the more intensive HCI smoking conditions in both the Ames test mutagenicity and a cytotoxicity test.[61]  As noted by the authors, the results of this study supported prior findings that mutagenicity per milligram tar decreases when cigarettes are smoked more intensely:

> The results of research reported to date have shown that while intensive smoking conditions give higher TPM yields on a per cigarette basis, both the cytotoxicity and mutagenicity of the TPM is reduced when the results are reported on a per unit TPM basis. . . .  In the present investigation, the most striking observation was the decrease in specific activity under "intensive" smoking.

101.    One study, published by DeMarini et al. in 2008, reported seemingly inconsistent results, in that the CSC of a cigarette (brand not identified) smoked under MDPH conditions was more mutagenic in the Ames test than CSC of that cigarette smoked under FTC conditions.[62]  The results of this study are more limited than those of previous studies because only a single cigarette was compared under both sets of smoking conditions.  When the data from this publication are further analyzed, it can be

demonstrated that the potency comparisons between the two smoking conditions can vary significantly depending on how the data are examined.

102.    When smoke constituent yields are calculated on a per milligram tar (or per milligram nicotine) basis, some constituent yields increase, some decrease, and others are equivalent between Marlboro Lights/Marlboro Ultra Lights and Marlboro Full Flavor cigarettes.[35, 103]  The majority of smoke constituents decrease on a per milligram tar or nicotine basis when a cigarette is smoked more intensely, using machine-smoking methods of increasing intensity such as the MDPH method and HCI method.[35, 103]   For example, when calculated on a per milligram tar or nicotine basis, yields of both benzo[a]pyrene and the tobacco-specific nitrosamine NNN are lower under the MDPH and HCI methods than under the ISO method for Full Flavor, Light, and Ultra Light cigarettes.[103]  This further supports my conclusion that the reported differences in individual smoke constituent yields per milligram tar (or per milligram nicotine) do not establish that Marlboro Lights are more dangerous or potentially more dangerous than Marlboro Full Flavor cigarettes.

103.    On a per milligram tar (or nicotine), basis, the yields of individual smoke constituents and mutagenicity have been shown to vary with different styles of smoking.  A number of studies have shown that the smoking method and intensity are the major determinants of the amount of tar per cigarette and the mutagenicity per milligram of tar.  The individual chemical constituents of the smoke and tar are the same regardless of the designated tar level, or whether different smoking conditions are used, but there are differences between cigarette types in the relative proportions of the different chemical constituents.  There is also evidence showing that the burning rate of the tobacco, which

is affected by puff intensity and duration, changes the constituent composition of tar.

104.    The study published by Roemer et al. in 2004 [35] showed that the relative proportions of the individual smoke constituents changed with smoking intensity. For example, 24/29 (83%) of individual smoke constituents were lower per mg nicotine when Marlboro Lights were smoked according to more intense MDPH protocols than when smoked according to FTC protocols. When constituent yields per mg nicotine were compared between tars from a Marlboro Full Flavor cigarette smoked using the FTC protocol and a Marlboro Light cigarette smoked using the MDPH protocol, 20/29 (69%) had lower yields in the Lights smoked according to the more intense MDPH protocol.

105.    Others have likewise observed that constituent-to-nicotine ratios can increase or decrease when cigarettes are smoked under more intense conditions. As noted by Hammond et al. in 2007, "[N]ot all constituents change to the same extent or even in the same direction under different testing regimes – for example, the NNK and benzo[a]pyrene:nicotine ratios decrease under more intense puffing conditions, whereas the nicotine ratio for carbon monoxide increases, as does the overall tar-nicotine ratio."[54]

106.    Published data are available that allow comparisons of constituent levels per milligram nicotine when cigarettes are machine-smoked at increasing levels of intensity. For example, data from a report published by Counts et al. (2005) [104] can be used to compare component levels in Marlboro Full Flavor and Marlboro Lights cigarettes when smoked using the FTC, MDPH, and HCI procedures. Although the same components were produced under all three smoking conditions, the concentrations of constituents per milligram nicotine varied. For the full-flavored cigarette, of the 39 constituents measured (excluding tar and nicotine), 69% and 62% were lower in the

MDPH and HC tars, respectively, when compared to the FTC procedure.  The
corresponding values for light cigarette tars were 46% for both the MDPH and HC
procedures.

107.    A study from the U.K. Department of Health (LGC, 2000)[105] measured
16 polyaromatic hydrocarbon smoke constituents of Marlboro king-size cigarettes when
smoked by the FTC, MDPH, and HCI procedures.  When the constituent yields per
milligram nicotine are compared, 50% and 83% of the MDPH and HC constituents,
respectively, are lower than the FTC constituents.  When the yields per milligram tar
were compared, 42% and 89% of the MDPH and HC constituents, respectively, were
lower than the FTC constituents.  A companion study by the U.K. Department of Health
(LGC, 2002)[105] measured 9 volatile organic compounds.  When the yields per milligram
tar were compared, 56% and 67% of the MDPH and HC constituents, respectively, were
lower than the FTC constituents.  The respective reductions per milligram nicotine cannot
be assessed because nicotine yields were not measured in this study.

