# Exhibit 17

1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MAINE
 3
 4
 5   IN RE:  LIGHT CIGARETTES    ) MDL DOCKET NO.
             MARKETING and       ) 1-09-MD-2068
 6           SALES PRACTICES     )
             LITIGATION          )
 7   _____ )
                                 )CASE NO.
 8           Plaintiff,          )09-CV-05867
                                 )
 9           VS.                 )
     PHILIP MORRIS USA, INC.,    )
10           Defendant.          )
11
12           VIDEOTAPED DEPOSITION of
13   JEFFREY E. HARRIS, M.D., Ph.D., called
14   as a witness by and on behalf of the
15   Defendant, pursuant to the Federal Rules of
16   Civil Procedure, before Teresa E. Costello,
17   Certified Realtime Reporter, Registered
18   Professional Reporter, Certified Shorthand
19   Reporter No. 1452S98, and Notary Public
20   within and for the Commonwealth of
21   Massachusetts, at the offices of
22   Whatley, Drake & Kallas, 60 State Street,
23   Boston, Massachusetts, on Wednesday,
24   January 20, 2010, commencing at 10:08 a.m.
```

**Page 2**

APPEARANCES:

DUGAN LAW FIRM
650 Poydras Street
Suite 2150
New Orleans, Louisiana 70130
BY:  James Dugan, Esquire
     jdugan@duganlawfirm.com
     504-648-0180
     Attorney for the Plaintiffs.

WHATLEY DRAKE & KALLAS, LLC
60 State Street
7th Floor
Boston, Massachusetts 02109
BY:  Patrick J. Sheehan, Esquire
     psheehan@wdklaw.com
     617-573-5118
     Attorney for the Plaintiffs.

LANHAM BLACKWELL
470 Evergreen Woods
Bangor, Maine 04401
BY:  Samuel W. Lanham, Jr., Esquire
     slanham@lanhamblackwell.com
     207-942-2898
     Attorney for the Plaintiffs.

ARNOLD & PORTER, LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
BY:  Robert A. McCarter, III, Esquire
     robert.a.mccarter@aporter.com
     202-942-5376
BY:  Ryan L. Richardson, Esquire
     ryan.richardson@aporter.com
     202-942-6365
     Attorneys for the Defendant.

**Page 3**

APPEARANCES:

SHAPIRO HABER & URMY, LLP
53 State Street
Boston, Massachusetts 02109
BY:  Thomas V. Urmy, Jr., Esquire
     turmy@shulaw.com
     617-439-3939
     Also Present

Sean McDonald, Legal Videographer

**Page 4**

I N D E X

| DEPONENT | PAGE |
|---|---|
| JEFFREY E. HARRIS, M.D., Ph.D. | |
| Examination by Mr. McCarter | 7 |

E X H I B I T S

| NO. | | PAGE |
|---|---|---|
| 1 | Expert Report dated 12-6-09 | 26 |
| 2 | Electronic Spreadsheet | 48 |
| 3 | E-mail dated 1-8-10 | 49 |
| 4 | Expert Report dated 9-29-09 | 75 |

**Page 5**

S T I P U L A T I O N S

It is agreed by and between counsel for the respective parties that the deponent will read and sign the deposition within thirty (30) days from receipt, and the signing before a Notary Public is waived.

It is further agreed that all objections, except as to form and motions to strike, are reserved for the time of trial.

* * * * * * * * * *

VIDEOGRAPHER:  My name is Sean McDonald of Veritext New York.  Today's date is January 20th, 2010, and the time is approximately 10:08 a.m.  This deposition is being held in the office of HQ Global, 60 State Street, Boston, Massachusetts. The caption of this case is In Re:  Light Cigarettes Marketing and Sales Practices Litigation versus Philip Morris USA, Incorporated, pending in the United States District Court for the District of Maine, MDL Docket Number 109MD2068.  The name of

6

1  the witness is Doctor Jeffrey E. Harris.
2  At this time the attorneys will identify
3  themselves and the parties they represent
4  after which our court reporter, Teresa
5  Costello, of Veritext New York, will swear
6  in the witness and we can proceed.
7        MR. MCCARTER:  Robert McCarter
8  with the law firm of Arnold & Porter
9  representing Philip Morris USA, Inc.
10       MS. RICHARDSON:  Ryan Richardson
11  with the law firm Arnold & Porter also
12  representing Philip Morris USA, Inc.
13       MR. DUGAN:  James Dugan
14  representing the plaintiff steering
15  committee in the MDL.
16       MR. SHEEHAN:  Patrick Sheehan of
17  Whatley, Drake & Kallas, representing the
18  plaintiffs.
19       MR. LANHAM:  Sam Lanham for the
20  plaintiffs
21       MR. URMY:  Thomas Urmy from
22  Shapiro, Haber & Urmy in Boston, and I'm an
23  observer.
24

7

1        JEFFREY E. HARRIS, M.D., Ph.D.,
2        having been satisfactorily
3        identified by the production of
4        his driver's license, and duly
5        sworn by the Notary Public, was
6        examined and testified as
7        follows to direct interrogatories:
8  BY MR. MCCARTER:
9  Q.  Good morning, Doctor Harris.
10  A.  Good morning, sir.
11  Q.  I mentioned off the record my name is Bob
12      McCarter.  I'm going to be asking you
13      questions today.  What's your understanding
14      of the nature of this case?
15  A.  My understanding is that this is a class
16      action demand which is pending in the
17      Federal District Court in the District of
18      Maine, but is a consequence of a
19      consolidation of multiples of cases under
20      the device of multi-district litigation,
21      and that I have been asked to write a
22      report by counsel for the plaintiff and
23      that this is a deposition concerning my
24      opinions in that case.

8

1  Q.  What is your understanding of the
2      underlying allegations in the case?
3  A.  I can only respond with respect to a
4      document that I read which was supplied to
5      me by plaintiff which represented a
6      complaint in reference to the state of
7      Louisiana which I believe I received from
8      Mr. Dugan to my right.
9  Q.  Have you reviewed any documents other than
10      that complaint relating to this case?
11  A.  With respect to pleadings by the parties,
12      no.
13  Q.  With respect to other materials?
14  A.  Other than the materials that I relied upon
15      in forming my opinion in my report, no.
16  Q.  And are all the materials you relied upon
17      in forming the opinions expressed in your
18      report -- are all those documents
19      referenced in your report?
20  A.  That is correct.
21  Q.  Okay.  So other than what's mentioned in
22      your report, the only document you've
23      reviewed relating to this case is the
24      Louisiana complaint, is that correct?

9

1  A.  That is correct.
2  Q.  I started down this line by asking you what
3      your understanding of the underlying
4      allegations were, and you referred me to
5      the fact that you had read the Louisiana
6      complaint, but I don't think you answered
7      my original questions.  Let me ask it
8      again.
9        What is your understanding of the
10      nature of the allegations underlying the
11      lawsuit?
12  A.  With respect to the Louisiana complaint, I
13      understand that plaintiff is seeking a
14      class action and that there are multiple
15      causes of action within that device.
16        One of them, I believe, is
17      consumer fraud under state fraud statutes.
18      Another is what is called redhibition in
19      the state of Louisiana.  Another is a cause
20      of action seeking ill-gotten gains from the
21      defendant.  Beyond that, I'd have to refer
22      to the document that I saw to give you a
23      more complete answer.
24  Q.  You've described for me, I think, some of

3 (Pages 6 to 9)

10

1  the legal causes of action and legal terms
2  of the complaint. What's your
3  understanding of the underlying factual
4  allegations? In other words, what it is
5  that Philip Morris is claimed to have done
6  wrong?
7  A. It's my understanding that plaintiff has
8  alleged that the defendant fraudulently
9  misrepresented cigarettes that it placed in
10 the stream of commerce and that these
11 fraudulent misrepresentations were part of
12 a larger pattern of practice that included
13 persistent denial that cigarettes and
14 smoking and nicotine were addictive;
15 concealment of knowledge that the defendant
16 had concerning its own research into the
17 characteristics of nicotine and the way in
18 which smokers smoke light cigarettes; and
19 that these activities resulted in injury to
20 class members.
21 Q. You started the answer by referring to
22 fraudulent misrepresentation regarding
23 cigarettes in the stream of commerce. Do
24 you have an understanding as to what style

11

1  or type of cigarettes are at issue in the
2  allegation?
3  A. Yes, I do.
4  Q. What is that?
5  A. It's my understanding that the
6  allegation -- in fact, the caption of the
7  case refers to cigarettes specifically
8  denominated light.
9  Q. And what is the -- what's your
10 understanding of the alleged fraudulent
11 misrepresentations relating to light
12 cigarettes?
13    MR. DUGAN: Objection. Calls for
14 a legal conclusion. This witness is
15 obviously testifying in his capacity as an
16 economist, and I don't think it's
17 appropriate.
18 Q. I asked for your understanding, Doctor
19 Harris, not the law. So you can answer the
20 question.
21 A. It's my understanding that plaintiffs
22 allege that the sale of cigarettes
23 described and denominated as light and as
24 lower tar and nicotine, was done

12

1  fraudulently and constituted
2  misrepresentation and that such descriptors
3  constituted a misleading representation of
4  the health benefits of smoking such
5  cigarettes.
6  Q. What do you understand the nature of the
7  injury claimed by plaintiff to be?
8     MR. DUGAN: Objection. Calls for
9  a legal conclusion. You can answer the
10 question if you can or want to.
11 A. My understanding is that the nature of the
12 injury is necessarily guided by the law.
13 On the one hand, plaintiffs may seek
14 recovery of the entire purchase price if so
15 permitted by a particular relevant statute,
16 or plaintiffs may seek recovery of
17 ill-gotten gains, or plaintiffs may seek
18 recovery under another standard of damages,
19 but in each and every case that would
20 depend on the relevant law.
21 Q. When you use the term "ill-gotten gains,"
22 what do you mean by that?
23 A. My non-legal understanding refers to before
24 tax profits earned on the sale of those

13

1  cigarettes which plaintiff alleges were
2  fraudulently or tortiously sold to the
3  members of the class.
4  Q. Would it be fair to say that your
5  understanding is that ill-gotten gains
6  would be profits that are causally linked
7  to the alleged wrongful conduct in the
8  case?
9  A. I'm not sure I understand what you mean by
10 "causally linked" other than they were
11 profits gleaned from the sale of the
12 cigarettes that plaintiff alleges were sold
13 illegally.
14 Q. Do you understand ill-gotten gains to refer
15 to profits that would not have occurred but
16 for the alleged wrongful conduct?
17    MR. DUGAN: Objection. Calls for
18 a legal conclusion. Objection. Asked and
19 answered. I believe he's answered.
20 Q. You can answer, Doctor Harris.
21 A. When you use the terminology "but for," it
22 raises the possibility that the defendant
23 may have earned profits by some other means
24 or through some other sale in the event

4 (Pages 10 to 13)

14

1     that it did not engage in the alleged
2     misconduct.  In that case, I don't know
3     what the answer is.  If you mean the narrow
4     sense that the profits were gleaned
5     directly from the sale of the product, then
6     the answer is yes.
7  Q.  Well, let me give you a couple of examples.
8     I want to understand what you mean by
9     ill-gotten gains.  I understand that you're
10    not here to tell us what the law is.  Let
11    me give you a couple of examples and see if
12    I can figure out -- if I can understand
13    what you're talking about.
14        If you have somebody who purchased
15    light cigarettes resulting in a profit to
16    Philip Morris and they would have purchased
17    light cigarettes regardless of the alleged
18    wrongful conduct, would you consider those
19    profits to be ill-gotten gains?
20  A.  From the economist standpoint, no.  From
21    the legal standpoint, I don't know.
22  Q.  Okay.  And from an economist standpoint, if
23    a person purchased light cigarettes
24    resulting in a profit to Philip Morris and

15

1     in a world without the fraud, they would
2     have bought a different brand of cigarettes
3     that cost the same price resulting in the
4     same profit to Philip Morris, would you
5     consider the profit to be ill-gotten gains?
6  A.  I think I referred to that possible
7    scenario in a previous answer.  I think the
8    correct answer is I don't know.  It would
9    depend on a legal standard.
