# Exhibit 18

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| **IN RE: LIGHT CIGARETTES MARKETING SALES PRACTICES LITIGATION** | ) | **MDL Docket No. 1:09-MD-2068 ALL CASES** |

**DECLARATION AND EXPERT DISCLOSURE**
**STATEMENT OF ERIC M. KAPLAN**

I, Eric M. Kaplan, M.D. make the following declaration of my opinions:

1. My name is Eric Michael Kaplan, M.D. I am a physician, specializing in the field of psychiatry. My education, experience and background are discussed below.

2. I received a Bachelor's Degree from Emory University in Biology and Anthropology in 1982. In 1986, I received a Doctor of Medicine Degree from the University of Miami, School of Medicine. From 1986 to 1987, I completed an internship at the University of South Florida, School of Medicine focusing on Internal Medicine and Neurology. From 1987 to 1990, I completed a residency in Psychiatry at the University of South Florida, Department of Psychiatry. From 1989 to 1990, I was the Chief Resident of the Department of Psychiatry.

3. After residency I started a private practice in Psychiatry. I joined the affiliate faculty of the University of South Florida, Department of Psychiatry in 1990 and have been an active member of the affiliate faculty, teaching medical students and residents. I am currently an Assistant Professor of the University of South Florida, Department of Psychiatry.

4. I was the Medical Director of Charter Hospital of Pasco, where I treated patients with a variety of mental and substance dependence disorders. I was the service director of the Alcohol and Drug Program at Charter Hospital for several years. I assisted in developing a Smoking Cessation Tract at the hospital. In addition, I assisted in developing a Smoking Cessation Tract at Care Unit of South Florida, a substance dependence facility.

5. My current practice includes treating outpatients with a variety of mental disorders and substance abuse/dependence disorders. I assist patients in smoking cessation when they desire treatment. I specialize in psychopharmacology.

6. I conduct clinical research on psychiatric medications. I have lectured extensively in the United States and internationally in regards to psychopharmacology. I have published in various peer reviewed journals on the topic of brain chemistry and psychiatric medications.

7. I am also a Forensic Psychiatrist. I am a Diplomat of the American Board of Forensic Medicine. I consult on various types of legal cases including Tobacco Litigation. I have consulted on several cases involving the issues of Smoking Behavior, Nicotine Dependence, Light Cigarettes and Compensation/Titration.

8. A copy of my Curriculum Vitae is attached for additional information regarding my education and experience (Ex. 19).

## I. Conclusions

9. The opinions in this report are stated to a reasonable degree of medical certainty based on my knowledge, training and experience as well as my review of relevant scientific literature.

- Smoking is a complex behavior that varies significantly among individuals.

- A significant percentage of smokers are not addicted to or dependent upon nicotine.
- Compensation and titration may play a role in the smoking behavior in some addicted or dependent smokers. Even in these individuals, compensation and titration are highly variable.
- Many factors in addition to nicotine play an important role in smoking behavior.
- Without a proper evaluation of each individual smoker by a trained professional, an accurate understanding of nicotine addiction or dependence and smoking behavior, including compensation and titration, cannot be obtained.

10. Nicotine is a psychoactive substance. When nicotine binds to brain receptors, various effects may occur. Some of the psychopharmacologic effects of nicotine include improved attention span and memory, increased energy levels, a sense of relaxation, reduced appetite and a sense of enjoyment or pleasure.[1,2]

11. Nicotine is one of the important reasons why some people smoke. However, the importance of nicotine varies among individual smokers. If nicotine was the primary reason why all regular smokers smoked, the use of nicotine replacement therapies would be much more successful than current scientific studies report. Most studies report that the success rate of nicotine replacement therapies is less than 30%.[3] Nicotine replacement therapies which more closely resemble nicotine serum levels through smoking (i.e. nasal inhalers) are no more effective than nicotine patches which do not resemble the serum levels obtained through smoking. In addition, if nicotine was a highly addictive substance, the abuse of nicotine replacement therapies should be observed. In all my years as a psychiatrist and physician, I have yet to see or hear of any abuse histories involving nicotine replacement therapies or intravenous nicotine use.

12. Smokers vary as to the number and importance of nicotine-related effects, and therefore the importance of nicotine varies among individuals who are addicted or dependent upon nicotine.

13. The behavior of smoking also produces positive effects in both smokers who are addicted to or dependent upon nicotine and smokers who are infrequent smokers or not addicted to or dependent upon nicotine. The non-pharmacologic effects of smoking may include a sense of relaxation, a sense of pleasure, enjoying a break in one's daily activities, social aspects of smoking and enjoyment of the smell, taste and feel of smoking.[2]

14. Individuals vary among the reasons why they began to smoke and continue to smoke, and therefore assuming that all smokers in any class would smoke for similar reasons is not accurate.

15. In addition to differences among individuals as to why they smoke, there also exist epidemiologic data documenting differences among various populations concerning other factors involved in smoking behavior. Factors which may influence smoking behavior include personality characteristics, emotional states, gender differences, genetics, suffering from a mental illness, and environmental factors.[4-7] Since so many factors influence smoking behavior, the only way to determine the importance of these factors in a smoker is to evaluate each smoker individually.

