# Exhibit 19

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| IN RE: LIGHT CIGARETTES MARKETING AND SALES PRACTICES LITIGATION | MDL DOCKET NO. 1-09-MD-2068 ALL CASES |
|---|---|

**DECLARATION AND EXPERT DISCLOSURE STATEMENT OF
DENNIS W. CARLTON**

January 28, 2010

## I.      QUALIFICATIONS

1.      I, Dennis W. Carlton, am the Katherine Dusak Miller Professor of Economics at the Booth School of Business of The University of Chicago.  I received my A.B. in Applied Mathematics and Economics from Harvard University and my M.S. in Operations Research and Ph.D. in Economics from the Massachusetts Institute of Technology.  I have served on the faculties of the Law School and the Department of Economics at The University of Chicago and the Department of Economics at the Massachusetts Institute of Technology.  I specialize in the economics of industrial organization.  I am co-author of the book Modern Industrial Organization, a leading text in the field of industrial organization, and I also have published over 100 articles in academic journals and books.  In addition, I am Co-Editor of the Journal of Law and Economics, a leading journal that publishes research applying economic analysis to industrial organization and legal matters, Co-Editor of Competition Policy International, a journal devoted to competition policy, and on the Advisory Board of the Journal of Competition Law and Economics, a journal focusing on competition policy.  I have also served as an Associate Editor of the International Journal of Industrial Organization and Regional Science and Urban Studies, and on the Editorial Board of Intellectual Property Fraud Reporter.

2.      In addition to my academic experience, I served as Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice from October 2006 through January 2008.  I also served as a Commissioner of the Antitrust Modernization Commission, created by Congress to evaluate U.S. antitrust laws.  I have served as a consultant to the Department of Justice on the Horizontal Merger Guidelines (1992) of the Department of

1

Justice and Federal Trade Commission, as a general consultant to the Department of Justice and Federal Trade Commission on antitrust matters, and as an advisor to the Bureau of the Census on the collection and interpretation of economic data.  I currently am a Senior Managing Director of Compass Lexecon, a consulting firm that specializes in the application of economics to legal and regulatory issues.

3.      A copy of my curriculum vita, which contains a listing of my previous testimony, is attached to this report as Exhibit A. Compass Lexecon bills my time at $1250 per hour. Compass Lexecon's reimbursement does not depend on the outcome of this case.

## II.      OVERVIEW AND SUMMARY

### A.  Task

4.      As part of my work in this matter, I and my staff, under my direction, have reviewed among other things the Complaints for various state cases; and the Expert Report of Jeffrey E. Harris, M.D., Ph.D., December 6, 2009, in In Re: Light Cigarettes Marketing and Sales Practices Litigation, United States District Court, District of Maine, MDL Docket No. 1-09-MD-2068, All Cases ("Harris Report").  A complete list of the materials upon which I explicitly rely in reaching my opinions is provided in Exhibit B.

5.      I understand that the Plaintiffs claim that Philip Morris USA Inc. ("PM USA") deceptively marketed certain cigarettes as being lower in tar and nicotine than full-flavored cigarettes, including through the use of the descriptors "lights" and "ultra lights". [1]

---

[1] "Full-flavor" cigarettes refer to non-light cigarettes.

6.      Plaintiffs have put forth Dr. Harris's Expert Report (December 6th, 2009), in which he proposes a method to estimate total consumer expenditures on Marlboro Lights and the profit that PM USA earned on Marlboro Lights sales.

7.      I have been asked by counsel for PM USA to address the following questions:

a.   Does the Harris Report offer a reliable measure of the amount by which consumer expenditures on Marlboro Lights, and the profits that PM USA earned on those expenditures, would have been lower, but for PM USA's alleged wrongful conduct (i.e., in the "but-for world")?

b.   Does the Harris Report reliably establish any injury to the proposed class as a whole or to any individual class member?  In particular, has Dr. Harris limited his estimates of ill-gotten expenditures and profits to consumers who would not have purchased the products but for the alleged bad conduct?

c.   Are available industry data consistent with the implications of Plaintiffs' allegation that the proposed class experienced common injury?

