# Exhibit 25

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN RE: LIGHT CIGARETTES MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) )    **MDL  DOCKET NO.: 1:09-2068** |

IN RE: LIGHT CIGARETTES
MARKETING AND SALES PRACTICES
LITIGATION        ) ) ) ) )    **MDL  DOCKET NO.: 1:09-2068**

This Document Relates to:       )

MILES TYRER, individually and on behalf of all others similarly situated.      )   Case No. 3:09-CV-0052-W-CAB

              Plaintiff        )

              v.         )

PHILIP MORRIS USA, INC., a Virginia corporation and ALTRIA GROUP, INC., a Virginia Corporation      )

            Defendants       )

---

## PLAINTIFF MILES TYRER'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT PHILIP MORRIS, USA, INC.'S FIRST SET OF INTERROGATORIES FOR PURPOSES OF CLASS CERTIFICATION, NOS. 1, 3, 21-25

Pursuant to Federal Rule of Civil Procedure 33, Plaintiff Miles Tyrer("Plaintiff"), by and through his attorneys, hereby objects and responds to Defendant Philip Morris USA Inc.'s First Set of Interrogatories for Purposes of Class Certification ("Interrogatories") as follows:

### DEFINITIONS

A.     "Light Cigarettes" and "lights cigarettes" refer to any of Defendants' cigarettes labeled and/or represented as "Light," "Lights," "Ultra-Light," "Ultra-Lights," "low tar," "lower

1

tar," "lowered tar," "low nicotine," "lower nicotine," "lowered nicotine," and/or any similar descriptor.

 B. "Defendants" refers to Philip Morris USA, Inc. and Altria Group, Inc.

 C. "Complaint" refers to Second Amended Complaint

 D. "Putative Class" refers to the following, as defined in the Second Amended Complaint: "All persons residing in the State of California who purchased for personal use and not for resale Defendants' Light Cigarettes that are labeled 'Light' and/or 'Ultra Light' and/or purport to have lower tar and nicotine than conventional, full-flavor cigarettes ('Light Cigarettes'), during the Class Period, through the present."

## GENERAL OBJECTIONS

 A. Plaintiff has not yet completed discovery or preparation for trial. Therefore, Plaintiff's responses are made only on the basis of information that is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of Plaintiff's knowledge or theory regarding any particular subject and are made without prejudice to Plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, after discovery and trial preparation have been completed.

 B. Plaintiff objects to the Interrogatories to the extent they purport to impose upon Plaintiff any obligation beyond those required by Federal Rule of Civil Procedure 33.

 C. Plaintiff objects to the Interrogatories to the extent that they seek information that is not reasonably calculated to lead to the discovery of admissible evidence.

 D. Plaintiff objects to the Interrogatories to the extent that they present legal conclusions, certain information, allegations or ideas as undisputed fact. Plaintiff's responses to the Interrogatories do not constitute, and shall not be construed as, either directly or by

implication, any assent to, or agreement with, any conclusion or characterization contained herein.

     E.    Plaintiff objects to the Interrogatories to the extent that they are vague or ambiguous or contain terms or phrases that are undefined and subject to varying interpretations or meanings and that may, therefore, make responses misleading or incorrect.

     F.    Plaintiff objects to the Interrogatories to the extent that they call for the production of information pertaining to or protected by any privilege, protection or immunity (including, but not limited to the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection or immunity) ("Privileged Information"). Plaintiff does not intend to waive any privilege, protection or immunity related to any matter referred to in response to the Interrogatories. If any Privileged Information is inadvertently produced, the production of such information shall not be deemed or construed as a waiver of any applicable privilege, protection or immunity, either generally or with respect to the specific information produced, and Plaintiff expressly reserves the right to have such information returned.

     G.    Plaintiff objects to the Interrogatories as unduly burdensome to the extent that information requested is within the knowledge of Defendants or within public domain or otherwise equally available to Defendants and, thus, more conveniently obtained from Defendants' own files or other sources.

     H.    Plaintiff objects to each Interrogatory to the extent it constitutes a premature contention interrogatory for which Defendant has failed to meet its burden to justify requiring answers prior to the completion of essential discovery. *See In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 338-339 (N.D. Cal. 1985).

     I.    Plaintiff objects to the Interrogatories to the extent that they present legal conclusions or certain information, allegations or ideas as undisputed fact. Plaintiff's responses to the Interrogatories do not constitute, and shall not be construed as, either directly or by implication, any assent or agreement with any conclusion or characterization contained therein.

J.      Plaintiff reserves all evidentiary objections under the Federal Rules of Evidence. By responding to these Interrogatories, Plaintiff does not admit the competence, admissibility or relevance of any fact or document referenced, and does not admit the truth or accuracy of any characterizations contained in the Interrogatories.

K.      Plaintiff incorporates the above General Objections into each specific response to the Interrogatories set forth below as if set forth in full therein.  The response to an interrogatory shall not operate as a waiver of any applicable specific or general objection.

## OBJECTIONS TO DEFINITIONS IN DEFENDANT'S FIRST SET OF INTERROGATORIES FOR PURPOSES OF CLASS CERTIFICATION

Plaintiff objects to the following definitions contained in the "DEFINITIONS" section of Defendant's Request for Interrogatories and incorporates each objection by reference into the responses below:

1.      Plaintiff objects to the definition of "Public Health Community" in Definition No. 4 because it was not used and is therefore irrelevant to Defendant's Interrogatories or Plaintiff's Responses.

2.      Plaintiff objects to the definition of "FTC Method" in Definition No. 8 in that the description of the method and duration of its use is inaccurate and to the extent that such definition does not refer to the Cambridge Filter Method.

3.      Plaintiff objects to the definition of "[c]omplete compensation" in Definition No. 10 because it is ambiguous, and further implies that such "compensation" is measured by the FTC Method.

