# Exhibit 26



## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CASE NO.

98-6002 H

---

LORI ASPINALL and THOMAS
GEANACOPOULOS, On Behalf of
Themselves and All Others Similarly
Situated,
           Plaintiffs,

v.

PHILIP MORRIS COMPANIES INC.,
PHILIP MORRIS INCORPORATED,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

NOV 2 4 1998



---

### COMPLAINT

Plaintiffs, Lori Aspinall and Thomas Geanacopoulos, by their attorneys, allege on

behalf of themselves and all others similarly situated, on information and belief based,

_inter alia_, upon the investigation of counsel, except as to those allegations which pertain

to the named Plaintiffs or their attorneys, which are alleged on personal information and

belief, as follows:

### I.   NATURE OF THE ACTION

1.    This is a class action for economic damages and declaratory and injunctive

relief on behalf of persons in the Commonwealth of Massachusetts who purchased and

consumed Marlboro Lights "low-tar," filtered cigarettes manufactured, distributed

and/or sold by defendants Philip Morris Companies Inc., and Philip Morris Incorporated,

1

(hereinafter, collectively "Defendants"). "Light cigarettes" are generally defined as containing between seven and fifteen milligrams of tar.

2.     This action alleges, among other things, that Defendants engaged in deceptive and unlawful conduct in connection with the manufacture, distribution, advertising, promotion, marketing and sale of Marlboro Lights cigarettes by:

a.     falsely claiming that their product had "lowered tar and nicotine" in comparison to regular cigarettes;

b.     failing to disclose the material fact that the so-called lower tar and nicotine content of their product was unrelated to the content of the tobacco in Marlboro Lights, and depended on vent holes that theoretically diluted the tar and nicotine content of smoke per puff;

c.     failing to disclose the material fact that smokers could not achieve lower tar or nicotine in Marlboro Lights if they blocked those vent holes with their lips or fingers, or if they increased puff volume or frequency; and

d.     failing to disclose the material fact that Defendants intentionally manipulated the tobacco used in Marlboro Lights so as to boost or increase its addictive propensities.

3.     As more fully set forth herein, Defendants manufacture so-called "low-tar," filtered cigarettes under the brand name Marlboro Lights.  Defendants distribute and sell Marlboro Lights in Massachusetts and throughout the United States.

4.     Although the Marlboro Lights package states, "Lowered Tar & Nicotine," a Marlboro Light contains the same tobacco as a regular Marlboro.  The main feature

2

that makes the Marlboro Light supposedly "low tar" and "low nicotine" is an extra row of nearly invisible vent holes in the paper of the Marlboro Light filter. A regular Marlboro has one row of vent holes. A Marlboro Light has two. The alleged lowered tar and nicotine of these light cigarettes is predicated upon the ventilation holes, which are located directly on the filter and are essentially invisible to the naked eye. These vent holes supposedly permit increased amounts of air to mix with the smoke, and therefore "reduce" the ratio of tar, nicotine and carbon monoxide in the smoke that is inhaled.

5.      Defendants market Marlboro Lights as low-tar, low-nicotine alternatives to regular cigarettes. Under normal use, however, Marlboro Lights are not low-tar or low-nicotine.   Under normal use, the ventilation holes are obstructed by a smoker's lips and fingers and do not alter the relative mixture of air to the amounts of tar, nicotine and carbon monoxide inhaled.  Moreover, even if smokers do not block the vent holes, the total amount of tar, nicotine and carbon monoxide inhaled is the same as that for a regular Marlboro if smokers increase the volume and/or frequency of their puffs.

6.      Defendants knew that light cigarettes would not produce the reductions of tar and nicotine they claimed under normal and reasonably foreseeable patterns of use by consumers. Defendants have unfairly and unjustly profited from their failure to adequately disclose to consumers the true nature and function of their so-called "low-tar" cigarettes.

7.      Defendants also omit and suppress the fact that they manipulate the nicotine levels in their light cigarettes through various techniques, including: modifying tobacco blend, weight, rod length, and circumference; using reconstituted tobacco sheets

3

and/or expanded tobacco; and increasing the smoke pH level by adding chemicals such as ammonia.

8.    Finally, Defendants omit and suppress the motivation behind their nicotine manipulation; that is, to target and achieve a "habituating" level of nicotine so as to sustain consumer addiction to their product and increase sales.  By hiding the ventilation holes and manipulating nicotine levels in their light cigarettes, Defendants sought to ensure that smoking light cigarettes would not assist smokers in successfully quitting smoking.

9.    This is a class action suit which seeks recovery of damages in the form of a refund of all purchase monies paid by Plaintiffs, and the class members, for purchases of Marlboro Lights manufactured, distributed and/or sold by Defendants to residents of Massachusetts, as well as disgorgement of Defendants' ill-gotten profits.  Plaintiffs also seek injunctive relief, including disclosures and/or instructions which will inform consumers of: a) the existence of the ventilation holes;  b) the need to refrain from obstructing these holes in order to obtain the full low tar benefits of Marlboro Lights; and c) the fact of Defendants' nicotine manipulation and chemical additions to their tobacco, and the motivations therefor.

