# Exhibit 28

CC: Case Management

WILLIAMS & CUKER
By: Esther Berezofsky, Esq.
Woodland Falls Corporate Park
200 Lake Drive East, Suite 100
Cherry Hill, NJ 08002
(609) 667-8660

SHELLER, LUDWIG & BADEY
By: Stephen A. Sheller, Esquire
One Greentree Centre
Suite 201
Route 73 & Greentree Road
Marlton, NJ 08053
(609) 988-5590

DAVIS SAPERSTEIN & SALOMON, PC
By: Marc C. Saperstein, Esquire
375 Cedar Lane
Teaneck, NJ 07666
(201) 907-5000

SPOHRER, WILNER, MAXWELL,
MACIEJEWSKI & MATTHEWS
By: Norwood S. Wilner, Esquire
444 E. Duval Street
Jacksonville, Florida 32202

**Attorneys for Plaintiffs**

---

| | | |
|---|---|---|
| PAMELA TROMBINO, | : | SUPERIOR COURT OF NEW JERSEY |
| on Behalf of Herself and All Others | : | LAW DIVISION |
| Similarly Situated, | : | MIDDLESEX COUNTY |
| | : | DOCKET NO. L-11263-98 |
| Plaintiffs, | : | |
| v. | : | CASE CODE NO. 241 |
| | : | |
| R.J. REYNOLDS TOBACCO COMPANY; | : | Civil Action |
| and N.J.R. NABISCO, INC. | : | |
| | : | CLASS ACTION COMPLAINT |
| Defendants. | : | AND JURY DEMAND |

---

## CLASS ACTION COMPLAINT

AND NOW comes the individual and representative Plaintiff, Pamela Trombino, by and through her attorneys, WILLIAMS & CUKER, SHELLER, LUDWIG & BADEY, DAVIS SAPERSTEIN & SALOMON, PC, and SPOHRER, WILNER, MAXWELL, MACIEJEWSKI & MATTHEWS and files the following Complaint in Civil Action on behalf of herself and all others similarly situated against the Defendants and alleges the following:

## NATURE OF THE ACTION

1.     Through a course of conduct spanning several decades, Defendants manufactured, marketed, and distributed cigarettes designated as "light" or "ultralight". Following the release of scientific studies which revealed that higher tar and nicotine levels correlated to a significantly increased risk of developing smoking-related diseases, Defendant, R.J. Reynolds Tobacco Company (hereinafter referred to as "Reynolds") marketed and portrayed "light" and "ultralight" cigarettes as containing reduced levels of these compounds. Defendant R.J.R. Nabisco, Inc. (hereinafter referred to as "Nabisco") affirmatively acted to aid and abet R.J. Reynolds in furtherance of their fraudulent and deceptive practices of marketing and portraying "light" and "ultralight" cigarettes as having reduced levels of tar and nicotine. Defendants preyed on health conscious consumers by conveying a message that "light" and "ultralight" cigarettes were less hazardous to human health by virtue of their allegedly diminished tar and nicotine levels. In reality, the "light" and "ultralight" cigarettes were intentionally designed to generate reduced tar and nicotine levels on the Federal Trade Commission's Cambridge Filter System while simultaneously delivering significantly higher levels of tar and nicotine to human smokers. These actions violated the New Jersey Consumer Fraud Act,

2

N.J.S.A. 56:8-1 et seq. Plaintiff, individually and on behalf of the Class, seeks damages in the form of reimbursement of all monies paid to Defendants for the purchase of "light" and/or "ultralight" cigarettes. Plaintiff also seeks, on behalf of herself and the Class, equitable relief in the form of an Order requiring Defendants to cease making the misrepresentations complained of herein and cease the deceptive and fraudulent trade practices complained of herein.

## JURISDICTION AND VENUE

2.       This class action is properly within this Court's jurisdiction because it is an action brought by residents of the State of New Jersey against Defendants Reynolds, a New Jersey corporation and Nabisco, which regularly conducts business in New Jersey.

3.       At all times material to the allegations in this Complaint, Defendants Reynolds and Nabisco acted by and through their duly authorized agents, servants, and employees who were acting in the course and scope of their employment, and in furtherance of the business of said Defendants.

4.       Jurisdiction is proper in this Court, as Defendants at all times material to the allegations in this Complaint transacted business within the State of New Jersey. Said business transactions consisted of the sale and distribution of cigarettes within the State of New Jersey which led to the consumption of cigarettes by citizens and residents of the State of New Jersey. At all times relevant hereto, the sale and distribution of cigarettes within the State of New Jersey was engaged in for the express purpose of realizing pecuniary benefit.

