# Exhibit 29

CC: Case Management



**SHELLER, LUDWIG & BADEY.**
BY:   STEPHEN A. SHELLER, ESQ./KATE MCNAMARA, ESQ.
IDENTIFICATION NO.  03270/80269      ATTORNEY FOR  Plaintiff
1528 WALNUT STREET
3RD FLOOR
PHILADELPHIA, PENNSYLVANIA 19102
(215) 546-5510

PATRICIA A. OLIVER
2039 WALNUT AVENUE
HOLMES,   PA  19043-1213
Individually and on Behalf of All
Other Similarly Situated Individuals

    vs.

R.J. REYNOLDS TOBACCO CO.
through its agent for service of
process The Prentice-Hall Corporation
Systems, Inc.
319 South Broad Street
Harrisburg,   PA  17101
(See attached sheet for Additional Defendants)

*COURT OF COMMON PLEAS*
PHILADELPHIA *DIVISION*

MARCH      *TERM,*  1998

*No.*    268

## AMENDED CLASS ACTION COMPLAINT IN CIVIL ACTION
### MISCELLANEOUS   26070

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

**PHILADELPHIA BAR ASSOCIATION**
**LAWYER REFERRAL AND INFORMATION SERVICE**
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone: 215-238-1701

### AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya aún previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELÉFONO A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**ASOCIACIÓN DE LICENCIADOS DE FILADELFIA**
**SERVICIO DE REFERENCIA E INFORMACIÓN LEGAL**
One Reading Center
Filadelfia, Pennsylvania 19107
Teléfono: 215-238-1701

**DEFENDANTS CONTINUED FROM ATTACHED SHEET**

R.J.R. NABISCO, INC.,
1302 Avenue of the Americas
New York, NY   10015

    and

UNITED WHOLESALE TOBACCO AND
CANDY, d/b/a UNITED VENDING SERVICE,
INC.,
4718 Pennypack Street
Philadelphia, PA 19136

**CC: Case Management**

## AMENDED CLASS ACTION COMPLAINT IN CIVIL ACTION

AND NOW comes the individual and representative Plaintiff, Patricia A. Oliver, by and through her attorneys, SHELLER, LUDWIG & BADEY, and files the following Complaint in Civil Action on behalf of herself and all others similarly situated against the Defendants:

### NATURE OF THE CASE

1.      Through a course of conduct spanning several decades, Defendants manufactured, marketed, and distributed cigarettes designated as "light" or "ultralight".  Following the release of scientific studies which revealed that higher tar and nicotine levels correlated to a significantly increased risk of developing smoking-related diseases, Defendants-Reynolds and Nabisco marketed and portrayed "light" and "ultralight" cigarettes as containing reduced levels of these compounds. Defendants preyed on health conscious consumers by conveying a message that "light" and "ultralight" cigarettes were less hazardous to human health by virtue of their allegedly diminished tar and nicotine levels.  In reality, the "light" and "ultralight" cigarettes were intentionally designed to generate reduced tar and nicotine levels on the Federal Trade Commission's Cambridge Filter System while simultaneously delivering significantly higher levels of tar and nicotine to human smokers. These actions violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* (1998).  Plaintiff, individually and on behalf of the Class, seeks damages in the form of reimbursement of all monies paid to Defendants for the purchase of "light" and/or "ultralight" cigarettes.  Plaintiff also seeks, on behalf of herself and the Class, equitable relief in the form of an Order requiring Defendants to cease making the misrepresentations complained of herein and cease the deceptive trade practices complained of herein.

1

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this Class Action because it is a claim by residents of the Commonwealth of Pennsylvania, including Philadelphia County, against several Defendants that are foreign corporations and one Defendant that is a Pennsylvania corporation, created under the laws of the Commonwealth of Pennsylvania.

3.      At all times material to the allegations in this Complaint, Defendants acted by and through their duly authorized agents, servants, and employees who were acting in the course and scope of their employment, and in furtherance of the business of said Defendants.

4.      Jurisdiction is proper in this Court, as Defendants at all times material to the allegations in this Complaint transacted business within the Commonwealth of Pennsylvania, including but not limited to Philadelphia County.   Said business transactions consisted of the sale and distribution of cigarettes within the Commonwealth of Pennsylvania, which led to the consumption of cigarettes by citizens and residents of the Commonwealth of Pennsylvania.   At all times relevant hereto, the sale and distribution of cigarettes within the Commonwealth of Pennsylvania was engaged in for the express purpose of realizing pecuniary benefit.

