# Exhibit 30

1  Donald F. Hildre, Esq.; Bar # 066188
   Thomas Haklar, Esq.; Bar # 169039
2  Peggy J. Reali Esq.; Bar # 153102
   DOUGHERTY, HILDRE, DUDEK & HAKLAR
3  2550 Fifth Avenue, Suite 600
   San Diego, CA 92103
4  (619) 232-9131, FAX (619) 232-7317

5  Mark P. Robinson, Jr., Esq.; Bar # 054426
   Kevin Calcagnie, Esq.; Bar #108994
6  Karen Karavatos, Esq.; Bar #131718
   ROBINSON, CALCAGNIE & ROBINSON
7  620 Newport Center Drive, 7th Floor
   Newport Beach, CA 92660
8  (949) 720-1288; FAX (949) 720-1292

9  David S. Casey, Jr., Esq.; Bar # 060768
   Thomas Penfield, Esq.; Bar #062380
10 CASEY, GERRY, REED & SCHENK
   110 Laurel Street
11 San Diego, California 92101
   (619) 238-1811; FAX (619) 544-9232

12
   and the Castano Plaintiffs' Legal Committee (PLC) Members
13 (see attached list)

14 Attorneys for Plaintiffs

15

16              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

17                 **FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| 18 Coordination Proceeding Special Title (Rule 1550(b)) | JCCP No. 4042 |
| 19 | |
| IN RE TOBACCO CASES II | Case No. 711400 |
| 20 | |
| 21 This Document Relates To: | **NINTH AMENDED COMPLAINT FOR:** |
| 22 WILLARD R. BROWN, DAMIEN BIERLY, MICHELLE DENISE BULLER-SEYMORE, | **RESTITUTION; DISGORGEMENT OF PROFITS AND OTHER EQUITABLE** |
| 23 and DANIEL KAGEI, individually, on behalf of the General Public of the State of | **RELIEF (CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200 et** |
| 24 California, as well as on Behalf of All Others Similarly Situated, | **seq and §17500 et seq); AND VIOLATION OF BUSINESS AND** |
| 25 | **PROFESSIONS CODE SECTIONS 17200 AND 17500 et seq.** |
| 26 Plaintiffs, | |
| v. | |
| 27 | |
| 28 THE AMERICAN TOBACCO COMPANY, INC.; PHILIP MORRIS, INCORPORATED; | |

1

1 | R.J. REYNOLDS TOBACCO COMPANY; )
BROWN & WILLIAMSON TOBACCO )
2 | CORPORATION; BRITISH AMERICAN )
TOBACCO CO., LTD.; LIGGETT GROUP, )
3 | INC.; LIGGETT & MYERS, INC.; THE )
COUNCIL FOR TOBACCO RESEARCH- )
4 | U.S.A., INC.; THE TOBACCO INSTITUTE, )
INC.; LORILLARD TOBACCO COMPANY,)
5 | and DOES 1 through 500, inclusive, )
)
6 | _____ Defendants. _____ )
)
7 | SERVICE LIST D/G

8

9

10        Individual and representative Plaintiffs WILLARD R. BROWN, DAMIEN BIERLY,

11 MICHELLE DENISE BULLER-SEYMORE, and DANIEL KAGEI ("Plaintiffs"), individually, on

12 behalf of the general public, and on behalf of all others similarly situated, alleges on personal

13 knowledge those facts which pertain to the named Plaintiffs or to his attorneys and further allege on

14 information and belief as follows:

15                               **NATURE OF THE CASE**

16        1.        Through a fraudulent course of conduct that has spanned decades, Defendants have

17 manufactured, promoted, distributed or sold tobacco products to Plaintiffs and thousands of

18 California citizens and residents.   Defendants through a series of public statements have

19 misrepresented, concealed and falsely denied the health hazards and addictive nature of cigarette

20 smoking.  Unbeknownst to the public, Defendants have intentionally controlled and manipulated the

21 amount and bio-availability of nicotine in their tobacco products to create and sustain addiction to

22 their products.  Defendants have also deceptively, unfairly and unlawfully marketed so-called "light

23 cigarettes" as having reduced  tar and nicotine levels creating the false impression that they are less

24 dangerous than other cigarettes.  Plaintiffs, on behalf of themselves and the General Public, and on

25 Behalf of All Others Similarly Situated, seek the establishment of a fund for the creation of smoking

26 cessation programs through which Plaintiffs individually, the General Public and All Others Similarly

27 Situated would enable the same to discontinue smoking.  Plaintiffs' causes of action are Unfair

28 Competition Under California Business and Professions Code §17200, et seq. and False and

2

NINTH AMENDED COMPLAINT

1   Misleading Advertising under Business and Professions Code §17500.

2                    **JURISDICTION AND VENUE**

3          2.      This Court has jurisdiction over the First and Second Causes of Action (Unfair

4   Competition under California Business and Professions Code §17200, et seq.) pursuant to California

5   Business and Professions Code §17203.

6          3.      Plaintiff, Willard Brown, is a resident of the State of California, County of San Diego.

7          4.      Plaintiff, Damien Bierly is a resident of the State of California, County of San Diego.

8          5.      Plaintiff, Michelle Denise Buller-Seymore, is a resident of the State of California,

9   County of Placer.

10         6.      Plaintiff, Daniel Kagei, is a resident of the State of California, County of San Diego.

11         7.      At all relevant times, Defendants have done and continue to do business in the State of

12  California and County of San Diego.  They have made contracts to be performed in whole or in part

13  in California.  Defendants' products have been manufactured, tested, sold, offered for sale, supplied

14  or placed in the stream of commerce in California.  In the course of business, Defendants have

15  materially participated with other Defendants in performing the acts described above, while knowing

16  tobacco products were and are addictive, dangerous and substantially certain to cause injury to

17  Plaintiffs, the General Public and All Others Similarly Situated.  They have received and continue to

18  receive substantial compensation and profits from the sale of tobacco products in California and San

19  Diego County.  Defendants have made material omissions and misrepresentations in California.  The

20  wrongful acts and conduct, in furtherance of a conspiracy, are the basis of the claims that have

21  occurred and continue to occur in California and San Diego County.

22         8.      Venue in this case is appropriate as it is based upon California Code of Civil

23  Procedure §395.  The injuries to Plaintiffs to the General Public and to those Similarly Situated

24  occurred in the State of California, and more particularly, within the County of San Diego.

25                         **DEFINITIONS**

26         9.      The term "addictive," as used in this Eighth Amended Complaint, is synonymous and

27  interchangeable with the term "dependence-producing."  Both terms refer to the persistent and

28  repetitive intake of psychoactive substances despite evidence of harm and a desire to quit.  Some

                                    3

                                                         NINTH AMENDED COMPLAINT

1   scientific organizations have replaced the term "addictive" with "dependence-producing" to shift the

2   focus to dependent patterns of behavior and away from the moral and social issues associated with

3   addiction.  Both terms are equally relevant for purposes of understanding the drug effects of nicotine.

4

5                                         **PARTIES**

6       **A.     Plaintiff (and the General Public and Those Similarly Situated)**

7           10.     Plaintiffs are adults who reside in the State of California  and appear individually and

8   on behalf of a class of  individuals similarly situated and on behalf of the general public of the State of

9   California pursuant to California Business and Professions Code §17204 as a private attorney-

10  general.

11          11.     Plaintiff  Willard R. Brown began smoking at age 16 and has smoked several different

12  brands of cigarettes, including, but not limited to Marlboro Red, GNP, Benson & Hedges Gold, L &

13  M and Salem over the last 38 years.

14          12.     Plaintiff Damien Bierly began smoking at age 13 and has smoked several different

15  brands of cigarettes, including, but not limited to Newport, Newport Lights, Parliament, Camel,

16  Camel Light, Marlboro Medium, Marlboro Light and Marlboro Ultra Lights over the last 8 years.

17          13.     Plaintiff Michelle Denise Buller-Seymore began smoking at age 12 and has smoked the

18  Marlboro brand of cigarettes for six years, and for the past year has smoked Newport cigarettes.

19          14.     Plaintiff Daniel Kagei began smoking at age 15, and has smoked Marlboro Reds,

20  Marlboro Medium and currently smokes Marlboro Lights.

21      **B.     Defendants.**

22          15.     Defendant **Philip Morris Incorporated** (hereinafter "Philip Morris") is a Virginia

23  corporation having its principal place of business located at 120 Park Avenue, New York, New York.

24  Philip Morris manufactures, advertises and sells Philip Morris, Merit, Cambridge, Marlboro, Benson

25  & Hedges, Virginia Slims, Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga and Parliament

26  cigarettes throughout the United States, including the State of California and San Diego County.

27          16.     Defendant **R.J. Reynolds Tobacco Company** (hereinafter "R. J. Reynolds") is a New

28  Jersey corporation having its principal place of business located at Fourth and Main Streets, Winston-

                                         4
                                                        NINTH AMENDED COMPLAINT

1  Salem, North Carolina.  R.J. Reynolds manufactures, advertises and sells Camel, Vantage, Now,
2  Doral, Winston, Sterling, Magna, More, Century, Bright Rite and Salem cigarettes throughout the
3  United States, including the State of California and San Diego County.
4          17.     Defendant **Brown & Williamson Tobacco Corporation** (hereinafter "Brown &
5  Williamson") is a Kentucky corporation, having its principal place of business at 1500 Brown &
6  Williamson Tower, Louisville, Kentucky.  Brown & Williamson manufactures, advertises and sells
7  Kool, Barclay, BelAir, Capri, Raleigh, Richland,  Laresh, Eli Cutter and Viceroy cigarettes
8  throughout the United States, including the State of California and San Diego County.
9          18.     Defendant **British American Tobacco Co., Ltd.**  (hereinafter "British American") is
10  a British corporation having its principal place of business at Millbank, Knowle, Green, Staines,
11  Middlesex, England TWI81DY.  British American distributed its tobacco products throughout the
12  United States, including the State of California and San Diego County, through Brown & Williamson,
13  a subsidiary or division of British American, at all times relevant to the complaint.
14          19.     Defendant **Lorillard Tobacco Company** (hereinafter "Lorillard") is a Delaware
15  corporation having its principal place of business located at One Park Avenue, New York, New
16  York.  Lorillard manufactures, advertises and sells Old Gold, Kent, Triumph, Satin, Max, Spring,
17  Newport and True cigarettes throughout the United States, including the State of California and San
18  Diego County.
19          20.     Defendant **The American Tobacco Company** (hereinafter "American Tobacco") is a
20  Delaware corporation having its principal place of business located at Six Stamford Forum, Stamford,
21  Connecticut.  American Tobacco manufactures, advertises and sells Lucky Strike, Pall Mall,
22  Tareyton, Malibu, American, Montclair, Newport, Misty, Barkeley, Iceberg, Silk Cut, Silva Thins,
23  Sobrania, Bull Durham and Carlton cigarettes throughout the United States, including the State of
24  California and San Diego County.
25          21.     Defendants **Liggett Group Inc.** and its wholly-owned subsidiary, **Liggett & Myers**
26  **Inc.** are Deleware corporations having their principal place of businesses at Main and Fuller Streets,
27  Durham, North Carolina (hereinafter both shall be referred to as "Liggett").  Liggett manufactures,
28  advertises and sells Chesterfield, Decade, L&M, Pyramid, Dorado, Eve, Stride, Generic and Lark

5

NINTH AMENDED COMPLAINT

1   cigarettes throughout the United States, including the State of California and San Diego County.

