# Exhibit 31

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

|  |  |  |
|---|---|---|
| SARAH DAHLGREN, 2320 Wisconsin Avenue, NW Washington, DC 20007, On Behalf of Herself And All Others Similarly Situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | CASE NO. _____ |
| vs. | ) ) | |
| PHILIP MORRIS COMPANIES, INC., 120 Park Avenue, New York, NY 10017, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| PHILIP MORRIS INCORPORATED, 120 Park Avenue, New York, NY 10017, | ) ) ) ) | **CLASS ACTION COMPLAINT** |
| Defendants. | ) ) | |

Plaintiff, Sarah Dahlgren ("Plaintiff"), by her attorneys, alleges on behalf of herself and all others similarly situated (the "Class" or "Class Plaintiffs"), on information and belief based, inter alia, upon the investigation of her counsel, except as to those allegations which pertain to the named Plaintiff or her attorneys, which are alleged on personal information and belief, as follows:

### I. NATURE OF THE ACTION

1.       This is a class action under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, for economic damages and declaratory and injunctive relief on behalf of District of Columbia residents who purchased and consumed Marlboro Lights "low-tar," filtered cigarettes manufactured, distributed and/or sold by

defendants Philip Morris Companies Inc.. and Philip Morris Incorporated, (hereinafter, collectively "Philip Morris" or "Defendants"). "Light cigarettes" are generally defined as cigarettes containing between seven and fifteen milligrams of tar.

2.      As more fu'ly set forth herein, Defendants manufacture so-called "low-tar," filtered cigarettes under the brand name Marlboro Lights. Defendants distribute and sell Marlboro Lights in the District of Columbia and throughout the United States.

3.      By the late 1960s, scientific studies. including some endorsed by the Surgeon General, revealed that higher tar and nicotine levels correlated with a significantly increased risk of developing smoking-related diseases. Defendants viewed these findings as a threat to their corporate welfare. In response. Defendants waged a campaign of deception and omission on District of Columbia consumers which persists to this day. In 1971, Philip Morris started selling "Marlboro Lights" cigarettes. packaged and sold as having "lowered tar and nicotine."

4.      While promoting decreased tar and nicotine deliveries, Defendants *designed* Marlboro Lights cigarettes to deliver higher levels of tar and nicotine than could be measured by the standard testing apparatus. Defendants thereby achieved apparent support for their claim that their cigarettes were "light" and that their cigarettes contained "lowered tar and nicotine." Additionally. Defendants failed to disclose that the smoke produced by Marlboro lights is also more genotoxic (causing genetic and chromosomal damage) per milligram of tar than 'regular' cigarettes.

5.      Defendants engaged in a common course of deceptive and unlawful conduct in connection with the manufacture, distribution. promotion, marketing and sale of Marlboro Lights cigarettes by·

2

a. falsely and/or misleadingly representing that their product delivers "lowered tar and nicotine" in comparison to regular cigarettes;

b. failing to disclose the material fact that the so-called lowered tar and nicotine deliveries of their product were unrelated to benign changes in the content of the tobacco in Marlboro Lights. but rather depended on deceptive changes in cigarette design and composition. These changes include the addition of microscopic vent holes on or around the cigarette filter that theoretically dilute the tar and nicotine content of smoke per puff as measured by the industry standard testing apparatus, and alteration of the materials used in filters and cigarette paper;

c. failing to disclose the material fact that Defendants intentionally manipulated the design and content of Marlboro Lights in order to maximize nicotine delivery while falsely and/or deceptively claiming "lowered tar and nicotine." These manipulations include the modification of tobacco blend, weight, rod length, and circumference; the use of reconstituted tobacco sheets and/or expanded tobacco; and the increase of smoke pH levels by chemical processing and additives. such as ammonia. which resulted in the delivery of far greater amounts of tar and nicotine when smoked under realistic conditions than Defendants' claims of "lowered tar and nicotine" would support;

d. failing to disclose that these changes in design and composition were intended by Defendants to fool the machine tests that Defendants use as a basis to market their cigarettes as "lights"; and,

e failing to disclose the material fact that the techniques employed by Defendants that purportedly reduce the levels of tar in their Marlboro Lights actually *increase* the harmful biological effects. including mutagenicity (genetic or chromosomal damage) caused by the tar

3

ingested by the consumer.

6.      Defendants' purpose in controlling the tar and nicotine delivery of Marlboro Lights under machine testing conditions is to achieve artificially low tar and nicotine ratings to lend credence to their claims that Marlboro Lights are "light" and contain "lowered tar and nicotine." In fact, Defendants conducted their own internal tests to ensure that the actual amounts of tar and nicotine delivered under normal use remained at higher levels.

7.      Defendants' representations that Marlboro Lights cigarettes deliver lower tar and nicotine are illusory. Defendants have unfairly and unjustly profited from their failure to adequately disclose to consumers the true nature and function of their so-called "light" cigarettes.

