# Exhibit 33

cc: case management

HRW
MAB
Gardner
Grove
Securing
01/21/00

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BRIAN CLEARY and DAN TRENHOLM,　　)
individually and on behalf of all others　　)
similarly situated,　　)
　　)
　　　　　　　　Plaintiffs.　　)
　　)
　　　　v.　　)
　　)
PHILIP MORRIS INCORPORATED;　　)
R.J. REYNOLDS TOBACCO COMPANY;　　)
AMERICAN TOBACCO COMPANY, INC.;　　)
BROWN & WILLIAMSON TOBACCO CORP.;)
LIGGETT & MYERS, INC.; LORILLARD　　)
TOBACCO COMPANY, INC.; UNITED　　)
STATES TOBACCO COMPANY;　　)
B.A.T. INDUSTRIES, P.L.C.; BRITISH　　)
AMERICAN TOBACCO COMPANY, LTD.;　　)
THE COUNCIL FOR TOBACCO　　)
RESEARCH-U.S.A., INC.; TOBACCO　　)
INSTITUTE, INC.; and JOHN DOES 1-10,　　)
　　)
　　　　　　　　Defendants.　　)

No.　98 L 6427

FILED-2
00 JAN 19 AM 9:29

Judge James Henry

Class Action

### AMENDED COMPLAINT

1.　　Brian Cleary and Dan Trenholm, individually and on behalf of all others similarly situated, through their attorneys, state as follows for their complaint against defendants:

### Introduction

2.　　This is a class action on behalf of three independent classes of persons who have been victimized by the following conduct:  (i) defendants' multi-part conspiracy pursuant to which defendants concealed material facts regarding the addictive nature of nicotine; (ii) Philip Morris' acts of targeting its advertising and marketing to minors; and (iii) Philip Morris' misrepresentations and omissions regarding the true content of its Marlboro Lights cigarettes.

3.     Through their wrongful acts, defendants have committed fraudulent concealment, violated the Illinois Consumer Fraud Act and have been unjustly enriched with monies that they would not have received but for their wrongful acts.  Plaintiffs, individually and on behalf of three independent classes of persons similarly situated, seek to recover the costs of the tobacco products that they purchased, as well as punitive and unjust enrichment damages.  In no event will either of the plaintiffs or any of the proposed class members seek in excess of $75,000 each, inclusive of interest, costs and fees.  Moreover, neither the plaintiffs nor the class members will bring personal injury claims in this action.

## The Parties

### Plaintiffs

4.     Plaintiffs are residents of Cook County, Illinois.  At all relevant times, plaintiffs used tobacco products manufactured, promoted and sold by one or more of the defendants.

### Defendants

A.     Tobacco Company Defendants[1]

    1.   *American Tobacco Companies*

5.     Defendant Philip Morris Incorporated ("Philip Morris") is a Virginia corporation whose principal place of business is 120 Park Avenue, New York, New York 10017.  Philip Morris manufactures, promotes and sells Philip Morris, Merit, Cambridge, Marlboro, Marlboro Lights, Marlboro Ultra Lights, Benson & Hedges, Virginia Slims, Alpine, English Ovals, Galaxy, Players, Saratoga and Parliament cigarettes and other tobacco products throughout Illinois.

---

[1]   The tobacco company defendants will at times be collectively referred to throughout this complaint as the "Tobacco Companies."  The Tobacco Companies and all other defendants will at times be collectively referred to as the "Tobacco Industry."

6.     Defendant R.J. Reynolds Tobacco Company ("Reynolds") is a New Jersey corporation whose principal place of business is Fourth & Main Street, Winston-Salem, North Carolina 27102.   Reynolds manufactures, promotes and sells Camel, Vantage, Now, Doral, Winston, Sterling, Magna, More, Century, Bright Rite, Best Value, Monarch, Prince Albert and Salem cigarettes and other tobacco products throughout Illinois.

7.     Defendant Liggett & Myers, Inc. ("Liggett") is a Delaware corporation whose principal place of business is Main & Fuller, Durham, North Carolina.   Liggett manufactures, promotes and sells Chesterfield, Decade, L&M, Pyramid, Dorado, Eve, Stride, Generic and Lark cigarettes and other tobacco products throughout Illinois.

8.     Defendant Lorillard Tobacco Company, Inc. ("Lorillard") is a Delaware corporation whose principal place of business is 1 Park Avenue, New York, New York 10016.   Lorillard manufactures, advertises and sells Old Gold, Kent, Triumph, Satin, Max, Spring, Newport and True cigarettes and other tobacco products throughout Illinois.

9.     Defendant United States Tobacco Company ("U.S. Tobacco") is a Delaware corporation whose principal place of business is 100 West Putnam Avenue, Greenwich, Connecticut.   U.S. Tobacco manufactures, promotes and sells Sano cigarettes throughout Illinois. U.S. Tobacco also manufactures, promotes and sells approximately 88 percent of the smokeless tobacco (snuff and chewing tobacco) sold in Illinois, under such names as Happy Days, Skoal and Copenhagen.

10.     Defendant Brown & Williamson Tobacco Corporation ("Brown & Williamson") is a Delaware corporation whose principal place of business is 1500 Brown & Williamson Tower, Louisville, Kentucky 40202.   Brown & Williamson manufactures, promotes and sells Kool, Raleigh, Barclay, BelAir, Capri, Richland, Laredo, Eli Cutter and Viceroy cigarettes and other

3

tobacco products throughout Illinois.  Brown & Williamson is wholly owned by defendant B.A.T. Industries, P.L.C.  Brown & Williamson is or was a subsidiary or division of defendant British American Tobacco Company, Ltd.

11.   Defendant American Tobacco Company, Inc. ("American Tobacco") is a Delaware corporation whose principal place of business is Six Stamford Forum, Stamford, Connecticut 06904.  American Tobacco manufactures, promotes and sells Lucky Strike, Pall Mall, Tareyton, American, Malibu, Montclair, Newport, Misty, Iceberg, Silk Cut, Silva Thins, Sobrania, Bull Durham and Carlton cigarettes and other tobacco products throughout Illinois.  On December 21, 1994, American Tobacco was purchased by defendant B.A.T. Industries, P.L.C. and was merged into Brown & Williamson, which succeeded to American Tobacco's liabilities by operation of law or as a matter of fact.

   2.  *British Tobacco Companies*

12.   Defendant British American Tobacco Company, Ltd. ("BATCO") is a British Corporation whose principal place of business is Milbank, Knowle Green, Staines, Middlesex, England TW181DY.  As noted above, Brown & Williamson is or was a subsidiary or division of BATCO.  BATCO manufactures, promotes and sells 555 Express cigarettes and other tobacco products throughout Illinois.  In addition, at times relevant to this complaint, BATCO, individually or through its affiliate, alter ego, subsidiary and/or division, Brown & Williamson, designed, tested, manufactured, marketed and sold cigarettes for use in Illinois.  Moreover, BATCO, individually or through its associated companies, agents, or subsidiaries, conducted research for Brown & Williamson on the topics of smoking, disease and addiction.  On information and belief, Brown & Williamson sent to BATCO or its associated companies, agents or subsidiaries in England, research and development reports compiled in the United States on

4

the topics of smoking, disease and addiction, in order to remove sensitive and inculpatory documents from United States jurisdiction. BATCO participated in the conspiracy alleged throughout this complaint and has caused harm and affected commerce in Illinois.

13.     Defendant B.A.T. Industries P.L.C. ("BAT Industries") is a British corporation whose principal place of business is Windsor House, 50 Victoria Street, London. Through a succession of intermediary corporations and holding companies, BAT Industries is the sole beneficial shareholder of Brown & Williamson. Through Brown & Williamson, BAT Industries manufactures cigarettes, and promotes and sells them throughout Illinois. BAT Industries, individually or through its agents, subsidiaries, associated companies and/or co-conspirators, conducted significant research for Brown & Williamson on the topics of smoking, disease and addiction. On information and belief, Brown & Williamson also sent to BAT Industries in England research and development reports compiled in the United States on the topic of smoking, disease and addiction, in order to remove sensitive and inculpatory documents from United States jurisdiction. Such documents were, on information and belief, subject to the control of BAT Industries or its associated companies, agents or subsidiaries in England. BAT Industries participated in the conspiracy described throughout this complaint and has caused harm and affected commerce in Illinois.

14.     Also with regard to BAT Industries, it describes itself as i) a global tobacco and financial operation, and ii) the world's most international cigarette manufacturer with an unrivaled range of international and domestic brands. In 1995, BAT Industries and its associated companies, which include Brown & Williamson and BATCO (collectively referred to as the "BAT Group"), sold more than 670 billion cigarettes and achieved 12.4% of the world cigarette market. This world market includes Illinois--the BAT Group receives an average of one quarter

of a million dollars a day from the sale of its cigarettes in Illinois. By intentionally reaping such returns in Illinois, BAT Industries has purposely availed itself of the benefits of doing business in Illinois.

15.   Further, BAT Industries plays and played a key role in the events preceding BAT Group's sale of millions of packs a year of cigarettes in Illinois. BAT Industries, on information and belief, is the ultimate decision maker within the BAT Group on issues including smoking and health research, tobacco agriculture, public relations policies, and cigarette design, manufacture and marketing. In this role, BAT Industries, among other things, promulgated and enforced deceptive smoking and health policies, and manipulated nicotine levels in cigarettes. BAT Industries directed programs, some of which were secret, as part of its smoking related research.

16.   BAT Industries has also directly and/or through its agents committed tortious acts in Illinois out of which this action arose. BAT Industries and/or its agents have participated in a fraud against plaintiff and the proposed class. BAT Industries: concealed from plaintiff and the proposed class members scientific and other knowledge relating to smoking, nicotine's addictive nature and the manipulation of nicotine content in cigarettes; directed the research and design of cigarettes sent into Illinois for sale; and ensured the participation by the other BAT Group members in the conspiracy described in this complaint.

17.   Even aside from BAT Industries' activities described above which relate specifically to this case, BAT Industries regularly does and solicits business in Illinois. BAT Industries representatives, including the chairperson of BAT Industries' board, have repeatedly visited Illinois in order to solicit individual and institutional investments in BAT Industries' securities and debt instruments. This solicitation was part of an aggressive marketing plan over the years

by BAT Industries to acquire greater American investment, which likely involved substantial Illinois dollars.

18.   Moreover, BAT Industries has in fact previously submitted itself voluntarily to jurisdiction in the United States when it was beneficial to do so.  For example, BAT Industries submitted itself to jurisdiction in various states when it needed to go through the insurance approval process pursuant to its $5.2 billion purchase of the Farmer's Group insurance company. Further, BAT Industries submitted to the Federal Trade Commissions' jurisdiction when BAT Industries sought to purchase American Tobacco, and admitted in those proceedings that it was involved in commerce between the various states.   When a BAT Industries United States subsidiary sought to raise millions of dollars in the American financial markets through the sale of promissory notes, BAT Industries submitted to the jurisdiction of New York courts and unconditionally guaranteed payment on the notes.

19.   In sum, BAT Industries has directly affected commerce and persons in Illinois through the fraud it committed in complicity with the other defendants in this case and through its regular business dealings in Illinois.  Thus, BAT Industries must be required to defend itself in this action in Illinois.  (See Appendix 1 for further details regarding BAT's involvement in the present conspiracy.)

B.   Public Relations Firm Defendants

20.   Defendant The Council for Tobacco Research–U.S.A. ("CTR") is a non-profit New York corporation whose principal place of business is 900 3rd Avenue, New York, New York 10022.  CTR is the successor in interest to the Tobacco Institute Research Committee ("TIRC"). At all relevant times, CTR and TIRC operated as the Tobacco Companies' public relations and lobbying arms, and as their agents.   CTR and TIRC also acted as facilitating agencies in

furtherance of defendants' conspiracy as described throughout this complaint. In doing the things alleged, CTR and TIRC acted within the course and scope of their agency and acted with the consent, permission and authorization of each of the Tobacco Companies. All of CTR's and TIRC's actions alleged herein were ratified and approved by the Tobacco Companies' officers or managing agents. CTR and TIRC have been continuously involved in the conspiracy described herein and CTR's and TIRC's actions have affected commerce and caused harm in Illinois.

21. Defendant Tobacco Institute, Inc. ("TI") is a New York non-profit corporation whose principal place of business is 1875 I Street Northwest, Suite 800, Washington, D.C. 20006. At all relevant times, TI operated as a public relations and lobbying arm of the Tobacco Companies and was an agent of the Tobacco Companies. It also acted as a facilitating agency in furtherance of defendants' conspiracy described throughout this complaint. In doing the things alleged herein, TI acted within the course and scope of its agency, and acted with the consent, permission and authorization of the Tobacco Companies. All of TI's actions alleged herein were ratified and approved by the officers or managing agents of the Tobacco Companies. TI has, since its creation, been involved in the conspiracy described in this complaint, and TI's actions have affected commerce and caused harm in Illinois.

22. Smokeless Tobacco Council, Inc. ("STC"), a non-defendant co-conspirator, is a New York corporation whose principal place of business is 1627 K Street Northwest, Suite 800, Washington, D.C. 20006. At all relevant times, STC operated as a public relations and lobbying arm of the Tobacco Companies and as their agent. It also acted as a facilitating agency in furtherance of defendants' conspiracy described throughout this complaint. In doing the things alleged herein, STC acted within the course and scope of its agency, and acted with the consent, permission and authorization of the Tobacco Companies. All of STC's actions alleged herein

were ratified and approved by the officers or managing agents of the Tobacco Companies. STC has been involved in the conspiracy described in this complaint, and STC's actions have affected commerce and caused harm in Illinois.

C.     John Doe Defendants

23.     There are other as yet unidentified co-conspirators who committed acts in furtherance of the conspiracy.

## Jurisdiction and Venue

24.     Jurisdiction and venue are proper in this Court because this action arose out of: (i) business transacted by defendants in Illinois; (ii) tortious acts committed by defendants in Illinois; and iii) economic injury caused by defendants to persons in Illinois. In addition, defendants regularly do business in Illinois.

## Nature of Claims

### Conspiracy and Deception Regarding Nicotine and Addiction

25.     Each defendant is sued individually as a primary violator and co-conspirator. Each defendant committed acts in furtherance of the agreement to, inter alia, conceal material information regarding the addictive nature of nicotine.

### Targeting Minors and Consumer Fraud Regarding Light Cigarettes

26.     Philip Morris is also sued individually for its unlawful act of targeting its advertising and marketing to minors, and for its misrepresentations and omissions relating to the sale of Marlboro Lights cigarettes.

## Specific Factual Allegations

I.     **CONSPIRACY AND DECEPTION REGARDING NICOTINE AND ADDICTION**

27.     As discussed below, between 1953 through at 1995, defendants conspired to create a bogus dispute among the public regarding smoking and health, and to actively conceal material

9

facts regarding nicotine and addiction. This action concerns the nicotine and addiction portion of the conspiracy only, but the smoking and health portion is included in this complaint for purposes of background and context.

