# Exhibit 36

# REGULATING TOBACCO

EDITED BY
ROBERT L. RABIN
STEPHEN D. SUGARMAN

1910
R35
2001

# 7

# The Third Wave of Tobacco Tort Litigation

Robert L. Rabin

In a quiet way, tobacco tort litigation emerged as a challenge to the tobacco industry in the mid-1950s at the height of the popularity of smoking—long before a more pervasive regulatory attack on the industry was envisioned by even the most ardent of antitobacco activists. At the time, roughly half the adult population in the United States smoked. There were no limitations on advertising; indeed, tobacco was among the leading industry advertisers on television and radio and in the print media. Similarly, there were no limitations on where smoking might take place, no enforcement of bans on sales to minors, minimal excise taxes, and no public health reports on the risks of smoking. Against this backdrop the initial cancer scare based on scientific data triggered the first wave of lawsuits against tobacco manufacturers (Rabin 1993).

By now, the consequent total lack of success in the courthouse over the course of almost forty years, involving two waves of litigation, is a familiar story.[1] At the end of that period, tobacco observers on all sides awaited with great anticipation the U.S. Supreme Court's decision in the 1992 case of *Cipollone v. Liggett Group, Inc.*,[2] addressing the question of whether the 1965 cigarette labeling act preempted state tort claims based on negligent failure to warn. The preemption defense, along with assumption of risk, had been the hallmarks of industry success in fending off the second wave of tort claimants. *Cipollone* was the case, many thought, that would indicate whether a breakthrough would finally occur against Fortress Tobacco. And immediately after the Court concurred with the industry's preemption claim, it appeared that yet another wave of tort litigation might be a long time in coming.

---

As it happened, less than two years later, the industry was under assault from two formidable directions: private class action tort litigation and state health care reimbursement suits (Pringle 1998). Within the relatively short span of another five years, the industry had entered into multibillion dollar settlements in the state litigation, remained precariously positioned in the class action litigation, and faced an uncertain future in the newly rejuvenated individual tort suits. A clearly discernible third wave of tobacco-related claims showed no signs of abating and raised the specter of unpredictable liability—the industry's nightmare of potential catastrophic loss—far more vividly than ever before.

In this chapter, I will discuss the developments that so dramatically challenged the industry's long success on the litigation front. As I will indicate, the industry had to contend with two convergent and unexpected circumstances: the revelation of highly damaging internal documents tracing a pattern of industry concealment and misrepresentation of tobacco-related health information, and the adoption by adversaries of a new litigation strategy based on aggregating claims rather than proceeding on a case-by-case basis. Nonetheless, the resulting turnabout in industry fortunes on the litigation front is far more ambiguous than it first appears. This ambiguity—a mixed "scorecard" of successes and defeats—offers insights that I will also discuss into the institutional strengths and weaknesses of the tort system generally as a medium for achieving broader public health goals. That discussion, in turn, will lead me to some general observations about the future course of tobacco tort litigation.

## 1. Prelude

When the U.S. Supreme Court decided *Cipollone* in 1992, reading the federal cigarette labeling act to preempt state tort suits based on a post-1965 negligent failure to warn, its pronouncement had all the trappings of a monumental setback for tobacco tort litigation. From the time the case was filed on August 1, 1983, *Cipollone* had the aura of the best effort that could be launched against the industry. Rose Cipollone's lawyer, Marc Edell, was an energetic young litigator who had accumulated highly relevant experience in successfully handling asbestos cases. He was associated with a law firm that appeared willing to bankroll the case at a level that at least began to match the virtually unlimited resources the industry had typically made available to defend prior litigation. The case was initially tried before Judge H. Lee Sarokin, an activist federal jurist who made no bones about his antipathy toward the tobacco industry. The applicable products liability precedents in the forum state of New Jersey were as plaintiff-favorable as any corpus of common

## 190  Regulating Tobacco

In essence, the states' legal theories—which later came to include statutorily based claims, such as violation of consumer protection laws—asserted that the industry's deceptive and misleading conduct constituted a wrong against the public as well as against individual smokers. In arguing unjust enrichment, the claim was for restitution of public tax funds allocated for treating impecunious smokers whose health problems were allegedly the industry's responsibility. A similar theory—wrongfully profiting at the expense of the public—undergirded claims of conspiracy and consumer fraud, particularly those industry tactics aimed at making smoking attractive to underage youths (Ciresi 1999).

