# Exhibit 37

1  DANIEL E. LUNGREN, Attorney General
     of the State of California
2  HERSCHEL T. ELKINS (State Bar No. 27279)
   CHARLTON G. HOLLAND, III (State Bar No. 36404)
3  FLOYD D. SHIMOMURA (State Bar No. 58294)
   THOMAS GREENE (State Bar No. 57159)
4    Senior Assistant Attorneys General
   1300 I Street, Suite 125
5  Post Office Box 944255
   Sacramento, California  94244-2550
6  Telephone:  (916) 324-7874  (Greene)

7  (All Counsel Listed on Last Page)

8  Attorneys for Plaintiffs

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              COUNTY OF SACRAMENTO

11

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA ex rel. DANIEL E. LUNGREN, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA; S. KIMBERLY BELSHÉ, DIRECTOR OF HEALTH SERVICES OF THE STATE OF CALIFORNIA, <br><br>        Plaintiffs, <br><br>    v. <br><br> PHILIP MORRIS, INC.; R.J. REYNOLDS TOBACCO COMPANY; BROWN & WILLIAMSON TOBACCO CORPORATION; B.A.T. INDUSTRIES P.L.C.; LORILLARD TOBACCO COMPANY, INC.; AMERICAN TOBACCO COMPANY, INC.: UNITED STATES TOBACCO COMPANY; HILL & KNOWLTON, INC.; THE COUNCIL FOR TOBACCO RESEARCH-U.S.A., INC; TOBACCO INSTITUTE, INC.; SMOKELESS TOBACCO COUNCIL, INC. and DOES 1 through 200, inclusive, <br><br>        Defendants. | Case No.  **97AS03031** <br><br> COMPLAINT FOR RECOVERY OF MEDI-CAL COSTS AND CIVIL PENALTIES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE CARTWRIGHT ACT; THE CALIFORNIA FALSE CLAIMS ACT; AND THE UNFAIR COMPETITION ACT |

        The People of the State of California, by and through Daniel E. Lungren,

Attorney General of the State of California, and S. Kimberly Belshé, in her official capacity

as Director of Health Services for the State of California, allege on information and belief as

follows:

1.

65278  7308

# PARTIES

1.  Plaintiff Daniel E. Lungren is the duly elected Attorney General of the State of California and is the chief law officer of the State.  (Cal. Const., art. 5, § 13.)  He is authorized by Business and Professions Code section 16750 et seq. to bring actions to enforce the State's antitrust statutes.  He is authorized by Government Code section 12652 to bring a civil action against persons violating the California False Claims Act, Government Code sections 12650 et seq.  Finally, he is authorized by Business and Professions Code section 17206 to bring actions to enforce the State's statutes governing unfair competition.

2.  Plaintiff S. Kimberly Belshé is the Director of Health Services of the State of California.  Plaintiff Belshé administers the Department of Health Services ("Health Services") which is the single state agency responsible for administering and managing the California Medical Assistance Program ("Medi-Cal") pursuant to Welfare and Institutions Code section 14000 et seq.  Plaintiff Belshé is authorized by section 14124.71 of the Welfare and Institutions Code to bring an action against any person who is liable for an injury to a Medi-Cal beneficiary to recover the reasonable value of Medi-Cal benefits provided or to be provided to the Medi-Cal beneficiary because of such injury.

3.  Defendant Philip Morris, Inc. ("Philip Morris") is a Virginia corporation whose principal place of business is 120 Park Avenue, New York, New York 10017.  Philip Morris manufactures, advertises, promotes and sells Philip Morris, Merit, Cambridge, Marlboro, Benson & Hedges, Virginia Slims, Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga, and Parliament cigarettes and other tobacco products throughout the United States.  Philip Morris advertises, promotes and sells its tobacco products throughout the State of California.

4.  Defendant Brown & Williamson Tobacco Corporation ("Brown & Williamson") is a Delaware corporation whose principal place of business is 1500 Brown & Williamson Tower, Louisville, Kentucky 40202.  Brown & Williamson manufactures, advertises, promotes and sells Kool, Raleigh, Barclay, Belair, Capri, Richland, Loredo, Eli Cutter, and Viceroy cigarettes and other tobacco products throughout the United States.

2

1   Brown & Williamson advertises, promotes and sells tobacco products throughout the State of

2   California.

3       5.   Defendant R.J. Reynolds Tobacco Company ("Reynolds") is a New Jersey

4   corporation whose principal place of business is Fourth and Main Streets, Winston-Salem,

5   North Carolina 27102.  Reynolds manufactures, advertises, promotes and sells Camel,

6   Vantage, Now, Doral, Winston, Sterling, Magna, More, Century, Bright Rite and Salem

7   cigarettes and other tobacco products throughout the United States.  Reynolds advertises,

8   promotes and sells its products throughout the State of California.

9       6.   Defendant B.A.T. Industries, P.L.C. ("B.A.T. Industries") is a British

10  corporation whose principal place of business is Windsor House, 50 Victoria Street, Town of

11  London.  Through a succession of intermediary corporations and holding companies, B.A.T.

12  Industries is the sole shareholder of Brown & Williamson.  B.A.T. Industries has placed

13  cigarettes and other tobacco products into the stream of commerce with the expectation that

14  substantial sale of cigarettes and other tobacco products would be made in the United States

15  and in the State of California.  B.A.T. Industries has also, through its agents, subsidiaries,

16  and/or associated companies, participated in the conspiracy described below by, among other

17  things, conducting significant research for Brown & Williamson on the topic of smoking,

18  disease and addiction and, on information and belief, assisting Brown and Williamson in

19  removing sensitive and exculpatory documents from the United States.

