# EXHIBIT 38

DEC-19-95 TUE 16:38    CONNARTON WOOD CALLAHAN    FAX NO. 617 443 1696         P.02

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT
Civil Action No.

---

COMMONWEALTH OF MASSACHUSETTS,

Plaintiff,

v.

PHILIP MORRIS INC., R.J. REYNOLDS
TOBACCO COMPANY, BROWN & WILLIAMSON
TOBACCO CORPORATION, B.A.T.
INDUSTRIES P.L.C., LORILLARD
TOBACCO COMPANY, LIGGETT GROUP, INC.,
NEW ENGLAND WHOLESALE TOBACCO CO., INC.
ALBERT H. NOTINI & SONS, INC.,
THE COUNCIL FOR TOBACCO
RESEARCH - U.S.A., INC., and
THE TOBACCO INSTITUTE, INC.,

Defendants.

---

## COMPLAINT

The Commonwealth of Massachusetts, by Attorney General Scott Harshbarger, for its Complaint alleges as follows:

### NATURE OF THE ACTION

1.   For years, and continuing to date, the defendant cigarette manufacturers and their trade associations have engaged in a conspiracy to mislead, deceive and confuse the Commonwealth of Massachusetts and its citizens regarding the overwhelming evidence that cigarette smoking causes fatal disease -- and that the nicotine in cigarettes is a powerfully addictive substance. Although the cigarette manufacturers promised the Massachusetts public that they would lead the effort to discover and disclose

SJack
K Vaughan
J Guest

65156 9649

the truth about smoking and health, they have, in fact, systematically suppressed and concealed material information and waged an aggressive campaign of disinformation about the health consequences of cigarette smoking. The cigarette manufacturers have taken these actions, even though they have known for years, based on their own secret research, that their products eventually injure or kill the consumer when used exactly as intended.

2.   The cigarette manufacturers have known for decades, on the basis of their own long-concealed research, that nicotine is addictive. At the same time, at least certain defendants have developed sophisticated techniques to manipulate the nicotine delivery of cigarettes so as to create and sustain addiction in smokers. Yet publicly the cigarette manufacturers have denied, and continue to deny, that nicotine is addictive and that they manipulate the nicotine delivery of cigarettes. In April 1994, each of the Chief Executive Officers of the defendant cigarette manufacturers testified before the Congressional Subcommittee on Health and the Environment that nicotine is not addictive.

3.   The cigarette manufacturers are engaged in this course of conduct despite their knowledge that the vast majority of new smokers are children and teenagers. Of daily smokers, eighty-two percent start before the age of eighteen. Every day more than 3,000 American teenagers begin smoking.

4.   Each year, more than 10,000 Massachusetts residents die from smoking the defendant cigarette manufacturers' products. Each year, the Commonwealth must spend millions of dollars to

2

65156 9650

purchase or provide medical and related services for
Massachusetts citizens suffering from diseases caused by
cigarette smoking.  Each year, the defendant cigarette
manufacturers reap huge profits from the sale of cigarettes in
Massachusetts.  Each year, the defendant cigarette manufacturers
spend millions of dollars on advertising in Massachusetts which
has enormous appeal to young people.  Each year, more
Massachusetts children and teenagers begin smoking.

5.   The Commonwealth seeks both monetary damages and
injunctive relief for the conduct alleged in this Complaint.
Among other things, the Commonwealth seeks a permanent injunction
to require the defendants to disclose their research on smoking,
addiction and health, to fund a remedial public education
campaign on the health consequences of smoking and to fund
smoking cessation programs for nicotine-dependent smokers.

<u>THE PARTIES</u>

6.   The Attorney General, Scott Harshbarger, brings this
action on behalf of the Commonwealth of Massachusetts and its
Division of Medical Assistance (collectively, the "Commonwealth")
pursuant to his authority under, <u>inter alia</u>, Massachusetts common
law, G.L c. 12, §§ 3, 5 and 10, G.L. c. 118E, § 22 and St. 1994,
c. 60, § 276.  The Attorney General brings this action to obtain
declaratory and equitable relief, damages and restitution.  The
Attorney General seeks to recover the smoking-related costs to
the Commonwealth, including, but not limited to, increased
expenditures for:

a.   Medical assistance provided under Massachusetts'

3

65156 9651

Medicaid program pursuant to G.L. c. 118E.  Under the medical assistance program, the Commonwealth pays for medical services provided to program recipients.  The Commonwealth pays a substantial share of these costs, with the federal government bearing the remaining costs.  In fulfilling its statutory duties, the Commonwealth has expended and will expend substantial sums of money due to the increased costs of providing health care services for smoking-related diseases.

b.   Medical assistance provided under the CommonHealth Program pursuant to G.L. c. 118E, §§ 16, 16A.  Under this program, the Commonwealth pays for medical services for disabled adults and children who are not eligible for Medicaid.  In fulfilling its statutory duties, the Commonwealth has expended and will expend substantial sums of money due to the increased costs of providing health care services for smoking-related diseases.

<u>THE DEFENDANTS</u>

7.   Philip Morris Incorporated ("Philip Morris") is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, New York 10017.

8.   R.J. Reynolds Tobacco Company ("RJR") is a New Jersey corporation with its principal place of business at North Main Street, Winston-Salem, North Carolina 27102.

9.   Brown & Williamson Tobacco Corporation ("Brown & Williamson") is a Delaware corporation with its principal place of business at 1500 Brown & Williamson Tower, Louisville, Kentucky 40202.  On information and belief, the American Tobacco

4

65156 9652

Company ("ATC") was purchased by Brown & Williamson and merged into Brown & Williamson.  On information and belief, Brown & Williamson has succeeded to the liabilities of ATC either by operation of law, or as a matter of fact.

10.  B.A.T. Industries P.L.C. ("B.A.T. Industries") is a British corporation with its principal place of business at Windsor House, 50 Victoria St., London.  Through a succession of intermediary corporations and holding companies, B.A.T. Industries is the sole shareholder of Brown & Williamson. Through Brown & Williamson, B.A.T. Industries has placed cigarettes into the stream of commerce with the expectation that substantial sales of cigarettes would be made in the United States and in Massachusetts.  B.A.T. Industries has also conducted, or through its agents, subsidiaries, associated companies, and/or co-conspirators, conducted significant research for Brown & Williamson on the topics of smoking, disease and addiction.  On information and belief, Brown & Williamson also sent to England research conducted in the United States on the topics of smoking, disease and addiction in order to remove sensitive and inculpatory documents from United States jurisdiction, and such documents were subject to B.A.T Industries' control.  B.A.T. Industries is a participant in the conspiracy described herein and has caused harm in Massachusetts.

11.  Lorillard Tobacco Company ("Lorillard") is a Delaware corporation with its principal place of business at 1 Park Avenue, New York, New York 10016.

12.  Liggett Group, Inc. ("Liggett") is a Delaware

65156 9653

corporation with its principal place of business at 700 West Main
Street, Durham, North Carolina 27702.

    13.  New England Wholesale Tobacco Co., Inc. is a
Massachusetts corporation with its principal and/or usual place
of business at 231 New Boston Street, Woburn, Massachusetts 01801
(hereinafter "distributor defendant").

    14.  Albert H. Notini & Sons, Inc. is a Massachusetts
corporation with its principal and/or usual place of business at
225 Aiken Street, Lowell, Massachusetts 01853 (hereinafter
"distributor defendant").

    15.  The Council for Tobacco Research - U.S.A., Inc.
("CTR"), successor in interest to the Tobacco Industry Research
Committee ("TIRC"), is a nonprofit corporation organized under
the laws of the State of New York with its principal place of
business at 900 3rd Avenue, New York, New York 10022.

    16.  The Tobacco Institute, Inc. ("TI") is a nonprofit
corporation organized under the laws of the State of New York
with its principal place of business at 1875 I Street N.W., Suite
800, Washington, D.C. 20006.

    17.  As used in this complaint, the term "defendant"
includes all predecessor and successor entities to the named
defendants.

    18.  All defendants did and continue to do business in the
Commonwealth; made contracts to be performed in whole or in part
in the Commonwealth; and/or manufactured, tested, sold, offered
for sale, supplied, or placed in the stream of commerce, or in
the course of business, materially participated with others in so

65156 9654

doing, cigarettes; and performed such acts as were intended to, and did, result in the sale and distribution in the Commonwealth of cigarettes from which the defendants derived substantial revenue. All defendants also caused tortious injury by acts or omissions in the Commonwealth, and/or caused tortious injury in the Commonwealth by acts or omissions outside the Commonwealth.

<u>JURISDICTION AND VENUE</u>

19. This Court has jurisdiction over the subject matter of this action pursuant to, <u>inter alia</u>, G.L. c. 212, § 4, and G.L. c. 214, §§ 1 and 5. This Court has personal jurisdiction over the defendants pursuant to G.L. c. 223A, § 3.

20. Venue is proper in Middlesex County pursuant to G.L. c. 223, § 5.

<u>THE HEALTH CONSEQUENCES OF SMOKING</u>

21. The human tragedy of smoking-related disease is practically beyond comprehension. Cigarette smoking is the leading cause of premature death in the United States. According to the federal Centers for Disease Control and Prevention, each year cigarette smoking kills more than 400,000 Americans, exceeding the combined deaths caused by automobile accidents, AIDS, alcohol use, use of illegal drugs, homicide, suicide and fires. Smoking-related illnesses account for one of every five deaths each year in the United States.

22. At least 43 chemicals in the smoke inhaled by persons using defendant cigarette manufacturers' products have been determined to be carcinogenic. Cigarette smoking causes more than 85% of all lung cancer, which has now surpassed breast

7

65156 9655

cancer as the primary cause of death from cancer among women. Smoking is also linked to cancers of the mouth, larynx, esophagus, stomach, pancreas, uterus, cervix, kidney and colon, among others.  All told, cigarette smoking is responsible for at least 30% of all deaths from cancer.

23.  Smoking is the cause of more than 80% of deaths from pulmonary diseases such as emphysema and bronchitis.  These chronic obstructive lung diseases have a profound social impact because of the extended disability of their victims.

24.  Cigarette smoking is one of three major independent causes of coronary heart disease.  Smoking is also responsible for thousands of deaths from cardiovascular disease, including stroke, heart attack, peripheral vascular disease and aortic aneurysm.  Smoking is also linked to a large number of other serious illnesses.

25.  The health consequences of smoking among women are of special concern because of the deleterious effect on reproduction.  Smoking reduces fertility, increases the rate of miscarriages and stillbirths, retards uterine fetal growth and results in lower birth weights in infants.

26.  The nicotine in cigarettes is addictive.  Nicotine is recognized as an addictive substance by such major medical organizations as the Office of the U.S. Surgeon General, the World Health Organization, the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Society of Addiction Medicine, and the Medical Research Council in the United Kingdom.  All of these

8

65156 9656

organizations acknowledge tobacco use as a form of drug
dependence or addiction with severe adverse health consequences.

