# EXHIBIT 39

## IN THE CIRCUIT COURT FOR BALTIMORE CITY

**STATE OF MARYLAND**

v.

**PHILIP MORRIS INCORPORATED (Philip Morris U.S.A.)**
120 Park Avenue
New York, New York  10016

**96122017** / *Ch 211487*

     Resident Agent:
          The Corporation Trust Incorporated
          32 South Street
          Baltimore, Maryland  21202

**PHILIP MORRIS COMPANIES, INC.**
120 Park Avenue
New York, New York  10016

     Resident Agent:
          Hill Wellford, Jr.
          951 E. Byrd Street
          Richmond, Virginia  23219

**R.J. REYNOLDS TOBACCO COMPANY**
Reynolds Building
4th & Main Street
Winston-Salem, North Carolina  27102

     Resident Agent:
          Prentice-Hall Corporation System, Maryland
          11 E. Chase Street
          Baltimore, Maryland  21202

**RJR NABISCO, INC.**
1301 Avenue of the Americas
New York, New York  10015

     Resident Agent:
          The Prentice-Hall Corporation System, Inc.

1209 Orange Street
Wilmington, DE 19805

**BROWN & WILLIAMSON TOBACCO CORPORATION**
1500 Brown & Williamson Tower
P.O. Box 35090
Louisville, Kentucky 40232

Resident Agent:
Corporation Trust Company
1209 Orange Street
Wilmington, DE 19807

**BRITISH AMERICAN TOBACCO CO., LTD.**
Millbank, Knowle Green
Staines
Middlesex, England TW181DY

Serve On:

BRITISH AMERICAN TOBACCO CO., LTD.
Millbank, Knowle Green
Staines
Middlesex, England TW181DY

**BATUS HOLDINGS INC.**
1500 Brown & Williamson Tower
Louisville, Kentucky 40202

Resident Agent:
The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

**B.A.T. INDUSTRIES P.L.C.**
Windsor House
50 Victoria Street
London, England SWIH ONL

2

Serve On:

      **B.A.T. INDUSTRIES P.L.C.**
      **Windsor House**
      **50 Victoria Street**
      **London, England  SW1H ONL**

**LORILLARD TOBACCO COMPANY**
**1 Park Avenue**
**New York, N.Y. 10016**

      **Resident Agent:**
            **Prentice-Hall Corporation System, Inc.**
            **1209 Orange Street**
            **Wilmington, Delaware 19805**

**LORILLARD CORPORATION**
**1 Park Avenue**
**New York, New York  10016**

      **Resident Agent:**
            **The Corporation Trust Company**
            **1209 Orange Street**
            **Wilmington, Delaware  19801**

**LOEWS CORPORATION**
**1 Park Avenue**
**New York, New York  10016**

      **Resident Agent:**
            **Corporation Trust Company**
            **1209 Orange Street**
            **Wilmington, Delaware  19805**

**THE AMERICAN TOBACCO COMPANY**
**6 Stamford Forum**
**Stamford, Connecticut 06904**

3

Resident Agent:
    Corporation Trust Company
    1209 Orange Street
    Wilmington, Delaware 19805

**AMERICAN BRANDS, INC.**
1700 East Putnam Avenue
Old Greenwich, Connecticut  06870

Resident Agent:
    Corporation Trust Company
    1209 Orange Street
    Wilmington, Delaware  19805

**LIGGETT GROUP INC.**
700 W. Main Street
Durham, North Carolina  27701

Resident Agent:
    CSC - Lawyers Incorporating Service Company
    11 E. Chase Street, Ste. 9E
    Baltimore, Maryland  21202

**LIGGETT & MYERS, INC.**
700 West Main Streets
Durham, North Carolina  27701

Resident Agent:
    The Corporation Trust Company
    1209 Orange Street
    Wilmington, Delaware  19801

**THE BROOKE GROUP, LIMITED**
100 Southwest 2nd Street
Floor 32
Miami, Florida 33131

Resident Agent:
    The Corporation Trust Company

1209 Orange Street
Wilmington, Delaware  19801

HILL & KNOWLTON, INC.
420 Lexington Avenue
New York, New York  10070

Resident Agent:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

THE COUNCIL FOR TOBACCO RESEARCH--U.S.A., INC.
900 3rd Avenue
New York, New York  10022

Resident Agent:
The Council for Tobacco Research - U.S.A., Inc.
110 E. 59th Street
New York, New York  10022

THE TOBACCO INSTITUTE, INC.
1875 I Street, N.W.
Washington, D.C.  20006

Resident Agent:
The Corporation Trust Incorporated
32 South Street
Baltimore, Maryland  21202

## COMPLAINT AND ELECTION FOR JURY TRIAL

The State of Maryland, by Attorney General J. Joseph Curran, Jr., for its

complaint alleges, upon information and belief, as follows:

5

## I.   NATURE OF THE ACTION

1.    The State of Maryland, by Attorney General J. Joseph Curran, Jr.,

brings this action for monetary damages, civil penalties, declaratory and injunctive

relief, and restitution.  As set forth below, over a long period of time, Defendants

conspired to deceive the State of Maryland and its citizens about the addictive

properties of nicotine and the full extent of the health risks of smoking.  Every year in

Maryland, more than 7000 addicted smokers die from using Defendants' products

precisely as Defendants have designed them and intended that they be used.  Yet

through a campaign of fraud, lies, intimidation, and deception, Defendants have

succeeded in avoiding legal responsibility for engineering and selling the most lethal

consumer product in the history of humanity, while reaping hundreds of billions of

dollars in profits.  In carrying out the conspiracy, Defendants committed a host of

fraudulent and unlawful acts, including but not limited to:

> *    Publicly undertaking, as a "paramount" special
> responsibility, the duty of researching and disclosing to
> public health authorities and the public at large, including
> the State of Maryland, the full extent of the health risks of
> cigarette smoking, then suppressing, concealing, distorting,
> and lying about the state of their knowledge of those risks;
>
> *    Creating and/or funding fraudulent "front"
> organizations, such as the Tobacco Industry Research
> Council (later the Council for Tobacco Research), which
> was held out to the public as an independent research
> organization, but which was in fact secretly controlled by
> lawyers and public relations firms, to prevent the public
> from learning what Defendants knew about the health risks

6

of smoking;

* Secretly destroying, concealing, and shipping overseas incriminating evidence of industry testing and research on the health risks of cigarette smoking and the addictive nature of nicotine, shutting down laboratories overnight and making personal threats against scientists who tried to publish research revealing what the industry knew, and asserting bogus claims of attorney-client privilege and work product to conceal their scientific research;

* Engaging in unfair and deceptive trade practices by, among other things, jointly sponsoring false, deceptive, and misleading advertising and public relations campaigns intended to confuse and create doubt among governmental entities, including the State of Maryland, and the public about the health risks of cigarette smoking;

* Jointly and collectively making false and misleading representations to Congress, other governmental entities, including the State of Maryland, and the public regarding the health risks of cigarette smoking, the addictive nature of nicotine, and the manipulation of nicotine levels in cigarettes, with the intent to defraud and knowing that the State and others would reasonably rely on their representations;

* Conspiring to use monoploy power, and using that power, to suppress research into the health effects of smoking and to halt research, development, marketing and sales of "safer" cigarettes; and

* Engaging in unfair trade practices by targeting marketing and advertising efforts to promote illegal sales of cigarettes to minors, and developing products and deceptive advertising campaigns designed to appeal to African-Americans and women.

As a direct, foreseeable result of these and other actions, the State of Maryland has

suffered enormous damages.

7

2.      Over many years, the State of Maryland has paid billions of dollars in medical assistance for smoking-related health care costs, which would not have been incurred but for Defendants' misconduct.  Defendants created an ongoing public health crisis of unrivalled proportions, all the while knowing and appreciating that the State of Maryland would be required to cover health care costs for its indigent and needy citizens with smoking-related illnesses.  Under time-honored principles of equity, the State of Maryland is entitled to restitution for the medical assistance funds it has paid, because, under the circumstances, it would be unjust and unconscionable for Defendants to retain the benefits the State of Maryland conferred on them or to profit in any way from their illegal course of conduct.

3.      The Defendant cigarette manufacturers control virtually 100% of the market for cigarettes in the United States.  Their longstanding conspiracy to mislead the public about the harmful and addictive effects of cigarette smoking has placed them among the most profitable industries in the world.  The breadth and audacity of the conspiracy was recently displayed before Congress in April 1994, when the chief executive officers of the leading cigarette manufacturers testified, under oath, that they do not believe that smoking causes death or that smoking is addictive.  In truth, Defendants have known for longer than the scientific community and public health authorities, that cigarettes are both addictive and deadly.

4.      Despite representations to the contrary, Defendant manufacturers

8

carefully calibrate, control, and manipulate nicotine in cigarettes so that beginning smokers and others will become addicted to nicotine and develop a physical and psychological dependency that can be satisfied only by cigarette smoking.  As a direct result of Defendants' choices about how to manufacture cigarettes, long-term smokers find it extremely painful -- and in many cases impossible -- to withdraw from their physical dependency on nicotine.

5.      With full knowledge that they are selling an addictive and deadly product, Defendants deliberately advertise and market cigarettes in such a way as to target promising markets of new smokers, such as teenagers.  Every day, 3000 American youths are seduced by Defendants' unfair and misleading advertising and marketing ploys and start smoking, each a potential addict and life-long profit center for Defendants.

6.      Despite the particularly harmful health consequences of smoking for women, Defendants target advertising to this segment of the population.  For women, smoking reduces fertility, increases the rate of miscarriages and stillbirths, retards uterine fetal growth and results in lower birth weights in infants.  Yet Defendants have targeted and continue to target young women with advertising campaigns designed for their psychological appeal to this group of potential smokers.

7.      The same pattern emerges from marketing efforts directed at African-Americans.  Despite the high incidence of smoking-related illness among

9

African-Americans, Defendants intentionally target predominantly African-American, inner city areas in Maryland for intensified billboard and other advertising and marketing, even going so far as to design products with the intent to appeal to African-Americans. As a Baltimore federal judge has noted, tobacco companies "focus [billboard advertising] on depressed inner-city areas. Billboards are conspicuously absent from more affluent communities."

8.     These despicable marketing strategies further the conspiracy to distort the truth about cigarette smoking. The net effect of Defendants' unlawful, deceptive, and unconscionable conduct, over several decades, has been to convey the message that intensive scientific research has uncovered no reliable evidence about the real health effects of smoking. As described by one industry representative, Defendants' campaign of deception has been a "brilliantly conceived and executed" strategy to "creat[e] doubt about the health charge without actually denying it." Defendants knew that if smokers fully appreciated the risks of addiction and death, many would never have started smoking or would have quit, and Defendants would have lost the significant profits they accumulated by shifting the costs of their conduct onto the State of Maryland, among others.

9.     With the financial strength that comes from sale of an addictive drug, Defendants have fended off meritorious legal claims with a litigation strategy of attrition and delay: as an attorney for Defendant R.J. Reynolds Tobacco Company

10

noted: "[T]he aggressive posture we have taken regarding depositions and discovery in general continues to make these cases extremely burdensome and expensive for plaintiffs' lawyers, particularly sole practitioners. To paraphrase General Patton, the way we won these cases was not by spending all of [Reynolds's] money, but by making that other son of a bitch spend all his."

      10. Defendants' conduct has generated a human tragedy practically beyond comprehension. Cigarette smoking is the leading cause of premature death in the United States. According to the Federal Centers for Disease Control and Prevention, each year cigarette smoking kills more than 400,000 Americans, exceeding the combined deaths caused by automobile accidents, AIDS, alcohol use, use of illegal drugs, homicide, suicide, and fires. Smoking-related illnesses account for one of every five deaths each year in the United States.

      11. Cigarette smoking causes, among other serious illnesses, cancer, pulmonary diseases, and coronary heart disease:

        a. <u>Cancer</u>: At least 43 chemicals in cigarette smoke have been determined to be carcinogenic. All told, cigarette smoking is responsible for at least 30% of all deaths from cancer. Cigarette smoking causes more than 85% of all lung cancer, which has now surpassed breast cancer as the primary cause of death from cancer among women. Smoking is also linked to cancers of the mouth, larynx, esophagus, stomach, pancreas, uterus, cervix, kidney and colon, among others.

        b. <u>Pulmonary Disease</u>: Smoking is the cause of

11

more than 80% of deaths from pulmonary diseases such as emphysema and bronchitis, which have a profound social impact because of the extended suffering and disability of their victims.

c. <u>Heart Disease</u>: Cigarette smoking is one of three major independent causes of coronary heart disease. Smoking is also responsible for thousands of deaths from cardiovascular disease, including stroke, heart attack, peripheral vascular disease and aortic aneurysm.

12.    The impact of cigarette smoking on the national economy is staggering. In May of 1993, the Office of Technology Assessment advised the United States Congress that in 1990, smoking-related illnesses cost United States taxpayers a total of approximately $50 billion in direct health care costs, $68 billion in indirect costs for morbidity, and $40.3 billion in direct costs for mortality.

13.    The State of Maryland bears a proportionately large share of this human and economic impact. For example, in 1990, over 7300 Marylanders died that year from smoking-related diseases, resulting in an estimated total loss of over 92,000 years of life. In the same year, the direct medical costs related to smoking in Maryland equalled approximately $800 million.

14.    The State of Maryland seeks monetary damages, civil penalties, declaratory and injunctive relief, and restitution for the conduct alleged in this Complaint. Among other things, the State of Maryland seeks a permanent injunction to require Defendants to cease marketing tobacco products to children, to disclose their research on smoking, addiction, and health, to fund a remedial public education campaign on the

12

health consequences of smoking, and to fund smoking cessation programs for nicotine-dependent smokers.

## II. THE PARTIES

### A.   The Plaintiff

15.   Plaintiff, the State of Maryland, is a free, sovereign, and independent State and brings this civil action through its Attorney General, J. Joseph Curran, Jr., at the direction of the Governor of Maryland, Parris N. Glendening, and pursuant to the Attorney General's constitutional and statutory authority under, inter alia, Md. Const. Art. V., §3(a)(2); Md. State Gov't Code Ann. §§ 6-101 et seq., and Md. Com. Law Code Ann. §§ 11-201 et seq. (the "Antitrust Act") and §§ 13-101 et seq. (the "Consumer Protection Act"). The State seeks, among other forms of relief, the specific measures set forth below:

> a. Consumer Protection Enforcement. The Attorney General has broad authority to institute actions under the Consumer Protection Act to safeguard Maryland citizens from, inter alia, unfair and deceptive trade practices, including the use of false and misleading advertising campaigns and the marketing of dangerous products to minors. Under this authority, the Attorney General seeks civil penalties, restitution, and appropriate injunctive relief, including but not limited to a permanent injunction to require Defendants to cease marketing tobacco products to children, to disclose their knowledge of and research into smoking, addiction, and health, to publish corrective advertising, and to fund a public education campaign on the health consequences of smoking as well as smoking cessation programs for nicotine-dependent smokers, and other remedial measures.

