UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

IN RE:  LIGHT CIGARETTES MARKETING  )  MDL DOCKET NO. 1-09-MD-2068
SALES PRACTICES LITIGATION          )           ALL CASES

## ORDER ON PHILIP MORRIS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR PURCHASES AFTER DECEMEBER 1, 2002

Occasionally, the law's logic leads to peculiar positions. To succeed on its motion for summary judgment, Philip Morris USA, Inc. (PM) must accept the Plaintiffs' premise that it spent decades lying to the consuming public about the health effects of its light cigarettes,[1] but it urges the Court to grant summary judgment against all claims that took place after it began telling the truth. PM's argument has a certain tautological attractiveness: to maintain a misrepresentation cause of action there must be a misrepresentation, and once the defendant began telling the truth, there is no ongoing misrepresentation and hence no cause of action. The Court denies PM's motion because the record viewed in the light most favorable to the Plaintiffs creates a genuine issue of material fact as to whether PM began telling the whole truth about light cigarettes as of December 1, 2002.

I.  STATEMENT OF FACTS

In the past, PM marketed light cigarettes as a healthier choice for smokers and did not disclose to consumers all the health risks it knew were associated with smoking light cigarettes. *Plaintiffs' Statement of Material Facts* ¶¶ 139, 146-52, 155-60 (Docket # 189) (*PSMF*).[2,3] PM gradually changed tacks.

---

[1] "Light cigarettes" refers to all "low tar" cigarettes, including products with the descriptors "Lights" and Ultra-Lights." *PM's Mot. for Summ. J.* at 1 n.2 (Docket # 130) (*PM's Mot.*).

[2] Although contested by PM, in ruling on a motion for summary judgment, the Court recites the facts "in the light most favorable to the nonmovant." *Carreras v. Sajo, García & Partners*, 596 F.3d 25, 32 (1st Cir. 2010) (citing *Cabán-Hernández v. Philip Morris USA, Inc*., 486 F.3d 1, 8 (1st Cir. 2007)).

In 1999, PM posted information about the health risks of smoking light cigarettes on its website and sent a direct mailing to 7 million adult smokers publicizing that its website now contained information about "health issues for smokers" and "tar and nicotine numbers"; for recipients who did not have internet access, the mailing provided a toll-free number that customers could call to receive the information in hard copy. *Aff. of Brendan McCormick*, Ex. 7 ¶¶ 26-27 (Docket # 130).[4] At the end of 2000, PM added a legend to all its light cigarettes advertising that stated, "[t]he amount of 'tar' and nicotine you inhale will vary depending on how you smoke" and directed consumers to PM's website and toll-free number. *PM's Mot.* at 10. In November 2002, PM included an "onsert"—a folded leaflet placed under the cellophane packaging—on approximately 130 million packs of light cigarettes.[5] Also in November 2002,

---

In its Reply to Plaintiffs' Statement of Material Facts, PM moved under Local Rule 56 to strike the additional facts included in Plaintiffs' statement of material facts "in its entirety." *PM's Additional Statement of Material Facts* at 2 (Docket # 195) (*PM's ASMF*). First, PM contends that the additional facts "consist[] largely of quotations from past hearsay testimony that are either taken out of context and/or have nothing to do with the issues here, mischaracterized documents, and findings from *United States v. Philip Morris USA, Inc.* [(*DOJ*)], 449 F. Supp. 2d 1 (D.D.C. 2006)." *Id.* at 1. Although a trial ruling on the admissibility of this and similar evidence must await a trial context, to the extent the Plaintiffs cite PM admissions, the statements of material fact are not hearsay because they are admissions of a party opponent. To the extent the Plaintiffs' statements of material fact rely on factual findings in Judge Kessler's opinion, the Plaintiffs ignored the Court's March 5, 2010 Order in which the Court declined to hold PM bound by Judge Kessler's factual findings. *Order on Pls.' Mot. for Application of the Collateral Estoppel Doctrine* (Docket # 178). Consistent with its earlier opinion, the Court grants PM's motion to strike to the extent the Plaintiffs rely on factual findings from Judge Kessler's opinion.

