

**KATHLEEN DONOVAN and PATRICIA CAWLEY, on behalf of themselves and others similarly situated, Plaintiffs, v. PHILIP MORRIS USA, INC., Defendant.**

**Civil Action No. 06cv12234-NG**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHU-SETTS**

*2010 U.S. Dist. LEXIS 62982*

**June 24, 2010, Decided
June 24, 2010, Filed**

**COUNSEL:** [*1] For Kathleen Donovan, Plaintiff: Amber Long, Erik Shawn, Jerome H. Block, Stephanie L. Busse, LEAD ATTORNEYS, Levy, Phillips & Konigsberg, LLP, New York, NY; Victoria E. Phillips, LEAD ATTORNEY, PRO HAC VICE, Levy, Phillips & Konigsberg, LLP, New York, NY; Christopher Weld, Jr., Kevin T. Peters, LEAD ATTORNEYS, Edward Foye, Todd & Weld LLP, Boston, MA; David C. Strouss, Michael A. Lesser, Neil T. Leifer, LEAD ATTORNEYS, Thornton & Naumes LLP, Boston, MA; Steven Phillips, LEAD ATTORNEY, Levy, Phillips & Konisberg, New York, NY; Steven J. Phillips, LEAD ATTORNEY, PAIR Project, Boston, MA.

For Patricia Cawley, James Teague, Plaintiffs: Christopher Weld, Jr., Kevin T. Peters, LEAD ATTORNEYS, Edward Foye, Todd & Weld LLP, Boston, MA; David C. Strouss, Michael A. Lesser, Neil T. Leifer, LEAD ATTORNEYS, Thornton & Naumes LLP, Boston, MA; Stephanie L. Busse, LEAD ATTORNEY, Amber Long, Jerome H. Block, Levy, Phillips & Konisberg LLP, New York, NY; Victoria E. Phillips, LEAD ATTORNEY, PRO HAC VICE, Levy, Phillips & Konisberg LLP, New York, NY; Steven J. Phillips, LEAD ATTORNEY, PAIR Project, Boston, MA.

For Laurence O'Kelly, Plaintiff: Amber Long, Stephanie L. Busse, Victoria E. Phillips, PRO [*2] HAC VICE, LEAD ATTORNEYS, Levy, Phillips & Konisberg LLP, New York, NY; Michael A. Lesser, LEAD ATTOR-NEY, Neil T. Leifer, Thornton & Naumes LLP, Boston, MA; Steven J. Phillips, LEAD ATTORNEY, PAIR Project, Boston, MA; Edward Foye, Todd & Weld LLP, Boston, MA.

For Philip Morris USA, Inc., Defendant: For Philip Morris USA, Inc., Defendant: Gary R. Long, LEAD ATTORNEY, Shook, Hardy & Bacon L.L.P., Kansas City, MO; Jennifer L. Brown, Tammy B. Webb, LEAD ATTORNEYS, Shook, Hardy & Bacon LLP, San Francisco, CA; John K. Sherk, III, LEAD ATTORNEY, Shook, Hardy & Bacon LLP, Kansas City, MO; Edward Foye, Todd & Weld LLP, Boston, MA; Kenneth J. Parsigian, Michael K. Murray, Goodwin Procter, LLP, Boston, MA.

**JUDGES:** NANCY GERTNER, United States District Judge.

**OPINION BY:** NANCY GERTNER

**OPINION**

   **GERTNER, D.J.:**

**TABLE OF CONTENTS**

   **MEMORANDUM AND ORDER RE: MOTION TO CERTIFY CLASS**

| I. INTRODUCTION |
| II. DISCUSSION |
| A. Rule 23 Standard |
| B. Ascertainability |
| C. 23(a) Factors |
| 1. Numerosity |
| 2. Commonality |
| 3. Typicality |
| 4. Adequacy |
| D. 23(b) Requirements |
| 1. *Rule 23(b)(2)* |
| a. Group Injury: Has Philip Morris "[a]cted ... on grounds generally applicable to the class?" |
| (1) The Medical Monitoring Cause of Action |
| (a) Design Defect |
| (b) Causation |
| (c) Exposure: Plaintiff Was Exposed to A Hazardous Substance That Produced, At Least, Subcellular Changes That Substantially Increased the Risk of Serious Disease, Illness, or Injury |
| (d) LDCT Scans: An Effective Medical Test for Reliable Early Detection Exists and Early Detection, Combined with Prompt and Effective Treatment, Will Significantly Decrease the Risk c Death or the Severity of the Disease, Illness or Injury |
| (e) Such Diagnostic Medical Examinations A Reasonably (and Periodically) Necessary, Conformably with the Standard of Care |
| (f) The Present Value of the Reasonable Cost Such of Tests and Care, as of the Date of the Filing of the Complaint |
| (2) Philip Morris' Affirmative Defenses |
| (a) Choice of Law |
| (b) Statute of Limitations |
| (c) Unreasonable Use (Breach of Warranty) |
| (d) Comparative Negligence |
| (3) Medical Monitoring and Opt Out |
| b. Is Injunctive Relief Appropriate? |
| (1) Is Medical Monitoring Injunctive? |
| (2) SJC Opinion |
| (3) Injunctive Relief Requirements |
| (4) Predominance of Injunctive Relief |
| c. Group Remedy |
| 2. Rule 23(b)(3) Certification |
| a. Predominance |
| b. Superiority |
| 3. Bench or Jury Trial |
| III. CONCLUSION |

**I. [*3] INTRODUCTION**

Plaintiffs bring this purported class action on behalf of Massachusetts residents, age fifty and older, who have smoked Marlboro cigarettes for at least twenty pack-

years. [1] They allege that Philip Morris designed, marketed, and sold Marlboro cigarettes that delivered an excessive and dangerous level of carcinogens. Plaintiffs rest their product defect claims on breach of implied warranty and negligence theories as well as violations of *Mass. Gen. L. c. 93A, § § 2, 9*, which prohibits "unfair or deceptive" trade practices.

> 1   A "pack-year" is the average number of packs of cigarettes smoked per day multiplied by the number of years the person has smoked. One pack a day for twenty years, for example, equals twenty pack-years.

Where this case diverges from a typical tobacco suit is that plaintiffs have no apparent symptoms of lung cancer, and as such, are not seeking damages. Instead, plaintiffs want medical monitoring -- that is, regular screenings to determine whether they have early signs of the disease. They assert that if they do eventually develop lung cancer, these screenings will increase their likelihood of survival almost six-fold.

The proposed class consists of Massachusetts [*4] residents who have a smoking history of at least twenty pack-years and either continue to smoke or quit smoking within one year of filing the initial complaint. No class member may be diagnosed with lung cancer or be under a physician's care for suspected lung cancer, and all must have smoked Marlboro cigarettes within the Commonwealth of Massachusetts. The named plaintiffs, Kathleen Donovan and Patricia Cawley, began to smoke more than thirty years ago, and, by virtue of their age and "prolonged and heavy use of Marlboro cigarettes," allegedly suffered lung tissue damage resulting in "a significantly higher risk of lung cancer." (Third Am. Compl. PP 12, 17, 25-29, 105 (document # 29)).

While plaintiffs moved for class certification on July 1, 2008, (document # 60), the motion was not easily resolved because it raised threshold issues of Massachusetts products liability law. The first set of issues involves the unusual remedy plaintiffs seek, a supervised medical monitoring program using Low-Dose Computed Tomography ("LDCT") scans. According to plaintiffs, before the development of LDCT scanning, there was no effective or accepted method of lung cancer screening. Prior technology, such [*5] as x-rays, was only able to identify lung cancer when it had reached an advanced stage. LDCT scans, however, can identify lung cancer at a much earlier stage, significantly increasing survival rates from about fifteen percent to eighty-five percent. (Phillips' Aff. Ex. 30 at 3-4 (L. Christine Oliver Report) (document # 64-28); Phillips' Aff. Ex. 3 P 28 (Albert Miller Letter) (document # 61-3).)

Monetary damages, plaintiffs claim, do not provide meaningful relief. Class members could not purchase the monitoring regime on their own even if they received a lump sum award. The LDCT screening program requires the hiring of medical personnel, the purchase of equipment, and the development of outreach and record keeping procedures, among other things, which may make the program inaccessible to individual plaintiffs. In fact, plaintiffs allege that LDCT screening is not generally available in Massachusetts and even when it is, most health insurance plans will not cover it. Moreover, many class members may lack the primary care physicians necessary to prescribe LDCT screens.

This unusual remedy is closely tied to the second threshold issue, the question of the plaintiffs' standing to bring these [*6] claims. By definition, plaintiffs who seek medical monitoring to determine whether they have cancer are asymptomatic. If they had objective symptoms, the cancer would be too advanced for LDCT scans to make a difference. Whatever damage they have suffered is subcellular; without overt symptoms of disease, they could not recover under traditional tort theories.

The third novel issue pertains to the timing of plaintiffs' claims and the related issue of claim preclusion. Typically, toxic tort exposure cases put the plaintiffs on the horns of a dilemma. If they bring a claim when they are aware of their exposure -- assuming the standing issues are resolved -- they take the risk that they cannot recover if they develop cancer in the future under the "single controversy rule." If they wait until they develop cancer to bring a claim, the statute of limitations will have expired because they knew of the risks at an earlier time.

Plaintiffs claim that this case is structured to avoid the usual dilemma: The statute of limitations should run from the date that plaintiffs develop subcellular changes that substantially increase their risk of cancer *and* where that increase triggers a medically-accepted [*7] form of screening. Further, they argued that the single controversy rule should not apply. If plaintiffs get LDCT scanning as part of this litigation, and they develop the disease, they should be able to sue again.

Accordingly, on February 23, 2009, after Philip Morris filed a motion for summary judgment and a motion to dismiss, [2] I certified two questions to the Supreme Judicial Court ("SJC"), pursuant to *Rule 1:03, § 3 of the Rules of the Supreme Judicial Court*. The SJC's answers to those questions are significant, necessarily shaping this Court's class certification analysis. I asked: (1) Does the plaintiffs' suit for medical monitoring, based on the subclinical effects of exposure to cigarette smoke and increased risk of lung cancer, state a cognizable claim and/or permit a remedy under Massachusetts state law?

(2) If the plaintiffs have successfully stated a claim or claims, has the statute of limitations governing those claims expired? A unanimous SJC answered the first question, "Yes," and answered the second question, "No." *Donovan v. Philip Morris, 455 Mass. 215, 914 N.E.2d 891, 894-95 (Mass. 2009).*

> 2   Philip Morris filed a motion for judgment on the pleadings pursuant to *Rule 12(c) of the Federal Rules of Civil Procedure* [*8] -- arguing that the plaintiffs failed to allege an actual "present physical injury" (D.'s Mot. for J. 1 (Document # 32)) -- and a motion for summary judgment pursuant to *Rule 56* -- arguing that the plaintiffs' claims were untimely since the plaintiffs knew of the "increased risk of lung cancer due to smoking more than four years before filing the complaint." (D.'s Mem. in Supp. of Mot. for Summ. J. 6 (document # 35).)

On the first question, the court held that subclinical effects on lung tissue constituted a legally cognizable injury on which plaintiffs' medical monitoring claim could be based and outlined what comprised proof of such a claim. On the second question, the court held that the statute of limitations began to run only after the plaintiffs suffered "physiological change[s] resulting in a substantial increase in the risk of cancer" due to their smoking and "that increase, under the standard of care, triggers the need for available diagnostic testing . . ." *Id. at 903.* Finally, the SJC held that there would be no claim preclusion under the "single controversy rule." Litigation of the plaintiffs' medical monitoring claim in this action would not preclude a future action for [*9] damages if plaintiffs eventually contract lung cancer.

With the SJC's guidance in hand, I now turn to the class action issues. While mass tort claims that seek monetary damages generally fit uncomfortably under *Rule 23(b)(3),* this case is different. *Rule 23(b)(3)* requires certain procedural protections -- the right to notice and the opportunity to opt out -- as well as certain substantive standards -- the "predominance" and "superiority" requirements. These standards and requirements make sense given the preclusive effect of a money judgment on class members. Once there is a judgment, class members cannot bring another claim. "Mandatory" classes under *23(b)(2),* in contrast, need not meet those substantive or procedural requirements. They involve prospective equitable relief, where the defendant has "acted or refused to act on grounds that apply generally to the class." *Fed. R. Civ. P. 23(b)(2).* Since such a remedy seeks to prevent a future harm as to which all class members are similarly situated, (b)(2) certification offers fewer procedural protections. Class members have no need to opt out because the best result absent class mem-

bers could receive is the same relief they would have [*10] received as class members. All members of the class stand in exactly the same relationship to one another and to the claim.