108.    From the overall evidence, I conclude as a general principle that smoking
a cigarette more intensely reduces the in vitro mutagenicity per milligram tar, and also
reduces the levels of some (though not all) smoke constituents per milligram tar.  Of note,
this principle has now been further extended to include data from animal cancer tests.  In
a recently published study, Philip Morris Research Laboratories-Germany and PM USA
scientists examined three reference cigarettes, yielding 2 (1R5F; ultra-low), 12 (2R4F;
low), and 26 (2R1F; full flavor) mg TPM when smoked by the ISO (FTC) method.[106]
These tar fractions were tested *in vitro* for toxicity to mammalian cells (cytotoxicity) and
mutagenicity using the Ames test.  The authors concluded that the TPM from all three

cigarettes had equivalent toxicity per milligram of TPM, although when they were all smoked to yield 26 mg TPM, the toxicity per mg TPM was highest for the 26 mg TPM cigarette and lowest for the 2 mg TPM cigarette.

109.    With respect to mutagenicity, as had been shown previously in a number of studies, the mutagenicity per mg TPM according to the Ames test was highest in the 2 mg cigarette and lowest in the 26 mg cigarette when all cigarettes were smoked to the 2 mg TPM level.  When smoked to the 12 and 26 mg levels, however, the TPM from the 26 mg cigarette was the most mutagenic, and the TPM from the 2 mg cigarette was the least. When Ames test strain TA98 was used, the comparison of smoke from a high tar cigarette with that from a light and ultra-light cigarette smoked to the high tar level showed that the low- and ultra-low TPM was less mutagenic per mg than the high tar. When the other Ames tester strain, TA100, was used, the low-tar TPM showed the highest mutagenicity followed by the high tar and the ultra-low tar TPM.  In all cases, the differences among the different TPM samples within a cigarette type were minimal.

110.    This study is particularly novel and noteworthy in that it used the same cigarette TPM samples for mutagenicity and subsequent animal carcinogenicity tests, a study design that permits a more direct and reliable comparison with the preceding data from mutagenicity and other *in vitro* tests.  The various TPM samples were tested for carcinogenicity by skin application using a mouse strain (SENCAR) that is preferred because it is highly sensitive to skin cancer induction.  The authors concluded that "[w]hen the cigarettes were smoked to the same nominal TPM yield [2, 12, or 26 mg] there were no statistically significant differences in tumor incidence at 2 and 12 mg TPM/cigarette.  At 26 mg TPM/cigarette, however, tumor incidence was statistically

higher in the 2R1F [full-flavor] group than in the 1R5F [ultra-low] group." In general, more intense smoking resulted in a decrease in mouse skin tumor incidence, *in vitro* cytotoxicity, and Ames test mutagenicity.

111.    In a recent publication in a peer-reviewed journal, Okuwa and colleagues at the Tobacco Science Research Center in Japan evaluated the effects of smoke generated by the ISO and HCI methods on the induction of micronuclei in mammalian cells in a 2R4F reference cigarette. The per cigarette TPM yields were 11.3 mg and 32.0 mg for the ISO and HCI regimens, respectively. The authors showed that TPM from the HCI procedure was more cytotoxic to the cells than from the ISO procedure, but that the TPM from the HCI procedure produced a less potent micronucleus response, when measured as the slope of the dose response.[115]

112.    To the extent that there is variability within and among smokers with respect to (a) their levels of total smoke intake, (b) the existence or extent of compensation, and/or (c) the various methods of compensation, I conclude, to a reasonable degree of scientific certainty, that there will also be variability within and among smokers with respect to the total amounts of smoke constituents and mutagenicity that will be produced when smoking Marlboro Lights. This variability, if demonstrated to exist, would preclude sweeping generalizations that all Marlboro Lights/Marlboro Ultra Lights smokers are exposed to higher levels of smoke constituents and mutagenicity.

### F.    Counterpart Philip Morris Lights and Ultra Lights vs. Full Flavor

113.    I have seen no data which cause me to believe that the conclusions I have reached with respect to Marlboro Lights, Marlboro Ultra Lights, and Marlboro Full

Flavor cigarettes would not also apply to other Philip Morris low tar, lights, ultra lights, and full flavor cigarettes sold and/or marketed under different brand names.  To the contrary, those conclusions are consistent with my conclusions regarding other full-flavor and lights brands for which data are available, and low- and high-tar reference cigarettes with FTC yields comparable to those brands.  The most plausible interpretation of the available body of evidence – in the absence of specific data to the contrary – and my conclusions expressed herein regarding Marlboro Lights, Marlboro Ultra Lights, and Marlboro Full Flavor cigarettes can be extended in accordance with scientific principles and with a reasonable degree of scientific certainty to other Philip Morris cigarette brands having similar qualities.  Accordingly, in those instances in which I specifically refer to conclusions regarding Marlboro brand cigarettes, it should be clear that my conclusions are applicable to all other similar cigarettes by Philip Morris, and that the Marlboro brand is used for exemplary purposes.