10  Q.  Okay, but there's no -- you don't have a
11    view from an economic standard whether that
12    would count as an ill-gotten gain or not?
13  A.  No, I do not.
14  Q.  When were you first contacted in relation
15    to this case?
16  A.  In either October or November of 2009.
17  Q.  Who contacted you?
18  A.  Mr. James Dugan.
19  Q.  And what did -- what was the nature of the
20    conversation you had with Mr. Dugan at that
21    time?
22  A.  He asked me if I would be willing to serve
23    as an expert in Light Cigarettes
24    Litigation, and I responded that the answer

16

1     was yes.
2  Q.  Did he tell you what he had in mind for you
3    to do in the case?
4  A.  Not in the first conversation.
5  Q.  When you said yes, you were willing to be
6    involved, did you have any understanding at
7    the time as to what you would be asked to
8    do?
9  A.  Having served as an expert in other lights
10    cases, I assume that I would serve in a
11    similar capacity, but that I did not know
12    anything more specific at the time.
13  Q.  Was there -- you had some subsequent
14    conversation with Mr. Dugan or somebody
15    else on the plaintiff's side, is that
16    right?
17  A.  That's correct.
18  Q.  When was the next time you spoke with
19    Mr. Dugan or someone else representing
20    plaintiffs?
21  A.  I cannot recall what time interval passed,
22    but during the fall of 2009, prior to the
23    time I submitted an expert report, I did
24    have another conversation in which

17

1     plaintiff's representative narrowed my task
2     to those assignments which are memorialized
3     in the report I submitted in this case.
4  Q.  Who was the plaintiff's representative to
5    whom you're referring?
6  A.  I believe it was Mr. Dugan, but it is
7    possible that it was someone else in
8    Mr. Dugan's firm or in the Murray Law Firm.
9  Q.  And you refer to it as narrowing your task.
10    Why did you describe it as narrowing your
11    task?
12  A.  In other cases involving light cigarettes,
13    I have been asked to make calculations in
14    accordance with various legal standards.
15    At the time I was initially contacted, I
16    did not know what specific calculations or
17    specific legal standards Mr. Dugan or
18    plaintiff's counsel had in mind, nor did I
19    know the jurisdictions that might be
20    involved, the brands of cigarettes that
21    plaintiff allege were sold illegally, nor
22    the time period involved.  Those facts were
23    narrowed down in a subsequent conversation.
24  Q.  In other cases you've been -- other lights

5 (Pages 14 to 17)



18

1      cases you've been asked to calculate what's
2      referred to as benefit of the bargain
3      damages, correct?
4   A. That is correct.
5   Q. And you were not asked to do that here?
6   A. That is correct.
7   Q. In other cases you've been asked to
8      calculate damages under a standard referred
9      to as loss of value, correct?
10  A. Not exactly.
11  Q. How did I misstate it?
12  A. In a particular case which was captioned
13     Schwab, which, my understanding, was a
14     racketeering case, I use the term "loss of
15     value," myself, to refer to a particular
16     concept of damages. I don't believe that
17     counsel ever used that term or referred to
18     it as a legal standard.
19  Q. Have you ever calculated damages in a
20     lights case under this legal standard
21     described as the out-of-pocket standard?
22  A. The direct answer to your question is no,
23     but it probably requires an additional
24     sentence.

19

1   Q. Okay, please.
2   A. In my assignments to calculate damages
3      under the benefit of the bargain standard,
4      I have received from counsel various legal
5      materials that refer to and contrast and
6      compare the benefit of the bargain standard
7      with the out-of-pocket standard, but in no
8      case that I'm aware of have I been asked to
9      apply the out-of-pocket standard.
10  Q. In the legal materials you've read, was the
11     out-of-pocket standard described as the
12     difference between the price of the product
13     and the actual value of the product?
14  A. No, not exactly.
15  Q. What's your recollection as to the
16     definition of out-of-pocket damages in the
17     materials you read?
18  A. It's my understanding that out-of-pocket
19     damages, in general, refers to a difference
20     in the amount paid and that such a
21     difference does not necessarily capture the
22     benefit that the buyer bargained for in the
23     contract.
24  Q. When you say the "difference in the amount

20

1      paid," a difference generally requires
2      comparing two things. Difference between
3      the amount paid and what?
4   A. In general, I believe it is the difference
5      between the amount that the buyer paid for
6      the good, as represented, and the amount
7      that the buyer would have paid for the good
8      that was actually delivered.
9   Q. And in this case the MDL we're here for
10     today, you have not calculated or attempted
11     to calculate that difference, correct?
12  A. I have not been asked to do so, and I have
13     not made such a calculation.
14  Q. Thank you. You've told me about two
15     discussions you had with plaintiff's
16     counsel in this case. Have you had any
17     other discussions or meetings with counsel
18     for plaintiffs?
19  A. Several conversations.
20  Q. Okay. Can you walk me through them
21     chronologically?
22  A. I had a conversation with Mr. Dugan in
23     which he informed me that there was a
24     deadline imposed by the court or the

21

1      magistrate in charge of discovery to submit
2      expert reports by a date specific. At that
3      time I asked further details concerning my
4      assignment such as the time period under
5      discussion, whether or not any interest
6      calculations would be made, whether any
7      calculations referable to the future were
8      at issue, what types of cigarettes were the
9      subject of the calculation, and either in
10     that conversation or a subsequent
11     conversation, what states I should focus
12     on, and the response was for the purposes
13     of my report, the jurisdictions of the
14     State of California and the District of
15     Columbia.
16        And then in a series of
17     conversations, which I cannot disentangle
18     one-by-one at this point, I explained that
19     I could, in principle, apply the
20     methodology for making calculations of
21     total cigarette sales, consumer
22     expenditures on cigarettes at retail and,
23     in addition, manufacturer's before-tax
24     profits in accordance with the methodology

6 (Pages 18 to 21)

22

1    that I used in a case in the state of
2    Illinois where the principal named
3    plaintiff was named Price.
4        After writing a draft of my
5    report, I had another conversation with a
6    conference call of attorneys; that is,
7    multiple individuals on the same line, in
8    which I received comments on the draft
9    before it was finalized.
10       In terms of conversations, I think
11   that would be it up to the time I submitted
12   my report.  Since I don't want to give a
13   speech --
14   Q.  I appreciate that.
15   A.  -- and I understand that you're asking the
16   questions, I can stop there and continue
17   the narrative if you want.
18   Q.  Let's stop there.  Thank you.
19       MR. MCCARTER:  James, my
20   understanding is there's an agreement
21   between the parties relating to drafts, and
22   the drafts are not discoverable.  Is that
23   your understanding?
24       MR. DUGAN:  That's correct.

23

1        MR. MCCARTER:  Okay.  And that
2    raises the question, in my mind, whether
3    conversations in which attorneys provided
4    comments on drafts fall within that
5    exclusion.
6        MR. DUGAN:  Yes, they usually do,
7    yes.
8        MR. MCCARTER:  Okay.  So that's
9    your interpretation.
10       MR. DUGAN:  Yes.
11       MR. MCCARTER:  Then we'll operate
12   under that.  Then I won't ask Doctor Harris
13   about the comments he received on his draft
14   report in light of the agreement between
15   the parties.
16       MR. DUGAN:  Correct.
17       MR. MCCARTER:  Okay.  Thank you.
18   Q.  Doctor Harris, thanks for pausing there
19   because I did have some follow-up questions
20   for you, all right?  In your report you
21   focus, in the exposition, on two cigarette
22   brands; Marlboro Lights and Marlboro Ultra
23   Lights, correct?
24   A.  Correct.

24

1    Q.  It appeared to me, in reviewing your
2    calculations, that your calculations
3    related only to Marlboro Lights and not to
4    Marlboro Ultra Lights, is that true?
5    A.  My illustrative calculation indeed referred
6    only to Marlboro Lights.
7    Q.  Why did you, in your report, focus in terms
8    of the exposition only on Marlboro Lights
9    and Marlboro Ultra Lights?
10   A.  Could the question be read back?  I missed
11   one word.
12       COURT REPORTER:  "Why did you, in
13   your report, focus in terms of the
14   exposition only on Marlboro Lights and
15   Marlboro Ultra Lights?"
16   A.  Counsel advised me to do so.
17   Q.  And did you receive any explanation as to
18   why?
19   A.  No.
20   Q.  Why, in estimating the numbers you estimate
21   in your report, did you focus only on
22   Marlboro Lights and not on Marlboro Ultra
23   Lights as well?
24   A.  The short answer is that I was providing an

25

1    illustration of a calculation that I could
2    make for any brand whether it be Marlboro
3    Lights or Marlboro Ultra Lights or another,
4    if I had the necessary additional
5    information.
6    Q.  What necessary additional information are
7    you talking about?
8    A.  That information is delineated in my
9    report, and I can point you to the specific
10   place where I wrote it, or I can give a
11   speech.
12   Q.  Well, are you referring to the information
13   for other brands that you used in
14   calculating the numbers you calculated for
15   Marlboro Lights?
16   A.  No.
17   Q.  Okay.  We'll get to your report later.  Are
18   you referring to the paragraph where you
19   say you need additional information and you
20   may supplement your report?
21   A.  No.
22   Q.  Okay.  Let me mark your report then so you
23   can tell me.
24

7 (Pages 22 to 25)

**26**

1          (Expert Report marked
2          Exhibit Number 1.)
3  Q. Doctor Harris, will you please confirm
4      Exhibit 1 is the Expert Report and
5      attachments that you produced in this case?
6  A. Yes, it is.
7  Q. I apologize for trying to guess the answer
8      and guessing incorrectly, but will you show
9      me in your report what you're referring to
10     in terms of the other data you would need
11     to calculate similar estimates for other
12     cigarette brands?
13 A. I refer you to paragraph 17 on page seven.
14 Q. Okay. And paragraph 17 refers to
15     information or data relating to market
16     share of particular brands of Philip Morris
17     shipment data, correct?
18 A. To be more precise, I did not have
19     available data on the direct shipments by
20     defendant Philip Morris USA for particular
21     brands to the direct buyers in the
22     particular states at issue either for
23     Marlboro Lights, Marlboro Ultra Lights, or
24     any other Philip Morris brand, but as

**27**

1      indicated in paragraph 17, it was my
2      understanding that Philip Morris, as
3      defendant in other cases, had provided data
4      for other jurisdictions in other years. In
5      the event that I receive such information,
6      which was not in the public domain, then I
7      could proceed with more than simply an
8      illustrative calculation.
9  Q. So for Marlboro Lights, you had access to
10     some Philip Morris data on shipments from
11     2003 at least, correct?
12 A. Not exactly. And the answer is amplified
13     in paragraph 19 on the same page.
14 Q. What data did you have available on Philip
15     Morris shipments of Marlboro Lights?
16 A. I had data on Philip Morris shipments of
17     Marlboro Lights for the state of Illinois
18     in connection with the Price case during
19     the relevant time period as well as data
20     produced by Philip Morris in the state of
21     Missouri in the Craft case for the relevant
22     time period in that case and no other data
23     that I can recall.
24 Q. No other data relating to shipments of

**28**

1      Marlboro Lights?
2  A. It is possible that I had data on Marlboro
3      Lights shipments in the Schwab case, but I
4      cannot remember right now.
5  Q. And did you have access to shipment data
6      for any brand other than Marlboro Light?
7  A. In the Price case in Illinois, I had
8      shipment data for Cambridge Lights from
9      Philip Morris. In the Craft case I had
10     data for no other brand from Philip Morris
11     or from any other manufacturer.
12          In the Schwab case I may have had
13     direct shipment data on multiple brands,
14     but I cannot recall right now.
15 Q. In preparing your work in this case, did
16     you review the data that you received in
17     Schwab?
18 A. No, I did not.
19 Q. Schwab was a case that involved roughly a
20     hundred or so different light cigarette
21     brands, correct?
22 A. It involved multiple brands. I don't
23     remember how many.
24 Q. In preparing your work in this case, did

**29**

1      you ask plaintiff's counsel to obtain for
2      you data from Philip Morris on shipments
3      relating to different light cigarette
4      brands?
5  A. To be more precise, I informed plaintiff's
6      counsel that it would be necessary during
7      the course of discovery to ask for that
8      information.
9  Q. And what, if anything, was plaintiff's
10     counsel's response?