16. Since virtually all smokers are aware that smoking can be related to the development of various medical illnesses, one theory regarding the reason they continue to smoke is secondary to Nicotine Dependence. Some clinicians theorize that once a smoker is dependent upon nicotine, the smoker will maintain serum levels of nicotine sufficient to prevent withdrawal symptoms from developing. Therefore, the smoker must smoke in order

to "feel normal."[9] While this theory is interesting, clinical observation of many smokers shows that prevention of nicotine withdrawal symptoms is not the primary reason why most regular smokers continue to smoke. In studies focusing on nicotine withdrawal, withdrawal from nicotine was found to be a highly variable phenomenon. It is generally mild and transient, and many regular smokers do not complain of withdrawal symptoms.[10-13]

17. In order to determine the importance of nicotine withdrawal symptoms in a class of regular smokers, each individual smoker would need to be evaluated by a trained clinician utilizing DSM-4-TR criteria for Nicotine Withdrawal Syndrome or some other valid protocol. Assuming that all regular smokers smoke to maintain nicotine serum levels in order to prevent nicotine withdrawal is simply not accurate.

18. In general terms, smoking compensation means that the smoker changes his or her smoking behavior in order to adjust or compensate for any change in the smoke yield (as measured by the FTC method) of the cigarette currently smoked compared to the cigarette previously smoked. Examples of smoking compensation may include the number of cigarettes smoked, the number of puffs per cigarette, the frequency of puffing, taking bigger puffs, the pressure applied during puffing, the amount of smoke expelled from the mouth, the depth and duration of inhalation, how much of the cigarette is smoked and blocking of filter vents.[14]

19. When compensation occurs, to the extent that a constant serum level of nicotine is maintained, compensation is said to be "complete." Compensation can also be "incomplete." Compensation is incomplete when serum levels of nicotine are reduced despite some degree of compensation taking place.

20. Closely related to compensation is the phenomenon known as "titration." "Titration" is commonly used to describe efforts by a smoker to continuously modify his or her smoking patterns so as to maintain a constant serum level of nicotine over the course of the day, regardless of surrounding conditions and regardless of the type of cigarette being smoked.

21. Using these theories, plaintiffs in Lights cases generally have argued that once smokers habituate, they will utilize compensation and titration in order to maintain the serum level of nicotine to sustain their habituation, dependence or addiction upon cigarette smoking.

22. One would assume that the individuals selected to serve as class representatives exemplify the various issues involved in these cases. For example, when switching from a cigarette of higher tar and nicotine levels (including Marlboro Reds) to a cigarette with lower tar and nicotine levels (including Marlboro Lights), the class representatives should have compensated and titrated in order to achieve adequate serum levels of nicotine to satisfy their smoking addiction.

23. However, in the depositions taken of the class representatives in this pending litigation, we can see that even the class representatives vary significantly with respect to their smoking behaviors.

24. In the December 16, 2009 deposition of Miles Tyrer, he provided information regarding his smoking history and behavior. Miles Tyrer smoked 1 pack per day of Marlboro Kings and then 1 pack per day of Marlboro Medium 100s. He switched to Marlboro Lights 100s in 2002, continuing to smoke 1 pack per day or less. After switching from Marlboro Medium 100s to Marlboro Lights 100s, Miles Tyrer stated he did not change

the number of cigarettes he smoked. He also did not take more puffs per cigarette, he did not take in more smoke per puff and did not change the way he held his cigarette. The information which Miles Tyrer provided in his deposition is not consistent with the theories of compensation and titration. Miles Tyrer successfully quit smoking cold turkey on multiple occasions for significant periods of time. He quit smoking when his wife became pregnant in 1973 and did not smoke again on a regular basis until 1992. He resumed smoking in 1992 after going through a divorce and quit after smoking for three months. He did not smoke again on a regular basis until 1999, when he developed a relationship with a woman he referred to as a "serial smoker." He also quit smoking when he was hospitalized in October 2008. He quit for 13 days while in the hospital and did not begin smoking until a month after he was discharged from the hospital. During these long time periods of smoking cessation, Miles Tyrer was neither dependent upon nor addicted to nicotine. Non-nicotine factors played an important role in his choice to return to smoking.

25. In the December 10, 2009 deposition of Allain Thibodeau, he provided information regarding his smoking history and behavior. Allain Thibodeau smoked 1 pack per day of Vantage. He switched to Marlboro Lights during the mid to late '80s. After switching to Marlboro Lights, Allain Thibodeau increased his smoking to 10 packs per week over the following two years. After switching from Vantage to Marlboro Lights, Allain Thibodeau stated he took longer drags and deeper puffs. Since Vantage cigarettes have the same or lower FTC Test Method level of tar and nicotine compared to Marlboro Lights, Allain Thibodeau's smoking behavior is not consistent with the theories of compensation and titration which are fundamental issues to this class action litigation. In fact, Mr.

Thibodeau's smoking behavior is opposite of what would be expected if compensation and titration had occurred.

26. In the December 11, 2009 deposition of David Williams, he provided information regarding his smoking history and behavior. David Williams smoked 1 pack per day of Marlboro Reds full flavor. He switched to Marlboro Lights in 2002. After switching to Marlboro Lights, David Williams increased his smoking, but did not recall how many more cigarettes he smoked. He knew the more he smoked, the more nicotine he would get. After switching to Marlboro Lights, David Williams stated he inhaled deeper and sometimes held the smoke in longer. He denied changing the way he held a cigarette in his hand or smoking the cigarette further down the rod. David Williams stated there was inconsistency to how many cigarettes he smoked on a daily basis, while smoking Marlboro Reds full flavor and Marlboro Lights. His school and work schedule would significantly influence his smoking behavior. Mr. Williams described changes in his smoking behavior which may be consistent with some degree of compensation and titration including increasing the number of cigarettes smoked daily. However, based on his description of significant variability in the number of cigarettes smoked, any degree of compensation and titration which may have occurred would be minimal compared to non-nicotine factors influencing his smoking behavior.