**B.  Summary of Conclusions**

8.      Based on my expertise as an economist, my review of the materials I received and my ongoing analysis of industry data, which I discuss at greater length below, my initial conclusions are:

a.   Dr. Harris fails to connect his estimates of PM USA's sales or profits in any way to PM USA's alleged wrongful conduct.  Therefore, the Harris Report does not offer a reliable measure of the amount, if any, by which consumer expenditures

on Marlboro Lights, and the profits that PM USA earned on those expenditures, would have been lower in the "but-for" world.  Specifically, Dr. Harris makes no attempt to exclude purchases made by individuals who were not affected by PM USA's alleged bad conduct, and thus includes purchases that would have taken place, even in the absence of this conduct.  Dr. Harris also makes no attempt to account for Marlboro Lights smokers who would have switched to other PM USA products in the but-for world, and thus overstates the extent to which PM USA's sales and profits would have fallen in the absence of the alleged bad conduct.

b.  The Harris Report provides no basis from which to conclude that any common injury was experienced by members of the proposed class.  As I have noted above, Dr. Harris fails to establish a link between the alleged bad acts and any extra sales or profits that PM USA earned as a result.  This failure renders his analysis unrelated not only to class-wide injury, but also to the injury experienced by any individual class member.  Dr. Harris provides no evidence that either market prices or consumption of Marlboro Lights changed as a result of PM USA's alleged bad conduct, and thus provides no basis to conclude that the class of Plaintiffs suffered a common injury.

c.  Finally, my examination to date of industry data, which I discuss below, reveals that neither market prices nor consumption for Marlboro Lights fell relative to full-flavor Marlboros when the alleged bad acts were revealed, facts that run directly contrary to Plaintiffs' allegations that PM USA's bad conduct had a substantial impact on demand for a number of consumers of Marlboro Lights.

4

Thus, this available evidence undermines Plaintiffs' allegation of common injury to the proposed class.

9.      I base these conclusions on several key economic observations and empirical findings, which I discuss in further detail in the remainder of this report.  My work in this matter is ongoing, and I reserve the right to update my findings.

10.     The remainder of this report is structured as follows. Section III presents my reasons for concluding that the Harris Report does not provide a reliable measure of the amount by which consumer expenditures on Marlboro Lights, and the profits that PM USA earned on those expenditures, would have been lower in the "but-for" world.  In Section IV, I explain that, not only does the Harris Report fail to provide reliable estimates of PM USA's Marlboro Lights sales and profits, but it also fails to address the question of common injury to the proposed class. Section V presents the results of my examination to date of industry data, which suggests that PM USA's alleged bad conduct does not appear to have had an impact on either the market prices or the consumption levels for a number of consumers of Marlboro Lights during the class period.

III.    **THE HARRIS REPORT DOES NOT OFFER A RELIABLE METHOD FOR MEASURING THE AMOUNT BY WHICH PM USA'S SALES OF MARLBORO LIGHTS OR PROFITS WOULD HAVE BEEN LOWER IN THE BUT-FOR WORLD.**

11.     In his Report, Dr. Harris proposes a set of calculations to estimate total consumer expenditures on Marlboro Lights, and PM USA's total profits from Marlboro Lights, in a particular state and in a particular year.  Dr. Harris illustrates this methodology with the example

of the state of California in 2005.  However, as I discuss in this section, the Harris Report

contains no analysis of, and provides no insights into, either the losses experienced by the

proposed class or monies wrongfully obtained by PM USA; rather, it is simply an exercise in

accounting arithmetic.

12.     Dr. Harris first estimates the number of Marlboro Lights sold as the product of

two quantities: the total number of cigarettes (regardless of brand) sold in California in 2005, and

his own estimate of Marlboro Lights' share of those sales.  He estimates Marlboro Lights' share

of sales by computing the product of two other quantities: Marlboro Lights' share of all PM

USA's cigarette shipments to California in 2005 and PM USA's share of total national cigarette

sales in 2005.  This calculation, it should be noted, assumes that PM USA's share of cigarette

sales in California (and, if extended to estimate damages elsewhere, every other state) is identical

to its national share of sales.

13.     Having used this method to estimate the number of Marlboro Lights sold in

California in 2005, Dr. Harris multiplies this number by an estimate of the average price of

premium cigarettes in California in 2005 to arrive at an estimate of total consumer expenditures

on Marlboro Lights in the state in that year.  Similarly, to estimate PM USA's profits from

Marlboro Lights in California in 2005, he multiplies his estimate of the number of Marlboro

Lights sold in California in 2005 by an estimate of PM USA's national average per-unit profit in

2005.