4.      Plaintiff objects to the definition of "[p]ermanent compensation" in Definition No. 11 in that it is overly broad, ambiguous, and calls for speculation.

5.      Plaintiff objects to the definition of "[t]itrate" and "titration" in Definition No. 12

4

because it is an improper use of the terms, commonly understood to represent a volumetric analysis. Plaintiff also objects in that the definition is overly broad, irrelevant, and inappropriately refers to the manner in which an individual smokes as being measurable by the FTC Method. Furthermore, Defendant's definition assumes facts not in evidence by implying that individuals attempt to "achieve a particular level of nicotine or smoke exposure," change the manner in which they smoke when switching from one cigarette brand to another with "the same tar and nicotine yields," and alter their conduct when continuing to smoke the same kind of cigarettes.

6.      Plaintiff objects to Definition No. 16 because it is irrelevant to the extent it refers to a Request for Production of Documents.

## PLAINTIFF'S GENERAL RESPONSE TO DEFENDANT'S DISCOVERY

While Plaintiff's claims are found more specifically in Second Amended Complaint, the misrepresentations, both express and implied, were those raised in Judge Kessler's opinion and include but are not limited to the following:

Defendants have stated publicly that they produce low tar cigarettes only to accommodate consumer taste preferences for "lighter," "milder" tasting cigarettes, and that they do not intend their use of brand descriptors or their marketing of low tar cigarettes to imply a less harmful product. 476 ¶ 2239  "Philip Morris has always denied publicly that it markets low tar cigarettes as safe or safer than full-flavor brands;" and  "Philip Morris has always denied publicly that it uses brand descriptors such as 'light' and 'ultra light' to communicate they are safe or safer than full-flavor brands." 527 ¶ 2471 While defending the FTC Method and resisting proposed changes to it, Defendants have made repeated public assertions that they have substantially reduced the tar and nicotine deliveries of cigarettes, citing the FTC ratings as their primary support for this assertion. 502 ¶ 2357 According to Nancy Lund, Senior Vice President of Marketing at Philip Morris, Philip Morris was aware in the 1970s and 1980s that some consumers believed that light/low tar cigarettes were safer than full-flavored cigarettes. She also noted that, during this time period, Philip Morris marketed such cigarettes to these consumers and profited from those sales. 524 ¶ 2461 Although James Morgan conceded that "we were aware of that," he admitted that, despite being armed with this knowledge, Philip Morris took no additional steps to counter that mistaken perception. 524 ¶ 2462 The Defendants have repeatedly made vigorous and impassioned public denials-before Congressional committees, in advertisements in the national

print media, and on television-that neither smoking nor nicotine is addictive, and that they do not manipulate, alter, or control the amount of nicotine contained in the cigarettes they manufacture. The Findings of Fact contained in this Section and Section V(B), supra, provide overwhelming evidence that those statements are false. 374 ¶ 1758 In sum, the evidence as presented in these Findings of Fact is overwhelming that Defendants have, over the course of many years, time and again-and with great self-righteousness-denied that they manipulated the nicotine in cigarettes so as to increase the addiction and dependence of smokers. Those denials were false. 384 ¶ 1763

Many of Defendants' advertising campaigns had, over the course of the preceding four decades, "impl [ied] that smoking a particular brand solves the health problem or at least minimizes the risk." 509 ¶ 2386   "When filtered and low-yield cigarettes were introduced into U.S. markets, they were heavily promoted and marketed with both explicit and implicit claims of reducing the risk of smoking... [T]he tobacco companies have appealed to health concerns of smokers at least since 1927. Claims about tar and nicotine levels appeared as early as 1942"). 510 ¶ 2391 Internal Philip Morris documents show that Philip Morris conducted consumer marketing research not just on individual low tar cigarette brands, but on low tar cigarettes as a category. These documents establish that Philip Morris has long known and intended that its advertisements and marketing for low tar cigarettes, featuring claims of lowered tar and nicotine and "light" and "ultra light" brand descriptors, contributed to and reinforced consumers' mistaken belief that low tar cigarettes are better for their health, and encouraged consumers to smoke them for this reason. 524 ¶ 2460

Over the last 50 years Philip Morris has used a variety of marketing techniques to reassure smokers that certain brands and types of cigarettes would reduce their health risk from smoking by reducing their exposure to tar :

MERIT

Philip Morris's Merit brand of cigarettes utilized a marketing strategy, titled "Merit Solutions," that was intended to communicate to consumers that "Merit was a solution to the problem of finding a low tar brand with good taste." 477 ¶ 2242  Philip Morris's marketing for some of its low tar cigarette brands, including Merit, "encouraged consumers [whom Philip Morris referred to as potential 'down-switchers'] to switch from regular cigarettes to low tar cigarettes." 518 ¶ 2430

In 1976, Philip Morris introduced a new brand, Merit, at 9 milligrams tar with "enriched flavor." Merit formed the basis for line extensions to Merit Ultra at 4 milligrams and later Merit Ultima at 1 milligram. The three were jointly advertised in a "low, lower, lowest" presentation of the product line. 518 ¶ 2429
The following Merit advertisements, in conformity with the internal marketing documents detailed above, communicated to consumers that, with Merit, they could reduce their tar intake and thus reduce their health risk, without sacrificing taste:

1976: "New Low Tar Entry Packs Taste of Cigarettes Having 60% More Tar
1976: "The greatest challenge to cigarette-makers in the last two decades has been how to make a low tar cigarette that wasn't 'low'; in taste. It seemed impossible. Until now. After twelve long,

hard, often frustrating years, Philip Morris has developed the way to do it. The cigarette is called MERIT. It delivers only 9 mg. tar. One of the lowest tar levels in smoking today
1977: "New MERIT 100's. Only 12 mg. of tar. Yet packed with extra flavor. The kind of flavor that makes 'low tar, good taste' a reality for 100's smokers
1978: "Merit Solving Smoker Dilemma."
1978: " 'Best Move Yet.' MERIT['s] .... ability to satisfy over long periods of time could be the most important evidence to date that MERIT is what it claims to be: The first real alternative for high tar smokers."
1978: "Research concludes MERIT taste makes move from high tar to low tar smoking unexpectedly easy
1988: "You Won't Miss What You'll Miss."
1988: "Our Less Is Your Gain."
1989: "Smoke This Page. If That Reminds You of Your Ultra Lights, Read This Ad.".
1994: "You can do it! You really can switch down to lower tar and enjoy satisfying taste."
1994: "Yes you can! You can switch down to lower tar and still get satisfying taste. You've got MERIT 519 ¶ 2436

Merit marketing focused more heavily on communicating that it is low in tar, and less on sending a message about the brand's taste. 521 ¶ 2441 Merit's "positioning should convey acceptability of smoking." "Additive Free" Merit line extension: "Additive-free is an excellent fit with 'light' " because it "[r]einforces 'better for you.' " 521 ¶ 2443

PARLIAMENT

Philip Morris advertisements in the early 1950s made explicit claims of reduced harm, such as the following:

1952: "If, like millions today, you are turning to filter cigarettes for pleasure plus protection ... it's important that you know the Parliament Story."
1952: "Parliament's exclusive Filter Mouthpiece gives you the important extra protection of the Parliament 'Safety-Zone' Construction.... As the irritants, brown tars and colorless nicotine are trapped, they remain where they belong-in the recessed filter, completely out of contact with your lips."
1954: "You're So Smart to Smoke Parliaments." (1956 Parliament advertisement in Sports Illustrated magazine noting same).
1954: "The cigarette that takes the FEAR out of smoking!" 513 ¶ 2400

As noted in the 1981 FTC Report on cigarette advertising, Philip Morris's Parliament advertisements from the time period preceding the Report (i.e., late 1970s-1981) implied that its "special filters minimize the risks of smoking." FTC, 1981 Report at 2-12 524 ¶ 2458

A "Benefit Statement" in the document was: "Parliament Lights-since tar on the filter tip never touches your lips, the taste is refreshingly light." 523 ¶ 2455

A 1975 Parliament advertisement in Sports Illustrated magazine stated that, although cigarette holders gave "cleaner taste," there was "[n]o need for a cigarette holder today. Parliament's filter

is recessed, so you taste only rich, clean tobacco flavor. It's the neatest trick in smoking." 523 ¶ 2456

A 1977 Parliament advertisement in Cosmopolitan magazine stated: As you smoke, tar builds up on the tip of your cigarette filter. That's "filter feedback." Ordinary flush-tipped cigarettes put that tar build-up against your lips. And that's where Parliament has the advantage. Parliament's filter is recessed to keep tar buildup from touching your lips. 523 ¶ 2457

## MARLBORO

A December 1971 Marlboro Lights "Product Promotion Plan" distributed to the Philip Morris sales force discussed the introduction of Marlboro Lights and ways to market and maximize sales of the brand. It stated: "The introduction of Marlboro Lights is a very timely move on the part of your company. The consumer is becoming increasingly aware of tar and nicotine contents in cigarettes and many are searching for one with low tar and nicotine content and full flavor. Marlboro Lights fill this need". 516 ¶ 2418

A 1974-1975 Philip Morris magazine advertisement for Marlboro Lights stated: "Marlboro Lights. The spirit of a Marlboro in a low tar cigarette." Philip Morris has used the phrases "lowered tar and nicotine" and "Lights" in association with Marlboro Lights for over 30 years. 516 ¶ 2420

Marlboro Medium: "gives you a flavorful smoke in a low tar cigarette" and "bridges the flavor gap between low tar and full flavor cigarettes."

With respect to Marlboro Lights, Philip Morris designs the packaging to distinguish it from Marlboro Red and communicate to consumers that it provides "the best of both worlds,"-low tar and good taste. 516 ¶ 2416

The introduction of a Marlboro Ultra Light brand appeared to be viewed in the following manner: ... An attempt to produce a safer cigarette for those interested in cutting down their smoking and in a lighter cigarette.... 521 ¶ 2445

On May 1, 1989, Philip Morris began test marketing Marlboro Ultra Lights, which it positioned as delivering 6 mg. of tar (per the FTC Method). 522 ¶ 2447

"A blue/gray pack with white tipping ... provides traditional ultra low tar reassurance." 522 ¶ 2448

## CAMBRIDGE

In 1979, Philip Morris promoted Cambridge as a low tar brand yielding 0.0 mg tar (less than 0.1 mg tar) on the FTC test. The 0.0 mg tar Cambridge cigarette was removed from the market and replaced by Cambridge light and ultra light brands, all of which had considerably more tar than the original Cambridge cigarette. 517 ¶ 2426

It is clear, based on their internal research documents, reports, memoranda, and letters, that Defendants have known for decades that there is no clear health benefit from smoking low tar/low nicotine cigarettes as opposed to conventional full-flavor cigarettes. It is also clear that while Defendants knew that the FTC Method for measuring tar and nicotine accurately compared the nicotine/tar percentages of different cigarettes, they also knew that that Method was totally unreliable for measuring the actual nicotine and tar any real-life smoker would absorb because it did not take into account the phenomenon of smoker compensation. Defendants also knew that many smokers were concerned and anxious about the health effects of smoking, that a significant percentage of those smokers were willing to trade flavor for reassurance that their brands carried lower health risks, and that many smokers who were concerned and anxious about the health risks from smoking would rely on the health claims made for low tar cigarettes as a reason, or excuse, for not quitting. 560 ¶ 2627 Despite this knowledge, Defendants extensively- and successfully-marketed and promoted their low tar/Light Cigarettes as less harmful alternatives to full-flavor cigarettes. Moreover, Defendants denied that they were making any health claims for their low tar/Light Cigarettes, and claimed that their marketing for these cigarettes was based on smokers' preference for a "lighter," "cleaner" taste. 560 ¶ 2628.  By engaging in this deception, Defendants dramatically increased their sales of low tar/Light Cigarettes, assuaged the fears of smokers about the health risks of smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking. 561 ¶ 2629