## II. PARTIES, JURISDICTION AND VENUE

10.    Plaintiff Lori Aspinall is a resident of Boston, Massachusetts.  She has purchased and consumed on average approximately one-half to one pack a day of Marlboro Lights cigarettes in the Commonwealth of Massachusetts since approximately 1992.

11.   Plaintiff Thomas Geanacopoulos is a resident of Ashburnham, Massachusetts.  He has purchased and consumed on average approximately 1 to 1-1/2 packs a day of Marlboro Lights cigarettes in the Commonwealth of Massachusetts since approximately 1991.

12.   The claims for damages by the named Plaintiffs herein do not amount to as much as $75,000 each.

13.   Plaintiffs purchased and smoked Marlboro Lights in the Commonwealth of Massachusetts that were manufactured and distributed by Defendants named herein. The packages of Marlboro Lights purchased by Plaintiffs and all class members indicated that they contained lower levels of tar and nicotine by using words such as "Lights," and "Lowered Tar & Nicotine."  The Marlboro Lights purchased by Plaintiffs and all class members contained no disclosures, markings, or instructions regarding the ventilation holes in the filter, the need to refrain from obstructing these holes and to refrain from increasing puff volume or frequency to obtain the full benefits of the Marlboro Lights when smoked under normal and expected use, the alteration of nicotine levels through the use of chemical additives and Defendants' financial motivation for such alteration.

14.   Defendant Philip Morris Companies Inc. ("Philip Morris") is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, N.Y.  At all times relevant hereto, Philip Morris, through its wholly owned subsidiary Philip Morris Incorporated ("PMI" or the "subsidiary"), was in the business of manufacturing, promoting, marketing, distributing and selling Marlboro Lights brand light cigarettes. Philip Morris conducts business in Massachusetts and at all relevant times manufactured,

promoted, marketed, distributed and sold the aforementioned products in interstate commerce and in Massachusetts. Philip Morris is subject to the jurisdiction of this Court pursuant to M.G.L. ch. 223A §3(a) and (c).

15.    Defendant Philip Morris Incorporated ("PMI" or the "subsidiary") is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, N.Y. PMI is a wholly owned subsidiary of Philip Morris. At all times relevant hereto, PMI was in the business of manufacturing, promoting, marketing, distributing and selling Marlboro Lights brand Light Cigarettes. PMI conducts business in Massachusetts and at all relevant times manufactured, promoted, marketed, distributed and sold the aforementioned products in interstate commerce and in Massachusetts. PMI is subject to the jurisdiction of this Court pursuant to M.G.L. ch. 223A §3(a) and (c).

16.    Venue lies in this Court pursuant to Section M.G.L. ch. 223 §8(4).

### III.  CLASS ACTION ALLEGATIONS

17.    Plaintiffs make these allegations pursuant to Rule 23 of the Massachusetts Rules of Civil Procedure and M.G.L. ch. 93A §9(2). Certification is sought pursuant to Massachusetts Rule of Civil Procedure Rule 23 and M.G.L. ch. 93A §9(2).

18.    Plaintiffs bring this action on their own behalf and on behalf of all other residents of the Commonwealth of Massachusetts who purchased and consumed Defendants' Marlboro Lights cigarettes but who do not have a claim for personal injury resulting from the purchase or consumption of cigarettes (the "Class"). The class period commences on the first date that Defendants placed their Marlboro Lights into the stream of commerce, up to the date of trial (the "Class Period"). Not included within

6

the Class definition are individuals who are directors and officers of the Defendants' corporations, or their affiliates.

19.   The Class is composed of at least hundreds of thousands of persons, the joinder of whom is impracticable except by means of a class action. The disposition of their claims in a class action will benefit both the parties and the Court. Defendants sell hundreds of thousands of packs of Marlboro Lights in Massachusetts every year, and thus the Class is sufficiently numerous to make joinder impracticable, if not completely impossible.

20.   There is a well-defined community of interest in the questions of law and fact involving and affecting the parties to be represented. Common questions of law and fact exist and such common questions predominate over any question of law or fact which may affect only individual Class members. Such common questions include the following:

a.   whether the Defendants violated, *inter alia*, the Massachusetts General Law, Chapter 93A;

b.   whether the Defendants were unjustly enriched at the expense of the class members; and

c.   whether the Class has been damaged and, if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or exemplary damages to which the Class is entitled to plead and prove.

21.   Plaintiffs assert claims that are typical of the claims of the entire Class. They will fairly and adequately represent and protect the interests of the Class. Plaintiffs

have no interests antagonistic to those of the Class. Plaintiffs have retained counsel who are competent and experienced in class action litigation.

22.     Plaintiffs and the members of the Class are similarly situated and have suffered similar injuries as a result of Defendants' wrongful conduct as alleged herein.