5.       Jurisdiction is further proper in this Court, as Defendants, by acts and omissions, caused harm and injury to persons within the State of New Jersey. Specifically, Defendants caused harm and injury to Plaintiff and Class Members through violations of New Jersey's Consumer Fraud

3

Act. The named Plaintiff and Class Members purchased cigarettes which were marketed, distributed, and/or sold by Defendants Reynolds and Nabisco in the State of New Jersey. The named Plaintiff is a citizen of the State of New Jersey who smoked Reynolds brand Salem Lights cigarettes which were purchased in the State of New Jersey.

6.      Defendants Reynolds and Nabisco received substantial compensation and profits from the sale of cigarettes in the State of New Jersey, made material omissions and misrepresentations about their products in the State of New Jersey, and breached express and implied warranties in the State of New Jersey.

## PARTIES

### *Plaintiff and Proposed Class Representative*

7.      The Plaintiff and proposed Class Representative, Pamela Trombino, is a citizen of the State of New Jersey currently residing at 532 Birmingham Ave., Toms River, New Jersey 08754. Ms. Trombino began smoking at age seventeen (17) and continues to smoke to this day . Ms. Trombino attempted to minimize any potential health risks of cigarettes by smoking Reynolds brand Salem Lights cigarettes, manufactured by Defendants. Ms. Trombino smoked Salem Lights from the time Salem Lights were made available to the public until the present. During this period, Ms. Trombino smoked at least one and a half packs per day. The Reynolds brand Salem Lights was marketed by Defendant Reynolds under the pretense that it contained extremely low levels of tar and nicotine, the compounds generally associated with the development of smoking-related diseases.

### *Defendants*

8.      The Defendant, R.J. Reynolds Tobacco Company ("Reynolds"), is a New Jersey corporation with its principal place of business located at Fourth and Main Streets, Winston-Salem,

4

North Carolina.  Reynolds currently manufactures, advertises, and sells Camel, Vantage, Now,

Doral, Winston, Sterling, Magna, More, Century, Bright Rite, and Salem cigarettes throughout the

United States and in the State of New Jersey.  Reynolds is a wholly-owned subsidiary of Defendant

R.J.R. Nabisco, Inc.

9.      The Defendant, R.J.R. Nabisco, Inc. ("Nabisco"), is a Delaware corporation with its

principal place of business located at 1301 Avenue of the Americas, New York, New York 10015.

Nabisco is the parent corporation of Reynolds and has indirectly and/or directly participated in the

sale and manufacture of cigarettes both individually and through its agent and/or alter ego, Reynolds.

Nabisco conducts the aforementioned activities throughout the United States and in the State of New

Jersey.


## CLASS ACTION ALLEGATIONS

10.     Plaintiff brings this class action lawsuit pursuant to R.4:3-2. on behalf of herself and

all other similarly situated individuals, specifically:

> Residents of the State of New Jersey who, on or after March 3, 1992,
> purchased and smoked light and/or ultralight cigarettes within the
> State of New Jersey that were manufactured, marketed, and/or
> distributed by Defendants.

11.     Excluded from the Class are Defendants, their officers, directors, employees,

representatives, agents, successors and assigns, and entities in which Defendants have a controlling

interest.

12.     The Class is so numerous that joinder of all Members is impracticable.  While the

exact number of Class Members is currently unknown, Plaintiff believes and therefore avers that

5

hundreds of thousands of New Jersey residents are encompassed within the class definition. Class

Members may be informed of the pendency of this Class Action by published and broadcast notice.

13.    The claims of Class Members are inextricably intertwined by common questions of

law and fact, which predominate over any questions affecting only individual Class Members. These

common legal and factual questions arise from two central issues, which do not vary from Class

Member to Class Member and which may be determined without reference to the individual damages

incurred by any:

    a.    Defendant's intentional design and distribution of "light" and "ultralight"cigarettes, which generate reduced tar and nicotine levels on the Cambridge Filter System while delivering significantly higher levels of these compounds when smoked by actual human consumers; and

    b.    Defendant Reynolds' manipulation and control of nicotine levels in its products.