5.      Jurisdiction is further proper in this Court, as Defendants caused harm and injury to persons within the Commonwealth of Pennsylvania, by acts and omissions committed within the Commonwealth.   Specifically, Defendants caused harm and injury to Plaintiff and Class Members through violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law.   The named Plaintiff and Class Members purchased cigarettes which were marketed, distributed, and/or sold by Defendants in the Commonwealth of Pennsylvania, including but not limited to Philadelphia County.   The named Plaintiff is a citizen of the Commonwealth of Pennsylvania and a substantial

2

number of Class Members reside in Philadelphia County.

6.      Defendants advertised in the Commonwealth of Pennsylvania, received substantial compensation and profits from the sale of cigarettes in the Commonwealth of Pennsylvania, made material omissions and misrepresentations about their products in the Commonwealth of Pennsylvania, and breached express and implied warranties in the Commonwealth of Pennsylvania. One Defendant, United Wholesale Tobacco and Candy, is a corporation duly organized under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Philadelphia County.

7.      Venue is proper in this Court, as each of the Defendants regularly conducts business within Philadelphia County through the sale and distribution of cigarettes. Furthermore, Defendants' acts and omissions in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, as detailed more fully below, and the transactions and/or occurrences out of which said violations arose took place in Philadelphia County.

## PARTIES

*Plaintiff and Proposed Class Representative*

8.      The Plaintiff and proposed Class Representative, Patricia A. Oliver, is an adult individual currently residing at 2039 Walnut Avenue, Holmes, Pennsylvania 19043-1213. Ms. Oliver began smoking at age 16 and continued to smoke for forty-three (43) years until diagnosed with terminal lung cancer as a result of smoking cigarettes in January of 1997. Prior to being diagnosed with terminal lung cancer, Ms. Oliver attempted to minimize any potential health risk by smoking Vantage ultralight cigarettes, manufactured by Defendants. Ms. Oliver smoked Vantage ultralights from the time they came on the market until her cancer diagnosis in 1997. During this period, Ms.

3

Oliver smoked at least two (2) packs per day. The Vantage "ultralight" brand was marketed by Defendants-Reynolds and Nabisco and distributed by Defendant-United Wholesale Tobacco and Candy under the pretense that it contained extremely low levels of tar and nicotine, the compounds generally associated with the development of smoking-related diseases.

*Defendants*

9.       The Defendant, R.J. Reynolds Tobacco Company ("Reynolds"), is a New Jersey corporation with its principal place of business located at Fourth and Main Streets, Winston-Salem, North Carolina. Reynolds currently manufactures, advertises, and sells Camel, Vantage, Now, Doral, Winston, Sterling, Magna, More, Century, Bright Rite, and Salem cigarettes throughout the United States and in the Commonwealth of Pennsylvania, including but not limited to Philadelphia County. Reynolds is a wholly-owned subsidiary of Defendant R.J.R. Nabisco, Inc.

10.       The Defendant, R.J.R. Nabisco, Inc. ("Nabisco"), is a Delaware corporation with its principal place of business located at 1301 Avenue of the Americas, New York, New York 10015. Nabisco is the parent corporation of Reynolds and has indirectly and/or directly participated in the sale and manufacture of cigarettes both individually and through its agent and/or alter ego, Reynolds. Nabisco conducts the aforementioned activities throughout the United States and in the Commonwealth of Pennsylvania, including but not limited to Philadelphia County.

11.       The Defendant, United Wholesale Tobacco and Candy ("United"), is a Pennsylvania Corporation organized and doing business under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 4718 Pennypack Avenue, Philadelphia, Pennsylvania 19136. At all times material to the allegations in this Complaint, United promoted the distribution and sale of cigarettes manufactured by Defendant-Reynolds and Defendant-Nabisco throughout the

4

Commonwealth of Pennsylvania, including but not limited to Philadelphia County.

## CLASS ACTION ALLEGATIONS

12.     Plaintiff brings this class action lawsuit on behalf of herself and all other similarly situated individuals, specifically:

> Residents of the Commonwealth of Pennsylvania who, on or after March 3, 1992, purchased and smoked light and/or ultralight cigarettes within the Commonwealth of Pennsylvania that were manufactured, marketed, and/or distributed by Defendants.

13.     Excluded from the Class are Defendants, their officers, directors, employees, representatives, agents, successors and assigns, and entities in which Defendants have a controlling interest.