2         22.     The Defendants described above may also be referred to collectively, hereinafter, as

3   the "Tobacco Companies" or "Tobacco Industry."

4         23.     Defendant, **The Council for Tobacco Research - U.S.A., Inc.** (hereinafter "CTR"),

5   successor in interest to the Defendant Tobacco Industry Research Committee ("TIRC"), is a

6   nonprofit corporation organized under the laws of the State of New York having its principal place of

7   business at 900 3rd Avenue, New York, New York 10022.  CTR is an organization that has

8   participated in the promotion of Defendants' cigarettes in the State of California and County of San

9   Diego.

10         24.     Defendant **The Tobacco Institute, Inc.** (hereinafter "Tobacco Institute") is a New

11   York corporation, having its principal place of business located at 1875 "I" Street, N.W., Suite 800,

12   Washington, D.C.  The Tobacco Institute has, since its incorporation in 1958, operated as the public

13   relations and lobbying arm of the Tobacco Companies.

14         25.     Plaintiffs are informed and believes and thereon alleges that at all times herein

15   mentioned, the true names and capacities, whether individual, corporate, associate or otherwise of

16   Defendants DOES 1 through 500, inclusive, are unknown at this time to Plaintiffs who therefore sue

17   said Defendants by such fictitious names.  Plaintiffs are informed and believe and thereon allege that

18   each of the Defendants designated herein by such fictitious names were involved in the distribution,

19   manufacturing, promotion and/or sale of tobacco products. Furthermore, these Defendants were in

20   some way negligently or otherwise legally responsible for the events and happenings herein referred

21   to which were a legal cause and substantial factor in bringing about injuries and damages to Plaintiff

22   as alleged.  Plaintiffs will amend this complaint to allege the true names and capacities of the DOE

23   Defendants when ascertained.

24         26.     At all times herein mentioned, Defendants and each of them acted through their duly

25   authorized agents, servants, and employees.  The agents and employees, at all relevant times, acted

26   within the scope, purpose and authority of that agency and with the full knowledge, permission and

27   consent of the officers, directors and other Defendants to further the conspiracy.  Additionally, each

28   Defendant was an agent of each of the other named and unnamed Defendants.

6

NINTH AMENDED COMPLAINT

## CO-CONSPIRATORS

27.     Each Defendant is sued individually as a primary violator and as a co-conspirator. The liability of each Defendant arises from each Defendant's agreement to commit unlawful acts and the performance of those acts, in concert, to further the agreement. The conspiracy began as early as the 1950's and continues to the present. Defendants and each of them, knowingly and willfully entered into and pursued a common course of conduct, by agreement with the other Defendants and third parties, to commit all or part of the unlawful acts alleged herein. Such unlawful acts were committed intentionally, knowingly, maliciously and without legal justification or excuse.

28.     With an intentional and unlawful purpose, Defendants agreed to restrain and suppress research and information on the harmful effects of smoking, agreed not to produce and market a safer cigarette, agreed not to compete for the market share with safer and/or less addictive cigarettes, all in violation of California Business and Professions Code sections 16720, et seq.. Defendants manipulated the nicotine content and bio-availability of nicotine in tobacco products to cause and maintain addiction, while continually denying same. Defendants misrepresented and suppressed information on the addictive properties of nicotine. Cigarettes were falsely advertised, marketed and sold, as safe, non-addictive products. Research, development, production and the making of a safer cigarette was purposefully suppressed to protect market share and profitability. In furtherance of the conspiracy, Defendants encouraged, substantially assisted and otherwise aided and abetted each other with respect to these and the other wrongful acts set forth herein. As a result of the conspiracy, the Defendants are vicariously, jointly and severally liable with respect to each of the actions described herein.

## FRAUDULENT CONCEALMENT

29.     Beginning over four decades ago and continuing to the present date, Defendants and each of them, engaged in a purposeful and fraudulent concealment of the facts known solely to them, and undiscoverable to Plaintiffs and those Similarly Situated, regarding the addictive nature of their products and their purposeful manipulation thereof.

30.     Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment of the addictive nature of nicotine and their manipulation of nicotine levels

1  and the bio-availability of nicotine in their tobacco products.  Defendants were under a duty to

2  disclose the manipulation of nicotine levels and bio-availability of nicotine in their tobacco products

3  because it is non-public information over which Defendants had exclusive control.  Further,

4  Defendants undertook to study, research, and test their tobacco products to provide the public with

5  honest, full disclosure of the results of said studies, research and testing.  Defendants controlled this

6  crucial information, preventing disclosure to Plaintiffs, the General Public and those Similarly

7  Situated.  Indeed, this information was kept concealed from the public, including Plaintiffs, the

8  General Public, and Those Similarly Situated,  until Congressman Thomas J. Bliley obtained the

9  relevant documents and caused them to be released into the public domain in or about 1997.  Despite

10  this documentation, Defendants still refuse to admit that nicotine is addictive and that they have

11  manipulated the levels of nicotine in their tobacco products.  As a result  of Defendants' conduct,

12  Plaintiffs, the General Public and Those Similarly Situated, were unable to bring their claims prior to

13  the time of filing this complaint.

14       31.    Defendants and co-conspirators, through various devices and techniques of secrecy,

15  fraudulently and affirmatively concealed the existence of their unlawful acts and conspiracy, through

16  acts that include, but are not limited to:

17           Providing false explanations and reassurances to customers and to
         governmental entities regarding the health hazards of tobacco and the

18           addictive qualities of nicotine;

19           Using medical experts and research reports to mislead the public
         regarding the health hazards of tobacco and the addictive qualities of

20           nicotine;

21           Conducting activities in furtherance of the conspiracy in secret and
         clandestine meetings;

22

23           Routing documents which revealed that cigarettes are dangerous and
         addictive through tobacco company attorneys to secure and suppress
         the information from the public and opposing counsel;

24

25           Modifying and destroying documents, closing down research projects
         or moving research and information facilities outside the United States;

26           Using cryptic code names and acronyms to conceal the contents of, and
         conclusions in, documents;

27

28

NINTH AMENDED COMPLAINT

1           Requiring employees to keep secret all information about the dangers
2           of cigarette smoking, the addictive nature of nicotine, and the
manipulation of nicotine levels under threat of severe legal reprisal.

3        32.     Through such acts of fraudulent concealment, Defendants have for decades

4 successfully concealed from the public facts necessary to support the claims herein. Plaintiffs, the

5 General Public and Those Similarly Situated, were prevented from knowing and had no knowledge of

6 such unlawful conduct or of facts that might have led to the discovery thereof. Plaintiffs exercised

7 due diligence to learn of their legal rights and despite such diligence, failed to uncover the existence

8 of the violations alleged herein until some time shortly before filing this complaint.

9                               **CLASS ACTION ALLEGATIONS**

10        33.     Plaintiffs bring this Class action, on behalf of themselves and all others similarly

11 situated, as a Class action pursuant to Section 382 of the California Code of Civil Procedure with

12 respect to the First and Second Causes of Action (for violations of Business & Professions Code

13 Sections 17200 and 17500. The Class is defined, as set forth and expounded upon in the Honorable

14 Judge Ronald Prager's tentative ruling of April 11, 2001 and as ordered April 29, 2001, as all people

15 who at the time they were residents of California, smoked in California one or more cigarettes

16 between June 10, 1993 through April 23, 2001 and who were exposed to defendants' marketing and

17 advertising activities in California.

18        34.     This action is brought and may properly be maintained as a Class action pursuant to

19 California Code of Civil Procedure § 382. The community of interest in the litigation is well defined

20 and the proposed Class is easily ascertainable. This action satisfies the numerosity, commonality,

21 typicality, adequacy, predominance and superiority requirements of this provision.

22        35.     Numerosity of the Class. The Class is so numerous that the individual joinder of all

23 Members is impractical under the circumstances of this case. While the exact number of Class

24 Members is unknown to Plaintiffs at this time, Plaintiffs believe that at a minimum, there are hundreds

25 of thousands of Class Members located throughout the State of California.

26        36.     Common Questions Predominate. Common questions of law and fact exist as to all

27 Members of the Class and predominate over any questions affecting only individual Members of the

28 Class. These common legal and factual questions arise from two central issues, which do not vary

               NINTH AMENDED COMPLAINT

among Class Members:   (1) Defendants' common course of conduct in manufacturing, promoting, distributing and selling cigarettes; and (2) the biochemical and psychoactive properties of nicotine. These common legal and factual questions contained within these issues include, but are not limited to, the following:

       1)     Whether nicotine is addictive;

       2)     When Defendants knew that nicotine is addictive;

       3)     Whether Defendants have artificially manipulated the levels and bio-availability of nicotine in their cigarettes to cause and sustain dependence on their products;

       4)     Whether Defendants have intentionally raised the level and/or increased the bio-availability of nicotine in low tar cigarettes to keep smokers of low tar cigarettes addicted to nicotine;

       5)     Whether Defendants knew or should have known that the levels of nicotine in their cigarettes were addictive;

       6)     Whether Defendants have suppressed medical research conducted: (1) in the Defendants' research and development laboratories, (2) through selected grants; and/or (3) through the Special Projects Division of the CTR, that indicates nicotine is addictive and smoking cigarettes poses serious health hazards.

       7)     Whether the Special Projects Division of the CTR was established to fraudulently omit and conceal material facts and medical research that linked smoking cigarettes to life-threatening diseases and nicotine to addiction;

       8)     Whether Defendants have acted in concert or pursuant to a common design;

       9)     Whether the Defendants knew, from independent research and from research conducted through the Special Projects Division, that cigarette smoking causes lung cancer, pancreatic and other cancers, heart disease, emphysema and other diseases;

      10)     Whether the Defendants conspired to misrepresent, have repeatedly misrepresented, and continue to misrepresent to Plaintiffs and Class Members that smoking does not cause diseases, including, but not limited to, lung disease, heart disease, various cancers and other diseases;

NINTH AMENDED COMPLAINT

1    11)    Whether the Defendants have been aware, for decades, that there are safer

2  alternatives and non-addictive designs for cigarettes, but have intentionally disregarded the safer

3  alternatives to maximize the sale of a defective, addictive product;

4    12)    Whether the Defendants, through the Special Projects Division of CTR,

5  fraudulently utilized the attorney-client privilege to suppress medical research linking disease to

6  cigarette smoke and nicotine to addiction;

7    13)    Whether Defendants' spokespersons misrepresented to Plaintiffs, Class

8  Members and to Members of Congress on March 25, 1994 and April 14, 1994, under oath, that

9  tobacco containing nicotine is not addictive and that smoking cigarettes does not cause disease and

10  death;

11    14)    Whether Defendants intentionally miscalculated and inaccurately measured the

12  levels of tar and nicotine in cigarettes, so that less tar and nicotine is reported on cigarette packages

13  than is actually taken into the lungs during the smoking process;

14    15)    Whether Defendants intentionally designed a filter with tiny, nearly invisible

15  holes, so that conventional measuring mechanisms measure far less tar and nicotine than is actually

16  received in the lungs of the smoker.

17    37.    Typicality of Claims.  Plaintiffs' claims are typical of the claims of Members of the

18  Class, all of whom have purchased and  smoked products manufactured, distributed, and marketed by

19  Defendants.  Plaintiffs and all Class Members have sustained, and will continue to sustain damages,

20  injuries and irreparable harm arising out of Defendants' common course of conduct designed to

21  create and sustain addiction to, and dependency on, Defendants' products.