8.      Plaintiff seeks a refund of all sums she and the Class members paid to purchase Marlboro Lights manufactured, distributed and/or sold by Defendants to residents of the District of Columbia, as well as disgorgement of Defendants' ill-gotten profits. Plaintiff also seeks treble damages under § 28-3905 (k)(1)(B) of the CPPA. Plaintiff further seeks mandatory injunctive relief sufficient to inform consumers of: a) the existence of the ventilation holes; b) the need to refrain from obstructing these holes in order to achieve the claimed lowered tar of Marlboro Lights; c) the fact of Defendants' nicotine manipulation and chemical additions to their tobacco and the motivations therefor; and d) the fact that "light" smoke is actually more mutagenic than regular tobacco smoke.

## II. PARTIES, JURISDICTION AND VENUE

9      Plaintiff brings this action in her individual capacity and on behalf of all others similarly situated.

10.      Plaintiff's damages are less than $75,000.

4

11.     Plaintiff Sarah Dahlgren is a resident of the District of Columbia.  Plaintiff has

purchased and consumed (on average) approximately 10-15 Marlboro Lights cigarettes per day

for 15 years.  Plaintiff was without knowledge of the conduct by Defendants alleged in this

complaint, or of any facts from which it might reasonably be concluded that Defendants were so

acting, or which would have led to the discovery of such action, until mid-1999.  Through

longstanding and fraudulent conduct, Defendants wilfully concealed and misrepresented their

manipulations of "light" cigarette design and composition.

12.     Through the packaging of Marlboro Lights purchased by Plaintiff and all Class

members, Defendants represented that these cigarettes contained lower levels of tar and nicotine

by using words such as "Lights," and "Lowered Tar & Nicotine."  The Marlboro Lights

purchased and consumed by Plaintiff and all Class members contained no disclosures, markings

or instructions regarding: 1) the ventilation holes in the filter; 2) the need to refrain from

obstructing these holes and from increasing puff volume or frequency in order to achieve the

claimed lowered tar of Marlboro Lights; 3) the increased mutagenicity of "light" cigarette smoke;

or 4) the alteration of nicotine levels through the use of chemical or other additives.

13      Defendant Philip Morris Companies Inc. ("Philip Morris") is a Virginia

corporation with its principal place of business at 120 Park Avenue, New York, N.Y.  At all

times relevant hereto, Philip Morris, through its wholly owned subsidiary Philip Morris

Incorporated ("PMI" or the "subsidiary"), engaged in the business of manufacturing, promoting,

marketing, distributing and selling Marlboro Lights brand light cigarettes.  Philip Morris

conducts business in the District of Columbia, and at all relevant times manufactured, promoted,

marketed, distributed and sold cigarettes in interstate commerce and in the District of Columbia.

5

14.     Defendant Philip Morris Incorporated ("PMI" or the "subsidiary") is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, N.Y.  PMI is a wholly owned subsidiary of Philip Morris.  At all times relevant hereto, PMI engaged in the business of manufacturing, promoting, marketing, distributing and selling Marlboro Lights brand light cigarettes.  PMI conducts business in the District of Columbia, and at all relevant times manufactured, promoted, marketed, distributed and sold cigarettes in interstate commerce and in the District of Columbia.

15.     Jurisdiction is proper in the District of Columbia and this Court, pursuant to § 28-3905(k)(1).

### III. CLASS ACTION ALLEGATIONS

16.     Plaintiff makes these allegations pursuant to the laws of the District of Columbia and D.C. Superior Court Rule of Civil Procedure 23.  Each prerequisite of Rule 23 applicable to the case is met.

17     Plaintiff brings this action on her own behalf and on behalf of all other residents of the District of Columbia similarly situated.  Without prejudice to later expansion, the Class which Plaintiff seeks to represent consists of all residents of the District of Columbia who purchased and consumed Defendants' Marlboro Lights cigarettes but who do not have a claim for personal injury resulting from the purchase or consumption of cigarettes ("the Class").  The class period commences on the first date the Defendants placed their Marlboro Lights into the stream of commerce, up to the date of trial (the "Class Period").  Not included within the Class definition are individuals who are directors and officers of the Defendants' corporations, or their affiliates.

6

18.     The Class is composed of at least hundreds of thousands of persons, the joinder of whom is impracticable except by means of a class action.  The disposition of their claims in a class action will benefit both the parties and the Court.  Defendants sell hundreds of thousands of packs of Marlboro Lights in the District of Columbia every year and, thus, the Class is sufficiently numerous to make joinder impracticable, if not completely impossible.

19.     There is a well-defined community of interest in the questions of law and fact involving and affecting the parties to be represented.  Common questions of law and fact exist and such common questions predominate over any question of law or fact which may affect only individual Class members.  Such common questions include the following:

a.  Whether Defendants misrepresented the true tar and nicotine yields of the "light" cigarettes they manufactured, marketed, and/or distributed;

b.  Whether Defendants intentionally designed "light" cigarettes to generate misleading tar and nicotine measurements on the Cambridge Filter System while delivering significan.!y higher quantities of tar and nicotine to human smokers;

c.  Whether the Defendants violated, inter alia, the District of Columbia Consumer Protection Procedures Act through their course of deceptive conduct as alleged herein;

d.  Whether the Defendants were unjustly enriched at the expense of the Class members; and

e.  Whether the Class has been damaged and, if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or exemplary damages which the Class is entitled to plead and prove.