A.   **The Conspiracy**

     i.     1930-1953--Events Leading up to Conspiracy

28.   From approximately 1930 through 1953, the Tobacco Companies promoted their tobacco products by, among other things, making express health warranties regarding such products. For example: Old Gold—"Not a cough in a carload"; Camel—"Not a single case of throat irritation due to smoking Camels"; Philip Morris—"The throat-tested cigarette"; and Chesterfield—"never...did you any harm."

29.   The Tobacco Companies continued to make these warranties even after the following two reports:

    i)    In 1945, Alton Ochsner, M.D., a New Orleans surgeon and regional medical director of the American Cancer Society, reported that "there is a distinct parallelism between the incidence of cancer and the sale of cigarettes....[T]he increase is due to the increased incidence of smoking and...smoking is a factor because of the chronic irritation it produces."

    ii)    In 1946, a Lorillard chemist reported to its manufacturing committee that "[c]ertain scientists and medical authorities have claimed for many years that the use of tobacco contributes to cancer development in susceptible people. Just enough evidence has been presented to justify the possibility of such a presumption."

30.   It was only in 1953, after the following two reports were widely published and created what is known as the "Big Scare" among the public, that the Tobacco Companies ceased making their health warranties:

    i)    In 1952, Richard Doll, M.D., a British researcher, published a statistical analysis showing that lung cancer was more common among people who smoked and that the risk of lung cancer was directly proportional to the number of cigarettes smoked.

10

    ii)    In December 1953, Ernest L. Wynder, M.D., of the Sloan-Kettering Institute, published the results of a study with mice, which provided biological evidence that cigarette smoke caused cancer.

31.    By the end of 1953, tobacco consumption and the stock prices of many of the Tobacco Companies had decreased significantly.

    ii.    <u>1953--The Conspiracy Begins</u>

32.    On December 14, 1953, in response to the Big Scare, Timothy V. Hartnett, president of Brown & Williamson, circulated a memorandum to his counterparts at other Tobacco Companies, which included his proposal to "collectively deal with the health issue...to get the industry out of this hole." Hartnett's two prong proposal consisted of (a) "unstinted assistance to scientific research," and then confronting the difficult decision of "how to handle significantly negative research results, if, as, and when they develop"; and (b) retaining "the best obtainable" public relations counsel as none "has ever been handed so real and yet so *delicate* a multimillion dollar problem." (Emphasis in original.)

33.    Thus, on or about December 15, 1953, the Tobacco Companies retained Hill & Knowlton, Inc. as their public relations counsel. As its first order of business, Hill & Knowlton coordinated and attended a meeting on December 15, 1993 at the Plaza Hotel in New York City at which the Tobacco Companies formulated their conspiracy to deceive the public. Present at that meeting besides Hill & Knowlton were the presidents of American Tobacco, Brown & Williamson, Lorillard, Philip Morris, R.J. Reynolds and U.S. Tobacco.

34.    According to Hill & Knowlton's documentation of the December 15, 1953 meeting, the Tobacco Companies agreed, in part, as follows:

    (a)    The current problem was "extremely serious and worthy of drastic action."

(b)     "The chief executive officers of all the leading companies--R.J. Reynolds, Philip Morris, Benson & Hedges, U.S. Tobacco Company, Brown & Williamson--have agreed to go along with a public relations program on the health issue."

(c)     "Each of the company presidents attending emphasized the fact that they consider the program to be a long term one, [and were] emphatic in saying that the entire activity is a long-term, continuing program, since they feel the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future."

(d)     "Because of [the Tobacco Companies'] antitrust background, the companies do not favor the incorporation of a formal association. Instead, they prefer strongly the organization of an informal committee which will be specifically charged with the public relations function and readily identified as such."

(e)     With regard to the "informal committee" to be created, Hill & Knowlton, was "to serve as the operating agency of the companies, hiring all the staff and disbursing all funds."

(f)     All of the Tobacco Companies would join in the public relations strategy, except for Liggett. Liggett decided not to participate at that time because it felt "that the proper procedure is to ignore the whole controversy."

35.     On or about December 24, 1953, in follow up to the December 15 meeting and in furtherance of the conspiracy, Hill & Knowlton presented a memorandum to the Tobacco Companies and their co-conspirators, in which it emphasized to the "industry group," among other things, the importance of avoiding the appearance of bias to the public and that "[t]he situation is one of extreme delicacy."

36.     Thus, the conspiracy of industry-wide and international proportion was born. As confirmed by overwhelming documentation and the Tobacco Industry's actions over the past several decades, defendants' multi-part conspiracy consisted of at least two objectives which have directly victimized plaintiffs and the proposed class:  (i) the misrepresentation and concealment of material information regarding the addictive nature of nicotine; and (ii) the manipulation of the nicotine content in cigarettes and other tobacco products.

37.    With regard to the means for carrying out these two objectives, the Tobacco Companies, heeding Hill & Knowlton's advice to avoid the appearance of bias, created sham organizations that the Tobacco Companies represented would conduct independent, unbiased research.    In reality, however, these so-called "independent" trade organizations, with the Tobacco Companies' authority and the assistance of Hill & Knowlton and several lawyers: cherry picked research projects; selectively reported and distorted research results; effectively distanced the Tobacco Companies from adverse research results; deceptively shielded the Tobacco Companies from discovery in legal proceedings; allowed the Tobacco Companies to gain political and public favor by appearing as though they were deeply concerned with all research, including negative research; and enabled the defendants to meet the objectives of their conspiracy.

       iii.    The Sham "Independent" Research Organizations, and the Assistance of Hill & Knowlton and Lawyers to Effectuate the Conspiracy

38.    On January 4, 1954, only twenty days after the conspiracy's creation, the Tobacco Industry announced in a "Frank Statement to Cigarette Smokers" the formation of the first sham organization, Tobacco Industry Research Committee ("TIRC").    This announcement was published in 448 newspapers with readership of over 43 million people, and stated as follows:

> Many people have asked us what we are doing to meet the public's concern aroused by the recent reports [of a causal relationship between smoking and disease].  Here is the answer:
>
> 1.    We are pledging aid and assistance to the research effort into all phases of tobacco use and health.  This joint financial aid will of course be in addition to what is already being contributed by the individual companies.
>
> 2.    For this purpose we are establishing a joint industry group consisting initially of the undersigned.  This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE.

13

3.    In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute.   In addition there will be an Advisory Board of scientists disinterested in the cigarette industry.  A group of distinguished men from medicine, science, and education will be invited to serve on this Board.  These scientists will be invited to serve on this Board.  These scientists will advise the Committee on its research activities.

This statement is being issued because we believe that people are entitled to know where we stand on this matter and what we intend to do about it.

39.    Listed as sponsors of this announcement were, among others, American Tobacco, Brown & Williamson, Lorillard, Philip Morris, Reynolds and U.S. Tobacco.  Indeed, all of the leading Tobacco Companies were original members of TIRC, except for Liggett who joined in 1964.  Paul Hahn of American Tobacco "was the moving force in setting up the TIRC."

40.    TIRC operated as a public relations "front" for the Tobacco Industry from its inception, in direct opposition to the Tobacco Industry's promise, as set out in the Frank Statement, that TIRC would support independent and objective research into the claimed hazards of smoking.  Indeed, from TIRC's creation, Hill & Knowlton--the Tobacco Industry's public relations firm--was intimately involved in all aspects of TIRC's operations.  Not only were TIRC's offices located one floor below Hill & Knowlton's offices, "[Hill & Knowlton] provided the administrative staff for TIRC in its infancy."  In 1954, 35 staff members of Hill & Knowlton worked full or part time for TIRC.

41.    Hill & Knowlton also played a major role in the creation, development and dissemination of "selection criteria" for a publication entitled "Tobacco & Health Research," which was used as a vehicle for the dissemination of much of the false and misleading information generated by the Tobacco Industry.  For this and Hill & Knowlton's other tasks, in 1954, Hill & Knowlton received $477,955 from TIRC, the purported research firm.  This amount was more than 50% of TIRC's entire budget.

14

42.     On July 31, 1954, Hill & Knowlton issued a "Confidential Memorandum" in which it confirmed that the formation of TIRC was the result of a decision that "joint action" was imperative.

43.     In 1958, the Tobacco Industry formed the second sham organization, Tobacco Institute ("TI"). As with TIRC, the Tobacco Industry misrepresented that TI would promote the research and disclosure of information relating to smoking and health:  "The Tobacco Institute believes that the American public is entitled to complete, authenticated information about cigarette smoking and health." A TI advertisement captioned "A Statement About Tobacco and Health" further deceptively represented:

> We recognize that we have a special responsibility to the public – to help scientists determine the facts about tobacco and health, and about certain diseases that have been associated with tobacco use.
>
> We accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee, which provides research grants to independent scientists.  We pledge continued support of this program of research until the facts are known.
>
> We shall continue all possible efforts to bring the facts to light.

44.     In reality, TI was formed at the insistence of Dr. Clarence Cook Little, TIRC's "Scientific Director." Dr. Little, who was concerned that TIRC appear to be independent, "concluded that TIRC shouldn't serve as the PR vehicle to respond to any and all adverse claims in the press." Thus, like TIRC, TI served only to assist the tobacco industry with its public relations efforts and was nothing more than another "front" for the conspirators to hide behind.

45.     In 1964, TIRC changed its name to Council for Tobacco Research, ("CTR"), but in all other ways remained the same.

46.     As contemplated by the Frank Statement, TIRC/CTR created a "Science Advisory Board" ("SAB").  Contrary to the promise of staffing SAB with "scientists disinterested in the

cigarette industry," however, representatives of the Tobacco Companies set out to hire "eminent scientists" "with whom [they were] acquainted" and that would "support 'less irritating' claims." Ed Jacobs, counsel for TIRC/CTR, was "intimately involved" in the selection of TIRC's Scientific Advisory Board members.

47.     Not only did the Tobacco Industry selectively staff SAB, it stifled, distorted and suppressed the research conducted by SAB.  In the 1960s, for example, SAB researchers were precluded from conducting central nervous system research.  This was because the Tobacco Industry knew by the mid-1960s, at the latest, that nicotine's reinforcing actions for smoking related directly to nicotine's effects on the central nervous system.  Furthermore, an abstract by a researcher named Leuchtenberger "was apparently revised at the insistence of lawyers, which was done through [Dr.] Hockett, who 'leaned' on [Leuchtenberger]."

48.     Lawyer involvement in the defendants' conspiracy was crucial--such involvement created principle tools with which defendants effectuated their conspiracy.  Namely, lawyers oversaw and censored all research projects, and based upon their "professional judgment," would edit reports, prohibit research or simply--and improperly--hide the documents behind the attorney-client or work product privileges.  Lawyer involvement was so pervasive that the industry itself predicted backlash among disaffected researchers.  For example, in an internal Reynolds document, it was acknowledged that disaffected SAB researchers would "complain about being pushed around by lawyers (including Jacob, Shinn and Hardy)."

49.     In approximately 1965, as yet another tool with which to carry out their conspiracy, the Tobacco Companies added a division to CTR called "Special Projects."  "Special Projects" was initially formed as a result of scheduled Congressional hearings on cigarette warning labels. According to a Reynolds' internal memorandum, the industry had become complacent after

victories in all smoking and health lawsuits prior to that time, and was "in need of developing witnesses to testify that (i) association is not equal to causation, and (ii) you can't extrapolate from animals to men. In reviewing CTR's research, the Tobacco Industry found no usable research to present to Congress."

50.    Accordingly, the Tobacco Industry directed its lawyers, Ed Cook in particular, to get the needed data and witnesses, and Special Projects was born. The industry's own internal documents confirm that "the underlying purpose of special projects was to develop witnesses."

51.    Notes regarding Special Projects, which were prepared at a meeting of the Tobacco Companies' Committee of General Counsel also confirms this purpose, as well as the fact that Special Projects eventually evolved into a vehicle for hiding adverse documents behind claimed legal privileges:

> When we started the CTR Special Projects, the idea was that the scientific director of CTR would review a project. If he liked it, it was a CTR special project. If he did not like it, then it became a lawyers' special project.... [W]e were afraid of discovery for FTC and Aviado, we wanted to protect it under the lawyers. We did not want it out in the open.

52.    An internal Reynolds memorandum, moreover, stated that lawyers reviewed "everything written by CTR." Projects designated by the lawyers as "Special Projects" were monitored by them to prevent disclosure of results adverse to the Tobacco Industry position. One Philip Morris official characterized CTR as a "front" for performing "special projects." Thus, Special Projects ultimately became a key tool through which defendants both created an arsenal of witnesses and documents for public relations and lobbying purposes, and hid unfavorable documents by asserting attorney-client or work product privilege.

53.    In addition to Special Projects, CTR created a division called "Special 4 Projects." Special 4 Projects were not funded or administered by CTR. Rather, they were funded by a

special account held by "JM&F," an outside law firm.  Funds were used for various purposes, including to "finance research on specific issues needing resolution and somebody to talk about it."  "[T]he ability to publish Special 4 research was controlled by contract."  The most sensitive research projects were designated as "Special 4 Projects."

54.     Not only would the Tobacco Industry "edit" internal research reports, it would "slant" or "influence" external research reports as well.  For example, in approximately 1965, Harrogate, a research lab in England, was scheduled to publish a report which "accepts…epidemiological evidence of a causal connection between smoking and health."  In October 8, 1965, Addison Yeaman, Brown & Williamson's general counsel, wrote to Ed Finch, president of Brown & Williamson and chairman of TI, regarding this matter.  In that letter, Yeaman, among other things, explained to Finch that the "American industry is deeply concerned" with the looming publication of a Harrogate report.  Yeaman then described his discussion with industry lawyer David Hardy regarding which individual at Harrogate to approach in order to "influence the tone and even the context of the report (if a report must be published) before it is written."

55.     Further, on February 28, 1966, Yeaman wrote to Anthony D. McCormick, attorney for BATCO, and again discussed the looming publication of the Harrogate report, in addition to other "joint" topics:

a.)     Regarding the Harrogate report, "[w]e are troubled lest that approach be taken to concede a significant causal relation between the use of tobacco and cancer of the lung."  Further, "we would hope to be afforded the opportunity of consulting with the people on your side concerning the way Harrogate's work is presented, admittedly with the hope of 'slanting' the report."

b)      "I would hope to explore the possibility of closer liaison between Harrogate, Hamburg and our C.T.R. on a more active and current basis.  I realize that as things now stand there is complete openness between our people here and yours, but I believe that it is not as detailed nor kept on as current a basis as it might and I think should.  Moreover, in view of the

amount of money being spent, could we not actively explore closer coordination of work in the interest of (1) quicker results, (2) avoidance of conflict, and (3) assurance that all relevant areas are getting adequate and efficient attention?"

c)   "[R]emember that the cigarette companies in the U.S. have given the prime responsibility in the health area to their lawyers. In every case, save that of Lorillard, each of the General Counsel is Vice President and a member of the Executive Committee of his respective company. In each of the six companies, including Lorillard, both day-by-day decision and policy directions are in the first instance in the province of the lawyers, subject always of course to the ultimate authority of their Presidents and Boards of Directors."