In reality, these theories were largely untested, and the claim that the state's interest was independent of and distinct from the individual smoker's generally rested on a shaky foundation. Consider, for example, the claim of unjust enrichment. The industry was only "unjustly enriched," presumably, if it profited from harm for which it should have been held legally responsible. But this sounds suspiciously circular: industry responsibility presupposes smoker nonresponsibility, which is precisely the issue at the core of the individual cases. Similarly, a conspiracy claim rests on the wrongful imposition of harm on the public, where "wrongful" once again arguably raises individual issues of reliance and comparative responsibility, even if the tobacco companies misrepresented health information. Moreover, in purely economic terms, the claim for recovery of health care costs would seem to be interlocked with the excise tax payments levied on the industry, if not—as some economists argued—the net health cost savings to social welfare programs from premature deaths of smokers as well (Viscusi 1999; Schwartz 1999).

Untested or not, the theories of recovery multiplied, finally including deceptive advertising, antitrust violations, federal RICO (racketeering) claims, unfair competition, a variety of fraud allegations, and in at least two states (Florida and Massachusetts) statutory claims based on the enactment of specific health care cost recovery legislation. By summer 1997, the number of states bringing suit had grown to 40, with virtually every still-uncommitted state considering action; Blue Cross and labor union insurers were devising parallel lawsuits, and, in California, cities and counties had joined in the fray (Geyelin 1998; Weinstein 1998).

Then, after months of rumors, in June 1997 the states and the major tobacco companies reached a "global settlement," in reality, a detailed legislative proposal that was presented to Congress as an effort to virtually extinguish the tobacco wars. The tobacco industry, which for more than forty years had proudly proclaimed its invincibility from product liability, was now prepared to underwrite the largest civil settlement ever, paying $368.5 billion over 25 years to bring an end to the third wave of aggregate claims. In addition, the proposed legislative package would have bound the industry to

## The Third Wave of Tobacco Tort Litigation  191

an array of public health proposals, including acknowledgment of FDA jurisdiction to engage in constrained regulation of nicotine, agreement to a "look back" provision under which the industry would be subject to fines linked to failure to reduce underage smoking according to targeted goal and timelines; and bans on billboard advertising, use of human and cartoon figures in ads, and brand-name sponsorship of sporting events and promotional merchandise (Geyelin 1997b).

Beyond doubt, the June 1997 agreement is a testament to the awesome threat posed by the litigation strategy. What the industry was willing to buy, at a considerable price, was relief from litigation uncertainty. This latter point is underscored by the concessions offered by the antitobacco forces in the proposal, in other words, the industry's quid pro quo. Under the plan, the state health care reimbursement suits would have been settled and the industry would have been granted immunity from all other forms of class action. Thus, in one fell swoop, the industry would have eliminated its greatest nightmare—the prospect of catastrophic loss from a cluster of state recoupments, certified classes of tort claimants, or third-party sources such as Blue Cross or union health plans, successfully convincing juries that the industry's past course of conduct warranted potential multibillion dollar recoveries in compensatory and punitive damages for the legions of injury victims represented in the particular cases. Moreover, under still another provision in the settlement plan, there would have been no punitive damages allowed in individual cases for industry conduct prior to the enactment by Congress of the legislation. Once again, this provision directly targeted a massive source of uncertainty—the prospect of a breakthrough in individual cases with one jury after another reacting with vehemence against the narrative of industry deceit. A third provision would have capped the total annual liability for awards on future individual claims at $5 billion, a considerable sum, but nonetheless a fixed cap that would contribute from yet another perspective to the predictability that the industry sought (New York Times 1997).

There were other restrictions on litigation as well, but the point is clear. The state health care cases may have rested on dubious theoretical premises. But a realistic assessment of the threat presented by potential catastrophic loss litigation requires more than just finely honed theoretical analysis. By mid-1997, the industry faced the prospect of being sued by virtually every state in the country, represented on a retainer basis by a cadre of the most experienced and skilled tobacco lawyers, pressing a variety of common law and statutory claims. Other third-party claims lurked in the background. The documents told a tale of industry deceit and indifference to public health considerations. Could trial court judges in every, or virtually all, state health care recovery cases be counted on to enter summary judgment, or would the industry be at the mercy of juries exposed to the tale of industry wrongdoing?