20      7.   Defendant Lorillard Tobacco Company, Inc. ("Lorillard") is a Delaware

21  corporation whose principal place of business is One Park Avenue, New York, New York

22  10016.  Lorillard manufactures, advertises, promotes and sells Old Gold, Kent, Triumph,

23  Satin, Max, Spring, Newport, and True cigarettes and other tobacco products throughout the

24  United States.  Lorillard advertises, promotes and sells its tobacco products throughout the

25  State of California.

26      8.   Defendant American Tobacco Company, Inc. ("American Tobacco") is a

27  Delaware corporation whose principal place of business is Six Stamford Forum, Stamford,

28  Connecticut 06904.  American Tobacco manufactured, advertised, promoted and sold Lucky

1    Strike, Pall Mall, Tareyton, American, Malibu, Montclair, Newport, Misty, Iceberg, Silk

2    Cut, Silva Thins, Sobrania, Bull Durham, and Carlton cigarettes and other tobacco products

3    throughout the United States.  American Tobacco advertised, promoted and sold its tobacco

4    products throughout the State of California.  In 1994, American Tobacco was sold to British-

5    American Tobacco Co., a company related to BAT Industries, P.L.C., the parent of Brown

6    & Williamson.

7             9.  Defendant United States Tobacco Company ("U.S. Tobacco") is a

8    Delaware corporation with its principal place of business at 100 West Putnam Avenue,

9    Greenwich, Connecticut.  U.S. Tobacco manufactures, advertises, promotes and sells Sano

10   cigarettes.  U.S. Tobacco also manufactures, advertises and sells more than 88% of the

11   smokeless tobacco (snuff and chewing tobacco) sold in the United States under various brand

12   names including Happy Days, Skoal and Copenhagen.  U.S. Tobacco advertises, promotes

13   and sells its tobacco products throughout the State of California.

14            10.  Hill & Knowlton, Inc. ("Hill") is a public relations firm whose principal

15   place of business is 420 Lexington Avenue, New York, New York.  Hill was the primary

16   advertising agency for Philip Morris, Reynolds, American Tobacco, Lorillard, The Tobacco

17   Institute Research Committee ("TIRC"), and The Council for Tobacco Research-U.S.A.

18   ("CTR").  As such, Hill aided and conspired with these defendants in doing the things

19   hereinafter alleged, including, but not limited to, creating false information concerning the

20   link between smoking and cancer and other health hazards, the addictive nature of nicotine,

21   and the true nature of the relationship between TIRC/CTR and the tobacco industry.

22            11.  Defendant Tobacco Institute, Inc. ("Tobacco Institute") is a New York

23   non-profit corporation with its principal place of business at 1875 I Street Northwest, Suite

24   800, Washington, D.C. 20006.  Tobacco Institute is operated as the Tobacco Companies'

25   public relations and lobbying arm and as their agent and employee.  As such, it acted to

26   facilitate and further the unlawful acts in or affecting the State of California set forth in this

27   complaint.

28   //

4

65278 7311

12. Defendant the Council for Tobacco Research-U.S.A., Inc. ("CTR"), the successor to the Tobacco Institute Research Committee ("TIRC"), is a New York non-profit corporation with its principal place of business at 900 3rd Avenue, New York, New York 10022. CTR is operated as the Tobacco Companies' public relations and lobbying arm and as their agent and employee, it acted to facilitate and further the unlawful acts in or affecting the State of California set forth in this complaint. By way of example, the Defendant Tobacco Companies created TIRC, and later CTR, with the intent of suppressing information from the consuming public and from public health officials or others who may have taken steps to inform or safeguard the public.

13. Defendant Smokeless Tobacco Council, Inc. ("STC") is a New York non-profit corporation whose principal place is 1627 K Street, Northwest, Washington, D.C.. STC, which was ostensibly formed to support objective research into the biologic consequences of smokeless tobacco, is operated as the Tobacco Companies' public relations and lobbying arm and, as their agent and employee, it acted to facilitate and further the unlawful acts set forth in this complaint in or affecting the State of California. By way of example, STC was reliably informed that nicotine is equally addictive whether delivered by cigarette or by smokeless tobacco products, but failed to disclose that information to consumers or to public health officers or others who may have taken action to inform or safeguard the public.

14. The true names and capacities of defendants sued in the Complaint under the fictitious names of Does 1 through 200, inclusive, are unknown to plaintiffs who therefore sue such defendants by such fictitious names.

15. All the defendants described in paragraphs 3 through and 9 -- Philip Morris, Inc., Brown & Williamson, R. J. Reynolds, BAT Industries, Lorillard, American Tobacco and U.S. Tobacco -- shall collectively be referred to as "Defendant Tobacco Companies" in this complaint.

16. Whenever reference is made in this complaint to any act of defendants, such allegation shall mean that each defendant acted individually and jointly with the other

65278   7312

1    defendants named in that cause of action.

2         17.  Whenever reference is made in this complaint to any act of any corporate

3    or other business defendant, such allegation shall mean that such corporation or other

4    business did the acts alleged in the complaint through its officers, directors, employees,

5    agents and/or representatives while they were acting within the actual or ostensible scope of

6    their authority.

7         18.  At all relevant times, each of the defendants has acted as an agent,

8    representative, or employee of each of the other defendants and has acted within the course

9    and scope of said agency or representation or employment with respect to the causes of

10   action in this complaint.