<u>1994 Congressional Testimony by Cigarette Manufacturers</u>

27.  Last year, the chief executives of the defendant
cigarette manufacturers testified under oath before the
Subcommittee on Health and the Environment of the Committee on
Energy and Commerce, U.S. House of Representatives, chaired by
Congressman Waxman ("Waxman Subcommittee").  These executives
knowingly made material misrepresentations and/or omissions to
the Subcommittee about smoking, health and addiction, and in
particular, stated that nicotine is not addictive.  These
statements were made with the knowledge that they would be
communicated to Massachusetts consumers.  These defendants'
testimony to the Waxman Subcommittee included the following:

a.  Andrew Tisch, then CEO of Lorillard, asserted that
smoking does not cause cancer.  "We have looked at the data and
the data that we have been able to see has all been statistical
data that has not convinced me that smoking causes death."

b.  Philip Morris President and CEO William I. Campbell,
said that:

i.  "Philip Morris does not manipulate nor
independently control the level of nicotine in our
products."

ii.  "Cigarette smoking is not addictive."

iii.  "Philip Morris research does not establish that
smoking is addictive."

c.  RJR CEO James W. Johnston said that, "smoking is no

9

65156 9657

more 'addictive' than coffee, tea or Twinkies."

28.   These representations were made despite a substantial body of evidence, including evidence developed by the cigarette manufacturers themselves, dating from as early as 1962, indicating that nicotine is not only addictive, but is the reason why people smoke.

29.   The cigarette manufacturers continue to deny that nicotine is addictive and instead use various misleading euphemisms to describe the role of nicotine, such as "satisfaction," "impact," "strength," "rich aroma" and "pleasure."  Nonetheless, there is widespread agreement in the medical and scientific communities that the primary, if not sole, function of nicotine is to provide a pharmacological effect on the smoker that leads to addiction.

THE COMPOSITION OF THE CIGARETTE INDUSTRY IN THE UNITED STATES

30.   At all relevant times, Philip Morris, RJR, Brown & Williamson, B.A.T. Industries, Lorillard, Liggett and ATC (hereafter sometimes collectively  "the cigarette manufacturers") together control virtually 100% of the cigarette market in Massachusetts and in the United States.

31.   The cigarette industry is one of the most profitable industries in the United States, with profit margins estimated to be in the range of 30%.  Industry profits are in the billions of dollars annually from domestic sales alone.

32.   The unusually small and highly profitable cigarette industry has facilitated the planning, implementation and funding of a decades-long conspiracy by the cigarette manufacturers and

65156 9658

their trade associations relating to the issues of smoking,
health and addiction.

### NATURE OF THE CONSPIRACY

33.  This action arises out of an ongoing conspiracy by the
leading cigarette manufacturers and their trade associations
which together control the cigarette industry in Massachusetts.

34.  The cigarette manufacturers have pursued a conspiracy
of deceit and misrepresentation against the public designed to
protect cigarette sales.  The means by which the cigarette
manufacturers carried out their conspiracy were twofold:  first,
they agreed falsely to represent to the public that questions
about smoking and health would be answered by a new unbiased and
therefore trustworthy source; and second, they counted on that
trust to more effectively misrepresent, suppress and confuse the
facts about the health dangers of smoking, including addiction.
The cigarette manufacturers set their plan in motion by creating
a joint industry research organization in 1954.  Since that time,
they have used the credibility gained by claims of disinterested
industry funded research better to misrepresent the material
facts to the public.  In what has become the industry "mantra,"
cigarette manufacturers claim that there is insufficient
"objective" research to determine if cigarette smoking causes
disease, and that cigarettes are not addictive.

35.  The two interconnected strategies of misrepresenting
their objectivity to gain credibility, and using that credibility
better to deceive the public about smoking and health, have been
repeated consistently for more than four decades.  The cigarette

65156 9659

manufacturers and their trade associations have engaged in a
continuous conspiracy to deceive the public regarding facts
material to the decision to purchase cigarettes.

36. Moreover, as internal industry research confirmed the
dangers of smoking and addiction, their deception rose to a new
level: they concealed their own negative health and addiction
research results from both the public and public health
officials. These research results have still not been
voluntarily released. But the internal research that has become
available directly contradicts what the cigarette manufacturers
and their trade associations have told the public for decades.

37. The cigarette manufacturers have also not told the
public that they manipulate and control the nicotine content and
delivery of their products to create and sustain smokers'
addiction to cigarettes.

38. The success of the industry's campaign of deceit and
misinformation depended on the cigarette manufacturers acting in
concert. If one company broke ranks and told the public what it
knew about the health consequences of cigarette smoking, or its
addictive nature, the conspiracy would fail. Without the
agreement of each cigarette manufacturer to suppress the truth,
the deception that the joint industry research efforts were
objective would be revealed, and the substantive claim that "not
enough facts are known" to indict cigarette smoking as a cause of
disease would ring hollow. The cigarette manufacturers agreed to
come together and to stay together in order to accomplish what
could not have otherwise occurred -- the unified and consistent

12

65156 9660

distortion of public information on smoking, health and addiction.

39. The testimony of the cigarette manufacturers before Congress last year that smoking is not a proven cause of disease and death, and that nicotine is not addictive, is only one recent example of this ongoing pattern of deception and suppression that began more than 40 years ago.

I. **CIGARETTE SMOKING AND DISEASE:**
   **THE INDUSTRY'S PUBLIC AND PRIVATE RESPONSES**

   **1953 "Big Scare" and the Joint Industry Response**

   40. In December of 1953, Dr. Ernest L. Wynder of the Sloan-Kettering Institute published the results of a study where he painted the shaved backs of mice with cigarette smoke condensate residue. Malignant tumors grew in 44% of the mice in Dr. Wynder's study, providing biological evidence that cigarette smoke caused cancer. The previous year, a British researcher, Dr. Richard Doll, published a statistical analysis showing that lung cancer was more common among people who smoked and that the risk of lung cancer was directly proportional to the number of cigarettes smoked. The widespread reporting of these studies caused what cigarette company officials later called the "Big Scare."

   41. The cigarette industry responded quickly to the mounting adverse publicity of a link between smoking and cancer. The Chief Executive Officers of the leading cigarette manufacturers met on December 15, 1953, at the Plaza Hotel in New York City. Also in attendance was the public relations firm of

13

65156 9661

Hill and Knowlton which was to play a central role in formulating and executing the industry response.

42.  According to a Hill and Knowlton memorandum summarizing the meeting, cigarette industry executives viewed the problem as "extremely serious and worthy of drastic action."  The document continues, "officials stated that salesmen in the industry are frantically alarmed and that the decline in tobacco stocks on the stock exchange market has caused grave concern . . . ."

43.  The participants in the meeting agreed that a strong public relations response from the industry was necessary.  From the beginning, the emerging research linking smoking and cancer was viewed by these defendants as a public relations problem, not a public health issue.  According to the Hill and Knowlton memorandum summarizing the meeting:

    a.   The Chief Executive Officers of all the leading companies, except Liggett, "agreed to go along with a public relations program on the health issue."

    b.   "They are also emphatic in saying that the entire activity is a long-term, continuing program, since they feel that the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future."

    c.   "The current plans are for Hill and Knowlton to serve as the operating agency of the companies, hiring all the staff and disbursing all funds."

Creation of Tobacco Industry Research Committee

44.  Nine days later, Hill and Knowlton presented a detailed

65156 9662

recommendation to the cigarette manufacturers and others.  The
recommendation recognized the importance of gaining the public
trust, and avoiding the appearance of bias, if the "pro-
cigarette" industry strategy was to be successful.  According to
the memorandum:

> "[T]he grave nature of a number of recently highly
> publicized research reports on the effects of cigarette
> smoking . . . have confronted the industry with a serious
> problem of public relations.
>
> It is important that the industry do nothing to appear
> in the light of being callous to considerations of health or
> of belittling medical research which goes against
> cigarettes.
>
> The situation is one of extreme delicacy.  There is
> much at stake and the industry group, in moving into the
> field of public relations, needs to exercise great care not
> to add fuel to the flames."

45.  As a result of the meeting of December 15, 1953, and
the recommendations of Hill and Knowlton, five of the six
cigarette manufacturers agreed to create the Tobacco Industry
Research Committee ("TIRC").  Liggett joined the industry trade
group in 1964, the same year the Surgeon General issued his first
report linking cigarette smoking to lung cancer.  Also in 1964,
TIRC changed its name to the Council for Tobacco Research
("CTR").  A second trade group, the Tobacco Institute, was formed
by cigarette manufacturers in 1958.

65156 9663

## TIRC Control by Hill and Knowlton

46.   As had been proposed at the December 15, 1953 meeting, the cigarette manufacturers (except Liggett), through their agent Hill and Knowlton, operated, and effectively controlled TIRC.

47.   TIRC was physically established in the Empire State building, one floor below the Hill and Knowlton offices. Internal documents confirm that Hill and Knowlton, and not independent scientists, actually ran TIRC. A "highly confidential" internal memo reported:

> "Since the [TIRC] had no headquarters and no staff, Hill and Knowlton, Inc. was asked to provide a working staff and temporary office space. As a first organizational step, public relations counsel assigned one of its experienced executives, W.T. Hoyt, to serve as account executive and handle as one of his functions the duties of executive secretary for the [TIRC]."

48.   In 1954, 35 staff members of Hill and Knowlton worked full or part time for TIRC. In that year, TIRC spent $477,955 on payments to Hill and Knowlton, over 50% of TIRC's entire budget.

## The Industry's Promise to Smokers

49.   Shortly after creating TIRC, the member cigarette manufacturers made an unambiguous pledge to the public, including the people of Massachusetts and those who advance and protect the public health. These defendants represented that through TIRC, they would conduct and report objective and unbiased research regarding smoking and health. When they made this

65156 9664

representation, these defendants knew or should have known that Massachusetts consumers would consider the representation material to their decisions to purchase and smoke cigarettes. At that time, and continuing to the present, these defendants knew or should have known that their failure to fulfill the duty they undertook, and other conduct as alleged herein, would directly increase the health care costs to the Commonwealth.

50. On January 4, 1954, the member defendants announced the formation and purpose of TIRC, with a full page newspaper advertisement entitled "A Frank Statement to Cigarette Smokers." The statement appeared in 448 newspapers across the nation, reaching a circulation of 43,245,000 in 258 cities. The advertisement ran in the daily newspapers in Boston, Springfield and Worcester, Massachusetts.

51. The "Frank Statement to Cigarette Smokers" stated in part:

a. "Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings."

b. "Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research."

c. "[T]here is no proof that cigarette smoking is one of the causes [of lung cancer]."

d. "We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business."

17

65156 9665

e.    "We believe the products we make are not injurious to
health."

f.    "We always have and always will cooperate closely with
those whose task it is to safeguard the public health."

g.    "We are pledging aid and assistance to the research
effort into all phases of tobacco use and health."

h.    "For this purpose we are establishing a joint industry
group consisting initially of the undersigned.  This
group will be known as TOBACCO INDUSTRY RESEARCH
COMMITTEE."

i.    "In charge of the research activities of the Committee
will be a scientist of unimpeachable integrity and
national repute.  In addition there will be an Advisory
Board of scientists disinterested in the cigarette
industry.  A group of distinguished men from medicine,
science, and education will be invited to serve on this
Board.  These scientists will advise the Committee on
its research activities."

j.    "This statement is being issued because we believe the
people are entitled to know where we stand on this
matter and what we intend to do about it."

52.  By the spring of 1955, the self-defense strategy
recommended by Hill and Knowlton and implemented by the industry
through the "Frank Statement" was largely successful.  Hill and
Knowlton reported to TIRC:

a.    "progress has been made" . . . "The first 'big scare'
continues on the wane."

18

65156 9666

b.   "The research program of the [TIRC] has won wide
     acceptance in the scientific world as a sincere,
     valuable and scientific effort."

c.   "Positive stories are on the ascendancy."