> b. Antitrust Enforcement. The Antitrust Act gives the

13

Attorney General broad powers to protect the public and foster fair and honest intrastate competition by instituting actions against persons who conspire to restrain trade and commerce or monopolize markets in Maryland. Under this authority, the Attorney General seeks civil penalties and appropriate injunctive relief, including but not limited to a permanent injunction to require Defendants to disclose their knowledge of and research into smoking, addiction, and health.

    c. <u>Medical Assistance</u>. Among other things, the State seeks restitution for the costs paid by the State through its Department of Health and Mental Hygiene ("DHMH"), a principal department of State government. Pursuant to statute, the Secretary of DHMH, Martin P. Wasserman, is charged with protecting the health interests of the people of the State, which includes taking affirmative steps to promote education, to control and prevent disease, and to intercept falsely labeled drugs, among other things. The Secretary of DHMH also administers the Maryland Medical Assistance Program and Pharmacy Assistance Program pursuant to Title 15 of the Health-General Article of the Annotated Code of Maryland. In addition to other relief, the State seeks restitution for:

        i.)    Health care costs under the Maryland Medical Assistance Program, under which the State provides financial assistance for a broad range of health care services to eligible low income Maryland residents. The State pays approximately half of these health care costs, with the federal government paying the remainder. A significant portion of the monies the State has paid out, and will continue to pay out, to recipients under the Maryland Medical Assistance Program covers health care costs attributable to smoking-related illnesses and diseases.

        ii.)    The costs of certain prescription drugs and other medical supplies under the

14

Pharmacy Assistance Program, which provides financial assistance to low-income individuals who are not eligible for Medical Assistance. A significant portion of the monies the State has paid out, and will continue to pay out, under the Pharmacy Assistance Program, which is entirely State-funded, covers costs attributable to smoking-related illnesses and diseases.

**B.   THE DEFENDANTS**

16.   Defendant **Philip Morris Incorporated (Philip Morris U.S.A.)** (hereinafter "Philip Morris") is a Virginia corporation whose principal place of business is located at 120 Park Avenue, New York, New York. Defendant **Philip Morris Incorporated (Philip Morris U.S.A.)** manufactures, advertises and sells Philip Morris, Merit, Cambridge, Marlboro, Benson & Hedges, Virginia Slims, Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga and Parliament cigarettes throughout the United States and in Maryland.

17.   Defendant **Philip Morris Companies Inc.** is a Virginia corporation whose principal place of business is located at 120 Park Avenue, New York, New York 10016. **Philip Morris Companies, Inc.** is the parent corporation of **Philip Morris Incorporated (Philip Morris U.S.A.)** and has participated in the manufacture and distribution of cigarettes and other tobacco products both individually and through its agent and alter ego, Defendant **Philip Morris Incorporated (Philip Morris U.S.A.)**.

18.   Defendant **R.J. Reynolds Tobacco Company** (hereinafter "R. J. Reynolds") is a New Jersey corporation whose principal place of business is located at

15

Fourth and Main Streets, Winston-Salem, North Carolina. Defendant **R.J. Reynolds Tobacco Company** manufactures, advertises and sells Camel, Vantage, Now, Doral, Winston, Sterling, Magna, More, Century, Bright Rite and Salem cigarettes throughout the United States and in Maryland.

      19.    Defendant **RJR Nabisco, Inc.** is a Delaware corporation whose principal place of business is 1301 Avenue of the Americas, New York, New York 10015. **RJR Nabisco** is the parent corporation of **R.J. Reynolds Tobacco Company** and has participated in the sale and manufacture of cigarettes and other tobacco products both individually and through its agent or alter ego, Defendant **R.J. Reynolds Tobacco Company**.

      20.    Defendant **Brown & Williamson Tobacco Corporation** (hereinafter "Brown & Williamson") is a Delaware corporation, with its principal place of business at 1500 Brown & Williamson Tower, Louisville, Kentucky. Defendant **Brown & Williamson Tobacco Corporation** is a subsidiary or division of Defendant **Batus Holdings, Inc.** and Defendant **B.A.T. Industries, P.L.C.** Defendant **Brown & Williamson Tobacco Corporation** manufactures, advertises and sells Kool, Barclay, BelAir, Capri, Raleigh, Richland, Laredo, Eli Cutter and Viceroy cigarettes throughout the United States and in Maryland.

      21.    Defendant **British American Tobacco Co., Ltd.** is a British corporation whose principal place of business is Millbank, Knowle Green, Staines,

Middlesex, England TW181DY. **Brown & Williamson Tobacco Corporation** is or was a subsidiary or division of **British American Tobacco Co., Ltd.**

22.   Defendant **Batus Holdings Inc.** is a Delaware corporation with its principal place of business at 1500 Brown & Williamson Tower, Louisville, Kentucky 40202. **Batus Holdings Inc.** is a subsidiary of **B.A.T. Industries PLC. Batus Holdings Inc.** is or has been the parent corporation of **Brown & Williamson Tobacco Corporation** and has participated in the manufacture and distribution of cigarettes and other tobacco products both individually and through its agent and alter ego, Defendant **Brown & Williamson Tobacco Corporation.**

23. Defendant **B.A.T. Industries P.L.C.** (hereinafter "B.A.T. Industries") is a British corporation with its principal place of business at Windsor House, 50 Victoria St., London. Through a succession of intermediary corporations and holding companies, **B.A.T. Industries P.L.C.** is the sole shareholder of **Brown & Williamson Tobacco Corporation.** Through **Brown & Williamson Tobacco Corporation, B.A.T. Industries P.L.C.** has placed cigarettes into the stream of commerce with the expectation that substantial sales of cigarettes would be made in the United States and in Maryland. In addition, **B.A.T. Industries P.L.C.** conducted, or through its agents and/or co-conspirators conducted, critical research for **Brown & Williamson Tobacco Corporation** on the issue of smoking and health. Further, **Brown & Williamson Tobacco Corporation** is believed to have sent to England research conducted in the

17

United States on the issue of smoking and health in an attempt to remove sensitive and inculpatory documents from United States jurisdiction, and these documents were subject to the control of **B.A.T. Industries P.L.C. B.A.T. Industries P.L.C.** has been involved in the conspiracy described herein and the actions of **B.A.T. Industries P.L.C.** has affected and caused harm in Maryland.

24.    Defendant **Lorillard Tobacco Company** (hereinafter "Lorillard") is a Delaware corporation whose principal place of business is located at 1 Park Avenue, New York, New York. Defendant **Lorillard Tobacco Company** manufactures, advertises and sells Old Gold, Kent, Triumph, Satin, Max, Spring, Newport and True cigarettes throughout the United States and in Maryland.

25.    Defendant **Lorillard Corporation** is a Delaware corporation whose principal place of business is located at 1 Park Avenue, New York, New York 10016. **Lorillard Corporation** is wholly-owned subsidiary or division of **Loews Corporation**. **Lorillard Corporation** participated in the manufacture and sale of cigarettes and/or other tobacco products both individually and through its agent or alter ego **Lorillard Tobacco Company**.

26.    Defendant **Loews Corporation** is a Delaware corporation whose principal place of business is located at 1 Park Avenue, New York, New York 10016. **Loews Corporation** participated in the manufacture and sale of cigarettes and/or other tobacco products both individually and through its agent or alter ego **Lorillard Tobacco**

18

Company.

27.     Defendant **The American Tobacco Company** (hereinafter

"American Tobacco") is a Delaware corporation whose principal place of business is

located at Six Stamford Forum, Stamford, Connecticut.  The **American Tobacco**

**Company** is or was a subsidiary or division of Defendant **American Brands, Inc.  The**

**American Tobacco Company** manufactures, advertises and sells Lucky Strike, Pall Mall,

Tareyton, Malibu, American, Montclair, Newport, Misty, Barkeley, Iceberg, Silk Cut,

Silva Thins, Sobrania, Bull Durham and Carlton cigarettes throughout the United States

and in Maryland.  On December 21, 1994, **The American Tobacco Company** was

purchased by **B.A.T. Industries, P.L.C.** who, on information and belief, has succeeded

to the liabilities of **The American Tobacco Company** by operation of law or as a matter

of fact.

28.     Defendant **American Brands, Inc.** is a Delaware corporation whose

principal place of business is located at 1700 East Putnam Avenue, Old Greenwich,

Connecticut 06870.  **American Brands, Inc.** is the parent corporation of or the successor

in interest to the **American Tobacco Company** and has participated in the manufacture

and distribution of cigarettes and other tobacco products both individually and through its

alter ego the Defendant **American Tobacco Company**.

29.     Defendant **Liggett Group, Inc.,** (hereinafter "Liggett") is **a**

Delaware corporation whose principal place of businesses is located at 700 Main Street,

19

Durham, North Carolina.  Defendant **Liggett Group, Inc.** is a subsidiary or division of

Defendant **The Brooke Group, Limited**.  Defendant **Liggett Group, Inc.** manufactures,

advertises and sells Chesterfield, Decade, L&M, Pyramid, Dorado, Eve, Stride, Generic

and Lark cigarettes throughout the United States and in Maryland.

       30.      Defendant **Liggett & Myers Inc.,** is a Delaware corporation whose

principal place of business is 700 W. Main Street, Durham, North Carolina 27702.

**Liggett & Myers Inc.** is wholly-owned subsidiary or division of Liggett Group, Inc.

       31.      Defendant **The Brooke Group, Limited** is a Delaware corporation

with its principal place of business at 100 Southeast 2nd Street, Miami, Florida.

Defendant **The Brooke Group, Limited** is the parent corporation of Defendant **Liggett**

**Group, Inc.** and **Liggett & Myers, Inc.**  **The Brooke Group, Limited** participated in the

manufacture and sale of cigarettes and/or other tobacco products both individually and

through its agents or alter egos **Liggett Group** and **Liggett & Myers**.

       32.      Defendant **Hill & Knowlton, Inc.** (hereinafter "Hill & Knowlton")

is a New York corporation whose principal place of business is located at 420 Lexington

Avenue, New York, New York.  Defendant **Hill & Knowlton, Inc.** is an international

public relations firm.  Defendant **Hill & Knowlton, Inc.** played an active and knowing

role in the conspiracy complained of by aiding the circulation and/or publication of many

false statements of the tobacco industry attributable to the Tobacco Industry Research

Committee and the Council for Tobacco Research.

20

33.    Defendant **The Council for Tobacco Research - U.S.A., Inc.** (hereinafter "CTR"), successor in interest to the Defendant Tobacco Industry Research Committee ("TIRC"), is a nonprofit corporation organized under the laws of the State of New York with its principal place of business at 900 3rd Avenue, New York, New York 10022.

34.    Defendant **The Tobacco Institute, Inc.** (hereinafter "Tobacco Institute") is a New York corporation, whose principal place of business is located at 1875 "I" Street, N.W., Suite 800, Washington, D.C., Defendant **The Tobacco Institute, Inc.** has since its incorporation in 1958, operated as the public relations and lobbying arm of the Tobacco Companies.

35.    Each Defendant is sued individually as a primary violator and as a co-conspirator and the liability of each arises from the fact that each Defendant entered into an agreement with the other Defendants and third parties to pursue, and knowingly pursued, the common course of conduct to commit or participate in the commission of all or part of the unlawful acts, tortious acts, plans, schemes, transactions, and artifices to defraud alleged herein.

36.    Such acts of conspiracy included, among other things, falsely advertising, marketing and selling cigarettes as safe, non-addictive, and not containing levels of nicotine manipulated by Defendants to cause addiction.

37.    The liability of each Defendant arises from the fact that each

21

committed and/or engaged in a conspiracy to accomplish the commission of all or part of the unlawful and/or tortious conduct alleged herein, and/or intentionally, knowingly, with evil motive, intent to injure, ill will or fraud and without legal justification or excuse, engaged in the conduct herein alleged.

38.     At all pertinent times, Defendants acted through their duly authorized agents, servants, and employees who were then acting in the course and scope of their employment, and in furtherance of the business of said Defendants. At all pertinent times, Hill & Knowlton, CTR, and the Tobacco Institute were the agents, servants, and/or employees of Defendants and acted within the scope of said agency, servitude or employment.

39.     Defendants listed above, and/or their predecessors and successors in interest did business in the State of Maryland, made contracts to be performed in whole or in part in Maryland; and/or manufactured, tested, sold, offered for sale, supplied or placed in the stream of commerce, or, in the course of business, materially participated with others in so doing, tobacco products which the Defendants knew to be defective, unreasonably dangerous and hazardous and which the Defendants knew would be substantially certain to cause injury to the State, and to persons within the State, thereby negligently and intentionally causing injury to persons within Maryland and to the State, and as described herein, committed and continue to commit tortious and other unlawful acts in the State of Maryland.

40.     The Defendants, and/or their predecessors and successors in interest,

22

performed such acts as were intended to, and did, result in the sale and distribution of tobacco products in the State of Maryland and the consumption of tobacco products by residents of the State of Maryland.

41.     The term "addictive" used in this Complaint is synonymous and interchangeable with the term "dependence-producing"; both terms refer to the persistent and repetitive intake of psychoactive substances despite evidence of harm and a desire to quit.  Some scientific organizations have replaced the term "addictive" with "dependence-producing" to shift the focus to dependent patterns of behavior and away from the moral and social issues associated with addiction.  Both terms are equally relevant for purposes of understanding the drug effects of nicotine.

## III.  JURISDICTION AND VENUE

42.     This Court has jurisdiction over the subject matter of this action pursuant to, inter alia, the provisions of Maryland Courts and Judicial Proceedings Code Annotated §1-501.  This Court has personal jurisdiction over the Defendants pursuant to, inter alia, the provisions of Maryland Courts and Judicial Proceedings Code Annotated §§ 6-102, 6-103.

43.     Venue is proper in the Circuit Court for Baltimore City pursuant to, inter alia, the provisions of Maryland Courts and Judicial Proceedings Code Annotated §§ 6-201, 6-202.

## IV.  RELEVANT MARKET

44.    For the purposes of this action, the sale of cigarettes is the relevant product market.  The relevant geographic markets are the United States and the State of Maryland.

## V.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**"Of course it's addictive.  That's why you smoke the stuff."**

> **— F. Ross Johnson, former CEO of R.J. Reynolds (quoted in Wall Street Journal, Oct. 6, 1994)**

**"We are, then, in the business of selling nicotine, an addictive drug . . . ."**
**-- Addison Yeaman, Brown & Williamson General Counsel, 1963**
**(from a document revealed in Congressional hearings in 1994)**

45.    On April 14, 1994, each of the chief executives of Defendant tobacco companies swore under oath that he believes nicotine is not addictive.  Testifying before the House Subcommittee on Health and the Environment of the Committee on Energy and Commerce, chaired by Congressman Henry Waxman, these executives misrepresented their companies' knowledge about the health risks of smoking, nicotine addiction, and nicotine manipulation in the cigarette manufacturing process.  For example:

a.    William I. Campbell, then President and CEO of Philip Morris, stated:

i.    "Philip Morris does not manipulate nor independently control the level of nicotine in our products."

ii.    "Cigarette smoking is not addictive."

24

iii.    "Philip Morris research does not establish that smoking is addictive."

b.    R.J. Reynolds CEO James W. Johnston said that, "Smoking is no more addictive, than coffee, tea or Twinkies."

c.    Andrew Tisch, then CEO of Lorillard, asserted that smoking does not cause death: "We have looked at the data and the data that we have been able to see has all been statistical data that has not convinced me that smoking causes death."

46.    In fact, research conducted by Philip Morris scientists -- which Philip Morris and other Defendants attempted to suppress -- has demonstrated, in the scientists' own words, that nicotine is addictive "on a level comparable to cocaine." High-ranking officers in the tobacco industry have privately acknowledged, since at least the early 1960s, that nicotine is an addictive drug. For example, Addison Yeaman, general counsel at Brown & Williamson, wrote in an internal memorandum in 1963: "Moreover, nicotine is addictive. We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms." And in 1962, the scientific advisor to the board of directors of British American Tobacco Company ("BATCO"), Brown & Williamson's parent company, stated that "smoking is a habit of addiction" and that "[n]icotine is not only a very fine drug, but the technique of administration by smoking has considerable psychological advantages . . . ." He subsequently described Brown & Williamson as being "in the nicotine rather than the tobacco industry."

47.    The tobacco executives' false Congressional testimony about nicotine is but the most recent sordid episode in the industry's campaign, spanning five decades, to

sow confusion and misinformation about the health effects of smoking. As described in various internal memoranda of tobacco industry executives, the scheme has been "a brilliantly conceived and executed" strategy to "creat[e] doubt about the health charge without actually denying it."