Second, PM contends that the Plaintiffs' additional facts "frequently offer argument, comment, and improper characterizations of testimony and documents" and place "an unduly burdensome response" on PM. *PM's ASMF* at 2. Rather than strike all of the Plaintiffs' statements of material fact, the Court ignores statements that violate Local Rule 56. *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 29, 864 A.2d 169, 179 (describing the Court's discretion in addressing local rule 56 violations). However, the Court does not agree with PM that the Plaintiffs are guilty of inappropriate adjectival advocacy in their statement of material facts. *Cf. Good v. Altria Group, Inc.*, 231 F.R.D. 446, 447 n.1 (D. Me. 2005).

The Court denies in part and grants in part PM's motion to strike (Docket # 195).

[3] The parties filed unsealed redacted documents under docket numbers 187, 189, and 195 and sealed unredacted versions under docket numbers 188, 190, and 196. The Court cites the redacted versions.

[4] PM states in its Motion for Summary Judgment that it sent the direct mailings in June 2003. *PM's Mot.* at 9-10 (citing *Aff. of Brendan McCormick* ¶ 26). However, Mr. McCormick stated in his affidavit that the direct communications occurred in 1999. *Aff. of Brendan McCormick* ¶ 26. PM referenced the 1999 date at oral argument. *Tr.* at 27:17-22.

[5] The onsert reads:

There is no such thing as a safe cigarette, including this one.

2

PM included 16.7 million "inserts"—20-page booklets detailing the health risks of light cigarettes—in 25 major newspapers, such as *The New York Times*, the *Los Angeles Times*, *The Washington Post*, and *USA Today*.

On January 22, 2010, PM moved for summary judgment on the Plaintiffs' claims involving purchases of light cigarettes after December 1, 2002. *PM's Mot.*[6] On March 31, 2010, the Plaintiffs filed a response in opposition to the motion. *Pls.' Resp. in Opp'n to PM's Mot. for Summ. J.* (Docket # 187) (*Pls.' Resp.*). On April 14, 2010, PM replied to the Plaintiffs' response. *PM's Reply to Pls.' Resp. in Opp'n to PM's Mot. for Summ. J.* (Docket # 194) (*PM's Reply*). On April 27, 2010, PM moved for oral argument and the Court granted the request. *Oral Mot. for Oral Argument/Hearing* (Docket # 200); *Order* (Docket # 201). The Court held oral argument on May 18, 2010.

---

The terms "Ultra Light," "Light," "Medium" and "Mild" are used as descriptors of strength of taste and flavor. These terms also serve as a relative indication of the average tar and nicotine yield as measured by a standard government test method.

The tar and nicotine yield numbers are not meant to communicate the amount of tar and nicotine actually inhaled by any smoker, as individuals do not smoke like the machine used in the government test method. The amount of tar and nicotine you inhale will be higher than the stated tar and nicotine yield numbers if, for example, you block ventilation holes, inhale more deeply, take more puffs or smoke more cigarettes.

Similarly, if you smoke brands with descriptors such as "Ultra Light", "Light," "Medium," or "Mild," you may not inhale less tar and nicotine than you would from other brands. It depends on how you smoke.

You should not assume that cigarette brands using descriptors like "Ultra Light," "Light," "Medium" or "Mild" are less harmful than full flavor cigarette brands or that smoking such cigarette brands will help you quit smoking.

If you are concerned about the health effects of smoking, you should quit.