Notwithstanding these protections and requirements, recent decisions reflect the Supreme Court's skepticism of the class action treatment of mass torts under *Rule 23(b)(3),* and may well caution against *Rule 23(b)(2)* treatment. See *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).* [3] Significantly, the medical monitoring relief proposed here, as it is framed by the SJC's decision, avoids the difficulties that typically plague mass tort cases. In fact, the relief proposed resembles a more traditional *Rule 23(b)(2)* remedy. It is a remedy intended to prevent a future harm of the lung cancer that arguably derives from exposure to tobacco. Since it does not preclude a claim for damages if the plaintiffs develop cancer, an opt out provision is unnecessary. From the perspective of a medical monitoring regime, each plaintiff stands in the same position, making this case entirely appropriate for group-wide, rather than individual, relief.

> 3   In *Amchem, 521 U.S. at 625-28,* a product liability suit against several asbestos manufacturers, the Court held that a proposed settlement [*11] class failed to meet the 23(a)(4) adequacy requirement. The class representatives could not adequately represent the class members because they did not share the same injuries and interests. The currently injured would seek immediate payment, while those who were only exposed to asbestos but were asymptomatic would seek a future medical expenses fund. Id. The Court also found that the class did not meet the 23(b)(3) predominance requirement for similar reasons. *Id. at 623-25.*

No doubt some will raise concerns about the breadth of the SJC's decision, see, e.g. Recent Cases, Supreme Judicial Court of Massachusetts Recognizes Cause of Action for Medical Monitoring of Tobacco Users, *123 Harv. L. Rev. 1771 (2010),* but these concerns do not apply here. As described below, the narrow class definition, restricted to *one* product in *one* state, the existing Massachusetts case law on tobacco products, and the particular advantages of LDCT screening for this disease, lung cancer, make the case unique, and the approach uniquely circumscribed.

Accordingly, for the reasons described below, I **GRANT plaintiffs' motion for class certification (document # 60) under both *Rule 23(b)(2)* and *Rule 23(b)(3),* [*12] but only as to the implied warranty and Chapter 93A claims. I DENY plaintiffs' motion for class certification as to the negligence claim under**

both *Rule 23(b)(2)* and *Rule 23(b)(3)*. Due to *Seventh Amendment* concerns, this case will go forward as a jury trial.

## II. DISCUSSION

### A. Rule 23 Standard

Before certifying a class, the district court must undertake a careful review of whether the plaintiffs have met their burden of proving each *Rule 23(a)* factor and one of the *Rule 23(b)* requirements. *Smilow v. Sw. Bell Mobile Sys. Inc., 323 F.3d 32, 38 (1st Cir. 2003)*. When the legal and factual premises of a case are disputed, "the court may 'probe behind the pleadings,' to 'formulate some prediction as to how specific issues will play out' in order to assess whether the proposed class meets the legal requirements for certification." *In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 17 (1st Cir. 2008)* (quoting *Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*; *Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 293 (1st Cir. 2000)*). Nevertheless, the class certification proceeding must not become "a mini-trial on the merits." *In re PolyMedica Corp. Securities Litig., 432 F.3d 1, 16 (1st Cir. 2005)*. [*13] Furthermore, "[t]he class certification prerequisites should be construed in light of the underlying objectives of class actions." *Smilow, 323 F.3d at 41*.

The class action has both procedural and substantive purposes. It is designed to enable a large number of individuals to bring a single proceeding -- plainly a more convenient way to deal with a controversy than advancing in a fragmentary fashion with multiple actions. 7A Charles Alan Wright, Arthur Miller, & Mary Kay Kane, Federal Practice and Procedure § 1751 (3d ed. 2005). See also *Shaw v. Toshiba Am. Info. Sys., 91 F. Supp. 2d 942, 946-52 (E.D. Tex. 2000)* (describing the history of the class action and its purposes). The class action also serves the substantive goal of "vindicat[ing] . . . the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem, 521 U.S. at 617* (internal quotations omitted). It allows people to aggregate claims that would be too costly and time-consuming to bring individually. See *Smilow, 323 F.3d at 41* (The purpose of class actions is "to vindicate the claims of consumers and other groups of people whose individual claims would be [*14] too small to warrant litigation."); Bryant G. Garth, Conflict and Dissent in Class Actions: A Suggested Perspective, 77 Nw. U. L. Rev. 492, 492 (1982) ("Class action litigation often promotes the legal and political interests of those whose interests might not be promoted at all were it not for the class action device -- disadvantaged or deprived groups or even large segments of the public.").

Philip Morris claims that suits against tobacco companies, like most mass product liability cases, are inappropriate for class treatment. And indeed, many courts have agreed, denying class certification in tobacco lawsuits, often finding that the individual issues outweighed common issues. See, e.g., *McLaughlin v. Am. Tobacco Co., 522 F.3d 215 (2d Cir. 2008)*; *Barnes v. Am. Tobacco Co., 161 F.3d 127 (3d Cir. 1998)*; *Castano v. Am. Tobacco Co., 84 F.3d 734 (5th Cir. 1996)*; *Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90 (W.D. Mo. 1997)*. Yet as the court in Smith said, "It is inappropriate to grant or deny class certification in *this* case based simply on the truth or falsity of whether mass tort cases are amenable to certification. The only way to decide the issue in the context of this case [*15] is to examine the claims" plaintiffs actually assert and analyze them through the prism of *Rule 23*. *Smith, 174 F.R.D. at 94*. That is precisely what I will do.

### B. Ascertainability

Philip Morris argues first that the plaintiffs cannot meet the threshold *Rule 23* requirement of "ascertainability." While not explicitly mentioned in *Rule 23*, an implicit prerequisite to class certification is that a "class" exists -- in other words, it must be "administratively feasible for the court to determine whether a particular individual is a member." *Kent v. SunAmerica Life Ins. Co., 190 F.R.D. 271, 278 (D. Mass. 2000)* (citing 7A Wright, Miller, & Kane, supra § 1760)); see *In re Lupron Marketing and Sales Practices Litig., 228 F.R.D. 75, 93 (D. Mass. 2005)*. To be ascertainable, all class members need not be identified at the outset; the class need only be determinable by "stable and objective factors." *Kent, 190 F.R.D. at 278*. While the four traditional 23(a) factors embrace this appraisal (and most courts do not independently address "administrative feasibility" or "ascertainability," see, e.g., *In re Credit Suisse-AOL Securities Litig., 253 F.R.D. 17, 22 (D. Mass. 2008)*; *Southern States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equipment, Inc., 241 F.R.D. 85, 87 (D. Mass. 2007)*; [*16] *Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21 (D. Mass. 2003)*), for the sake of thoroughness, I will address the proposed class' ascertainability here.

Philip Morris asserts that two requirements of the plaintiffs' described class are subjective and will prevent the court from determining who its members are: first, the requirement that a member have a smoking history of at least twenty pack-years, and second, that a member is not under a physician's care for lung cancer. As to the first, Philip Morris argues that a purported member's smoking history cannot be objectively determined; it will rely on the individual's account. As to the requirement that the member not be under care for lung cancer, Philip

Morris argues that this is a fact-intensive inquiry requiring a detailed evaluation of individual medical records.

The cases cited by Philip Morris are not apposite. They involve much more complex medical determinations than those at issue here. See, e.g., *In re Fosamax Products Liability Litig.*, 248 F.R.D. 389, 397 (S.D.N.Y. 2008) ("Class membership is not feasibly ascertainable where it hinges on myriad medical factors individual to each class member."). Here, there are only two [*17] factors to examine -- smoking history and a diagnosis of lung cancer. Surely, any potential class member would know whether or not a doctor suspects he or she has lung cancer. Indeed, courts have not found ascertainability to be a problem when membership hinged on far more difficult determinations than those at issue here. See, e.g., *Hilao v. Estate of Marcos*, 103 F.3d 767, 774 (9th Cir. 1996) (Class defined as "[a]ll current civilian citizens of the Republic of the Philippines, their heirs and beneficiaries, who between 1972 and 1986 were tortured, summarily executed or disappeared while in the custody of military or paramilitary groups" was ascertainable.).

Smoking history and whether one is under care for cancer are objective criteria. Either someone has smoked for at least twenty pack-years or he has not; either someone is under a physician's care for suspected cancer or he is not. Class members can sign affidavits under penalty of perjury or submit doctors' letters to detail their smoking histories and medical status. Further, Philip Morris itself possesses an objective way to determine the smoking history of many purported class members, namely, its internal database of long-term [*18] customer information, the Marlboro Miles Program, which contained about 25 million names as of 1999. (Phillip's Aff. Ex. 106 at 34,714-99 (Testimony of James Morgan, Engle v. R.J. Reynolds Tobacco Co, No. 94-08723) (document # 66-6)). In any event, what Philip Morris complains of is a potential administrative burden in determining who is a class member, but this issue is "primarily one of manageability, and not ascertainability." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.*, 209 F.R.D. 323, 337 n.20 (S.D.N.Y. 2002).

Finally, potential class members who are already suspected of having lung cancer would have little incentive to lie about their situation. Medical monitoring would not benefit them. Presumably, they are already about to undergo or are in the midst of far more intensive screening and treatment. In fact, once someone presents with any indication of lung cancer, by definition, they would be excluded from the class. And since plaintiffs do not seek money damages, only monitoring, class members cannot "cash out their share of the medical monitoring relief." Pankaj Venugopal, Note, The Class Certification of Medical Monitoring Claims, *102 Colum. L. Rev. 1659*, 1693 (2002). [*19] "[A]n illiquid remedy

reduces the incentives for plaintiffs to falsely claim relief not owed to them." Id.

I find the proposed class to be ascertainable.

## C. 23(a) Factors

Philip Morris does not contest the preliminary 23(a) factors of numerosity, commonality, typicality, and adequacy. (See D.'s Mem. in Opp. (document # 72); D.'s Supp. Mem. in Opp. (document # 114).) Nevertheless, given the First Circuit's directive to undertake a "rigorous analysis," *Smilow*, 323 F.3d at 38, I will address each requirement in turn.

### 1. *Numerosity*

The numerosity requirement is satisfied when "the class is so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1)*. The plaintiff need not pinpoint the exact number of class members, so long as she can demonstrate the impracticality of joinder. *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005). Here, common sense suggests that the number of smokers age fifty and above who are not under care for lung cancer would be in the thousands. And indeed, the plaintiff's experts, Christine Oliver, M.D., and Ronald Deprez, Ph.D., have calculated that the putative class would contain about 60,000 members. (Phillips Aff. Ex. 30 [*20] at 6 (L. Christine Oliver Report) (document # 64-28).) Joinder is clearly impractical.

### 2. *Commonality*

Commonality requires only that the plaintiffs show that "there are questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2)*. A single factual issue can suffice. *Payne*, 216 F.R.D. at 25. Commonality is a "low hurdle." *Southern States Police Benev. Ass'n*, 241 F.R.D. at 87. Here, plaintiffs assert several common issues of fact and law. The case involves one manufacturer of one brand of cigarettes. Common questions of law include proximate causation and breach of warranty deriving from that one brand. Accordingly, plaintiffs have met the commonality requirement.

### 3. *Typicality*

The class representative's claims are "typical" under *Rule 23(a)(3)* when the named plaintiffs "possess the same interest and suffer the same injury as class members." *Mogel v. UNUM Life Ins. Co.*, 646 F. Supp. 2d 177, 182 (D. Mass. 2009) (quoting *Falcon*, 457 U.S. at 156). "The plaintiff can meet this requirement by showing that its injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class." *In re Boston Scientific Corp. Securities Litig.*, 604 F. Supp. 2d 275, 282 (D. Mass. 2009). [*21] All purported class members have suffered the same alleged

2010 U.S. Dist. LEXIS 62982, *

injury, subclinical harm and increased risk of lung cancer, and assert harm based on the same course of conduct by Philip Morris. The claims of the class representatives and those of the proposed class are based on the same legal theory. As such, the typicality requirement is satisfied.

**4. Adequacy**

Adequacy requires that the class representatives "fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. This requires a two-part showing: "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)*. Here, the interests of the class representatives do not conflict with those of the class, particularly in light of the SJC's holding in *Donovan, 914 N.E.2d at 902*, that this medical monitoring claim will not bar a subsequent action if one of the plaintiffs actually develops cancer. Plaintiffs' counsel is qualified and [*22] experienced. The adequacy prong has been met.