## References

1.   L.S. Gold, E. Zeiger (Editors). HANDBOOK OF CARCINOGENIC POTENCY AND GENOTOXICITY DATABASES. CRC Press, Boca Raton (1997).

2.   B.N. Ames. The detection of chemical mutagens with enteric bacteria *In* Chemical Mutagens: Principles and Methods for Their Detection. Vol. 1. Ed. A. Hollaender, Plenum Press, New York, pp. 267-282 (1971).

3.   B.N. Ames, W.E. Durston, E. Yamasaki, F.D. Lee. Carcinogens are mutagens: a simple test system combining liver homogenates for activation and bacteria for detection. Proceedings of the National Academy of Sciences USA 70, 2281-2285 (1973).

4.   B.N. Ames, F.D. Lee, W.E. Durston. An improved bacterial test system for the detection and classification of mutagens and carcinogens. Proceedings of the National Academy of Sciences USA 70, 782-786 (1973).

5.   B.N. Ames, J, McCann, E. Yamasaki. Methods for detecting carcinogens and mutagens with the Salmonella/mammalian-microsome mutagenicity test. Mutation Research 31, 347-363 (1975).

6.   D.M. Maron, B.N. Ames. Revised methods for the Salmonella mutagenicity test. Mutation Research 113, 173-215 (1983).

7.   E. Zeiger, K. Mortelmans. The Salmonella (Ames) test for mutagenicity. *In* CURRENT PROTOCOLS IN TOXICOLOGY, Eds. M.D. Maines, L.G. Costa, D.J. Reed, S. Sassa, L.G. Sipes. John Wiley & Sons, New York. pp. 3.1.1-3.1.29. (1999).

8.   K. Mortelmans, E. Zeiger. The Ames Salmonella/microsome mutagenicity assay. Mutation Research 455, 29-60 (2000).

9.   J. McCann, E. Yamasaki, B.N. Ames. Detection of carcinogens in the Salmonella/microsome test: Assay of 300 chemicals. Proceedings of the National Academy of Sciences USA 72, 5135-5139 (1975).

10.  I.F.H. Purchase, E. Longstaff, J. Ashby, J.A. Styles, D. Anderson, P.A. Lefevre, F.R. Westwood. An evaluation of 6 short-term tests for detecting organic chemical carcinogens. British Journal of Cancer 37, 873-903 (1978).

11.  T. Sugimura, S. Sato, M. Nagao, T. Yahagi, T. Matsushima, Y. Seino, M. Takeuchi, T. Kawachi. Overlapping of carcinogens and mutagens. *In* FUNDAMENTALS OF CANCER PREVENTION. Eds. P.N. Magee, S. Takayama, T. Sugimura, T. Matsushima. University Park Press, Baltimore, pp. 191-215 (1976).

12.   R.W. Tennant, B.H. Margolin, M.D. Shelby, E. Zeiger, J.K. Haseman, J. Spalding, W. Caspary, M. Resnick, S. Stasiewicz, B. Anderson, R. Minor. Prediction of chemical carcinogenicity in rodents from *in vitro* genetic toxicity assays. Science 236, 933-941 (1987).

13.   E. Zeiger, J.K. Haseman, M.D. Shelby, B.H. Margolin, R.W. Tennant. Evaluation of four *in vitro* genetic toxicity tests for predicting rodent carcinogenicity: Confirmation of earlier results with 41 additional chemicals. Environmental and Molecular Mutagenesis 16(Suppl. 18), 1-14 (1990).

14.   E. Zeiger. Identification of rodent carcinogens and noncarcinogens using genetic toxicity tests: premises, promises, and performance. Regulatory Toxicology and Pharmacology 28, 85-95 (1998).

15.   E. Zeiger. Mutagens that are not carcinogens: faulty theory or faulty tests? Mutation Research 492, 29-38 (2001).

16.   A.E. Auletta, K.L. Dearfield, M.C. Cimino. Mutagenicity test schemes and guidelines: U.S. EPA Office of Pollution Prevention and Toxics and Office of Pesticide Programs. Environmental and Molecular Mutagenesis 21, 38-45 (1993).

17.   Committee on Mutagenicity of Chemicals in Food, Consumer Products and the Environment (COM) [United Kingdom].  GUIDANCE ON A STRATEGY FOR TESTING OF CHEMICALS FOR MUTAGENICITY. Dec., 2000. [on line at http://www.advisorybodies.doh.gov.uk/com/guidance.pdf].

18.   K.L. Dearfield, A.E. Auletta, M.C. Cimino, M.M. Moore. Considerations in the U.S. Environmental Protection Agency's testing approach for mutagenicity. Mutation Research 258, 259-283 (1991).

19.   Health Protection Branch [of Canada]. The Assessment of Mutagenicity. Health Protection Branch mutagenicity guidelines. Environmental and Molecular Mutagenesis 21, 15-37 (1992).