11 A. Given the deadlines for submission of
12     expert reports imposed by the court, there
13     was not adequate time to ask for and obtain
14     such information, and counsel instructed me
15     to proceed with an illustrative
16     calculation, if necessary, substituting an
17     assumed value for the purposes of that
18     calculation rather than any actual data
19     received from defendant in the relevant
20     jurisdictions.
21 Q. And the value you assumed was that Marlboro
22     Lights' share of Philip Morris direct
23     shipments to California was 40 percent in
24     2005?

**8 (Pages 26 to 29)**

30

1  A. That is correct.
2  Q. And you noted that in the Missouri data you
3     had, the market share was slightly lower,
4     38 percent, but was trending upward,
5     correct?
6  A. Yes, that's in paragraph 19.
7  Q. Over what period of time has the share of
8     Marlboro Lights been trending upward in the
9     data you have reviewed?
10 A. I'm assuming that your question refers to
11    the share of Marlboro Lights shipped to
12    direct buyers in Missouri.  I did look at
13    the data, but I cannot answer right now.  I
14    can't recall the trend.
15 Q. Your report focuses on calculations
16    relating to the year 2005, correct?
17 A. The illustrative calculation in my report
18    does indeed.
19 Q. Why did you limit your calculation to 2005?
20 A. I thought that laying out each and every
21    step of the calculation and each and every
22    data source for a particular brand in a
23    particular jurisdiction in a particular
24    year, in that case 2005, was sufficient to

31

1     explain my methodology so that both
2     parties, as well as any other expert, could
3     understand how I formulated my opinion.
4  Q. You testified earlier that you did not have
5     data necessary to run your calculation on
6     brands other than Marlboro Lights, right?
7  A. That's not correct.
8  Q. Well, let me ask a different question.  Did
9     you have sufficient information and data
10    available to you to run your calculation on
11    years other than 2005?
12 A. Within the class period imposed by
13    plaintiff's counsel, I could have chosen
14    another year, but, again, in that case I
15    would still have been making an
16    illustrative calculation in that I did not
17    have any direct shipment data from Philip
18    Morris in either California or the District
19    of Columbia for Marlboro Lights, Marlboro
20    Ultra Lights, or any other Philip Morris
21    brand during any of the relevant years.
22 Q. Could you have run the same calculation
23    that you actually did in this case on data
24    for all the years between 2005 and 2009?

32

1  A. If I had the additional data from Philip
2     Morris, yes.
3  Q. Well, you didn't have that data for Philip
4     Morris for the year 2005, right?
5  A. That is correct.
6  Q. But you were able to make an assumption and
7     do your calculations for the year 2005,
8     correct?
9  A. Yes.
10 Q. Could you have used that same methodology
11    for the years 2006, 7, 8, and 9, and do the
12    same calculation?
13 A. Yes, though I would have had to make
14    additional assumptions about the market
15    share of Marlboro Lights in the relevant
16    jurisdictions for each and every
17    jurisdiction in each and every year.
18 Q. I'm not talking about the other
19    jurisdictions right now.  I'm just saying
20    for California.  In your report you
21    calculated total sales, expenditures, and
22    profits for one state, California, correct?
23 A. Correct.
24 Q. You could have done that same calculation

33

1     for California in the years 2006, 2007,
2     2008, and 2009, correct?
3  A. Correct, provided that I made assumptions
4     concerning Philip Morris direct shipments
5     of the relevant brand in those years.
6  Q. Which is the same assumption -- same input
7     you assumed in 2005, correct?
8  A. Correct.
9  Q. Your report discusses both California and
10    the District of Columbia, correct?
11 A. Correct.
12 Q. Your calculations, however, are based only
13    on California, correct?
14 A. Correct.
15 Q. Is there a reason why you did not run the
16    same calculations on the District of
17    Columbia?
18 A. I can think of only one reason.  Other than
19    that, no.
20 Q. Okay.  And what's the one reason?
21 A. Plaintiff's counsel had not given me
22    specific instruction as to which
23    transactions in a particular state fell
24    within the definition of the class.  One

9 (Pages 30 to 33)

34

1  such definition is all cigarettes purchased
2  within the state such as the state of
3  California regardless of the state of
4  residence of the purchaser. An alternative
5  definition is all cigarettes purchased
6  within the relevant state such as
7  California by residents of California. I
8  commented in my report that relying on
9  other public sources, I could make
10 appropriate calculations under either
11 definition.
12     Illustrating that concept was
13 simpler for the case of California than for
14 the District of Columbia and for that
15 reason, I chose to display the calculations
16 in the California case.
17 Q. In the bottom line estimates in your report
18 of total sales, expenditures, and profits,
19 which definition of purchases did you use
20 of the two that you just outlined?
21 A. I believe I included all purchases, whether
22 or not the purchaser was a resident of
23 California, in the illustrative
24 calculations that appear in my report with

35

1  the exception of one paragraph where I
2  explained how an adjustment could be made,
3  if necessary.
4  Q. Okay. But you have not made that
5  adjustment, correct?
6  A. I need to refer to my report to answer. I
7  refer you to paragraph 15 on page six.
8  Q. Okay. From paragraph 15 you did make that
9  adjustment in the text of the report for
10 the total sales in California of Marlboro
11 Lights in 2005, correct?
12 A. Correct, within that paragraph, but I did
13 not carry over that adjustment into the
14 later calculations.
15 Q. Okay. So your estimates of total consumer
16 expenditures in California do not reflect
17 this adjustment that's discussed in
18 paragraph fifteen, correct?
19 A. That is correct.
20 Q. And same for your estimate of total
21 profits, correct?
22 A. That is correct.
23 Q. In what way or ways was the District of
24 Columbia more difficult than California on

36

1  this issue?
2  A. I relied on a research report by Professor
3  Lovenheim which is cited in paragraph
4  fifteen. In that report Professor
5  Lovenheim estimated that the net inflow or
6  outflow of cigarettes from out-of-state in
7  the case of California was relatively
8  small.
9      Although I do not have, in my head
10 right now, exactly the numbers for the
11 District of Columbia, my best recollection
12 is that many residents of DC went out of
13 the district to buy cigarettes and that the
14 illustrative calculation would involve more
15 explanation and would not be as easy to
16 understand in a report.
17 Q. Well, let me see if I can understand this.
18 In California, according to the Lovenheim
19 article, there is, smuggling occurs whereby
20 somebody who lives in a neighboring state
21 to California goes into California and buys
22 cigarettes, correct?
23 A. We'll call it cross-border traffic. It
24 doesn't have to be smuggling, and it

37

1  doesn't necessarily have to connote any
2  illegal activity.
3  Q. Fair enough, but in the Lovenheim article,
4  the point is that this cross-border traffic
5  means that if you looked at the total
6  cigarettes purchased in California, that
7  would overstate slightly perhaps the total
8  cigarettes purchased in California by
9  California residents, correct?
10 A. That's correct, where the slightly is
11 actually 0.36 percent.
12 Q. The District of Columbia, the number cuts
13 in the opposite direction, correct?
14 A. That's my recollection.
15 Q. And I think the article talks about the
16 wide disparity in cigarette prices between
17 Virginia and DC, right?
18 A. I'd have to look at the article.
19 Q. Okay. If the effect is going in the
20 opposite direction, then how does the
21 cross-border purchases affect an estimate
22 of purchases by DC residents in DC?
23 A. It does not, but using that as an
24 explanation does not adequately inform the

10  (Pages 34 to 37)

38

1    reader that the opposite phenomenon could
2    indeed occur.
3  Q.  I started down this line of questioning
4    asking you why you calculated the numbers
5    only for California, and not the District
6    of Columbia, and you mentioned the
7    Lovenheim article.
8        Could you explain for me why the
9    issue of cross-border purchases made it
10   difficult or had some impact on your
11   decision not to calculate the figures for
12   the District of Columbia?
13  A.  According to Lovenheim's calculations, on
14   average, individuals from out-of-state
15   enter the state of California to buy
16   cigarettes, although the proportion of
17   sales was small.  Accordingly, relying on
18   the case of California illustrated for the
19   reader the concept of adjusting or
20   discounting total sales to exclude
21   nonresident purchases.
22       My best recollection is that
23   residents of DC left DC to buy cigarettes
24   in less expensive jurisdictions, and that

39

1    relying on the DC example would not inform
2    the reader as to how Lovenheim's data could
3    be used to make the California type
4    adjustment.
5  Q.  So had you decided, in your head, to do a
6    calculation for one state only and then the
7    next step was to decide which state it
8    would be?
9  A.  Correct.
10  Q.  And what was the reason for making the
11   calculations for one state only?
12  A.  My objective in the report was to explain,
13   in detail, my methodology and to indicate
14   to both parties as well as another reader,
15   another expert, if, and how, the
16   calculation could be done.
17       It was my opinion, and still is,
18   that a calculation for one brand in one
19   state in one year is more than adequate to
20   illustrate exactly how the calculation is
21   made.
22       Additional calculations would
23   involve additional assumptions about data
24   that I did not have, but would not add

40

1    anything material to the exposition of the
2    calculation methodology.
3  Q.  Did you have any additional data with
4    respect to California that you did not have
5    with respect to other states?
6  A.  If other states includes the universe of
7    all states, I'd have to think about it.  If
8    you're referring to California versus DC,
9    the answer is no.
10  Q.  Okay.  Of the data you used in your
11   calculations, isn't it true that all the
12   data sources have the same data for all the
13   states?
14  A.  I'm referring to page 14 in my report which
15   is a list of end notes and, in effect, a
16   list of reliance materials.  Indeed, in
17   reference for note four, the publication by
18   Orzechowski and Walker has data for all the
19   states including the District of Columbia.
20   In that sentence the answer is yes.
21       Data on Philip Morris shipments,
22   as we've discussed, I did not have for the
23   two states at issue in the report as I've
24   testified earlier.  Other data such as

41

1    Philip Morris' national market share or
2    Philip Morris' operating profits was not
3    broken down by state and is only available,
4    so far as I know, at a national level as
5    published in its annual reports and its SEC
6    filings.
7  Q.  The data that you used to calculate the
8    numbers you did for California, you had
9    that same data available to make those
10   calculations for any other state you chose
11   to do, correct?
12  A.  If you're referring to the data on tax-paid
13   cigarette sales, excise taxes, sales taxes,
14   and average prices as reported in tax
15   burden on tobacco, yes.
16  Q.  And that data is the only state-specific
17   data you used in your calculations,
18   correct?
19  A.  Except for the possibility of an adjustment
20   for out-of-state purchases, yes.
21  Q.  And the adjustment for out-of-state
22   purchases is based on the Lovenheim
23   article, correct?
24  A.  Correct.

11 (Pages 38 to 41)

**42**

1    Q. And Lovenheim calculated the equivalent
2       number to the California number you
3       mentioned, the .36 percent?  Lovenheim
4       calculated the equivalent number for every
5       other state in the country, correct?
6    A. Correct.
7    Q. So you had data from Lovenheim to make that
8       adjustment for every other state had you
9       wanted to do so?
10   A. Correct.
11   Q. You had paused in describing your
12      conversations with plaintiff's counsel I
13      believe at the time you produced your
14      report, is that right?
15   A. That's correct.
16   Q. Can you give me a chronology of discussions
17      or conversations after that point in time?
18   A. I had a number of conversations with
19      plaintiff's counsel about scheduling the
20      deposition.  In addition, I had a
21      conference call with multiple counsel,
22      presumably representing the plaintiff, this
23      week in advance of today's deposition.
24   Q. Okay.  And what was discussed on that call?

**43**

1    A. Plaintiff's counsel advised me concerning
2       the scope of the deposition.
3    Q. And what was the --
4    A. I should say plaintiff's counsel.  Multiple
5       people were on the line, but the principal
6       substance of the conversation was the scope
7       of the deposition.
8    Q. Which -- who was on the call, to your
9       knowledge?
10   A. Mr. Dugan, Mr. Sheehan, Mr. Lanham,
11      Mr. Whatley, briefly.  I don't remember
12      anybody else, but there could have been
13      other people.
14   Q. And what was the nature of the discussion
15      as to the scope of the deposition?