27. In the December 7, 2009 deposition of Carolyn Mirick, she provided information regarding her smoking history and behavior. Carolyn Mirick smoked 1 pack per day of Salem and Virginia Slims Menthol. She switched to Salem Lights and Virginia Slims Menthol Lights during the '90s, continuing to smoke 1 pack per day. During the 2000's, she switched to Salem Ultra-lights and Virginia Slims Menthol Ultra-lights,

continuing to smoke 1 pack per day. After switching from Salem and Virginia Slims Menthol to Salem Lights and Virginia Slims Menthol Lights, Carolyn Mirick stated she inhaled deeper and she smoked the cigarette further down the rod. These changes in smoking behavior may be consistent with some degree of compensation and titration. However, when Carolyn Mirick switched from Salem Lights and Virginia Slims Menthol Lights to Salem Ultra-lights and Virginia Slims Menthol Ultra-lights, she denies any behavior consistent with compensation and titration. Her testimony questions the importance which compensation and titration may have played in the smoking behavior of Carolyn Mirick. Carolyn Mirick successfully quit smoking cold turkey for one month during the late '70s and for three months during 1990 or 1991. During this time period, Carolyn Mirick was neither dependent upon nor addicted to nicotine.

28. In the December 17, 2009 deposition of Charles Wyatt, he provided information regarding his smoking history and behavior. Charles Wyatt smoked 1 pack per day of Kent and then 1 pack per day of Marlboro Reds full flavor. He switched to Marlboro Lights in 2003, continuing to smoke 1 pack per day or less. After switching from Marlboro Reds full flavor to Marlboro Lights, Charles Wyatt stated he did not change the number of cigarettes he smoked. He stated the Marlboro Lights tasted lighter and did not seem as harsh compared to Marlboro Reds full flavor. He did not notice any changes in the way he smoked after changing to Marlboro Lights. He did not change the way he held a cigarette, he did not take more puffs per cigarette and he smoked the cigarette the same length of the rod. The information which Charles Wyatt provided in his deposition is not consistent with the theories of compensation and titration.

29. In the January 7, 2010 deposition of Melanie Haubrich, she provided information regarding her smoking history and behavior. Melanie Haubrich smoked 1 pack per day of Marlboro Reds full flavor. After quitting smoking for 11 months associated with her first pregnancy, she began to smoke Marlboro Lights. Initially she smoked 1 pack per day, gradually increasing her smoking up to 3 packs per day over the next 4 plus years. After quitting smoking for 8 months associated with her second pregnancy, she began to smoke Marlboro Ultra-Lights, smoking 1.5 packs per day. After switching from Marlboro Reds full flavor to Marlboro Lights, Melanie Haubrich stated she initially smoked the same number of cigarettes and did not change the way she smoked her cigarettes. After switching from Marlboro Lights to Marlboro Ultra-Lights, Melanie Haubrich stated she reduced the number of cigarettes smoked, however she inhaled more smoke and she smoked the Marlboro Ultra-Lights further down the rod. The changes in smoking behavior described by Melanie Haubrich provide inconsistent information regarding compensation and titration. Melanie Haubrich successfully quit smoking cold turkey for 11 months and 8 months associated with her two pregnancies. During these time periods, Melanie Haubrich was neither dependent upon nor addicted to nicotine. Non-nicotine factors played an important role in her choice to return to smoking.

30. In the December 17, 2009 deposition of Alexander Slater, he provided information regarding his smoking history and behavior. Alexander Slater smoked less than 5 Marlboro Reds full flavor cigarettes per day from 1994 to 1995. After beginning college, he switched to Marlboro Lights. At the time he switched, Alexander Slater did not fulfill the DSM-4 criteria for Nicotine Dependence. During the school year, he gradually increased his smoking to 10-15 Marlboro Lights cigarettes per day. After switching from

Marlboro Reds full flavor to Marlboro Lights, Alexander Slater stated he took deeper puffs, inhaled more deeply and smoked the cigarette further down the rod. He did not change the way he held the cigarette. Alexander Slater described changes in his smoking behavior which may be consistent with some degree of titration.

31. In the December 9, 2009 deposition of Lori Spellman, she provided information regarding her smoking history and behavior. Lori Spellman has smoked Marlboro Lights on a regular basis since at least 1990. She has smoked between ¾ to 1 ½ packs per day. She has never smoked a full flavor or an Ultra-Light cigarette on a regular basis. Based on her description of significant variability in the number of cigarettes smoked, any degree of compensation and titration which may have occurred would be minimal compared to non-nicotine factors influencing her smoking behavior.

32. In the December 8, 2009 deposition of Leonardo Biundo, he provided information regarding his smoking history and behavior. Leonardo Biundo smoked 1 pack per day of Marlboro Reds full flavor. He switched to Marlboro Lights in 2005. After switching to Marlboro Lights, Leonardo Biundo continued to smoke 1 pack per day. He has been trying to quit smoking during 2009 and currently smokes approximately 1 cigarette every other day. After switching to Marlboro Lights, Leonardo Biundo stated he inhaled deeper, took more puffs and smoked further down the rod. He denied changing the way he held a cigarette in his hand or mouth. Leonardo Biundo described changes in his smoking behavior which may be consistent with some degree of compensation and titration in the past after he switched to Marlboro Lights. Leonardo Biundo does not currently fulfill the DSM-4 criteria for Nicotine Dependence and therefore there is no current evidence supporting compensation and titration.