14.     Plaintiffs seek restitution for the monies that PM USA wrongfully obtained as a

result of the alleged bad conduct.  However, the calculations proposed in the Harris Report

would at best provide estimates of PM USA's total sales revenues and profits from Marlboro

6

Lights. Dr. Harris's proposed methodology ignores the necessity of establishing a link between these calculations and any effect of the alleged bad acts. Because his proposed calculations do not distinguish between the monies that PM USA received as a result of the challenged conduct and the monies it would have received even in the absence of the challenged conduct, they cannot provide any evidence relevant to the restitution sought by the Plaintiffs.

15.     For example, Dr. Harris's calculations make no allowance for the possibility that some consumers would have chosen to smoke Marlboro Lights even in the absence of the alleged bad acts. Moreover, Dr. Harris makes no allowance for the possibility that, in the absence of the alleged bad acts, some consumers would have chosen to smoke another PM USA product instead of Marlboro Lights, in which case the increased sales and profits of those products would have offset the potential loss in Marlboro Lights sales and profits. Dr. Harris's analysis would make sense <u>only</u> if no sales of Marlboro Lights would have occurred absent the alleged bad acts <u>and</u> if none of those lost sales would have been gained by other PM USA products. He offers no evidence to verify either assumption.

16.     My analysis to date of industry data, described in Section V below, casts significant doubt on the assumption, inherent in Dr. Harris's analysis, that consumers would not have purchased Marlboro Lights even in the absence of the challenged conduct. Therefore, if used to calculate sales and profits for disgorgement, Dr. Harris's calculations would include revenues earned from consumers who were not affected by PM USA's alleged bad conduct and would lead to the disgorgement of revenues that PM USA would have received even in the "but-for" world. If Dr. Harris's calculations were used to measure injury, they would find injury to the proposed class even if none existed. Therefore, the calculations proposed in the Harris

Report are unreliable as a method for measuring PM USA's "ill-gotten gains" or consumer injury due to the alleged wrongful conduct.

### IV.   THE HARRIS REPORT MAKES NO ATTEMPT TO ESTABLISH COMMON INJURY.

17.     I have already explained that Dr. Harris's methodology does not measure the ill-gotten gains from PM USA's alleged bad conduct and cannot be linked to injury experienced by consumers.  This implies that his analysis cannot be used to determine whether the proposed class suffered common injury from PM USA's alleged wrongful acts.

18.     In order to determine whether and to what extent PM USA's alleged wrongful conduct caused a common economic injury to members of the proposed class, Dr. Harris could have examined, but did not, the effect of this conduct on the demand for Marlboro Lights by providing evidence on two key questions: 1) Were prices of Marlboro Lights affected by PM USA's alleged misrepresentations? and 2) Was total consumption of Marlboro Lights affected by PM USA's alleged misrepresentations?  If the answer to both these questions is no, then this would directly undermine the conclusion that the alleged bad acts created a common injury to the proposed class, for the following reasons.

19.     First, without an impact on pricing, smokers of Marlboro Lights would not have experienced a common injury from PM's alleged misrepresentations through a general elevation in cigarette prices, relative to what smokers would have paid in the but-for world.

20.     Second, the absence of an impact on the total consumption of Marlboro Lights would suggest that a number of consumers of the proposed class did not alter their purchasing

behavior because of the alleged misrepresentations. That is, a potential source of injury to smokers of Marlboro Lights arises from the possibility that some members of the proposed class may have purchased as a result of PM's alleged misrepresentations, and so smoked more Marlboro Lights than they would have in the "but-for world". On the other hand, members of the class who did not purchase as a result of PM USA's reported tar and nicotine levels would not have been injured, as they would have acted similarly in the but-for world (in terms of smoking Marlboro Lights).

21.     If total consumption levels of Marlboro Lights did not change due to PM USA's alleged bad conduct, this would suggest that many members of the proposed class were not "misled" into purchasing additional Marlboro Lights, and so were not injured. Hence, the class as currently defined would include many individuals who were not affected in a common way.

22.     My preliminary analysis, which I describe below, shows that neither market prices nor total consumption levels of Marlboro Lights appear to have been substantially affected by PM USA's alleged wrongful conduct. Hence, this evidence is inconsistent with a common injury to the proposed class members from this conduct.