For several decades, Defendants have marketed and promoted their low tar brands as being less harmful than conventional cigarettes. That claim is false, as these Findings of Fact demonstrate. By making these false claims, Defendants have given smokers an acceptable alternative to quitting smoking, as well as an excuse for not quitting.  430 ¶ 2023 Even as they engaged in a campaign to market and promote filtered and low tar cigarettes as less harmful than conventional ones, Defendants either lacked evidence to substantiate their claims or knew them to be false. 430 ¶ 2025 Defendants' marketing has emphasized claims of low tar and nicotine delivery accompanied by statements that smoking these brands would reduce exposure to the "controversial" elements of cigarette smoke (i.e., tar). Since the 1970s, Defendants also have used so-called brand descriptors such as "light" and "ultra light" to communicate reassuring messages that these are healthier cigarettes and to suggest that smoking low tar cigarettes is an acceptable alternative to quitting. 430 ¶ 2024 Defendants made, and continue to make, false and misleading statements regarding low tar cigarettes in order to reassure smokers and dissuade them from quitting. These actions include: assertions that low tar cigarettes deliver "low," "lower," or "less" tar and nicotine than full-flavor cigarettes; claims that low tar cigarettes are "mild" or deliver "clean" taste; and use of brand names with descriptors such as "light" and "ultra light," with full knowledge that consumers interpret these claims and descriptors to convey reduced risk of harm. 507 ¶ 2377

Defendants' misrepresentations and omissions of vital health information as discussed herein is on going and continues through today.

The class members' beliefs about and reasons for purchasing "Light" cigarettes as raised

by Interrogatories Nos. 2-9, 16-17 and 19 are irrelevant and thus objectionable with respect to many of the legal claims presented here such as "Unjust Enrichment" or "Consumer Claims" where reliance is not a requirement. However, while Plaintiff does not contend that each member of the class shared the exact same belief(s) or reason(s), it is clear that all shared a common belief that "Light" cigarettes were safer and/or healthier than "Regular" cigarettes. This consumer belief motivated Defendant's to introduce "Light" cigarettes into the market and is well supported within Judge Kessler's opinion:

Philip Morris USA's 1992-1996 Strategic Plan for Research and Development stated, under the heading "Perceived Health Concerns," that: "An analysis of the cigarette market over the last 50 years suggests that there have been only two major influences on smokers buying patterns; namely smokers seeking to address their perceived health concerns and smokers seeking price relief." The document further stated: "The development of products which address perceived health concerns ... is very much an R & D issue. Previous product changes driven by "perceived health concerns" were the growth of filtered products from 3 to 70% of the market between 1945 and 1953, and the growth of the low tar segment to nearly 50% of the market by 1985.... Filtered cigarettes now make up over 96% of the market." 526 ¶ 2470

James Morgan, the former CEO of Philip Morris, acknowledged that the trend in the 1970s toward low tar cigarettes was due in large part to consumer perception that they were less hazardous to health than higher tar cigarettes, and specifically admitted that "the consumer was perceiving in the 1970s lower tar as tied to less hazardous." 524 ¶ 2462 According to Morgan, Philip Morris made a calculated decision to use the phrase "lower tar and nicotine" even though its own marketing research indicated that consumers interpreted that phrase as meaning that the cigarettes not only contained comparatively less tar and nicotine, but also that they were a healthier option. 513 ¶ 2402 A January 1979 study prepared for Philip Morris stated: These ultra low tar smokers indicated that they are aware of the low tar levels in their brands and that they switched to them specifically because of advertising calling this fact to their attention.... As lower and lower tar brands become available, it would appear smokers are subject to advertising pressure and brand availability, and the opportunity for switching obviously occurs.... Characteristics of ultra low tar smokers were: people who want to quit ... more interested in health.... 525 ¶ 2464 A 1986 CDC control study showed that 85% of those who switched from full flavored cigarettes to light or ultra Light Cigarettes were concerned about the health risks of smoking. Moreover, 83% of the ultra light smokers believed that switching from a 20 mg to a 5 mg cigarette would significantly reduce health risks. 476 ¶ 2238

There is little, if any, dispute that consumers believe that "light" cigarettes deliver less tar and nicotine than regular cigarettes, and that consumers believe that regular cigarettes are more hazardous than "light" cigarettes. 510 ¶ 2389
    "Merit is a brand smokers switch to in order to reduce tar/nicotine."
    "Merit smokers tell us that they come to the franchise because they desire a lower tar cigarette that still tastes good - switching down makes them feel better about the fact that they smoke." 519 ¶ 2435
    Merit users "like perceiving [Merit cigarettes] as rather safe, sensible, middle-of-the-road, non-threatening, and generating the feeling that they aren't doing anything wrong." 520 ¶ 2439

"How Marlboro Ultra Lights Were Positioned," the report stated: The following is a description of a brand image developed from the discussions [with consumers] in all three groups: ... Safer cigarette-less tar and nicotine.... Probably a "better/innovative filter." The report further stated: "With regard to smoker image, respondents suggested: ... People cutting down for health reasons/people trying to quit. More concerned people (about health). More aware people (those reading the numbers in the ads)." 522 ¶ 2446