23.     Defendants have acted or refused to act on grounds generally applicable to all the members of the Class, thereby making final injunctive relief or declaratory relief concerning the class as a whole appropriate.

24.     Plaintiffs and the Class have suffered irreparable harm and damages as a result of Defendants' wrongful conduct as alleged herein. Absent a representative action, Class members will continue to suffer losses, thereby allowing these alleged violations of law to proceed without remedy and allowing Defendants to retain the proceeds of their ill-gotten gains.

25.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IV.  FACTUAL ALLEGATIONS

### A.  Development of the Light Cigarette Market

26.     Tobacco companies first began developing and marketing low-tar light cigarettes in the early 1970s. Defendants manufacture, distribute and sell low-tar cigarettes in Massachusetts under the brand name of Marlboro Lights.

27.     Prior to the introduction of light cigarettes into the market, the Federal Trade Commission ("FTC") began conducting tests, using smoking machines, to

8

measure the levels of tar and nicotine in cigarettes. A primary purpose of this testing method was to eliminate inconsistent or confusing advertising claims being made to consumers regarding tar and nicotine levels in light cigarettes and to provide manufacturers with uniform statistics to promote their products.

28. In 1987, the FTC closed its cigarette testing laboratories. That same year, the Tobacco Institute Testing Laboratory ("TITL"), a private laboratory operated by the cigarette industry, began conducting cigarette testing using the FTC smoking machine method. TITL has conducted cigarette testing at all relevant times since it began testing in 1987.

29. According to a 1997 release by the FTC entitled "Cigarette Testing - Request for Public Comment," the methodology, processes and procedures that the Defendants, through TITL, currently employ to test cigarettes are identical to those the FTC employed until 1987 in its own testing laboratory.

30. Defendants market Marlboro Lights through campaigns consisting of advertisements, promotional literature, and packaging. Defendants place the words, "Lights," and "Lowered Tar and Nicotine," on their light cigarettes packages. (A true and correct copy of a Marlboro Lights package is attached hereto as Exhibit "A".)

31. Demand for light cigarettes has sky-rocketed in recent years. According to findings published in the Centers for Disease Control Prevention publication Morbidity and Mortality Weekly Report, in an article entitled "Filter Ventilation Levels in Selected U.S. Cigarettes, 1997" ("CDC publication"), sales of light cigarettes made up 72.7% of the domestic cigarette market in 1995. By comparison, sales of light cigarettes a decade

9

earlier, in 1985, accounted for only slightly more than half of the domestic market (51.9%).

### B.   Invisible Ventilation Holes Negate Low-Tar Claims

32.    According to the CDC publication, many brands of light cigarettes are manufactured with ventilation holes in the filter.  The holes are designed to allow the smoker to draw in additional air when inhaling.  In theory, the additional air mixes with the tar, nicotine, and carbon monoxide in cigarette smoke and thereby reduces the relative levels of these substances per volume of smoke that enters the human body.

33.    Defendants' light cigarettes contain ventilation holes.  The holes, however, are obstructed during normal use of the product because the holes are placed in the area of the filter that is covered by the smoker's lips or fingers.  This blocking problem is exacerbated with Defendants' light cigarettes because the Marlboro Lights' vent holes are virtually invisible to the naked eye.  Defendants' vent holes also are not marked (e.g. with a colored band or some other method), to indicate their location.

34.    As a result of this design, the cigarettes do not fulfill the Defendants' claims of lowered tar and nicotine.  According to studies cited in the CDC publication, blocking even some of the ventilation holes in light cigarettes can dramatically increase the smoker's exposure to the tar and nicotine contained in cigarette smoke.

35.    In 1980, researchers conducted a study on low tar cigarettes, the results of which are cited in the CDC publication.  The study showed that blocking just half of the ventilation holes in a cigarette containing 4mg of tar, 0.5mg of nicotine, and 5mg of

carbon monoxide increased the FTC - rated tar yields by 60%, nicotine levels by 62% and carbon monoxide levels by 73%.

36.     Based on this study, smokers of cigarettes with less than 15 mg of tar who block just half of the vent holes in their cigarettes could inhale as much, or even more, tar, nicotine, and carbon monoxide as that from a regular yield cigarette.  To illustrate, the FTC report on tar, nicotine, and carbon monoxide of the smoke of the 1,206 varieties of domestic cigarettes for the year of 1994 ("FTC 1994 report") lists the Marlboro brand cigarette as containing 16mg of tar, 1.1mg of nicotine, and 14mg of carbon monoxide, and the Marlboro Light brand cigarette as containing 10mg of tar, 0.8mg of nicotine, and 11mg of carbon monoxide.  Based on the studies cited in the CDC publication, blocking just half of the vent holes on a Marlboro Light would result in ingestion of 16mg of tar, nearly 1.3 mg of nicotine, and an astounding 19mg of carbon monoxide, or the same amount of tar, and even more nicotine and carbon monoxide than regular Marlboro cigarettes.