14.    Legal and factual questions which are common to all Class Members include, but are

not limited to:

    a.    Whether Defendants misrepresented the true tar and nicotine yields of the light" and "ultralight" cigarettes they manufactured, marketed, and/or distributed;

    b.    Whether Defendant Reynolds intentionally designed "light" and "ultralight" cigarettes to generate misleading tar and nicotine measurements on the Cambridge Filter System while delivering significantly higher quantities of tar and nicotine to human smokers;

    c.    Whether Defendants Reynolds manipulated and/or controlled nicotine;

    d.    Whether Plaintiff and Class Members are entitled to return of the monies paid for Defendants' cigarettes, as provided by N.J.S.A. 56:8-19 et seq.; and

    e.    Whether Class Members are entitled to injunctive, declaratory, and other equitable relief, pursuant to N.J.S.A. 56:8-19.

6

15.     Plaintiff was exposed to Defendants' commercial misrepresentations and deceptive trade practices in connection with the sale and distribution of "light" and "ultralight" cigarettes. Ms. Trombino purchased cigarettes that were the subject of these misrepresentations and deceptive trade practices. Consequently, Plaintiff's claims are typical of the claims presented by the Class Members.

16.     As representative of the Class, the named Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff has no interests adverse to Class Members and has retained competent counsel experienced in the prosecution of complex consumer class actions. Plaintiff intends to vigorously prosecute this action to conclusion for the benefit of the Class.

17.     A Class Action provides a fair and efficient method for adjudication of the controversy for the following reasons:

a.      Common questions of law and fact, as stated more fully in paragraph 17, predominate over any question affecting only individual members;

b.      Joinder of hundreds of thousands of tobacco consumer fraud cases arising across the State of New Jersey would be overwhelmingly complex, exceedingly time-consuming, and unduly burdensome to the courts in which such individual litigation would proceed;

c.      Individual litigation would magnify the delay and expense to all parties of litigating the wrongdoing, injuries, and harm caused by Defendant;

d.      Adjudicating these claims in the form of a Class Action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court;

e.      Prosecution of separate actions by individual Members of the Class presents the potential and high risk of inconsistent contradictions that would confront Defendant with incompatible standards of conduct;

f.      Plaintiff believes and therefore avers that no other litigation of this type has been filed in the State of New Jersey; and

g.      The Superior Court of New Jersey is an appropriate forum for this litigation

7

because it has the power to exercise jurisdiction over absent class members who are New Jersey residents and Defendant, a New Jersey corporation actively conducting business within the State of New Jersey.

18.     Plaintiff seeks all damages available under the New Jersey Consumer Fraud Act including reasonable attorneys' fees and costs of suit.

19.     A Class Action seeking declaratory and equitable relief is appropriate in this matter, as Defendants' misrepresentations and deceptive conduct are carried on in a manner generally applicable to the Class. To this end, Plaintiff seeks an Order, on equitable grounds, requiring the following:

      a.     That Defendant ceases to make the misrepresentations complained of herein; and

      b.     That Defendant ceases the deceptive trade practices complained of herein.

## FACTUAL ALLEGATIONS

### *Dose-Response Findings and Development of the Cambridge Filter System*

20.     Between 1950 and 1964, numerous published scientific reports revealed a dose-response relationship between smoking and cancer. Specifically, the research established that the incidence of cancer was proportionally related to the level of exposure to the components of cigarette smoke. Furthermore, several laboratory studies demonstrated that carcinomas *were not* generated below a particular dose level.

21.     The United States Federal Trade Commission was deeply concerned by the dose-response findings and anxious to provide consumers with a meaningful method of comparing the tar and nicotine doses of brands on the market. Thus, in 1967 the Federal Trade Commission approved the Cambridge Filter System to provide consumers with uniform measurements of tar and nicotine.

In an August 1994 report, Dr. Alan Rodgman, a top Research and Development scientist at the R.J.

Reynolds Tobacco Company observed that

> Because of the dose-response relationships reported in the human epidemiological studies and the dose-response relationships in the biological studies conducted with CSC[1]-painted laboratory animals, the FTC proposed that the consumer should know the "tar" deliveries of marketed cigarettes in order to make an informed choice of his/her brand, depending on his/her degree of concern about the reported relationship between smoking and certain disease entities.

22.    The Cambridge Filter System purports to measure the amount of tar and nicotine in

a cigarette with a machine that "mimics" human smoking behavior.  The "inhaled" material is

collected on a pad, extracted, and analyzed to arrive at the tar and nicotine yield levels of that

particular cigarette.