14.     This action may properly be maintained as a Class Action pursuant to Rule 1702 of the Pennsylvania Rules of Civil Procedure for the following reasons:

15.     The Class is so numerous that joinder of all Members is impracticable.  While the exact number of Class Members is currently unknown, Plaintiff believes and therefore avers that hundreds of thousands of Pennsylvania residents are encompassed within the class definition.  Class Members may be informed of the pendency of this Class Action by published and broadcast notice.

16.     The claims of Class Members are inextricably intertwined by common questions of law and fact, which predominate over any questions affecting only individual Class Members.  These common legal and factual questions arise from two central issues, which do not vary from Class Member to Class Member:

> a.     Defendants' intentional design and distribution of "light" and "ultralight" cigarettes, which generate reduced tar and nicotine levels on the Cambridge Filter System while delivering significantly higher levels of these compounds when smoked by actual human consumers; and

5

> b.    Defendant-Reynolds' manipulation and control of nicotine levels in its products.

17.    Legal and factual questions which are common to all Class Members include, but are not limited to:

> a.    Whether Defendants misrepresented the true tar and nicotine yields of the "light" and "ultralight" cigarettes they manufactured, marketed, and/or distributed;
>
> b.    Whether Defendant-Reynolds intentionally designed "light" and "ultralight" cigarettes to generate misleading tar and nicotine measurements on the Cambridge Filter System while delivering significantly higher quantities of tar and nicotine to human smokers;
>
> c.    Whether Defendant-Reynolds manipulated and/or controlled nicotine;
>
> d.    Whether Plaintiff and Class Members are entitled to return of the monies paid for Defendants' cigarettes, as provided by 73 P.S.§ 201-9.2(a) (1997); and
>
> e.    Whether Class Members are entitled to injunctive, declaratory, and other equitable relief, pursuant to 73 P.S. § 201-9.2(a) (1997).

18.    Plaintiff was exposed to Defendants' commercial misrepresentations and deceptive trade practices in connection with the sale and distribution of "light" and "ultralight" cigarettes. Ms. Oliver purchased cigarettes that were the subject of these misrepresentations and deceptive trade practices. Consequently, Plaintiff's claims are typical of the claims presented by the Class Members.

19.    As representative of the Class, the named Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff has no interests adverse to Class Members and has retained competent counsel experienced in the prosecution of complex consumer class actions. Plaintiff intends to vigorously prosecute this action to conclusion for the benefit of the Class.

6

20.    A Class Action provides a fair and efficient method for adjudication of the controversy for the following reasons:

a.    Common questions of law and fact, as stated more fully in paragraph 17, predominate over any question affecting only individual members;

b.    Joinder of hundreds of thousands of tobacco consumer fraud cases arising across the Commonwealth of Pennsylvania would be overwhelmingly complex, exceedingly time-consuming, and unduly burdensome to the courts in which such individual litigation would proceed;

c.    Individual litigation would magnify the delay and expense to all parties of litigating the wrongdoing, injuries, and harm caused by Defendants;

d.    Adjudicating these claims in the form of a Class Action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court;

e.    Prosecution of separate actions by individual Members of the Class engenders a high risk of inconsistent and varying adjudications that would confront Defendants with incompatible standards of conduct;

f.    Plaintiff believes and therefore avers that no other litigation of this type has been filed in the Commonwealth of Pennsylvania; and

g.    The Court of Common Pleas of Philadelphia County is an appropriate forum for this litigation because it has the power to exercise jurisdiction over absent class members who are Pennsylvania residents and Defendants, who actively conduct business within the Commonwealth.

21.    Plaintiff seeks all damages available under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, *et seq.*, including reasonable attorneys' fees and costs.

22.    A Class Action seeking declaratory and equitable relief is appropriate in this matter, as Defendants' misrepresentations and deceptive conduct are carried on in a manner generally applicable to the Class.  To this end, Plaintiff seeks an Order, on equitable grounds, requiring the following:

7

a. That Defendants cease making the misrepresentations complained of herein; and

b. That Defendants cease the deceptive trade practices complained of herein.

## FACTUAL ALLEGATIONS

### *Dose-Response Findings and Development of the Cambridge Filter System*

23. Between 1950 and 1964, numerous published scientific reports revealed a dose-response relationship between smoking and cancer. Specifically, the research established that the incidence of cancer was proportionally related to the level of exposure to the components of cigarette smoke. Furthermore, several laboratory studies demonstrated that carcinomas *were not* generated below a particular dose level.