22    38.    Adequacy of Representation.  Plaintiffs will fairly and adequately protect the interest

23  of Members of the Plaintiff Class.  Plaintiffs reside in California and purchased Defendants' products

24  in California during the Class period.  Plaintiffs are representative Members of the Class, are united by

25  a common interest, and are adequate representatives since they have no interests that are adverse to

26  the interests of absent Class Members.  Plaintiffs have retained counsel who are both competent and

27  experienced in the prosecution of complex consumer fraud, mass tort and class actions.  Both

28  Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Class.

1  Plaintiffs and their counsel will fairly and adequately protect the interests of the Members of the
2  Class.

3       39.    Superiority and Substantial Benefit. A class action is superior to other available
4  methods for the fair and efficient adjudication of this litigation since individual litigation of Class
5  Members' claims is impractical. Even if all Class Members could afford individual litigation, the court
6  system could not. It would be unduly burdensome for the courts to adjudicate identical legal and
7  factual issues in hundreds of thousands of cases. Individual litigation increases delay and expense to
8  all parties, and especially the court system, associated with the resolution of the complex legal and
9  factual issues of the case. The prosecution of separate actions by the individual Members of the Class
10  would create a risk of inconsistent adjudications with respect to individual Class Members, thus
11  establishing incompatible standards of conduct for Defendants. The prosecution of separate actions
12  would create a risk of adjudications that would be dispositive of the interests of the other Class
13  Members who are not parties to such adjudications, thus substantially impairing the ability of such
14  non-party Class Members to protect their interests. Individual litigation of this case presents a great
15  potential for inconsistent or contradictory judgments.

16       40.    Class action treatment is a superior method of adjudication and provides a substantial
17  benefit to the litigants and the courts since it presents far fewer management difficulties and provides
18  the benefits of a single adjudication and comprehensive supervision by a single court. Furthermore,
19  as the damages suffered by each individual Member of the Class may be relatively small, the expenses
20  and burden of individual litigation would make it difficult or impossible for individual Members of the
21  Class to redress the wrongs done to them. An important public interest will be served by addressing
22  the matter as a class action. Notice of the pendency and of any resolution of this class action can be
23  provided to Class Members by publication and broadcast.

24       41.    Furthermore, Plaintiffs' claims are certifiable as a Class action because Defendants
25  have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate
26  final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

27       42.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the
28  management of this action that would preclude its maintenance as a class action. Accordingly, the

12

1  proposed Class fulfills the certification criteria of California law and certification of the above-defined

2  Class is appropriate under one or more of the provisions of California law.

3  ### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

4  **Introduction**

5  43.    Defendants reap enormous profits from the manufacture and sale of cigarettes

6  throughout the United States.  Defendants net manufacture, promote and sell cigarettes.  Defendants'

7  earnings on cigarettes sold throughout the United States exceeded six billion dollars this past year

8  alone, on gross sales of forty-five billion dollars.

9  44.    Cigarettes contain hazardous substances that cause serious and often fatal diseases of

10  the throat, lungs, and heart, as well as the cardiovascular and pulmonary systems generally, and cause

11  stillbirths and neonatal deaths of babies whose mothers smoke.  The hazardous substances include,

12  inter alia, nicotine, a powerful addictive drug, and carbon monoxide, nitrosamines, formaldehyde,

13  formic acid, acetaldehyde, ammonia, benzene, hydrogen cyanide, and "tar", all highly dangerous

14  substances.

15  45.    More than ten million Americans have died as a result of smoking cigarettes; more

16  than 400,000 Americans die every year as a result of smoking cigarettes; almost one death in every

17  five is due to smoking-related illness; the leading cause of preventable death in the United States is

18  smoking cigarettes.  Approximately 50 million Americans smoke cigarettes, and an average of 3,000

19  teenagers become smokers daily.  Congressman Henry A. Waxman (D. Calif.), Chairman of the

20  House Subcommittee on Health and the Environment, stated recently that "cigarettes are the single

21  most dangerous consumer product ever sold."

22  46.    Defendants have for many years known of the relationship between cigarettes and

23  disease, but have concealed their research, they have publicly denied the relationship between

24  cigarettes and disease, and continued aggressively to promote and sell cigarettes.  In 1946,

25  Defendants' chemists reported concern for the health of smokers.  A 1946 letter from a Lorillard

26  chemist to its manufacturing committee states: "Certain scientists and medical authorities have

27  claimed for many years that the use of tobacco contributes to cancer development in susceptible

28  people.  Just enough evidence has been presented to justify the possibility of such a presumption."

47.     Defendants have also known for many years that nicotine is addictive, but have publicly denied both the fact that nicotine is addictive and their knowledge of this fact, in order to conceal the addictive nature of cigarettes from the public, including Plaintiff, the General Public and Those Similarly Situated.  Defendants have known for many years of ways to make safer cigarettes, but have intentionally chosen not to do so.

48.     At the same time Defendants were publicly denying the addictive nature of nicotine, they were intentionally and artificially manipulating the level of nicotine and other toxic substances in the cigarettes they were selling in order to preserve the dependence of smokers on cigarettes.  To this end, Defendants have utilized additives such as ammonia, and sought patents for nicotine delivery devices. Defendants have intentionally sought to increase the delivery of nicotine and almost double the nicotine transfer efficiency of cigarettes.

49.     Despite their voluntary and public undertaking to protect the public's health, Defendants intentionally avoided researching or developing cigarettes that should not cause dependence or addiction.  Defendants have intentionally failed in their duty to study and test the harmful effects of smoking.

50.     Defendants have spent millions of dollars each year in advertising and promoting cigarettes, and have geared their advertising efforts particularly toward teenagers and children, through efforts such as the "Joe Camel" advertising campaign, because Defendants have known for years that unless a person begins smoking before the age of twenty, that person is unlikely ever to begin.

51.     In their efforts to conceal the health hazards of smoking and the addictive nature of nicotine, Defendants have: 1) testified falsely under oath before the United States Congress; 2) provided false explanations to customers and governmental entities about the health hazards of tobacco and the harmful qualities of nicotine; 3) concealed their secret research and testing on the dangers of cigarette smoking; 4) concealed their deliberate manipulation of the nicotine levels of cigarettes; 5) required employees under threat of severe legal sanctions to keep secret all information they have learned through their employment about the dangers of cigarette smoking, and; 6) concealed documents through devices such as the unwarranted invocation of the attorney client

1   privilege.

2       52.    Defendants have acted in concert or pursuant to a common design through their above

3   described actions and omissions. Due to Defendants' public denials and concealment of research,

4   Plaintiffs, despite their exercise of due diligence, has been previously unaware of and unable to

5   discover his causes of actions against Defendants.

6               **I. <u>Industry Knowledge of the Harmful Effects of Smoking</u>**

7       53.    As early as 1946, Lorillard chemist H.E. Parmele, who later became Vice President of

8   Research and a member of Lorillard's Board of Directors, wrote to his company's manufacturing

9   committee: "Certain scientists and medical authorities have claimed for many years that the use of

10  tobacco contributes to cancer development in susceptible people.  Just enough evidence has been

11  presented to justify the possibility of such a presumption."

12      54.    Internal cigarette industry documents reveal, for example:

13          a)    A 1956 memorandum from the Vice President of Phillip Morris' Research and

14  Development Department to top executives at the company regarding the advantages of "ventilated

15  cigarettes" stated that: "Decreased carbon monoxide and nicotine are related to decreased harm to

16  the circulatory system as a result of smoking, decreased irritation is desirable as a partial elimination

17  of a potential cancer hazard."

18          b)    A 1958 memorandum sent to the Vice President of Research at Phillip Morris

19  who later became a member of its Board of Directors from a company researcher stated: "The

20  evidence is building up that heavy cigarette smoking contributes to lung cancer, either alone, or in

21  association with physical and physiological factors."

22          c)    A 1961 document presented to the Phillip Morris Research and Development

23  Committee by the company's Vice President of Research and Development included a section entitled

24  "Reduction of Carcinogens in Smoke."  The document stated, in part: "To achieve this objective will

25  require a major research effort, because carcinogens are found in practically every Class of

26  compounds.  The best we can hope for is to reduce a particularly bad Class, i.e., the polynuclear

27  hydrocarbons, or phenols.  Flavor substances and carcinogenic substances come from the same

28  Classes, in many instances."

15

NINTH AMENDED COMPLAINT

d)      A 1963 memorandum to Phillip Morris, President and CEO, from the company's Vice President of Research describes a number of Classes of compounds in cigarette smoke which are "known carcinogens." The document goes on to describe the link between smoking and bronchitis and emphysema. "Irritation problems are now receiving greater attention because of the general medical belief that irritation leads to chronic bronchitis and emphysema. These are serious diseases involving millions of people. Emphysema is often fatal either directly or through other respiratory complications. A number of experts have predicted that the cigarette Industry ultimately may be in greater trouble in this area than in the lung cancer field."

e)      Brown & Williamson and its parent company, BATCO, researched the health effects of nicotine and were aware early on, as reported at a B.A.T. Group Research Conference in November 1970, that "nicotine may be implicated in the etiology of cardiovascular disease."

f)      A 1961 "Confidential" memorandum from the consulting research firm hired by Liggett to do research for the company states; "There are biologically active materials present in cigarette tobacco. These are: a) cancer causing: b) cancer promoting; c) poisonous; d) stimulating, pleasurable, and flavorful."

g)      A 1963 memorandum from Liggett consulting research firm states: "Basically, we accept the inference of a causal relationship between the chemical properties of ingested tobacco smoke and the development of carcinoma, which is suggested by the statistical association shown in the studies of Doll and Hill, Horn, and Dorn with some reservations and qualifications and even estimated by how much the incidence of cancer may possibly be reduced if the carcinogenic matter can be diminished, by an appropriate filter, by a given percentage."

## II. The Nicotine in Cigarettes is Highly Addictive

55.     Cigarettes contain nicotine. Nicotine is an addictive substance and the use of cigarettes results in addiction to them. Nicotine causes compulsive use of cigarettes, despite knowledge that they are harmful, if not lethal; nicotine has a psychoactive (mood-altering) effect in the brain; and nicotine invokes what is called "reinforcing behavior", causing continued use of the nicotine-containing products. Cigarette smokers suffer an inability to quit, notwithstanding a desire to do so, and those who do quit (or attempt to) endure withdrawal symptoms such as headaches,

1    insomnia, depression, lack of concentration, and anxiety.

2        56.    There is an overwhelming weight of scientific evidence that smoking cigarettes poses

3    serious health risks, however, millions of California residents continue to smoke cigarettes, including

4    many new teenage smokers everyday, because they are addicted and dependent upon these products.

5        57.    The addictive power of nicotine is further illustrated by these statistical facts: at least

6    two-thirds of adults who smoke say they wish they could quit; 17 million Americans try to quit

7    smoking each year, but fewer than 1 out of 10 succeed; for every smoker who quits, 9 try and fail; 8

8    out of 10 smokers say they wish they have never started smoking; among smokers who suffer heart

9    attacks, thirty-eight percent (38%) resume smoking while they are still in the hospital; even when a

10   smoker has their larynx removed, forty percent (40%) try smoking again; seventy percent (70%) of

11   young people ages 12 to 18 who smoke say they believe they are already dependent on cigarettes; and

12   forty percent (40%) of high school seniors who smoke regularly have tried to quit and failed.

13   According to David A. Kessler, M.D., Commissioner of the United States Food and Drug

14   Administration, "[Once they have started smoking regularly, most smokers are in effect deprived of

15   the choice to stop smoking.  Seventeen million Americans try to quit smoking each year.  But, more

16   than fifteen million are unable to exercise that choice because they cannot break their addiction to

17   cigarettes.]"