20.     Plaintiff asserts claims that are typical of the claims of the entire Class.  Plaintiff

7

will fairly and adequately represent and protect the interests of the Class.  Plaintiff has no
interests antagonistic to those of the Class.  Plaintiff has retained counsel who are competent and
experienced in class action litigation.

21.     Defendants have acted or refused to act on grounds generally applicable to all the
members of the Class, thereby making final injunctive relief or declaratory relief concerning the
Class as a whole appropriate.

22.     Plaintiff and the Class have suffered irreparable harm and damages as a result of
Defendants' wrongful conduct as alleged herein.  Absent a representative action, Class members
will continue to suffer losses, thereby allowing these alleged violations of law to proceed without
remedy, and allowing Defendants to retain the proceeds of their ill-gotten gains.

23.     Plaintiff anticipates that there will be no insuperable difficulty in the management
of this litigation.  A class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

24.     All conditions precedent to the maintenance of this action have been met.

25.     A Class Action also provides a fair and efficient method for adjudication of the
controversy for the following reasons:

a   Common questions of law and fact, as stated more fully above predominate
over any question affecting only individual members;

b.  Joinder of thousands of tobacco consumer sales practices cases arising across
the District of Columbia would be overwhelmingly complex, exceedingly time-consuming, and
unduly burdensome to the courts if such individual litigation would proceed;

c.  Individual litigation would magnify the delay and expense to all parties of

8

litigating the wrongdoing, injuries, and harm caused by Defendants;

 d. Adjudicating these claims in the form of a Class Action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court; and

 e. Prosecution of separate actions by individual Members of the Class presents the potential and high risk of inconsistent contradictions that would confront Defendants with incompatible standards of conduct.

## IV.  FACTUAL ALLEGATIONS

### A.  Development of the Light Cigarette Market

26. In 1987, the Tobacco Institute Testing Laboratory ("TITL"), a private laboratory operated by the cigarette industry, began conducting cigarette testing using the Cambridge Filter System.  TITL has conducted cigarette testing at all relevant times since it began testing in 1987.

27. According to a 1997 release by the Federal Trade Commission ("FTC") entitled "Cigarette Testing – Request for Public Comment," the methodology, processes and procedures that the Defendants, through TITL, have used and currently employ to test cigarettes are identical to those the FTC employed until 1987 in its own testing laboratory.

28. Defendants promote Marlboro Lights through placement of the words "Lights" and "Lowered Tar and Nicotine" on their cigarette packages.  This statement is false and deceptive.

29. Demand for light cigarettes has sky-rocketed in recent years.  According to findings published in the Centers for Disease Control Prevention publication <u>Morbidity and Mortality Weekly Report</u>, in an article entitled "Filter Ventilation Levels in Selected U.S.

Cigarettes, 1997" ("CDC publication"), sales of light cigarettes made up 72.7% of the domestic cigarette market in 1995. By comparison, sales of light cigarettes a decade earlier, in 1985, accounted for only slightly more than half of the domestic market (51.9%).

### B. Design Changes Negate Low-Tar Claims

30.     Defendants have omitted and suppressed the fact that they manipulate the tar and nicotine deliveries of their light cigarettes through a variety of design parameters, including but not limited to: the inclusion of microscopic ventilation holes in or around cigarette filters, the modification of tobacco blend and weight; the modification of tobacco rod length and circumference; the use of reconstituted tobacco sheets and/or expanded tobacco; and the increase of smoke pH levels through the use of chemical additives and processes such as ammoniation.

31.     Many brands of light cigarettes are manufactured with ventilation holes in the filter. The holes are designed to allow the smoker to draw in additional air when inhaling. In theory, the additional air mixes with the tar, nicotine, and carbon monoxide in cigarette smoke and thereby reduces the relative levels of these substances per volume of smoke that enters the human body.

32.     Defendants' light cigarettes contain ventilation holes. The holes, however, are obstructed during normal use of the product because the holes are placed in the area of the filter that is covered by the smoker's lips or fingers. This blocking problem is exacerbated with Defendants' light cigarettes because the Marlboro Lights' vent holes are virtually invisible to the naked eye. Defendants' vent holes also are not marked (e.g. with a colored band or some other method), to reveal their existence or location.

33      As a result of this design, the cigarettes do not fulfill the Defendants' claims of

lowered tar and nicotine.  According to studies cited in the CDC publication, blocking even some of the ventilation holes in light cigarettes can dramatically increase the smoker's exposure to the tar and nicotine contained in cigarette smoke.