56.   The world-wide extent of the conspirators' agreement is further illustrated by the "strictly confidential" minutes of the "First Meeting with U.S. Company Lawyers" in New York on March 8, 1967 at CTR's offices. Present at that meeting were Mr. W.T. Hoyt (CTR Chairman), Dr. R.H. Hockett (CTR), M. H. Ramm (Reynolds), Mr. P. Smith (Philip Morris) and Mr. C. Hetsko (American Tobacco), in addition to industry lawyers and representatives from the United Kingdom. The main topic of discussion was the publication by the CTR's counterpart in the United Kingdom, the Tobacco Research Council ("TRC"), of adverse biological research. At the meeting, Ramm and Smith "immediately stated in strongest possible terms" that "T.R.C. had been unwise to carry out any biological research at all, that we were being very foolish in reporting it and that, although scientifically we had discovered nothing new, we were likely to embarrass the United States' industry severely by the course which we were following." Thus, the conspirators felt the need to confirm the "American position"-- their collective story to the public--which consisted in part of the following:

1.   "The causation theory remains an unproved hypothesis and there is no further scientific data to confirm it." (According to the American lawyers, "[B]y taking any other course of action, we were merely giving support to enemies of the industry in the United States.")

2.    "Research workers in the U.S.A. live off Federal grants and thus take the 'causative' line to ensure continued support."

3.    "Nevertheless, to avoid legal liability of one sort or another, there is a strong argument in favor of a general cautionary statement on cigarette packets such as is now adopted in the U.S.A."

4.    "The printing on the packet or advertising of "tar" and nicotine figures such as in the case of "Carlton" or "True" represents simply an approach to a marketing situation which is (as far as the manufacturers are concerned) unconnected with health."

5.    "The Magnuson Bill has not yet been re-introduced into this Session of Congress and, when it is introduced, it may not contain any reference to nicotine. The view was expressed, however, that it might be a good idea if nicotine were to be included as then the Bill could be more easily suppressed."

6.    "In the view of [the Tobacco Industry's] American lawyers, T.R.C. should have a suitable 'pressure' man in The Commons or at least some form of organized lobbying to assert their point of view."

57.    Also at the March 8, 1967 meeting, the Tobacco Industry's American lawyers expressed their desire to meet with British lawyers to discuss "the whole matter of legal liability in regard to smoking and health."

58.    In an April 15, 1968 internal TI memorandum, TI's public relations program is described, and it is admitted that, by virtue of its conduct, TI "may be subject to a finding that we are making false or misleading statements to promote the sale of cigarettes." The memo was copied to, among other tobacco executives, Brown & Williamson attorney (and later CTR director) Addison Yeaman, Reynolds' Charles Wade, and Reynolds' attorney, Henry Ramm.

59.    Despite the true functions of TIRC/CTR and TI, the Tobacco Companies used TI and the print media in 1970 to again foster the false message that CTR was "independen[t]", and that the question of a link between smoking and health risks was still open:

The question about smoking and health is still a question:

20

And the industry has committed itself to this task in the most objective and scientific way possible.... Completely autonomous, CTR's research is directed by a board of ten scientists and physicians.... This board has full authority and responsibility for policy, development and direction of the research effort.

61.    Another example of the tobacco industry's suppression of research as a means of effectuating the conspiracy is the "Mouse House" incident.  Reynolds established the Mouse House in the 1960s in Winston-Salem, North Carolina.  Researchers were to explore the health effects of smoking on mice.  Although the researchers at the Mouse House made significant progress, especially with regard to determining the relationship between smoking and emphysema, Reynolds and its lawyers fired all 26 scientists in one day in 1970 and disbanded the entire operation.  Several months prior to the 1970 closure and firings, Reynolds attorneys collected dozens of research notebooks from scientists.   One Reynolds researcher later commented that, with regard to Reynolds' executives and lawyers, "they like to take the position that you can't prove harm because you don't know [the] mechanism [linking smoking and emphysema]....And sitting right under their noses is evidence of mechanism[.]  What are they going to do with the stuff?  They decided to kill it."

62.    In 1972, suppression of potentially adverse projects continued.  According to Dr. Senkus of Reynolds, CTR attorney Ed Jacobs urged tobacco industry members to unite in an effort to block the National Cancer Institute from performing dog smoke-inhalation studies. Jacobs himself drafted the letter to be signed by the Tobacco Companies, urging NCI scientist Dr. Gio Gori not to do the inhalation studies.  According to Senkus, industry attorneys felt that the studies were premised on the idea that smoking was harmful, and that the inhalation experiments with the dogs might show nicotine habituation.

63.    Another example of the suppression of research concerns the works of Dr. Freddy Homburger.  In approximately 1974, Freddy Homburger, M.D., a researcher in Cambridge,

Massachusetts, undertook a study of smoke exposure on hamsters pursuant to a grant from CTR.

CTR, however, changed the project half-way through from a grant to a contract "so they could

control publication." Dr. Homburger testified that when the study was completed, the scientific

director of CTR and a CTR lawyer "didn't want us to call anything cancer" and that they

threatened Dr. Homburger with "never get[ting] a penny more" if his paper was published

without deleting the word cancer.  An internal CTR document describes CTR's actions in halting

a press conference called by Dr. Homburger to discuss the incident:

> He...was [going] to tell the press that the tobacco industry was attempting to suppress
> important scientific information about the harmful effects of smoking.  He was going to
> point specifically at CTR....I arranged later that evening for it to be canceled.
> Homburger was given a cordial welcome and nicely hastened out the door.  P.S. I doubt
> if you or Tom will want to retain this note.

64.    A 1974 report to Lorillard's CEO from a research executive confirms that CTR's

scientific projects were not selected against specific scientific goals, but rather "for various

purposes such as public relations, political relations, position for litigation, etc."

65.    As a further indication of defendants' abuse of legal privileges to aid in their ongoing

efforts at suppression of adverse information, Dr. James Mold, Liggett's assistant research

director, stated with regard to a project by Liggett regarding "safer cigarettes" that, after 1975,

"all meetings that we had regarding this project were to be attended by a lawyer.... All paper

that was generated...[was] to be directed to the Law Department."  Dr. Mold also stated that

lawyers even collected all the notes after each meeting.  Further, Liggett's lawyers ordered Dr.

Mold not to publish the results of the project.

66.    In 1976, the law firm Shook, Hardy & Bacon wrote to the various Tobacco

Companies and stated that a study to measure environmental tobacco smoke should be modified

so that it de-emphasized the role of second-hand tobacco smoke relating to indoor environmental quality.

67. In 1977, in furtherance of defendants' conspiracy, CTR's then chairman and president Yeaman falsely stated during a public speech that "[CTR] has no propaganda function of any kind..."

68. Once again, internal documents show the true nature of CTR. A 1978 memorandum addressed to the CTR file from a Philip Morris official noted that CTR's true function was as "an industry 'shield.'" The memorandum goes on to state that: "the 'public relations' value of CTR must be considered and continued...It is extremely important that the industry continue to spend their dollars on research to show that we don't agree that the case against smoking is closed for 'PR' purposes...." In another internal document, an industry official described a meeting that included high level officials from various Tobacco Companies, and stated that "CTR is the best & cheapest insurance the tobacco industry can buy and without it the Industry would have to invent CTR or would be dead."

69. In a September 11, 1978 letter, Brown & Williamson attorney Ernest Pepples acknowledged to Yeaman that "The structures, including CTR,...were put together in the 1950's to deal with the legal and public relations impact of the health scare...." Also in that letter, Pepples suggests putting together a group of industry executives, lawyers and public relations people to focus on research regarding "problem areas" and how such research should be coordinated. As Pepples contemplated, the group would not approve specific projects, but would recommend through the "companies' general counsel the appropriate policy concepts for consideration and approval by the CEO's of their respective companies."

70.   As described in a September 29, 1978 internal Brown & Williamson memorandum,

attorney Pepples documented attorney Bill Shinn's statement that "the value of Council for

Tobacco Research" was twofold:   "(1) the direct legal protection derived by Brown &

Williamson and (2) the political and public relations advantage accruing to the industry."   Also

in that memorandum, Pepples states that:

> CTR is our window on the world of smoking and health research.  This avoids the
> research dilemma presented to a responsible manufacturer of cigarettes, which on
> the one had needs to know the state of the art and on the other hand cannot afford
> the risk of having in-house work turn sour.
> ***
> The point here is the value of having CTR doing work in a non-directed and
> independent fashion as contrasted with work either in-house or under [Brown &
> Williamson] contract which, if it goes wrong, can become the smoking pistol in a
> lawsuit.

71.   In an October 11, 1978 Reynolds memorandum from Dr. Chin K. Lee to Alan

Rodgman, Lee documents another example of the suppression of unfavorable research.  In that

memorandum, Dr. Lee communicates attorney Max Crohn's denial of permission to Rodgman to

"examine the mutagenicity of smoke condensate fractions and denicotinized tobacco smoke

condensate."  Crohn's reason for his denial was that it "is unwise from a legal point of view.  To

conduct such experiments will compromise the philosophy of our defense against claims raised

in the smoking-health issue."

72.   Max Crohn also authored a memorandum entitled "Re: Invalidation of Some Reports

in the Research Department."  In this document, it is apparent that, in the face of pending and

future litigation, Reynolds embarked on a strategy to destroy potentially inculpatory research

reports, and then created a "reasonable" excuse for destroying or removing such documents.

Specifically, Crohn states as follows:

> We do not foresee any difficulty in the event a decision is reached to remove
> certain reports from Research files.  Once it becomes clear that such action is

necessary for the successful defense of our present and future suits, we will promptly remove all such reports from our files.
\*\*\*
As to the reports which you are recommending to be invalidated, we can cite misinterpretation of data as a reason for invalidation. A further reason is that many of these are needless repetitions and are being removed to alleviate overcrowding of our files.

As an alternative to invalidation, we can have the authors rewrite those sections of the reports which appear objectionable.

73.    Also out of Reynolds came a "privileged and confidential" memorandum, in which the author discusses how to deal with the "problem" of a certain researcher, "GRD," and his apparent "views on causation." GRD had asked for permission to do research related to smoking and health. Reynolds, however, was hesitant to grant him such permission because of its concern "with regard to [GRD's] underlying beliefs on the causation issue in the context of smoking and health litigation." GRD had previously stated that (a) "I wouldn't mind being regulated by FDA"; and (b) "Long-time chronic abuse of just about any substance can cause cancer." Reynolds eventually agreed to let GRD's program go forward, but with "close legal monitoring and control as well as some real sensitivity on R & D's part to [Reynold's] concerns."

74.    In a further abuse of legal privileges, Brown & Williamson's J.K. Wells wrote to attorney Pepples on November 9, 1979 to discuss the handling of scientific reports sent to Brown & Williamson by BAT Industries "in such a way that would afford some degree of protection against discovery." Wells and Pepples agreed that all such scientific reports would go directly to Pepples or to a researcher named Dr. Gil Erterle, as Pepple's designated agent for acquisition of such material, and would be specified as "prepared in anticipation of litigation." This policy would apply even to BAT Industries documents received by and paid for by Brown & Williamson pursuant to a cost sharing arrangement between BAT Industries and Brown & Williamson.

75.    In a December 9, 1981 memorandum, F.G. Colby, then Associate Director of Scientific Issues at Reynolds, notes that "[a] number of research proposals to be granted - or not granted – by the Council for Tobacco Research, were assessed at the request of the Legal Department."

76.    According to handwritten notes of a December 4, 1984 internal interview with Colby, Colby stated, among other things, that:

    i)     "TI's role was PR only."

    ii)    Smoking and health literature at Reynolds was under the jurisdiction of the legal department--even Colby's superior did not have access to these documents.

    iii)   The legal department ordered that documents be removed from Colby's files.

    iv)   "Special Projects" were CTR contract research projects initiated by company lawyers or defense attorneys.

77.    In July 1984, in their continuing course of suppression of information, a Shook, Hardy & Bacon lawyer wrote to Philip Morris' Assistant General Counsel, Fredric Newman, and included an analysis of an industry researcher's published literature, unpublished manuscripts, and in-press manuscripts.  The analysis concluded that "[r]esearch engaged in, as well as some possibly under consideration, by Philip Morris has undesirable and dangerous implications for litigation positions the industry takes in regard to smoking behavior.... In the final analysis, the performing and publishing of nicotine related research clearly seems ill-advised from a litigation point of view."

78.    A January 12, 1984 memorandum by Brown & Williamson attorney J.K. Wells regarding additives research at the Southampton facility in England is a further testament to the Tobacco Industry's efforts at 'slanting' research reports.  In that memorandum, Wells admonishes that "[research & development] should ask Southampton to avoid any mention of

health or biologic consequences in the report or in any other documentation pertaining to the experiments."

79.     Despite its clearly selective research and publishing policy, CTR stated in its annual reports published between 1985 and 1992, that its SAB funded peer-reviewed research projects "judging them solely on the basis of scientific merit and relevance."

80.     Unwilling to come forward with the truth even to the government, Dr. James F. Glenn, CEO of CTR, stated in 1994 to the Waxman Subcommittee that, "a. [CTR] sponsors research into questions of tobacco use and health and makes the results available to the public. b. [G]rantees are assured complete scientific freedom in conducting these studies....[P]ublication [of research results] is encouraged in every instance."

81.     As illustrated, the Tobacco Companies effectuated their conspiracy by using CTR/TIRC and TI as "industry shields," and by enlisting the assistance of Hill & Knowlton and several lawyers.  Through these mechanisms, defendants suppressed, distorted and prevented research, abused legal privileges, gained public and political favor through their self professed "good faith" efforts at conducting independent research--and ultimately achieved, among others, the two objectives that victimized the plaintiff class:  i.e. i) the misrepresentation and concealment of the addictive nature of nicotine, and ii) the manipulation and control of the nicotine content in their products.  The achievement of these two objectives is described in the next section.

iv.     The Conspiracy Objective Which Victimized the Plaintiff Class

a.     *Concealing the Addictive Nature of Nicotine*

82.     As part of defendants' conspiracy, they misrepresented and concealed material information regarding the addictive nature of nicotine.  Since at least 1940, defendants have been

27

compiling an expansive body of research regarding nicotine's addictive and otherwise "psychoactive," or mind affecting, attributes. Based upon this research, defendants quickly realized the commercial value of these attributes. For decades, defendants have capitalized on nicotine's qualities in this regard by misrepresenting and concealing their indisputable knowledge of nicotine's true nature. In fact, defendants have affirmatively marketed cigarettes and other tobacco products as socially beneficial.