11        19.  At all relevant times, each defendant has committed the acts, caused

12   others to commit the acts, or permitted others to commit the acts referred to in this complaint

13   and has made, caused, or permitted others to make the deceptive statements referred to in

14   this complaint.

15        20.  While not named as a defendant herein, Liggett & Myers, Inc.

16   ("Liggett") is a Delaware corporation whose principal place of business is Main and Fuller,

17   Durham, North Carolina.  Liggett manufactures, advertises, promotes and sells Chesterfield,

18   Decade, L&M, Pyramid, Dorado, Eve, Stride, Generic, and Lark cigarettes and other

19   tobacco products throughout the United States.  Liggett advertises, promotes, and sells its

20   tobacco products throughout the State of California.

21        21.  Whenever reference is made in this complaint to the Tobacco Companies,

22   such allegation shall mean the Defendant Tobacco Companies and Liggett.

23                 **VENUE**

24        22.  The violations of law alleged in this Complaint occurred in Sacramento

25   County and in other counties in California or occurred outside California but were intended

26   by defendants to influence consumers and prospective consumers of the Tobacco Companies'

27   products in Sacramento County and in other counties in California, and consumers in

28   Sacramento County and elsewhere in the State of California purchased the cigarettes and

65278  7313

1   other tobacco products manufactured and sold by the Defendant Tobacco Companies.

2   ## NATURE OF TRADE AND COMMERCE

3   23. For purposes of this action, cigarettes and smokeless tobacco products

4   constitute relevant product markets. The Tobacco Companies manufacture, ship and sell

5   tobacco products throughout the United States and throughout the State of California. The

6   relevant geographic markets are the United States and the State of California.

7   24. Six tobacco companies, including American Tobacco, Reynolds, Brown &

8   Williamson, Philip Morris, Liggett and Lorillard, dominate and control the market for

9   cigarettes and other tobacco products in the United States and the State of California. Two

10   companies, Philip Morris and Reynolds, are dominant in the industry, with national market

11   shares at approximately 46% and 25%, respectively.

12   ## FACTUAL ALLEGATIONS

13   25. In the 1940's and early 1950's, scientists and doctors began finding a link

14   between cigarette smoking and health. The Tobacco Companies were, at that time, aware of

15   this research.

16   26. Until the mid-1950's, in public statements and advertisements, the

17   Tobacco Companies disseminated explicit and implied health related claims about their

18   products and smoking. These claims included, but were not limited to, deceptive

19   representations of safety and medical endorsements.

20   27. Through at least the 1950's, the Tobacco Companies introduced products

21   that were claimed to be safer for consumers. The Tobacco Companies introduced and

22   promoted filtered cigarettes, as being better for consumers' health. For example, in 1952

23   Lorillard introduced the Kent micronite filter, which Lorillard represented removed seven

24   times more tar and nicotine than any other cigarette. Filtered cigarettes were very popular

25   with consumers.

26   28. As demonstrated by the health-related advertising claims and the

27   introduction and promotion of filtered cigarettes, the Tobacco Companies understood that

28   consumers were concerned about their health and wanted safer products. During this period,

1   the Tobacco Companies competed vigorously on the basis of health and safety, in their

2   advertising and promotional material and in the products they marketed.

3        29. In the early 1950's, two significant scientific studies were published

4   warning of the health hazards of cigarettes. These studies not only confirmed the

5   relationship between cancer and smoking, but they also established the causal link between

6   exposure to tobacco products and cancer.

7        30. In December 1953, Hill organized a meeting of Philip Morris, Brown &

8   Williamson, Reynolds, Lorillard, American Tobacco, and U.S. Tobacco to discuss the effect

9   of these health studies. The attendees discussed forming an association specifically charged

10  with a public relations function of disinformation and chose Hill to hire the staff, disburse the

11  funds, and play a central role in this function. Shortly thereafter, Hill presented a detailed

12  recommendation which included the creation of the Tobacco Industry Research Committee

13  ("TIRC") which was to, and did, operate for the primary purpose of suppressing information

14  from the consuming public and from public health officials or others who may have taken

15  steps to inform or safeguard the public.

16       31. As a result of this meeting, the Defendant Tobacco Companies and Hill

17  formed TIRC. Hill controlled the operation of TIRC and TIRC's successor, the Council for

18  Tobacco Research ("CTR"). There was substantial staff overlap between Hill and TIRC and

19  CTR. TIRC and later CTR were intended to provide a vehicle for the Tobacco Companies'

20  joint actions.

21       32. In 1964, TIRC changed its name to Council for Tobacco Research (CTR).

22       33. Also in 1964, Liggett joined the TIRC/CTR.

23       34. Another organization, the Tobacco Institute, was formed by the Tobacco

24  Companies in 1958. It performed a variety of functions for the Tobacco Companies in

25  relation to their joint activities, including exchanges of information, policing the agreement

26  and coordinating activities. By way of example, Tobacco Institute placed false

27  advertisements on behalf of the Tobacco Companies stating that, in the interest of absolute

28  objectivity, they were supporting totally independent research efforts with completely non-

65278 7315

1   restrictive funding and that the tobacco industry recognized and accepted the responsibility to

2   promote the progress of independent scientific research in the field of tobacco and health.

3   Tobacco Institute knew at the time it placed those advertisements that the statements were

4   deceptive.

5          35.  Beginning with the meeting in December 1953, and continuing to the

6   present, the defendants, and each of them, and their coconspirators, formed and maintained

7   an illegal combination to restrain and manipulate health information about tobacco and

8   cigarettes and to restrain and limit the development of new products in order to stabilize

9   and/or increase the market for cigarettes and other tobacco products.