     <u>Industry Knowledge that Smoking is Harmful</u>

53.   Even before the sponsors of the Frank Statement
represented that "there is no proof that cigarette smoking is one
of the causes" of lung cancer, an industry researcher had
reported the contrary.  As early as 1946, Lorillard chemist H.B.
Parmele, who later became Vice President of Research and a member
of Lorillard's Board of Directors, wrote to his company's
manufacturing committee:

     "Certain scientists and medical authorities have claimed for
     many years that the use of tobacco contributes to cancer
     development in susceptible people.  Just enough evidence has
     been presented to justify the possibility of such a
     presumption."

54.   In the years following the 1954 "Frank Statement," and
continuing to the present, the cigarette companies have
repeatedly acted in breach of their assumed duty to report
objective facts on smoking and health.  As evidence mounted, both
through industry research and truly independent studies, that
cigarette smoking causes cancer and other diseases, the cigarette
manufacturers and their trade associations continued publicly to
represent that nothing was proven against smoking.  Internal
documents show that the truth was very different.  The cigarette
manufacturers knew and acknowledged internally the veracity of

19

65156 9667

scientific evidence of the health hazards of smoking, and at the same time suppressed such evidence where they could, and attacked it when it did appear.

    55.   Internal cigarette industry documents reveal, for example:

        a.    A 1956 memorandum from the Vice President of Philip Morris' Research and Development Department to top executives at the company regarding the advantages of "ventilated cigarettes" stated that: "Decreased carbon monoxide and nicotine are related to decreased harm to the circulatory system as a result of smoking . . . . Decreased irritation is desirable . . . as a partial elimination of a potential cancer hazard."

        b.    A 1958 memorandum sent to the Vice President of Research at Philip Morris who later became a member of its Board of Directors from a company researcher stated "the evidence . . . is building up that heavy cigarette smoking contributes to lung cancer either alone or in association with physical and physiological factors . . . ."

        c.    A 1961 document presented to the Philip Morris Research and Development Committee by the company's Vice President of Research and Development included a section entitled "Reduction of Carcinogens in Smoke." The document stated, in part:

            "To achieve this objective will require a major research effort, because

20

65156 9668

    -   Carcinogens are found in practically every
    class of compounds in smoke.
    This fact prohibits complete solution of the
    problem by eliminating one or two classes of
    compounds.
    The best we can hope for is to reduce a
    particularly bad class, i.e., the polynuclear
    hydrocarbons, or phenols . . . .
    -   Flavor substances and carcinogenic substances
    come from the same classes, in many instances."

d.   A 1963 memorandum to Philip Morris' President and CEO
     from the company's Vice President of Research describes
     a number of classes of compounds in cigarette smoke
     which are "known carcinogens."  The document goes on to
     describe the link between smoking and bronchitis and
     emphysema.  "Irritation problems are now receiving
     greater attention because of the general medical belief
     that irritation leads to chronic bronchitis and
     emphysema.  These are serious diseases involving
     millions of people.  Emphysema is often fatal either
     directly or through other respiratory complications.  A
     number of experts have predicted that the cigarette
     industry ultimately may be in greater trouble in this
     area than in the lung cancer field."

e.   Brown & Williamson and its parent company, BATCO,
     researched the health effects of nicotine and were
     aware early on, as reported at a B.A.T. Group Research

21

65156 9669

Conference in November 1970, that "nicotine may be
implicated in the aetiology [cause] of cardiovascular
disease . . . ."

f.   A 1961 "Confidential" memorandum from the consulting
     research firm hired by Liggett to do research for the
     company states:

     "There are biologically active materials present in
     cigarette tobacco.

     These are:    a)   cancer causing

                   b)   cancer promoting

                   c)   poisonous

                   d)   stimulating, pleasurable, and
                        flavorful."

g.   A 1963 memorandum from the Liggett consulting research
     firm states:  "Basically, we accept the inference of a
     causal relationship between the chemical properties of
     ingested tobacco smoke and the development of
     carcinoma, which is suggested by the statistical
     association shown in the studies of Doll and Hill,
     Horn, and Dorn with some reservations and
     qualifications and even estimate by how much the
     incidence of cancer may possibly be reduced if the
     carcinogenic matter can be diminished, by an
     appropriate filter, by a given percentage."

56.  These internal Liggett documents sharply contrast with
the information Liggett provided to the Surgeon General in 1963.
Liggett withheld from the Surgeon General the views of its

22

65156 9670

researchers and consultants that the evidence showed cigarette
smoking causes human disease.

57.  The report Liggett presented to the Surgeon General
omitted all of these views.  Instead, it focused on alternative
causes of disease, such as air pollution, coffee and alcohol
consumption, diet, lack of exercise, and genetics.  Liggett
criticized the known statistical association between smoking and
mortality and various diseases as "unreliably conducted" and
"inadequately analyzed."  The Liggett report concluded that the
association between smoking and disease was inconclusive, and was
in fact due to other factors coincidentally associated with
smoking.

58.  Philip Morris also concealed from the public its actual
views of the research conducted outside the influence of the
industry.  In a 1971 memorandum, Dr. H. Wakeham, then Vice
President of Research and Development, referring to a recent
study which found cigarette smoke inhalation caused lung cancer
in beagles:  "1970 might very properly be called the year of the
beagle.  Early in the year, the American Cancer Society announced
that they had finally demonstrated the formation of lung cancer
in beagles by smoke inhalation in the now infamous Auerbach and
Hammond study."  Although Dr. Wakeham criticized the mice
cancer studies, he conceded that "the beagle test was a critical
one . . . for the cigarette causation hypothesis."

59.  Dr. Wakeham's memorandum demonstrates Philip Morris'
approval of the industry's public dismissals of these independent
studies:  "The strong opposition of the industry to the beagle

23

65156 9671

test is indicative of a new, more aggressive stance on the part
of the industry in the smoking and health controversy. We have
gone over from what I have called the 'vigorous denial' approach,
the take it on the chin and keep quiet attitude, to the strongly
voiced opposition and criticism. I personally think this
counter-propaganda is a better stance than the former one."

60. Similarly, BATCO's internal view of the validity of
mouse skin painting experiments differed markedly from the view
expressed in public statements. Minutes from a 1969 BATCO
research conference stated "[h]istorically, bioassay experiments
were undertaken by the industry with the object of clarifying the
role of smoke constituents in pulmonary carcinogenesis. The most
widely used of these methods [was] mouse-skin painting . . . .
(a) In the foreseeable future, say five years, mouse-skin
painting would remain as the ultimate court of appeal on
carcinogenic effects." Two years later a Brown & Williamson
public relations document stated that "[m]uch of the experimental
work involves mouse-painting or animal smoke inhalation
experiments . . . . [T]he results obtained on the skin of mice
should not be extrapolated to the lung tissue of the mouse, or to
any other animal species. Certainly such skin results should not
be extrapolated to the human lung."

                    Repeated False Promises to the Public

61. The deceptions of the 1954 "Frank Statement to
Cigarette Smokers" were renewed and repeated by the industry.
RJR chairman Bowman Gray told Congress in 1964: "If it is proven
that cigarettes are harmful, we want to do something about it

65156 9672

regardless of what somebody else tells us to do.  And we would do our level best.  It's only human."

62.  Another advertisement co-sponsored by TIRC and the Tobacco Institute called "A Statement about Tobacco and Health," stated:

"We recognize that we have a special responsibility to the public -- to help scientists determine the facts about tobacco and health, and about certain diseases that have been associated with tobacco use.  We accepted this responsibility in 1954 by establishing the TIRC, which provides research grants to independent scientists.  We pledge continued support of this program of research until the facts are known."

"We shall continue all possible efforts to bring the facts to light."

63.  Additional representations were made in 1970 when the cigarette industry through its lobbying group, the Tobacco Institute, placed a number of advertisements similar to the 1954 "Frank Statement."  One advertisement stated in part:

a.   "After millions of dollars and over 20 years of research: The question about smoking and health is still a question."

b.   "In the interest of absolute objectivity, the tobacco industry has supported totally independent research efforts with completely non-restrictive funding."

c.   "In 1954, the Industry established what is now known as CTR, the Council for Tobacco Research--USA, to provide

25

65156 9673

financial support for research by independent
scientists into all phases of tobacco use and health.
Completely autonomous, CTR's research activity is
directed by a board of ten scientists and physicians
who retain their affiliations with their respective
universities and institutions. This board has full
authority and responsibility for policy, development
and direction of the research effort."

    d.   "The findings are not secret."

    64.  Another advertisement in 1970 stated that the industry
"believes the American public is entitled to complete,
authenticated information about cigarette smoking and
health . . . . The tobacco industry recognizes and accepts a
responsibility to promote the progress of independent scientific
research in the field of tobacco and health."

    65.  In 1972 Tobacco Institute President Horace Kornegay
testifying before Congress, stated that "the cigarette industry
is as vitally concerned or more so than any other group
in determining whether cigarette smoking causes human
disease . . . . That is why the entire tobacco industry . . .
since 1954 has committed a total of $40 million for smoking and
health research through grants to independent scientists and
institutions."

    66.  In March of 1983, Sheldon Sommers, MD, scientific
director of CTR, testified before Congress that: "Cigarette
smoking has not been scientifically established to be a cause of
chronic diseases, such as cancer, cardiovascular disease, or

65156 9674

emphysema.  Nor has it been shown to affect pregnancy outcome
adversely."

.    67. In 1984, RJR placed an editorial style advertisement in
the "New York Times" stating that "[s]tudies which conclude that
smoking causes disease have regularly ignored significant
evidence to the contrary."

68.  In April 1994, William Campbell, President of Philip
Morris, told the Waxman Subcommittee, in response to what he
described as "a number of charges . . . leveled against
the tobacco industry generally, and Philip Morris
specifically . . .":

> ". . . our consumers are being misled and when that happens
> Philip Morris has and will continue to speak out loudly and
> clearly.  Our consumers deserve to know the truth . . . ."

69.  Each of the representations by defendants to the public
about sponsoring independent objective research and bringing the
truth to light were false and deceptive.  These
misrepresentations seek to gain the trust of the public in order
to better distort and suppress substantive information about
smoking and health.

### The Gentlemen's Agreement

70.  This industry strategy depended for its success on
joint and concerted action by the cigarette manufacturers and
their trade associations.  Upon information and belief, each of
these defendants agreed not to reveal to the public the true
nature of TIRC, and later CTR, and not to disclose adverse
information on smoking and health, in order to protect continued

27

65156 9675

cigarette sales.

71. In 1968, a memo addressed to the CEO of Liggett regarding a meeting of the research directors of the six cigarette manufacturers stated on the topic of smoking and health "a general feeling that an industry approach as opposed to an individual company approach was highly desirable."

72. Each company also agreed not to perform research on smoking and health on their own. This agreement was referred to as the "Gentlemen's Agreement." A 1968 internal Philip Morris draft memorandum entitled "Need for biological research by Philip Morris research and development," and prepared by the company's Vice President of Research and Development, states:

> "We have reason to believe that in spite of the gentlemans [sic] agreement for the tobacco industry in previous years that at least some of the major companies have been increasing biological studies with their own facilities."

73. As indicated by the 1968 "Gentlemans Agreement" memo, it was believed within the industry that individual companies were performing certain research on their own, in addition to the joint industry research. But the fundamental understanding and agreement remained intact: that harmful information and activities would be restrained, suppressed, and/or concealed. This included restraining, suppressing, and concealing research on the health effects of smoking, including the addictive qualities of cigarettes, and restraining, concealing, and suppressing the research and marketing of safer cigarettes.