## A.   THE INDUSTRY CONSPIRACY ON SMOKING AND HEALTH: DECEIVING THE PUBLIC ABOUT DISEASE AND DEATH

### 1. The Early Days--Claiming Cigarettes Are Healthful

48.    Although tobacco in various forms has been consumed by Americans for many centuries, it was not until the 19th century that an easily inhalable tobacco product, the cigarette, became widely popular. Cigarette smoking increased dramatically in the first half of the 20th century. As early as 1946, tobacco company chemists themselves reported concern for the health of smokers. A 1946 letter from a Lorillard chemist to its manufacturing committee states: "Certain scientists and medical authorities have claimed for many years that the use of tobacco contributes to cancer development in susceptible people. Just enough evidence has been presented to justify the possibility of such a presumption." Neither this letter nor the information it contained was ever voluntarily released.

49.    Industry spokesmen referred to these and similar reports as "the health scare," and throughout the 1930s through the 1950s, countered with express advertising claims and warranties as to the healthfulness of their products. These claims were knowingly and/or recklessly false, misleading, deceptive and/or fraudulent. Examples of these health warranties include the following:

a.    Old Gold reacted to early negative medical studies with the slogan: "If pleasure's your aim, not medical claims..." and made claims such as Old Gold - "Not a cough in a Carload."

b.    R.J. Reynolds claimed that there was "Not a single case of throat irritation due to smoking Camels."

c.    Philip Morris brand was held out as "The Throat-tested cigarette" on the basis of supposed studies showing that Philip Morris brand cigarettes were less irritating. An ad by the company in a 1943 issue of the National Medical Journal read: "'Don't smoke' is advice hard for patients to swallow. May we suggest instead 'Smoke Philip Morris?' Tests showed three out of every four cases of smokers' cough cleared on changing to Philip Morris. Why not observe the results for yourself?"

d.    In 1942, Brown and Williamson claimed that Kools would keep the head clear and/or give extra protection against colds.

e.    In 1952, Liggett & Myers widely publicized the "results" of tests showing that "smoking Chesterfields would have no adverse effects on the throat, sinuses or affected organs." The tests were conducted by Arthur D. Little, Inc. for advertising purposes and were designed to have no real scientific value. These ads ran, among other places on the nationally popular Arthur Godfrey radio and television show. Arthur Godfrey subsequently contracted lung cancer caused by smoking cigarettes.

f.    Ads from the 1930s and 1940s often carried wide-ranging medical claims that placed cigarette-touting physicians in the company of endorsers such as Santa Claus ("Luckies are easy on my throat"), movie stars, sports heroes, and steady-nerved circus stars.    Some companies hired attractive women to deliver cigarette samples to physicians and the patients in their waiting rooms.

g.    In the New York State Journal of Medicine, Chesterfield ads began running in 1933 and often carried claims such as, "Just as pure as the water you drink . . . and practically

untouched by human hands."

h. During the 1950s, Defendants attempted to counter the "health scare" with campaigns like "The Filter Derby" and "Tar Wars," making false and fraudulent warranties of health claims based on tar and nicotine content.

50. Defendants sponsored cigarette ads in medical journals such as the Journal of the American Medical Association ("JAMA") from the 1930s through the 1950s. After the appearance of landmark studies such as the 1952 JAMA article on smoking and bronchial carcinoma by Alton Ochsner, M.D., JAMA ceased running cigarette ads.

2.   The "Big Scare" and the Birth of the Conspiracy

51. The industry conspiracy began in earnest in the 1950s, when the tobacco companies were confronted with the publication of several scientific studies which sounded grave warnings on the health hazards of cigarettes. The widespread reporting of these studies caused what tobacco company officials later called the "Big Scare."

52. Confronted with the studies, the presidents of the leading tobacco companies met at an extraordinary gathering in the Plaza Hotel in New York City on December 15, 1953. Hill and Knowlton, a public relations agency, coordinated the meeting and later prepared a memorandum summarizing the discussions of that day. According to the Hill and Knowlton memorandum:

a. The companies had not met together since two previous antitrust decrees had prohibited "many group activities." However, the companies viewed the current problem "as being extremely serious and worthy of drastic action."

b. Another indication of the seriousness of the problem

28

was "that salesmen in the industry are frantically alarmed and that the decline in tobacco stocks on the stock exchange market has caused grave concern. . . . "

c. The situation was viewed entirely in terms of a public relations problem, as opposed to a public health concern. The industry leaders "feel that the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future" and that the industry "should sponsor a public relations campaign which is positive in nature and is entirely 'pro-cigarettes.'"

d. All of the leading manufacturers, except Liggett, agreed to "go along" with the public relations strategy. Liggett decided not to participate at that time "because that company feels that the proper procedure is to ignore the whole controversy."

e. The group discussed forming an association "specifically charged with the public relations function."

f. Hill and Knowlton was to play a central role in the industry association. "The current plans are for Hill and Knowlton to serve as the operating agency of the companies, hiring all the staff and disbursing all funds."

53. Thus, the Tobacco Industry Research Committee ("TIRC"), eventually renamed as Council for Tobacco Research ("CTR"), was conceived and born with five of the Big Six cigarette manufacturers as original members. Liggett finally joined in 1964, in response to the Surgeon General's first report on smoking and health.

54. Nine days after the December 15, 1953 meeting, Hill and Knowlton presented a detailed recommendation to the cigarette manufacturers and others. The recommendation recognized the importance of gaining the public trust, and avoiding the appearance of bias, if the "procigarette" industry strategy was to be successful. According

29

to the memorandum:

> a. "[T]he grave nature of a number of recently highly publicized research reports on the effects of cigarette smoking . . . have confronted the industry with a serious problem of public relations."

> b. "It is important that the industry do nothing to appear in the light of being callous to considerations of health or of belittling medical research which goes against cigarettes."

> c. "The situation is one of extreme delicacy. There is much at stake and the industry group, in moving into the field of public relations, needs to exercise great care not to add fuel to the flames."

### 3.   The "Frank Statement to Cigarette Smokers": A Scheme to Defraud Consumers

55.   The cigarette industry announced the formation of TIRC on January 4, 1954, with newspaper advertisements placed in virtually every city with a population of 50,000 or more, including Baltimore, reaching a circulation of more than 43 million Americans. The advertisement in The Baltimore Sun was captioned "A Frank Statement to Cigarette Smokers" and was run under the auspices of TIRC with, inter alia, five of the Big Six manufacturers listed by name. The advertisement promised that Defendants would undertake the responsibility of learning and disclosing the facts about smoking:

> "RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked to lung cancer in human beings. Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive, should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest to call attention to the fact that eminent

doctors and research scientists have publicly questioned the claimed significance of these experiments.   Distinguished authorities point out:

1.   That medical research of recent years indicates many possible causes of lung cancer.

2.   That there is no agreement among the authorities regarding what the cause is.

3.   That there is no proof that cigarette smoking is one of the causes.

4.   That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many aspects of modern life.   Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business. We believe the products we make are not injurious to health. We always have and always will cooperate closely with those whose task it is to safeguard the public health. For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during those years, critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence. Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of serious disease is a matter of deep concern to us. Many people have asked us what we are doing to meet the public's concern aroused by the recent reports. Here is the answer:

1.   We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies.

2.   For this purpose we are establishing a joint group consisting initially of the undersigned. This group will be

31

known as the TOBACCO INDUSTRY RESEARCH COMMITTEE.

3.    In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities. This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

56.    In this advertisement, the participating Defendants recognized and acknowledged their "special responsibility" to the public, and promised to learn the facts about smoking and health. The participating Defendants promised to sponsor independent research on the subject, claiming they would make health a basic responsibility, paramount to any other consideration in their business. The participating Defendants also promised to cooperate closely with public health officials. At the time these promises were made, Defendants had no intent to honor their promises. In fact, these promises so publicly and dramatically made to the public, the citizens of Maryland and government regulators, have been breached over and over again.

4.    "Scientific Research" as a Public Relations Front: Control of TIRC by Hill and Knowlton

57.    As had been proposed at the December 15, 1953 meeting, Defendants (except Liggett), through their agent Hill and Knowlton, operated, and effectively controlled TIRC.

58.    TIRC was physically established in the Empire State Building, one floor

32

below the Hill and Knowlton offices. Internal documents confirm that Hill and Knowlton, and not independent scientists, actually ran TIRC. A "highly confidential," internal memo reported:

> "Since the [TIRC] had no headquarters and no staff, Hill and Knowlton, Inc. was asked to provide a working staff and temporary office space. As a first organizational step, public relations counsel assigned one of its experienced executives, W.T. Hoyt, to serve as account executive and handle as one of his functions the duties of executive secretary for the [TIRC]"

59.   In 1954, 35 staff members of Hill and Knowlton worked full or part time for TIRC. In that year, TIRC spent $477,955 on payments to Hill and Knowlton, over 50% of TIRC's entire budget.

60.   After lulling the public into a false sense of security concerning smoking and health, the TIRC continued to act as a front for tobacco industry interests. Despite the initial public statements and posturing, and the repeated assertions that they were committed to full disclosure and vitally concerned with public health, the TIRC secretly failed to make the public health a concern. Rather the TIRC, at the direction of Defendants, acted solely to protect tobacco industry profits. A coordinated, industry-wide strategy was designed to actively mislead and confuse the public about the true dangers associated with smoking cigarettes. Rather than work for the good of the public health and sponsor independent research, as it had voluntarily undertaken, Defendants, acting through the TIRC/CTR, concealed, undermined, and distorted information coming from the scientific and medical community.

33

61.    By the spring of 1955, the self-defense strategy recommended by Hill and Knowlton and implemented by the industry through the "Frank Statement" was largely successful. Hill and Knowlton reported to TIRC:

       a. "progress has been made" . . . "The first big scare continues on the wane."

       b. "The research program of the [TIRC] has won wide acceptance in the scientific world as a sincere, valuable and scientific effort."

       c. "Positive stories are on the ascendancy."

## 5. The Best Insurance the Industry Can Buy

62.    Since its inception, CTR has functioned as a remarkably effective vehicle to perpetuate the deception that the health risks of smoking and nicotine addiction have never been proven. The industry has congratulated itself on a brilliantly conceived and executed strategy to create doubt about the charge that cigarette smoking is deleterious to health without actually denying it. A 1962 memo stated that they had handled the "Big Scare" effectively, by treating the public health threat as a public relations problem that was solved for the self-preservation of the industry's image and profit. One Defendant's executive called the CTR the best, cheapest insurance the tobacco industry can buy, noting that without it Defendants would have to invent CTR or would be dead.

63.    In 1993, a former 24-year employee of CTR confirmed publicly that the joint industry research efforts were not objective: "When CTR researchers found out that cigarettes were bad and it was better not to smoke, we didn't publicize that. The CTR is just

34

a lobbying thing. We were lobbying for cigarettes."

## 6. "Special Projects": Lawyer Control of Scientific Research

64.    The cigarette manufacturers have used lawyers and fraudulent claims of attorney/client privilege and work product to insulate CTR-funded research projects from disclosure to the public and to government officials. This conduct demonstrates the falsity of the industry representations jointly to fund objective research and to report the results of that research to the public.

65.    CTR used the term "special projects" to mean a project that carried a risk of a negative result that might have to be suppressed. "Special projects" were selected and monitored by industry lawyers to prevent disclosure. One Philip Morris official characterized CTR as a "front" for performing "special projects."

66.    Notes prepared at a 1981 meeting of the cigarette industry's Committee of General Counsel state: "When we started the CTR Special Projects, the idea was that the scientific director of CTR would review a project. If he liked it, it was a CTR special project. If he did not like it, then it became a lawyers' special project. . . We were afraid of discovery for FTC and Aviado, we wanted to protect it under the lawyers. We did not want it out in the open."

67.    The sole purpose of the "Special Projects" division within CTR was to conceal research that was harmful to the tobacco industry and to promote and develop research and expert witnesses needed for the defense of tort litigation. Incriminating reports and documents contained within this division were passed through attorneys and are now

35

claimed by Defendants to be privileged.

68.    CTR-sponsored research projects were directed away from research that might add to the evidence against smoking.  When CTR-sponsored research did produce unfavorable results, however, the information was distorted or simply suppressed.  For example, Dr. Freddy Homburger, a researcher in Cambridge, Massachusetts, undertook a study of smoke exposure on hamsters.  According to Dr. Homburger, he received a grant from CTR which was changed half-way through the study to a contract "so they could control publication -- they were quite open about that."  Dr. Homburger has testified that when the study was completed in 1974, the Scientific Director of CTR and a CTR lawyer "didn't want us to call anything cancer" and that they threatened Dr. Homburger with "never get[ting] a penny more" if his paper was published without deleting the word cancer.

69.    An internal CTR document describes how Dr. Homburger attempted to call a press conference about the incident and how CTR stopped it: "He . . . was to tell the press that the tobacco industry was attempting to suppress important scientific information about the harmful effects of smoking.  He was going to point specifically at CTR.  I arranged later that evening for it to be canceled.  Homburger was given a cordial welcome and nicely hastened out the door.  P.S. I doubt if you or Tom will want to retain this note."

70.    Not content with the holding strategy employed by the TIRC and the CTR, Defendants advocated a more offensive role through their lobbying arm, the Tobacco Institute.  This tobacco industry-supported group actively seeks to increase doubt about the negative health effects of smoking by suggesting that there are alternative explanations to the

data. One "theory" detailed how individual genetic makeups predisposed individuals to illnesses. Another, the "multi-factorial hypothesis," asserted that multiple factors should be blamed, i.e., food additives, viruses, occupational hazards, air pollution or stress, for causing cancer. The tobacco industry financed, supported and encouraged the manufacture of fraudulent science.

## 7. The Kings of Concealment and Disinformation

71.    On February 6, 1992, United States District Court Judge H. Lee Sarokin for the District of New Jersey issued an opinion in Haines v. Liggett Group, Inc., Civ. Action 84-678. After reviewing 1500 documents in camera, Judge Sarokin noted that "In 1954, the tobacco industry promised to disseminate the results of industry-sponsored, independent scientific research for the purpose of answering the question: 'Does cigarette smoking cause illness?' To fulfill its promise, the tobacco industry proffered the allegedly 'independent' research organization, the Council for Tobacco Research (the CTR), which purportedly would examine the risks of smoking and report its findings to the public." After his review of the withheld documents, Judge Sarokin concluded that Defendants had intentionally breached their promises to the public:

> "Despite the industry's promise to engage independent researchers to explore the dangers of cigarette smoking and to publicize their findings the evidence clearly suggests the research was not independent; that potentially adverse results were shielded under the caption of "special projects"; that the attorney-client privilege was intentionally employed to guard against such unwanted disclosure; and that the promise of full disclosure was never meant to be honored, and never was."

37

As a result of this finding, Judge Sarokin went on to note that Defendants' actions constituted a fraud:

> "A jury might reasonably conclude that the industry's announcement of proposed independent research into the dangers of smoking and its promise to disclose its findings was nothing but a public relations ploy -- a fraud -- to deflect the growing evidence against the industry, to encourage smokers to continue and non-smokers to begin, and to reassure the public that adverse information would be disclosed."

72.     Undaunted by Judge Sarokin's findings, in April 1994, tobacco company executives asserted, under oath, that tobacco does not cause death, that nicotine is not addictive and that tobacco advertising does not target new smokers. Judge Sarokin's earlier written opinion in <u>Haines</u> is still valid for describing the Defendants: ". . . despite some rising pretenders, the tobacco industry may be the king of concealment and disinformation."

8.     **Repeated False Promises to the Public**

73.     Using CTR as a "front," Defendants pursued a public disinformation strategy to confuse and mislead public health authorities and the public about the true health risks of cigarette smoking.