*PM's Mot.* at 5-6.
[6] PM seeks summary judgment against the six cases with claims based solely on purchases made after 2002: *Nikolic*, *Williams*, *Biundo*, *Corse*, *Domaingue*, and *Tyrer*. *PM's Mot.* at 1. PM seeks partial summary judgment on the seven cases with longer class periods, asking that the Court limit the claims to pre-December 2002 purchases: *Mirick*, *Parsons*, *Slater*, *Good*, *Mulford*, *Tang*, and *Haubrich*. *Id.*

## II.     THE PARTIES' POSITIONS

### A.      PM

PM argues that its disclaimers preclude the Plaintiffs' unjust enrichment and consumer fraud claims. *PM's Mot.* at 13. According to PM, "the crux of plaintiffs' claims . . . is that PM USA deceived consumers by describing their cigarettes as 'lights,' 'ultra-lights' or 'low tar' and by stating that they have 'lowered tar and nicotine' without disclosing to consumers that depending on how they smoked, consumers could inhale as much tar and nicotine from a low tar cigarette as they could from a full flavored brand." *Id*. at 13-14. By 2002 at the latest, PM asserts that it "provided this exact disclosure to its low tar cigarettes consumers." *Id*. at 14. PM argues that courts, including the courts in states at issue here, "have consistently held that no fraud or deception exists as a matter of law where—as here—the defendant expressly disclaimed the alleged misrepresentation or disclosed the allegedly concealed information." *Id*. at 15.

PM presents two reasons for why its disclosures were sufficiently extensive despite the the fact that onserts were not included on every pack. First, PM contends that summary judgment is appropriate where, as here, a disclaimer is "reasonably calculated to reach a wide audience"; whether or not class members received, read, or believed the disclosures is a question of causation, not the sufficiency of PM's disclosure. *PM's Reply* at 6-7. Because cigarette smoking is a "regular and repeated activity," PM argues that "including the onsert on one-to-two week supplies of cigarettes is more than sufficient" to satisfy the requirement that disclosures be "extensive." *Id*. at 6-7. Second, PM argues that other forms of disclosures make up for any gaps in onsert distribution. *Id*. at 7. At oral argument, PM emphasized that the five types of disclaimers it made as of December 1, 2002, taken as a whole, were sufficient to preclude the Plaintiffs' claims as a matter of law. *Tr*. at 25:21-28:16 (Docket # 209).

### B.     Plaintiffs

As an initial matter, Plaintiffs argue that the sufficiency of PM's disclaimers is irrelevant to Plaintiffs' unjust enrichment claims. Plaintiffs state that because in most jurisdictions unjust enrichment does not "require wrongful conduct by the one enriched," the claim does not depend on material misrepresentation, eliminating disclaimers as a defense. *Pls.' Resp.* at 13-15.

The Plaintiffs give two reasons for why the adequacy of the disclaimers is a question of material fact for the jury. First, the Plaintiffs argue that the information contained in the onserts neither expressly disclaims the alleged misrepresentations nor discloses the information that was allegedly concealed: they describe the onsert language as "waffling" or "intentionally vague" and argue that the onserts failed to include material health information. *Id*. at 4-5. The Plaintiffs assert that the "deceptive and fraudulent conduct engaged in by Defendant prior to December 1, 2002, amounted to an impenetrable message embedded into the minds of its victims, whereby its practice of 'saying less' at a later point in time had no effect on the unstoppable inertia of its past conduct." *Id*. at 6.

Second, the Plaintiffs contend that PM has not demonstrated a legally sufficient reach to the onserts. The Plaintiffs emphasize that the onserts were included on only a small percentage of light cigarette packs. *Id*. at 15-16. Further, the Plaintiffs question the effectiveness of PM's periodic placement of onserts: although the packs with onserts were *distributed* in concentrated one-week supplies, the packs were presumably *sold* over a longer period of time, decreasing the concentration of packs containing onserts and the chances that any one purchaser received one. *Id*. at 17-18. The Plaintiffs assert that relevant to the question of sufficiency is whether PM's disclosures were "actually read and understood by consumers" and that PM has offered little evidence that they were. *Id*. at 16.