**D. 23(b) Requirements**

The critical contested issue in this case involves *Rule 23(b)*. Plaintiffs must meet one of the *Rule 23(b)* requirements. Here, plaintiffs seek certification under *23(b)(2)* on the grounds that Philip Morris "has acted . . . on grounds that apply generally to the class." *Fed. R. Civ. P. 23(b)(2)*. They also assert that in the alternative, or in addition, 23(b)(3) certification would be appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members." *Fed. R. Civ. P. 23(b)(3)*.

**1. Rule 23(b)(2) Certification**

A class qualifies for certification under *Rule 23(b)(2)* when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Fed. R. Civ. P. 23(b)(2)*. In recent years, several courts have departed from the text of *23(b)(2)* to create an additional requirement for (b)(2) classes -- that the class must be "cohesive." [4] See, e.g., *Barnes, 161 F.3d at 142-43*. Following this line of cases, Philip Morris [*23] argues that (b)(2) certification must be denied because the plaintiffs' proposed class is not cohesive. It asserts that *(b)(2)* is intended for group injuries, as opposed to individual ones, see *id. at 143 n.18*, and that the tort claims asserted here involve individual facts and circumstances of use.

[4]  Cohesiveness is not to be confused with ascertainability. Cohesiveness is a substantive requirement. As used by the Supreme Court and expanded upon by other courts, see *Amchem, 521 U.S. at 623*; *Barnes, 161 F.3d at 142-43*, it is essentially coextensive with predominance. A cohesiveness inquiry asks whether common issues sufficiently outweigh individual issues so that class members claims may be fairly tried together. Ascertainability centers instead around administrative concerns: Is it possible for a court to determine who is and is not a member of the class? See *Kent, 190 F.R.D. at 278*.

The Third Circuit, in *Barnes, 161 F.3d at 142-43*, appears to be the first court to apply a cohesiveness requirement for 23(b)(2) classes. In doing so, it cited the Supreme Court's holding in *Amchem, 521 U.S. at 623*, that the (b)(3) predominance requirement demands that classes be "sufficiently cohesive to [*24] warrant adjudication by representation." In effect, the court imported the (b)(3) predominance requirement into the (b)(2) realm, despite the fact that the Rule itself contains no such language. While other cases have repeated and applied the cohesiveness test, see *In re St. Jude Medical, Inc., 425 F.3d 1116, 1121-22 (8th Cir. 2005)* ("Although *Rule 23(b)(2)* contains no predominance or superiority requirements, class claims thereunder still must be cohesive."); *Thompson v. Am. Tobacco Co., Inc., 189 F.R.D. 544, 557 (D. Minn. 1999)* ("*Rule 23(b)(2)* includes an implicit 'cohesiveness' requirement, which precludes certification when individual issues abound."), the Supreme Court has never approved the extension of the predominance requirement into (b)(2) classes, nor has the First Circuit.

Indeed, the First Circuit has declared that "the existence of 'predominating' questions and the availability of other methods of resolution which might be superior to a class action are not criteria of a subdivision (b)(2) class, but again of a (b)(3) class . . . ." *Yaffe v. Powers, 454 F.2d 1362, 1366 (1st Cir. 1972)*; see also *Walters v. Reno, 145 F.3d 1032, 1047 (9th Cir. 1998)* ("We note that with respect [*25] to *23(b)(2)* in particular, the [defendant's] dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding of the rule. Although common issues must predominate for class certification under *Rule 23(b)(3)*, no such requirement exists under *23(b)(2)*.").

Furthermore, the First Circuit and district courts within the circuit have only discussed cohesiveness in the context of *23(b)(3)* inquiries. See *In re PolyMedica Corp., 432 F.3d at 4 n.5* (The predominance requirement, "although reminiscent of the commonality requirement of *Rule 23(a)*, is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohe-

sive to warrant adjudication by representation.'" (quoting *Unger v. Amedisys Inc., 401 F.3d 316, 320 (5th Cir. 2005)*)); *In re Xcelera.com Securities Litig., 430 F.3d 503, 506 n.5 (1st Cir. 2005)* (quoting *Polymedica, 432 F.3d at 4 n.5*); *Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 19 (D. Mass. 2010; In re TJX Companies Retail Sec. Breach Litig., 246 F.R.D. 389, 397 (D. Mass. 2007); In re Pharmaceutical Industry Average Wholesale Price Litig., 230 F.R.D. 61, 81 (D. Mass. 2005); In re Relafen Antitrust Litig., 231 F.R.D. 52, 70 (D. Mass. 2005)*.

While [*26] it is certainly true that "[a] class action may not be certified under *Rule 23(b)(2)* if relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant," 5 James Wm. Moore et al., *Moore's Federal Practice Civil § 23.43* (2007), "[a]ctions under *Rule 23(b)(2)* may be more rough-hewn than those in which the court is asked to award damages." *Griffin v. Burns, 570 F.2d 1065, 1074 (1st Cir. 1978)*.

Thus, rather than inserting a 23(b)(2) requirement not found in the Rule itself, or the cases of the Supreme Court or the First Circuit, I will treat Philip Morris' objections as more appropriately going to the three-step inquiry actually set out by the Rule -- that (1) the defendant has "acted . . . on grounds that apply generally to the class," (2) "so that final injunctive relief . . . is appropriate" (3) "respecting the class as a whole." In effect, the actual requirements of the Rule are meant to ensure there is *group* harm that a *group* injunctive remedy will correct. The first prong, acting on grounds generally applicable to the class, requires that "the case will not depend on adjudication of facts particular to any subset of the [*27] class." *Lemon v. International Union of Operating Engineers, 216 F.3d 577, 580 (7th Cir. 2000)*. The second, whether injunctive relief is appropriate, depends on the oft-repeated factors of irreparable harm, inadequate remedy at law, and balance of the equities. The third requires that group relief must "operate [] across the board" and "address [] generalized needs, not particular injuries." Mark C. Weber, Preclusion and Procedural Due Process in *Rule 23(b)(2) Class Actions, 21 U. Mich. J.L. Ref. 347, 378 (1988)*. [5] Since I find that plaintiffs have satisfied these three prongs as to the breach of warranty and Chapter 93A claims, I GRANT class certification on these claims. I DENY certification on the negligence claim.

---

5   This three part-inquiry will often look similar to a "cohesiveness" determination, but there is an important distinction. "Group harm" looks at the nature of the injury, while "cohesiveness" looks at the characteristics of the class. Discrimination cases exemplify why importing cohesiveness, and its attendant focus on the identity of the parties,

into the 23(b)(2) context is problematic. For example, in *Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 751, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976)*, the [*28] Supreme Court approved the district court's 23(b)(2) certification of a class of black employees and non-employee job applicants who alleged Bowman Transportation engaged in racially discriminatory employment practices. If *Rule 23(b)(2)* required class "cohesiveness," the court may have found that differences among the potential class members prevented certification. Some were job applicants, others employees, some were not hired or transferred for legitimate reasons, and so on. Instead, 23(b)(2) certification focuses on the uniform nature of the harm -- discriminatory employment practices against one group. Similarly, in *Gratz v. Bollinger, 539 U.S. 244, 267-68, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003)*, the Supreme Court approved the district court's 23(b)(2) certification of a class of students who were denied admission to the University of Michigan and who were members of groups that the University treated less favorably on the basis of their race. If cohesiveness were a 23(b)(2) requirement, the court may not have certified the class because of the differences among potential class members -- some were denied admission because of their race, others because their grades were too low, some because their test scores [*29] were insufficient. Instead, the 23(b)(2) inquiry properly looked at the group-wide nature of the harm.

#### a. Group Injury: Has Philip Morris "[a]cted . . . on grounds generally applicable to the class?"

When examining the first prong of *23(b)(2)*, the court must determine "whether the defendant's behavior similarly affected all members of the prospective class." 5 Moore et al., supra § 23.43. That is -- was there group injury that may be proven on a class-wide basis? To answer this requires examination of the medical monitoring cause of action as set out by the SJC in Donovan:

(1) The defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical ex-

aminations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value [*30] of the reasonable cost of such tests and care, as of the date of the filing of the complaint.

*Donovan, 914 N.E.2d at 902.* I will take each element individually.

### (1) The Medical Monitoring Cause of Action Outlined by the SJC

#### (a) Design Defect

Plaintiffs bring a design defect claim based on negligence, breach of implied warranty, and Chapter 93A theories of liability. All center on the same alleged design defect - Philip Morris improperly designed, manufactured, and sold cigarettes that delivered a dangerous level of carcinogens despite having available feasible alternative designs that would have reduced the level of carcinogens in Marlboro cigarettes, and with it, subcellular harm and the risk of developing cancer. [6]

> 6  Plaintiffs' Chapter 93A cause of action is based upon breach of warranty, and as such, lives or dies with that claim.

Philip Morris argues that since it has manufactured many different types and designs of cigarettes over the years, it is impossible to consider all Marlboro cigarettes as one product with one design. Addressing plaintiffs design defect claims, it asserts, will require determinations for each cigarette design and could result in different resolutions. For example, [*31] in *Rose v. Brown & Williamson Tobacco Corp., 53 A.D.3d 80, 94, 855 N.Y.S.2d 119 (N.Y. App. Div. 2008)*, the jury found two brands of cigarettes were defective but another was not. Several courts have found the differences among cigarette brands to present individual questions weighing against certification. See *Emig v. Am. Tobacco Co., Inc., 184 F.R.D. 379, 391 (D. Kan. 1998)* ("Because of the variations in cigarettes and the variations among class members in terms of what they smoked and when they smoked, there are variations in the elements of each member's claim. Each would have to show that the product he or she used at a particular time was 'defective.'"); *Smith, 174 F.R.D. at 98* (finding "design changes in defendant's products add further lines of distinction -- a person who smoked Raleigh in 1945 did not smoke the same cigarette as a Raleigh smoker in 1985"); *Arch v. Am. Tobacco Co., Inc., 175 F.R.D. 469, 488-89 (E.D. Pa. 1997)* ("[T]he possibility that plaintiffs' common defect theory will fail and that the class will be splintered into various subclasses --creating manageability concerns --

'weighs against a finding of predominance of common issues.'" (citations omitted)).

Here, however, plaintiffs [*32] have only challenged one brand, Marlboro; almost all the cases cited by Philip Morris involved multiple cigarette manufacturers and multiple brands, see *Arch, 175 F.R.D. at 488-89; Emig, 184 F.R.D. at 391; Rose, 53 A.D.3d at 94.* The variation among the brands is much greater, plaintiffs allege, than those within one. Further, plaintiffs argue that *all* Marlboro cigarettes suffer from the identical defect - excessive carcinogenicity. [7] While the different styles of cigarettes may contain minor variations, they all share one major characteristic -- substantially elevated levels of carcinogens. Moreover, plaintiffs state that the safer alternative design features suggested by plaintiff's expert, Dr. Farone, could have been used in all cigarette styles. (Phillip's Aff. Ex. 23 (Expert Report of William A. Farone) (document # 64-18)). To be sure, plaintiffs will have to demonstrate these claims at trial, but at this point, they have offered sufficient evidence for the purposes of class certification that a design defect can be proven across all models within the Marlboro brand.

> 7  It is not clear that there is a "safe" level of carcinogens in cigarettes, but as discussed in the section on causation, [*33] infra Section II.D.1.a(1)(b), plaintiffs need only show that Philip Morris enhanced their injury "'over and above' that which would have been sustained in the absence of the alleged defect." *Lally v. Volkswagen Aktiengesellschaft, 45 Mass. App. Ct. 317, 698 N.E.2d 28, 38 (Mass. App. Ct. 1998).* In other words, Philip Morris could be liable for a design defect of excessive carcinogenicity, as opposed to just ordinary carcinogenicity.