20.   D.J. Kirkland. Genetic toxicology testing requirements: Official and unofficial views from Europe. Environmental and Molecular Mutagenesis 21, 8-14 (1992).

21.   T. Sofuni. Japanese guidelines for mutagenicity testing. Environmental and Molecular Mutagenesis 21, 2-7 (1992).

22.   EPA. Health Effects Test Guidelines. OPPTS 870.5100, Bacterial Reverse Mutation Test.  EPA 712-C-98-247 (August 1998).

23.     FDA Redbook 2000.  Toxicological Principles for the Safety of Food Ingredients.
        IV.C.1. Short-Term Tests for Genetic Toxicity.  July, 2000.  IV.C.1.a. Bacterial
        Reverse Mutation Test.

24.     ICH (International Cooperation on Harmonization) Harmonized Tripartite
        Guideline. S2A. Guidance on Specific Aspects of Regulatory Genotoxicity Tests
        for Pharmaceuticals. July 1995.

25.     ICH (International Cooperation on Harmonization) Harmonized Tripartite
        Guideline. S2B. Genotoxicity: A Standard Battery for Genotoxicity Testing of
        Pharmaceuticals. July 1997.

26.     OECD (Organization for Economic Co-operation and Development).  OECD
        Guidelines for the Testing of Chemicals. No. 471. Bacterial Reverse Mutation
        Test. July 1997.

27.     UKEMS sub-committee on guidelines for mutagenicity testing.  Report. Part I
        revised.  Basic mutagenicity tests: UKEMS recommended procedures. 1990;
        Report of the UKEMS sub-committee on guidelines for mutagenicity testing. Part
        1: Basic Test Battery; Minimal Criteria; Professional Standards; Interpretation;
        Selection of Supplementary Assays. Feb. 1983.

28.     W.G. Flamm, L.R. Valcovic, W. D'Aguanno, L. Fishbein, S. Green, H.V.
        Malling, V. Mayer, M. Prival, G. Wolff, E. Zeiger. Approaches to determining the
        mutagenic properties of chemicals:  Risk to future generations.  Journal of
        Environmental Pathology and Toxicology 1, 301-352 (1977).

29.     National Research Council.  Quantitative Relationship Between Mutagenic and
        Carcinogenic Potencies.  Committee on Chemical Environmental Mutagens,
        National Research Council, National Academy of Sciences. National Academy
        Press, Washington DC (1983).

30.     IARC (International Agency for Research on Cancer).  IARC MONOGRAPHS
        ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS. Volume
        83, Tobacco Smoke and Involuntary Smoking.  World Health Organization, Lyon,
        France (2004).

31.     E. Zeiger, A.T. Sheldon. The mutagenicity of *N*-nitrosopiperidines for *Salmonella
        typhimurium*. Mutation Research 57, 85-89 (1978).

32.     B.H. Margolin, B.S. Kim, M.G. Smith, B.A. Fetterman, W.W. Piegorsch, E.
        Zeiger.  Some comments on potency measures in mutagenicity research.
        Environmental Health Perspectives 102(Suppl. 1), 91-94 (1994).

33.     B.A. Fetterman, B.S. Kim, B.H. Margolin, J.S. Schildcrout, M.G. Smith, S. M.
        Wagner, E. Zeiger.  Predicting rodent carcinogenicity from mutagenic potency

measured in the Ames Salmonella assay. Environmental and Molecular Mutagenesis 29, 312-322 (1997).

34.     L.D. Kier, E. Yamasaki, B.N. Ames. Detection of mutagenic activity in cigarette smoke condensates. Proceedings of the National Academy of Sciences USA 71, 4159-4163 (1974).

35.     E. Roemer, R. Stabbert, K. Rustemeier, D.J. Veltel, T.J. Meisgen, W. Reininghaus, R.A. Carchman, C.L. Gaworski, K.F. Podraza. Chemical composition, cytotoxicity and mutagenicity of smoke from US commercial and reference cigarettes smoked under two sets of machine smoking conditions. Toxicology 195, 31-52 (2004).

36.     J.E. Swauger, T.J. Steichen, P.A. Murphy, S. Kinsler. An analysis of the mainstream smoke chemistry of samples of the U.S. cigarette market acquired between 1995 and 2000. Regulatory Toxicology and Pharmacology 35, 142-156 (2002).

37.     National Cancer Institute.  Smoking and Tobacco Control Monograph No. 13. Risks associated with smoking cigarettes with low machine-measured yields of tar and nicotine. U.S. Department of Health and Human Services, National Institutes of Health.  (2001).

38.     J.W.D. Foy, B.R. Bombick, D.W. Bombick, D.J. Doolittle, A.T. Mosberg, J.E. Swauger. A comparison of *in vitro* toxicities of cigarette smoke condensate from Eclipse cigarettes and four commercially available ultra low-"tar" cigarettes. Food and Chemical Toxicology 42, 237-243 (2004).

39.     The 1999 Massachusetts Benchmark Study. Final Report, July 24, 2000. Compiled by M.F. Borgerding, J.A. Bodnar, D.E. Wingate.