16   A. Plaintiff's counsel advised me with respect
17      to two dimensions.  First, that I might be
18      asked to respond to questions that would
19      require a legal opinion rather than some
20      facts or something about economics.  In
21      those cases, counsel might object to the
22      question.
23        The second dimension was that I
24      was being deposed for my opinions in this

**44**

1    specific case and that if defense counsel
2    sought information or opposed questions
3    concerning opinions I did not have in this
4    case, but might have in others, that
5    plaintiff's counsel would likewise object.
6    Q. Okay.  Did this conference call of
7       discussions involve other topics than the
8       scope of the deposition?
9    A. Two other topics.  First, routine
10      arrangements as to who was going to arrive
11      at what time, take what flight and stay
12      where, and, second, someone, although I do
13      not recall who, asked if it were
14      appropriate if Mr. Urmy attended the
15      deposition.
16   Q. I assume whoever was the decision-maker
17      said yes.  You don't have to answer that.
18   A. Okay.
19   Q. Have you had any other discussions with
20      plaintiff's counsel that you have not
21      already told me about?
22   A. I had a brief discussion with Mr. Dugan
23      when I arrived this morning a few minutes
24      before 10 o'clock.

**45**

1    Q. Okay.  And what was the nature of that
2       discussion?
3    A. Actually Mr. Dugan called me first while I
4       was on the train to say he got a flight in
5       and asked me how I was.  I said fine.  Then
6       in our very brief discussion prior to
7       10 o'clock he reiterated that if, in his
8       view, the deposition strayed to matters
9       that he viewed as outside the scope, that I
10      should pause so that he could lodge
11      whatever was the appropriate objection.
12   Q. Okay.  And did you discuss anything else
13      relating to this case this morning?
14   A. No.
15   Q. Have you had any conversations,
16      discussions, or meetings, with any of the
17      class representatives in this case?
18   A. No, I've not.
19   Q. Other than the discussions you've already
20      told me about, have you had any discussions
21      relating to this case with anyone else?
22   A. Yes.
23   Q. Who?
24   A. Two individuals or maybe three.  The first

12  (Pages 42 to 45)

46

1       individual is Mr. Carl Hillemann.
2   Q.  Will you spell his last name, please?
3   A.  H-I-L-L-E-M-A-N-N.  The second is
4       Mr. Steven Swedlow.
5   Q.  Okay.
6   A.  And when I spoke to Mr. Swedlow, Andrea
7       Hertzfeld may have been on the call.
8   Q.  Is she the third then?
9   A.  Correct.
10  Q.  Who was Carl Hillemann?
11  A.  Carl Hillemann is an attorney with the firm
12      of Lashley & Baer.
13  Q.  And are they plaintiff's counsel in the
14      city of St. Louis case?
15  A.  Correct.
16  Q.  And what did you discuss with Carl
17      Hillemann as it relates to this case?
18  A.  I advised Mr. Hillemann yesterday, by
19      phone, that I had submitted a report in the
20      MDL Lights Case as well as in the Craft
21      case.
22  Q.  And what did Mr. Hillemann say, if
23      anything?
24  A.  Mr. Hilleman was more interested in the

47

1       Craft case.  He made no comment at all
2       about the MDL case.
3   Q.  Is that the full extent of your
4       conversation with Mr. Hillemann related to
5       this case?
6   A.  Correct.
7   Q.  Steven Swedlow is one of the plaintiff's
8       attorneys in the Craft case, correct?
9   A.  Correct.
10  Q.  As is Andrea Hertzfeld?
11  A.  Correct.
12  Q.  When did you discuss with them matters
13      relating to this case?
14  A.  I had a series of conversations with
15      Mr. Swedlow and Miss Hertzfeld on the
16      telephone prior to my deposition in the
17      Craft case on February 8th; that is, the
18      deposition took place.  The conversations
19      occurred prior and I informed Mr. Swedlow
20      and, I believe, Miss Hertzfeld, that I had
21      submitted a report in the MDL case and that
22      defense counsel had sought my deposition
23      testimony.
24          I do not recall if, at that time,

48

1       the date of this deposition had been
2       scheduled, and I believe I informed him
3       that it was pending.
4   Q.  And what, if anything, did either
5       Mr. Swedlow or Miss Hertzfeld say in
6       response?
7   A.  I think Mr. Swedlow asked me at one point
8       who was the principal attorney representing
9       plaintiffs who I was in contact with, and
10      I answered Mr. Dugan.  I don't recall
11      Mr. Swedlow asking anything else specific
12      about the MDL case.  At one point
13      Mr. Swedlow commented You're in good hands,
14      and that's about it.
15  Q.  Did you and Mr. Swedlow or Miss Hertzfeld
16      discuss anything else related to this case?
17  A.  I don't remember anything.
18  Q.  Did you bring any documents with you
19      relating to this case today?
20  A.  No, I did not.
21  Q.  Let me mark for you a printout of some
22      materials we received.
23          (Electronic Spreadsheet
24          marked Exhibit Number 2.)

49

1   Q.  Do you recognize, Doctor Harris, Exhibit 2?
2   A.  Yes, I do.
3   Q.  And what is it?
4   A.  This is not a document that I printed, but
5       I believe it is a printout of an electronic
6       spreadsheet that I sent to plaintiff's
7       counsel in response to his request, and I
8       am assuming that plaintiff's counsel
9       printed it out and forwarded it to you.
10  Q.  We received it electronically and printed
11      it out.
12  A.  Okay.
13          MR. MCCARTER:  Let's mark this as
14      the next one.
15          (E-mail marked
16          Exhibit Number 3.)
17  Q.  Doctor Harris, Exhibit 3 is an e-mail
18      string reflecting some e-mail
19      correspondence between myself and Mr. Dugan
20      and a colleague of Mr. Dugan named Douglas
21      Plymale.
22          MR. DUGAN:  Did I get that right,
23      James?
24          MR. DUGAN:  Yes.

13 (Pages 46 to 49)

50

```
1          MR. MCCARTER:  All right.
2    Q.  If you look at the bottom, Doctor Harris,
3         there's an e-mail from me to Mr. Dugan.
4         Have you seen -- did that e-mail get
5         forwarded to you?
6    A.  Let me read it.
7    Q.  Okay.
8    A.  Okay.  There are two e-mails.  I have not
9         seen, up until now, the first e-mail.  Let
10        me look at the second part.  There are
11        three e-mails, and if your question is have
12        I seen them before, the answer is no;
13        although on the continuation page, that was
14        part of the third e-mail.  I haven't seen
15        that before, either.
16   Q.  Have you read the e-mail at the top of the
17        page from Mr. Plymale to Mr. Dugan and me?
18   A.  Yes, I have.
19   Q.  And is the description of your calculations
20        and supporting materials in that paragraph
21        accurate?
22   A.  To the extent it describes my supporting
23        materials and reliance materials, yes.
24   Q.  Do you agree with the description where it
```

51

```
1         says "The formulas are basic arithmetic and
2         no electronic data exists"?
3    A.  The only way to give an accurate and
4         complete answer is to describe what data I
5         had, and in some cases it's unclear whether
6         the data "electronic," as the word is used.
7         With respect to my calculations, I had only
8         the spreadsheet, a copy of which is set
9         forth as Exhibit 2.
10             With respect to the volume called
11        The Tax Burden on Tobacco, and with respect
12        to Altria's Annual Report, I had them both
13        as PDF documents in electronic format and,
14        where necessary, copied and pasted the
15        appropriate figures into the spreadsheet.
16             Strictly speaking, those are
17        electronic sources.  Beyond that, no other
18        electronic data were created by me in
19        connection with this report or relied upon
20        by me.
21   Q.  So looking at Exhibit 1, which is your
22        report, and Exhibit 2, which is your
23        spreadsheet, those were the only materials
24        you have generated in this case?
```

52

```
1    A.  Correct.
2    Q.  And to generate those materials you used
3         only those sources described in your report
4         in the reference section and in the text of
5         the report?
6    A.  Correct.
7    Q.  There's nothing else out there that we
8         don't have already?
9    A.  If the report refers to the appendix, that
10        is the included materials I attached to my
11        report.  No, there is nothing else.
12   Q.  I want to turn to your report which is
13        Exhibit 1.  On page five, paragraph eight,
14        you list three questions that plaintiff's
15        counsel has asked you to address in this
16        case, correct?
17   A.  Correct.
18   Q.  In other cases in which you have testified
19        on tobacco-related issues, you've offered
20        opinions on subjects other than these,
21        correct?
22   A.  Correct.
23   Q.  And in this case -- in other cases, for
24        example, you've offered opinions on medical
```

53

```
1         issues, right?
2    A.  On issues concerning the health
3         consequences of smoking, yes.
4    Q.  In this case you have not been asked to
5         offer opinions on the health consequences
6         of smoking, correct?
7    A.  That is correct.
8    Q.  And sitting here today, you have no
9         intention to do so, correct?
10   A.  That is correct.
11   Q.  All right.  And you haven't been asked to
12        offer opinions on epidemiological issues in
13        this case?
14   A.  That is correct.  I have not been asked.
15   Q.  And you have no intention to do so?
16   A.  No, I do not.
17   Q.  And the same with compensation as it
18        relates to tar and nicotine delivery.  You
19        haven't been asked to opine on that issue,
20        and you have no intention to do so?
21   A.  That is correct.
22   Q.  Same thing for constituent levels, levels
23        of constituents or chemicals in tobacco
24        smoke?
```

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430



**54**

1  A. I have not been asked to opine concerning
2     levels of constituents in tobacco smoke,
3     and I have no intention of doing so.
4  Q. Okay. Would the same answer apply to
5     opinions with respect to collusion or
6     conspiracy among members of the tobacco
7     industry?
8  A. I have not been asked to opine concerning
9     those topics, no.
10 Q. And you have not been asked to opine
11    concerning tobacco industry conduct
12    generally or Philip Morris' conduct
13    specifically, correct?
14 A. No, I have not.
15 Q. And other than the three questions listed
16    in your report, you have not been asked to
17    opine on any other issues, correct?
18 A. That is correct.
19 Q. On page five, paragraph eleven, we may have
20    already covered this, but I want to make
21    sure. You note that some of the
22    information required to carry out the
23    calculations described in this report is
24    not publicly available. Do you see that?

**55**

1  A. Yes, I see that.
2  Q. And what information are you referring to?
3  A. I'm referring specifically to the data on
4     Philip Morris shipments to direct buyers of
5     specific relevant brands in the appropriate
6     jurisdictions and the appropriate time
7     period.
8  Q. Is there any other data that you require to
9     carry out the calculations described in the
10    report?
11 A. No.
12 Q. Your calculations of total sales refers to
13    total sales at retail, correct?
14 A. Correct.
15 Q. And your calculation of total expenditures
16    refers to expenditures at retail, right?
17 A. Correct.
18 Q. Why are you in need of data on PMs, Philip
19    Morris' shipments, rather than data on
20    retail sales?
21 A. Based on my experience in other cases, I
22    have not had access nor am I aware of data
23    on retail sales of specific Philip Morris
24    brands at the state level. And,

**56**

1     accordingly, I relied on other sources such
2     as Philip Morris direct shipments in
3     combination with tax-paid sales and the
4     other sources enumerated in my report to
5     estimate retail sales.
6  Q. Philip Morris does not sell cigarettes at
7     retail, correct?
8  A. So far as I know it does not.
9  Q. Philip Morris sells cigarettes to
10    wholesalers, right?
11 A. That is my understanding.
12 Q. And then wholesalers, in turn, sell
13    cigarettes to retailers, right?
14 A. Generally speaking, yes.
15 Q. And retailers are the ones who sell
16    cigarettes to consumers, correct?
17 A. Generally speaking, yes.
18 Q. A wholesaler that is located in a
19    particular state may sell cigarettes to
20    retailers both within the state in which
21    the wholesaler is located as well as in
22    other states, correct?
23 A. Correct.
24 Q. In fact, do you know from your work in the

**57**

1     Price case that there are wholesalers who
2     sell cigarettes in multiple states?
3  A. That is correct.
4  Q. Have you evaluated the extent to which
5     wholesalers in California who buy
6     cigarettes from Philip Morris sell those
7     cigarettes outside of California?