33. In the December 9, 2009 deposition of Carol Corse, she provided information regarding her smoking history and behavior. Carolyn Mirick smoked ½ to 3/4 pack per day of Marlboro Reds full flavor. She switched to Marlboro Lights smoking ¾ pack per day and over the following 3 years increasing to almost 1 pack per day. During the past 3 years, she switched to L&M Light 100s and smokes 1 ½ pack per day. After switching from Marlboro Red full flavor to Marlboro Lights, Carol Corse stated she was puffing quicker and harder and was smoking a little bit more. These changes in smoking behavior may be consistent with some degree of compensation and titration.

34. In the December 16, 2009 deposition of Kathryn Domaingue, she provided information regarding her smoking history and behavior. Kathryn Domaingue smoked 5 packs per week of Marlboro Lights. She switched to Marlboro Ultra-Lights, continuing to smoke approximately 5 packs per week. After several years, Kathryn Domaingue switched from Marlboro Ultra-Lights to Parliament Lights, smoking 5 packs per week eventually increasing up to 7 packs per week. After switching from Marlboro Lights to Marlboro Ultra-Lights or Parliament Lights, Kathryn Domaingue did not notice any difference in how she puffed the cigarette, how many puffs she took per cigarette, the length of the rod smoked or any difference in the taste of the cigarettes smoked. She does believe she smoked more cigarettes. While she has never smoked a full flavor cigarette on a regular basis, Kathryn Domaingue has smoked Marlboro Reds full flavor and Virginia Slims full flavor on occasion. When she smoked these full flavor cigarettes, she did not notice any changes in her smoking behavior. Kathryn Domaingue's smoking behavior does not support any significant degree of compensation and titration. Kathryn Domaingue

successfully quit smoking for 6 weeks. During this time period, Kathryn Domaingue was neither dependent upon nor addicted to nicotine. Kathryn Domaingue believes she is addicted to nicotine.

35. In the December 14, 2009 deposition of Stephanie Good, she provided information regarding her smoking history and behavior. Stephanie Good has smoked Marlboro Lights on a regular basis since at least 1998. She smokes between 8 to 15 cigarettes per day. She has never smoked a full flavor or an Ultra-Light cigarette on a regular basis. Based on her description of significant variability in the number of cigarettes smoked, any degree of compensation and titration which may have occurred would be minimal compared to non-nicotine factors influencing her smoking behavior.

36. In the December 18, 2009 deposition of Aubrey Parsons, he provided information regarding his smoking history and behavior. Aubrey Parsons smoked 1 pack per day of Camel full flavor. He switched to Parliament Lights in 2000, continuing to smoke 1 pack per day or less. After switching from Camel full flavor to Parliment Lights, Aubrey Parsons stated he believes he smoked Parliament Lights more quickly compared to the Camel full flavor. He denies any other changes in his smoking behavior after he switched. The information which Aubrey Parsons provided in his deposition is not consistent with the theories of compensation and titration.

37. In the December 8, 2009 deposition of Bryant Tang, he provided information regarding his smoking history and behavior. Bryant Tang smoked 1 pack per day of Newport cigarettes. He switched to Marlboro Lights in 1996-1997. After switching, he increased to 1 ½ pack per day. Over the years, his smoking has fluctuated on a frequent basis ranging from 1 pack per day to 3 packs per day. This fluctuation appears to be related

to non-nicotine factors including his work schedule. After switching from Newport to Marlboro Lights, Bryant Tang stated he probably took more puffs. He did not inhale differently, he did not hold the smoke in his lungs longer, he did not smoke further down the rod and he did not change the way he held the cigarette in his hand or mouth. Mr. Tang described changes in his smoking behavior which may be consistent with some degree of compensation and titration including increasing the number of cigarettes smoked daily. However, based on his description of significant variability in the number of cigarettes smoked, any degree of compensation and titration which may have occurred would be minimal compared to non-nicotine factors influencing his smoking behavior. Bryant Tang quit smoking cold turkey for two months after starting an internet sales company. During this time period, Bryant Tang was neither dependent upon nor addicted to nicotine. Non-nicotine factors played an important role in his choice to return to smoking.

38. Smoking behaviors of the class representatives in other Lights litigation similarly vary significantly. For example, in the March 10, 2006 deposition of Harrison Mulford, he provided information regarding his smoking history and behavior. Harrison Mulford smoked up to 1 ½ packs per day of Marlboro Reds full flavor, which have an FTC Test Method level of tar and nicotine of 15/1.1 and Marlboro Reds medium in a hard pack, which have an FTC Test Method level of tar and nicotine of 12/.9. (Deposition of Harrison Mulford, III, Exhibit 20, at pp. 20-21). During his 40's, Harrison Mulford switched to Marlboro Lights, which have an FTC Test Method level of tar and nicotine of 11/0.8 and then Marlboro Ultra-lights, which have an FTC Test Method level of tar and nicotine of 6/.5. (*Id.* at pp. 21-22). Harrison Mulford reduced his cigarette consumption from 1 ½ packs per day to less than 1 pack per day as he switched to the Light cigarettes. (*Id.* at p.

21). In addition, Mr. Mulford did not notice any change in his smoking behavior when he switched to Light cigarettes including the length of the cigarette rod smoked, the number of puffs taken or blocking vent holes. (*Id.* at pp. 193-196). The information which Harrison Mulford provided in his deposition is not consistent with the theories of compensation and titration which are fundamental issues to this class action litigation.