V.      **INDUSTRY DATA UNDERMINE PLAINTIFFS' ALLEGATIONS THAT PM USA'S MISREPRESENTATIONS HAD A SUBSTANTIAL IMPACT ON THE PRICING AND CONSUMPTION OF MARLBORO LIGHTS.**

23.     As discussed in Section IV, a key empirical question in assessing common injury is whether PM USA's alleged misrepresentations with respect to reported tar and nicotine yields were important factors driving demand for Marlboro Lights during the class period. In particular, Plaintiffs' theory of injury requires that the alleged bad conduct altered consumer demand for

Marlboro Lights during the class period, relative to what it would have been in the "but-for world", and thereby affected market prices and/or consumption of Marlboro Lights.

24.      To examine whether PM's alleged misrepresentations affected pricing or consumption of Marlboro Lights, I evaluated the changes in each in response to the public dissemination of information on the health risks of light cigarettes.  Of particular importance, NCI Monograph 13, which stated explicitly that light cigarettes may not provide any health benefits, was published in November 2001.  Since that time, additional information has been disseminated.  For example, since 2002, PM USA's website has stated explicitly that:

> Smokers should not assume that brand descriptors such as "light" or "ultra-light" indicate with any precision either the actual amount of tar and nicotine they will inhale from any particular cigarette, or the relative amount as compared to competing cigarette brands. Some researchers report that consumers who smoke "light" cigarettes inhale as much tar and nicotine as from full-flavor brands….Philip Morris does not imply in its marketing, and smokers should not assume, that lower-yielding brands are "safe," or are "safer" than full-flavor brands.[2]

Additionally, beginning in 2002 and continuing through 2008, PM USA's light cigarette packages included explicit disclaimers against the assumption that smoking light cigarettes provides health benefits relative to smoking regular cigarettes.[3]

---

[2] Philip Morris Usa Inc.'s Motion for Summary Judgment on Plaintiffs' Claims for Purchases After December 1, 2002 and Memorandum in Support, United States District Court District Of Maine, 1/22/2010, p. 8.

[3] Philip Morris Usa Inc.'s Motion for Summary Judgment on Plaintiffs' Claims for Purchases

25.     The observed changes in market prices and consumption of Marlboro Lights after the release of Monograph 13 in 2001 provide a measure of how consumer demand was affected by PM USA's alleged bad conduct.  To the extent that prices and consumption for Marlboro Lights did not fall after 2001, this would suggest that PM USA's alleged misconduct is unlikely to have resulted in a common injury to the proposed class.[4]

### A. The Evidence Indicates that the Price of Marlboro Lights did not Fall Substantially Relative to the Price of Full Flavor Marlboro Cigarettes After the Health Warnings, as Plaintiffs' Allegations Predict.

26.     One way in which the proposed class in principle could have suffered a common injury would be if PM USA's alleged misrepresentations led consumers to alter their demand for Marlboro Lights, and thereby caused the market price of Marlboro Lights to rise.  If so, then after better health information regarding light cigarettes became widely disseminated – at least by 2001 – the demand for Marlboro Lights should have been affected, and consequently, the price of Marlboro Lights should have fallen.

27.     Using his methodology, Dr. Harris estimated that 237.7 million packs of Marlboro Lights were sold in California in 2005.  He also estimated PM USA's profits from Marlboro Lights in California in 2005 at $111.7 million.  To put this latter figure in perspective, in order to justify this amount as an injury to the proposed class through the effect of higher prices for Marlboro Lights, PM USA would have had to be able to charge $0.47 more per pack for

---

After December 1, 2002 and Memorandum in Support, United States District Court District Of Maine, 1/22/2010, p. 5-6.

[4] In implementing a "before-and-after" analysis, one is implicitly assuming that no other important factors that influence the variable under analysis are changing, besides the factors controlled for in the analysis.

Marlboro Lights because of the alleged wrongful acts.  However, my analyses to date, presented in this section, suggest that there is no empirical support for such a claim.

28.     Because there are other factors besides new health information which also affect the market price for Marlboro Lights, a reliable economic analysis must compare not simply the price of Marlboro Lights before and after the dissemination of the new health information, but should instead compare changes in the price of Marlboro Lights with changes in the price of a benchmark cigarette unaffected by health information regarding light cigarettes.  A natural benchmark for Marlboro Lights is full-flavored Marlboro cigarettes, sometimes known as Marlboro "Reds".  If the price of Marlboro Lights did not fall relative to the price of Marlboro Reds after customers learned that light cigarettes were not as healthy as they previously believed, this would be evidence against a common injury to consumers from higher prices of Marlboro Lights.