Ultra Light users "note their further downswitching to ultralights from lights for health benefits primarily." 520 ¶ 2439

"Marlboro Medium Smoker Image Study," Most smokers said they chose Medium because of its perceived health benefit. 515 ¶ 2411

The evidence shows that even though low tar smokers may have a greater desire to quit, the misperception of increased safety associated with low tar cigarettes persuades them to avoid quitting. 475 ¶ 2230 Defendants' internal documents demonstrate their recognition that smokers interested in quitting smoking were instead switching to low tar cigarettes under the mistaken belief that doing so would either help them quit or be better for their health. 475 ¶ 2234 Many smokers who were concerned about the risks of smoking responded by switching to low tar cigarettes instead of quitting. 475 ¶ 2231 The 2004 Report of the Surgeon General noted that "[r]esearch has demonstrated that with the expectation of reducing risk, many smokers switched to low machine-measured tar/nicotine cigarettes, and may thus have been deterred from quitting". 475 ¶ 2233 Over the last five decades, Philip Morris has conducted extensive consumer research to perfect the delivery of its "light" and low tar cigarette brand marketing message to ensure it provided smokers with health reassurance and offered an alternative to quitting. 515 ¶ 2415 Contrary to their public statements, however, Defendants' internal marketing documents establish that Defendants have known for decades that even though consumers prefer the taste of regular cigarettes to low tar cigarettes, they are willing to forgo them and smoke low tar cigarettes, which are less enjoyable and have a less appealing taste, because they believe low tar cigarettes are better for their health. 476 ¶ 2239

Plaintiff further objects to Interrogatories 2-9, 16-17 and 19since it is irrelevant whether all class members compensated in the same way or received less tar and nicotine from smoking "Light" cigarettes in equity actions such as Unjust Enrichment or Consumer Claims that do not require reliance. However, Plaintiff will rely upon the exhaustive analysis by Judge Kesler that establishes that all "Light" cigarette smokers compensate to receive the same amount of tar and nicotine as in "Regular" cigarettes and virtually all do so completely with any variance biologically immaterial:

Philip Morris knew in 1967 that human smokers compensated by increasing their smoke intake when switching from non-filter to filter cigarettes, and in doing so, smokers received the same amount of tar and nicotine from their filter cigarettes as from non-filter cigarettes. 462 ¶ 2180 Because each smoker smokes to obtain his or her own particular nicotine quota, smokers end up inhaling essentially the same amount of nicotine-and tar-from so-called "low tar and nicotine" cigarettes as they would inhale from regular, "full flavor" cigarettes. This is referred to as "complete" compensation. Virtually all smokers, over 95%, compensate for nicotine. 438 ¶ 2072 The amount of nicotine that smokers need to sustain their nicotine addiction does not change over time. Therefore, compensation for reduced deliveries is permanent, and occurs for as long

as the smoker smokes the low tar product. 438 ¶ 2073 A September 17, 1975 Philip Morris document from Goodman to Leo F. Meyer, Philip Morris Director of Research, reflecting results of Philip Morris's studies with its Human Smoker Simulator, reported that, due to compensation, smokers got as much tar and nicotine from Marlboro Lights as from full-flavor Marlboros: "In effect, the Marlboro 85 smokers in this study did not achieve any reduction in smoke intake by smoking a cigarette (Marlboro Lights) normally considered lower in delivery."   465 ¶ 2192

"[S]pontaneous brand switching studies generally show that there is no reduction in smoke intake [including nicotine and tar intake] per cigarette....." 441 ¶ 2088 Cross-sectional studies also lead to the conclusion that compensation is essentially complete: "Cross-sectional studies involve sampling smokers in the general population who are smoking their own chosen brand of cigarettes ... show that there is very little difference in tobacco smoke exposure in people smoking cigarettes with different machine-determined yields.... There have been many cross-sectional studies performed, and overall they demonstrate that while there are some differences in nicotine exposure when high- and low-yield cigarette brands are compared, these differences are quite small.... Cross-sectional studies show nearly 100 percent compensation". 443 ¶ 2100 "What Benowitz['s] study, and then many other studies showed, is that if you looked at actual intake of people, there was virtually no difference at all in intake. And it wasn't just that the ranking was off a little bit, it was that, for example, the Marlboro Light, according to the Massachusetts data can get -give you about three times as much nicotine as it was rated, and more than twice as much as the Marlboro regular, …they're not getting biologically meaningful lower tar and nicotine...." 450 ¶ 2125

Low tar cigarettes have not reduced the risks of smoking relative to full-flavor cigarettes. ("I have concluded that the changes in cigarettes that resulted in a lowering of the FTC tar and nicotine yields over the past 50 years have not resulted in a reduction in the disease risks of smoking cigarettes for the smokers who use these cigarettes."). Dr. William Farone, fact and expert witness and former Director of Applied Research at Philip Morris, concluded that, based on his training and experience, " 'light' cigarettes-because they generally permit easy compensation and employ levels of dilution that increase the mutagenicity of the tar - are not any less hazardous than their full flavor versions." 444 ¶ 2104 Because compensation is essentially complete, low tar cigarette smokers inhale essentially the same amount of tar and nicotine as they would from full flavor cigarettes, thereby eliminating any purported health benefit from low tar cigarettes. In short, "light and ultra-Light Cigarettes" do not, in actuality, "reduce the risks of smoking. 438 ¶ 2074 Even if it were true that lower tar cigarettes result in some minor incremental reduction in tar, they do not provide any meaningful health benefit relative to higher tar cigarettes "from the perspective of human exposure ... or meaningful exposure." 450 ¶ 2125