37.     A recent study issued by the Massachusetts Department of Public Health ("MDPH study") based on 1997 data concluded that "when smokers place their mouth or fingers over the vents, they keep outside air from diluting the mixture and so take in higher levels of tar and nicotine."

38.     Furthermore, the design of Defendants' light cigarettes makes it difficult, if not impossible, to remedy the blocking problem.  After analyzing fifteen different cigarette brands, including Marlboro Lights, the MDPH study stated that:

> Many brands have vents that are so tiny they are invisible to
> the naked eye.  Often the placement of the holes makes it

11

difficult if not impossible for a smoker to smoke a cigarette without blocking some or all of the vents.

The cigarettes are designed so that it is "natural" to cover-up some or all of the filter vents and "natural" to breathe in heavier amounts of tar and nicotine.

## C.  Defendants' Knowledge and Suppression of the True Nature of Their Light Cigarettes

39.    Upon information and belief, Defendants were fully aware of the problems associated with blocking filter vent holes but nonetheless suppressed and omitted this information from consumers with the intention of deceiving same.  This knowledge and suppression is demonstrated by a 1974 Philip Morris document entitled, "Some Unexpected Observations on Tar and Nicotine and Smoker Behavior," which notes: "Generally, people smoke in such a way that they get more than predicted by machines. This is especially true for dilution cigarettes [i.e. low tar, low nicotine] . . . The FTC standardized test should be retained:  It gives low ratings."

40.    Defendants' knowledge can be further demonstrated by other important facts:

a.    Defendants manufacture, test and market their light cigarettes, thereby providing them with increased knowledge and insight into the design aspects and potential defects in their product with regard to tar and nicotine intake levels; and

b.    Defendants are members of the very industry that conducts testing for tar, nicotine, and carbon monoxide levels in cigarettes.  As such, Defendants were, or should have been, particularly cognizant of the inaccuracies in their testing

12

methodologies and aware of the alternative, more accurate methods of testing available. In particular, Defendants were, or should have been aware of the Massachusetts method for testing tar and nicotine (discussed in the MDPH study, *supra*), a method more reflective of actual smoking patterns. This method indicates that tar and nicotine levels in light cigarettes and ultra-light cigarettes, (which are generally defined as containing less than 7mg of tar), are actually about twice as high as those found by the FTC method employed by the cigarette industry. Differences between the FTC and Massachusetts methods were greatest for ultra-light cigarettes, and greater for light cigarettes than for full flavor cigarettes. Nicotine levels for ultra-light cigarettes, for example, were more than 150% greater in Massachusetts testing than under the FTC method.

### D.   Nicotine Manipulation and Targeting "Habituating" Levels of Nicotine

41.     Defendants also took affirmative steps in the design and manufacture of their light cigarette – such as hiding the vent holes and manipulating smoke pH – to increase the discrepancy between the purported "lowered tar and nicotine" and the actual amount of tar and nicotine inhaled. Knowing that the inclusion of vent holes in their cigarettes reduced the levels of nicotine as well as tar, Defendants wanted to ensure that smoking light cigarettes would not make it easier for smokers to quit, and that smokers of light cigarettes would receive the nicotine "satisfaction" of a regular cigarette.

42.     Defendants intentionally manipulated the tar and nicotine levels in their product by modifying tobacco blend, weight, rod length and circumference; using

13

reconstituted tobacco sheets and/or expanded tobacco and increasing smoke pH by adding chemicals such as ammonia.

43. These tobacco manipulation techniques allowed Defendants to maximize the amount of addictive nicotine delivered to smokers, thereby retaining customers and maximizing their own profits by cornering higher market share. Upon information and belief, Defendants used their research concerning tobacco manipulation to ascertain the "habituating level of nicotine" (i.e. the level of nicotine below which the smoker would no longer be addicted). When the Defendants purportedly lowered the tar in their cigarettes, they deliberately increased the amount of nicotine to a habituating level so as to maintain sales by sustaining consumer addiction.

44. Defendants manipulate the smoke pH in their light cigarettes in order to create more "free" nicotine in the smoke and thereby enhance the actual nicotine delivery to smokers beyond that measured by the smoking machines. In addition to "fooling" the smoking machines by delivering more nicotine to the human smoker than indicated by the machines, Defendants had a more deplorable goal: to sustain consumer addiction to light cigarettes by increasing the nicotine in their light cigarettes to a level at, or above, the "habituation" level. In other words, Defendants targeted the level of nicotine below which consumers would no longer be addicted, and manipulated the tobacco in their light cigarettes to ensure that the nicotine would not fall below this habituating level. Defendants could thereby sustain and even increase their share of the light cigarette market.