### *The Inherent Inaccuracy of the Cambridge Filter System*

23.    Defendant-Reynolds has long conceded that the FTC method is neither a valid nor

reliable method to measure tar and nicotine intake in actual human smokers.  In fact, Dr. Alan

Rodgman, stated in a 1965 report that:

> The conclusion is therefore inescapable that labeling the amount of "tar and nicotine" on a cigarette package cannot give to the smoker meaningful information as to the amount or composition of the total solids and nicotine he receives from the cigarettes he smokes.  *He is more likely to be misled than informed.*  (emphasis added) [2]

24.    Defendant-Reynolds was intimately familiar with the flaws and inaccuracies of the

Cambridge Filter System because they used many of the same analytical procedures in Reynolds'

own laboratories.

---

[1]CSC is cigarette smoke condensate, a non-vapor form of the constituents of "tar" which has frequently been used in laboratory studies to determine the cancer-causing and cancer-promoting properties of cigarette smoke.

[2]Deposition of Alan Rodgman, August 5, 1997, p. 864:7.

25.     Several factors account for the inaccuracy and unreliable nature of the tar and nicotine yields, including but not limited to:

     a.     Reliance on unrealistic smoking parameters (e.g. puff size, duration, frequency) which results in an understatement of the amount of material actually ingested by human smokers; and

     b.     Design features which artificially minimize the tar and nicotine measurements on the Cambridge Filter System.

26.     Defendant-Reynolds' internal research revealed long ago that because the smoking machine does not rely on realistic smoking parameters, human smokers are actually ingesting an increased amount of tar and nicotine.  Specifically, in his August 1994 report, Dr. Rodgman noted that "An individual cigarette smoker generally does not consume his/her cigarette by the major smoking parameters . . . defined for use in the FTC smoking procedure . . . . 'Tar' and nicotine yields are increased by increasing the puff frequency and by increasing the puff volume."  The same report includes a table showing significantly increased tar and nicotine yields in Winston and Marlboro cigarettes when "realistic" smoking parameters are used.[2]  Unlike Dr. Rodgman or Defendant-Reynolds, consumers of "light" and/or "ultralight" cigarettes have no knowledge that the Cambridge Filter System relies on unrealistic and inaccurate parameters that essentially eviscerate the meaning of the resultant tar and nicotine yields.

27.     Inexplicably, despite Defendant-Reynolds belief that the "amount of total solids and nicotine collected by the smoking machine is not the same as what the individual smoker receives" (Rodgman, 1965), Defendants continue to market these cigarettes as "light" and "ultralight" to health

---

[2]Attached hereto as Exhibit "A" is a true and correct copy of Tables 8 and 9 to a report entitled "FTC Smoking Method Used for 'Tar' and Nicotine Data" by Alan Rodgman, a research and development scientist for Defendant-Reynolds.  These tables contrast tar and nicotine yields between "realistic" smoking parameters and the FTC Cambridge Filter System.

conscious smokers. Despite the fact that the so-called "light" and "ultralight" cigarettes *do not* deliver reduced levels of tar and nicotine to smokers, Defendant continues to distribute these products and exploit the belief of health conscious smokers that they pose a reduced risk to human health. Defendants know that health conscious smokers are purchasing "light" and/or "ultralight" cigarettes with the belief that reduced tar and nicotine levels pose a minimized risk to their health. In fact, Defendant-Reynolds fostered and encouraged this belief, as evidenced by Dr. Rodgman's statement in the August 1994 report that:

> In response to [the dose-response] reports, the U.S. cigarette manufacturers subsequently marketed newly designed cigarette brands which provided a range of "tar" (and nicotine) yields, *thus enabling the consumer to choose a brand whose "tar" yield satisfied his/her concern about smoking and health.*

(emphasis added).

28.     On one hand, Defendant-Reynolds fully intended that consumers would correlate the Cambridge Filter System tar and nicotine yields to the risk level each cigarette brand posed to their health. On the other, more sinister hand, Defendant-Reynolds possessed a keen awareness that the tar and nicotine yields generated by the Cambridge Filter System were fatally inaccurate and "more likely to misle[a]d than inform[]."

### The Fallacy of "Light" and "Ultralight" Cigarettes

29.     By identifying "light" and "ultralight" products as containing reduced tar and nicotine levels in the wake of the dose-response research, Defendant-Reynolds conveyed a clear message to consumers that "light" and "ultralight" cigarettes posed a decreased health risk. In reality, Defendant-Reynolds' "light" and "ultralight" products contained significantly higher tar and nicotine

11

levels than indicated, thus causing a likelihood of confusion and/or misunderstanding as to the certification of these brands as "light" or "ultralight".