24. The United States Federal Trade Commission was deeply concerned by the dose-response findings and anxious to provide consumers with a meaningful method of comparing the tar and nicotine doses of brands on the market. Thus, in 1967 the Federal Trade Commission approved the Cambridge Filter System to provide consumers with uniform measurements of tar and nicotine. In an August 1994 report, Dr. Alan Rodgman, a top Research and Development scientist at the R.J. Reynolds Tobacco Company observed that

> Because of the dose-response relationships reported in the human epidemiological studies and the dose-response relationships in the biological studies conducted with CSC[1]-painted laboratory animals, the FTC proposed that the consumer should know the "tar" deliveries of marketed cigarettes in order to make an informed choice of his/her brand, depending on his/her degree of concern about the reported relationship between smoking and certain disease entities.

_____

[1]CSC is cigarette smoke condensate, a non-vapor form of the constituents of "tar" which has frequently been used in laboratory studies to determine the cancer-causing and cancer-promoting properties of cigarette smoke.

8

25.     The Cambridge Filter System purports to measure the amount of tar and nicotine in a cigarette with a machine that "mimics" human smoking behavior.   The "inhaled" material is collected on a pad, extracted, and analyzed to arrive at the tar and nicotine yield levels of that particular cigarette.

*The Inherent Inaccuracy of the Cambridge Filter System*

26.     Defendant-Reynolds has long conceded that the FTC method is neither a valid nor reliable method to measure tar and nicotine intake in actual human smokers.   In fact, Dr. Alan Rodgman, stated in a 1965 report that:

> The conclusion is therefore inescapable that labeling the amount of "tar and nicotine" on a cigarette package cannot give to the smoker meaningful information as to the amount or composition of the total solids and nicotine he receives from the cigarettes he smokes. *He is more likely to be misled than informed.*  (emphasis added)

27.     Defendant-Reynolds was intimately familiar with the flaws and inaccuracies of the Cambridge Filter System because they used many of the same analytical procedures in Reynolds' own laboratories.

28.     Several factors account for the inaccuracy and unreliable nature of the tar and nicotine yields, including but not limited to:

      a.     Reliance on unrealistic smoking parameters (e.g. puff size, duration, frequency) which results in an understatement of the amount of material actually ingested by human smokers; and

      b.     Design features which artificially minimize the tar and nicotine measurements on the Cambridge Filter System.

29.     Defendant-Reynolds' internal research revealed long ago that because the smoking machine does not rely on realistic smoking parameters, human smokers are actually ingesting an

9

increased amount of tar and nicotine. Specifically, in his August 1994 report, Dr. Rodgman noted that "An individual cigarette smoker generally does not consume his/her cigarette by the major smoking parameters . . . defined for use in the FTC smoking procedure . . . . 'Tar' and nicotine yields are increased by increasing the puff frequency and by increasing the puff volume." The same report includes a table showing significantly increased tar and nicotine yields in Winston and Marlboro cigarettes when "realistic" smoking parameters are used.[2] Unlike Dr. Rodgman or Defendant-Reynolds, consumers of "light" and/or "ultralight" cigarettes have no knowledge that the Cambridge Filter System relies on unrealistic and inaccurate parameters that essentially eviscerate the meaning of the resultant tar and nicotine yields.

30.    Inexplicably, despite Defendant-Reynolds belief that the "amount of total solids and nicotine collected by the smoking machine is not the same as what the individual smoker receives" (Rodgman, 1965), Defendants continue to market these cigarettes as "light" and "ultralight" to health conscious smokers. Despite the fact that the so-called "light" and "ultralight" cigarettes *do not* deliver reduced levels of tar and nicotine to smokers, Defendant-United Wholesale Candy and Tobacco continues to distribute these products and exploit the belief of health conscious smokers that they pose a reduced risk to human health. Defendants know that health conscious smokers are purchasing "light" and/or "ultralight" cigarettes with the belief that reduced tar and nicotine levels pose a minimized risk to their health. In fact, Defendant-Reynolds fostered and encouraged this belief, as evidenced by Dr. Rodgman's statement in the August 1994 report that:

---

[2]Attached hereto as Exhibit "A" is a true and correct copy of Tables 8 and 9 to a report entitled "FTC Smoking Method Used for 'Tar' and Nicotine Data" by Alan Rodgman, a research and development scientist for Defendant-Reynolds. These tables contrast tar and nicotine yields between "realistic" smoking parameters and the FTC Cambridge Filter System.