18       58.    After an extensive investigation, the FDA proposed regulation of cigarettes and

19   nicotine.  The results of that inquiry and analysis supported a finding that nicotine in cigarettes and

20   smokeless tobacco is a drug, and that these tobacco products are drug delivery devices within the

21   meaning of the Federal Food, Drug, and Cosmetic Act.

22                    II.  **Defendants' Knowledge of Nicotine Addiction**

23       59.    The Defendants know of the difficulties smokers experience in quitting smoking and of

24   the tendency of addicted individuals to focus on any rationalization to justify their continued smoking.

25   By no later than the early 1960's, and perhaps as early as the 1940's, the Tobacco Companies were

26   fully aware, based on their own scientific research, that nicotine is an addictive substance and that

27   regular cigarette smoking results in nicotine dependence.  For example, an internal Phillip Morris

28   report from 1971 describes the difficulties a smoker has in an effort to stop smoking once they are

                                                    17
                                                                          NINTH AMENDED COMPLAINT

1    addicted to nicotine: "Even after eight months, quitters were apt to report having neurotic symptoms,

2    such as feeling depressed, being restless and tense, being ill-tempered, having a loss of energy, being

3    apt to doze off, etc. They were further troubled by constipation and weight gain."

4          60.    An internal report written in 1973 by William J. Dunn, Jr., a senior scientist with

5    Phillip Morris, says the following:

> The primary incentive to cigarette smoking is the immediate salutatory
> effect of inhaled smoke upon body function. As with eating and
> copulating, so it is with smoking. The physiological effects serve as the
> primary incentive; all other incentives are secondary. Without nicotine,
> the argument goes, there would be no smoking. Some strong evidence
> can be marshaled to this argument:
>
>     (1)    No one has ever become a cigarette smoker by smoking
> cigarettes without nicotine.
>
>     (2)    Most of the physiological responses to inhaled smoke
> have been shown to be nicotine-related.

      61.    Another internal Phillip Morris document, this one from 1981, acknowledges that:

> Nicotine is a powerful pharmacological agent with multiple sites of
> action and may be the most important component of cigarette smoke.
> Nicotine and an understanding of its properties are important to the
> continued well being of our cigarette business since this "alkaloid has
> been cited often as the reason for smoking" and theories have been
> advanced for "nicotine titration" by the smoker. Nicotine is known to
> have effects on the central nervous system as influencing memory,
> learning, pain perception, response to stress, and level of arousal.

      62.    Additional documents likewise are replete with evidence of such knowledge:

>     a)    In 1962, Sir Charles Ellis, a scientific advisor to the
> board of directors of British American Tobacco Company ("BATCO"),
> Brown & Williamson's parent company, stated at a meeting of
> BATCO's worldwide subsidiaries that "smoking is a habit of addiction"
> and the "nicotine is not only a very fine drug, but the technique of
> administration by smoking has considerable psychological advantages."
> He subsequently described Brown & Williamson as being "in the
> nicotine rather than the tobacco industry."
>
>     b)    A research report from 1963 commissioned by Brown &
> Williamson states that when a chronic smoker is denied nicotine, "A
> body left in this unbalanced state craves for renewed drug intake in
> order to restore the physiological equilibrium. This unconscious desire
> explains the addiction of the individual to nicotine." No information
> from that research has ever been voluntarily disclosed to the public; in
> particular, it was not shared with the Committee that was preparing the
> Surgeon General report and hence was not reflected in that report.

18

NINTH AMENDED COMPLAINT

c) Addison Yeaman, General Counsel at Brown & Williamson, summarized his view about nicotine in an internal memorandum also in 1963: "Moreover, nicotine is addictive. We are then, in the business of selling nicotine, an addictive drug, effective in the release of stress mechanisms."

d) Internal reports prepared by Phillip Morris in 1972 and the Phillip Morris U.S.A. Research Center in March 1978 demonstrate Phillip Morris' understanding of the role of nicotine in tobacco use: "We think that most smokers can be considered nicotine seekers, for the pharmacological effect of nicotine is one of the rewards that come from smoking. When the smoker quits, he forgoes his accustomed

nicotine. The change is very noticeable, he misses the reward, and so he returns to smoking."

e) From 1940-1970, the American Tobacco Company conducted its own nicotine research, funding over 90 studies on the pharmacological and other effects of nicotine on the body. This research constitutes eighty percent (80%) of all biological studies funded by the company over this period. In 1969, the American Tobacco Company marketed a nicotine-enriched cigarette in Seattle, Washington.

f) In a 1972 document entitled "RJR Confidential Research Planning Memorandum on the Nature of the Tobacco Business and the Crucial Role of Nicotine Therein", an R.J. Reynolds executive wrote: "In a sense, the tobacco industry may be thought of as being a specialized, highly ritualized, and stylized segment of the pharmaceutical industry. Tobacco products uniquely contain and deliver nicotine, a potent drug with a variety of physiological effects."

63. Documents from a BATCO study called project Hippo, now uncovered, show that as far back as 1961, this cigarette company was actively studying the physiological and pharmacological effects of nicotine. Project Hippo reports were circulated to other U.S. cigarette manufacturers and to the Tobacco Industry Research Committee ("TIRC"). BATCO sent the reports to officials at Brown & Williamson and R.J. Reynolds and circulated a copy to the TIRC with a request that it "consider whether it would help the U.S. industry for these reports to be passed on to the Surgeon General's Committee."

64. An internal Phillip Morris draft document analyzes the competitive market for nicotine products for the years 1990-1992. The report describes the importance of nicotine: "Different people smoke for different reasons. But the primary reason is to deliver nicotine into their bodies." It is a physiologically active, nitrogen containing substance. Similar organic chemicals include

19                                    NINTH AMENDED COMPLAINT

1  nicotine, quinine, cocaine, atropine and morphine.  While each of these substances can be used to

2  affect human physiology, nicotine has a particularly broad range of influence.  During the smoking

3  act, nicotine is inhaled into the lungs in smoke, enters the bloodstream and travels to the brain in

4  about eight to ten seconds.

5      65.      Recently disclosed handwritten notes dated 1965 from Ronald A. Tamol, who until

6  1993 was Director of Research and Brand Development at Phillip Morris, states "minimum nicotine

7  ... is to keep the normal smoker hooked."

8                  **III.  Defendants' Denial That Nicotine is Addictive**

9      66.      To this day, the cigarette manufacturers have concealed from the public and public

10  health officials their extensive knowledge of the addictive properties of nicotine and its critical role in

11  smoking and continue to contend that nicotine is not addictive and that cigarettes are not harmful to

12  your health.

13      67.      The cigarette manufacturers have affirmatively misrepresented to consumers and to

14  Congress the role of nicotine in tobacco use.  Even today, Brown & Williamson, R.J. Reynolds and

15  the Tobacco Institute continue to claim that nicotine is important in cigarettes for taste and "mouth-

16  feel".  Tobacco industry patents, however, specifically distinguish nicotine from flavorants and an R.J.

17  Reynolds book on tobacco flavorants, fails to include nicotine.  Defendants have researched

18  technologies to mask the acrid flavor of increased levels of nicotine in cigarettes.

19      68.      The Congressional Subcommittee on Health and the Environment commenced

20  hearings on March 25, 1994, on the potential regulation of nicotine-containing products under the

21  Federal Food, Drug and Cosmetic Act.  In the wake of the March 25, 1994, Congressional Hearings,

22  spokespersons for the Tobacco Institute and the Tobacco Companies have denied in nationwide

23  television broadcasts and print publications that nicotine is addictive.  Following the appearance of

24  the Tobacco Companies, executives before Congress, Phillip Morris took out full-page newspaper

25  ads that stated, in part: "Phillip Morris does not believe cigarette smoking is addictive."

26      69.      On February 25, 1994, David A. Kessler, M.D., Commissioner of the FDA, sent a

27  letter to Scott D. Bailin, Esquire, Chairman of the Coalition on Smoking and Health, asserting:

28  "Evidence brought to our attention is accumulating that suggests that cigarette manufacturers may

                                        20
                                                        NINTH AMENDED COMPLAINT

1   intend that their products contain nicotine to satisfy an addiction on the part of some of their

2   customers.  The possible inference that cigarette vendors intend cigarettes to achieve drug effects in

3   some smokers is based on mounting evidence we have received that:  (1) the nicotine ingredient in

4   cigarettes is a powerfully addictive agent; and (2) cigarette vendors control the levels of nicotine that

5   satisfy this addiction."

6        70.      In response to Kessler's letter, on March 15, 1994, in a letter to The New York Times,

7   James W. Johnston, Chairman and Chief Executive Officer of R.J. Reynolds, continued to assert that

8   nicotine was not addictive.  Johnston based his assertion upon the success rate of American adults

9   who had quit smoking.

10       71.      The American public is only now beginning to learn that Defendants concealed the

11  truth about nicotine.  A previously secret Phillip Morris-funded research study substantiates the

12  addictive nature of nicotine.  Phillip Morris scientists, upon conducting tests, found strong evidence

13  that nicotine might be addicting, which suggested further testing should be done.  The experiment

14  (self-administration by rats) is one of the primary tests used by the U.S. Food and Drug

15  Administration, the U.S. Drug Enforcement Agency, and the World Health Organization to determine

16  whether a drug is addictive.  The research was submitted in 1983 to the scientific journal

17  Psychopharmacology and was accepted for publication.  Prior to publication, the journal was notified

18  by the scientist that the article was being withdrawn "due to factors beyond his control."  The

19  scientist subsequently left Phillip Morris and in 1986 re-submitted a revised version of the article to

20  the journal.  After the article was accepted for publication again, the scientist was forced to withdraw

21  it by Phillip Morris.

22       72.      Had Defendants disclosed their knowledge of the addictive nature of nicotine when

23  they first acquired this knowledge, then the public would have learned about the addictiveness of

24  nicotine many years ago.  As a result, the scientific and medical community would have had access to

25  critical Tobacco Industry secrets on the subject, which would have resulted in more rapid popular

26  determination and consensus on the subject.  The Tobacco Industry concealed and continues to

27  attempt to conceal the truth about nicotine in order to sustain the addictions of existing cigarette

28  smokers and to "hook" thousands of new smokers every day, so that Tobacco Companies can

NINTH AMENDED COMPLAINT

1  continue to profit at the expense of the lives and health of the American public.

2      73.    Not only do Defendants know and conceal that nicotine is an addictive drug, the

3  Plaintiff is informed and believes that Defendants intend that their products contain sufficient nicotine

4  to satisfy addiction on the part of smokers, and therefore control the levels of nicotine in these

5  products to create and sustain the addiction.  It is this scheme to deceive the American public that

6  enables Defendants to sell their life-threatening products to tens of millions of Americans, including

7  millions of Californians.

8

9                 **IV.**    **Manipulation by the Tobacco Companies of**

                             **Nicotine Levels to Create and Sustain Addiction**

10

11      74.    Plaintiffs are informed and believe that Defendants control and manipulate the levels of

12  nicotine in cigarettes.  Defendants developed technology years ago to remove nicotine from tobacco

13  and to control precisely the amount of nicotine in cigarettes.  By adding nicotine to their cigarettes

14  through a variety of methods, they were able to maintain levels of nicotine sufficient to make their

15  cigarettes addictive to consumers.