      34.     After analyzing fifteen different cigarette brands, including Marlboro Lights, a Massachusetts Department of Public Health ("MDPH") study stated that:

> Many brands have vents that are so tiny they are invisible to the naked eye. Often the placement of the holes makes it difficult if not impossible for a smoker to smoke a cigarette without blocking some or all of the vents.
>
> The cigarettes are designed so that it is "natural" to cover-up some or all of the filter vents and "natural" to breathe in heavier amounts of tar and nicotine.

      35.     The Cambridge Filter System purports to measure the amount of tar and nicotine in a cigarette with a machine that "mimics" the human smoking behavior.  The "inhaled" material is collected on a pad, extracted, and analyzed to arrive at the tar and nicotine yield levels of that particular cigarette.

      36.     In 1980, researchers conducted a study on low tar cigarettes, the results of which are cited in the CDC publication.  The study showed that blocking just half of the ventilation holes in a cigarette containing 4 mg of tar, 0.5 mg of nicotine, and 5 mg of carbon monoxide increased the Cambridge Filter System-measured tar yields by 60%, nicotine levels by 62% and carbon monoxide levels by 73%.

      37.     Based on this study, smokers of cigarettes with less than 15 mg of tar who block just half of the vent holes in their cigarettes could inhale as much, or even more, tar, nicotine, and carbon monoxide as that from a regular yield cigarette.  To illustrate, the FTC report on tar, nicotine, and carbon monoxide of the smoke of the 1,206 varieties of domestic cigarettes for the

11

year of 1994 ("FTC 1994 report") lists the Marlboro brand cigarette as containing 16 mg of tar, 1.1 mg or nicotine, and 14 mg of carbon monoxide, and the Marlboro Lights brand cigarette as containing 10 mg of tar, 0.8 mg of nicotine, and 11 mg of carbon monoxide.  Based on the studies cited in the CDC publication, blocking just half of the vent holes on a Marlboro Lights results in ingestion of 16 mg of tar, nearly 1.3 mg of nicotine, and an astounding 19 mg of carbon monoxide, or in other words the same amount of tar, and even more nicotine and carbon monoxide than regular Marlboro cigarettes.

38.     A recent MDPH study based on 1997 data concluded that "when smokers place their mouth or fingers over the vents, they keep outside air from diluting the mixture and so take in higher levels of tar and nicotine."  These facts were known to, and knowingly exploited by, Defendants.

### C. Increasing Puff Volume & Frequency

39.     Even if it were possible for a smoker *not* to block the vent holes, Defendants' design for Marlboro Lights enables smokers to achieve total tar, nicotine and carbon monoxide deliveries at least equal to that of a regular Marlboro simply by increasing puff volume and/or frequency.  Defendants have long been aware of this tendency, and yet continue to market Marlboro Lights as "light" and containing "lowered tar and nicotine."

40.     Upon information and belief, Defendants were fully aware of the discrepancies between actual tar and nicotine deliveries and those achieved under machine testing conditions, but nonetheless suppressed, omitted and withheld this information from consumers.

41.     This knowledge and suppression is demonstrated by a 1974 Philip Morris document entitled, "Some Unexpected Observations on Tar and Nicotine and Smoker Behavior,"

which notes: "Generally, people smoke in such a way that they get more than predicted by machines. This is especially true for dilution cigarettes [i.e. low tar, low nicotine]. ... The FTC standardized test should be retained: It gives low ratings."

42.    Defendants' knowledge can be further demonstrated by other important facts:

a. Defendants manufacture, test and market their light cigarettes, thereby providing them with increased knowledge and insight into the design aspects and potential defects in their product with regard to tar and nicotine intake levels; and

b. Defendants are members of the very industry that conducts testing for tar, nicotine, and carbon monoxide levels in cigarettes. As such, Defendants were, or should have been, particularly cognizant of the inaccuracies in their testing methodologies and aware of the alternative, more accurate methods of testing available. In particular, Defendants were, or should have been, aware of the Massachusetts method for testing tar and nicotine (discussed in the MDPH study, supra), a method more reflective of actual smoking patterns. This method indicates that tar and nicotine levels in light cigarettes and ultra-light cigarettes, (which are generally defined as containing less than seven milligrams of tar), are actually about twice as high as those found by the FTC method employed by the cigarette industry. Differences between the Cambridge Filer System and Massachusetts methods were greatest for ultra-light cigarettes, and greater for light cigarettes than for full flavor cigarettes. Nicotine levels for ultra-light cigarettes, for example, were more than 150% greater in Massachusetts testing than under the Cambridge Filter System method.

### D. Manipulation of Nicotine Amount, Form & Impact

43.     Defendants also employed various chemical processes and additives in designing and manufacturing Marlboro Lights in order to increase the discrepancy between the purported "lowered tar and nicotine" and the actual amounts of tar and nicotine deliveries.  When Defendants purportedly lowered tar in their cigarettes, they deliberately increased the amount of nicotine and chemically altered its form so that it would escape detection under the Cambridge Filter System method.

44.     By doing so, Defendants sought to ensure that smoking light cigarettes would not make it easier for smokers to quit, and that smokers of lights cigarettes would receive the nicotine "satisfaction" of a regular cigarette.  Defendants tested their "Light" cigarette designs against their own internally established measure of "cigarette acceptability."