83.     Defendants' primary motivation to commit this fraud was fear of FDA regulation of nicotine as a drug, and the consequent heavy disclosure obligations and further limits on advertising and marketing that such regulation would bring. FDA regulation would have translated into reduced revenues. Thus, characteristically, what defendants knew varied drastically from what they told the public. On information and belief, by approximately 1950, defendants knew or but for their deliberate ignorance would have known that nicotine is an addictive drug.

84.     From 1940 to 1970, for example, American Tobacco conducted its own nicotine research, and funded, in whole or in part, over 90 studies on the pharmacological and other effects of nicotine on the body. From its earliest work, American Tobacco understood that nicotine had addictive qualities. Indeed, in 1945, American Tobacco completed a study regarding the need or desire of smokers for nicotine. In the study, 24 smokers were given cigarettes with extremely low levels of nicotine. Twelve of the subjects "definitely missed the nicotine" and 9 of those 12 subjects continued to do so throughout the one month period of the study. The study concluded that "with some individuals, nicotine becomes a major factor in the cigarette habit." This information was not released to the public.

28

85.   In the early 1960s, moreover, Philip Morris launched an in-depth "Nicotine Program" with the objective of determining "why people smoke."  Consistent with this objective, the program's name was later changed to "Smoker Psychology/Behavioral Research Program."  For years, Philip Morris funded internal and external research projects concerning a wide array of nicotine-related topics including, but not limited to:

- A "'rat project' with a goal of producing smoking animals in an effort to determine whether nicotine dependency could be produced in different strains of rats."

- Studies to determine whether smoking--and nicotine--improved efficiency or influenced aggression, learning or emotional arousal.

- Studies to develop nicotine analogues which would increase nicotine's effects on the central nervous system, but decrease its negative effects on the peripheral nervous system e.g., the cardiovascular system.

- Studies to develop a better understanding of the behavioral pharmacological actions of nicotine, particularly the effect which reinforces smoking behavior.

86.   Through this research, Philip Morris developed a vast collection of information confirming nicotine's pharmacological effects and addictive nature.  In 1961, for example, Dr. Helmut Wakeham, a senior Philip Morris research scientist, stated to the company's Research and Development Committee that "smoking produces pleasurable reactions or tranquility, and that this is due at least in part to nicotine...."  Dr. Wakeham also stated that "nicotine is believed essential to cigarette acceptability."

87.   In 1962, the BAT Group met in Southampton, England.  Sir Charles Ellis, Scientific Advisor to BATCO's Board of Directors, stated that "smoking is a habit of addiction" and that "[n]icotine is not only a very fine drug, but the technique of administration by smoking has considerable psychological advantages."  Ellis also expressed his view that nicotine functions as a drug much like stimulants and tranquilizers.

29

88.   In 1962 and 1963, BATCO also received the results of its Project HIPPO I and HIPPO II studies, the aims of which were to i) "understand some of the activities of nicotine—those activities that could explain why smokers are so fond of their habit," and ii) compare the effects of nicotine with those of then-new tranquilizers, "which might supersede tobacco habits in the near future." The Project HIPPO reports were disseminated to Brown & Williamson officials, in addition to BATCO officials.

89.   A 1963 research report later commissioned by Brown & Williamson describes what happens when a chronic tobacco user is denied nicotine:

> A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine.

90.   Also in 1963, Addison Yeaman, general counsel at Brown & Williamson, wrote in an internal memorandum: "[N]icotine is addictive. We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms."

91.   Based on the research to date, as early as 1967, a BAT Group researcher admitted that the company "is in the nicotine rather than the tobacco industry."

92.   Evidencing the British industry's cognizance of nicotine's role in "hooking" customers to future purchases, during a March 8, 1967 meeting in New York at CTR's offices between American and British tobacco industry lawyers, the British lawyers confirmed that "the U.K. industry believes that nicotine content of cigarettes should not be greatly lowered if consumer acceptance is to be maintained."

93.   A 1971 internal report distributed to Philip Morris executives further illustrated the tobacco executives' knowledge of the addictive nature of nicotine in cigarettes. The report

studied persons who had tried to stop smoking, and concluded that only 28 percent of those who

tried to quit were still non-smokers eight months later:

> Even after eight months quitters were apt to report having neurotic symptoms, such as feeling depressed, being restless and tense, being ill-tempered, having a loss of energy, being apt to doze off. They were further troubled by constipation and weight gains which averaged about five pounds per quitter.... This is not the happy picture painted by the Cancer Society's anti-smoking commercial which shows an exuberant couple leaping into the air and kicking their heels with joy because they've kicked the habit. A more appropriate commercial would show a restless, nervous, constipated husband bickering viciously with his bitchy wife who is nagging him about his slothful behavior and growing waistline.

94.    In 1972, Dr. William Dunn, Jr., Director of Philip Morris' Smoker

Psychology/Behavioral Research Program, summarized a conference sponsored by CTR as

follows:

> Most of the conferees would agree with this proposition: The primary incentive to cigarette smoking is the immediate salutary effect of inhaled smoke upon body function.
> ***
> The majority of the conferees would go even further and accept the proposition that nicotine is the active constituent of cigarette smoke. Without nicotine, the argument goes, there would be no smoking.   Some strong evidence can be marshalled [sic] to support this argument:
>
> 1)    No one has ever become a cigarette smoker by smoking cigarettes without nicotine.
>
> 2)    Most of the physiological responses to inhaled smoke have been shown to be nicotine-related.
>
> 3)    Despite many low nicotine brand entries in the market place, none of them have captured a substantial segment of the market....

95.    In another 1972 internal Philip Morris report, Philip Morris' understanding of the role

of nicotine in tobacco use is further illustrated:

> We think that most smokers can be considered nicotine seekers, for the pharmacological effect of nicotine is one of the rewards that come from smoking.   When the smoker quits, he foregoes [sic] his accustomed nicotine.   The change is very noticeable, he misses the reward, and so he returns to smoking.

31

96.   In an April 14, 1972 document entitled "RJR Confidential Research Planning Memorandum on the Nature of the Tobacco Business and the Crucial role of Nicotine Therein," Reynolds' Claude Teague wrote as follows:

> In a sense, the tobacco industry may be thought of as being a specialized, highly ritualized, and stylized segment of the pharmaceutical industry.   Tobacco products uniquely contain and deliver nicotine, a potent drug with a variety of physiological effects....   Thus a tobacco product is, in essence, a vehicle for delivery of nicotine, designed to deliver the nicotine in a generally acceptable and attractive form.   Our industry is then based upon design, manufacture and sale of attractive dosage forms of nicotine, and our Company's position in our Industry is determined by our ability to produce dosage forms of nicotine which have more overall value, tangible or intangible, to the consumer than those of our competitors....
>
> Therefore, in addition to competing with products of the tobacco industry, our products may, in a sense, compete with a variety of other products with certain types of drug action.

97.   The smokeless tobacco industry was similarly aware of nicotine's importance in its products.  In a 1972 memorandum on product development, U.S. Tobacco noted that a particular focus should be on assuring adequate "nicotine satisfaction."

98.   In addition to scientific research, the Tobacco Companies also conducted market research.   In the late 1970s, for example, a marketing firm hired by Brown & Williamson prepared a document entitled "Proposal for Low Delivery Project for [Brown & Williamson]." This document contained the following statement to the effect that a sufficient dose of nicotine is essential to sell cigarettes and, implicitly, to maintain market share:

99.   [I]f a satisfying, low-nicotine cigarette were to be developed, it could represent an effective means of withdrawal...with severe implications for long-term market growth.

100.   Another market research report shows that the Tobacco Companies conducted research regarding behavior associated with quitting tobacco use, particularly with regard to young smokers' habits:

However intriguing smoking was at 11, 12 or 13, by the age of 16 and 17, many regretted their use of cigarettes for health reasons and because they feel unable to stop smoking when they want to.

101.   In a January 10, 1978 internal Philip Morris memorandum, T.S. Osdene, a Philip Morris official, expressed his views regarding a research proposal presented by Dr. Leo Abood, a CTR researcher, at a November 22, 1977 CTR meeting.   At that meeting, Dr. Abood proposed that he be permitted to conduct research "to localize and isolate nicotine receptors and to characterize their biochemical make-up" with the goal being to make a "clinically acceptable antagonist to nicotine."   Recognizing the danger of developing an antagonist, or blocker, to nicotine, Osdene wrote that "Philip Morris has grave concerns" about this goal and that "[t]his goal would have the potential of putting the tobacco manufacturers out of business."

102.   Nevertheless, because Philip Morris desired to "improve its own Nicotine Program" and because Dr. Abood was recognized as a leader in the field of nicotine research, Philip Morris offered Dr. Abood, among other things, a contract position, pursuant to which Abood would test specific compounds developed at Philip Morris.   The purpose of the "contract" was to "retain absolute control over the disposal of any data generated on these compounds."

103.   A 1980 internal memorandum from a Philip Morris official confirms the company's view that nicotine's pharmacological effects on the central nervous system are critical to the Tobacco Industry's success:

> Nicotine is a powerful pharmacological agent with multiple sites of action and may be the most important component of cigarette smoke.   Nicotine and an understanding of its properties are important to the continued well being of our cigarette business since this alkaloid has been cited often as 'the reason for smoking' and theories have been advanced for 'nicotine titration' by the smoker.   Nicotine is known to have effects on the central and peripheral nervous system as well as influencing memory, learning, pain perception, response to stress and level of arousal.

104. In a March 18, 1980 internal Philip Morris memorandum, J.L. Charles stated that because nicotine is a "powerful pharmacological agent" and had been cited as "'a reason for smoking'":

> [O]ur ability to ascertain the structural features of the nicotine molecule which are responsible for its various pharmacological properties can lead to the design of compounds with enhanced desirable properties (central nervous system effects) and minimized suspect properties (peripheral nervous system effects). There are many opportunities for acquiring proprietary compounds which can serve as a firm foundation for new and innovative products in the future.

105. In furtherance of their search for just such a "proprietary compound," in 1980, Philip Morris hired Dr. Victor DeNoble with the express goal of "develop[ing] nicotine analogues which will have desirable effects on the central nervous system (CNS) without the undesirable effects of nicotine on the peripheral nervous system." DeNoble, in turn, recruited Paul C. Mele, a behavioral pharmacologist.

106. DeNoble and Mele indeed confirmed that nicotine met two of the hallmarks of an addictive drug: (1) self-administration (rats would press levers to inject themselves with a nicotine solution), and (2) tolerance (a given dose of nicotine over time had a reduced effect). Furthermore, DeNoble & Mele successfully developed a nicotine analogue. This analogue affected the brain much like nicotine, but did not seem to produce the undesirable effects of nicotine on the peripheral nervous system, including the cardiovascular system.

107. In furtherance of their conspiracy to conceal the addictive nature of nicotine, Philip Morris, instructed DeNoble and Mele to keep their work secret, even from fellow Philip Morris scientists. Test animals were delivered at dawn and brought from the loading dock to the laboratory under cover. DeNoble was even told by lawyers for the company that the data he and Mele were generating could be dangerous. Philip Morris executives began talking of killing the

34

research or moving it outside of the company so Philip Morris would have more freedom to disavow the results.

108. In the meantime, in a March 21, 1980 internal Philip Morris memorandum by W.L. Dunn to Dr. R.B. Seligman, Dunn discusses Philip Morris' Nicotine Receptor Program. In so doing, Dunn confirmed the Tobacco Companies' knowledge of the addictive qualities of nicotine, and the companies' reasons for concealing this knowledge:

> We are now being allowed to conduct research on the immediate effects of nicotine.... We can work with biological systems; we can inject nicotine in rats and we can perform the [certain required surgery].... But in doing so we are engaging in research on the pharmacological action of nicotine, which brings us to [a] concern of our attorneys. This is a more recent concern arising from increasingly favorable prospects for the success of a legislative effort to transfer authority for the regulation of tobacco manufacture to a Federal agency (F.D.A.) known to have interests and powers antithetical to the interests of the industry. Any action on our part, such as research on the psycho-pharmacology of nicotine, which implicitly or explicitly treats nicotine as a drug could well be viewed as a tacit acknowledgment that nicotine is a drug. Such acknowledgment, contend our attorneys, would be untimely. Therefore, although permitted to continue the development of a three-pronged program to study the drug nicotine, we must not be visible about it.

> Our attorneys...will likely continue to insist upon a clandestine effort in order to keep nicotine the drug in low profile.

> [W]e must be officially heedless of the drug properties of nicotine, and cannot openly communicate with our counterparts in other laboratories, and cannot aggressively institute a large-scale neuroscience's program on site....

109. Also in 1980, a BATCO report was drafted which addressed the critical role of nicotine's drug effects:

> Nicotine is an extremely biologically active compound capable of eliciting a range of pharmacological, biochemical, and physiological responses.... In some instances, the pharmacological response of smokers to nicotine is believed to be responsible for an individual's smoking behavior, providing the motivation for and the degree of satisfaction required by the smoker.

110.   In 1981, the smokeless tobacco industry again confirmed the importance of nicotine it its products.  U.S. Tobacco's Senior Vice-president of Marketing, PerErik Lindqvist, wrote in an internal memorandum the criteria for a new smokeless tobacco product:

> Flavorwise we should try for innovation, taste and strength, nicotine should be medium....   Virtually all tobacco usage is based upon nicotine, "the kick," satisfaction.

111.   In approximately summer 1983, DeNoble was called to the Philip Morris headquarters in New York to brief top executives, and following the meeting, company lawyers visited the lab and reviewed the research notebooks.   There were discussions of shifting the research out of the company, perhaps to DeNoble and Mele as outside contractors or to a lab in Switzerland, to distance Philip Morris from the results.

112.   In August 1983, Philip Morris ordered DeNoble to withdraw from publication a research paper on nicotine that had already been accepted for publication after full peer review by the journal Psychopharmacology.

113.   Finally, in April 1984, DeNoble and his colleagues were abruptly told to halt their work, turn off their instruments and turn in their security badges.   Philip Morris executives threatened them with legal action if they published or talked about their nicotine research. According to DeNoble, the lab literally vanished overnight.   DeNoble recalled, "The lab was gone, everything was gone.   The cages were gone, the animals were all gone, all the data was gone.   It was empty rooms."

114.   DeNoble has stated that Philip Morris officials were specifically told about nicotine's addictiveness.     Further, DeNoble told Jack Heningfield, Ph.D., Chief of the Clinical Pharmacology Branch of the National Institute on Drug Abuse's Addiction Research Center, that

a Philip Morris official had correctly interpreted the suppressed nicotine studies as showing that, in terms of addictiveness, "nicotine looked like heroin."

115.   With regard to DeNoble's termination, an internal Philip Morris report stated that: "Although there were no internal documents found stating the reasons why DeNoble and his program were terminated, it could be easily concluded that the unfavorable analysis of the program submitted by Philip Morris' legal counsel prompted DeNoble's termination and the program's cancellation"

116.   In continuing with its research conferences, a 1984 BATCO Group R&D Smoking Behavior-Marketing Conference focused almost entirely on the role of nicotine pharmacology in smoking.  One presentation, for example, included the following observation:

> Smoking is then seen [by the industry] as a personal tool used by the smoker to refine his behavior and reactions to the world at large.