10         36.  The tools used by the conspirators to achieve their goals include: a

11  campaign of disinformation by misrepresenting the health effects of smoking and by

12  suppressing research relating to the dangers of cigarettes, while purporting to provide honest,

13  unbiased information regarding the safety of tobacco and cigarettes; misleading the public

14  about the addictive qualities of nicotine; agreeing among themselves not to conduct individual

15  research on the issue of health and tobacco; and suppression of research, development, and

16  marketing of safer cigarettes.

17         37.  The purpose and effect of this conspiracy has been to unreasonably

18  restrain and to stabilize the market for cigarettes and other tobacco products.

19         38.  Defendant TIRC placed an advertisement in the newspapers of the State

20  of California on January 4, 1954, which promised that the tobacco industry had undertaken a

21  special and continuing duty to protect the public health by representing that it would conduct

22  and disclose unbiased and authenticated research on the health risks of cigarette smoking.

23  The issuance of this publication was an integral step in the conspiracy to suppress and

24  conceal information that might reduce the sale of tobacco products.

25         39.  Despite this statement, TIRC and the Tobacco Companies did not live up

26  to their commitment.  TIRC, and later CTR, developed and implemented a coordinated,

27  industry-wide strategy, on behalf of the Tobacco Companies, to mislead and confuse the

28  public about the dangers of smoking, by suppressing information about tobacco and cigarettes

9.

65278 7316

1 and by challenging or diluting any negative information that became public. This strategy

2 included the dissemination of articles, publications and advertisements that misrepresented

3 scientific knowledge about the health effects of smoking and the addictive nature of nicotine,

4 the suppression of research by tobacco industry scientists relating to the dangers of smoking

5 and the addictive qualities of nicotine, and wrongful claims of privilege in order to keep

6 documents and information from the public.

7        40.  In 1964, in furtherance of the conspiracy, CTR formed a "Special

8 Projects Division" as a method to create an artificial attorney-client and attorney work

9 product privilege for projects of the Division, so that the Tobacco Companies could  conceal

10 unfavorable information about tobacco products.  A series of research grants designated as

11 CTR "Special Projects" were developed by defendants in a manner so as to artificially cloak

12 this work with the protection of the attorney-client or attorney work product privilege.

13 Defendants have used the CTR Special Projects Division to conceal accurate information that

14 was harmful to the object of the Tobacco Companies' conspiracy.  Defendants shielded

15 company documents with artificial claims of attorney-client privilege and as attorney work

16 product and made documents unavailable by sending them out of the United States so that

17 they would not be discovered in legal proceedings in the United States.  To this day the

18 Tobacco Companies have kept research from the Special Projects Division shielded from

19 public scrutiny.  The artificial attorney-client and attorney work product privileges the

20 Tobacco Company Defendants created were part of a scheme intended to cover-up and

21 conceal over forty years of misconduct and illegal actions.

22        41.  In furtherance of this conspiracy, the Tobacco Companies agreed among

23 themselves to limit individual research.

24        42.  In furtherance of this conspiracy, the Tobacco Companies agreed not to

25 develop and market safer cigarettes.  All defendants knew such products would have

26 significant effects on the Tobacco Companies' joint defense efforts, because they had taken

27 the position in litigation that there was no alternative design for cigarettes.  In addition,

28 defendants knew that the introduction of safer cigarettes would imply other cigarettes were

65278 7317

1    not safe.  Defendants stopped and/or suppressed laboratory research on safer cigarettes.

2    While some defendants, in violation of the agreement, did work to develop safer cigarettes,

3    none of these products were marketed, except in limited test markets.  For example, in 1968,

4    Liggett stopped marketing a "safer cigarette" because it was threatened with retaliation by

5    industry leader Philip Morris.

6           43.  Defendants have represented to the consuming public that the Tobacco

7    Companies would conduct and disclose unbiased research on the health risks of cigarette

8    smoking to the smoker and health risks to non-smokers who are recipients of second-hand

9    smoke, and that CTR would fully and honestly publicize any information it obtained

10   implicating cigarette smoking and ingestion of other tobacco products as causing human

11   disease.  Although CTR obtained such information and although such information was known

12   to defendants, CTR and the other defendants concealed that information from the consuming

13   public and from public health officials or others who may have taken steps to inform or

14   safeguard the public.

15          44.  Defendants have claimed nicotine is not addictive, when they knew that it

16   was.  Defendants have assured the consuming public that they would disclose information

17   concerning the addictive nature of nicotine and although they have continually denied they

18   have such information, they have been in possession of such information.  By way of

19   example, researchers working for Philip Morris confirmed the addictive nature of nicotine

20   and attempted to develop a synthetic form of nicotine that would avoid its cardiovascular

21   complications.  Philip Morris fired the researchers, closed their laboratory, and threatened

22   them with legal action if they published their work.

23          45.  In furtherance of selling their "lite" or "light" cigarettes, the defendants

24   have represented that these products are healthier and have less tar and nicotine than regular

25   cigarettes.  In fact, the amount of nicotine in these cigarettes is higher than the amount set

26   forth on the cigarette package;   the amount of nicotine in these cigarettes is equivalent to the

27   amount of nicotine in standard cigarettes; and such cigarettes are not healthier for consumers

28   than are "regular" cigarettes.

65278  7318

1      46.  Defendants have manipulated the amount of nicotine in cigarettes and

2  other tobacco products, in order to maintain and increase their market for tobacco products.