65156 9676

### Suppression and Concealment of Industry-Sponsored Biological Research

### Role of CTR as a "Front"

74.  Internal documents demonstrate that the joint industry research efforts undertaken through TIRC, and later, through CTR, were not disinterested or objective.  Rather, they were designed and used to promote favorable research, to suppress negative research where possible, and to attack negative research where it could not be suppressed, all in order to convince the public that the "case against smoking is not closed."

75.  A 1974 report to the CEO of Lorillard from a research executive described CTR's scientific projects as "hav[ing] not been selected against specific scientific goals, but rather for various purposes such as public relations, political relations, position for litigation, etc.  Thus, it seems obvious that reviews of such programs for scientific relevance and merit in the smoking and health field are not likely to produce high ratings."

76.  A 1972 internal document from a Tobacco Institute official to the group's President described the importance of using joint industry research to maintain public doubt about the link between smoking and disease:

"For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts -- litigation, politics, and public opinion.
While the strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not - nor was it ever intended to be

65156 9677

- a vehicle for victory.  On the contrary, it has always

been a holding strategy, consisting of

--    creating doubt about the health charge without actually

denying it

--    advocating the public's right to smoke, without

actually urging them to take up the practice

--    encouraging objective scientific research as the only

way to resolve the question of the health hazard"

"As an industry, therefore, we are committed to an ill-

defined middle ground which is articulated by variations on

the theme that, 'the case is not proved.'"

"In the cigarette controversy, the public -- especially

those who are present and potential supporters (e.g. tobacco

state congressmen and heavy smokers) -- must perceive,

understand, and believe in evidence to sustain their

opinions that smoking may not be the causal factor."

"As things stand, we supply them with too little in the

way of ready-made credible alternatives."

77.  A 1978 memo addressed to the CTR file from a Philip

Morris official characterized CTR as "an industry 'shield'."

The memorandum goes on to state:

"the 'public relations' value of CTR must be considered

and continued . . . .  It is extremely important that

the industry continue to spend their dollars on

research to show that we don't agree that the case

against smoking is closed . . . .  There is a

'CTR basket' which must be maintained for 'PR'

30

65156 9678

purposes . . . ."

78.  In 1993, a former 24-year employee of CTR confirmed publicly that the joint industry research efforts were not objective:

> "When CTR researchers found out that cigarettes were bad and it was better not to smoke, we didn't publicize that."  "The CTR is just a lobbying thing.  We were lobbying for cigarettes."

79.  This and other evidence demonstrates that the role and purpose of TIRC and CTR in the cigarette manufacturers' strategy was to seek to use the public's trust to propagate "pro-cigarette" propaganda.  An industry official wrote in his personal notes describing a meeting which included high level officials from various cigarette manufacturers that:

> "CTR is best & cheapest insurance the tobacco industry can buy and without it the Industry would have to invent CTR or would be dead."

80.  Nonetheless, in its annual reports published between 1985 and 1992, CTR stated that its Scientific Advisory Board funded peer-reviewed research projects "judging them solely on the basis of scientific merit and relevance."  In 1994, Dr. James F. Glenn, CEO of CTR, submitted testimony to the Waxman Subcommittee that:

a.  "[t]he Council . . . sponsors research into questions of tobacco use and health and makes the results available to the public."

b.  "Council grantees are assured complete scientific

31

65156 9679

freedom in conducting their studies . . . . Publication
of research results is encouraged in all instances."

### The Example of Dr. Homburger

81.  In fact, CTR-sponsored research projects were directed
away from research that might add to the evidence against
smoking.  When CTR-sponsored research did produce unfavorable
results, however, the information was distorted or simply
suppressed.  For example, Dr. Freddy Homburger, a researcher in
Cambridge, Massachusetts, undertook a study of smoke exposure on
hamsters.  According to Dr. Homburger, he received a grant from
CTR which was changed half-way through the study to a contract
"so they could control publication -- they were quite open about
that."  Dr. Homburger has testified that when the study was
completed in 1974, the Scientific Director of CTR and a CTR
lawyer "didn't want us to call anything cancer" and that they
threatened Dr. Homburger with "never get[ting] a penny more" if
his paper was published without deleting the word cancer.

82.  An internal CTR document describes how Dr. Homburger
attempted to call a press conference about the incident and how
CTR stopped it:

"He . . . was to tell the press that the tobacco industry
was attempting to suppress important scientific information
about the harmful effects of smoking.  He was going to point
specifically at CTR."

"I arranged later that evening for it to be cancelled."

"Homburger was given a cordial welcome and nicely hastened"
[sic] out the door."

32

65156 9680

"P.S. I doubt if you or Tom will want to retain this note."

#### CTR Special Projects Division

83. Another mechanism that CTR used to suppress research results that implicated smoking in disease was selectively to involve lawyers, and then invoke the attorney/client privilege to prevent the disclosure of harmful information. CTR used the term "special projects" to mean a project that carried a risk of a negative result that might have to be suppressed. "Special projects" were selected and monitored by industry lawyers to prevent disclosure. One Philip Morris official characterized CTR as a "front" for performing "special projects."

84. Notes prepared at a 1981 meeting of the cigarette industry's Committee of General Counsel state:

> "When we started the CTR Special Projects, the idea was that the scientific director of CTR would review a project. If he liked it, it was a CTR special project. If he did not like it, then it became a lawyers' special project."

> ". . . we were afraid of discovery for FTC and Aviado, we wanted to protect it under the lawyers. We did not want it out in the open."

85. At least one cigarette company used similar tactics to suppress and avoid disclosure of its internal research on smoking and disease. At a time when the company was resisting discovery in a number of personal injury lawsuits, Brown & Williamson's general counsel, J. Kendrick Wells, recommended in a memorandum dated January 17, 1985, that much of the company's biological

33

65156 9681

research be declared "deadwood" and shipped to England.  He

recommended that no notes, memos or lists be made about these

documents.  Wells stated, "I had marked certain of the document

references with an X . . . which I suggested were deadwood in the

behavioral and biological studies area.  I said that the "B"

series are "Janus" series studies and should also be considered

as deadwood."  ("Janus" was a name of a project that attempted to

isolate and remove the harmful elements of tobacco.)  Wells

further recommended that the research, development and

engineering department also should undertake "to remove the

deadwood from the files."

86.  Through CTR, the cigarette manufacturers have used

lawyers and the claim of attorney/client privilege to insulate

CTR-funded research projects from disclosure to the public and to

government officials. This conduct demonstrates the falsity of

the industry representations jointly to fund objective research,

and to report the results of that research to the public.

Suppression and Concealment of Internal Biological Research

Mouse House Massacre

87.  In the 1960s, RJR established a facility in Winston-

Salem, North Carolina, to perform research on the health effects

of smoking using mice.  Nicknamed the "Mouse House," RJR

scientists conducted research in a number of specific areas,

including studies of the actual mechanism whereby smoking causes

emphysema in the lungs.

88.  The RJR lab made significant progress in understanding

this mechanism.  Despite this progress, RJR disbanded the entire

65156 9682

research division in one day, and fired all 26 scientists without
notice.

89.  Several months before the 1970 closure and firings, RJR
attorneys collected dozens of research notebooks from the
scientists.  The notebooks have still not been disclosed.  One of
the researchers later stated about RJR's executives and lawyers
that "they like to take the position that you can't prove harm
because you don't know mechanism . . . .  And sitting right under
their noses is evidence of mechanism[.]  What are they going to
do with this stuff?  They decided to kill it."

90.  Internally, an RJR-commissioned report  favorably
described the Mouse House work as "the more important of the
smoking and health research effort because it comes close to
determining what was thought to be the underlying pathobiology of
emphysema."  None of the work done at the "Mouse House" was
disclosed to the public.

<u>Safer Cigarette</u>

91.  Several cigarette manufacturers' biological research
appears to have been directed toward developing a cigarette with
reduced health risks.  These companies performed research which
involved dividing cigarette smoke into its different chemical
constituents, or "fractions," to discover which part of the
cigarette smoke caused disease.  Several companies were
successful in discovering which specific constituents in tobacco
smoke were carcinogens, or were linked to other diseases.  This
research was kept secret and never reported to the public.

92.  A number of companies also successfully removed certain

35

65156 9683

harmful constituents from cigarette smoke, and developed
prototype cigarettes with reduced health effects.  These products
were never marketed.

93.  A memorandum written by an attorney at the firm of
Shook, Hardy & Bacon, long-time lawyers for the cigarette
industry, articulated the industry-wide position regarding the
issue of a safer cigarette.  The 1987 memorandum, referring to
the marketing by RJR of a smokeless cigarette, Premier, stated
that the smokeless cigarette could "have significant effects on
the tobacco industry's joint defense efforts" and that "[t]he
industry position has always been that there is no alternative
design for a cigarette as we know them."  The attorney also noted
that, "Unfortunately, the Reynolds announcement . . . seriously
undercuts this component of industry's defense."

94.  As early as 1958, a memorandum from a Philip Morris
researcher to the company's Vice President of Research and
Development proposed that the company attempt to make a safer
cigarette that could enable it to "jump on the other side of the
fence . . . on the issue of tobacco smoking and health . . . ."

95.  Philip Morris did perform the research and development
of such a product.  However, the company never released the
research, and never informed the public that existing cigarettes
were not safe or that a safer cigarette was possible.  A 1964
Philip Morris research and development presentation to its Board
of Directors stated:

"Two years ago, in anticipation of a health crisis to
be precipitated by the Smoking and Health Report of the

36

65156 9684

Surgeon General's Committee, we undertook to develop a
physiologically superior cigarette.

[W]e put together a charcoal filter product with
performance superior to anything in the market place.  That
product was known as Saratoga.  Physiologically it was an
outstanding cigarette.  Unfortunately then after much
discussion we decided not to tell the physiological story
which might have appealed to a health conscious segment of
the market.  The product as test marketed didn't have good
'taste' and consequently was unacceptable to the public
ignorant of its physiological superiority."

96.  The research and development department at Philip
Morris nonetheless viewed continued research into safer
cigarettes as necessary to compete in the event that another
cigarette company marketed a safer cigarette.  The presentation
to the Philip Morris Board of Directors continued:

"The Research and Development Department is working to
establish a strong technological base with both defensive
and offensive capabilities in the smoking and health
situation.  Our philosophy is not to start a war, but if war
comes, we aim to fight well and to win."

### Liggett Safer Cigarette: XA

97.  Liggett also developed a safer cigarette.  Company
researchers believed that they had discovered which cigarette
smoke constituents were carcinogens, and found a way to remove
them.  Despite Liggett officials' belief that the product was
commercially marketable, the company never marketed the safer

65156 9685

cigarette and suppressed the research that led to its
development.

98.  Liggett began its research by repeating the smoke
condensate painting studies of mice performed by Dr. Wynder
through a contract with a consulting firm.  The consulting firm
confirmed Dr. Wynder's findings, and as a result in 1968, Liggett
began "a tobacco additive program designed to reduce or eliminate
the tumorigenic activity of cigarette smoke."

99.  By 1979, Liggett had declared the work a success.
Company documents state:

> "Briefly, as a result of 20 years effort in cooperation with
> [the consulting firm], we have developed a cigarette system
> which produces smoke of reduced biological activity . . . .
> [T]here can be no argument that the use of the additives has
> resulted in a product with lower carcinogenic
> effects . . . ."