74.     Defendants created a publication called Tobacco and Health (later, Tobacco and Health Research), distributed to the press, doctors, and health officials, to disseminate false information and generate confusion over the causal connection between cigarette smoking and disease. The "Criteria For Selection" of articles for publication included an example of "a report in which smoking-associated diseases are questioned."

38

75.    The deceptions of the 1954 "Frank Statement to Cigarette Smokers" were renewed and repeated by the industry. R.J. Reynolds Chairman Bowman Gray told Congress in 1964: "If it is proven that cigarettes are harmful, we want to do something about it regardless of what somebody else tells us to do. And we would do our level best. It's only human."

76.    The January 15, 1968 issue of True Magazine contained an article written by Stanley Frank called, "To Smoke or Not to Smoke -- That is Still the Question." The article dismissed the evidence against smoking as "inconclusive and inaccurate" and claimed that "[s]tatistics alone link cigarettes with lung cancer . . . it is not accepted as scientific proof of the cause and effect." A few months later, a similar but shorter article appeared in the National Enquirer entitled "Cigarette Cancer Link is Bunk" written by "Charles Golden" (a fictitious name commonly used by the Enquirer.) The real author was Stanley Frank.  Two million reprints of the True Magazine article were distributed to physicians, scientists, journalists, government officials, and other opinion leaders with a small card which stated, "As a leader in your profession and community, you will be interested in reading this story from the January issue of True Magazine about one of today's controversial issues." The cost for this was paid by Brown and Williamson, Philip Morris and R.J. Reynolds. It was subsequently disclosed that author Frank had been paid $500 to write the article, by Joseph Field, a public relations professor working for Brown and Williamson. Brown and Williamson reimbursed Field for that amount.

77.    In 1970, the Tobacco Institute ran an advertisement captioned "A

39

Statement About Tobacco and Health," which stated:

    a. "We recognize that we have a special responsibility to the public – to help scientists determine the facts about tobacco and health and about certain diseases that have been associated with tobacco use."

    b. "We accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee, which provides research grants to independent scientists. We pledge continued support of this program of research until all the facts are known."

    c. "Scientific advisors inform us that until much more is known about such diseases as lung cancer, medical science probably will not be able to determine whether tobacco or any other single factor plays a causative role -- or whether such a role might be direct or indirect, incidental or important."

    d. "We shall continue all possible efforts to bring the facts to light."

78.    Also, in 1970, the Tobacco Institute ran an advertisement captioned, "The question about smoking and health is still a question." In this advertisement, the Tobacco Institute stated:

    a. "[A] major portion of this scientific inquiry has been financed by the people who know the most about cigarettes and have a great desire to learn the truth . . . the tobacco industry."

    b. "[T]he industry has committed itself to this task in the most objective and scientific way possible."

    c. "In the interest of absolute objectivity, the tobacco industry has supported totally independent research efforts with completely nonrestrictive funding."

    d. "Completely autonomous, CTR's research is directed by a board of ten scientists and physicians . . . . This board has

full authority and responsibility for policy, development and direction of the research effort."

e.  "The findings are not secret."

f.  "From the beginning, the tobacco industry has believed that the American people deserve objective, scientific answers."

79.    Again, in 1970, the Tobacco Institute stated, "The Tobacco Institute believes that the American public is entitled to complete, authenticated information about cigarette smoking and health."  The Tobacco Institute further stated that, "The tobacco industry recognizes and accepts a responsibility to promote the progress of independent scientific research in the field of tobacco and health."

## B.    INDUSTRY KNOWLEDGE THAT SMOKING CAUSES DEATH

80.    In the years following the 1954 "Frank Statement," and continuing to the present, Defendants have repeatedly acted in breach of their assumed duty to report objective facts on smoking and health.  As evidence mounted, both through industry research and truly independent studies, that cigarette smoking causes cancer and other diseases, Defendants continued publicly to represent that nothing was proven against smoking. Internal documents show that the truth was very different.  Defendants knew and acknowledged internally the veracity of scientific evidence of the health hazards of smoking, and at the same time suppressed such evidence where they could, and attacked it when it did appear.

81.    As early as 1946, Lorillard chemist H.E. Parmele, who later became

41

Vice President of Research and a member of Lorillard's Board of Directors, wrote to his company's manufacturing committee: "Certain scientists and medical authorities have claimed for many years that the use of tobacco contributes to cancer development in susceptible people. Just enough evidence has been presented to justify the possibility of such a presumption."

82.   A 1956 memorandum from the Vice President of Philip Morris' Research and Development Department to top executives at the company regarding the advantages of "ventilated cigarettes" stated that: "Decreased carbon monoxide and nicotine are related to decreased harm to the circulatory system as a result of smoking . . . . Decreased irritation is desirable . . . as a partial elimination of a potential cancer hazard."

83.   A 1958 memorandum sent to the Vice President of Research at Philip Morris, who later became a member of its Board of Directors, from a company researcher stated "the evidence . . . is building up that heavy cigarette smoking contributes to lung cancer either alone or in association with physical and physiological factors . . . ."

84.   A 1961 document presented to the Philip Morris Research and Development Committee by the company's Vice President of Research and Development included a section entitled "Reduction of Carcinogens in Smoke." The document stated, in part: "To achieve this objective will require a major research effort, because carcinogens are found in practically every class of compounds in smoke. This fact prohibits complete solution of the problem by eliminating one or two classes of compounds. The best we can hope for is to reduce a particularly bad class, i.e., the polynuclear hydrocarbons, or phenols

42

. . . . Flavor substances and carcinogenic substances come from the same classes, in many instances."

85.   A 1963 memorandum to Philip Morris, President and CEO from the company's Vice President of Research describes a number of classes of compounds in cigarette smoke which are "known carcinogens." The document goes on to describe the link between smoking and bronchitis and emphysema. "Irritation problems are now receiving greater attention because of the general medical belief that irritation leads to chronic bronchitis and emphysema.  These are serious diseases involving millions of people. Emphysema is often fatal either directly or through other respiratory complications. A number of experts have predicted that the cigarette industry ultimately may be in greater trouble in this area than in the lung cancer field."

86.   Brown & Williamson and its parent company, BATCO, researched the health effects of nicotine and were aware early on, as reported at a B.A.T. Group Research Conference in November 1970, that "nicotine may be implicated in the aetiology [cause] of cardiovascular disease . . . ."

87.   A 1961 "Confidential" memorandum from the consulting research firm hired by Liggett to do research for the company states: "There are biologically active materials present in cigarette tobacco.  These are: a) cancer causing; b) cancer promoting; c) poisonous; d) stimulating, pleasurable, and flavorful."

88.   A 1963 memorandum from the Liggett consulting research firm states: "Basically, we accept the inference of a causal relationship between the chemical properties

43

of ingested tobacco smoke and the development of carcinoma, which is suggested by the statistical association shown in the studies of Doll and Hill, Horn, and Dorn with some reservations and qualifications and even estimate by how much the incidence of cancer may possibly be reduced if the carcinogenic matter can be diminished, by an appropriate filter, by a given percentage."

## C.    SUPPRESSING THE TRUTH ABOUT CIGARETTES AND NICOTINE

89.    Not only have Defendants failed to disclose the information they repeatedly pledged to make public, they have also actively conspired to suppress research and publication concerning the health risks of cigarette smoking, and to misstate and distort published research linking smoking to disease, even going so far as to make personal threats against the researchers themselves. A CTR director's claim that tobacco industry scientists could "freely publish what they find as they choose" was a hollow deception.

### 1.    The Gentlemen's Agreement

90.    The actions of Defendants in suppressing and misleading the public as to the harmful effects of cigarettes stands in sharp contrast to Defendant Lorillard's 1994 assertion to Congress that the data had still not convinced its CEO that smoking causes death. The tobacco industry long ago entered into a "gentlemen's agreement" to suppress independent research on smoking and health. A 1968 internal Philip Morris draft memo refers to this conspiratorial agreement: "We have reason to believe that in spite of gentlemen's agreement from the tobacco industry in previous years that at least some of the major companies have been increasing biological studies within their own facilities." This

44

memo also acknowledged that cigarettes are inextricably intertwined with the health field, stating, "Most Philip Morris products, both tobacco and non-tobacco, are directly related to the health field."

91.   The industry believed that individual companies were performing certain research on their own in addition to the joint industry research. But the fundamental understanding and agreement remained intact: any harmful information and activities would be restrained, suppressed, and/or concealed. This secret agreement included restraining, suppressing, and concealing research on the health effects of smoking, including the addictive qualities of nicotine, and restraining, concealing, and suppressing the research and marketing of safer cigarettes.

92.   The general counsel of the major cigarette manufacturers, through joint meetings to review and direct proposals for scientific research for the entire industry, furthered the conspiracy of the tobacco industry to defraud the public about smoking and health. For example, Defendants have attempted wrongfully to create a privilege for various documents reflecting scientific research that they wish to conceal by routing such documents to their legal departments and law firms to support claims that such materials are protected from disclosure by the attorney-client or attorney work-product privileges.

93.   In addition, Defendants have destroyed evidence of their internal research into smoking and health. For example, at a time when the company was resisting discovery in a number of personal injury lawsuits, Brown & Williamson's general counsel, J. Kendrick Wells, recommended in a memorandum dated January 17, 1985, that much of

the company's biological research be declared "deadwood" and shipped to England. He recommended that no notes, memos or lists be made about these documents. Wells stated, "I had marked certain of the document references with an X . . . which I suggested were deadwood in the behavioral and biological studies area. I said that the "B" series are "Janus" series studies and should also be considered as deadwood." ("Janus" was a name of a project that attempted to isolate and remove the harmful elements of tobacco.) Wells further recommended that the research, development, and engineering department also should undertake "to remove the deadwood from the files."

2.   **The Mouse House Massacres**

94.   In the 1960s, R.J. Reynolds established a facility in Winston-Salem, North Carolina, to perform research on the health effects of smoking using mice. Nicknamed the "Mouse House," R.J. Reynolds scientists conducted research in a number of specific areas, including studies of the actual mechanism whereby smoking causes emphysema in the lungs.

95.   The R.J. Reynolds lab made significant progress in understanding this mechanism. Despite this progress, R.J. Reynolds disbanded the entire research division in one day, and fired all 26 scientists without notice.

96.   Several months before the 1970 closure and firings, R.J. Reynolds attorneys collected dozens of research notebooks from the scientists. The notebooks have still not been disclosed. One of the researchers later stated about R.J. Reynolds' executives and lawyers that "they like to take the position that you can't prove harm because you don't

46

know mechanism . . . . And sitting right under their noses is evidence of mechanism[.] What are they going to do with this stuff? They decided to kill it."

97.   Internally, an R.J. Reynolds-commissioned report favorably described the mouse house work as "the more important of the smoking and health research effort because it comes close to determining what was thought to be the underlying pathobiology of emphysema." None of the work done at the "Mouse House" was disclosed to the public.

98.   In a similar incident, Philip Morris hired Victor DeNoble in 1980 to study nicotine's effects on the behavior of rats and to research and test potential nicotine analogues. DeNoble, in turn, recruited Paul C. Mele, a behavioral pharmacologist.

99.   DeNoble and Mele discovered that nicotine met two of the hallmarks of potential addiction – self-administration (rats would press levers to inject themselves with a nicotine solution) and tolerance (a given dose of nicotine over time had a reduced effect).

100.   However, Philip Morris instructed DeNoble and Mele to keep their work secret, even from fellow Philip Morris scientists. Test animals were delivered at dawn and brought from the loading dock to the laboratory under cover.

101.   DeNoble was later told by lawyers for the company that the data he and Mele were generating could be dangerous. Philip Morris executives began talking of killing the research or moving it outside of the company so Philip Morris would have more freedom to disavow the results.

102.   In April 1984, Philip Morris closed DeNoble's nicotine research lab. DeNoble and Mele were forced abruptly to halt their studies, turn off all their instruments

47

and turn in their security badges by morning. Philip Morris executives threatened them with legal action if they published or talked about their nicotine research. According to DeNoble, the lab literally vanished overnight. The animals were killed, the equipment was removed, and all traces of the former lab were eliminated.

103.   DeNoble has testified "senior research management in Richmond, Va., as well as top officials at the Philip Morris Company in New York, continually reviewed our research and approved our research." DeNoble also stated that these officials were specifically told that nicotine was a drug of abuse.

104.   In August 1983, Philip Morris ordered DeNoble to withdraw from publication a research paper on nicotine that had already been accepted for publication after full peer review by the journal Psychopharmacology. According to DeNoble, the company changed its mind because it did not want its own research showing nicotine was addictive or harmful to compromise the company's defense in litigation recently filed against it. He said that Philip Morris officials had rightly interpreted the suppressed nicotine studies as showing that, in terms of addictiveness, "nicotine looked like heroin."

105.   Liggett & Myers also refused to disclose research by Dr. Ernest Wynder showing the cancer causing propensity of cigarettes.

106.   Brown & Williamson undertook its potentially sensitive research on nicotine through a contractor in Geneva, Switzerland, and through British affiliates at an English lab called Harrogate.

107.   In 1963, Brown & Williamson debated internally whether to disclose

48

to the U.S. Surgeon General, who was preparing his first official report on smoking and health, what the company knew about the addictiveness of nicotine and the adverse effects of smoking on health. Addison Yeaman, general counsel, advised Brown & Williamson to "accept its responsibility" and disclose its findings to the Surgeon General. He said that such disclosure would then allow the company openly to research and develop a safer cigarette.

108.    Brown & Williamson rejected Yeaman's advice to make full disclosure to the Surgeon General. A series of six letters and telexes exchanged by Yeaman and senior BATCO official A. D. McCormick between June 28 and August 8, 1963, document the company's decision not to disclose its research findings to the Surgeon General. That research, some of which was later characterized in a report in the Journal of the American Medical Association as "at the cutting edge of nicotine pharmacology," preceded the main published reports from the general scientific community by several years.

## D.    SUPPRESSION OF SAFER CIGARETTES

109.    Defendants could have designed and manufactured a safer cigarette, but refused to do so. The need for a "safer" tobacco product results from the harmful chemical compounds occurring in tobacco products and/or formed as a result of burning. These compounds include carbon monoxide, nicotine, nickel carbon dioxide, benzene, hydrazine, formaldehyde, Polonium-210, ammonia, nicotine sulfate, Freon II, hydrogen cyanide and certain liver toxins known collectively as furans. More than forty (40) known carcinogens are found in cigarette tobacco. Defendants artificially add chemicals and flavorings to their products that increase toxicity and/or carcinogenicity.

49

110.   Defendants have long understood that reducing or eliminating nicotine from their products would hurt sales. As one company researcher wrote in a 1978 report to Philip Morris executives: "If the industry's introduction of acceptable low-nicotine products does make it easier for dedicated smokers to quit, then the wisdom of the introduction is open to debate."

111.   Instead, the industry attempted to develop ostensibly safer ways of delivering adequate doses of nicotine to create and sustain addiction in the smoker.

112.   Some members of the industry studied artificial nicotine or nicotine analogues that would have the addictive and psychopharmacological properties of nicotine without its dangerous effects on the heart. Dr. Victor DeNoble was hired by Philip Morris, in part, to research and develop a nicotine analogue.

113.   Dr. DeNoble did discover such an analogue, but Philip Morris chose to halt its effort to determine whether the nicotine analogue could be used to make a safer cigarette.

114.   Brown & Williamson also understood that nicotine was the essential ingredient in maintaining tobacco sales. The company attempted to develop a "safer" cigarette which internal documents described as "a nicotine delivery device."

115.   By the end of the 1970s, however, Brown & Williamson, in a pattern that was repeated throughout the industry, closed its research labs and halted all work on a safer cigarette.