### III. DISCUSSION

#### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moveant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). On a summary judgment motion, "[a] genuine issue exists where a 'reasonable jury could resolve the point in favor of the nonmoving party.'" *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (quoting *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997)) (internal quotation marks omitted).

Although the Plaintiffs bring claims under individual state statutes, an element of all consumer fraud claims is "a deceptive act or practice by the defendant." *Perona v. Volkswagen of America, Inc.*, 684 N.E.2d 859, 864 (Ill. App. Ct. 1997).[7] A deceptive act is "any false or misleading [representation] . . . which may, tends to or does deceive or mislead any person," *Salazar v. D.W.B.H., Inc.*, 192 P.3d 1205, 1212 (N.M. 2008), including "[a]n omission or concealment of a material fact." *Perona*, 684 N.E.2d at 866. Thus, there is no actionable consumer fraud if "the allegedly withheld [or false] information was in fact disclosed to the public." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 676 (6th Cir. 2005).[8]

---

[7] The language among state statutes varies slightly, but the parties have not argued that the differences are significant and the Court agrees. Although a general overview is helpful, the Court's decision does not turn on any one definition of consumer fraud and its conclusion is broad enough to include variations among statutes.

[8] Because the Court finds a question of material fact as to the sufficiency of the disclaimers, the Court does not address the standard for unjust enrichment and whether sufficient disclaimers could preclude the cause of action. Neither party suggests that disclaimers could be insufficient to preclude consumer fraud claims but sufficient to preclude unjust enrichment claims.

B.       **Whether PM Told the Whole Truth by December 1, 2002**

Whether PM stopped misrepresenting the health benefits of light cigarettes as of December 1, 2002 is a question of fact and compels the denial of its motion.[9] First, after December 1, 2002, PM continued to, and still does, label certain brands of cigarettes "Lights" or Ultra-Lights." These labels alone raise a factual question as to whether consumers associate the term "light" with healthier.[10] At oral argument, PM responded that it had made multiple "other statements that say that the consumers should not view [the light label] as a representation that they will get lower tar or that the cigarettes are safer." *Tr.* at 29:25-30:2. Although PM is free to make this argument at trial, a reasonable factfinder could conclude that these "other statements" failed to negate the common understanding of the primary label on light cigarette packs. *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1086 (E.D.N.Y. 2006), *rev'd on other grounds*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) (stating that "[t]o prevail before trial on all [civil RICO] claims after November 2002, PM USA must demonstrate . . . that its disclosures were so widely distributed and so clear that, as a matter of law, no scheme to defraud existed after that date").

---

[9] At oral argument, the Court clarified with PM that its motion was directed to claims after a specific date, December 1, 2002. *Tr.* at 10:8-11. In other words, PM's motion is not a sliding scale motion, where the Court is invited to pick a date by which PM's truthful disclosures had effectively saturated the market and undid the misimpression caused by its earlier misrepresentations. In fact, it is doubtful that the Court could engage in such a process without factfinding. This is significant because PM included in the summary judgment record a substantial amount of information about its efforts to disseminate the message about the health risks associated with light cigarettes after December 1, 2002. When asked why this additional information was included in the record, PM counsel explained it was "highly important contextually." *Tr.* at 10:13-14. Be that as it may, PM's choice of December 1, 2002 as the date after which no claim could be sustained makes the resolution of this motion much easier, since PM had only just begun to tell the truth as of December 1, 2002 and the Court concludes there is a genuine issue of material fact as to whether it continued to make misrepresentations about the health effects of light cigarettes after then.

[10] A factfinder could determine that consumers expect a light version of a regular product to provide a health benefit, such as lower-levels of sugar, fat, or in cigarettes, lower nicotine and tar. Further, the association between "Lights" and "Ultra-Lights" and lowered health risks represents not only the common understanding of the terms but also the understanding that PM actively cultivated through decades of affirmative misrepresentation.