#### (b) Causation

Plaintiffs must prove that the design defect -- Marlboro cigarettes' excessive carcinogenicity - caused their injury, meaning both proximate cause (legal cause) and the cause-in-fact (actual cause) of their subcellular harm. *Wasylow v. Glock, Inc., 975 F. Supp. 370, 377 (D. Mass. 1996); Ulwick v. DeChristopher, 411 Mass. 401, 582 N.E.2d 954, 958 (Mass. 1991).* Proximate causation requires a showing that the harm was reasonably foreseeable. *Nna v. Am. Standard, Inc., 630 F. Supp. 2d 115, 130 (D. Mass. 2009).* Reasonable foreseeability is an objective requirement that focuses on what the defendant knew at the time of the alleged wrongdoing. See, e.g. *United States v. Patriarca, 912 F. Supp. 596, 608 (D. Mass. 1995)* (internal quotations omitted) ("[It] is an objective test. A reasonably [*34] foreseeable act is an act that a reasonable person who knew everything that the defendant knew at the time would have been able to know in advance with a fair degree of probability."). It

can therefore be proven on a class-wide basis and is not at issue here. Actual causation requires proof that the defect was a but-for cause of the injury. [8] *Matsuyama v. Birnbaum, 452 Mass. 1, 890 N.E.2d 819, 842 (Mass. 2008).*

> 8   Massachusetts courts use a substantial factor test, instead of a but-for cause test, in cases in which there were two or more causal events sufficient to bring about the plaintiffs' harm. But in cases in which one defendant's conduct is alleged to have caused the harm, a but-for cause test is appropriate. *Matsuyama, 890 N.E.2d at 842 & 842 n.47.*

Philip Morris focuses on actual causation, which it maintains cannot be proven on a class-wide basis for two reasons: (1) Plaintiffs must prove that the alternative design *would have* prevented their injury, which they cannot do; and (2) proof of alternative design requires proof that the plaintiffs *would have* smoked the less carcinogenic cigarettes, which necessarily involves individual inquiries. Philip Morris asserts that the excessive carcinogenicity [*35] cannot be the "but for" cause of plaintiffs' injuries because their subcellular harm would have occurred even if they had smoked cigarettes that were less carcinogenic.

Defendant mischaracterizes the law. While Philip Morris asserts that plaintiffs have to show "the 'better' design would have prevented [their] injury," *Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 27 (1st Cir. 2004),* in fact, Massachusetts law only requires the plaintiff to show that "an available design modification . . . would *reduce* the risk." *Colter v. Barber-Greene Co., 403 Mass. 50, 525 N.E.2d 1305, 1310 (Mass. 1988)* (quoting *Uloth v. City Tank Corp., 376 Mass. 874, 384 N.E.2d 1188, 1193 (Mass. 1978)* (emphasis added)); *see also Simmons v. Monarch Mach. Tool Co., Inc., 413 Mass. 205, 596 N.E.2d 318, 322-23 (Mass. 1992)* ("We previously have rejected the notion, however, that liability for negligent design is limited to situations where the design defect was the causative factor of an accident. Rather, liability will also attach where the design defect enhances the injuries a person sustains in an otherwise foreseeable" way), abrogated on other grounds, *Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 696 N.E.2d 909, 922 (Mass. 1998); Smith v. Ariens Co., 375 Mass. 620, 377 N.E.2d 954, 956-58 (Mass. 1978)* [*36] (holding that manufacturer may be liable for design defects that enhance rather than cause injuries); *Lally v. Volkswagen Aktiengesellschaft, 45 Mass. App. Ct. 317, 698 N.E.2d 28, 38 (Mass. App. Ct. 1998)* (Product liability may be premised on "existence of some enhanced injury, i.e., an injury 'over and above' that which would have been sustained in the absence of the alleged defect."). Therefore,

under Massachusetts law, plaintiffs need only show that the less carcinogenic cigarette design would have *reduced* their risk of lung cancer, not that it would have prevented it entirely.

To hold otherwise would contradict the SJC's holding in *Haglund v. Philip Morris, 446 Mass. 741, 847 N.E.2d 315, 321-27 (Mass. 2006),* in which the SJC agreed that "there is no such thing as a safe cigarette." *Id. at 319.* The best plaintiffs can ask for is a *safer* cigarette. To require plaintiffs to prove that their proposed alternative design would completely prevent injury would preclude all liability in design defect cases for tobacco and, indeed, all other dangerous products -- just what the SJC opinion in Haglund seeks to avoid. The SJC's comments in that regard are worth reproducing at some length: "[W]here the defendant merchant affirmatively [*37] invites the consumer to use a product that cannot safely be used for its ordinary purposes, then public policy demands that the merchant bear the burden of reasonably foreseeable injuries that result from that invitation." *Id. at 326.* "If Philip Morris chooses to market an inherently dangerous product, it is at the very least prepared to allow the company to escape liability" by imposing the impossible burden on plaintiffs of inventing a "safe cigarette." Id. "To allow cigarette manufacturers to benefit from the fact that cigarettes can never be used safely would "sidestep [] . . .[t]he legislative intent of our warranty laws." *Id. at 325.* Philip Morris' proposed requirement that an alternate cigarette design completely prevent injury is incompatible with both Massachusetts design defect case law and the SJC's holding in Haglund.

Next, Philip Morris argues that cause-in-fact requires plaintiffs to prove they would have smoked the less carcinogenic cigarettes. It further asserts that since lower tar cigarettes were available at all relevant times, (App. to Def.'s Opp. Ex. 5 PP 87-156 (Aff. and Expert Disclosure Report of Janette Thomas Greenwood) (document # 73-5)), and the named plaintiffs [*38] knew about them but chose not to switch, (App. to Def.'s Opp. Ex. 1 37:24-85:5, 44:9-11, 53:17-23 (Donovan Dep.) (document # 73-1); App. to Def.'s Opp. Ex. 2 34:4-35:5, 47:3-13, 66:6-14 (Cawley Dep.) (document # 73-2)), plaintiffs cannot succeed in proving a feasible alternative design.

Again, defendant mischaracterizes Massachusetts law. Massachusetts design defect law does not require proof that the plaintiff would have used the alternative design had it been available. Rather, the plaintiffs must prove only that Marlboro cigarettes' design enhanced their injury "'over and above' that which would have been sustained" with a safer design. *Lally, 698 N.E.2d at 38.* Thus, in the remand of *Haglund v. Philip Morris, Inc., No. 01-2367C, 2009 Mass. Super. LEXIS 285, 2009 WL 3839004, at *7 (Mass. Super. 2009),* the court asked

the usual "but for" causation question: Would plaintiffs' harm have occurred but for Philip Morris' misconduct? It then concluded that whether plaintiffs would have used the alternative cigarette had it been available was irrelevant to resolving that question. Id.

Rather than proving that the plaintiff would have used the alternative design, "[t]he plaintiff need only convince the jury that [*39] a safer alternative design was feasible, not that any manufacturer in the industry employed it or even contemplated it." Haglund, 847 N.E.2d at 323; see Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 699 n.2 (1st Cir. 1988) ("The alternative [design] need not be in fact available . . . . The . . . test is one of feasibility. . . . All the jury must find is that a more reasonable design than the one in question could have been produced."). If the plaintiff need not prove that a manufacturer even contemplated an alternative design, she obviously cannot be required to prove she would have used it. [9]

> 9   This also disposes of Philip Morris' argument that whether the less carcinogenic cigarette would reduce a class member's risk of cancer will vary because individuals smoke cigarettes differently -- for example, they take different sized puffs, take a different number of puffs per cigarette, etc. This, according to defendants, affects the amount of tar they inhale, and thus, their cancer risk. Further, Philip Morris asserts, some smokers may compensate if they switch cigarette styles by smoking more cigarettes or holding smoke in their lungs longer. This may mean that the less carcinogenic [*40] design does not reduce their risk of lung cancer.
>
>     Yet whether an alternative design will decrease risk is a theoretical and probabilistic inquiry. Since plaintiffs did not use the alternative design (indeed the design need not have ever been manufactured), it is impossible to know the exact effect on the particular smoker. If Philip Morris' argument were correct, no plaintiff could prove causation, as a defendant could always argue that the plaintiff would have used the alternative design in such a way as to reintroduce the risk.

Finally, defendant claims that plaintiffs cannot prove causation on a class basis because the harm of cigarettes is intimately tied to whether the plaintiffs were addicted, something that they must prove on an individual basis. In Arch, 175 F.R.D. at 488, for example, the court held that plaintiffs could not prove causation on a class basis because the harm alleged was addiction. Unless plaintiffs could prove that cigarettes always cause addiction --

which they could not do -- proof would have to be individually based.

Here, however, plaintiffs do not base their claim on addiction at all. One can be exposed to subcellular harm and increased risk of cancer without [*41] being addicted. Indeed, subcellular harm, according to plaintiffs, begins as soon as someone takes a single puff. (Victoria Phillips' Aff. Ex. A 98:11-21 (Miller Dep.) (document # 116-2).) While the extent of the damage and risk may vary among class members, allegedly twenty pack-years of smoking necessarily causes subcellular harm. [10] Plaintiffs, of course, must prove this at trial, but I find their expert affidavits and depositions, (e.g. Phillips' Aff. Ex. 34 at 34:21-35:16 (Philippe Grenier Dep.) (document # 64-34); Phillips' Aff. Ex. 41 at 195:4-10 (Samuel V. Spagnolo Dep.) (document # 64-43)), sufficient on this point for class certification purposes.

> 10   While plaintiffs' expert, Dr. Miller, does allow that it is theoretically possible for someone to have "a genetic constitution which renders one impervious to the carcinogenic effects of smoking," he asserts that he would have no way of knowing "who has that constitution if it exists." (Victoria Phillips Aff. Ex. A at 73:15-19 (Albert Miller Dep.) (document # 116-2)).

**(c) Exposure: Plaintiff Was Exposed to A Hazardous Substance That Produced, At Least, Subcellular Changes That Substantially Increased the Risk of Serious Disease, [*42] Illness, or Injury**

Exposure can also be proven on a class-wide basis. It is built into the class definition, which requires all class members to have smoking histories of at least twenty pack-years.

Philip Morris argues that plaintiffs will not be able to prove they have subcellular damage because, by definition, it is extremely difficult to detect. But according to plaintiffs' experts, everyone with a twenty pack-year smoking history has suffered subcellular harm, (Phillips' Aff. Ex. 34 at 34:21-35:16 (Philippe Grenier Dep.) (document # 64-34)), and subcellular changes necessarily mean increased risk of lung cancer. If plaintiffs can successfully prove this link at trial, they will not need to show (through genomic analysis for example) that each class member has suffered subcellular harm.

**(d) LDCT Scans: An Effective Medical Test for Reliable Early Detection Exists and Early Detection, Combined with Prompt and Effective Treatment, Will Significantly Decrease the Risk of Death or the Severity of the Disease, Illness or Injury**

This inquiry goes to the effectiveness of LDCT screening, which can be proven on a class-wide basis.

Whether LDCT scans will decrease the risk of death is really [*43] a matter of probabilities, something that can certainly be proven class-wide. Either LDCT scans are effective or they are not. No medical technology works for everyone all the time. Plaintiffs need only prove that it lowers the chance of death.

### (e) Such Diagnostic Medical Examinations Are Reasonably (and Periodically) Necessary, Conformably with the Standard of Care

Philip Morris argues that plaintiffs cannot prove that LDCT screening is "reasonably necessary" on a class basis. See *Arch, 175 F.R.D. at 490* (finding that whether "increased risk makes periodic medical examinations 'reasonably necessary' will vary among class members"). It relies on statements made by one of plaintiffs' experts, Dr. Miller, that before prescribing a LDCT scan to a class member, he would also consider that person's other illnesses and overall state of health; an individual inquiry. (D.'s App. to Supp. Mem. in Opp. Ex. 7 at 74:2-8; 74:17-75:2 (Miller Dep.) (document # 114-8).) But this threshold question need not foreclose class certification. The remedy plaintiffs seek is a program that invites medical personnel to manage it and its participants. They would surely ask preliminary medical questions before [*44] performing the scan to ensure its safety for the patient. As in any medical monitoring program, some variation among patients is built into the program.

### (f) The Present Value of the Reasonable Cost of Such Tests and Care, as of the Date of the Filing of the Complaint

Philip Morris argues that plaintiffs have failed to offer expert testimony or other method of common proof that the value of the class' medical monitoring damages can be aggregated. The cost of the LDCT monitoring program is, however, a merits issue to be determined at trial. All that is clear at this juncture is that it is *capable* of proof on a class-wide basis.

### (2) Philip Morris' Affirmative Defenses

Philip Morris raises several issues it asserts make class treatment inappropriate, including choice of law issues and the affirmative defenses of statute of limitations, comparative negligence, and unreasonable use. Plaintiffs counter that affirmative defenses are not available to Philip Morris because plaintiffs seek injunctive relief, not damages.