40.     WHO. World Health Organization. The Scientific Basis of Tobacco Product Regulation.  Second Report of a WHO Study Group.  WHO Technical Report Series 951 (2008).

41.     E.L. Wynder, D. Hoffmann. TOBACCO AND TOBACCO SMOKE. Studies in Experimental Carcinogenesis.  Academic Press, New York. 730 pp. (1967).

42.     E.L. Wynder, D. Hoffmann. Experimental tobacco carcinogenesis.  Science 162, 862-871 (1968).

43.     S. Sato, Y. Seino, T. Ohka, T. Yahagi, M. Nagao, T. Matsushima, T. Sugimura. Mutagenicity of smoke condensates from cigarettes, cigars and pipe tobacco. Cancer Letters 3, 1-8 (1977).

44.   S. Mizusaki, H. Okamoto, A. Akiyama, Y. Fukuhara. Relation between chemical constituents of tobacco and mutagenic activity of cigarette smoke condensate. Mutation Research 48, 319-325 (1977); S. Mizusaki, T. Takashima, K. Tomaru; Factors affecting mutagenic activity of cigarette smoke condensate in *Salmonella-typhimurium* TA 1538. Mutation Research 48, 29-36 (1977); S. Sato, T. Ohka, M. Nagao, K. Tsuju, T. Kosuge. Reduction in mutagenicity of cigarette smoke condensate by added sugars. Mutation Research 60, 155-61 (1979).

45.   IARC (International Agency for Research on Cancer)  IARC MONOGRAPHS ON THE EVALUATION OF THE CARCINOGENIC RISK OF CHEMICALS TO HUMANS. Volume 38, Tobacco Smoking.  World Health Organization, Lyon, France (1986).

46.   R.H. Steele, V.M. Payne, C.W. Fulp, D.C. Rees, C.K. Lee, D.J. Doolittle.  A Comparison the mutagenicity of cigarette smoke condensates from a representative sample of the U.S cigarette market with a reference cigarette (K1R4F).  Mutation Research 342, 179-190 (1995).

47.   U.S. Department of Health and Human Services.  The Health Consequences of Smoking – The Changing Cigarette – A Report of the Surgeon General.  DHHS Publication No. (PHS) 81-50156, at 34-35 (1981).

48.   Poison Gases in Your Cigarettes: Carbon Monoxide.  Reader's Digest, 114-118 (Oct. 1976); Poison Gases in your Cigarettes, Part II: Hydrogen Cyanide and Nitrogen Oxides. Reader's Digest, 92-98 (Dec. 1976).

49.   Topical Report NCI/SP/ORNL #35: Chemical Analysis of Smoke From Certain Domestic Commercial Low Tar and Nicotine Cigarettes (Dec. 1, 1976), ENA004 2974-2984.

50.   National Cancer Institute Smoking and Health Program. Report No. 3, Toward Less Hazardous Cigarettes:  The Third Set of Experimental Cigarettes.  G. B. Gori, ed. DHEW Publication No. (NIH) 77-1280 (1977).

51.   D. Hoffmann, T.C. Tso, G.B. Gori. The less harmful cigarette.  Preventive Medicine 9, 287-296 (1980).

52.   J.D. Adams, K.J. O'Mara-Adams, D. Hoffmann.  Toxic and carcinogenic agents in undiluted mainstream smoke and sidestream smoke of different types of cigarettes. Carcinogenesis 8, 729-731 (1987).

53.   D. Hammond, F. Wiebel, L.T. Kozlowski, R. Borland, K.M. Cummings, R.L. O'Connor, A. McNeill, G.N. Connolly, D. Arnott, G.T. Fong.  Revising the machine smoking regime for cigarette emissions; implications for tobacco control policy.  Tobacco Control 16, 8-14 (2007).

54.    W.K. DeRaat.  Comparison of the induction by cigarette smoke condensates of sister-chromatid exchanges in Chinese hamster cells and of mutations in *Salmonella typhimurium.*  Mutation Research 66, 253-259 (1979).

55.    M. Sorsa, H. Norppa, A. Leppanen, M. Rimpela.  Induction of sister-chromatid exchange in human lymphocytes by smoke condensates from different brands of cigarette.  Mutation Research 103, 149-153 (1982).

56.    J.M. Hopkin, H.J. Evans.  Cellular effects of smoke from "safer" cigarettes.  British Journal of Cancer 49, 333-336 (1984).

57.    A. Lafi, J.M. Parry.  The effects of ventilation and the dilution of smoke upon the clastogenic and aneugenic activity of tobacco particulate matter in cultured mammalian cells.  Mutation Research 264, 51-57 (1991).

58.    H. Schramke, T.J. Miesgen, F.J. Tewes, W. Gomm, E. Roemer.  The mouse lymphoma thymidine kinase assay for the assessment and comparison of the mutagenic activity of cigarette mainstream smoke particulate phase.  Toxicology 227, 193-210 (2006).

59.    C. Gairola.  Genetic effects of fresh cigarette smoke in *Saccharomyces cerevisiae*.  Mutation Research 102, 123-136 (1982).