8  A. No, I have not.
9  Q. Do you -- are you assuming that the share
10    of Marlboro Lights shipments to wholesalers
11    in California is the same as the share of
12    Marlboro Lights sold at retail in
13    California?
14 A. Yes, I am.
15 Q. Have you done anything to validate that
16    assumption?
17 A. Yes.
18 Q. What?
19 A. In the report in the Illinois Price case
20    that I appended to my report in this case,
21    I compared estimates of Marlboro Lights
22    sales at retail by my method with the
23    absolute values of the direct shipments of
24    Marlboro Lights as offered or submitted by

15 (Pages 54 to 57)

58

1    Philip Morris in discovery in that case.
2    And I found that, in general, they were
3    consistent.
4  Q.  And that analysis was focusing on Illinois
5    specifically, is that correct?
6  A.  Yes, and it is a comparison of estimates of
7    retail sales and not a direct verification
8    of the assumption mentioned in your
9    previous question.
10  Q.  What data did you use to estimate the
11    retail sales in the Price case that you're
12    referring to?
13  A.  I could draw your attention to a specific
14    paragraph in that report since it's
15    appended to my report in this case.
16  Q.  Okay.
17  A.  I'm referring to appendix B of Exhibit 1
18    at page 12 of that report, paragraph 21,
19    beginning with the sentence: "I consider
20    two alternative methods to compute the
21    quantity of each brand of cigarettes sold
22    at retail in a particular year."
23    Continuing, "I term these two methods,
24    respectively, the 'Philip Morris direct

59

1    buyers method,' and the 'taxable cigarettes
2    method.'"  The former refers specifically
3    to the data submitted by Philip Morris as
4    defended during discovery, and the second
5    refers to the results of calculations that
6    I made.  In subsequent paragraphs within
7    the same report, I compared the results of
8    the two methods.
9  Q.  The second method which you call the -- I
10    lost my place here -- the retail method.
11  A.  I think I called it the tax paid cigarette
12    sales method or taxable cigarettes method.
13  Q.  And is the taxable cigarettes method, is
14    that referring to sales at retail?
15  A.  Correct.
16  Q.  Does the taxable cigarettes method use the
17    same methodology that you used in this
18    case?
19  A.  Correct.
20  Q.  And you testified earlier that that
21    methodology employs an assumption that
22    Marlboro Lights share of shipments in
23    California is equal to Marlboro Lights
24    share at retail in California, correct?

60

1  A.  Correct.
2  Q.  I'm having a hard time following it.  Are
3    you validating that assumption by using a
4    formula that includes that assumption?
5  A.  Correct.
6  Q.  Okay.  Have you validated the assumption in
7    any other way?
8  A.  No, I've not.
9  Q.  And you haven't done anything specific to
10    California to validate the assumption,
11    correct?
12  A.  No, I have not.
13  Q.  Other than potentially supplementing your
14    report if and when you get market share
15    data that you referred to, do you have any
16    other plans to supplement your report?
17  A.  I have not been asked to do so, no.
18  Q.  In your estimate of total sales of Marlboro
19    Lights in California in 2005, you include
20    all sales of Marlboro Lights in California,
21    correct?
22  A.  Correct, in two senses.  The first, in that
23    I do not exclude out of -- purchases by
24    out-of-state residents, and, second, that

61

1    it refers to taxable or tax-paid cigarette
2    sales.
3  Q.  Okay, but subject to those two caveats, you
4    include all sales of Marlboro Lights in
5    California regardless of the reason why the
6    purchaser decided to buy Marlboro Lights,
7    correct?
8  A.  Correct.
9  Q.  Your estimate of total sales of Marlboro
10    Lights in California, subject to the two
11    caveats you mentioned, includes all such
12    sales regardless of whether the purchaser
13    believed that lights would deliver less tar
14    and nicotine, correct?
15  A.  Correct.
16  Q.  It includes all such sales regardless of
17    whether the purchaser believed that lights
18    were safer than --
19  A.  Correct.
20  Q.  And it includes all such sales regardless
21    of whether the purchaser ultimately
22    received less tar and nicotine from lights
23    than they would have received from a
24    full-flavored cigarette, correct?

16 (Pages 58 to 61)

62

1  A. Correct.
2  Q. We've touched on the issue of cross-border
3     purchasing by out-of-state residents and
4     discussed the Lovenheim article, and you
5     describe that in your report, but there can
6     be other means by which out-of-state
7     residents purchase cigarettes in
8     California, correct?
9  A. Correct.
10 Q. For example, somebody might go to Disney
11    Land for vacation or some other place in
12    California and buy cigarettes while they're
13    in California, right?
14 A. I have a two-part answer.
15 Q. Okay.
16 A. The first is yes. The second is I would
17    consider that a purchase by an out-of-state
18    resident and not distinguishable from the
19    category you previously mentioned.
20 Q. Is it -- do you believe that Lovenheim's
21    calculation, the .36 percent we discussed
22    earlier, is intended to capture both
23    cross-border purchases where somebody comes
24    from a neighboring state to buy cigarettes

63

1     in California and purchases by
2     non-California residents who, for example,
3     go on vacation in California?
4  A. My understanding is that Lovenheim's
5     calculations focus on cross-border traffic
6     among regular commuters and other
7     travelers. I don't recall any attempt at
8     calculating purchases by tourists from
9     different locations, no.
10 Q. Lovenheim focuses on -- Lovenheim focuses
11    on purchases by out-of-state residents who
12    live within a certain distance of the
13    state, correct?
14 A. Correct.
15 Q. Lovenheim does not capture purchases in the
16    state by people who live further away than
17    a certain number of miles from the state,
18    correct?
19 A. Correct.
20 Q. So even if you made the adjustment proposed
21    by Lovenheim of the .36 percent, you would
22    not be excluding all purchases in
23    California by out-of-state residents,
24    correct?

64

1  A. In principle, that's correct.
2  Q. Have you proposed any methodology for
3     excluding all purchases in California by
4     out-of-state residents from your estimates?
5  A. Other than that articulated in my report,
6     no.
7  Q. And as you testified, the adjustment
8     articulated in your report would not be
9     sufficient to exclude out-of-state
10    purchases, correct?
11 A. If, in fact, such additional out-of-state
12    purchases were more than de minimis, no, it
13    would not.
14 Q. And do you know whether such out-of-state
15    purchases would be more than de minimis?
16 A. No, I do not.
17 Q. Is that something you've studied at all at
18    this point?
19 A. I have studied it, but I have not reached
20    any conclusions yet.
21 Q. Okay. I'm informed that I have less than
22    five minutes left on the tape, so why don't
23    we take a break?
24 A. Okay.

65

1     VIDEOGRAPHER: We're now going off
2  the record. This is the end of tape number
3  one. The time is 11:38 a.m. Thank you.
4     (Brief Recess.)
5     VIDEOGRAPHER: We're now going
6  back on the record. This is tape number
7  two. The time is 11:48.
8  Q. Doctor Harris, I want to stick on your
9     calculation of total sales of Marlboro
10    Lights in California for a few more
11    minutes. On page six of your report you
12    have the equation that you use to calculate
13    that figure, correct?
14 A. Correct.
15 Q. And the second component -- there's two
16    components to the calculation; total number
17    of cigarettes taxed in California in 2005
18    and the market share of Marlboro Lights
19    cigarettes in California in 2005, correct?
20 A. Correct.
21 Q. And that second component, itself, is the
22    product of two inputs, correct?
23 A. Correct.
24 Q. And those two inputs are the Marlboro

17 (Pages 62 to 65)

66

1    Lights share of Philip Morris shipments in
2    California in 2005 and Philip Morris'
3    national market share in 2005, correct?
4  A. Correct.
5  Q. Are you assuming that Philip Morris'
6    national market share equals its market
7    share in California?
8  A. Correct.
9  Q. Have you done anything to validate that
10   assumption?
11 A. No, I have not.
12 Q. Would you agree that market share for a
13   company can vary from state to state?
14 A. Yes, it can.
15 Q. And Philip Morris' market share may vary
16   from state to state, correct?
17 A. Correct.
18 Q. And the market share of different brands of
19   cigarettes may vary from state to state,
20   correct?
21 A. Correct.
22 Q. And, in fact, the market share of certain
23   brands of cigarettes varies according to
24   different demographic characteristics,

67

1    correct?
2  A. Correct.
3  Q. And California has a different demographic
4    composition than other states, right?
5  A. That's my understanding, correct.
6  Q. Okay. But you haven't explored the extent
7    to which any different demographic
8    characteristics of California affects
9    market share in terms of Philip Morris'
10   overall market share or the market share of
11   Marlboro Lights specifically, correct?
12 A. No, I have not.
13 Q. On page eight in paragraph 20 you begin
14   your discussion of your calculation of
15   total expenditures by consumers at retail
16   on Marlboro Lights in California in 2005,
17   correct?
18 A. Correct.
19 Q. And you note in paragraph 20 that this
20   follows the same methodology that you used
21   in Price, right?
22 A. Correct.
23 Q. Does it also follow the same methodology
24   that you used in your loss of market model

68

1    in Schwab with the exception that the
2    Schwab calculation was national whereas
3    this calculation is specific to one state?
4  A. I believe that's correct, but I'd have to
5    look at my Schwab report to give you an
6    accurate answer.
7  Q. What your loss of market calculation in
8    Schwab estimated was total expenditures on
9    light cigarettes by consumers at retail
10   nationwide, correct?
11 A. In Schwab I recall that I did have a loss
12   of market concept of damages as well as
13   loss of value and that I did estimate
14   nationwide sales of specific lights brands
15   during the relevant time period at retail.
16 Q. And you also estimated not just the number
17   of cigarettes sold, but also the total
18   consumer expenditures on those cigarette
19   brands, correct?
20 A. Correct.
21 Q. And that's the same thing you're measuring
22   here except your estimate here is limited
23   to one cigarette brand, Marlboro Lights, in
24   one state in one year, correct?

69

1  A. Correct.
2  Q. And your estimate of the total expenditures
3    on Marlboro Lights in California includes
4    all the money spent on Marlboro Lights in
5    California in 2005, correct?
6  A. That's my best estimate, yes.
7  Q. It includes money spent by consumers at
8    retail on Marlboro Lights regardless of why
9    the person purchased the cigarette,
10   correct?
11 A. I think I answered that question already --
12 Q. Well --
13 A. -- almost verbatim, but the answer is yes.
14   It is all cigarettes purchased.
15 Q. I asked you earlier in reference to your
16   calculation of the total number of
17   cigarettes sold, not in reference to the
18   total expenditures. That's the difference
19   in the question. Let me see if I can
20   shortcut it so I don't have to ask it again
21   for profits when I get to that. Your
22   estimate of total sales, total consumer
23   expenditures at retail, and total profits,
24   is based on all purchases, regardless of

18  (Pages 66 to 69)

70

1    whether the purchaser believed that light
2    cigarettes were safer, correct?
3  A. Correct.
4  Q. And those calculations are based on all
5    purchases regardless of why the person
6    bought the Marlboro Lights, correct?
7  A. Correct.
8  Q. And those calculations are based on all
9    purchases regardless of whether the person
10   believed that Marlboro Lights would deliver
11   less tar and nicotine?
12 A. Correct.
13 Q. And your calculations are based on all
14   purchases regardless of whether the
15   purchaser ultimately received less tar or
16   nicotine?
17 A. Correct.
18 Q. Your estimate of the total consumer
19   expenditures at retail includes money spent
20   to pay for excise taxes, correct?
21 A. Correct.
22 Q. Both federal and state excise taxes.
23 A. Correct.
24 Q. It includes money paid for state sales

71

1    taxes, correct?
2  A. Correct.
3  Q. And it includes money paid on account of
4    mark-ups by wholesalers along the chain of
5    distribution, correct?
6  A. That's included in the retail price,
7    correct.
8  Q. Your profits calculation is the third
9    calculation you've tendered in this case,
10   correct?
11 A. Correct.
12 Q. And the profits you estimate are pre-tax
13   profits, correct?
14 A. Correct.
15 Q. You note in your report that you could
16   attempt to calculate post tax profits,
17   correct?
18 A. Correct.
19 Q. Have you attempted to do so?
20 A. No, I have not.
21 Q. What materials would you use to make that
22   calculation?
23 A. The regular publicly-filed financial
24   statements of the parent company Altria for

72

1    the relevant years.