39. In the March 14, 2006 deposition of Corey Fox, she provided information regarding her smoking history and behavior. Corey Fox smoked an average of 3 to 5 Winston full flavor cigarettes per day with an FTC Test Method level of tar and nicotine of 14/1.0 prior to switching to Marlboro Lights. (Deposition of Corey Fox, Exhibit 21, at pp. 22, 34). Upon switching to Marlboro Lights, Corey Fox began smoking between 5 to 10 cigarettes per day. (*Id.*, at p. 35). While the number of cigarettes Corey Fox smoked increased when she switched from Winston full flavor cigarettes to Marlboro Light cigarettes, Corey Fox did not recall making any changes to the way she inhaled cigarette, or how much of the cigarette rod she smoked. (*Id.* at pp. 79-82). Corey Fox's consumption of Marlboro Lights further increased on two different occasions in response to marital or work status related events: Corey Fox first increased her consumption of Marlboro Light cigarettes to around 10 cigarettes per day in response to "open communication" with her husband regarding her smoking; and then subsequently doubled her consumption to roughly 20 Marlboro Light cigarettes per day (a pack a day) upon taking over management of a mini-mart convenience store. (*Id.* at pp. 35-39). Between May 2005 and January 2006, Corey Fox stopped smoking during her pregnancy. During this time period, Corey Fox was neither dependent upon nor addicted to nicotine. (*Id.* at p. 40). After the birth of her child, she resumed smoking Marlboro Lights at a frequency of 2 to 3 cigarettes daily. (*Id.* at p.

42). As of the date of her deposition, Corey Fox was smoking 4 to 5 Marlboro Light cigarettes daily. (*Id.* at p. 16). As noted above, Corey Fox's changes in her cigarette consumption appear primarily linked to non-nicotine factors such as pregnancy, marital circumstances, and work status, and thus inconsistent with the Plaintiffs' theory of compensation or titration based upon nicotine dependence.

40. In the March 13, 2006 deposition of Rhonda Newby, she provided information regarding her smoking history and behavior. Rhonda Newby quit smoking Marlboro Lights in March 2003. (Deposition of Rhonda Newby, Exhibit 22, at p. 11). Because she has successfully quit smoking, she is not dependent upon nor addicted to nicotine. Furthermore, Rhonda Newby's deposition testimony indicates that she did not engage in compensatory behavior. Rhonda Newby primarily smoked only one brand of cigarettes, Marlboro Lights, and her smoking behavior – such as how she held the cigarette, the length of cigarette rod smoked, and how she inhaled the cigarette smoke – did not vary over time. (*Id.* at pp. 81-84).

41. In the March 9, 2006 deposition of Richard DeLuna, he provided information regarding his smoking history and behavior. Richard DeLuna's smoking history has varied dramatically over time – ranging from two packs a day to 1 cigarette a month. Richard DeLuna initially consumed two packs a day of Marlboro Red cigarettes. (Deposition of Richard DeLuna, Exhibit 23, at pp. 33-34). At a certain point, Richard DeLuna began smoking roughly equal numbers of Marlboro Light and Marlboro Red cigarettes – while he preferred the taste and feel of Marlboro Light cigarettes, he felt peer pressure to smoke Marlboro Reds. (*Id.* at pp. 28-29). Richard DeLuna consequently rotated his smoking between these brands, without altering the number of cigarettes smoked. (*Id.* at pp. 21-23).

In response to the death of his uncle, and through the use of acupuncture and peer support groups, Richard DeLuna subsequently reduced his consumption of cigarettes from 2 packs a day to between 2 cigarettes a day and 1 cigarette a week. (*Id.* at pp. 39-41). Upon moving to New Mexico in 2000, Richard DeLuna was smoking around ½ a pack of cigarettes per day. (*Id.* at pp. 164-164). This amount subsequently decreased to a pack a week, but increased to ½ a pack per day in response to the September 11, 2001 terrorist attacks. (*Id.* at pp. 164-166). At the beginning of 2002, Richard DeLuna made a New Year's resolution to decrease his consumption of cigarettes, and subsequently reduced his cigarette consumption to a pack a month. (*Id.* at p. 167). Richard DeLuna's cigarette consumption subsequently increased again after he attended his grandmother's funeral in late 2002, where he came into contact with family members that smoke. (*Id.* at pp. 54-55,167). Several months after attending the funeral, Richard DeLuna once again began attending meetings of his peer support group and his cigarette consumption again decreased to a pack a month. (*Id.* at p. 168). At the time of his deposition, Richard DeLuna had only smoked one cigarette during the past month and had only smoked a few cigarettes (roughly a pack a month) during the past year. (*Id.* at pp. 11-12, 169). Richard DeLuna is not currently dependent upon nor addicted to nicotine. Similar to Corey Fox, Richard DeLuna's smoking history demonstrates the importance of non-nicotine factors associated with smoking behavior. Rather than exhibiting a pattern of compensatory smoking behavior based upon nicotine dependence, Richard DeLuna's varying consumption of cigarettes appears closely tied to non-nicotine factors such as peer pressure, stress resulting from the deaths of family members, and traumatic events such as the September 11, 2001 terrorist attacks.

42. In the December 21, 2004 deposition of Sidney Stern, he provided information regarding his smoking history and behavior. Mr. Stern smoked non-filtered Camel brand of cigarettes and switched in 1946 to Marlboro Red filtered brand of cigarettes, which were generally regarded as having less tar and nicotine. In the early 1970s, he claims to have switched from Marlboro Red, which in 1971 had an FTC tar/nicotine yield of 20/1.3 to Marlboro Light cigarettes, which had an FTC tar/nicotine yield of 14/1.1. Mr. Stern smoked approximately one pack per day of each brand of cigarette, even though the FTC levels of tar and nicotine vary among these three cigarette brands. Mr. Stern did not recall any differences in the way he smoked these three cigarette brands. Mr. Stern's smoking behavior is not consistent with compensation or titration.