29.     To determine whether the price consumers paid for Marlboro Lights, relative to Marlboro Reds, changed after information about their lack of health benefits became public, I examined retail pricing data for cigarettes that are collected and maintained by Information Resources, Inc. (IRI) on a store-by-store basis.  To clarify the nature of the analysis, I understand that PM USA markets cigarettes under general "brand families" including, for instance, Marlboro.  These families include cigarettes with a wide variety of different characteristics and packaging, including different flavors (e.g., menthol and non-menthol), package types (e.g., box or soft pack), and other variations.  For simplicity, I will refer to these different products within the same brand family as different "packing titles".  For my initial analysis, I focus on non-menthol Marlboro "King" and Marlboro "100" cigarettes sold either in boxes or in soft-packs in

California.  PM USA produces both full-flavor and light versions of each of these packing titles, and together, they constitute the vast majority of all Marlboros sold.

30.     Figure 1 plots the average prices of Marlboro Reds and Marlboro Lights among these packing titles across all California retail establishments surveyed by IRI, for each year between 1998 and 2008.[5]  Examination of Figure 1 clearly shows that pricing trends of Marlboro Lights do not differ materially from those of full-flavor Marlboro cigarettes.  In fact, retail prices of Lights and Reds appear to track each other very closely.[6]

31.     I understand that PM USA has generally set the same list prices for all similar-count cigarette packing titles within a brand family, and with few exceptions, offers uniform discounts and price promotions within a brand family.[7]  My calculations from IRI data, which show that average per-pack prices of Marlboro Lights and Marlboro Reds are very similar at all dates, are consistent with this understanding.

32.     The fact that the retail prices of Lights and Reds did not diverge substantially after the widespread dissemination of health information about light cigarettes beginning in 2001 means that the evidence provides no support for any claim that the alleged bad acts elevated the price of Marlboro Lights by anything like the 47 cents that I derived earlier from Dr. Harris's calculations.

---

[5] I calculated the prices of Reds and Lights separately for each of the packing titles specified in
    ¶29, for each retail location in California surveyed by IRI, and for cartons and single-pack
    sales.  Then I computed the average (weighted by the number of packs sold) of these prices
    in each week, and then averaged within years to arrive at the values plotted in Figure 1.
[6] I have also performed this analysis for all other states and find a similar result.
[7] Declaration of Bruce Neidle, ¶¶4, 7.

33.     For my next analysis, I examined IRI data for each location surveyed across the

U.S.  Specifically, I calculated the difference in price between Marlboro Lights and Marlboro

Reds separately for each of the packing titles specified above at each retail location.  I then

performed a standard statistical test to determine whether the average of these differences

(weighted by the total number of packs of Lights and Reds sold) changed between two time

periods, December 1998 – October 2001 and January 2003 – December 2008, representing the

market before and after the dissemination of health information regarding light cigarettes.[8]  The

result of this test indicates that, within the same packing title and the same retail location, the

price of Marlboro Lights did not fall (in fact it rose by $0.004) relative to the price of Marlboro

Reds.  Most importantly, the evidence indicates that, relative to the price of Marlboro Reds, the

price of Marlboro Lights did not fall by anything like the $0.47 I derived earlier from Dr.

Harris's calculations.


### B. The Evidence Indicates that Consumption of Marlboro Lights did not Fall Substantially Relative to Consumption of Full Flavor Marlboro Cigarettes After the Health Warnings, as Plaintiffs' Allegations Predict.

34.     Another way in which members of the proposed class in principle could have

suffered a common injury from PM USA's alleged bad conduct would be if the alleged

misrepresentations caused all consumers to purchase more Marlboro Lights than they otherwise

---

[8] Specifically, I calculated the difference in prices between Reds and Lights for each of the packing titles used in ¶29, for each retail location surveyed by IRI, and for cartons and single-pack sales separately.  Then I computed the average (weighted by the number of packs of Reds and Lights sold) of these differences for each week.  I then ran a regression of these prices against a constant and an indicator variable for weeks in the latter period, January 2003 – December 2008, adjusting the standard error for autocorrelation using the Newey-West procedure with lags up to six periods.

would have.  If so, then when better health information regarding light cigarettes became more widely disseminated after 2001, the demand for Marlboro Lights should have fallen, and consequently, total consumption of Marlboro Lights should have declined.  In other words, if consumers place a large value on the perceived health benefits of light cigarettes, as Plaintiffs allege, one would expect that the consumption levels of light cigarettes would drop dramatically after information regarding the health risks associated with lights was disseminated.