Plaintiff does contend that all class members received smoke from "Light" cigarettes that was more "mutagenic" or contained higher levels of certain constituents than smoke from "Regular" cigarettes. As Judge Kessler's opinion makes clear:

Defendants have used a variety of physical and chemical design parameters to manipulate the nicotine delivery of their commercial products. 310 ¶ 1510 Defendants' internal documents demonstrate that, based on their knowledge of nicotine's pharmacological properties and addictive nature, they incorporated physical and chemical design techniques into their commercial products that would assure delivery of the precise levels of nicotine necessary to

12

assure taste, impact, and satisfaction, i.e., to maintain addiction. 310 ¶ 1373 Defendants have used chemical additives in order to modify the form of nicotine delivered to the smoker and enhance its speed of absorption in the body. Alteration of the pH of cigarette smoke was one of the primary areas of research they pursued for this purpose. 352 ¶ 1592

For decades, Defendants have conducted their research and developed their manufacturing processes on the basis of the scientific principles set forth above. In reliance on those principles, they have incorporated the use of ammonia technology in their commercial products with the intent to alter the pH of cigarette smoke and thereby affect nicotine delivery and absorption. 356 ¶ 1612 Philip Morris appears to have been the first tobacco manufacturer to use the ammonia process in the United States, and started using it in the 1950s. 357 ¶ 1617 Defendants have added ammonia compounds in order to enhance consumer use of cigarettes by: (1) increasing the amount of nicotine that is transferred from the tobacco to the smoke; (2) improving the sensory response to nicotine in the mouth and oral mucosa; and (3) increasing the speed of delivery of nicotine to the bloodstream and possibly to the brain. 355-56 ¶ 1609 By 1993, all the cigarette company Defendants used some form of ammonia technology in some of their cigarette products. 356 ¶ 1611

By 1990, Philip Morris's research efforts included producing low tar cigarettes with more nicotine impact. As scientists Gulotta, Hayes, and Martin explained in a December 14, 1990 memorandum to R.D. Kinser, one study found "that one could produce a low nicotine delivery cigarette with a higher proportion of free to protonated nicotine. Such a cigarette would be analytically similar to other cigarettes at comparable nicotine deliveries, but would be judged to have much more impact." 359 ¶ 1628 Dr. Farone stated that Philip Morris's Marlboro full-flavor and Marlboro Lights cigarettes are "essentially identical except for dilution"-i.e., that Marlboro Lights have more dilution, dilution referring to ventilation that dilutes the smoke, particularly when machine-smoked by the FTC method, with ambient air. "[A]s you increase dilution, the toxicity in [the Ames] test increases, which is more likely than not associated with a toxicity increase in smokers." 456 ¶ 2147 In fact, Dr. Farone explained that the very Ames mutagenicity testing that Philip Morris has conducted for the past 25 years, and that "Philip Morris has concluded ... predicts carcinogenicity" has indicated that Philip Morris's Marlboro Lights cigarettes are, as designed, more mutagenic than Marlboro full-flavor cigarettes: "[I]n the case of Marlboro Lights, the Philip Morris test data that I have reviewed on that level of dilution for equivalent blends indicated that the product design for their Light Cigarettes was more mutagenic than the full flavor Marlboro, Marlboro Reds, and therefore predictive of more potential cancer risk." These studies were repeated multiple times over the past 20 years and continue to be repeated to this day. The Philip Morris data, as was used by Philip Morris, was a strong warning that their product design change between a Marlboro Red and a Marlboro Light-increased ventilation-resulted in a potentially more dangerous product. 456 ¶ 2148 In this case, A. Clifton Lilly, Senior Vice President of Technology, confirmed that data from tests run at Philip Morris's INBIFO facility showed that the Ames test for mutagenicity from Marlboro Lights produces significantly higher results than the tar from Marlboro full flavor products. 457 ¶ 2154 A 2001 document about Ames mutagenicity testing from Philip Morris's INBIFO laboratory in Germany demonstrated that, in every case, the mutagenicity of Marlboro Lights is higher than the mutagenicity of Marlboro full-flavor. 458 ¶ 2155

The internal research documents of Defendants, discussed in the Findings of Fact, infra, show that: (1) the cigarette company Defendants have been aware at least since the 1960s of their ability to alter the amount and form of nicotine delivered to smokers by using cigarette design techniques intended to raise the pH of cigarette smoke; (2) they have incorporated design techniques-including, but not limited to, the use of ammonia technology and alterations to the tobacco blend-to raise the pH of the smoke in their commercial products with the purpose and intent of creating cigarettes that would deliver a greater amount of free nicotine and faster absorption of nicotine than cigarettes with lower smoke pH; (3) they took these actions in order to assure that their low tar products would deliver doses of nicotine sufficient to create and sustain addiction in cigarette smokers; and (4) their extensive research on the methods and effects of altering the pH of cigarette smoke demonstrates that their own scientists accepted and operated on the same basic principles of chemistry concerning alteration of smoke pH as those already set forth. 356-57 ¶ 1613

It is for these and other reasons that while the Putative Class Members sought to purchase a safer and healthier option to "Regular" cigarettes, they did not receive a "Light" cigarette as marketed but rather a valueless product that had the unknown potential to create an increased health risk for the purchaser. Plaintiff relies upon this General Response, Judge Kessler's opinion and the depositions of Class Representations to further supplement the following responses:

## **INTERROGATORIES**

**INTERROGATORY NO. 1:** Identify with specificity, and set forth verbatim, each and every statement made by Philip Morris USA, or by a person you contend was acting for Philip Morris USA, that you claim was false, deceptive, misleading, and/or a misrepresentation regarding any low tar cigarettes, including Marlboro Lights; and separately for each statement by Philip Morris USA: (a) identify when and where such statement appeared; (b) identify who made the statement and their affiliation, if any, with Philip Morris USA; (c) state whether you contend that the statement was made in New York and, if so, identify with particularity all facts supporting such contention; (d) state whether you saw the statement prior to the filing of your Complaint; and (e) state with particularity, and in full, the meaning you ascribed to the statement, i.e., what you interpreted the statement to mean.