14

45.   Defendants' manipulation, and the motivations behind this manipulation, are evidenced by the following internal documents and studies:

a.   A November, 1971 Philip Morris internal report entitled, "Tar, Nicotine, and Smoking Behavior" illustrates Defendants' knowledge and ability to add nicotine to reduced tar cigarettes:

> Tar reduction [in our study] was accomplished by means of an air dilution technique.   This results in a reduction of tar delivery.   However, it also results in a reduction of nicotine delivery.   Therefore, when the tar delivery was reduced to get the medium tar delivery, it also reduced the nicotine delivery by a like amount.   Thus, just to maintain the original nicotine delivery required that nicotine be added to that cigarette.

This report determined that the level of nicotine which "resulted in the greatest cigarette acceptability" was apparently 1.3mg.   In fact, the report even indicated Defendants' motivation to manipulate their light cigarettes in order to maintain higher levels of tar: "Low tar resulted in least acceptability at all levels of nicotine."

b.   A 1973 report by researcher Claude E. Teague, Jr. of competitor R.J. Reynolds, entitled "Implications and Activities Arising From the Correlation of Smoke pH with Nicotine Impact, Other Smoke Qualities, and Cigarette Sales" evidences the alteration of smoke pH by Philip Morris.   The increase in smoke pH (usually through the addition of ammonia) increases the level of "free" nicotine in the cigarettes and provides a greater nicotine "kick" to smokers through faster absorption of nicotine into the blood stream.   The report notes that "the most significant difference" between RJR's brands and Philip Morris's brands "has been in the area of smoke pH."   More specifically:

15

> Our data show that smoke from our brands, and all other
> significant competitive brands, in recent years has been
> consistently and significantly lower in pH (less alkaline) than
> smoke from Marlboro . . . All evidence indicates that the
> relatively high smoke pH (high alkalinity) shown by Marlboro
> (and other Philip Morris brands) and Kool is deliberate and
> controlled.

c.   A March, 1978 Philip Morris report by J. Ryan and the Philip

Morris USA Research Center entitled, "Ex-Brand Cigarettes, a Study of Ex-Smokers,"

notes:

> If the industry's introduction of acceptable low-nicotine
> products does make it easier for dedicated smokers to quit,
> then the wisdom of the introduction is open to debate.
> (emphasis in original).

d.   An October, 1990 Philip Morris research report which notes that

nicotine strength in tobacco smoke can be increased through the addition of ammonia,

nicotine salt or nicotine citrates.  These chemical additives increase smoke pH, which

"governs the ratio of nicotine in free protonated forms."

e.   Research performed for Philip Morris by researcher Frank Ryan

illustrated that cigarette sales could be predicted at a 96% accuracy rate using data on

nicotine and acetaldehyde (a chemical compound with dopamine-type euphoria-enabling

characteristics).  According to an April 6, 1994 report entitled, "Philip Morris Research

on Nicotine Pharmacology and Human Smoking Behavior," Ryan's studies could

accurately "predict blindly which cigarettes would sell and which wouldn't based on the

combination of nicotine and acetaldehyde delivery."

## E.  Defendants' Omissions

46.     Knowing the truth, but motivated by profit and their related goal of maintaining light cigarette smokers' addiction, Defendants suppressed and failed to disclose to the public material facts concerning the actual intake of tar, nicotine, and carbon monoxide from light cigarettes if the product is not smoked in a manner that takes full advantage of the ventilation holes purported to reduce the smokers' exposure to these substances.  While the packaging containing Defendants' light cigarettes prominently displays the words "Lights," and "Lowered Tar and Nicotine,"  Defendants omitted and continue to omit numerous material facts regarding their light cigarettes, including:

      a.   The existence and purpose of ventilation holes;

      b.   The effect of blocking some or all of these holes;

      c.   The fact that the tar and nicotine levels measured by the smoking machines do not accurately reflect the actual amount of tar and nicotine ingested by the human smoker;

      d.   The fact that the Defendants manipulated nicotine levels in their light cigarettes through various techniques, including:

            (i)   Modifying tobacco blend, weight, rod length, and circumference;

17

(ii)   Using reconstituted tobacco sheets and/or expanded tobacco; and

(iii)   Increasing smoke pH level by adding chemicals such as ammonia; and

e.   The fact that Defendants manipulated nicotine levels in order to target and achieve a "habituating" level of nicotine so as to sustain consumer addiction to their product and increase sales.

47.   Defendants knew of the inaccuracies associated with the measurement of the tar and nicotine levels in these products and the deceptive nature of the terms used on light cigarette packages to describe the "low-tar" cigarettes.   Yet, in the face of increasing sales, Defendants chose not to reveal such information, or effectively disclose to consumers the true nature of their so called "low-tar" cigarettes.

48.   Defendants also knew that the omitted information was material.   For example, Defendants believed that consumers' motivation to smoke light cigarettes stems from the general perception that light cigarettes pose less risk of harmful consequence than regular cigarettes.   Defendants' belief as to this motivation is evidenced by the following:

a.   "Exit-brand cigarettes, a study of ex-smokers," supra, which explains:

> The very fact, then, that a smoker has decided to switch from a full-flavor cigarette to a low-delivery cigarette tells us something very important about him.  He is concerned about his health, and he is willing to do something about it.