30.    Health conscious smokers seeking to minimize any risk of developing smoking-related diseases had no knowledge that "light" and "ultralight" cigarettes were designed to deliver much different tar and nicotine levels and purchased these cigarettes believing that they represented a less hazardous smoking alternative.   In developing and marketing "light" and "ultralight" cigarettes, Defendant-Reynolds *intended* that consumers would associate the allegedly lower tar and nicotine yields with a decreased risk of developing smoking-related diseases.

31.    Defendant-Reynolds classified cigarettes as "light" or "ultralight" based on whether they fall within defined tar and nicotine yield ranges.


### *Designing "Light" and "Ultralight" Cigarettes to Exploit the Cambridge Filter System*

32.    By the late 1960's, Defendant-Reynolds had developed sufficient product technology to enable them to consciously and intentionally control mainstream tar delivery and composition. By virtue of this technology, Defendant-Reynolds was able to intentionally incorporate design parameters into its commercial cigarettes which facilitated active control and manipulation of the tar level.  These design parameters include, but are not limited to:

      a.      Tobacco blend and weight;

      b.      Tobacco rod length and circumference;

      c.      Filter tips (material type and additives);

      d.      Processed tobaccos (reconstituted tobacco sheet, expanded tobacco);

12

> e.    Paper (type and additives);
>
> f.    Additives (ammoniation); and
>
> g.    Air dilution (increased paper porosity, filter tip perforation).

33.    Dr. Rodgman's August 1994 report references an internal study of variations in the composition of mainstream tar in various types of cigarettes and demonstrates the ease with which Defendants were able to manipulate tar content to the exact level desired in any particular product. Specifically, he observed that

> Cigarette design technologies for the cigarettes . . . included RTS inclusion, stem inclusion, tobacco substitute inclusion, nitrate enhancement, humectant (glycerol) effect, tobacco additives, *e.g.*, cocoa, nicotine adjustment, use of high porosity citrate-treated cigarette paper. Several of these together with other technologies (expanded tobacco, perforated filter tips, filter-tip additives) have been used in concert and to different degrees to attain specific tar" yields, ranging from 0.1 to over 40 mg.

34.    Through utilization of these design parameters, Defendant-Reynolds was able to actively control and manipulate tar levels and claim an alleged decline in the tar yield of its commercial cigarettes.

35.    However, in addition to uncovering design innovations that made active control and manipulation of tar levels and composition possible, Defendant-Reynolds' scientists had taken tar control one reprehensible step further. Through research and development, Defendant-Reynolds developed design innovations which generated reduced tar and nicotine yields on the Cambridge Filter System but which produced significantly higher levels when smoked by actual human consumers. In the 1981 Report of the Surgeon General on "The Health Consequences of Smoking: The Changing Cigarette", as quoted in Dr. Rodgman's August 1994 report, it was noted that "the relative yield of many constituents is affected by butt length, puff frequency, and degree of

13

ventilation."

36.     For several decades, Defendant-Reynolds adhered to a policy of designing commercial cigarettes to generate reduced tar and nicotine levels on the Cambridge Filter System but significantly higher levels when smoked by actual human consumers.   Although the 1981 Surgeon General's report hinted at the existence of a problem, consumers remained thoroughly in the dark as to the fact that the "light" and "ultralight" cigarettes they were smoking to reduce their health risks really did not fall into that category at all.   In fact, by intentionally designing its cigarettes to trick the Cambridge Filter System, Defendant-Reynolds used additives and processes which introduced dangerous components into tobacco and its smoke, thus heightening the risk to the public of developing smoking-related diseases.

37.     One technique commonly employed by Defendant-Reynolds to generate lower tar and nicotine ratings for their "light" and "ultralight" products on the Cambridge Filter System is filter ventilation.   In this process, Defendant-Reynolds drills nearly invisible holes in the filter paper or otherwise render the filter paper more porous.   Predictably, many smokers of "light" and/or "ultralight" cigarettes block the tiny, laser generated perforations in the "ventilated" filters with their fingers or lips.   This blockage results in the reduction or elimination of dilution by ventilation, thereby resulting in greater tar and nicotine yields to smokers than those measured by the Cambridge Filter System.