10

> In response to [the dose-response] reports, the U.S. cigarette manufacturers subsequently marketed newly designed cigarette brands which provided a range of "tar" (and nicotine) yields, *thus enabling the consumer to choose a brand whose "tar" yield satisfied his/her concern about smoking and health.*

(emphasis added).

31.     On one hand, Defendant-Reynolds fully intended that consumers would correlate the Cambridge Filter System tar and nicotine yields to the risk level each cigarette brand posed to their health.  On the other, more sinister hand, Defendant-Reynolds possessed a keen awareness that the tar and nicotine yields generated by the Cambridge Filter System were fatally inaccurate and "more likely to misle[a]d than inform[]."

### *The Fallacy of "Light" and "Ultralight" Cigarettes*

32.     By identifying "light" and "ultralight" products as containing reduced tar and nicotine levels in the wake of the dose-response research, Defendant-Reynolds conveyed a clear message to consumers that "light" and "ultralight" cigarettes posed a decreased health risk.  In reality, Defendant-Reynolds' "light" and "ultralight" products contained significantly higher tar and nicotine levels than indicated, thus causing a likelihood of confusion and/or misunderstanding as to the certification of these brands as "light" or "ultralight".

33.     Health conscious smokers seeking to minimize any risk of developing smoking-related diseases had no knowledge that "light" and "ultralight" cigarettes were designed to deliver much different tar and nicotine levels and purchased these cigarettes believing that they represented a less hazardous smoking alternative.  In developing and marketing "light" and "ultralight" cigarettes, Defendant-Reynolds *intended* that consumers would associate the allegedly lower tar and nicotine yields with a decreased risk of developing smoking-related diseases.

11

34.     Defendant-Reynolds classified cigarettes as "light" or "ultralight" based on whether they fall within defined tar and nicotine yield ranges.

*Designing "Light" and "Ultralight" Cigarettes to Exploit the Cambridge Filter System*

35.     By the late 1960's, Defendant-Reynolds had developed sufficient product technology to enable them to consciously and intentionally control mainstream tar delivery and composition.  By virtue of this technology, Defendant-Reynolds was able to intentionally incorporate design parameters into its commercial cigarettes which facilitated active control and manipulation of the tar level.  These design parameters include, but are not limited to:

    a.     Tobacco blend and weight;

    b.     Tobacco rod length and circumference;

    c.     Filter tips (material type and additives);

    d.     Processed tobaccos (reconstituted tobacco sheet, expanded tobacco);

    e.     Paper (type and additives);

    f.     Additives (ammoniation); and

    g.     Air dilution (increased paper porosity, filter tip perforation).

36.     Dr. Rodgman's August 1994 report references an internal study of variations in the composition of mainstream tar in various types of cigarettes and demonstrates the ease with which Defendants were able to manipulate tar content to the exact level desired in any particular product.  Specifically, he observed that

> Cigarette design technologies for the cigarettes . . . included RTS inclusion, stem inclusion, tobacco substitute inclusion, nitrate enhancement, humectant (glycerol) effect, tobacco additives, *e.g.*, cocoa, nicotine adjustment, use of high porosity citrate-treated cigarette paper.  Several of these together with

12

other technologies (expanded tobacco, perforated filter tips, filter-tip additives) have been used in concert and to different degrees to attain specific tar" yields, ranging from 0.1 to over 40 mg.

37.    Through utilization of these design parameters, Defendant-Reynolds was able to actively control and manipulate tar levels and claim an alleged decline in the tar yield of its commercial cigarettes.

38.    However, in addition to uncovering design innovations that made active control and manipulation of tar levels and composition possible, Defendant-Reynolds' scientists had taken tar control one reprehensible step further.  Through research and development, Defendant-Reynolds developed design innovations which generated reduced tar and nicotine yields on the Cambridge Filter System but which produced significantly higher levels when smoked by actual human consumers.  In the 1981 Report of the Surgeon General on "The Health Consequences of Smoking:  The Changing Cigarette", as quoted in Dr. Rodgman's August 1994 report, it was noted that "the relative yield of many constituents is affected by butt length, puff frequency, and degree of ventilation."

39.    For several decades, Defendant-Reynolds adhered to a policy of designing commercial cigarettes to generate reduced tar and nicotine levels on the Cambridge Filter System but significantly higher levels when smoked by actual human consumers.  Although the 1981 Surgeon General's report hinted at the existence of a problem, consumers remained thoroughly in the dark as to the fact that the "light" and "ultralight" cigarettes they were smoking to reduce their health risks really did not fall into that category at all.  In fact, by intentionally designing its cigarettes to trick the Cambridge Filter System, Defendant-Reynolds used additives and processes which introduced dangerous components into tobacco and its smoke, thus heightening the risk to the public of developing smoking-related diseases.