16      75.    Just as they have denied that the nicotine is addictive, Defendants, through their

17  individual advertising and public relations campaigns and collectively through the Tobacco Institute,

18  have unequivocally denied that they are engaged in controlling the level of nicotine in cigarettes for

19  the purpose of developing and sustaining addiction.  Spokespersons for the Tobacco Institute and the

20  Tobacco Companies have in nationwide television broadcasts and publications denied all the charges

21  that Defendants manipulate nicotine levels in cigarettes.  During their appearance before Congress on

22  April 14, 1994, the chief executives of each of the Tobacco Companies testified that their companies

23  do not manipulate nicotine levels in or otherwise add nicotine to their cigarettes to create or sustain

24  addiction to their products.

25      76.    Defendants maintain that nicotine levels follow tar levels.  In a 1981 study not

26  intended for public release, Dr. Alexander Spears of Lorillard stated explicitly that low-tar cigarettes

27  use special blends of tobacco to keep the level of nicotine up while tar is reduced: "The lowest tar

28  segment of product categories is composed of cigarettes utilizing a tobacco blend which is

                                            22                                    NINTH AMENDED COMPLAINT

1    significantly higher in nicotine."

2         77.    R.J. Reynolds, Lorillard, the American Tobacco Company and the Tobacco Institute

3    have similarly represented to the public and to the FDA that the nicotine levels in their products are

4    purely a function of setting the tar levels of such products.

5         78.    Internal company documents reviewed by the Waxman Subcommittee show that the

6    American Tobacco Company's experimentation with adding nicotine to its tobacco was extensive

7    enough for American Tobacco Company executive John T. Ashworth to instruct employees in a

8    confidential memorandum: "In the future, our use of nicotine should be referred to as 'Compound W'

9    in our experimental work, reports, and memorandums, either for distribution within the Department

10   or for outside distribution."

11        79.    Recent tests conducted at the direction of the FDA show that the low-tar brands

12   actually have more nicotine by weight than the non-"light" brands.  The high level of nicotine found in

13   lower tar cigarettes seriously misleads consumers and renders the industry's claim of an "essentially

14   perfect" correlation between reduced tar and nicotine levels false.  According to the FDA, this has

15   been accomplished by a combination of the methods described above for boosting nicotine delivery to

16   compensate for nicotine losses from the application of tar-reducing design modifications.  The

17   cigarette industry thereby maintains a continuing market for a product that consumers are misled to

18   believe contains less of all of the harmful ingredients in regular cigarettes.

19                    V.  **Manipulation by Tobacco Reconstitution**

20        80.    Defendants prepare a substantial portion of the contents of their cigarettes through

21   what is called a "reconstitution process".  Prior to the 1940's, the waste products from cigarettes -

22   tobacco leaf scraps and stems, dried tobacco dust, adhesive reinforcing fibers, mineral ash modifiers,

23   humectant, and some other inexpensive materials were discarded.  Thereafter, Defendants began to

24   use these previously unusable materials to make reconstituted tobacco.  As part of the process,

25   Defendants removed ingredients from these materials at an early stage of the process and replaced

26   some of the nicotine in later stages.  The reconstitution process allows Defendants to manufacture

27   cigarettes at a lower cost by using less tobacco, which is the most expensive part of the cigarette, and

28   by making up the difference in content with the reconstituted tobacco.  By removing the nicotine and

                                        23                    NINTH AMENDED COMPLAINT

1   then carefully replacing as much nicotine as desired, Defendants are able to control the precise

2   amount of nicotine in cigarettes.

3          81.    LT. Industries, a subsidiary of Kimberly-Clarke Corporation, specializes in the tobacco

4   reconstitution process and, as LT. says, helping tobacco companies "control" their nicotine.  The LT.

5   reconstitution process is the most widely used in the world.  An LT. advertisement, entitled "More

6   Nicotine, Or Less", published in tobacco trade publications states:

7               Nicotine levels are becoming a growing concern to the designers of
                modern cigarettes, particularly those with lower "tar" deliveries.  The
8               Kimberly-Clarke tobacco reconstitution process, used by LT.
                Industries, permits adjustments that will not affect the other important
9               properties of customized reconstituted tobacco produced at LT.
                Industries: low tar delivery, high filling power, high yield, and the
10              flexibility to convey organoleptic modifications.  We can help you
                control your tobacco.
11

12         82.    In fact, the process described in the LT. advertisement can raise the level of nicotine

13  beyond that which is naturally found in tobacco materials.  In 1985, a Tobacco Journal article

14  describing the LT. process states: "Those standards reconstituted Tobacco Products contained 0.7-

15  1.0 nicotine.  LT. Industries offers the possibility of increasing the nicotine content of the final sheet

16  to a maximum of 3.5%.  A dramatic increase in tobacco taste and smoke is noted in the nicotine-

17  fortified reconstituted tobacco."

18         83.    Without informing the American public, Defendants have long viewed cigarettes in

19  terms of their nicotine delivery function.  For example, Phillip Morris' William L. Dunn Jr., wrote in a

20  1973 internal memorandum:

21              Why then is there not a market for nicotine perse, to be eaten, sucked,
                drunk, injected, inserted or inhaled as a pure aerosol?  The answer, and
22              I feel quite strongly about this, is that the cigarette is in fact among the most awe-
                inspiring examples of the ingenuity of man.
23
                The cigarette should be conceived not as a product, but as a package.
24              The product is nicotine.  The cigarette is but one of many package
                layers.  There is the carton, which contains the pack, which contains
25              the cigarette, which contains the smoke.  The smoker must rip off all of
                these packaged layers to get to that which he seeks.  Think of the
26              cigarette as a storage container for a day's supply of nicotine ... Think
                of the cigarette as a dispenser for a dose unit of nicotine ... Think of a
27              puff of smoke as the vehicle for nicotine ... Smoke is beyond question
                the most optimized vehicle of nicotine and the cigarette the most
28              optimized dispenser of smoke ...

                                    24                    NINTH AMENDED COMPLAINT

84.     Likewise, a 1981 Lorillard study indicates that "current research is directed toward increasing the nicotine levels while maintaining or marginally reducing the 'tar' deliveries."

## VI.  Patent Applications Evidence Manipulation

85.     Evidence of Defendants' intent and ability to manipulate nicotine in cigarettes at a sufficiently high level to provide the "desired physiological activity" is found in years of Tobacco Company patent applications.  Tobacco Company patents illustrate an intent and ability by Defendants to control the amount of nicotine in cigarettes; to provide desired physiological effects; to increase nicotine content in cigarettes by adding nicotine to various parts of the cigarette; to manipulate nicotine levels in cigarettes; and to manipulate the rate at which the nicotine is delivered in the cigarettes.  For example, a Philip Morris patent application discusses an invention that "permits the release into tobacco smoke, in controlled amounts, of desirable flavorants, as well as the release, in controlled amounts and when desired, of nicotine into tobacco smoke."  A 1971 Philip Morris patent specifically states:

> It has long been known in the Tobacco Industry that in order to provide a satisfactory smoke, it is desirable to maintain a nicotine content of Tobacco Products at a uniform level.  However, it is difficult to accomplish this result since the nicotine content of tobacco varies widely, depending on the type of tobacco and the conditions under which the tobacco was grown.

> Maintaining the nicotine content at a sufficiently high level to provide the desired physiological activity, taste and odor, which this material imparts to the smoke, without raising the nicotine content through an undesirably high level, can thus be seen to be a significant problem in the tobacco art.  The addition of nicotine to tobacco in such a way that it remains inert and stable in the product, and yet is released in a controlled amount into the smoke aerosol when the tobacco is paralyzed, is a result which is greatly desirable.

> The present invention provides a solution to this long-standing problem and results in accurate control of the nicotine which is released in tobacco smoke.  By employing the nicotine-releasing agents in methods of the present invention, it is possible to incorporate exact amounts of nicotine into tobacco composition, which will remain constant over extended periods of time and which will ultimately yield smoke containing a controlled amount of nicotine.

86.     Another 1971 Philip Morris patent application discusses a design to increase the nicotine content in the smoke of the tobacco product by adding nicotine.  One of the expressed objects of the invention was to "provide an agent for the treatment of tobacco smoke whereby

NINTH AMENDED COMPLAINT

1   nicotine is easily released under controlled amounts." The same Philip Morris application explains

2   that the proposed invention "is particularly useful for the maintenance of the proper amount of

3   nicotine in tobacco smoke," and notes that "previous efforts have been made to add nicotine to

4   Tobacco Products when the nicotine level in the tobacco was undesirably low."

5       87.     A 1980 Loew's Corporation patent application discusses a process that "enables the

6   manipulation of the nicotine content of tobacco material, such as cut leaf and reconstituted leaf, by

7   removal of nicotine from a suitable nicotine tobacco source, or by the addiction of nicotine to a low

8   nicotine material."

9       88.     In a 1986 patent, R.J. Reynolds indicates that the Tobacco Companies can precisely

10  manipulate the rate at which the nicotine is delivered in the cigarette: "It is a further object of this

11  invention to provide a cigarette which delivers a larger amount of nicotine in the first few puffs of the

12  cigarette than in the last few puffs."

13      89.     Another R.J. Reynolds patent application dated in 1991 states that "processed

14  tobaccos can be manufactured under conditions suitable to provide products having various nicotine

15  levels."

16  **VII.  Sustaining Addiction of Nicotine Through Addition of Ammonia**

17      90.     The nicotine content of the raw tobacco is not the only variable manipulated by the

18  cigarette manufacturers to deliver a pharmacologically active dose of nicotine to the smoker.

19  Cigarettes are not simply cut tobacco rolled into a paper tube. Modern cigarettes as sold in California

20  are painstakingly designed and manufactured to control nicotine delivery to the smoker. For

21  example, cigarette manufacturers add several ammonia compounds during the manufacturing process

22  which increase the delivery of nicotine and almost double the nicotine transfer efficiency of cigarettes.

23      91.     Brown & Williamson publicly denies that the use of ammonia in the processing of

24  tobacco increases the amount of nicotine absorbed by the smoker. Yet, the company's own internal

25  documents reveal that it and its rivals use ammonia compounds to increase nicotine delivery. A 1991

26  Brown & Williamson confidential blending manual states:

27

28

26                                                    NINTH AMENDED COMPLAINT

1        Ammonia, when added to a tobacco blend, reacts with the indigenous
nicotine salts and liberates free nicotine.  As the result of such change,
2        the ration of extractable nicotine to bound nicotine in the smoke may
be altered in favor of extractable nicotine.  As we know, extractable
3        nicotine contributes to impact in cigarette smoke and this is how
ammonia can act as an impact booster.

4

5      92.     According to the Brown & Williamson manual, all American cigarette manufacturers

6  except Liggett use ammonia technology in their cigarettes.

7                  **VIII.**  **Fraudulent Advertising of Tar and Nicotine Content**

8      93.     Defendants' campaign of deception in advertising regarding filters and tar and nicotine

9  content began in the 1950's and has continued unabated through the present.  Defendants have

10  specifically designed their products to deceive the public into thinking they are getting a low tar and

11  low nicotine cigarette, when in fact they are getting significantly higher deliveries of tar and nicotine

12  in smoke.

13      94.     Brown & Williamson had even complained to the FTC that American Brands, Inc.,

14  Phillip Morris U.S.A., and R.J. Reynolds were engaging in deceptive advertising.  While promoting

15  very low-tar cigarettes packaged in flip-top boxes, the three were also marketing cigarettes containing

16  10 to 100 times more tar in look alike soft packages.  Brown & Williamson's much publicized low-tar

17  Barclay was designed to fool the FTC's smoking machines.  The machines preserve Barclay filters but

18  the human lips probably destroy it, giving smokers heavy doses of just what they were trying to

19  avoid.