45.     Defendants also control and manipulate the nicotine levels in cigarettes through the use of reconstituted tobacco.  Reconstituted tobacco is an amalgamation of tobacco stalks, stem, floor sweepings and dust that Defendants previously discarded, but now re-deploy to enhance profits  In the reconstitution process, pieces of tobacco material undergo treatment that results in the extraction of some soluble components, including nicotine.  The pieces are then combined to form a sheet, to which Defendants *directly apply nicotine extract in the exact amount they desire.*  Through this application procedure, Defendants are able to control and manipulate the exact amount of nicotine that ultimately winds up in cigarettes smoked by consumers.

46.     Defendants manipulate the smoke pH in their light cigarettes in order to create more "free" nicotine in the smoke and thereby enhance the actual nicotine delivery to smokers

14

beyond that measured by the smoking machines. Defendants added ammonia and other substances to tobacco to create a more potent "kick" in its cigarettes. Some of these additives liberate nicotine from its salt form and transform it into an extremely potent vaporized form. Thus, the nicotine is converted into a "free-base" form, just as powdered cocaine is converted into crack cocaine. Significantly, however, the "lowered tar and nicotine" levels represented by Defendants and derived from the Cambridge Filter System testing method do not reflect the additional, free-base nicotine particles that are able to evade detection by the Cambridge Filter System.

47.    In addition to the use of chemical additives to increase nicotine bioavailability while generating reduced nicotine levels on the Cambridge Filter System, Defendants employ design techniques similar to those used to control and manipulate tar levels. Tobacco blend and weight, rod length and circumference, filters, tobacco processing, papers, and air dilution are all used to actively manipulate and control tar and nicotine levels.

48.    These tobacco manipulation techniques allowed Defendants to maximize the amount of nicotine delivered to smokers, and to maintain the illusion of a "Light" cigarette, thereby retaining customers and maximizing their own profits by cornering higher market share.

49.    Defendants' manipulations are further evidenced by, inter alia the following internal documents and studies:

a.  A November, 1971 Philip Morris internal report entitled, "Tar, Nicotine, and Smoking Behavior" illustrates Defendants' knowledge and ability to add nicotine to reduced tar cigarettes:

Tar reduction [in our study] was accomplished by means of an air dilution

15

> technique. This results in a reduction of tar delivery. However, it also
> results in a reduction of nicotine delivery. Therefore, when the tar delivery
> was reduced to get the medium tar delivery, it also reduced the nicotine
> delivery by a like amount. Thus, just to maintain the original nicotine
> delivery required that nicotine be added to that cigarette.

This report determined that the level of nicotine wh ich "resulted in the greatest cigarette
acceptability" was apparently 1.3 mg. In fact, the report even indicated Defendants' motivation
to manipulate their light cigarettes in order to maintain higher levels of tar: "Low tar resulted in
least acceptability at all levels of nicotine."

   b. A 1973 report by researcher Claude E. Teague, Jr. of competitor R.J. Reynolds,
entitled "Implications and Activities Arising From the Correlation of Smoke pH with Nicotine
Impact, Other Smoke Qualities, and Cigarette Sales" evidences the alteration of smoke pH by
Philip Morris. The increase in smoke pH (usually through the addition of ammonia) increases
the level of "free" nicotine in the cigarettes and provides a greater nicotine "kick" to smokers
through faster absorption of nicotine into the blood stream. The report notes that "the most
significant difference" between Reynolds's brands and Philip Morris's brands "has been in the
area of smoke pH." More specifically:

> Our data shows that smoke from our brands, and all other significant
> competitive brands, in recent years has been consistently and significantly
> lower pH (less alkaline) than smoke from Marlboro .... All evidence
> indicates that the relatively high smoke pH (high alkalinity) shown by
> Marlboro (and other Philip Morris brands) and Kool is deliberate and
> controlled.

   c. A March, 1978 Philip Morris report by J. Ryan and the Philip Morris USA
Research Center entitled, "Exit-Brand Cigarettes, a Study of Ex-Smokers," notes:

> If the industry's introduction of acceptable low-nicotine products does
> make it easier for dedicated smoker to quit, then the wisdom of the

16

introduction is open to debate. (Emphasis in original.)

d. An October, 1990 Philip Morris research report which notes that nicotine strength in tobacco smoke can be increased through the addition of ammonia, nicotine salt or nicotine citrates. These chemical additives increase smoke pH, which "governs the ratio of nicotine in free protonated forms."

e. Research performed for Philip Morris by researcher Frank Ryan illustrated that cigarette sales could be predicted at a 96% accuracy rate using data on nicotine and acetaldehyde (a chemical compound with dopamine-type euphoria-enabling characteristics). According to an April 6, 1994 report entitled, "Philip Morris Research on Nicotine Pharmacology and Human Smoking Behavior," Ryan's studies could accurately "predict blindly which cigarettes would sell and which wouldn't based on the combination of nicotine and acetaldehyde delivery."