> It is apparent that nicotine largely underpins these contributions through its role as a generator of central physiological arousal effects which express themselves as changes in human performance and psychological well-being.

117.   At another 1984 BATCO conference focusing on nicotine, a Brown & Williamson official described one lecture as follows:

> The presentation was concerned with summarizing and outlining the central role of nicotine in the smoking process and our business generally.... There are two areas of nicotine action that are of primary importance:  (i) to identify to what extent the pharmacological properties or responses to nicotine are influenced by blood and tissue levels of nicotine; (ii) what is the significance and role of nicotine in eliciting the impact response and upper respiratory tract responses...

Another presenter at the conference explained that, while a large percentage of smokers do not want to smoke, most of those smokers feel compelled to continue to smoke:

> Although intentions and attempts to quit are relatively high (30-40% of smokers [in a given year]), the actual success rate of quitting is relatively low and stable.

118.  Despite this overwhelming collection of data to the contrary, in 1994, several tobacco company CEOs testified under oath and continued to deny that nicotine is addictive. For example, Thomas E. Sandefur, former CEO of Brown & Williamson, testified that nicotine is not addictive and that Brown & Williamson scientists had concluded that none of Brown & Williamson's research indicated that nicotine was addictive. Sandefur further testified that "nicotine is a very important constituent in the cigarette smoke for taste." In fact, however, nicotine tastes bad, and the industry has concluded hundreds of tests designed to increase nicotine without injecting a bad taste.

119.  Further, Edward Horrigan, Chairman and CEO of Reynolds, testified that there is "no proof that cigarettes are addictive."

120.  It is clear that the Tobacco Companies have known for decades, on the basis of their own long-concealed research and testing, that nicotine is addictive and has mind-effecting attributes. Through their course of denial and distortion, which continues to today, defendants have victimized the plaintiff class in order to ensure repeat business for the Tobacco Companies.

b.  *Manipulating Nicotine Content*

121.  Although not a direct basis for the causes of action in the current complaint, defendants acts of manipulating nicotine content and concealing theses acts from the public are set out herein to further exemplify the extent of their wrongful actions over the last several decades.

122.  Armed with the knowledge that nicotine is in fact addictive, defendants expanded their conspiracy by manipulating and controlling the nicotine content in their tobacco products to ensure that smokers became and remained hooked on nicotine. A particularly egregious aspect of this quest for guaranteed future business was defendants' marketing efforts aimed at children.

Defendants have for years exploited the fact that kids are impressionable and can be more easily encouraged to start smoking. By the time they are old enough to make a truly reasoned decision whether to smoke, it is too late because they are already hooked. Indeed, as defendants' own research confirms, once they start, a significant percentage of these kids will require their nicotine "fix" for the rest of their lives.

123. The Tobacco Companies have left no aspect of the cigarette manufacturing process untainted when in comes to manipulating nicotine content. Indeed, manipulation of nicotine begins at the agricultural stage, from soil and climate selection, to processing the tobacco plant seed before it even hits the ground. The tobacco plants can then be "pruned" in such a way so that maximum nicotine content is achieved in the tobacco leaves. Once harvested, the tobacco leaves may be "blended" with other tobacco leaves and/or chemicals in order to optimize nicotine content. In addition, sophisticated and patented "nicotine delivery systems" have been designed to manipulate nicotine levels at the manufacturing stage. Allowing nothing to go to waste, Tobacco Companies also routinely use a "tobacco reconstitution" process, through which tobacco waste products are transformed into usable "tobacco," and nicotine levels are controlled.

124. With regard to nicotine manipulation at the agricultural stage, the Tobacco Companies' have clearly succeeded in their efforts. Indeed, nicotine levels in the most widely grown American tobaccos increased 10 to 50% between 1955 and 1980.

125. A particularly gross example of nicotine manipulation at this early stage--and the concealment thereof--is Brown & Williamson's development of "Y-1" tobacco. In a decade-long project, Brown & Williamson secretly developed a genetically-engineered tobacco plant, which the company called "Y-1," with a nicotine content more than twice the average found naturally in tobacco. Brown & Williamson obtained a Brazilian patent for the new plant, which

was printed in Portuguese.  Brown & Williamson and a Brazilian sister company, Souza Cruz Overseas, grew Y-1 in Brazil and shipped it to the United States where it was used in five of Brown & Williamson's cigarette brands, including three that are labeled "light."

126.  Brown & Williamson officials, however, denied that the company was involved in "any breeding of tobacco for high or low nicotine levels" when, on May 3, 1994, four investigators from the FDA visited the Brown & Williamson plant in Macon, Georgia.  As part of its attempt to cover-up its project, Brown & Williamson instructed the company that developed Y-1, i.e. DNA Plant Technology Corporation of Oakland, California, to tell FDA investigators that Y-1 had "never [been] commercialized."

127.  Nicotine manipulation is also achieved through various ways of "pruning" the tobacco plants before they are harvested.  According to Ian Uydess, a former Philip Morris scientist, Philip Morris explored one such technique:

> In the 1980s, Philip Morris conducted field experiments on the growth of tobacco with elevated nicotine levels for possible use in their products.  Philip Morris examined a technique called 'ratooning' which involved cutting down of the tobacco plant early in the harvest cycle before the plant had fully matured.  As the cut plant resumed its growth, the roots deposited elevated levels of nicotine in the leaves of the plant....This technique produced tobacco leaves that had higher nicotine levels than the leaves of non-ratooned plants.

128.  Another technique available during the tobacco plant's growth stage is to apply large amounts of nitrogen fertilizer and exercise "sucker" control over the plant, which consists of manipulating the bud growth at the junction of the stalk and leaves in such a way that nicotine is pushed upward in the plant.

129.  Once the tobacco plants are harvested, the Tobacco Companies employ a process called "blending" to manipulate and controlled nicotine content.  As described by Ian Uydess:

> Nicotine levels were routinely targeted and adjusted by Philip Morris in its various products at least in part through blend changes and blend design....

40

> Tobacco Companies like Philip Morris learned a long time ago that it was hard to get people to stay with a good tasting product if the nicotine level was too low.... The information gained by Philip Morris from the chemical analysis of tobacco of different varieties, ripeness, etc., was used in the blend design of new products to ensure that the desired amount of "high" or "low" nicotine tobaccos were present in order to deliver the amount of nicotine (or other tobacco constituents) that had been targeted for that product.

Dr. Uydess also maintained that when Philip Morris' sales of a new product in test markets were disappointing, "it was suggested that the product development group might have to adjust the blend so as to raise the nicotine level in order to increase its 'staying power' (acceptability and sale) in the market place."

130.   According to Dr. Jeffrey Wigand, a former researcher for Brown & Williamson, that company also manipulated nicotine levels through blending, and did so "as a way of assuring the appropriate nicotine level."

131.   Another aspect of blending is the addition of several ammonia compounds to tobacco. This results in the delivery of increased amounts of nicotine and almost double the nicotine transfer efficiency of cigarettes.   A 1991 Brown & Williamson confidential blending manual states:

> Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine salts and liberates free nicotine...extractable nicotine to bound nicotine in the smoke may be altered in favor of extractable nicotine.  As we know, extractable nicotine contributes to impact in cigarette smoke and this is how ammonia can act as an impact booster.

132.   According to the Brown & Williamson manual, all American tobacco companies except Liggett use ammonia compounds in their cigarettes.  Moreover, Dr. Wigand stated that "[t]he primary form of managing or manipulating nicotine delivery...is by use of ammonia compounds."

133.   Nicotine levels are also manipulated through sophisticated and patented nicotine delivery technology.   Various patent applications show that the Tobacco Companies have developed the capability to manipulate nicotine levels in cigarettes to an exacting degree.   For example:

    a.    A Philip Morris patent application discusses an invention that "permits the release...in controlled amounts and when desired, of nicotine into tobacco smoke."

    b.    Another Philip Morris patent application explains that the proposed invention "is particularly useful for the maintenance of the proper amount of nicotine in tobacco smoke," and notes that "previous efforts have been made to add nicotine to Tobacco Products when the nicotine level in the tobacco was undesirably low."

    c.    A 1991 Reynolds patent application states that "processed tobaccos can be manufactured under conditions suitable to provide products having various nicotine levels."

134.   The Tobacco Companies also manipulate and control nicotine through a process called tobacco reconstitution, which transforms tobacco waste products into usable "tobacco." Kimberly-Clark Corporation's subsidiary, LTR Industries, has patented this process and markets it throughout the industry.

135.   In the reconstitution process, pieces of tobacco plant stalks and stems undergo treatment that results in the extraction of some soluble components, including nicotine.  The stalk and stem pieces are then physically formed into a sheet of tobacco material, to which the extracted nicotine is re-added.

136.   Kimberly-Clark has told the Tobacco Industry that Kimberly-Clark's tobacco reconstitution process marketed through LTR Industries "permits adjustment of nicotine to your exact requirements.... We can help you control your tobacco."

137.   Moreover, the Kimberly-Clark process enables manufacturers to triple or even quadruple the nicotine content of reconstituted tobacco, thereby increasing the nicotine content of the final manufactured product.

138.   Against this substantial body of evidence of the Tobacco Industry's manipulation and control of nicotine levels in cigarettes, the cigarette manufacturers continue to deny to the public, and in 1994 denied to Congress under oath, that they manipulate and control nicotine levels:

a.   William I. Campbell, President and CEO of Philip Morris, testified that "Philip Morris does not manipulate nor independently control the level of nicotine in our products."

b.   James W. Johnston, President and CEO of Reynolds, told Congress that "We do not add or otherwise manipulate nicotine to addict smokers."

c.   Andrew J. Schindler, President and COO of Reynolds, told Congress that "We do not restore any nicotine anywhere in our process.... We lose nicotine, for example, in the reconstituted sheet process.... [N]owhere in that process is any nicotine being incrementally added into the process."

d.   Andrew H. Tisch, Chairman and CEO of Lorillard, told Congress that "Lorillard does not take any steps to assure a minimum level of nicotine in our products. Lorillard does not add nicotine to cigarette tobacco for the purpose of manipulating or spiking the amount of nicotine received by the smoker."

e.   Edward A. Horrigan, Jr., Chairman and CEO of Liggett Group, Inc., told Congress that "In all my years in this business worldwide, I have never known of a product design objective or goal that included even the notion of spiking the amount of nicotine in a cigarette to achieve a level that would hook or addict smokers."

f.   Thomas E. Sandefur, Jr., CEO of Brown & Williamson, in the face of overwhelming evidence to the contrary, denied secretly growing Y-1 in sworn testimony before Congress on June 23, 1994, and stated that his company was being "set up." He admitted that the company controlled nicotine, but in a shop-worn and now familiar refrain, misrepresented that the company did so only for "taste."

g.   T.R. Riehl, Vice President for Research and Development at Brown & Williamson, denied that the company mixed the tobacco for the Barclay cigarette to have a higher concentration of nicotine and told Congress, "No, sir. We blend for taste, not nicotine." However, internal documents from Brown & Williamson

indicate that Riehl, himself, has conducted research focusing on the adjustment of nicotine and tar levels without regard to taste.

139.   In addition to their misrepresentations to Congress, as recently as April 1994, the cigarette industry placed advertisements across the country denying that it "spikes" cigarettes with nicotine, denying that it believes cigarette smoking is addictive, and misleading the public about whether the cigarette companies deliberately control nicotine levels in their products.

140.   In stark contrast to the Tobacco Companies' representations before Congress and the industry's 1994 advertisements, the FDA published a report in August 1995 entitled Nicotine in Cigarettes and Smokeless Tobacco Products, which stated:

> [C]igarette manufacturers manipulate and control the delivery of nicotine in marketed products.  Cigarettes are designed to supply nicotine at consistent levels despite the wide variations in the nicotine levels of the raw materials, the immensely complicated combustion chemistry, and the complex chemical flow properties of a modern cigarette.

> Manufacturers use many techniques to control nicotine deliveries.   The application of these modifications in cigarette design and their interactive nature pose complex problems in maintaining brand uniformity and consistency regarding nicotine delivery.  Yet, the nicotine content and delivery of each brand of cigarettes is remarkably consistent from batch-to-batch and year-to-year.  This level of control is analogous to that of the pharmaceutical industry in the production of prescription drugs.  In fact, to determine how well nicotine content is controlled in cigarettes, FDA laboratories compared the content uniformity of drugs in tablet or capsule form to the content uniformity of nicotine in cigarettes.  The results showed that nicotine content varies from cigarette to cigarette no more than the content of active ingredients in marketed pharmaceuticals.

> FDA's investigation has also disclosed that the tobacco industry uses a number of methods to boost nicotine delivery in low-yield cigarettes.  The cigarette industry has successfully used these methods to maintain adequate nicotine delivery from low-yield products.  Without the independent manipulation of nicotine, many of the techniques used to reduce tar would also substantially reduce nicotine. Instead, regardless of differences in labeled/advertised FTC nicotine yields and manufacturers' claims of low-nicotine delivery for certain brands, all cigarettes contain approximately the same amount of nicotine in the rod, and deliver about 1 mg of nicotine, enough to produce pharmacological effects.  Moreover, studies by FDA and others have demonstrated that the lowest-yield cigarettes have the

44

highest concentrations of nicotine, demonstrating that nicotine delivery has been independently manipulated.

The tobacco industry's control and manipulation of nicotine delivery from cigarettes provides additional evidence of the industry's intent to deliver pharmacologically satisfying levels of nicotine to smokers.

141. Nicotine manipulation is also a common practice in the smokeless tobacco industry. Indeed, U.S. Tobacco has manipulated the amount of nicotine in is products since at least the 1970s. Like the cigarette companies, U.S. Tobacco carefully monitors the agronomic process related to the tobacco it purchases, and purchases tobacco leaves based upon their nicotine content. Then, various types of tobacco leaves are blended together with other compounds to achieve optimal nicotine content. U.S. Tobacco then carefully controls the levels of "free" nicotine in its products, which determines how much nicotine is actually absorbed into the user's system. The amount of free nicotine is controlled by adjusting the pH of the product, either through a fermentation process, by adding alkaline buffering agent such as sodium bicarbonate and ammonium bicarbonate, or by altering moisture content.

142. According to U.S. Tobacco employees: (1) "U.S. Tobacco routinely adds chemical to its snuff to deliver the free nicotine faster and the make the product stronger," and (2) "The fermentation process involves adding chemicals and, at the end, you add some more chemicals which increase the pH too... Without increasing the pH, you couldn't get nicotine release."

143. U.S. Tobacco has used its manipulation of nicotine content in a carefully designed marketing strategy to attract new users to its smokeless tobacco and then to addict them to the nicotine in its products. This strategy has been described by U.S. Tobacco as a "graduation" strategy because it involves selling products with lower nicotine levels, from which the user graduates to products containing larger doses of nicotine as he becomes more "experienced."