3  Defendants have failed to disclose these facts.

4      47.  The Tobacco Companies have specifically targeted minors through their

5  advertisement and marketing campaigns in order to induce minors to start smoking cigarettes

6  and in order to increase cigarette sales to minors. The Tobacco Companies need to induce

7  minors to start smoking in order to maintain their customer base. The Tobacco Companies

8  have known for years that most people who are addicted to smoking cigarettes begin smoking

9  cigarettes as minors.  According to a 1994 U.S. Surgeon General's report, 3000 children

10  become regular smokers each day.

11      48.  The Tobacco Companies have specifically targeted youthful consumers,

12  including children, in their advertising with sophisticated promotional schemes.  By way of

13  example, Reynolds in a secret memorandum, stated that evidence is available that the 14 to

14  18-year-old market is an increasing segment of the smoking population and that Reynolds

15  must soon establish a successful new brand in that market in order to maintain its industry

16  position.  It also wrote to public school principals asking that the principals inform students

17  that scientists do not know the causes of chronic diseases reported to be associated with

18  smoking.

19      49.  Several brands were repositioned in the market to appeal to young

20  consumers.

21      50.  The Tobacco Companies have developed advertising imagery intended to

22  appeal to children.  The Tobacco Companies have employed various techniques to induce

23  children to smoke or to increase their consumption of cigarettes, including the give-away of

24  T-shirts, caps and other items with decals or graphics associated with tobacco products,

25  promoting sporting events and other activities associated with successful and/or healthy

26  athletes, associating cigarette smoking with independence and freedom from authority, with

27  success, with risk-taking, with sexual attractiveness, and with a healthful, athletic, youthful

28  and glamorous lifestyle, and by emphasizing girls' and young women's interests in slim and

12.

65278 7319

1   feminine products.  Marlboro was transformed from a red-tipped cigarette for women to the

2   cigarette for manly cowboys, and Philip Morris developed the "Joe Camel" cartoon

3   character.

4          51.  The Tobacco Companies further target children as consumers by the

5   placement of their advertising.  For example, cigarette advertisements are conspicuous in

6   youth-oriented publications.  As a further example, Reynolds ordered its employees to

7   identify stores near high schools so as to increase its marketing efforts in those locations.

8   The California Department of Health Services, in a July 1995 report, found that stores within

9   1,000 feet of a school had significantly more tobacco advertising and promotion than the

10  average store and that stores near schools were more likely to have at least one tobacco

11  advertisement placed next to a candy display than were other stores.

12         52.  The Tobacco Institute and several Tobacco Companies have begun public

13  relations campaigns which purportedly aim to discourage children from smoking.  In reality,

14  they are a pro-smoking subterfuge.  The only reason given children for not smoking is that

15  smoking, like marriage and driving, is i 'r "grown-ups".  By describing smoking as an

16  "adult" decision or as something "adults" can do safely, tobacco companies make smoking

17  more attractive to children.  None of the materials developed by these public relations

18  campaigns discloses to children the real risks of smoking.

19         53.  U.S. Tobacco aimed its smokeless tobacco sales campaigns at young

20  people to such an extent that the percentage of its advertising budget for "starter brands"

21  such as Happy Days, Skoal Bandits, and Skoal Long Cut was more than 20 times the

22  percentage of sales for those brands.  The "starter brands" have low nicotine and are utilized

23  to adjust the young user to smokeless tobacco and to avoid rejection of the product.  When

24  accustomed to the "starter brand", the user is then introduced to a product with much greater

25  nicotine.

26         54.  The Medi-Cal program, Welfare and Institutions Code section 14000 et

27  seq., is jointly funded by the federal government and the State on a fifty-fifty basis.  The

28  State of California through the Medi-Cal program pays for necessary medical treatment for

13.

65278 7320

1   approximately 5½ million Medi-Cal beneficiaries or those who otherwise meet the eligibility

2   requirements for receipt of Medi-Cal benefits.  Thousands of these Medi-Cal beneficiaries

3   are receiving treatment for tobacco-related injuries as a result of using tobacco products from

4   the Defendant Tobacco Companies.

## FIRST CAUSE OF ACTION

### Recovery of Medi-Cal Expenditures

### (Welfare and Institutions Code section 14124.71)

8        55.  Plaintiff S. Kimberly Belshé restates and realleges and incorporates herein

9   the foregoing paragraphs 1 through 54 of this Complaint.

10       56.  Over the years and continuing to the present time, the Defendant Tobacco

11  Companies placed on the market defective tobacco products, knowing that they would be

12  used without inspection for defects, which have caused injury to human beings, including

13  many who were and are California Medi-Cal beneficiaries.

14       57.  The Defendant Tobacco Companies' products were defectively designed

15  because their products failed to perform as safely as an ordinary smoker or user would

16  expect when used in the intended or reasonably foreseeable manner.  Among other things,

17  while ordinary smokers or users understood that the normal use of tobacco would expose

18  them to certain health risks, they were unaware that over the years the Tobacco Companies

19  took steps to increase, rather than decrease, the addictive nature of their products.

20       58.  The Defendant Tobacco Companies' products were defectively designed

21  because they contained excessive preventable dangers.  Among other things, as research

22  revealed and confirmed the harmful, addictive nature of nicotine in their products, the

23  Defendant Tobacco Companies failed to redesign their products to reduce this health risk

24  and, in fact, frequently took steps to increase or enhance this risk.

25       59.  The Defendant Tobacco Companies' products were defective when they

26  were sold to California consumers and users, including Medi-Cal beneficiaries.