100. Liggett's safer cigarette, a product called "XA," was
never marketed and the XA project was abandoned.  On information
and belief, Liggett did so for two reasons.  First, disclosing
the feasibility of a safer cigarette would imply that all
existing cigarettes were not safe.  Second, Philip Morris
apparently threatened Liggett with retaliation if Liggett
violated the industry agreement not to disclose negative
information on smoking and health.  Liggett's Assistant Research
Director, Dr. James Mold, reported that Liggett's president said
that he was "told by someone in the Philip Morris Company that if
we tried to market such a product that they would clobber us."

65156 9686

### Liggett, James Mold and the Suppression of the XA Research

101. During the XA project, Liggett attempted to insulate the research by the use of company lawyers. According to Dr. Mold, after 1975, "all meetings that we had regarding this project were to be attended by a lawyer . . . . All paper that was generated . . . [was] to be directed to the Law Department." Dr. Mold stated that lawyers even collected all the notes after each meeting.

102. Dr. Mold stated that despite its significance, the company lawyers not only ultimately succeeded in stopping the project, but ordered him not to publish the results of the research that led to the safer cigarette. Only an abstract of the paper, modified by·the legal department, was published by the consulting firm, without Dr. Mold's name.

103. When asked why Liggett never marketed the safer XA cigarette, Dr. Mold explained that:

> "[Management circles] felt that such a cigarette if put on the market would seriously indict them for having sold other types of cigarettes that didn't contain this, for example. Or that they were carrying on this biological research at the same time saying it meant nothing."

### Liggett Safer Cigarette Patent

104. Liggett had also obtained a patent for the process it had discovered to produce its safer cigarette. The patent application described the reduction in cancer in mouse studies, prompting stories in the media that Liggett was the first cigarette company to admit that smoking caused cancer. Liggett

65156 9687

responded by issuing a press release it called a "Liggettgram"
which stated:

> "Liggett and the cigarette industry continue to deny,
> as they have consistently, that any conclusions can be drawn
> relating such test results on mice in laboratories to cancer
> in human beings.  It has never been established that smoking
> is a cause of human cancer."

> "The laboratory experiments reported in the patent were
> conducted for Liggett by an independent researcher, The Life
> Sciences Division of Arthur D. Little, Inc."

105. At the time Liggett made this statement, Dr. Mold
estimates that Liggett had spent a total of $10 million on
research involving mice, in part to develop the safer XA
cigarette.  Liggett's internal reports on the benefit of the XA,
and the absence of increased risk of harm from the additives
used, specifically used animal studies as reliable indicators of
the health effect of the product on humans.

106. Despite overwhelming scientific evidence, and the
confirmation of this evidence by their own internal research, the
cigarette manufacturers and their trade associations continue to
this day to repeat over and over, in a unified stance, that there
is no causal connection between cigarette smoking and adverse
health effects.  These representations are misleading, deceptive
and untrue.  They rest at the heart of the industry's ongoing
conspiracy to market and profit from a product it knows is
deadly.

40

65156 9688

## II.  THE ROLE OF NICOTINE IN SMOKING

107.  The other fact that the cigarette industry has made every effort to conceal and deny is that nicotine is a powerfully addictive substance.  While carefully studying its addictive character and acting upon that knowledge to maintain cigarette sales, each of the cigarette manufacturers has denied that nicotine is addictive.

108.  This public deception and the industry's secret manipulation of nicotine were and are critically important to the cigarette manufacturers.  As objective researchers increased their warnings of the health dangers of cigarettes, nicotine addiction kept people smoking.  This second front in their strategy to sell their dangerous products allows the cigarette manufacturers to continue to sell their dangerous products -- even to those who eventually come to doubt the industry's health claims.  And if a new consumer is fooled for a time by "pro-cigarette" disinformation on health, and takes up the habit, it may well be too late.  Instead of a simple decision not to purchase a product, the consumer must fight an addiction.

### Industry Knowledge of the Addictiveness of Nicotine

109.  Cigarette manufacturers have known since at least the early 1960s, of the addictive properties of the nicotine contained in the cigarettes they manufacture and sell.  Industry documents are replete with evidence of such knowledge:

   a.   In 1962, Sir Charles Ellis, scientific advisor to the
        board of directors of British American Tobacco Company
        ("BATCO"), Brown & Williamson's parent company, stated

65156 9689

at a meeting of BATCO's worldwide subsidiaries, that
"smoking is a habit of addiction" and that "[n]icotine
is not only a very fine drug, but the technique of
administration by smoking has considerable
psychological advantages . . . ." He subsequently
described Brown & Williamson as being "in the nicotine
rather than the tobacco industry."

b.   A research report from 1963 commissioned by Brown &
Williamson states that when a chronic smoker is denied
nicotine: "A body left in this unbalanced state craves
for renewed drug intake in order to restore the
physiological equilibrium. This unconscious desire
explains the addiction of the individual to nicotine."
No information from that research has ever been
voluntarily disclosed to the public.

c.   Addison Yeaman, general counsel at Brown & Williamson,
summarized his view about nicotine in an internal
memorandum also in 1963: "Moreover, nicotine is
addictive. We are, then, in the business of selling
nicotine, an addictive drug effective in the release of
stress mechanisms."

d.   Internal reports prepared by Philip Morris in 1972 and
the Philip Morris U.S.A. Research Center in March 1978,
demonstrate Philip Morris' understanding of the role of
nicotine in tobacco use: "We think that most smokers
can be considered nicotine seekers, for the
pharmacological effect of nicotine is one of the

42

65156 9690

rewards that come from smoking.  When the smoker quits,
he foregoes [sic] his accustomed nicotine.  The change
is very noticeable, he misses the reward, and so he
returns to smoking."

e.   From 1940-1970, ATC conducted its own nicotine
research, funding over 90 studies on the
pharmacological and other effects of nicotine on the
body, 80% of all biological studies funded by ATC over
this period.  In 1969, ATC even test marketed a
nicotine-enriched cigarette in Seattle, Washington.

f.   In a 1972 document entitled "RJR confidential research
planning memorandum on the nature of the tobacco
business and the crucial role of nicotine therein," an
RJR executive wrote:  "In a sense, the tobacco industry
may be thought of as being a specialized, highly
ritualized, and stylized segment of the pharmaceutical
industry.  Tobacco products uniquely contain and
deliver nicotine, a potent drug with a variety of
physiological effects."

<u>Suppression and Concealment of Research on Nicotine Addiction</u>

110.  The cigarette manufacturers, rather than fulfilling
their promise to the public to disclose material information
about smoking and health, chose a course of suppression,
concealment, and disinformation about the true properties of
nicotine and the addictiveness of smoking.

111.  Philip Morris hired Victor DeNoble in 1980 to study
nicotine's effects on the behavior of rats and to research and

43

65156 9691

test potential nicotine analogues.  DeNoble, in turn, recruited
Paul C. Mele, a behavioral pharmacologist.

112. DeNoble and Mele discovered that nicotine met two of
the hallmarks of potential addiction -- self-administration (rats
would press levers to inject themselves with a nicotine solution)
and tolerance (a given dose of nicotine over time had a reduced
effect).

113. However, Philip Morris instructed DeNoble and Mele to
keep their work secret, even from fellow Philip Morris
scientists.  Test animals were delivered at dawn and brought from
the loading dock to the laboratory under cover.

114. DeNoble was later told by lawyers for the company that
the data he and Mele were generating could be dangerous.  Philip
Morris executives began talking of killing the research or moving
it outside of the company so Philip Morris would have more
freedom to disavow the results.

115. In August 1983, Philip Morris ordered DeNoble to
withdraw from publication a research paper on nicotine that had
already been accepted for publication after full peer review by
the journal Psychopharmacology.  According to DeNoble, the
company changed its mind because it did not want its own research
showing nicotine was addictive or harmful to compromise the
company's defense in litigation recently filed against it.  He
said that Philip Morris officials had rightly interpreted the
suppressed nicotine studies as showing that, in terms of
addictiveness, "nicotine looked like heroin."

116. In April 1984, Philip Morris closed DeNoble's nicotine

65156 9692

research lab.  DeNoble and Mele were forced abruptly to halt
their studies, turn off all their instruments and turn in their
security badges by morning.  Philip Morris executives threatened
them with legal action if they published or talked about their
nicotine research.  According to DeNoble, the lab literally
vanished overnight.  The animals were killed, the equipment was
removed and all traces of the former lab were eliminated.

117. DeNoble testified to the Waxman Subcommittee that
"senior research management in Richmond, Va., as well as top
officials at the Philip Morris Company in New York, continually
reviewed our research and approved our research."  DeNoble also
stated that these officials were specifically told that nicotine
was a drug of abuse.

118. Brown & Williamson undertook its potentially sensitive
research on nicotine through a contractor in Geneva, Switzerland,
and through British affiliates at an English lab called
Harrogate.

119. In 1963, Brown & Williamson debated internally whether
to disclose to the U.S. Surgeon General, who was preparing his
first official report on smoking and health, what the company
knew about the addictiveness of nicotine and the adverse effects
of smoking on health.  Addison Yeaman, general counsel, advised
Brown & Williamson to "accept its responsibility" and disclose
its findings to the Surgeon General.  He said that such
disclosure would then allow the company openly to research and
develop a safer cigarette.

120. Brown & Williamson rejected Yeaman's advice to make

65156 9693

full disclosure to the Surgeon General.  A series of six letters
and telexes exchanged by Yeaman and senior BATCO official A.D.
McCormick between June 28 and August 8, 1963, document the
company's decision not to disclose its research findings to the
Surgeon General.  That research, some of which was later
characterized in a report in the Journal of the American Medical
Association as "at the cutting edge of nicotine pharmacology,"
preceded the main published reports from the general scientific
community by several years.

<u>The Industry's Interest in Nicotine</u>

121. A chronology of the industry's research and development
activities confirms that the cigarette manufacturers understood
early on that nicotine was the key to their industry's success.
The industry has conducted extensive research establishing that
smokers require a certain level of nicotine from their cigarettes
and that tobacco "satisfaction" is attributable to nicotine's
effect on the body after absorption.

122. Philip Morris internal reports from 1972 and 1978
characterize the role of nicotine in tobacco use: "The cigarette
should be conceived not as a product but as a package.  The
product is nicotine . . . . Think of the cigarette pack as a
storage container for a day's supply of nicotine . . . . Think
of the cigarette as a dispenser for a dose unit of nicotine."

123. Documents from a BATCO study called Project Hippo,
uncovered only in May 1994, show that as far back as 1961, this
cigarette company was actively studying the physiological and
pharmacological effects of nicotine.  Project Hippo reports were

65156 9694

circulated to other U.S. cigarette manufacturers and to TIRC,
demonstrating that at least some of the industry's nicotine
research was shared.  BATCO sent the reports to officials at
Brown & Williamson and RJR, and circulated a copy to TIRC with a
request that TIRC "consider whether it would help the U.S.
industry for these reports to be passed on to the Surgeon
General's Committee."

124. Similarly, an RJR-MacDonald Marketing Summary Report
from 1983 concluded that the primary reason people smoke "is
probably the physiological satisfaction provided by the nicotine
level of the product."

125. To this day, the cigarette manufacturers have concealed
from the public and public health officials their extensive
knowledge of the addictive properties of nicotine and its
critical role in smoking.