116.   R.J. Reynolds' efforts to develop a safer cigarette also focused on

50

delivering nicotine to the consumer without the harmful constituents of tobacco smoke. In the late 1980s, R.J. Reynolds developed and test marketed "Premier," a smokeless and virtually tobacco-free cigarette which was, in essence, a nicotine delivery system.

117. At Liggett & Myers, Dr. James Mold conducted tests to divide the components of cigarette smoke into separate entities and to interrupt the process that produces carcinogens by using a catalyst. Liggett & Myers researchers were able to produce a so-called "safer" cigarette, designated as the "XA Project" that eliminated the carcinogenic activity on mouse skin. However, Liggett & Myers did not want to be identified publicly as the source of the research behind this non-carcinogenic "safer" cigarette.

118. Dr. Mold has provided the following overview of the XA Project and its abandonment:

   a.   Dr. Mold stated that the XA project produced a safer cigarette. He stated, "We produced a cigarette which was, we felt, commercially acceptable as established by some consumer tests, which eliminated carcinogenic activity. . ."

   b.   Dr. Mold stated that after 1975, all meetings on the project were attended by lawyers. Lawyers collected notes after all meetings. All documents were directed to the law department to cloak the documents with the attorney-client privilege. He stated, "Whenever any problem came up on the project, the Legal Department would pounce upon that in an attempt to kill the project, and this happened time and time again."

   c.   Dr. Mold was asked why Liggett did not market a safer cigarette. He stated, "Well, I can't give you, you know, a positive statement because I wasn't in the management circles that made the decision, but I certainly had a pretty fair idea why . . . [T]hey felt that such a cigarette, if put on the market, would

51

seriously indict them for having sold other types of cigarettes that didn't contain this, for example . . . [a]t a meeting we held in . . . New Jersey at the Grand Met headquarters . . . at which the various legal people involved and the management people involved and myself were present. At one point, Mr. Dey . . . who at that time, and I guess still is the president of Liggett Tobacco, made the statement that he was told by someone in the Philip Morris Company that if we tried to market such a product that they would clobber us."

119.   Liggett had also obtained a patent for the process it had discovered to produce its safer cigarette. The patent application described the reduction in cancer in mouse studies, prompting stories in the media that Liggett was the first cigarette company to admit that smoking caused cancer. Liggett responded by issuing a press release it called a "Liggettgram" which stated: "Liggett and the cigarette industry continue to deny, as they have consistently, that any conclusions can be drawn relating such test results on mice in laboratories to cancer in human beings. It has never been established that smoking is a cause of human cancer. The laboratory experiments reported in the patent were conducted for Liggett by an independent researcher, The Life Sciences Division of Arthur D. Little, Inc."

120.   At the time Liggett made this statement, Dr. Mold estimates that Liggett had spent a total of $10 million on research involving mice, in part to develop the safer XA cigarette. Liggett's internal reports on the benefit of the XA, and the absence of increased risk of harm from the additives used, specifically used animal studies as reliable indicators of the health effect of the product on humans.

E.   KNOWLEDGE OF NICOTINE'S ADDICTIVENESS

121.   An advertisement placed by Philip Morris in newspapers across the

52

country in April 1994, affirmatively represented that Philip Morris does not "manipulate" nicotine levels in its cigarettes, and that "Philip Morris does not believe that cigarette smoking is addictive."

122.    R.J. Reynolds placed a similar advertisement in newspapers across the United States in 1994 stating that "we do not increase the level of nicotine in any of our products in order to addict smokers. Instead of increasing the nicotine levels in our products, we have in fact worked hard to decrease tar, and nicotine . . . ." R.J. Reynolds' advertisement then touted its use of "various techniques that help us reduce the tar, (and consequently the nicotine) yields of our products."

123.    In fact, Defendants have known of the difficulties smokers experience in quitting smoking and of the tendency of addicted individuals to focus on any rationalization to justify their continued smoking. Defendants exploit this weakness and capitalize upon the known addictive nature of nicotine. Nicotine addiction guarantees a market for cigarettes. The addictive nature of the nicotine in cigarettes virtually eliminates personal choice in those who become addicted. Modern cigarettes as sold in Maryland are painstakingly designed and manufactured to control nicotine delivery to the smoker.

124.    Defendants had secretly known since at least the early 1960s of the addictive properties of the nicotine contained in the cigarettes they manufacture and sell. Sworn testimony of a former research chief for Brown & Williamson Tobacco Corporation, Dr. Jeffrey S. Wigand, and former Philip Morris scientists, Jerome Rivers, Dr. Ian L. Uydess and Dr. William Farone belie the industry's denials, and industry documents are replete with

evidence of Defendants' historical knowledge of nicotine's addictiveness.

125.   In 1962, Sir Charles Ellis, scientific advisor to the board of directors of British American Tobacco Company ("BATCO"), Brown & Williamson's parent company, stated at a meeting of BATCO's worldwide subsidiaries, that "smoking is a habit of addiction" and that "[n]icotine is not only a very fine drug, but the technique of administration by smoking has considerable psychological advantages . . . ." He subsequently described Brown & Williamson as being "in the nicotine rather than the tobacco industry."

126.   A research report from 1963 commissioned by Brown & Williamson states that when a chronic smoker is denied nicotine: "A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine." No information from that research has ever been voluntarily disclosed to the public; in particular it was not shared with the Committee that was preparing the first Surgeon General report and hence was not reflected in that report.

127.   Addison Yeaman, general counsel at Brown & Williamson, summarized his view about nicotine in an internal memorandum also in 1963: "Moreover, nicotine is addictive. We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms."

128.   Internal reports prepared by Philip Morris in 1972 and the Philip Morris U.S.A. Research Center in March 1978, demonstrate Philip Morris' understanding of the role

of nicotine in tobacco use: "We think that most smokers can be considered nicotine seekers, for the pharmacological effect of nicotine is one of the rewards that come from smoking. When the smoker quits, he forgoes his accustomed nicotine. The change is very noticeable, he misses the reward, and so he returns to smoking."

129.    From 1940-1970, the American Tobacco Company conducted its own nicotine research, funding over 90 studies on the pharmacological and other effects of nicotine on the body, 80% of all biological studies funded by the company over this period. In 1969, the American Tobacco Company even test marketed a nicotine-enriched cigarette in Seattle, Washington.

130.    In a 1972 document entitled "RJR confidential research planning memorandum on the nature of the tobacco business and the crucial role of nicotine therein," a R.J. Reynolds executive wrote: "In a sense, the tobacco industry may be thought of as being a specialized, highly ritualized, and stylized segment of the pharmaceutical industry. Tobacco products uniquely contain and deliver nicotine, a potent drug with a variety of physiological effects."

131.    The industry's recognition of the extent to which nicotine -- and not tobacco -- defines its product is illustrated in a 1972 Philip Morris report on a CTR conference, which stated:

a.    "As with eating and copulating so it is with smoking. The physiological effect serves as the primary incentive, all other incentives are secondary. The majority of the conferees would go even further and accept the proposition that nicotine is the active constituent of cigarette smoke. Without nicotine,

the argument goes, there would be no smoking."

b. "Why then is there not a market for nicotine per se, eaten, sucked, drunk, injected, inserted or inhaled as a pure aerosol? The answer, and I feel quite strongly about this, is that the cigarette is in fact among the most awe-inspiring examples of the ingenuity of man. Let me explain my conviction. The cigarette should be conceived not as a product but as a package. The product is nicotine."

c. "Think of the cigarette pack as a storage container for a day's supply of nicotine. . . Think of the cigarette as a dispenser for a dose unit of nicotine."

132. Documents from a BATCO study called Project Hippo, uncovered only in May 1994, show that as far back as 1961, this cigarette company was actively studying the physiological and pharmacological effects of nicotine. Project Hippo reports were circulated to other U.S. cigarette manufacturers and to TIRC, demonstrating that at least some of the industry's nicotine research was shared. BATCO sent the reports to officials at Brown & Williamson and R.J. Reynolds, and circulated a copy to TIRC with a request that TIRC "consider whether it would help the U.S. industry for these reports to be passed on to the Surgeon General's Committee."

133. Similarly, an RJR-MacDonald Marketing Summary Report from 1983 concluded that the primary reason people smoke "is probably the physiological satisfaction provided by the nicotine level of the product."

134. As recently as December 1995, the Wall Street Journal reported on an internal Philip Morris draft document analyzing the competitive market for nicotine products for the years 1990-1992. The report describes the importance of nicotine: "Different people

56

smoke for different reasons. But the primary reason is to deliver nicotine into their bodies. . . . It is a physiologically active, nitrogen containing substance. Similar organic chemicals include nicotine, quinine, cocaine, atropine and morphine. While each of these substances can be used to affect human physiology, nicotine has a particularly broad range of influence. During the smoking act, nicotine is inhaled into the lungs in smoke, enters the bloodstream and travels to the brain in about eight to ten seconds."

135.   Recently disclosed handwritten notes dated 1965 from Ronald A. Tamol, who until 1993 was Philip Morris' director of research and brand development, refer to "minimum nicotine . . . to keep the normal smoker hooked."

136.   In fact, in a decade-long project, Brown & Williamson secretly developed a genetically engineered tobacco plant with a nicotine content more than twice the average found naturally in flue-cured tobacco. Brown & Williamson took out a Brazilian patent for the new plant, which was printed in Portuguese. Brown & Williamson and a Brazilian sister company, Souza Cruz Overseas, grew Y-1 in Brazil and shipped it to the United States where it was used in five Brown & Williamson cigarette brands sold in Maryland, including three labeled "light." When the company's deception was uncovered, company officials stated that close to four million pounds of Y-1 were stored in company warehouses in the United States.

137.   As part of its cover-up, Brown & Williamson even went so far as to instruct the DNA Plant Technology Corporation of Oakland, California, which had developed Y-1, to tell FDA investigators that Y-1 had "never [been] commercialized." Only

57

after the FDA discovered two United States Customs Service invoices indicating that "more than a million pounds" of Y-1 tobacco had been shipped to Brown & Williamson on September 21, 1992, did the company admit that it had developed the high-nicotine tobacco.

138.   In addition, cigarette manufacturers add several ammonia compounds during the manufacturing process which increase the delivery of nicotine and almost double the nicotine transfer efficiency of cigarettes.

139.   Brown & Williamson publicly denies that the use of ammonia in the processing of tobacco increases the amount of nicotine absorbed by the smoker. Nevertheless, the company's own internal documents reveal that it and its rivals use ammonia compounds to increase nicotine delivery. As John Kreisher, a former associate scientific director for CTR, conceded, "[a]mmonia helped the industry lower the tar and allowed smokers to get more bang with less nicotine. It solved a couple of problems at the same time."

140.   The cigarette industry's manipulation of nicotine is particularly harmful in view of its deceptive marketing of "light" or low-tar and low-nicotine cigarettes to retain the health conscious segment of the smoking market. Recent studies demonstrate that cigarettes advertised as low tar and low nicotine have higher concentrations of nicotine, by weight, than high-yield cigarettes. The tobacco companies manipulate nicotine delivery levels in supposedly reduced tar and reduced nicotine cigarettes through various strategies. For example:

a.   Industry studies show that smokers tend to obtain

58

close to the same amount of nicotine from each cigarette despite differences in yield as measured by the FTC smoking machine. Cigarette manufacturers have designed "light" cigarettes in a deliberate attempt to circumvent FTC methods of measuring tar and nicotine levels. By drilling nearly invisible holes in the filter paper, the cigarette manufacturers have prevented FTC smoking machines from accurately measuring the actual tar and nicotine delivery to smokers, who naturally block the tiny, laser-generated perforations with their fingers or lips, and thereby receive greater tar and nicotine yields than indicated by FTC measurements.

b.  The FTC testing method does not distinguish between the slower acting salt-bound nicotine and the more potent "free" nicotine that ammonia helps release. An ammoniated cigarette that delivers more potent nicotine to smokers measures the same as a cigarette with no such additives.

141.   The cigarette industry maintains that nicotine levels follow tar levels. In the words of Dr. Alexander Spears, Vice Chairman of Lorillard, in his 1994 testimony before the Waxman Subcommittee -- "[n]icotine [level] follows the tar level," and the correlation between the two "is essentially perfect," and "shows that there is no manipulation of nicotine." Dr. Spears neglected to mention to Congress that in a 1981 study, not intended for public release, he stated explicitly that low-tar cigarettes use special blends of tobacco to keep the level of nicotine up while tar is reduced: "[T]he lowest tar segment [of product categories] is composed of cigarettes utilizing a tobacco blend which is significantly higher in nicotine."

142.   R.J. Reynolds, Lorillard, the American Tobacco Company, and the Tobacco Institute have similarly represented to the public and to the FDA that the nicotine levels in their products are purely a function of setting the tar levels of such products.

59

Internal company documents show, however, that the American Tobacco Company's experimentation with adding nicotine to its tobacco was extensive -- extensive enough for American Tobacco Company executive John T. Ashworth to instruct employees in a confidential memorandum: "In the future, our use of nicotine should be referred to as 'Compound W' in our experimental work, reports, and memorandums, either for distribution within the Department or for outside distribution."

143.   Tobacco industry patents also show that the cigarette industry has developed the capability to manipulate nicotine levels in cigarettes to an exacting degree. For example:

a.   A Philip Morris patent application discusses an invention that "permits the release . . . in controlled amounts and when desired, of nicotine into tobacco smoke."

b.   Another Philip Morris patent application explains that the proposed invention "is particularly useful for the maintenance of the proper amount of nicotine in tobacco smoke," and notes that "previous efforts have been made to add nicotine to Tobacco Products when the nicotine level in the tobacco was undesirably low."

c.   A 1991 R. J. Reynolds patent application states that "processed tobaccos can be manufactured under conditions suitable to provide products having various nicotine levels."

## F.   TARGETING CHILDREN AND MINORITIES

144.   Across the nation, the overwhelming majority of cigarette use and addiction begins when users are children or teenagers. Eighty-two (82%) percent of daily smokers had their first cigarette before age 18, sixty-two (62%) percent before the age of 16,

thirty-eight (38%) percent before the age of 14. Thus, a person who does not begin smoking in childhood or adolescence is unlikely ever to begin. The younger a person begins to smoke, the more likely he or she is to become a heavy smoker. Sixty-seven (67%) percent of children who start smoking in the sixth grade become regular adult smokers and forty-six (46%) percent of teenagers who start smoking in the eleventh grade become regular adult smokers.

145.   Smoking at an earlier age increases the risk of lung cancer and other diseases. Studies have shown that lung cancer mortality is highest among adults who began smoking before the age of 15.

146.   Although young people frequently believe they will not become addicted to nicotine or become long-term users of tobacco products, they often find themselves unable to quit smoking. Among smokers age 12 to 17 years, a 1992 Gallup survey found that 70% said if they had to do it over again, they would not start smoking and 66% said that they want to quit. Fifty-one percent of the teen smokers surveyed had made a serious effort to stop smoking -- but had failed.

147.   Cigarette smoking among children and teens is on the rise. A 1995 National Institute of Drug Abuse study found that between 1991 and 1994, the proportional increase in smoking rates was greatest among eighth graders, rising by 30%.

148.   For many years, Defendants have engaged in a vast and misleading promotional, public relations, and sham lobbying blitz that had as its goal increasing the numbers of people addicted to nicotine in cigarettes and decreasing the number of people

61

who attempt or succeed in quitting. Their efforts have been and continue to be directed toward children. They have done so and continue to do so in contravention of their duty not to make false statements of material fact and their duty not to conceal such true facts from the public. At the cost of countless lives, Defendants spend billions of dollars every year misleading the public and promoting the myth that smoking cigarettes does not cause cardiovascular disease, lung and other cancers, emphysema and other diseases and that smokers live healthy and vital lives. Defendants have at all pertinent times presented and promoted smoking as an attractive, glamorous, youthful, and relaxing pastime, associating it with movie stars, athletes, and successful professionals.