Moreover, PM did not remove "express references to tar and nicotine on low tar cigarette packages—such as the words 'Lowered Tar and Nicotine' on Marlboro Lights cigarettes"—until the first quarter of 2003. *PM's Mot.* at 6. It would be difficult to conclude that PM's misrepresentations ceased as a matter of law by December 1, 2002, since PM's light cigarette packs continued to explicitly claim to be lower in tar and nicotine.

Reasonable jurors could also differ about whether PM's disclaimers sufficiently disclosed all material health information.[11] The disclaimers did not inform consumers that light cigarette smokers compensate subconsciously, that the design of light cigarettes results in more mutagenic smoke than regular cigarettes, or that additives alter pH levels resulting in greater tar and nicotine delivery. *Pls.' Resp.* at 8. Such omissions raise a factual question of whether PM disclosed all material information but they are particularly significant in light of the tenor of the disclosures as a whole, which suggests that light cigarette smokers could inhale less tar and nicotine depending on "how you [the smoker] smoke." *PM's Mot.* at 5. This is not a situation where PM disclosed the "ultimate fact"—no increased health benefits from light cigarettes—and stopped; instead, PM went on to provide an explanation that effectively reopened the possibility that light cigarettes might in fact be healthier. *Cf. PM's Reply* at 2 (citing *Mittendorf v. J.R. Williston & Beane, Inc.*, 372 F. Supp. 821, 828 (S.D.N.Y. 1974) (stating that "only the essence of a point need be disclosed, not the minute details")). This potential misimpression is reinforced by word choice: the disclaimers state that "you *may* not inhale less tar and nicotine than you would from other brands" not "you *will* not." *PM's Mot.* at 5 (emphasis added). When, as PM urges, the Court considers PM's representations "viewed as a whole," the Court finds multiple

---

[11] The Court treats PM's disclaimers as providing essentially equivalent information. PM has not argued that there are any material differences in content and the portions of the disclaimers excerpted in PM's statement of material facts are comparable. *PM's Statement of Material Facts* ¶¶ 19, 21-23, 28-29 (Docket # 159). Had such a difference existed, however, its effect on the overall sufficiency of the disclaimers is a question of fact.

questions of fact for the jury. *Tr.* at 16:19.[12]

## IV. CONCLUSION

The Court DENIES PM's Motion for Summary Judgment (Docket # 130). PM's Motion to Strike is DENIED to the extent the statements are party admissions and GRANTED to the extent the statements rely on Judge Kessler's factual findings (Docket # 196).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 26th day of May, 2010

---

[12] Having found there is a factual question as to whether PM ceased misrepresentations after December 1, 2002, the Court does not decide whether the standard for disclaiming misrepresented information is different in the context of addictive products. Nevertheless, a powerful case can be made that cigarettes are different than most other consumer products because they are so addictive. *See Schwab*, 449 F. Supp. 2d at 1088 (describing cigarette smokers as "following a habit embedded by addiction"). PM itself admits that "[i]t can be very difficult to quit smoking." *A Closer Look at the Resources, Links and Information You'll Find At WWW.PHILIPMORRISUSA.COM*, Ex. 7, Ex. A, at 4 (Docket # 130) (stating that "cigarette smoking is addictive"). PM had reason to know that once started, many smokers would become addicted and that disclosers would have less of an impact on consumer behavior. This is not a situation where once the consumers were made aware of the true facts, each consumer could simply decide to stop using the product. *Perona*, 684 N.E.2d 859 (finding that disclosure of automobile defect prevented consumer fraud claims based on purchases made after the disclosures). Having cultivated customers by misrepresenting light cigarettes as a healthier alternative to regular cigarettes and having succeeded in getting them addicted, PM's past misrepresentations arguably linger significantly beyond whatever point it decided to tell the truth. *Schwab*, 449 F. Supp. 2d at 1087 (discussing the need for cigarette companies to "'clear[] the air' of any lingering misrepresentations").
    Having found summary judgment inappropriate, the Court also does not address whether PM's disclaimers had sufficient reach.