The Court should consider affirmative defenses when making class certification determinations, whether the remedy sought is injunctive relief or damages. *Mowbray, 208 F.3d at 295.* [*45] While defenses like unreasonable use and comparative negligence generally arise in 23(b)(3) class certification, in *Barnes v. Am. Tobacco Co., Inc., 984 F. Supp. 842, 865-66 (E.D. Pa. 1997)*, the court allowed the defendant to assert the affirmative defenses of comparative negligence, assumption of risk, and consent in a 23(b)(2) class action. The court's reasoning on this issue is persuasive. Accordingly, I find that Philip Morris may also bring affirmative defenses in a (b)(2) class action to the extent allowed under Massachusetts law. [11]

> 11   Philip Morris makes much of the SJC's note that a "plaintiff's claim would, of course, remain subject to all available affirmative defenses, such as comparative negligence." *Donovan, 914 N.E.2d at 901 n.11*. Of course, available defense are defined by the prior Massachusetts case law on affirmative defenses in tobacco cases, which the above description reflects.

The fact that the remedy plaintiffs seek may be characterized as an equitable one does not prevent the defendants from asserting legal defenses, since the rights plaintiffs seek to vindicate -- implied warranty of merchantability and negligence -- are legal rights. As the court noted in Barnes: [*46] "A court may not . . . use its equitable powers to deprive defendants of a legal right to which they would otherwise be entitled in an action at law." *984 F. Supp. at 865*. Barnes quotes extensively from *Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 55 S. Ct. 444, 79 L. Ed. 982 (1935)*, which held that an equity court could not deprive a party of its legal rights by applying the equitable unclean hands doctrine. See *Manufacturers', 294 U.S. at 448-49* ("The mere fact that a party is obliged to go into a federal court of equity to enforce an essentially legal right . . . under controlling state law does not authorize that court to modify or ignore the terms of the legal obligations upon the claim."). Here, as in Barnes, the plaintiffs' action is a hybrid one: It implicates both equitable and legal rights. Given that plaintiffs' claims are legal (though the remedy is equitable), out of an abundance of caution, I will allow Philip Morris to assert affirmative legal defenses.

However, while affirmative defenses often require individual determinations, see *Barnes, 161 F.3d at 143*; *Castano, 84 F.3d at 742-43 n.15*; *Thompson, 189 F.R.D. at 556*, their existence does not per se prevent class certification. In fact, "[c]ourts [*47] traditionally have been reluctant to deny class action status . . . simply because affirmative defenses may be available against individual members." *Smilow, 323 F.3d at 39*; see also *De Giovanni v. Jani-King Intern., Inc., 262 F.R.D. 71, 76 (D. Mass. 2009)*; *New England Carpenters Health Benefits Fund v. First Databank, Inc., 244 F.R.D. 79, 87 (D. Mass. 2007)* (holding affirmative defense of mitigation did not preclude class certification). "If, moreover, evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has

available adequate procedural mechanisms. For example, it can place class members with potentially barred claims in a separate subclass, or exclude them from the class altogether." *Smilow, 323 F.3d at 39-40.*

### (a) Choice of Law

Philip Morris claims that many class members will not be governed by Massachusetts law, and as such, the case requires examination of individual issues. Citing to plaintiffs' expert (Victoria Phillips' Aff. Ex. A 98:11-21 (Miller Dep.) (document # 116-2)), who maintains that the injury alleged, subcellular harm, occurred as soon as plaintiffs began to smoke, Philip Morris argues that many [*48] class members may have been "injured" in states other than Massachusetts. Philip Morris states, for example, that any plaintiffs who moved to Massachusetts from Louisiana or West Virginia could have been class members of the certified state-wide classes in *Scott v. Am. Tobacco Co., 725 So.2d 10 (La. Ct. App. 2001)* and *In re Tobacco Litig. ("Blankenship"), 215 W. Va. 476, 600 S.E.2d 188 (W. Va. 2004).* Or, plaintiffs may have suffered physiological changes in states that either reject medical monitoring claims outright or recognize medical monitoring based on different criteria than those articulated by the SJC.

But Philip Morris never identifies which states' laws are applicable, just those that *may* be. This complicates the analysis because Massachusetts choice of law evaluation often requires a comparison of the competing jurisdictions' laws and policies. Nevertheless, for the sake of thoroughness, and because if these substantive conflicts of law exist, they would affect the result of the proceeding, I will proceed to a choice of law analysis. *Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29 (1st Cir. 1997).*

Massachusetts' choice-of-law rules govern. *Lexington Ins. Co. v. General Acc. Ins. Co., 338 F.3d 42, 46 (1st Cir. 2003)* [*49] ("[F]ederal court[s] must apply the choice-of-law framework of the forum state."). In Massachusetts, tort law actions are governed by the law of the state where the injury occurred unless another state has a more significant relationship to the cause of action. *Dunfey v. Roger Williams Univ., 824 F. Supp. 18, 21 (D. Mass. 1993).* In determining the significance of a state's relationship to the cause of action, "Massachusetts courts take a flexible interest-based approach . . . and will consider a wide variety of factors in choosing the applicable law." *Millipore Corp., 115 F.3d at 30* (citing *Cosme v. Whitin Mach. Works, Inc., 417 Mass. 643, 632 N.E.2d 832, 834 (Mass. 1994)).* These factors include those in the *Restatement (Second) Conflict of Laws* § 146:

> (1) the needs of the interstate and international system, (2) the policies of the fo-

rum, (3) the policies of other interested jurisdictions, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease of applicability. They also include factors proposed by conflict of laws commentators: (1) predictability, (2) maintaining interstate [*50] and international order, (3) simplifying the judicial task, (4) advancing the interests of the forum, and (5) applying the better legal rule.

*Millipore Corp., 115 F.3d 21, 30 (1st Cir. 1997)* (citing *Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d at 669-70).* Applying those factors to the case at bar, I conclude Massachusetts law applies since it has the most significant relationship to the cause of action. While it is true that the original injury of subcellular harm may have begun in other states for some small segment of the class, it is a continuing injury that is enhanced each time someone smokes. Since all potential class members have smoked Marlboro cigarettes in Massachusetts, some degree of harm occurred in Massachusetts. Further, all of the class members are residents of Massachusetts and have bought Marlboro cigarettes in Massachusetts. If plaintiffs are successful, their program would be run by Massachusetts doctors and technicians pursuant to Massachusetts medical guidelines.

Looking in particular at concerns for advancing the forum's interests and the policies underlying the particular field of law, both Massachusetts law and product liability law generally support "holding [*51] accountable those whose defective products cause injuries." *Cosme, 632 N.E.2d at 835.* "[P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them." *Correia v. Firestone Tire & Rubber Co., 388 Mass. 342, 446 N.E.2d 1033, 1040 (Mass. 1983).* Further, since the SJC has now explicitly recognized a cause of action for medical monitoring, Massachusetts has a clear interest in allowing its residents to pursue claims under it. "Massachusetts has a significant interest in seeing that its resident plaintiff be compensated." *Cosme, 632 N.E.2d at 836.* Given all of the above factors, Massachusetts has a substantial relationship to the plaintiffs' cause of action, and Massachusetts law will apply. [12]

> 12  Philip Morris also asserts that another state's statute of limitations may apply to some class members. Massachusetts courts will apply the Massachusetts statute of limitations to a claim unless "'(a) maintenance of the claim would serve

no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.'" *Nierman v. Hyatt Corp., 441 Mass. 693, 808 N.E.2d 290, 292 (Mass. 2004)* [*52] (quoting *Restatement (Second) of Conflict of Laws § 142*). For all of the reasons given, maintenance of the medical monitoring claim would serve the substantial interest of Massachusetts, and therefore the Massachusetts statute of limitations as set out by the SJC will apply.

**(b) Statute of Limitations**

Philip Morris argues that the statute of limitations test set out by the SJC requires an individual inquiry. The SJC decision lays out three elements for the commencement of the statute of limitations in medical monitoring cases. "[T]he statute begins to run when [first] there is a physiological change resulting in a substantial increase in the risk of cancer, and [second] that increase, under the standard of care, triggers the need for available diagnostic testing that has been accepted in the medical community as an efficacious method of lung cancer screening or surveillance." *Donovan, 914 N.E.2d at 903.* Third, "plaintiffs also must show that the standard of care of the reasonable physician did not call for monitoring of any precancerous condition prior to the statute of limitations period, not just that the technology at that time was less effective for monitoring." *Id. at 904.*

While [*53] plaintiffs have the burden of proving these facts at trial, for class certification purposes my concern is whether this will be a class or individual determination. According to plaintiffs, the physiological change causing an increased risk of cancer occurs almost as soon as someone begins to smoke. (Victoria Phillips' Aff. Ex. A 98:11-21 (Miller Dep.) (document # 116-2).) By definition, all class members will have triggered the first prong. The second prong, an inquiry as to the efficacy of LDCT screening and when, if ever, it became the standard of care, likewise can be determined class-wide. It is tied to the third requirement that no other form of monitoring was the prior standard of care.

To be sure, there are several possible outcomes to these inquiries, but none requires an individual examination. First, plaintiffs could demonstrate that LDCT screening became a standard of care within the limitations period and that prior to then, no other effective monitoring technology existed. Plaintiffs' claims are then timely. Second, the factfinder could find that LDCT screening has become a standard of care, but either it did so before 2002 or some other earlier screening technology existed, [*54] such that the statute of limitations has run. Third, the factfinder could find that LDCT screening

has not become a standard of care and no other screening exists. In that case, the cause of action will not have accrued. Finally, a factfinder could find that LDCT screening is not a standard of care, but some other screening technology was, and the limitations period will have run. All of these possibilities are merits issues; none implicate individual questions. [13]

> 13   Philip Morris points to the SJC's statement that "notice most likely will take the form of advice by a physician, together with a recommendation for diagnostic testing comfortably with the medical standard of care," *Donovan, 914 N.E.2d at 903*, as evidence that individual determinations are necessary. But once again, it takes the SJC's language out of context. The SJC developed the medical monitoring accrual test out of the general "discovery rule" of accrual. The court discussed physician's notice to explain how it formulated that statute of limitations standard. It did not create a new element in the statute of limitations analysis.

Since the statute of limitations determination depends on evidence that is unaffected by [*55] individual inquiries -- whether and when LDCT screening became the standard of care - the statute of limitations does not prevent class certification.

**(c) Unreasonable Use (Breach of Warranty)**

In most breach of warranty cases, defendants may bring an affirmative defense of unreasonable use -- that is, the plaintiff "unreasonably used a product that he knows to be defective and dangerous." *Correia, 446 N.E.2d at 1040.* The SJC has effectively eliminated the unreasonable use defense for cigarettes. *Haglund, 847 N.E.2d at 315.* In *Haglund, 847 N.E.2d at 319*, the SJC noted that the unreasonable use defense "presumes that the product at issue is, in normal circumstances, reasonably safe and capable of being reasonably safely used." There is, however, "no such thing as a safe cigarette," id., because cigarette smoking is, in itself, dangerous. See *id. at 325* ("The purpose of our warranty laws, as we have shown, is to encourage safe products in the stream of commerce. The duty of the consumer is 'to act reasonably with respect to a product which he knows to be defective and dangerous.' But in the case of cigarette use, the consumer cannot fulfil that duty, because no nonunreasonable use of cigarettes, [*56] as they are currently designed, is possible.").

The SJC did leave open a small window. It held that there may be some conceivable situation in which "an individual consumer's behavior may be so overwhelmingly unreasonable in light of the consumer's knowledge about, for example, a specific medical condition from

which he suffers," *id. at 319-20*, that the unreasonable defense may be invoked. To succeed in such a defense, "the defendant must demonstrate that the plaintiff knew of her particular medical condition and the risks smoking posed to that specific condition at the time she began smoking." *Id. at 327*. The only example of such a medical condition the SJC gave was emphysema. Id.

This defense could not be narrower. Philip Morris tries to argue that the "specific medical condition" referred to by the SJC includes any increased risk of lung cancer. (D.'s Opp. at 50.) In essence, anyone who smoked cigarettes knowing that smoking would increase her risk of lung cancer would be barred from recovery. This conclusion is wholly inconsistent with the holding in Haglund, and circular, as it would carve out an unreasonable use defense broader in tobacco cases than in any other. Haglund explicitly [*57] holds that "aware[ness] of the well-publicized health risks of cigarettes" is insufficient to be "overwhelmingly unreasonable." *Id. at 326, 320*. The SJC meant to limit the unreasonable use defense in tobacco cases to only the most extreme situations, as the only example it gives -- emphysema -- demonstrates.