60.    J.S. Schildcrout, B.H. Margolin, E. Zeiger.  Predicting rodent carcinogenicity using potency measures of the in vitro sister chromatid exchange and chromosome aberration assays.  Environmental and Molecular Mutagenesis 33, 59-64 (1999).

61.    W.S. Rickert, A.H. Trivedi, R.A. Momin, W.G. Wright, J.H. Lauterbach.  Effect of smoking conditions and methods of collection on the mutagenicity and cytotoxicity of cigarette mainstream smoke.  Toxicological Sciences 96, 285-293 (2007).

62.    D.M. DeMarini, R. Gudi, A. Szludlinska, M. Rao, L. Recio, M. Kehl, P.E. Kirby, G. Polzin, P.A. Richter.  Genotoxicity of 10 cigarette smoke condensates in four tests systems: Comparisons between assays and condensates.  Mutation Research 650, 15-29 (2008).

63.    Committees on Toxicity, Carcinogenicity, Mutagenicity of Chemicals in Food, Consumer Products and the Environment (COT, COC, COM). Joint Statement on the Re-assessment of the Toxicological Testing of Tobacco Products (2004).  Available on-line at: http://cot.food.gov.uk/pdfs/cotstatementtobacco0409.

64.    M. McClelland, K.E. Sanderson, J. Spieth, S.W. Clifton, P. Latreille, L. Courtney, S. Porwollik, J. Ali, M. Dante, F. Du, S. Hou, S., D. Layman, D., S. Leonard, S., C. Nguyen, C., K. Scott, K., A. Holmes, N. Grewal, E. Mulvaney, E. Ryan, H.

Sun, L. Florea, W. Miller, T. Stoneking, M. Nhan, R. Waterston, R.K. Wilson. Complete genome sequence of *Salmonella enterica* serovar Typhimurium LT2. Nature 413, 852-856 (2001).

65.     International Human Genome Sequencing Consortium. Finishing the euchromatic sequence of the human genome. Nature 431, 931-945 (2004).

66.     Venter, J.C. et al. The sequence of the human genome. Science 291, 1304-1351 (2001).

67.     L.R. Ferguson. Natural and man-made mutagens and carcinogens in the diet. Mutation Research 443, 1-10 (1999).

68.     L.D. Claxton, P.P. Matthews, S.H. Warren. The genotoxicity of ambient outdoor air, a review: Salmonella mutagenicity. Mutation Research 567, 347-399 (2004).

69.     L.D. Claxton, R. Pegram, K.M. Schenck, J.E. Simmons, S.H. Warren. Integrated disinfection by-products research: Salmonella mutagenicity of water concentrates disinfected by chlorination and ozonation/postchlorination. Journal of Toxicology and Environmental Health A. 71, 1187-1194 (2008).

70.     IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS. Volume 52. Chlorinated Drinking-Water; Chlorination By-Products; Some Other Halogenated Compounds; Cobalt and Cobalt Compounds. World Health Organization, Lyon, France (1991).

71.     R.M. Maertens, J. Bailey, P.A. White. The mutagenic hazards of settled house dust: a review. Mutation Research 567, 401-425 (2004).

72.     R. Goldman, P.G. Shields. Food mutagens. Journal of Nutrition 133(Suppl. 3), 965s-973s (2003).

73.     F.T. Hatch, J.T. MacGregor, E. Zeiger. Review: Putative mutagens and carcinogens in foods. VII. Genetic toxicology of the diet.  Environmental Mutagenesis 8, 467-484 (1986).

74.     L.S. Gold, T.H. Slone, B.N. Ames. Overview and update analyses of the Carcinogenic Potency Database.  in L.S. Gold, E. Zeiger (Editors).  HANDBOOK OF CARCINOGENIC POTENCY AND GENOTOXICITY DATABASES. CRC Press, Boca Raton , pgs. 661-685 (1997).

75.     V.C. Dunkel, E. Zeiger, D, Brusick, E. McCoy, D. McGregor, K. Mortelmans, H.S. Rosenkranz, V.F. Simmon. Reproducibility of microbial mutagenicity assays: II. Testing of carcinogens and noncarcinogens in *Salmonella typhimurium* and *Escherichia coli*.  Environmental Mutagenesis 7(Suppl. 5): 1-248 (1985).

66

76.   R.J. Preston, G.M. Williams.  DNA-reactive carcinogens: mode of action and human cancer hazard.  Critical Reviews in Toxicology 35, 673-683 (2005).

77.   A.M. Jarabek, L.H. Pottenger, L.S. Andrews, D. Casciano, M.R. Embry, J.H. Kim, R.J. Preston, M.V. Reddy, R. Schoeny, D. Shuker, J. Skare, J. Swenberg, G.M. Williams, E. Zeiger. Creating context for the use of DNA adduct data in cancer risk assessment: I. Data organization.  Critical Reviews in Toxicology 39, 659-678 (2009).