2  Q. For your calculations that you've tendered
3    in this case, you looked at the Altria
4    Group annual report for 2005, is that
5    right?
6  A. Correct.
7  Q. Did you explore whether other public
8    filings by Altria Group reflect after-tax
9    profits by Philip Morris USA?
10 A. I did not do so specifically in this case,
11   but I am well aware that its SEC 10-Q
12   filings quarterly, 10-K filings, and annual
13   reports, include information not only on
14   before-tax profits, but also taxes paid in
15   particular income taxes.
16 Q. Do the reports you reference -- strike
17   that.  Do you know whether the Altria SEC
18   filings -- whether it's the 10-K or the
19   10-Q or an 8-K -- include Philip Morris USA
20   Inc.'s post tax profits?
21 A. The reports do not break down income taxes
22   paid by specific line of business.
23   Instead, a calculation of Philip Morris
24   USA's pre-tax or post tax profits would

73

1    have to be made from data on the operating
2    profits of the Philip Morris USA division
3    and an allocation of total income taxes
4    paid corporate-wide to the Philip Morris
5    USA division, but the direct answer is that
6    that estimate is, to my knowledge, not
7    contained in any of the filings you
8    mentioned.
9  Q. If that number was contained in the filings
10   I mentioned, would you be able then to
11   calculate post tax profits attributable to
12   Marlboro Light sales?
13 A. I believe that I could make an estimate
14   even if the filings do not contain that
15   information or that is a specific
16   calculation of post tax profits
17   attributable to the domestic tobacco
18   division of Philip Morris.
19 Q. But if that information was available,
20   that would make your calculation even
21   easier, right?
22 A. It would avoid the necessity to allocate
23   income taxes paid to different operating
24   divisions, yes.

19 (Pages 70 to 73)

74

1  Q. Okay. What's the most recent Altria Group
2     financial statement that you looked at?
3     For what year?
4  A. The quarterly filing for the period ending
5     September 30th, 2009.
6  Q. Did you look at the balance sheet and
7     statement of earnings and statement of cash
8     flow in that document?
9  A. Yes, I did.
10 Q. Do you recall seeing a specific column for
11    Philip Morris USA?
12 A. There are definitely tables that break down
13    financial data by lines of business
14    including Philip Morris USA, but you have
15    to show me the document because I cannot
16    recall right now every table in the SEC
17    filing.
18 Q. When you refer to line of business, are you
19    talking about something that's labeled
20    domestic cigarette sales, along those
21    lines, or is it a reference specifically to
22    Philip Morris USA?
23 A. In some cases the filings say domestic
24    cigarette sales, and in other cases they

75

1     say Philip Morris USA, but to my knowledge
2     they're regarded as equivalent in those
3     financial filings. For example, Altria
4     acquired U.S. Tobacco. To my knowledge,
5     that is not part of domestic cigarette
6     sales.
7        MR. MCCARTER: Let's mark this as
8     the next exhibit.
9        (Expert Report marked
10       Exhibit Number 4.)
11 Q. Doctor Harris, do you recognize Exhibit 4
12    as an Expert Report you produced in
13    September in the City of St. Louis case?
14 A. Yes, it is.
15 Q. And I don't intend to go into the
16    details of the opinions here, but I want to
17    refer you to paragraph eight on page four
18    of the report just to get some terminology
19    down.
20       In paragraph eight you write that
21    "Counsel for plaintiffs has asked me to
22    address the following question: What
23    proportion, if any, of their expenditures
24    on smoking-related illness during the

76

1     damages period can be attributed to the
2     wrongful conduct of defendants? Here, I
3     refer to this proportion as the
4     misconduct-attributable fraction."
5        My question for you is whether you
6     have been asked, in this case, to calculate
7     the portion of sales, consumer
8     expenditures, or profits, that can be
9     attributed to the wrongful conduct alleged
10    in this case?
11 A. No, I have not.
12 Q. And you have not done that, correct?
13 A. That's correct.
14 Q. Does your estimate, in the City of
15    St. Louis, measure the effect of any
16    wrongful conduct involving light
17    cigarettes?
18 A. Yes.
19 Q. How so?
20 A. It is my understanding that plaintiff's
21    allegations in the City of St. Louis case
22    include several different forms of alleged
23    misconduct including, but not limited to,
24    persistent denials that cigarette smoking

77

1     was addictive; actions taken by
2     manufacturers, including Philip Morris, to
3     engineer or adjust cigarettes so as to make
4     them more addictive and sustain addiction
5     as well as allegations concerning
6     fraudulent misrepresentation concerning the
7     characteristics of light cigarettes.
8  Q. Do the estimates you produced in the City
9     of St. Louis case, in terms of this
10    misconduct-attributable fraction, measure
11    only the effects of fraud relating to light
12    cigarettes or some broader conduct, one
13    component of which relates to light
14    cigarettes?
15       MR. DUGAN: Objection. Same
16    objection. Calls for a legal conclusion.
17    Objection to this document's introduction.
18    It's outside the scope of the foundation
19    that Doctor Harris laid earlier that he's
20    hired in the MDL case and he's hired, in
21    particular, this report, to do an analysis
22    of California and DC law.
23 Q. You can answer.
24 A. Would it be appropriate if I had the text

20 (Pages 74 to 77)

78

1     of your question read back?
2  Q. Yes.  Thank you.
3        COURT REPORTER:  "Do the estimates
4     you produced in the City of St. Louis case,
5     in terms of this misconduct-attributable
6     fraction, measure only the effects of fraud
7     relating to light cigarettes or some
8     broader conduct, one component of which
9     relates to light cigarettes?"
10 A. The answer is the latter.
11 Q. Okay.  So if one were to look at whatever
12    your calculations are in City of St. Louis,
13    those calculations would not measure or be
14    limited solely to the effect of the alleged
15    lights conduct?
16 A. I don't think I'm prepared to answer that
17    question.  It's my understanding that
18    plaintiffs in this case, the MDL case, have
19    made allegations concerning manufacturer's
20    conduct that go beyond the narrow --
21    narrower rubric of the sale of light
22    cigarettes to include persistent denial of
23    the health effects of cigarettes, failure
24    to disclose internal knowledge about

79

1     nicotine addiction and other aspects of
2     misconduct.  I think I should hesitate
3     before answering that until I have more
4     information about the nature of plaintiff's
5     complaint in this case.
6  Q. If there are people who -- strike that.  If
7     there are consumers of light cigarettes who
8     never believed that light cigarettes would
9     deliver less tar, are there expenditures in
10    sales and profits from those sales included
11    in your estimates?
12       MR. DUGAN:  Objection.  Calls for
13    a legal conclusion.  I think he's already
14    answered that question.
15 Q. You can answer, Doctor Harris?
16 A. I think I've answered that my estimate of
17    total sales, total expenditures, and
18    after-tax profits refer to all purchases
19    within the relevant jurisdiction at the
20    relevant time period without respect --
21    without respect to the buyer's motives or
22    underlying knowledge.  To that extent I
23    can't see how I can answer your question
24    any further.  To the extent that you're

80

1     referring to the legal concept of a buyer's
2     knowledge or the appropriate measure of
3     damages, I haven't been asked to render an
4     opinion about that in this case.
5  Q. Could you, if asked, develop a model that
6     produces a conduct-attributable fraction
7     for this case?
8  A. If I were asked to do so, in general, the
9     answer is yes.
10 Q. Could you, if asked, to estimate total sales
11    of Marlboro Light Cigarettes in California
12    in 2005 attributable to the wrongful
13    conduct alleged in this case?
14 A. Given the appropriate legal standard and
15    instructions concerning what was the
16    alleged wrongful conduct, yes.
17 Q. Could you calculate total consumer
18    expenditures attributable to the wrongful
19    conduct alleged in this case if asked to do
20    so?
21 A. I think you just asked me that.
22 Q. I asked with regard to total sales, and I'm
23    just asking now about the dollar figure
24    rather than the number of cigarettes sold.

81

1  A. Given instructions concerning the
2     appropriate legal standard and the scope of
3     wrongful conduct, yes.
4  Q. And could you, if asked, calculate the
5     ill-gotten gains to Philip Morris resulting
6     or attributable to the alleged misconduct
7     in this case?
8  A. It would be more accurate to say yes.
9     Given the appropriate legal standard and
10    description of misconduct, I could estimate
11    what fraction of the manufacturer's or
12    defendant's profits were attributable to
13    such misconduct without implying anything
14    about the meaning of the phrase ill-gotten
15    gains.
16 Q. I asked you earlier about certain damage
17    standards, out-of-pocket damages, and
18    benefit of the bargain damages.  I'm going
19    to ask some follow-up on those concepts.
20    Let me start with measuring the difference
21    between the price paid by the consumer and
22    the price they would have paid, but for the
23    alleged misconduct, okay?  You have not
24    calculated that in this case, right?

21  (Pages 78 to 81)

82

1    A.  That is correct.
2    Q.  If asked to do so, could you do that?
3    A.  In general, yes.
4    Q.  Have you done that in prior cases involving
5        light cigarettes?
6    A.  I have been asked to and have calculated,
7        in some cases, the difference between the
8        price paid and the value to the consumer of
9        the good that was actually delivered.
10   Q.  In which cases were those?
11   A.  The Illinois Price case, the Craft case in
12       Missouri and, I believe in the Schwab case.
13   Q.  And are those the loss of value estimates
14       you referred to earlier?
15   A.  Yes.
16   Q.  Have you ever -- strike that.  I want to
17       talk about -- switch to benefit of the
18       bargain damages.  Are you capable of
19       estimating the value to consumers of light
20       cigarettes as they were represented to be?
21       MR. DUGAN:  I'm going to object
22       as asked and answered.  In addition,
23       Doctor Harris has testified that he hasn't
24       been asked to do those calculations in this

83

1        case.
2    Q.  Okay.  You can answer, Doctor Harris.
3    A.  I am not sure I understand your question.
4        You introduced it by referring to the
5        benefit of the bargain and then made
6        reference to a calculation which is not
7        equivalent or synonymous with benefit of
8        the bargain.
9    Q.  Let me reask so we have a clear record.
10       Have you -- strike that.  Reask it again.
11       Are you capable of estimating the value of
12       light cigarettes as represented to
13       consumers?
14   A.  Given the available methodologies which I
15       have relied upon in other cases, I am
16       capable of estimating the difference
17       between the value to the consumer of the
18       good, as promised, and the value to the
19       consumer of the good as delivered.
20       That is, based on the available data
21       sources, I cannot estimate the absolute
22       value of the good as promised to the
23       consumer, but rather the difference between
24       the value as promised and the value as

84

1        delivered.
2    Q.  I take it then that you have not, in prior
3        cases, estimated the value to the consumer
4        of the good as promised with respect to
5        light cigarettes, correct?
6    A.  Not exactly.
7    Q.  How so?
8    A.  In two cases, namely in the Illinois Price
9        case, which has been resolved and the
10       pending Craft case in Missouri, I made the
11       conservative assumption that the value to
12       the consumer of the good as promised was
13       equal to the purchase price based on
14       materials supplied to me by counsel
15       concerning various court's approaches to
16       the calculation of the value of the good,
17       as promised, to the consumer.
18   Q.  Other than assuming that the value of the
19       good, as promised, to the consumer equal
20       the purchase price, have you attempted to
21       calculate the value of the good to the
22       consumer, as promised?
23   A.  Only the difference between the value as
24       promised, and the value as delivered, but

85

1        not the absolute value of the good as
2        promised based on the available
3        methodology.
4    Q.  Okay.  I asked you whether you had
5        attempted to do it.  Could you calculate
6        the value of the good as promised?
7    A.  In principle, yes; however, the available
8        data sources in those prior cases did not,
9        in fact, permit me to do so.
10   Q.  I want to talk about the other component.
11       You described that you have calculated the
12       difference between two things, the value as
13       promised and the value as delivered.  Have
14       you separately calculated at any time the
15       value of light cigarettes as delivered to
16       consumers?