43. In the December 21, 2004 deposition of Theresa Stern, she provided information regarding her smoking history and behavior. Mrs. Stern quit smoking when she was pregnant in 1954 and returned to smoking after her last child was born in 1962. Since she did not smoke for eight years, she was not addicted to or dependent upon nicotine. Non-nicotine factors played an important role in her choice to return to smoking.

44. Mrs. Stern smoked Marlboro Red brand of cigarettes. She quit smoking in the early to mid 1970s for approximately three months. She chose to restart smoking because she gained weight after quitting smoking. She chose to begin smoking Marlboro Lights. Mrs. Stern smoked approximately one half pack per day of each brand of cigarette, even though the FTC levels of tar and nicotine vary among her cigarette brands. Mrs. Stern did not recall any differences in the way she smoked her cigarettes. Mrs. Stern's smoking behavior is not consistent with compensation or titration.

45. In the May 4, 2000 deposition of Stephany Gesser, she provided information regarding her smoking history and behavior. Ms. Gesser quit smoking when she was pregnant in 1977 and returned to smoking after her child was born. Since she did not smoke for approximately eight months, she was not addicted to or dependent upon nicotine. Non-nicotine factors played an important role in her choice to return to smoking.

46. Ms. Gesser smoked Marlboro Red brand of cigarettes. In 1983, she switched to Marlboro Light brand of cigarettes. Ms. Gesser smoked approximately one pack per day of each brand of cigarette, even though the FTC levels of tar and nicotine vary among her cigarette brands. Ms. Gesser did not recall any differences in the way she smoked her cigarettes. Ms. Gessser's smoking behavior is not consistent with compensation or titration.

47. In the February 15, 2005 deposition of Nicholas Commisso, he provided information regarding his smoking history and behavior. Mr. Commisso smoked approximately five cigarettes per day when he smoked Marlboro Red and Newport brand cigarettes.

48. He switched from Newport cigarettes to Marlboro Light cigarettes in 1979 or 1980. After he switched, Mr. Commisso described changes in the smoking behavior which may be consistent with compensation and titration including increasing the number of cigarettes smoked daily from four or five to ten or twelve. He also described taking longer puffs and smoking the cigarette further down the rod.

49. Within one year after switching to Marlboro Light cigarettes, Mr. Commisso increased his daily consumption of cigarettes to two and one half packs per day. This significant increase in his smoking consumption is much greater than would be expected secondary to compensation or titration. In 1984, he reduced his daily consumption of

cigarettes to between one pack to one and one half packs per day secondary to changes in his work environment. This change in smoking behavior is also not consistent with compensation or titration, and suggests non-nicotine factors played a significant role in his smoking behavior. Mr. Comisso's smoking behavior shows that even when elements of smoking behavior are consistent with compensation and titration, other smoking behaviors are inconsistent with these issues.

50. I have also reviewed the deposition testimony of the following absent class members in other Lights litigation: Kevin Hagan, William Hall, and Tara McClure. Kevin Hagan is a current smoker of Marlboro Lights, and at the time of his deposition, consumed around a pack a day. (Deposition of Kevin Hagan, Exhibit 24, at p. 6). Kevin Hagan initially smoked Vantage regular cigarettes, with an FTC Test Method level of tar and nicotine of 9/.8, before quitting smoking for three months. (*Id.* at p. 8). When Kevin Hagan resumed smoking, he started smoking Marlboro Lights because he preferred the taste and flavor of Marlboro Light cigarettes to Vantage cigarettes. (*Id.* at p. 9). According to Kevin Hagan, his smoking behavior depended upon the job he had, and the opportunities the job provided to him to smoke. When Kevin Hagan began working at Wal-Mart after graduating from college, his smoking consumption decreased from two packs per day to between ¾ of a pack and a pack per day because Kevin was not permitted to smoke in the store. According to Kevin, the amount he smoked on a daily basis would depend on how busy he was at work – on some days he hardly smoked at all. (*Id.* at p. 18). Kevin Hagan estimates that his smoking increased to between a pack and a pack and a half per day when he switched jobs and began working at City Finance, where he was allowed to smoke in his office. (*Id.* at p. 19). In addition, according to Kevin Hagan, his smoking behavior is

dependent on his social activities. Since his parents do not want him to smoke, he had does not smoke when he visits his parents for one or two days. (*Id.* at p. 41).

51. William Hall's smoking history indicates that he has smoked several different brands of cigarettes. William Hall started smoking Salem Light 100's, and then switched to Marlboro Reds, then to Camel Lights, then to Marlboro Lights, and currently smokes Parliament Lights and Marlboro Ultra Lights. (Deposition of William Hall, Exhibit 25, at p. 10). Salem Light 100's have an FTC Test Method level of tar and nicotine of 12/1.0 for hard packs and 8/.7 for soft packs, Camel Lights have an FTC Test Method level of tar and nicotine of 11/.8 for hard packs and 11/.9 for soft packs, and Parliament Lights have an FTC Test Method level of tar and nicotine of 9/.7. William Hall recalls that the number of cigarettes he smoked per day increased as he went from full flavored to Light cigarettes, though he does not believe that how he smoked the cigarettes varied between different brands. (*Id.* at pp. 51-52, 59). William Hall consumed between 1 to 2 Marlboro Reds per day, increased to 3 to 4 cigarettes per day upon initially switching from Marlboro Reds to Camel Lights, and reached a maximum consumption of a pack to a pack and a half per day of Camel Lights and Marlboro Lights. (*Id.* at pp. 59-60). William Hall subsequently decided to limit his smoking to social occasions when he had "good reason" to smoke, and over a two week time span decreased his consumption of Marlboro Light cigarettes to 4 to 5 cigarettes per day. (*Id.* at p. 64-65). William Hall currently smokes a combination of Parliament Lights and Marlboro Ultra Lights and estimates that 2 out of every 10 packs he puchases are Marlboro Ultra Lights. (*Id.* at 7). William Hall does not smoke every day – he estimates that he smokes 4-5 days out of the week – and on the days he does smoke, he consumes 4-5 cigarettes per day. (*Id.* at p. 54). William Hall smokes