35.    As in the case of market prices, which I analyzed above, a reliable economic analysis requires a benchmark with which to compare changes over time in the total consumption of Marlboro Lights.  For my analyses to date, I have used full-flavor Marlboro Reds as a benchmark.  Specifically, I examined the share of Marlboro Lights relative to all Marlboro shipments for two different segmentations of the data.  In the first segmentation, I look at only the same non-menthol Marlboro "King" and "100" packing titles that I used for my price analysis, which constitute the vast majority of all U.S. Marlboro sales.  In the second segmentation, I look at all Marlboro packing titles.

36.    If, after customers learned about the health profile of light cigarettes, the total consumption of Marlboro Lights did not fall substantially relative to Marlboro Reds, then this would suggest that some consumers were not affected by PM USA's alleged misrepresentations, and therefore, that there was no common injury to Plaintiffs based on additional purchases.

37.    Table 1 presents the share of Marlboro shipments held by Marlboro Lights between 1995 and 2008.  My analysis of these data to date indicates that Marlboro Lights sales did not decline substantially as a share of all Marlboro cigarette sales after the dissemination of additional information about the health characteristics of light cigarettes in the early 2000s.

15

Between 2001 and 2008, the share of total Marlboro shipments accounted for by Marlboro Lights increased for both the top packing titles and for all packing titles.

38.     The results from this analysis suggest that the dissemination of information concerning the relative health risks associated with light cigarettes since 2001 did not lead to a large decline in the consumption of Marlboro Lights.  This finding undermines Plaintiffs' claim that the class suffered a common injury from PM USA's alleged wrongful conduct.

39.     This finding also undermines Plaintiffs' claim that PM USA's alleged bad conduct substantially increased consumer demand for Marlboro Lights.  In other words, the fact that the consumption of Marlboro Lights has not dropped dramatically relative to Marlboro Reds – a product which, according to Plaintiffs' theory, has not lost value as a result of the expanded information – undermines Plaintiffs' central allegation that PM USA's bad conduct was an important factor driving each consumer's demand for Marlboro Lights.

40.     My work in this matter is ongoing, and I reserve the right to update my findings.

Dated January 28, 2010

*Dennis W. Carlton*

Dennis W. Carlton



**Figure 1:  Average California Retail Prices for Major Marlboro Full Flavor and Light Cigarettes 1998-2008**

Source:    IRI.

Notes:    Major Marlboro cigarettes include regular-flavor "King" and "100" varieties.

Averages are weighted by packs sold.

**Table 1: Marlboro Lights Share of Marlboro Cigarette Shipments**
**1995-2008**

| Year | Four Leading Packing Titles | All Marlboro Packing Titles |
|------|------|------|
| 1995 | 50.3% | 50.9% |
| 1996 | 52.0% | 52.8% |
| 1997 | 53.6% | 54.5% |
| 1998 | 52.6% | 56.8% |
| 1999 | 54.4% | 59.0% |
| 2000 | 55.9% | 60.7% |
| 2001 | 57.0% | 61.8% |
| 2002 | 57.9% | 62.9% |
| 2003 | 59.1% | 64.0% |
| 2004 | 59.3% | 63.6% |
| 2005 | 59.3% | 63.4% |
| 2006 | 59.2% | 63.3% |
| 2007 | 59.2% | 62.4% |
| 2008 | 59.3% | 62.4% |

Source:  MSA shipments data.

Notes:  Four leading packing titles are "King Box", "King Soft", "100 Box" and "100 Soft".

Share is calculated as shipments of lights and ultra-lights, divided by shipments of all full-flavor, light, and ultra-light Marlboro cigarettes.

Light, ultra-light, and full-flavor cigarettes are identified by whether tar level is "Light", "Ultra", or "Full Flavor".

# Exhibits And Attachments To Declaration And Expert Disclosure Statement Of Dennis W. Carlton

(filed and served on all parties as an electronic DVD)