      **OBJECTIONS:**    Plaintiff incorporates by reference the General Objections and Objections to Definitions and Plaintiff's General Response to Defendants' Discovery.

Plaintiff objects to this interrogatory as overbroad, unduly burdensome, and as seeking information within Defendants' possession. The size and scope of the false advertising campaign at issue is extraordinary. Over decades, Defendants spent millions on advertisements misrepresenting their Light Cigarettes as healthier to smoke than regular cigarettes of the same brand. Thus, Plaintiff cannot possibly identify with specificity each and every false statement Defendants have made regarding their Light Cigarettes. Plaintiff objects to this Interrogatory as exceeding the scope of class certification discovery. Plaintiff objects to this Interrogatory as premature, as Defendants have not yet produced all of the evidence relating to the representations of fact made with respect to their Light Cigarettes, and it is believed that the production of such information by Defendants in the future will contain additional evidence regarding additional misrepresentations.

**ANSWER**:    Notwithstanding, subject to and without waiver of any objections, Defendants' misrepresentations include, but are not limited to, all statements that Defendants' Light Cigarettes were in any way "Light," "Lights," "Ultra-Light," "Ultra-Lights"  and/or contained lower or reduced tar and/or nicotine. For further answer Plaintiff relies upon the General Response, herein, and the deposition of the Class Representative(s). Plaintiff reserves the right to further supplement this response upon review of Defendants' responses to discovery in this matter.

**INTERROGATORY NO. 3:**  Do you contend that each member of the putative class would not have purchased any Marlboro Lights had he had knowledge of Philip Morris USA's alleged deception identified in your Complaint, including knowledge that he might not receive lower tar

and nicotine from smoking such cigarettes instead of regular cigarettes? If the answer is "Yes," (a) state with particularity all facts that support your contention; (b) identify all documents that support your contention, specifying the portion of each document that supports your contention; and (c) identify each and every witness you intend to call in support of class certification who will provide testimony about each such fact. If the answer is "No," but some class members would not have purchased Marlboro Lights if they had knowledge of Philip Morris USA's alleged deception identified in your Complaint, including knowledge that they might not receive lower tar and nicotine when smoking such cigarettes instead of regular cigarettes, (a) describe in detail how your class-wide proofs will address this distinction between putative class members in the trial of a class action, (b) state with particularity each fact you intend to prove in support of these contentions; (c) identify all documents you intend to rely upon to support each such fact; and (d) identify each and every witness you intend to call in support of class certification who will provide testimony about each such fact.

> **OBJECTIONS:**  Plaintiff objects to this interrogatory as calling for a legal conclusion, and as being vague and ambiguous, specifically as to its use of the terms "knowledge" and "receive." Plaintiff does not allege that "each member of the putative class would not have purchased any Marlboro Lights had he had knowledge of Philip Morris USA's" deceptive practices, "including knowledge that he might not receive lower tar and nicotine from smoking such cigarettes instead of regular cigarettes," and Plaintiff need not show this for class certification in this matter. Further, the Interrogatory is vague, ambiguous and misleading as it does not specify which purchase. Plaintiff further objects to this interrogatory as calling for speculation.
>
> **ANSWER:**  Subject to and without waiver of any objections, Plaintiff would not have purchased Defendants' Light Cigarettes if he had known that Defendants' representations

were false and that Light Cigarettes were not healthier to smoke and would not result in Plaintiff inhaling less tar and nicotine than smoking regular cigarettes of the same brand. The factual and documentary support for all Plaintiff's Responses and the basis of Plaintiff's claims overall, are contained within, inter alia, the business records maintained by the Defendants, including those contained in the Minnesota Tobacco litigation Repository and the Philip Morris USA Document Site, which contain documents from which the answers to plaintiff's Responses to Admit, as well as Responses to these Interrogatories, may be derived or ascertained. Accordingly, pursuant to Fed. R. Civ. P. 33(d), the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory, as for the party served. Additionally, Plaintiff will further rely on documents that are admitted into evidence, produced, and obtained through other litigation arising out of and relating to the same or similar allegations as set forth in the Complaint. Finally, discovery is continuing and Plaintiff reserves the right to amend this response.

**INTERROGATORY NO. 21:** Identify the injury that you allege each member of the putative class has suffered as a result of the deceptive conduct alleged in the complaint and how you would establish on a class-wide basis the fact that such an injury occurred to each member of the putative class, the extent of each such injury, and the fact that each such injury was caused by the deception.

    **OBJECTIONS:**  Plaintiff incorporates by reference the General Objections and Objections to Definitions and Plaintiff's General Response to Defendants' Discovery. Plaintiff further objects to this interrogatory as compound, seeking work product, and as calling for legal conclusions. Plaintiff objects to this interrogatory as seeking information more properly addressed by expert testimony.

    **ANSWER:**  Subject to and without waiver of any objections, to the extent the interrogatory seeks Plaintiff to identify the injury that he and the other putative Class

members suffered as the result of Defendants' deceptive conduct, Plaintiff responds as follows: Defendants' Light Cigarettes did not have the qualities and attributes that Defendants represented them to have. As such, Plaintiff and the other members of the putative Class did not receive what they paid for when purchasing Defendants' Light Cigarettes—cigarettes that were healthier to smoke than regular cigarettes and which delivered less tar and nicotine than regular cigarettes. As such, Plaintiff received a product that Plaintiff did not seek and one without value making the price of the product the Plaintiff's measure of actual damages. Other remedies such as Unjust Enrichment would have different measures such as disgorgement of the Defendants' revenues or profits or as otherwise provided by law. Discovery is continuing and Plaintiff reserves the right to amend this response.