18

b.    March 20, 1984 edition of Philip Morris' "The Cigarette Consumer," which states:

Historically, motivation has come from health issue.

- People willing to stick with lower tar because they feel they are doing themselves a favor.
- Most successful new brands have had low tar/health motivation: Merit.

49.    The shortcomings of the testing methodologies alerted, or should have alerted, Defendants as to the inaccuracies and misleading nature of the packaging of their light cigarettes, and these inaccuracies should have been revealed and explained to the purchasers and consumers of their light cigarettes.

50.    Despite this knowledge, Defendants failed to reveal these inaccuracies, the ongoing tobacco manipulation or the reasons for such manipulation.  Instead, Defendants sold light cigarettes to Plaintiffs and members of the Class by making materially false, misleading and deceptive claims of lowered tar and nicotine levels.

## COUNT I – DECEPTIVE AND UNFAIR TRADE PRACTICES

51.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 50 as if fully set forth herein and further allege:

52.    This claim is brought pursuant to M.G.L. ch 93A  §§2 and 9.

53.    At all times relevant hereto, Plaintiffs and the class were "persons" within the meaning of M.G.L. ch. 93A §1(a) and are entitled to relief under the Act in accordance with M.G.L. 93A §9.

54.   At all times relevant hereto, Defendants were engaged in "trade or commerce" as defined by M.G.L. ch. 93A §1(b).

55.   Plaintiffs and the Class entered into consumer transactions with the Defendants by purchasing Marlboro Lights cigarettes.

56.   During the course of these transactions, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, unfair or deceptive acts or practices, or all of the foregoing in the conduct of any trade or commerce in violation of M.G.L. ch. 93A § 2 as follows:

a.   incorrectly advertising and making false claims that their light cigarettes, when smoked under normal use, were low tar and low nicotine;

b.   placing vent holes on the portion of the filter of light cigarettes that is covered or blocked by the smoker's lips under normal use, thereby negating the claimed effects of the low tar, low nicotine brand;

c.   failing to mark the vent holes or make them visible to the naked eye such that smokers could attempt to smoke the cigarettes to obtain the claimed reduced tar and nicotine;

d.   failing to disclose to consumers that smoking the Defendants' cigarettes with the vent holes blocked results in the smoker receiving an increased amount of tar and nicotine;

e.   failing to instruct smokers, on the packaging or elsewhere, on how to smoke the cigarettes so as to obtain the claimed low tar and low nicotine.

20

f.   failing to inform consumers as to the manipulation of the tobacco in Marlboro Lights by, *inter alia*, the addition of chemicals, as well as Defendants' reasons for such manipulation.

57.   Defendants' acts, practices and conduct were willful and knowing violations of M.G.L. ch. 93A §2.

58.   As a direct result of Defendants' violations, Plaintiffs and the Class are have been damaged.

59.   More than 30 days prior to filing this Complaint, Plaintiffs made a written demand for relief on Defendants pursuant to M.G.L. ch. 93A §9(3).  (A copy of this letter is attached hereto as Exhibit B).  At the time of filing the Complaint, Plaintiffs had received no reply to their demand letter.

60.   Defendants' refusal to grant relief upon demand was made in bad faith and with knowledge or reason to know that the acts or practices complained of herein violated M.G.L. ch. 93A §2.

## COUNT II - UNJUST ENRICHMENT

61.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 60 as if fully set forth herein and further allege:

62.   As stated more particularly above, Defendants embarked on and carried out a scheme of marketing and selling light cigarettes by falsely and deceptively advertising that the cigarettes were "Lights," or  contained "Lowered Tar and Nicotine."  In addition, Defendants failed to inform consumers that the tobacco in their Marlboro Lights was manipulated through, *inter alia*, the addition of chemicals, and that

such manipulation was conducted in order to sustain consumer addiction and thereby increase sales.

63.    The Defendants' omissions and practices resulted in Plaintiffs and the Class purchasing light cigarettes in order to receive a low tar, low nicotine alternative to regular cigarettes, but without knowing of either the existence or function of the invisible or hidden ventilation holes.

64.    Defendants' practices further resulted in Plaintiffs and the Class purchasing light cigarettes without understanding that Defendants manipulated the tobacco in their light cigarettes to increase their own ill-gotten profits.

65.    The monies paid by Plaintiffs and the Class to the Defendants in the purchase of Marlboro Lights conferred substantial benefits upon the Defendants.  The Defendants knew of and appreciated the benefits conferred upon them by Plaintiffs and the Class and accepted and retained these benefits.

66.    Under these circumstances, it would be inequitable and unjust for the Defendants to retain the benefits conferred by Plaintiffs and the Class.  Defendants therefore should disgorge their ill-gotten gains to the Plaintiffs and the Class.

67.    Plaintiffs and the members of the Class are entitled to recover damages and to receive equitable relief in the form of appropriate restitution and disgorgement of all earnings, profits, compensation and benefits obtained by Defendants.