38.     As far back as 1976, Reynolds researcher Murry Senkus recognized that "a confirmed smoker attempts to get a certain desired level of nicotine . . . . after all the nicotine has been biologically, or pharmacologically inactivated, the smoker experiences a need for nicotine and lights up another cigarette."

14

39.     For many years, Defendant-Reynolds has been acutely aware that the ability to block ventilation holes enables smokers to "compensate" for the reduced nicotine levels in "light" and "ultralight" cigarettes.  Through extensive internal research, Defendant-Reynolds knew and continues to be aware that smokers of "light" and "ultralight" cigarettes unconsciously modified their ‑smoking behavior to obtain a higher amount of nicotine than that measured by the FTC smoking machine (e.g. deeper and more frequent puffs).

40.     Defendant-Reynolds has not only expended significant research and development resources on the study of smoker compensation, but has applied the resultant knowledge to the design of cigarettes that enable smokers to more effectively compensate for lower nicotine yields.  Plaintiff believes and therefore avers that smokers of Defendant-Reynolds' "light" and/or "ultralight" products have no knowledge that these products are designed to facilitate smoker compensation and deliver higher tar and nicotine levels than those indicated by the Cambridge Filter System.

41.     Another technique utilized by Defendant-Reynolds to ensure that smokers ingest a higher level of nicotine than that registered by the FTC smoking machine is manipulation of the pH of smoke.  Reynolds scientists have amassed significant research which demonstrates that increased smoke pH correlates with increased bioavailability of nicotine in smoke.  Plaintiffs believe and therefore aver that purchasers of Defendants' "light" and/or "ultralight" cigarettes have no knowledge that these products are specifically designed to deliver higher nicotine levels than those indicated by the Cambridge Filter System.

*Brazen Contravention of Federal Trade Commission Mandates*

42.     On March 25, 1966, the Federal Trade Commission issued a letter to each U.S. cigarette manufacturer which specifically limited usage of the Cambridge Filter System tar and

15

nicotine yields to "a factual statement of the tar and nicotine content (expressed in milligrams) of the mainstream smoke from a cigarette . . . so long as (1) no collateral representations (other than factual statements of tar and nicotine contents of cigarettes offered for sale to the public) are made . . . ."

43.     In brazen contravention of this clear mandate, Defendant-Reynolds augmented its "factual statement[s] of the tar and nicotine content" with collateral representations that particular lines of cigarettes were "light" or "ultralight".

44.     Defendant-Reynolds was acutely aware of widely publicized studies which scientifically connected smoking with the development of cancer, heart disease, emphysema and other serious health risks.  Furthermore, Defendant-Reynolds was sharply cognizant of the fact that consumers associated reduced tar and nicotine levels with a reduced risk of developing various smoking-related diseases.  Consumers clearly did not have access to the information Defendant-Reynolds possessed regarding the inaccuracies and unreliable nature of the Cambridge Filter System.  Having fostered and encouraged this consumer misperception, Defendant-Reynolds brazenly capitalized on the belief of health conscious smokers that smoking "light" and "ultralight" cigarettes equated to a reduced risk of developing smoking-related disease.  Predictably, consumers anxious to reduce their smoking-related health risks flocked to these brands, unaware that the products they were purchasing were not what Defendants purported to be selling.

### *Designing Cigarettes to Maximize the Addictive Properties of Nicotine*

45.     For several decades, Defendant-Reynolds pursued a research agenda which focused, *inter alia*, on various methods of nicotine manipulation and maximizing the effect of nicotine in the body.  This research is routinely applied to its product line and used to manipulate nicotine levels

16

in cigarettes. One example of this manipulation is the addition of various chemicals (e.g. ammonia) to tobacco to increase nicotine delivery to the smoker.

46.     Defendant-Reynolds also controls and manipulates the nicotine levels in cigarettes through the use of reconstituted tobacco. Reconstituted tobacco is an amalgamation of tobacco stalks, stems, and dust that manufacturers previously discarded, but now recycle as a cost savings measure. In the reconstitution process, pieces of tobacco material undergo treatment that results in the extraction of some soluble components, including nicotine. The pieces are then combined to form a sheet, to which Defendant-Reynolds *directly applies nicotine extract in the exact amounts it desires*. Through this application procedure, Defendant-Reynolds is able to control and manipulate the exact amount of nicotine that ultimately winds up in cigarettes smoked by consumers.