13

40.    One technique commonly employed by Defendant-Reynolds to generate lower tar and nicotine ratings for their "light" and "ultralight" products on the Cambridge Filter System is filter ventilation.  In this process, Defendant-Reynolds drills nearly invisible holes in the filter paper or otherwise render the filter paper more porous.  Predictably, many smokers of "light" and/or "ultralight" cigarettes block the tiny, laser generated perforations in the "ventilated" filters with their fingers or lips.  This blockage results in the reduction or elimination of dilution by ventilation, thereby resulting in greater tar and nicotine yields to smokers than those measured by the Cambridge Filter System.

41.    As far back as 1976, Reynolds researcher Murry Senkus recognized that "a confirmed smoker attempts to get a certain desired level of nicotine . . . . after all the nicotine has been biologically, or pharmacologically inactivated, the smoker experiences a need for nicotine and lights up another cigarette."

42.    For many years, Defendant-Reynolds has been acutely aware that the ability to block ventilation holes enables smokers to "compensate" for the reduced nicotine levels in "light" and "ultralight" cigarettes.  Through extensive internal research, Defendant-Reynolds knew and continues to be aware that smokers of "light" and "ultralight" cigarettes unconsciously modified their smoking behavior to obtain a higher amount of nicotine than that measured by the FTC smoking machine (e.g. deeper and more frequent puffs).

43.    Defendant-Reynolds has not only expended significant research and development resources on the study of smoker compensation, but has applied the resultant knowledge to the design of cigarettes that enable smokers to more effectively compensate for lower nicotine yields.  Plaintiff believes and therefore avers that smokers of Defendant-Reynolds' "light" and/or "ultralight" products

14

have no knowledge that these products are designed to facilitate smoker compensation and deliver higher tar and nicotine levels than those indicated by the Cambridge Filter System.

44.     Another technique utilized by Defendant-Reynolds to ensure that smokers ingest a higher level of nicotine than that registered by the FTC smoking machine is manipulation of the pH of smoke. Reynolds scientists have amassed significant research which demonstrates that increased smoke pH correlates with increased bioavailability of nicotine in smoke. Plaintiffs believe and therefore aver that purchasers of Defendants' "light" and/or "ultralight" cigarettes have no knowledge that these products are specifically designed to deliver higher nicotine levels than those indicated by the Cambridge Filter System.

### *Brazen Contravention of Federal Trade Commission Mandates*

45.     On March 25, 1966, the Federal Trade Commission issued a letter to each U.S. cigarette manufacturer which specifically limited usage of the Cambridge Filter System tar and nicotine yields to "a factual statement of the tar and nicotine content (expressed in milligrams) of the mainstream smoke from a cigarette . . . so long as (1) no collateral representations (other than factual statements of tar and nicotine contents of cigarettes offered for sale to the public) are made . . . ."

46.     In brazen contravention of this clear mandate, Defendant-Reynolds augmented its "factual statement[s] of the tar and nicotine content" with collateral representations that particular lines of cigarettes were "light" or "ultralight".

47.     Defendant-Reynolds was acutely aware of widely publicized studies which scientifically connected smoking with the development of cancer, heart disease, emphysema and other serious health risks. Furthermore, Defendant-Reynolds was sharply cognizant of the fact that consumers associated reduced tar and nicotine levels with a reduced risk of developing various

15

smoking-related diseases.  Consumers clearly did not have access to the information Defendant-Reynolds possessed regarding the inaccuracies and unreliable nature of the Cambridge Filter System. Having fostered and encouraged this consumer misperception, Defendant-Reynolds brazenly capitalized on the belief of health conscious smokers that smoking "light" and "ultralight" cigarettes equated to a reduced risk of developing smoking-related disease.  Predictably, consumers anxious to reduce their smoking-related health risks flocked to these brands, unaware that the products they were purchasing were not what Defendants purported to be selling.

## *Designing Cigarettes to Maximize the Addictive Properties of Nicotine*

48.    For several decades, Defendant-Reynolds pursued a research agenda which focused, *inter alia*, on various methods of nicotine manipulation and maximizing the effect of nicotine in the body.  This research is routinely applied to its product line and used to manipulate nicotine levels in cigarettes.  One example of this manipulation is the addition of various chemicals (e.g. ammonia) to tobacco to increase nicotine delivery to the smoker.