20      95.     Throughout the 1980's and 1990's, Defendants have continued the "tar and nicotine

21  reduction" deception by increasing the bio-availability of nicotine through pH manipulation and use of

22  additives, such as acetaldehyde and ammonia, to boost the pharmacological impact of nicotine, while

23  still publishing "FTC Method" measurements and advertising their products as "Light" or "Ultra-

24  light".

25                 **IX.**  **Light Cigarettes:  A Marketing Hoax**

26      96.     Recent studies demonstrate that cigarettes advertised as low tar and low nicotine have

27  higher concentrations of nicotine, by weight, than high-yield cigarettes.  Nevertheless, Defendants

28  successfully identified "light" cigarettes to consumers as a reduced tar and reduced nicotine product.

1    Defendants accomplished this deception through several strategies.

2        97.    Defendants designed their "light" products so that advertised tar and nicotine levels, as

3    measured by the FTC method, understate the amounts of tar and nicotine actually ingested by human

4    smokers.  Such design features include a technique called "filter ventilation" where nearly invisible

5    holes are drilled in the filter paper, or the filter paper is made more porous.  Predictably, many

6    smokers of advertised low tar/low nicotine cigarettes block the tiny, laser-generated perforations in

7    the ventilated filters with their fingers or lips, thereby resulting in greater tar and nicotine yields than

8    those measured by the FTC smoking machine.

9

10           **X.  The Tobacco Industry Conspiracy and the Creation**
                  **of the Tobacco Industry Research Committee**
11                    **("TIRC" later known as "CTR")**

12       98.    The industry conspiracy began as early as the 1950's, when cigarette manufacturers

13   were confronted with the publication of several scientific studies which gave grave warnings on the

14   health hazards of cigarettes.  One of the first of these studies was published in 1952 by Dr. Richard

15   Doll, a British researcher.  Dr. Doll, in a statistical analysis, found that lung cancer was more common

16   among people who smoked, and that risk of lung cancer was directly proportional to the number of

17   cigarettes smoked.  A report published in December, 1953 by Dr. Ernst L. Wynder of the Sloan-

18   Kettering Institute disclosed to the scientific community and Defendants a definitive link between

19   smoking and cancer.

20       99.    Confronted with this evidence, the presidents of the leading tobacco companies met at

21   an extraordinary gathering in the Plaza Hotel in New York City on December 15, 1953.  Hill and

22   Knowlton, a public relations agency, coordinated the meeting.  The companies had not met together

23   since two previous antitrust decrees had prohibited "group activities."  The companies, however,

24   viewed the current problem "as being extremely serious and worthy of drastic action."

25       100.   Publication of these scientific studies was viewed by Defendants not as a public health

26   concern, but rather as an entirely public relations problem.  The industry leaders felt that "the problem

27   is one of promoting cigarettes and protecting them from these and other attacks that may be expected

28   in the future" and that the industry "should sponsor a public relations campaign which is positive in

28

1   nature and is entirely 'pro-cigarettes.'"

2       101.   All of the leading manufacturers, except Liggett, agreed to "go along" with the public

3   relations strategy.  Liggett decided not to participate at that time "because that company feels that the

4   proper procedure is to ignore the whole controversy."  The group discussed forming an association

5   "specifically charged with the public relations function."

6       102.   As a result, the Tobacco Industry Research Committee ("TIRC") was conceived and

7   born.  Five of the Big Six cigarette manufacturers were original members.  Liggett did not join until

8   1964, the same year that the Surgeon General issued its first report on smoking and health and

9   concluded that cigarette smoking caused lung cancer.  Also in 1964, the TIRC changed its name to

10   the Council for Tobacco Research ("CTR").

11       103.   Nine days after the December 15, 1953 meeting, Hill and Knowlton presented a

12   detailed recommendation to the cigarette manufacturers and others, as a "pro-cigarette" industry

13   strategy.  The recommendation recognized the importance of gaining the public trust and avoiding the

14   appearance of bias.

### XI.  The "Frank Statement to Cigarette Smokers"

16       104.   Defendants announced formation of the TIRC on January 4, 1954.  Newspaper

17   advertisements were placed in virtually every city with a population of 50,000 or more, including Los

18   Angeles, reaching more than 43 million Americans.  The advertisement was captioned "A Frank

19   Statement to Cigarette Smokers" and ran under the auspices of the TIRC with, inter alia, five of the

20   Big Six manufacturers listed by name.  The advertisement stated, in part:

> Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked to lung cancer in human beings.  Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research.  However, we do not believe that any serious medical research, even though its results are inconclusive, should be disregarded or lightly dismissed.  At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.  Distinguished authorities point out:

29

1.     That medical research of recent years indicates many possible causes of lung cancer.

2.     That there is no agreement among the authorities regarding what the cause is.

3.     That there is no proof that cigarette smoking is one of the causes.

4.     That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many aspects of modern life.  Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.  We believe the products we make are not injurious to health.  We always have and always will cooperate closely with those whose task it is to safeguard the public health.  For more than 300 years, tobacco has given solace, relaxation, and enjoyment to mankind.  At one time or another during those years, critics have held it responsible for practically every disease of the human body.  One by one these charges have been abandoned for lack of evidence.  Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of serious disease is a matter of deep concern to us.  Many people have asked us what we are doing to meet the public's concern aroused by the recent reports.  Here is the answer:

1.     We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies.

2.     For this purpose, we are establishing a joint group consisting initially of the undersigned.  This group will be known as the TOBACCO INDUSTRY RESEARCH COMMITTEE.

3.     In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute.  In addition, there will be an Advisory Board of scientists disinterested in the cigarette industry.  A group of distinguished men from medicine, science and education will be invited to serve on this Board.  These scientists will advise the Committee on its research activities.  This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it.

105.    In this advertisement, the participating Tobacco Companies recognized their "special responsibility" to the public, and promised to learn the facts about smoking and health.  In addition, the participating companies promised to sponsor independent research on the subject, claiming they

NINTH AMENDED COMPLAINT

1   would make health a basic responsibility, paramount to any other consideration in their business.

2   Moreover, they promised to cooperate closely with public health officials.  Yet, at the time these

3   promises were made, the Tobacco Companies had no intention of honoring their promises.  In fact,

4   these promises, so publicly and dramatically made to the public, the citizens of California and

5   government regulators, have been breached over and over again.

6

7   **XII.   "Scientific" Research as a Public Relations  Front:**
8   **Control of TIRC by Hill and Knowlton**

9   106.   TIRC was physically established in the Empire State Building, one floor below the Hill

10  and Knowlton offices.  Internal documents confirm that Hill and Knowlton, and not independent

11  scientists actually ran the TIRC.  A "highly confidential" internal memo reported:

12

13          Since the [TIRC] had no headquarters and no staff, Hill and Knowlton,
              Inc. was asked to provide a working staff and temporary office space.
14          As a first organizational step, public relations counsel assigned one of
              its experienced executives, W.T. Hoyt, to serve as account executive
15          and handle as one of his functions, the duties of executive secretary for
              the TIRC.
16

17  In 1954, the TIRC retained thirty-five staff members of Hill and Knowlton, amounting to over fifty

18  percent (50%) of TIRC's entire budget.

19  107.   After lulling the public into a false sense of security concerning smoking and health,

20  the TIRC continued to act as a front for tobacco industry interests.  A coordinated, industry-wide

21  strategy was designed to actively mislead and confuse the public about the true dangers associated

22  with smoking cigarettes.  Rather than work for the good of the public health and sponsor independent

23  research as it had promised, Defendants, acting through TIRC/CTR, concealed, undermined and

24  distorted information from the scientific and medical community.

25  108.   Defendants congratulated themselves on a brilliantly conceived and executed strategy

26  to create doubt about the charge that cigarette smoking is deleterious to health without denying it.  A

27  1962 memo stated that the industry had handled the Wynder report emergency effectively by treating

28  the public health threat as a public relations problem, thus preserving the industry's image and profit.

NINTH AMENDED COMPLAINT

1   A former 24-year employee of CTR confirmed that the joint industry research efforts were not

2   objective: "When CTR researchers found out that cigarettes were bad and it was better not to smoke,

3   we didn't publicize that.  The CTR is just a lobbying thing.  We were lobbying for cigarettes."

4       109.    CTR-sponsored research projects were directed away from research that might add to

5   the evidence against smoking.  When CTR-sponsored research did produce unfavorable results,

6   however, the information was distorted or simply suppressed.  For example, Dr. Freddy Homburger,

7   a researcher in Cambridge, Massachusetts, undertook a study of smoke exposure on hamsters.

8   According to Dr. Homburger, he received a grant from CTR which was changed halfway through the

9   study to a contract "so they could control publication - they were quite open about that."  Dr.

10  Homburger has testified that when the study was completed in 1974, the Scientific Director of CTR

11  and a CTR lawyer "didn't want us to call anything cancer" and they threatened him with "never

12  getting a penny more" if his paper was published without deleting the word cancer.

13      110.    An internal CTR document describes how Dr. Homburger attempted to call a press

14  conference about the incident and how CTR stopped it: "He was to tell the press that the tobacco

15  industry was attempting to suppress important scientific information about the harmful effects of

16  smoking.  He was going to point specifically at CTR.  I arranged later that evening for it to be

17  canceled.  Homburger was given a cordial welcome and nicely hastened out the door.  P.S. I doubt if

18  you or Tom will want to retain this note."

19              **XIII.  The Role of Tobacco Lawyers and Tobacco Lobbyists**

20      111.    The general counsel of Defendants, through joint meetings to review and direct

21  proposals for scientific research for the entire industry, aided in the conspiracy of Defendants to

22  defraud the public on the issue of tobacco and health.  Defendants' corporate officials and the

23  Tobacco Trade Associations have attempted wrongfully to create a privilege for various documents

24  that they wish to conceal by sending such documents through their legal departments and law firms in

25  order that they might claim the documents to be protected by the attorney-client or attorney work-

26  product privileges.  Through the CTR, Defendants have used lawyers and the claim of privilege to

27  insulate CTR-funded research projects from disclosure to the public and to government officials.

28  This conduct demonstrates that Defendants never intended to jointly fund objective research and

1   report the results to the public, contrary to their public representations.  CTR used the term "special

2   projects" to mean a project that carried a risk of a negative result that might have to be suppressed.

3   "Special projects" were selected and monitored by Defendants' lawyers to prevent disclosure.

4        112.   The sole purpose of the Special Projects Division within the CTR was to conceal

5   research that was harmful to Defendants and to promote and develop research and expert witnesses

6   needed for the defense of tort litigation.  Incriminating reports and documents contained within this

7   division were passed through attorneys and are now claimed to be privileged by Defendants.

8        113.   At least one cigarette company used similar tactics to suppress and avoid disclosure of

9   its internal research on smoking and disease.  At a time when the company was resisting discovery in

10  a number of personal injury lawsuits, Brown & Williamson's general counsel, J. Kendrick Wells,

11  recommended in a memorandum dated January 17, 1985, that much of the company's biological

12  research be declared "deadwood" and shipped to England.  He recommended that no notes, memos

13  or lists be made about these documents.  Wells further recommended that the research, development

14  and engineering department also should undertake "to remove the deadwood from the files."