### E. Increased Mutagenicity

50.   The AMES test is a test utilized by scientists to assess the mutagenic property of a substance. The AMES test has been employed by the tobacco industry and by Defendants to ascertain the levels of harmful biological activity in cigarette smoke.

51.   The results of these tests indicate that the tar found in regular cigarette smoke has a lower AMES activity on a reverted per milligram basis than the tar found in light cigarette smoke. In other words, light cigarette smoke has more harmful biological activity per milligram of tar than regular cigarette smoke.

### F. Defendants' Omissions and Fraudulent Concealment

52.   Knowing the truth, but motivated by profit and market share, Defendants suppressed and failed to disclose to the public material facts concerning Marlboro Lights.

17

53. While the packaging containing Defendants' light cigarettes prominently displays the words "Lights" and "Lowered Tar and Nicotine," Defendants omitted and continue to omit numerous material facts regarding their lights cigarettes, including:

    a. the existence and purpose of ventilation holes;

    b. the effect of blocking some or all of these holes;

    c. the fact that the tar and nicotine levels measured by the smoking machines do not accurately reflect the actual amount of tar and nicotine ingested by the human smoker;

    d. the fact that Defendants manipulated nicotine levels in their light cigarettes through various techniques, including;

        (i) modifying tobacco blend, weight, rod length, and circumference;

        (ii) using reconstituted tobacco sheets and/or expanded tobacco; and

        (iii) increasing smoke pH level by adding chemicals such as ammonia;

    e. the fact that Defendants manipulated nicotine levels in order to maximize nicotine delivery while reducing tar and nicotine ratings in order to support their claims that Marlboro Lights were "light" and contained "lowered tar and nicotine";

    f. the fact that the techniques employed by Defendants purportedly to reduce the levels of tar in their Marlboro Lights - including increased air dilution through the use of ventilation holes - actually increase the mutagenicity of the tar ingested by the consumer.

54. Defendants knew of (a) the inaccuracies associated with the measurement of the tar and nicotine levels in these products, (b) the tests indicating increased mutagenicity of low tar smoke. and (c) the deceptive nature of the terms used on their "light" cigarette packages to describe the "lowered tar" cigarettes. Yet, in the face of increasing sales, Defendants chose not

18

to reveal such information or effectively disclose to consumers the true nature of their so called "low-tar" cigarettes.

55.    Defendants also knew that the omitted information was material.  For example, Defendants believed that consumers' motivation to smoke light cigarettes stems from the general perception that light cigarettes pose less risk of harmful consequence than regular cigarettes. Defendants' belief as to this motivation is evidence by the following:

a.  "Exit-Brand Cigarettes, a Study by Ex-smokers," supra, which explains:

The very fact, then, that a smoker has decided to switch from a full-flavor cigarette to a low-delivery cigarette tells us something very important about him.  He is concerned about his health, and he is willing to do something about it.

b.  March 20, 1984 edition of Philip Morris' "The Cigarette Consumer," which states:

Historically, motivation has come from health issue.

- People willing to stick with lower tar because they feel they are doing themselves a favor.

- Most successful new brands have had low tar/health motivation:  Merit.

56.    Because they knew of shortcomings in the testing methodologies, Defendants were aware of the inaccuracies and misleading nature of the packaging of their light cigarettes, and these material inaccuracies - as well as information regarding the higher mutagenicity of lights cigarette smoke - should have been revealed and explained to the purchasers and consumers of their light cigarettes.

57.    Despite the knowledge, Defendants failed to reveal these inaccuracies, any information regarding increased mutagenicity, the ongoing tobacco manipulation or the reasons

19

for such manipulation. Instead, Defendants sold light cigarettes to Plaintiff and members of the Class by misrepresenting material facts regarding the levels of tar and nicotine, thereby misleading consumers.

58.     Defendants knew and exploited the short comings in the Cambridge Filter System method, yet consciously and deliberately acted to conceal this information and preclude its dissemination to the consumers.

59     Defendants over the course of decades have avoided, concealed, suppressed and failed to disclose their active manipulation of "light" cigarettes to achieve bogus Cambridge Filter System method ratings. Through longstanding and fraudulent conduct Defendants willfully concealed and misrepresented the true nature of Marlboro Lights.

**COUNT I**
**(District of Columbia Consumer Protection and Procedures Act)**

60.     Plaintiff realleges and incorporates by reference paragraphs 1 through 59 as if fully set forth herein and further alleges:

61.     This claim is brought pursuant to the District of Columbia Consumer Protection and Procedures Act, D.C. Code §§ 28-3901, *et seq.*

62     Plaintiff and the Class are entitled to bring this action pursuant to D.C. §§ 28-3905(k)(1) and D C Superior Court Rule of Civil Procedure 23.

63.     Plaintiff and the Class entered into consumer transactions with the Defendants by purchasing Marlboro Lights cigarettes.