45

144.  This strategy was employed because U.S. Tobacco knows that if new smokeless tobacco users start with one of U.S. Tobacco's high nicotine brands, such as Skoal Fine Cut or Copenhagen, a toxic response to the nicotine such as dizziness or nausea may occur and the novice is more likely to quit before developing a tolerance to the toxic effects of the nicotine. Thus, U.S. Tobacco has developed low nicotine "starter" brands such as Happy Days, Skoal Bandits and Skoal Long Cut.

145.  Indeed, in 1985, Jack Frick, U.S. Tobacco Vice President, explained in a company newsletter that, "[a]s far as our strategy for entering a new market is concerned, for each market there is a set of criteria which have been established, and must be met.  Skoal Bandits is the introductory product, and then we look towards establishing a normal graduation process."

146.  Moreover, according to Ken Carlson, a division manager in U.S. Tobacco's sales department for 1979 to 1986, "they talked about graduation all the time—in sales meting, memos and manuals for the college program.  In was a mantra."

147.  As demonstrated by a 1986 brochure for Skoal Bandits, U.S. Tobacco even instructed new users on how to undertake the graduation process:

> How long should I keep the pouch in my mouth?  If you haven't tried Skoal Bandits before, we recommend that you keep your first one in for about a minute—then remove. The next time you try another one, leave it in for a bit longer.  Like your first beer, Skoal Bandits can be a taste that takes time to acquire and get the most out of.  After four or five Skoal Bandits you'll find you've developed quite a taste for them and you'll want to keep a pouch in as long as the flavor lasts—this varies from person to person.

148.  Not surprisingly, the FDA's 1995 investigation into nicotine and tobacco products confirmed that, with respect to smokeless tobacco products, "tobacco manufacturers control the delivery of nicotine" so that products that deliver lower doses of nicotine are provided to "new users" who are then encouraged by tobacco marketing to "graduate" to products that deliver "higher doses of nicotine."

46

149. It is now without a doubt that defendants secretly manipulated the nicotine levels in cigarettes and smokeless tobacco through a variety of techniques, all with the purpose of hooking people on their products and thus ensuring for themselves repeat business.

## II. TARGETING MINORS

150. Philip Morris and the other Tobacco Companies determined long ago that they need to generate 2 million new smokers per year in order to maintain their revenues. Not content to deceive and hook adults on smoking, the Tobacco Companies unashamedly concluded that children and adolescents were the ideal targets for this new customer base. Indeed, as their own behavioral and psychological research confirmed: i) more than 80% of smokers began smoking when they were under the age of eighteen, and people rarely begin smoking after the age of 25; ii) children and adolescents have impressionable minds and can be more readily convinced to begin smoking than adults; iii) children and adolescents do not yet have a grasp on their mortality; and iv) children and adolescents would get hooked on nicotine before they were old enough to make a reasoned decision whether to smoke. In addition, children and adolescents have the longest life span out of the pool of potential new smokers, and thus would ensure defendants the greatest amount of repeat business.

151. The following internal documents glaringly evidence Philip Morris' deliberate focus on young people, and the research it conducted regarding the same:

    i)     A 1969 research report presented to Philip Morris' Board of Directors concluded that, "The 16 to 20-year old begins smoking for psychosocial reasons. The act of smoking is symbolic; it signifies adulthood, he smokes to enhance his image in the eyes of his peers."

    ii)    In 1974, Philip Morris conducted a study in an attempt to determine which children in particular might be more likely to become smokers. One theory posited in this regard was as follows:

It has been found that amphetamines, which are strong stimulants, have the anomalous effect of quieting these children down.... Many children are therefore regularly administered amphetamines throughout grade school years.... We wonder whether such children may not eventually become cigarette smokers in their teenage years as they discover the advantage of self-stimulation via nicotine. We have already collaborated with a local school system in identifying some such children in the third grade.

\*\*\*

We don't propose giving cigarettes to first graders, of course, but we think that it is quite possible that as such children reach adolescence at least some of them will find that smoking produced--for them--the advantage of improving their ability to concentrate.

iii)     A 1974 Philip Morris marketing study states: "With the intention of probing the dynamics of the market.... In this study, no lower age limit was set."

iv)     A 1981 Philip Morris document refers specifically to teenagers:

It is important to know as much as possible about teenager smoking patterns and attitudes. Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens.... [S]moking patterns of teenagers are particularly important to Philip Morris.... Because of our high share of the market among the youngest smokers, Philip Morris will suffer more than the other companies from the decline in the number of teenage smokers.

v)     Another 1981 Philip Morris document states:

The most important finding, and the one of the greatest significance to the company, is...price elasticity of cigarettes among teenagers.... [A] ten percent increase in price would lead to a decline of 12 percent in the number of teenagers who would begin to smoke.... We can never look with equanimity on increases in excise tax;

vi)     A 1983 Philip Morris document states:

You may recall that two years ago I wrote a memo and gave talks at a Richmond meeting and in New York on trends in smoking prevalence among high school seniors and college freshman. At that time smoking prevalence was declining at an increasing rate, and that fact, plus the decline in the absolute number of people reaching 18, did not augur well for future cigarette sales.... I have just received data on the graduation class of 1982 [high school] and the results are much more encouraging.

152.   Philip Morris' aggressive foray into the youth market is illustrated by the fact that its brand names, logos and advertising messages pervade all aspects of young people's lives. Indeed, they appear on billboards and in stores located near schools, on trains and buses, in magazines with high-youth readership, in newspapers, on clothing, and on countless other goods. The uniform message conveyed through this advertising, moreover, is that tobacco use is desirable, "cool," sexy, glamorous, adventurous, socially beneficial, socially acceptable and healthy.

153.   The "Marlboro Man," a particularly well known cigarette advertising campaign of Philip Morris', presents an image of adventure and freedom.   Such advertising appeals to the need of young persons to express their independence, adulthood and sense of adventure.

154.   While the Marlboro Man was intended to appeal to young male smokers, Philip Morris has also specifically targeted young females with brands such as Virginia Slims.

155.   Philip Morris has had particular success in appealing to adolescent girls with its "You've Come a Long Way Baby" campaign, promoting Virginia Slims cigarettes.   This campaign played on two of the most important psychological needs of most adolescent girls: i) to become independent from their parents, and ii) to be perceived as slim and attractive.  Indeed, by associating smoking with women's liberation, Virginia Slims represents in the minds of teenage girls that smoking is a symbol of autonomy and independence.  Moreover, by associating their cigarettes with images of thin and glamorous models, Philip Morris conveys the image that smoking will help girls to lose weight, and look slim and beautiful.  Indeed, the very name, Virginia Slims, is suggestive.  Also with regard to their marketing to young girls, Philip Morris placed particularly clever ads in nearly every issue of magazines for young girls, like *Teen* and *Young Miss*.

156.   Philip Morris has also intentionally placed advertisements in locations close to high schools and other areas frequented by adolescents.   A July 1995 report by the California Department of Health Services found that stores within 1,000 feet of a school had significantly more tobacco advertising and promotions than average.   Stores near schools were more likely to have at least one tobacco advertisement placed next to candy or displayed at three feet or below. A significantly higher average number of tobacco advertisements also were found on the exterior of stores located in young neighborhoods--communities in which at least one-third of the population was 17 years of age or less.

157.   Another strategy that Philip Morris and other tobacco companies use to appeal to children and adolescents is to distribute promotional items, such as t-shirts, baseball caps and pocket knives, through the mail and at promotional events.   These items have a great appeal to young people and indeed encourage them to accumulate merchandise by buying more cigarettes. More importantly, the items, which do not generally display warning labels, turn the children into walking advertisements that penetrate into schools and other areas where advertising would otherwise be restricted.   A 1992 Gallup Poll found that about half of adolescent smokers and one-quarter of non-smoking adolescents had received at least one of these items.

158.   The sponsorship and placement of billboards at sporting and entertainment events is another effective means of furtive advertising to children.   Such advertising makes its way onto television, where cigarette advertising is otherwise prohibited.   By way of example, when the 1989 Marlboro Grand Prix was televised, the Marlboro logo could be seen for 46 of the 94 total minutes of the event's broadcast time.

159.   Philip Morris' and the other Tobacco Companies' marketing efforts have paid off. Indeed, the prevalence of tobacco use among adolescents is continually increasing.   In 1993 in

Illinois, 29.1% of high school students reported that they had smoked in the past month, and 16.2% of all high school boys had used smokeless tobacco products.

160.   Further, studies also demonstrate the success of the Tobacco Companies' efforts to target girls under the age of 18.   Starting in 1987, with the commencement of new campaigns targeting young girls, there was a sharp rise in new users in the 12-17 year old age group.   The jump was 100% in 12 year olds; 55% among 13 year olds; 70% among 14 year olds; 75% among 15 year olds; 55% among 16 year olds; and 35% among 17 year olds.

161.   Despite the overwhelming evidence of their attempts--and success--at capturing the youth market, Philip Morris and the other Tobacco Companies continue to deny any youth-directed advertising and promotional activities.   The Tobacco Companies claim instead that the purpose and effect of their advertising is the establishment and maintenance of brand loyalty pertaining to existing adult smokers only, and that their advertising plays no role in encouraging children and adolescents to experiment with tobacco products.

162.   In fact, the Tobacco Companies have launched a number of campaigns designed to make the public at large believe that the companies wish to discourage young people from smoking.   In reality, such campaigns have the purpose and effect of assuaging parental and governmental concerns while imposing minimal restraints on, or even ironically enhancing, Tobacco Companies' ability to continue to market to children and adolescents.

163.   In 1965, for example, in response to the Federal Trade Commission's efforts to regulate cigarette advertising, the cigarette companies created a self-regulatory advertising and promotional code.   The code prohibited testimonials from athletes or other celebrities perceived to appeal to the young, representations that smoking was essential to social success, representations that the healthiness of models was due to cigarette smoking, the use of models

who were participating in physical activity or the use of models who were younger, or appeared younger, than 25 years of age. Such guidelines have been routinely ignored and violated. Indeed, four months after the code had been put into effect, Viceroy ads depicted tennis players smoking, Salem ads utilized images of a young couple playing alongside a waterfall and a television producer admitted to searching for models for cigarette advertisements who were over 25 but looked younger.

164.   Also evidencing Philip Morris' lack of any serious desire to discourage young people from smoking is its knowledge of the ease with which minors can obtain tobacco products, and its failure to take steps to prevent such distribution to minors. For example, despite the fact that Philip Morris had promised to suspend merchandising payments to merchants caught selling to minors, and despite the fact that Philip Morris had been informed of a number of merchants who were convicted of selling to minors, Philip Morris has admitted that not one merchandising payment in the entire country has been suspended under this program. Instead, the Philip Morris actively encourages such distribution through their advertising and marketing practices.

165.   As demonstrated above, Philip Morris' pervasive and effective advertising aimed at the young associates tobacco use with fun, glamour, athletics, success, sex, independence, a sense of adventure, and as the "in" thing to do. These advertisements indeed encourage young people to try smoking, and within a short period of time, the young person becomes addicted to tobacco. Later, as the maturing tobacco user begins to wish he or she could quit, advertising reinforces the practice, and seeks to minimize health concerns and create doubt and confusion. Philip Morris' conduct in this regard is particularly unconscionable in that it is directed to persons who lack the maturity, judgment and experience of adults. Moreover, Philip Morris

knows that the products it is pushing at these minors are harmful to their health, addictive and have had their addiction inducing component manipulated to ensure addiction.

166.   Philip Morris' pervasive marketing and advertising campaigns, unlawfully targeted toward minors, influenced plaintiffs and the 'targeting minors' class in a direct or indirect way to begin smoking, and continue to effect the youth market in the same way.

## III.   LIGHT CIGARETTES

167.   This section concerns Philip Morris' fraudulent conduct in manufacturing, distributing, advertising, promoting, marketing and selling Marlboro Lights cigarettes, its "light cigarettes."

168.   In the 1950s and 1960s, scientific reports revealed a dose-response relationship between smoking and cancer.  Specifically, the research showed that the incidence of cancer was proportionately related to the level of exposure to the components of cigarette smoke, e.g. tar, nicotine and carbon monoxide.   Furthermore, several laboratory studies demonstrated that carcinomas were not generated below a particular dose level.

169.   The United States Federal Trade Commission ("FTC") was concerned by the dose-response findings and sought out a way to provide consumers with a meaningful method of comparing the tar and nicotine doses of the cigarette brands on the market.  In 1967, the FTC approved the Cambridge Filter System for this purpose.  The Cambridge Filter System purported to measure the amount of tar and nicotine in a cigarette with a machine that "mimics" human smoking behavior.  The "inhaled" material is collected on a pad, extracted, and analyzed to arrive at the tar and nicotine yield levels of that particular cigarette.

170.   Also largely due to the dose-response studies, in the early 1970s, Philip Morris began manufacturing and marketing Marlboro Lights as having "Lowered Tar & Nicotine."  (See Ex. A.)

53

Unbeknownst to the public, the theory behind light cigarettes is essentially "dilution" of tar and nicotine through a design change to the filter--not to the cigarette or its contents. That is, two rows of ventilation holes are placed on the cigarette's filter, which make it possible for the smoker to draw in additional air when inhaling. In theory, the additional air mixes with the tar, nicotine, and carbon monoxide in the smoke, thereby reducing the relative levels of these substances per volume of smoke that enters the smoker's body.

171.   When tested by the Cambridge Filter System, Marlboro Lights indeed indicate a lower tar and nicotine content than regular cigarettes. "Light cigarettes" have come to be generally defined as those that generate a reading from the Cambridge Filter System as containing between six and fourteen milligrams of tar.

172.   Philip Morris knew from almost the beginning, however, that cigarettes with a "light" filter could trick the Cambridge Filter System--i.e., it was not an accurate or reliable barometer of a light cigarette's tar and nicotine content. In a 1974 Philip Morris internal memorandum entitled "Some Unexpected Observations on Tar and Nicotine and Smoker Behavior," the author noted: "Generally, people smoke in such a way that they get more than predicted by machines. This is especially true for dilution cigarettes [i.e. low tar, low nicotine].... The FTC standardized test should be retained: It gives low ratings."

173.   More specifically, Philip Morris realized that although the ventilation holes on Marlboro Lights' filters are essential to achieving the lower tar and nicotine readings on the machine, those ventilation holes are useless to smokers because the holes are placed in the area of the filter that is covered by the smoker's lips or fingers. This blocking problem is exacerbated by the fact that the ventilation holes are virtually invisible the naked eye, and are not marked (e.g. with a colored band or some other method) to indicate their location. The ventilation holes are not

blocked when tested by the Cambridge Filter System and thus they perform their dilution function during the test. As a result of the Marlboro Lights design, the cigarettes under normal use do not fulfill Philip Morris' claims of "Lowered Tar & Nicotine."