27  //

28  //

65278  7321

60.  California consumers, including Medi-Cal beneficiaries, used Defendant Tobacco Companies' products in the intended and reasonably foreseeable way when they caused injury.

61.  As a direct and proximate result of the design defect alleged above, California Medi-Cal beneficiaries have been injured and as a result have received health care benefits paid for by the Medi-Cal program.

62.  Welfare & Institutions Code section 14124.71(a) provides in pertinent part that:

> "When benefits are provided or will be provided to a beneficiary under this chapter because of an injury for which another person is liable, . . . the director [of the Department of Health Services] shall have a right to recover from such person or carrier the reasonable value of benefits so provided."

63.  Plaintiff Belshé is entitled to recover from Defendant Tobacco Companies, the reasonable value of the Medi-Cal health care benefits provided to treat injuries or illnesses for which Defendant Tobacco Companies are liable.

64.  For each of the past three years, Health Services has paid health care providers hundreds of millions of dollars for treating tobacco-related illnesses of Medi-Cal beneficiaries.  In the 1995/96 fiscal year, Health Services paid approximately $433 million dollars for treatment of tobacco-related illnesses of Medi-Cal beneficiaries.

<u>SECOND CAUSE OF ACTION</u>

<u>Violation of the Cartwright Act</u>

<u>(Business and Professions Code section 16720 et seq.)</u>

65.  Plaintiff People of the State of California ex rel. Daniel E. Lungren, Attorney General, realleges and incorporates by reference paragraphs 1 through 45 inclusive as if fully set forth herein.

66.  Since 1953 and up to the present time, defendants, and each of them, combined, conspired, and agreed together and continue to combine, conspire and agree to unreasonably restrain the market for cigarettes and other tobacco products, in violation of Business and Professions Code section 16720, by limiting and suppressing research and

15.

1   information which could have led to product innovations, including, but not limited to,

2   making a safer cigarette available to the consuming public, and which could have allowed

3   other manufacturers to lawfully compete against defendants and by limiting, misrepresenting

4   and suppressing information regarding the health effects of smoking and the addictive

5   qualities of nicotine.

6         67.   As a direct consequence of the agreements by defendants, and each of

7   them, competition in the tobacco industry has been restrained, suppressed, and eliminated.

8   The People of the State of California have been deprived of the benefit of a free, competitive

9   marketplace for cigarettes and of the benefit of full and truthful information in deciding

10   whether to smoke and in making their selection of cigarettes, and they have been deprived of

11   a choice of safer cigarette products.

12         68.   Defendants' continuing wrongful conduct as alleged herein, unless and

13   until restrained by order of this court, will cause great and irreparable harm to the People of

14   the State of California.

15         69.   The People of the State of California have no adequate remedy at law for

16   the injuries currently being suffered or which will result in the future from defendants'

17   continued wrongful conduct since damages flowing from the artificial restraint of the free

18   market are difficult if not impossible to ascertain.

19                         **THIRD CAUSE OF ACTION**

20                   False Record Or Statement To Avoid Obligation

21                  (Government Code section 12650 et seq.)

22         70.   Plaintiff People of the State of California ex rel. Daniel E. Lungren,

23   Attorney General, realleges and incorporates by reference paragraphs 1 through 54 inclusive

24   as if fully set forth herein.

25         71.   This is a claim under the California False Claims Act (Gov. Code, §

26   12651(a)(7)), which provides that a person shall not knowingly make, use, or cause to be

27   made a false record or statement to conceal, avoid, or decrease any obligation to pay money

28   to the state or to any political subdivision.

1    72.  As alleged in the Fourth Cause of Action, defendants have engaged in

2  activities in violation of Business and Professions Code sections 17200 et seq. (Unfair

3  Competition Act) which gives rise, among other things, to the obligation to pay monetary

4  fines and penalties.

5    73.  Defendants utilized, among others, attorneys in carrying out and planning

6  such violations, and knowingly undertook to make, use, or caused to be made or used false

7  records or statements to conceal, avoid, or decrease their obligation to pay monetary fines

8  and penalties arising as a result of such violations.  Defendants' knowingly created false

9  records and statements by falsely marking documents and cloaking otherwise non-privileged

10  projects as being artificially covered by the attorney/client or work product privilege in order

11  to conceal evidence of their payment obligations arising from their unlawful activities when

12  they knew such documents were not privileged and/or fell within the "crime/fraud"

13  exception.

14    74.  As a result of the continued making and use of such false records and

15  statements, up to the present day through artificial creation of the attorney-client and attorney

16  work product privileges, the defendants have significantly impaired the ability of enforcement

17  officials to detect violations and collect the fines and penalties arising therefrom.

18    75.  Because of defendants' conduct, the State of California and its

19  subdivisions have suffered "damages" under Government Code section 12651, subdivision (a)

20  based upon each payment obligation arising from defendants' statutory violations of the

21  Business and Professions Code, as alleged in the Fourth Cause of Action, which defendants

22  sought to conceal by making or using such false records or statements.

23  ## FOURTH CAUSE OF ACTION

24  ### Violation of the Unfair Competition Act

25  ### (Business and Professions Code Section 17200)

26    76.  Plaintiff People of the State of California ex rel. Daniel E. Lungren,

27  Attorney General, realleges and incorporates by reference paragraphs 1 through 54 inclusive

28  as if fully set forth herein.

17.

65278 7324

77.  Defendants, and each of them, have engaged in and are still engaged in acts of unfair competition, as defined in Business and Professions Code **section** 17200, including but not limited to the following:

A.   Defendants have violated and continued to violate Business and Professions Code section 16720, as alleged hereinabove.