126. As recently as December 1995, the Wall Street Journal
reported on an internal Philip Morris draft document analyzing
the competitive market for nicotine products for the years 1990 -
1992.  The report describes the importance of nicotine:

"Different people smoke for different reasons.  But the
primary reason is to deliver nicotine into their bodies.
. . . . It is a physiologically active, nitrogen containing
substance.  Similar organic chemicals include nicotine,
quinine, cocaine, atropine and morphine.  While each of
these substances can be used to affect human physiology,
nicotine has a particularly broad range of influence.

During the smoking act, nicotine is inhaled into the

47

65156 9695

lungs in smoke, enters the bloodstream and travels to the
brain in about eight to ten seconds."

127. The cigarette manufacturers have long understood that
reducing or eliminating nicotine from their products would hurt
sales. As one company researcher wrote in a 1978 report to
Philip Morris executives:

"If the industry's introduction of acceptable low-nicotine
products does make it easier for dedicated smokers to quit,
then the wisdom of the introduction is open to debate."

128. Instead, the industry attempted to develop ostensibly
safer ways of delivering adequate doses of nicotine to create and
sustain addiction in the smoker.

129. Some members of the industry studied artificial
nicotine or nicotine analogues that would have the addictive and
psychopharmacological properties of nicotine without its
dangerous effects on the heart. Dr. DeNoble was hired by Philip
Morris, in part, to research and develop a nicotine analogue.

130. DeNoble did discover such an analogue, but Philip
Morris chose to halt its effort to determine whether the nicotine
analogue could be used to make a safer cigarette. On information
and belief, Philip Morris decided not to pursue nicotine
analogues in order to avoid the risk of adverse publicity and of
compromising the industry's consistent position that there was no
alternative design for cigarettes.

131. Brown & Williamson also understood that nicotine was
the essential ingredient in maintaining tobacco sales. The
company attempted to develop a "safer" cigarette which internal

65156 9696

documents described as "a nicotine delivery device."

132. By the end of the 1970's, however, Brown & Williamson, in a pattern that was repeated throughout the industry, closed its research labs and halted all work on a safer cigarette.

133. RJR's efforts to develop a safer cigarette also focused on delivering nicotine to the consumer without the harmful constituents of tobacco smoke.  In the late 1980's, RJR developed and test marketed Premier, a smokeless and virtually tobacco-free cigarette which was, in essence, a nicotine delivery system.

134. The cigarette manufacturers have affirmatively misrepresented to consumers and to Congress the role of nicotine in tobacco use.  Even today, Brown & Williamson, RJR and TI continue to claim that nicotine is important in cigarettes for taste and "mouth-feel."  However, tobacco industry patents specifically distinguish nicotine from flavorants and an RJR book on flavoring tobacco, while listing approximately a thousand flavorants, fails to include nicotine as a flavoring agent.  The cigarette industry has actually concentrated on developing technologies to mask the acrid flavor of increased levels of nicotine in cigarettes.

### Industry Control and Manipulation of Nicotine

135. Cigarette manufacturers have developed and used highly sophisticated technologies designed to deliver nicotine in precisely calculated quantities -- quantities that are more than sufficient to create and sustain addiction in the vast majority of individuals who smoke regularly.  Cigarette manufacturers control the nicotine content of their products through selective

49

65156 9697

breeding and cultivation of plants for nicotine content, and
careful tobacco leaf purchasing plans.  The companies control
nicotine delivery (i.e. the amount received by the smoker) with
various design and manufacturing techniques.

### Manipulation of Nicotine Content: Y-1

136. The story of Brown & Williamson's development of a new
tobacco plant dubbed "Y-1" is one of the more egregious examples
of the cigarette industry's concealment of its control and
manipulation of the nicotine levels in its products.

137. On June 21, 1994, Dr. David A. Kessler told the Waxman
Subcommittee that FDA investigators had discovered that Brown &
Williamson had developed a high nicotine tobacco plant, which the
company called "Y-1."  This discovery followed Brown &
Williamson's flat denial to the FDA on May 3, 1994, that it had
engaged in "any breeding of tobacco for high or low nicotine
levels."

138. When four FDA investigators visited the Brown &
Williamson plant in Macon, Georgia on May 3, 1994, Brown &
Williamson officials denied that the company was involved in
breeding tobacco for specific nicotine levels.  Only after the
FDA had learned of the development of Y-1 in its investigation
and confronted company officials with the evidence did the
company admit that it was growing and using the high-nicotine
plant.

139. In fact, in a decade-long project, Brown & Williamson
secretly developed a genetically-engineered tobacco plant with a
nicotine content more than twice the average found naturally in

50

65156 9698

flue-cured tobacco.  Brown & Williamson took out a Brazilian
patent for the new plant, which was printed in Portuguese.  Brown
& Williamson and a Brazilian sister company, Souza Cruz Overseas,
grew Y-1 in Brazil and shipped it to the United States where it
was used in five Brown & Williamson cigarette brands sold in
Massachusetts, including three labelled "light."  When the
company's deception was uncovered, company officials admitted
that close to four million pounds of Y-1 were stored in company
warehouses in the United States.

140.  As part of its cover-up, Brown & Williamson even went
so far as to instruct the DNA Plant Technology Corporation of
Oakland, California, which had developed Y-1, to tell FDA
investigators that Y-1 had "never [been] commercialized."  Only
after the FDA discovered two United States Customs Service
invoices indicating that "more than a half-million pounds" of Y-1
tobacco had been shipped to Brown & Williamson on September 21,
1992, did the company admit that it had developed the
high-nicotine tobacco.

141.  Y-1 is one example of an overall trend in the tobacco
industry to increase the nicotine content of tobaccos.  American
tobaccos of all types have undergone cumulative increases in
total nicotine levels since the 1950s.  Nicotine levels in the
most widely grown American tobaccos increased between 10 - 50
percent between 1955 and 1980.  On information and belief, this
increase is the result of the industry's active and controlling
participation in efforts to breed and cultivate tobacco for high
nicotine levels.

65156 9699

## Manipulation of Nicotine Delivery

142. The nicotine content of the raw tobacco is not the only variable manipulated by the cigarette manufacturers to deliver a pharmacologically active dose of nicotine to the smoker. Cigarettes are not simply cut tobacco rolled into a paper tube. Modern cigarettes as sold in Massachusetts are painstakingly designed and manufactured to control nicotine delivery to the smoker.

143. For example, cigarette manufacturers add several ammonia compounds during the manufacturing process which increase the delivery of nicotine and almost double the nicotine transfer efficiency of cigarettes.

144. Just this year, Brown & Williamson publicly denied that the use of ammonia in the processing of tobacco increases the amount of nicotine absorbed by the smoker. Nevertheless, the company's own internal documents reveal that it and its rivals use ammonia compounds to increase nicotine delivery. A 1991 Brown & Williamson confidential blending manual states:

"Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine salts and liberates free nicotine . . . . As the result of such change the ratio of extractable nicotine to bound nicotine in the smoke may be altered in favor of extractable nicotine. As we know, extractable nicotine contributes to impact in cigarette smoke and this is how ammonia can act as an impact booster."

According to the Brown & Williamson manual, all American cigarette manufacturers except Liggett use ammonia technology in

65156 9700

their cigarettes.

145. Tobacco industry patents also show that the cigarette industry has developed the capability to manipulate nicotine levels in cigarettes to an exacting degree.  For example:

a.   A Philip Morris patent application discusses an invention that "permits the release . . . in controlled amounts and when desired, of nicotine into tobacco smoke."

b.   Another Philip Morris patent application explains that the proposed invention "is particularly useful for the maintenance of the proper amount of nicotine in tobacco smoke," and notes that "previous efforts have been made to add nicotine to Tobacco Products when the nicotine level in the tobacco was undesirably low."

c.   A 1991 RJR patent application states that "processed tobaccos can be manufactured under conditions suitable to provide products having various nicotine levels."

146. David A. Kessler, MD, Commissioner of the Food and Drug Administration, testified in detail before the Waxman Committee about the various forms of nicotine manipulation practiced by the tobacco industry: manipulating the rate at which nicotine is delivered in the cigarette; transferring nicotine from one material to another; increasing the amount of nicotine in cigarettes; and adding nicotine to any part of a cigarette.

147. Dr. Kessler's disclosures show that nicotine is not an inevitable or unavoidable component of tobacco products.  In fact, each of the defendant cigarette manufacturers has the

65156 9701

capability to remove all or virtually all of the nicotine from cigarettes using technology already in existence.

148. The cigarette manufacturers' manipulation and control of nicotine levels is further evidenced by the emergence of companies that specialize in manipulating nicotine and that are now offering their services to tobacco manufacturers.  On information and belief, a process called tobacco reconstitution, patented and marketed by the Kimberly-Clark Corporation subsidiary, LTR Industries, is widely used throughout the industry.

149. Reconstituted tobacco is made from stalks and stems and other waste that cigarette manufacturers formerly discarded and now used to make cigarettes more cheaply.  In the reconstitution process, pieces of tobacco material undergo treatment that results in the extraction of some soluble components, including nicotine.  The pieces are then physically formed into a sheet of tobacco material, to which the extracted nicotine is re-added. Although denied by tobacco executives, it is publicly reported that this process adjusts nicotine levels in the products, and that one manufacturer "readily admits to setting levels of nicotine . . . for the tobacco sheet."

150. An advertisement in tobacco industry trade publications for the Kimberly-Clark tobacco reconstitution process states:

"Nicotine levels are becoming a growing concern to the designers of modern cigarettes, particularly those with lower 'tar' deliveries.  The Kimberly-Clark tobacco reconstitution process used by LTR Industries permits

54

65156 9702

adjustments of nicotine to your exact requirements . . . .
We can help you control your tobacco."

151. The tobacco industry's own trade literature explains
that the Kimberly-Clark process enables manufacturers to triple
or even quadruple the nicotine content of reconstituted tobacco,
thereby increasing the nicotine content of the final manufactured
product.

152. Another enterprise quite explicitly specializes in the
manipulation of nicotine and its use as an additive.  This
company does business under the name "The Tobacco Companies of
the Contraf Group."  An advertisement run by the Contraf Group in
the international trade press states: "Don't Do Everything
Yourself!  Let us do it More Efficiently!"  Calling itself "The
Niche Market Specialists," Contraf lists among its areas of
specialization "Pure Nicotine and other special additives,"

<u>Light Cigarettes: a Marketing Hoax</u>

153. The cigarette industry's manipulation of nicotine is
particularly deceptive in its marketing of "light" or low-tar and
low-nicotine cigarettes to retain the health conscious segment of
the smoking market.  Recent studies demonstrate that cigarettes
advertised as low tar and low nicotine have higher concentrations
of nicotine, by weight, than high yield cigarettes.
Nevertheless, the cigarette manufacturers have successfully
identified "light" cigarettes to consumers as a reduced tar and
reduced nicotine product.  The cigarette manufacturers have
accomplished this deception through several strategies.

154. First, cigarette manufacturers have designed their

65156 9703

"light" products so that advertised tar and nicotine levels, as measured by the FTC method, understate the amounts of tar and nicotine actually ingested by human smokers. Such design features include a technique called filter ventilation in which nearly invisible holes are drilled in the filter paper, or the filter paper is made more porous. Predictably, many smokers of advertised low tar and nicotine cigarettes block the tiny, laser-generated perforations in ventilated filters with their fingers or lips, thereby resulting in greater tar and nicotine yields to those smokers than those measured by the FTC smoking machine.