149.   Cigarettes are among the most promoted consumer products in the United States. The Federal Trade Commission reported to Congress that domestic cigarette advertising and promotional expenditures rose from close to $4 billion in 1990 to more than $6 billion in 1993. Tobacco product brand names, logos, and advertising messages are all-pervasive, appearing on billboards, buses, trains, in magazines and newspapers, on clothing and other goods. The effect is to convey the message to young people that tobacco use is desirable, socially acceptable, safe, healthy, and prevalent in society. Additionally, young people buy the most heavily advertised cigarette brands, whereas many adults buy more generic or value-based cigarette brands which have little or no image-based advertising. Cigarette manufacturers, knowing that their advertising appeals to young people, continue to use these same marketing techniques to sell their products.

150.   A July 1995 report by the California Department of Health Services

surveyed tobacco advertisements in or around stores. In looking at almost 6,000 stores, it was found that the total average tobacco advertisements and promotions per store was 25.26. Marlboro was the most frequently advertised and promoted cigarette brand with an average of 10.15 advertisements and promotions per store. Camel was the second most frequently advertised and promoted cigarette brand and had an average of 4.84 advertisements and promotions per store. These two brands were the most frequently advertised and promoted cigarette brands. Not surprisingly, Marlboro, Camel, and Newport, the most heavily advertised brands, are the leading brands smoked by children.

151.   This same report also found that stores within 1,000 feet of a school had significantly more tobacco advertising and promotions than stores that were not near schools. Stores near schools were also more likely to have at least one tobacco advertisement placed next to candy or displayed at three feet or below. A significantly higher average number of tobacco advertisements also were found on the exterior of stores located in young neighborhoods -- communities in which at least one-third of the population in that zip code were 17 years of age or less.

152.   R. J. Reynolds has even identified the stores in proximity to the youth market. R.J. Reynolds' Division Manager for Sales wrote all R.J. Reynolds sales representatives in 1990 regarding the "Young Adult Market" and asked them to identify what stores were in proximity to colleges or high schools. A follow-up letter by the sales division calls for a resubmitted list of Y.A.S. (Young Adult Smoker) accounts using new criteria, focusing on all accounts located across from, adjacent to, or in the general vicinity of high

63

schools or college campuses.

153.   Despite these disturbing statistics, each of the cigarette manufacturers maintains that the effect of its pervasive advertising and promotion of cigarettes is limited to maintaining brand loyalty and that it has no role in encouraging adolescents to experiment with smoking.

154.   The cigarette manufacturers know that they attract underage consumers to their products. For example, since 1988, R.J. Reynolds has used a cartoon character called Joe Camel in its advertising campaign. It has massively disseminated products such as matchbooks, signs, clothing, mugs, and drink can holders advertising Camel cigarettes. The advertising has been effective in attracting adolescents, and R.J. Reynolds has knowledge of this fact but still continues the Joe Camel advertising campaign. As a result of the campaign, the number of teenage smokers who smoke Camel cigarettes has risen dramatically. Studies found that Joe Camel is almost as familiar to six-year old children as Mickey Mouse. is enticing thousands of teens to smoke that brand. and has caused Camel's popularity with 12-17 year olds to surge dramatically. R.J. Reynolds knew or willfully disregarded the fact that cartoon characters attract children.

155.   The model who portrayed the "Winston Man" for R.J. Reynolds' Winston brand cigarettes testified before Congress: "I was clearly told that young people were the market that we were going after." He further testified "it was made clear to us that this image was important because kids like to role play, and we were to provide the attractive role models for them to follow . . . . I was told I was a live version of the GI Joe . . . ."

64

156.   An R.J. Reynolds affiliate studied in detail the motivations of young smokers. A "Youth Target" study was the first of a planned series of research studies into the lifestyles and value systems of young men and women in the 15-24 age range, the stated purpose of which was to "provide marketers and policy makers with an enriched understanding of the mores and motives of this important emerging adult segment which can be applied to better decision making in regard to products and programs directed at youth." The study focused on the "primary elements of lifestyles and values among the youth of today," in learning how to market products to children and teens.

157.   Defendants used this information in devising advertising to create a mental image associating smoking with health, glamorous and athletic lifestyles, and with success and sexual attractiveness. Their advertising and marketing campaigns increase demand for tobacco products among young people. The ease with which children and teenagers can obtain cigarettes from vending machines, assures that there is a ready supply to meet this demand. It has been shown repeatedly that cigarette vending machines (even those located in bars and other supposedly adult locations) are readily available to children and teenagers. Within a short period of time, the young smoker becomes physiologically and emotionally dependent, i.e., addicted to tobacco. Later, as the maturing smoker begins to wish he or she could quit, advertising reinforces the practice and seeks to minimize health concerns, create doubt and confusion, which are used by smokers as an excuse to avoid the pain and discomfort of attempting to break their addiction to nicotine.

158.   One of the best examples of this was the transformation of Marlboro

cigarettes, from a red-tipped cigarette for women to the cigarette for the "macho cowboy". By changing advertising imagery, Philip Morris was able to tap into a wholly new and different market. In 1950, R.J. Reynolds was the king of the cigarette business. It sold more cigarettes than any other company. Philip Morris, though doing well on the basis of its fraudulent health oriented advertising, was still far behind. In 1981, Philip Morris overtook R.J. Reynolds, and each year has extended its lead, by developing an effective marketing campaign for recruiting young new smokers to its brands. The image created by the Marlboro man captured the adolescent imagination, leading to experimentation with that particular cigarette and eventual addiction due to the manipulation by Philip Morris of the nicotine and other ingredients in the cigarette. The children and teenagers who started smoking Marlboro became tenaciously loyal customers. Soon, Marlboro became the "gold standard" of cigarettes among teenagers. Through the year 1988, nearly three-fourths of teenage smokers used Marlboro.

159. At about the time it lost market leadership to Philip Morris, R.J. Reynolds dedicated itself to a ruthless advertising campaign encouraging children and teenagers to smoke. One of the key elements of the R.J. Reynolds' strategy for attracting children was to reposition many of its cigarette brands to younger audiences. Just as Marlboro was repositioned from the women's market, to the macho male market, by a new advertising campaign, R.J. Reynolds has positioned its cigarette advertising campaigns to younger and younger audiences using a succession of advertising images of men engaged in extraordinary feats of physical and athletic achievements.

66

160.   R.J. Reynolds' Vantage cigarettes entered the 1980s as a brand targeted at the health conscious adult smoker. Advertisements were intended to assuage fears of lung cancer and other diseases and give the concerned smoker arguments for rationalizing their continuation of the addiction. Through multiple-advertising transmogrifications, Vantage cigarettes have been progressively repositioned to ever-younger audiences. During the mid-1980s, this advertising campaign featured young, successful professionals (including architects, fashion designers, lawyers, etc.) with the slogan "The Taste of Success." These ads promoted the implication that smoking is helpful -- if not essential -- to success or prominence. In the late 1980s, the advertising theme for Vantage cigarettes began to feature professional-caliber athletes and auto racers. These advertisements depict physical activity requiring strength or stamina beyond that of everyday activity. The obvious implication is that smoking does not harm you.

161.   During the 1980s, advertising for Salem cigarettes also became more youth-oriented. Whereas the dominant advertising theme for Salem cigarettes used to be clean, fresh country air, during the 1980s', Salem ads were populated by muscular surfers and bikini clad women, fun-loving party animals, and other attractive adolescent role models. Another successful advertising campaign targeted at young people is the Lorillard Tobacco Company campaign promoting Newport cigarettes. Newport ads frequently show men and women in sexually suggestive positions always having fun, using the slogan "Alive With Pleasure."

162.   Another successful advertising campaign has been the "You've Come

67

A Long Way Baby" campaign, promoting Virginia Slims cigarettes. One of the most important psychological needs of most adolescent girls, is to become independent from their parents. By associating smoking with women's liberation, Philip Morris intended to create in the minds of teenage girls, the vision of smoking as a symbol of autonomy and independence. Ads for Virginia Slims and other "feminine" cigarettes prey upon the natural and common insecurity and sense of inferiority experienced by adolescents, by portraying the cigarette as a crutch and a symbol of superiority. Perhaps the most acute psychological need of adolescence is to fit in, to be accepted, to be popular. Ads for Philip Morris' Benson & Hedges cigarettes developed an image of smoking as a happy pleasure to be shared in the company of others and the easy road to instant acceptance within a group.

163.   In today's culture, many teenage girls perceive that a prerequisite to popularity is to be thin. Philip Morris and other cigarette companies capitalize upon this perception by presenting cigarette smoking as a suitable alternative to a diet, for being thin. Virtually every "feminine" cigarette includes words like slim, light, super slim, ultra light, etc. The photographic imagery in cigarette advertising that targets young females universally portrays attractive young women in glamorous outfits. Smoking is thus associated with being sexy and beautiful. In cigarette ads, the air is fresh and clear; magical things happen. The reality is that cigarette smoking causes addiction, disease and death.

164.   Many teenage boys fantasize about owning a powerful motorcycle. For this reason many cigarette brands have used motorcycle imagery to encourage teenage boys to smoke. Many cigarette ads that target young boys glamorize high risk activities like hang

68

gliding, motorcycle racing, mountain climbing, etc. Cigarette makers do this deliberately to undermine awareness that smoking is dangerous. In its campaign to attract adolescent boys to become smokers, the R.J. Reynolds Tobacco Company has made extensive use of risk-taking and danger in its advertising. By glorifying risk-taking, these ads have a more insidious purpose. How a person estimates the magnitude and likelihood of a risk can be significantly affected by what it is compared against. By portraying dangerous activities like hang-gliding, mountain climbing, and stunt motorcycle riding in tobacco advertising, R.J. Reynolds minimizes the dangers of smoking in adolescent minds.

165.   The great success that R.J. Reynolds had in its effort to overtake Philip Morris in the youth market is the "Joe Camel" cartoon character. This campaign was inaugurated in the United States in 1987 to commemorate the 75th anniversary of Camel cigarettes. In the first ads, the camel leered out over the ad saying, "75 Years And Still Smoking." The implication is obvious. It soon became evident that "Joe Camel" would strike a responsive chord among children and teenagers and has been used by R.J. Reynolds to target children to get them to start smoking as early as possible, so they can become addicted to nicotine at the earliest age possible. R.J. Reynolds has more than tripled its advertising expenditures for Camel cigarettes since 1988, utilizing themes like "Joe Camel" guaranteed to be attractive to young people at high risk of becoming smokers.

166.   When R.J. Reynolds began the Joe Camel cartoon campaign, Camel's share of the children's market was only 0.5%. In just a few years, Camel's share of this illegal market has increased to 32.8%, representing sales estimated at $476 million per year.

Another indication of the phenomenal success of this marketing campaign is the fact that in a recent survey of six year olds, 91% of the children could correctly match Joe Camel with a picture of a cigarette, and both the silhouette of Mickey Mouse and the face of Joe Camel were nearly equally well-recognized by almost all children surveyed.

167.   The themes within cigarette advertising are not the only feature of tobacco marketing that betray the real target. The location and placement of those ads further reveal that children are the intended target. During the decade of the 1980s, there was a steady migration of cigarette advertising into youth-oriented publications. Magazines with sexually-oriented themes and those concerning entertainment and sporting activities, had the highest concentration of cigarette ads. For many of these magazines, teenagers comprise a quarter or more of the total readership. Cigarette ads in these youth-oriented magazines were frequently multi-page, pop-up ads which are significantly more costly, but also more attention-grabbing than conventional ads. News magazines, like Time and Newsweek which have older audiences, had few cigarette ads, and those tended to emphasize health promises concerning tar and nicotine rather than glamorous images.

168.   The tobacco companies sell more than one billion packs of cigarettes per year to children under the age of 18. In 1988, the tobacco industry reaped $221 million in profits from $1.25 billion in sales to children under the age of 18. Marlboro and Camel cigarettes dominate the teenage smoking market.

169.   In late 1990, the Tobacco Institute, on behalf of the industry, inaugurated a public relations campaign designed to convince the public that the cigarette

companies wished to discourage young people from smoking. Several tobacco companies began their own campaigns at the same time. In fact, these programs are just a continuation of the Defendants' ongoing fraud and conspiracy. While these programs call for age 18 as the national standard for tobacco sales to children, and for requiring "adult supervision" of cigarette vending machines, in fact, Defendants hope to freeze the status quo with regard to children's access to tobacco as most states already have a minimum age of 18 or older. Brochures, like "Tobacco: Helping Youth Say No", are being distributed by the Tobacco Institute and tobacco industry. In reality, this is a pro-smoking subterfuge. The brochure presents smoking as a permissible "adult" decision and smoking as something an "adult" can safely do. The only reason given children for not smoking is that -- like getting married or driving a car -- smoking is for grown-ups. Of course, that message really makes smoking more desirable to children. An R.J. Reynolds' brochure even tells parents to tell their children that the parents smoke "because they enjoy it." None of these brochures disclose that smoking is highly addictive and harmful to human life.

170.    Perhaps the most vicious element of this advertising campaign has been advertising aimed at young girls. Nearly every issue of magazines for young girls, like Teen and Young Miss, includes an advertisement by R.J. Reynolds urging children not to smoke. But the reasons given for refraining are not that smoking is addictive, that it can harm or kill the infants of pregnant woman, or that it causes cancer and other lethal diseases; rather, the reason given is that it is an "adult decision."

171.    The likely effect of these ads is that, rather than discouraging children

71

from smoking, they plant the notion that smoking is something to do to show one's independence, to act grown-up. This notion is, of course, reinforced by the ubiquitous cigarette ads depicting glamorous young adult women smoking, as a way of demonstrating their independence.

172.    This despicable conduct has gone on for 40 years and continues into this decade. In January 1990, the Manager of Public Relations of R.J. Reynolds wrote the principal of a public school that:

> The tobacco industry is also concerned about the charges being made that smoking is responsible for so many serious diseases. Long before the present criticism began the tobacco industry in a sincere attempt to determine the harmful effects, if any, smoking might have on human health, established the Council for Tobacco Research-USA. The industry has also supported research grants by the American Medical Association. Over the years the tobacco industry has given in excess of $162 million to independent research on the controversies surrounding smoking -- more than all voluntary health associations combined.
>
> Despite all the research going on, the simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The answers to many unanswered controversies surrounding smoking -- and the fundamental causes of the diseases often statistically associated with smoking -- we do believe can only be determined through much more scientific research. Our company intends, therefore, to continue to support such research in a continuing search for answers.
>
> **We would appreciate your passing this information along to your students . . . .**

(emphasis added).

72

173.   The targeting of children, while unquestionably wanton, reckless, and unethical, and cynically denied by the industry, was and continues to be, vitally important to the tobacco industry. Children enticed into smoking provide a guaranteed future market for a product that each year kills the industry's best customers by the hundreds of thousands.

174.   Defendants have for many years also targeted Maryland inner city African-American communities with billboard and other advertising so as to lure African-American citizens into smoking, to introduce them at an early age into the use of cigarettes, and, by the manipulation of nicotine levels, to keep them addicted to such usage. This has been achieved by a cleverly contrived, targeted advertising campaign designed to depict smoking as an especially attractive and appealing lifestyle. This advertising has been the result of a contemptuous disregard of the health concerns of African-Americans and has been carried out with callous disregard of the rights of the citizens.

175.   African-American-owned   and   -oriented   magazines   receive proportionately more revenues from cigarette advertising than other consumer magazines. In addition, stronger, mentholated brands are more commonly advertised in African-American-oriented magazines than in other magazines. In fact, cigarettes advertised in African-American media have higher levels of tar and nicotine than those advertised elsewhere.