The class member who would fit into this exception is rare, if she exists at all. As the SJC said, "in most tobacco liability warranty actions, the Correia [unreasonable use] defense will be inapplicable." *Id. at 324*. Such a narrow exception surely cannot stand in the way of class certification. The class can be certified so as to exclude those who had serious medical conditions such as emphysema when they began to smoke.

**(d) Comparative Negligence**

Philip Morris asserts that plaintiffs were comparatively negligent by continuing to smoke despite knowing it could lead to cancer and other medical issues. These affirmative defenses require individual assessment, which, Philip Morris alleges, will make the case impossible to manage.

A plaintiff must "act reasonably with respect to the product he or she is using." *Colter, 525 N.E.2d at 1314*. Comparative negligence is only a defense in negligence [*58] actions; it is not a defense in breach of warranty claims. *Correia, 446 N.E.2d at 1039*. Under the Massachusetts comparative negligence statute, *Mass. Gen. L. c. 231, § 85*, a plaintiff's damages recovery will be reduced by the proportion of negligence attributable to the plaintiff. If the plaintiff's negligence is greater than that of the defendant, recovery is barred. *Mass. Gen. L. c. 231, § 85*; *Colter, 525 N.E.2d at 1313-14*.

The SJC has not addressed the comparative negligence defense in tobacco cases, but in many ways, their reasoning in Haglund is analogous. If there is no such thing as a safe cigarette, a plaintiff cannot "act reasonably" with respect to cigarettes. If tobacco companies are allowed to assert that smoking cigarettes is itself a negligent act, then it will be nearly impossible for plaintiffs to bring negligence claims against them or any other manufacturer of a dangerous product.

Yet, there are important distinctions between comparative negligence and unreasonable use. Product liability and negligence, as the SJC has noted, "impose distinct duties and standards of care." *Colter, 525 N.E.2d at 1313*. Product liability focuses on the *product*, not on the conduct of either [*59] the *plaintiff* or *defendant*. It emphasizes the manufacturer's duty to provide safe products. *Haglund, 847 N.E.2d at 322-23*. By contrast, "[i]n a negligence action, the conduct of the defendant takes center stage, and liability will be imposed where the defendant 'has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury.'" *Id. at 323 n.9* (quoting *Colter, 525 N.E.2d at 1305*). In a parallel fashion, the conduct of the plaintiff "takes center stage" in the comparative negligence inquiry. Finally, unreasonable use is a court-created defense, while comparative negligence is statutory in Massachusetts. Therefore, it is possible that given the different goals of the two theories (whatever their similarities in the abstract), the SJC would allow a comparative negligence defense while limiting the unreasonable use defense in cases such as the case at bar.

Without guidance from the SJC on the applicability of the comparative negligence defense in tobacco cases, I will presume defendants may assert it. Since comparative negligence would require individual inquiries and prevent a class-wide determination of liability, I will not certify [*60] plaintiffs' negligence claim as a class action.

**(3) Medical Monitoring and Opt Out**

The conclusion that the plaintiffs' alleged harm is a group injury is bolstered by a lack of procedural necessity for an opt out. In 23(b)(3) classes, purported class members may opt out of litigation in order to preserve their claims. *Fed. R. Civ. P. 23(c)(2)(B)*. They must be given the opportunity to "take whatever steps they deem appropriate to make certain that their interests are protected." 7AA Moore et al., supra, § 1786. The ability to opt out protects the due process rights of the absentees and is "essential to give binding effect to a class-action judgment." Id.; see *Ortiz v. Fibreboard Corp., 527 U.S. 815, 848, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999)*.

In 23(b)(2) classes, conversely, notice to all class members and the ability to opt out of the class are not mandatory. *Fed. R. Civ. P. 23(c)(2)(A)*. This is because in *(b)(2)* suits, the injury is group; no missing class member is in a different position than anyone else in the

Case 1:09-md-02068-JAW   Document 228-1   Filed 07/15/10   Page 16 of 23

Page 16
2010 U.S. Dist. LEXIS 62982, *

class. Therefore, "once the court determines that the members are adequately represented as required by *Rule 23(a)(4)*, it is reasonably certain that the named representatives will protect the absent members [*61] and give them the functional equivalent of a day in court." 7AA Moore et al, supra, § 1786.

Since the class members all have the same claim, the remedy a class member may seek is the same as that of all the other members -- medical monitoring. Further, because the prosecution of the medical monitoring claim does not preclude members from bringing suit if they eventually develop lung cancer, an opt out is not necessary to protect later claims. Looked at this way, the need for medical monitoring is appropriately classified as a group injury. The opt out serves no purpose. "It makes little sense for one plaintiff playing the same game of chance as other class members to opt out and independently seek a medical monitoring fund; the best she can do on her own is to get the same as what she would have received as a member of the class." *Venugopal, supra, at 1684-85.*

Because the injury alleged in a (b)(2) class is group, "the injunctive relief referred to (in the rule) does not require that the district court look into the particular circumstances of each member of the class." *Griffin, 570 F.2d at 1074* (quoting 3B Moore et al, supra at 23-653, -654 (1977)). I find that the medical monitoring [*62] claim alleges group harm, and plaintiffs therefore have met the first prong of the (b)(2) test.

### b. Is Injunctive Relief Appropriate

### (1) Is Medical Monitoring Injunctive

A preliminary question to whether injunctive relief is appropriate is whether medical monitoring is, in fact, injunctive. Courts have classified medical monitoring as both monetary and equitable, depending on the contours of the requested relief. In *Day v. NLO, Inc., 144 F.R.D. 330, 335-36 (S.D. Ohio 1992)*, vacated in part on other grounds, *In re NLO. Inc., 5 F.3d 154, 160 (6th Cir. 1993)*, the court clarified the distinction between a medical monitoring remedy that is a disguised damages claim and one that is properly injunctive:

> Relief in the form of medical monitoring may be by a number of means. First, a court may simply order a defendant to pay a plaintiff a certain sum of money. The plaintiff may or may not choose to use that money to have his medical condition monitored. Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice. Neither of these forms of relief

constitute injunctive relief as required by *Rule 23(b)(2)*.

> However, [*63] a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced is utilized for group studies. In this situation, a defendant, of course, would finance the program as well as being required by the Court to address issues as they develop during the program administration. Under these circumstances, the relief constitutes injunctive relief as required by *Rule 23(b)(2)*.

Id. Other courts have reiterated this distinction. In *Arch, 175 F.R.D. at 483-84*, the court cited Day approvingly. It "reject[ed] defendants' argument that a medical monitoring claim can never be characterized as injunctive" and, subscribing to the Day analysis, found that a "court-supervised medical monitoring program through which the class members will receive periodic medical examinations" constitutes injunctive relief. *Arch, 175 F.R.D. at 483*. See also *Fried v. Sungard Recovery Services, Inc., 925 F. Supp. 372, 374* (implying that a medical monitoring fund is equitable while a lump sum payment is legal).

The medical monitoring remedy that plaintiffs seek [*64] here is nearly identical to the injunctive program described by *Day, 144 F.R.D. at 335-36*, and *Arch, 175 F.R.D. at 483-84*. The plaintiffs seek a structured program, monitored by and staffed with medical personnel, in which class members will receive regular medical screenings. To effectuate the program, plaintiffs would have to hire medical and administrative personnel, purchase equipment, and establish procedures for intake, informed consent, record keeping, and so on.

Many courts have found medical monitoring relief structured as this one would be to be injunctive. See *Gibbs v. E.I. DuPont De Nemours & Co., Inc., 876 F. Supp. 475, 481 (W.D.N.Y. 1995)* (certifying class under *23(b)(2)* in case where employees sought injunctive relief in form of court-administered medical monitoring program against manufacturers of chemicals to which employees were allegedly exposed in the workplace); *German v. Federal Home Loan Mortgage Corp., 885 F. Supp. 537, 559-60 (S.D.N.Y. 1995)* (finding that plaintiffs presented "colorable claim for medical monitoring as injunctive relief" in suit against landlords for failure to remove lead paint); *In re Copley Pharmaceutical, Inc., 161 F.R.D. 456, 469 (D. Wyo. 1995)* [*65] (noting medical monitoring remedy is equitable); *In re Telec-*

*tronics Pacing Sys., Inc., 164 F.R.D. 222, 229 (S.D. Ohio 1995); Day v. NLO, 851 F. Supp. 869 (S.D. Ohio 1994)* (certifying medical monitoring class under *23(b)(2)* in suit brought by employees of nuclear weapons plant for exposure to radiation); *In re NLO, Inc., 5 F.3d 154, 159 (6th Cir. 1993)* (Case law "generally support[s] the proposition that such relief [medical monitoring] is injunctive in nature."); *Yslava v. Hughes Aircraft Co., 845 F. Supp. 705, 713 (D. Ariz. 1993)* (holding that plaintiffs' request for court-supervised program requiring ongoing, elaborate medical monitoring of class members exposed to contaminated groundwater qualified as injunctive relief, and the court could properly certify the class under *Rule 23(b)(2)*); *Barth v. Firestone Tire & Rubber Co., 673 F. Supp. 1466, 1477 (N.D. Cal. 1987)* (Medical monitoring program "which will pool and share knowledge about the results of the alleged exposure and will provide for diagnosis and preventive medical advice" is equitable relief; *Ayers v. Jackson Township, 106 N.J. 557, 525 A.2d 287, 314 (N.J. 1987)* ("[T]he use of a court-supervised fund to administer medical-surveillance [*66] payments in mass exposure cases . . . is a highly appropriate exercise of the Court's equitable powers."); *Burns v. Jaquays Min. Corp., 156 Ariz. 375, 752 P.2d 28, 34 (Ariz. App. Ct. 1987)* (holding that court-supervised medical surveillance fund is exercise of court's equitable powers).

Nor does the proposed remedy suffer from the defects that have prevented courts from finding the proposed medical monitoring to be predominantly injunctive. For example, relief in the form of medical monitoring coupled with damages is generally classified as compensatory. See *Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1196 (9th Cir. 2001)* (Where the complaint sought "past and future damages, compensation for future medical treatment, plus other compensatory and punitive damages," the injunctive relief was "merely incidental to the primary claim for money damages."); *Emig, 184 F.R.D. at 383 n.3* ("In addition to monetary damages, plaintiffs seek injunctive relief including a claim for medical monitoring. . . . Plaintiffs do not argue that certification is proper under *Rule 23(b)(2)*, and in any event, *Rule 23(b)(2)* certification is improper since the primary relief sought is damages."); *Arch, 175 F.R.D. at 484* [*67] (23(b)(2) certification is not appropriate where the "substantial majority of relief requested [was] monetary in nature."); *Castano v. Am. Tobacco Co., 160 F.R.D. 544, 552 (E.D. La. 1995)*, rev. on other grounds, *84 F.3d 734 (5th Cir. 1996)* (Where "medical-monitoring program sought by plaintiffs is but one type of relief sought among many" including "compensatory, statutory and punitive damages," plaintiffs primarily sought monetary damages.); *Guillory v. Am. Tobacco Co., No. 97c8641, 2001 U.S. Dist. LEXIS 3353, 2001 WL 290603 (N.D. Ill. 2001)* (holding that class seeking monetary damages in addition to medical monitoring did not seek certification pursuant to *23(b)(2)*, only *23(b)(3)*).

Even those courts that have found the monitoring remedy as proposed to be compensatory have reiterated that claims for medical monitoring alone may indeed be certified under *23(b)(2)*. See *Thompson, 189 F.R.D. at 553* ("The proposed court-administered medical monitoring program, on the other hand, does constitute injunctive relief. Although the program would be funded by defendants, it would be developed and managed by the court, thereby nullifying the risk that Plaintiffs would misappropriate the money."); *Arch, 175 F.R.D. at 484* ("Plaintiffs [*68] seek the establishment of a court-supervised program through which the class members would undergo periodic medical examinations in order to promote the early detection of diseases caused by smoking. This portion of plaintiffs' request is the *paradigmatic request for injunctive relief* under a medical monitoring claim.") (emphasis added); *Boughton v. Cotter Corp., 65 F.3d 823, 827 (10th Cir. 1995)* (Medical monitoring claims, if brought alone, request injunctive relief and "certification of a class under such circumstances [would be] legally permissible under *Rule 23(b)(2)*."). In sum, the plaintiffs' proposed remedy is injunctive in nature and may be pursued under *23(b)(2)*.