78.   G.J. Patskan, K.F. Podraza, K. Meurrens,  C.R.E. Coggins, B. Friedrichs, B. Gerstenberg, W. Gomm, P. Schnell, R. Stabbert, D. Veltel, S. Weber, P. Terpstra. Toxicological comparisons of three styles of a commercial U.S. cigarette (Marlboro) with the 1R4F reference cigarette. Inhalation Toxicology, 20, 695-721 (2008).

79.   IHGSC. Initial sequencing and analysis of the human genome. Nature 409, 860-921 (2001).

80.   D.M. DeMarini, M.L. Shelton, L.F. Stankowski Jr. Mutation spectra in Salmonella of sunlight, white fluorescent light, and light from tanning salon beds: induction of tandem mutations and role of DNA repair. Mutation Research 327, 131-149 (1995).

81.   M. Nagao, Y. Takahashi, H. Yamanaka, T. Sugimura. Mutagens in coffee and tea. Mutation Research 68: 101-106 (1979).

82.   B.S. Shane, A.M. Troxclair, D.J. McMillin, C.B. Henry. Comparative mutagenicity of nine brands of coffee to *Salmonella typhimurium* TA100, TA102, and TA104. Environmental and Molecular Mutagenesis 11, 195-206 (1988).

83.   P.G. Shields, G.X. Xu, W.J. Blot, J.F. Fraumeni Jr., G.E. Trivers, E.D. Pellizzari, Y.H. Qu, Y.T. Gao, C.C. Harris. Mutagens from heated Chinese and U.S. cooking oils.  Journal of the National Cancer Institute 87, 836-841 (1995).

84.   J.S. Felton, M.G. Knize, F.A. Dolbeare, R. Wu. Mutagenic activity of heterocyclic amines in cooked foods.  Environmental Health Perspectives  102 (Suppl. 6): 201-204 (1994).

85.   H. Hayatsu. (editor)  MUTAGENS IN FOOD: DETECTION AND PREVENTION. CRC Press, 286 pages (1991).

86.   J.E. Harris. Incomplete compensation does not imply reduced harm: Yields of 40 smoke toxicants per milligram nicotine in regular filter versus low-tar cigarettes in the 1999 Massachusetts Benchmark Study. Nicotine and Tobacco Research 6, 797-807 (2004).

87.     M.W. Pariza, H.-U, Aeschbacher, J.S. Felton, S. Sato. (Editors) MUTAGENS AND CARCINOGENS IN THE DIET. PROGRESS IN CLINICAL AND BIOLOGICAL RESEARCH, Volume 247.  Wiley-Liss, 332 pages (1990).

88.     R.T. Taylor, E. Fultz, M.G. Knize. Mutagen formation in a model beef boiling system. III. Purification and identification of three heterocyclic amine mutagens-carcinogens. Journal of Environmental Science and Health A20: 135-148 (1985).

89.     R.T. Taylor, E. Fultz, M. Knize. Mutagen Formation in a model beef supernatant fraction. IV. Properties of the system. Environmental Health Perspectives 67: 59-74 (1986).

90.     IARC (International Agency for Research on Cancer). World Health Organization. IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS. Complete List of Agents Evaluated and their Classification.  Available on line at: http://monographs.iarc.fr/ENG/Classification/index.php.  (Accessed January 19, 2010).

91.     NTP (U.S. National Toxicology Program). Database Search Application.  On-line at: http://ntp-apps.niehs.nih.gov/ntp_tox/index.cfm  (2009).

92.     L.S. Gold (Director). The Carcinogenic Potency Project.  The Carcinogenic Potency Database (CPDB).  Online at: http://potency.berkeley.edu/cpdb.html (2009).

93.     Committee on Mutagenicity, "Draft Discussion Paper: Regulatory Aspects Surrounding the Toxicological Evaluation of Tobacco Products," May 2009 at 2.

94.     Ministry of Health, Committees on Toxicity, Carcinogenicity and Mutagenicity, 2008 Annual Report at 14-16.

95.     WHO Technical Report Series 945, The Scientific Basis of Tobacco Product Regulation, Report of a WHO Study Group (2007) at 44.

96.     P.N. Lee, B.A. Forey, G.B. Gori. Do reductions in the tar and nicotine yields of cigarettes help to explain recent reductions in lung cancer rates in young men and women in the United States?  Inhalation Toxicology 18, 365-388 (2006).

97.     P. Lee,  B. Forey, J. Fry, J. Hamling, J. Hamling, E.Sanders, R. Carchman. Does use of flue-cured rather than blended cigarettes affect international variation in mortality from lung cancer and COPD? Inhalation Toxicology, 21(5). 404-430 (2009).

98.     IOM (Institute of Medicine). CLEARING THE SMOKE. ASSESSING THE
        SCIENTIFIC BASE FOR TOBACCO HARM REDUCTION.  K. Stratton, P.
        Shetty, R. Wallace, S. Bondurant (editors). National Academy Press (2001).

99.     J.F. Pankow, K.H. Watanabe, P.L. Toccalino, W. Luo, D.F. Austin. Calculated
        cancer risks for conventional and "potentially reduced exposure product"
        cigarettes. Cancer Epidemiology and Biomarkers Prevention 16, 584-592 (2007).