17   A.  Yes.
18   Q.  When or where?
19   A.  In the Illinois Price case, plaintiff's
20       counsel introduced the results of a survey
21       carried out by the firm Knowledge Networks
22       in which consumers of Marlboro Lights were
23       asked, in essence, what discount from the
24       purchase price they would need to receive

22  (Pages 82 to 85)

86

```
1      to continue to purchase Marlboro Lights,
2   having been informed that they did not
3   deliver what was promised.  In that case,
4   the survey methodology was anchored on the
5   purchase price, and the valuation of what
6   was delivered was elicited by asking the
7   respondent about a discount off of the
8   purchase price.
9   Q.  If asked to do so in this case, could you
10   estimate the value of light cigarettes as
11   delivered to the consumer?
12   A.  If I were given a similar data set with
13   comparable methodology, yes.
14   Q.  In your prior work you've relied upon
15   Knowledge Networks dataset and the
16   conjoined analysis provided by Doctor
17   Hauser, correct?
18   A.  Correct.
19   Q.  Have you ever sought to obtain your own
20   information that could be used to value
21   light cigarettes either as promised or as
22   delivered?
23   A.  Not being an expert in consumer survey
24   methodology, I have not made any
```

87

```
1      independent effort to do so.
2   Q.  Have you made any independent effort to try
3   to value light cigarettes as promised or as
4   delivered based on market data?
5   A.  I'm not sure I understand what you mean by
6   "market data."
7   Q.  Economists use data relating to supply and
8   demand to make estimates about market
9   behavior, correct?
10   A.  Could the question be repeated?  There was
11   some background noise.
12   Q.  Sure.
13          COURT REPORTER:  "Economists use
14   data relating to supply and demand to make
15   estimates about market behavior, correct?"
16   A.  I don't understand what you mean by "market
17   behavior."  They do use data on supply and
18   demand and on quantities and prices.
19   Q.  And economists use data on supply and
20   demand to value products, correct?
21   A.  It's hard for me to answer because
22   economists don't exactly use those terms.
23   Economists do use data on prices to
24   calculate price differentials and cost
```

88

```
1      differentials and concepts such as marginal
2   cost and social marginal cost.
3   Q.  Would it be possible to use data on supply
4   and demand to estimate the value of light
5   cigarettes as promised or as delivered?
6   A.  Based on my review of the literature and my
7   knowledge and experience in the field, it
8   would be difficult for a number of economic
9   reasons.
10   Q.  Will you please list them for me?
11   A.  First, cigarettes are sold in a highly
12   concentrated oligopoly in which prices are
13   not set by the freely-moving forces of
14   supply and demand, but rather by the
15   strategic considerations of the small
16   number of players in the oligopoly game.
17          As a consequence, the apparent
18   equality of the price of light cigarettes
19   such as Marlboro Lights and other non light
20   premium cigarettes cannot be used as
21   evidence of a difference in price or a
22   value differential because such prices were
23   set according to oligopoly strategy.
24   That's the first reason.  I could continue
```

89

```
1      giving a speech, but it's your deposition,
2   so.
3   Q.  Okay.  This may be unique among people
4   taking your deposition, but I'd like to
5   continue with the speech.
6   A.  Second, data on the sales of light
7   cigarettes, after their true
8   characteristics were allegedly disclosed in
9   full to the public, need to be treated with
10   caution because of the phenomena of
11   addiction and consumer or smoker
12   accommodation.  I think they summarized the
13   two principal dimensions of the economic
14   problem.
15   Q.  Are there any other dimensions of the
16   economic problem other than these two?
17   A.  To some extent they're subsumed, but I'll
18   continue.  To my knowledge, such legal
19   standards of injury, such as the benefit of
20   the bargain, have a temporal dimension in
21   the sense that they refer to the value as
22   promised and the value as delivered at the
23   time of the transaction.
24          As a consequence, evidence of
```

23  (Pages 86 to 89)

90

1    subsequent consumer behavior needs to be
2    viewed with caution because of investments
3    that consumers make in goods, including
4    cigarettes, once they have committed to a
5    purchase.
6    Q.  Okay.  Any other reasons why this economic
7        issue is problematic?
8    A.  I believe those are the principal
9        considerations why an economist cannot
10       simply take raw market data and calculate
11       damages in a manner consistent with the
12       legal standards that I am aware of.
13   Q.  Why don't we break for lunch now and then
14       we'll continue on?
15   A.  Thank you.
16           VIDEOGRAPHER:  We're now going off
17       the record.  The time is 12:31 p.m.
18           (Lunch Recess.)
19           VIDEOGRAPHER:  Now going back on
20       the record the time is 1:13 p.m.
21   Q.  Doctor Harris, I want to start after lunch
22       here with where we left off before lunch in
23       which you gave me -- depending on how you
24       count it -- three different reasons or

91

1        maybe two-and-a-half if one is subsumed as
2        to why the market evidence may not provide
3        a good basis for valuing damages or light
4        cigarettes as promised or as delivered.  I
5        don't mean to sum up what you said.  I'm
6        going to stop there, and then we'll have a
7        little paragraph break, and then I'll
8        actually ask you a question.
9            One of the reasons you gave
10       referenced the oligopoly in the cigarette
11       market and the effect that may have on
12       cigarette prices, right?
13   A.  Right.
14   Q.  Would the effect of an oligopoly be to
15       result in higher prices than what otherwise
16       prevail in a freely competitive market?
17   A.  All other things being equal, yes.
18   Q.  Freely competitive market in theory.  At
19       least, is a market that produces the lowest
20       prices possible, right?
21   A.  In the long run, yes, in theory.
22   Q.  If there had been a freely competitive
23       market among the cigarette companies rather
24       than the oligopoly you described, is it

92

1        your opinion that the prices of light
2        cigarettes that prevailed in the market
3        would have been lower than actually did
4        prevail?
5    A.  The economic evidence is that all premium
6        cigarettes, whether they be light
7        cigarettes or, for example, Marlboro Reds,
8        would, in all likelihood, have lower prices
9        had the cigarette market been perfectly or
10       nearly perfectly competitive.
11   Q.  So the effect of the oligopoly to which you
12       spoke in the cigarette market was to cause
13       the price of light cigarettes to be higher
14       than they otherwise would have been?
15   A.  That is one of the many effects of the
16       presence of oligopoly.
17   Q.  The second point I wrote down had to do
18       with a statement by you, and I'm not trying
19       to get it verbatim, but I wrote down
20       something along the lines that data on
21       sales of lights after their data
22       characteristics were allegedly disclosed
23       and full to the public need to be treated
24       with caution because of the phenomena of

93

1        addiction and smoker compensation.  That's
2        what I wrote down.  You may have said
3        something slightly different or completely
4        different, but let me ask you, is this the
5        issue that you and Mr. Wagner went back and
6        forth on, to some extent, in your recent
7        Craft deposition?
8    A.  First, the word I used is "smoker
9        accommodation," and, second, the answer is
10       yes.
11   Q.  Okay.  I don't want to retread the ground
12       that you and Mr. Wagner covered, but I do
13       want to make sure I understand the theory.
14       Is the theory that the -- a belief that
15       lights were safer caused the initial
16       transaction of purchasing light cigarettes
17       which, in turn, caused the consumer to
18       become addicted or acclimated or to
19       otherwise prefer lights?
20           MR. DUGAN:  Objection.  Calls for
21       a legal conclusion.  Also calls for a
22       medical conclusion in reference to
23       addiction.  As Doctor Harris has testified
24       earlier in his deposition, he is here in

24 (Pages 90 to 93)

94

1    his capacity as an economist.
2  Q. You can answer, Doctor Harris.
3  A. In the Craft deposition taken by
4    Mr. Wagner, the issue was whether or not
5    data on the sales of Marlboro Lights in the
6    aggregate or the continued use of Marlboro
7    Lights as a brand on an individual basis
8    constituted reliable evidence to be used in
9    a valuation.
10       And I expressed the opinion that
11   they were not necessarily reliable and had
12   to be viewed with great caution, first,
13   because consumers are addicted to
14   cigarettes and if there is, in fact, no
15   safe cigarette, the consumer has to smoke
16   something; and second, there is a
17   well-known phenomenon of acclamation or
18   accommodation in which consumers, after a
19   very short time, become adjusted to what
20   they perceive as the taste of light
21   cigarettes and then after the fact, may
22   think that they prefer them.
23  Q. Does that acclamation or accommodation have
24   an impact on the consumer's valuation of

95

1    the product?
2  A. It has an impact on economic decisions that
3    they make subsequent to the initial
4    transaction and may have an impact on their
5    valuation depending on the method for
6    eliciting such a valuation. And I do
7    believe this was covered in the deposition
8    recently.
9  Q. Why should that impact on valuation, if
10   there is one, resulting from acclamation or
11   accommodation not be included in the
12   analysis in valuing light cigarettes?
13  A. As I testified before lunch, the legal
14   standard is what was the value or what
15   would have been the value that the consumer
16   placed on the product at the time of the
17   transaction and not after the consumer has
18   made what economists would call an
19   investment in the product.
20       And, in fact, I remember offering
21   to give Mr. Wagner several examples. I
22   don't think he ever took me up on it, but
23   the basic idea is the legal standard is
24   valuation at the time of the purchase and

96

1    not the valuation after the consumer has
2    made an investment in the product which may
3    alter the consumer's preferences.
4  Q. If they -- let's take an example of a
5    consumer who buys light cigarettes over the
6    course of ten years, say, a pack a day. In
7    espousing this theory or referring to the
8    legal standard, are you viewing that entire
9    ten-year period as one transaction, or is
10   it a discrete transaction every time the
11   person purchases the product?
12       MR. DUGAN: Objection. Calls for
13   a legal conclusion. Asked and answered.
14   This line of questioning, is this any basis
15   for any of the opinions that you have in
16   the MDL case which you are noticed for
17   deposition here today?
18  Q. You can answer my question.
19  A. One can take either point of view. It may
20   be as a legal standard that each and every
21   pack of cigarettes or carton of cigarettes
22   purchased needs to be regarded as an
23   individual standard, but the economic and
24   medical facts are that individuals initiate

97

1    a brand and, over a considerable period,
2    commit to that brand with switch rates that
3    are not zero, but relatively low.
4    Accordingly, from the economic and the
5    medical standpoint the transaction is one
6    over the medium run, if not the long run.
7    Depending on the legal standard, it could
8    be each and every individual transaction.
9  Q. In giving the answer you gave before lunch
10   as to the problems with looking at the
11   market data, were you assuming that the
12   transaction was a single transaction or
13   that there was a different transaction
14   every time somebody bought light
15   cigarettes?
16  A. I'm trying to parse your question.
17       MR. DUGAN: Would you like him to
18   repeat the question?
19       THE WITNESS: No. The question,
20   in my mind, is compound and I'm trying to
21   extricate for myself from it.
22  A. The issues of consumer addiction and
23   acclamation are particularly important in
24   evaluating the evidence as to consumer

25 (Pages 94 to 97)

98

1   behavior or purchases if and when the
2   consumer became apprised of the exact
3   nature of the product.  Since the
4   phenomenon of addiction and acclamation
5   happen fairly rapidly, this point is
6   relevant even in the fairly short run.
7       When it comes to practical
8   valuation of damages, the survey methods
9   that I have relied upon generally refer to
10  light cigarettes, either as promised or as
11  delivered, in general, without regard to a
12  specific transaction at a specific time
13  and I think could be validly applied to the
14  entire history of an individual smoking the
15  cigarette.
16  Q.  Have you completed your answer?
17  A.  Yes.  And I am not sure I'm responsive
18  because I have difficulty understanding
19  your question.  These considerations focus
20  on the limitations of using after-the-fact
21  consumption and preferences, but your
22  question referred to the distinction
23  between a long run measure of damage and a
24  pack-by-pack measure of damage, and I'm

99

1   trying to mix the apples and oranges.
2   Q.  Well, when you gave me the criticism of the
3   use of market data to value lights that you
4   did before lunch, were you assuming one way
5   or the other that the nature of the
6   transaction in these cases is that the
7   purchase of lights over a period of time
8   constitutes one transaction or instead each
9   purchase amounts to a separate transaction?
10  A.  From the economic and physiological
11  standpoint, there is compelling evidence
12  that the single long run transaction is an
13  accurate description.  But from the legal
14  standpoint, that may not be the relevant
15  standard, and I'm not sure that I should be
16  forming my own opinion in that respect.