more when he is working at his restaurant job, because the job is stressful, he drinks more when he works at the restaurant, and he stays up later at night. (*Id.* at p. 54). The number of cigarettes William Hall smokes does not vary regardless of whether he is smoking Parliament Lights or Marlboro Lights. William Hall has also quit on two separate occasions, each time for three months, to prove that he could quit if he chose. (*Id.* at pp. 66-70). On both occasions William Hall resumed smoking because he felt that not smoking infringed upon his freedom as an adult, he was unhappy with not getting smoking breaks, and he was "tired" of being a non-smoker. (*Id.* at pp. 67-68, 70). William Hall's smoking history strongly suggests that his level of cigarette consumption is primarily based upon social and work related factors, and is thus inconsistent with a compensation model based upon nicotine dependence.

52. Tara McClure's smoking history indicates that while she has occasionally smoked different brands of cigarettes, the only brand she has smoked regularly has been Marlboro Lights. (Deposition of Tara McClure, Exhibit 26, at p. 13). It is thus not possible to accurately make a determination regarding the issues of compensation or titration, as these terms are generally applied, to Tara McClure while she was a regular smoker of Marlboro Light cigarettes. In addition, Tara McClure's smoking behavior is inconsistent with a nicotine-dependence based theory of compensation. While at one time Tara McClure smoked Marlboro Light cigarettes on a daily basis, at the time of her deposition Tara McClure had decreased her smoking to weekends and once a week during the evenings. (*Id.* at p. 7-8). Tara McClure generally smokes her cigarettes about half way down the cigarette rod (*id.* at p. 28), which is inconsistent with smoking primarily to satisfy nicotine dependence. Tara McClure also occasionally refrains from smoking during the weekend,

and she testified that she does not experience any physical cravings during the weekends she does not smoke. (*Id.* at p. 51). Tara McClure describes herself as "habitually" addicted, rather than "physically" addicted (*id.* at p. 51), and she testified that the number of cigarettes she consumes depends heavily on the social setting. Tara McClure normally consumes 10 cigarettes per day on the weekend, but her consumption can increase to a pack a day on social occasions, yet she has also gone for a week without smoking when she is surrounded by non-smokers. (*Id.* at pp. 7-8, 51). In addition to social occasions, Tara McClure also notices that she smokes more when she is subject to work stress, when the weather is nice (and she can smoke outside), and when she is traveling by herself and staying in hotels (Tara McClure refrains from smoking in her own house, but does smoke in hotel rooms). (*Id.* at pp. 33-35). Tara McClure has attempted to quit by using a nicotine patch but was unsuccessful. (*Id.* at p. 48-49). While Tara McClure reduced the number of cigarettes she smoked per day, she found she missed the social and stress relieving aspects of smoking. (Id.)

53. The testimony of the class representatives from this pending litigation, and the testimony of the class representatives and absent class members from other litigation provide real life examples of the need to evaluate each smoker individually. To assume that thousands of potential class members have similar smoking behaviors, when numerous class representatives and absent class members as described above vary significantly, is impossible.

54. Plaintiffs' typical argument that all smokers compensate or titrate is based on a number of assumptions that are inaccurate and contradicted by generally accepted scientific and medical facts. For instance, this allegation erroneously assumes that:

a. All smokers are addicted or dependent upon nicotine.

b. All addicted or dependent smokers will compensate or titrate.

c. All smokers smoke primarily for the psychopharmacologic effects of nicotine and most smokers would stop smoking, but for the withdrawal phenomenon associated with the addiction or dependence upon nicotine.

Based on my clinical experience as a physician and psychiatrist, as a Forensic Psychiatrist and my knowledge of published scientific literature, I conclude that these assumptions are not accurate for many smokers.

55. Like many other behaviors, smoking varies among individuals. Each individual smoker must be evaluated in order to make a determination if they are addicted or dependent upon nicotine, and if they utilize compensation or titration when changing from a full flavored or a regular cigarette to Marlboro Lights.

56. In order for a smoker to compensate or titrate, they need to be addicted to or dependent upon nicotine. While there currently exist numerous definitions for the term addiction, one of the most frequently utilized definitions of addiction is found in the 1988 Surgeon General's Report on Smoking and Health, which states that addiction is the compulsive use of a psychoactive substance which is self-reinforcing.[1]

57. In Psychiatry, the term addiction has been replaced with a more specific term called Nicotine Dependence. In the Diagnostic and Statistical Manual of Mental Disorders (DSM-4-TR), the criteria for Nicotine Dependence include tolerance, withdrawal, the substance taken in larger amounts or over a longer period of time than was intended, a persistent desire or unsuccessful efforts to cut down or control substance use, a great deal of time is spent in activities necessary to obtain the substance, important social, occupational

or recreational activities are given up or reduced because of the substance use and the substance is continued despite knowledge of having a physical or psychological problem that is likely to have been caused or exacerbated by the substance.[15]

58. In order to diagnose a person with Nicotine Dependence, the evaluating professional needs to be trained and experienced. According to DSM-4-TR, "It is important that DSM-4 not be applied mechanically by untrained individuals. The specific diagnostic criteria included in DSM-4 are meant to serve as guidelines to be informed by clinical judgment and not meant to be used in a cookbook fashion."[15] Therefore, in evaluating the members of any class which involves the issue of Nicotine Dependence, individual assessment by trained professionals is required, as opposed to assuming that all smokers fulfill the DSM-4 criteria for Nicotine Dependence. Failure to perform such individual assessments would be a breach of the standard of care for mental health professionals.