**INTERROGATORY NO. 22:** Describe in detail the monetary relief that you allege each member of the putative class is entitled to receive as a result of the deceptive conduct alleged in the complaint, how you would establish on a class-wide basis each putative class member's entitlement to such monetary relief and, as to each, the amount thereof.

**OBJECTIONS:** Plaintiff incorporates by reference the General Objections and Objections to Definitions and Plaintiff's General Response to Defendants' Discovery. Plaintiff objects to this interrogatory as overbroad, unduly burdensome, seeking information not relevant to class certification, and as seeking legal conclusions and information more properly addressed by expert testimony.

**ANSWER:** Subject to and without waiver of any objections, to the extent the interrogatory seeks Plaintiff to identify the injury that he and the other putative Class

members suffered as the result of Defendants' deceptive conduct, Plaintiff responds as follows: Defendants' Light Cigarettes did not have the qualities and attributes that Defendants represented them to have. As such, Plaintiff and the other members of the putative Class did not receive what they paid for when purchasing Defendants' Light Cigarettes—cigarettes that were healthier to smoke than regular cigarettes and which delivered less tar and nicotine than regular cigarettes. As such, Plaintiff received a product that Plaintiff did not seek and one without value making the price of the product the Plaintiff's measure of actual damages. Other remedies such as Unjust Enrichment would have different measures such as disgorgement of the Defendants' revenues or profits or as otherwise provided by law. Discovery is continuing and Plaintiff reserves the right to amend this answer.

**INTERROGATORY NO. 23:** Do you contend that there are no individual issues relating to the determination of entitlement to and (if necessary) the amount of punitive damages for the putative class and/or each member of the putative class? If the answer is "Yes," then (a) set forth all reasons and bases in support of your contention; (b) state with particularity all facts that support your contention; (c) identify all documents that support your contention, specifying the portion of each document that supports your contention; and (d) identify each and every witness you intend to call in support of class certification who will provide testimony about each such fact. If the answer is "No," and there are individual issues relating to the determination of entitlement to and (if necessary) the amount of punitive damages for the putative class and/or each member of the putative class, (a) describe in detail how your class-wide proofs will address this distinction between putative class members in the trial of a class action, (b) state with particularity each fact

you intend to prove in support of these contentions; (c) identify all documents you intend to rely upon to support each such fact; and (d) identify each and every witness you intend to call in support of class certification who will provide testimony about each such fact.

> **OBJECTIONS:** Plaintiff incorporates by reference the General Objections and Objections to Definitions and Plaintiff's General Response to Defendants' Discovery. Further, this interrogatory seeks legal conclusions and information more properly addressed by expert testimony. Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, seeking information not relevant to class certification, and as seeking legal conclusions and information more properly addressed by expert testimony.

> **ANSWER:** Subject to and without waiver of any objections, Plaintiff asserts that punitive damages may be determined on a class wide basis as predicated upon Defendants' conduct.

**INTERROGATORY NO. 24:** Set forth your trial plan for this case, including, but not limited to, your trial plan for the following issues: (a) identification of those issues that will be resolved as common issues for all putative class members and how these issues will be resolved; (b) identification of those issues that will be resolved on an individual basis for all putative class members (including, but not limited to, causation, injury, affirmative defenses, and damages) and how these issues will be resolved; (c) whether the same jury that resolves common issues will resolve these individual issues (including, but not limited to, causation, injury, affirmative defenses, and damages); (d) the process for resolving Class Representative claims, including any limitations on the claims that Class Representatives can litigate; (e) the process for resolving Absent Class Member claims, including any limitations on claims that Absent Class Members

can litigate; (f) when you contend judgment will be final in this case; and (g) identification of the process that you propose be used for the calculation and distribution of any damages that may be awarded in this case to putative class members, including but not limited to whether such damages should be distributed pursuant to the fluid recovery doctrine, and if so, your plan for a fluid recovery distribution.

**OBJECTIONS:** Plaintiff incorporates by reference the General Objections and Objections to Definitions and Plaintiff's General Response to Defendants' Discovery. Plaintiff objects to this interrogatory as premature at this time, as discovery is ongoing in this matter and Plaintiffs' Motion for Collateral Estoppel is currently pending before the Court. Plaintiff objects to this interrogatory as seeking work product to which no response is required.

**ANSWER:** Subject to and without waiver of any objections, Plaintiff will rely upon Judge Kessler's opinion and the presentation of evidence in that matter to support and define the trial of this matter as a class action.

**INTERROGATORY NO. 25:** For each request for admission that you deny in response to Philip Morris USA's First Requests for Admissions for Purposes of Class Certification, state the basis for your denial and (a) state with particularity all facts that support your denial; (b) identify all documents that support your denial, specifying the portion of each document that supports your contention; (c) identify each and every witness you intend to call in support of class certification who will provide testimony about each such fact; and (d) explain how you would establish such facts on a class-wide basis.

**OBJECTIONS:** Plaintiff incorporates by reference the General Objections and

Objections to Definitions and Plaintiff's General Response to Defendants' Discovery. Plaintiff further objects to this Interrogatory as seeking information outside the scope of Rule 33. Plaintiff refers Defendants to Plaintiff's Responses to Defendant's Requests for Admission.

Dated: February 17, 2010

Respectfully Submitted,

Wayne S. Kreger, CA State Bar No. 154759
Sara D. Avila, CA State Bar No. 263213
MILSTEIN, ADELMAN & KREGER, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405
Tel: (310) 396-9600
Fax: (310) 396-9635
*Attorneys for Plaintiff Miles Tyrer*