## COUNT III - INJUNCTIVE AND EQUITABLE RELIEF

68.    Plaintiffs hereby reallege and incorporates by reference paragraphs 1 through 67 as if fully set forth herein and further alleges:

22

69.     Defendants manufacture, distribute and/or sell light cigarettes without explaining to consumers that the lowered tar and nicotine claimed by Defendants is not obtained under the consumers' normal and foreseeable patterns of use.  Defendants also fail to disclose their intentional manipulation of the tobacco in their light cigarettes and the financial motivations for such manipulation.  Plaintiffs and the Class therefore request equitable relief in the form of revised disclosures, or equivalent remedial and corrective action, at Defendants' expense, to make the terms "Lights" and "Lowered Tar & Nicotine" not misleading, and to disclose the tobacco manipulation and the reasons therefor.

70.     Plaintiffs and the Class will suffer irreparable harm if the requested injunctive relief is not granted.  The hardships that Plaintiffs and the Class would endure if the requested injunctive and equitable relief are denied greatly outweigh any hardships that Defendants may endure if such relief is granted.  An injunction requiring revised disclosures would result in minimal monetary hardship to Defendants while preventing potentially drastic harm to a vast number of Class members. Furthermore, such prospective relief may not be obtained through monetary compensation at law, but may only be obtained through an injunction.

71.     As a proximate result of the Defendants' conduct described herein, and in consideration of the above factors, Plaintiffs, on behalf of themselves and all others similarly situated, are entitled to the requested injunctive and equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class members pray for relief as follows:

23

1.    Certification of this action as a class action pursuant to Rule 23 of the Massachusetts Rules of Civil Procedure and M.G.L. ch. 93A §9(2) on behalf of the proposed plaintiff class and designation of the Plaintiffs as the representatives of the Class;

2.    A declaratory judgment that Defendants' acts, practices and conduct have violated M.G.L. ch. 93A;

3.    An order enjoining Defendants from continuing to violate M.G.L. ch. 93A through the acts and practices complained of herein;

4.    Actual damages or damages in the amount of $25 per class member, whichever is greater, pursuant to M.G.L. ch. 93A § 9(3);

5.    Three times the amount of damages awarded pursuant to M.G.L. ch. 93A §9(3);

6.    An order directing that Defendants conduct a corrective advertising campaign to explain to smokers (i) the existence of the vent holes; (ii) the importance of same; (iii) if possible, a method by which a smoker can smoke the low tar, low nicotine cigarette and achieve Defendants' claims of lowered tar and nicotine; and (iv) the deliberate manipulation of tar and nicotine levels in Defendants' Marlboro Lights and the reasons for same.

7.    An order requiring Defendants to alter their products so that the ventilation holes are clearly marked and identified such that consumers may observe them with the naked eye;

24

8.    An order requiring Defendants to include instructions on or with their products' packaging instructing consumers on the purpose and use of the ventilation holes;

9.    Full refund and disgorgement of all purchase costs Plaintiffs and the members of the Class have incurred for Marlboro Lights cigarettes;

10.    An order requiring Defendants to disclose any manipulation of, or additives to their tobacco which may have the purpose or effect of augmenting the tobacco's additive propensities;

11.    Prejudgment and post-judgment interest as provided by law;

12.    Attorneys' fees, expenses and costs of this action; and

13.    Such further relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury on all issues raised in this Complaint which are triable by jury.

Dated:  November 24, 1998                    By their attorneys,

Thomas G. Shapiro  BBO #454680
Janet M. McGarry BBO #564728
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA  02109
(617) 439-3939

William P. Butterfield
FINKELSTEIN, THOMPSON &
LOUGHRAN
1055 Thomas Jefferson Street, N.W.
Suite 601
Washington, D. C. 20007
202/337-8000
202/337-8090 Fax

Jonathan L. Alpert
Chris Barker
William J. Cook
ALPERT, BARKER & RODEMS, P.A.
100 South Ashley Drive
Suite 2000
Tampa, Florida 33602
(813) 223-4131
(813) 228-9612 Fax

G. Martin Meyers
LAW OFFICES OF G. MARTIN MEYERS,
P.C.
35 West Main Street, Suite 106
Denville, NJ 07834
(973) 625-0838
(973) 625-5350 Fax

Lisa J. Rodriguez
TRUJILLO RODRIGUEZ & RICHARDS, LLC
20 Brace Road
Cherry Hill, NJ 08034
(609) 616-2103
(609) 616-2073 Fax

Herbert E. Milstein
Lisa Mezzetti
COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.
West Tower, Suite 500
1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 408-4600
(202) 408-4699 Fax

26

H. Sullivan Bunch
BONNET, FAIRBOURNE, FRIEDMAN & BALINT
57 Carriage Hill Overlook
Signal Mountain, TN 37377
(423) 886-9736
(423) 886-9739 Fax

Counsel for Plaintiffs

27



# SHAPIRO HABER & URMY LLP

### Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Andrew A. Rainer

Theodore M. Hess-Mahan
Janet M. McGarry
Christine E. Morin

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan
Michael Roitman

E-mail: shu@shulaw.com

July 10, 1998

Philip Morris, Inc.
120 Park Avenue
New York, NY 10017

Attention:   Office of General Counsel

Dear Sirs:

This letter constitutes a demand letter pursuant to Massachusetts General **Laws**, Chapter 93A, on behalf of Lori Jean Aspinall and all other Massachusetts residents who purchased and consumed Marlboro Lights cigarettes in the Commonwealth of Massachusetts.