47.     To create a more potent nicotine kick in its cigarettes, Defendant-Reynolds incorporates various chemical additives (e.g. ammonia) into the manufacturing process. These additives liberate nicotine from its salt form and transform it into an extremely potent vaporized form. This free-base nicotine has a significantly increased effect on the smoker and a unique ability to evade detection by the Cambridge Filter System. Plaintiff believes, and therefore avers, that consumers are unaware that the nicotine levels represented by Defendant-Reynolds do not include additional, free-base nicotine particles that are able to evade detection by the Cambridge Filter System.

48.     In addition to the use of chemical additives to increase nicotine bioavailability while generating reduced nicotine levels on the Cambridge Filter System, Defendant-Reynolds employs design techniques similar to those used to control and manipulate tar levels. Tobacco blend and weight, rod length and circumference, filters, tobacco processing, papers, and air dilution are all used

to actively manipulate and control nicotine levels.

49.     By intentionally packaging a dependency-creating form of nicotine in its products and representing that these products have a lower nicotine yield level, Defendant-Reynolds intended to foster and perpetuate nicotine-dependency in its consumers.  This conduct was solely motivated by a desire to keep people smoking, thus maintaining and expanding Defendant-Reynolds' profit margins.

50.     At all times material to the allegations contained herein, Defendant-Reynolds had knowledge that the nicotine in its cigarettes had a much greater physiological impact on smokers than its low nicotine level would otherwise indicate.  Defendant-Reynolds knew consumers believed a low nicotine level indicated a less hazardous product and intentionally exploited this belief by touting low nicotine levels while secretly manipulating the form of the nicotine to deliver a greater impact.

51.     Through each and every one of the aforementioned actions, Defendant-Reynolds has sustained a continuing market for products that consumers are routinely misled to believe contains less of the harmful ingredients found in regular cigarettes.

## COUNT I - NEW JERSEY CONSUMER FRAUD ACT - LEGAL RELIEF

52.     Plaintiff, on behalf of herself and the Class, re-allege, as if fully set forth herein, each and every allegation contained in paragraphs 1-51.

53.     In purchasing cigarettes manufactured and distributed by Defendant, the Plaintiff and Class Members purchased goods which were primarily used for personal, family and/or household purposes.  Plaintiff and Class Members purchased Defendants' cigarettes for the sole objective of personal consumption, with absolutely no commercial purpose.

18

54.     Defendant, in its' capacity as a manufacturer, seller, and distributor of cigarettes within the State of New Jersey, is a "person" for purposes of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

55.     Defendants committed unconscionable commercial practices, fraud, deception, false pretense, misrepresentation, and/or the knowing concealment, suppression or omission of material facts with intent that others rely on such concealment, suppression or omission in connection with the sale or advertisement of merchandise in violation of N.J.S.A. 56:8-2, generally and in the following particulars:

  a.     By intentionally designing "light" and "ultralight" cigarettes in a manner which generated reduced tar and nicotine levels on the Cambridge Filter System, but which delivered substantially higher amounts to consumers, Defendants Reynolds and Nabisco committed an unconscionable commercial practice and used deception, fraud, false pretense, misunderstanding in "light" and "ultralight" cigarettes, and/or omitted material facts with the intent that plaintiff class rely on this omission.

  b.     In designing and marketing "light" and "ultralight" cigarettes, Defendants Reynolds and Nabisco intended for consumers to associate these brands with a reduced risk of developing smoking-related diseases. A reasonable person when confronted with such a characterization, equates it to reduced tar and nicotine levels in these products. Because Defendants Reynolds and Nabisco intentionally designed "light" and "ultralight" cigarettes in a manner that caused smokers to ingest significantly greater quantities of tar and nicotine than the "light" and/or "ultralight" designation would indicate, Defendants Reynolds and Nabisco committed an unconscionable commercial practice and used deception, fraud, false pretense, misunderstanding in "light" and "ultralight" cigarettes, and/or omitted material facts with the intent that plaintiff class rely on this omission.

  c.     By representing that "light" and "ultralight" cigarettes have significantly reduced levels of tar and nicotine, Defendant Reynolds committed deception, fraud, false pretense and unconscionable commercial practice.

  d.     By representing that the nicotine found in their cigarettes has not been manipulated and/or controlled, Defendants Reynolds and Nabisco committed

deception, fraud, false pretense and unconscionable commercial practice.