49.    Defendant-Reynolds also controls and manipulates the nicotine levels in cigarettes through the use of reconstituted tobacco.  Reconstituted tobacco is an amalgamation of tobacco stalks, stems, and dust that manufacturers previously discarded, but now recycle as a cost savings measure.  In the reconstitution process, pieces of tobacco material undergo treatment that results in the extraction of some soluble components, including nicotine.  The pieces are then combined to form a sheet, to which Defendant-Reynolds *directly applies nicotine extract in the exact amounts it desires*.  Through this application procedure, Defendant-Reynolds is able to control and manipulate the exact amount of nicotine that ultimately winds up in cigarettes smoked by consumers.

16

50.     To create a more potent nicotine kick in its cigarettes, Defendant-Reynolds incorporates various chemical additives (e.g. ammonia) into the manufacturing process. These additives liberate nicotine from its salt form and transform it into an extremely potent vaporized form. This free-base nicotine has a significantly increased effect on the smoker and a unique ability to evade detection by the Cambridge Filter System. Plaintiff believes, and therefore avers, that consumers are unaware that the nicotine levels represented by Defendant-Reynolds do not include additional, free-base nicotine particles that are able to evade detection by the Cambridge Filter System.

51.     In addition to the use of chemical additives to increase nicotine bioavailability while generating reduced nicotine levels on the Cambridge Filter System, Defendant-Reynolds employs design techniques similar to those used to control and manipulate tar levels. Tobacco blend and weight, rod length and circumference, filters, tobacco processing, papers, and air dilution are all used to actively manipulate and control nicotine levels.

52.     By intentionally packaging a dependency-creating form of nicotine in its products and representing that these products have a lower nicotine yield level, Defendant-Reynolds intended to foster and perpetuate nicotine-dependency in its consumers. This conduct was solely motivated by a desire to keep people smoking, thus maintaining and expanding Defendant-Reynolds' profit margins.

53.     At all times material to the allegations contained herein, Defendant-Reynolds had knowledge that the nicotine in its cigarettes had a much greater physiological impact on smokers than its low nicotine level would otherwise indicate. Defendant-Reynolds knew consumers believed a low nicotine level indicated a less hazardous product and intentionally exploited this belief by touting low nicotine levels while secretly manipulating the form of the nicotine to deliver a greater impact.

17

54.     Through each and every one of the aforementioned actions, Defendant-Reynolds has sustained a continuing market for products that consumers are routinely misled to believe contains less of the harmful ingredients found in regular cigarettes.

## COUNT I - PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *et seq.*) - LEGAL RELIEF

55.     Plaintiffs, on behalf of themselves and the Class, re-allege, as if more fully set forth herein, each and every allegation contained in paragraphs 1-65.

56.     In purchasing cigarettes manufactured and distributed by Defendants, the Plaintiff and Class Members purchased goods which were primarily used for personal, family and/or household purposes.  Plaintiff and Class Members purchased Defendants' cigarettes for the sole objective of personal consumption, with absolutely no commercial purpose.

57.     Defendants, in their capacity as manufacturers, sellers, and distributors of cigarettes within the Commonwealth of Pennsylvania, are "person[s]" for purposes of the Unfair Trade Practices and Consumer Protection Law, pursuant to 73 P.S. §201-2(2).

58.     Defendants committed unfair and/or deceptive acts or practices, as defined by 73 P.S. §201-2(4), generally and in the following particulars:

    a.     By intentionally designing "light" and "ultralight" cigarettes in a manner which generated reduced tar and nicotine levels on the Cambridge Filter System, but which delivered substantially higher amounts to consumers, Defendants-Reynolds and Nabisco caused a likelihood of confusion and/or mis-understanding as to the certification of tar and nicotine yields in "light" and "ultralight" cigarettes.  73 P.S. §201-2(4)(ii).

    b.     In designing and marketing "light" and "ultralight" cigarettes, Defendants-Reynolds and Nabisco intended for consumers to associate these brands with a reduced risk of developing smoking-related diseases.  A reasonable person when confronted with such a characterization, equates it to reduced tar and nicotine levels in these products.  Because Defendants-Reynolds and Nabisco

18

intentionally designed "light" and "ultralight" cigarettes in a manner that caused smokers to ingest significantly greater quantities of tar and nicotine than the "light" and/or "ultralight" designation would indicate, Defendants-Reynolds and Nabisco caused a likelihood of confusion and misunderstanding as to the approval and/or certification of the cigarettes as "light" and/or "ultralight". 73 P.S. §201-2(4)(ii).