15                    **XIV. <u>Misrepresentations to the Public</u>**

16       114.   The public disinformation strategy employed by Defendants and the Tobacco Trade

17  Associations was a strategy best described as "see no evil, hear no evil, and speak no evil" concerning

18  the health effects of cigarette smoking.  A publication called Tobacco and Health (later, Tobacco and

19  Health Research) was created by Defendants and the Tobacco Trade Associations and was used by

20  them to disseminate false information and create confusion over the causal connection between

21  cigarette smoking and disease.

22       115.   The January 15, 1968 issue of True Magazine contained an article written by Stanley

23  Frank called, "To Smoke or Not to Smoke - That is Still the Question."  The article dismissed the

24  evidence against smoking as "inconclusive and inaccurate" and claimed that "statistics alone link

25  cigarettes with lung cancer . . . it is not accepted as scientific proof of the cause and effect."

26       116.   A few months later, a similar but shorter article appeared in the National Enquirer

27  entitled "Cigarette Cancer Link is Bunk" written by "Charles Golden" (a fictitious name commonly

28  used by the Enquirer).  The real author was Stanley Frank.  Two million reprints of the True

33                                        NINTH AMENDED COMPLAINT

1   Magazine article were distributed to physicians, scientists, journalists, government officials. The cost

2   for this was paid by Brown and Williamson, Philip Morris and R.J. Reynolds.  It was subsequently

3   disclosed that the author, Frank, had been paid $500.00 to write the article by Joseph Field, a public

4   relations professor working for Brown and Williamson.  Brown and Williamson reimbursed Field for

5   that amount.

6          117.    Other public statements by the Defendants over the years have repeated the

7   misrepresentations that Defendants were dedicated to the pursuit and dissemination of the scientific

8   truth regarding smoking and health.  For example, the Tobacco Institute in 1970 ran an advertisement

9   captioned "A Statement About Tobacco and Health" which stated:

              a.      "We recognize that we have a special responsibility to
       the public to help scientists determine the facts about tobacco and
       health, and about certain diseases that have been associated with
       tobacco use."

              b.      "We accepted this responsibility in 1954 by establishing
       the Tobacco Industry Research Committee, which provides research
       grants to independent scientists.  We pledge continued support of this
       program of research until all the facts are known."

              c.      "Scientific advisors inform us that until much more is
       known about such diseases as lung cancer, medical science probably
       will not be able to determine whether tobacco or any other single factor
       plays a causative role, or whether such a role might be direct or
       indirect, incidental or important."

              d.      "We shall continue all possible efforts to bring the facts
       to light."

          118.    Also, in 1970, the Tobacco Institute ran an advertisement captioned, "The question

   about smoking and health is still a question."  In this advertisement, the Tobacco Institute stated:

              a.      "[A] major portion of this scientific inquiry has been
       financed by the people who know the most about cigarettes and have a
       great desire to learn the truth ... the tobacco industry."

              b.      "The industry has committed itself to this task in the
       most objective and scientific way possible."

              c.      "In the interest of absolute objectivity, the tobacco
       industry has supported totally independent research efforts with
       completely nonrestrictive funding."

              d.      "Completely autonomous, CTR's research is directed by
       a board of ten scientists and physicians ... This board has full authority
       and responsibility for policy, development and direction of the research

                                   34                    NINTH AMENDED COMPLAINT

1    effort."

2              e.      "The findings are not secret."

3              f.      "From the beginning, the tobacco industry has believed
     that the American people deserve objective, scientific answers."

4

5    119.    In direct contrast to what Defendants and Tobacco Trade Associations were telling

6    the public, a memo from the Tobacco Institute by Vice President Fred Panzer to President Horace

7    Carnage dated May 1, 1972, acknowledges that the industry had employed a single strategy for nearly

8    twenty (20) years to defend itself on three major fronts: litigation, politics, and public opinion. This

9    strategy consisted of "creating doubt about the health charge without actually denying it - advocating

10   the public's right to smoke without actually urging them to take up the practice - encouraging

11   objective scientific research as the only way to resolve the question of health hazard." Panzer

12   proposed that the industry supply the public with "ready-made credible alternatives" to the prevalent

13   view that smoking causes cancer, such as genetic and environmental explanations for smoking-related

14   diseases.

15   120.    In the 1930's through the 1950's, in response to what industry spokesmen referred to

16   as "the health scare," Defendants made express claims and warranties as to the healthiness of their

17   products with reckless disregard to the falsity of their claims and the consequential adverse impact on

18   consumers. Examples of these health warranties include the following: Old Gold - "Not a cough in a

19   Carload"; Camel - "Not a single case of throat irritation due to smoking Camels"; Philip Morris -

20   "The throat-tested cigarette."

21   121.    In 1942, Brown and Williamson claimed that Kohls would keep the head clear and

22   give extra protection against colds.

23   122.    In 1952, Liggett & Myers conducted a test for advertising purposes to demonstrate

24   the absence of harmful effects of smoking Chesterfields on the nose, throat, and affected organs. The

25   tests were conducted by Arthur D. Little, Inc. and were designed so as to have no real scientific

26   value. Nonetheless, its conclusion that smoking Chesterfields had no harmful effect on the organs in

27   question was widely publicized and the purported results used to assure the general public that

28   Chesterfields were harmless.

35                                NINTH AMENDED COMPLAINT

123.    During the 1950's, Liggett & Myers sponsored the nationally popular Arthur Godfrey radio and television show wherein health claims were made based on the alleged scientific studies assuring, "Smoking Chesterfields would have no adverse effects on the throat, sinuses or affected organs."

124.    Earlier consumer-oriented ads from the 1930's and 1940's often carried wide-ranging medical claims that placed cigarette-touting physicians in the company of endorsers such as Santa Claus ("Luckys are easy on my throat"), movie stars, sports heroes, and steady-nerved circus stars. Similar ads appeared in medical journals. For example, one ad showed the Camel cigarettes booth at the American Medical Association's 1942 Annual Meeting.

125.    In the New York State Journal of Medicine, Chesterfield ads began running in 1933. They often carried claims such as, "Just as pure as the water you drink and practically untouched by human hands."

126.    Defendants sponsored cigarette ads in the New England Journal of Medicine, Journal of the American Medical Association ("JAMA") and The Lancet from the 1930's through the 1950's.

127.    Philip Morris ran an ad in a 1943 issue of the National Medical Journal that read: "'Don't smoke" is advice hard for patients to swallow. May we suggest instead "Smoke Philip Morris"? Tests showed three out of every four cases of smokers' cough cleared on changing to Philip Morris. "Why not observe the results for yourself?" An ad by the company in JAMA in 1949 stated: "Why many leading nose and throat specialists suggest, 'Change to Philip Morris!'"

128.    Other companies added different angles for physicians. Camel cigarettes paid tribute to medical pioneers and concluded: "Experience is the best teacher . . . experience is the best teacher in cigarettes too." Old Gold reacted to early negative medical studies with the slogan: "If pleasure's your aim, not medical claims..." Some companies hired attractive women to deliver cigarette samples to physicians and the patients in their waiting rooms.

129.    The appearance of landmark studies such as the 1952 JAMA article on smoking and bronchial carcinoma, by Alton Ochsner, M.D. and others prompted JAMA's decision to ban cigarette ads from their journal.

NINTH AMENDED COMPLAINT

1    130.    During the 1950's, Defendants employed yet another method of deception in

2    manufacturing and advertising to boost sales to counter the "health scare", "The Filter Derby" and

3    "Tar Wars." Defendants manufactured filtered cigarettes that were advertised with explicit and

4    implicit warranties of tar/nicotine content and health claims. Defendants' health claims and claims as

5    to the effectiveness of the filters in removing tar and nicotine were knowingly deceptive when made,

6    and were made with reckless disregard for the health risks to the cigarette smokers.

7                    XVI. **Targeting Children and Minors**

8    131.    Across the nation, the overwhelming majority of cigarette use and addiction begins

9    when users are children or teenagers. Eighty-two percent (82%) of daily smokers had their first

10   cigarette before age 18, sixty-two percent (62%) before the age of 16, and thirty-eight percent (38%)

11   before the age of 14. Thus, a person who does not begin smoking in childhood or adolescence is

12   unlikely ever to begin. The younger a person begins to smoke, the more likely he or she is to become

13   a heavy smoker. Sixty-seven percent (67%) of children who start smoking in the sixth grade become

14   regular adult smokers and forty-six percent (46%) of teenagers who start smoking in the eleventh

15   grade become regular adult smokers.

16   132.    Smoking at an earlier age increases the risk of lung cancer and other diseases. Studies

17   have shown that lung cancer mortality is highest among adults who began smoking before the age of

18   15.

19   133.    Cigarette smoking among children and teens is on the rise. A 1995 National Institute

20   of Drug Abuse study found that between 1991 and 1994, the proportional increase in smoking rates

21   was greatest among eighth graders, rising by thirty percent (30%).

22   134.    Tobacco product brand names, logos, and advertising messages are all-pervasive,

23   appearing on billboards, buses and trains, in magazines, on clothing and other goods. The effect is to

24   convey the message to young people that tobacco use is desirable, socially acceptable, safe, healthy,

25   and prevalent in society. Additionally, young people buy the most heavily advertised cigarette brands,

26   whereas many adults buy more generic or value-based cigarette brands which have little or no image-

27   based advertising. Cigarette manufacturers, knowing that their advertising appeals to young people,

28   continue to use these same marketing techniques to sell their products.

                              37                    NINTH AMENDED COMPLAINT

135.   A July 1995 report by the California Department of Health Services surveyed tobacco advertisements in or around stores.  Marlboro was the most frequently advertised and promoted cigarette brand with an average of 10.15 advertisements and promotions per store.  Camel was the second most frequently advertised and promoted cigarette brand and had an average of 4.84 advertisements and promotions per store.  These two brands were the most frequently advertised and promoted cigarette brands.  Not surprisingly, Marlboro, Camel and Newport, the most heavily advertised brands, are the leading brands smoked by children.

136.   This same report also found that stores within 1,000 feet of a school had significantly more tobacco advertising and promotions than stores that were not near schools.  Stores near schools were also more likely to have at least one tobacco advertisement placed next to candy or displayed at three feet or below.  A significantly higher average number of tobacco advertisements also were found on the exterior of stores located in young neighborhoods, communities in which at least one-third of the population in that zip code were 17 years of age or less.

137.   R.J. Reynolds has even identified the stores in proximity to the youth market.  R.J. Reynolds' Division Manager for Sales wrote to all R.J. Reynolds sales representatives in 1990 regarding the "Young Adult Market" and asked them to identify what stores were in proximity to colleges or high schools.  A follow-up letter by the sales division calls for a re-submitted list of Y.A.S. (Young Adult Smoker) accounts using new criteria, focusing on all accounts located across from, adjacent to, or in the general vicinity of high schools or college campuses.

138.   Defendants know that they attract underage consumers to their products.  For example, since 1988, R.J. Reynolds has used a cartoon character called "Joe Camel" in its advertising campaign.  It has massively disseminated products such as matchbooks, signs, clothing, mugs, and drink can holders advertising Camel cigarettes.  The advertising has been effective in attracting adolescents.  As a result of the campaign, the number of teenage smokers who smoke Camel cigarettes has risen dramatically.  One study found that Joe Camel is almost as familiar to six-year-old children as Mickey Mouse, enticing thousands of teens to smoke that brand, and has caused Camel's popularity with 12-17 year-olds to surge dramatically.  R.J. Reynolds knew or willfully disregarded the fact that cartoon characters attract children.