64.     During the course of these transactions, the Defendants engaged in unfair or deceptive trade practices including the sale and advertisement of Marlboro Lights by an unlawful

20

trade practice, deception, fraud, false pretense, false promise, misrepresentation and the knowing failure to state material facts, including:

    a.  falsely representing that their light cigarettes, when smoked under normal use, contained lower tar and nicotine than regular cigarettes;

    b.  failing to state that changes in cigarette design and composition were intended to deliver lowered tar and nicotine levels under machine testing conditions while delivering heightened levels of these compounds when smoked by consumers, such facts being material;

    c.  placing vent holes on the filter of light cigarettes that are covered or blocked by the smoker's lips or fingers under normal use, thereby negating the represented effects of the low tar, low nicotine brand;

    d.  failing to mark the vent holes or make them visible to the naked eye such that smokers could attempt to correctly smoke the cigarettes to obtain the claimed reduced tar and nicotine;

    e.  failing to disclose to consumers that smoking Defendants' cigarettes with the vent holes blocked results in the smoker receiving an increased amount of tar and nicotine;

    f.  failing to instruct smokers, on the packaging or elsewhere, on how to correctly smoke the cigarettes to obtain the claimed lowered tar and nicotine;

    g.  failing to disclose to consumers that the techniques employed by Defendants to purportedly reduce the levels of tar in their Marlboro Lights actually increase the mutagenicity of the tar ingested by the consumer and thereby increase the levels of harmful toxins ingested by the consumer;

    h.  manipulating the nicotine levels in their light cigarettes; and

i. failing to inform consumers as to the manipulation of the tobacco in Marlboro Lights by, <u>inter alia</u>, the addition of chemicals, as well as Defendants' reasons for such manipulation.

65.     As a direct result of Defendants' violations, Plaintiff and the Class are aggrieved and suffered ascertainable losses by, among other things, failing to receive the qualities and economic value promised to them: a low tar, low nicotine cigarette.

WHEREFORE, Plaintiff and the Class request the following relief:

a. Certification of this action as a class action pursuant to D.C. Superior Court Rule of Civil Procedure 23 on behalf of the proposed Plaintiff Class and designation of Plaintiff Sarah Dahlgren as the representative of the Class;

b. A declaratory judgment that Defendants' acts, practices and conduct have violated the District of Columbia Consumer Protection and Procedures Act ;

c. A refund of the amounts paid by Plaintiff and the Class to purchase Marlboro Lights.

d. An order enjoining Defendants from continuing to violate the CPPA through the acts and practices complained of herein;

e. Treble damages;

f. Attorney's fees and court costs;

g. Appropriate equitable relief, including but not limited to, an order directing that Defendants conduct a corrective advertising campaign to explain to smokers:  (i) the existence of vent holes; (ii) the importance of same; (iii) a method, if one exists, by which a smoker can smoke the low tar, low nicotine cigarette and achieve Defendants' claims of lowered

tar and nicotine; (iv) the AMES test results and the importance thereof; and (v) the deliberate manipulation of tar and nicotine levels in Defendants' Marlboro Lights and the reasons for same.

h.  Such other or further relief as this Court may deem appropriate.

## COUNT II
### (Unjust Enrichment)

66.    Plaintiff realleges and incorporates by reference paragraph 1 through 65 as if fully set forth herein and further allege:

67.    As stated more particularly above, Defendants embarked on and carried out a scheme of marketing and selling light cigarettes by falsely and deceptively advertising that the cigarettes were "Lights," or contained "Lowered Tar and Nicotine." Defendants failed to inform consumers of the material fact that the tar in their light cigarette smoke contains higher levels of harmful toxins than the tar in regular cigarette smoke. In addition, Defendants failed to inform consumers of the material fact that the tobacco in their Marlboro Lights was manipulated through, inter alia. the addition of chemicals. and that such manipulation was conducted in order to maximize nicotine delivery and thereby increase sales.

68.    Defendants' omissions and practices resulted in Plaintiff and the Class purchasing light cigarettes in order to receive a low tar, low nicotine alternative to regular cigarettes, but not getting the benefits of less tar and nicotine than in regular cigarettes.

69.    Defendants' practices further resulted in Plaintiff and the Class purchasing light cigarettes without understanding the true nature of Defendants' product or that Defendants manipulated the tobacco in their light cigarettes to increase their own ill-gotten profits.

70.    The monies paid by Plaintiff and the Class to Defendants in the purchase of

23

Marlboro Lights conferred substantial benefits upon Defendants. Defendants knew of and appreciated the benefits conferred upon them by Plaintiff and the Class and accepted and retained these benefits.

71.     Under these circumstances, it would be inequitable and unjust for Defendants to retain the benefits conferred by Plaintiff and the Class. Defendants therefore should disgorge their ill-gotten gains to Plaintiff and the Class.

WHEREFORE, Plaintiff and the members of the Class seek certification of this action as a class action pursuant to D.C. Superior Court Rule of Civil Procedure 23 on behalf of the proposed Plaintiff Class and designation of Plaintiff Sarah Dahlgren as the representatives of the Class, as well as an award of damages and equitable relief in the form of appropriate restitution and disgorgement of all earnings, profits, compensation and benefits obtained by Defendants and all other relief as the Court may deem appropriate.