174. Significantly, blocking even some of the ventilation holes in light cigarettes can dramatically increase the smoker's exposure to the tar and nicotine contained in cigarette smoke. One Center for Disease Control study shows that blocking just half of the ventilation holes in a cigarette containing 4 mg. of tar, 0.5 mg of nicotine, and 5 mg of carbon monoxide increased the Cambridge Filter System tar yields by 60%, nicotine yields by 62% and carbon monoxide yields by 73%. Based on this study, smokers of so-called "light" cigarettes which measure less than 15 mg. of tar who block just half of the filters' vent holes could inhale as much, or even more, tar, nicotine, and carbon monoxide as that from a regular filtered cigarette.

175. To illustrate, the Cambridge Filter System report on tar, nicotine and carbon monoxide of the smoke of the 1,206 varieties of domestic cigarettes for the year of 1994 lists the Marlboro cigarette as containing 16 mg. of tar, 1.1 mg. of nicotine, and 14 mg. of carbon monoxide, and the Marlboro Lights cigarette as containing 10 mg. of tar, 0.8 mg. of nicotine, and 11 mg. of carbon monoxide. Based on the CDC study, blocking just half of the vent holes on a Marlboro Lights would result in the ingestion of 16mg. of tar, nearly 1.3 mg. of nicotine, and 19 mg. of carbon monoxide, or the same amount of tar, and even more nicotine and carbon monoxide than regular Marlboro cigarettes.

176. Philip Morris has and continues to engage in deceptive and unlawful conduct in connection with the manufacture, distribution, advertising, promotion, marketing and sale of Marlboro Lights cigarettes by falsely claiming that their product has "Lowered Tar & Nicotine" in comparison to regular cigarettes.

## IV.   FURTHER EVIDENCE OF THE WILLFUL AND WANTON NATURE OF DEFENDANTS' CONDUCT

177.   As described above, defendants defrauded the plaintiffs and putative subclasses by misrepresenting and concealing the addictive nature of nicotine, and by secretly manipulating the nicotine content in their products.   Moreover, they targeted tobacco to minors and defrauded plaintiffs with regard to light cigarettes.   As further evidence of defendants' utter disregard for the truth and the overall egregiousness of their conduct, defendants' behavior with regard to disseminating information relating to the link between smoking and disease is set out below.

178.   Defendants set out to deliberately confuse and mislead the public with regard to the causal connection between smoking and disease.   This strategy is succinctly set out in the following internal document by a TI official:

> For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts – litigation, politics, and public opinion.   While that strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not – nor was it ever intended to be – a vehicle for victory.   On the contrary, it has always been a holding strategy, consisting of * creating doubt about the health charge without actually denying it * advocating the public's right to smoke, without actually urging them to take up the practice * encouraging objective scientific research as the only way to resolve the question of the health hazard.
>
> As an industry, therefore, we are committed to an ill-defined middle ground which is articulated by variations on the theme that, 'the case is not proved.'
>
> In the cigarette controversy, the public – especially those who are present and potential supporters (e.g. tobacco state congressman and heavy smokers) – must perceive, understand, and believe in evidence to sustain their opinions that smoking may not be the causal factor.   As things stand, we supply them with too little in the way of ready-made credible alternatives.

179.   Characteristically, there was a vast difference between what the defendants knew and what they said with regard to smoking and health.   Indeed, in 1953, the same year as the "Big Scare" described in paragraph 28, above, Reynolds' own Claude Teague conducted an internal

survey of cancer research and concluded that "studies of clinical data tend to confirm the relationship between heavy and prolonged tobacco smoking and the incidence of lung cancer." Teague recommended that the "management take cognizance of the problem and its implications to our industry."

180.   Nevertheless, in their January 1954 "Frank Statement to Cigarette Smokers," the Tobacco Companies represented that "there is no proof that cigarette smoking is one of the causes" of lung cancer, and that "we believe the products we make are not injurious to health."

181.   A 1956 internal memorandum from Philip Morris' Vice-president of Research and Development to top executives at the company stated that: "Decreased carbon monoxide and nicotine are related to decreased harm to the circulatory system as a result of, smoking.... Decreased irritation is desirable...as a partial elimination of a potential cancer hazard."

182.   In March 1957, moreover, one of Brown & Williamson's British affiliates, which conducted much of the health research for Brown & Williamson, stated in an internal report that "[a]s a result of several statistical surveys, the idea has arisen that there is a causal relation between zephyr and tobacco smoking, particularly cigarette smoking."   "Zephyr" was a code name for cancer.

183.   Nevertheless, on December 16, 1957, the Tobacco Companies, through TIRC, issued a release misrepresenting that "extensive scientific research now underway into tobacco use does not substantiate generalized charges against smoking as a cause of lung cancer."

184.   Adding to the internal evidence of the harms associated with smoking was a 1958 memorandum from a Philip Morris researcher to the company's Vice-president of Research, who later became a member of the Board of Directors: "the evidence...is building up that heavy

cigarette smoking contributes to lung cancer either alone or in association with physical and physiological factors...."

185.   Again, however, on December 27, 1958, the Tobacco Companies, through TIRC, issued a release which provided the following false reassurance:

> At its formation in January 1954, the Tobacco Industry Research Committee stated its fundamental position: We believe the products we make are not injurious to health. We are providing aid and assistance to research efforts into all phases of tobacco and health.
>
> That statement and pledge are reaffirmed today by members of the Tobacco Industry Research Committee.

186.   Similarly, on March 28, 1960, again through TIRC, the Tobacco Companies issued a release challenging any link between smoking and lung cancer.  In the release, the companies repeated that "we have frankly accepted a responsibility for financing independent research into health problems, including lung cancer, in an effort to get needed facts and evidence."

187.   A 1961 internal document presented to the Philip Morris Research and Development Committee by the company's Vice-president of Research and Development included a section entitled "Reduction of Carcinogens in Smoke." The document states in part:

> To achieve this objective will require a major research effort, because Carcinogens are found in practically every class of compounds in smoke.  This fact prohibits complete solution of the problem by eliminating one or two classes of compounds.
>
> The best we can hope for is to reduce a particularly bad class, i.e. the polynuclear hydrocarbons, or phenols...
>
> Flavor substances and carcinogenic substances come from the same classes, in many instances.

188.   Moreover, a 1961 "confidential" memorandum from a consulting research firm hired by Liggett to do research for the company stated:

> There are biologically active materials present in cigarette tobacco.

58

They are:     a)     cancer causing

              b)     cancer promoting

              c)     poisonous

              d)     stimulating, pleasurable, and flavorful.

189.   Apparently sensing future problems, a research executive stated at a 1962 meeting of the BAT Group in Southampton, England that he "thought we should adopt the attitude that the causal link between smoking and lung cancer was proven because then at least we could not be any worse off." This suggestion was clearly never heeded. Rather, the deceit continued.

190.   Indeed, in 1963, Brown & Williamson failed to disclose what it knew about the adverse effects of smoking to the Surgeon General, who was preparing his first official report on cigarettes. Addison Yeaman, then General Counsel for Brown & Williamson, partook in the internal debate relating to this disclosure. In this regard, Yeaman submitted an analysis stating that:

              a.     "[N]icotine is addictive."

              b.     "We are, then, in the business of selling nicotine, an addictive drug..."

              c.     Cigarettes "cause, or predispose, lung cancer..."

              d.     "They contribute to certain cardiovascular disorders..."

              e.     "They may well be truly causative in emphysema, etc."

191.   Yeaman suggested that Brown & Williamson "accept its responsibility" and disclose the hazards of cigarettes to the Surgeon General. He noted that this would allow the company to openly research and develop a safer cigarette. Yeaman warned, however, that one danger of candid disclosure was that jurors would learn that the cigarette companies knew of hazards of their products and had the means to make a safer cigarette--but didn't. Yeaman noted that this

might cause an "emotional reaction" in jurors. Ultimately, Yeaman's suggestions regarding full disclosure were rejected.

192. In line with Brown & Williamson, Liggett also withheld from the Surgeon General the views of its researchers and consultants that the evidence showed that cigarette smoking causes human disease. An internal Liggett document called "Draft of an Outline for a Background Paper on the Smoking Problem to be Used in Connection with a Presentation of Arguments Before the Surgeon General's Committee," it stated:

a.   "All Types of Smoking are Associated with Increased Mortality form all causes combined...."

b.   "For cigarette smokers who smoke regularly, excess mortality increases with current number of cigarettes smoked...."

c.   "Lung cancer extremely rare among nonsmokers...."

d.   As "reported by Hammond...Excess Mortality [is] (1) higher for cigarette smokers than others and (2) increases with daily cigarette consumption."

e.   "For both sexes, all chronic respiratory diseases, chronic bronchitis, irreversible obstructive lung diseases...increased in prevalence with increasing current amount of smoking." (Emphasis in original.)

The report Liggett presented to the Surgeon General contained none of these conclusions.

193. Internal evidence continued to accumulate regarding the adverse health effects of smoking. A 1963 memorandum to Philip Morris' President and CEO from the company's Vice-president of Research, for example, describes a number of classes of compounds in cigarette smoke which are "known carcinogens." The document goes on to describe the link between smoking and bronchitis and emphysema:

Irritation problems are now receiving greater attention because of the general medical belief that irritation leads to chronic bronchitis and emphysema. These are serious diseases involving millions of people. Emphysema is often fatal either directly or through other respiratory complications. A number of experts have

predicted that the cigarette industry ultimately may be in greater trouble in this area than in the lung cancer field.

The Tobacco Industry, however, continued to conceal and deny such links.

194.   During the course of the conspiracy, moreover, Brown & Williamson, among other Tobacco Companies, continued to conduct and suppress biological research.  Some of these research projects confirmed causation.  The more sensitive research was often undertaken by Brown & Williamson's British affiliate, acting on behalf of the BAT Group.  Much of the work was performed at a British laboratory called Harrogate, at which research was performed for a number of other cigarette manufacturers as well.  The negative results of the Harrogate research were also concealed.

195.   Continuing with their "open controversy" strategy, in 1967, American Tobacco issued a release describing a 46 page booklet prepared by the Tobacco Industry which "refutes anticigarette charges."  In that booklet, American Tobacco called the evidence on smoking and health "an open one," refuted the studies linking smoking with cancer in mice, and claimed that "no one does more" about smoking and health than "The Tobacco People."

196.   At a March 8, 1968 New York meeting between the American and British tobacco company lawyers at CTR's offices, the U. K. representatives stated to all present that "the research at Harrogate had gone further than the previous work of Wynder in that fresher condensates had been used and the carcinogenic effect was not an artifact due to storage."  The U. K. lawyers also made it known to all present that "[t]he medical profession in the United Kingdom is unanimously convinced that the causative hypothesis is valid and this is taken for granted in regard to their attitude to smoking."  Nevertheless, all present agreed to maintain the party line, which, among other things, was "The causation theory remain an unproved hypotheses and there is no further scientific data to confirm it."

61

197. Evidencing the defendants' continuing commitment to a united front was the following: When a U.S. Tobacco employee stated in 1977 to *The New York Times* that "[smokeless tobacco] presents the least possible danger of all [and] that it's when you light tobacco that you start doing damage," U.S. Tobacco apologized to each of the cigarette companies and fired the employee who made that statement. U.S. Tobacco did this even despite the fact that the statement did not implicate its own products, i.e. smokeless tobacco.

198. Moreover, in 1979, TI issued a document entitled "Tobacco Industry Research on Smoking and Health." The report, among other things, described how the industry spent $82 million in research "into all phases of tobacco use and health." The report then misrepresented that "the findings are not secret" and reaffirmed the false commitment of the tobacco industry:

> From the beginning the tobacco industry has believed the American people deserve objective, scientific answers.

> With this credo in mind, the tobacco industry stands ready today to make new commitments for additional valid scientific research that may shed light on the question of smoking and health.

199. In June 1980, at a Conference on Research Needs on Low Yield Cigarettes, Dr. William Castelli of the Framingham Heart Study stated with regard to low yield cigarettes that we could be "looking at a lower dose with the same poisons which take a longer time to do their dirty work." This statement was cited to in a BAT Industries "Personal-Confidential, For Use of Counsel Only" memorandum.

200. On September 23, 1981, all of the Tobacco Companies, except U.S. Tobacco, met at a Committee of Counsel meeting to discuss how to respond to the government's inquiry regarding cigarette additives. Lorillard, for example, wanted to "stall any disclosure by [the] industry for as long as possible" and suggested, along with other companies, the appointment of an independent toxicologist to review the additives. The Tobacco Companies had apparently not

engaged in a full review of their additives on their own. Indeed, the companies speculated at the September 23 meeting about what a toxicologist might find, and contemplated that a toxicologist "would probably find four or five substance which were problems." Meeting attendee Bob Northrip suggested that, rather than an independent toxicologist, there should be "company review and testing of additives." In this event, "[i]f company testing began to show adverse results pertaining to a particular additive, the company control would enable the company to terminate the research, remove the additive, and destroy the data."

201. In a March 8, 1983 internal--and particularly morbid--Reynolds memorandum, it is stated that "for several years, [Reynolds] Germany has had problems with Dr. Adolkofer, the Scientific Director of [CTR's German counterpart] Verband." This is because Dr. Adolkofer "believes and openly expresses his view that smoking causes lung cancer and other diseases." The memorandum further states that Dr. Adolkofer "believes that smoking is killing a couple of hundred thousand people a year and...his job is to cut that figure down to only 50,000 or so."

202. Consistent with defendants' pattern of deception, despite all of the internally known evidence to the contrary, Edward Horrigan, Chairman and CEO of Reynolds, testified before Congress in 1994 that as far as the industry was concerned "no causal link has been shown" between smoking and heart disease, lung disease and cancer.

### The Tolling of the Statute of Limitations

203. The statute of limitations for the portion of this action brought under the Illinois Consumer Fraud and Deceptive Business Practices Act was tolled as of November 12, 1996 because: i) the Illinois Attorney General filed an action in the Circuit Court of Cook County on that date; ii) the present action is based in whole or in part on matters complained of in the

Attorney General's action, and iii) the Attorney General's action was pending when this action was filed.

204.  Furthermore, all applicable statutes of limitation have been tolled by the defendants' affirmative and intentional acts of fraudulent concealment, suppression and denial of the facts as alleged herein.  Such acts of fraudulent concealment include, but are not limited to, intentionally covering up and refusing to disclose internal documents, shipping documents overseas in an attempt to prevent discovery of the same, improperly abusing the attorney/client privilege and work-product privileges to prevent discovery of non-privileged documents, and suppressing and subverting medical and scientific research, and the many misrepresentations set forth herein.

205.  Because of defendants' fraudulent and active concealment in this regard, plaintiff and putative class members could not reasonably have discovered the wrongdoing until sometime after August 1995--i.e., after the FDA published its report entitled <u>Nicotine and Smoke in Cigarettes and Smokeless Tobacco Products</u>.  In that report, the FDA elicited information regarding nicotine, including the fact that the Tobacco Companies manipulate and control the levels of nicotine in their tobacco products.  That Report eventually became a catalyst for at least some public disclosure that new smokers had been duped into believing that they could begin smoking without subjecting themselves to the risk of nicotine addiction.