B.  Defendants have violated and continue to violate Civil Code section 1770(a)(16), in that in furtherance of selling their cigarettes and other tobacco products they represent that they are being supplied in accordance with previous representations, to wit, that defendants would affirmatively disclose to the public complete and accurate information about smoking and health, when in fact defendants have not made such disclosures.

C.  Defendants have violated and continue to violate Civil Code section 1770(a)(16), in that in furtherance of selling their products they represent that they are being supplied in accordance with previous representations, to wit, that defendants' products are not addictive, when in fact they are addictive.

D.  Defendants have violated and continue to violate Civil Code section 1770(a)(5), in that in furtherance of selling their products defendants have represented that cigarettes and other tobacco products have uses or benefits which they do not have, in that:

i.  They imply that their cigarettes can be smoked and enjoyed and other tobacco products ingested without consumers becoming addicted to cigarette or other tobacco products; when in fact, cigarettes and other tobacco products are addictive;

ii.  Defendants have assured the consuming public that they would disclose information concerning the addictive nature of nicotine and although they have continually denied they have such information, they have been in possession of such information.

E.  Defendants have violated and continue to violate Civil Code section 1770(a)(5), in that in furtherance of selling their products they imply that their cigarettes can be smoked and enjoyed and other tobacco products ingested without worry over health concerns, when, in fact, defendants knew of the health hazards of using cigarettes and other

18.

65278 7325

1    tobacco products and actively concealed the results of research and other information that

2    demonstrated the dangers of using cigarettes and other tobacco products.

3                F. Defendants have violated and continue to violate Civil Code section

4    1770(a)(5), in that in furtherance of selling their "lite" or "light" cigarettes which

5    purportedly contain lower levels of nicotine than standard cigarettes, they have represented

6    that these products have characteristics, ingredients, or benefits which they do not have, in

7    that:

8                i. The amount of nicotine in these cigarettes is higher than the

9    amount set forth on the cigarette package.

10               ii. The amount of nicotine in these cigarettes is equivalent to

11    the amount of nicotine in standard cigarettes.

12               iii. Defendants imply that such cigarettes are healthier for

13    consumers than are "regular" cigarettes, when in fact they are not.

14               iv. Defendants manipulate the delivery system so as to provide

15    more nicotine and tar to the smoker than is listed on the cigarette package.

16               G. Defendants have violated and continue to violate Civil Code section

17    1770(a)(2) in that in furtherance of selling their products they have represented that cigarettes

18    are regarded as a safe product by CTR, successor in interest to TIRC, allegedly an

19    independent research group, without disclosing that CTR and TIRC are organizations funded

20    and controlled by the Defendant Tobacco Companies and are not independent organizations.

21               H. Defendants have violated and continue to violate Penal Code

22    section 272, in that in furtherance of selling their products they market their products in such

23    a way as to attract, encourage, cause, or tend to cause minors to purchase, receive, or

24    possess tobacco products in violation of Penal Code section 308(b).

25               I. Defendants have aided and abetted and continue to aid and abet

26    retailers to sell their products to minors in violation of Penal Code section 308(a).

27               J. Defendants have violated and continue to violate Penal Code section

28    370, in that in furtherance of selling their products they market their products in such a way

65278 7326

1    as to attract, encourage, cause, or tend to cause minors to purchase and smoke their products

2    even though such products are addictive and otherwise injurious to health and the use,

3    purchase, and possession of such products by minors is contrary to public morals and in

4    violation of Penal Code section 308.

5            K.  Defendants have failed to advise potential consumers of the

6    addictive qualities of nicotine.

7            L.  Defendants have failed to advise potential consumers under the age

8    of 18 years of the addictive qualities of nicotine.

9            M.  Defendants have encouraged consumers under the age of 18 years

10   to purchase and use cigarettes and other tobacco products through various promotional

11   efforts.

12           N.  Defendants have deceptively represented to the public and to public

13   health officers or others who may have taken action to inform or safeguard the public that

14   defendants would:

15               i.  Aid and assist research related to tobacco use and health, and

16               ii.  Provide the public with information on the relationship

17   between tobacco use and health;

18   and defendants have failed to honor their commitment to inform the public about research

19   showing tobacco products to have adverse health effects.

20           O.  Defendants disseminated false or misleading statements to

21   legislators, public health officials, and the general public about the adverse health effects of

22   tobacco use on health.

23           P.  Defendants have used or have directed the use of techniques or

24   processes in the growth of tobacco and the manufacture of tobacco products to control the

25   level of nicotine in tobacco and tobacco products and the effects of nicotine on users of

26   tobacco products.  By way of example, defendants have increased the pH of tobacco or

27   cigarette smoke in order to boost the delivery and the pharmacological effects of nicotine.

28   //

65278  7327

1  Q. Defendants have misrepresented or failed to disclose that they have

2  used or have directed the use of techniques or processes in the growth of tobacco and the

3  manufacture of tobacco products to control the level of nicotine in tobacco and tobacco

4  products and the pharmacological effects of nicotine on users of tobacco products.  By way

5  of example, defendants have increased the pH of tobacco or cigarette smoke in order to boost

6  the delivery and the pharmacological effects of nicotine.

7  R. Defendants have suppressed scientific research or suppressed the

8  disclosure of scientific research regarding the health effects of tobacco use.

9  S. Defendants have suppressed research and development of cigarettes

10  that delivered less nicotine and/or had fewer deleterious health effects on smokers than

11  standard cigarettes manufactured and sold to the public.