155. Cigarette manufacturers know that the ability to block ventilation holes allows smokers to "compensate" for nicotine losses that would otherwise be caused by tar-reducing modifications. The industry has studied smoker compensation in order to design cigarettes that allow smokers to compensate for lower nicotine yields. One such design feature is known as "elasticity." This refers to the ability of a cigarette, whatever its FTC measured nicotine yield, to deliver enough smoke to permit a smoker to obtain the nicotine he needs, e.g., through more or longer puffs, or by covering ventilation holes.

156. Industry studies show that smokers tend to obtain close to the same amount of nicotine from each cigarette despite differences in yield as measured by the FTC smoking machine. In a 1974 BATCO conference, researchers described the result of one such study:

"The Kippa study in Germany suggests that whatever the characteristics of cigarettes as determined by smoking

56

65156 9704

machines, the smoker adjusts his pattern to deliver his own
nicotine requirements (about 0.8 mg. per cigarette)."
Smokers' compensation to obtain adequate nicotine also results in
the delivery of more tar than the FTC test measure.

157. Second, the FTC testing method does not distinguish
between the slower acting salt-bound nicotine and the more potent
"free" nicotine that ammonia helps release. An ammoniated
cigarette that delivers more potent nicotine to smokers measures
the same as a cigarette with no such additives.

158. The use of ammonia is another method used by the
cigarette industry to reduce the FTC measured tar and nicotine
levels in their cigarettes over the past two decades while still
furnishing smokers with sufficient nicotine delivery. According
to John Kreisher, a former associate scientific director for CTR,
"[a]mmonia helped the industry lower the tar and allowed smokers
to get more bang with less nicotine. It solved a couple of
problems at the same time."

159. Third, the cigarette industry maintains that nicotine
levels follow tar levels. In the words of Dr. Alexander Spears,
Vice Chairman of Lorillard, in his 1994 testimony before the
Waxman Subcommittee -- "[n]icotine [level] follows the tar
level," and the correlation between the two "is essentially
perfect," and "shows that there is no manipulation of nicotine."
Dr. Spears neglected to mention to Congress that in a 1981 study,
not intended for public release, he stated explicitly that
low-tar cigarettes use special blends of tobacco to keep the
level of nicotine up while tar is reduced: "[T]he lowest tar

65156 9705

segment [of product categories] is composed of cigarettes utilizing a tobacco blend which is significantly higher in nicotine." RJR, Lorillard, ATC, and TI have similarly represented to the public and to the FDA that the nicotine levels in their products are purely a function of setting the tar levels of such products.

160. ATC told the Waxman Subcommittee in an October 14, 1994 letter that "nicotine follows 'tar' delivery, i.e. high 'tar' -- high nicotine, low 'tar' -- low nicotine . . . . Nicotine is neither adjusted nor altered to compensate for losses inherent in the manufacturing process." Internal company documents reviewed by the Waxman Subcommittee show, however, that ATC's experimentation with adding nicotine to its tobacco was extensive -- extensive enough for ATC executive John T. Ashworth to instruct employees in a confidential memorandum: "In the future, our use of nicotine should be referred to as 'Compound W' in our experimental work, reports, and memorandums, either for distribution within the Department or for outside distribution."

161. Recent tests conducted at the direction of the FDA show that the low-tar brands actually have more nicotine by weight than the non-"light" brands. The high level of nicotine found in lower tar cigarettes seriously misleads consumers and renders the industry's claim of an "essentially perfect" correlation between reduced tar and nicotine levels false. According to the FDA, this has been accomplished by a combination of the methods described above for boosting nicotine delivery to compensate for nicotine losses from the application of tar-reducing design

58

65156 9706

modifications. The cigarette industry thereby maintains a continuing market for a product that consumers are misled to believe contains less of all of the harmful ingredients in regular cigarettes.

162. Against this mounting body of evidence of the cigarette industry's manipulation and control of nicotine levels in cigarettes, the cigarette manufacturers continue to deny to the public, and recently denied to Congress under oath, that they manipulate and control nicotine levels. Top executives from Philip Morris, RJR, Lorillard, Liggett and Brown & Williamson testified in April 1994 that their respective companies do not manipulate nicotine, add it, independently control it, restore it during the manufacturing process, or otherwise achieve a minimum level of nicotine in their products. Thomas E. Sandefur, Jr., CEO of Brown & Williamson, has admitted that the company controlled nicotine, but in a now familiar refrain, stated that the company did so only for "taste."

163. Thus the cigarette manufacturers' attempt to deceive the public and government officials continues. As recently as April 1994, cigarette manufacturers placed advertisements across the country denying that they believe cigarette smoking is addictive, and misleading the public about whether the cigarette manufacturers deliberately control nicotine levels in their products.

164. An advertisement placed by Philip Morris in newspapers across the country in April 1994, affirmatively represented that Philip Morris does not "manipulate" nicotine levels in its

65156 9707

cigarettes, and that "Philip Morris does not believe that cigarette smoking is addictive."

165. RJR placed a similar advertisement in newspapers across the United States in 1994 stating that "we do not increase the level of nicotine in any of our products in order to 'addict' smokers. Instead of increasing the nicotine levels in our products, we have in fact worked hard to decrease 'tar' and nicotine . . . ." RJR's advertisement then touted its use of "various techniques that help us reduce the 'tar' (and consequently the nicotine) yields of our products."

166. These statements mislead the consuming public because, as alleged above, Philip Morris and RJR use various sophisticated techniques to increase the nicotine content in their cigarettes and the actual nicotine delivery to the smokers.

## SALES TO MINORS

167. In Massachusetts, and across the nation, the overwhelming majority of cigarette use and addiction begins when users are children or teenagers. Eighty-two (82%) percent of daily smokers had their first cigarette before age 18, sixty-two (62%) percent before the age of 16, thirty-eight (38%) percent before the age of 14. Thus, a person who does not begin smoking in childhood or adolescence is unlikely ever to begin. The younger a person begins to smoke, the more likely he or she is to become a heavy smoker. Sixty-seven (67%) percent of children who start smoking in the sixth grade become regular adult smokers and forty-six (46%) percent of teenagers who start smoking in the

65156 9708

eleventh grade become regular adult smokers.

168. Smoking at an earlier age increases the risk of lung cancer and other diseases.  Studies have shown that lung cancer mortality is highest among adults who began smoking before the age of 15.

169. Although young people frequently believe they will not become addicted to nicotine or become long-term users of tobacco products, they often find themselves unable to quit smoking. Among smokers age 12 to 17 years, a 1992 Gallup survey found that 70% said if they had to do it over again, they would not start smoking and 66% said that they want to quit.  Fifty-one percent of the teen smokers surveyed had made a serious effort to stop smoking -- but had failed.

170. Cigarette smoking among children and teens is on the rise.  A 1995 National Institute of Drug Abuse study found that between 1991 and 1994, the proportional increase in smoking rates was greatest among eighth graders, rising by 30%.

171. Cigarettes are among the most promoted consumer products in the United States.  The Federal Trade Commission reported to Congress that domestic cigarette advertising and promotional expenditures rose from close to $4 billion in 1990 to more than $6 billion in 1993.  Tobacco product brand names, logos, and advertising messages are all-pervasive, appearing on billboards, buses, trains, in magazines and newspapers, on clothing and other goods.  The effect is to convey the message to young people that tobacco use is desirable, socially acceptable, safe, healthy, and prevalent in society.  Additionally, young

61

65156 9709

people buy the most heavily advertised cigarette brands, whereas many adults buy more generic or value-based cigarette brands which have little or no image-based advertising.  Cigarette manufacturers, knowing that their advertising appeals to young people, continue to use these same marketing techniques to sell their products.

172. A July 1995 report by the California Department of Health Services surveyed tobacco advertisements in or around stores.  In looking at almost 6,000 stores, it was found that the total average tobacco advertisements and promotions per store was 25.26.  Marlboro was the most frequently advertised and promoted cigarette brand with an average of 10.15 advertisements and promotions per store.  Camel was the second most frequently advertised and promoted cigarette brand and had an average of 4.84 advertisements and promotions per store.  These two brands were the most frequently advertised and promoted cigarette brands.  Not surprisingly, Marlboro, Camel, and Newport, the most heavily advertised brands, are the leading brands smoked by children.

173. This same report also found that stores within 1,000 feet of a school had significantly more tobacco advertising and promotions than stores that were not near schools.  Stores near schools were also more likely to have at least one tobacco advertisement placed next to candy or displayed at three feet or below.  A significantly higher average number of tobacco advertisements also were found on the exterior of stores located in young neighborhoods - communities in which at least one-third

65156 9710

of the population in that zip code were 17 years of age or less.

174. RJR has even identified the stores in proximity to the youth market.  RJR's Division Manager for Sales wrote all RJR sales representatives in 1990 regarding the "Young Adult Market" and asked them to identify what stores were in proximity to colleges or high schools.  A follow-up letter by the sales division calls for a resubmitted list of Y.A.S. (Young Adult Smoker) accounts using new criteria, focusing on all accounts located across from, adjacent to, or in the general vicinity of high schools or college campuses.

175. Despite these disturbing statistics, each of the cigarette manufacturers maintains that the effect of its pervasive advertising and promotion of cigarettes is limited to maintaining brand loyalty and that it has no role in encouraging adolescents to experiment with smoking.

176. The cigarette manufacturers know that they attract underage consumers to their products.  For example, since 1988, RJR has used a cartoon character called Joe Camel in its advertising campaign.  It has massively disseminated products such as matchbooks, signs, clothing, mugs, and drink can holders advertising Camel cigarettes.  The advertising has been effective in attracting adolescents, and RJR has knowledge of this fact but still continues the Joe Camel advertising campaign.  As a result of the campaign, the number of teenage smokers who smoke Camel cigarettes has risen dramatically.  One study found that Joe Camel is almost as familiar to six-year old children as Mickey Mouse, is enticing thousands of teens to smoke that brand, and

65156 9711

has caused Camel's popularity with 12-17 year olds to surge dramatically. RJR knew or willfully disregarded the fact that cartoon characters attract children.

177. The model who portrayed the "Winston Man" for RJR's Winston brand cigarettes testified before Congress: "I was clearly told that young people were the market that we were going after." He further testified "it was made clear to us that this image was important because kids like to role play, and we were to provide the attractive role models for them to follow . . . . I was told I was a live version of the GIJoe . . . ."

178. An RJR affiliate studied in detail the motivations of young smokers. A "Youth Target" study was the first of a planned series of research studies into the lifestyles and value systems of young men and women in the 15-24 age range, the stated purpose of which was to "provide marketers and policy makers with an enriched understanding of the mores and motives of this important emerging adult segment which can be applied to better decision making in regard to products and programs directed at youth." The study focused on the "primary elements of lifestyles and values among the youth of today," in learning how to market products to children and teens.

Sale of Defective and Unreasonably Dangerous Products

179. The cigarette manufacturers' products are designed, manufactured, marketed, sold and distributed by defendants to be smoked by the consuming public of Massachusetts.

180. The defendants collectively sold or distributed, or aided and abetted in the sale or distribution, of cigarettes

64

65156 9712

containing disease-causing ingredients and nicotine in addictive
amounts, which cigarettes were and are defective and unreasonably
dangerous.

181. At all relevant times, defendants knew or should have
known that smoking their cigarettes is hazardous to human health,
causes human disease and is addictive.