176.   Cigarette billboard advertising is placed in predominantly African-American communities four to five times more often than in predominantly white communities. A Baltimore federal judge has observed that tobacco companies "focus

73

[billboard advertising] on depressed inner-city areas. Billboards are conspicuously absent from more affluent communities."

177.   Defendants also target African-Americans in product development. For example, in the early 1990s, R.J. Reynolds developed Uptown, a "designer cigarette" for African-Americans. R.J. Reynolds planned to begin test marketing Uptown on the first day of Black History Month in 1990, with a promotional campaign featuring African-Americans enjoying urban nightlife and the slogan: "Uptown. The Place. The Taste." According to Lynn Beasley, R.J. Reynolds vice president for strategic marketing, the company expected "Uptown to appeal most strongly to Black smokers." R.J. Reynolds expected Uptown to challenge Lorillard's Newport and Brown & Williamson's Kool brands for the African-American smoker market.

178.   As a result of this targeting, African American men are 30% more likely than white men to die from smoking related diseases.

179.   Defendants' reckless disregard for the health risks of smoking for the youth and minorities of America is reflected in the response of an R. J. Reynolds executive to the question of a former "Winston Man," David Goerlitz, when he asked why the R.J. Reynolds executives did not smoke: "We don't smoke the shit, we just sell it. We reserve that for the young, the black, the poor and the stupid."

## G.   CONCENTRATION IN THE TOBACCO INDUSTRY

180.   Cigarette manufacturing has been one of the most concentrated

industries in the United States throughout this century. Together, Philip Morris, R.J. Reynolds, Brown & Williamson, Lorillard, American Tobacco, and Liggett comprise the Big Six cigarette manufacturers, which control virtually 100% of the market in the United States and in Maryland. Philip Morris and R.J. Reynolds are the industry leaders, with national market shares of approximately 42% and 29%, respectively. The approximate market shares of the other Big Six manufacturers are: Brown & Williamson, 12%; Lorillard, 7%; American Tobacco Company, 7%, and Liggett, 3%.

181.   In part because of its concentration, the cigarette industry has long been one of America's most profitable businesses, with profit margins estimated in at least the 30% range. The industry continues to harvest billions of dollars in profits each year from domestic sales alone.

182.   In addition, the concentration of the industry has allowed the manufacturers and their two trade associations to engage in a decades-long conspiracy relating to the issue of smoking and health and to direct their considerable profits to further that end.

## H.   FRAUDULENT CONCEALMENT

183.   Defendants have fraudulently concealed the existence of the violations alleged below. The Attorney General has exercised due diligence to learn of his and the State's legal rights, and despite such diligence, failed to uncover the existence of the violations alleged below until very recently. Defendants affirmatively concealed the existence of the violations alleged below through the following actions, among others:

a. Testifying falsely under oath before the United States Congress.

b. Providing false explanations to customers and to governmental entities regarding the health hazards of tobacco and the addictive qualities of nicotine.

c. Conducting activities in furtherance of the conspiracy in secret, including clandestine meetings, using tobacco company attorneys to secure documents that might reveal the dangers of cigarettes and the addictive nature of nicotine, closing down research projects and moving research and information facilities outside the United States.

d. Requiring employees to keep secret all information about the dangers of cigarette smoking and the addictive nature of nicotine under threats of severe legal consequences.

## VI.   CAUSES OF ACTION

### COUNT ONE

**(Violations of Maryland Consumer Protection Act)**
**(Against all Defendants)**

184.    The State restates and incorporates herein the foregoing paragraphs 1-183 of its Complaint.

185.    Sections 13-406 and -410 of the Maryland Consumer Protection Act, Md. Com. Law Code Ann. §§ 13-101 et seq., authorize the Attorney General to seek an injunction and civil penalties against persons who have engaged in or are engaging in violations of the Consumer Protection Act. In addition, the State of Maryland, as a person, is entitled to damages and attorneys' fees under section 13-408 of the Consumer Protection Act.

76

186.  By engaging in the conduct described above, Defendants have violated and continue to violate section 13-303 of the Consumer Protection Act by, among other things:

a.  Engaging in unfair or deceptive trade practices as defined in section 13-301(1) by making false and misleading oral and written statements that had, and have, the capacity, tendency, or effect of deceiving or misleading Maryland consumers, including but not limited to statements concerning the Defendants' knowledge, the harmful health effects of smoking and the addictive properties of nicotine;

b.  Engaging in unfair or deceptive trade practices as defined in section 13-301(2)(i) by making representations that their products have an approval, characteristic, ingredient, use or benefit which they do not have, including but not limited to their statements concerning the harmful health effects of smoking and the addictive properties of nicotine;

c.  Engaging in unfair and deceptive trade practices as defined in Section 13-301(2)(ii) by misrepresenting the sponsorship, approval, status, affiliation or connection of the Tobacco Industry Research Committee/Council for Tobacco Research and other of their agents, including, but not limited to representations that TIRC would be run by a scientist of unimpeachable integrity and advised by a board of distinguished scientists disinterested in the tobacco industry when, in fact, the TIRC was controlled by the Defendants and used to promote the sale of their tobacco products;

d.  Engaging in unfair or deceptive trade practices as defined in Section 13-301(3) by failing to state material facts the omission of which deceived or tended to deceive, including but not limited to facts relating to the harmful health effects of smoking and the addictive properties of nicotine;

e.  Engaging in unfair or deceptive trade practices as defined in Section 13-301(9) through their deception, fraud, misrepresentation, and knowing concealment, suppression, and

77

omission of material facts with the intent that Maryland consumers rely upon the same in connection with the promotion or sale of tobacco products, including but not limited to facts relating to the harmful health effects of smoking and the addictive properties of nicotine;

f. Engaging in unfair trade practices, including but not limited to, promoting and selling tobacco products to minors, promoting and selling harmful tobacco products that addict consumers, and misleading the public as to Defendants' concern and knowledge about the harmful health effects and addictive nature of their products, the information available to them regarding the health effects and addictive nature of their products, and the purpose and independence of the Tobacco Industry Research Committee/Council for Tobacco Research.

187. To remedy these violations of the Consumer Protection Act, the State requests that this Court award damages in an amount to be proven at trial and enter an order for general restitution, for civil penalties pursuant to section 13-410 of the Consumer Protection Act, for the costs of the action (including, but not limited to attorneys' fees) pursuant to section 13-410 of the Consumer Protection Act, and for the injunctive relief requested below.

## COUNT TWO

### (Violation of Section 11-204(a)(1) of the Maryland Antitrust Act)

### (Against All Defendants)

188. The State restates and incorporates herein the foregoing paragraphs 1-187 of its Complaint.

189. This count is brought under Md. Com. Law Code Ann. §11-209(a)(1990) for civil penalties and injunctive relief and under Md. Com. Law Code §11-

209(b)(1990) for treble damages.

190.    Beginning at least as early as the 1950s, and continuing until the present date, Defendants entered into a contract, combination and conspiracy in unreasonable restraint of trade and commerce in the market for cigarettes in Maryland in violation of Md. Com. Law Code Ann. §11-204 (a)(1)(1990).

191.    This contract, combination or conspiracy had the purpose and effect of:

    a.  Restraining competition in the market for cigarettes in the United States and in Maryland;

    b.  Restraining and suppressing research on the health effects of smoking;

    c.  Restraining and suppressing the dissemination of information on the harmful effects of smoking;

    d.  Restraining and suppressing the research, development, production and marketing of safer cigarettes;

    e.  Preventing loss of sales revenues that would have resulted if information on the harmful effects of cigarettes and the addictive effects of nicotine had been made public; and

    f.  Preventing expensive and costly competition among the defendant tobacco companies for sales and marketing of safer cigarettes.

192.    In furtherance of their conspiracy, Defendants did those things that they conspired to do including, without limitation:

    a.  Creation by the Defendant tobacco companies of the Tobacco Industry Research Committee (later known as the Council for Tobacco Research), charged with the task of

79

disseminating false and misleading information regarding the health risks of cigarette smoking;

    b. Agreement among Defendants to suppress independent research regarding the health risks of cigarette smoking and the addictive nature of nicotine;

    c. Destruction and concealment of evidence by Defendant tobacco companies of research and information revealing the health dangers of cigarette smoking and the addictive nature of nicotine;

    d. Joint sponsorship by Defendant tobacco companies of mass media articles and advertisements intended to deceive governmental entities and the public about the health risks of cigarette smoking;

    e. False representations concerning the commitment of Defendant tobacco companies to sponsoring and making public "objective" scientific information regarding these risks;

    f. The joint and collective making of false and misleading representations to Congress, other governmental entities and the public regarding the addictive nature of nicotine and the manipulation of nicotine levels in cigarettes by Defendant tobacco companies; and.

    g. Agreements, some obtained by coercion, among Defendant tobacco companies to halt research, development, marketing and sales of "safer" cigarettes;

The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among Defendants, the substantial terms of which were:

    a. Withholding of information to governmental entities and the citizens of Maryland about the harmful effects of cigarettes and the addictive effects of nicotine;

    b. Support of public relations campaigns that falsely promoted cigarettes as harmless:

c. Suppression of sponsorship of independent research on the issues of smoking and health;

d. Destruction or concealment of documents relating to the health effects of cigarettes and the addictive nature of nicotine;

e. Intimidation of persons with information about the health effects of cigarettes and the addictive qualities of nicotine;

f. Termination of research and development programs seeking to develop safer cigarettes; and

g. Suppression of sales and marketing of safer cigarettes.

193. This unlawful conspiracy and the effects thereof are continuing and will continue unless the injunctive relief sought by plaintiff is granted. Plaintiff has no adequate remedy at law.

194. For purposes of Md. Com. Law Code Ann. §11-209(b)(1990), the State has been injured as a result of the unlawful conspiracy. Cigarette smoking and health are inextricably intertwined. Defendants' actions have resulted in substantially higher rates of illness and death than would have occurred absent their unlawful conduct. Defendants knew and expected that their actions would require the State to pay higher health care costs for citizens of Maryland requiring public assistance. These increased costs, which were paid by the State, flow directly from Defendants' unlawful conduct.

## COUNT THREE

**(Violation of Section 11-204(a)(2) of the Maryland Antitrust Act)**

81

**(Against All Defendants)**

195.   The State restates and incorporates herein the foregoing paragraphs 1-194 of its Complaint.

196.   This count is brought under Md. Com. Law Code Ann. §11-209(a)(1990) for civil penalties and injunctive relief and under Md. Com. Law Code §11-209(b)(1990) for treble damages.

197.   Beginning at least as early as the 1950s, and continuing until the present date, Defendants conspired with the specific intent to preserve, maintain, extend, leverage and exercise their monopoly power over cigarettes in the United States and in Maryland in violation of Md. Com. Law Code Ann. §11-204 (a)(2)(1990).

198.   This contract, combination or conspiracy had the purpose and effect of:

a.  Restraining competition in the market for cigarettes in the United States and in Maryland;

b.  Restraining and suppressing research on the health effects of smoking,

c.  Restraining and suppressing the dissemination of information on the harmful effects of smoking;

d.  Restraining and suppressing the research, development, production and marketing of safer cigarettes;

e.  Preventing loss of sales revenues that would have resulted if information on the harmful effects of cigarettes and the addictive effects of nicotine had been made public; and

f.  Preventing expensive and costly competition among

82

Defendant tobacco companies for sales and marketing of safer cigarettes.

199.  In furtherance of their conspiracy, Defendants did those things that they conspired to do including, without limitation:

a.  Creation by the Defendant tobacco companies of the Tobacco Industry Research Committee (later known as the Council for Tobacco Research), charged with the task of disseminating false and misleading information regarding the health risks of cigarette smoking;

b.  Agreement among the Defendants to suppress independent research regarding the health risks of cigarette smoking and the addictive nature of nicotine;

c.  Destruction and concealment of evidence by Defendant tobacco companies of research and information revealing the health dangers of cigarette smoking and the addictive nature of nicotine;

d.  Joint sponsorship by Defendant tobacco companies of mass media articles and advertisements intended to deceive governmental entities and the public about the health risks of cigarette smoking;

e.  Falsely representing the commitment of Defendant tobacco companies to sponsoring and making public "objective" scientific information regarding these risks;

f.  Jointly and collectively making false and misleading representations to Congress, other governmental entities and the public regarding the addictive nature of nicotine and the manipulation of nicotine levels in cigarettes by Defendant tobacco companies; and

g.  Agreements, some obtained by coercion, among Defendant tobacco companies to halt research, development, marketing and sales of "safer" cigarettes.

83

200.   The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among Defendants, the substantial terms of which were:

    a.  Withholding from governmental entities and citizens information regarding health concerns with tobacco that would have diminished their collective profits and affected the prices that they would have had to charge for their products; and

    b.  Suppressing and preventing the development, marketing and sale of better and safer cigarettes that would have threatened sales of conventional cigarettes.

201.   This unlawful conspiracy and the effects thereof are continuing and will continue unless the injunctive relief sought by plaintiff is granted. Plaintiff has no adequate remedy at law.

202.   For purposes of Md. Com. Law Code Ann. §11-209(b)(1990), the State has been injured as a result of the unlawful conspiracy.  Cigarette smoking and health are inextricably intertwined.  Defendants' actions have resulted in substantially higher rates of illness and death than would have occurred absent their unlawful conduct. Defendants knew and expected that their actions would require the State to pay higher health care costs for citizens of Maryland requiring public assistance.  These increased costs, which were paid by the State, flow directly from Defendants' unlawful conduct.

## COUNT FOUR

### (Violation of Section 11-204(a)(2) of the Maryland Antitrust Act)

### (Against All Defendants)

84

203. The State restates and incorporates herein the foregoing paragraphs 1-202 of its Complaint.

204. This count is brought under Md. Com. Law Code Ann. §11-209(a)(1990) for civil penalties and injunctive relief and under Md. Com. Law Code §11-209(b)(1990) for treble damages.

205. In violation of Md. Com. Law Code Ann. §11-204(a)(2)(1990), Defendant tobacco manufacturers have willfully monopolized the market for cigarettes in Maryland and the United States.

206. Defendant tobacco manufacturers collectively possess monopoly power over the market for cigarettes in Maryland an the United States.

207. Defendants have willfully maintained, extended, leveraged and exercised their monopoly power by:

    a. Withholding from governmental entities and citizens information regarding health concerns with tobacco that would have diminished their collective profits and affected the prices that they would have had to charge for their products; and

    b. Suppressing and preventing the development, marketing and sale of better and safer cigarettes that would have threatened sales of conventional cigarettes.

208. The monopolization and the effects thereof are continuing and will continue unless the injunctive relief sought by plaintiff is granted. Plaintiff has no adequate remedy at law.

209. For purposes of Md. Com. Law Code Ann. §11-209(b)(1990), the

85

State has been injured as a result of the unlawful monopolization. Cigarette smoking and health are inextricably intertwined. Defendants' actions have resulted in substantially higher rates of illness and death than would have occurred absent their unlawful conduct. Defendants knew that their actions would require the State to pay higher health care costs for citizens of Maryland requiring public assistance. These increased costs, which were paid by the State, flow directly from Defendants' unlawful conduct.

## COUNT FIVE

### (Restitution based upon Unjust Enrichment)

### (Against all Defendants)

210.   The State restates and incorporates herein the foregoing paragraphs 1-209 of its Complaint.

211.   Defendants, through their fraudulent and wrongful conduct as described herein, have reaped substantial and unconscionable profits from the sale of cigarettes in Maryland, while at the same time engendering an ongoing public health crisis of unrivalled proportions. Defendants caused a public health crisis through their sale of a product that they knew would cause addiction and illness when used as intended, and they knew that the State of Maryland would be required to pay ongoing health care costs for citizens with smoking-related illnesses.