### (2) SJC Opinion

Philip Morris argues that the SJC effectively closed off the possibility of class certification under *Rule 23(b)(2)* because it held medical monitoring to be a legal, not equitable, claim. *Donovan, 914 N.E.2d at 898*. Since plaintiffs have an adequate remedy at law in the form of payment of future medical expenses, Philip Morris asserts, they are not entitled to an injunction. See *Lopez v. Garriga, 917 F.2d 63, 68 (1st Cir. 1990)* (holding that injunction seeker must demonstrate no adequate remedy at law). [*69] It points to several statements made by the SJC, including:

> The expense of medical monitoring is thus a form of future medical expense and should be treated as such. *Donovan, 914 N.E.2d at 901*.

> [T]he cause of action is in tort, not equity. *Id. at 903*.

> When competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease due to physiological changes indicating a substantial increase in risk of harm from exposure to a known hazardous substance, the element of injury and damage will have been satis-

Case 1:09-md-02068-JAW   Document 228-1   Filed 07/15/10   Page 18 of 23

Page 18
2010 U.S. Dist. LEXIS 62982, *

fied and the cost of that monitoring is re-coverable in tort. *Id. at 901.*

> We conclude that the plaintiffs have stated a claim under Massachusetts law for future medical expenses that may be satisfied by an adequate remedy at law. *Id. at 898.*

But Philip Morris takes the SJC's statements out of context. The specific question asked of the SJC was whether the "plaintiffs' suit for medical monitoring, based on the subclinical effects of exposure to cigarette smoke and increased risk of lung cancer, state[d] a cognizable claim and/or permit[ted] a remedy under Massachusetts state law." *Id. at 894.* The SJC was *not* asked how the class [*70] should be certified in this case; in fact, the SJC repeatedly declared that it was addressing the certified questions only in the context of an individual action between the potential class representatives and Philip Morris.

In effect, the issue presented to the SJC was what character or form of harm was sufficient to be considered "injury" given the historical limitations of Massachusetts tort law. In other words, where along the continuum of injury -- from fear of future harm all the way to objective physical injury -- does a tort cause of action for negligence or breach of warranty lie? The SJC did not address this question in a vacuum, nor did it create a new cause of action out of thin air. Massachusetts tort law already presented the underlying framework for plaintiffs' medical monitoring claims -- negligence and implied warranty law.

The SJC began its analysis by laying out the elements of a negligence cause of action -- (1) negligence, (2) causation, and (3) damages or injury, *id. at 898-99* -- and then locating subcellular harm and risk of illness within the injury prong. It discussed different points along the continuum of injury. It rejected one end of the continuum; "injury" [*71] does not require "proof of physical harm manifested by objective symptomology." *Id. at 900.* Plaintiffs did not seek recognition of the other end of the spectrum -- loss of chance or pure exposure to toxic substance as sufficient injury. Id. The court chose a point somewhere between the poles of injury. "[T]he physiological changes with the attendant substantial increase in risk of cancer, and the medical necessity of monitoring . . . may adequately establish the elements of injury and damages." *Id. at 901.* "[E]vidence of physiological changes caused by smoking" and a resultant increased risk of cancer is "sufficient proof of 'impact.'" *Id. at 900.* Thus, the court made clear it was not creating a new cause of action so much as addressing how subcellu-

lar injury and increased risk of illness fit into the traditional causes of action of negligence and warranty.

In addition, the SJC's discussion was set in the context of an existing medical monitoring case law that suggested the cause of action permits either legal or equitable remedies, depending upon how the remedy is structured. See supra Section II.D.1.b(1); *Arch, 175 F.R.D. at 483*; *Day, 144 F.R.D. at 335-36.* Notably, *Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 982 (Utah 1993),* [*72] a case cited by the SJC several times, repeatedly distinguishes between a legal remedy of damages and an equitable remedy of a court-supervised medical monitoring fund limited to plaintiffs actual expenses. Id. ("[T]he remedy should provide for the cost of medical monitoring actually received by the plaintiff, *not for damages*.") (emphasis added); id. ("[T]he use of a court-supervised fund to administer medical-surveillance payments . . . is a highly appropriate use of the Court's *equitable powers.*" (quoting *Ayers, 525 A.2d at 313-14*) (emphasis added).

In keeping with the wealth of case law on the wide range of relief available for medical monitoring claims, see supra Section II.D.1.b(1), the SJC left open the possibility of purely equitable relief for medical monitoring product liability claims. It explicitly declined to limit the type of available remedy or specify the way in which the class should be certified:

> Future damages must be reduced to an amount as of the date of the filing of the complaint. This requirement is based on the assumption, stated earlier, that this opinion addresses only individual claims, and not a class action. We express no view about the superiority of a [*73] class action (the use of a court-supervised medical monitoring program) over an individual adjudication of claims and an award of monetary damages.

*Donovan, 914 N.E.2d at 900 & 900 n.10.* The SJC recognized that either remedy, monitoring program or damages, would be possible, but one may be superior in a given case. Indeed, the SJC's characterization of the remedy suggests equity:

> Because the nature of these medical expenses is diagnostic, in contrast to responsive treatment costs, they are somewhat akin to what we customarily have seen as medical expenses that have already been incurred. In this respect, the lump sum usually awarded for future medical expenses, may, in cases such as this, be or-

dered paid into an appropriate account and drawn down as the expenses are actually incurred. *If they are not used, the award, or balance thereof, may be returned to the defendant who was obligated to make such payment.* A plaintiff's reasonable attorney's fees and costs may be paid out of such award.

*Id. at 902 n.12* (emphasis added). Legal damages, while intended to compensate the plaintiff for some harm, may be used for anything. Courts may not put restrictions on monetary awards once paid. Money [*74] damages are meant to stand in and compensate in whatever way the plaintiff chooses. Equity, on the other hand, is specific. "With substitutionary remedies, plaintiff suffers harm and receives a sum of money. Specific remedies seek to avoid this exchange. They aspire to prevent harm, or undo it, rather than let it happen and compensate for it." Douglas Laycock, The Death of the Irreparable Injury Rule, *103 Harv. L. Rev. 687, 696 (1990)*. Medical monitoring here is specific. Funds not used for this purpose are returned to the defendant.

The SJC opinion acknowledged that in some circumstances, legal damages will be perfectly appropriate, even preferable. For example, if a medical test is easily accessible and can be purchased, damages will suffice. This is most likely to be the case in an individual suit, which was precisely the way in which the SJC approached the certified questions. See *Donovan, 914 N.E.2d at 899, 900 n.10.* An elaborate medical monitoring program may not make sense if only a few individuals seek relief. But a class presents different issues -- including lack of doctors and access to technology.

Moreover, the fluid nature of medical monitoring remedies fits within broader [*75] tort law, which envisions a range of remedies. A cause of action in tort does not preclude an injunctive remedy, [14] despite what Philip Morris argues. While in most tort cases, plaintiffs seek compensation in the form of money, in some circumstances, money cannot adequately compensate, and an injunction is therefore required to remedy the harm. The remedy follows from the type of harm or injury alleged. Damages or injunctive relief may be appropriate in a nuisance case depending on the nature of the injury. If the nuisance is continuing, an injunction is appropriate because damages will not fully remedy the harm. See, e.g. *Stevens v. Rockport Granite Co., 216 Mass. 486, 104 N.E. 371, 374-75 (Mass. 1914)* ("The propriety of granting an injunction depends upon whether the other remedy by way of damages will be adequate. The injury in this case would be recurring constantly. . . . Its nature is

such that money damages would not be adequate relief.").

> 14   Injunctions may properly issue for several types of torts, including nuisance, waste, trespass, and equitable conversion.

The 23(b)(2) test does not look at the type of claim brought but at the remedy or form of relief sought. See *Fed. R. Civ. P. 23(b)(2)* [*76] (Class action permitted if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, *so that final injunctive relief or corresponding declaratory relief is appropriate* respecting the class as a whole") (emphasis added). Thus, the fact that the cause of action is in tort does not prevent the certification of a (b)(2) class.

### (3) Injunctive Relief Requirements

To obtain injunctive relief, a plaintiff generally must satisfy a four-part test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008)* (quoting *Ebay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)).*

The First Circuit has held that the first two factors are "satisfied on a showing of 'substantial injury that is not accurately measurable or adequately compensable by money damages.'" *CoxCom, Inc, 536 F.3d at 112* (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000)).* [*77] Plaintiffs' subcellular injury and increased risk of cancer are obviously irreparable. The harm to plaintiffs caused by smoking is irreversible, and according to plaintiffs, current technology cannot diagnose lung cancer until it has reached more advanced stages, reducing survival rates to about twenty percent. (Phillips' Aff. Ex. 30 at 1 (L. Christine Oliver Report) (document # 64-28)). LDCT scans, they allege, can detect lung cancer much earlier than prior technology could, and when lung cancer is caught in Stage I, the chance of survival improves to above 85%. (Phillips' Aff. Ex. 3 *P* 28 (Albert Miller Letter) (document # 61-3).) LDCT screening, therefore, could significantly increase the likelihood of survival. "Postponing or foregoing action that, if taken now, might result in the saving of human life would constitute irreparable harm in the eyes of this Court." *Barth, 673 F. Supp. at 1478.*

Plaintiffs' injuries are not adequately compensable by monetary damages. Plaintiffs assert that class members would not be able to purchase LDCT tests if they were simply awarded damages. To begin with, LDCT

screening is not available through most health insurance programs, (see, e.g., Phillips' [*78] Aff. Ex. 45 177:19-178:5 (Philip Goodman Dep.) (document # 64-48)), and many class members may lack primary care physicians to prescribe LDCT screening. Further, LDCT scans are not generally available throughout Massachusetts. (Phillips' Aff. Ex. 31 228:5-20 (L. Christine Oliver Dep.) (document # 64-31).) Determining the cost of the tests, particularly where potential class members are dispersed around Massachusetts and have access to different types of facilities, will be difficult. Plaintiffs lack an adequate remedy at law. See *Barth, 673 F. Supp. at 1478* ("It is clear that no remedy at law exists that would permit a court to fashion an underlying remedy such as the medical monitoring fund sought here.").

As to a balance of the hardships, an injunctive remedy benefits both parties. Again, plaintiffs would not be able to receive the relief they seek through monetary damages, but the defendant, too, would benefit. Because the LDCT screening program is so difficult to monetize, a monetary remedy may overcompensate plaintiffs. A screening program would limit Philip Morris' potential expenses to actual costs.

The public interest would not be harmed by an injunction. In fact, if plaintiffs [*79] succeed, injunctive relief will better serve the public. Because injunctive relief is the only remedy that will serve plaintiffs, and the public has a clear interest in the prevention and treatment of lung cancer, an effective program will benefit the public.

### (4) Predominance of Injunctive Relief

A class certified under *Rule 23(b)(2)* must seek chiefly injunctive relief; "*Rule 23(b)(2)* certification is not appropriate when money damages are the predominant relief that the plaintiffs seek." *DeRosa v. Massachusetts Bay Commuter Rail Co.,    F. Supp. 2d   , 2010 U.S. Dist. LEXIS 25027, 2010 WL 956795, at *4 (D. Mass. 2010)*; see *Rule 23(b)(2)* Advisory Committee Notes (1966 Rule Amendment).

Philip Morris argues that the medical monitoring claim is a "thinly-disguised request for money damages," (D.'s Opp. at 29), and emphasizes that a plaintiff cannot convert a legal action into an equitable one by asking for an injunction ordering the payment of money. See *Richards v. Delta Airlines, Inc., 453 F.3d 525, 530-31, 372 U.S. App. D.C. 53 (D.C. Cir. 2006)*; *Jaffee v. United States, 592 F.2d 712, 715 (3d Cir. 1979)*. Plaintiffs, however, are not asking for an injunction that orders the payment of money. They are seeking a specific, equitable remedy. [*80] Simply because an injunction requires the defendant to pay money does not convert it into a monetary action. First, injunctive relief includes both mandatory and prohibitory orders. See 7AA Wright,

Miller, & Kane, supra, at § 1775. But most significantly, nearly all injunctions cost money in one way or another. "[I]n contemporary times, almost everything costs something. An injunction which does not compel some expenditure or loss of monies may often be an effective nullity." *Penn Terra Ltd. v. Dep't of Envtl. Res., 733 F.2d 267, 278 (3d Cir. 1984)*. The 23(b)(2) test is not whether an injunction costs money but whether injunctive relief predominates.