100.    K.H. Watanabe, M.V. Djordjevic, S.D. Stellman, P.L. Toccalino, D.F. Austin, J.F.
        Pankow. Incremental lifetime cancer risks computed for benzo[a]pyrene and two
        tobacco-specific N-nitrosamines in mainstream cigarette smoke compared with
        lung cancer risks derived from epidemiologic data.  Regulatory Toxicology and
        Pharmacology 55, 123-133 (2009).

101.    AOAC (Association of Official Analytical Chemists). AOAC® Official
        Methods[SM] Validation Program. on line at
        http://www.eoma.aoac.org/validation_program.asp

102.    D.J. Doolittle, C.K. Lee, J.L. Ivett, J.C. Mirsalis, E. Riccio, C.J. Rudd, G.T.
        Burger, A.W. Hayes. Comparative studies on the genotoxic activity of
        mainstream smoke condensate from cigarettes which burn or only heat tobacco.
        Environmental and Molecular Mutagenesis 15, 93-105 (1990).

103.    M.E. Counts, M.J. Morton, S.W. Laffoon, R.H. Cox, P.J. Lipowicz. Smoke
        composition and predicting relationships for international commercial cigarettes
        smoked with three machine-smoking conditions.  Regulatory Toxicology and
        Pharmacology 41 185–227 (2005).

104.    LGC. Cigarette yields using intense smoking protocols. United Kingdom
        Department of Health. Smoking Policy Unit. Part 2, Polycyclic Aromatic
        Hydrocarbon Yields. (2000).

105.    LGC. Cigarette yields using intense smoking protocols. United Kingdom
        Department of Health. Smoking Policy Unit. Part 4, Volatile Organic
        Compounds. (2001).

106.    E. Roemer, T.H. Ottmueller, V. Zenzen, S. Wittke, F. Radtke, I. Blanco, R.A.
        Carchman. Cytotoxicity, mutagenicity and tumorigenicity of mainstream smoke
        from three reference cigarettes machine-smoked to the same yields of total
        particulate matter per cigarette.  Food and Chemical Toxicology 47, 1810-1818
        (2009).

107.    Trial Testimony of Dr. Jeffery Harris, *Miles v. Philip Morris Cos. Inc.*, No. 00-L-
        0112 (Ill. Cir. Ct. Feb. 6, 2003) Vol. 12(a) at 94-95.

108. Letter from Peter G. Shields, M.D., Professor of Med. and Oncology , Lombardi Comprehensive Cancer Ctr., Georgetown Univ. Sch. of Med., to Dr. Cathy L. Backinger, PhD, MPH, Chief, Tobacco Control Research Branch, Behavioral Research Program, Div. of Cancer Control and Population Sci., Nat'l Cancer Inst., et al. (May 6, 2008).

109. D.K. Hatsukami, A.M. Joseph, M. Lesage, J. Jensen, S.E. Murphy, P.R. Pentel, M. Kotlyar , E. Borgida, C. Le, S.S. Hecht.  Developing the science base for reducing tobacco harm. Nicotine & Tobacco Research S537-S553 (2007).

110. Deposition Testimony of Dr. Peter Shields, *Schwab v. Philip Morris USA, Inc.* No. CV 04-1945 (USDC EDNY, June 17, 2005) at 71.

111. OECD Guideline for the Testing of Chemicals. Draft Proposal for a New Guideline 487: *In Vitro* Mammalian Cell Micronucleus Test (MNvit). 2 November 2009.  available at: http://www.oecd.org/dataoecd/45/51/43996258.pdf

112. International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use. Draft Consensus Guideline. Guidance on Genotoxicity Testing and Data Interpretation for Pharmaceuticals Intended for Human Use. S2(R1). 6 March 2008. available at: ttp://www.ich.org/LOB/media/MEDIA4474.pdf

113. Department of Health and Human Services. Food and Drug Administration [Docket No. FDA-2009-N-0519]  Public Workshop: International Conference on Harmonisation S2 Genetic Toxicology Issues; Request for Comments.  Federal Register Vol. 74, No. 211, Tuesday, November 3, 2009.

114. E.L. Wynder, D.A. Hoffman.  A contribution to experimental tobacco carcinogenesis.  (orig. in German).  Deut. Med. Wochenschr. 88, 623-628 (1963).

115. K. Okuwa, M. Tanaka, Y. Fukano, H. Nara, Y. Nishijima, T. Nishino.  In vitro micronucleus assay for cigarette smoke using a whole smoke exposure system:  A comparison of smoking regimens.  Experimental and Toxicologic Pathology [epub doi:10.1016/j.etp.2009.06.002]

I Errol Zeiger declare under the penalty of perjury that the foregoing is true and correct.

Further, affiant sayeth naught.

_____
Errol Zeiger, Ph.D.

# Exhibits To Declaration And Expert Disclosure Statement Of Errol Zeiger, Ph.D.

(filed and served on all parties as an electronic DVD)