17  Q.  Well, my question though is whether, when
18  you gave me the criticism you gave before
19  lunch, you were assuming the nature of the
20  transaction one way or the other, whether
21  it was a single transaction or a series of
22  separate transactions.
23  A.  The vast majority of smokers find a favored
24  brand and commit to that brand over a long

100

1   period with switch rates that are
2   relatively low.  The facts that I brought
3   to bear refer to what is the value of
4   evidence in the event that such a consumer,
5   having smoked a Marlboro Light or another
6   brand under a misperception as to its
7   benefits, then finds out that the
8   cigarette, in fact, does not confer those
9   benefits.
10      The framework I use is to evaluate
11  the relevance of the consumer's behavior,
12  so to speak post notice, in assessing what
13  the injury was at the time of the original
14  purchase.
15      From the economic standpoint,
16  there is compelling evidence, as well as
17  from the medical standpoint, that there is
18  a long-term commitment to a brand and that
19  it is realistic to talk about an individual
20  purchase, but I believe I'm just repeating
21  myself if I say -- if I draw any
22  conclusions.  I don't think it's
23  appropriate to draw any conclusions about
24  what the legal standard is.

101

1   Q.  And I'm asking whether, when you gave the
2   criticism you gave me before lunch, you
3   were assuming that the transaction was one
4   transaction or a separate -- a series of
5   separate transactions.  I don't think
6   you've answered that question.
7       Maybe you didn't have any
8   assumption, but my question is whether, an
9   assumption one way or the other, was
10  embedded in your criticism?
11  A.  I don't think I can add any more to the
12  answers I've given so far.
13  Q.  If the law regards each purchase as a
14  separate transaction and requires that
15  damages for each purchase be valued at the
16  time of each particular transaction, would
17  your criticism remain valid?
18      MR. DUGAN:  Objection.  Calls for
19  a legal conclusion.  Asked and answered.
20  Q.  You can answer.
21  A.  We did cover this with Mr. Wagner.  The
22  consumer buys or tries out a light
23  cigarette in the beginning -- now I think
24  I'm just repeating myself.  I'm not sure I

26  (Pages 98 to 101)

102

1    have anything else I can add.  I'm about to
2    say what I just said again.
3    Q.  Okay.  I don't think you've answered this
4    question.  I'm not sure how it requires
5    repeating prior answers.  Let me try it
6    again and see if -- and see if there's an
7    answer to this.
8         If the law treats each separate
9    purchase as a separate transaction and
10   requires damages to be valued at the time
11   of each separate transaction, would the
12   criticism that you gave me before lunch
13   still remain valid?
14        MR. DUGAN:  Objection.  Asked and
15   answered.  Just because you don't like his
16   answer doesn't mean that he's not entitled
17   to have his answer.
18   Q.  You can answer, Doctor Harris.
19   A.  My legal opinion is yes.
20   Q.  Okay.  And what is your legal opinion based
21   on?
22   A.  Because of the phenomenon of addiction --
23   accommodation or acclamation or what
24   economists would call investment, the

103

1    appropriate valuations of the product, as
2    promised, as the product delivered, should
3    be made before the consumer makes any such
4    investments.  As a consequence, though the
5    economists can value each and every
6    purchase of a pack separately, those
7    valuations should refer to the initial
8    decision and not be tainted by the fact of
9    addiction once the smoker has made an
10   investment in the brand.
11   Q.  My question may not have been clear.  I
12   want -- you said there's a -- you referred
13   to a legal standard or your understanding
14   of the law.  I want to know what your
15   understanding of the law is based on.  I
16   mean, was it conversation with counsel or
17   doing legal research, reading cases?
18   What's --
19        MR. DUGAN:  Objection.  Calls for
20   a legal opinion.  I understand he said
21   "legal opinion," so you have a right to his
22   understanding, so.
23        MR. MCCARTER:  Okay.  Thank you.
24   Q.  You can answer, Doctor Harris.

104

1    A.  In using the phrase, my legal opinion, it
2    is my speculation, as an economist and a
3    physician, as to what is likely or should
4    be the legal standard.  Beyond that, I
5    don't have any cases to cite or
6    jurisprudence to rely on.
7    Q.  Have you read cases on this issue?
8    A.  I have read cases on this issue though I
9    should caution I'm not an expert on whether
10   one case is exactly on point or slightly
11   tangential but, yes, I have read cases.
12   Q.  Do you have cases in mind that you've read
13   that would support your speculative view of
14   the law?
15   A.  Without being able to cite specific case in
16   specific jurisdictions, I recall reviewing
17   cases in which a consumer may have
18   purchased a real estate property having
19   been allegedly mislead as to its market
20   value or its characteristics.
21        The consumer then made an
22   investment in the property.  Subsequently,
23   the plaintiff consumer was apprised that he
24   or she was mislead as to the value of the

105

1    property.  The defendant in those cases
2    attempts to introduce evidence that the
3    plaintiff still wants to hold on to the
4    property now after the fact.
5         It is my understanding as a
6    non-lawyer, but as an economist, or my
7    interpretation, that in those cases the
8    buyer has made an investment in the good
9    after the time of the initial purchase, and
10   that evidence concerning the buyer's
11   preferences after the fact cannot be used
12   or are not relevant in an assessment of the
13   damages the purchaser claims before the
14   investment, but at the time of the
15   transaction.  As to whether they are
16   partially on point or exactly on point,
17   that's for legal scholars.
18   Q.  That's fine.  I appreciate that.  What
19   jurisdiction do you remember cases from?
20   A.  I've read cases from at least in
21   jurisdictions in Illinois and in Missouri.
22   Probably in other jurisdictions, but I
23   can't name them right offhand.
24   Q.  If I remember right, you referred in your

27 (Pages 102 to 105)

**106**

1     recent deposition to having fairly recently
2     read Missouri cases.  Do you remember that?
3   A.  Yes, I do.
4   Q.  Do you remember what cases in Missouri you
5     read for this legal proposition?
6   A.  No.
7   Q.  Did you get sent those cases by counsel, or
8     were they cases identified in the judge's
9     order?
10  A.  Although from time to time I have made my
11    own searches of case law, the direct answer
12    to your question is the Missouri cases were
13    sent to me by counsel.
14  Q.  Have you done any review of the law in
15    California or the District of Columbia on
16    this point we've been discussing?
17  A.  No.
18  Q.  Or in any other states besides Illinois or
19    Missouri?
20  A.  I think I have, over time, seen cases in
21    other jurisdictions or cases that were at
22    the federal appellate level and therefore
23    referred to regions rather than states.
24    Also, law review articles which really

**107**

1     aren't geographically pinned down, and
2     probably some cases in other jurisdictions
3     that were cited for the same point by
4     jurisdictions in -- not Mississippi -- but
5     in Missouri or in Illinois.
6   Q.  Is that the best you can do for me to
7     describe any other cases you've reviewed on
8     the valuation issue?
9   A.  At this time, yes.
10  Q.  Okay.  Are you aware of any studies or data
11    showing that the market share of lights has
12    declined since the year 2000?
13  A.  No, I have not -- no, I am not.
14  Q.  Do you know whether the market share of
15    light cigarettes has, in fact, increased
16    since the year 2000?
17  A.  Whether your question refers to Marlboro
18    Lights or Marlboro Ultra Lights
19    specifically, or to all lights, I cannot
20    recall offhand.
21  Q.  Okay.  If I were to ask you the question
22    for all lights or Marlboro Lights or
23    Marlboro Ultra Lights, specifically you
24    would not know either way?

**108**

1   A.  I can recall reading data and articles
2     about market trends, but I cannot give you
3     an answer with certainty or precision right
4     now, no.
5   Q.  To your knowledge, Philip Morris light
6     cigarettes have never been priced any
7     differently at retail compared to full
8     flavor cigarettes of the same brand,
9     correct?
10  A.  Correct.
11  Q.  And that's true generally with respect to
12    light and full-flavor cigarettes in the
13    marketplace not limited to Philip Morris,
14    correct?
15  A.  Correct.
16  Q.  Consumers never paid more for light
17    cigarettes than they would have paid for a
18    full-flavored cigarette of the same brand,
19    correct?
20  A.  Your question includes the phrase "would
21    have paid," which is a conditional -- I'm
22    not sure what conditions you're attaching.
23    If I assume that a consumer can either buy
24    one pack of Marlboro Reds or one pack of

**109**

1     Marlboro Lights at the same gas station,
2     it's my understanding that they would have
3     the same price.
4   Q.  Are you aware of any studies or data
5     suggesting that the price of light
6     cigarettes has decreased since the year
7     2000?
8   A.  No.
9   Q.  Is it true that the price of light
10    cigarettes has, in fact, increased since
11    the year 2000?
12  A.  I'd have to look at the data to answer your
13    question.  I can't say offhand.
14        MR. MCCARTER:  Let's take a break.
15    I want to look at my notes.  I may be done.
16        VIDEOGRAPHER:  I'm going off the
17    record.  The time is 1:43.
18        (Brief Recess.)
19        VIDEOGRAPHER:  Now going back on
20    the record the time is 1:46 p.m.
21        MR. MCCARTER:  Doctor Harris,
22    thank you for your time.  I have no further
23    questions.
24        THE WITNESS:  You're welcome.

28  (Pages 106 to 109)

## 110

1       MR. DUGAN:  No questions from the
2  plaintiffs.
3       VIDEOGRAPHER:  Now going off the
4  record.  This deposition is concluded.  The
5  time is 1:46.
6            (Whereupon the deposition
7            concluded at 1:46 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## 112

1  Commonwealth of Massachusetts
2  South Middlesex, ss.
3
4
5       I, Teresa E. Costello, Notary
   Public in and for the Commonwealth of
   Massachusetts, do hereby certify that there
6  came before me on the 20th day of January,
   2010, JEFFREY E. HARRIS, M.D., Ph.D., who
7  was duly sworn by me; that the ensuing
   examination upon oath of the said deponent
8  was reported stenographically by me and
   transcribed into typewriting under my
9  direction and control; and that the within
   transcript is a true record of the
10 questions asked and answers given at said
   deposition.
11
12      I FURTHER CERTIFY that I am
   neither attorney nor counsel for, nor
13 related to or employed by any of the
   parties to the action in which this
14 deposition is taken; and, further, that I
   am not a relative or employee of any
15 attorney or financially interested in the
   outcome of the action.
16
17      IN WITNESS WHEREOF I have hereunto
   set my hand and affixed my seal of office
18 this 22nd day of January, 2010, at Boston,
   Massachusetts.
19
20
21
22 Teresa E. Costello, RPR, CRR,
   CSR, #1452S98
   Notary Public
23 Commonwealth of Massachusetts
   My Commission
24 Expires: 5/13/16

## 111

1          CERTIFICATE OF DEPONENT
2
3       I have read the foregoing transcript of
4  my deposition and except for any corrections or
5  changes noted on the errata sheet, I hereby
6  subscribe to the transcript as an accurate
7  record of the statements made by me.
8
9
     _____
10    JEFFREY E. HARRIS, M.D., Ph.D.
11
12 Signed under the pains and penalties of perjury
13 this _____ day of _____, 20___.
14
15
16
17
18
19
20
21
22
23
24

## 113

1          ERRATA SHEET
          VERITEXT REPORTING COMPANY
2          1350 BROADWAY
          NEW YORK, NEW YORK 10018
3          800-362-2520
4  CASE: LIGHT CIGARETTES AND SALES PRACTICES
   DEPOSITION DATE: APRIL 6, 2010
5  DEPONENT:  JEFFREY E. HARRIS, M.D., Ph.D.
6  PAGE LINE(S)  CHANGE          REASON
7  ___|___|_____|_____
8  ___|___|_____|_____
9  ___|___|_____|_____
10 ___|___|_____|_____
11 ___|___|_____|_____
12 ___|___|_____|_____
13 ___|___|_____|_____
14 ___|___|_____|_____
15 ___|___|_____|_____
16 ___|___|_____|_____
17 ___|___|_____|_____
18 ___|___|_____|_____
19 ___|___|_____|_____
20
       _____
21     JEFFREY E. HARRIS, M.D., Ph.D.
22
23 SIGNED UNDER THE PAINS AND PENALTIES OF
24 PERJURY THIS _____ DAY OF _____, 20__.

29  (Pages 110 to 113)