59. A number of published studies have reported on the prevalence of Nicotine Dependence or addiction in the smoking population. The reported prevalence of Nicotine Dependence or addiction has varied significantly in these studies, ranging from as low as 32% to as high as 90%.[15-18] The variability between these studies underscores the necessity of individual professional assessments in diagnosing Nicotine Dependence. Based on these studies, as well as on my clinical experience as a physician and psychiatrist, I conclude that many smokers are not dependent on or addicted to nicotine and therefore do not compensate or titrate for nicotine.

60. Smokers who are not dependent or addicted to nicotine include, but are not limited to, the so-called "chippers" – also known as "occasional" smokers or "someday" smokers. These smokers do not smoke every day or, if they do, smoke a relatively small

number of cigarettes per day. Studies of these smokers establish that many of them settle into these smoking patterns for the long-term. According to the U.S. Centers for Disease Control and Prevention (CDC), 24.0% of current adult smokers in the U.S. population as of 2001 were "someday" smokers.[8] These smokers are not dependent or addicted to nicotine and do not smoke frequently enough to compensate or titrate to a constant serum level of nicotine.

61. Smoking behavior may still be variable even among chippers and other smokers who are not dependent or addicted to nicotine.

62. In summary, smoking is a complex behavior that varies significantly among individuals. Many smokers are not addicted to or dependent upon nicotine. These smokers do not compensate or titrate. For those smokers who are addicted or dependent, compensation and titration may play a role in their smoking behavior. However, even in these individuals, compensation and titration are variable and often incomplete. In addition, many other non-nicotine factors play a significant role in their smoking behavior.

63. Because of these facts, it is my opinion that it would be necessary to perform individual professional assessments for every class member in order to determine if they are dependent upon nicotine, if they are compensating and/or titrating, and which of the myriad of social, psychological, genetic and environmental factors play a significant role in their smoking behavior.

Further, affiant sayeth naught.

## References


1. The Health Consequences of Smoking, Nicotine Addiction, A Report of the Surgeon General, 1988, U.S. Department of Health and Human Services.

2. Nicotine in Psychiatry, Psychopathology and Emerging Therapeutics, Ed. Piasecki, M. and Newhouse, P., American Psychiatric Press, Washington, D.C., 2000.

3. Treating Tobacco Use and Dependence, Clinical Practice Guideline. U.S. Department of Health and Human Services. PHS. June 2000.

4. Gilbert, D., Smoking: Individual Differences, Psychopathology and Emotion, Chapter 1, Taylor & Francis, 1995.

5. Perkins, K., et al., Sex differences in nicotine effects and self-administration: review of human and animal evidence, Nicotine & Tobacco Research (1999) 1: 301-315.

6. Benowitz, N., Hatsukami, D., Gender differences in the pharmacology of nicotine addiction, Addiction Biology (1998) 3: 383-404.

7. Netter, P., et al., Personality related effects of nicotine, mode of application, and expectancies of performance, emotional states, and desire for smoking, Psychopharmacology (1998) 135: 52-62.

8. Morbidity and Mortality Weekly Report, Department of Health and Human Services, Centers for Disease Control and Prevention, April 11, 2003, Vol. 52, No. 14.

9. Monograph 13, Risks Associated with Smoking Cigarettes with Low Machine Measured Yields of Tar and Nicotine, Chapter 3, Benowitz, N., National Institutes of Health, October 2001.

10. Symptoms of Tobacco Withdrawal, John Hughes, M.D. et al., Arch Gen Psychiatry, (1991) 48: 52-59.

11. Nicotine withdrawal versus other drug withdrawal syndromes: similarities and dissimilarities. John Hughes, et al. Addiction (1994) 89: 1461-1470.

12. Sequelae to Smoking Cessation: A Review. Murry, A. and Lawrence, P., Clinical Psychology Review (1984) 4: 143-157.

13. J.E. Henningfield, "Pharmacologic Basis and Treatment of Cigarette Smoking," 45(12) J. Clin. Psychiatry 24-36, 26 (1984).

14. Scherer, G., Smoking Behavior and Compensation: A Review of the Literature, Psychopharmacology (1999) 145: 1-20.

15. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, American Psychiatric Association, Washington, D.C., 2000.

16. Giovino, Gary, et al., Epidemiology of Tobacco Use and Dependence. Epidemiologic Reviews (1995) 17: 48-65.

17. Donny, Eric C., Dierker, Lisa C., The absence of DSM-IV nicotine dependence in moderate-to-heavy daily smokers. Drug and Alcohol Dependence (2007), doi:10.1016/j.drugalcdep.2006.11.019.

18. Hughes, John R., et al., Prevalence of DSM/ICD-defined nicotine dependence. Drug and Alcohol Dependence 85 (2006) 91-102.

I, Eric M. Kaplan declare under the penalty of perjury that the foregoing is true and correct.

M.D.
_______________________
Eric M. Kaplan

19th day of January, 2010.

# Exhibits and Attachments To Declaration And Expert Disclosure Statement Of Eric M. Kaplan

(filed and served on all parties as an electronic DVD)