Your companies committed unfair and deceptive acts or practices in violation of Massachusetts General Laws, Chapter 93A, with respect to your manufacturing, promoting, marketing, distributing and selling Marlboro Lights cigarettes.

Among other things, your companies committed unfair and deceptive acts or practices by:

(a)     falsely claiming and advertising that Marlboro Lights cigarettes had "lowered tar and nicotine" in comparison to regular cigarettes;

(b)     designing the Marlboro Lights cigarettes such that the claimed lower tar and nicotine levels are purportedly achieved by placing vent holes on the filter, when you knew or should have known that such holes are covered or blocked by the smoker's fingers or lips under normal use, thereby negating any effect of such holes in achieving a lower tar or lower nicotine cigarette;

(c)     failing to mark such vent holes or to make them visible to the naked eye, so that they could attempt to smoke the cigarettes in a fashion that does not block the vent holes;

SHAPIRO HABER & URMY LLP

Philip Morris, Inc.
July 10, 1998
Page 2

      (d)     failing to instruct smokers, on the packaging or elsewhere, on how to smoke the cigarettes so as to obtain the claimed low tar and low nicotine;

      (e)     failing to disclose the material fact that smokers could not achieve lower tar or nicotine in Marlboro Lights if they blocked those vent holes with their lips or fingers, or if they increased puff volume or frequency;

      (f)     failing to disclose the material fact that you intentionally manipulated the tobacco used in Marlboro Lights so as to boost or increase its addictive propensities.

     Plaintiffs demand as damages the amount of all monies paid to purchase Marlboro Lights cigarettes in the Commonwealth of Massachusetts, or statutory damages of $25.00 per pack of Marlboro Lights cigarettes sold in the Commonwealth of Massachusetts, whichever is greater.

     Sincerely yours,

     Thomas G. Shapiro

TGS/ckh

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Andrew A. Rainer

Theodore M. Hess-Mahan
Janet M. McGarry
Christine E. Morin

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan
Michael Roitman

E-mail: shu@shulaw.com

July 10, 1998

Philip Morris Companies, Inc.
120 Park Avenue
New York, NY 10017

Attention:   Office of General Counsel

Dear Sirs:

This letter constitutes a demand letter pursuant to Massachusetts General Laws, Chapter 93A, on behalf of Lori Jean Aspinall and all other Massachusetts residents who purchased and consumed Marlboro Lights cigarettes in the Commonwealth of Massachusetts.

Your companies committed unfair and deceptive acts or practices in violation of Massachusetts General Laws, Chapter 93A, with respect to your manufacturing, promoting, marketing, distributing and selling Marlboro Lights cigarettes.

Among other things, your companies committed unfair and deceptive acts or practices by:

(a)    falsely claiming and advertising that Marlboro Lights cigarettes had "lowered tar and nicotine" in comparison to regular cigarettes;

(b)    designing the Marlboro Lights cigarettes such that the claimed lower tar and nicotine levels are purportedly achieved by placing vent holes on the filter, when you knew or should have known that such holes are covered or blocked by the smoker's fingers or lips under normal use, thereby negating any effect of such holes in achieving a lower tar or lower nicotine cigarette;

(c)    failing to mark such vent holes or to make them visible to the naked eye, so that they could attempt to smoke the cigarettes in a fashion that does not block the vent holes;

75 State Street, Boston, Massachusetts 02109   (617) 439-3939   Fax (617) 439-0134

SHAPIRO HABER & URMY LLP

Philip Morris Companies, Inc.
July 10, 1998
Page 2


      (d)    failing to instruct smokers, on the packaging or elsewhere, on how to smoke the cigarettes so as to obtain the claimed low tar and low nicotine;

      (e)    failing to disclose the material fact that smokers could not achieve lower tar or nicotine in Marlboro Lights if they blocked those vent holes with their lips or fingers, or if they increased puff volume or frequency;

      (f)    failing to disclose the material fact that you intentionally manipulated the tobacco used in Marlboro Lights so as to boost or increase its addictive propensities.

Plaintiffs demand as damages the amount of all monies paid to purchase Marlboro Lights cigarettes in the Commonwealth of Massachusetts, or statutory damages of $25.00 per pack of Marlboro Lights cigarettes sold in the Commonwealth of Massachusetts, whichever is greater.

Sincerely yours,

Thomas G. Shapiro

TGS/ckh