e.  By representing that "light" and "ultralight" cigarettes contain significantly reduced quantities of tar and nicotine when in reality, the smoker ingests a substantially higher amount of these materials, Defendants have committed deception, fraud, false pretense and unconscionable commercial practice.

f.  By advertising certain of their cigarettes as "light" and/or "ultralight", with full knowledge that said cigarettes do not contain "light" and/or "ultralight" levels of tar and nicotine when smoked by actual human consumers and with the concomitant intent to sell said cigarettes despite this knowledge, Defendants Reynolds and Nabisco committed an unconscionable commercial practice and used deception, fraud, false pretense, misunderstanding in "light" and "ultralight" cigarettes, and/or omitted material facts with the intent that plaintiff class rely on this omission.

g.  By designing "light" and "ultralight" cigarettes to deliver amounts of tar and nicotine to consumers that are significantly higher than the measurements generated by the Cambridge Filter System, Defendants Reynolds and Nabisco committed an unconscionable commercial practice and used deception, fraud, false pretense, misunderstanding in "light" and "ultralight" cigarettes, and/or omitted material facts with the intent that plaintiff class rely on this omission.

56.  As a result of the aforementioned unfair and/or deceptive acts and/or practices, Plaintiffs and Class Members have suffered an ascertainable loss of money, in that they have purchased cigarettes from Defendants.

57.  Pursuant to the terms of the New Jersey Consumer Fraud Act, Plaintiffs and Class Members are entitled to recover up to three times the actual damages sustained, plus attorneys fees, filing fees and reasonable costs of suit pursuant to N.J.S.A. 56:8-19.

WHEREFORE, Plaintiffs and Class Members demand judgment in their favor and respectfully request damages for each Class Member , exclusive of costs, interest, and reasonable attorney fees and all other such relief as the Court deems appropriate.

## COUNT II - NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. 56:8-19 - EQUITABLE RELIEF

58.     Plaintiff, on behalf of herself and the Class, re-allege, as if fully set forth herein, each and every allegation contained in paragraphs 1-57.

59.     Defendants' misrepresentations about the true amount of tar and nicotine ingested by smokers has exposed smokers to a greater health hazard than Defendants' advertising, marketing, and representations would otherwise indicate.

60.     Defendants' continuing misrepresentations about the true tar and nicotine yields of its products is causing immediate and irreparable injuries to the health and well-being of smokers. The demographic group most important to Defendants— children — is the one group of individuals least able to defend itself against the persistent and pernicious misrepresentations of Defendants, resulting daily in scores of new victims of the life-threatening products peddled by Defendants.

WHEREFORE, Plaintiffs and Members of the Class demand judgment in their favor and respectfully request the following equitable relief:

1.     That Defendants cease making the misrepresentations complained of herein;

2.     That Defendants cease the deceptive trade practices complained of herein; and

3.     Any and all such other equitable relief as this Court shall deem appropriate.

Respectfully submitted,

WILLIAMS & CUKER

By:_____

Esther Berezofsky, Esquire
Attorneys for Plaintiffs

21

SHELLER, LUDWIG & BADEY
By:     Stephen A. Sheller, Esquire
        Attorneys for Plaintiffs

DAVIS, SAPERSTEIN & SALOMON, PC
By:     Marc C. Saperstein, Esquire
        Attorneys for Plaintiffs

SPOHRER, WILNER, MAXWELL,
MACIEJEWSKI & MATTHEWS
By:     Norwood S. Wilner, Esquire
        Attorneys for Plaintiffs

Date: November 9, 1998

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury.

WILLIAMS & CUKER

By:_____
        Esther Berezofsky, Esquire
        Attorneys for Plaintiffs

SHELLER, LUDWIG & BADEY
By:     Stephen A. Sheller, Esquire
        Attorneys for Plaintiffs

DAVIS, SAPERSTEIN & SALOMON, PC
By:     Marc C. Saperstein, Esquire
        Attorneys for Plaintiffs

SPOHRER, WILNER, MAXWELL,
MACIEJEWSKI & MATTHEWS
By:     Norwood S. Wilner, Esquire
        Attorneys for Plaintiffs

Date: November 9, 1998

22



Z 096 496 198

**MAIL**

*Return Receipt Requested*

DEC 04 1998

# FIRST CLASS MAIL





Woodland Falls Corporate Park
200 Lake Drive East, Suite 100
Cherry Hill, New Jersey 08002

R.J. Reynolds Tobacco Company
Fourth and Main Streets
Winston-Salem, North Carolina