c.   By representing that "light" and "ultralight" cigarettes have significantly reduced levels of tar and nicotine, Defendants represented that these cigarettes have characteristics, benefits and/or quantities that they did not ever and do not currently have. 73 P.S. §201-2(4)(v).

d.   By representing that the nicotine found in their cigarettes has not been manipulated and/or controlled, Defendants-Reynolds and Nabisco have represented that these cigarettes have characteristics, benefits and/or quantities that they did not ever and do not currently have. 73 P.S. §201-2(4)(v).

e.   By representing that "light" and "ultralight" cigarettes contain significantly reduced quantities of tar and nicotine when in reality, the smoker ingests a substantially higher amount of these materials, Defendants have represented that "light" and "ultralight" cigarettes are of a particular standard, quality or grade, namely "light" and/or "ultralight", when they are actually of a different standard, quality or grade. 73 P.S. §201-2(4)(vii).

f.   By advertising certain of their cigarettes as "light" and/or "ultralight", with full knowledge that said cigarettes do not contain "light" and/or "ultralight" levels of tar and nicotine when smoked by actual human consumers and with the concomitant intent to sell said cigarettes despite this knowledge, Defendants-Reynolds and Nabisco have advertised goods with an intent not to sell them as advertised. 73 P.S. § 201-1(ix).

g.   By designing "light" and "ultralight" cigarettes to deliver amounts of tar and nicotine to consumers that are significantly higher than the measurements generated by the Cambridge Filter System, Defendants-Reynolds and Nabisco engaged in deceptive conduct which creates a likelihood of confusion and/or misunderstanding. 73 P.S. § 201-1(xxi).

59.   As a result of the aforementioned unfair and/or deceptive acts and/or practices, Plaintiffs and Class Members have suffered an ascertainable loss of money, in that they have purchased cigarettes from Defendants.

19

60.      Pursuant to the terms of the Unfair Trade Practices and Consumer Protection Law,

Plaintiffs and Class Members are entitled to recover up to three times the actual damages sustained,

but in any event, not less than $100.00.  73 P.S. § 201-9.2(a) (1997).

WHEREFORE, Plaintiffs and Class Members demand judgment in their favor and respectfully

request damages for each Class Member not in excess of $75,000 (inclusive of treble damages),

exclusive of costs, interest, and reasonable attorney fees.

## COUNT II - PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq.*) - EQUITABLE RELIEF

61.      Plaintiffs, on behalf of themselves and the Class, re-allege, as if more fully set forth

herein, each and every allegation contained in paragraphs 1-65.

62.      Defendants' misrepresentations about the true amount of tar and nicotine ingested by

smokers has exposed smokers to a greater health hazard than Defendants' advertising, marketing, and

representations would otherwise indicate.

63.      Defendants' continuing misrepresentations about the true tar and nicotine yields of its

products is causing immediate and irreparable injuries to the health and well-being of smokers.  The

demographic group most important to Defendants — children — is the one group of individuals least

able to defend itself against the persistent and pernicious misrepresentations of Defendants, resulting

daily in scores of new victims of the life-threatening products peddled by Defendants.

WHEREFORE, Plaintiffs and Members of the Class demand judgment in their favor and

respectfully request the following equitable relief:

1.      That Defendants cease making the misrepresentations complained of herein;

20

2.  That Defendants cease the deceptive trade practices complained of herein; and

3.  Any and all such other equitable relief as this Court shall deem appropriate.

Respectfully submitted,

SHELLER, LUDWIG & BADEY

BY: _____

Stephen A. Sheller, Esquire
Kate McNamara, Esquire
Attorneys for Plaintiffs

Date: 3/6/98

Thomas E. Mellon, Jr., Esquire
Mellon, Webster & Mellon
87-89 North Broad Street
Doylestown, PA 18901
(215)348-7700

21

## VERIFICATION

I, **KATE MCNAMARA, ESQUIRE,** hereby state that I am the attorney for the plaintiffs in the foregoing action; that I am authorized to make this verification on their behalf and that the facts set forth in the foregoing **AMENDED CLASS ACTION COMPLAINT IN CIVIL ACTION,** are true and correct to the best of my knowledge, information and belief.  These statements are made subject to the penalties of 18 Pa.  C.S. §4904 relating to unsworn falsification to authorities.


_____
**KATE MCNAMARA, ESQUIRE**

Date: _3/4/98_____