38

NINTH AMENDED COMPLAINT

139.    The model who portrayed the "Winston Man" for R.J. Reynolds Winston brand cigarettes testified before Congress: "I was clearly told that young people were the market that we were going after." He further testified, "It was made clear to us that this image was important because kids like to role play, and we were to provide the attractive role models for them to follow. . . . I was told I was a live version of the GI Joe...."

140.    An R.J. Reynolds affiliate studied in detail the motivations of young smokers. A "Youth Target" study was the first of a planned series of research studies into the lifestyles and value systems of young men and women in the 15-24 age range, the stated purpose of which was to "provide marketers and policy makers with an enriched understanding of the mores and motives of this important emerging adult segment which can be applied to better decision making in regard to products and programs directed at youths" all in violation of California Penal code section 380.

141.    For many years, the Defendants have engaged in a vast and misleading promotional, public relations, and sham lobbying blitz that had as its goals: (1) increasing the number of people addicted to nicotine in cigarettes and/or smokeless tobacco products; and (2) decreasing the number of people who attempt or succeed in quitting. Their efforts have been and continue to be directed toward children. The Defendants have at all pertinent times presented and promoted smoking as an attractive, glamorous, youthful, and relaxing pastime, associating it with movie stars, athletes and successful professionals.

142.    Smoking among young people has remained alarmingly constant since the late 1970's. Tobacco companies advertising and marketing campaigns increase demand for tobacco products among young people. The ease with which children and teenagers have been able to obtain cigarettes from vending machines has assured that there is a ready supply to meet this demand. It has been shown repeatedly that cigarette vending machines (even those located in bars and other supposedly adult locations) are readily available to children and teenagers. Within a short period of time, the young smoker becomes physiologically and emotionally dependent ( i.e., addicted to tobacco). Later, as the maturing smoker begins to wish he or she could quit, advertising reinforces the practice and seeks to minimize health concerns and creates doubt and confusion, which is used by smokers as an excuse to avoid the pain and discomfort of attempting to break their addiction to

NINTH AMENDED COMPLAINT

1 nicotine.

2    143.    One of the best examples of this was the transformation of Marlboro cigarettes, from a
3 red-tipped cigarette for women to the cigarette for the "macho cowboy."  By changing advertising
4 imagery, Philip Morris was able to tap into a wholly new and different market. In 1981, Philip Morris
5 developed an effective marketing campaign for recruiting young new smokers to its brands.  The
6 image created by the Marlboro man captured the adolescent imagination, leading to experimentation
7 with that particular cigarette and eventual addiction due to the manipulation by Philip Morris of the
8 nicotine and other ingredients in the cigarette.  The children and teenagers who started smoking
9 Marlboro became tenaciously loyal customers.  Soon, Marlboro became the "gold standard" of
10 cigarettes among teenagers.  Through the year 1988, nearly three-fourths of teenage smokers used
11 Marlboro.

12    144.    At about the time it lost market leadership to Philip Morris, R.J. Reynolds dedicated
13 itself to a ruthless advertising campaign encouraging children and teenagers to smoke.  One of the key
14 elements of the R.J. Reynolds' strategy for attracting children was to reposition many of its cigarette
15 brands to younger audiences by using a succession of advertising images of men engaged in
16 extraordinary feats of physical and athletic achievements.

17    145.    R.J. Reynolds' Vantage cigarettes entered the 1980's as a brand targeted at the health
18 conscious adult smoker.  Advertisements were intended to give the smoker arguments for their
19 continuation of their habit.  Through multiple-advertising transmogrifications, Vantage cigarettes
20 have been progressively repositioned to appeal to ever-younger audiences.  During the mid-1980's,
21 this advertising campaign featured young, successful professionals including architects, fashion
22 designers, lawyers, etc., with the slogan "The Taste of Success."  In the late 1980's, the advertising
23 theme for Vantage cigarettes began to feature professional-caliber athletes and auto racers.

24    146.    During the 1980's, advertising for Salem cigarettes also became more youth-oriented.
25 Whereas the dominant advertising theme for Salem cigarettes used to be "clean, fresh country air."
26 During the 1980's, Salem ads were populated by muscular surfers, bikini clad women and other
27 attractive adolescent role models.  Another successful advertising campaign targeted at young people
28 is Defendant Lorillard's campaign promoting Newport cigarettes.  Newport ads frequently show men

1  and women in sexually suggestive positions always having fun, using the slogan "Alive With

2  Pleasure."

3      147.    A similar advertising campaign has been the "You've Come A Long Way Baby"

4  campaign, promoting Virginia Slims cigarettes.  One of the most important psychological needs of

5  most adolescent girls is to become independent from their parents.  By associating smoking with

6  women's liberation, Philip Morris intended to create in the minds of teenage girls the vision of

7  smoking as a symbol of autonomy and independence.  Likewise, ads for Philip Morris' Benson &

8  Hedges cigarettes developed an image of smoking as a happy pleasure to be shared in the company of

9  others and the easy road to instant acceptance within a group.

10      148.    When R.J. Reynolds began the Joe Camel cartoon campaign, Camel's share of the

11  children's market was only 0.5 %.  In just a few years, Camel's share of this illegal market has

12  increased to 32.8%, representing sales estimated at $476 million per year.  Another indication of the

13  phenomenal success of this marketing campaign is the fact that in a recent survey of six-year-olds,

14  ninety-one percent (91%) of the children could correctly match Joe Camel with a picture of a

15  cigarette.  Both the silhouette of Mickey Mouse and the face of Joe Camel were nearly equally well-

16  recognized by almost all children surveyed.

17      149.    The location and placement of Defendants' ads further reveal that children are the

18  intended target.  During the decade of the 1980's, there was a steady migration of cigarette

19  advertising into youth-oriented publications.  Magazines with sexually-oriented themes and those

20  concerning entertainment and sporting activities had the highest concentration of cigarette ads.

21  Cigarette ads in these youth-oriented magazines were frequently multi-page, pop-up ads which are

22  significantly more costly, but also more attention-grabbing than conventional ads.

23      150.    In 1988, the tobacco industry reaped $221 million in profits from $1.25 billion in sales

24  to children under the age of 18.  Marlboro and Camel cigarettes dominate the teenage smoking

25  market.

26      151.    In late 1990, the Tobacco Institute, on behalf of Defendants, inaugurated a public

27  relations campaign designed to convince the public that Defendants wished to discourage young

28  people from smoking.  Several of the Defendants began their own campaigns at the same time.  In

                NINTH AMENDED COMPLAINT

1 fact, these programs are just a continuation of Defendants' ongoing fraud and conspiracy. While
2 these programs call for age 18 as the national standard for tobacco sales to children and for requiring
3 "adult supervision" of cigarette vending machines, in fact, the Tobacco Institute and Defendants'
4 hope to freeze the status quo with regard to children's access to tobacco as most states already have a
5 minimum age of 18 or older. Brochures, like "Tobacco: Helping Youth Say No," are being
6 distributed by the Tobacco Institute and Defendants. In reality, this is a pro-smoking subterfuge.
7 The brochure presents smoking as a permissible "adult" decision and smoking as something an
8 "adult" can safely do. That message really makes the smoking more desirable to kids. An R.J.
9 Reynolds' brochure even tells parents to tell their children that they smoke "because they enjoy it."
10 None of these brochures disclose that smoking is highly addictive and harmful to human life.

11     152. The targeting of children, while unquestionably wanton, reckless, and unethical, and
12 continually denied by Defendants, was and continues to be vitally important to Defendants. Children
13 enticed into smoking provide a guaranteed future market for a product that each year kills
14 Defendants' best customers by the hundreds of thousands.

15     153. Defendants' reckless disregard for the health risks for the youth of America is
16 reflected in the response of an R. J. Reynolds executive to the question of a former "Winston Man,"
17 David Goerlitz, when he asked why the R.J. Reynolds executives did not smoke: "We don't smoke
18 the shit, we just sell it. We reserve that for the young, the black, the poor and the stupid."

19     154. Additionally, the defendants' conduct as alleged above, constitutes a violation of
20 California Penal Code section 380, the Corporate Criminal Liability Act as set forth in California
21 Penal Code §387, and California Business and Professions Code sections 16720. 17200 and 17500, et
22 sq.

23 **FIRST CAUSE OF ACTION**

24 **CLASS ACTION FOR UNFAIR COMPETITION UNDER CALIFORNIA
BUSINESS AND PROFESSIONS CODE SECTION 17200**
25 **(By Plaintiff and the General Public Against All Named Defendants)**

26     155. Plaintiffs hereby incorporate by reference the allegations contained in the preceding
27 paragraphs as though fully set forth herein.

28

NINTH AMENDED COMPLAINT

156.    The acts complained of in each of the preceding paragraphs of this complaint, and each of them, constitute unfair, deceptive, fraudulent  and/or unlawful acts in competition in violation of Section 17200 of the California Business and Professions Code.  Defendants' unlawful conduct includes but is not limited to violation of California Health & Safety Code §§ 111260 and 111285, violation of California Penal Code Section and perjury in violation of the laws of California and the United States of America.  Such acts and violations have not abated and will continue to occur unless enjoined.

157.    These violations have injured Plaintiffs, the General Public, and fair and lawful competition.  These violations have co-extensively unjustly enriched the Defendants.  Plaintiffs the Class Members and the general public are entitled to injunctive, restitution, and other equitable relief.

**SECOND CAUSE OF ACTION**

**CLASS ACTION FOR FALSE AND MISLEADING ADVERTISING  UNDER**

**CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17500**

158.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

159.    The acts complained of in each of the preceding paragraphs of this complaint, and each of them, constitute false and misleading advertising in violation of Section 17500 of the California Business and Professions Code.  Such acts and violations have not abated and will continue to occur unless enjoined.

160.    These violations have injured Plaintiff, the General Public, and fair and lawful competition.  These violations have co-extensively unjustly enriched the defendants.  Plaintiffs, the Class Members and the general public are entitled to injunctive, restitution, and other equitable relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief and judgment against Defendants, jointly and severally, as follows:

43

NINTH AMENDED COMPLAINT

1.      Plaintiff prays for equitable relief for violations of Section 17200 and Section 17500 of the Business and Professions Code as herein above alleged.  Such relief includes:

       (a)      Injunctive relief to halt prior violations of law and to assure fair and lawful competition, including court orders regulating advertising, marketing, and production practices;

       (b)      Restitution to plaintiff and the general public who have been injured or otherwise disadvantaged by defendants' unfair, deceptive  and unlawful acts in competition and for false and misleading advertising;

       (c)      Restitution sufficient to fully disgorge the revenues obtained from plaintiff and the general public for unfair, deceptive and unlawful acts in competition and for false and misleading advertising;

       (d)      For other relief as the Court deems proper;

       (e)      For attorneys' fees pursuant to Section 1021.5 of the Code of Civil Procedure and/or pursuant to the "common fund" doctrine and/or pursuant to equitable principles of contribution.

2.      For Plaintiff's reasonable attorneys' fees and costs.

3.      For prejudgment interest as provided by law.

4.      For costs of suit incurred herein.

5.      For such other and further relief as this Court deems equitable, just and proper.

DATED: October 15, 2001            DOUGHERTY, HILDRE, DUDEK & HAKLAR




                    By:      <u>Donald F. Hildre</u>
                        DONALD F. HILDRE
                        THOMAS D. HAKLAR
                        Attorneys for Plaintiffs Willard Brown, Damien Bierly, Michelle Denise Buller-Seymore, and Daniel Kagei, individually, on behalf of the General Public and on Behalf of Those Similarly Situated

44

NINTH AMENDED COMPLAINT