### COUNT III
### Injunctive and Equitable Relief

72.     Plaintiff hereby realleges and incorporates by reference paragraph 1 through 71 as if fully set forth herein and further allege:

73.     Defendants manufacture, distribute and/or sell lights cigarettes without explaining to consumers that the lowered tar and nicotine claimed by Defendants is not obtained under the consumers' normal and foreseeable patterns of use, thereby misrepresenting the nature of the product sold. Defendants fail to disclose the material fact that the techniques employed by them to purportedly reduce the levels of tar in their Marlboro Lights actually increase the mutagenicity of the tar ingested by the consumer. Defendants also fail to disclose their intentional

24

manipulation of the tobacco in their light cigarettes and the financial motivation of such manipulation. Plaintiff and the Class therefore request equitable relief in the form of revised disclosures, a corrective advertising campaign, or equivalent remedial and corrective action, at Defendants' expense, to make the terms "Lights" and "Lowered Tar & Nicotine" not misleading, to disclose appropriate information regarding the increased mutagenicity of the tar in light cigarette smoke and to disclose their tobacco manipulation and the reasons therefor.

74.    Plaintiff and the Class will suffer irreparable harm if the requested injunctive relief is not granted. The hardships that Plaintiff and the Class would endure if the requested injunctive and equitable relief are denied greatly outweigh any hardships that Defendants may endure if such relief is granted. An injunction requiring the appropriate disclosures would result in minimal monetary hardship to Defendants while preventing potentially drastic harm to a vast number of Class members. Furthermore, such prospective relief may not be obtained through monetary compensation by law, but may only be obtained through an injunction.

75    As a proximate result of Defendants' conduct described herein, and in consideration of the above factors, Plaintiff, on behalf of herself and all other similarly situated, is entitled to the requested injunctive and equitable relief.

## JURY DEMAND

76.    Plaintiff demands a jury determination of all issues so triable.

DATED this 17th day of November, 1999.

FINKELSTEIN, THOMPSON & LOUGHRAN

William P. Butterfield, Bar No. 420354
Richard M. Volin, Bar No. 457292
1055 Thomas Jefferson Street, NW
Suite 601
Washington, DC  20007
(202) 337-8000
(202) 337-8090 FAX
Attorneys for Plaintiff


OF COUNSEL:

Esther E. Berezofsky
Gerald J. Williams
WILLIAMS CUKER & BEREZOFSKY
51 Haddonfield Road
Suite 160
Cherry Hill, NJ 08002
(609) 663-5155

Stephen A. Sheller
Jonathan Shub
Charles Mangan
SHELLER LUDWIG & BADEY
1528 Walnut Street
3rd Floor
Philadelphia, PA  19102
(215) 790-7300

26

Herbert E. Milstein
COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.
West Tower, Suite 500
1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 408-4600

Lisa J. Rodriguez
TRUJILLO RODRIGUEZ & RICHARDS, LLC
3 Kings Highway East
Haddonfield, NJ 08033
(856) 795-9002

Ira Richards
TRUJILLO RODRIGUEZ & RICHARDS, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA  19103
(215) 731-9004

H. Sullivan Bunch
BONNET, FAIRBOURN, FRIEDMAN & BALINT
57 Carriage Hill Overlook
Signal Mountain, TN 37377
(423) 886-9736
          and
4041 North Central Avenue
Suite 1100
Phoenix, Arizona 85012

Jonathan L. Alpert
William J. Cook
ALPERT, BARKER & RODEMS, P.A.
100 South Ashley Drive
Suite 2000
Tampa, Florida 33602
(813) 223-4131

27

Thomas G. Shapiro
Thomas V. Urmy, Jr.
SHAPIRO HABER & URMY LLP
75 State Street
Boston, MA  02109
(617) 439-3939

G. Martin Meyers
LAW OFFICES OF G. MARTIN MEYERS, P.C.
35 West Main Street, Suite 106
Denville, NJ  07834
(973) 625-0838

Martin C. Meltzer
LAW OFFICES OF MARTIN C. MELTZER
Fairfax Office Center
2005 Concord Pike, Suite 209
Wilmington, DE 19803
(302) 651-7970

Jan Schlichtmann
342 N. Main Street
Andover, MA 01810
(978) 927-1037

A. Russell Smith
Bryan Nace
A. RUSSELL SMITH LAW OFFICES
503 Key Building
159 S. Main Street
Akron, OH 44308
(330) 434-7167

Gerson H. Smoger
SMOGER & ASSOCIATES, P.C.
Suite 3
3175 Monterey Boulevard
Oakland, CA 94602
(510) 531-4529

Norwood S. Wilner
SPOHRER WILNER MAXWELL
 MACIEJEWSKI & MATTHEWS
444 E. Duval Street
Jacksonville, FL 32202
(904) 354-5560

Counsel for Plaintiff