206.  In the alternative, the defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment of the addictive nature of nicotine and the Tobacco Companies' control of nicotine levels in their tobacco products.

## Class Action Allegations

207.  Plaintiffs' proposed classes are defined as follows:

Class A:    All Illinois residents who, between December 14, 1953 (the date the conspiracy began) and July 27, 1965 (the effective date of the federal labeling act), purchased and used tobacco products manufactured by the Tobacco Companies, and the estates, representatives, guardians and administrators of all Illinois residents who purchased and used tobacco products manufactured by the Tobacco Companies between December 14, 1953 and July 27, 1965;

Class B:    All Illinois residents who, as minors, purchased and smoked cigarettes designed, manufactured, promoted, or sold by Philip Morris, and the estates, representatives, guardians and administrators of all Illinois residents who, as children, purchased and smoked cigarettes designed, manufactured, promoted, or sold by Philip Morris; and

Class C:    All Illinois residents who purchased and smoked Marlboro Lights cigarettes from the time such cigarettes were placed into the stream of commerce to present, and the estates, representatives, guardians and administrators of all residents of Illinois who purchased and smoked Marlboro Lights cigarettes from the time such cigarettes were placed into the stream of commerce to present.

208.  This action is brought, and may properly be maintained, as a class action pursuant to the provisions of 735 ILCS 5/2-801.

209.  Members of the class and subclasses are so numerous that individual joinder is impracticable.  The total number of class and subclass members is unknown to plaintiffs at this time, but is reasonably believed to be in excess of one million people.  Members of the class and subclasses may be notified and informed of the pendency of the action by several means, including the print media, the broadcast media, internet web sites, and the establishment of a 1-800 number to answer questions and provide updated information concerning the status of the case.

210.  Common questions of law or fact exist as to all members of the class and subclasses and predominate over any questions affecting only individual members of the class and subclasses.  These common legal and factual questions arise from the following central issues, which do not vary from class/subclass member to class/subclass member:  the defendants' course of conduct in the research, design, manufacture, promotion, and sale of cigarettes and smokeless tobacco products, and from the characteristics of the products themselves.

211.  These common legal and factual questions regarding the class and subclasses include, but are not limited to, the following:

-Whether nicotine is addictive;

-Whether and when the defendants knew or but for their deliberate ignorance would have known that nicotine is addictive;

-Whether the defendants knew or but for their deliberate ignorance would have known that the levels of nicotine in the Tobacco Companies' cigarettes and smokeless tobacco products were and are addictive;

-Whether the defendants' course of conduct in concealing that nicotine is addictive constitutes fraudulent concealment;

-Whether the defendants knowingly and intentionally joined in a common scheme to conceal information and provide misleading information to plaintiff and the class about nicotine's addictiveness, and whether such conduct constitutes fraudulent concealment;

-Whether Philip Morris engaged in a course of conduct in which it targeted cigarette advertising and marketing to minors, and whether such conduct constitutes a violation(s) of the Illinois Consumer Fraud and Deceptive Business Practices Act;

-Whether Philip Morris intended to deceive class C in its representations regarding the content of Marlboro Lights cigarettes and whether such conduct constitutes a violation(s) of the Illinois Consumer Fraud and Deceptive Business Practices Act;

-Whether defendants have been unjustly enriched by the classes' purchases of defendants' products;

-Whether the class members are entitled to damages;

66

-Whether the defendants are liable to members of the classes for punitive or exemplary damages, and, if so, how much is necessary and appropriate to punish them for their conduct, to deter the defendants and others, and to fulfill the other policies and purposes of punitive or exemplary damages; and

-Whether defendants must pay the classes' attorneys' fees and costs.

212.   Plaintiffs will fairly and adequately protect the interests of the class and subclasses. Plaintiffs do not have any interests which are adverse to the other class members. Plaintiffs have retained competent counsel who are experienced in the prosecution of complex consumer and fraud class actions. Plaintiffs intend to vigorously prosecute this action, to conclusion, for the benefit of the class.

213.   A class action is an appropriate method for the fair and efficient adjudication of this litigation because the joinder of all putative class members is impracticable. In addition, the number of individual claims which would otherwise be filed by putative class members would be unduly burdensome to the courts in which such individual litigation would proceed. Individual litigation would also magnify the delay and expense to all parties in litigating the wrongdoing, injuries, and harm caused by the defendants.

214.   In contrast, the class action device presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court. Concentrating this litigation within one forum will aid with judicial economy and efficiency and promote parity among the claims of the putative class, as well as provide judicial consistency.

## Count I
### Fraudulent Concealment
### (All Defendants)

215.  Plaintiffs repeat and reallege paragraphs 1 through 214 as paragraph 215, and state that this count is brought by Trenholm individually and on behalf of Class A.

216.  Defendants have known since at least 1953 that nicotine is addictive.

217.  That nicotine is addictive is a material fact that Trenholm and putative Class A were entitled to know in order to made an informed decision as to whether to smoke or use tobacco products.

218.  Defendants, armed with this superior knowledge, had a duty to disclose the fact that nicotine is addictive to the public.

219.  Defendants intended that plaintiffs would rely upon their concealment of material facts by purchasing defendants' products in ignorance of the risk that plaintiffs could become addicted to nicotine.

220.  Defendants' above described fraudulent concealment was a proximate cause of Trenholm's and Class A's decision to (a) purchase and use cigarettes and/or smokeless tobacco products manufactured by the Tobacco Companies' when they would not otherwise have done so; and (b) the economic losses suffered by Trenholm and Class A consisting of the cost of purchasing such cigarettes and/or smokeless tobacco products.

221.  Each defendant is sued as a co-conspirator for having knowingly and intentionally joined in and acted in furtherance of a common scheme to fraudulently conceal from Trenholm and proposed Class A that fact that nicotine is an addictive substance.

WHEREFORE, Trenholm, individually and on behalf of putative Class A, requests that judgment be entered in their favor and against all defendants, and that Trenholm and Class A be awarded the following relief:

A.      Damages to compensate them for all the economic losses they have sustained to date as the result of defendants' conduct, but in no event more than $75,000 each, inclusive of punitive damages, attorneys' fees, costs and interest;

B.      Punitive and exemplary damages in an amount sufficient to punish defendants and deter them and others from similar wrongdoing; and

C.      An order enjoining defendants from pursuing the policies, acts, and practices complained of herein.

**Count II**
**Unjust Enrichment**
**(All Defendants)**

222.   Plaintiffs repeat and reallege paragraphs 1 through 214 as paragraph 222, and state that this count is brought by Trenholm individually and on behalf of Class A.

223.   A party is unjustly enriched when it retains a benefit to the detriment of another party against the fundamental principles of justice, equity and good conscience.

224.   Here, defendants have reaped billions of dollars in profits as a result of their scheme to deceive plaintiffs and the proposed class regarding the addictive nature of nicotine.   That defendants have amassed such earnings pursuant to this behavior violates the fundamental principles of justice, equity and good conscience.

225.   Defendants have been and continue to be unjustly enriched through the effectuation of their conspiracy.

226.   Trenholm and putative Class A seek to have defendants disgorge their unjust enrichment from the profits they have amassed pursuant to their conspiracy to defraud.

WHEREFORE, Trenholm, individually and on behalf of putative Class A, request that judgment be entered in their favor and against all defendants, and that Trenholm and Class A be awarded the following relief:

A.      That defendants be ordered to disgorge all profits unjustly received through their sale of cigarettes to Trenholm and Class A, which in no

event will be greater than $75,000 each, inclusive of punitive damages, interest and costs; and

B.      Punitive or exemplary damages in an amount sufficient to punish defendants and deter them and others from similar wrongdoing.

<u>Count III</u>
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/2**
**(Philip Morris/Targeting Minors)**

227.    Plaintiffs repeat and reallege paragraphs 1 through 214 as paragraph 227, and state that this count is brought individually and on behalf of Class B.

228.    This count is brought pursuant to Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA").  815 ILCS 505/2.

229.    Plaintiffs are consumers entitled to the protections of the CFA.

230.    Philip Morris' act of targeting its cigarette marketing and advertising toward minors is an unfair business practice under Section 2 of the CFA for at least three independent reasons:

(i) The Marlboro Man and 'You've Come a Long Way Baby' advertising campaigns unfairly target minors, luring them into becoming smokers before they have achieved the maturity necessary to make an informed decision regarding whether to take up smoking;

(ii) Philip Morris' knows or should know that its advertising campaigns encourage minors to take up smoking before they have achieved the maturity necessary to make an informed decision regarding whether to take up smoking, and thereby encourages minors to violate the law, namely 720 ILCS 675/1, which provides the 'No minor under 18 years of age shall buy any cigar, cigarette, smokeless tobacco or tobacco in any of its forms.'; and

70

(iii) Philip Morris' advertising campaigns solicit, encourage and/or aid and abet illegal conduct by cigarette retailers, namely 720 ILCS 675/1, which states that "No person shall sell, buy for, distribute samples of or furnish any cigar, cigarette, smokeless tobacco or tobacco in any of its forms, to any minor under 18 years of age."

231. Section 2 of the CFA also prohibits "deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, … misrepresentation or the concealment… of any material fact…." Philip Morris has deceived and defrauded plaintiffs and Class B by denying that it's advertising campaigns target minors, and claiming that it does not want to know what would motivate a child to smoke.

232. Philip Morris' pervasive marketing and advertising campaigns, unlawfully targeted toward minors, influenced plaintiffs and Class B in a direct or indirect way to begin smoking, and continue to effect the youth market in the same way.

233. The above described CFA violations were a proximate cause of: (a) plaintiffs' and Class B's decision to purchase and use cigarettes manufactured by Philip Morris when they would not otherwise have done so; and (b) the economic losses suffered by plaintiffs and Class B consisting of the cost of purchasing such cigarettes.

WHEREFORE, plaintiffs, individually and on behalf of the putative Class B, request that judgment be entered in their favor and against all defendants, and that plaintiffs and Class B be awarded the following relief:

A.      Damages to compensate them for all the economic losses they have sustained to date as the result of Philip Morris' conduct, but in no event more than $75,000 each, inclusive of punitive damages, attorneys' fees, costs and interest;

B.      An award of reasonable attorneys fees and costs of suit;

C.  Punitive and exemplary damages in an amount sufficient to punish Philip Morris and deter it and others from similar wrongdoing; and

D.  An Order enjoining Philip Morris from failing or refusing to stop targeting its cigarettes to minors.

<u>Count IV</u>
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/2**
**(Philip Morris/Light Cigarettes)**

234.   Plaintiffs repeat and reallege paragraphs 1 through 214 as paragraph 234, and state that this count is brought individually and on behalf of Class C.

235.   This count is brought pursuant to Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA").  815 ILCS 505/2.

236.   Plaintiffs are consumers entitled to the protections of the CFA.

237.   Section 2 of the CFA prohibits:  "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, ... misrepresentation or the concealment... of any material fact..., or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act."  Section 2 of the Uniform Deceptive Trade Practices Act, moreover, prohibits:  "(5) represent[ing] that goods...have ingredients...that they do not have....  (9) advertis[ing] goods...with intent not to sell them as advertises....  (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

238.   Philip Morris intended to deceive plaintiffs and the proposed Class C in violation of the CFA by promoting and selling Marlboro Lights in Illinois through their course of misrepresenting and concealing material facts regarding the true content of the cigarettes.

239.   Philip Morris intended that plaintiffs would rely upon their misrepresentations and concealment of material facts by purchasing Marlboro Lights in ignorance of their true content of

hazardous substances, which was equal to or greater than that in regular cigarettes when smoked by humans in the usual and customary way.

240.   The above described CFA violations were a proximate case of:  (a) plaintiffs' and Class C's decision to purchase and use Marlboro Lights cigarettes when they would not otherwise have done so; and (b) the economic losses suffered by plaintiffs and Class C consisting of the cost of purchasing such cigarettes.

WHEREFORE, plaintiffs, individually and on behalf of the putative Class C, request that judgment be entered in their favor and against Philip Morris, and that plaintiffs and Class C be awarded the following relief:

A.   Damages to compensate them for all the economic losses they have sustained to date as the result of Philip Morris' conduct, but in no event more than $75,000 each, inclusive of punitive damages, attorneys' fees, costs and interest;

B.   An award of reasonable attorneys fees and costs of suit;

C.   Punitive and exemplary damages in an amount sufficient to punish Philip Morris and deter it and others from similar wrongdoing; and

D.   An order enjoining Philip Morris from advertising and marketing Marlboro Lights as having "lowered tar & nicotine."

**Count V**
**Unjust Enrichment**
**(Philip Morris)**

241.   Plaintiffs repeat and reallege paragraphs 1 through 214 as paragraph 241, and state that this count is brought individually and on behalf of Classes B and C.

242.   A party is unjustly enriched when it retains a benefit to the detriment of another party against the fundamental principles of justice, equity and good conscience.

243.   Here, Philip Morris has reaped billions of dollars in revenues as a result of its acts of targeting minors (Class B) and deceiving plaintiffs and the proposed Class C regarding the true

content of Marlboro Lights cigarettes. That Philip Morris has amassed such profits pursuant to this behavior violates the fundamental principles of justice, equity and good conscience.

244. Philip Morris has been and continues to be unjustly enriched through the continuation of this deceit.

245. Plaintiffs and the putative Classes B and C seek to have Philip Morris disgorge its unjust enrichment from the revenues that it has amassed pursuant to this fraud.

WHEREFORE, plaintiffs, individually and on behalf of putative Classes B and C, request that judgment be entered in their favor and against Philip Morris, and that plaintiffs and Classes B and C be awarded the following relief:

A.   That Philip Morris be ordered to disgorge all profits unjustly received through its sale of cigarettes to plaintiffs and Class B, and through its sale of Marlboro Lights cigarettes to plaintiffs and Class C, which in no event will be greater than $75,000 each, inclusive of punitive damages, interest and costs; and

B.   Punitive or exemplary damages in an amount sufficient to punish Philip Morris and deter it and others from similar wrongdoing.

Respectfully submitted,

BRIAN CLEARY and DAN TRENHOLM, individually and on behalf of all others similarly situated,

By:   _____
One of their attorneys.

Edward T. Joyce
Arthur W. Aufmann
Eileen A. Maastricht
EDWARD T. JOYCE & ASSOCIATES, P.C.
11 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
312/641-2600
Atty. No. 32513

Michael H. Moirano
NISEN & ELLIOT
200 West Adams Street, Suite 2500
Chicago, Illinois  60606
312/696-2508
Atty. No. 90559

Patrick J. Sherlock
LAW OFFICE OF PATRICK J. SHERLOCK
11 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
312/683-5575
Atty. No. 27812