12  T. Defendants have designed cigarettes, including cigarette filters, in a

13  manner that would cause the cigarettes to register low levels of tar and/or nicotine under the

14  artificial circumstances of federally prescribed tests but that would deliver tar and/or nicotine

15  levels comparable to the levels of standard cigarettes to smokers under the circumstances in

16  which cigarettes are generally held and smoked.

17  U. Defendants have marketed and sold cigarettes under brands

18  represented to the public as low in tar and/or nicotine when the cigarettes contained tobacco

19  and other ingredients similar to that contained in standard cigarettes and delivered

20  comparable levels of tar and/or nicotine when smoked.

21  WHEREFORE, plaintiffs pray for judgment against defendants, and each of

22  them as follows:

23  First Cause of Action

24  1. For the costs of Medi-Cal benefits provided on behalf of Medi-Cal

25  beneficiaries for treatment of tobacco-related illnesses for the past three years in an amount

26  according to proof.

27  2. For costs of suit incurred herein;

28  3. For such other and further relief as the Court deems just and proper.

65278 7328

Second Cause of Action

1. For an order declaring that the defendants have conspired to and did engage in conduct that is an unreasonable restraint of trade in violation of the Cartwright Act, Business and Professions Code section 16720 et seq.

2. For a permanent injunction, enjoining defendants, and each of them, their agents, servants, and employees, and all persons acting under, in concert with, or for them, from directly or indirectly or in any other manner engaging in conduct as hereinabove alleged in violation of the Cartwright Act, Business and Professions Code section 16720 et seq.;

3. For payment of plaintiff's reasonable attorneys' fees;

4. For costs of suit herein incurred; and

5. For such other and further relief as the court may deem proper.

Third Cause of Action

1. For civil penalties of $10,000 for each violation of Government Code section 12651(a)(7).

2. For reasonable attorneys' fees;

3. For costs of suit incurred herein;

4. For such other and further relief as the court deems just and proper.

Fourth Cause of Action

1. That pursuant to Business and Professions Code section 17203 defendants, and each of them, their successors, agents, representatives, employees and all persons acting in concert with them be permanently enjoined and restrained from engaging in unfair competition as defined in Business and Professions Code section 17200, including, but not limited to the types of acts or practices alleged in the Fourth Cause of Action.

2. Pursuant to Business and Professions Code section 17206, the Court assess a civil penalty of two thousand five hundred dollars ($2,500) against each defendant for each violation of Business and Professions Code section 17200 alleged in the Fourth Cause of //
//

65278 7329

1   Action, and that the Court assess a total penalty of no less than five hundred million dollars

2   ($500,000,000).

3           3.  For costs of suit incurred herein.

4           4.  For such other and further relief as the nature of the case may require and

5   the court deems appropriate and just.

6   Dated: June 12, 1997

7                           DANIEL E. LUNGREN, Attorney General
                          of the State of California

8

9                           M. DAVID STIRLING
                          Chief Deputy Attorney General

10                          ROBERT L. MUKAI
                        RODERICK E. WALSTON

11                            Chief Assistant Attorneys General

12

13                          THOMAS GREENE
                          Senior Assistant Attorney General

14

15                          FLOYD D. SHIMOMURA

16                            Senior Assistant Attorney General

17                          HERSCHEL T. ELKINS
                        CHARLTON G. HOLLAND, III

18                            Senior Assistant Attorneys General
                        LINDA CABATIC

19                          DENNIS ECKHART
                        BARBARA M. MOTZ

20                          ALBERT NORMAN SHELDEN
                          Supervising Deputy Attorneys General

21                          EILEEN GRAY
                        LARRY RASKIN

22                          THEODORE GARELIS
                        RONALD A. REITER

23                            Deputy Attorneys General

24

25

26

27

28

65278 7330

1                             **All Plaintiffs' Counsel**

2

3 DANIEL E. LUNGREN, Attorney General
   of the State of California

4 M. DAVID STIRLING
   Chief Deputy Attorney General

5

6 ROBERT L. MUKAI
  RODERICK E. WALSTON
   Chief Deputy Attorneys General

7

8 HERSCHEL T. ELKINS (State Bar No. 27279)
  CHARLTON G. HOLLAND, III (State Bar No. 36404)
  FLOYD D. SHIMOMURA (State Bar No. 58294)

9 THOMAS GREENE (State Bar No. 57159)
   Senior Assistant Attorneys General

10 1300 I Street, Suite 125
  Post Office Box 944255

11 Sacramento, California  94244-2550
  Telephone:  (916) 324-7874  (Greene)

12

13 LINDA CABATIC (State Bar No. 87483)
  DENNIS ECKHART (State Bar No. 70730)
  BARBARA M. MOTZ (State Bar No. 66933)

14 ALBERT NORMAN SHELDEN (State Bar No. 46277)
   Supervising Deputy Attorneys General

15 EILEEN GRAY (State Bar No. 95770)
  LARRY RASKIN (State Bar No. 116112)

16 THEODORE GARELIS (State Bar No. 95193)
   Deputy Attorneys General

17 1300 I Street, Suite 125
  Post Office Box 944255

18 Sacramento, California  94244-2550
  Telephone:  (916) 324-5501 (Raskin)

19                (916) 445-0767 (Garelis)

20 RONALD A. REITER (State Bar No. 62497)
   Deputy Attorney General

21 300 South Spring Street
  Los Angeles, California  90013

22 Telephone:  (619) 645-2089 (Shelden)
             (213) 897-2628 (Reiter)

23

24

25

26

27

28

65278  7331