182. The cigarette manufacturers and their trade
associations, through their funding and control of various
studies on the effects of smoking on human health, their control
over trade publications, advertising, marketing, and/or through
other agreements, understandings and joint ventures and
enterprises, conspired with, cooperated with, and/or rendered
substantial assistance to each other in the wrongful suppression,
active concealment and misrepresentation of material information
concerning the facts about the addictiveness of smoking and its
role in human disease, to the public at large, constituting a
public misrepresentation and a fraud on the marketplace, all to
the detriment of the public health, safety and welfare, and
thereby causing harm to the Commonwealth of Massachusetts.

183. Cigarettes are an inherently, abnormally, and
unreasonably dangerous product. The health risks and costs of
cigarette smoking to the citizens of Massachusetts and to the
State greatly outweigh any utility that defendants could
conceivably claim for their cigarettes. Defendants knew or
should have known of the dangers inherent in the use of their
product by citizens of Massachusetts, and that those citizens and
the Commonwealth itself would be harmed by the foreseeable and

65156 9713

intended use of their cigarettes.

## COUNT I

### (Undertaking Of Special Duty)

(Against all defendants except distributor defendants)

184. The Commonwealth restates and incorporates herein the foregoing paragraphs 1-183 of its Complaint.

185. Defendants represented that they would undertake a special responsibility and duty to citizens of the Commonwealth of Massachusetts, and those who advance and protect the public health, including the Department of Medical Assistance, to accept an interest in the public's health as a basic and paramount responsibility; to cooperate closely with those who safeguard the public health; to aid and assist the research effort into all aspects of tobacco use and human health; to continue to research and otherwise undertake all possible efforts to learn all the facts and to discover the truth about smoking and health; and finally, to disclose to the Commonwealth of Massachusetts and its citizens complete and accurate information about the effects of cigarette smoking on human health.

186. Defendants undertook to render such services recognizing that they were necessary for the protection of the public health, including the health of millions of Massachusetts citizens.

187. Defendants have breached and continue to breach their special responsibility and duty by failing to exercise reasonable

66

care to protect their undertaking.  Defendants' failure to use due care in performing the duty that they voluntarily undertook to perform has increased the risk of harm to the public and the cost of health care for the Commonwealth of Massachusetts above and beyond what it would have been had defendants not publicly represented that they were going to engage in the undertaking at all.

188. As a direct and proximate result of defendants' conduct, the Commonwealth has suffered and will continue to suffer substantial injuries and damages for which the Commonwealth is entitled to recovery.

<u>COUNT II</u>

(Breach Of Warranty)

189. The Commonwealth restates and incorporates herein the foregoing paragraphs 1-188 of its Complaint.

190. Defendants have been engaged for many years in the business, or have aided and abetted in the business, of manufacturing, testing, designing, advertising, marketing, packaging, selling, distributing, and placing into the stream of commerce in and into Massachusetts their tobacco products, including various brands of cigarettes.

191. Defendants' tobacco products reach Massachusetts users and consumers in substantially the same condition they are in when originally manufactured, distributed and sold by defendants. Defendants have delivered their tobacco products to the residents of Massachusetts in a defective condition, unreasonably dangerous

67

65156 9715

to users and consumers. Defendants expect and intend for their tobacco products to be used by residents of Massachusetts without substantial change affecting the unreasonably dangerous condition.

192. Safer alternative designs have been technologically and economically feasible and known to defendants for years, but defendants have failed to implement them and, in fact, have deliberately suppressed and concealed their research on and development of safer alternative designs.

193. In breaching their duties to plaintiff, defendants have acted intentionally, recklessly, maliciously and wantonly in that each defendant knew or should have known through information exclusively within their control that their cigarettes were defective and unreasonably dangerous if used in the manner intended by defendants. Defendants also knew or should have known that their breach of duty would be substantially certain to result in the injuries complained of herein.

194. The defective condition of defendants' tobacco products directly and proximately caused thousands of Massachusetts citizens to suffer various tobacco-induced diseases, injuries and sicknesses, and directly and proximately caused the Commonwealth of Massachusetts to expend millions of dollars to provide necessary medical and health care to such citizens, thereby causing damage to Massachusetts.

195. Defendants, jointly and severally, expressly and impliedly warranted that their products were safe, of merchantable quality and fit for their intended uses. Defendants

68

breached their warranties because their products were unsafe, were not of merchantable quality and were unfit for their intended uses.  Defendants are on notice of these breaches of warranties.

196. As a direct and proximate result of defendants' conduct, the Commonwealth has suffered and will continue to suffer substantial injuries and damages for which the Commonwealth is entitled to recovery.

### COUNT III

#### (Conspiracy And Concert Of Action)

(Against all defendants except distributor defendants)

197. The Commonwealth restates and incorporates herein the foregoing paragraphs 1-196 of its Complaint.

198. At least as early as the 1950's, defendants entered into an agreement for the unlawful purposes of suppressing and concealing material scientific and medical information concerning smoking, addiction and diseases; representing falsely to the public at various times that they would undertake a special responsibility and duty to citizens of the Commonwealth of Massachusetts to undertake all possible efforts to learn all the facts and to discover and disclose the truth about smoking and health; and of keeping the public ignorant of the defective and unreasonably dangerous condition of cigarettes.

199. Defendants agreed to act jointly and to cooperate with each other in this conspiracy in order to seek to mislead the public.  This deception would not have been possible for each

69

65156 9717

cigarette manufacturer acting individually.  Through their combined actions of misrepresentation and concealment over the last four decades, defendants have managed to control the material information concerning smoking and health and thereby ensure, through joint misrepresentations and concealment, that the public remains ignorant of the true facts about smoking and health.

200. In furtherance of their conspiracy, the cigarette manufacturers formed the Tobacco Industry Research Council, its successor Council for Tobacco Research, and the Tobacco Institute, whose true purpose was not to discover and disclose the facts about smoking and health, but falsely to gain the public's confidence so that the cigarette manufacturers could suppress and conceal those facts more effectively.

201. The TIRC, CTR and TI actively participated in the conspiracy to conceal, suppress and diffuse all information about the hazards of cigarette smoking.

202. In furtherance of defendants' conspiracy, they also restrained and suppressed research, development, production and marketing of safer cigarettes.  Defendants, in furtherance of their conspiracy, gave encouragement and substantial assistance to each other and otherwise aided and abetted each other in perpetrating these wrongful acts.

203. As a direct and proximate result of defendants' unlawful conspiracy, the Commonwealth has suffered and will continue to suffer substantial injuries and damages.

204. As a result of defendants' unlawful conspiracy,

65156 9718

defendants are vicariously and jointly and severally liable as to each cause of action alleged in this Complaint.

205. As a direct and proximate result of defendants' conduct, the Commonwealth has suffered and will continue to suffer substantial injuries and damages for which the Commonwealth is entitled to recovery.

## COUNT IV

### (Restitution)

(Against all defendants except distributor defendants)

206. The Commonwealth restates and incorporates herein the foregoing paragraphs 1-205 of its Complaint.

207. Defendants assumed and owe a duty to pay for the harm caused by their wrongful conduct, yet have repeatedly refused to do so.  Instead, defendants have engaged in a conspiracy of suppression, concealment, and deceit in order to deny responsibility and avoid paying for the consequences of the harm they have caused the Commonwealth of Massachusetts and its citizens.

208. Plaintiff has been and is required by statute and contractual obligations to expend substantial sums of money to pay for the harm caused by the wrongful conduct of defendants. Plaintiff intends to charge and recoup from defendants these sums of money.  Plaintiff's expenditures are immediately necessary to protect the public health and safety.

209. As a result of defendants' wrongful activities, plaintiff has borne a duty that, in law, equity and fairness,

71

65156 9719

ought to have been borne by defendants.

210. As a direct and proximate result of defendants'
conduct, the Commonwealth has suffered and will continue to
suffer substantial injuries and damages for which the
Commonwealth is entitled to recovery.

<u>COUNT V</u>

(Unjust Enrichment)

211. The Commonwealth restates and incorporates herein the
foregoing paragraphs 1-210 of its Complaint.

212. Defendants, through their wrongful conduct as described
in this Complaint, have reaped substantial profits from the sale
of cigarettes in Massachusetts.  These cigarette sales, in turn,
have resulted in enormous increases in health care costs directly
attributable to cigarette smoking.

213. Without justification, defendants have refused and
failed to pay for the consequences of their unlawful conduct.
The Commonwealth's expenditure of substantial sums to pay for the
costs of medical care for indigent smokers has unjustly enriched
the defendants.

214. As a result, plaintiff has been required to pay for the
medical costs resulting from defendants' unlawful conduct.
Plaintiff has borne a duty that, in law, equity and fairness,
ought to have been borne by defendants.

215. In equity and good conscience, it would be unjust for
defendants to enrich themselves at the expense of plaintiff.

216. As a direct and proximate result of defendants'

65156 9720

conduct, the Commonwealth has suffered and will continue to suffer substantial injuries and damages for which the Commonwealth is entitled to recovery.


## RELIEF REQUESTED

WHEREFORE, the Commonwealth requests that this Honorable Court issue an order and judgment against the defendants, jointly and severally, as follows:

A.   Ordering defendants to disclose, disseminate, and publish all research previously conducted directly or indirectly by themselves and their respective agents, affiliates, servants, officers, directors, employees, and all persons acting in concert with them, that relates to the issue of smoking and health and addiction;

B.   Ordering defendants to fund a corrective public education campaign relating to the issue of smoking and health, administered and controlled by an independent third party;

C.   Ordering defendants to fund smoking cessation programs including the provision of nicotine replacement therapy for dependent smokers;

D.   Ordering defendants to disclose the nicotine yields of their products based on machine tests and human confirmation studies for each brand;

E.   Ordering defendants to pay restitution;

F.   Awarding damages and compensation to the Commonwealth for past and future damages, including but not limited to health

73

65156 9721

care expenditures, caused by the defendants' actions in violation of the laws of the Commonwealth, together with interests and costs;

G.   Awarding the Commonwealth reasonable attorney's fees and costs pursuant to St. 1994, c. 60, § 276;

74

65156 9722

H.   Granting such other and further relief as this Court
deems equitable and proper.

PLAINTIFF DEMANDS A JURY TRIAL OF ALL CLAIMS SO TRIABLE

COMMONWEALTH OF MASSACHUSETTS

SCOTT HARSHBARGER
ATTORNEY GENERAL

Scott Harshbarger
BBO # 224000
Office of the Attorney General
One Ashburton Place
Boston Massachusetts
(617) 727-2200

SPECIAL ASSISTANT
ATTORNEYS GENERAL:

Laurence H. Tribe
BBO # 502380
Hauser Hall, Room 420
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4621

Dated:  December 19, 1995

65156 9723

Thomas M. Sobol
BBO #471770
Brown Rudnick Freed & Gesmer
1 Financial Center, 18th Fl.
Boston, MA 02111
(617) 330-9000


Michael P. Thornton
BBO # 497390
Thornton, Early & Naumes
60 State Street, 6th Fl.
Boston, MA 02109
(617) 720-1333


Jeffrey D. Woolf
BBO #534360
Schneider, Reilly, Zabin & Costello
Three Center Plaza, Suite 430
Boston, MA 02108
(617) 227-7500


Dated: December 19, 1995

65156 9724

Ronald L. Motley
Ness, Motley, Loadholt,
Richardson & Poole
151 Meeting Street, Suite 600
Post Office Box 1137
Charleston, South Carolina 29402
(803) 720-9000
(pending admission Pro Hac Vice)

Richard M. Heimann
Lieff, Cabraser, Heimann &
Bernstein
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-
3339
(415) 956-1000
(pending admission Pro Hac Vice)

Dated:  December 19, 1995

65156 9725