212.   The State of Maryland, rather than Defendants, bore the financial burden of paying the increased health care costs caused by Defendants' fraudulent and wrongful conduct, thereby conferring benefits on Defendants by, inter alia, satisfying

their legal duties and saving them from bearing the costs for harm proximately caused by their fraudulent and wrongful conduct.

213.   Defendants knew of and appreciated the benefits that the State's payment of increased health care costs conferred on them.

214.   Defendants' fraudulent and wrongful conduct, and its perpetuation, make it inequitable, unjust, and unconscionable for Defendants to retain the benefits conferred on them by the State of Maryland.

215.   The State of Maryland is therefore entitled to restitution from Defendants for the benefits the State of Maryland conferred on them, and to the extent required by equity to prevent Defendants' unjust enrichment as a result of their fraudulent and wrongful conduct.

### COUNT SIX

### (Breach of Voluntarily Undertaken Duty)

### (Against All Defendants)

216.   The State restates and incorporates herein the foregoing paragraphs 1-215 of its Complaint.

217.   Defendants represented that they would undertake a special responsibility and duty to citizens of the State of Maryland, and those who advance and protect the public health, including the State and the Department of Health and Mental Hygiene, to accept an interest in the public's health as a basic and paramount responsibility; to cooperate closely with those who safeguard the public health; to aid and

87

assist the research effort into all aspects of tobacco use and human health; to continue to research and otherwise undertake all possible efforts to learn all the facts and to discover the truth about smoking and health; and finally, to disclose to the State of Maryland and its citizens complete and accurate information about the effects of cigarette smoking on human health.

218.   Defendants undertook to render such services recognizing that they were necessary for the protection of the public health, including the health of millions of Maryland citizens.

219.   Defendants have breached and continue to breach their special responsibility and duty by failing to exercise reasonable care to protect their undertaking. Defendants' failure to use due care in performing the duty that they voluntarily undertook to perform increased the risk of harm to the public, including the risk that Maryland citizens would become addicted to smoking and suffer illness and death from smoking-related causes, and thereby increase the costs of health care paid by the State of Maryland above and beyond what it would have been had Defendants not publicly represented that they were going to engage in the undertaking at all.

220.   As a direct and proximate result of Defendants' conduct, the State has suffered and will continue to suffer substantial injuries and damages for which the State is entitled to recovery.

### COUNT SEVEN

### (Fraud and Deceit)

(Against all Defendants)

221.   The State restates and incorporates herein the foregoing paragraphs 1-220 of its Complaint.

222.   At all times during the course of dealing between Defendants, through advertising in the mass media and by other communications, Defendants repeatedly made the misrepresentation that nicotine is not addictive and that cigarette smoking is not a proven cause of disease.  Moreover, Defendants have recently stated that they do not manipulate nicotine levels in their tobacco products so as to addict consumers.  The individual and cumulative effect of these misrepresentations was to mislead the State of Maryland and its citizens as to the addictiveness and actual health effects of cigarette smoking.

223.   In representations to the State of Maryland and its citizens, Defendants omitted the following material information: (1) nicotine is addictive and Defendants manipulate nicotine levels in their tobacco products so as to addict consumers; and (2) Defendants had detailed knowledge of the harmful health effects of cigarette smoking.

224.   Defendants were under a duty to disclose to the State of Maryland and its citizens the addictive nature of nicotine; the manipulation of the nicotine levels in tobacco products; their intent to addict the cigarette consuming public; and the full extent of their research on the adverse health effects of using their products.  Defendants had

89

sole access to material facts concerning the addictive nature of nicotine; the manipulation of nicotine levels in tobacco products; the intent to addict Plaintiff and the cigarette consuming public; and their research on the adverse health effects of using their products. Defendants knew that, prior to their addiction to nicotine, Maryland citizens could not reasonably have discovered the addictive nature of nicotine; the manipulation of the nicotine levels in tobacco products; the intent to addict Plaintiff and the cigarette consuming public; and Defendants' research on the adverse health effects of their products. In addition, Defendants actively concealed the addictive nature of nicotine, the manipulation of nicotine levels in the tobacco products, and the intent to addict the cigarette consuming public.

225. The representations were false when made and known by Defendants to be false or were made with reckless indifference. The actions of Defendants, all done to maximize sales and profit at the expense of the public's health and safety, were so outrageous as to constitute gross fraud, ill will or evil motive.

226. These misrepresentations and omissions were made deliberately, willfully, and maliciously to mislead the State of Maryland and its citizens into reliance and action thereon, and to cause Maryland citizens to purchase and use Defendants' tobacco products as Defendants intended them to be used.

227. The State of Maryland and its citizens had no way to determine that the representations were false and misleading, and that they included material omissions,

and these persons reasonably relied on Defendants' representations.

228.   By reason of the reliance on Defendants' misrepresentations and omissions by the State of Maryland and its citizens, Plaintiff has been damaged.

229.   Defendants knew or acted with reckless indifference to the fact that nicotine was addictive. Defendants manipulated the amount of nicotine levels in the tobacco products, and Defendants intended to addict cigarette smokers but refrained from disclosing the facts to cigarette smokers, for the purpose of inducing them to purchase tobacco products, thus causing Plaintiff to incur economic and other damages in an amount to be proven at trial.

230.   In addition to either having actual knowledge or a reckless indifference to the true facts, the conduct of Defendants amounted to a willful refusal to know or to learn.

231.   The State is therefore entitled to damages in an amount to be proven at trial, punitive damages, plus interest and costs.

## COUNT EIGHT

### (Negligent Misrepresentation)

### (Against all Defendants)

232.   The State restates and incorporates herein the foregoing paragraphs 1-231 of its Complaint.

233.   By reason of their knowledge and expertise regarding the addictive

91

nature of nicotine, manipulation of the amount of nicotine level in tobacco products, intent to addict, their research into the adverse health effects of their products, and by reason of their statements to consumers in advertisements and other communications, at all times relevant hereto, Defendants owed the State of Maryland and its citizens a duty of care which required, among other things, that Defendants be truthful and accurate in their representations to the State of Maryland and its citizens concerning their tobacco products.

234. Defendants breached their duty of care to the Plaintiff by negligently making the material misrepresentations alleged herein.

235. The State of Maryland and its citizens reasonably relied on Defendants' representations, when in fact those representations constituted negligent misrepresentations.

236. Such reliance was not only foreseeable by Defendants but also intended by them, and it was foreseeable to Defendants that such reliance would cause injury to the State of Maryland and its citizens because the State would incur increased health care costs.

237. The conduct of Defendants as more fully described above, all done to maximize sales and profit at the expense of the public's health and safety, was outrageous and performed with evil motive, intent to injure, ill will and without legal justification or excuse.

238. The State is therefore entitled to damages in an amount to be proven

at trial, punitive damages, plus interest and costs.

## COUNT NINE

### (Breach of Express Warranty)
### (Against all Defendants)

239.   The State restates and incorporates herein the foregoing paragraphs 1-238 of its Complaint.

240.   Defendants' advertisements and promotional statements contained broad claims amounting to a warranty that their products were not addictive, that they did not manipulate the nicotine levels in tobacco products, that they did not intend to addict Maryland citizens, and that their were no adverse health effects arising from the use of their products.

241.   Defendants breached their warranties by offering for sale, and selling as non-addictive, tobacco products that were addictive and contained levels of nicotine manipulated to make them addicted.

242.   This breach of the express warranties by Defendants has caused Maryland citizens to become addicted to Defendants' tobacco products and to suffer adverse health effects.

243.   It was foreseeable to Defendants that their breach of warranties

93

would cause injury to the State of Maryland because the State would incur increased health care costs.

244. The State is therefore entitled to damages in an amount to be proven at trial, plus interest and costs.

## COUNT TEN

### (Breach of Implied Warranty)
### (Against all Defendants)

245. The State restates and incorporates herein the foregoing paragraphs 1-244 of its Complaint.

246. Defendants impliedly warranted that their tobacco products, which they designed, manufactured, marketed and sold to Maryland citizens, were merchantable and fit and safe for their ordinary use.

247. Defendants' tobacco products purchased and consumed by Maryland citizens were addictive, unmerchantable, and unfit for use when sold, and subjected these persons to addiction and/or increasing addiction and to suffer adverse health effects. Therefore, Defendants breached the implied warranty of merchantability at the time the tobacco products were sold to Maryland citizens in that the tobacco products were not fit for their ordinary purposes.

248. As a direct and proximate result of the breach of the implied warranty of merchantability by Defendants these persons are addicted or subject to addiction to Defendants' tobacco products, and the State of Maryland has incurred

94

increased health care costs. It was foreseeable to Defendants that their breach of warranties would cause injury to the State of Maryland because the State would incur increased health care costs.

249.  The State is therefore entitled to damages in an amount to be proven at trial, plus interest and costs.

## COUNT ELEVEN

### (Negligence)
### (Against all Defendants)

250.  The State restates and incorporates herein the foregoing paragraphs 1-249 of its Complaint.

251.  Defendants had a duty to the State of Maryland and its citizens to provide a reasonably safe product in design and manufacture, and to warn of the addictive nature of nicotine and the defective nature of their products.

252.  Defendants breached this duty of reasonable care by the following acts and omissions:

a.  failure to design and manufacture tobacco products that were not addictive, that did not contain unreasonable levels of nicotine, and/or did not minimize adverse health effects;

b.  failure prior to 1969 to warn consumers of the addictive nature of nicotine when they knew or should have known of nicotine's addictive nature and of the adverse health effects of their products when they knew or should have known of these adverse health effects; and

c.  otherwise failing to exercise due care under the

95

circumstances.

253.   As a direct and proximate result of the carelessness and negligence of Defendants, Maryland citizens have become addicted to Defendants' tobacco products and have suffered adverse health effects and the State has suffered reasonably foreseeable damages.

254.   At all times relevant hereto, Defendants actually knew of the defective nature of tobacco products as herein set forth and continued to design, manufacture, market and sell tobacco products so as to maximize sales and profits at the expense of the publics' health and safety in conscious disregard of the foreseeable harm caused by these products.

255.   The State is therefore entitled to damages in an amount to be proven at trial, punitive damages, plus interest and costs.

## COUNT TWELVE

### (Strict Liability)

### (Against all Defendants)

256.   The State restates and incorporates herein the foregoing paragraphs 1-255 of its Complaint.

257.   At all relevant times, Defendants were engaged in the business of manufacturing, marketing, selling and supplying tobacco products for ultimate retail sale to consumers. Defendants manufactured their tobacco products, manipulated the level of nicotine in their tobacco products and through their sales and marketing efforts sold these

96

tobacco products to retailers, who in turn sold the tobacco products to Maryland citizens.

258.   These tobacco products were expected to and did reach the purchaser without substantial change in their condition as manufactured, manipulated, marketed and sold by Defendants.

259.   Maryland citizens consumed the tobacco products in the manner in which the tobacco products were intended to be used, that is, for personal consumption, causing and/or subjecting them to become addicted to nicotine and tobacco products and to suffer adverse health effects.

260.   These persons were not aware of the addictive nature of tobacco products, the manipulation of the nicotine levels of these tobacco products, Defendants' intent to addict them, and the adverse health effects of the tobacco products.

261.   As a direct and proximate result of Defendants' design, manufacture, and the marketing and sale of the tobacco products, these persons have suffered addiction or adverse health effects or are subject to addiction to said products or adverse health effects and the State has suffered damages.  It was foreseeable to Defendants that their design, manufacture, and the marketing and sale of the tobacco products would cause injury to the State of Maryland because the State would incur increased health care costs.

262.   Defendants' tobacco products, containing manipulated levels of nicotine, as manipulated by Defendants, which caused or subjected Maryland citizens to become addicted to nicotine and the tobacco products upon personal consumption and to suffer adverse health effects from the use of these products, constitute defective and

unreasonably dangerous products.

263.    At all times relevant hereto, Defendants actually knew of the defects herein set forth and continued to design, manufacture, market and sell tobacco products so as to maximize sales and profits at the expense of the publics' health and safety in conscious disregard of the foreseeable harm caused by these products.

264.    The State is therefore entitled to damages in an amount to be proven at trial, punitive damages, plus interest and costs.

## COUNT THIRTEEN

### (Conspiracy)

### (Against all Defendants)

265.    The State restates and incorporates herein the foregoing paragraphs 1-264 of its Complaint.

266.    Beginning at least as early as the 1950s, and continuing until the present day, Defendants entered into an agreement or understanding to commit unlawful or tortious acts or to use unlawful or tortious means to commit acts not themselves illegal, and in fact did commit unlawful or tortious acts or use unlawful or tortious means to commit acts not themselves illegal, including without limitation, restraining and suppressing research on the harmful effects of smoking; restraining and suppressing the dissemination of information on the addictive effects of nicotine and the harmful effects of smoking; engaging in affirmative misrepresentations on the addictive effects of nicotine and the harmful effects of smoking; and restraining and suppressing the research,

development, production, and marketing of a safer cigarette. In furtherance of Defendants' conspiracy, Defendants lent encouragement, substantial assistance, and otherwise aided and abetted each other with respect to these wrongful acts.

267.    As a direct and proximate result of Defendants' unlawful conspiracy, the State has suffered and will continue to suffer substantial injuries and damages.

268.    As a result of Defendants' conspiracy, Defendants are vicariously and jointly and severally liable with respect to each cause of action described above in Counts One through Twelve above.

269.    The State is therefore entitled to damages in an amount to be proven at trial, punitive damages, plus interest and costs.

## VII.    RELIEF REQUESTED

WHEREFORE, the State of Maryland requests that this Honorable Court issue an order and judgment against the Defendants, jointly and severally, as follows:

A.    Ordering Defendants to disclose, disseminate, and publish all research previously conducted directly or indirectly by themselves and their respective agents, affiliates, servants, officers, directors, employees, and all persons acting in concert with them, that relates to the issue of smoking and health and addiction;

B.    Ordering Defendants to fund a corrective public education campaign relating to the issue of smoking and health, administered and controlled by an independent third party;

C.    Ordering Defendants to make corrective statements regarding the

99

health risks of smoking and the addictive properties of nicotine in future advertising and enjoining them from continuing to make false. misleading, or deceptive statements or representations;

D.     Ordering Defendants to fund smoking cessation programs including the provision of nicotine replacement therapy for dependent smokers;

E.     Ordering Defendants to disclose the nicotine yields of their products based on machine tests and human confirmation studies for each brand;

F.     Imposing on Defendants civil penalties for violations of the Maryland Antitrust Act and the Maryland Consumer Protection Act;

G.     Ordering Defendants to pay restitution in an amount to be proven at trial, presently estimated to be at least Three Billion Dollars ($3,000,000,000), together with interests and costs;

H.     Awarding damages and compensation to the State for past and future damages, including but not limited to health care expenditures, caused by Defendants' actions in violation of the laws of the State of Maryland, presently estimated to be at least Three Billion Dollars ($3,000,000,000), together with interests and costs;

I.     Awarding the State reasonable attorney's fees and costs;

J.     Awarding the State punitive money damages in an amount of Ten Billion Dollars ($10,000,000,000) against Defendants to sufficiently punish the Defendants for their conduct and to deter such conduct in the future;

K.     Declaring that the Defendants, now and in the past, use and did use

100

marketing and advertising campaigns that target and/or encourage children to purchase and consume tobacco products;

      L.    Enjoining the Defendants from using marketing or advertising campaigns that target and/or encourage children to purchase and consume tobacco products;

      M.    Awarding the State such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure the State has an effective remedy; and

      N.    For such other and further relief, as the Court deems just and proper, that the State is entitled to receive.

## VIII. JURY DEMAND

The State demands a trial by jury for all issues triable by jury.

Respectfully Submitted,

J. JOSEPH CURRAN, JR.
Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6300

PETER G. ANGELOS
The Law Offices of Peter G. Angelos
300 E. Lombard St.
Baltimore, MD 21202
(410) 659-0100

May 1, 1996

101