Courts have applied one of two standards for evaluating whether injunctive relief is predominant. The First Circuit has not adopted either. See *DeRosa, 2010 U.S. Dist. LEXIS 25027, 2010 WL 956795, at *12*. The Fifth Circuit standard (since adopted by the Third, Sixth, Seventh, and Eleventh) holds that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief. . . . By incidental, we mean damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive [*81] or declaratory relief." *Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)*. The Second Circuit, conversely, has held that (b)(2) certification is appropriate if "(1) the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable." *Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 164 (2d Cir. 2001)* (internal citations omitted). Under either standard, the plaintiffs' class is properly certified under *(b)(2)* because the relief they seek is *wholly* injunctive. They do not seek compensatory or punitive damages, and the remedy will be class-wide.

As the plaintiffs assert, they have carefully crafted their class to address the concerns expressed by other courts. There is no claim for monetary damages, and plaintiffs state that, in fact, damages would not give them the relief they are after because the infrastructure necessary for this sort of medical monitoring is not in place. They seek one form of relief -- a medical monitoring program.

I find plaintiffs' claim for medical monitoring to invoke the Court's [*82] equitable powers and therefore appropriate for certification under *23(b)(2)*. See *Arch, 175 F.R.D. at 483-84*; *Day, 851 F. Supp. at 885*.

### c. Group Remedy

Finally, for (b)(2) certification, injunctive relief must be appropriate "respecting the class as a whole," that is, the remedy sought must be group. The medical monitoring remedy the plaintiffs seek here will be uniform for all members and does not require individual tailoring. Certainly, some minor variation among members is to be expected, but this is built into and part of the remedy.

The monitoring program would include medical personnel to manage the participants. It is a single consistent program and does not "depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon, 216 F.3d at 580.* "The groupwide provision of relief follows from the common nature of this uncertain harm." *Venugopal, supra, at 1684.* Indeed, the screening program is by its nature group; "[t]o administer medical monitoring piecemeal is unworkable." *Day, 851 F. Supp. at 886-87.* And this case, like many class actions, would be of little value if brought individually.

I find that [*83] plaintiffs have met the *Rule 23(b)(2)* criteria, and therefore the motion to certify the class pursuant to *Rule 23(b)(2)* is GRANTED as to the breach of warranty and Chapter 93A claims.

## 2. Rule 23(b)(3) Certification

I find that the class is properly certified under *Rule 23(b)(2)* for the breach of warranty and Chapter 93A claims. Nonetheless, I will also address plaintiffs' 23(b)(3) certification claims. *Rule 23(b)(3)* requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual member;" and (2) class treatment "is superior to other available methods for fairly and efficiently adjudicating the controversy." The Rule gives a non-exhaustive list of factors that may be relevant in evaluating these requirements:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Fed. R. Civ. P. 23(b)(3).* Because [*84] I find that plaintiffs have met both the predominance and superiority requirements as to the breach of warranty and Chapter 93A claims, I also GRANT certification pursuant to *Rule 23(b)(3)* for these claims, and DENY certification as to the negligence claim under this Rule.

### a. Predominance

To establish predominance under *Rule 23(b)(3)*, the plaintiffs must demonstrate that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem, 521 U.S. at 623.* While "the predominance criterion is far more demanding" than the commonality requirement, *id. at 624*, it presumes that individual issues will exist. *Payne, 216 F.R.D. at 26-27.* The heart of the predominance inquiry is whether the "uncommon questions," *Amchem, 521 U.S. at 624*, outweigh the commonalities. "*Rule 23(b)(3)* requires merely that common issues predominate, not that all issues be common to the class." *Smilow, 323 F.3d at 39.* Put another way, there must be a "sufficient constellation of common issues bind[ing] class members together . . . ." *Mowbray, 208 F.3d at 296.*

Mass tort defendants regularly point to the Advisory Committee Note for *Rule 23(b)(3)*, which states that a "'mass accident' resulting [*85] in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways." Advisory Committee Note 1966 Revision. Yet "the text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970s, have been certifying such cases in increasing number." *Amchem, 521 U.S. at 625.* Moreover, the note was written over forty years ago, before the inception and proliferation of mass tort litigation. Notably, Professor Charles Alan Wright, one of the drafters of the amended Rule, has since repudiated the note.

> I was an ex officio member of the Advisory Committee on Civil Rules when *Rule 23* was amended, which came out with an Advisory Committee Note saying that mass torts are inappropriate for class certification. I thought then that was true. I am profoundly convinced now that that is untrue. Unless we can use the class action and devices built on the class action, our judicial system is simply not going to be able to cope with the challenge of mass [*86] repetitive wrong.

5 Newberg on Class Actions § 17:06 (4th ed. 2010). While it is true that courts are often reluctant to certify mass tort cases, "[e]ven mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." *Amchem, 521 U.S. at 625.*

Here, plaintiffs' common issues predominate. Because all seven elements of the medical monitoring cause of action may be proven on a class-wide basis, supra Section II.D.1.a(1), all of these issues are common among class members. I need not go through each prong again. Suffice it to say, plaintiffs share common ques-

tions of (1) Philip Morris' alleged breach of warranty; (2) causation; (3) exposure, subcellular harm, and increased risk of cancer; (4) the efficacy of LDCT testing; (5) the standard of care; and (6) the cost of the proposed monitoring program. In addition, the claims of all plaintiffs are governed by Massachusetts law, and the plaintiffs may commonly prove issues related to the statute of limitations.

Furthermore, the proposed relief, the LDCT program, will be common to and uniform for all class members. If successful, plaintiffs will receive from Philip Morris a medical [*87] monitoring fund which they may only use to implement their proposed program. Thus damages will not present individualized determinations since class members will not receive individual awards.

The only potential individual issues are those involved in the affirmative defenses of comparative negligence and breach of warranty. The inquiry of whether the class members have "act[ed] reasonably with respect to the product he or she is using," *Colter, 525 N.E.2d at 1314*, requires an examination of individual circumstances of use. See *supra* Section II.D.1.a(2)(d). Courts have repeatedly found that determinations of comparative negligence create individual issues which outweigh common ones. See, e.g., *Castano, 84 F.3d at 750; Arch, 175 F.R.D. at 491*. For this reason, and without further guidance from the SJC on the applicability of comparative negligence to tobacco claims, I find that individual issues predominate in the negligence claims. I **DENY** certification pursuant to *Rule 23(b)(3)* as to this claim.

Conversely, the SJC has severely restricted the use of the unreasonable use defense in warranty claims. See *Haglund, 847 N.E.2d at 324-27; supra* Section II.D.1.a(2)(c). The defense is so narrow, [*88] in fact, that it is difficult to imagine it applying to anyone. At most, a very small number of class members would fall under its purview, and the class will be defined to exclude this group. Given this, the potential individual issues involved in the unreasonable use defense simply cannot outweigh the considerable number of common issues. I find that common issues predominate as to the breach of warranty and Chapter 93A claims. [15]

15   Although I concluded that "cohesiveness" is not necessary for 23(b)(2) certification, see *supra* Section II.D.1, I note that because the proposed class meets the 23(b)(3) predominance requirement, it would also meet the "cohesiveness" standard.

**b. Superiority**

Superiority exists where "there is a real question whether the putative class members could sensibly litigate on their own for these amounts of damages, espe-

cially with the prospect of expert testimony required." *Gintis v. Bouchard Transp. Co., Inc., 596 F.3d 64, 68 (1st Cir. 2010)* (Souter, J.)

Here, class members almost certainly would not be able to litigate these claims on their own. First and foremost, there is the considerable disparity in resources between a large corporation like Philip Morris [*89] and an individual plaintiff. Second, as plaintiffs assert, the medical monitoring they seek is not available for a simple sum of money. They bring this action seeking a court-supervised program because equipment must be purchased, medical personnel hired, and informed consent and follow up procedures implemented. It is unlikely a plaintiff, even armed with a lump sum award, would be able to purchase a LDCT scan. Third, even if LDCT scanning was able to be monetized, the vast resources necessary to bring these claims would far outweigh any individual recovery. Given all these reasons, a class action is far superior to individual suits. "The core purpose of *Rule 23(b)(3)* is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." *Smilow, 323 F.3d at 42*.

**3. Bench or Jury Trial**

Due to *Seventh Amendment* concerns, the case will go forward as a jury trial. In determining whether a party is entitled to a jury trial, a court must examine "both the nature of the issues involved and the remedy sought. 'First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the [*90] courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.'" *Chauffeurs, Teamsters & Helpers v. Terry, 494 U.S. 558, 565, 110 S. Ct. 1339, 108 L. Ed. 2d 519 (1990)* (quoting *Tull v. United States, 481 U.S. 412, 417-18, 107 S. Ct. 1831, 95 L. Ed. 2d 365 (1987)*). For the reasons discussed in *supra* Section II.D.1.b(2), plaintiffs' cause of action is like a traditional breach of warranty tort action that requires a jury trial. *Ortiz, 527 U.S. at 846* ("[S]ince the merger of law and equity in 1938, it has become settled among the lower courts that 'class action plaintiffs may obtain a jury trial on any legal issues they present.'" (quoting *Ross v. Bernhard, 396 U.S. 531, 541, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970)*). The remedy sought is primarily equitable. The SJC determined that a court may impose equitable restrictions on the award, for example returning unused money to the defendant. *Donovan, 914 N.E.2d at 902 n.12; see also supra* Section II.D.1.b(2).

Given the characteristics of the plaintiffs' medical monitoring claim, I find that the parties have a *Seventh Amendment* right to a trial by jury on the question of liability, though the Court may retain the authority to

structure the remedy. The Supreme Court has held that "[n]othing [*91] in the [Seventh] Amendment's language suggests that the right to a jury trial extends to the remedy phase of a civil trial." *Tull, 481 U.S. at 426 n.9.* Other courts have submitted the question of liability in medical monitoring claims to a jury while retaining the power to structure relief. See *Fried, 925 F. Supp. at 374-75* ("Accordingly, at a minimum, the question of whether Plaintiffs . . . are entitled to medical monitoring will be submitted to the jury. We . . . reserve the power to structure any subsequent remedy, if necessary."). Thus, if a jury were to find the defendant liable, the Court will retain the authority to structure an appropriate equitable remedy -- namely, a fund limited to expenses incurred in setting up and continuing the LDCT screening program.

### III. CONCLUSION

Many things about this case make it unique. First, the SJC has singled out cigarettes as the only product whose nature absolutely forecloses reasonable use, making Massachusetts products liability law on cigarettes unlike that of any other product. Since cigarettes are, by design, impossible to use safely, the SJC has sharply curtailed the applicability of the unreasonable use defense. *Haglund, 847 N.E.2d at 324-27.* [*92] This, in turn, has limited the relevance of individual circumstances of use. Second, lung cancer is unlike many other types of serious illnesses. Its mortality rate is among the highest of all cancers. (Phillip's Aff. Ex. 20 P 27, at 6 (Expert Report of Frederic Grannis, Jr.) (document # 64-12).) Yet despite its prevalence, few advances have been made in treatment. In fifty years, the five-year cure rate has increased from 6% to only 15%, (id. P 28, at 6), and

efforts at early detection have proven unsuccessful. According to plaintiffs, no form of precancerous screening for lung cancer was an accepted standard of care until now. For many other types of serious illnesses and other forms of cancer, though of course not all, effective screening technology exists and has been the standard of care for years, which means the statute of limitations for those medical monitoring claims will have run. Third, plaintiffs allege that because of the bureaucracy of health care, money damages simply will not remedy their harm. While some other forms of screening may be accessible and easily purchased, given the relative novelty of LDCT testing, plaintiffs assert that only a court-supervised comprehensive [*93] monitoring program will provide them with relief.

Going forward, plaintiffs still face a substantial hurdle of proving liability. But based on the record before me, plaintiffs have demonstrated that they are able to do so as a class. Accordingly, plaintiffs' Motion for Class Certification (**document # 60**) is **GRANTED IN PART AND DENIED IN PART**. The motion is GRANTED on the implied warranty and Chapter 93A claims under both *Rule 23(b)(2)* and *23(b)(3)* and **DENIED** on the negligence claim. **Plaintiffs are to provide the Court with an appropriate form of order by July 13, 2010**.

**SO ORDERED**.

**Date: June 24, 2010**

/s/ Nancy Gertner

**NANCY GERTNER, U.S.D.C.**